No. 21-15163

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Plaintiffs-Appellants*,

v.

DEB HAALAND,* in her official capacity as Secretary of the Interior, et al.
*Defendants-Appellees*,

GLENN-COLUSA IRRIGATION DISTRICT, et al.,
*Intervenor-Defendants-Appellees*

_____

On Appeal from the United States District Court, Eastern District of California
Case No. 1:05-cv-01207-DAD-EPG (Hon. Dale A. Drozd)

_____

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
_____

KATHERINE POOLE
DOUGLAS ANDREW OBEGI
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100

HAMILTON CANDEE
BARBARA J. CHISHOLM
CORINNE JOHNSON
Altshuler Berzon LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Plaintiff-Appellant*
*Natural Resources Defense Council*

*Counsel for Plaintiff-Appellant*
*Natural Resources Defense Council*

(*Additional counsel on following page*)

_____

* Deb Haaland is substituted for her predecessor, Scott de la Vega, pursuant to Fed. R. App. P. 43(c)(2).

STACEY P. GEIS
NINA ROBERTSON
MARIE E. LOGAN
Earthjustice
50 California St., Suite 500
San Francisco, CA 94111
(415) 217-2000

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Natural Resources Defense Council, San Francisco Baykeeper, Friends of the River, The Bay Institute, and Pacific Coast Federation of Fishermen's Associations/Institute for Fisheries Resources certify that they have no parent corporations and that no publicly held corporation owns them or any part of them. The Winnemem Wintu Tribe is not a nongovernmental corporation under Rule 26.1.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED..........................................................................3

STATEMENT OF THE CASE..............................................................3

    A.   The Central Valley Project and SRS and DMC Contracts .......................3

    B.   ESA-Listed Fish Affected by the Contracts.................................6

    C.   Reclamation's History of Consultation on the Contracts .......................8

    D.   Challenged Agency Actions and Procedural History ...........................11

    E.   2019 CVP/SWP Biological Opinions ....................................14

STANDARD OF REVIEW ..................................................................14

SUMMARY OF ARGUMENT ............................................................15

ARGUMENT ......................................................................................16

I.   The 2015 Consultation On The Effects Of The Renewed Contracts On Delta Smelt Was Arbitrary, Capricious And Contrary To Law ........................16

    A.   By Relying Exclusively on the 2008 FWS BiOp, FWS Failed to Consider Important Aspects of the Problem ...........................................17

    B.   FWS Ignored the Best Available Science ...............................21

    C.   FWS Ignored Degraded Baseline Conditions and Relied on Incorrect Assumptions ......................................................25

    D.   FWS Failed to Consider the Entire Scope of the SRS Contracts............26

    E.   FWS Impermissibly Deferred Analysis of the Contracts' Effects..........29

ii

F. FWS Failed to Articulate a Rational Connection Between its Conclusion and the Evidence, and its Conclusion Is Counter to the Evidence ........................................................................30

II. Reclamation Is Violating Its ESA Duties To Consult On The Contract Renewals' Effects on Delta Smelt And To Avoid Jeopardizing Delta Smelt ...31

A. Reclamation Has Never Performed a Valid Delta Smelt Consultation on the Renewal of the Contracts ........................................31

B. Reclamation Obstructed the 2015 Consultation by Misrepresenting its Discretion in Renewing the SRS Contracts ........................................33

III. The District Court Erred In Dismissing NRDC's Claim That Reclamation Was Obligated To Reinitiate Consultation Regarding The SRS Contracts' Effects on ESA-Listed Chinook Salmon ........................................................41

A. The Terms of the SRS Contracts Confirm that Reclamation Retains Discretionary Involvement and Control ........................................44

1. Reclamation can take action during the term of the contracts to implement protections recommended in biological opinions ............44

2. Reclamation has broad discretion over project water ........................47

3. Reclamation has discretionary authority over the SRS Contractors' sales of contract water ........................................49

4. Reclamation has discretion under the contracts to reduce water releases when necessary to protect species under state or federal law ........................................................................50

B. Federal and State Law Independently Authorize Reclamation to Implement Water Contacts to Protect Species ........................................52

CONCLUSION ........................................................................54

SIGNATURE ATTESTATION ........................................................55

CERTIFICATE OF COMPLIANCE ........................................................56

STATUTORY ADDENDUM ........................................................ Add-1

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......................................................21, 26, 27, 29

*Cottonwood Env'tl L. Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..........................................................43

*Crowman Corp. v. United States*,
51 Fed. Cl. 654 (2002) ..........................................................43

*Ctr. for Biological Diversity v. Envt'l Protection Agency*,
847 F.3d 1075 (9th Cir. 2017) ..........................................................42

*Ctr. for Biological Diversity v. Raimondo*,
No. 19-cv-05206-JST, Dkt. 168 (N.D. Cal. July 5, 2022)...................................8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) ..........................................................32

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
33 F.4th 1202 (9th Cir. 2022) ..........................................................25

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) .......................................................21, 22, 23, 24

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S.Ct. 1891 (2020)...................................................................17, 31

*Flint v. United States*,
906 F.2d 471 (9th Cir. 1990) ..........................................................35

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*,
528 U.S. 167 (2000)..........................................................3

*In re Consolidated Delta Smelt Cases*,
717 F.Supp.2d 1021 (E.D. Cal. 2010) ..........................................................20

*In re Consolidated Delta Smelt Cases*,
    812 F.Supp.2d 1133 (E.D. Cal. 2011), *appeal dismissed*
    *as moot, judgment vacated* (9th Cir. 11-17143) ...................................................20

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) .....................................................................8, 50

*Kern Cnty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ..............................................................................21

*Nat. Res. Def. Council v. Houston*,
    146 F.3d 1118 (9th Cir. 1998) ...........................................................29, 31, 51

*Nat. Res. Def. Council v. Jewell*,
    749 F.3d 776 (9th Cir. 2014) .....................................................................*passim*

*Nat. Res. Def. Council v. Kempthorne*,
    506 F.Supp.2d 322 (E.D. Cal. 2007) .......................................................................9

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002) ..............................................................41, 53

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) ..............................................................................34

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ...........................................................25, 31

*Nordstrom v. Ryan*,
    856 F.3d 1265 (9th Cir. 2017) ...........................................................................35

*O'Neill v. United States*,
    50 F.3d 677 (9th Cir. 1995) ..............................................................42, 49, 50

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Dep't of the Interior*,
    655 F.App'x 595 (9th Cir. 2016) .......................................................................39

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) ..............................................................................27

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
    606 F.Supp.2d 1122 (E.D. Cal. 2008) ...............................................................10

v

*Pakootas v. Teck Cominco Metals, LTD*,
    830 F.3d 975 (9th Cir. 2016) ................................................................. 35

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017) ............................................................... 14

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) ............................................................... 32

*San Luis & Delta-Mendota Water Auth v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ......................................................... 37, 38

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ......................................................... *passim*

*Sierra Club v. Babbitt*,
    65 F.3d 1502 (9th Cir. 1995) ................................................................. 42

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*,
    340 F.3d 969 (9th Cir. 2003) ................................................................. 42

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    141 S.Ct. 777 (2021) ............................................................................. 9

*United States v. Alpine Land & Reservoir Co.*,
    697 F.2d 851 (9th Cir. 1983) ................................................................. 53

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ................................................................. 45

*United States v. State Water Res. Control Bd.*,
    694 F.2d 1171 (9th Cir. 1982) ............................................................... 41

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ......................................................... 17, 19

*Westlands Water Dist. v. United States*,
    337 F.3d 1092 (9th Cir. 2003) ............................................................... 49

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ......................................................... *passim*

**State Cases**

*Envt'l Def. Fund v. E. Bay Mun. Util. Dist.*,
26 Cal.3d 183 (Cal. 1980).................................................................39, 53

*Santa Barbara Channelkeeper v. City of San Buenaventura*,
19 Cal.App.5th 1176 (2018) ........................................................53, 54

*Stanford Vina Ranch Irrigation Co. v. California*,
50 Cal.App.5th 976 (2020), *as modified* (July 8, 2020) .....................53

*State Water Res. Control Bd. Cases*,
136 Cal.App.4th 674 (2006) ................................................................53

**Statutes**

5 U.S.C.
§702...................................................................................................2
§703...................................................................................................2
§704...................................................................................................2
§705...................................................................................................2
§706...................................................................................................2
§706(2)(A) ......................................................................................16

16 U.S.C.
§1533(b)(1)(A).................................................................................22
§1536(a)(2) ...................................................................1, 8, 21, 32
§1536(d) ...........................................................................................51
§1540(c) .............................................................................................2

28 U.S.C.
§1291...................................................................................................2
§1331...................................................................................................2

43 U.S.C.
§372...................................................................................................53
§383...................................................................................................53
§390hh(a) .........................................................................................35
§485h(e) ...........................................................................................35

Central Valley Project Improvement Act, Pub. L. No. 102-575 (1992)
§3404(c)(2) .......................................................................................52
§3406(b)...................................................................................37, 52, 53

**Regulations**

50 C.F.R.

§402.02 (as in effect Oct. 27, 2019) ......................................9, 20, 42
§402.13(b) (as in effect Oct. 27, 2019)......................................34
§402.14(a) (as in effect Oct. 27, 2019)......................................8, 31
§402.14(b) (as in effect Oct. 27, 2019)......................................9, 31
§402.14(e) (as in effect Oct. 27, 2019) ......................................9
§402.14(g) (as in effect Oct. 27, 2019)......................................34
§402.14(h) (as in effect Oct. 27, 2019)......................................34
§402.14(j) (as in effect Oct. 27, 2019)......................................34
§402.16 (as in effect Oct. 27, 2019) ......................................42, 52

**Constitutional Provisions**

Cal. Const. art. X, §2......................................39, 53

**Rules**

Fed. R. App. P. 4(a)(1)(B) ......................................2

Fed. R. Civ. P. 54(b) ......................................2, 13

**Agency Materials**

75 Fed. Reg. 17,667 (Apr. 7, 2010) ......................................6

**INTRODUCTION**

This appeal is the result of the U.S. Bureau of Reclamation's ("Reclamation") refusal to abide by this Court's 2014 unanimous en banc ruling that Reclamation is required under the Endangered Species Act ("ESA") to consult with expert wildlife agencies regarding the effects of dozens of long-term water delivery contracts that are wreaking devastation on native California fish species and habitat. *See Nat. Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014) (en banc). These 25-year and 40-year contracts obligate Reclamation to provide millions of acre-feet of water every year—approximately four times the amount used by the entire city of Los Angeles—to two sets of contractors: the Sacramento River Settlement ("SRS") Contractors, who divert water from the Sacramento River, and the Delta-Mendota Canal ("DMC") Contractors, who divert water pumped out of the Sacramento-San Joaquin River Delta ("Delta"). Although native Delta Smelt and Chinook salmon runs thrived for centuries in the Delta, those species are now at high risk of extinction. Yet for almost 20 years federal agencies have refused to examine the impacts of the long-term water contracts on the species.

Eight years ago, this Court squarely held that Reclamation must perform a consultation under Section 7 of the ESA, 16 U.S.C. §1536(a)(2), to ensure that the SRS and DMC Contracts are compatible with sustaining protected fish populations, and that Reclamation had discretion in negotiating the renewal of those contracts to act to benefit protected species. *Jewell*, 749 F.3d at 779. But on remand, Reclamation initiated a "consultation" in which it blatantly defied this

1

Court's rulings and denied that it had any such discretion. Instead, Reclamation engaged in a perfunctory sham consultation with the U.S. Fish and Wildlife Service ("FWS") that failed to actually assess the contracts' effects on threatened Delta Smelt. The district court's decision upholding that consultation violates basic principles of administrative review and misapplies ESA law, and should be reversed.

Reclamation also wrongly disavowed its discretion to act to benefit ESA-listed Chinook salmon during the duration of the renewed SRS Contracts. On that basis, it refused to reinitiate consultation with the National Marine Fisheries Service ("NMFS") regarding the SRS Contracts' devastating effects on the species, including releases and diversions pursuant to the SRS Contracts that contributed to two years of near complete mortality of protected Chinook salmon. The district court erred in dismissing Plaintiffs' claim for reinitiation of consultation.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331, 16 U.S.C. §1540(c), and 5 U.S.C. §§702-706, and entered final judgment on the three claims in this appeal under Federal Rule of Civil Procedure 54(b) on December 29, 2020. 1-ER-0003. Plaintiffs (collectively, Natural Resources Defense Council or "NRDC")[1] timely filed a notice of appeal on January 26, 2021. 26-ER-6050; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. §1291.

