# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Plaintiffs-Appellants*,

v.

DEB HAALAND,* in her official capacity as Secretary of the Interior, et al.,
*Defendants-Appellees*,

GLENN-COLUSA IRRIGATION DISTRICT, et al.,
*Intervenor-Defendants-Appellees.*

———————————

Appeal From The United States District Court,
For the Eastern District of California,
Case No. 1:05-cv-01207-JLT-EPG (Hon. Jennifer L. Thurston)

———————————

## DMC CONTRACTORS' ANSWERING BRIEF

———————————

KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
Daniel J. O'Hanlon
1331 Garden Hwy, 2nd Floor
Sacramento, California 95833
Telephone: (916) 321-4500
Facsimile: (916) 321-4555

*Attorneys for San Luis & Delta-Mendota Water Authority; Westlands Water District; Coelho Family Trust; Eagle Field Water District; Fresno Slough Water District; Mercy Springs Water District; Oro Loma Water District and Tranquillity Irrigation District*

(*Additional counsel on following page*)

* Deb Haaland is substituted for her predecessor, Scott de la Vega, pursuant to Fed. R. App. P. 43(c)(2).

Rebecca R. Akroyd
General Counsel
SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY
1331 Garden Hwy, 2nd Floor
Sacramento, California 95833
Telephone: (916) 321-4321
*Attorney for San Luis & Delta-Mendota Water Authority*

Jon D. Rubin
General Counsel
WESTLANDS WATER DISTRICT
P.O. Box 6056
Fresno, California 93703
Telephone: (916) 321-4207
*Attorneys For Westlands Water District*

Jeanne Zolezzi
HERUM\CRABTREE\SUNTAG
5757 Pacific Avenue, Suite 222
Stockton, California 95207
Telephone: (209) 472-7700
*Attorneys for Banta-Carbona Irrigation District, Patterson Irrigation District and West Stanislaus Irrigation District*

Michael E. Vergara
SOMACH SIMMONS & DUNN
500 Capitol Mall, Suite 1000
Sacramento, California 95814-2403
Telephone: (916) 446-7979
*Attorneys for Byron-Bethany Irrigation District and West Side Irrigation District*

Alan F. Doud
YOUNG WOOLDRIDGE, LLP
1800 30th St., Fourth Floor
Bakersfield, California 93301
Telephone: (661) 327-9661
*Attorneys for Del Puerto Water District and James Irrigation District*

Diane V. Rathmann
LINNEMAN LAW
1820 Marguerite Street
Dos Palos, California 93620
Telephone: (209) 392-2141
*Attorney for Eagle Field Water District*

Lauren D. Layne
Gabriel A. Delgado
BAKER MANOCK & JENSEN, PC
5260 North Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 432-5400
*Attorneys for Fresno Slough Water District, Mercy Springs Water District and Tranquillity Irrigation District*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the DMC Contractors certify they are local public agencies, with the exception of the Coelho Family Trust, which is a trust. None has a parent corporation. They do not issue stock, and hence no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ..........................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................5

STATEMENT OF THE CASE.................................................................5

      A.    The Federal Agencies Adopted a Two-Track Approach to ESA Consultation on Actions Involving the CVP......................6

      B.    Reclamation and FWS Have Been Consulting on the Effects of CVP Operations on Delta Smelt Since 1993, and That Consultation Continues Today ...................................8

      C.    The Agencies Consulted on Contract Renewal in 2005 ..........11

      D.    Appellants Challenged the 2005 Biological Opinion and Then Challenged Consultation on DMC Contract Renewal...................................................................................14

      E.    On Remand From *NRDC v. Jewell*, the Agencies Reinitiated Consultation on the DMC Contracts and Found No Changes Were Necessary to Implement the 2008 Biological Opinion..........................................................16

      F.    The District Court Granted Summary Judgment and Entered Final Judgment Against Appellants on Their Challenges to the 2015 ESA Consultation on the DMC Contracts ...................................................................................19

      G.    All the DMC Contracts Except the Oro Loma Contract Have Been Superseded Through the WIIN Act Conversions, by New Contracts.................................................20

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT .................................................................................23

      I.    The Appeal Is Moot As to All of the DMC Contracts But a Portion of One ........................................................................23

II.     FWS's ESA Consultation on the DMC Contracts Was Lawful
        and Reasonable ..................................................................................26

        A.      FWS Properly Relied Upon the 2008 Biological Opinion,
                Among Other Information, for the 2015 Consultation .............27

        B.      FWS Considered the Best Available Scientific Data in
                the 2015 Consultation ...............................................................32

        C.      FWS Considered the Effect of Temporary Changes to
                CVP Operations in 2014 and 2015 ...........................................34

        D.      FWS Did Not Defer Analysis of Whether the DMC
                Contracts Were Compatible With Outflows Required for
                Delta Smelt................................................................................36

        E.      FWS's Conclusion Is Rational and Supported by the
                Record ........................................................................................38

III.    Reclamation's ESA Consultation on the DMC Contracts Was
        Lawful and Reasonable .....................................................................38

IV.     Some of Appellants' Arguments Apply Only to the SRS
        Contracts.............................................................................................39

CONCLUSION ....................................................................................................40

SIGNATURE ATTESTATION..............................................................................42

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dufresne v. Veneman*,
    114 F.3d 952 (9th Cir. 1997) ...................................................................24

*Forest Conservation Council v. Espy*,
    835 F. Supp. 1202 (D. Idaho 1993) .....................................................31

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) ................................................................9

*Grant County Black Sands Irrigation Dist. v. U.S. Bureau of
    Reclamation*,
    579 F.3d 1345 (Fed. Cir. 2009) ...........................................................20

*Harrison Western Corp. v. U.S.*,
    792 F.2d 1391 (9th Cir. 1986) ........................................................24, 25

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
    893 F.2d 1012 (9th Cir. 1989) ..............................................................23

*Nat. Res. Def. Council v. Kempthorne*,
    2008 WL 5054115 (E.D. Cal. Nov. 19, 2008)....................................15

*Nat. Res. Def. Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007) .................................................14

*Nat. Res. Def. Council v. Kempthorne*,
    No. 1:05-cv-01207 OWW GSA, 2007 WL 4462391 (E.D. Cal.
    Dec. 14, 2007)........................................................................................15

*NRDC v. Jewell*,
    749 F.3d 776 (9th Cir. 2014) ........................................................*passim*

*Pac. Coast Fed'n of Fishermen's Ass'n/Inst. for Fisheries Res. v.
    Gutierrez*,
    No. 1:06–cv–00245 OWW LJO, 2007 WL 1752289 (E.D. Cal.
    June 15, 2007)..........................................................................................9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
No. 97-CV-775, 1998 WL 1988556 (W.D. Wash. May 29, 1998) ...................31

*Pub. Utilities Comm'n of State of Cal. v. FERC*,
100 F.3d 1451 (9th Cir. 1996) ..............................................................23

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*,
898 F.2d 1410 (9th Cir. 1990) ..............................................................39

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................................................*passim*

*Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
143 F.3d 515 (9th Cir. 1998) ..............................................................31

*W. Wood Preservers Inst. v. McHugh*,
925 F. Supp. 2d 63 (D.D.C. 2013) ........................................................31

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) ..............................................................39

**Federal Statutes**

5 U.S.C.
§ 702 ..........................................................................................4
§ 706(2) .....................................................................................26
§ 706(2)(A) .................................................................................27

16 U.S.C.
§ 1536(a)(2) ............................................................................9, 32
§ 1536(b)(3)(A) ...........................................................................10
§ 1540 .........................................................................................4

28 U.S.C.
§ 1291 .........................................................................................5
§ 1331 .........................................................................................4
§ 1346 .........................................................................................4

43 U.S.C.
§ 485h(d) ...................................................................................20
§ 485h(e) ...................................................................................20

Central Valley Project Improvement Act, Pub. L. No. 102-575, tit.
XXXIV, § 3401 *et seq.*, 106 Stat. 4706 (1992) ....................................................7

CVPIA § 3404(c) ............................................................................7, 11

Water Infrastructure Improvements for the Nation Act, Pub. L. No.
114-322, 130 Stat. 1628 (2016) ................................................1, 20, 24

WIIN Act
§ 4011........................................................................................1, 2, 20
§ 4011(a)(1) ...............................................................................1, 21, 24
§ 4011(a)(2) .......................................................................................21
§ 4011(a)(3) .......................................................................................21
§ 4011(a)(4)(C) ..................................................................................21

**State Statutes**

Cal. Wat. Code § 1435 ..............................................................................35

**Other Authorities**

40 C.F.R.
§ 1502.14...........................................................................................13

50 C.F.R.
§ 402.02.............................................................................................14
§ 402.16.............................................................................................16

Fed. R. App. P. 4(a)(1)(B) ..........................................................................4

Fed. R. Civ. P. 54(b) .......................................................................4, 6, 19

Reed D. Benson, *Whose Water Is It? Private Rights and Public
Authority Over Reclamation Project Water*, 16 Va. Envtl. L.J. 363,
371 (1997)..........................................................................................20

## INTRODUCTION

In 2005, the United States renewed thirteen water service contracts with irrigation districts, water districts, and a trust, for delivery of water to lands served by the Delta-Mendota Canal of the Central Valley Project (together, the "DMC Contracts"). In 2008, appellants filed a supplemental complaint in this litigation alleging the United States Bureau of Reclamation ("Reclamation") and the United States Fish and Wildlife Service ("FWS") did not adequately consult under the federal Endangered Species Act ("ESA") regarding effects of the DMC Contracts on a listed fish species, the delta smelt. Much has happened since 2008. Even assuming appellants' claims against the DMC Contracts had merit when first asserted in 2008, they have no merit in 2022.