---

[1] Plaintiffs also include San Francisco Baykeeper, Friends of the River, The Bay Institute, Pacific Coast Federation of Fishermen's Associations/Institute for Fisheries Resources ("PCFFA"), and the Winnemem Wintu Tribe, except that

## ISSUES PRESENTED

1.     Whether FWS's 2015 ESA consultation on the effects of renewing the SRS and DMC Contracts on Delta Smelt was arbitrary and capricious and contrary to law. 1-ER-0007.

2.     Whether Reclamation violated its procedural and substantive ESA obligations by failing to engage in a valid consultation on the effects of renewing the SRS and DMC Contracts on Delta Smelt, including by misrepresenting to FWS the action subject to the 2015 consultation. 1-ER-0007.

3.     Whether NRDC adequately alleged that Reclamation has sufficient discretion to act to benefit spring-run and winter-run Chinook salmon during the terms of the SRS Contracts to reinitiate of consultation on those contracts. 1-ER-0074.

## STATEMENT OF THE CASE

### A. The Central Valley Project and SRS and DMC Contracts

Reclamation is responsible for operating the Central Valley Project ("CVP"), a vast network of dams, reservoirs and pumping facilities that regulates the flows of California's major river systems and delivers water to users across the

---

Friends of the River is not a party to the Chinook salmon reinitiation claim, and PCFFA and the Tribe only assert that claim. Plaintiffs-Appellants have standing to bring their claims because their members' interests are injured by the agencies' violations; the interests are germane to Plaintiffs-Appellants' organizational purposes; the injuries are redressable; and the suit does not require members' individual participation. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180-83 (2000); 23-ER-5187-243.

state.[2]  5-ER-1037, 5-ER-1049, 5-ER-1056, 5-ER-1059; 24-ER-5521-22.

Reclamation's CVP operations affect the amount, timing, and temperature of the

water that flows through the Sacramento River and into the Delta, before flowing

to the Pacific Ocean through San Francisco Bay.  6-ER-1156; 24-ER-5521-22, 24-

ER-5527; *see generally San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d

971, 982-85 (9th Cir. 2014).  As part of its operations, Reclamation enters into

contracts to provide water from the CVP to other parties.  5-ER-1043.

In 2005, Reclamation executed new contracts with the SRS and DMC

Contractors.  3-ER-0538; 24-ER-5524-25.  The renewed DMC Contracts run

through 2030, and collectively require Reclamation to pump and deliver

approximately 350,000 acre-feet of water from the Delta each year to south-of-

Delta contractors.[3]  2-ER-0282-83, 2-ER-0338-39; 3-ER-0538.  The renewed SRS

Contracts run through 2045 and collectively authorize diversion of approximately

2.1 million acre-feet of water each year from the Sacramento River before it

reaches the Delta.[4]  3-ER-0365, 3-ER-0503-04; 24-ER-5552-53.  The SRS

---

[2] The State Water Project ("SWP") is a similar water management project operated by California in conjunction with the CVP.

[3] The 13 DMC Contractor parties to this litigation receive 90% of the total water deliveries provided for in the DMC contracts.  22-ER-5042, 22-ER-5053-54; 2-ER-0338-39.  The DMC Contracts are identical in all material respects, except for water quantities.  8-ER-1652 to 11-ER-2375.  NRDC cites to Tranquility Irrigation District's contract as an example.  8-ER-1552.

[4] The 28 SRS Contractor parties to this litigation are the largest diverters pursuant to the SRS Contracts; their diversions constitute 95% of the total SRS Contracts' amount.  22-ER-5042, 22-ER-5053-54; 3-ER-0502-04.  The SRS Contracts are identical in all material respects, except for water quantities.  *See* 8-

Contracts require Reclamation to release water from upstream reservoirs into the Sacramento River to satisfy the monthly diversion amounts provided in each contract. 5-ER-0905, 5-ER-0909-12; *see, e.g.*, 15-ER-3124-25, 15-ER-3153.

The SRS Contracts are considered "settlement" contracts because when Reclamation sought a state permit to construct reservoirs on and appropriate water from the Sacramento River, a dispute arose regarding the priority and quantity of existing rights to Sacramento River water. 3-ER-0373. The original SRS Contracts, executed in the 1960s, were a temporary compromise that avoided the need for a state-law water rights adjudication and allowed Reclamation to obtain a permit by agreeing to provide water to parties who claimed preexisting (yet unadjudicated and unquantified) water rights. 3-ER-0373; 15-ER-3119.

The SRS Contracts define two categories of diversions: "Base" supply is the parties' negotiated proxy for the disputed water rights, which Reclamation provides at no cost to the SRS Contractors; "project" water is additional water delivered from the CVP, for which the SRS Contractors pay rates similar to other CVP contractors. 3-ER-0373-74. In negotiating the 2005 renewals, Reclamation reduced the amounts of base or project water available to several contractors, increased the price of project water, and inserted new provisions that limit Reclamation's liability for shortages of project water. *See* Section II.B, *infra*.

//

//

---

ER-1508, 8-ER-1614; 11-ER-2376 to 16-ER-3547. NRDC cites to Glenn-Colusa Irrigation District's contract as an example. 15-ER-3116.

**B. ESA-Listed Fish Affected by the Contracts**

This case involves three protected fish species and their critical habitat: the Delta Smelt, and winter-run and spring-run Chinook salmon. The Delta Smelt is a small fish with a one-year lifespan that lives only in the Delta. 5-ER-0978. One of the most abundant species in the Delta as recently as the 1970s, the Delta Smelt is now listed as threatened under the ESA, and FWS has found that its declining condition warrants endangered status but is precluded from listing by other pending regulatory actions. *See* 75 Fed. Reg. 17,667 (Apr. 7, 2010). The Delta Smelt population has declined drastically to recent all-time lows. 6-ER-1162-63; 3-ER-0585-586. The entire Delta is designated as the species' critical habitat. 5-ER-0977.

Sufficient river flows through the Delta are vital to ensuring suitable habitat for Delta Smelt. 5-ER-0963-66, 5-ER-0977-88; 7-ER-1380, 7-ER-1407-08, 7-ER-1419-20. Delta Smelt live in the low-salinity zone at the saltwater-freshwater interface in the Delta. 3-ER-0579-80; 5-ER-0932-34; 6-ER-1190-99. When freshwater flows are low, that zone retreats inland, exposing Delta Smelt to unfavorable spawning and rearing conditions, more predators, temperature stress, and entrainment in the nearby Delta export pumps, which kill the fish that are sucked into them. 3-ER-0584, 3-ER-0597-98; 5-ER-0976-90; 6-ER-1190-99; 7-ER-1383, 7-ER-1408-10, 7-ER-1462, 7-ER-1421. Numerous analyses by FWS and other agencies have confirmed that diversions of water from the rivers that feed the Delta (such as the SRS Contractors' Sacramento River diversions) and pumping water out of the Delta (such as exports to the DMC Contractors) reduce

6

the fresh water flowing through the Delta, and thus contribute to the decline of the Delta Smelt's habitat and population. 3-ER-0592-93; 5-ER-0963-66, 5-ER-0982-89, 5-ER-0999-1004; 7-ER-1408-10, 7-ER-1423-24.

Winter-run and spring-run Chinook salmon are anadromous fish that hatch in the upper Sacramento River, migrate to the Pacific Ocean as juveniles, and then generally return to the Sacramento River as adults three years later to spawn. 24-ER-5545-46.[5] Winter-run Chinook are listed as endangered and spring-run Chinook are listed as threatened. 24-ER-5544-46. The winter-run Chinook population has declined precipitously since the early 1980s, and only remnant natural spring-run Chinook populations survive. 24-ER-5544-45. Both species' critical habitat includes the Sacramento River and its watershed. 24-ER-5544-46.

Cold river temperatures are necessary for successful Chinook salmon egg incubation and juvenile rearing. 24-ER-5544-46. Since Reclamation's construction of Shasta Dam, water temperature in the species' spawning and rearing habitat in the Sacramento River depends largely on the temperature of the water released upstream from Shasta Reservoir. 24-ER-5546. Reclamation must therefore retain cold-water reserves in the reservoir throughout the spring and summer to ensure that sufficiently cold water can be released in the fall when winter-run and spring-run Chinook need it. *Id*. Excessive releases from the reservoir earlier in the year (including those to meet downstream diversions of the

---

[5] Because the claim regarding Chinook salmon was dismissed on the pleadings, citations for that claim are to the then-operative complaint, rather than an administrative record.

SRS Contractors) reduce the cold water available in the fall and result in temperature-dependent mortality of Chinook salmon eggs and juveniles.  24-ER-5547-48.

### C. Reclamation's History of Consultation on the Contracts

The ESA "requires federal agencies to ensure that none of their activities jeopardizes the continued existence of endangered or threatened species or adversely modifies those species' critical habitats," and that "federal agencies must consult with [FWS] ... or [NMFS] ... prior to taking any action that could affect an endangered or threatened species or its critical habitat." *Jewell*, 749 F.3d at 779; *see* 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14(a) (as in effect Oct. 27, 2019).[6] "NMFS consults on marine and anadromous species" like Chinook salmon; FWS consults on the remainder of species, including Delta Smelt.  *Locke*, 776 F.3d at 987 n.7.  As the en banc Court held in this case regarding Reclamation's obligation to consult on the contracts: "consultation is required so long as the federal agency has some discretion to take action for the benefit of a protected species." *Jewell*, 749 F.3d at 779 (quotation omitted).

Upon consultation, if FWS or NMFS determines that "the proposed action is 'not likely to adversely affect any listed species or critical habitat,' … the process ends." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir.

---

[6] Applicable statutory provisions are set forth in the Addendum.  Certain ESA consultation regulations were amended in 2019, but those amendments were vacated.  *See Ctr. for Biological Diversity v. Raimondo*, No. 19-cv-05206-JST, Dkt. 168 (N.D. Cal. July 5, 2022).  This brief cites to the prior (now operative) version of those regulations.

2012) (en banc) (quoting 50 C.F.R. §402.14(b)(1)). If a proposed action is likely to adversely affect listed species or habitat, then FWS or NMFS must prepare a biological opinion that sets forth its "expert opinion [on] … whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, … identif[ies] reasonable and prudent alternatives that will avoid the action's unfavorable impacts," which the action agency must implement. *Jewell*, 749 F.3d at 779 (quotation omitted); *see U.S. Fish & Wildlife Serv. v. Sierra Club, Inc*., 141 S.Ct. 777, 784 (2021); 50 C.F.R. §§402.02, 402.14(e) (as in effect Oct. 27, 2019).

In the process of renewing the SRS and DMC Contracts in 2005, Reclamation asked FWS and NMFS to concur that the renewals would not adversely affect listed species. 2-ER-0198; 3-ER-0364; 24-ER-5525-27. FWS and NMFS issued letters of concurrence stating that the renewals were not likely to adversely affect Delta Smelt or Chinook salmon, but did not consider any specific terms of the contracts, instead basing their conclusions solely on the no-jeopardy findings and analyses contained in the agencies' biological opinions on the effects of the coordinated statewide operations of the CVP and SWP ("2005 FWS BiOp" and "2004 NMFS BiOp"). *Jewell*, 749 F.3d at 781; 3-ER-0494-531; 3-ER-0525-27;[7] 2-ER-0342-43; 24-ER-5527, 24-ER-5572.

Those biological opinions were invalidated by the district court, but Reclamation did not revisit or update its consultation on the contract renewals. *Jewell*, 749 F.3d at 781-82; 3-ER-0537; 24-ER-5527, 24-ER-5559-60; *see Nat.*

---

[7] FWS's three concurrence letters cover different sets of SRS Contracts but have identical reasoning. 3-ER-0537, 3-ER-0494; 4-ER-0767, 4-ER-0804.

*Res. Def. Council v. Kempthorne*, 506 F.Supp.2d 322 (E.D. Cal. 2007); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1122 (E.D. Cal. 2008). Reclamation's reliance on the invalidated biological opinions led to NRDC's claim in this case that no valid ESA consultation on Delta Smelt had occurred prior to Reclamation's renewal of the SRS and DMC Contracts and that Reclamation was jeopardizing the species' existence in violation of the ESA. 24-ER-5524-25, 24-ER-5577-78.