Appellants' claims are moot as to all but a portion of one of the thirteen DMC Contracts, because the DMC Contracts have been superseded. In 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act ("WIIN Act"). Pub. L. No. 114-322, 130 Stat. 1628 (2016). In section 4011 of the WIIN Act, Congress directed that Reclamation, upon request by a contractor, "shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract…." WIIN Act, § 4011(a)(1). The DMC Contracts were water service contracts. Except for a portion of one of the DMC Contracts, the DMC

Contracts have been superseded, pursuant to the conversion directed by Congress in section 4011 of the WIIN Act, by repayment contracts. This appeal as it relates to the DMC Contracts is moot because requiring further ESA consultation or other relief regarding superseded contracts would be pointless. This appeal should therefore be dismissed as it relates to the DMC Contracts, excepting only the remaining portion of the Oro Loma Water District contract that has not been superseded.

As to the portion of the Oro Loma Water District water service contract still in effect, and the remaining DMC Contracts if the appeal as to those contracts is not dismissed as moot, the Court should affirm the judgment. Under the two-track ESA consultation structure developed by the federal agencies, the potential effect of performance of the DMC Contracts on the delta smelt was addressed in the consultation track regarding Central Valley Project ("CVP") operations. Appellants based their original challenge to the consultation on the DMC Contracts on the invalidity of a 2005 biological opinion regarding CVP operations. That 2005 biological opinion was superseded by a 2008 biological opinion regarding CVP operations. 5-ER-0848. In separate litigation, this Court upheld the validity of the 2008 biological opinion. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014). In an opinion issued in this litigation, *NRDC v. Jewell*, 749 F.3d 776 (9th Cir. 2014), this Court held that, although the 2008 biological opinion was

valid and had superseded the 2005 biological opinion, appellants' claims against the DMC Contracts were not moot because Reclamation and FWS had not yet reinitiated consultation on the DMC Contracts in light of the conclusions and analysis in the 2008 biological opinion. *NRDC v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014).

On remand following that opinion, the district court stayed this case to allow Reclamation and FWS an opportunity to do just that. In 2015, Reclamation consulted with FWS on the DMC Contracts in light of the analysis and conclusions of the 2008 biological opinion and data developed since 2008. The agencies concluded that no changes to the DMC Contracts were necessary to implement the DMC Contracts in a way consistent with the requirements of the 2008 biological opinion and the ESA.

That was still not the end of litigation over the DMC Contracts, however. Appellants supplemented their complaint again, now to challenge the 2015 consultation. On cross-motions for summary judgment the district court issued a memorandum decision and order that carefully and thoroughly addressed each of appellants' contentions regarding the 2015 consultation, and rejected all of them. 1-ER-0007–73. In this appeal, appellants repeat the claims they raised in the district court, but almost entirely ignore the district court's thorough and sound explanation why their contentions fail. The unrefuted analysis in the district court's memorandum decision and order provides a compelling guide to the proper resolution of this appeal – to affirm.

It is past time for an end to this nearly fifteen-year long litigation saga regarding the DMC Contracts. The DMC Contractors[1] respectfully urge the Court to dismiss the appeal as to the DMC Contracts as moot, except as the judgment relates to the portion of the Oro Loma Water District water service contract that has not been converted to a repayment contract. The Court should affirm the judgment as to that contract. If the Court does not dismiss the appeal as to the superseded DMC Contracts, then it should affirm the judgment as to all the DMC Contracts.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1346, and 16 U.S.C. § 1540. Congress waived the sovereign immunity of the United States for this action in 5 U.S.C. § 702 and 16 U.S.C. § 1540. The district court entered final judgment on the claims at issue on this appeal pursuant to Federal Rule of Civil Procedure 54(b) on December 29, 2020. 1-ER-0003–06. Appellants filed a notice of appeal on January 26, 2021. 26-ER-6050–6053. The appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(B). Appellants' claims against all but a

---

[1] The thirteen entities who entered the DMC Contracts in 2005 and were named as defendants in 2008 are: Tranquility Irrigation District, West Stanislaus Irrigation District, Banta-Carbona Irrigation District, Patterson Irrigation District, West Side Irrigation District, James Irrigation District, Eagle Field Water District, Del Puerto Water District, Fresno Slough Water District, Mercy Springs Water District, Oro Loma Water District, Byron-Bethany Water District, and the Coehlo Family Trust. Appellees San Luis & Delta-Mendota Water Authority and Westlands Water District joined this litigation as intervenors. For convenience of reference, these agencies are collectively referred to in this brief as the "DMC Contractors."

portion of the Oro Loma Water District water service contract are moot, and hence this Court lacks jurisdiction over those claims. This Court has jurisdiction over the remaining claims before it under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether this appeal is moot as to all but a portion of one of the DMC Contracts because they have been superseded by new contracts.

2.      Whether FWS met its ESA consultation obligations as to the DMC Contracts when in 2015 it considered the DMC Contracts in light of the analysis and conclusions of its 2008 biological opinion on CVP operations and additional, more recent data, and concluded no changes to the DMC Contracts were necessary to comply with the 2008 biological opinion or the ESA.

3.      Whether Reclamation met its ESA consultation obligations as to the DMC Contracts by consulting with FWS in 2015 and receiving FWS's concurrence that no changes to the DMC Contracts were necessary to comply with the 2008 biological opinion or the ESA.

The pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

The district court's February 26, 2019, memorandum decision and order on cross-motions for summary judgment provides a thorough overview of the factual and procedural history relevant to the merits issues involving the DMC Contracts.

1-ER-0011–19.[2] Here, the DMC Contractors supplement that history, and describe events since the district court issued the memorandum decision and order that have rendered moot the claims against the DMC Contracts.

## A. The Federal Agencies Adopted a Two-Track Approach to ESA Consultation on Actions Involving the CVP

As the district court observed, "historical context on the consultation structure is helpful" to understanding the issues presented by this case. 1-ER-0023. The "consultation structure" involves two tracks. The first track of consultation assesses the impacts of ongoing operation of the reservoirs, dams, pumps, and other facilities of the CVP on ESA-listed species, including the delta smelt, and designated critical habitat. The second track of consultation assesses the impact of other agency actions related to the CVP, such as contract renewal. This second track of consultation relies on the first track for an analysis of the effects of CVP operations. This structure spares Reclamation and FWS from repeating the resource intensive and complex analysis of the effects of CVP operations every time there is an agency action related to the CVP that may affect a listed species. It also provides for a comprehensive analysis of intertwined operations of the CVP that cannot be disaggregated and analyzed as isolated actions.

---

[2] The district court's order granting appellants' motion for entry of separate judgment pursuant to FRCP 54(b) provides a detailed summary of the extensive and highly complex procedural history of this entire litigation, including claims not involving the DMC Contracts. 22-ER-4945–4953.

In 1992, Congress enacted the Central Valley Project Improvement Act ("CVPIA"). Pub. L. No. 102-575, tit. XXXIV, § 3401 *et seq.*, 106 Stat. 4706 (1992). The CVPIA expanded the scope of the CVP's authorized purposes and authorized and directed Reclamation to implement many actions and programs. One such action was renewal of hundreds of CVP water service contracts. CVPIA § 3404(c) ("Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the [CVP]..."). After passage of the CVPIA, and after development of plans for the actions and programs to implement the CVPIA, Reclamation engaged in a programmatic section 7 consultation with FWS on implementation of the CVPIA. That consultation concluded in November 2000, when FWS issued its "Biological Opinion on Implementation of the CVPIA and Continued Operation and Maintenance of the CVP" ("CVPIA biological opinion"). 1-ER-0024. The CVPIA biological opinion set out a roadmap for consultation on the CVPIA actions and programs, including renewal of water service contracts.

As the district court summarized, the agencies adopted:

a two-track process whereby the operative OCAP BiOp would address aquatic impacts of overall CVP and SWP operations on delta smelt, with the CVPIA BiOp then serving as a programmatic document for other contract-related impact analyses. These later contract-related analyses, possibly to include informal consultations, would then 'tier' off of the CVPIA BiOp.

1-ER-0025.[3]

The CVPIA biological opinion established that Reclamation's ongoing CVP operations would remain governed and covered for ESA purposes by the already established consultation process on CVP operations (the "OCAP" or later "LTO" consultation) described below, while parallel consultation processes would address other agency actions related to the CVP, such as contract renewal. 1-ER-0024–25. As a result, while the consultation on CVP operations had and would continue to address the aquatic effects of appropriating and re-appropriating water, including for the benefit of those that hold contracts for CVP water, separate consultations would assess potential impacts to terrestrial species in the service area of each of the contractors.[4]

## B. Reclamation and FWS Have Been Consulting on the Effects of CVP Operations on Delta Smelt Since 1993, and That Consultation Continues Today

By the time FWS issued the CVPIA biological opinion in 2000, an ESA consultation process regarding the effects of ongoing CVP operations on delta smelt was already established. Consultations on the potential impacts of CVP operations

---

[3] Appellants have expressly disavowed an intention to challenge this structure: "Plaintiffs do not challenge the structure of the consultations. Plaintiffs challenge FWS and BOR's actual performance of the 2015 consultation . . .." 1-DMCSER-0024, fn. 9.