It was this claim that was the subject of *Jewell*, in which Reclamation argued that it did not need to engage in a consultation on the renewal of the contracts. *Jewell*, 749 F.3d at 781. This Court unambiguously held that Reclamation "was ... required to engage in [ESA] consultation prior to renewing the" SRS and DMC contracts, and that Reclamation had "never" properly consulted on the contract renewals' effects on Delta Smelt. *Id.* at 782, 784-85.

Specifically, the Court held that Reclamation "was required to engage in ... consultation because, in renewing the challenged contracts, it retained 'some discretion' to act in a manner that would benefit the delta smelt." *Id.* at 779 (citation omitted). Although it did not decide the full scope of Reclamation's discretion, the Court specifically identified "revising the contracts' pricing scheme or changing the timing of water deliveries" as examples of how Reclamation "could have contracted to benefit the Delta Smelt." *Id.* at 783-85.

This Court in *Jewell* held that Reclamation's 2005 purported consultation on the contract renewals was invalid because it had been based exclusively on the invalidated 2005 FWS BiOp on CVP/SWP operations. *Id.* at 781-82. The Court

10

also specifically ruled that FWS's 2008 replacement biological opinion on system-wide CVP/SWP operations ("2008 FWS BiOp"), an opinion which found operations *would* jeopardize Delta Smelt, "does not represent a consultation with the FWS concerning the impact of [Reclamation]'s decision to renew the specific contracts before us." *Jewell*, 749 F.3d at 782; 5-ER-1005.

### D. Challenged Agency Actions and Procedural History

On remand, despite the ruling in *Jewell* that the 2008 FWS BiOp did *not* constitute a consultation regarding the impacts of the decision to renew the contracts, Reclamation specifically limited its consultation to a request that FWS concur that "the potential effects of the [renewals] on the Delta Smelt and its designated critical habitat [were] adequately covered in the analysis of the 2008 [FWS BiOp]." 3-ER-0532-34, 3-ER-0625-27; 2-ER-0186. Further, despite *Jewell*'s key holding that Reclamation possesses sufficient discretion to protect listed species during the SRS Contract renewals, Reclamation disavowed this discretion when it requested consultation, asserting that it could *not* negotiate changes in the SRS Contracts' timing or pricing of water deliveries—in direct contravention of this Court's conclusion to the contrary—and denying any discretion to negotiate the quantities of water diversions identified in the SRS Contracts.[8] 3-ER-0546-48; 4-ER-0743-44.

---

[8] As explained *infra* in Section II.B, Reclamation's assertion is also counterfactual: Reclamation *did* negotiate changes. It simply did not consult regarding the effect of those changes or of other potential changes it had discretion to negotiate. With respect to the DMC Contracts, Reclamation concedes it has discretion at contract renewal "to require contract terms to avoid jeopardizing the continued existence of the delta smelt." 3-ER-0549.

In December 2015, FWS issued a cursory concurrence letter agreeing that renewed contracts were not likely to adversely affect Delta Smelt and relying exclusively on the 2008 FWS BiOp. 4-ER-0746-49. The letter maintained the prior 2005 concurrence, with references to the 2005 FWS BiOp in that concurrence simply updated to reference 2008 instead. 4-ER-0749. The 2015 concurrence letter did not address any scientific data or information, let alone critical new information available since 2008. 4-ER-0746-49; Section I.B, *infra*. Nor did it address the effects of the contract terms on the Delta Smelt and its habitat; whether renewing the contracts was compatible with the reasonable and prudent alternatives that the FWS 2008 BiOp found were necessary to avoid jeopardy; or information showing that baseline requirements in the 2008 FWS BiOp were not being met. *See* Sections I.A, I.C, *infra*. And it failed adequately to account for the fact that the 2008 FWS BiOp only considered the effects of CVP/SWP operations through 2030—15 years short of the full term of the SRS Contracts (as renewed prior to any valid consultation). *See* Section I.D, *infra*.

In light of Reclamation's continued refusal to engage in valid consultation on the contract renewals, upon remand from the *Jewell* decision, NRDC sought summary judgment on its claim against Reclamation—namely, that there still had not been a valid consultation on the renewals and that Reclamation was jeopardizing the Delta Smelt.[9] *See* 1-ER-0007-08. NRDC also added and sought

---

[9] Following a ruling by the district court, NRDC provided Reclamation an updated 60-day notice of this claim. 1-ER-0155; 22-ER-5038-39; 22-ER-5047; 23-ER-5141.

summary judgment on an Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq.*, claim against FWS that challenged the consultation as arbitrary and capricious and contrary to law. 1-ER-0007-08; 22-ER-5042-44, 22-ER-5098-99. Finally, NRDC added a claim alleging that Reclamation had a duty to reinitiate consultation on the SRS Contracts with respect to winter-run and spring-run Chinook salmon due to significant new information about the SRS Contracts' effects on those species. 24-ER-5526-27, 24-ER-5581-82.

The district court resolved these three claims by granting summary judgment to Defendants on (1) NRDC's claim against FWS for its arbitrary, capricious, and unlawful 2015 Delta Smelt consultation and (2) NRDC's claim against Reclamation for failing to consult validly on the contract renewals regarding Delta Smelt and for jeopardizing Delta Smelt, 1-ER-0072-73; and (3) granting Federal Defendants' motion to dismiss NRDC's claim that Reclamation had a duty to reinitiate consultation on the SRS Contracts' effects on Chinook salmon, finding that "Plaintiffs have failed to plausibly allege that Reclamation retains discretionary Federal involvement or control sufficient to trigger re-consultation," 1-ER-0115 (quotation omitted). The district court granted NRDC's motion for Rule 54(b) judgment on the three consultation claims at issue in this appeal. 1-ER-0003.[10]

//

//

---

[10] Still pending in the district court is an ESA claim for the unlawful killing ("take") of Chinook salmon, which is stayed. *See* 22-ER-4965.

### E. 2019 CVP/SWP Biological Opinions

In 2019, FWS and NMFS issued new "no-jeopardy" biological opinions on statewide coordinated CVP/SWP operations; however, in the ensuing litigation challenging those opinions, the agencies requested and were granted voluntary remand to perform new consultations on statewide operations. *See* NRDC Request for Judicial Notice ("RJN") Ex. 1 at 2, 14, 23. The 2019 biological opinions are currently in effect and will remain in place during the reconsultation, which the agencies estimate will extend through late 2024. *Id.* Ex. 2 at 1. Those opinions do not analyze the effects of the renewal or execution of the SRS or DMC Contracts. *Id.* Ex. 3 at 4-9, 4-10.

In litigation challenging the 2019 biological opinions, the district court recognized that FWS "has expressed concern that the SRS Contracts in particular may not allow Reclamation to make operational adjustments necessary to protect smelt," and "[t]he record developed … in these cases strongly suggests that NMFS will face a similar conundrum" regarding Chinook salmon. *Id.* Ex. 1 at 92-93. The district court warned that "the senior contracts are the 800-pound gorilla in the room," and the federal agencies "will eventually be forced to confront, or at the very least fully appraise, the 800-pound gorilla" in a consultation. *Id.* The time for that long-delayed reckoning is now.

### STANDARD OF REVIEW

This Court reviews cross-motions for summary judgment de novo, and may direct that summary judgment be granted to either party based on its de novo review of the record. *Locke*, 776 F.3d at 991. This Court also reviews a dismissal

for failure to state a claim de novo, but must "accept as true all well-pleaded allegations of material fact and construe them in the light most favorable to the plaintiffs." *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017).

## SUMMARY OF THE ARGUMENT

This case is back before this Court for a second time due to the federal agencies' willful refusal to perform the ESA consultations on the SRS and DMC Contracts that are statutorily required of them—and despite this Court's en banc ruling that Reclamation was required to consult on the contracts' renewals and possessed sufficient discretion to do so.

FWS and Reclamation's superficial 2015 Delta Smelt "consultation" regarding the renewals of the SRS and DMC Contracts was arbitrary and capricious and contrary to law. By relying solely on the jeopardy 2008 FWS BiOp for its concurrence with Reclamation's request that it find that the contracts' renewal would not jeopardize Delta Smelt or its habitat, FWS failed to consider crucial aspects of the problem, including how commitments to remove vast amounts of water from the natural system would affect Delta Smelt, and ignored seven years of highly relevant scientific data regarding the species' declining population and habitat needs, 15 years of the SRS Contracts' term, and Reclamation's repeated failures to provide the Delta flows required by the 2008 FWS BiOp.

Reclamation independently violated its ESA obligations—first, by accepting the obviously flawed 2015 concurrence from FWS. And second, by misrepresenting the scope of Reclamation's discretion to negotiate terms when

renewing the SRS Contracts (in direct contravention of *Jewell*'s holding), thereby preventing FWS from adequately assessing the effects of the contracts and any alternatives necessary to protect Delta Smelt.

Reclamation also violated the ESA by refusing to reinitiate consultation regarding the effects of the SRS Contracts on Chinook salmon and its critical habitat, despite significant new information regarding those effects that was not previously considered. Reclamation was obligated to reinitiate consultation because it possesses discretion to take action that would benefit Chinook salmon under the terms of the SRS Contracts and pursuant to federal and state law.

## ARGUMENT

### I. The 2015 Consultation On The Effects Of The Renewed Contracts On Delta Smelt Was Arbitrary, Capricious And Contrary To Law

Federal Defendants flouted their obligation to consult under the ESA regarding the effects of renewing the long-term contracts on Delta Smelt, despite this Court's decision finding that no valid consultation had taken place, that the system-wide 2008 FWS BiOp did not constitute a consultation on the renewals, and that Reclamation retained sufficient discretion to require a consultation be conducted. Instead, on remand, Federal Defendants made a mockery of the consultation process.

ESA consultations are reviewed under the APA, which deems an agency action invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Locke*, 776 F.3d at 994; 5 U.S.C. §706(2)(A)). An agency action is arbitrary and capricious if the agency has "relied on factors which

16

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[11] *Locke*, 776 F.3d at 994 (quotation omitted).

A reviewing court must "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (quotation omitted). The agency is "obligated to articulate a rational connection between the facts found and the conclusions made." *Id.* at 529 (quotation omitted). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S.Ct. 1891, 1907 (2020).

## A. By Relying Exclusively on the 2008 FWS BiOp, FWS Failed to Consider Important Aspects of the Problem

FWS acted arbitrarily and contrary to its obligations under the ESA by wholly failing to consider the effects of the contract renewals on Delta Smelt and its critical habitat. FWS did not in any way analyze or discuss how the terms of the contracts and their renewals would affect the species. 4-ER-0746-49. Instead,

---

[11] NRDC's APA claim against FWS is based on FWS's administrative record. *See Locke*, 776 F.3d at 993. The district court properly held that NRDC's ESA citizen-suit claim against Reclamation is not limited to an administrative record. 23-ER-5341; *see W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). For that claim, NRDC cites to documents in the administrative record Reclamation purported to lodge and to limited additional documents provided to the district court.

FWS's "consultation" relied solely on the 2008 FWS BiOp, which only addressed systemwide operations for all CVP/SWP facilities, to conclude that the SRS and DMC Contracts do not adversely affect Delta Smelt.  *Id.*; *see* 5-ER-0862, 5-ER-0879-80, 5-ER-0900-25, 5-ER-1037-39, 5-ER-1049-50, 5-ER-1056-58.  This Court, however, has already rejected the notion that the 2008 FWS BiOp is a legally sufficient consultation on the SRS and DMC Contracts' effects on Delta Smelt: "The 2008 [Biological] Opinion merely assesses the general effects of … [Reclamation]'s Plan, and it does *not* represent a consultation with the FWS concerning the impact of [Reclamation]'s decision to renew the specific contracts[.]"  *Jewell*, 749 F.3d at 782 (emphasis added).

Even if this Court had not already addressed the question of whether the 2008 FWS BiOp was an adequate substitute for consultation on the contracts, FWS's concurrence is arbitrary because the agency "entirely failed to consider an important aspect of the problem," *Locke*, 776 F.3d at 994: namely, whether and how the obligations in the contracts for Reclamation to supply huge amounts of water for diversion upstream of the Delta, and to export huge amounts of water from the Delta, impact the Delta freshwater flows that are crucial to Delta Smelt and its habitat.  Nor did FWS analyze the important aspects of how the contracts' other terms—including shortage provisions (which can reduce contract water quantities during specified circumstances, including for drought or other needs), the timing of diversions (the contracts provide for monthly water amounts to be supplied pursuant to schedules dictated by the contractors), pricing (which can affect usage and encourage conservation, leaving more water for ecological

18

purposes),[12] and water conservation requirements—impact Delta outflow. *See, e.g.*, 15-ER-3128, 15-ER-3130, 15-ER-3148, 15-ER-3153. FWS failed to do this analysis despite its consistent acknowledgment that Delta outflow is a crucial factor affecting Delta Smelt habitat and entrainment and thus is a critical component to the species' recovery and survival. 3-ER-0584-85, 3-ER-0588-99; 5-ER-0963-66, 5-ER-0976-90, 5-ER-0999-1004. Given this Court's ruling that Reclamation could negotiate terms such as price and timing to benefit the Delta Smelt, *Jewell*, 749 F.3d at 784-85, it was arbitrary for FWS to accept Reclamation's claim to the contrary. *See* Section II.B, *infra*.