[4] *See, e.g.*, the biological assessment for the 2005 consultation on the DMC Contracts, which focused on conditions within the DMC Unit service area. 2-ER-0225.

on the delta smelt were first completed in 1993. 2-ER-0223–224 (listing May 23, 1993, February 4, 1994, and March 6, 1995 consultations on CVP operations and delta smelt). In 2004, Reclamation updated its written description of then existing CVP operations in a document known as the Operating Criteria and Plan or "OCAP." *Pac. Coast Fed'n of Fishermen's Ass'n/Inst. for Fisheries Res. v. Gutierrez*, No. 1:06–cv–00245 OWW LJO, 2007 WL 1752289, at *1-2 (E.D. Cal. June 15, 2007) ("[The OCAP] has been prepared to serve as a baseline description of the facilities and operating environment of the Central Valley Project (CVP) and State Water Project (SWP)."). The OCAP provided a complete, comprehensive description of then ongoing operations of the CVP, allowing for its use as a description of the proposed action in comprehensive consultations under section 7 of the ESA, 16 U.S.C. § 1536(a)(2).

In the early 2000s, using the OCAP as the description of the proposed action, Reclamation and FWS again consulted on the effect of CVP operations on the delta smelt. FWS issued a biological opinion in July 2004, and then in February 2005 issued a revised opinion to further address critical habitat in response to this Court's ruling in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004), amended by 387 F.3d 968 (9th Cir. 2004), which invalidated the regulation defining "destruction or adverse modification" of critical habitat. 5-ER-0851. In 2008, FWS and Reclamation concluded another formal consultation on

CVP operations and FWS issued the 2008 biological opinion. 5-ER-0848–1017. The 2008 biological opinion included a multi-faceted reasonable and prudent alternative that imposed modifications and restrictions on joint CVP and State Water Project ("SWP") operations intended to ensure the two projects would avoid jeopardizing the delta smelt or causing adverse modification to its designated critical habitat. 5-ER-1008–1017; 1-ER-0014.[5]

CVP operations are ongoing, and the agencies have continued to periodically reinitiate ESA consultation on CVP operations. The agencies reinitiated consultation on CVP operations in August 2016. 1-DMCSER-0026–30.[6] The agencies referred to this as a reinitiation of consultation on the "Coordinated Long-Term Operation (LTO) of the CVP and SWP," but the "LTO" consultation is a continuation of what was previously called the OCAP consultation. As the biological assessment prepared for the consultation initiated in 2016 explains, the proposed action included "the operation of the CVP and SWP to deliver water under the terms of all existing contracts up to full contract amounts, which includes the impacts of maximum water

---

[5] When FWS concludes a proposed agency action would jeopardize the continued existence of or adversely modify the critical habitat of a listed species, it must suggest "those reasonable and prudent alternatives" it believes would avoid those outcomes and "can be taken by the Federal agency." 16 U.S.C. §1536(b)(3)(A).

[6] The district court took judicial notice of this reinitiation of consultation. 1-ER-0018.

deliveries and diversions under the terms of existing contracts and agreements, including timing and allocation." Appellants' RJN, Ex. 3 at 4-9. That consultation concluded in 2019 with a biological opinion regarding the effects of CVP operations on delta smelt that superseded the 2008 biological opinion. The 2019 Biological Opinion for the Initiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project is included as Exhibit 14 to the Declaration of Daniel J. O'Hanlon in Support of Request for Judicial Notice ("O'Hanlon Decl."), filed concurrently with this brief.

In sum, the effect of CVP operations necessary to deliver water under the DMC Contracts has received and is still receiving ongoing consideration by the agencies in ESA consultations focused on CVP operations, consistent with the two-track approach outlined in the CVPIA biological opinion.

## C. The Agencies Consulted on Contract Renewal in 2005

CVPIA section 3404(c) mandated renewal of CVP water service contracts upon request by the contractor.[7] For ESA consultation on contract renewal, Reclamation and FWS followed the two-track approach for consultation set out in

---

[7] CVPIA section 3404(c) provides in pertinent part: "the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each."

the CVPIA biological opinion.[8] In 2003 Reclamation prepared and provided to FWS a biological assessment regarding its proposed action to enter the DMC Contracts. 2-ER-0187–335. The biological assessment explained that due to a combination of hydrological conditions and regulatory requirements "CVP contractors in the DMC Unit frequently receiv[ed] less than 100 percent of their CVP contract quantities. These reductions in annual deliveries have been accomplished under the shortage provisions of the existing contracts." 2-ER-0210. The biological assessment included an extensive discussion of the proposed contract terms, potentially affected species, local land management and development within the DMC Contractors' service areas, habitat types, and effects of contract renewal. 2-ER-0187–335. For analysis of the effects of contract renewal, Reclamation focused on changes between the terms of the existing contracts and the terms of the DMC Contracts it proposed to enter, and whether those changes in terms would result in changes to the physical environment that may affect listed species. 2-ER-0297–298. The proposed DMC Contracts did not change the total quantity of water to be delivered to each contractor, or impair Reclamation's ability to impose shortages to meet legal obligations or because of drought. 2-ER-0299, 0306, 0309. Regarding the effects of

---

[8] The district court's opinion summarizes the process and information considered in the consultation on contract renewal completed in 2005 at 1-ER-0012–13 and 0025–27.

the proposed DMC Contracts on delta smelt (and other listed fish species), Reclamation's biological assessment concluded:

> The conditions for the export of water from the Delta are determined by separate criteria in BO's governing CVP operations, by the CVPIA, and by hydrologic conditions. The implementation of long-term contract renewals for contract quantities no greater than those under the existing contracts would not result in any changes in conditions in the Delta and, therefore, would not be likely to adversely affect special-status fish species or their habitat.

2-ER-0322.

In 2005, FWS issued a letter of concurrence that the changes between the then existing contracts and the proposed DMC Contracts were not likely to adversely affect listed species. 2-ER-0336–354. FWS explained "[t]his consultation addresses the renewal of the existing contract amount and the continued delivery of water under the existing operating parameters to the DMC Unit water service areas." 2-ER-0336.[9] Regarding the delta smelt, FWS agreed with Reclamation that the 2005 biological opinion on CVP operations addressed "obligations of CVP water service contracts" and "all the aquatic effects of operating the CVP/SWP." 2-ER-0342.[10]

---

[9] As the district court correctly observed, "[u]nlike under NEPA, 40 C.F.R. § 1502.14, in an ESA consultation, there is no requirement that a 'no project' alternative be analyzed. FWS must analyze the project presented. Here, that project is contract renewal." 1-ER-0056.

[10] The concurrence memo regarding the DMC Contracts mistakenly refers to the 2004 biological opinion. By the time the concurrence memorandum issued in February 2005 the 2004 biological opinion had already been replaced by the 2005 biological opinion. See 4-ER-0747 at fn. 1, 4-ER-0749 at fn. 2.

FWS further explained that the 2005 biological opinion "addressed the effects of delivering CVP water for renewed long term water contracts and other actions on delta smelt and its critical habitat. The long term water contracts, while authorizing a maximum contract amount, recognize that the delivery of the entire contract amount is subject to the availability of water and other obligations (such as biological opinions)." 2-ER-0343. FWS also stated its findings could not "be made independently of the analysis and findings" of the 2005 biological opinion which it "incorporated by reference." *Id.*[11]

### D. Appellants Challenged the 2005 Biological Opinion and Then Challenged Consultation on DMC Contract Renewal

In 2005, appellants filed this action challenging the 2005 biological opinion regarding CVP operations. 26-ER-6054. In 2007, the district court held the 2005 biological opinion regarding CVP operations was invalid. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007).[12] Appellants thereafter

---

[11] Under the ESA consultation regulations, the impacts of future federal agency actions in the action area that have already undergone formal consultation are deemed part of the environmental baseline, to which the effects of the proposed action subject to the current consultation will be added. 50 C.F.R. § 402.02. This rule is found in the definition of "environmental baseline" in the current consultation regulations as revised in 2019 (50 C.F.R. § 402.02), and in the definition of "effects of the action" in the prior consultation regulations in effect in 2005 and 2015. Appellants' Addendum at Add-7. The effects of CVP operations on delta smelt as analyzed in the 2005 biological opinion were part of the environmental baseline for the 2005 consultation on the DMC Contracts.

[12] The district court did not vacate the 2005 biological opinion; it remanded without vacatur and imposed an injunction on CVP operations pending completion

supplemented their complaint to challenge the 2005 consultation on renewal of the thirteen DMC Contracts at issue here. 1-DMCSER-0041–70. Appellants also named each of the parties to the DMC Contracts as defendants. 1-DMCSER-0051–53.[13]

In 2008, the district court held appellants lacked standing to challenge renewal of the DMC Contracts because those contracts did not prevent any changes to CVP operations required to comply with the ESA, and held appellants' challenge to the SRS Contracts failed as a matter of law because federal defendants lacked discretion to modify the SRS Contracts to benefit appellants' interests. *Nat. Res. Def. Council v. Kempthorne*, 2008 WL 5054115 (E.D. Cal. Nov. 19, 2008).