The district court's conclusion that FWS acted reasonably by relying on the 2008 FWS BiOp merely because the operations analyzed in that opinion assumed implementation of the renewed SRS and DMC Contracts' terms, is flawed. *See* 1-ER-0034. The 2008 FWS BiOp assumed certain levels of deliveries and exports for all CVP and SWP contracts, looked at the effect of operating the CVP/SWP to meet that aggregate demand, but then critically found that the overall proposed CVP/SWP operations that included deliveries pursuant to the SRS and DMC Contracts *would* violate the ESA because they would jeopardize the existence of

---

[12] *See* 3-ER-0508-09 (FWS noting higher prices may decrease water diversions under renewed contracts); 17-ER-3569 ("Pricing is the driving force to achieve water conservation."); *id.* (Reclamation stating renewed contracts' increased project water prices "provide significant incentives for water conservation"); 17-ER-3616 (an "overall decrease in SRSC diversion[s] … would provide Reclamation with additional flexibility in meeting other … environmental water needs").

19

Delta Smelt and adversely affect critical habitat.[13]  5-ER-0862-78, 5-ER-0909, 5-ER-0925, 5-ER-1005-19.

Although FWS in 2008 identified significant alterations to proposed CVP/SWP operations in the reasonable and prudent alternatives ("RPA") that it deemed "necessary to ensure that implementation of the long term operations of the CVP/SWP does not appreciably reduce the likelihood of both the survival and recovery of the Delta Smelt," 5-ER-1008-14, FWS in no way considered (in either 2008 or 2015) whether the renewed contracts were compatible with the RPA, or whether changes to the contract terms were appropriate to meet the RPA—despite court decisions recognizing the tension between the RPA and contractors' water supply expectations.  *See* 3-ER-0623-24; *In re Consolidated Delta Smelt Cases*, 717 F.Supp.2d 1021, 1070 (E.D. Cal. 2010) (enjoining aspects of the RPA that clashed with "public expectations" for diversions and exports created by the water delivery contracts); *In re Consolidated Delta Smelt Cases*, 812 F.Supp.2d 1133, 1204 (E.D. Cal. 2011), *appeal dismissed as moot, judgment vacated* (9th Cir. 11-17143) (enjoining RPA's fall outflow action to reduce impacts to water contractors).[14]

---

[13] An action jeopardizes a species' existence if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild[.]"  50 C.F.R. §402.02 (as in effect Oct. 27, 2019).

[14] For instance, the RPA increasing fall outflow through the Delta required Reclamation to hold sufficient water behind upstream dams, including its largest—Shasta Dam—to be released in the fall and therefore could affect the amount of water in the Sacramento River in the summer and fall for diversion by the SRS

FWS failed to consider yet another important aspect of the problem when it refused to address the wealth of information available to the agency since 2008 showing that the Delta flows as actually implemented under the 2008 FWS BiOp were insufficient to protect Delta Smelt. *See* Section I.B, *infra*. This failure was particularly egregious given the evidence before FWS of Reclamation's inability to comply with required state law smelt protections (which the 2008 FWS BiOp had relied on) while providing contract deliveries during dry water years. *See* Section I.C, *infra*.

### B. FWS Ignored the Best Available Science

FWS made no attempt to ensure that its 2015 consultation was based on "the best scientific and commercial data available," as required by the ESA. 16 U.S.C. §1536(a)(2). "Under this standard, an agency must not disregard available scientific evidence that is in some way better than the evidence it relies on." *Locke*, 776 F.3d at 995 (brackets, quotation omitted). "Essentially, FWS 'cannot ignore available biological information.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). Even if an agency has a reasonable basis for disagreeing with available information, it must acknowledge and address that information in some way in its decision. *Locke*, 776 F.3d at 995; *see also Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068-69 (9th Cir. 2018) (agency ESA action

---

Contractors. 5-ER-1011-12. The RPA limiting water exports from the Delta at certain times of year affected the amount and timing of water that could be delivered to the DMC Contractors. 5-ER-1009-11.

was arbitrary and capricious for failing to provide any reason for ignoring a scientific study).[15]  An agency "cannot rely on its briefing… to explain why" it ignored scientific evidence.  *Ctr. for Biological Diversity*, 900 F.3d at 1069.  "The explanation must be evidenced from the … decision itself."  *Id.*

Here, FWS violated this statutory requirement by disregarding seven years of important data and analyses on the status of Delta Smelt, the impacts of low Delta outflow on the species, and hydrology and flows in the Delta.

To begin, FWS ignored a comprehensive 2015 study ("MAST Report") by federal and state scientists that concluded—based on new modeling and data—that Delta spring outflows have a strong effect on juvenile Delta Smelt abundance, in addition to the fall flows required by the 2008 FWS BiOp to protect adult Delta Smelt.  6-ER-1136, 6-ER-1154, 6-ER-1190-93, 6-ER-1197-1200.  There is no mention of the 2015 MAST Report in FWS's concurrence, even though FWS had previously acknowledged that the report constitutes "valid new information that spring outflow has a positive impact on the relative abundance of Delta Smelt[.]"  4-ER-0631 (FWS Jan. 30, 2015 letter to Reclamation).  Nor is there any analysis of the contracts' effects on Delta spring outflows and juvenile Delta Smelt.  FWS's failure to even mention, let alone provide any discussion or explanation of, this important new scientific evidence is arbitrary and capricious.

---

[15] *Center for Biological Diversity* concerned the identical ESA requirement that wildlife agencies rely on the "best scientific and commercial data available" when listing species as endangered.  *See* 900 F.3d at 1068; 16 U.S.C. §1533(b)(1)(A).

FWS also disregarded its and Reclamation's own 2010 expert testimony to the State Water Resources Control Board ("State Board") on the need for increased Delta outflow to ensure the continued survival of Delta Smelt.  *See* 7-ER-1424 ("Increased Delta inflows are needed to improve the quality and availability of habitat within the Delta."), 7-ER-1391-98, 7-ER-1407-12, 7-ER-141929.  FWS's and Reclamation's scientists' testimony "focused on providing the best available scientific information regarding flow criteria" for the Delta, 7-ER-1378, and provided analysis, as well as information from several studies, post-dating the 2008 FWS BiOp regarding the need for improved Delta flows to protect Delta smelt. *See, e.g.*, 7-ER-1391-98, 7-ER-1407-12, 7-ER-1419-29.  The ESA required FWS to address this updated scientific information regarding Delta flows in considering the contracts' effects.  *Ctr. for Biological Diversity*, 900 F.3d at 1069.

FWS also failed to address survey data showing that the Delta Smelt population had dropped to unprecedented low levels in the two years before the consultation.  *See* 4-ER-0737; 3-ER-0586, 3-ER-0609; 6-ER-1358-59; 7-ER-1504-05 (collectively, showing that fall, spring, and summer surveys by state fisheries agency returned record-low catches in 2014 and 2015).  There is no question that the 2014 and 2015 surveys were up-to-date information and "in some way better," *Locke*, 776 F.3d at 995, than the outdated population statistics in the 2008 FWS BiOp, particularly as they showed the current plight of the species and indicated that the 2008 RPA and state flow protections were not working as intended.  Yet FWS wrongly omitted any explanation or assessment of the survey results, or of how the renewed contracts could be expected to affect the species in light of the

23

increasing vulnerability of the population. *Cf.* 7-ER-1476 ("reduced survival in one year can have significant effects on the population over the long term").

Even though FWS based its concurrence letter entirely on the 2008 FWS BiOp, the district court incorrectly found that the surveys and MAST Report were "considered" because they were referenced or summarized in documents Reclamation provided to FWS. 1-ER-0066-68. But that FWS was aware of the science does not satisfy its obligation to actually address it: FWS's 2015 concurrence in no way assessed this updated available biological information, even to "disagree[] with" or "discredit[]" it, *Locke*, 776 F.3d at 995. FWS cannot simply ignore available studies that contradict its findings, but must "provide a reason" or "explain why" it chose to rely solely on the 2008 FWS BiOp to assess the contracts' impacts. *Ctr. for Biological Diversity*, 900 F.3d at 1068-69 (agency did not satisfy best available evidence requirement when it cited some portions of a recent study, but failed to explain why it did not rely on other portions that contradicted the agency's decision).[16]

FWS also failed to address new information pertaining to flows in the Delta that demonstrated Reclamation's failure to comply with minimum Delta flow protections while making CVP contract deliveries during drought years. This too violates the best available science requirement and is arbitrary and capricious. *See* Section I.C, *infra.*

---

[16] The concurrence letter's passing reference to FWS's "concern[]" about the "low numbers in … recent survey efforts," 4-ER-0749, does not satisfy the agency's obligation, including because FWS merely postponed any analysis of the declining population to a future time. *See* Section I.E, *infra.*

### C. FWS Ignored Degraded Baseline Conditions and Relied on Incorrect Assumptions

It is arbitrary and capricious for an agency to "fail[] to incorporate degraded baseline conditions into its jeopardy analysis." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008). "The proper baseline analysis is … what jeopardy might result from the agency's proposed actions *in the present and future human and natural contexts.*" *Id*. at 930 (quotation, brackets omitted). The consulting agency is required to "consider the effects of its actions within the context of other existing human activities that impact the listed species." *Id.* (quotation omitted). Moreover, basing a consultation decision on incorrect assumptions is arbitrary and capricious. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., 33 F.4th 1202, 1215, 1221 (9th Cir. 2022).

FWS's 2015 concurrence failed to address available information showing that the 2008 FWS BiOp's baseline requirement of Reclamation meeting state flow requirements under the State Board's Water Rights Decision No. 1641 ("D-1641") was not being met. The 2008 FWS BiOp requires those state Delta outflow requirements and export limits maintaining conditions suitable for Delta Smelt to remain in effect. 5-ER-0870, 5-ER-0882-86, 5-ER-1063-67; 4-ER-0635; 7-ER-1446-48. But Reclamation repeatedly sought and obtained waivers weakening those requirements during drought years, and therefore operated the CVP to provide significantly less Delta outflow and greater Delta water exports than the 2008 FWS BiOp had anticipated and relied on. *See, e.g.*, 7-ER-1461-65, 7-ER-1472-75, 7-ER-1487.

25

FWS knew that the 2008 FWS BiOp's requirements were not being met—it explicitly recognized in a March 2015 letter that Reclamation's "proposed modifications to D-1641 [in 2014 and 2015] were not anticipated in the project description for the 2008 BiOp." 4-ER-0737. FWS also knew that the contracts were contributing to Reclamation's failure to comply with the state requirements, as Reclamation sought waivers of the requirements in large part to continue delivering water pursuant to the contracts. 7-ER-1465, 7-ER-1490 ("Without the changes …, the Projects would need to reduce deliveries in order to satisfy D-1641 requirements."), *id.* ("The primary beneficiaries of the changes will be water users."), 7-ER-1493. The resulting Delta flows, which were lower than those evaluated and authorized by the 2008 BiOp, rendered the Delta Smelt's habitat even less hospitable, information FWS was obligated to evaluate. 7-ER-1477; 4-ER-0719-27; 6-ER-1373-74.

### D. FWS Failed to Consider the Entire Scope of the SRS Contracts.

FWS's concurrence is further invalid because, by relying exclusively on the 2008 FWS BiOp that considered the effects of CVP/SWP operations through 2030, the agency entirely failed to consider the effects of renewing the SRS Contracts through 2045. This is a clear violation of the ESA's requirement that a consulting agency "'analyze the effect of the *entire* agency action,'" *Wild Fish Conservancy*, 628 F.3d at 521 (quoting *Conner,* 848 F.2d at 1453). The district court's suggestion that it was permissible for FWS to truncate its analysis because it could conduct future consultations to address that flaw is wrong as a matter of law.