An *en banc* panel of this Court reversed and remanded. *NRDC v. Jewell*, 749 F.3d 776 (9th Cir. 2014). In *NRDC v. Jewell*, this Court made two rulings regarding appellants' challenge to the consultation on the DMC Contracts. First, this Court held issuance of the 2008 biological opinion on CVP operations did not moot appellants' claim because the "[2008 Opinion] does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts… ." *NRDC v. Jewell*, 749 F.3d at 782. This Court explained that "[a]lthough the DMC Contracts and Settlement Contracts were renewed based on

---

of a new biological opinion. *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-cv-01207 OWW GSA, 2007 WL 4462391 (E.D. Cal. Dec. 14, 2007).

[13] The thirteen DMC Contracts are included in appellants' excerpts of record at 8-ER-1552 to 8-ER-1613, and 8-ER-1652 to 11-ER-2375.

now invalidated [2004 and 2005] opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion." *Id*. Second, it held appellants have standing to challenge consultation on the DMC Contracts, because if appellants prevailed, a new consultation "could lead" to revisions to the DMC Contracts that would benefit the delta smelt. *NRDC v. Jewell* at 782–784.

Regarding the DMC Contracts, *NRDC v. Jewell* decided only mootness and standing. Appellants assert the Court held the 2005 consultation on the DMC Contracts was invalid, citing *NRDC v. Jewell*, 749 F.3d at 782, but their citation is to the Court's discussion of mootness. Op. Br. at 32. While *NRDC v. Jewell* did not decide the merits or mandate reinitiation of consultation on the DMC Contracts, its reasoning regarding mootness suggested that reinitiation in response to the changes between the 2005 and 2008 biological opinions was in order. *See* 50 C.F.R. § 402.16. On remand Reclamation promptly reinitiated consultation, as we explain next.

**E.    On Remand From *NRDC v. Jewell*, the Agencies Reinitiated Consultation on the DMC Contracts and Found No Changes Were Necessary to Implement the 2008 Biological Opinion**

After remand, the district court granted a stay of this litigation to allow the agencies to reinitiate consultation. 1-DMCSER-0031–34. On July 30, 2015, Reclamation requested reinitiation of consultation on the DMC Contracts in light of

the 2008 biological opinion. 3-ER-0532–534. With the request, Reclamation provided to FWS a package that included additional information that had become available since the consultation on CVP operations completed in 2008. As Reclamation's memorandum explained:

> Reclamation is providing updates to the status of the delta smelt and its designated critical habitat and data on water allocations under the SRS and DMC contracts since 2008. The attached "Supplemental Information" document serves as a supplement to both the August 2003 *Sacramento River Settlement Contractors Biological Assessment Long-term Contract Renewal* (2003 SRS BA) and the July 2003 *Delta-Mendota Canal Unit Draft Biological Assessment Long-term Contract Renewal* (2003 DMC BA).

3-ER-0533. Reclamation requested FWS's concurrence that the potential effect of the DMC Contracts on delta smelt and its critical habitat "is adequately covered in the analysis in of the 2008 LTO BO." 3-ER-0534, 0553.

The "supplemental information" provided by Reclamation for use in the 2015 consultation included a description of the 2005 consultation on the DMC Contracts and SRS Contracts, the provisions of the contracts, and the levels of water deliveries it had made each year from 2008 to 2015. 3-ER-0535–576. Regarding the DMC Contracts, Reclamation explained those contracts allowed it to reduce water deliveries as needed to meet legal obligations, including the reasonable and prudent alternative in the 2008 biological opinion, and that it had indeed reduced deliveries to south of Delta agricultural water service contractors (including the DMC Contractors) below the full contract amounts in every year since 2008, with zero

deliveries in 2014 and 2015. 3-ER-0549, 0551, 0571–576.[14] Reclamation also provided updated scientific data and information regarding the status of the delta smelt and its critical habitat. 3-ER-0577–620. This included abundance data through 2015, and data regarding the effect of alterations of Delta outflow on habitat for delta smelt. 3-ER-0585–587, 0592–595.

In correspondence to FWS dated November 13, 2015, Reclamation clarified its request for reinitiation of consultation. 3-ER-0625–627. It explained the only species at issue was the delta smelt, that the request was made in response to the observation by this Court in *NRDC v. Jewell* that Reclamation and FWS had never reconsidered the DMC Contracts in light of the 2008 biological opinion, and that Reclamation understood the 2008 biological opinion had addressed all possible effects of operating the CVP to deliver water under the DMC Contracts. *Id*. Reclamation asked that FWS amend its concurrence memoranda issued in 2005 by substituting references to the 2008 biological opinion in place of references to the invalidated 2004 and 2005 biological opinions on CVP operations. 3-ER-0627.

The consultation concluded on December 14, 2015, when FWS issued a letter of concurrence. 4-ER-0746–749. FWS agreed that "all of the possible effects to delta

---

[14] In the tables showing water supply allocations from 2008 to 2015 (3-ER-0571–576), the percentage allocation for DMC Contractors is included under "South of Delta," and is nearly entirely agricultural supply rather than urban supply.

smelt and its critical habitat by operating the CVP to deliver water under the SRS and DMC contracts were addressed in the 2008 LTO BiOp." 4-ER-0748. As requested by Reclamation, FWS stated that "all references to the 2004 and 2005 BiOps in the SRS consultations and the DMC consultations are amended to reference the 2008 LTO BiOp." 4-ER-0749.

## F. The District Court Granted Summary Judgment and Entered Final Judgment Against Appellants on Their Challenges to the 2015 ESA Consultation on the DMC Contracts

After completion of the 2015 consultations on the DMC Contracts, appellants filed a fourth supplemental complaint, in part to challenge the 2015 consultation. 24-ER-5519–5616. Ultimately, appellants filed the currently operative complaint, the sixth supplemental complaint. 22-ER-5036 to 23-ER-5186.

The parties filed cross-motions for summary judgment. On February 26, 2019, the district court granted summary judgment against plaintiffs on their Second Claim for Relief (against Reclamation) and Fourth Claim for Relief (against FWS), which alleged the 2015 consultation on the DMC Contracts was arbitrary and unlawful. 1-ER-0007–73. On December 29, 2020, the district court entered final judgment on both claims pursuant to Federal Rule of Civil Procedure 54(b). 1-ER-0003–06. This appeal followed.

## G. All the DMC Contracts Except the Oro Loma Contract Have Been Superseded Through the WIIN Act Conversions, by New Contracts

The DMC Contracts were "water service contracts." They were contracts entered by the United States under the authority of section 9(e) of the Reclamation Project Act of 1939. 43 U.S.C. § 485h(e). A second, alternative type of contract is a "repayment contract" authorized by section 9(d) of the same Act. 43 U.S.C. § 485h(d). "The principal difference between 9(d) and 9(e) contracts under the 1939 Act was that under a 9(d) contract, the irrigation district or water users' association assumed an obligation to repay the construction costs of the project works in fixed annual installments over a predetermined period of time. By contrast, a 9(e) contract was merely a contract to receive project water at an annual rate set by the Secretary." *Grant County Black Sands Irrigation Dist. (GCBSID) v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1352 (Fed. Cir. 2009) (describing differences between water service and repayment contracts). As one commenter has put it, "[t]he repayment contract is analogous to a mortgage, while a water service contract is more like a lease." Reed D. Benson, *Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water*, 16 Va. Envtl. L.J. 363, 371 (1997).

In 2016 Congress adopted the Water Infrastructure Improvements for the Nation Act ("WIIN Act"). Pub. L. No. 114-322, 130 Stat. 1628 (2016). In section 4011 of the WIIN Act Congress directed that Reclamation, upon request by a contractor, "shall convert any water service contract in effect on the date of

enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract…." WIIN Act, § 4011(a)(1). Congress also directed the terms for lump sum or accelerated prepayment of the share of CVP construction costs allocated to the contractor. WIIN Act, § 4011(a)(2), (3). Congress directed that the converted contracts shall "not modify other water service, repayment, exchange and transfer contractual rights between" the contractor and the United States. WIIN Act, § 4011(a)(4)(C).

In 2020 and 2021, in response to requests for contract conversion by the DMC Contractors, the United States and the DMC Contractors entered repayment contracts that have superseded all but a portion of one of the DMC Contracts. Copies of the DMC Contractors' repayment contracts are included as Exhibits 1 through 13 to the O'Hanlon Decl., filed concurrently with this brief.

Of the thirteen DMC Contracts challenged in this litigation, only a portion of the Oro Loma Water District water service contract has not been converted to a repayment contract. At the time appellants filed the operative sixth supplemental complaint, Oro Loma Water District held a water service contract for 4,600 acre-feet of water. 10-ER-2151. In 2020 Oro Loma Water District assigned the right to 4,000 acre-feet of that supply to Westlands Water District, and that contract right has been converted to a repayment contract. O'Hanlon Decl. Ex. 11. All that remains of the DMC Contracts entered in 2005 and challenged in this litigation is the

remaining 600 acre-feet of annual supply still subject to the Oro Loma Water District water service contract.

## SUMMARY OF ARGUMENT

The DMC Contracts have been superseded through conversion to repayment contracts, excepting only the Oro Loma Water District contract. This Court cannot grant any effective relief as to ESA consultation on contracts that have been superseded. This appeal as it relates to the DMC Contracts should therefore be dismissed as moot, except as to the remaining portion of the Oro Loma Water District contract.