26

It is well settled that a consultation "must be coextensive with the agency action." *Conner*, 848 F.2d at 1457-58. That means a consultation must analyze the entire duration of a proposed action. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005) (wildlife agency cannot approve action that impacts species "for several generations without any analysis of how doing so will affect the species"). Failure to do so is contrary to the ESA and arbitrary and capricious for failing to consider an important aspect of the problem. *See Wild Fish Conservancy*, 628 F.3d at 521.

Here, FWS's consultation only analyzed a portion of the SRS Contracts' duration. In 2005, Reclamation renewed the SRS Contracts for a term of 40 years—through 2045. 3-ER-0538. Because FWS's concurrence relied exclusively on the 2008 FWS BiOp, 4-ER-0746-49, it necessarily included no analysis of impacts of the contracts beyond 2030, the end of the period analyzed in the 2008 FWS BiOp. *See, e.g.*, 5-ER-0863, 5-ER-0992-95 (2008 FWS BiOp's modeling, analysis, and conclusions do not extend beyond 2030); 5-ER-1057, 5-ER-1106, 5-ER-1110. That means FWS approved a 40-year action without conducting *any* analysis of the effects of 15 years—*or nearly 40%*—of the action. FWS did not even acknowledge that its analysis only covered a fraction of the SRS Contracts' term, and provided no explanation of why such a truncated analysis would satisfy its ESA obligations to analyze the "entire" agency action, *Wild Fish Conservancy*, 628 F.3d at 521. FWS's omission is especially glaring given that the 2008 FWS BiOp found that CVP operations, including those to satisfy the SRS Contracts,

27

over 25 years *would* jeopardize the continued existence of the species, 5-ER-1005. FWS's failure to analyze the effects of the entire action was patently improper.

The district court properly recognized that if Reclamation was correct in its claim that it could not revise or depart from the renewed contracts upon a reinitiated consultation, then the truncated temporal scope of the consultation regarding Delta Smelt was unlawful. 1-ER-0055 ("Defendants cannot have it any other way. Either the present consultation fails … or the SRS Contracts must be subject to future restrictions[.]"). In upholding FWS's woefully inadequate consultation and the clear ESA violation occasioned by FWS's failure to consider the entire scope of the SRS Contracts, the district court held that Reclamation *could* "revisit" the terms of the SRS Contracts to impose "additional protections" for Delta Smelt under Article 7(b) if necessary in future consultations. 1-ER-0054-56.

As an initial matter, NRDC agrees with the district court's ruling that water quantities in the SRS Contracts can be revised under Article 7(b) in reinitiated consultations on the contracts. *See* Section III.A.1, *infra*. The court's reasoning, however, contradicts its earlier ruling that Reclamation could *not* change or depart from the SRS Contracts' terms once they were executed (including under SRS Contract Article 7(b)), 1-ER-0107-08, and thus that Reclamation could never be required to reinitiate consultation on those contracts, 1-ER-0095-111 (dismissing NRDC's claim for reinitiation of consultation on Chinook salmon).

Regardless, whether Reclamation and FWS have the ability to *reinitiate* consultation at some later point does not justify FWS's failure to consider the

28

entire scope of the SRS Contracts. Certainly, if the SRS Contract terms could not be revised in the future, then FWS was required to analyze the full effects of the renewals before it approved them. *See* Section I.E, *infra*. And if Reclamation retains discretion to revise the terms, FWS was still required to consider the SRS Contracts' full scope because the "artificial division" of an agency action into "incremental[] step[s]" can "undermine the consulting agency's ability to determine accurately the species' likelihood of survival" and result in "piecemeal chipping away of habitat" for endangered species. *Wild Fish Conservancy*, 628 F.3d at 522 (quotations omitted).

### E. FWS Impermissibly Deferred Analysis of the Contracts' Effects.

The ESA does not permit consulting agencies to postpone considering the effects of an action. *See Wild Fish Conservancy*, 628 F.3d at 522; *Conner*, 848 F.2d at 1455 (discussing ESA's "clear mandate" that a "comprehensive" consultation "be completed *before* initiation of the agency action") (italics added); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) ("The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal."). But although FWS's concurrence conceded that "recent survey efforts" demonstrated a "continued decline" of Delta Smelt, FWS improperly punted any analysis of whether the Delta outflows needed to protect the species could be met under the contracts to unspecified "future consultations." 4-ER-0749. FWS did so without explaining why or how the contracts would not jeopardize the species' continued existence and recovery in the meantime. *Id.* That deferral of analysis was unlawful: It is well-established that any "duty to

29

reinitiate consultation in the future … does not diminish the Service's obligation to prepare a comprehensive [consultation] now." *Wild Fish Conservancy*, 628 F.3d at 525. Moreover, FWS's finding of no adverse effects and postponement of any further action to protect Delta Smelt was plainly contrary to the evidence before it.[17] *See* Section I.F, *infra*.

### F. FWS Failed to Articulate a Rational Connection Between its Conclusion and the Evidence, and its Conclusion Is Counter to the Evidence.

FWS's concurrence that renewal of the contracts was not likely to adversely affect Delta Smelt was counter to the post-2008 evidence before it that the Delta Smelt population had crashed in recent years; that increased and more frequent Delta outflows were needed to sustain the population; that underlying state-law Delta flow requirements were being waived rather than left in place to protect Delta Smelt; and that the contracts' water delivery obligations interfered with Reclamation operating the CVP to provide the needed Delta flows. *See Locke*, 776 F.3d at 991; *see* Sections I.A-E, *supra*. The agency's perfunctory concurrence and reliance on outdated data is particularly glaring given that, just months later, FWS *admitted* the population and flows information post-dating 2008 was highly relevant and showed potential jeopardy of Delta Smelt. *See* RJN Ex. 4 (FWS

---

[17] FWS's failure to address the import of the Delta Smelt's continued decline was especially arbitrary and capricious given FWS's prior internal acknowledgement that the surveys showed current Delta flows might be insufficient to avoid jeopardy and that the contracts might need to be "revisited" to provide the needed flows, 3-ER-0624, and Reclamation's position that its actions could not be changed to protect species in future consultations, *see* Section III, *infra*.

reinitiating consultation on CVP/SWP operations in August 2016 because "new information is demonstrating the increasingly imperiled state of the Delta Smelt and … emerging science shows the importance of outflows to all life stages of Delta Smelt"). FWS should have found a likelihood of adverse effects and prepared a biological opinion on whether the SRS and DMC contracts jeopardize Delta Smelt. *See* 50 C.F.R. §402.14(a), (b) (as in effect Oct. 27, 2019).

By failing to address, explain, or provide *any* reasoning in the concurrence discussing its conclusion in light of post-2008 information or evidence, FWS failed to articulate a rational connection between its finding and the evidence in the record. *See Wild Fish Conservancy*, 628 F.3d at 529, 535. A reviewing court may not "infer an analysis that is not shown in the record." *Nat'l Wildlife Fed'n*, 524 F.3d at 923 n.10 (quotation omitted); *see also Dep't of Homeland Sec.*, 140 S.Ct. at 1907. Because FWS provided no justification or analysis for basing its concurrence solely on an outdated, jeopardy biological opinion, its finding of "no adverse effects" is arbitrary and capricious.

## II. Reclamation Is Violating Its ESA Duties To Consult On The Contract Renewals' Effects On Delta Smelt And To Avoid Jeopardizing Delta Smelt

### A. Reclamation Has Never Performed a Valid Delta Smelt Consultation on the Renewal of the Contracts

This Court previously stated in no uncertain terms that "[Reclamation] was … required to engage in a Section 7(a)(2) consultation prior to renewing the Settlement [and DMC] Contracts." *Jewell*, 749 F.3d at 785; *see also Houston*, 146 F.3d at 1129 (executing long-term water contracts before performing a valid

31

consultation violates the ESA). The 2005 consultation was invalid because it relied on the unlawful 2005 FWS BiOp. *Jewell*, 749 F.3d at 782. Ten years later, when Reclamation was finally forced to consult on the contract renewals, that consultation was invalid for multiple independent reasons, as explained above. *See* Section I, *supra*. Reclamation thus continues to be in violation of its procedural duty to perform a valid ESA consultation before executing the renewed contracts. *See* 16 U.S.C. §1536(a)(2).

Reclamation is also in violation of its substantive duty to ensure that its operations are not likely to jeopardize Delta Smelt. *See* 16 U.S.C. §1536(a)(2); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Reclamation cannot meet its substantive obligations by relying on a legally flawed consultation. *Wild Fish Conservancy*, 628 F.3d at 532; *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127 (9th Cir. 2012). An agency also violates its substantive obligations if it arbitrarily and capriciously continues its action despite "new information" that "undercut[s]" the consultation's conclusions. *Wild Fish Conservancy*, 628 F.3d at 532.

Here, it was arbitrary and capricious for Reclamation to rely on the 2015 consultation with its obvious legal flaws. *See* Sections I.A-F, *supra*; *Wild Fish Conservancy*, 628 F.3d at 532 (relying on consultation with improper scope and no rational connection to the evidence violated substantive ESA duties). It was further arbitrary and capricious for Reclamation to rely on the 2015 consultation given the other information before the agency that undercut the conclusion that the contracts did not adversely affect Delta Smelt. This includes Reclamation's

acknowledgment that "meeting the … needs of resident species in the Delta, delivery of water to … Sacramento Settlement Contractors, and Delta outflow requirements … may be in conflict." 23-ER-5264. That acknowledgment was consistent with other agencies' findings, including the State Board, which found that Reclamation's requested waivers of state flow requirements in 2014 and 2015 redirected more than *one million* acre-feet of water from Delta protections to contract deliveries, cutting Delta outflows in half, 23-ER-5280-81, and that those waivers harmed Delta Smelt, 23-ER-5259. *See also* 23-ER-5267, 23-ER-5270 (2015 fall smelt survey returned record-low results).

## B. Reclamation Obstructed the 2015 Consultation by Misrepresenting its Discretion in Renewing the SRS Contracts

Reclamation is further in violation of its duty to consult because it affirmatively undermined the 2015 consultation, instructing FWS in a manner designed to prevent FWS from considering the full effects of the very agency action at issue: Reclamation's contract renewal negotiations. Even though the consultation was purportedly to consider the renewals, Reclamation never acknowledged—and expressly disavowed—that the contracts entered into without a valid consultation could actually be modified or rescinded. This position was directly at odds with this Court's ruling in *Jewell*. 749 F.3d at 784-85.

Specifically, Reclamation impeded the 2015 consultation by misrepresenting Reclamation's abilities to negotiate different terms when renewing the SRS Contracts and to decide *whether* to renew those contracts. Reclamation's misrepresentations matter because consulting wildlife agencies can only consider

33

and formulate alternatives or modifications to the action that "can be implemented consistent with the scope of the Federal [action] agency's legal authority and jurisdiction." 50 C.F.R. §402.02; *see id.* §§402.13(b), 402.14(h)(3) (as in effect Oct. 27, 2019). By disclaiming any discretion to negotiate for different quantity, pricing, or timing terms or to consider non-renewal, Reclamation prevented FWS from analyzing whether such terms would be less detrimental to Delta Smelt and their habitat than the proposed terms, and thus prevented FWS from identifying any modifications to avoid the likelihood of adverse effects or any RPA to avoid jeopardy. *See id.* §§402.13(b) (modifications to avoid adverse effects), 402.14(g)(5), (h)(3) (RPA to avoid jeopardy), (j) (conservation recommendations).

Reclamation therefore improperly shielded the SRS Contract renewals from any meaningful ESA review. A consultation based on a false description of the agency's discretion cannot be valid; otherwise, agencies could circumvent ESA review at will. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (finding agency "improperly circumscribe[ed] the scope of the consultation" to shield parts of its action from the consultation analysis); *Wild Fish Conservancy*, 628 F.3d at 521-22 ("the scope of the agency action is crucial" and "can have a determinative effect on the ability of a biological opinion to fully describe" and mitigate the impact of the action) (quotation omitted).