Appellants' arguments on the merits of the ESA consultation on the DMC Contracts should be rejected. Contrary to appellants' arguments, *NRDC v. Jewell* did not foreclose FWS and Reclamation from relying on the analysis and conclusions in the 2008 biological opinion when they consulted on the DMC Contracts in 2015. And the agencies did not rely solely on the 2008 biological opinion; they considered the analysis and conclusions in that opinion together with the best scientific data available since 2008. The temporary changes to CVP operations required by drought conditions in 2014 and 2015 did not alter the baseline in a way that altered FWS's conclusions in the 2008 biological opinion, as FWS expressly found. The agencies considered the terms of the DMC Contracts and reasoned they would not prevent implementation of the reasonable and prudent alternative in the 2008 biological

opinion, as experience in operating the CVP since 2008 had in fact demonstrated. Finally, Reclamation reasonably and lawfully relied upon the available information and FWS's concurrence to conclude it had met its ESA consultation obligations regarding the DMC Contracts.

All these conclusions are grounded in the record and the sound reasoning of the district court. Appellants' merits arguments misstate or ignore the record, and largely fail to address the district court's reasoning. As to the Oro Loma Water District contract, and to the extent the Court reaches the merits regarding any other DMC Contract, the judgment should be affirmed.

## ARGUMENT

## I.     The Appeal Is Moot As to All of the DMC Contracts But a Portion of One

"A moot action is one where the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. We cannot take jurisdiction over a claim to which no effective relief can be granted." *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989), internal quotations and citations omitted (environmental groups' challenge to federal agency's management of certain timber lands mooted after timber already harvested). Mootness on appeal usually stems from some event following the district court's decision that has the practical effect of rendering any appellate decision meaningless, because it cannot grant effective relief. *Pub. Utilities Comm'n of State*

*of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996) (declaratory relief action requesting that federal agency's orders be vacated became moot when federal agency agreed to vacate challenged orders); *Dufresne v. Veneman*, 114 F.3d 952, 954 (9th Cir. 1997) (action to enjoin aerial pesticide spraying allegedly exacerbating chronic fatigue syndrome was mooted by medfly eradication and absence of plans for additional spraying to combat medfly).

This appeal is moot as to all the DMC Contracts except the portion of the Oro Loma Water District contract. As described above, the DMC Contracts have been converted into repayment contracts pursuant to the WIIN Act. O'Hanlon Decl. Exs. 1 to 13. The WIIN Act directs the Secretary to convert CVP water service contracts upon request. WIIN Act, § 4011(a)(1). The repayment contracts recite the history of the water service contracts, each contractor's request to convert its existing water service contract to a repayment contract pursuant to the WIIN Act, and the parties' intent to "amend and convert" the existing DMC Contract. *See, e.g.,* O'Hanlon Decl. Ex. 11, at p. 2–6. The repayment contract terms reflect the parties' intent that going forward the new repayment contracts will govern the provision of CVP water to the contractor, not the DMC Contracts.

These circumstances moot this appeal. *Harrison Western Corp. v. U.S.*, 792 F.2d 1391 (9th Cir. 1986). In *Harrison Western*, the district court granted summary judgment in favor of a construction contractor, ruling the contractor had properly

terminated its contract with Reclamation. 792 F.2d at 1393. Reclamation appealed, but while the case was on appeal Reclamation entered a second contract with the contractor to complete the same project, albeit now at a higher cost. *Id.* This Court held the second contract superseded the first contract and thereby mooted the government's appeal:

> we conclude that any claims the Government may have had against HWC under the first contract were abandoned upon the signing of a second contract which was complete in itself, covered the same subject matter, and contained no reservation of rights. Had the Government wanted to reserve its rights under the first contract, it should have done so explicitly in the second. Accordingly, we dismiss this appeal as moot.

*Id.*

Just as the second construction contract mooted the appeal in *Harrison Western*, the repayment contracts have superseded the DMC Contracts (except for the Oro Loma contract) and thereby mooted this appeal. In their operative complaint appellants seek an injunction against performance of the DMC Contracts, and to require reinitiation of ESA consultation on the DMC Contracts. 22-ER-5104 at ¶¶ F, J. That relief would be pointless now because with the exception of a portion of the Oro Loma Water District contract, the DMC Contracts no longer govern the United States' rights or obligations; the repayment contracts do.[15] As the Court cannot grant

---

[15] Appellants' operative complaint does not allege any claims against the repayment contracts. 22-ER-5036 to 23-ER-5186. It could not; it was filed in 2018, two years before the repayment contracts were executed. The repayment contracts

effective relief relating to superseded contracts, appellants' challenge to the ESA consultation on all but the remaining portion of the Oro Loma Water District contract is moot.

The Court should therefore dismiss this appeal as it relates to the DMC Contracts excepting only the Oro Loma Water District contract (10-ER-2138 to 2195) and only to the extent that contract is still in effect, for up to six hundred acre-feet of water supply annually.

## II.    FWS's ESA Consultation on the DMC Contracts Was Lawful and Reasonable

Turning to the merits, the district court carefully considered and rejected the arguments against FWS that appellants now raise on appeal. The district court's ruling that FWS lawfully and reasonably consulted on the DMC Contracts in 2015 should be affirmed.

The district court's ruling on summary judgment is reviewed de novo. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d at 601. ESA claims are reviewed under the standards of the Administrative Procedure Act ("APA"). *Id.* "Section 706(2) of the APA provides that an agency action must be upheld on review

---

have been challenged in three cases currently pending in the Eastern District of California: *North Coast Rivers Alliance, et al. v. USDOI, et al.*, Case No. 1:16-cv-00307-JLT-SKO, *Center for Biological Diversity, et al. v. USBOR, et al.*, Case No. 1:20-cv-00706-JLT-EPG, *Hoopa Valley Tribe v. USBOR, et al.*, Case No. 1:20-cv-01814-JLT-EPG. Any remedies related to the repayment contracts are properly addressed in those cases.

unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." *Id.* "Although [the Court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the court] may not substitute [its] judgment for that of the agency." *Id.* "The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise.... When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" *Id.*, at 602.

### A. FWS Properly Relied Upon the 2008 Biological Opinion, Among Other Information, for the 2015 Consultation

Appellants argue FWS "failed to consider important aspects of the problem" by relying "exclusively" on the 2008 biological opinion for the 2015 consultation. Op. Br. at 17–21. To the contrary, FWS's reliance on the analysis and conclusions in the 2008 biological opinion was reasonable and proper. And appellants misstate the record when they contend FWS relied exclusively on the 2008 biological opinion.

<u>First</u>, appellants contend that this Court's ruling in *NRDC v. Jewell* precluded FWS from relying upon the analysis and conclusions in the 2008 biological opinion for the 2015 consultation. Op. Br. at 17–18. Not so. As the district court explained:

> There is a subtle but important difference between what the Ninth Circuit actually said and what Plaintiffs contend. Critically, *NRDC v. Jewell* leaves open the possibility that a future (*post-NRDC v. Jewell*)

consultation could rely upon the 2008 OCAP BiOp to evaluate the impact of contract renewal on delta smelt. *NRDC v. Jewell* simply holds that as of the date of that decision, no such consultation had taken place. The Court interprets this finding in *NRDC v. Jewell* as a conclusion that, as of the date of the decision in *NRDC v. Jewell*, Reclamation and FWS had not *yet* <u>re-consulted</u> on SRS and DMC contract renewal in light of the 2008 OCAP BiOp.

1-ER-0032, at lines 18–25 (emphasis in original). Appellants have attempted to make the ruling in *NRDC v. Jewell* into something it is not.

<u>Second</u>, appellants contend that in the 2015 consultation FWS did not consider the effects on delta smelt from CVP operations necessary to deliver water pursuant to the terms of the DMC Contracts. Op. Br. at 17. But as they concede, and indeed complain, FWS considered and relied upon the analysis in the 2008 biological opinion for the 2015 consultation. The effects analysis in the 2008 biological opinion is based upon modeling of CVP operations that assumed varying levels of deliveries under the DMC Contracts, up to 100% of total contract quantity. 4-ER-0748; 5-ER-1123–1124. As Reclamation's policy lead for the consultation testified:

> Among other things, the 2008 [biological assessment] included the delivery of water under the renewed Sacramento River Settlement ("SRS") contracts and Delta-Mendota Canal Unit ("DMC") contracts. See Ex. A (2008 BA at 1-7, Appx. D). Reclamation modeled deliveries under the contracts in order to analyze project operations under existing and future conditions. *Id.* at 9-1. In all eight model scenarios, Reclamation assumed a range of 100 percent and 75 percent deliveries to the SRS contractors, and 100 percent to zero percent for "CVP agricultural" water service contracts, including the DMC contracts. *Id.*

at 9-36 to 9-52. Reclamation also assumed a range of 50 percent to 100 percent for CVP municipal and industrial contractors.

1-DMCSER-0036.

Appellants also argue FWS failed to consider the impact of the contracts on "freshwater flows" and "Delta outflow." Op. Br. at 18–19. But the analysis in the 2008 biological opinion expressly considered those effects. 5-ER-0996–1004. FWS designed Component 3 of the reasonable and prudent alternative in the 2008 biological opinion specifically to improve Delta outflow during the fall. 5-ER-1011–1012. To the extent appellants now contend FWS was required to separately repeat the analysis of effects on Delta outflow for the 2015 consultation, their contention has no merit. Under the two-track ESA consultation structure adopted for the CVP, by design the effects on delta smelt of CVP operations necessary to make contract deliveries are and were properly analyzed in the OCAP or LTO consultation. 1-ER-0023–25. In the district court, appellants expressly disavowed making any challenge to that structure. 1-DMCSER-0024, fn. 9.