This Court has already determined that Reclamation had discretion over the SRS Contracts' renewal and the renewal terms, and Reclamation's representations to the contrary to FWS were unreasonable and contrary to law. For example, Reclamation's 2015 assertion that it was required to renew the contracts for the

34

same pricing and timing terms, 3-ER-0546-48, was already decided by *Jewell*, which held "[Reclamation] could benefit the Delta Smelt by renegotiating the Settlement Contracts' terms with regard to, inter alia, their pricing scheme or the timing of water distribution," 749 F.3d at 785. Reclamation cannot relitigate those issues now. *See Pakootas v. Teck Cominco Metals, LTD*, 830 F.3d 975, 986 (9th Cir. 2016) ("An appellate panel simply cannot modify an en banc decision.") (quotation omitted); *Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017) (law of the circuit and law of the case). Reclamation's attempt to overrule *Jewell*'s plain holding by telling FWS it lacked discretion over timing and pricing is the epitome of agency action that is contrary to law.[18]

Reclamation's assertion to FWS that it was required to renew the contracts, and to renew them for the same quantities of water, also has no legal basis. *Jewell* held that "nothing in the original Settlement [SRS] Contracts requires the Bureau to renew" those contracts. 749 F.3d at 785. Moreover, in renewing the SRS Contracts in 2005, Reclamation *did* exercise discretion to negotiate changes to quantity terms, resulting in a net reduction of 170,000 acre-feet from the original contracts: Reclamation reduced base supply quantities in two of the

//

//

---

[18] *Jewell* already considered the same pricing statutes that Reclamation cited to FWS in 2015. *See* 25-ER-5789-99; 24-ER-5688-89. Those statutes only set a *minimum* for CVP contract pricing. *See Flint v. United States*, 906 F.2d 471, 475-76 (9th Cir. 1990); 43 U.S.C. §485h(e); 43 U.S.C. §390hh(a). Reclamation's claims to FWS regarding timing were based solely on Reclamation's contention that it could not change the quantity, which is wrong as discussed *infra*.

renewed SRS Contracts;[19] reduced project water for 18 renewed contracts;[20] increased base supply for four renewed contracts;[21] and increased project water for one contract by 30,000 acre-feet.[22]

Reclamation's renewal of the contracts in 2005 also demonstrated that it had discretion to negotiate other new terms. Reclamation negotiated a new shortage provision, Article 3(i), that reserves Reclamation the right to reduce project water quantities in certain circumstances; it negotiated for new water conservation requirements; *increased* the price of project water; and imposed a new fee for rescheduling base water diversions. 3-ER-0508-09; 17-ER-3569; *see, e.g.*, 15-ER-3126, 15-ER-3128, 15-ER-3130-31, 15-ER-3148.

---

[19] 3-ER-0502-03; *see* 17-ER-3660; 8-ER-1547 (Anderson-Cottonwood); 21-ER-4796; 16-ER-3499 (Sutter Mutual).

[20] Project water quantities were reduced for Anderson-Cottonwood, Carter Mutual, Conaway, Christo Bardis (Pelter Road 1700), M&T Chico (Pacific Realty), Natomas, Pelger Mutual, Pleasant Grove-Verona, Princeton, Provident, Reclamation District 1004, Reclamation District 108, River Garden Farms, Sacramento River Ranch (te Velde Family Trust), Sutter Mutual, Tisdale, Wallace (Knights Landing), and Windswept Land. *Compare* 17-ER-3660; 17-ER-3757; 17-ER-3809; 21-ER-4652; 18-ER-3943; 18-ER-4083; 19-ER-4216; 19-ER-4262; 19-ER-4303; 20-ER-20-ER-4374; 20-ER-4578; 20-ER-4536; 21-ER-4701; 21-ER-4744; 21-ER-4796; 21-ER-4836; 22-ER-4882; 22-ER-4926 (original contracts) *with* 8-ER-1547, 15-ER-3113, 12-ER-2588, 11-ER-2545, 14-ER-2900; 11-ER-2414; 15-ER-3278; 15-ER-3321; 16-ER-3368; 14-ER-3028; 16-ER-3412; 16-ER-3456; 14-ER-2945; 14-ER-2987; 16-ER-3499; 16-ER-3542; 13-ER-2731; 14-ER-3069 (renewed contracts, in the same order).

[21] *See* 17-ER-3757; 15-ER-3113 (Carter); 20-ER-4374; 14-ER-3028 (Provident); 20-ER-4495; 12-ER-2633 (Richter); 21-ER-4701; 14-ER-2945 (River Gardens).

[22] 18-ER-3859; 15-ER-3153.

Reclamation's 2015 disavowals of discretion are also belied by a long history of statements that it *could* negotiate for different terms—statements Reclamation made during the renewal process;[23] in this litigation;[24] and to the SRS Contractors.[25]

Reclamation's assertion that it cannot consider the needs of protected species when negotiating contracts that require Reclamation to operate the CVP to deliver water is also contrary to federal and state law. The Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575 (1992), §3406(b) requires Reclamation to "operate the [CVP] to meet all obligations under … Federal law, including but not limited to the Federal Endangered Species Act[.]" Thus, "Congress has stated, as clearly as it can, that Reclamation is to administer its obligations to the CVP consistent with the mandates of the ESA." *San Luis &*

//

---

[23] For instance, the final environmental impact statement on the 2005 renewals considered "five reasonable and feasible alternatives" that included different quantity and shortage contract provisions proposed by Reclamation. 17-ER-3592-98, 17-ER-3555-58.

[24] Among other concessions, Reclamation previously told this Court that at renewal "delivery of project water … can be reduced for … compliance with the ESA," 24-ER-5694, and agreed with NRDC that the original contracts did not require renewal or prevent Reclamation from negotiating base or project water quantities, 24-ER-5690, 24-ER-5695.

[25] *See, e.g.*, 23-ER-5309 (Reclamation 1999 letter to SRS Contractor: "[T]he Settlement Contracts provide[] each party discretion as the term of the contracts comes due. Options include allowing the contracts to expire, contract renewal, and contract renegotiation."); 23-ER-5315 (Reclamation's prior interrogatory responses to contractor regarding Reclamation's "final position … that for any renewals of the Settlement Contracts, the quantities of water … may be adjusted").

*Delta-Mendota Water Auth v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014). Nothing about the SRS Contracts' renewals removed that statutory discretion.

Federal and state law also give Reclamation discretion to negotiate reduced water quantities if the water Reclamation provides is not being put to reasonable and beneficial use or would harm public trust resources. *See* Section III.B, *infra*. Reclamation has conceded that in renewing the SRS Contracts it can reduce even base supply if the water will not be put to reasonable and beneficial use. 4-ER-0742; 24-ER-5683-84.

The rationales Reclamation provided to FWS in 2015 in support of its constrained scope of consultation find no support in the law. First, despite previously representing to this Court that Article 9(a) in the original SRS Contracts did not require renewal or prevent Reclamation from negotiating changes to project or base water to protect listed species, 24-ER-5690, 24-ER-5695, on remand Reclamation instructed FWS that Article 9(a) required renewal for the same water quantities.[26] 3-ER-0546-47. Not so.

The SRS Contracts were negotiated in the 1960s to settle the federal government and SRS Contractors' disputes regarding the contractors' claimed water rights. 15-ER-3119-20; 17-ER-3561-62. In that context, the purpose and effect of Article 9(a) was to establish that the original contracts, as well as "any renewals thereof," 18-ER-3837-47, would constitute a settlement of the parties'

---

[26] Contrary to Reclamation's assertion to FWS, 3-ER-0546, *Jewell* offered no opinion on whether Article 9(a) limited Reclamation's discretion to negotiate quantity terms if the SRS Contracts were renewed. *See* 749 F.3d at 785.

dispute over the contractors' quantity of water during the "*term* of [the original] contract," or, subsequently, during "the *term* of … any renewals thereof."[27]  *Id.* (italics added).  Article 9(a) thus ensured the contracts actually settled the parties' dispute for the duration of the contracts.  It does not bind the parties indefinitely and such a reading of the contracts would be unreasonable.  *Cf. Pac. Coast Fed'n of Fishermen's Ass'ns v. Dep't of the Interior*, 655 F.App'x 595, 598 (9th Cir. 2016) ("We also reject Reclamation's argument that the contracts themselves mandated renewal.  NEPA imposes obligations on agencies considering major federal actions that may affect the environment.  An agency may not evade these obligations by contracting around them.").

Second, Reclamation's 2015 request for consultation asserted that the purported reasonable beneficial use of Sacramento River water by the contractors "eliminated" Reclamation's ability to negotiate for different quantities of base supply water.  3-ER-0546.  That claim fundamentally misunderstands the reasonable and beneficial use doctrine.  That doctrine prevents Reclamation from putting its CVP water rights to uses that are not reasonable and beneficial.  Cal. Const. art. X, §2; *Envt'l Def. Fund v. E. Bay Mun. Util. Dist*., 26 Cal.3d 183, 200 (Cal. 1980).  It does not *require* Reclamation to give a contract to everyone who

---

[27] Article 9(a) in the original contracts provided: "During the term of this contract and any renewals thereof: (1) It shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between base supply and Project water which may be diverted by the Contractor from its source of supply for beneficial use …. (2) The Contractor shall not claim any right against the United States in conflict with the provisions hereof."  18-ER-3837-38.

contends they will put (or will continue putting) the water provided by Reclamation to reasonable and beneficial use.[28]  Although the SRS Contractors may claim water rights under state law, those asserted rights have never been specifically defined or quantified.[29]  *See* 25-ER-5925-27; 26-ER-6034; 3-ER-0365; 17-ER-3562-62, 17-ER-3585-86.

Finally, the SRS Contractors' repeated protestations that their undefined senior water rights entitle them to the exact terms of the 1960s settlement contracts are unfounded.  To give one example, the original claimed rights only allow the SRS Contractors to divert in accordance with the natural flows of the undammed Sacramento River, which had little to no summer flows.  17-ER-3561, 17-ER-3614-16.  Any right to divert those natural flows does not entitle the SRS Contractors to the specific quantities and timing of diversions in the renewed contracts, which provide vastly more water during the peak irrigation months of summer than would be possible to divert if the contractors were limited to their asserted water rights.  *See, e.g.*, 15-ER-3153; 16-ER-3499; 3-ER-0501.  The SRS Contractors want to have it both ways—contending that their asserted (yet

---

[28] Plus, any reliance on reasonable and beneficial use assessments from 2004 would be unreasonable, given the intervening decline of Delta Smelt numbers and increase in drought years.  *See* Section III.B, *infra*.

[29] While Reclamation previously agreed that its discretion to "negotiate the terms of the SRS Contracts … including the quantities of water … is not constrained by [State Water Board Decision] D-990" (which granted Reclamation's state water rights permits), 23-ER-5331, and the district court similarly rejected the SRS Contractors' (counter-factual) arguments that D-990 and state law precluded Reclamation from negotiating new terms on renewal, 25-ER-5921-31, Reclamation attempted to resurrect those arguments in briefing to the district court.  They should be rejected again.

unadjudicated) senior rights are inviolate while also cementing the more beneficial settlement terms.

In short, the SRS Contractors have no legal entitlement to new contracts on the same terms as their original settlement contracts, and certainly no entitlement to new contracts on terms that jeopardize listed species.[30] Reclamation's insistence otherwise and its disavowal of discretion—including discretion that *Jewell* already confirmed exists—resulted in an arbitrary and unlawful consultation that failed adequately to assess the impacts of the renewed SRS Contracts on Delta Smelt.

## III. The District Court Erred In Dismissing NRDC's Claim That Reclamation Was Obligated To Reinitiate Consultation Regarding The SRS Contracts' Effects On ESA-Listed Chinook Salmon

Reclamation was required to reinitiate consultation regarding the effects of the SRS Contracts on ESA-listed Chinook salmon because Reclamation retained sufficient discretion and control over the contracts and significant new information demonstrated that the SRS Contracts are having devastating impacts on the species. Dismissal of this claim was error.

"Reinitiation of … consultation is required … where discretionary Federal involvement or control over the action has been retained or is authorized by law and ... new information reveals effects of the action that may affect listed species

---

[30] Even if state law did purport to prevent Reclamation from negotiating renewed contract terms necessary to conserve Delta Smelt (which it does not), it would be preempted by the ESA. *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 852 (9th Cir. 2002), *amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002) ("to the extent [state law] prevents federal agencies from protecting ESA-listed species, it is preempted by the ESA"); *United States v. State Water Res. Control Bd.*, 694 F.2d 1171, 1177 (9th Cir. 1982).

or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. §402.16 (as in effect Oct. 27, 2019). "Action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies[.]" *Id.* §402.02. To determine discretion, a court asks "whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat." *Jewell*, 749 F.3d at 784. An "agency lacks discretion only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit." *Id.*

"An agency's duty to … reinitiate consultation, applies whether an agency action is ongoing or complete." *Ctr. for Biological Diversity v. Envt'l Protection Agency*, 847 F.3d 1075, 1084 (9th Cir. 2017) (quotation omitted). Thus, "a project undertaken pursuant to a preexisting agreement [can] not avoid the … [consultation] requirements of section 7(a)(2) if the project's implementation depend[s] on an additional agency action." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1508 (9th Cir. 1995) (*citing O'Neill v. United States*, 50 F.3d 677, 680-81 (9th Cir. 1995) as "explaining why [the consultation requirement] applies to a preexisting water service contract where the United States must act each year to supply the water"). This is because an agency has sufficient discretion to trigger a reinitiation obligation with respect to an "ongoing agency activity" if it could exercise discretion for protected species, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003); even where an agency's action is "complete," "continuing [federal] authority" over the action that could "inure to the benefit" of protected species will be sufficient to warrant reinitiation.