Appellants argue the district court's conclusion that FWS and Reclamation could reasonably rely on the analysis in the 2008 biological opinion "is flawed" because the 2008 biological opinion found that operations as proposed would have caused jeopardy and adverse modification of critical habitat. Op. Br. at 19–20. Appellants concede the 2008 biological opinion identified a reasonable and prudent alternative operation that FWS concluded would avoid jeopardy or adverse

modification (5-ER-1008–1014), but they argue FWS never considered whether the terms of the DMC Contracts were "compatible" with that reasonable and prudent alternative. Op. Br. at 20. As the district court explained, there are at least two fatal defects in this argument. <u>First</u>, the record conclusively demonstrates the DMC Contracts allow for whatever limitations on CVP operations that are necessary to accommodate the requirements of the ESA, including reducing water deliveries to DMC Contractors to zero. 1-ER-0037–38; 3-ER-0549, 0551, 0571–576. <u>Second</u>, the district court explained appellants' argument is contrary to this Court's ruling in *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014). In *San Luis v. Jewell* this Court held the reasonable and prudent alternative in the 2008 biological opinion met all the requirements for a reasonable and prudent alternative, including that it is consistent with the underlying purpose of the action and Reclamation's legal authority. 1-ER-0039–40. That holding contradicts appellants' argument that the DMC Contract terms could prevent Reclamation from implementing the reasonable and prudent alternative in the 2008 biological opinion.

Finally, appellants contend FWS was required to analyze what effect different, alternative contract terms would have had on Delta outflow, and hence on delta smelt. Op. Br. at 18–19. There is no such requirement in the ESA. As the district court correctly observed, under the ESA FWS was required to analyze the proposed action presented to it by Reclamation for consultation, here the DMC

Contracts. FWS was not required to do a NEPA-like analysis of a range of alternatives with different contract terms. 1-ER-0034–37, 0041. FWS "is instructed only to determine 'whether *the action*, taken together with cumulative effects, is likely to jeopardize' endangered species." *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 77 (D.D.C. 2013) (quoting 50 C.F.R. § 402.14(g)(4)); *see also Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1217 (D. Idaho 1993) ("Nor is [the consulting agency] required to develop and evaluate alternatives to the action proposed by the [action agency]; it must simply evaluate the *effects of the proposed action . . .*"); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, No. 97-CV-775, 1998 WL 1988556, at *10 (W.D. Wash. May 29, 1998) ("Under the ESA, [the consulting agency] must analyze the action *as proposed* by the proponent agencies."). The relevant question for consultation on the DMC Contracts was their potential effects given the actual contract terms, not whether the agencies should have considered some other, different contract terms that might better align with what appellants might want. *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). FWS fulfilled its ESA obligations by consulting on the DMC Contracts as presented by Reclamation. 3-ER-0561–569.

In sum, appellants' argument that FWS failed to consider "an important aspect of the problem" by relying on the 2008 biological opinion has no merit.

## B. FWS Considered the Best Available Scientific Data in the 2015 Consultation

Appellants further and relatedly assert FWS relied "exclusively" on the 2008 biological opinion and therefore did not consider scientific data that became available after 2008. Op. Br. at 21–24. This assertion too is contradicted by the record.

Consultation under ESA section 7 must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Appellants argue FWS ignored data regarding the importance of outflow for delta smelt as described in a 2015 study known as the "MAST Report" and 2010 testimony before the California State Water Resources Control Board, as well as abundance survey data for delta smelt for the years 2014 and 2015. Op. Br. at 21–24. The district court directly addressed and properly rejected these contentions.

As described above, Reclamation provided FWS with supplemental information at the time it requested consultation in 2015. The linchpin to appellants' insistence that FWS relied "exclusively" on the 2008 biological opinion is their premise that unless a study or data is expressly referred to on the face of FWS's 2015 letter of concurrence itself, FWS must be deemed to have ignored that study or data for purposes of the consultation. The district court properly rejected appellants' contention:

while the law requires that a rationale be reasonably discernable, nothing requires that all information pertaining to that rationale be included within the formal decision-making document. In reviewing agency action under the APA, a court must examine the 'whole record.' 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party. . . ."). 'The whole record' includes everything that was before the agency pertaining to the merits of its decision.' *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

1-ER-0042. The whole record before FWS when it issued its 2015 letter of concurrence includes data appellants argue was ignored.

As the district court explained, "Plaintiffs are incorrect to assert that the MAST Report was not considered in the context of this consultation. It was cited in the 2015 Status of the Species document and explicitly discussed therein. *See, e.g.*, FWS 13184-13186. Plaintiffs do not take issue with how the MAST Report was treated in the record. Their motion fails on this ground." 1-ER-0068; 3-ER-0586–588.[16] Regarding appellants' insistence that FWS failed to consider its own testimony regarding the importance of outflow for delta smelt provided in a 2010 administrative hearing process before the California State Water Resources Control Board, the district court observed that 2010 testimony appeared to be a precursor to

---

[16] The title of the MAST Report, as included in the list of references cited in Reclamation's compilation of supplemental information about the status of the delta smelt, is: "IEP (Interagency Ecological Program for the San Francisco Estuary) 2015. An Updated Conceptual Model of Delta Smelt Biology: Our Evolving Understanding of an Estuarine Fish. January, 2015." 3-ER-0614. The MAST Report is part of the administrative record, and is in appellants' excerpts of record at 6-ER-1136–1356. "MAST" is the Management, Analysis and Synthesis Team.

the later MAST Report that was expressly considered, and appellants had failed to articulate what different information the 2010 testimony provided. 1-ER-0068. In their brief on appeal, appellants once again fail to explain what material information about Delta outflow was in the 2010 testimony that was not also in the more recent MAST Report or other information provided by Reclamation.

Regarding the supposedly ignored abundance survey data from 2014 and 2015, the district court explained:

> as part of its consultation package, Reclamation provided to FWS Supplemental Information, which included an Appendix updating FWS on the Status of the Species, including the information about recent population surveys. FWS 13183 (discussing survey data through 2015, including the fact that the 2015 'population index was at an all-time historic low at 0.0'). FWS indicated that it considered this information as part of its review. FWS 13721 (2015 LOC indicating FWS considered Reclamation's Supplemental Information document, which in turn referenced the Status of the Species update as an Appendix thereto (*see* 13148)). Plaintiffs are simply incorrect on this point.

1-ER-0066; 3-ER-0585–587 [abundance data]; 4-ER-0749 [FWS letter of concurrence mentioning "low numbers in all recent survey efforts" and citing to supplemental information documents].

## C.  FWS Considered the Effect of Temporary Changes to CVP Operations in 2014 and 2015

Appellants argue FWS did not consider the effects on delta smelt of temporary changes to CVP operations in response to drought conditions in 2014 and 2015 they allege reduced Delta outflow. Op. Br. at 25–26. Appellants frame FWS's supposed

failure to consider these temporary changes to CVP operations as a failure to consider "degraded baseline conditions" as compared to conditions analyzed in the 2008 biological opinion. *Id.* The district court correctly rejected this argument too. 1-ER-0062–65.

Reclamation and FWS separately consulted on these temporary changes to CVP operations during 2014 and 2015. The district court explained:

> Reclamation re-initiated consultation on the 2008 OCAP BiOp in light of the multiple consecutive drought years that occurred in 2014 and 2015, along with related drought response modifications to CVP and SWP operations. *See* BOR 8829 (FWS response to BOR's January 31, 2014 request for consultation); BOR 12959-12962 (Jan. 27, 2015 request to reinitiate consultation). . . . [A]ll of the TUCP-related changes implemented during that entire period were subject to consultation as cited in the above paragraphs. FWS concluded that the proposed TUCP modifications, including modifications to D-1641 requirements, were 'within the range of effects previously analyzed in the [2008 OCAP BiOp]' and that the 'proposed modification will have no additional adverse effects on delta smelt or its critical habitat.' BOR 8830. FWS issued similar concurrences for each TUCP request, confirming that each set of temporary changes to operations on delta smelt were within the effects analyzed in the 2008 OCAP BiOp. See, e.g., BOR 8892-31; BOR 9033-36; BOR 12925-27; BOR 12965-12967.[17]

1-ER-0063–64.

_____

[17] A "TUCP" is a temporary urgency change petition filed with the California State Water Resources Control Board. Such a petition is the means under California law to request an urgently needed, temporary change to water rights. *See* California Water Code § 1435. Reclamation filed TUCPs to seek the temporary changes to CVP water rights necessary to modify CVP operations in 2014 and 2015. FWS's concurrences following the ESA consultations on the TUCPs are at 1-DMCSER-0005–20 and 4-ER-0630–632, 0736–738.

Appellants do not challenge the results of those consultations on temporary changes to operations in this litigation. Instead, they argue the changes altered the baseline on which the 2008 biological opinion was based. But as the district court observed,

> [t]he problem is, given the reasoning provided in FWS's concurrences issued in connection with these drought-related reconsultations and absent contrary evidence, any shift to the baseline is immaterial to the ultimate question: whether the action will jeopardize the delta smelt or adversely modify its critical habitat. The 2008 OCAP BiOp concluded that with the implementation of the RPA, operation of the SVP [sic] and SWP will not cause jeopardy or adverse modification. The drought-related reconsultations relatedly concluded that drought-related deviations from D-1641 would result in no additional impacts to delta smelt, and thus the deviations from D-1641 do not represent a material degradation to the baseline conditions.