42

*Cottonwood Env'tl L. Ctr. v. U.S. Forest Serv.,* 789 F.3d 1075, 1087 (9th Cir. 2015) (quotations omitted) (reinitiation regarding forest management plans appropriate where agency remained "involved" because it would "make additional decisions" to "implement" the plans at the site-specific level); *see also Crowman Corp. v. United States*, 51 Fed. Cl. 654, 657-58 (2002) (agency need not be entitled to "amend" an existing contract to reinitiate consultation; reinitiation is also required if the agency retains "sufficient discretionary authority" to act "pursuant to the contract" to benefit species).

Here, Reclamation's responsibility to reinitiate consultation was triggered when NMFS's 2009 replacement biological opinion on CVP/SWP operations ("2009 NMFS BiOp") concluded that CVP/SWP operations *would* jeopardize Chinook salmon; when Reclamation's 2014 and 2015 Shasta Dam releases to satisfy the SRS Contracts caused high Sacramento River temperatures and the near-total mortality of juvenile Chinook salmon each year; and when Reclamation sought and secured waivers in 2014 and 2015 that weakened Chinook salmon protections required by the 2009 NMFS BiOp and allowed Reclamation to increase water deliveries to contractors, including the SRS Contractors. 24-ER-5526-28; 24-ER-5559-60, 24-ER-5571-72, 24-ER-5424-89.

The district court erred in dismissing NRDC's claim for reinitiation of consultation on the SRS Contracts for ESA-listed Chinook salmon on the ground that NRDC failed to allege sufficient discretion on the part of Reclamation to act to protect the species after the contracts were renewed. On the contrary, NRDC alleged ample continuing discretion, including Reclamation's continuing

43

involvement and control, provided by the terms of the contracts and authorized by state and federal law, over its operations of the CVP to provide water for the SRS Contractors' diversions and to otherwise perform the contracts' terms. *See* 24-ER-5572-73, 24-ER-5581.

### A. The Terms of the SRS Contracts Confirm that Reclamation Retains Discretionary Involvement and Control

To provide water to satisfy the SRS Contractors' diversions under the contracts, Reclamation must release water from upstream CVP reservoirs, including Shasta Reservoir, into the Sacramento River. 24-ER-5527-28, 24-ER-5546-48. In drought years when the reservoirs are low, releases to satisfy the SRS Contractors' demands in the spring often deplete the cold-water pool to such an extent that the warmer water released in the fall causes river temperatures that are lethal to juvenile Chinook salmon. 24-ER-5546-48, 24-ER-5572-74. The terms of the SRS Contracts confirm that Reclamation retains discretion over how to perform the contracts' provisions pertaining to diversions and releases and how to structure its CVP operations pursuant to those provisions. The SRS Contract terms also confirm that Reclamation can exercise its discretion for the benefit of Chinook salmon, including to enhance cold water storage in Shasta Reservoir.

### 1. Reclamation can take action during the term of the contracts to implement protections recommended in biological opinions

As the district court confirmed, if a consultation finds Reclamation's commitments in the SRS Contracts—including the commitment to supply certain quantities of water to the contractors at certain times—are inconsistent with the ESA, then Federal Defendants can take action to resolve the inconsistency and

44

comply with the ESA.  1-ER-0054-56.  Specifically, the district court held that Article 7(b) of the contracts authorizes Federal Defendants to "revisit" the contracts' water quantities and other terms "if future ... consultations indicate impacts ... [that] are not compatible with continued implementation of the SRS Contracts."[31]  1-ER-0055-56.  Under Article 7(b), if a future consultation "concludes additional protections are needed to avoid jeopardy to Delta Smelt or adverse modification to its critical habitat ... [that] will require Federal Defendants to revisit the SRS Contracts if doing so is necessary to implement the recommended protections."  1-ER-0054-55.

This interpretation of Article 7(b) is consistent with the position Federal Defendants took during the 2015 Delta Smelt consultation.  As FWS explained: "Reclamation has identified Article 7(b) of the SRS contracts as one that 'may affect the availability of water under the SRS contracts' by requiring compliance with biological opinions prepared as a result of a consultation regarding the execution of the SRS contracts .... As articulated in Reclamation's letter dated December 11, 2015, ... any subsequent reinitiation of consultation on the coordinated operations of the CVP and SWP ... or the SRS and DMC contract

---

[31] As noted above, the district court interpreted Article 7(b) this way when considering FWS's failure to consider the full temporal scope of the SRS Contracts.  *See* Section I.D, *supra*.  Article 7(b) provides: "The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973, as amended, that are within the Contractor's legal authority to implement."  15-ER-3130; *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (contract terms properly considered on motion to dismiss).

renewals would also be one 'regarding the execution of the contract' and would, therefore, be subject to the terms of Article 7(b)."  4-ER-0749.

Article 7(b) was a new provision added for the first time in the renewed contracts.  *Compare* 15-ER-3130 *with* 18-ER-3835.  At the time the renewed SRS Contracts were executed, there were no existing "requirements … in a biological opinion[] prepared as a result of a consultation regarding the execution of the … Contract[s]" under Article 7(b), 15-ER-3130, because the 2004 FWS BiOp and 2005 concurrence on the contract renewals had found no jeopardy.  24-ER-5558-59.  If Federal Defendants did not have discretion to reinitiate consultation on the contracts, then Article 7(b)'s requirement for compliance with the requirements in biological opinions would be meaningless.

Defendants' argument that Article 7(b)'s requirement that SRS Contractors comply with a biological opinion somehow means that Reclamation possesses no discretion under the contracts makes no sense.  1-ER-0107-08.  The parties plainly contracted for continued discretionary federal involvement and control by agreeing that the SRS Contractors would be bound by any restrictions imposed by a federal wildlife agency in a biological opinion to avoid jeopardy.  Moreover, Article 7(b) provides Reclamation with the ability to depart from the terms of the contracts to protect species: The SRS Contractors have no contractual right to performance under the contracts that conflicts with the requirements of a biological opinion, and Reclamation is freed from performing any conflicting contract obligations and instead may operate the CVP consistent with the biological opinion's protections.

46

## 2. Reclamation has broad discretion over project water

The SRS Contracts' terms establish Reclamation's substantial authority and control over the administration and provision of project water.[32]  To begin, Article 3(i) of the SRS Contracts is a shortage provision that allows Reclamation to reduce the water it provides to the SRS Contractors in order "to meet legal obligations."[33] This provision is effectively identical to the term in the DMC Contracts pursuant to which Reclamation regularly reduces water deliveries to DMC Contractors to benefit listed species.  *See* 8-ER-1587 (DMC Art. 12(b)); 2-ER-0210; 3-ER-0549.

Throughout this litigation, Reclamation has consistently represented that Reclamation retains discretionary authority under Article 3(i) to reduce provision of project water to the SRS Contractors if necessary to protect species or their habitat.  For instance, Federal Defendants previously told this Court: "Reclamation can reduce 'project water' under Article (3)(i) of the SRS Contracts to comply with the ESA" and "[s]hould it ever prove necessary for project water under the SRS contracts to be reduced to meet legal obligations under the ESA to benefit the Delta Smelt or other listed species, Article 3(i) gives Reclamation the same ability to do so as it has under the DMC[] contracts."  24-ER-5677-78; *see also* 25-ER-5944, 25-ER-5954 (SRS Contracts "do not prevent Reclamation from reducing

_____

[32] Project water is approximately 17% of the water in the SRS Contracts.  3-ER-0365.

[33] Article 3(i) provides: "[I]f there is a shortage of Project Water because of actions taken by [Reclamation] to meet legal obligations, then ... no liability shall accrue against the United States ... for any damage, direct or indirect, arising therefrom."  15-ER-3128.

47

deliveries or taking any other actions that are necessary to avoid jeopardizing the continued existence of the delta smelt."); 25-ER-5844-46 (Article 3(i) "allow[s] the Bureau to completely withhold deliveries").

Under the plain language of Article 3(i), relevant legal obligations for which Reclamation can reduce project water include Reclamation's duty to provide sufficient cold water rearing habitat for juvenile Chinook salmon species below Shasta Dam as imposed by a NMFS biological opinion to prevent jeopardy, *see, e.g.*, 24-ER-5544-48, as well as conditions on Reclamation's water rights permit requiring it to provide protective cold water habitat conditions in the Sacramento River, *see* 23-ER-5363-66 (State Board Order 90-5), 23-ER-5373-77 (D-1641).[34] Reclamation's continuing ability to reduce project water supplies to the SRS Contractors pursuant to an ESA obligation is, independently, sufficient discretion to reinitiate consultation.[35]

//

---

[34] NRDC submitted these State Board decisions as judicially noticeable documents relevant to contract interpretation. 23-ER-5405. If necessary, NRDC could amend its complaint to add the undisputed facts in those documents.

[35] Reclamation's ability to decrease project water supply to comply with legal obligations is in addition to the default shortage provision that reduces the SRS Contracts' water amounts by 25% during a "critical year." 15-ER-3129 (Art. 5(a)). A "critical year" is defined by forecasted inflow to Shasta Reservoir. 15-ER-3121-22 (Art. 1(f)). Reclamation is responsible for selecting the forecast and has discretion to choose which forecast is used. *Id.* This discretion can be exercised to benefit listed salmon—a more conservative forecast will "protect the cold water pool in Shasta Reservoir." *See* 23-ER-5395; 24-ER-5497 (SRS Contractors admitting "there is some discretion to be exercised in forecasting" a critical year).

48

### 3. Reclamation has discretionary authority over the SRS Contractors' sales of contract water

Under Article 3(e), Reclamation must approve any "sale, transfer, exchange, or other disposal of any of the Contract Total" by the SRS Contractors, 15-ER-3127, where "Contract Total" means all base and project water provided in the contract, 15-ER-3121 (Art. 1(e)). To the extent Reclamation rejects a sale in order to retain water in the Sacramento River basin, or conditions the sale on environmental protections, the discretion could inure to the benefit of listed species. The contracts expressly contemplate that Reclamation will consider the effects on listed species when determining whether to approve a sale. 15-ER-3127 (requiring that a proposal for sale or transfer must provide "information sufficient to enable [Reclamation] to comply with the … Endangered Species Act"). And Reclamation in fact considers the impact on listed species when reviewing proposed sales or transfers and retains the right to disapprove sales or transfers that would adversely affect water supplies for fish and wildlife.[36] For instance, in 2014, Reclamation approved 155,500 acre-feet of SRS Contract water transfers to TCCA only after concluding the sales would not harm fish species, 23-ER-5385-86, and approved up to 175,226 acre-feet transfers to south-of-Delta contractors with conditions imposed to benefit listed species, 23-ER-5389. Reclamation explicitly

---

[36] *See* 23-ER-5382 (Reclamation requiring that SRS Contractors' 2014 sales to Tehama-Colusa Canal Authority ("TCCA") "will not adversely affect water supplies for fish and wildlife purposes"). For federal water contracts, extrinsic evidence is admissible "to explain or supplement the agreement," *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1101 (9th Cir. 2003), "even if the contract terms are clear," *O'Neill*, 50 F.3d at 684.

considered the impact on Chinook habitat below Shasta Dam before approving the sales. 23-ER-5393. It is thus plain that Reclamation retains discretionary authority not just over providing contract water from Shasta Reservoir to the SRS Contractors for sales or transfers, but also over approving or conditioning those sales or transfers, and can exercise that discretion to benefit protected species. *See Karuk Tribe*, 681 F.3d at 1026-27 (consultation duty is triggered "whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed").

## 4. Reclamation has discretion under the contracts to reduce water releases when necessary to protect species under state or federal law

Article 3(h) is a shortage provision that absolves Reclamation of any liability under the contracts for "a shortage of water … on account of errors in operation, drought, or unavoidable causes." 15-ER-3128. This provision allows Reclamation to reduce releases for base and project water diversions due to drought (when those releases are most harmful to Chinook salmon) and also due to "unavoidable causes," which include mandatory and unavoidable legal obligations, such as compliance with the ESA and CVPIA to avoid jeopardy to listed species, *see O'Neill*, 50 F.3d at 682-87 ("mandatory compliance with ESA and CVPIA are shortages" excused under water contract shortage provision applying to "errors in operation, drought, or any other causes").