1-ER-0064–65.

In sum, FWS considered the effects of temporary changes to CVP operations during 2014 and 2015, and FWS concluded those effects did not materially alter the conclusions in its 2008 biological opinion. 1-DMCSER-0006, 0009, 0013, 0016, 0019, 4-ER-0737–738. That scientific judgment was within FWS's expertise and is due substantial deference. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d at 601.

### D. FWS Did Not Defer Analysis of Whether the DMC Contracts Were Compatible With Outflows Required for Delta Smelt

Appellants argue that in the 2015 letter of concurrence FWS impermissibly deferred analysis of whether the contract terms would prevent changes to CVP

operations to increase Delta outflows appellants contend are necessary to avoid jeopardizing the delta smelt. Op. Br. at 29–30. As the district court observed, this assertion is contradicted by the 2015 letter of concurrence, which expressly confirms that project operations necessary for deliveries under the contracts were analyzed in the 2008 biological opinion, and the 2008 biological opinion found CVP operations in accordance with the reasonable and prudent alternative would not jeopardize the delta smelt. 1-ER-0068–70.

Appellants' argument is further contradicted as to the DMC Contracts by the evidence in the record that deliveries under the DMC Contracts could be reduced to zero, if deemed necessary to implement measures required by the ESA. 3-ER-0549, 0551, 0571–576. The DMC Contractors received less than their full contract amounts in every year from 2008 (when the 2008 biological opinion issued) through 2015, with zero percent allocations in 2014 and 2015. 3-ER-0551, 0571–576. As explained and found by the agencies, the DMC Contracts allowed whatever reductions in deliveries were deemed required to comply with ESA requirements to avoid jeopardizing the delta smelt. 3-ER-0549–551. No analysis was deferred; it was obvious in 2015 that the DMC Contracts did not constrain Reclamation's ability to provide Delta outflow when required by the ESA.

### E. FWS's Conclusion Is Rational and Supported by the Record

Finally, as a catch-all argument against FWS, appellants assert that, based on all the issues discussed above, FWS's conclusion in the 2015 letter of concurrence was not rational and was contrary to the evidence. Op. Br. 30–31. The district court correctly rejected each of appellants' arguments, as discussed above. In addition, the district court properly rejected appellants' related argument that the conclusion in the 2015 letter of concurrence ran counter to the evidence before FWS. 1-ER-0070–71.

In sum, for the reasons discussed above, the district court's ruling that FWS acted reasonably and met the requirements of law in the 2015 consultation on the DMC Contracts should be affirmed.

### III. Reclamation's ESA Consultation on the DMC Contracts Was Lawful and Reasonable

Appellants rely on their arguments addressed above regarding FWS and the 2015 consultation to argue Reclamation's reliance on the 2015 consultation was arbitrary and capricious and violated its procedural and substantive duties under the ESA. Op. Br. at 31–33. For the reasons discussed above, the 2015 consultation was reasonable and lawful.[18] Appellants have not identified any material information

---

[18] DMC Contractors join in the argument by the SRS Contractors that this claim is barred for failure to provide the required 60-day notice. The lack of proper 60-day notice is an alternative ground for affirming the judgment on appellants' Second Claim.

known to Reclamation that FWS did not take into account and that challenges the conclusions of the 2015 letter of concurrence. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Nor have they established any legal flaw in the 2015 consultation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). Reclamation acted reasonably and in accordance with the law in relying upon the 2015 consultation on the DMC Contracts to meet its ESA obligations, as the district court held. 1-ER-0071–72.

The Court should affirm the district court's ruling that in the 2015 consultation on the DMC Contracts Reclamation satisfied its obligations under the ESA.

## IV. Some of Appellants' Arguments Apply Only to the SRS Contracts

Appellants' brief makes frequent generalized references to the renewed contracts collectively, without always acknowledging that some of their arguments are inapplicable to the DMC Contracts. DMC Contractors therefore briefly identify and explain the irrelevance of three arguments to the DMC Contracts. This explanation is intended only to clarify, and should not be construed as agreement that any of these arguments have merit as to the SRS Contracts.

First, appellants argue that FWS failed to adequately consider the effects of renewing the SRS Contracts because those contracts run through 2040, and FWS considered effects of CVP operations through 2030. Op. Br. at 26–29. All the DMC Contracts challenged by appellants in this case were twenty-five year term

agricultural water service contracts, which by their terms were subject to renewal had they not been converted pursuant to Congressional authorization. 2-ER-0206; *See, e.g.,* 8-ER-1563. Appellants' argument related to the supposed mismatch in the term and the consultation does not apply to the DMC Contracts.

Second, appellants argue Reclamation "obstructed" the 2015 consultation by supposedly misrepresenting its ability to negotiate different terms and to decide whether to renew the SRS Contracts. Op. Br. at 33–41. Appellants make no similar argument regarding the DMC Contracts.

Third, appellants challenge the district court's dismissal of their claim that Reclamation violated the ESA by not reinitiating consultation with the National Marine Fisheries Service regarding the effects of the SRS Contracts on ESA-listed salmon. Op. Br. at 41–54. Appellants have not alleged Reclamation was required to reinitiate consultation with the National Marine Fisheries Service regarding the DMC Contracts.

## CONCLUSION

Litigation regarding ESA consultation on the DMC Contracts began in 2008. Given that the DMC Contracts have been almost entirely superseded, that the effects of CVP operations on delta smelt are addressed in a separate consultation, and that the DMC Contracts allowed for whatever actions the ESA required to protect delta smelt, it is puzzling that appellants perceive any value in continuing to press this

claim. Whatever their reasons for pressing on, the Court should end this litigation. The DMC Contractors respectfully urge the Court to dismiss the appeal as to the DMC Contracts as moot, except as the judgment relates to the remaining existing portion of the Oro Loma Water District contract that has not been converted to a repayment contract. To that extent the Court should affirm the judgment. If the Court does not dismiss the appeal as moot, it should affirm the judgment as to all the DMC Contracts.

DATED: October 21, 2022

KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
A Professional Corporation


By: _____ */s/ Daniel J. O'Hanlon* _____
Daniel J. O'Hanlon
*Attorneys for San Luis & Delta-Mendota Water Authority; Westlands Water District; Coelho Family Trust; Eagle Field Water District; Fresno Slough Water District; Mercy Springs Water District; Oro Loma Water District and Tranquillity Irrigation District*


DATED: October 21, 2022

HERUM\CRABTREE\SUNTAG


By: _____ */s/ Jeanne Zolezzi* _____
Jeanne Zolezzi, Esq.
*Attorneys For Banta-Carbona Irrigation District, Patterson Irrigation District and West Stanislaus Irrigation District*

DATED:  October 21, 2022          SOMACH SIMMONS & DUNN
                                  A Professional Corporation


                                  By:      _/s/ Michael Vergara_
                                           Michael Vergara
                                           *Attorneys for Byron Bethany Irrigation*
                                           *District and West Side Irrigation District*


DATED:  October 21, 2022          YOUNG WOOLDRIDGE, LLP


                                  By:      _/s/ Alan F. Doud_
                                           Alan F. Doud
                                           *Attorneys for Del Puerto Water District*
                                           *and James Irrigation District*


## SIGNATURE ATTESTATION

Pursuant to Circuit Rule 25-5(e), I, Daniel J. O'Hanlon, attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing content and have authorized this filing.


                                  By:      _/s/ Daniel J. O'Hanlon_
                                           Daniel J. O'Hanlon

# ADDENDUM

Except for the following, all pertinent statutes and regulations are contained in appellants' Addendum.

## Table of Contents

**Central Valley Project Improvement Act, Pub. L. No. 102-575, tit. XXXIV, § 3401 et seq., 106 Stat. 4706 (1992)** .......................................... ii

    § 3404(c) ......................................................................... ii

**Water Infrastructure Improvements for the Nation Act, Pub. L. 114-322, 130 Stat. 1628 (2016)** .......................................... ii

    § 4011(a) ......................................................................... ii

**Title 43, United States Code, Chapter 12, Subchapter X-Payment of Construction Charges**.................................................................. iv

    43 U.S.C. § 485 (d) and (e)......................................... iv

**California Water Code, Section 1435**........................................... vii

**Administrative Procedure Act, 5 U.S.C. § 551 et seq.** ............................... viii

    5 U.S.C. § 706................................................................ viii

**Code of Federal Regulations, Title 40, Chapter V. Subchapter A. National Environmental Policy Act Implementing Regulations** ................ ix

    40 C.F.R. § 1502.12 ...................................................... ix

# Central Valley Project Improvement Act, Pub. L. No. 102-575, tit. XXXIV, § 3401 et seq., 106 Stat. 4706 (1992)

## Section 3404(c)

(c) RENEWAL OF EXISTING LONG–TERM CONTRACTS.—Notwithstanding the provisions of the Act of July 2, 1956 (70 Stat. 483), the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each.