In addition, Article 9(a) expressly incorporates the state law restriction on reasonable and beneficial use, providing that an SRS Contractor can only divert

50

water pursuant to the contract that it puts to reasonable beneficial use.[37]  Article 9(a) thus confirms Reclamation's continuing discretion to assess the reasonable beneficial use of the water it provides to the SRS Contractors and make adjustments if necessary.  *See* Section III.B, *infra*.

Finally, Article 30(b) reinforces Reclamation's discretion to protect ESA-listed species that is memorialized throughout the contracts.  By reserving to Reclamation the right to implement the contracts consistent with federal and state law,[38] Article 30(b) confirms Reclamation retains discretion to make determinations under Articles 9(a) and 3(a) (reasonable and beneficial use), 3(i) (legal obligations), 3(h) (drought and unavoidable causes), 7(b) (compliance with biological opinions), and other contract provisions to meet state and federal environmental requirements, including ensuring listed species are not jeopardized.[39]

---

[37] *See* 15-ER-3124-25 (Art. 3(a): "the Contractor is hereby entitled and authorized to divert …, for beneficial use … the Contract Total"), 15-ER-3135 (Art. 9(a): the contract "shall constitute full agreement … as to the quantities of water … which may be diverted by the Contractor … for beneficial use").

[38] *See* 15-ER-3151 (Reclamation "shall have the right to make determinations necessary to administer [the] … Contract that are consistent with the provisions of [the contract], the laws of the United States and of the State of California, and the rules and regulations promulgated by the Secretary of the Interior").

[39] Additionally, if this Court confirms there has yet to be a valid consultation on the renewals regarding Delta Smelt, *see* Section I, *supra*, then Reclamation will once again be in the position of consulting on the *renewal* of the SRS Contracts, and at that time it will possess all of the discretion otherwise available to it at renewal.  *See* 1-ER-0163-64; 24-ER-5572; *Houston*, 146 F.3d at 1129 (contracts signed without valid consultation are not validly executed); 16 U.S.C. §1536(d).

### B. Federal and State Law Independently Authorize Reclamation to Implement Water Contracts to Protect Species

Even without Article 30(b), the terms of the SRS Contracts could not override the federal and state laws that require Reclamation's ongoing contract operations to avoid jeopardizing protected species. These laws require Reclamation to perform contract terms and, if necessary, depart from them, to protect ESA-listed species, and thus provide the requisite discretionary authority necessary to justify reinitiation. *See* 50 C.F.R. §402.16 (as in effect Oct. 27, 2019).

First, the CVPIA requires that Reclamation "administer all existing, new, and renewed contracts in conformance with the requirements" of the CVPIA, which include that Reclamation "operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act." CVPIA, §§3404(c)(2), 3406(b). The CVPIA was passed in 1992, and the contract parties were well aware of its requirements and applicability when they renewed the SRS Contracts. *See* 15-ER-3122. Reclamation's permits to operate the CVP, as amended by the State Board in 2000, also require Reclamation to provide CVP water in compliance with ESA requirements. 23-ER-5373-77.

Furthermore, the background state law principles of reasonable and beneficial use and public trust authorize and require Reclamation to reduce its

//

---

Thus, Reclamation at that time will necessarily have at least "some discretion" to reinitiate consultation with respect to Chinook salmon. *Jewell*, 749 F.3d at 785.

Case: 21-15163, 07/22/2022, ID: 12500431, DktEntry: 31, Page 63 of 78

deliveries to SRS Contractors when necessary to protect species.[40]  *See Santa Barbara Channelkeeper v. City of San Buenaventura*, 19 Cal.App.5th 1176, 1184 (2018).  In California, all water rights, including Reclamation's state permits for water rights to operate the CVP, are limited to reasonable and beneficial use.  Cal. Const. art. X, §2; *Envt'l Def. Fund*, 26 Cal.3d at 200; 26-ER-6041-42.  The reasonable and beneficial use of water depends on the circumstances and can change over time.  *Envt'l Def. Fund*, 26 Cal.3d at 194; *United States v. Alpine Land & Reservoir Co*., 697 F.2d 851, 854-55 (9th Cir. 1983).  Reclamation is thus authorized to assess whether it is unreasonable to release water from Shasta Reservoir for SRS Contractors because that water is necessary for the preservation of protected species.  *See Stanford Vina Ranch Irrigation Co. v. California*, 50 Cal.App.5th 976, 1003 (2020), *as modified* (July 8, 2020); 23-ER-5287-307.

Similarly, the public trust doctrine requires that natural resources, including water and species, be held in trust for the benefit of the public, and thus provides Reclamation discretion to reduce contract deliveries if appropriate to protect public trust resources.  *See Nat'l Audubon Soc'y*, 33 Cal.3d at 444 n.23, 446 ("[N]o one can acquire a vested right to the unreasonable use of water."); *State Water Res. Control Bd. Cases*, 136 Cal.App.4th 674, 806 n.54 (2006) ("[T]he rights of an appropriator are always subject to the public trust doctrine …, [and] the same is true of the rights of a person who contracts with an appropriator for the use of the

---

[40] The federal Reclamation Act and CVPIA require Reclamation to comply with that non-conflicting state law when supplying CVP water.  *See* 43 U.S.C. §§372, 383; CVPIA §3406(b).

53

water appropriated.") (citation omitted); *Santa Barbara Channelkeeper*, 19 Cal.App.5th at 1185-86. Because Reclamation is obligated to implement the SRS Contracts consistent with these legal requirements, it retains sufficient discretion to warrant reinitiation of consultation on the SRS Contracts' effects on listed Chinook salmon.

## CONCLUSION

The Court should reverse the district court's decision to grant summary judgment to Defendants, and direct the district court to enter judgment for NRDC, on the Delta Smelt consultation claims against FWS and Reclamation, and should reverse the district court's dismissal of the Chinook salmon reinitiation claim against Reclamation.

Dated: July 22, 2022                    Respectfully submitted,

*/s/ Barbara J. Chisholm*

HAMILTON CANDEE
BARBARA J. CHISHOLM
CORINNE F. JOHNSON
Altshuler Berzon LLP

KATHERINE POOLE
DOUGLAS ANDREW OBEGI
Natural Resources Defense Council

*Counsel for Plaintiffs-Appellants NRDC*

/s/ *Nina Robertson*

STACEY P. GEIS
NINA ROBERTSON

54

MARIE E. LOGAN
Earthjustice

*Counsel for Plaintiffs-Appellants*

## SIGNATURE ATTESTATION

Pursuant to Circuit Rule 25-5(e), I, Barbara J. Chisholm, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and have authorized this filing.

By: <u>s/ Barbara J. Chisholm</u>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-15163

I am the attorney or self-represented party.

**This brief contains** | 13,998 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [＿＿＿＿＿＿＿].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Barbara J. Chisholm | **Date** | Jul 22, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**            56            *Rev. 12/01/2018*

# STATUTORY ADDENDUM

## Table of Contents

**Endangered Species Act, 16 U.S.C. §1531 et seq.** ........................................ Add-2

§1533(a), (b)(1)(A) ................................................................. Add-2

§1536(a)(2), (b)(3), (4) ............................................................ Add-2

§1536(d) ............................................................................ Add-3

**Central Valley Project Improvement Act, Pub. L. No. 102-575 (1992)** ...................................................................... Add-4

§3404(c)(2) ......................................................................... Add-4

§3406(b) ............................................................................ Add-4

**Reclamation and Irrigation of Lands by Federal Government, 43 U.S.C. Ch. 12** ...................................................................... Add-5

§372 ................................................................................ Add-5

§383 ................................................................................ Add-5

§390hh(a) ........................................................................... Add-5

§485h(e) ............................................................................ Add-5

**ESA Consultation Procedures, 50 C.F.R. §402.01 et seq. (as in effect Oct. 27, 2019)** ............................................................. Add-6

§402.02 ............................................................................. Add-6

§402.13 ............................................................................. Add-8

§402.14(a), (b), (e), (g), (h), (j) .................................................. Add-9

§402.16 ............................................................................. Add-11

**California Constitution** ........................................................... Add-12

Cal. Const. art. X, §2 .............................................................. Add-12

**Endangered Species Act, 16 U.S.C. §1531 *et seq.***

**16 U.S.C. §1533(a), (b)(1)(A):**

(a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors: …

(b) (1)(A) The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

…

**16 U.S.C. §1536(a)(2), (b)(3), (4):**

(a) …

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

…

(b) …

(3) (A)Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is

found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

…

(4) If after consultation under subsection (a)(2), the Secretary concludes that--
   (A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;
   (B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and
   (C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;
   the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--
      (i) specifies the impact of such incidental taking on the species,
      (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
      (iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and
      (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

…

**16 U.S.C. §1536(d):**

…

(d) After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

…

Add-3

## **Central Valley Project Improvement Act, Pub. L. No. 102-575 (1992) ("CVPIA")**

### **CVPIA §3404(c)(2):**

…

(c) …

(2) Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts. The Secretary shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title.

…

### **CVPIA §3406(b):**

…

(b) Fish and Wildlife Restoration Activities.--The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the federal Endangered Species Act, 16 U.S.C. s 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interests, is further authorized and directed to:

(1) Develop within three years of enactment and implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991; …; Provided further, That the programs and activities authorized by this section shall, when fully implemented, be deemed to meet the mitigation, protection, restoration, and enhancement purposes established by subsection 3406(a) of this title; And provided further, That in the course of developing and implementing this program the Secretary shall make all reasonable efforts consistent with the 2 requirements of this section to address other identified adverse environmental impacts of the Central Valley Project not specifically enumerated in this section.

…

Add-4

**Reclamation and Irrigation of Lands by Federal Government,
43 U.S.C. Ch. 12**

**43 U.S.C. §372:**

The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the rights.

**43 U.S.C. §383:**

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

**43 U.S.C. §390hh(a):**

(a) The price of irrigation water delivered by the Secretary pursuant to a contract or an amendment to a contract with a district, as specified in section 390cc of this title, shall be at least sufficient to recover all operation and maintenance charges which the district is obligated to pay to the United States.

…

**43 U.S.C. §485h(e):**

…
(e) In lieu of entering into a repayment contract pursuant to the provisions of subsection (d) of this section to cover that part of the cost of the construction of works connected with water supply and allocated to irrigation, the Secretary, in his discretion, may enter into either short- or long-term contracts to furnish water for irrigation purposes. Each such contract shall be for such period, not to exceed forty years, and at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary

Add-5

deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation; and shall require payment of said rates each year in advance of delivery of water for said year. In the event such contracts are made for furnishing water for irrigation purposes, the costs of any irrigation water distribution works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project, shall be covered by a repayment contract entered into pursuant to subsection (d) of this section.

…

## ESA Consultation Procedures,
## 50 C.F.R. §402.01 *et seq.* (as in effect Oct. 27, 2019)

### 50 C.F.R. §402.02:

Definitions.

Act means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

  (a) actions intended to conserve listed species or their habitat;

  (b) the promulgation of regulations;

  (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

  (d) actions directly or indirectly causing modifications to the land, water, or air.

…

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

…

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

…

Add-6

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

…

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

…

Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

…

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11–17.12.
…

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.
…

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.
…

### 50 C.F.R. §402.13:

(a) Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non–Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

(b) During informal consultation, the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat.

//

//

Add-8

**50 C.F.R. §402.14(a), (b), (e), (g), (h), (j):**

(a) Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) (1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

(2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

…

(e) Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

(1) The reasons why a longer period is required,

(2) The information that is required to complete the consultation, and

(3) The estimated date on which the consultation will be completed.

A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

…

(g) Service responsibilities during formal consultation are as follows:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

Add-9

(2) Evaluate the current status of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1)–(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45–day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45–day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10–day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.

…

(h) The biological opinion shall include:

    (1) A summary of the information on which the opinion is based;

    (2) A detailed discussion of the effects of the action on listed species or critical habitat; and

    (3) The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion). A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

…

(j) The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

## 50 C.F.R. §402.16:

Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

    (a) If the amount or extent of taking specified in the incidental take statement is exceeded;

    (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

    (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

    (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

//

//

//

Add-11

## **California Constitution**

### **Cal. Const. art. X, §2:**

It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.