# Water Infrastructure Improvements for the Nation Act, Pub. L. 114-322, 130 Stat. 1628 (2016)

## Section 4011(a)

(a) PREPAYMENT OF CERTAIN REPAYMENT CONTRACTS BETWEEN THE UNITED STATES AND CONTRACTORS OF FEDERALLY DEVELOPED WATER SUPPLIES.—

(1) CONVERSION AND PREPAYMENT OF CONTRACTS.—Upon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions. The manner of conversion under this paragraph shall be as follows:

(A) Water service contracts that were entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat. 1195).

(B) Water service contracts that were entered under subsection (c)(2) of section 9 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195).

(2) PREPAYMENT.—Except for those repayment contracts under which the contractor has previously negotiated for prepayment, all repayment contracts under section 9(d) of that Act (53 Stat. 1195) in effect on the date of enactment of this

subtitle at the request of the contractor, and all contracts converted pursuant to paragraph (1)(A) shall—

(A) provide for the repayment, either in lump sum or by accelerated prepayment, of the remaining construction costs identified in water project specific irrigation rate repayment schedules, as adjusted to reflect payment not reflected in such schedules, and properly assignable for ultimate return by the contractor, or if made in approximately equal installments, no later than 3 years after the effective date of the repayment contract, such amount *1879 to be discounted by 1/2 the Treasury rate. An estimate of the remaining construction costs, as adjusted, shall be provided by the Secretary to the contractor no later than 90 days following receipt of request of the contractor;

(B) require that construction costs or other capitalized costs incurred after the effective date of the contract or not reflected in the rate schedule referenced in subparagraph (A), and properly assignable to such contractor shall be repaid in not more than 5 years after notification of the allocation if such amount is a result of a collective annual allocation of capital costs to the contractors exercising contract conversion under this subsection of less than $5,000,000. If such amount is $5,000,000 or greater, such cost shall be repaid as provided by applicable reclamation law;

(C) provide that power revenues will not be available to aid in repayment of construction costs allocated to irrigation under the contract; and

(D) continue so long as the contractor pays applicable charges, consistent with section 9(d) of the Act of August 4, 1939 (53 Stat. 1195), and applicable law.

(3) CONTRACT REQUIREMENTS.—Except for those repayment contracts under which the contractor has previously negotiated for prepayment, the following shall apply with regard to all repayment contracts under subsection (c)(1) of section 9 of that Act (53 Stat. 1195) in effect on the date of enactment of this subtitle at the request of the contractor, and all contracts converted pursuant to paragraph (1)(B):

(A) Provide for the repayment in lump sum of the remaining construction costs identified in water project specific municipal and industrial rate repayment schedules, as adjusted to reflect payments not reflected in such schedules, and properly assignable for ultimate return by the contractor. An estimate of the remaining construction costs, as adjusted, shall be provided by the Secretary to the contractor no later than 90 days after receipt of the request of contractor.

(B) The contract shall require that construction costs or other capitalized costs incurred after the effective date of the contract or not reflected in the rate schedule referenced in subparagraph (A), and properly assignable to such contractor, shall be repaid in not more than 5 years after notification of the allocation if such amount is a result of a collective annual allocation of capital costs to the contractors exercising contract conversion under this subsection of less than $5,000,000. If such amount is $5,000,000 or greater, such cost shall be repaid as provided by applicable reclamation law.

(C) Continue so long as the contractor pays applicable charges, consistent with section 9(c)(1) of the Act of August 4, 1939 (53 Stat. 1195), and applicable law.

(4) CONDITIONS.—All contracts entered into pursuant to paragraphs (1), (2), and (3) shall—

(A) not be adjusted on the basis of the type of prepayment financing used by the water users' association;

(B) conform to any other agreements, such as applicable settlement agreements and new constructed appurtenant facilities; and

(C) not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation, or any rights, obligations, or relationships of the water users' association and their landowners as provided under State law.


## Title 43, United States Code, Chapter 12, Subchapter X-Payment of Construction Charges

## 43 U.S.C. § 485 (d) and (e)

### (d) Delivery of water for irrigation; repayment contract prerequisites

No water may be delivered for irrigation of lands in connection with any new project, new division of a project, or supplemental works on a project until an organization, satisfactory in form and powers to the Secretary, has entered into a repayment contract with the United States, in a form satisfactory to the Secretary, providing among other things—

(1) That the Secretary may fix a development period for each irrigation block, if any, of not to exceed ten years from and including the first calendar year in which water is delivered for the lands in said block; and that during the development period water shall be delivered to the lands in the irrigation block involved at a charge per annum per acre-foot, or other charge, to be fixed by the Secretary each year and to be paid in advance of delivery of water: Provided, That where the lands included in an irrigation block are for the most part lands owned by the United States, the Secretary, prior to execution of a repayment contract, may fix a development period, but in such case execution of such a contract shall be a condition precedent to delivery of water after the close of the development period: Provided further, That when the Secretary, by contract or by notice given thereunder, shall have fixed a development period of less than ten years, and at any time thereafter but before commencement of the repayment period conditions arise which in the judgment of the Secretary would have justified the fixing of a longer period, he may amend such contract or notice to extend such development period to a date not to exceed ten years from its commencement, and in a case where no development period was provided, he may amend such contract within the same limits: Provided further, That when the Secretary shall have deferred the payment of all or any part of any installments of construction charges under any repayment contract pursuant to the authority of the Act of September 21, 1959 (73 Stat. 584), he may, at any time prior to the due date prescribed for the first installment not reduced by such deferment, and by agreement with the contracting organization, terminate the supplemental contract by which such deferment was effected, credit the construction payments made, and exercise the authority granted in this section. After the close of the development period, any such charges collected and which the Secretary determines to be in excess of the cost of the operation and maintenance during the development period shall be credited to the construction cost of the project in the manner determined by the Secretary.

(2) That the part of the construction costs allocated by the Secretary to irrigation shall be included in a general repayment obligation of the organization; and that the organization may vary its distribution of construction charges in a manner that takes into account the productivity of the various classes of lands and the benefits accruing to the lands by reason of the construction: Provided, That no distribution of construction charges over the lands included in the organization shall in any manner be deemed to relieve the organization or any party or any land therein of the organization's general obligation to the United States.

(3) That the general repayment obligation of the organization shall be spread in annual installments, of the number and amounts fixed by the Secretary, over a period of not more than 40 years, exclusive of any development period fixed under

paragraph (1) of this subsection, for any project contract unit or, if the project contract unit be divided into two or more irrigation blocks, for any such block, or as near to said period of not more than forty years as is consistent with the adoption and operation of a variable payment formula which, being based on full repayment within such period under average conditions, permits variance in the required annual payments in the light of economic factors pertinent to the ability of the organization to pay.

(4) That the first annual installment for any project contract unit, or for any irrigation block, as the case may be, shall accrue, on the date fixed by the Secretary, in the year after the last year of the development period or, if there be no development period, in the calendar year after the Secretary announces that the construction contemplated in the repayment contract is substantially completed or is advanced to a point where delivery of water can be made to substantially all of the lands in said unit or block to be irrigated; and if there be no development period fixed, that prior to and including the year in which the Secretary makes said announcement water shall be delivered only on the toll charge basis hereinbefore provided for development periods.

### (e) Contracts to furnish water

In lieu of entering into a repayment contract pursuant to the provisions of subsection (d) of this section to cover that part of the cost of the construction of works connected with water supply and allocated to irrigation, the Secretary, in his discretion, may enter into either short- or long-term contracts to furnish water for irrigation purposes. Each such contract shall be for such period, not to exceed forty years, and at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation; and shall require payment of said rates each year in advance of delivery of water for said year. In the event such contracts are made for furnishing water for irrigation purposes, the costs of any irrigation water distribution works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project, shall be covered by a repayment contract entered into pursuant to said subsection (d).

# California Water Code, Section 1435

(a) Any permittee or licensee who has an urgent need to change a point of diversion, place of use, or purpose of use from that specified in the permit or license may petition for, and the board may issue, a conditional, temporary change order without complying with other procedures or provisions of this division, but subject to all requirements of this article.

(b) Prior to issuing a change order pursuant to this article, the board shall make all of the following findings:

(1) The permittee or licensee has an urgent need to make the proposed change.

(2) The proposed change may be made without injury to any other lawful user of water.

(3) The proposed change may be made without unreasonable effect upon fish, wildlife, or other instream beneficial uses.

(4) The proposed change is in the public interest, including findings to support change order conditions imposed to ensure that the change is in the public interest, and may be made without injury to any other lawful user of the water, and without unreasonable effect upon fish, wildlife, and other instream beneficial uses.

(c) "Urgent need," for the purposes of this article, means the existence of circumstances from which the board may in its judgment conclude that the proposed temporary change is necessary to further the constitutional policy that the water resources of the state be put to beneficial use to the fullest extent of which they are capable and that waste of water be prevented; except that the board shall not find a petitioner's need to be urgent if the board in its judgment concludes, if applicable, that the petitioner has not exercised due diligence either (1) in petitioning for a change pursuant to provisions of this division other than this article, or (2) in pursuing that petition for change.

(d) The board may delegate to any officer or employee of the board all or any of its functions under this article, as provided in Section 7.

## Administrative Procedure Act, 5 U.S.C. § 551 et seq.

## 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# Code of Federal Regulations, Title 40, Chapter V. Subchapter A. National Environmental Policy Act Implementing Regulations

## 40 C.F.R. § 1502.12

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-15163

I am the attorney or self-represented party.

**This brief contains** | 9,951 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ◉ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [          ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Daniel J. O'Hanlon | **Date** | October 21, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/2018*