Case No. 21-15163

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Plaintiffs-Appellants*,

v.

DEB HAALAND,* in her official capacity as Secretary of the Interior, et al.,
*Defendants-Appellees*,

GLENN-COLUSA IRRIGATION DISTRICT, et al.,
*Intervenor-Defendants-Appellees.*

———————————

Appeal From The United States District Court,
For the Eastern District of California,
Case No. 1:05-cv-01207-JLT-EPG (Hon. Jennifer L. Thurston)

———————————

## DMC CONTRACTORS' REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF DANIEL J. O'HANLON IN SUPPORT THEREOF

———————————

KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
Daniel J. O'Hanlon
1331 Garden Hwy, 2nd Floor
Sacramento, California 95833
Telephone: (916) 321-4500
Facsimile: (916) 321-4555

*Attorneys for San Luis & Delta-Mendota Water Authority; Westlands Water District; Coelho Family Trust; Eagle Field Water District; Fresno Slough Water District; Mercy Springs Water District; Oro Loma Water District and Tranquillity Irrigation District*

(*Additional counsel on following page*)

* Deb Haaland is substituted for her predecessor, Scott de la Vega, pursuant to Fed. R. App. P. 43(c)(2).

Rebecca R. Akroyd
General Counsel
SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY
1331 Garden Hwy, 2nd Floor
Sacramento, California 95833
Telephone: (916) 321-4321
*Attorney for San Luis & Delta-Mendota Water Authority*

Jon D. Rubin
General Counsel
WESTLANDS WATER DISTRICT
P.O. Box 6056
Fresno, California 93703
Telephone: (916) 321-4207
*Attorneys for Westlands Water District*

Jeanne Zolezzi
HERUM\CRABTREE\SUNTAG
5757 Pacific Avenue, Suite 222
Stockton, California 95207
Telephone: (209) 472-7700
*Attorneys for Banta-Carbona Irrigation District, Patterson Irrigation District and West Stanislaus Irrigation District*

Michael E. Vergara
SOMACH SIMMONS & DUNN
500 Capitol Mall, Suite 1000
Sacramento, California 95814-2403
Telephone: (916) 446-7979
*Attorneys for Byron Bethany Irrigation District and West Side Irrigation District*

Alan F. Doud
YOUNG WOOLDRIDGE, LLP
1800 30th St., Fourth Floor
Bakersfield, California 93301
Telephone: (661) 327-9661
*Attorneys for Del Puerto Water District and James Irrigation District*

Diane V. Rathmann
LINNEMAN LAW
1820 Marguerite Street
Dos Palos, California 93620
Telephone: (209) 392-2141
*Attorney for Eagle Field Water District*

Lauren D. Layne
Gabriel A. Delgado
BAKER MANOCK & JENSEN, PC
5260 North Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 432-5400
*Attorneys for Fresno Slough Water District, Mercy Springs Water District and Tranquillity Irrigation District*

# REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, the DMC Contractors[1] request the Court take judicial notice of the facts described below. A court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). "The court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d).

The DMC Contractors request that the Court take judicial notice of the existence, recitals and terms of the thirteen contracts attached to the declaration of Daniel J. O'Hanlon as Exhibits 1 through 13. The contracts are relevant to mootness. As is explained in the DMC Contractors' answering brief, these thirteen contracts between the various DMC Contractors and the United States were entered in 2020 or 2021 pursuant to section 4011 of the Water Infrastructure Improvements for the

---

[1] The thirteen entities who entered the DMC Contracts in 2005 and were named as defendants in 2008 are: Tranquillity Irrigation District, West Stanislaus Irrigation District, Banta-Carbona Irrigation District, Patterson Irrigation District, West Side Irrigation District, James Irrigation District, Eagle Field Water District, Del Puerto Water District, Fresno Slough Water District, Mercy Springs Water District, Oro Loma Water District, Byron-Bethany Water District, and the Coehlo Family Trust. Appellees San Luis & Delta-Mendota Water Authority and Westlands Water District joined this litigation as intervenors. For convenience of reference, these agencies are collectively referred to as the "DMC Contractors."

Nation Act ("WIIN Act"). Pub. L. 114-322, 130 Stat. 1628. Pursuant to section 4011 of the WIIN Act, each of the DMC Contracts except the Oro Loma Water District has been converted from a water service contract to a repayment contract. The contractual rights to four thousand acre-feet of water supply originally subject to the Oro Loma Water District contract (of a total of 4,600 acre-feet) were assigned to Westlands Water District, and the contractual right assigned to Westlands has been converted to a repayment contract. (See Ex. 11.) The attached contracts have superseded all the DMC Contracts challenged in this case, excepting only the Oro Loma Water District contract. Since no effective relief related to ESA consultation can be granted on contracts that are no longer in effect, this appeal is moot as to the superseded DMC Contracts.

Each of the attached contracts was downloaded from and may be viewed at a website maintained by the United States Bureau of Reclamation. The thirteen contracts, attached as Exhibits 1 through 13, are:

1.       "Contract Between the United States and Tranquillity Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-701-A-LTR1-P) dated October 22, 2020.

2.       "Contract Between the United States and West Stanislaus Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-1072-LTR1-P) dated October 22, 2020.

3.     "Contract Between the United States and Banta-Carbona Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-4305A-LTR1-P) dated October 22, 2020.

4.     "Contract Between the United States and Patterson Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-3598A-LTR1-P) dated October 26, 2020.

5.     "Contract Between the United States and James Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-700-A-LTRl -P) dated October 22, 2020.

6.     "Contract Between the United States and West Side Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 7-07-20-W0045-LTR1-P) dated October 22, 2020.

7.     "Contract Between the United States and Eagle Field Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-7754-LTRl-P) dated October 22, 2020.

8.     "Contract Between the United States and Del Puerto Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-922-LTRl-P) dated September 29, 2020.

9. "Contract Between the United States and Fresno Slough Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-4019A-LTR1-P) dated October 22, 2020.

10. "Contract Between the United States and Mercy Springs Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-3365A-LTRl-P) dated October 22, 2020.

11. "Contract Between the United States and Westlands Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No.14-06-200-7823J-LTRl-P) dated September 28, 2020.

12. "Contract Between the United States and Byron-Bethany Water District Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-785-LTRl-P) dated October 22, 2020.

13. "Contract Between the United States and Coehlo Family Trust Providing for Project Water Service From Delta Division and Facilities Repayment" (Contract No. 14-06-200-7859A-LTR1-P) dated December 15, 2021.

The DMC Contractors further request that the Court take judicial notice of the fact that in 2019 the U.S. Fish and Wildlife Service issued another in the series of biological opinions regarding the effect of Central Valley Project operations on the delta smelt. The existence and contents of the 2019 biological opinion are relevant as background and contextual information to assist the Court in understanding the

structure and status of ESA consultation related to ongoing operations of the Central Valley Project. The 2019 biological opinion post-dates the 2015 consultation on the DMC Contracts, and hence is offered only for background and contextual information, rather than to prove the validity of the 2015 consultation.

A copy of the 2019 biological opinion was downloaded from and may be viewed at a website maintained by the United States Fish and Wildlife Service. The biological opinion, attached as Exhibit 14, is titled:

14.     "Biological Opinion For the Initiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project" issued by U.S. Fish and Wildlife Service and dated October 21, 2019.

DATED:  October 21, 2022  KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
           A Professional Corporation


           By:   */s/ Daniel J. O'Hanlon*
             Daniel J. O'Hanlon
             *Attorneys for San Luis & Delta-Mendota Water Authority; Westlands Water District; Coelho Family Trust; Eagle Field Water District; Fresno Slough Water District; Mercy Springs Water District; Oro Loma Water District; and Tranquillity Irrigation District*

# DECLARATION OF DANIEL J. O'HANLON
## IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE

I, Daniel J. O'Hanlon, declare as follows:

1.      I am shareholder in the firm Kronick, Moskovitz, Tiedemann & Girard, counsel of record for several of the DMC Contractors.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the "Contract Between the United States and Tranquillity Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the "Contract Between the United States and West Stanislaus Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the "Contract Between the United States and Banta-Carbona Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the

U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

5. Attached hereto as Exhibit 4 is a true and correct copy of the "Contract Between the United States and Patterson Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 26, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

6. Attached hereto as Exhibit 5 is a true and correct copy of the "Contract Between the United States and James Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

7. Attached hereto as Exhibit 6 is a true and correct copy of the "Contract Between the United States and West Side Irrigation District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

8.     Attached hereto as Exhibit 7 is a true and correct copy of the "Contract Between the United States and Eagle Field Water District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

9.     Attached hereto as Exhibit 8 is a true and correct copy of the "Contract Between the United States and Del Puerto Water District Providing for Project Water Service From Delta Division and Facilities Repayment" dated September 29, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the "Contract Between the United States and Fresno Slough Water District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

11.     Attached hereto as Exhibit 10 is a true and correct copy of the "Contract Between the United States and Mercy Springs Water District Providing for Project

Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

12.     Attached hereto as Exhibit 11 is a true and correct copy of the "Contract Between the United States and Westlands Water District Providing for Project Water Service From Delta Division and Facilities Repayment" dated September 28, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

13.     Attached hereto as Exhibit 12 is a true and correct copy of the "Contract Between the United States and Byron-Bethany Water District Providing for Project Water Service From Delta Division and Facilities Repayment" dated October 22, 2020. On August 9, 2022, my associate obtained this document by accessing the U.S. Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

14.     Attached hereto as Exhibit 13 is a true and correct copy of the "Contract Between the United States and Coehlo Family Trust Providing for Project Water Service From Delta Division and Facilities Repayment" dated December 15, 2021. On August 9, 2022, my associate obtained this document by accessing the U.S.

Department of the Interior Bureau of Reclamation website at: https://www.usbr.gov/mp/wiin-act/negotiated-conversion-contracts.html.

15.     Attached hereto as Exhibit 14 is a true and correct copy of the "Biological Opinion For the Initiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project" issued by U.S. Fish and Wildlife Service and dated October 21, 2019. On August 15, 2022, my associate obtained this document by accessing an archived version of Bay Delta Fish & Wildlife Office website at: https://web.archive.org/web/20210322114200/https://www.fws.gov/sfbaydelta/cvp-swp/documents/10182019_ROC_BO_final.pdf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21st day of October, 2022, at Sacramento, California.


*/s/ Daniel J. O'Hanlon*
Daniel J. O'Hanlon

**EXHIBIT 1**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



Board of Directors
Tranquility Irrigation District
P.O. Box 487
Tranquility, CA 93668

Subject:  Water Infrastructure Improvements for the Nation Act Contract No. 14-06-200-701-A-LTR1-P Between the United States and the Tranquility Irrigation District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records.  The Bureau of Reclamation appreciates the effort expended by the Tranquility Irrigation District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
TRANQUILLITY IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 32 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 34 |
| 11. | Temporary Reductions – Return Flows | 35 |
| 12. | Constraints on the Availability of Water | 36 |
| 13. | Unavoidable Groundwater Percolation | 38 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 43 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 48 |
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 51 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 54 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41 | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A    Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
TRANQUILLITY IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1    THIS CONTRACT, made this 2nd day of October , 20 20 , in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and TRANQUILLITY

12   IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13   of California, duly organized, existing, and acting pursuant to the laws thereof;

14       WITNESSETH, That:

15 <u>EXPLANATORY RECITALS</u>

16       [1st]    WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22       [2nd]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25       [3rd]    WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27       [4th]    WHEREAS, the United States and the Contractor entered into Contract

28 No. 14-06-200-701-A, dated December 23, 1963, which established terms for the delivery of

29 20,200 acre feet of Schedule 2 water as a permanent adjustment and settlement of the

30 Contractor's asserted claims of rights to water in Fresno Slough, tributary to the San Joaquin

31 River in fulfillment of such rights; and

32       [5th]    WHEREAS, Schedule 2 water is not the subject of this Contract and will

33 continue to be delivered and administered under the terms and conditions of Contract No. 14-06-

34 200-701-A; and

35       [6th]    WHEREAS, Contract No. 14-06-200-701-A also established the terms for

36 the delivery of 13,800 acre-feet of supplemental water, hereinafter referred to as Project Water,

2

37 to the Contractor from Delta Division facilities from December 23, 1963 through December 23,

38 2003; and

39        [7th]    WHEREAS, the United States and the Contractor have pursuant to

40 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

41 entered into interim renewal contract(s) identified as Contract No. 14-06-200-701-A-IR1 and

42 14-06-200-701-A-IR2, which provided for the delivery of Project Water to the Contractor from

43 March 1, 2004, through February 28, 2006; and

44        [8th]    WHEREAS, the United States and the Contractor entered into a long-term

45 contract identified as Contract No. 14-06-200-701-A-LTR1, hereinafter referred to as the

46 Existing Contract, which provided for the continued water service to the Contractor following

47 expiration of Contract No. 14-06-200-701-A-IR2, and which was in effect the date the WIIN Act

48 was enacted; and

49        [9th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

50 States of America enacted the WIIN Act; and

51        [10th]    WHEREAS, Section 4011(a)(1) provides that "upon request of the

52 contractor, the Secretary of the Interior shall convert any water service contract in effect on the

53 date of enactment of this subtitle and between the United States and a water users' association

54 [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

55 mutually agreeable terms and conditions."; and

56        [11th]    WHEREAS, Section 4011(a)(1) further provides that "the manner of

57 conversion under this paragraph shall be as follows: (A) Water service contracts that were

58 entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

3

59    this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

60    1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

61    of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

62    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

63          [12th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

64    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

65    repayment, exchange and transfer contractual rights between the water users' association

66    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

67    water users' association [Contractor] and their landowners as provided under State law."; and

68          [13th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

69    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

70    service or repayment contractor to receive water; or (4) except as expressly provided in this

71    section, any obligations under the Federal Reclamation law, including the continuation of

72    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

73    repayment contractors making prepayments pursuant to this section."; and

74          [14th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

75    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

76    service contracts into repayment contracts, amend existing repayment contracts, and allow

77    contractors to prepay their construction cost obligations pursuant to applicable Federal

78    Reclamation law; and

79          [15th]   WHEREAS, the United States has determined that the Contractor has

80    fulfilled all of its obligations under the Existing Contract; and

81      [16th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

82   Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

83   reasonable and beneficial use and/or has demonstrated future demand for water use such that the

84   Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

85   quantity of Project Water to be made available to it pursuant to this Contract; and

86      [17th]   WHEREAS, water obtained from the Project has been relied upon by

87   urban and agricultural areas within California for more than 50 years, and is considered by the

88   Contractor as an essential portion of its water supply; and

89      [18th]   WHEREAS, the economies of regions within the Project, including the

90   Contractor's, depend upon the continued availability of water, including water service from the

91   Project; and

92      [19th]   WHEREAS, the Secretary intends through coordination, cooperation, and

93   partnerships to pursue measures to improve water supply, water quality, and reliability of the

94   Project for all Project purposes; and

95      [20th]   WHEREAS, the mutual goals of the United States and the Contractor

96   include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

97   achieve repayment of the Project as required by law; to guard reasonably against Project Water

98   shortages; to achieve a reasonable balance among competing demands for use of Project Water;

99   and to comply with all applicable environmental statutes, all consistent with the legal obligations

100   of the United States relative to the Project; and

101      [21st]   WHEREAS, the parties intend by this Contract to maintain a cooperative

102   relationship in order to achieve their mutual goals; and

5

103         [22nd] WHEREAS, the Contractor has utilized or may utilize transfers, contract

104  assignments, rescheduling, and conveyance of Project Water and non-Project water under this

105  Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

106  beneficial use of water; and

107         [23rd] WHEREAS, the parties desire and intend that this Contract not provide a

108  disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

109  Explanatory Recital immediately above; and

110         [25th] WHEREAS, the Contracting Officer and the Contractor agree that this

111  Contract complies with Section 4011 of the WIIN Act; and

112         [26th] WHEREAS, the Contracting Officer and the Contractor agree to amend

113  and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

114  Reclamation law on the terms and conditions set forth below.

115         NOW, THEREFORE, in consideration of the mutual and dependent covenants

116  herein contained, it is hereby mutually agreed by the parties hereto as follows:

117  <div align="center">DEFINITIONS</div>

118      1.     When used herein unless otherwise distinctly expressed, or manifestly

119  incompatible with the intent of the parties as expressed in this Contract, the term:

120         (a)     "Additional Capital Obligation" shall mean construction costs or other

121  capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

122  Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

123  (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

124  Stat. 1628) ("WIIN Act");

125    (b) "Calendar Year" shall mean the period January 1 through December 31,

126 both dates inclusive;

127    (c) "Charges" shall mean the payments required by Federal Reclamation law

128 in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

129 annually by the Contracting Officer pursuant to this Contract;

130    (d) "Condition of Shortage" shall mean a condition respecting the Project

131 during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

132 Contract Total;

133    (e) "Contracting Officer" shall mean the Secretary of the Interior's duly

134 authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

135 or regulation;

136    (f) "Contract Total" shall mean the maximum amount of water to which the

137 Contractor is entitled under subdivision (a) of Article 3 of this Contract;

138    (g) "Contractor's Service Area" shall mean the area to which the Contractor is

139 permitted to provide Project Water under this Contract as described in Exhibit "A" attached

140 hereto, which may be modified from time to time in accordance with Article 34 of this Contract

141 without amendment of this Contract;

142    (h) "CVPIA" shall mean the Central Valley Project Improvement Act, Title

143 XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

144    (i) "Delta Division Facilities" shall mean those existing and future Project

145 facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

146 the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

147     Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

148     Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

149             (j)     "Eligible Lands" shall mean all lands to which Irrigation Water may be

150     delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

151     1263), as amended;

152             (k)     "Excess Lands" shall mean all lands in excess of the limitations contained

153     in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

154     acreage limitation under Federal Reclamation law;

155             (l)     "Existing Capital Obligation" shall mean the remaining amount of

156     construction costs or other capitalized costs allocable to the Contractor as described in Section

157     4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

158     Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

159     in the Final Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

160     Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

161     Exhibit "C", which is incorporated herein by reference;

162             (m)     "Full Cost Rate" shall mean an annual rate, as determined by the

163     Contracting Officer that shall amortize the expenditures for construction properly allocable to the

164     Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

165     deficits funded, less payments, over such periods as may be required under Federal Reclamation

166     law, or applicable contract provisions. Interest will accrue on both the construction expenditures

167     and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

168     date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

169    in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

170    The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

171    Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

172                (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

173    be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

174                (o)    "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

175    to the delivery of Irrigation Water;

176                (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
177    primarily for the production of commercial agricultural crops or livestock, and domestic and
178    other uses that are incidental thereto;

179                (q)    "Landholder" shall mean a party that directly or indirectly owns or leases

180    nonexempt land, as provided in 43 CFR 426.2;

181                (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
182    Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
183    of "Irrigation Water" or within another category of water use under an applicable Federal
184    authority;

185                (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

186    the delivery of M&I Water;

187                (t)    "Operation and Maintenance" or "O&M" shall mean normal and

188    reasonable care, control, operation, repair, replacement (other than capital replacement), and

189    maintenance of Project facilities;

190                (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

191    successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

192    the Delta Division Facilities pursuant to written agreement(s) with the United States.  When this

193 Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

194 Water Authority;

195       (v)    "Project" shall mean the Central Valley Project owned by the United

196 States and managed by the Department of the Interior, Bureau of Reclamation;

197       (w)   "Project Contractors" shall mean all parties who have contracts for water

198 service for Project Water from the Project with the United States pursuant to Federal

199 Reclamation law;

200       (x)    "Project Water" shall mean all water that is developed, diverted, stored, or

201 delivered by the Secretary in accordance with the statutes authorizing the Project and in

202 accordance with the terms and conditions of water rights acquired pursuant to California law;

203 however, Schedule 2 Water shall not be considered Project Water for purposes of this Contract;

204       (y)    "Rates" shall mean the payments determined annually by the Contracting

205 Officer in accordance with the then-current applicable water ratesetting policies for the Project,

206 as described in subdivision (a) of Article 7 of this Contract;

207       (z)    "Recent Historic Average" shall mean the most recent five (5)-year

208 average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

209 or its preceding contract(s);

210       (aa)   "Repayment Obligation" for Water Delivered as Irrigation Water shall

211 mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

212 amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

213 Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

214 United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

215          (bb)   "Schedule 2 Water" shall mean that water as so defined under Contract

216  No. 14-06-200-701-A with the United States, which will continue to be delivered and

217  administered under said contract;

218          (cc)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

219  successor, or an authorized representative acting pursuant to any authority of the Secretary and

220  through any agency of the Department of the Interior;

221          (dd)   "Tiered Pricing Component" shall be the incremental amount to be paid

222  for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

223  for in Exhibit "B";

224          (ee)   "Water Delivered" or "Delivered Water" shall mean Project Water

225  diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

226  Officer;

227          (ff)   "Water Made Available" shall mean the estimated amount of Project

228  Water that can be delivered to the Contractor for the upcoming Year as declared by the

229  Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

230          (gg)   "Water Scheduled" shall mean Project Water made available to the

231  Contractor for which times and quantities for delivery have been established by the Contractor

232  and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

233          (hh)   "Year" shall mean the period from and including March 1 of each

234  Calendar Year through the last day of February of the following Calendar Year.

235    <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

236    2.    (a)    This Contract shall be effective November 1, 2020, hereinafter known as

237    the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

238    Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

239    (53 Stat. 1195) as applicable, and applicable law;

240            (1)    *Provided, That* the Contracting Officer shall not seek to terminate

241    this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

242    unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

243    to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

244    or to diligently commence and maintain full curative payments satisfactory to the Contracting

245    Officer within the sixty (60) calendar days' notice period;

246            (2)    *Provided, further, That* the Contracting Officer shall not seek to

247    suspend making water available or declaring Water Made Available pursuant to this Contract for

248    non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

249    Contracting Officer has first provided at least thirty (30) calendar days written notice to the

250    Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

251    curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

252    cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

253    suspended making water available pursuant to this paragraph, upon cure of such non-compliance

254     satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

255     available and declaring Water Made Available pursuant to this Contract;

256                (3)    *Provided, further, That* this Contract may be terminated at any

257     time by mutual consent of the parties hereto.

258           (b)    Upon complete payment of the Repayment Obligation by the Contractor,

259     and notwithstanding any Additional Capital Obligation that may later be established, the acreage

260     limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

261     and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

262     this Contract shall no longer be applicable.

263           (c)    Notwithstanding any provision of this Contract, the Contractor reserves

264     and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

265     allowed by law.

266           (d)    Notwithstanding any provision of this Contract, the Contractor reserves

267     and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

268     allowed by law.

269     <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

270     3.    (a)    During each Year, consistent with all applicable State water rights permits,

271     and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

272     Contract, the Contracting Officer shall make available for delivery to the Contractor 13,800 acre-

273     feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

274     accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

275     Articles 4 and 7 of this Contract. Schedule 2 Water shall continue to be delivered to the

276     Contractor at no cost pursuant to Contract No. 14-06-200-701-A, dated December 23, 1963, and

277     shall not be subject to the provisions of this Contract, and said Contract No. 14-06-200-701-A

278     shall be in full force and effect insofar as it pertains to the furnishing of Schedule 2 Water.

279     (b)     Because the capacity of the Project to deliver Project Water has been

280     constrained in recent years and may be constrained in the future due to many factors including

281     hydrologic conditions and implementation of Federal and State laws, the likelihood of the

282     Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

283     Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

284     programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

285     CVPIA projected that the Contract Total set forth in this Contract will not be available to the

286     Contractor in many years. During the most recent five years prior to execution of the Existing

287     Contract, the Recent Historic Average Water Made Available to the Contractor was 9,080 acre-

288     feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

289     parties under any provision of this Contract.

290     (c)     The Contractor shall utilize the Project Water in accordance with all

291     applicable legal requirements.

292     (1)     In the event any Project Contractor (other than a Cross Valley

293     Contractor) that receives Project Water through the Delta Division Facilities obtains a

294     contractual agreement that the Contracting Officer shall make Project Water available at a point

295     or points of delivery in or north of the Delta, at the request of the Contractor and upon

296     completion of any required environmental documentation, this Contract shall be amended to

297     provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

298 this Contract shall be limited solely to those changes made necessary by the addition of such

299 alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

300 of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

301 amendment.

302   (d) The Contractor shall make reasonable and beneficial use of all water

303 furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

304 groundwater banking programs, surface water storage programs, and other similar programs

305 utilizing Project Water or other water furnished pursuant to this Contract conducted within the

306 Contractor's Service Area which are consistent with applicable State law and result in use

307 consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

308 program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

309 Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

310 sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

311 the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

312 compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

313 banking programs, surface water storage programs, and other similar programs utilizing Project

314 Water or other water furnished pursuant to this Contract conducted outside the Contractor's

315 Service Area may be permitted upon written approval of the Contracting Officer, which approval

316 will be based upon environmental documentation, Project Water rights, and Project operational

317 concerns. The Contracting Officer will address such concerns in regulations, policies, or

318 guidelines.

319              (e)     The Contractor shall comply with requirements applicable to the

320    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

321    of any water service contract between the Contracting Officer and the Contractor in effect

322    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

323    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

324    implement. The Existing Contract, which evidences in excess of 41 years of diversions for

325    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

326    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

327    required biological assessment(s) prepared pursuant to the ESA, and any other needed

328    environmental review. Nothing herein shall be construed to prevent the Contractor from

329    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

330    biological opinion or other environmental documentation referred to in this Article.

331              (f)     Following the declaration of Water Made Available under Article 4 of this

332    Contract, the Contracting Officer will make a determination whether Project Water, or other

333    water available to the Project, can be made available to the Contractor in addition to the Contract

334    Total under this Article during the Year without adversely impacting other Project Contractors.

335    At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

336    making such a determination. If the Contracting Officer determines that Project Water, or other

337    water available to the Project, can be made available to the Contractor, the Contracting Officer

338    will announce the availability of such water and shall so notify the Contractor as soon as

339    practical. The Contracting Officer will thereafter meet with the Contractor and other Project

340    Contractors capable of taking such water to determine the most equitable and efficient allocation

341 of such water.  If the Contractor requests the delivery of any quantity of such water, the

342 Contracting Officer shall make such water available to the Contractor in accordance with

343 applicable statutes, regulations, guidelines, and policies.  Subject to existing long-term

344 contractual commitments, water rights, and operational constraints, long-term Project

345 Contractors shall have a first right to acquire such water, including Project Water made available

346 pursuant to Section 215 of the Reclamation Reform Act of 1982.

347    (g) The Contractor may request permission to reschedule for use during the

348 subsequent Year some or all of the Water Made Available to the Contractor during the current

349 Year, referred to as "rescheduled water."  The Contractor may request permission to use during

350 the current Year a quantity of Project Water which may be made available by the United States

351 to the Contractor during the subsequent Year referred to as "preuse."  The Contracting Officer's

352 written approval may permit such uses in accordance with applicable statutes, regulations,

353 guidelines, and policies.

354    (h) The Contractor's right pursuant to Federal Reclamation law and applicable

355 State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

356 shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

357 Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

358 August 4, 1939 (53 Stat. 1195) as applicable, and applicable law.  Nothing in the preceding

359 sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

360 subdivision (b) of Article 12 of this Contract.

361    (i) Project Water furnished to the Contractor pursuant to this Contract may be

362 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

363 Contract upon written approval by the Contracting Officer in accordance with the terms and

364 conditions of such approval.

365     (j)     The Contracting Officer shall make reasonable efforts to protect the water

366 rights necessary for the Project and to provide the water available under this Contract. The

367 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

368 extent permitted by law, in administrative proceedings related to the Project Water rights;

369 *Provided,* *That* the Contracting Officer retains the right to object to the substance of the

370 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

371 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

372 Contract to use Project Water.

373 <div align="center">TIME FOR DELIVERY OF WATER</div>

374 4.     (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

375 announce the Contracting Officer's expected declaration of the Water Made Available. Such

376 declaration will be expressed in terms of Water Made Available and the Recent Historic Average

377 and will be updated monthly, and more frequently if necessary, based on the then-current

378 operational and hydrologic conditions and a new declaration with changes, if any, to the Water

379 Made Available will be made. The Contracting Officer shall provide forecasts of Project

380 operations and the basis of the estimate, with relevant supporting information, upon the written

381 request of the Contractor. Concurrently with the declaration of the Water Made Available, the

382 Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

383     (b)     On or before each March 1 and at such other times as necessary, the

384 Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

<div align="center">18</div>

385 Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

386 United States to the Contractor pursuant to this Contract for the Year commencing on such

387 March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

388 according to the approved schedule for the Year commencing on such March 1.

389      (c)    The Contractor shall not schedule Project Water in excess of the quantity

390 of Project Water the Contractor intends to put to reasonable and beneficial use within the

391 Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

392 during any Year.

393      (d)    Subject to the conditions set forth in subdivision (a) of Article 3 of this

394 Contract, the United States shall deliver Project Water to the Contractor in accordance with the

395 initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

396 written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

397 time prior to the date(s) on which the requested change(s) is/are to be implemented.

398 <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

399     5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

400 Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

401 any additional point or points of delivery either on Project facilities or another location or

402 locations mutually agreed to in writing by the Contracting Officer and the Contractor.

403      (b)    The Contracting Officer, either directly or indirectly through its written

404 agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

405 maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

406    the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

407    Article.

408            (c)     The Contractor shall deliver Irrigation Water in accordance with any

409    applicable land classification provisions of Federal Reclamation law and the associated

410    regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

411    Service Area unless approved in advance by the Contracting Officer.

412            (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

413    measured and recorded with equipment furnished, installed, operated, and maintained by the

414    Contracting Officer either directly or indirectly through its written agreements(s) with the

415    Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

416    Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

417    this Article. Upon the request of either party to this Contract, the Contracting Officer shall

418    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

419    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

420    therein. For any period of time when accurate measurements have not been made, the

421    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

422    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

423    of time.

424            (e)     Absent a separate contrary written agreement with the Contractor, neither

425    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

426    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

427    pursuant to this Contract beyond the point or points of delivery established pursuant to

20

428    subdivision (a) of this Article.  The Contractor shall indemnify the United States, its officers,

429    employees, agents, and assigns on account of damage or claim of damage of any nature

430    whatsoever for which there is legal responsibility, including property damage, personal injury, or

431    death arising out of or connected with  the control, carriage, handling, use, disposal, or

432    distribution of such Water Delivered beyond such point or points of delivery except for any

433    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

434    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

435    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

436    Contracting Officer or any of its officers, employees, agents, and assigns, including the

437    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

438    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

439    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

440    Federal Entity(ies).

441    <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

442        6.      (a)       The Contractor has established a measuring program satisfactory to the

443    Contracting Officer.  The Contractor shall ensure that all surface water delivered for irrigation

444    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

445    water delivered for M&I purposes is measured at each M&I service connection.  The water

446    measuring devices or water measuring methods of comparable effectiveness must be acceptable

447    to the Contracting Officer.  The Contractor shall be responsible for installing, operating,

448    maintaining, and repairing all such measuring devices and implementing all such water

449    measuring methods at no cost to the United States.  The Contractor shall use the information

450 obtained from such water measuring devices or water measuring methods to ensure its proper

451 management of the water; to bill water users for water delivered by the Contractor; and, if

452 applicable, to record water delivered for M&I purposes by customer class as defined in the

453 Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

454 contained, however, shall preclude the Contractor from establishing and collecting any charges,

455 assessments, or other revenues authorized by California law. The Contractor shall include a

456 summary of all its annual surface water deliveries in the annual report described in subdivision

457 (c) of Article 25 of this Contract.

458       (b)     To the extent the information has not otherwise been provided, upon

459 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

460 report describing the measurement devices or water measuring methods being used or to be used

461 to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

462 service connections or alternative measurement programs approved by the Contracting Officer,

463 at which such measurement devices or water measuring methods are being used, and, if

464 applicable, identifying the locations at which such devices and/or methods are not yet being used

465 including a time schedule for implementation at such locations. The Contracting Officer shall

466 advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

467 if any, of the measuring devices or water measuring methods identified in the Contractor's report

468 and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

469 the Contracting Officer notifies the Contractor that the measuring devices or methods are

470 inadequate, the parties shall within 60 days following the Contracting Officer's response,

471 negotiate in good faith the earliest practicable date by which the Contractor shall modify said

472   measuring devices and/or measuring methods as required by the Contracting Officer to ensure

473   compliance with subdivision (a) of this Article.

474            (c)     All new surface water delivery systems installed within the Contractor's

475   Service Area after the Effective Date shall also comply with the measurement provisions

476   described in subdivision (a) of this Article.

477            (d)     The Contractor shall inform the Contracting Officer and the State of

478   California in writing by April 30 of each Year of the monthly volume of surface water delivered

479   within the Contractor's Service Area during the previous Year.

480            (e)     The Contractor shall inform the Contracting Officer and the Operating

481   Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

482   Irrigation Water and M&I Water taken during the preceding month.

483                     RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
484                                 REPAYMENT OF FACILITIES

485      7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

486   Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

487   Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

488   (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

489   Article, subsection (b), the Contractor's Project construction and other obligations shall be

490   determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

491   in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

492   WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

493   a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

494  rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

495  shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

496  agreed to in writing by the Contractor and the Contracting Officer.  The Rates, Charges, and

497  Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

498  forth in Exhibit "B", as may be revised annually.

499  (1)  The Contractor shall pay the United States as provided for in this

500  Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

501  in accordance with policies for Irrigation Water and M&I Water.  The Contractor's Rates shall

502  be established to recover its estimated reimbursable costs included in the operation and

503  maintenance component of the Rate and amounts established to recover deficits and other

504  charges, if any, including construction costs as identified in the following subdivisions.

505  (2)  In accordance with the WIIN Act, the Contractor's allocable share

506  of Project construction costs will be repaid pursuant to the provisions of this Contract.

507  (A)  The amount due and payable to the United States, pursuant

508  to the WIIN Act, shall be the Repayment Obligation.  The Repayment Obligation has been

509  computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

510  as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

511  installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

512  set forth in Exhibit "C".  The Repayment Obligation is due in lump sum by December 30, 2020

513  as provided by the WIIN Act.  The Contractor must provide appropriate notice to the Contracting

514  Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

515  amount due using the lump sum alternative.  If such notice is not provided by such date, the

24

516    Contractor shall be deemed to have elected the installment payment alternative, in which case,

517    the first such payment shall be made no later than December 30, 2020.  The second payment

518    shall be made no later than the first anniversary of the first payment date.  The third payment

519    shall be made no later than the second anniversary of the first payment date.  The final payment

520    shall be made no later than November 1, 2023.  If the installment payment option is elected by

521    the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

522    by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

523    Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

524    methodology as was used to compute the initial annual installment payment amount, which is

525    illustrated in Exhibit "C".  Notwithstanding any Additional Capital Obligation that may later be

526    established, receipt of the Contractor's payment of the Repayment Obligation to the United

527    States shall fully and permanently satisfy the Existing Capital Obligation.

528                         (B)    Additional Capital Obligations that are not reflected in, the

529    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

530    prescribed by the WIIN Act without interest except as required by law.  Consistent with Federal

531    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

532    Obligation assigned to the Contractor until such costs are paid.  Increases or decreases in the

533    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

534    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

535    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

536    however, will be considered under subdivision (b) of this Article.  A separate agreement shall be

537    established by the Contractor and the Contracting Officer to accomplish repayment of the

538   Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

539   WIIN Act, subject to the following:

540         (1)     If the collective Additional Capital Obligation

541   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

542   is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

543   to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

544   notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

545   amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

546         (2)     If the collective Additional Capital Obligation

547   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

548   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

549   properly assignable to the Contractor shall be repaid as provided by applicable Federal

550   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

551   five million dollars ($5,000,000) shall not be a precedent in any other context.

552         (b)     In the event that the final cost allocation referenced in Section 4011(b) of

553   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

554   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

555   allocated costs. The term of such additional repayment contract shall be not less than one (1)

556   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

557   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

558   the event that the final cost allocation indicates that the costs properly assignable to the

559   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

560     overpayment as an offset against any outstanding or future obligations of the Contractor, with the

561     exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

562            (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

563     and Tiered Pricing Component as follows:

564            (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

565     provide the Contractor an estimate of the Charges for Project Water that will be applied to the

566     period October 1, of the current Calendar Year, through September 30, of the following Calendar

567     Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

568     to review and comment on such estimates. On or before September 15 of each Calendar Year,

569     the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

570     the period October 1 of the current Calendar Year, through September 30, of the following

571     Calendar Year, and such notification shall revise Exhibit "B".

572            (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

573     shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

574     for Project Water for the following Year and the computations and cost allocations upon which

575     those Rates are based. The Contractor shall be allowed not less than two months to review and

576     comment on such computations and cost allocations. By December 31 of each Calendar Year,

577     the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

578     Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B".

579            (d)     At the time the Contractor submits the initial schedule for the delivery of

580     Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

581     Contractor shall make an advance payment to the United States equal to the total amount payable

582 pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

583 scheduled to be delivered pursuant to this Contract during the first two calendar months of the

584 Year. Before the end of the first month and before the end of each calendar month thereafter, the

585 Contractor shall make an advance payment to the United States, at the Rate(s) set under

586 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

587 during the second month immediately following. Adjustments between advance payments for

588 Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

589 the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

590 to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

591 Contract during any month shall be accompanied with appropriate advance payment, at the Rates

592 then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

593 payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

594 this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

595 additional Project Water shall be delivered to the Contractor unless and until an advance

596 payment at the Rates then in effect for such additional Project Water is made. Final adjustment

597 between the advance payments for the Water Scheduled and payments for the quantities of Water

598 Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

599 later than April 30th of the following Year, or 60 days after the delivery of Project Water

600 rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

601 the last day of February.

602         (e)    The Contractor shall also make a payment in addition to the Rate(s) in

603 subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

604 appropriate Tiered Pricing Component then in effect, before the end of the month following the

605 month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

606 Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

607 consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

608 water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

609 there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

610 shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

611 for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

612 through the adjustment of payments due to the United States for Charges for the next month.

613 Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

614 be computed pursuant to Article 19 of this Contract.

615        (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

616 (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

617 applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

618 policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

619 Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

620 under subdivision (a) of this Article.

621        (g)    Payments to be made by the Contractor to the United States under this

622 Contract may be paid from any revenues available to the Contractor.

623        (h)    All revenues received by the United States from the Contractor relating to

624 the delivery of Project Water or the delivery of non-Project water through Project facilities shall

625 be allocated and applied in accordance with Federal Reclamation law and the associated rules or

626 regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

627        (i)     The Contracting Officer shall keep its accounts pertaining to the

628 administration of the financial terms and conditions of its long-term contracts, in accordance

629 with applicable Federal standards, so as to reflect the application of Project costs and revenues.

630 The Contracting Officer shall, each Year upon request of the Contractor, provide to the

631 Contractor a detailed accounting of all Project and Contractor expense allocations, the

632 disposition of all Project and Contractor revenues, and a summary of all water delivery

633 information. The Contracting Officer and the Contractor shall enter into good faith negotiations

634 to resolve any discrepancies or disputes relating to accountings, reports, or information.

635        (j)     The parties acknowledge and agree that the efficient administration of this

636 Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

637 policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

638 and/or for making and allocating payments, other than those set forth in this Article may be in

639 the mutual best interest of the parties, it is expressly agreed that the parties may enter into

640 agreements to modify the mechanisms, policies, and procedures for any of those purposes while

641 this Contract is in effect without amending this Contract.

642        (k)   1.     Beginning at such time as deliveries of Project Water in a Year

643 exceed 80 percent of the Contract Total, then before the end of the month following the month of

644 delivery the Contractor shall make an additional payment to the United States equal to the

645 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

646 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

647 Contract Total, shall equal one-half of the difference between the Rate established under

648     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

649     Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

650     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

651     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

652     Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

653     subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

654     Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

655     the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

656           2.     Subject to the Contracting Officer's written approval, the

657     Contractor may request and receive an exemption from such Tiered Pricing Component for

658     Project Water delivered to produce a crop which the Contracting Officer determines will provide

659     significant and quantifiable habitat values for waterfowl in fields where the water is used and the

660     crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

661     Irrigation Water shall apply only if such habitat values can be assured consistent with the

662     purposes of the CVPIA through binding agreements executed with or approved by the

663     Contracting Officer prior to use of such water.

664           3.     For purposes of determining the applicability of the Tiered Pricing

665     Component pursuant to this Article, Water Delivered shall include Project Water that the

666     Contractor transfers to others but shall not include Project Water transferred to the Contractor,

667     nor shall it include the additional water provided to the Contractor under the provisions of

668     subdivision (f) of Article 3 of this Contract.

669           (l)     For the term of this Contract, Rates applied under the respective

670 ratesetting policies will be established to recover only reimbursable O&M (including any

671 deficits) and capital costs of the Project, as those terms are used in the then-current Project

672 ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

673 applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

674 practices which implement the Contracting Officer's ratesetting policies will not be implemented

675 until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

676 need, and impact of the proposed change.

677        (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

678 CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

679 in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

680 reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

681 transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

682 lower Rates and Charges because of inability to pay and is transferring Project Water to another

683 entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

684 for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

685        (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

686 Officer is authorized to adjust determinations of ability to pay every five years.

687        (o)    Omitted

688                NON-INTEREST BEARING O&M DEFICITS

689    8.    The Contractor and the Contracting Officer concur that, as of the Effective Date

690 the Contractor has no non-interest bearing O&M deficits and shall have no further liability

691 therefore.

692 ## SALES, TRANSFERS, OR EXCHANGES OF WATER

693     9.    (a)     The right to receive Project Water provided for in this Contract may be

694 sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

695 California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

696 and applicable guidelines or regulations then in effect. No sale, transfer, or exchange of Project

697 Water under this Contract may take place without the prior written approval of the Contracting

698 Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

699 exchanges shall be approved absent all appropriate environmental documentation, including, but

700 not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

701 documentation should include, as appropriate, an analysis of groundwater impacts and economic

702 and social effects, including environmental justice, of the proposed water transfers on both the

703 transferor and transferee.

704        (b)     In order to facilitate efficient water management by means of water

705 transfers of the type historically carried out among Project Contractors located within the same

706 geographical area and to allow the Contractor to participate in an accelerated water transfer

707 program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

708 all necessary environmental documentation, including, but not limited to, documents prepared

709 pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

710 the Contracting Officer shall determine whether such transfers comply with applicable law.

711 Following the completion of the environmental documentation, such transfers addressed in such

712 documentation shall be conducted with advance notice to the Contracting Officer, but shall not

713 require prior written approval by the Contracting Officer. Such environmental documentation

714   and the Contracting Officer's compliance determination shall be reviewed every five years and

715   updated, as necessary, prior to the expiration of the then existing five (5)-year period.  All

716   subsequent environmental documentation shall include an alternative to evaluate not less than the

717   quantity of Project Water historically transferred within the same geographical area.

718          (c)     For a water transfer to qualify under subdivision (b) of this Article, such

719   water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

720   years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

721   activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

722   be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

723   within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

724   through existing facilities with no new construction or modifications to facilities and be between

725   existing Project Contractors and/or the Contractor and the United States, Department of the

726   Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

727   requirements imposed for protection of the environment and Indian Trust Assets, as defined

728   under Federal law.

729          APPLICATION OF PAYMENTS AND ADJUSTMENTS

730          10.     (a)     The amount of any overpayment by the Contractor of the Contractor's

731   O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

732   liabilities of the Contractor arising out of this Contract then due and payable.  Overpayments of

733   more than $1,000 shall be refunded at the Contractor's request.  In lieu of a refund, any amount

734   of such overpayment, at the option of the Contractor, may be credited against amounts to become

735   due to the United States by the Contractor.  With respect to overpayment, such refund or

34

736     adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

737     have the right to the use of any of the Project Water supply provided for by this Contract. All

738     credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

739     obtaining direction as to how to credit or refund such overpayment in response to the notice to

740     the Contractor that it has finalized the accounts for the Year in which the overpayment was

741     made.

742         (b)     All advances for miscellaneous costs incurred for work requested by the

743     Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

744     when the work has been completed. If the advances exceed the actual costs incurred, the

745     difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

746     advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

747     Contract.

748                    <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

749        11.    (a)     Subject to: (i) the authorized purposes and priorities of the Project and the

750     requirements of Federal law, and (ii) the obligations of the United States under existing

751     contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

752     Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

753     provided in this Contract.

754         (b)     The Contracting Officer or Operating Non-Federal Entity(ies) may

755     temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

756     provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

757     of the Project facilities or any part thereof necessary for the delivery of Project Water to the

758 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

759 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

760 except in case of emergency, in which case no notice need be given; *Provided, That* the United

761 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

762 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

763 the United States will, if possible, deliver the quantity of Project Water which would have been

764 delivered hereunder in the absence of such discontinuance or reduction.

765         (c)     The United States reserves the right to all seepage and return flow water

766 derived from Water Delivered to the Contractor hereunder which escapes or is discharged

767 beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

768 the United States any right to seepage or return flow being put to reasonable and beneficial use

769 pursuant to this Contract within the Contractor's Service Area by the Contractor or those

770 claiming by, through, or under the Contractor.

771        <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

772     12.    (a)     In its operation of the Project, the Contracting Officer will use all
773 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
774 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
775 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
776 Contractor of said determination as soon as practicable.

777        (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting
778 or other similar operational errors affecting the Project; drought and other physical or natural
779 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
780 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
781 17 of this Contract, no liability shall accrue against the United States or any of its officers,
782 agents, or employees for any damage, direct or indirect, arising therefrom.

783        (c)     In any Year in which there may occur a Condition of Shortage for any of

784    the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

785    Article, the Contracting Officer will first allocate the available Project Water consistent with the

786    Project M&I Water Shortage Policy as finally adopted after environmental review for

787    determining the amount of Project Water Available for delivery to the Project Contractors.

788    Subject to the foregoing allocation, in any year in which there may occur a Condition of

789    Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

790    others entitled to Project Water from Delta Division Facilities under long-term water service or

791    repayment contracts (or renewals thereof or binding commitments therefore) in force on

792    February 28, 2005, as follows:

793              (1)    The Contracting Officer shall make an initial and subsequent

794    determination as necessary of the total quantity of Project Water estimated to be scheduled or

795    actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

796    renewal, long-term water service or repayment contracts then in force for the delivery of Project

797    Water by the United States from Delta Division Facilities during the relevant Year, the quantity

798    so determined being hereinafter referred to as the scheduled total;

799              (2)    A determination shall be made of the total quantity of Project

800    Water that is available for meeting the scheduled total, the quantity so determined being

801    hereinafter referred to as the available supply;

802              (3)    The total quantity of Project Water estimated to be scheduled or

803    actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

804    of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

805    hereinafter referred to as the Contractor's proportionate share; and

806          (4)     The available supply shall be multiplied by the Contractor's

807    proportionate share and the result shall be the quantity of Project Water made available by the

808    United States to the Contractor for the relevant Year in accordance with the schedule developed

809    by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

810    amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

811    that the Contracting Officer can increase or needs to decrease the available supply for delivery

812    from Delta Division Facilities to long-term water service and repayment contractors during the

813    relevant Year, such additions or reductions to the available supply shall be apportioned

814    consistent with subparagraphs (1) through (4), inclusive.

815          (d)     By entering into this Contract, the Contractor does not waive any legal

816    rights or remedies it may have to file or participate in any administrative or judicial proceeding

817    contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

818    such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

819    implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

820    *That* the Contractor has commenced any such judicial challenge or any administrative procedures

821    necessary to institute any judicial challenge within six months of the policy becoming final.  By

822    agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

823    that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

824    validate or invalidate the Project M&I Water Shortage Policy.

825                  UNAVOIDABLE GROUNDWATER PERCOLATION

826    13.    (a)     To the extent applicable, the Contractor shall not be deemed to have

827    delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

38

828 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

829 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

830         (b)     Upon complete payment of the Repayment Obligation by the Contractor,

831 this Article 13 shall no longer be applicable.

## COMPLIANCE WITH FEDERAL RECLAMATION LAWS

833       14.     The parties agree that the delivery of Irrigation Water or use of Federal facilities
834 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
835 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and supplemented, and
836 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
837 law.

## PROTECTION OF WATER AND AIR QUALITY

839     15.   (a)     Omitted

840         (b)     The United States will care for, operate and maintain reserved works in a
841 manner that preserves the quality of the water at the highest level possible as determined by the
842 Contracting Officer. The United States does not warrant the quality of the water delivered to the
843 Contractor and is under no obligation to furnish or construct water treatment facilities to
844 maintain or improve the quality of water delivered to the Contractor.

845 None of the foregoing affects or modifies the obligations of the United States under Contract No.

846 14-06-200-701-A, dated December 23, 1963, with respect to Schedule 2 Water, including but not

847 limited to, Article 10 of said contract.

848         (c)     The Contractor will comply with all applicable water and air pollution
849 laws and regulations of the United States and the State of California; and will obtain all required
850 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
851 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
852 State, and local water quality standards applicable to surface and subsurface drainage and/or
853 discharges generated through the use of Federal or Contractor facilities or Project Water
854 provided by the Contractor within its Service Area.

855         (d)     This Article shall not affect or alter any legal obligations of the Secretary
856 to provide drainage or other discharge services.

857         (e)     Omitted

## WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED STATES

860    16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

861  other than from the United States and Irrigation Water furnished pursuant to the terms of this

862  Contract may be simultaneously transported through the same distribution facilities of the

863  Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

864  and non-Project water were constructed without funds made available pursuant to Federal

865  Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

866  Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

867  Irrigation Water must be established through the certification requirements as specified in the

868  Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

869  Eligible Lands within the Contractor's Service Area can be established and the quantity of

870  Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

871  Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

872  Project water are (were) constructed with funds made available pursuant to Federal Reclamation

873  law, the non-Project water will be subject to the acreage limitation provisions of Federal

874  Reclamation law, unless the Contractor pays to the United States the incremental fee described in

875  43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

876  annually the cost to the Federal Government, including interest, of storing or delivering non-

877  Project water, which for purposes of this Contract shall be determined as follows:  The quotient

878  shall be the unpaid distribution system costs divided by the total irrigable acreage within the

879  Contractor's Service Area.  The incremental fee per acre is the mathematical result of such

880 quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

881 (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

882 within the Contractor's Service Area that receives non-Project water through Federally financed

883 or constructed facilities. The incremental fee calculation methodology will continue during the

884 term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

885 regulation, or policy adopted after the Contractor has been afforded the opportunity to review

886 and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

887 adopted, it shall supersede this provision.

888       (b)     Water or water rights now owned or hereafter acquired by the Contractor,

889 other than from the United States may be stored, conveyed, and/or diverted through Project

890 facilities, subject to the completion of appropriate environmental documentation, with the

891 approval of the Contracting Officer and the execution of any contract determined by the

892 Contracting Officer to be necessary, consistent with the following provisions:

893       (1)     The Contractor may introduce non-Project water into Project

894 facilities and deliver said water to lands within the Contractor's Service Area, including

895 Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

896 Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

897 policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

898 use power policy is applicable, each as amended, modified, or superseded from time to time.

899       (2)     Delivery of such non-Project water in and through Project facilities

900 shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

901 purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

41

902 available to other Project Contractors; (iii) interfere with the delivery of contractual water

903 entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

904 the Project facilities.

905    (3) Neither the United States nor the Operating Non-Federal

906 Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

907 is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

908 releases and agrees to defend and indemnify the United States and the Operating Non-Federal

909 Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

910 persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

911 employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

912 (ii) diverting such non-Project water into Project facilities.

913    (4) Diversion of such non-Project water into Project facilities shall be

914 consistent with all applicable laws, and if involving groundwater, consistent with any applicable

915 groundwater management plan for the area from which it was extracted.

916    (5) After Project purposes are met, as determined by the Contracting

917 Officer, the United States and Project Contractors entitled to Project Water from Delta Division

918 Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

919 available by the Contracting Officer for conveyance and transportation of non-Project water prior

920 to any such remaining capacity being made available to non-Project contractors.  Other Project

921 Contractors shall have a second priority to any remaining capacity of facilities declared to be

922 available by the Contracting Officer for conveyance and transportation of non-Project water prior

923 to any such remaining capacity being made available to non-Project contractors.

924                (c)     Upon complete payment of the Repayment Obligation by the Contractor,

925    subdivision (a) of this Article 16 shall no longer be applicable.

926                      OPINIONS AND DETERMINATIONS

927       17.    (a)     Where the terms of this Contract provide for actions to be based upon the

928    opinion or determination of either party to this Contract, said terms shall not be construed as

929    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

930    determinations.  Both parties, notwithstanding any other provisions of this Contract, expressly

931    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

932    or unreasonable opinion or determination.  Each opinion or determination by either party shall be

933    provided in a timely manner.  Nothing in this subdivision (a) of this Article is intended to or shall

934    affect or alter the standard of judicial review applicable under Federal law to any opinion or

935    determination implementing a specific provision of Federal law embodied in statute or

936    regulation.

937                (b)     The Contracting Officer shall have the right to make determinations

938    necessary to administer this Contract that are consistent with the provisions of this Contract, the

939    laws of the United States and of the State of California, and the rules and regulations

940    promulgated by the Secretary.  Such determinations shall be made in consultation with the

941    Contractor to the extent reasonably practicable.

942                   COORDINATION AND COOPERATION

943       18.    (a)     In order to further their mutual goals and objectives, the Contracting

944    Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

945    with other affected Project Contractors, in order to improve the O&M of the Project.  The

946     communication, coordination, and cooperation regarding O&M shall include, but not be limited

947     to, any action which will or may materially affect the quantity or quality of Project Water supply,

948     the allocation of Project Water supply, and Project financial matters including, but not limited to,

949     budget issues. The communication, coordination, and cooperation provided for hereunder shall

950     extend to all provisions of this Contract. Each party shall retain exclusive decision making

951     authority for all actions, opinions, and determinations to be made by the respective party.

952          (b)     Within 120 days following the Effective Date, the Contractor, other

953     affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

954     Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

955     amended as necessary separate and apart from this Contract. The goal of this process shall be to

956     provide, to the extent practicable, the means of mutual communication and interaction regarding

957     significant decisions concerning Project O&M on a real-time basis.

958          (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

959     Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

960     intent:

961              (1)     The Contracting Officer will, at the request of the Contractor,

962     assist in the development of integrated resource management plans for the Contractor. Further,

963     the Contracting Officer will, as appropriate, seek authorizations for implementation of

964     partnerships to improve water supply, water quality, and reliability.

965              (2)     The Secretary will, as appropriate, pursue program and project

966     implementation and authorization in coordination with Project Contractors to improve the water

967     supply, water quality, and reliability of the Project for all Project purposes.

968           (3)     The Secretary will coordinate with Project Contractors and the

969    State of California to seek improved water resource management.

970           (4)     The Secretary will coordinate actions of agencies within the

971    Department of the Interior that may impact the availability of water for Project purposes.

972           (5)     The Contracting Officer shall periodically, but not less than

973    annually, hold division-level meetings to discuss Project operations, division-level water

974    management activities, and other issues as appropriate.

975           (d)     Without limiting the contractual obligations of the Contracting Officer

976    under the other Articles of this Contract, nothing in this Article shall be construed to limit or

977    constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

978    Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

979    protect health, safety, or the physical integrity of structures or facilities.

980                          CHARGES FOR DELINQUENT PAYMENTS

981      19.    (a)     The Contractor shall be subject to interest, administrative, and penalty
982    charges on delinquent payments. If a payment is not received by the due date, the Contractor
983    shall pay an interest charge on the delinquent payment for each day the payment is delinquent
984    beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
985    addition to the interest charge, an administrative charge to cover additional costs of billing and
986    processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
987    shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
988    payment is delinquent beyond the due date, based on the remaining balance of the payment due
989    at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
990    collection services associated with a delinquent payment.

991           (b)     The interest rate charged shall be the greater of either the rate prescribed
992    quarterly in the Federal Register by the Department of the Treasury for application to overdue
993    payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
994    determined as of the due date and remain fixed for the duration of the delinquent period.

995     (c)  When a partial payment on a delinquent account is received, the amount
996 received shall be applied first to the penalty charges, second to the administrative charges, third
997 to the accrued interest, and finally to the overdue payment.

998          EQUAL EMPLOYMENT OPPORTUNITY

999    20.  During the performance of this Contract, the Contractor agrees as follows:

1000     (a)  The Contractor will not discriminate against any employee or applicant for
1001 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1002 origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1003 that employees are treated during employment, without regard to their race, color, religion, sex,
1004 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1005 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1006 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1007 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1008 places, available to employees and applicants for employment, notices to be provided by the
1009 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1010     (b)  The Contractor will, in all solicitations or advertisements for employees
1011 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1012 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1013 gender identity, or national origin.

1014     (c)  The Contractor will not discharge or in any other manner discriminate
1015 against any employee or applicant for employment because such employee or applicant has
1016 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1017 employee or applicant. This provision shall not apply to instances in which an employee who
1018 has access to the compensation information of other employees or applicants as part of such
1019 employee's essential job functions discloses the compensation of such other employees or
1020 applicants to individuals who do not otherwise have access to such information, unless such
1021 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1022 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1023 consistent with the Contractor's legal duty to furnish information.

1024     (d)  The Contractor will send to each labor union or representative of workers
1025 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1026 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1027 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1028 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1029 applicants for employment.

1030            (e)     The Contractor will comply with all provisions of Executive Order No.
1031  11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1032  Labor.

1033            (f)     The Contractor will furnish all information and reports required by
1034  Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1035  Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1036  by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1037  compliance with such rules, regulations, and orders.

1038            (g)     In the event of the Contractor's noncompliance with the nondiscrimination
1039  clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1040  canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1041  ineligible for further Government contracts in accordance with procedures authorized in
1042  Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1043  remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1044  regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1045            (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1046  every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1047  Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1048  1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1049  will take such action with respect to any subcontract or purchase order as may be directed by the
1050  Secretary of Labor as a means of enforcing such provisions, including sanctions for
1051  noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1052  threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1053  Contractor may request the United States to enter into such litigation to protect the interests of
1054  the United States.

1055      GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1056      21.    (a)     The obligation of the Contractor to pay the United States as provided in
1057  this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1058  obligation may be distributed among the Contractor's water users and notwithstanding the default
1059  of individual water users in their obligation to the Contractor.

1060            (b)     The payment of charges becoming due pursuant to this Contract is a
1061  condition precedent to receiving benefits under this Contract. The United States shall not make
1062  water available to the Contractor through Project facilities during any period in which the
1063  Contractor is in arrears in the advance payment of water rates due the United States. The
1064  Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1065  parties that are in arrears in the advance payment of water rates as levied or established by the
1066  Contractor.

1067             (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1068 obligation to require advance payment for water rates which it levies.

<u>COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS</u>

1069

1070      22.    (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1071 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1072 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1073 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1074 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1075 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1076 Interior and/or Bureau of Reclamation.

1077           (b)     These statutes prohibit any person in the United States from being
1078 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1079 discrimination under any program or activity receiving financial assistance from the Bureau of
1080 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1081 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1082 obligation, including permitting officials of the United States to inspect premises, programs, and
1083 documents.

1084           (c)     The Contractor makes this Contract in consideration of and for the
1085 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1086 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1087 Reclamation, including installment payments after such date on account of arrangements for
1088 Federal financial assistance which were approved before such date. The Contractor recognizes
1089 and agrees that such Federal assistance will be extended in reliance on the representations and
1090 agreements made in this Article and that the United States reserves the right to seek judicial
1091 enforcement thereof.

1092           (d)     Complaints of discrimination against the Contractor shall be investigated
1093 by the Contracting Officer's Office of Civil Rights.

<u>PRIVACY ACT COMPLIANCE</u>

1094

1095      23.    (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1096 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1097 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1098 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1099 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1100 C.F.R. § 426.18.

1101         (b)     With respect to the application and administration of the criminal penalty
1102 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1103 employees who are responsible for maintaining the certification and reporting records referenced
1104 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1105 U.S.C. § 552a(m).

1106         (c)     The Contracting Officer or a designated representative shall provide the
1107 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1108 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1109 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1110 information contained in the Landholders' certification and reporting records.

1111         (d)     The Contracting Officer shall designate a full-time employee of the
1112 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1113 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1114 The Contractor is authorized to grant requests by individuals for access to their own records.

1115         (e)     The Contractor shall forward promptly to the System Manager each
1116 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1117 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1118 System Manager with information and records necessary to prepare an appropriate response to
1119 the requester. These requirements do not apply to individuals seeking access to their own
1120 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1121 the requester elects to cite the Privacy Act as an authority for the request.

1122         (f)     Upon complete payment of the Repayment Obligation by the Contractor,

1123 this Article 23 will no longer be applicable.

1124         <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1125     24.     In addition to all other payments to be made by the Contractor pursuant to this

1126 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1127 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1128 of direct cost incurred by the United States for work requested by the Contractor associated with

1129 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1130 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1131 to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1132 contract administration.

1133 <u>WATER CONSERVATION</u>

1134     25.    (a)    Prior to the delivery of water provided from or conveyed through
1135 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1136 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1137 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1138 Additionally, an effective water conservation and efficiency program shall be based on the

1139 Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1140 the conservation and efficiency criteria for evaluating water conservation plans established under

1141 Federal law. The water conservation and efficiency program shall contain definite water

1142 conservation objectives, appropriate economically feasible water conservation measures, and

1143 time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1144 Contract shall be contingent upon the Contractor's continued implementation of such water

1145 conservation program. In the event the Contractor's water conservation plan or any revised water

1146 conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1147 determined by the Contracting Officer to meet such criteria, due to circumstances which the

1148 Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1149 made under this Contract so long as the Contractor diligently works with the Contracting Officer

1150 to obtain such determination at the earliest practicable date, and thereafter the Contractor

1151 immediately begins implementing its water conservation and efficiency program in accordance

1152 with the time schedules therein.

1153         (b)     Should the amount of M&I Water delivered pursuant to subdivision (a) of

1154   Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1155   Contractor shall implement the Best Management Practices identified by the time frames issued

1156   by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1157   Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1158   the Contractor.

1159         (c)     The Contractor shall submit to the Contracting Officer a report on the

1160   status of its implementation of the water conservation plan on the reporting dates specified in the

1161   then-existing conservation and efficiency criteria established under Federal law.

1162         (d)     At five (5)-year intervals, the Contractor shall revise its water

1163   conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1164   water conservation plans established under Federal law and submit such revised water

1165   management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1166   will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1167   existing conservation and efficiency criteria for evaluating water conservation plans established

1168   under Federal law.

1169         (e)     If the Contractor is engaged in direct groundwater recharge, such activity

1170   shall be described in the Contractor's water conservation plan.

1171                  EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1172   26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1173   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1174   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1175    Area. Any such water shall not be considered Project Water under this Contract. In addition,

1176    this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1177    any water user within the Contractor's Service Area acquires or has available under any other

1178    contract pursuant to Federal Reclamation law.

1179    <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1180    27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1181    and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1182    San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1183    agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1184    Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1185    affect the rights or obligations of the Contractor or the United States hereunder.

1186    (b)    The Contracting Officer has previously notified the Contractor in writing

1187    that the O&M of a portion of the Project facilities which serve the Contractor has been

1188    transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1189    therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1190    Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1191    the terms and conditions of the separate agreement between the United States and the Operating

1192    Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1193    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1194    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1195    such successor determines, sets, or establishes for the O&M of the portion of the Project

1196    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

52

1197     Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1198     Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1199     Contractor of its obligation to pay directly to the United States the Contractor's share of the

1200     Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1201     Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1202     United States in accordance with the separate agreement identified in subdivision (a) of this

1203     Article.

1204          (c)     For so long as the O&M of any portion of the Project facilities serving the

1205     Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1206     Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1207     Rates for Water Delivered under this Contract representing the cost associated with the activity

1208     being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1209     or its successor.

1210          (d)     In the event the O&M of the Project facilities operated and maintained by

1211     the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1212     the United States during the term of this Contract, the Contracting Officer shall so notify the

1213     Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1214     the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1215     representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1216     The Contractor shall, thereafter, in the absence of written notification from the Contracting

1217     Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1218     revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

## CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS

28. The expenditure or advance of any money or the performance of any obligation of the United States under this Contract shall be contingent upon appropriation or allotment of funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any obligations under this Contract. No liability shall accrue to the United States in case funds are not appropriated or allotted.

## BOOKS, RECORDS, AND REPORTS

29. (a) The Contractor shall establish and maintain accounts and other books and records pertaining to administration of the terms and conditions of this Contract, including the Contractor's financial transactions; water supply data; project operations, maintenance, and replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting Officer may require. Reports shall be furnished to the Contracting Officer in such form and on such date or dates as the Contracting Officer may require. Subject to applicable Federal laws and regulations, each party to this Contract shall have the right during office hours to examine and make copies of the other party's books and records relating to matters covered by this Contract.

(b) Notwithstanding the provisions of subdivision (a) of this Article, no

books, records, or other information shall be requested from the Contractor by the Contracting

Officer unless such books, records, or information are reasonably related to the administration or

performance of this Contract. Any such request shall allow the Contractor a reasonable period of

time within which to provide the requested books, records, or information.

(c) At such time as the Contractor provides information to the Contracting

Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

to the Operating Non-Federal Entity(ies).

## ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED

30. (a) The provisions of this Contract shall apply to and bind the successors and assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest therein by either party shall be valid until approved in writing by the other party.

1248           (b)     The assignment of any right or interest in this Contract by either party

1249 shall not interfere with the rights or obligations of the other party to this Contract absent the

1250 written concurrence of said other party.

1251           (c)     The Contracting Officer shall not unreasonably condition or withhold

1252 approval of any proposed assignment.

1253 <div align="center">SEVERABILITY</div>

1254      31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1255 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1256 an association or other form of organization whose primary function is to represent parties to

1257 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1258 enforceability of a provision included in this Contract and said person, entity, association, or

1259 organization obtains a final court decision holding that such provision is legally invalid or

1260 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1261 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1262 final court decision identify by mutual agreement the provisions in this Contract which must be

1263 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1264 The time periods specified above may be extended by mutual agreement of the parties. Pending

1265 the completion of the actions designated above, to the extent it can do so without violating any

1266 applicable provisions of law, the United States shall continue to make the quantities of Project

1267 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1268 Contract which were not found to be legally invalid or unenforceable in the final court decision.

## RESOLUTION OF DISPUTES

32.     Should any dispute arise concerning any provisions of this Contract, or the parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to resolve the dispute.  Prior to the Contractor commencing any legal action, or the Contracting Officer referring any matter to the Department of Justice, the party shall provide to the other party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall not be required where a delay in commencing an action would prejudice the interests of the party that intends to file suit.  During the 30-day notice period, the Contractor and the Contracting Officer shall meet and confer in an attempt to resolve the dispute.  Except as specifically provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor or the United States may have.

## OFFICIALS NOT TO BENEFIT

33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of the Contractor shall benefit from this Contract other than as a water user or landowner in the same manner as other water users or landowners.

## CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA

34.     (a)     While this Contract is in effect, no change may be made in the Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other changes which may affect the respective rights, obligations, privileges, and duties of either the United States or the Contractor under this Contract, including, but not limited to, dissolution, consolidation, or merger, except upon the Contracting Officer's written consent.

(b)     Within 30 days of receipt of a request for such a change, the Contracting Officer will notify the Contractor of any additional information required by the Contracting Officer for processing said request, and both parties will meet to establish a mutually agreeable schedule for timely completion of the process.  Such process will analyze whether the proposed

1294     change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1295     (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1296     to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1297     have an impact on any Project Water rights applications, permits, or licenses.  In addition, the

1298     Contracting Officer shall comply with the NEPA and the ESA.  The Contractor will be

1299     responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1300     be paid in accordance with Article 24 of this Contract.

1301 <div align="center">FEDERAL LAWS</div>

1302     35.     By entering into this Contract, the Contractor does not waive its rights to contest

1303     the validity or application in connection with the performance of the terms and conditions of this

1304     Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1305     the terms and conditions of this Contract unless and until relief from application of such Federal

1306     law or regulation to the implementing provision of the Contract is granted by a court of

1307     competent jurisdiction.

1308 <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1309     36.     (a)     Upon a Contractor's compliance with and discharge of the Repayment

1310     Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1311     Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1312     (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1313     shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1314     the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1315     Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1316     <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

1317          37.    The Contractor hereby certifies that it does not maintain or provide for its
1318     employees any segregated facilities at any of its establishments and that it does not permit its
1319     employees to perform their services at any location under its control where segregated facilities
1320     are maintained. It certifies further that it will not maintain or provide for its employees any
1321     segregated facilities at any of its establishments and that it will not permit its employees to
1322     perform their services at any location under its control where segregated facilities are
1323     maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1324     Employment Opportunity clause in this Contract. As used in this certification, the term
1325     "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1326     restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1327     parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1328     facilities provided for employees which are segregated by explicit directive or are in fact
1329     segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1330     disability, or otherwise. The Contractor further agrees that (except where it has obtained
1331     identical certifications from proposed subcontractors for specific time periods) it will obtain
1332     identical certifications from proposed subcontractors prior to the award of subcontracts
1333     exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1334     Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1335     following notice to such proposed subcontractors (except where the proposed subcontractors
1336     have submitted identical certifications for specific time periods):

1337         NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1338             CERTIFICATIONS OF NONSEGREGATED FACILITIES

1339     A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1340     exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1341     Opportunity clause. The certification may be submitted either for each subcontract or for all
1342     subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1343     making false statements in offers is prescribed in 18 U.S.C. § 1001.

1344     <u>NOTICES</u>

1345          38.    Any notice, demand, or request authorized or required by this Contract shall be
1346     deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1347     delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1348     California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1349     postage prepaid, or delivered to the Board of Directors of the Tranquillity Irrigation District, P.O.

1350 Box 487, Tranquillity, California 93668. The designation of the addressee or the address may be
1351 changed by notice given in the same manner as provided in this Article for other notices.

1352 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1353     39.    (a)    All payments from the Contractor to the United States under this Contract
1354 shall be by the medium requested by the United States on or before the date payment is due. The
1355 required method of payment may include checks, wire transfers, or other types of payment
1356 specified by the United States.

1357     (b)    Upon execution of this Contract, the Contractor shall furnish the
1358 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1359 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1360 out of the Contractor's relationship with the United States.

1361 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1362     40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1363 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1364 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1365 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1366 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1367 <u>CONFIRMATION OF CONTRACT</u>

1368     41.    Promptly after the execution of this amended Contract, the Contractor will
1369 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1370 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1371 for the authorization of the execution of this amended Contract. This amended Contract shall not
1372 be binding on the United States until the Contractor secures a final decree.

1373

1374        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375    day and year first above written.

1376                            UNITED STATES OF AMERICA

1377                            By: _____
1378                                Regional Director
1379                                Interior Region 10: California-Great Basin
1380                                Bureau of Reclamation

1381                            TRANQUILLITY IRRIGATION DISTRICT
1382    (SEAL)

1383                            By: _____
1384                                President of the Board of Directors

1385    Attest:

1386    By: _____
1387          Secretary of the Board of Directors

~ASD

1374        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375    day and year first above written.

1376

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**

Digitally signed by BRIAN
HUGHES
Date: 2020.10.19 10:02:12
-07'00'

**OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**
TIME STAMP: 1:37 pm, May 11 2020

UNITED STATES OF AMERICA

1377          By: _____
1378                  Regional Director
1379                  Interior Region 10: California-Great Basin
1380                  Bureau of Reclamation

1381          TRANQUILLITY IRRIGATION DISTRICT
1382    (SEAL)

1383          By: _____
1384                  President of the Board of Directors

1385    Attest:

1386    By: _____
1387        Secretary of the Board of Directors



**Tranquillity Irrigation District**

Contract No. 14-06-200-701-A-LTR1-P
Exhibit A

◻ District Boundary

⧄ Contractor's Service Area

— BUREAU OF —
RECLAMATION

Date: 9/18/2020
File Name: N:\Districts\Contracts\tranquillity\tranquillity_20200401.mxd

Miles
0    0.5    1

N

214-202-891

**EXHIBIT B**
**TRANQUILLITY IRRIGATION DISTRICT**
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $59.84 | |
| DMC Aqueduct Intertie | $1.01 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost (ARRA Cost included) | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $87.83 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

## The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

### Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

Contractor: **Tranquillity Irrigation District**
Facility: **Delta-Mendota Pool**
Contract: **14-06-200-701-A-LTR1-P**

| Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 1,844,486 | |
| 2019 Repayment (Estimate) ** | $ | 745,423 | |
| Adjusted Construction Cost | $ | 1,099,063 | $ 1,066,754 |
| Intertie Construction Cost (N/A): | $ | 124,281 | $ 111,310 |
| Total | $ | 1,223,344 | $ 1,178,064 |

| If Paid in Installments (Used 20 yr CMT) | | | |
|---|---|---|---|
| | Due**** | | |
| Payment 1 | 9/1/2020 | $ | 298,207 |
| Payment 2 | 9/1/2021 | $ | 298,207 |
| Payment 3 | 9/1/2022 | $ | 298,207 |
| Payment 4 ~~ | 9/1/2023 | $ | 298,207 |
| Total Installment Payments | | $ | 1,192,827 |

| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
|---|---|
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

| M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba) | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 $ | 1,099,063 | $ 99,915 | $ 99,378 | $ 124,281 | $ 2,825 | $ 2,809 | $ 102,188 |
| 2021 $ | 999,148 | $ 99,915 | $ 98,923 | $ 121,456 | $ 2,825 | $ 2,797 | $ 101,720 |
| 2022 $ | 899,234 | $ 99,915 | $ 98,431 | $ 118,632 | $ 2,825 | $ 2,783 | $ 101,214 |
| 2023 $ | 799,319 | $ 99,915 | $ 97,941 | $ 115,807 | $ 2,825 | $ 2,769 | $ 100,710 |
| 2024 $ | 699,404 | $ 99,915 | $ 97,454 | $ 112,983 | $ 2,825 | $ 2,755 | $ 100,209 |
| 2025 $ | 599,489 | $ 99,915 | $ 96,969 | $ 110,158 | $ 2,825 | $ 2,741 | $ 99,710 |
| 2026 $ | 499,574 | $ 99,915 | $ 96,487 | $ 107,334 | $ 2,825 | $ 2,728 | $ 99,214 |
| 2027 $ | 399,659 | $ 99,915 | $ 96,007 | $ 104,509 | $ 2,825 | $ 2,714 | $ 98,721 |
| 2028 $ | 299,745 | $ 99,915 | $ 95,529 | $ 101,684 | $ 2,825 | $ 2,701 | $ 98,230 |
| 2029 $ | 199,830 | $ 99,915 | $ 95,054 | $ 98,860 | $ 2,825 | $ 2,687 | $ 97,741 |
| 2030 $ | 99,915 | $ 99,915 | $ 94,581 | $ 96,035 | $ 2,825 | $ 2,674 | $ 97,255 |
| 2031-63 | | | | $ 93,211 | $ 93,211 | $ 81,153 | $ 81,153 |
| Total, Lump Sum Payment | | | $ 1,066,754 | | | $ 111,310 | $ 1,178,064 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | | $ 32,309 | | | $ 12,971 | $ 45,280 |

* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

**** Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@] To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~ Final Payment made in installments must be repaid by this date.

**EXHIBIT 2**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
West Stanislaus Irrigation District
P.O. Box 37
Westley, CA 95387

Subject: Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-1072-LTR1-P</u> Between the United States and the West Stanislaus Irrigation District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of Reclamation appreciates the effort expended by the West Stanislaus Irrigation District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

*Sheri A. Looper*

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
WEST STANISLAUS IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 11 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 35 |
| 12. | Constraints on the Availability of Water | 36 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |

## Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

<u>CONTRACT BETWEEN THE UNITED STATES
AND
WEST STANISLAUS IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT</u>

1      THIS CONTRACT, made this 30th day of October , 2020 , in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and WEST STANISLAUS

12     IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13     of California, duly organized, existing, and acting pursuant to the laws thereof;

14          WITNESSETH, That:

| | |
|---|---|
| 15 | EXPLANATORY RECITALS |

16          [1st]     WHEREAS, the United States has constructed and is operating the

17   California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18   beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19   mitigation, protection and restoration, generation and distribution of electric energy, salinity

20   control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21   River, the Trinity River, and the San Joaquin River and their tributaries; and

22          [2nd]     WHEREAS, the United States constructed the Delta-Mendota Canal and

23   related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24   to the terms of this Contract; and

25          [3rd]     WHEREAS, the rights to Project Water were acquired by the United

26   States pursuant to California law for operation of the Project; and

27          [4th]     WHEREAS, the United States and the Contractor entered into Contract

28   No. 14-06-200-1072, as amended, which established terms for the delivery to the Contractor of

29   Project Water from the Delta Division facilities from February 14, 1953, through February 28,

30   1994; and

31          [5th]     WHEREAS, the United States and the Contractor have pursuant to

32   Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33   entered into interim renewal contract(s) identified as Contract No. 14-06-200-1072-IR1 and

34   subsequent Interim Renewal Contracts 14-06-200-1072-IR2 through 14-06-200-1072-IR10,

35   which provided for water service to the Contractor from March 1, 1995 through February 28,

36   2006; and

37          [6th]    WHEREAS, the United States and the Contractor entered into a long-term

38    contract identified as Contract No. 14-06-200-1072-LTR1, hereinafter referred to as the Existing

39    Contract, which provided for the continued water service to the Contractor following expiration

40    of Contract No. 14-06-200-1072-IR10, and which was in effect the date the WIIN Act was

41    enacted; and

42          [7th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

43    States of America enacted the WIIN Act; and

44          [8th]    WHEREAS, Section 4011(a)(1) provides that "upon request of the

45    contractor, the Secretary of the Interior shall convert any water service contract in effect on the

46    date of enactment of this subtitle and between the United States and a water users' association

47    [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

48    mutually agreeable terms and conditions."; and

49          [9th]    WHEREAS, Section 4011(a)(1) further provides that "the manner of

50    conversion under this paragraph shall be as follows: (A) Water service contracts that were

51    entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

52    this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

53    1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

54    of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

55    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

56          [10th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

57    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

58    repayment, exchange and transfer contractual rights between the water users' association

3

59    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

60    water users' association [Contractor] and their landowners as provided under State law."; and

61          [11th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

62    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

63    service or repayment contractor to receive water; or (4) except as expressly provided in this

64    section, any obligations under the Federal Reclamation law, including the continuation of

65    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

66    repayment contractors making prepayments pursuant to this section."; and

67          [12th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

68    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

69    service contracts into repayment contracts, amend existing repayment contracts, and allow

70    contractors to prepay their construction cost obligations pursuant to applicable Federal

71    Reclamation law; and

72          [13th]   WHEREAS, the United States has determined that the Contractor has

73    fulfilled all of its obligations under the Existing Contract; and

74          [14th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

75    Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

76    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

77    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

78    quantity of Project Water to be made available to it pursuant to this Contract; and

79        [15th]  WHEREAS, water obtained from the Project has been relied upon by

80  urban and agricultural areas within California for more than 50 years, and is considered by the

81  Contractor as an essential portion of its water supply; and

82        [16th]  WHEREAS, the economies of regions within the Project, including the

83  Contractor's, depend upon the continued availability of water, including water service from the

84  Project; and

85        [17th]  WHEREAS, the Secretary intends through coordination, cooperation, and

86  partnerships to pursue measures to improve water supply, water quality, and reliability of the

87  Project for all Project purposes; and

88        [18th]  WHEREAS, the mutual goals of the United States and the Contractor

89  include: to provide for reliable Project Water supplies; to control costs of those supplies; to

90  achieve repayment of the Project as required by law; to guard reasonably against Project Water

91  shortages; to achieve a reasonable balance among competing demands for use of Project Water;

92  and to comply with all applicable environmental statutes, all consistent with the legal obligations

93  of the United States relative to the Project; and

94        [19th]  WHEREAS, the parties intend by this Contract to maintain a cooperative

95  relationship in order to achieve their mutual goals; and

96        [20th]  WHEREAS, the Contractor has utilized or may utilize transfers, contract

97  assignments, rescheduling, and conveyance of Project Water and non-Project water under this

98  Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

99  beneficial use of water; and

100        [21st]   WHEREAS, the parties desire and intend that this Contract not provide a

101 disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

102 Explanatory Recital immediately above; and

103        [22nd]   WHEREAS, the Contracting Officer and the Contractor agree that this

104 Contract complies with Section 4011 of the WIIN Act; and

105        [23rd]   WHEREAS, the Contracting Officer and the Contractor agree to amend

106 and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

107 Reclamation law on the terms and conditions set forth below.

108        NOW, THEREFORE, in consideration of the mutual and dependent covenants

109 herein contained, it is hereby mutually agreed by the parties hereto as follows:

110 <div align="center">DEFINITIONS</div>

111     1.      When used herein unless otherwise distinctly expressed, or manifestly

112 incompatible with the intent of the parties as expressed in this Contract, the term:

113        (a)     "Additional Capital Obligation" shall mean construction costs or other

114 capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

115 Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

116 (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

117 Stat. 1628) ("WIIN Act");

118        (b)     "Calendar Year" shall mean the period January 1 through December 31,

119 both dates inclusive;

120        (c)    "Charges" shall mean the payments required by Federal Reclamation law

121   in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

122   annually by the Contracting Officer pursuant to this Contract;

123        (d)   "Condition of Shortage" shall mean a condition respecting the Project

124   during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

125   Contract Total;

126        (e)   "Contracting Officer" shall mean the Secretary of the Interior's duly

127   authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

128   or regulation;

129        (f)   "Contract Total" shall mean the maximum amount of water to which the

130   Contractor is entitled under subdivision (a) of Article 3 of this Contract;

131        (g)   "Contractor's Service Area" shall mean the area to which the Contractor is

132   permitted to provide Project Water under this Contract as described in Exhibit "A" attached

133   hereto, which may be modified from time to time in accordance with Article 34 of this Contract

134   without amendment of this Contract;

135        (h)   "CVPIA" shall mean the Central Valley Project Improvement Act, Title

136   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

137        (i)   "Delta Division Facilities" shall mean those existing and future Project

138   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

139   the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

140   Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

141   Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

142        (j)    "Eligible Lands" shall mean all lands to which Irrigation Water may be

143   delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

144   1263), as amended;

145        (k)    "Excess Lands" shall mean all lands in excess of the limitations contained

146   in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

147   acreage limitation under Federal Reclamation law;

148        (l)    "Existing Capital Obligation" shall mean the remaining amount of

149   construction costs or other capitalized costs allocable to the Contractor as described in Section

150   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

151   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

152   in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

153   Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

154   Exhibit "C", which is incorporated herein by reference;

155        (m)    "Full Cost Rate" shall mean an annual rate, as determined by the

156   Contracting Officer that shall amortize the expenditures for construction properly allocable to the

157   Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

158   deficits funded, less payments, over such periods as may be required under Federal Reclamation

159   law, or applicable contract provisions. Interest will accrue on both the construction expenditures

160   and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

161   date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

162   in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

163    The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

164    Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

165           (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

166    be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

167           (o)    "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

168    to the delivery of Irrigation Water;

169           (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
170    primarily for the production of commercial agricultural crops or livestock, and domestic and
171    other uses that are incidental thereto;

172           (q)    "Landholder" shall mean a party that directly or indirectly owns or leases

173    nonexempt land, as provided in 43 CFR 426.2;

174           (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
175    Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
176    of "Irrigation Water" or within another category of water use under an applicable Federal
177    authority;

178           (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

179    the delivery of M&I Water;

180           (t)    "Operation and Maintenance" or "O&M" shall mean normal and

181    reasonable care, control, operation, repair, replacement (other than capital replacement), and

182    maintenance of Project facilities;

183           (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

184    successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

185    the Delta Division Facilities pursuant to written agreement(s) with the United States.  When this

186    Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

187    Water Authority;

188              (v)      "Project" shall mean the Central Valley Project owned by the United

189    States and managed by the Department of the Interior, Bureau of Reclamation;

190              (w)      "Project Contractors" shall mean all parties who have contracts for water

191    service for Project Water from the Project with the United States pursuant to Federal

192    Reclamation law;

193              (x)      "Project Water" shall mean all water that is developed, diverted, stored, or

194    delivered by the Secretary in accordance with the statutes authorizing the Project and in

195    accordance with the terms and conditions of water rights acquired pursuant to California law;

196              (y)      "Rates" shall mean the payments determined annually by the Contracting

197    Officer in accordance with the then-current applicable water ratesetting policies for the Project,

198    as described in subdivision (a) of Article 7 of this Contract;

199              (z)      "Recent Historic Average" shall mean the most recent five (5)-year

200    average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

201    or its preceding contract(s);

202              (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

203    mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

204    amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

205    Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

206    United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

207          (bb)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

208   successor, or an authorized representative acting pursuant to any authority of the Secretary and

209   through any agency of the Department of the Interior;

210          (cc)    "Tiered Pricing Component" shall be the incremental amount to be paid

211   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

212   for in Exhibit "B";

213          (dd)    "Water Delivered" or "Delivered Water" shall mean Project Water

214   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

215   Officer;

216          (ee)    "Water Made Available" shall mean the estimated amount of Project

217   Water that can be delivered to the Contractor for the upcoming Year as declared by the

218   Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

219          (ff)    "Water Scheduled" shall mean Project Water made available to the

220   Contractor for which times and quantities for delivery have been established by the Contractor

221   and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

222          (gg)    "Year" shall mean the period from and including March 1 of each

223   Calendar Year through the last day of February of the following Calendar Year.

224   <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

225   2.    (a)    This Contract shall be effective November 1, 2020, hereinafter known as

226   the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

11

227 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

228 (53 Stat. 1195) as applicable, and applicable law;

229         (1)    *Provided, That* the Contracting Officer shall not seek to terminate

230 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

231 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

232 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

233 or to diligently commence and maintain full curative payments satisfactory to the Contracting

234 Officer within the sixty (60) calendar days' notice period;

235         (2)    *Provided, further, That* the Contracting Officer shall not seek to

236 suspend making water available or declaring Water Made Available pursuant to this Contract for

237 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

238 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

239 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

240 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

241 cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

242 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

243 satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

244 available and declaring Water Made Available pursuant to this Contract;

245         (3)    *Provided, further, That* this Contract may be terminated at any

246 time by mutual consent of the parties hereto.

247         (b)    Upon complete payment of the Repayment Obligation by the Contractor,

248 and notwithstanding any Additional Capital Obligation that may later be established, the acreage

249     limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

250     and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

251     this Contract shall no longer be applicable.

252            (c)     Notwithstanding any provision of this Contract, the Contractor reserves

253     and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

254     allowed by law.

255            (d)     Notwithstanding any provision of this Contract, the Contractor reserves

256     and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

257     allowed by law.

258     <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

259     3.     (a)     During each Year, consistent with all applicable State water rights permits,

260     and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

261     Contract, the Contracting Officer shall make available for delivery to the Contractor 50,000 acre-

262     feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

263     accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

264     Articles 4 and 7 of this Contract.

265            (b)     Because the capacity of the Project to deliver Project Water has been

266     constrained in recent years and may be constrained in the future due to many factors including

267     hydrologic conditions and implementation of Federal and State laws, the likelihood of the

268     Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

269     Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

270     programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

271     CVPIA projected that the Contract Total set forth in this Contract will not be available to the

272     Contractor in many years. During the most recent five years prior to execution of the Existing

273     Contract, the Recent Historic Average Water Made Available to the Contractor was 32,900 acre-

274     feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

275     parties under any provision of this Contract.

276          (c)     The Contractor shall utilize the Project Water in accordance with all

277     applicable legal requirements.

278          (1)     In the event any Project Contractor (other than a Cross Valley

279     Contractor) that receives Project Water through the Delta Division Facilities obtains a

280     contractual agreement that the Contracting Officer shall make Project Water available at a point

281     or points of delivery in or north of the Delta, at the request of the Contractor and upon

282     completion of any required environmental documentation, this Contract shall be amended to

283     provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

284     this Contract shall be limited solely to those changes made necessary by the addition of such

285     alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

286     of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

287     amendment.

288          (d)     The Contractor shall make reasonable and beneficial use of all water

289     furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

290     groundwater banking programs, surface water storage programs, and other similar programs

291     utilizing Project Water or other water furnished pursuant to this Contract conducted within the

292     Contractor's Service Area which are consistent with applicable State law and result in use

293   consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

294   program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

295   Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

296   sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

297   the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

298   compliance with Federal Reclamation law.  Groundwater recharge programs, groundwater

299   banking programs, surface water storage programs, and other similar programs utilizing Project

300   Water or other water furnished pursuant to this Contract conducted outside the Contractor's

301   Service Area may be permitted upon written approval of the Contracting Officer, which approval

302   will be based upon environmental documentation, Project Water rights, and Project operational

303   concerns.  The Contracting Officer will address such concerns in regulations, policies, or

304   guidelines.

305         (e)     The Contractor shall comply with requirements applicable to the

306   Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

307   of any water service contract between the Contracting Officer and the Contractor in effect

308   immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

309   Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

310   implement.  The Existing Contract, which evidences in excess of 50 years of diversions for

311   irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

312   Article 3 of this Contract, will be considered in developing an appropriate baseline for any

313   required biological assessment(s) prepared pursuant to the ESA, and any other needed

314   environmental review.  Nothing herein shall be construed to prevent the Contractor from

315   challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

316   biological opinion or other environmental documentation referred to in this Article.

317        (f)     Following the declaration of Water Made Available under Article 4 of this

318   Contract, the Contracting Officer will make a determination whether Project Water, or other

319   water available to the Project, can be made available to the Contractor in addition to the Contract

320   Total under this Article during the Year without adversely impacting other Project Contractors.

321   At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

322   making such a determination. If the Contracting Officer determines that Project Water, or other

323   water available to the Project, can be made available to the Contractor, the Contracting Officer

324   will announce the availability of such water and shall so notify the Contractor as soon as

325   practical. The Contracting Officer will thereafter meet with the Contractor and other Project

326   Contractors capable of taking such water to determine the most equitable and efficient allocation

327   of such water. If the Contractor requests the delivery of any quantity of such water, the

328   Contracting Officer shall make such water available to the Contractor in accordance with

329   applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

330   contractual commitments, water rights, and operational constraints, long-term Project

331   Contractors shall have a first right to acquire such water, including Project Water made available

332   pursuant to Section 215 of the Reclamation Reform Act of 1982.

333        (g)     The Contractor may request permission to reschedule for use during the

334   subsequent Year some or all of the Water Made Available to the Contractor during the current

335   Year, referred to as "rescheduled water." The Contractor may request permission to use during

336   the current Year a quantity of Project Water which may be made available by the United States

337    to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

338    written approval may permit such uses in accordance with applicable statutes, regulations,

339    guidelines, and policies.

340            (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

341    State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

342    shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

343    Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

344    August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

345    sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

346    subdivision (b) of Article 12 of this Contract.

347            (i)    Project Water furnished to the Contractor pursuant to this Contract may be

348    delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

349    Contract upon written approval by the Contracting Officer in accordance with the terms and

350    conditions of such approval.

351            (j)    The Contracting Officer shall make reasonable efforts to protect the water

352    rights necessary for the Project and to provide the water available under this Contract. The

353    Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

354    extent permitted by law, in administrative proceedings related to the Project Water rights;

355    *Provided, That* the Contracting Officer retains the right to object to the substance of the

356    Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

357    Contracting Officer shall recognize the Contractor has a legal right under the terms of this

358    Contract to use Project Water.

359 <u>TIME FOR DELIVERY OF WATER</u>

360     4.     (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

361 announce the Contracting Officer's expected declaration of the Water Made Available. Such

362 declaration will be expressed in terms of Water Made Available and the Recent Historic Average

363 and will be updated monthly, and more frequently if necessary, based on the then-current

364 operational and hydrologic conditions and a new declaration with changes, if any, to the Water

365 Made Available will be made. The Contracting Officer shall provide forecasts of Project

366 operations and the basis of the estimate, with relevant supporting information, upon the written

367 request of the Contractor. Concurrently with the declaration of the Water Made Available, the

368 Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

369     (b)     On or before each March 1 and at such other times as necessary, the

370 Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

371 Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

372 United States to the Contractor pursuant to this Contract for the Year commencing on such

373 March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

374 according to the approved schedule for the Year commencing on such March 1.

375     (c)     The Contractor shall not schedule Project Water in excess of the quantity

376 of Project Water the Contractor intends to put to reasonable and beneficial use within the

377 Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

378 during any Year.

379     (d)     Subject to the conditions set forth in subdivision (a) of Article 3 of this

380 Contract, the United States shall deliver Project Water to the Contractor in accordance with the

18

381     initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

382     written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

383     time prior to the date(s) on which the requested change(s) is/are to be implemented.

384     <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

385     5.     (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

386     Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

387     any additional point or points of delivery either on Project facilities or another location or

388     locations mutually agreed to in writing by the Contracting Officer and the Contractor.

389     (b)     The Contracting Officer, either directly or indirectly through its written

390     agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

391     maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

392     the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

393     Article.

394     (c)     The Contractor shall deliver Irrigation Water in accordance with any

395     applicable land classification provisions of Federal Reclamation law and the associated

396     regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

397     Service Area unless approved in advance by the Contracting Officer.

398     (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

399     measured and recorded with equipment furnished, installed, operated, and maintained by the

400     Contracting Officer either directly or indirectly through its written agreements(s) with the

401     Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

402     Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

403    this Article.  Upon the request of either party to this Contract, the Contracting Officer shall

404    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

405    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

406    therein.  For any period of time when accurate measurements have not been made, the

407    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

408    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

409    of time.

410              (e)     Absent a separate contrary written agreement with the Contractor, neither

411    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

412    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

413    pursuant to this Contract beyond the point or points of delivery established pursuant to

414    subdivision (a) of this Article.  The Contractor shall indemnify the United States, its officers,

415    employees, agents, and assigns on account of damage or claim of damage of any nature

416    whatsoever for which there is legal responsibility, including property damage, personal injury, or

417    death arising out of or connected with  the control, carriage, handling, use, disposal, or

418    distribution of such Water Delivered beyond such point or points of delivery except for any

419    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

420    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

421    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

422    Contracting Officer or any of its officers, employees, agents, and assigns, including the

423    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

424    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

425 a malfunction of facilities owned and/or operated by the United States or the Operating Non-

426 Federal Entity(ies).

427 MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA

428 6. (a) The Contractor has established a measuring program satisfactory to the

429 Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

430 purposes within the Contractor's Service Area is measured at each agricultural turnout and such

431 water delivered for M&I purposes is measured at each M&I service connection. The water

432 measuring devices or water measuring methods of comparable effectiveness must be acceptable

433 to the Contracting Officer. The Contractor shall be responsible for installing, operating,

434 maintaining, and repairing all such measuring devices and implementing all such water

435 measuring methods at no cost to the United States. The Contractor shall use the information

436 obtained from such water measuring devices or water measuring methods to ensure its proper

437 management of the water; to bill water users for water delivered by the Contractor; and, if

438 applicable, to record water delivered for M&I purposes by customer class as defined in the

439 Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

440 contained, however, shall preclude the Contractor from establishing and collecting any charges,

441 assessments, or other revenues authorized by California law. The Contractor shall include a

442 summary of all its annual surface water deliveries in the annual report described in subdivision

443 (c) of Article 25 of this Contract.

444 (b) To the extent the information has not otherwise been provided, upon

445 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

446 report describing the measurement devices or water measuring methods being used or to be used

21

447    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

448    service connections or alternative measurement programs approved by the Contracting Officer,

449    at which such measurement devices or water measuring methods are being used, and, if

450    applicable, identifying the locations at which such devices and/or methods are not yet being used

451    including a time schedule for implementation at such locations.  The Contracting Officer shall

452    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

453    if any, of the measuring devices or water measuring methods identified in the Contractor's report

454    and if the Contracting Officer does not respond in such time, they shall be deemed adequate.  If

455    the Contracting Officer notifies the Contractor that the measuring devices or methods are

456    inadequate, the parties shall within 60 days following the Contracting Officer's response,

457    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

458    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

459    compliance with subdivision (a) of this Article.

460              (c)     All new surface water delivery systems installed within the Contractor's

461    Service Area after the Effective Date shall also comply with the measurement provisions

462    described in subdivision (a) of this Article.

463              (d)     The Contractor shall inform the Contracting Officer and the State of

464    California in writing by April 30 of each Year of the monthly volume of surface water delivered

465    within the Contractor's Service Area during the previous Year.

466              (e)     The Contractor shall inform the Contracting Officer and the Operating

467    Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

468    Irrigation Water and M&I Water taken during the preceding month.

469              RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
470                          REPAYMENT OF FACILITIES

471       7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

472    Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

473    Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

474    (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

475    Article, subsection (b), the Contractor's Project construction and other obligations shall be

476    determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

477    in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

478    WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

479    a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

480    rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

481    shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

482    agreed to in writing by the Contractor and the Contracting Officer.  The Rates, Charges, and

483    Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

484    forth in Exhibit "B", as may be revised annually.

485                (1)     The Contractor shall pay the United States as provided for in this

486    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

487    in accordance with policies for Irrigation Water and M&I Water.  The Contractor's Rates shall

488    be established to recover its estimated reimbursable costs included in the operation and

489     maintenance component of the Rate and amounts established to recover deficits and other

490     charges, if any, including construction costs as identified in the following subdivisions.

491            (2)      In accordance with the WIIN Act, the Contractor's allocable share

492     of Project construction costs will be repaid pursuant to the provisions of this Contract.

493              (A)      The amount due and payable to the United States, pursuant

494     to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

495     computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

496     as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

497     installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

498     set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

499     as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

500     Officer in writing no later than thirty (30) days prior to the Effective Date if electing to repay the

501     amount due using the lump sum alternative. If such notice is not provided by such date, the

502     Contractor shall be deemed to have elected the installment payment alternative, in which case,

503     the first such payment shall be made no later than December 30, 2020. The second payment

504     shall be made no later than the first anniversary of the first payment date. The third payment

505     shall be made no later than the second anniversary of the first payment date. The final payment

506     shall be made no later than November 1, 2023. If the installment payment option is elected by

507     the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

508     by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

509     Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

510     methodology as was used to compute the initial annual installment payment amount, which is

511    illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

512    established, receipt of the Contractor's payment of the Repayment Obligation to the United

513    States shall fully and permanently satisfy the Existing Capital Obligation.

514                (B)    Additional Capital Obligations that are not reflected in, the

515    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

516    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

517    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

518    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

519    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

520    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

521    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

522    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

523    established by the Contractor and the Contracting Officer to accomplish repayment of the

524    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

525    WIIN Act, subject to the following:

526                (1)    If the collective Additional Capital Obligation

527    properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

528    is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

529    to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

530    notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

531    amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

532         (2)     If the collective Additional Capital Obligation

533   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

534   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

535   properly assignable to the Contractor shall be repaid as provided by applicable Federal

536   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

537   five million dollars ($5,000,000) shall not be a precedent in any other context.

538         (b)     In the event that the final cost allocation referenced in Section 4011(b) of

539   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

540   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

541   allocated costs. The term of such additional repayment contract shall be not less than one (1)

542   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

543   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

544   the event that the final cost allocation indicates that the costs properly assignable to the

545   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

546   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

547   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

548         (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

549   and Tiered Pricing Component as follows:

550         (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

551   provide the Contractor an estimate of the Charges for Project Water that will be applied to the

552   period October 1, of the current Calendar Year, through September 30, of the following Calendar

553   Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

554     to review and comment on such estimates. On or before September 15 of each Calendar Year,

555     the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

556     the period October 1 of the current Calendar Year, through September 30, of the following

557     Calendar Year, and such notification shall revise Exhibit "B."

558                (2)      Prior to October 1 of each Calendar Year, the Contracting Officer

559     shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

560     for Project Water for the following Year and the computations and cost allocations upon which

561     those Rates are based. The Contractor shall be allowed not less than two months to review and

562     comment on such computations and cost allocations. By December 31 of each Calendar Year,

563     the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

564     Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

565                (d)      At the time the Contractor submits the initial schedule for the delivery of

566     Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

567     Contractor shall make an advance payment to the United States equal to the total amount payable

568     pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

569     scheduled to be delivered pursuant to this Contract during the first two calendar months of the

570     Year. Before the end of the first month and before the end of each calendar month thereafter, the

571     Contractor shall make an advance payment to the United States, at the Rate(s) set under

572     subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

573     during the second month immediately following. Adjustments between advance payments for

574     Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

575     the following month; _Provided, That_ any revised schedule submitted by the Contractor pursuant

576    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

577    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

578    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

579    payment.  In any month in which the quantity of Water Delivered to the Contractor pursuant to

580    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

581    additional Project Water shall be delivered to the Contractor unless and until an advance

582    payment at the Rates then in effect for such additional Project Water is made.  Final adjustment

583    between the advance payments for the Water Scheduled and payments for the quantities of Water

584    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

585    later than April 30th of the following Year, or 60 days after the delivery of Project Water

586    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

587    the last day of February.

588              (e)    The Contractor shall also make a payment in addition to the Rate(s) in

589    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

590    appropriate Tiered Pricing Component then in effect, before the end of the month following the

591    month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

592    Pricing Component pursuant to subdivision (k)(2) of this Article.  The payments shall be

593    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

594    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

595    there is no Operating Non-Federal Entity, by the Contracting Officer.  The water delivery report

596    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

597    for Water Delivered.  Adjustment for overpayment or underpayment of Charges shall be made

598    through the adjustment of payments due to the United States for Charges for the next month.

599    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

600    be computed pursuant to Article 19 of this Contract.

601            (f)      The Contractor shall pay for any Water Delivered under subdivision (a),

602    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

603    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

604    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

605    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

606    under subdivision (a) of this Article.

607            (g)      Payments to be made by the Contractor to the United States under this

608    Contract may be paid from any revenues available to the Contractor.

609            (h)      All revenues received by the United States from the Contractor relating to

610    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

611    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

612    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

613            (i)      The Contracting Officer shall keep its accounts pertaining to the

614    administration of the financial terms and conditions of its long-term contracts, in accordance

615    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

616    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

617    Contractor a detailed accounting of all Project and Contractor expense allocations, the

618    disposition of all Project and Contractor revenues, and a summary of all water delivery

619    information. The Contracting Officer and the Contractor shall enter into good faith negotiations

620     to resolve any discrepancies or disputes relating to accountings, reports, or information.

621     (j)     The parties acknowledge and agree that the efficient administration of this

622     Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

623     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

624     and/or for making and allocating payments, other than those set forth in this Article may be in

625     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

626     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

627     this Contract is in effect without amending this Contract.

628     (k)     (1)     Beginning at such time as deliveries of Project Water in a Year

629     exceed 80 percent of the Contract Total, then before the end of the month following the month of

630     delivery the Contractor shall make an additional payment to the United States equal to the

631     applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

632     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

633     Contract Total, shall equal one-half of the difference between the Rate established under

634     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

635     Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

636     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

637     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

638     Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

639     subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

640     Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

641     the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

642          (2)          Subject to the Contracting Officer's written approval, the

643     Contractor may request and receive an exemption from such Tiered Pricing Component for

644     Project Water delivered to produce a crop which the Contracting Officer determines will provide

645     significant and quantifiable habitat values for waterfowl in fields where the water is used and the

646     crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

647     Irrigation Water shall apply only if such habitat values can be assured consistent with the

648     purposes of the CVPIA through binding agreements executed with or approved by the

649     Contracting Officer prior to use of such water.

650          (3)          For purposes of determining the applicability of the Tiered Pricing

651     Component pursuant to this Article, Water Delivered shall include Project Water that the

652     Contractor transfers to others but shall not include Project Water transferred to the Contractor,

653     nor shall it include the additional water provided to the Contractor under the provisions of

654     subdivision (f) of Article 3 of this Contract.

655          (l)          For the term of this Contract, Rates applied under the respective

656     ratesetting policies will be established to recover only reimbursable O&M (including any

657     deficits) and capital costs of the Project, as those terms are used in the then-current Project

658     ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

659     applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

660     practices which implement the Contracting Officer's ratesetting policies will not be implemented

661     until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

662     need, and impact of the proposed change.

663          (m)          Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

664    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

665    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

666    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

667    transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

668    lower Rates and Charges because of inability to pay and is transferring Project Water to another

669    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

670    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

671            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

672    Officer is authorized to adjust determinations of ability to pay every five years.

673            (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

674    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

675    of the date of this Contract or deficit-related interest charges thereon. By entering into this

676    Contract, the Contractor does not waive any legal rights or remedies that it may have with

677    respect to such disputed issues. Notwithstanding the execution of this Contract and payments

678    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

679    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

680    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

681    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

682    the Rates; (4) the application by the United States of payments made by the Contractor under its

683    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

684    application of such payments in the Rates. The Contracting Officer agrees that the Contractor

685    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

686    M&I contractor on any of these issues, and credits for payments heretofore made, provided that

687    the basis for such ruling is applicable to the Contractor.

688    <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

689    8.      The Contractor and the Contracting Officer concur that, as of the Effective Date

690    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

691    therefore.

692    <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

693    9.    (a)    The right to receive Project Water provided for in this Contract may be

694    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

695    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

696    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

697    Water under this Contract may take place without the prior written approval of the Contracting

698    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

699    exchanges shall be approved absent all appropriate environmental documentation, including, but

700    not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

701    documentation should include, as appropriate, an analysis of groundwater impacts and economic

702    and social effects, including environmental justice, of the proposed water transfers on both the

703    transferor and transferee.

704    (b)    In order to facilitate efficient water management by means of water

705    transfers of the type historically carried out among Project Contractors located within the same

706    geographical area and to allow the Contractor to participate in an accelerated water transfer

707    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

<div align="center">33</div>

708    all necessary environmental documentation, including, but not limited to, documents prepared

709    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

710    the Contracting Officer shall determine whether such transfers comply with applicable law.

711    Following the completion of the environmental documentation, such transfers addressed in such

712    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

713    require prior written approval by the Contracting Officer. Such environmental documentation

714    and the Contracting Officer's compliance determination shall be reviewed every five years and

715    updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

716    subsequent environmental documentation shall include an alternative to evaluate not less than the

717    quantity of Project Water historically transferred within the same geographical area.

718            (c)    For a water transfer to qualify under subdivision (b) of this Article, such

719    water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

720    years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

721    activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

722    be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

723    within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

724    through existing facilities with no new construction or modifications to facilities and be between

725    existing Project Contractors and/or the Contractor and the United States, Department of the

726    Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

727    requirements imposed for protection of the environment and Indian Trust Assets, as defined

728    under Federal law.

34

729 ## APPLICATION OF PAYMENTS AND ADJUSTMENTS

730    10.    (a)    The amount of any overpayment by the Contractor of the Contractor's

731  O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

732  liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

733  more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

734  of such overpayment, at the option of the Contractor, may be credited against amounts to become

735  due to the United States by the Contractor. With respect to overpayment, such refund or

736  adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

737  have the right to the use of any of the Project Water supply provided for by this Contract. All

738  credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

739  obtaining direction as to how to credit or refund such overpayment in response to the notice to

740  the Contractor that it has finalized the accounts for the Year in which the overpayment was

741  made.

742        (b)    All advances for miscellaneous costs incurred for work requested by the

743  Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

744  when the work has been completed. If the advances exceed the actual costs incurred, the

745  difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

746  advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

747  Contract.

748 ## TEMPORARY REDUCTIONS – RETURN FLOWS

749    11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

750  requirements of Federal law, and (ii) the obligations of the United States under existing

35

751    contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

752    Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

753    provided in this Contract.

754            (b)      The Contracting Officer or Operating Non-Federal Entity(ies) may

755    temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

756    provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

757    of the Project facilities or any part thereof necessary for the delivery of Project Water to the

758    Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

759    will give the Contractor due notice in advance of such temporary discontinuance or reduction,

760    except in case of emergency, in which case no notice need be given; _Provided, That_ the United

761    States shall use its best efforts to avoid any discontinuance or reduction in such service.  Upon

762    resumption of service after such discontinuance or reduction, and if requested by the Contractor,

763    the United States will, if possible, deliver the quantity of Project Water which would have been

764    delivered hereunder in the absence of such discontinuance or reduction.

765            (c)      The United States reserves the right to all seepage and return flow water

766    derived from Water Delivered to the Contractor hereunder which escapes or is discharged

767    beyond the Contractor's Service Area; _Provided, That_ this shall not be construed as claiming for

768    the United States any right to seepage or return flow being put to reasonable and beneficial use

769    pursuant to this Contract within the Contractor's Service Area by the Contractor or those

770    claiming by, through, or under the Contractor.

771                CONSTRAINTS ON THE AVAILABILITY OF WATER

772        12.     (a)      In its operation of the Project, the Contracting Officer will use all

773 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
774 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
775 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
776 Contractor of said determination as soon as practicable.

777       (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting
778 or other similar operational errors affecting the Project; drought and other physical or natural
779 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
780 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
781 17 of this Contract, no liability shall accrue against the United States or any of its officers,
782 agents, or employees for any damage, direct or indirect, arising therefrom.

783       (c)     In any Year in which there may occur a Condition of Shortage for any of

784 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

785 Article, the Contracting Officer will first allocate the available Project Water consistent with the

786 Project M&I Water Shortage Policy as finally adopted after environmental review for

787 determining the amount of Project Water Available for delivery to the Project Contractors.

788 Subject to the foregoing allocation, in any year in which there may occur a Condition of

789 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

790 others entitled to Project Water from Delta Division Facilities under long-term water service or

791 repayment contracts (or renewals thereof or binding commitments therefore) in force on

792 February 28, 2005, as follows:

793       (1)     The Contracting Officer shall make an initial and subsequent

794 determination as necessary of the total quantity of Project Water estimated to be scheduled or

795 actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

796 renewal, long-term water service or repayment contracts then in force for the delivery of Project

797 Water by the United States from Delta Division Facilities during the relevant Year, the quantity

798 so determined being hereinafter referred to as the scheduled total;

799          (2)     A determination shall be made of the total quantity of Project

800   Water that is available for meeting the scheduled total, the quantity so determined being

801   hereinafter referred to as the available supply;

802          (3)     The total quantity of Project Water estimated to be scheduled or

803   actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

804   of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

805   hereinafter referred to as the Contractor's proportionate share; and

806          (4)     The available supply shall be multiplied by the Contractor's

807   proportionate share and the result shall be the quantity of Project Water made available by the

808   United States to the Contractor for the relevant Year in accordance with the schedule developed

809   by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

810   amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

811   that the Contracting Officer can increase or needs to decrease the available supply for delivery

812   from Delta Division Facilities to long-term water service and repayment contractors during the

813   relevant Year, such additions or reductions to the available supply shall be apportioned

814   consistent with subparagraphs (1) through (4), inclusive.

815          (d)     By entering into this Contract, the Contractor does not waive any legal

816   rights or remedies it may have to file or participate in any administrative or judicial proceeding

817   contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

818   such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

819   implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

820   *That* the Contractor has commenced any such judicial challenge or any administrative procedures

38

821 necessary to institute any judicial challenge within six months of the policy becoming final. By

822 agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

823 that it may have to assert in such a proceeding. Nothing contained herein shall be interpreted to

824 validate or invalidate the Project M&I Water Shortage Policy.

825 <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

826 13. (a) To the extent applicable, the Contractor shall not be deemed to have

827 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

828 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

829 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

830 (b) Upon complete payment of the Repayment Obligation by the Contractor,

831 this Article 13 shall no longer be applicable.

832 <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

833 14. The parties agree that the delivery of Irrigation Water or use of Federal facilities
834 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
835 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and supplemented, and
836 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
837 law.

838 <u>PROTECTION OF WATER AND AIR QUALITY</u>

839 15. (a) Omitted

840 (b) The United States will care for, operate and maintain reserved works in a
841 manner that preserves the quality of the water at the highest level possible as determined by the
842 Contracting Officer. The United States does not warrant the quality of the water delivered to the
843 Contractor and is under no obligation to furnish or construct water treatment facilities to
844 maintain or improve the quality of water delivered to the Contractor.

845 (c) The Contractor will comply with all applicable water and air pollution
846 laws and regulations of the United States and the State of California; and will obtain all required
847 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
848 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,

849  State, and local water quality standards applicable to surface and subsurface drainage and/or
850  discharges generated through the use of Federal or Contractor facilities or Project Water
851  provided by the Contractor within its Service Area.

852       (d)  This Article shall not affect or alter any legal obligations of the Secretary
853  to provide drainage or other discharge services.

854       (e)  Omitted

855  WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
856                                STATES

857  16.  (a)  Water or water rights now owned or hereafter acquired by the Contractor

858  other than from the United States and Irrigation Water furnished pursuant to the terms of this

859  Contract may be simultaneously transported through the same distribution facilities of the

860  Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

861  and non-Project water were constructed without funds made available pursuant to Federal

862  Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

863  Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

864  Irrigation Water must be established through the certification requirements as specified in the

865  Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

866  Eligible Lands within the Contractor's Service Area can be established and the quantity of

867  Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

868  Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

869  Project water are (were) constructed with funds made available pursuant to Federal Reclamation

870  law, the non-Project water will be subject to the acreage limitation provisions of Federal

871  Reclamation law, unless the Contractor pays to the United States the incremental fee described in

872  43 CFR 426.15.  In determining the incremental fee, the Contracting Officer will calculate

40

873    annually the cost to the Federal Government, including interest, of storing or delivering non-

874    Project water, which for purposes of this Contract shall be determined as follows: The quotient

875    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

876    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

877    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

878    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

879    within the Contractor's Service Area that receives non-Project water through Federally financed

880    or constructed facilities. The incremental fee calculation methodology will continue during the

881    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

882    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

883    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

884    adopted, it shall supersede this provision.

885            (b)    Water or water rights now owned or hereafter acquired by the Contractor,

886    other than from the United States may be stored, conveyed, and/or diverted through Project

887    facilities, subject to the completion of appropriate environmental documentation, with the

888    approval of the Contracting Officer and the execution of any contract determined by the

889    Contracting Officer to be necessary, consistent with the following provisions:

890            (1)    The Contractor may introduce non-Project water into Project

891    facilities and deliver said water to lands within the Contractor's Service Area, including

892    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

893    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

894    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

895    use power policy is applicable, each as amended, modified, or superseded from time to time.

896             (2)     Delivery of such non-Project water in and through Project facilities

897    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

898    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

899    available to other Project Contractors; (iii) interfere with the delivery of contractual water

900    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

901    the Project facilities.

902             (3)     Neither the United States nor the Operating Non-Federal

903    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

904    is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

905    releases and agrees to defend and indemnify the United States and the Operating Non-Federal

906    Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

907    persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

908    employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

909    (ii) diverting such non-Project water into Project facilities.

910             (4)     Diversion of such non-Project water into Project facilities shall be

911    consistent with all applicable laws, and if involving groundwater, consistent with any applicable

912    groundwater management plan for the area from which it was extracted.

913             (5)     After Project purposes are met, as determined by the Contracting

914    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

915    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

916    available by the Contracting Officer for conveyance and transportation of non-Project water prior

917 to any such remaining capacity being made available to non-Project contractors. Other Project

918 Contractors shall have a second priority to any remaining capacity of facilities declared to be

919 available by the Contracting Officer for conveyance and transportation of non-Project water prior

920 to any such remaining capacity being made available to non-Project contractors.

921     (c)     Upon complete payment of the Repayment Obligation by the Contractor,

922 subdivision (a) of this Article 16 shall no longer be applicable.

<div align="center">OPINIONS AND DETERMINATIONS</div>

924     17.     (a)     Where the terms of this Contract provide for actions to be based upon the

925 opinion or determination of either party to this Contract, said terms shall not be construed as

926 permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

927 determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

928 reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

929 or unreasonable opinion or determination. Each opinion or determination by either party shall be

930 provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

931 affect or alter the standard of judicial review applicable under Federal law to any opinion or

932 determination implementing a specific provision of Federal law embodied in statute or

933 regulation.

934     (b)     The Contracting Officer shall have the right to make determinations

935 necessary to administer this Contract that are consistent with the provisions of this Contract, the

936 laws of the United States and of the State of California, and the rules and regulations

937 promulgated by the Secretary. Such determinations shall be made in consultation with the

938 Contractor to the extent reasonably practicable.

<div align="center">43</div>

939 <u>COORDINATION AND COOPERATION</u>

940     18.   (a)     In order to further their mutual goals and objectives, the Contracting

941 Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

942 with other affected Project Contractors, in order to improve the O&M of the Project. The

943 communication, coordination, and cooperation regarding O&M shall include, but not be limited

944 to, any action which will or may materially affect the quantity or quality of Project Water supply,

945 the allocation of Project Water supply, and Project financial matters including, but not limited to,

946 budget issues. The communication, coordination, and cooperation provided for hereunder shall

947 extend to all provisions of this Contract. Each party shall retain exclusive decision making

948 authority for all actions, opinions, and determinations to be made by the respective party.

949     (b)     Within 120 days following the Effective Date, the Contractor, other

950 affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

951 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

952 amended as necessary separate and apart from this Contract. The goal of this process shall be to

953 provide, to the extent practicable, the means of mutual communication and interaction regarding

954 significant decisions concerning Project O&M on a real-time basis.

955     (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

956 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

957 intent:

958         (1)     The Contracting Officer will, at the request of the Contractor,

959 assist in the development of integrated resource management plans for the Contractor. Further,

960 the Contracting Officer will, as appropriate, seek authorizations for implementation of

44

961 partnerships to improve water supply, water quality, and reliability.

962         (2)     The Secretary will, as appropriate, pursue program and project

963 implementation and authorization in coordination with Project Contractors to improve the water

964 supply, water quality, and reliability of the Project for all Project purposes.

965         (3)     The Secretary will coordinate with Project Contractors and the

966 State of California to seek improved water resource management.

967         (4)     The Secretary will coordinate actions of agencies within the

968 Department of the Interior that may impact the availability of water for Project purposes.

969         (5)     The Contracting Officer shall periodically, but not less than

970 annually, hold division-level meetings to discuss Project operations, division-level water

971 management activities, and other issues as appropriate.

972         (d)     Without limiting the contractual obligations of the Contracting Officer

973 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

974 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

975 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

976 protect health, safety, or the physical integrity of structures or facilities.

977 <u>CHARGES FOR DELINQUENT PAYMENTS</u>

978     19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
979 charges on delinquent payments. If a payment is not received by the due date, the Contractor
980 shall pay an interest charge on the delinquent payment for each day the payment is delinquent
981 beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
982 addition to the interest charge, an administrative charge to cover additional costs of billing and
983 processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
984 shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
985 payment is delinquent beyond the due date, based on the remaining balance of the payment due

45

986 at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
987 collection services associated with a delinquent payment.

988       (b)    The interest rate charged shall be the greater of either the rate prescribed
989 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
990 payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
991 determined as of the due date and remain fixed for the duration of the delinquent period.

992       (c)    When a partial payment on a delinquent account is received, the amount
993 received shall be applied first to the penalty charges, second to the administrative charges, third
994 to the accrued interest, and finally to the overdue payment.

995 <div align="center"><u>EQUAL EMPLOYMENT OPPORTUNITY</u></div>

996     20.    During the performance of this Contract, the Contractor agrees as follows:

997       (a)    The Contractor will not discriminate against any employee or applicant for
998 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
999 origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1000 that employees are treated during employment, without regard to their race, color, religion, sex,
1001 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1002 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1003 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1004 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1005 places, available to employees and applicants for employment, notices to be provided by the
1006 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1007       (b)    The Contractor will, in all solicitations or advertisements for employees
1008 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1009 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1010 gender identity, or national origin.

1011       (c)    The Contractor will not discharge or in any other manner discriminate
1012 against any employee or applicant for employment because such employee or applicant has
1013 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1014 employee or applicant. This provision shall not apply to instances in which an employee who
1015 has access to the compensation information of other employees or applicants as part of such
1016 employee's essential job functions discloses the compensation of such other employees or
1017 applicants to individuals who do not otherwise have access to such information, unless such
1018 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1019 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1020 consistent with the Contractor's legal duty to furnish information.

<div align="center">46</div>

1021         (d)     The Contractor will send to each labor union or representative of workers
1022 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1023 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1024 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1025 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1026 applicants for employment.

1027         (e)     The Contractor will comply with all provisions of Executive Order No.
1028 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1029 Labor.

1030         (f)     The Contractor will furnish all information and reports required by
1031 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1032 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1033 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1034 compliance with such rules, regulations, and orders.

1035         (g)     In the event of the Contractor's noncompliance with the nondiscrimination
1036 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1037 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1038 ineligible for further Government contracts in accordance with procedures authorized in
1039 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1040 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1041 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1042         (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1043 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1044 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1045 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1046 will take such action with respect to any subcontract or purchase order as may be directed by the
1047 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1048 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1049 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1050 Contractor may request the United States to enter into such litigation to protect the interests of
1051 the United States.

1052         GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1053     21.     (a)     The obligation of the Contractor to pay the United States as provided in
1054 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1055 obligation may be distributed among the Contractor's water users and notwithstanding the default
1056 of individual water users in their obligation to the Contractor.

1057         (b)     The payment of charges becoming due pursuant to this Contract is a
1058 condition precedent to receiving benefits under this Contract. The United States shall not make
1059 water available to the Contractor through Project facilities during any period in which the
1060 Contractor is in arrears in the advance payment of water rates due the United States. The
1061 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1062 parties that are in arrears in the advance payment of water rates as levied or established by the
1063 Contractor.

1064         (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1065 obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1067     22.     (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1068 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1069 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1070 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1071 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1072 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1073 Interior and/or Bureau of Reclamation.

1074         (b)     These statutes prohibit any person in the United States from being
1075 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1076 discrimination under any program or activity receiving financial assistance from the Bureau of
1077 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1078 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1079 obligation, including permitting officials of the United States to inspect premises, programs, and
1080 documents.

1081         (c)     The Contractor makes this Contract in consideration of and for the
1082 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1083 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1084 Reclamation, including installment payments after such date on account of arrangements for
1085 Federal financial assistance which were approved before such date. The Contractor recognizes
1086 and agrees that such Federal assistance will be extended in reliance on the representations and
1087 agreements made in this Article and that the United States reserves the right to seek judicial
1088 enforcement thereof.

1089         (d)     Complaints of discrimination against the Contractor shall be investigated
1090 by the Contracting Officer's Office of Civil Rights.

<p style="text-align: center;">PRIVACY ACT COMPLIANCE</p>

1091

1092 23. (a) The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1093 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1094 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1095 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1096 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1097 C.F.R. § 426.18.

1098 (b) With respect to the application and administration of the criminal penalty
1099 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1100 employees who are responsible for maintaining the certification and reporting records referenced
1101 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1102 U.S.C. § 552a(m).

1103 (c) The Contracting Officer or a designated representative shall provide the
1104 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1105 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1106 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1107 information contained in the Landholders' certification and reporting records.

1108 (d) The Contracting Officer shall designate a full-time employee of the
1109 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1110 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1111 The Contractor is authorized to grant requests by individuals for access to their own records.

1112 (e) The Contractor shall forward promptly to the System Manager each
1113 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1114 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1115 System Manager with information and records necessary to prepare an appropriate response to
1116 the requester. These requirements do not apply to individuals seeking access to their own
1117 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1118 the requester elects to cite the Privacy Act as an authority for the request.

1119 (f) Upon complete payment of the Repayment Obligation by the Contractor,

1120 this Article 23 will no longer be applicable.

<p style="text-align: center;">CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</p>

1121

1122 24. In addition to all other payments to be made by the Contractor pursuant to this

1123 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

<p style="text-align: center;">49</p>

1124     detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1125     of direct cost incurred by the United States for work requested by the Contractor associated with

1126     this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1127     and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1128     to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1129     contract administration.

1130     <u>WATER CONSERVATION</u>

1131     25.    (a)     Prior to the delivery of water provided from or conveyed through
1132     Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1133     shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1134     Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1135     Additionally, an effective water conservation and efficiency program shall be based on the

1136     Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1137     the conservation and efficiency criteria for evaluating water conservation plans established under

1138     Federal law. The water conservation and efficiency program shall contain definite water

1139     conservation objectives, appropriate economically feasible water conservation measures, and

1140     time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1141     Contract shall be contingent upon the Contractor's continued implementation of such water

1142     conservation program. In the event the Contractor's water conservation plan or any revised water

1143     conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1144     determined by the Contracting Officer to meet such criteria, due to circumstances which the

1145     Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1146     made under this Contract so long as the Contractor diligently works with the Contracting Officer

1147    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1148    immediately begins implementing its water conservation and efficiency program in accordance

1149    with the time schedules therein.

1150            (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1151    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1152    Contractor shall implement the Best Management Practices identified by the time frames issued

1153    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1154    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1155    the Contractor.

1156            (c)    The Contractor shall submit to the Contracting Officer a report on the

1157    status of its implementation of the water conservation plan on the reporting dates specified in the

1158    then-existing conservation and efficiency criteria established under Federal law.

1159            (d)    At five (5)-year intervals, the Contractor shall revise its water

1160    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1161    water conservation plans established under Federal law and submit such revised water

1162    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1163    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1164    existing conservation and efficiency criteria for evaluating water conservation plans established

1165    under Federal law.

1166            (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1167    shall be described in the Contractor's water conservation plan.

1168             <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1169          26.      Except as specifically provided in Article 16 of this Contract, the provisions of

1170   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1171   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1172   Area. Any such water shall not be considered Project Water under this Contract. In addition,

1173   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1174   any water user within the Contractor's Service Area acquires or has available under any other

1175   contract pursuant to Federal Reclamation law.

1176   <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1177          27.     (a)      The O&M of a portion of the Project facilities which serve the Contractor,

1178   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1179   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1180   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1181   Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1182   affect the rights or obligations of the Contractor or the United States hereunder.

1183             (b)      The Contracting Officer has previously notified the Contractor in writing

1184   that the O&M of a portion of the Project facilities which serve the Contractor has been

1185   transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1186   therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1187   Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1188   the terms and conditions of the separate agreement between the United States and the Operating

1189   Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1190    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1191    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1192    such successor determines, sets, or establishes for the O&M of the portion of the Project

1193    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1194    Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1195    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1196    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1197    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1198    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1199    United States in accordance with the separate agreement identified in subdivision (a) of this

1200    Article.

1201    (c)    For so long as the O&M of any portion of the Project facilities serving the

1202    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1203    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1204    Rates for Water Delivered under this Contract representing the cost associated with the activity

1205    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1206    or its successor.

1207    (d)    In the event the O&M of the Project facilities operated and maintained by

1208    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1209    the United States during the term of this Contract, the Contracting Officer shall so notify the

1210    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1211    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1212     representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1213     The Contractor shall, thereafter, in the absence of written notification from the Contracting

1214     Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1215     revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1216     <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1217     28.     The expenditure or advance of any money or the performance of any obligation of
1218     the United States under this Contract shall be contingent upon appropriation or allotment of
1219     funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1220     obligations under this Contract. No liability shall accrue to the United States in case funds are
1221     not appropriated or allotted.

1222     <u>BOOKS, RECORDS, AND REPORTS</u>

1223     29.    (a)     The Contractor shall establish and maintain accounts and other books and
1224     records pertaining to administration of the terms and conditions of this Contract, including the
1225     Contractor's financial transactions; water supply data; project operations, maintenance, and
1226     replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1227     census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1228     Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1229     such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1230     and regulations, each party to this Contract shall have the right during office hours to examine
1231     and make copies of the other party's books and records relating to matters covered by this
1232     Contract.

1233     (b)     Notwithstanding the provisions of subdivision (a) of this Article, no

1234     books, records, or other information shall be requested from the Contractor by the Contracting

1235     Officer unless such books, records, or information are reasonably related to the administration or

1236     performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1237     time within which to provide the requested books, records, or information.

1238     (c)     At such time as the Contractor provides information to the Contracting

1239     Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1240     to the Operating Non-Federal Entity(ies).

1241 <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1242     30.    (a)    The provisions of this Contract shall apply to and bind the successors and
1243 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1244 therein by either party shall be valid until approved in writing by the other party.

1245     (b)    The assignment of any right or interest in this Contract by either party

1246 shall not interfere with the rights or obligations of the other party to this Contract absent the

1247 written concurrence of said other party.

1248     (c)    The Contracting Officer shall not unreasonably condition or withhold

1249 approval of any proposed assignment.

1250 <u>SEVERABILITY</u>

1251     31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1252 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1253 an association or other form of organization whose primary function is to represent parties to

1254 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1255 enforceability of a provision included in this Contract and said person, entity, association, or

1256 organization obtains a final court decision holding that such provision is legally invalid or

1257 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1258 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1259 final court decision identify by mutual agreement the provisions in this Contract which must be

1260 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1261 The time periods specified above may be extended by mutual agreement of the parties. Pending

1262 the completion of the actions designated above, to the extent it can do so without violating any

1263 applicable provisions of law, the United States shall continue to make the quantities of Project

1264 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1265 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1266 <div align="center">RESOLUTION OF DISPUTES</div>

1267    32.    Should any dispute arise concerning any provisions of this Contract, or the

1268 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1269 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1270 Officer referring any matter to the Department of Justice, the party shall provide to the other

1271 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1272 not be required where a delay in commencing an action would prejudice the interests of the party

1273 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1274 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1275 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1276 or the United States may have.

1277 <div align="center">OFFICIALS NOT TO BENEFIT</div>

1278    33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1279 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1280 same manner as other water users or landowners.

1281 <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1282    34.    (a)    While this Contract is in effect, no change may be made in the
1283 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1284 changes which may affect the respective rights, obligations, privileges, and duties of either the
1285 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1286 consolidation, or merger, except upon the Contracting Officer's written consent.

1287    (b)    Within 30 days of receipt of a request for such a change, the Contracting

1288 Officer will notify the Contractor of any additional information required by the Contracting

<div align="center">56</div>

1289 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1290 schedule for timely completion of the process. Such process will analyze whether the proposed

1291 change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1292 (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1293 to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1294 have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1295 Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1296 responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1297 be paid in accordance with Article 24 of this Contract.

<div align="center">FEDERAL LAWS</div>

1298

1299      35.     By entering into this Contract, the Contractor does not waive its rights to contest

1300 the validity or application in connection with the performance of the terms and conditions of this

1301 Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1302 the terms and conditions of this Contract unless and until relief from application of such Federal

1303 law or regulation to the implementing provision of the Contract is granted by a court of

1304 competent jurisdiction.

<div align="center">RECLAMATION REFORM ACT OF 1982</div>

1305

1306      36.    (a)     Upon a Contractor's compliance with and discharge of the Repayment

1307 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1308 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1309           (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1310 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

<div align="center">57</div>

1311 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1312 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1313      CERTIFICATION OF NONSEGREGATED FACILITIES

1314    37.  The Contractor hereby certifies that it does not maintain or provide for its
1315 employees any segregated facilities at any of its establishments and that it does not permit its
1316 employees to perform their services at any location under its control where segregated facilities
1317 are maintained. It certifies further that it will not maintain or provide for its employees any
1318 segregated facilities at any of its establishments and that it will not permit its employees to
1319 perform their services at any location under its control where segregated facilities are
1320 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1321 Employment Opportunity clause in this Contract. As used in this certification, the term
1322 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1323 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1324 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1325 facilities provided for employees which are segregated by explicit directive or are in fact
1326 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1327 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1328 identical certifications from proposed subcontractors for specific time periods) it will obtain
1329 identical certifications from proposed subcontractors prior to the award of subcontracts
1330 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1331 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1332 following notice to such proposed subcontractors (except where the proposed subcontractors
1333 have submitted identical certifications for specific time periods):

1334    NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1335      CERTIFICATIONS OF NONSEGREGATED FACILITIES

1336 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1337 exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1338 Opportunity clause. The certification may be submitted either for each subcontract or for all
1339 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1340 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1341           NOTICES

1342    38.  Any notice, demand, or request authorized or required by this Contract shall be
1343 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1344 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1345 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1346 postage prepaid, or delivered to the Board of Directors of the West Stanislaus Irrigation District,

1347 P.O. Box 37, Westley, California 95387. The designation of the addressee or the address may be
1348 changed by notice given in the same manner as provided in this Article for other notices.

1349 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1350    39.    (a)    All payments from the Contractor to the United States under this Contract
1351 shall be by the medium requested by the United States on or before the date payment is due. The
1352 required method of payment may include checks, wire transfers, or other types of payment
1353 specified by the United States.

1354            (b)    Upon execution of this Contract, the Contractor shall furnish the
1355 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1356 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1357 out of the Contractor's relationship with the United States.

1358 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1359    40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1360 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1361 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1362 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1363 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1364 <u>CONFIRMATION OF CONTRACT</u>

1365    41.    Promptly after the execution of this amended Contract, the Contractor will
1366 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1367 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1368 for the authorization of the execution of this amended Contract. This amended Contract shall not
1369 be binding on the United States until the Contractor secures a final decree.

1370

1371       IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1372   day and year first above written.

1373                   UNITED STATES OF AMERICA

1374                   By: _____
1375                          Regional Director
1376                          Interior Region 10: California-Great Basin
1377                          Bureau of Reclamation

1378                   WEST STANISLAUS IRRIGATION DISTRICT
1379

1380                   By: _____
1381                          President of the Board of Directors

1382   Attest:

1383   By: _____
1384          Secretary of the Board of Directors

1371     IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1372   day and year first above written.

1373                                                    UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:21:52 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**

1374   **TIME STAMP:** 1:37 pm, May 11 2020        By: _____
1375                                                        Regional Director
1376                                                        Interior Region 10: California-Great Basin
1377                                                        Bureau of Reclamation


1378                                                    WEST STANISLAUS IRRIGATION DISTRICT
1379   (SEAL)


1380                                                    By: _____
1381                                                        President of the Board of Directors


1382   Attest:


1383   By: _____
1384       Secretary of the Board of Directors

60



**West Stanislaus Irrigation District**

Contract No. 14-06-200-1072-LTR1-P

Exhibit A

Legend:
- ▨ District Boundary
- ◇ Contractor's Service Area

BUREAU OF RECLAMATION

Date: 4/1/2020
File Name: N:\Districts\Contracts\w_stanislaus\w_stanislaus_20200401.mxd

0   1   2 Miles

N

214-202-886

## EXHIBIT B
## WEST STANISLAUS IRRIGATION DISTRICT
### 2020 Rates and Charges
### (Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $121.51 | |
| DMC Aqueduct Intertie | $0.90 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost | $0.78 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $150.17 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

## The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which equals a M&I Historic use average quantity of 0 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

Unpaid Construction Cost from the 2020 Water Rate Books*

| Contractor: | West Stanislaus Irrigation District |
|---|---|
| Facility: | Delta-Mendota Canal |
| Contract: | 14-06-200-1072-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

|  |  | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 7,420,674 |  |
| 2019 Repayment (Estimate) ** |  |  |  |
| Adjusted Construction Cost | $ | 7,420,674 | $ 7,202,529 |
| Intertie Construction Cost (N/A): | $ | 220,902 | $ 197,847 |
| Total | $ | 7,641,576 | $ 7,400,376 |

If Paid in Installments (Used 20 yr CMT)

|  | Due**** |  |  |
|---|---|---|---|
| Payment 1 | 9/1/2020 | $ | 1,873,278 |
| Payment 2 | 9/1/2021 | $ | 1,873,278 |
| Payment 3 | 9/1/2022 | $ | 1,873,278 |
| Payment 4 ~~~ | 9/1/2023 | $ | 1,873,278 |
| Total Installment Payments |  | $ | 7,493,111 |

| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
|---|---|
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

|  |  | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** |  |  |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
|  | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 7,420,674 | $ 674,607 | $ 670,985 | $ 220,902 | $ 5,021 | $ 4,994 | $ 675,979 |
| 2021 | $ 6,746,067 | $ 674,607 | $ 667,911 | $ 215,882 | $ 5,021 | $ 4,971 | $ 672,882 |
| 2022 | $ 6,071,461 | $ 674,607 | $ 664,588 | $ 210,861 | $ 5,021 | $ 4,946 | $ 669,534 |
| 2023 | $ 5,396,854 | $ 674,607 | $ 661,282 | $ 205,841 | $ 5,021 | $ 4,921 | $ 666,203 |
| 2024 | $ 4,722,247 | $ 674,607 | $ 657,992 | $ 200,820 | $ 5,021 | $ 4,897 | $ 662,888 |
| 2025 | $ 4,047,640 | $ 674,607 | $ 654,718 | $ 195,800 | $ 5,021 | $ 4,872 | $ 659,591 |
| 2026 | $ 3,373,034 | $ 674,607 | $ 651,461 | $ 190,779 | $ 5,021 | $ 4,848 | $ 656,309 |
| 2027 | $ 2,698,427 | $ 674,607 | $ 648,220 | $ 185,759 | $ 5,021 | $ 4,824 | $ 653,044 |
| 2028 | $ 2,023,820 | $ 674,607 | $ 644,995 | $ 180,738 | $ 5,021 | $ 4,800 | $ 649,795 |
| 2029 | $ 1,349,213 | $ 674,607 | $ 641,786 | $ 175,718 | $ 5,021 | $ 4,776 | $ 646,562 |
| 2030 | $ 674,607 | $ 674,607 | $ 638,593 | $ 170,697 | $ 5,021 | $ 4,752 | $ 643,345 |
| 2031-63 |  |  |  | $ 165,677 | $ 165,677 | $ 144,245 | $ 144,245 |
| Total, Lump Sum Payment |  | $ 7,202,529 |  |  |  | $ 197,847 | $ 7,400,376 |
| | | | | | | | |
| Amount of Reduction, Lump Sum |  | $ 218,145 |  |  |  | $ 23,055 | $ 241,200 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need
update, they are still required. Also, unpaid charges are still a requirement under contract.
\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.
\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.
\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.
~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.
[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.
~~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 3**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
Banta-Carbona Irrigation District
3517 West Lehman Road
Tracy, CA 95304

Subject: Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-4305A-</u><u>LTR1-P</u> Between the United States and the Banta-Carbona Irrigation District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of Reclamation appreciates the effort expended by the Banta-Carbona Irrigation District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

*Sheri A. Looper*

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
BANTA-CARBONA IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 7 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 14 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 34 |
| 9. | Sales, Transfers, or Exchanges of Water | 34 |
| 10. | Application of Payments and Adjustments | 36 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 40 |
| 14. | Compliance with Federal Reclamation Laws | 40 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 41 |
| 17. | Opinions and Determinations | 44 |
| 18. | Coordination and Cooperation | 45 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 47 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 49 |
| 23. | Privacy Act Compliance | 50 |
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 51 |
| 26. | Existing or Acquired Water or Water Rights | 53 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 53 |
| 28. | Contingent on Appropriation or Allotment of Funds | 55 |
| 29. | Books, Records, and Reports | 55 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 56 |
| 31. | Severability | 56 |
| 32. | Resolution of Disputes | 57 |
| 33. | Officials Not to Benefit | 57 |
| 34. | Changes in Contractor's Organization and/or Service Area | 57 |
| 35. | Federal Laws | 58 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 59 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 60 |
| 40. | Contract Drafting Considerations | 60 |
| 41. | Confirmation of Contract | 60 |
|  | Signature Page | 61 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
BANTA-CARBONA IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1    THIS CONTRACT, made this 22nd day of October, 20 20, in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and BANTA-CARBONA

12   IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13   of California, duly organized, existing, and acting pursuant to the laws thereof;

14   WITNESSETH, That:

15 ## EXPLANATORY RECITALS

16     [1st]     WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22     [2nd]     WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25     [3rd]     WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27     [4th]     WHEREAS, the United States and the Contractor entered into Contract

28 No. 14-06-200-4305A, as amended, which established terms for the delivery to the Contractor

29 of Project Water from the Delta Division facilities from February 14, 1969, through February 28,

30 1995; and

31     [5th]     WHEREAS, the United States and the Contractor have pursuant to

32 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33 entered into interim renewal contract(s) identified as Contract No. 14-06-200-4305A-IR1 and

34 subsequent Interim Renewal Contracts 14-06-200-4305A-IR2 through 14-06-200-4305A-IR8,

35 which provided for water service to the Contractor from March 1, 1995 through February 28,

36 2006; and

37           [6th]    WHEREAS, the United States and the Contractor entered into a long-term

38  contract identified as Contract No. 14-06-200-4305A-LTR1, hereinafter referred to as the

39  Existing Contract, which provided for the continued water service to the Contractor following

40  expiration of Contract No. 14-06-200-4305A-IR8, and which was in effect the date the WIIN Act

41  was enacted; and

42           [7th]    WHEREAS, pursuant to a June 5, 2001, "Agreement for Assignment of

43  Entitlement to CVP Water Between the City of Tracy and the Banta-Carbona Irrigation District,"

44  the Contractor assigned to the City of Tracy 5,000 acre-feet of the Contractor's entitlement to

45  Project Water under Contract No. 14-06-200-4305-IR7, which assignment is reflected in the

46  decreased quantity of Water Made Available under subdivision (a) of Article 3 of this Contract;

47  and

48           [8th]    WHEREAS, on February 27, 2004, the Contractor, the United States, and

49  the City of Tracy entered into an "Agreement for Assignment of Portion of Water Service

50  Contract" ("Assignment Agreement"), wherein the United States approved the assignment of

51  5,000 acre-feet of water under Contractor No. 14-06-200-4305A-IR7, as then being implemented

52  through Contract No. 14-06-200-4305A-B, to the City of Tracy; and

53           [9th]    WHEREAS, the Existing Contract reflects completion of the assignment,

54  referenced in 7th recital above, by reducing the quantity of Project Water made available to the

55  Contractor from 25,000 to 20,000 acre-feet; and

56           [10th]  WHEREAS, on December 16, 2016, the 114th Congress of the United

57        States of America enacted the WIIN Act; and

58        [11th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

59    contractor, the Secretary of the Interior shall convert any water service contract in effect on the

60    date of enactment of this subtitle and between the United States and a water users' association

61    [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

62    mutually agreeable terms and conditions."; and

63        [12th]   WHEREAS, Section 4011(a)(1) further provides that "the manner of

64    conversion under this paragraph shall be as follows: (A) Water service contracts that were

65    entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted

66    under this section shall be converted to repayment contracts under section 9(d) of that Act (53

67    Stat. 1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of

68    section 9 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall

69    be converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

70        [13th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

71    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

72    repayment, exchange and transfer contractual rights between the water users' association

73    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

74    water users' association [Contractor] and their landowners as provided under State law."; and

75        [14th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

76    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

77    service or repayment contractor to receive water; or (4) except as expressly provided in this

78    section, any obligations under the Federal Reclamation law, including the continuation of

4

79 Restoration Fund charges pursuant to Section 3407(d) (Pub. L. 102-575), of the water service

80 and repayment contractors making prepayments pursuant to this section."; and

81       [15th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

82 Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

83 service contracts into repayment contracts, amend existing repayment contracts, and allow

84 contractors to prepay their construction cost obligations pursuant to applicable Federal

85 Reclamation law; and

86       [16th] WHEREAS, the United States has determined that the Contractor has

87 fulfilled all of its obligations under the Existing Contract; and

88       [17th] WHEREAS, the Contractor has demonstrated to the satisfaction of the

89 Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

90 reasonable and beneficial use and/or has demonstrated future demand for water use such that the

91 Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

92 quantity of Project Water to be made available to it pursuant to this Contract; and

93       [18th] WHEREAS, water obtained from the Project has been relied upon by

94 urban and agricultural areas within California for more than 50 years, and is considered by the

95 Contractor as an essential portion of its water supply; and

96       [19th] WHEREAS, the economies of regions within the Project, including the

97 Contractor's, depend upon the continued availability of water, including water service from the

98 Project; and

99            [20th]  WHEREAS, the Secretary intends through coordination, cooperation, and

100    partnerships to pursue measures to improve water supply, water quality, and reliability of the

101    Project for all Project purposes; and

102           [21st]  WHEREAS, the mutual goals of the United States and the Contractor

103    include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

104    achieve repayment of the Project as required by law; to guard reasonably against Project Water

105    shortages; to achieve a reasonable balance among competing demands for use of Project Water;

106    and to comply with all applicable environmental statutes, all consistent with the legal obligations

107    of the United States relative to the Project; and

108           [22nd]  WHEREAS, the parties intend by this Contract to maintain a cooperative

109    relationship in order to achieve their mutual goals; and

110           [23rd]  WHEREAS, the Contractor has utilized or may utilize transfers, contract

111    assignments, rescheduling, and conveyance of Project Water and non-Project water under this

112    Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

113    beneficial use of water; and

114           [24th]  WHEREAS, the parties desire and intend that this Contract not provide a

115    disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

116    Explanatory Recital immediately above; and

117           [25th]  WHEREAS, the Contracting Officer and the Contractor agree that this

118    Contract complies with Section 4011 of the WIIN Act; and

119         [26th]   WHEREAS, the Contracting Officer and the Contractor agree to amend

120   and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

121   Reclamation law on the terms and conditions set forth below.

122         NOW, THEREFORE, in consideration of the mutual and dependent covenants

123   herein contained, it is hereby mutually agreed by the parties hereto as follows:

124                      <u>DEFINITIONS</u>

125     1.       When used herein unless otherwise distinctly expressed, or manifestly

126   incompatible with the intent of the parties as expressed in this Contract, the term:

127         (a)    "Additional Capital Obligation" shall mean construction costs or other

128   capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

129   Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

130   (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

131   Stat. 1628) ("WIIN Act");

132         (b)    "Calendar Year" shall mean the period January 1 through December 31,

133   both dates inclusive;

134         (c)    "Charges" shall mean the payments required by Federal Reclamation law

135   in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

136   annually by the Contracting Officer pursuant to this Contract;

137         (d)    "Condition of Shortage" shall mean a condition respecting the Project

138   during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

139   Contract Total;

140          (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

141 authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

142 or regulation;

143          (f)     "Contract Total" shall mean the maximum amount of water to which the

144 Contractor is entitled under subdivision (a) of Article 3 of this Contract;

145          (g)     "Contractor's Service Area" shall mean the area to which the Contractor is

146 permitted to provide Project Water under this Contract as described in Exhibit "A" attached

147 hereto, which may be modified from time to time in accordance with Article 34 of this Contract

148 without amendment of this Contract;

149          (h)     "CVPIA" shall mean the Central Valley Project Improvement Act, Title

150 XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

151          (i)     "Delta Division Facilities" shall mean those existing and future Project

152 facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

153 the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

154 Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

155 Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

156          (j)     "Eligible Lands" shall mean all lands to which Irrigation Water may be

157 delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

158 1263), as amended;

159          (k)     "Excess Lands" shall mean all lands in excess of the limitations contained

160 in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

161 acreage limitation under Federal Reclamation law;

162  (l)  "Existing Capital Obligation" shall mean the remaining amount of

163  construction costs or other capitalized costs allocable to the Contractor as described in Section

164  4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

165  Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

166  in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

167  Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

168  Exhibit "C", which is incorporated herein by reference;

169  (m)  "Full Cost Rate" shall mean an annual rate, as determined by the

170  Contracting Officer that shall amortize the expenditures for construction properly allocable to the

171  Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

172  deficits funded, less payments, over such periods as may be required under Federal Reclamation

173  law, or applicable contract provisions.  Interest will accrue on both the construction expenditures

174  and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

175  date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

176  in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

177  The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

178  Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

179  (n)  "Ineligible Lands" shall mean all lands to which Irrigation Water may not

180  be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

181  (o)  "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

182  to the delivery of Irrigation Water;

183        (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
184  primarily for the production of commercial agricultural crops or livestock, and domestic and
185  other uses that are incidental thereto;

186        (q)    "Landholder" shall mean a party that directly or indirectly owns or leases
187  nonexempt land, as provided in 43 CFR 426.2;

188        (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
189  Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
190  of "Irrigation Water" or within another category of water use under an applicable Federal
191  authority;

192        (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to
193  the delivery of M&I Water;

194        (t)    "Operation and Maintenance" or "O&M" shall mean normal and
195  reasonable care, control, operation, repair, replacement (other than capital replacement), and
196  maintenance of Project facilities;

197        (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)
198  successors or assigns, which has (have) the obligation to operate and maintain all or a portion of
199  the Delta Division Facilities pursuant to written agreement(s) with the United States. When this
200  Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota
201  Water Authority;

202        (v)    "Project" shall mean the Central Valley Project owned by the United
203  States and managed by the Department of the Interior, Bureau of Reclamation;

204        (w)    "Project Contractors" shall mean all parties who have contracts for water
205  service for Project Water from the Project with the United States pursuant to Federal
206  Reclamation law;

207         (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

208    delivered by the Secretary in accordance with the statutes authorizing the Project and in

209    accordance with the terms and conditions of water rights acquired pursuant to California law;

210         (y)     "Rates" shall mean the payments determined annually by the Contracting

211    Officer in accordance with the then-current applicable water ratesetting policies for the Project,

212    as described in subdivision (a) of Article 7 of this Contract;

213         (z)     "Recent Historic Average" shall mean the most recent five (5)-year

214    average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

215    or its preceding contract(s);

216         (aa)     "Repayment Obligation" for Water Delivered as Irrigation Water shall

217    mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

218    amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

219    Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

220    United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

221         (bb)     "Secretary" shall mean the Secretary of the Interior, a duly appointed

222    successor, or an authorized representative acting pursuant to any authority of the Secretary and

223    through any agency of the Department of the Interior;

224         (cc)     "Tiered Pricing Component" shall be the incremental amount to be paid

225    for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

226    for in Exhibit "B";

227        (dd)   "Water Delivered" or "Delivered Water" shall mean Project Water

228   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

229   Officer;

230        (ee)   "Water Made Available" shall mean the estimated amount of Project

231   Water that can be delivered to the Contractor for the upcoming Year as declared by the

232   Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

233        (ff)   "Water Scheduled" shall mean Project Water made available to the

234   Contractor for which times and quantities for delivery have been established by the Contractor

235   and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

236        (gg)   "Year" shall mean the period from and including March 1 of each

237   Calendar Year through the last day of February of the following Calendar Year.

238             <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

239   2.    (a)   This Contract shall be effective November 1, 2020, hereinafter known as

240   the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

241   Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

242   (53 Stat. 1195) as applicable, and applicable law;

243        (1)   <u>*Provided, That*</u> the Contracting Officer shall not seek to terminate

244   this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

245   unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

246   to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

247 or to diligently commence and maintain full curative payments satisfactory to the Contracting

248 Officer within the sixty (60) calendar days' notice period;

249     (2) *Provided, further, That* the Contracting Officer shall not seek to

250 suspend making water available or declaring Water Made Available pursuant to this Contract for

251 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

252 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

253 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

254 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

255 cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

256 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

257 satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

258 available and declaring Water Made Available pursuant to this Contract;

259     (3) *Provided, further, That* this Contract may be terminated at any

260 time by mutual consent of the parties hereto.

261    (b) Upon complete payment of the Repayment Obligation by the Contractor,

262 and notwithstanding any Additional Capital Obligation that may later be established, the acreage

263 limitations, reporting, and Full Cost pricing provisions of the Reclamation Reform Act of 1982,

264 and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

265 this Contract shall no longer be applicable.

266    (c) Notwithstanding any provision of this Contract, the Contractor reserves

267 and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

268 allowed by law.

13

269       (d)     Notwithstanding any provision of this Contract, the Contractor reserves

270   and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

271   allowed by law.

272       <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

273     3.     (a)     During each Year, consistent with all applicable State water rights permits,

274   and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

275   Contract, the Contracting Officer shall make available for delivery to the Contractor 20,000 acre-

276   feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

277   accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

278   Articles 4 and 7 of this Contract.

279       (b)     Because the capacity of the Project to deliver Project Water has been

280   constrained in recent years and may be constrained in the future due to many factors including

281   hydrologic conditions and implementation of Federal and State laws, the likelihood of the

282   Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

283   Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

284   programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

285   CVPIA projected that the Contract Total set forth in this Contract will not be available to the

286   Contractor in many years. During the most recent five years prior to execution of the Existing

287   Contract, the Recent Historic Average Water Made Available to the Contractor was 13,160 acre-

288   feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

289   parties under any provision of this Contract.

290        (c)    The Contractor shall utilize the Project Water in accordance with all

291 applicable legal requirements.

292        (1)    In the event any Project Contractor (other than a Cross Valley

293 Contractor) that receives Project Water through the Delta Division Facilities obtains a

294 contractual agreement that the Contracting Officer shall make Project Water available at a point

295 or points of delivery in or north of the Delta, at the request of the Contractor and upon

296 completion of any required environmental documentation, this Contract shall be amended to

297 provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

298 this Contract shall be limited solely to those changes made necessary by the addition of such

299 alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

300 of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

301 amendment.

302        (d)    The Contractor shall make reasonable and beneficial use of all water

303 furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

304 groundwater banking programs, surface water storage programs, and other similar programs

305 utilizing Project Water or other water furnished pursuant to this Contract conducted within the

306 Contractor's Service Area which are consistent with applicable State law and result in use

307 consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

308 program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

309 Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

310 sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

311 the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

312     compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

313     banking programs, surface water storage programs, and other similar programs utilizing Project

314     Water or other water furnished pursuant to this Contract conducted outside the Contractor's

315     Service Area may be permitted upon written approval of the Contracting Officer, which approval

316     will be based upon environmental documentation, Project Water rights, and Project operational

317     concerns. The Contracting Officer will address such concerns in regulations, policies, or

318     guidelines.

319            (e)     The Contractor shall comply with requirements applicable to the

320     Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

321     of any water service contract between the Contracting Officer and the Contractor in effect

322     immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

323     Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

324     implement. The Existing Contract, which evidences in excess of 36 years of diversions for

325     irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

326     Article 3 of this Contract, will be considered in developing an appropriate baseline for any

327     required biological assessment(s) prepared pursuant to the ESA, and any other needed

328     environmental review. Nothing herein shall be construed to prevent the Contractor from

329     challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

330     biological opinion or other environmental documentation referred to in this Article.

331            (f)     Following the declaration of Water Made Available under Article 4 of this

332     Contract, the Contracting Officer will make a determination whether Project Water, or other

333     water available to the Project, can be made available to the Contractor in addition to the Contract

334    Total under this Article during the Year without adversely impacting other Project Contractors.

335    At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

336    making such a determination. If the Contracting Officer determines that Project Water, or other

337    water available to the Project, can be made available to the Contractor, the Contracting Officer

338    will announce the availability of such water and shall so notify the Contractor as soon as

339    practical. The Contracting Officer will thereafter meet with the Contractor and other Project

340    Contractors capable of taking such water to determine the most equitable and efficient allocation

341    of such water. If the Contractor requests the delivery of any quantity of such water, the

342    Contracting Officer shall make such water available to the Contractor in accordance with

343    applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

344    contractual commitments, water rights, and operational constraints, long-term Project

345    Contractors shall have a first right to acquire such water, including Project Water made available

346    pursuant to Section 215 of the Reclamation Reform Act of 1982.

347            (g)      The Contractor may request permission to reschedule for use during the

348    subsequent Year some or all of the Water Made Available to the Contractor during the current

349    Year, referred to as "rescheduled water." The Contractor may request permission to use during

350    the current Year a quantity of Project Water which may be made available by the United States

351    to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

352    written approval may permit such uses in accordance with applicable statutes, regulations,

353    guidelines, and policies.

354            (h)      The Contractor's right pursuant to Federal Reclamation law and applicable

355    State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

356 shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

357 Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

358 August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

359 sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

360 subdivision (b) of Article 12 of this Contract.

361 (i) Project Water furnished to the Contractor pursuant to this Contract may be

362 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

363 Contract upon written approval by the Contracting Officer in accordance with the terms and

364 conditions of such approval.

365 (j) The Contracting Officer shall make reasonable efforts to protect the water

366 rights necessary for the Project and to provide the water available under this Contract. The

367 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

368 extent permitted by law, in administrative proceedings related to the Project Water rights;

369 *Provided, That* the Contracting Officer retains the right to object to the substance of the

370 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

371 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

372 Contract to use Project Water.

373 <u>TIME FOR DELIVERY OF WATER</u>

374 4. (a) On or about February 20 each Calendar Year, the Contracting Officer shall

375 announce the Contracting Officer's expected declaration of the Water Made Available. Such

376 declaration will be expressed in terms of Water Made Available and the Recent Historic Average

377 and will be updated monthly, and more frequently if necessary, based on the then-current

18

378    operational and hydrologic conditions and a new declaration with changes, if any, to the Water

379    Made Available will be made. The Contracting Officer shall provide forecasts of Project

380    operations and the basis of the estimate, with relevant supporting information, upon the written

381    request of the Contractor. Concurrently with the declaration of the Water Made Available, the

382    Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

383            (b)     On or before each March 1 and at such other times as necessary, the

384    Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

385    Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

386    United States to the Contractor pursuant to this Contract for the Year commencing on such

387    March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

388    according to the approved schedule for the Year commencing on such March 1.

389            (c)     The Contractor shall not schedule Project Water in excess of the quantity

390    of Project Water the Contractor intends to put to reasonable and beneficial use within the

391    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

392    during any Year.

393            (d)     Subject to the conditions set forth in subdivision (a) of Article 3 of this

394    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

395    initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

396    written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

397    time prior to the date(s) on which the requested change(s) is/are to be implemented.

398 <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

399     5.     (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

400 Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

401 any additional point or points of delivery either on Project facilities or another location or

402 locations mutually agreed to in writing by the Contracting Officer and the Contractor.

403     (b)     The Contracting Officer, either directly or indirectly through its written

404 agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

405 maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

406 the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

407 Article.

408     (c)     The Contractor shall deliver Irrigation Water in accordance with any

409 applicable land classification provisions of Federal Reclamation law and the associated

410 regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

411 Service Area unless approved in advance by the Contracting Officer.

412     (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

413 measured and recorded with equipment furnished, installed, operated, and maintained by the

414 Contracting Officer either directly or indirectly through its written agreements(s) with the

415 Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

416 Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

417 this Article. Upon the request of either party to this Contract, the Contracting Officer shall

418 investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

419 accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

420     therein. For any period of time when accurate measurements have not been made, the

421     Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

422     Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

423     of time.

424             (e)      Absent a separate contrary written agreement with the Contractor, neither

425     the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

426     control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

427     pursuant to this Contract beyond the point or points of delivery established pursuant to

428     subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

429     employees, agents, and assigns on account of damage or claim of damage of any nature

430     whatsoever for which there is legal responsibility, including property damage, personal injury, or

431     death arising out of or connected with the control, carriage, handling, use, disposal, or

432     distribution of such Water Delivered beyond such point or points of delivery except for any

433     damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

434     officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

435     the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

436     Contracting Officer or any of its officers, employees, agents, and assigns, including the

437     Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

438     officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

439     a malfunction of facilities owned and/or operated by the United States or the Operating Non-

440     Federal Entity(ies).

441    <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

442    6.    (a)    The Contractor has established a measuring program satisfactory to the

443    Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

444    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

445    water delivered for M&I purposes is measured at each M&I service connection. The water

446    measuring devices or water measuring methods of comparable effectiveness must be acceptable

447    to the Contracting Officer. The Contractor shall be responsible for installing, operating,

448    maintaining, and repairing all such measuring devices and implementing all such water

449    measuring methods at no cost to the United States. The Contractor shall use the information

450    obtained from such water measuring devices or water measuring methods to ensure its proper

451    management of the water; to bill water users for water delivered by the Contractor; and, if

452    applicable, to record water delivered for M&I purposes by customer class as defined in the

453    Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

454    contained, however, shall preclude the Contractor from establishing and collecting any charges,

455    assessments, or other revenues authorized by California law. The Contractor shall include a

456    summary of all its annual surface water deliveries in the annual report described in subdivision

457    (c) of Article 25 of this Contract.

458    (b)    To the extent the information has not otherwise been provided, upon

459    execution of this Contract, the Contractor shall provide to the Contracting Officer a written

460    report describing the measurement devices or water measuring methods being used or to be used

461    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

462    service connections or alternative measurement programs approved by the Contracting Officer,

463  at which such measurement devices or water measuring methods are being used, and, if

464  applicable, identifying the locations at which such devices and/or methods are not yet being used

465  including a time schedule for implementation at such locations. The Contracting Officer shall

466  advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

467  if any, of the measuring devices or water measuring methods identified in the Contractor's report

468  and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

469  the Contracting Officer notifies the Contractor that the measuring devices or methods are

470  inadequate, the parties shall within 60 days following the Contracting Officer's response,

471  negotiate in good faith the earliest practicable date by which the Contractor shall modify said

472  measuring devices and/or measuring methods as required by the Contracting Officer to ensure

473  compliance with subdivision (a) of this Article.

474        (c)    All new surface water delivery systems installed within the Contractor's

475  Service Area after the Effective Date shall also comply with the measurement provisions

476  described in subdivision (a) of this Article.

477        (d)    The Contractor shall inform the Contracting Officer and the State of

478  California in writing by April 30 of each Year of the monthly volume of surface water delivered

479  within the Contractor's Service Area during the previous Year.

480        (e)    The Contractor shall inform the Contracting Officer and the Operating

481  Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

482  Irrigation Water and M&I Water taken during the preceding month.

| | |
|---|---|
| 483 | **RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED** |
| 484 | **REPAYMENT OF FACILITIES** |

485    7.    (a)    Notwithstanding the Contractor's full prepayment of the Repayment

486    Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

487    Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

488    (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

489    Article, subsection (b), the Contractor's Project construction and other obligations shall be

490    determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

491    in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

492    WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

493    a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

494    rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

495    shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

496    agreed to in writing by the Contractor and the Contracting Officer.  The Rates, Charges, and

497    Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

498    forth in Exhibit "B", as may be revised annually.

499                        (1)    The Contractor shall pay the United States as provided for in this

500    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

501    in accordance with policies for Irrigation Water and M&I Water.  The Contractor's Rates shall

502    be established to recover its estimated reimbursable costs included in the operation and

503   maintenance component of the Rate and amounts established to recover deficits and other

504   charges, if any, including construction costs as identified in the following subdivisions.

505             (2)       In accordance with the WIIN Act, the Contractor's allocable share

506   of Project construction costs will be repaid pursuant to the provisions of this Contract.

507             (A)       The amount due and payable to the United States, pursuant

508   to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

509   computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

510   as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

511   installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

512   set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

513   as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

514   Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

515   amount due using the lump sum alternative. If such notice is not provided by such date, the

516   Contractor shall be deemed to have elected the installment payment alternative, in which case,

517   the first such payment shall be made no later than December 30, 2020. The second payment

518   shall be made no later than the first anniversary of the first payment date. The third payment

519   shall be made no later than the second anniversary of the first payment date. The final payment

520   shall be made no later than November 1, 2023. If the installment payment option is elected by

521   the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

522   by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

523   Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

524   methodology as was used to compute the initial annual installment payment amount, which is

25

525     illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

526     established, receipt of the Contractor's payment of the Repayment Obligation to the United

527     States shall fully and permanently satisfy the Existing Capital Obligation.

528                 (B)     Additional Capital Obligations that are not reflected in, the

529     schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

530     prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

531     Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

532     Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

533     Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

534     the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

535     be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

536     however, will be considered under subdivision (b) of this Article. A separate agreement shall be

537     established by the Contractor and the Contracting Officer to accomplish repayment of the

538     Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

539     WIIN Act, subject to the following:

540                 (1)     If the collective Additional Capital Obligation

541     properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

542     is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

543     to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

544     notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

545     amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

546                                   (2)       If the collective Additional Capital Obligation

547   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

548   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

549   properly assignable to the Contractor shall be repaid as provided by applicable Federal

550   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

551   five million dollars ($5,000,000) shall not be a precedent in any other context.

552                                (b)       In the event that the final cost allocation referenced in Section 4011(b) of

553   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

554   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

555   allocated costs. The term of such additional repayment contract shall be not less than one (1)

556   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

557   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

558   the event that the final cost allocation indicates that the costs properly assignable to the

559   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

560   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

561   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

562                                (c)       The Contracting Officer shall notify the Contractor of the Rates, Charges,

563   and Tiered Pricing Component as follows:

564                                   (1)       Prior to July 1 of each Calendar Year, the Contracting Officer shall

565   provide the Contractor an estimate of the Charges for Project Water that will be applied to the

566   period October 1, of the current Calendar Year, through September 30, of the following Calendar

567   Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

27

568 to review and comment on such estimates. On or before September 15 of each Calendar Year,

569 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

570 the period October 1 of the current Calendar Year, through September 30, of the following

571 Calendar Year, and such notification shall revise Exhibit "B."

572     (2) Prior to October 1 of each Calendar Year, the Contracting Officer

573 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

574 for Project Water for the following Year and the computations and cost allocations upon which

575 those Rates are based. The Contractor shall be allowed not less than two months to review and

576 comment on such computations and cost allocations. By December 31 of each Calendar Year,

577 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

578 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

579     (d) At the time the Contractor submits the initial schedule for the delivery of

580 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

581 Contractor shall make an advance payment to the United States equal to the total amount payable

582 pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

583 scheduled to be delivered pursuant to this Contract during the first two calendar months of the

584 Year. Before the end of the first month and before the end of each calendar month thereafter, the

585 Contractor shall make an advance payment to the United States, at the Rate(s) set under

586 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

587 during the second month immediately following. Adjustments between advance payments for

588 Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

589 the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

28

590   to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

591   Contract during any month shall be accompanied with appropriate advance payment, at the Rates

592   then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

593   payment.  In any month in which the quantity of Water Delivered to the Contractor pursuant to

594   this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

595   additional Project Water shall be delivered to the Contractor unless and until an advance

596   payment at the Rates then in effect for such additional Project Water is made.  Final adjustment

597   between the advance payments for the Water Scheduled and payments for the quantities of Water

598   Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

599   later than April 30th of the following Year, or 60 days after the delivery of Project Water

600   rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

601   the last day of February.

602          (e)     The Contractor shall also make a payment in addition to the Rate(s) in

603   subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

604   appropriate Tiered Pricing Component then in effect, before the end of the month following the

605   month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

606   Pricing Component pursuant to subdivision (k)(2) of this Article.  The payments shall be

607   consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

608   water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

609   there is no Operating Non-Federal Entity, by the Contracting Officer.  The water delivery report

610   shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

611   for Water Delivered.  Adjustment for overpayment or underpayment of Charges shall be made

29

612 through the adjustment of payments due to the United States for Charges for the next month.

613 Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

614 be computed pursuant to Article 19 of this Contract.

615        (f)    The Contractor shall pay for any Water Delivered under subdivision (a),

616 (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

617 applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

618 policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

619 Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

620 under subdivision (a) of this Article.

621        (g)    Payments to be made by the Contractor to the United States under this

622 Contract may be paid from any revenues available to the Contractor.

623        (h)    All revenues received by the United States from the Contractor relating to

624 the delivery of Project Water or the delivery of non-Project water through Project facilities shall

625 be allocated and applied in accordance with Federal Reclamation law and the associated rules or

626 regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

627        (i)    The Contracting Officer shall keep its accounts pertaining to the

628 administration of the financial terms and conditions of its long-term contracts, in accordance

629 with applicable Federal standards, so as to reflect the application of Project costs and revenues.

630 The Contracting Officer shall, each Year upon request of the Contractor, provide to the

631 Contractor a detailed accounting of all Project and Contractor expense allocations, the

632 disposition of all Project and Contractor revenues, and a summary of all water delivery

633 information. The Contracting Officer and the Contractor shall enter into good faith negotiations

30

634 to resolve any discrepancies or disputes relating to accountings, reports, or information.

635         (j)      The parties acknowledge and agree that the efficient administration of this

636 Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

637 policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

638 and/or for making and allocating payments, other than those set forth in this Article may be in

639 the mutual best interest of the parties, it is expressly agreed that the parties may enter into

640 agreements to modify the mechanisms, policies, and procedures for any of those purposes while

641 this Contract is in effect without amending this Contract.

642         (k)    (1)    Beginning at such time as deliveries of Project Water in a Year

643 exceed 80 percent of the Contract Total, then before the end of the month following the month of

644 delivery the Contractor shall make an additional payment to the United States equal to the

645 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

646 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

647 Contract Total, shall equal one-half of the difference between the Rate established under

648 subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

649 Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

650 Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

651 the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

652 Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

653 subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

654 Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

655 the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

656      (2)  Subject to the Contracting Officer's written approval, the

657 Contractor may request and receive an exemption from such Tiered Pricing Component for

658 Project Water delivered to produce a crop which the Contracting Officer determines will provide

659 significant and quantifiable habitat values for waterfowl in fields where the water is used and the

660 crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

661 Irrigation Water shall apply only if such habitat values can be assured consistent with the

662 purposes of the CVPIA through binding agreements executed with or approved by the

663 Contracting Officer prior to use of such water.

664      (3)  For purposes of determining the applicability of the Tiered Pricing

665 Component pursuant to this Article, Water Delivered shall include Project Water that the

666 Contractor transfers to others but shall not include Project Water transferred to the Contractor,

667 nor shall it include the additional water provided to the Contractor under the provisions of

668 subdivision (f) of Article 3 of this Contract.

669      (l)  For the term of this Contract, Rates applied under the respective

670 ratesetting policies will be established to recover only reimbursable O&M (including any

671 deficits) and capital costs of the Project, as those terms are used in the then-current Project

672 ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

673 applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

674 practices which implement the Contracting Officer's ratesetting policies will not be implemented

675 until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

676 need, and impact of the proposed change.

677      (m)  Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

678   CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

679   in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

680   reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

681   transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

682   lower Rates and Charges because of inability to pay and is transferring Project Water to another

683   entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

684   for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

685          (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

686   Officer is authorized to adjust determinations of ability to pay every five years.

687          (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

688   not legally obligated to pay any Project deficits claimed by the United States to have accrued as

689   of the date of this Contract or deficit-related interest charges thereon.  By entering into this

690   Contract, the Contractor does not waive any legal rights or remedies that it may have with

691   respect to such disputed issues.  Notwithstanding the execution of this Contract and payments

692   made hereunder, the Contractor may challenge in the appropriate administrative or judicial

693   forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

694   term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

695   interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

696   the Rates; (4) the application by the United States of payments made by the Contractor under its

697   Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

698   application of such payments in the Rates.  The Contracting Officer agrees that the Contractor

699   shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

700    M&I contractor on any of these issues, and credits for payments heretofore made, provided that

701    the basis for such ruling is applicable to the Contractor.

702    <u>NON-INTEREST BEARING O&M DEFICITS</u>

703    8.     The Contractor and the Contracting Officer concur that, as of the Effective Date

704    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

705    therefore.

706    <u>SALES, TRANSFERS, OR EXCHANGES OF WATER</u>

707    9.    (a)     The right to receive Project Water provided for in this Contract may be

708    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

709    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

710    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

711    Water under this Contract may take place without the prior written approval of the Contracting

712    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

713    exchanges shall be approved absent all appropriate environmental documentation, including, but

714    not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

715    documentation should include, as appropriate, an analysis of groundwater impacts and economic

716    and social effects, including environmental justice, of the proposed water transfers on both the

717    transferor and transferee.

718    (b)     In order to facilitate efficient water management by means of water

719    transfers of the type historically carried out among Project Contractors located within the same

720    geographical area and to allow the Contractor to participate in an accelerated water transfer

721    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

722 all necessary environmental documentation, including, but not limited to, documents prepared

723 pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

724 the Contracting Officer shall determine whether such transfers comply with applicable law.

725 Following the completion of the environmental documentation, such transfers addressed in such

726 documentation shall be conducted with advance notice to the Contracting Officer, but shall not

727 require prior written approval by the Contracting Officer. Such environmental documentation

728 and the Contracting Officer's compliance determination shall be reviewed every five years and

729 updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

730 subsequent environmental documentation shall include an alternative to evaluate not less than the

731 quantity of Project Water historically transferred within the same geographical area.

732        (c)        For a water transfer to qualify under subdivision (b) of this Article, such

733 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

734 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

735 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

736 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

737 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

738 through existing facilities with no new construction or modifications to facilities and be between

739 existing Project Contractors and/or the Contractor and the United States, Department of the

740 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

741 requirements imposed for protection of the environment and Indian Trust Assets, as defined

742 under Federal law.

743 APPLICATION OF PAYMENTS AND ADJUSTMENTS

744       10.   (a)    The amount of any overpayment by the Contractor of the Contractor's

745 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

746 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

747 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

748 of such overpayment, at the option of the Contractor, may be credited against amounts to become

749 due to the United States by the Contractor. With respect to overpayment, such refund or

750 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

751 have the right to the use of any of the Project Water supply provided for by this Contract. All

752 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

753 obtaining direction as to how to credit or refund such overpayment in response to the notice to

754 the Contractor that it has finalized the accounts for the Year in which the overpayment was

755 made.

756            (b)    All advances for miscellaneous costs incurred for work requested by the

757 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

758 when the work has been completed. If the advances exceed the actual costs incurred, the

759 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

760 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

761 Contract.

762 TEMPORARY REDUCTIONS – RETURN FLOWS

763       11.   (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

764 requirements of Federal law, and (ii) the obligations of the United States under existing

765 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

766 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

767 provided in this Contract.

768       (b)    The Contracting Officer or Operating Non-Federal Entity(ies) may

769 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

770 provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

771 of the Project facilities or any part thereof necessary for the delivery of Project Water to the

772 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

773 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

774 except in case of emergency, in which case no notice need be given; _Provided, That_ the United

775 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

776 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

777 the United States will, if possible, deliver the quantity of Project Water which would have been

778 delivered hereunder in the absence of such discontinuance or reduction.

779       (c)    The United States reserves the right to all seepage and return flow water

780 derived from Water Delivered to the Contractor hereunder which escapes or is discharged

781 beyond the Contractor's Service Area; _Provided, That_ this shall not be construed as claiming for

782 the United States any right to seepage or return flow being put to reasonable and beneficial use

783 pursuant to this Contract within the Contractor's Service Area by the Contractor or those

784 claiming by, through, or under the Contractor.

785              CONSTRAINTS ON THE AVAILABILITY OF WATER

786    12.   (a)    In its operation of the Project, the Contracting Officer will use all

37

787 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
788 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
789 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
790 Contractor of said determination as soon as practicable.

791         (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
792 or other similar operational errors affecting the Project; drought and other physical or natural
793 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
794 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
795 17 of this Contract, no liability shall accrue against the United States or any of its officers,
796 agents, or employees for any damage, direct or indirect, arising therefrom.

797         (c)    In any Year in which there may occur a Condition of Shortage for any of

798 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

799 Article, the Contracting Officer will first allocate the available Project Water consistent with the

800 Project M&I Water Shortage Policy as finally adopted after environmental review for

801 determining the amount of Project Water Available for delivery to the Project Contractors.

802 Subject to the foregoing allocation, in any year in which there may occur a Condition of

803 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

804 others entitled to Project Water from Delta Division Facilities under long-term water service or

805 repayment contracts (or renewals thereof or binding commitments therefore) in force on

806 February 28, 2005, as follows:

807         (1)    The Contracting Officer shall make an initial and subsequent

808 determination as necessary of the total quantity of Project Water estimated to be scheduled or

809 actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

810 renewal, long-term water service or repayment contracts then in force for the delivery of Project

811 Water by the United States from Delta Division Facilities during the relevant Year, the quantity

812 so determined being hereinafter referred to as the scheduled total;

38

813          (2)     A determination shall be made of the total quantity of Project

814   Water that is available for meeting the scheduled total, the quantity so determined being

815   hereinafter referred to as the available supply;

816          (3)     The total quantity of Project Water estimated to be scheduled or

817   actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

818   of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

819   hereinafter referred to as the Contractor's proportionate share; and

820          (4)     The available supply shall be multiplied by the Contractor's

821   proportionate share and the result shall be the quantity of Project Water made available by the

822   United States to the Contractor for the relevant Year in accordance with the schedule developed

823   by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

824   amount exceed the Contract Total. In the event the Contracting Officer subsequently determines

825   that the Contracting Officer can increase or needs to decrease the available supply for delivery

826   from Delta Division Facilities to long-term water service and repayment contractors during the

827   relevant Year, such additions or reductions to the available supply shall be apportioned

828   consistent with subparagraphs (1) through (4), inclusive.

829          (d)     By entering into this Contract, the Contractor does not waive any legal

830   rights or remedies it may have to file or participate in any administrative or judicial proceeding

831   contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

832   such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

833   implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

834   *That* the Contractor has commenced any such judicial challenge or any administrative procedures

835 necessary to institute any judicial challenge within six months of the policy becoming final. By

836 agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

837 that it may have to assert in such a proceeding. Nothing contained herein shall be interpreted to

838 validate or invalidate the Project M&I Water Shortage Policy.

839 ## UNAVOIDABLE GROUNDWATER PERCOLATION

840 13. (a) To the extent applicable, the Contractor shall not be deemed to have

841 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

842 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

843 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

844 (b) Upon complete payment of the Repayment Obligation by the Contractor,

845 this Article 13 shall no longer be applicable.

846 ## COMPLIANCE WITH FEDERAL RECLAMATION LAWS

847 14. The parties agree that the delivery of Irrigation Water or use of Federal facilities
848 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
849 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
850 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
851 law.

852 ## PROTECTION OF WATER AND AIR QUALITY

853 15. (a) Omitted

854 (b) The United States will care for, operate and maintain reserved works in a
855 manner that preserves the quality of the water at the highest level possible as determined by the
856 Contracting Officer. The United States does not warrant the quality of the water delivered to the
857 Contractor and is under no obligation to furnish or construct water treatment facilities to
858 maintain or improve the quality of water delivered to the Contractor.

859 (c) The Contractor will comply with all applicable water and air pollution
860 laws and regulations of the United States and the State of California; and will obtain all required
861 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
862 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,

863 State, and local water quality standards applicable to surface and subsurface drainage and/or
864 discharges generated through the use of Federal or Contractor facilities or Project Water
865 provided by the Contractor within its Service Area.

866         (d)     This Article shall not affect or alter any legal obligations of the Secretary
867 to provide drainage or other discharge services.

868         (e)     Omitted

869 <u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
870 STATES</u>

871     16.    (a)     Water or water rights now owned or hereafter acquired by the Contractor

872 other than from the United States and Irrigation Water furnished pursuant to the terms of this

873 Contract may be simultaneously transported through the same distribution facilities of the

874 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

875 and non-Project water were constructed without funds made available pursuant to Federal

876 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

877 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

878 Irrigation Water must be established through the certification requirements as specified in the

879 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

880 Eligible Lands within the Contractor's Service Area can be established and the quantity of

881 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

882 Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

883 Project water are (were) constructed with funds made available pursuant to Federal Reclamation

884 law, the non-Project water will be subject to the acreage limitation provisions of Federal

885 Reclamation law, unless the Contractor pays to the United States the incremental fee described in

886 43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

887 annually the cost to the Federal Government, including interest, of storing or delivering non-

888 Project water, which for purposes of this Contract shall be determined as follows: The quotient

889 shall be the unpaid distribution system costs divided by the total irrigable acreage within the

890 Contractor's Service Area. The incremental fee per acre is the mathematical result of such

891 quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

892 (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

893 within the Contractor's Service Area that receives non-Project water through Federally financed

894 or constructed facilities. The incremental fee calculation methodology will continue during the

895 term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

896 regulation, or policy adopted after the Contractor has been afforded the opportunity to review

897 and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

898 adopted, it shall supersede this provision.

899            (b)      Water or water rights now owned or hereafter acquired by the Contractor,

900 other than from the United States may be stored, conveyed, and/or diverted through Project

901 facilities, subject to the completion of appropriate environmental documentation, with the

902 approval of the Contracting Officer and the execution of any contract determined by the

903 Contracting Officer to be necessary, consistent with the following provisions:

904            (1)      The Contractor may introduce non-Project water into Project

905 facilities and deliver said water to lands within the Contractor's Service Area, including

906 Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

907 Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

908 policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

42

909    use power policy is applicable, each as amended, modified, or superseded from time to time.

910    (2)    Delivery of such non-Project water in and through Project facilities

911    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

912    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

913    available to other Project Contractors; (iii) interfere with the delivery of contractual water

914    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

915    the Project facilities.

916    (3)    Neither the United States nor the Operating Non-Federal

917    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

918    is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

919    releases and agrees to defend and indemnify the United States and the Operating Non-Federal

920    Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

921    persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

922    employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

923    (ii) diverting such non-Project water into Project facilities.

924    (4)    Diversion of such non-Project water into Project facilities shall be

925    consistent with all applicable laws, and if involving groundwater, consistent with any applicable

926    groundwater management plan for the area from which it was extracted.

927    (5)    After Project purposes are met, as determined by the Contracting

928    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

929    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

930    available by the Contracting Officer for conveyance and transportation of non-Project water prior

931 to any such remaining capacity being made available to non-Project contractors. Other Project

932 Contractors shall have a second priority to any remaining capacity of facilities declared to be

933 available by the Contracting Officer for conveyance and transportation of non-Project water prior

934 to any such remaining capacity being made available to non-Project contractors.

935         (c)     Upon complete payment of the Repayment Obligation by the Contractor,

936 subdivision (a) of this Article 16 shall no longer be applicable.

937                   OPINIONS AND DETERMINATIONS

938     17.     (a)     Where the terms of this Contract provide for actions to be based upon the

939 opinion or determination of either party to this Contract, said terms shall not be construed as

940 permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

941 determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

942 reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

943 or unreasonable opinion or determination. Each opinion or determination by either party shall be

944 provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

945 affect or alter the standard of judicial review applicable under Federal law to any opinion or

946 determination implementing a specific provision of Federal law embodied in statute or

947 regulation.

948         (b)     The Contracting Officer shall have the right to make determinations

949 necessary to administer this Contract that are consistent with the provisions of this Contract, the

950 laws of the United States and of the State of California, and the rules and regulations

951 promulgated by the Secretary. Such determinations shall be made in consultation with the

952 Contractor to the extent reasonably practicable.

953 <u>COORDINATION AND COOPERATION</u>

954     18.   (a)     In order to further their mutual goals and objectives, the Contracting

955 Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

956 with other affected Project Contractors, in order to improve the O&M of the Project. The

957 communication, coordination, and cooperation regarding O&M shall include, but not be limited

958 to, any action which will or may materially affect the quantity or quality of Project Water supply,

959 the allocation of Project Water supply, and Project financial matters including, but not limited to,

960 budget issues. The communication, coordination, and cooperation provided for hereunder shall

961 extend to all provisions of this Contract. Each party shall retain exclusive decision making

962 authority for all actions, opinions, and determinations to be made by the respective party.

963         (b)     Within 120 days following the Effective Date, the Contractor, other

964 affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

965 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

966 amended as necessary separate and apart from this Contract. The goal of this process shall be to

967 provide, to the extent practicable, the means of mutual communication and interaction regarding

968 significant decisions concerning Project O&M on a real-time basis.

969         (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

970 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

971 intent:

972               (1)     The Contracting Officer will, at the request of the Contractor,

973 assist in the development of integrated resource management plans for the Contractor. Further,

974 the Contracting Officer will, as appropriate, seek authorizations for implementation of

975 partnerships to improve water supply, water quality, and reliability.

976           (2)      The Secretary will, as appropriate, pursue program and project

977 implementation and authorization in coordination with Project Contractors to improve the water

978 supply, water quality, and reliability of the Project for all Project purposes.

979           (3)      The Secretary will coordinate with Project Contractors and the

980 State of California to seek improved water resource management.

981           (4)      The Secretary will coordinate actions of agencies within the

982 Department of the Interior that may impact the availability of water for Project purposes.

983           (5)      The Contracting Officer shall periodically, but not less than

984 annually, hold division-level meetings to discuss Project operations, division-level water

985 management activities, and other issues as appropriate.

986       (d)      Without limiting the contractual obligations of the Contracting Officer

987 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

988 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

989 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

990 protect health, safety, or the physical integrity of structures or facilities.

991 <div align="center">CHARGES FOR DELINQUENT PAYMENTS</div>

992     19.   (a)      The Contractor shall be subject to interest, administrative, and penalty
993 charges on delinquent payments. If a payment is not received by the due date, the Contractor
994 shall pay an interest charge on the delinquent payment for each day the payment is delinquent
995 beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
996 addition to the interest charge, an administrative charge to cover additional costs of billing and
997 processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
998 shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
999 payment is delinquent beyond the due date, based on the remaining balance of the payment due

1000     at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
1001     collection services associated with a delinquent payment.

1002     (b)     The interest rate charged shall be the greater of either the rate prescribed
1003     quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
1004     payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
1005     determined as of the due date and remain fixed for the duration of the delinquent period.

1006     (c)     When a partial payment on a delinquent account is received, the amount
1007     received shall be applied first to the penalty charges, second to the administrative charges, third
1008     to the accrued interest, and finally to the overdue payment.

1009     <div align="center"><u>EQUAL EMPLOYMENT OPPORTUNITY</u></div>

1010     20.     During the performance of this Contract, the Contractor agrees as follows:

1011     (a)     The Contractor will not discriminate against any employee or applicant for
1012     employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1013     origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1014     that employees are treated during employment, without regard to their race, color, religion, sex,
1015     sexual orientation, gender identity, or national origin. Such action shall include, but not be
1016     limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1017     recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1018     selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1019     places, available to employees and applicants for employment, notices to be provided by the
1020     Contracting Officer setting forth the provisions of this nondiscrimination clause.

1021     (b)     The Contractor will, in all solicitations or advertisements for employees
1022     placed by or on behalf of the Contractor, state that all qualified applicants will receive
1023     consideration for employment without regard to race, color, religion, sex, sexual orientation,
1024     gender identity, or national origin.

1025     (c)     The Contractor will not discharge or in any other manner discriminate
1026     against any employee or applicant for employment because such employee or applicant has
1027     inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1028     employee or applicant. This provision shall not apply to instances in which an employee who
1029     has access to the compensation information of other employees or applicants as part of such
1030     employee's essential job functions discloses the compensation of such other employees or
1031     applicants to individuals who do not otherwise have access to such information, unless such
1032     disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1033     proceeding, hearing, or action, including an investigation conducted by the employer, or is
1034     consistent with the Contractor's legal duty to furnish information.

1035         (d)    The Contractor will send to each labor union or representative of workers
1036 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1037 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1038 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1039 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1040 applicants for employment.

1041         (e)    The Contractor will comply with all provisions of Executive Order No.
1042 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1043 Labor.

1044         (f)    The Contractor will furnish all information and reports required by
1045 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1046 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1047 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1048 compliance with such rules, regulations, and orders.

1049         (g)    In the event of the Contractor's noncompliance with the nondiscrimination
1050 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1051 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1052 ineligible for further Government contracts in accordance with procedures authorized in
1053 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1054 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1055 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1056         (h)    The Contractor will include the provisions of paragraphs (a) through (g) in
1057 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1058 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1059 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1060 will take such action with respect to any subcontract or purchase order as may be directed by the
1061 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1062 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1063 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1064 Contractor may request the United States to enter into such litigation to protect the interests of
1065 the United States.

1066         <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1067      21.   (a)    The obligation of the Contractor to pay the United States as provided in
1068 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1069 obligation may be distributed among the Contractor's water users and notwithstanding the default
1070 of individual water users in their obligation to the Contractor.

1071        (b)    The payment of charges becoming due pursuant to this Contract is a
1072  condition precedent to receiving benefits under this Contract. The United States shall not make
1073  water available to the Contractor through Project facilities during any period in which the
1074  Contractor is in arrears in the advance payment of water rates due the United States. The
1075  Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1076  parties that are in arrears in the advance payment of water rates as levied or established by the
1077  Contractor.

1078        (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1079  obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1080

1081     22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1082  (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1083  amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1084  III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1085  336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1086  applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1087  Interior and/or Bureau of Reclamation.

1088        (b)    These statutes prohibit any person in the United States from being
1089  excluded from participation in, being denied the benefits of, or being otherwise subjected to
1090  discrimination under any program or activity receiving financial assistance from the Bureau of
1091  Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1092  Contract, the Contractor agrees to immediately take any measures necessary to implement this
1093  obligation, including permitting officials of the United States to inspect premises, programs, and
1094  documents.

1095        (c)    The Contractor makes this Contract in consideration of and for the
1096  purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1097  Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1098  Reclamation, including installment payments after such date on account of arrangements for
1099  Federal financial assistance which were approved before such date. The Contractor recognizes
1100  and agrees that such Federal assistance will be extended in reliance on the representations and
1101  agreements made in this Article and that the United States reserves the right to seek judicial
1102  enforcement thereof.

1103        (d)    Complaints of discrimination against the Contractor shall be investigated
1104  by the Contracting Officer's Office of Civil Rights.

1105                              PRIVACY ACT COMPLIANCE

1106        23.     (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1107   (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1108   (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1109   to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1110   Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1111   C.F.R. § 426.18.

1112                 (b)     With respect to the application and administration of the criminal penalty
1113   provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1114   employees who are responsible for maintaining the certification and reporting records referenced
1115   in paragraph (a) above are considered to be employees of the Department of the Interior.  See 5
1116   U.S.C. § 552a(m).

1117                 (c)     The Contracting Officer or a designated representative shall provide the
1118   Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1119   Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1120   31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1121   information contained in the Landholders' certification and reporting records.

1122                 (d)     The Contracting Officer shall designate a full-time employee of the
1123   Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1124   pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1125   The Contractor is authorized to grant requests by individuals for access to their own records.

1126                 (e)     The Contractor shall forward promptly to the System Manager each
1127   proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1128   filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1129   System Manager with information and records necessary to prepare an appropriate response to
1130   the requester.  These requirements do not apply to individuals seeking access to their own
1131   certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1132   the requester elects to cite the Privacy Act as an authority for the request.

1133                 (f)     Upon complete payment of the Repayment Obligation by the Contractor,

1134   this Article 23 will no longer be applicable.

1135                 CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS

1136        24.     In addition to all other payments to be made by the Contractor pursuant to this

1137   Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1138     detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1139     of direct cost incurred by the United States for work requested by the Contractor associated with

1140     this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1141     and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1142     to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1143     contract administration.

1144     <u>WATER CONSERVATION</u>

1145          25.     (a)     Prior to the delivery of water provided from or conveyed through
1146 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1147 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1148 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1149     Additionally, an effective water conservation and efficiency program shall be based on the

1150     Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1151     the conservation and efficiency criteria for evaluating water conservation plans established under

1152     Federal law. The water conservation and efficiency program shall contain definite water

1153     conservation objectives, appropriate economically feasible water conservation measures, and

1154     time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1155     Contract shall be contingent upon the Contractor's continued implementation of such water

1156     conservation program. In the event the Contractor's water conservation plan or any revised water

1157     conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1158     determined by the Contracting Officer to meet such criteria, due to circumstances which the

1159     Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1160     made under this Contract so long as the Contractor diligently works with the Contracting Officer

1161    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1162    immediately begins implementing its water conservation and efficiency program in accordance

1163    with the time schedules therein.

1164          (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1165    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1166    Contractor shall implement the Best Management Practices identified by the time frames issued

1167    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1168    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1169    the Contractor.

1170          (c)    The Contractor shall submit to the Contracting Officer a report on the

1171    status of its implementation of the water conservation plan on the reporting dates specified in the

1172    then-existing conservation and efficiency criteria established under Federal law.

1173          (d)    At five (5)-year intervals, the Contractor shall revise its water

1174    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1175    water conservation plans established under Federal law and submit such revised water

1176    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1177    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1178    existing conservation and efficiency criteria for evaluating water conservation plans established

1179    under Federal law.

1180          (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1181    shall be described in the Contractor's water conservation plan.

1182                    EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1183        26.    Except as specifically provided in Article 16 of this Contract, the provisions of

1184   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1185   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1186   Area.  Any such water shall not be considered Project Water under this Contract.  In addition,

1187   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1188   any water user within the Contractor's Service Area acquires or has available under any other

1189   contract pursuant to Federal Reclamation law.

1190      OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1191        27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1192   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1193   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1194   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1195   Luis & Delta-Mendota Water Authority.  That separate agreement shall not interfere with or

1196   affect the rights or obligations of the Contractor or the United States hereunder.

1197             (b)    The Contracting Officer has previously notified the Contractor in writing

1198   that the O&M of a portion of the Project facilities which serve the Contractor has been

1199   transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1200   therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1201   Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1202   the terms and conditions of the separate agreement between the United States and the Operating

1203   Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1204    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1205    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1206    such successor determines, sets, or establishes for the O&M of the portion of the Project

1207    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1208    Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1209    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1210    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1211    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1212    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1213    United States in accordance with the separate agreement identified in subdivision (a) of this

1214    Article.

1215            (c)    For so long as the O&M of any portion of the Project facilities serving the

1216    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1217    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1218    Rates for Water Delivered under this Contract representing the cost associated with the activity

1219    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1220    or its successor.

1221            (d)    In the event the O&M of the Project facilities operated and maintained by

1222    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1223    the United States during the term of this Contract, the Contracting Officer shall so notify the

1224    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1225    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1226    representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1227    The Contractor shall, thereafter, in the absence of written notification from the Contracting

1228    Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1229    revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1230                    CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS

1231        28.      The expenditure or advance of any money or the performance of any obligation of
1232    the United States under this Contract shall be contingent upon appropriation or allotment of
1233    funds.  Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1234    obligations under this Contract.  No liability shall accrue to the United States in case funds are
1235    not appropriated or allotted.

1236                            BOOKS, RECORDS, AND REPORTS

1237        29.   (a)      The Contractor shall establish and maintain accounts and other books and
1238    records pertaining to administration of the terms and conditions of this Contract, including the
1239    Contractor's financial transactions; water supply data; project operations, maintenance, and
1240    replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1241    census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1242    Officer may require.  Reports shall be furnished to the Contracting Officer in such form and on
1243    such date or dates as the Contracting Officer may require.  Subject to applicable Federal laws
1244    and regulations, each party to this Contract shall have the right during office hours to examine
1245    and make copies of the other party's books and records relating to matters covered by this
1246    Contract.

1247            (b)      Notwithstanding the provisions of subdivision (a) of this Article, no

1248    books, records, or other information shall be requested from the Contractor by the Contracting

1249    Officer unless such books, records, or information are reasonably related to the administration or

1250    performance of this Contract.  Any such request shall allow the Contractor a reasonable period of

1251    time within which to provide the requested books, records, or information.

1252            (c)      At such time as the Contractor provides information to the Contracting

1253    Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1254    to the Operating Non-Federal Entity(ies).

1255      <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1256      30.    (a)    The provisions of this Contract shall apply to and bind the successors and
1257 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1258 therein by either party shall be valid until approved in writing by the other party.

1259      (b)    The assignment of any right or interest in this Contract by either party

1260 shall not interfere with the rights or obligations of the other party to this Contract absent the

1261 written concurrence of said other party.

1262      (c)    The Contracting Officer shall not unreasonably condition or withhold

1263 approval of any proposed assignment.

1264                     <u>SEVERABILITY</u>

1265      31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1266 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1267 an association or other form of organization whose primary function is to represent parties to

1268 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1269 enforceability of a provision included in this Contract and said person, entity, association, or

1270 organization obtains a final court decision holding that such provision is legally invalid or

1271 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1272 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1273 final court decision identify by mutual agreement the provisions in this Contract which must be

1274 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1275 The time periods specified above may be extended by mutual agreement of the parties. Pending

1276 the completion of the actions designated above, to the extent it can do so without violating any

1277 applicable provisions of law, the United States shall continue to make the quantities of Project

1278   Water specified in this Contract available to the Contractor pursuant to the provisions of this

1279   Contract which were not found to be legally invalid or unenforceable in the final court decision.

1280   <div align="center">RESOLUTION OF DISPUTES</div>

1281       32.    Should any dispute arise concerning any provisions of this Contract, or the

1282   parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1283   resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1284   Officer referring any matter to the Department of Justice, the party shall provide to the other

1285   party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1286   not be required where a delay in commencing an action would prejudice the interests of the party

1287   that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1288   Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1289   provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1290   or the United States may have.

1291   <div align="center">OFFICIALS NOT TO BENEFIT</div>

1292       33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1293   the Contractor shall benefit from this Contract other than as a water user or landowner in the
1294   same manner as other water users or landowners.

1295   <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1296       34.   (a)    While this Contract is in effect, no change may be made in the
1297   Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1298   changes which may affect the respective rights, obligations, privileges, and duties of either the
1299   United States or the Contractor under this Contract, including, but not limited to, dissolution,
1300   consolidation, or merger, except upon the Contracting Officer's written consent.

1301        (b)    Within 30 days of receipt of a request for such a change, the Contracting

1302   Officer will notify the Contractor of any additional information required by the Contracting

<div align="center">57</div>

1303    Officer for processing said request, and both parties will meet to establish a mutually agreeable

1304    schedule for timely completion of the process. Such process will analyze whether the proposed

1305    change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1306    (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1307    to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1308    have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1309    Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1310    responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1311    be paid in accordance with Article 24 of this Contract.

1312                                   FEDERAL LAWS

1313        35.     By entering into this Contract, the Contractor does not waive its rights to contest

1314    the validity or application in connection with the performance of the terms and conditions of this

1315    Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1316    the terms and conditions of this Contract unless and until relief from application of such Federal

1317    law or regulation to the implementing provision of the Contract is granted by a court of

1318    competent jurisdiction.

1319                          RECLAMATION REFORM ACT OF 1982

1320        36.   (a)     Upon a Contractor's compliance with and discharge of the Repayment

1321    Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1322    Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1323              (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1324    shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1325    the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1326    Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1327    <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

1328       37.   The Contractor hereby certifies that it does not maintain or provide for its
1329    employees any segregated facilities at any of its establishments and that it does not permit its
1330    employees to perform their services at any location under its control where segregated facilities
1331    are maintained.  It certifies further that it will not maintain or provide for its employees any
1332    segregated facilities at any of its establishments and that it will not permit its employees to
1333    perform their services at any location under its control where segregated facilities are
1334    maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal
1335    Employment Opportunity clause in this Contract.  As used in this certification, the term
1336    "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1337    restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1338    parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1339    facilities provided for employees which are segregated by explicit directive or are in fact
1340    segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1341    disability, or otherwise.  The Contractor further agrees that (except where it has obtained
1342    identical certifications from proposed subcontractors for specific time periods) it will obtain
1343    identical certifications from proposed subcontractors prior to the award of subcontracts
1344    exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1345    Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1346    following notice to such proposed subcontractors (except where the proposed subcontractors
1347    have submitted identical certifications for specific time periods):

1348    NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1349    CERTIFICATIONS OF NONSEGREGATED FACILITIES

1350    A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1351    exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1352    Opportunity clause.  The certification may be submitted either for each subcontract or for all
1353    subcontracts during a period (i.e., quarterly, semiannually, or annually).  Note:  The penalty for
1354    making false statements in offers is prescribed in 18 U.S.C. § 1001.

1355    <u>NOTICES</u>

1356       38.   Any notice, demand, or request authorized or required by this Contract shall be
1357    deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1358    delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1359    California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1360    postage prepaid, or delivered to the Board of Directors of the Banta-Carbona Irrigation District,
1361    3514 West Lehman Road, Tracy, California, 95304.  The designation of the addressee or the

1362    address may be changed by notice given in the same manner as provided in this Article for other
1363    notices.

1364                    MEDIUM FOR TRANSMITTING PAYMENT

1365        39.      (a)      All payments from the Contractor to the United States under this Contract
1366    shall be by the medium requested by the United States on or before the date payment is due. The
1367    required method of payment may include checks, wire transfers, or other types of payment
1368    specified by the United States.

1369             (b)      Upon execution of this Contract, the Contractor shall furnish the
1370    Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1371    for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1372    out of the Contractor's relationship with the United States.

1373                   CONTRACT DRAFTING CONSIDERATIONS

1374        40.     This amended Contract has been negotiated and reviewed by the parties hereto,
1375    each of whom is sophisticated in the matters to which this amended Contract pertains. The
1376    double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1377    the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1378    spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1379                     CONFIRMATION OF CONTRACT

1380        41.     Promptly after the execution of this amended Contract, the Contractor will
1381    provide to the Contracting Officer a certified copy of a final decree of a court of competent
1382    jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1383    for the authorization of the execution of this amended Contract. This amended Contract shall not
1384    be binding on the United States until the Contractor secures a final decree.

1385

1386        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1387    day and year first above written.

1388                        UNITED STATES OF AMERICA

1389                        By: _____
1390                              Regional Director
1391                              Interior Region 10: California-Great Basin
1392                              Bureau of Reclamation

1393                        BANTA-CARBONA IRRIGATION DISTRICT
1394    (SEAL)

1395                        By: _____
1396                              President of the Board of Directors

1397    Attest:

1398    By: _____
1399        Secretary of the Board of Directors

1386       IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1387   day and year first above written.

1388                                            UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND SUFFICIENCY - REVIEWED BY:**

Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:20:13 -07'00'

**OFFICE OF THE REGIONAL SOLICITOR**

1389   **DEPARTMENT OF THE INTERIOR**     By: _____

    **TIME STAMP:** 1:37 pm, May 11 2020

1390                                        Regional Director

1391                                        Interior Region 10: California-Great Basin

1392                                        Bureau of Reclamation

1393                                       BANTA-CARBONA IRRIGATION DISTRICT

1394   (SEAL)

1395                                         By: _____

1396                                        President of the Board of Directors

1397   Attest:

1398   By: _____

1399       Secretary of the Board of Directors



**Banta-Carbona Irrigation District**

Contract No. 14-06-200-4305A-LTR1-P

EXHIBIT A

District Boundary

Contractor's Service Area

BUREAU OF RECLAMATION

Date: 9/18/2020
N:\Districts\Contracts\banta_carbona\banta_carbona_20200401.mxd

Miles
0    1    2

214-202-880

## EXHIBIT B
## BANTA-CARBONA IRRIGATION DISTRICT
### 2020 Rates and Charges
### (Per Acre-Foot)

| | Irrigation Water | M&I[1] Water |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $35.34 | |
| DMC Aqueduct Intertie | $1.14 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost | $0.00 | |
| **TOTAL COS RATE** | $63.46 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| P.L. 102-575 Surcharge (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| P.L. 106-377 Assessment (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

### EXPLANATORY NOTES

\#\# The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which **equals a M&I Historic use average quantity of 0 AF.**

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

### Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

**Unpaid Construction Cost from the 2020 Water Rate Books***

| | |
|---|---|
| **Contractor:** | **Banta-Carbona ID** |
| **Facility:** | **Delta Mendota Canal** |
| **Contract:** | 14-06-200-4305A-LTR1-P |

#### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba)

| | | Unpaid Cost | | Discount | |
|---|---|---|---|---|---|
| Construction Cost | ~ | $ | 1,620,086 | | |
| 2019 Repayment (Estimate) ** | | $ | 463,106 | | |
| Adjusted Construction Cost | | $ | 1,156,980 | $ | 1,122,969 |
| Intertie Construction Cost (N/A): | | $ | 209,945 | $ | 188,034 |
| Total | | $ | 1,366,925 | $ | 1,311,002 |

| If Paid in Installments (Used 20 yr CMT) | | | | |
|---|---|---|---|---|
| | Due**** | | | |
| Payment 1 | 9/1/2020 | | $ | 331,858 |
| Payment 2 | 9/1/2021 | | $ | 331,858 |
| Payment 3 | 9/1/2022 | | $ | 331,858 |
| Payment 4 ~~ | 9/1/2023 | | $ | 331,858 |
| Total Installment Payments | | | $ | 1,327,431 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

#### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost | |
|---|---|---|---|
| Construction Cost: | ~ | $ | - |
| 2019 Repayment (Estimate) ** | | | |
| Adjusted Construction Cost***: | | $ | - |

| **Calculation Support:** | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 1,156,980 | $ 105,180 | $ 104,615 | $ 209,945 | $ 4,771 | $ 4,746 | $ 109,361 |
| 2021 | $ 1,051,800 | $ 105,180 | $ 104,136 | $ 205,174 | $ 4,771 | $ 4,724 | $ 108,860 |
| 2022 | $ 946,620 | $ 105,180 | $ 103,618 | $ 200,402 | $ 4,771 | $ 4,701 | $ 108,319 |
| 2023 | $ 841,440 | $ 105,180 | $ 103,102 | $ 195,631 | $ 4,771 | $ 4,677 | $ 107,780 |
| 2024 | $ 736,260 | $ 105,180 | $ 102,590 | $ 190,859 | $ 4,771 | $ 4,654 | $ 107,243 |
| 2025 | $ 631,080 | $ 105,180 | $ 102,079 | $ 186,088 | $ 4,771 | $ 4,631 | $ 106,710 |
| 2026 | $ 525,900 | $ 105,180 | $ 101,571 | $ 181,316 | $ 4,771 | $ 4,608 | $ 106,179 |
| 2027 | $ 420,720 | $ 105,180 | $ 101,066 | $ 176,545 | $ 4,771 | $ 4,585 | $ 105,651 |
| 2028 | $ 315,540 | $ 105,180 | $ 100,563 | $ 171,773 | $ 4,771 | $ 4,562 | $ 105,125 |
| 2029 | $ 210,360 | $ 105,180 | $ 100,063 | $ 167,002 | $ 4,771 | $ 4,539 | $ 104,602 |
| 2030 | $ 105,180 | $ 105,180 | $ 99,565 | $ 162,230 | $ 4,771 | $ 4,517 | $ 104,082 |
| 2031-63 | | | | $ 157,459 | $ 157,459 | $ 137,090 | $ 137,090 |
| Total, Lump Sum Payment | | | $ 1,122,969 | | | $ 188,034 | $ 1,311,002 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Amount of Reduction, Lump Sum | | $ 34,012 | | | $ 21,911 | $ 55,923 |

\* Costs are assumed to be paid and all charges are assumed to be accurate.  If at a later date charges are determined to need update, they are still required.  Also, unpaid charges are still a requirement under contract.

\*\* 2019 Repayment is based on a conservative estimate.  If not sufficient, the remainder will be billed.

\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 4**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
Patterson Irrigation District
948 Orange Avenue
Patterson, CA 95363

Subject:  Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-3598A-LTR1-P</u> Between the United States and the Patterson Irrigation District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of Reclamation appreciates the effort expended by the Patterson Irrigation District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
PATTERSON IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 40 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |

## Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 57 |
| 34. | Changes in Contractor's Organization and/or Service Area | 57 |
| 35. | Federal Laws | 58 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 60 |
| 41. | Confirmation of Contract | 60 |
| | Signature Page | 61 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
PATTERSON IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1      THIS CONTRACT, made this 26th day of October, 2020, in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and PATTERSON

12     IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13     of California, duly organized, existing, and acting pursuant to the laws thereof;

14     WITNESSETH, That:

15                   EXPLANATORY RECITALS

16          [1st]    WHEREAS, the United States has constructed and is operating the

17   California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18   beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19   mitigation, protection and restoration, generation and distribution of electric energy, salinity

20   control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21   River, the Trinity River, and the San Joaquin River and their tributaries; and

22          [2nd]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23   related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24   to the terms of this Contract; and

25          [3rd]    WHEREAS, the rights to Project Water were acquired by the United

26   States pursuant to California law for operation of the Project; and

27          [4th]    WHEREAS, the Contractor and the United States entered Contract No.

28   14-06-200-3598A, which established the terms for the delivery to the Contractor of Project

29   Water from Delta Division Facilities from December 18, 1967, through February 28,1995; and

30          [5th]    WHEREAS, the United States and the Contractor have pursuant to

31   Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

32   entered into interim renewal contract(s) identified as Contract No. 14-06-200-3598A-IR1 and

33   subsequent Interim Renewal Contracts 14-06-200-3598A-IR2 through 14-06-200-3598A-IR8

34   which provided for water service to the Contractor from March 1, 1995, through February 29,

35   2006; and

2

36        [6th]    WHEREAS, the United States and the Contractor entered into a long-term

37   contract identified as Contract No. 14-06-200-3598A-LTR1, hereinafter referred to as the

38   Existing Contract, which provided for the continued water service to the Contractor following

39   expiration of Contract No. 14-06-200-3598A-IR8, and which was in effect the date the WIIN Act

40   was enacted; and

41        [7th]    WHEREAS, through Contract No. 14-06-200-3598A providing among

42   other things 6,000 acre-feet of Replacement Water, the parties reached a settlement with respect

43   to any and all of the Contractor's claims that the construction and operation of the Project has

44   interfered with its right in and to the use of the San Joaquin River; and

45        [8th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

46        States of America enacted the WIIN Act; and

47        [9th]    WHEREAS, Section 4011(a)(1) provides that "upon request of the

48   contractor, the Secretary of the Interior shall convert any water service contract in effect on the

49   date of enactment of this subtitle and between the United States and a water users' association

50   [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

51   mutually agreeable terms and conditions."; and

52        [10th]    WHEREAS, Section 4011(a)(1) further provides that "the manner of

53   conversion under this paragraph shall be as follows: (A) Water service contracts that were

54   entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

55   this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

56   1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

57 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

58 converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

59         [11th] WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

60 into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

61 repayment, exchange and transfer contractual rights between the water users' association

62 [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

63 water users' association [Contractor] and their landowners as provided under State law."; and

64         [12th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

65 "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

66 service or repayment contractor to receive water; or (4) except as expressly provided in this

67 section, any obligations under the Federal Reclamation law, including the continuation of

68 Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

69 repayment contractors making prepayments pursuant to this section."; and

70         [13th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

71 Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

72 service contracts into repayment contracts, amend existing repayment contracts, and allow

73 contractors to prepay their construction cost obligations pursuant to applicable Federal

74 Reclamation law; and

75         [14th] WHEREAS, the United States has determined that the Contractor has

76 fulfilled all of its obligations under the Existing Contract; and

77         [15th] WHEREAS, the Contractor has demonstrated to the satisfaction of the

78 Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

79    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

80    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

81    quantity of Project Water to be made available to it pursuant to this Contract; and

82            [16th]   WHEREAS, water obtained from the Project has been relied upon by

83    urban and agricultural areas within California for more than 50 years, and is considered by the

84    Contractor as an essential portion of its water supply; and

85            [17th]   WHEREAS, the economies of regions within the Project, including the

86    Contractor's, depend upon the continued availability of water, including water service from the

87    Project; and

88            [18th]   WHEREAS, the Secretary intends through coordination, cooperation, and

89    partnerships to pursue measures to improve water supply, water quality, and reliability of the

90    Project for all Project purposes; and

91            [19th]   WHEREAS, the mutual goals of the United States and the Contractor

92    include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

93    achieve repayment of the Project as required by law; to guard reasonably against Project Water

94    shortages; to achieve a reasonable balance among competing demands for use of Project Water;

95    and to comply with all applicable environmental statutes, all consistent with the legal obligations

96    of the United States relative to the Project; and

97            [20th]   WHEREAS, the parties intend by this Contract to maintain a cooperative

98    relationship in order to achieve their mutual goals; and

99            [21st]   WHEREAS, the Contractor has utilized or may utilize transfers, contract

100   assignments, rescheduling, and conveyance of Project Water and non-Project water under this

5

101    Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

102    beneficial use of water; and

103    [22nd] WHEREAS, the parties desire and intend that this Contract not provide a

104    disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

105    Explanatory Recital immediately above; and

106    [23rd] WHEREAS, the Contracting Officer and the Contractor agree that this

107    Contract complies with Section 4011 of the WIIN Act; and

108    [24th] WHEREAS, the Contracting Officer and the Contractor agree to amend

109    and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

110    Reclamation law on the terms and conditions set forth below.

111    NOW, THEREFORE, in consideration of the mutual and dependent covenants

112    herein contained, it is hereby mutually agreed by the parties hereto as follows:

113    <u>DEFINITIONS</u>

114    1.    When used herein unless otherwise distinctly expressed, or manifestly

115    incompatible with the intent of the parties as expressed in this Contract, the term:

116    (a)    "Additional Capital Obligation" shall mean construction costs or other

117    capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

118    Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

119    (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

120    Stat. 1628) ("WIIN Act");

121    (b)    "Calendar Year" shall mean the period January 1 through December 31,

122    both dates inclusive;

123        (c)     "Charges" shall mean the payments required by Federal Reclamation law

124   in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

125   annually by the Contracting Officer pursuant to this Contract;

126        (d)     "Condition of Shortage" shall mean a condition respecting the Project

127   during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

128   Contract Total;

129        (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

130   authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

131   or regulation;

132        (f)     "Contract Total" shall mean the maximum amount of water to which the

133   Contractor is entitled under subdivision (a) of Article 3 of this Contract;

134        (g)     "Contractor's Service Area" shall mean the area to which the Contractor is

135   permitted to provide Project Water under this Contract as described in Exhibit "A" attached

136   hereto, which may be modified from time to time in accordance with Article 34 of this Contract

137   without amendment of this Contract;

138        (h)     "CVPIA" shall mean the Central Valley Project Improvement Act, Title

139   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

140        (i)     "Delta Division Facilities" shall mean those existing and future Project

141   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

142   the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

143   Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

144   Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

145          (j)      "Eligible Lands" shall mean all lands to which Irrigation Water may be

146   delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

147   1263), as amended;

148          (k)      "Excess Lands" shall mean all lands in excess of the limitations contained

149   in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

150   acreage limitation under Federal Reclamation law;

151          (l)      "Existing Capital Obligation" shall mean the remaining amount of

152   construction costs or other capitalized costs allocable to the Contractor as described in Section

153   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

154   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

155   in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

156   Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

157   Exhibit "C", which is incorporated herein by reference;

158          (m)      "Full Cost Rate" shall mean an annual rate, as determined by the

159   Contracting Officer that shall amortize the expenditures for construction properly allocable to the

160   Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

161   deficits funded, less payments, over such periods as may be required under Federal Reclamation

162   law, or applicable contract provisions. Interest will accrue on both the construction expenditures

163   and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

164   date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

165   in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

166     The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

167     Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

168            (n)     "Ineligible Lands" shall mean all lands to which Irrigation Water may not

169     be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

170            (o)     "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

171     to the delivery of Irrigation Water;

172            (p)     "Irrigation Water" shall mean the use of Project Water to irrigate lands
173     primarily for the production of commercial agricultural crops or livestock, and domestic and
174     other uses that are incidental thereto;

175            (q)     "Landholder" shall mean a party that directly or indirectly owns or leases

176     nonexempt land, as provided in 43 CFR 426.2;

177            (r)     "Municipal and Industrial (M&I) Water" shall mean the use of Project
178     Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
179     of "Irrigation Water" or within another category of water use under an applicable Federal
180     authority;

181            (s)     "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

182     the delivery of M&I Water;

183            (t)     "Operation and Maintenance" or "O&M" shall mean normal and

184     reasonable care, control, operation, repair, replacement (other than capital replacement), and

185     maintenance of Project facilities;

186            (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

187     successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

188     the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

189    Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

190    Water Authority;

191          (v)    "Project" shall mean the Central Valley Project owned by the United

192    States and managed by the Department of the Interior, Bureau of Reclamation;

193          (w)    "Project Contractors" shall mean all parties who have contracts for water

194    service for Project Water from the Project with the United States pursuant to Federal

195    Reclamation law;

196          (x)    "Project Water" shall mean all water that is developed, diverted, stored, or

197    delivered by the Secretary in accordance with the statutes authorizing the Project and in

198    accordance with the terms and conditions of water rights acquired pursuant to California law;

199    however, Schedule 2 Water shall not be considered Project Water for purposes of this Contract;

200          (y)    "Rates" shall mean the payments determined annually by the Contracting

201    Officer in accordance with the then-current applicable water ratesetting policies for the Project,

202    as described in subdivision (a) of Article 7 of this Contract;

203          (z)    "Recent Historic Average" shall mean the most recent five (5)-year

204    average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

205    or its preceding contract(s);

206          (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

207    mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

208    amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

209    Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

210    United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

211        (bb)    "Replacement Water" shall mean all water delivered to the Contractor

212    without payment pursuant to this Contract, and without application of Federal Reclamation law,

213    including but not limited to the acreage limitation provision of the Reclamation Reform Act of

214    1982 (96 Stat. 1263), as amended, under the authority of Section 14 of the Reclamation Project

215    Act of 1939 (53 Stat. 1187 and 1197) as a full and complete adjustment and settlement of the

216    Contractor's asserted claim of right to water in the San Joaquin River in fulfillment of such

217    rights, during the term of this Contract and any amendment or renewal thereof; and ;

218        (cc)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

219    successor, or an authorized representative acting pursuant to any authority of the Secretary and

220    through any agency of the Department of the Interior;

221        (dd)    "Tiered Pricing Component" shall be the incremental amount to be paid

222    for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

223    for in Exhibit "B";

224        (ee)    "Water Delivered" or "Delivered Water" shall mean Project Water

225    diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

226    Officer;

227        (ff)    "Water Made Available" shall mean the estimated amount of Project

228    Water that can be delivered to the Contractor for the upcoming Year as declared by the

229    Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

230        (gg)    "Water Scheduled" shall mean Project Water made available to the

231    Contractor for which times and quantities for delivery have been established by the Contractor

232    and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

11

233          (hh)   "Year" shall mean the period from and including March 1 of each

234   Calendar Year through the last day of February of the following Calendar Year.

235   <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

236   2.    (a)   This Contract shall be effective November 1, 2020, hereinafter known as

237   the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

238   Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

239   (53 Stat. 1195) as applicable, and applicable law;

240          (1)   *Provided, That* the Contracting Officer shall not seek to terminate

241   this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

242   unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

243   to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

244   or to diligently commence and maintain full curative payments satisfactory to the Contracting

245   Officer within the sixty (60) calendar days' notice period;

246          (2)   *Provided, further, That* the Contracting Officer shall not seek to

247   suspend making water available or declaring Water Made Available pursuant to this Contract for

248   non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

249   Contracting Officer has first provided at least thirty (30) calendar days written notice to the

250   Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

251   curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

252   cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

253   suspended making water available pursuant to this paragraph, upon cure of such non-compliance

254     satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

255     available and declaring Water Made Available pursuant to this Contract;

256              (3)     *Provided, further, That* this Contract may be terminated at any

257     time by mutual consent of the parties hereto.

258           (b)     Upon complete payment of the Repayment Obligation by the Contractor,

259     and notwithstanding any Additional Capital Obligation that may later be established, the acreage

260     limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

261     and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

262     this Contract shall no longer be applicable.

263           (c)     Notwithstanding any provision of this Contract, the Contractor reserves

264     and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

265     allowed by law.

266           (d)     Notwithstanding any provision of this Contract, the Contractor reserves

267     and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

268     allowed by law.

269     <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

270     3.     (a)     During each Year, consistent with all applicable State water rights permits,

271     and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

272     Contract, the Contracting Officer shall make available for delivery to the Contractor 16,500 acre-

273     feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

274     accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

275     Articles 4 and 7 of this Contract.

276       (b)    Because the capacity of the Project to deliver Project Water has been

277    constrained in recent years and may be constrained in the future due to many factors including

278    hydrologic conditions and implementation of Federal and State laws, the likelihood of the

279    Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

280    Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

281    programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

282    CVPIA projected that the Contract Total set forth in this Contract will not be available to the

283    Contractor in many years.  During the most recent five years prior to execution of the Existing

284    Contract, the Recent Historic Average Water Made Available to the Contractor was 13,555 acre-

285    feet.  Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

286    parties under any provision of this Contract.

287       (c)    The Contractor shall utilize the Project Water in accordance with all

288    applicable legal requirements.

289          (1)    In the event any Project Contractor (other than a Cross Valley

290    Contractor) that receives Project Water through the Delta Division Facilities obtains a

291    contractual agreement that the Contracting Officer shall make Project Water available at a point

292    or points of delivery in or north of the Delta, at the request of the Contractor and upon

293    completion of any required environmental documentation, this Contract shall be amended to

294    provide for deliveries in or north of the Delta on mutually agreeable terms.  Such amendments to

295    this Contract shall be limited solely to those changes made necessary by the addition of such

296    alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

297    of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

298    amendment.

299            (d)      The Contractor shall make reasonable and beneficial use of all water

300    furnished pursuant to this Contract.  Groundwater recharge programs (direct, indirect, or in lieu),

301    groundwater banking programs, surface water storage programs, and other similar programs

302    utilizing Project Water or other water furnished pursuant to this Contract conducted within the

303    Contractor's Service Area which are consistent with applicable State law and result in use

304    consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

305    program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

306    Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

307    sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

308    the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

309    compliance with Federal Reclamation law.  Groundwater recharge programs, groundwater

310    banking programs, surface water storage programs, and other similar programs utilizing Project

311    Water or other water furnished pursuant to this Contract conducted outside the Contractor's

312    Service Area may be permitted upon written approval of the Contracting Officer, which approval

313    will be based upon environmental documentation, Project Water rights, and Project operational

314    concerns.  The Contracting Officer will address such concerns in regulations, policies, or

315    guidelines.

316            (e)      The Contractor shall comply with requirements applicable to the

317    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

318    of any water service contract between the Contracting Officer and the Contractor in effect

15

319    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

320    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

321    implement. The Existing Contract, which evidences in excess of 36 years of diversions for

322    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

323    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

324    required biological assessment(s) prepared pursuant to the ESA, and any other needed

325    environmental review. Nothing herein shall be construed to prevent the Contractor from

326    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

327    biological opinion or other environmental documentation referred to in this Article.

328    (f)    Following the declaration of Water Made Available under Article 4 of this

329    Contract, the Contracting Officer will make a determination whether Project Water, or other

330    water available to the Project, can be made available to the Contractor in addition to the Contract

331    Total under this Article during the Year without adversely impacting other Project Contractors.

332    At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

333    making such a determination. If the Contracting Officer determines that Project Water, or other

334    water available to the Project, can be made available to the Contractor, the Contracting Officer

335    will announce the availability of such water and shall so notify the Contractor as soon as

336    practical. The Contracting Officer will thereafter meet with the Contractor and other Project

337    Contractors capable of taking such water to determine the most equitable and efficient allocation

338    of such water. If the Contractor requests the delivery of any quantity of such water, the

339    Contracting Officer shall make such water available to the Contractor in accordance with

340    applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

341 contractual commitments, water rights, and operational constraints, long-term Project

342 Contractors shall have a first right to acquire such water, including Project Water made available

343 pursuant to Section 215 of the Reclamation Reform Act of 1982.

344      (g)    The Contractor may request permission to reschedule for use during the

345 subsequent Year some or all of the Water Made Available to the Contractor during the current

346 Year, referred to as "rescheduled water." The Contractor may request permission to use during

347 the current Year a quantity of Project Water which may be made available by the United States

348 to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

349 written approval may permit such uses in accordance with applicable statutes, regulations,

350 guidelines, and policies.

351      (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

352 State law to the reasonable and beneficial use of the Water Delivered and Replacement Water

353 pursuant to this Contract shall not be disturbed, and this Contract shall continue so long as the

354 Contractor pays applicable Rates and Charges under this Contract consistent with Section 9(d) or

355 9(c)(1) of the Act of August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing

356 in the preceding sentence shall affect the Contracting Officer's ability to impose shortages under

357 Article 11 or subdivision (b) of Article 12 of this Contract.

358      (i)    Project Water furnished to the Contractor pursuant to this Contract may be

359 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

360 Contract upon written approval by the Contracting Officer in accordance with the terms and

361 conditions of such approval.

17

362       (j)     The Contracting Officer shall make reasonable efforts to protect the water

363 rights necessary for the Project and to provide the water available under this Contract. The

364 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

365 extent permitted by law, in administrative proceedings related to the Project Water rights;

366 *Provided. That* the Contracting Officer retains the right to object to the substance of the

367 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

368 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

369 Contract to use Project Water.

370       (k)     In addition to Project Water and other water available to the Contractor

371 pursuant to this Contract, each Year the Contracting Officer shall furnish from the Delta Division

372 Facilities, free of charge to the Contractor, including free from the obligation to pay Rates and

373 Charges hereinafter provided for, and in accordance with a schedule submitted in the same

374 manner as required by subdivision (b) of Article 4 of this Contract, 6,000 acre-feet of

375 Replacement Water. For purposes of this Contract, the Replacement Water shall be considered

376 to be the first 6,000 acre-feet furnished in each Year. Nothing in this Contract is intended to

377 affect the Contractor's right to continue to divert water from the San Joaquin River pursuant to

378 State law. Nothing herein shall be deemed to be an assignment of any water right of the

379 Contractor.

380 <div align="center">TIME FOR DELIVERY OF WATER</div>

381    4.    (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

382 announce the Contracting Officer's expected declaration of the Water Made Available as well as

383 the quantity of Replacement Water expected to be delivered. Such declaration will be expressed

<div align="center">18</div>

384    in terms of Water Made Available as well as the quantity of Replacement Water expected to be

385    delivered and the Recent Historic Average and will be updated monthly, and more frequently if

386    necessary, based on the then-current operational and hydrologic conditions and a new declaration

387    with changes, if any, to the Water Made Available will be made.  The Contracting Officer shall

388    provide forecasts of Project operations and the basis of the estimate, with relevant supporting

389    information, upon the written request of the Contractor.  Concurrently with the declaration of the

390    Water Made Available, the Contracting Officer shall provide the Contractor with the updated

391    Recent Historic Average.

392            (b)      On or before each March 1 and at such other times as necessary, the

393    Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

394    Contracting Officer, showing the monthly quantities of Project Water and Replacement Water to

395    be delivered by the United States to the Contractor pursuant to this Contract for the Year

396    commencing on such March 1.  The Contracting Officer shall use all reasonable means to deliver

397    Project Water and Replacement Water according to the approved schedule for the Year

398    commencing on such March 1.

399            (c)      The Contractor shall not schedule Project Water or Replacement Water in

400    excess of the quantity of Project Water and Replacement Water the Contractor intends to put to

401    reasonable and beneficial use within the Contractor's Service Area or to sell, transfer, or

402    exchange pursuant to Article 9 of this Contract during any Year.

403            (d)      Subject to the conditions set forth in subdivision (a) of Article 3 of this

404    Contract, the United States shall deliver Project Water and Replacement Water to the Contractor

405    in accordance with the initial schedule submitted by the Contractor pursuant to subdivision (b) of

19

406　this Article, or any written revision(s) thereto satisfactory to the Contracting Officer, submitted

407　within a reasonable time prior to the date(s) on which the requested change(s) is/are to be

408　implemented.

409　　POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER

410　　5.　　(a)　　Project Water and Replacement Water scheduled pursuant to subdivision

411　(b) of Article 4 of this Contract shall be delivered to the Contractor at a point or points on the

412　Delta-Mendota Canal and any additional point or points of delivery either on Project facilities or

413　another location or locations mutually agreed to in writing by the Contracting Officer and the

414　Contractor.

415　　　　(b)　　The Contracting Officer, either directly or indirectly through its written

416　agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

417　maintain sufficient flows and levels of water in the Project facilities to deliver Project Water and

418　Replacement Water to the Contractor at the point or points of delivery established pursuant to

419　subdivision (a) of this Article.

420　　　　(c)　　The Contractor shall deliver Irrigation Water in accordance with any

421　applicable land classification provisions of Federal Reclamation law and the associated

422　regulations.  The Contractor shall not deliver Project Water to land outside the Contractor's

423　Service Area unless approved in advance by the Contracting Officer.

424　　　　(d)　　All Water Delivered to the Contractor pursuant to this Contract shall be

425　measured and recorded with equipment furnished, installed, operated, and maintained by the

426　Contracting Officer either directly or indirectly through its written agreements(s) with the

427　Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

428    Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

429    this Article. Upon the request of either party to this Contract, the Contracting Officer shall

430    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

431    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

432    therein. For any period of time when accurate measurements have not been made, the

433    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

434    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

435    of time.

436              (e)     Absent a separate contrary written agreement with the Contractor, neither

437    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

438    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

439    pursuant to this Contract beyond the point or points of delivery established pursuant to

440    subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

441    employees, agents, and assigns on account of damage or claim of damage of any nature

442    whatsoever for which there is legal responsibility, including property damage, personal injury, or

443    death arising out of or connected with the control, carriage, handling, use, disposal, or

444    distribution of such Water Delivered beyond such point or points of delivery except for any

445    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

446    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

447    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

448    Contracting Officer or any of its officers, employees, agents, and assigns, including the

449    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

450    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

451    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

452    Federal Entity(ies).

453        <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

454        6.     (a)     The Contractor has established a measuring program satisfactory to the

455    Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

456    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

457    water delivered for M&I purposes is measured at each M&I service connection. The water

458    measuring devices or water measuring methods of comparable effectiveness must be acceptable

459    to the Contracting Officer. The Contractor shall be responsible for installing, operating,

460    maintaining, and repairing all such measuring devices and implementing all such water

461    measuring methods at no cost to the United States. The Contractor shall use the information

462    obtained from such water measuring devices or water measuring methods to ensure its proper

463    management of the water; to bill water users for water delivered by the Contractor; and, if

464    applicable, to record water delivered for M&I purposes by customer class as defined in the

465    Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

466    contained, however, shall preclude the Contractor from establishing and collecting any charges,

467    assessments, or other revenues authorized by California law. The Contractor shall include a

468    summary of all its annual surface water deliveries in the annual report described in subdivision

469    (c) of Article 25 of this Contract.

470        (b)     To the extent the information has not otherwise been provided, upon

471    execution of this Contract, the Contractor shall provide to the Contracting Officer a written

472    report describing the measurement devices or water measuring methods being used or to be used

473    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

474    service connections or alternative measurement programs approved by the Contracting Officer,

475    at which such measurement devices or water measuring methods are being used, and, if

476    applicable, identifying the locations at which such devices and/or methods are not yet being used

477    including a time schedule for implementation at such locations. The Contracting Officer shall

478    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

479    if any, of the measuring devices or water measuring methods identified in the Contractor's report

480    and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

481    the Contracting Officer notifies the Contractor that the measuring devices or methods are

482    inadequate, the parties shall within 60 days following the Contracting Officer's response,

483    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

484    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

485    compliance with subdivision (a) of this Article.

486           (c)    All new surface water delivery systems installed within the Contractor's

487    Service Area after the Effective Date shall also comply with the measurement provisions

488    described in subdivision (a) of this Article.

489           (d)    The Contractor shall inform the Contracting Officer and the State of

490    California in writing by April 30 of each Year of the monthly volume of surface water delivered

491    within the Contractor's Service Area during the previous Year.

492    (e)    The Contractor shall inform the Contracting Officer and the Operating

493  Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

494  Irrigation Water and M&I Water taken during the preceding month.

495              RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
496                         REPAYMENT OF FACILITIES

497    7.    (a)    Notwithstanding the Contractor's full prepayment of the Repayment

498  Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

499  Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

500  (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

501  Article, subsection (b), the Contractor's Project construction and other obligations shall be

502  determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

503  in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

504  WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

505  a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

506  rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

507  shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

508  agreed to in writing by the Contractor and the Contracting Officer.  The Rates, Charges, and

509  Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

510  forth in Exhibit "B", as may be revised annually.

511                    (1)    The Contractor shall pay the United States as provided for in this

512  Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

513  in accordance with policies for Irrigation Water and M&I Water.  The Contractor's Rates shall

24

514  be established to recover its estimated reimbursable costs included in the operation and

515  maintenance component of the Rate and amounts established to recover deficits and other

516  charges, if any, including construction costs as identified in the following subdivisions.

517        (2)      In accordance with the WIIN Act, the Contractor's allocable share

518  of Project construction costs will be repaid pursuant to the provisions of this Contract.

519        (A)     The amount due and payable to the United States, pursuant

520  to the WIIN Act, shall be the Repayment Obligation.  The Repayment Obligation has been

521  computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

522  as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

523  installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

524  set forth in Exhibit "C".  The Repayment Obligation is due in lump sum by December 30, 2020

525  as provided by the WIIN Act.  The Contractor must provide appropriate notice to the Contracting

526  Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

527  amount due using the lump sum alternative.  If such notice is not provided by such date, the

528  Contractor shall be deemed to have elected the installment payment alternative, in which case,

529  the first such payment shall be made no later than December 30, 2020.  The second payment

530  shall be made no later than the first anniversary of the first payment date.  The third payment

531  shall be made no later than the second anniversary of the first payment date.  The final payment

532  shall be made no later than November 1, 2023.  If the installment payment option is elected by

533  the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

534  by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

535  Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

536    methodology as was used to compute the initial annual installment payment amount, which is

537    illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

538    established, receipt of the Contractor's payment of the Repayment Obligation to the United

539    States shall fully and permanently satisfy the Existing Capital Obligation.

540                    (B)       Additional Capital Obligations that are not reflected in, the

541    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

542    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

543    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

544    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

545    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

546    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

547    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

548    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

549    established by the Contractor and the Contracting Officer to accomplish repayment of the

550    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

551    WIIN Act, subject to the following:

552                    (1)       If the collective Additional Capital Obligation

553    properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

554    is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

555    to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

556    notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

557    amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

558           (2)      If the collective Additional Capital Obligation

559   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

560   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

561   properly assignable to the Contractor shall be repaid as provided by applicable Federal

562   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

563   five million dollars ($5,000,000) shall not be a precedent in any other context.

564           (b)      In the event that the final cost allocation referenced in Section 4011(b) of

565   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

566   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

567   allocated costs. The term of such additional repayment contract shall be not less than one (1)

568   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

569   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

570   the event that the final cost allocation indicates that the costs properly assignable to the

571   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

572   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

573   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

574           (c)      The Contracting Officer shall notify the Contractor of the Rates, Charges,

575   and Tiered Pricing Component as follows:

576           (1)      Prior to July 1 of each Calendar Year, the Contracting Officer shall

577   provide the Contractor an estimate of the Charges for Project Water that will be applied to the

578   period October 1, of the current Calendar Year, through September 30, of the following Calendar

579   Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

27

580    to review and comment on such estimates.  On or before September 15 of each Calendar Year,

581    the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

582    the period October 1 of the current Calendar Year, through September 30, of the following

583    Calendar Year, and such notification shall revise Exhibit "B."

584                    (2)    Prior to October 1 of each Calendar Year, the Contracting Officer

585    shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

586    for Project Water for the following Year and the computations and cost allocations upon which

587    those Rates are based.  The Contractor shall be allowed not less than two months to review and

588    comment on such computations and cost allocations.  By December 31 of each Calendar Year,

589    the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

590    Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

591                    (d)    At the time the Contractor submits the initial schedule for the delivery of

592    Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

593    Contractor shall make an advance payment to the United States equal to the total amount payable

594    pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

595    scheduled to be delivered pursuant to this Contract during the first two calendar months of the

596    Year.  Before the end of the first month and before the end of each calendar month thereafter, the

597    Contractor shall make an advance payment to the United States, at the Rate(s) set under

598    subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

599    during the second month immediately following.  Adjustments between advance payments for

600    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

601    the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

28

602    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

603    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

604    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

605    payment.  In any month in which the quantity of Water Delivered to the Contractor pursuant to

606    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

607    additional Project Water shall be delivered to the Contractor unless and until an advance

608    payment at the Rates then in effect for such additional Project Water is made.  Final adjustment

609    between the advance payments for the Water Scheduled and payments for the quantities of Water

610    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

611    later than April 30th of the following Year, or 60 days after the delivery of Project Water

612    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

613    the last day of February.

614                    (e)        The Contractor shall also make a payment in addition to the Rate(s) in

615    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

616    appropriate Tiered Pricing Component then in effect, before the end of the month following the

617    month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

618    Pricing Component pursuant to subdivision (k)(2) of this Article.  The payments shall be

619    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

620    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

621    there is no Operating Non-Federal Entity, by the Contracting Officer.  The water delivery report

622    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

623    for Water Delivered.  Adjustment for overpayment or underpayment of Charges shall be made

29

624    through the adjustment of payments due to the United States for Charges for the next month.

625    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

626    be computed pursuant to Article 19 of this Contract.

627              (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

628    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

629    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

630    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

631    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

632    under subdivision (a) of this Article.

633              (g)     Payments to be made by the Contractor to the United States under this

634    Contract may be paid from any revenues available to the Contractor.

635              (h)     All revenues received by the United States from the Contractor relating to

636    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

637    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

638    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

639              (i)     The Contracting Officer shall keep its accounts pertaining to the

640    administration of the financial terms and conditions of its long-term contracts, in accordance

641    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

642    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

643    Contractor a detailed accounting of all Project and Contractor expense allocations, the

644    disposition of all Project and Contractor revenues, and a summary of all water delivery

645    information.  The Contracting Officer and the Contractor shall enter into good faith negotiations

646    to resolve any discrepancies or disputes relating to accountings, reports, or information.

647          (j)     The parties acknowledge and agree that the efficient administration of this

648    Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

649    policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

650    and/or for making and allocating payments, other than those set forth in this Article may be in

651    the mutual best interest of the parties, it is expressly agreed that the parties may enter into

652    agreements to modify the mechanisms, policies, and procedures for any of those purposes while

653    this Contract is in effect without amending this Contract.

654          (k)    (1)    Beginning at such time as deliveries of Project Water in a Year

655    exceed 80 percent of the Contract Total, then before the end of the month following the month of

656    delivery the Contractor shall make an additional payment to the United States equal to the

657    applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

658    Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

659    Contract Total, shall equal one-half of the difference between the Rate established under

660    subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

661    Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

662    Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

663    the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

664    Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

665    subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

666    Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

667    the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

668         (2)     Subject to the Contracting Officer's written approval, the

669   Contractor may request and receive an exemption from such Tiered Pricing Component for

670   Project Water delivered to produce a crop which the Contracting Officer determines will provide

671   significant and quantifiable habitat values for waterfowl in fields where the water is used and the

672   crops are produced; _Provided, That_ the exemption from the Tiered Pricing Component for

673   Irrigation Water shall apply only if such habitat values can be assured consistent with the

674   purposes of the CVPIA through binding agreements executed with or approved by the

675   Contracting Officer prior to use of such water.

676         (3)     For purposes of determining the applicability of the Tiered Pricing

677   Component pursuant to this Article, Water Delivered shall include Project Water that the

678   Contractor transfers to others but shall not include Project Water transferred to the Contractor,

679   nor shall it include the additional water provided to the Contractor under the provisions of

680   subdivision (f) of Article 3 of this Contract.

681         (l)     For the term of this Contract, Rates applied under the respective

682   ratesetting policies will be established to recover only reimbursable O&M (including any

683   deficits) and capital costs of the Project, as those terms are used in the then-current Project

684   ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

685   applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

686   practices which implement the Contracting Officer's ratesetting policies will not be implemented

687   until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

688   need, and impact of the proposed change.

689         (m)     Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

32

690    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

691    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

692    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

693    transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

694    lower Rates and Charges because of inability to pay and is transferring Project Water to another

695    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

696    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

697            (n)     Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

698    Officer is authorized to adjust determinations of ability to pay every five years.

699            (o)     Omitted

700                    NON-INTEREST BEARING O&M DEFICITS

701    8.      The Contractor and the Contracting Officer concur that, as of the Effective Date

702    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

703    therefore.

704                SALES, TRANSFERS, OR EXCHANGES OF WATER

705    9.     (a)     The right to receive Project Water provided for in this Contract may be

706    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

707    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

708    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

709    Water under this Contract may take place without the prior written approval of the Contracting

710    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

711    exchanges shall be approved absent all appropriate environmental documentation, including, but

712    not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

713    documentation should include, as appropriate, an analysis of groundwater impacts and economic

714    and social effects, including environmental justice, of the proposed water transfers on both the

715    transferor and transferee.

716         (b)    In order to facilitate efficient water management by means of water

717    transfers of the type historically carried out among Project Contractors located within the same

718    geographical area and to allow the Contractor to participate in an accelerated water transfer

719    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

720    all necessary environmental documentation, including, but not limited to, documents prepared

721    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

722    the Contracting Officer shall determine whether such transfers comply with applicable law.

723    Following the completion of the environmental documentation, such transfers addressed in such

724    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

725    require prior written approval by the Contracting Officer. Such environmental documentation

726    and the Contracting Officer's compliance determination shall be reviewed every five years and

727    updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

728    subsequent environmental documentation shall include an alternative to evaluate not less than the

729    quantity of Project Water historically transferred within the same geographical area.

730         (c)    For a water transfer to qualify under subdivision (b) of this Article, such

731    water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

732    years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

733    activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

734   be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

735   within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

736   through existing facilities with no new construction or modifications to facilities and be between

737   existing Project Contractors and/or the Contractor and the United States, Department of the

738   Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

739   requirements imposed for protection of the environment and Indian Trust Assets, as defined

740   under Federal law.

741   <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

742   10.   (a)   The amount of any overpayment by the Contractor of the Contractor's

743   O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

744   liabilities of the Contractor arising out of this Contract then due and payable.  Overpayments of

745   more than $1,000 shall be refunded at the Contractor's request.  In lieu of a refund, any amount

746   of such overpayment, at the option of the Contractor, may be credited against amounts to become

747   due to the United States by the Contractor.  With respect to overpayment, such refund or

748   adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

749   have the right to the use of any of the Project Water supply provided for by this Contract.  All

750   credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

751   obtaining direction as to how to credit or refund such overpayment in response to the notice to

752   the Contractor that it has finalized the accounts for the Year in which the overpayment was

753   made.

754   (b)   All advances for miscellaneous costs incurred for work requested by the

755   Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

756     when the work has been completed. If the advances exceed the actual costs incurred, the

757     difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

758     advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

759     Contract.

760     <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

761     11.     (a)     Subject to: (i) the authorized purposes and priorities of the Project and the

762     requirements of Federal law, and (ii) the obligations of the United States under existing

763     contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

764     Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

765     provided in this Contract.

766     (b)     The Contracting Officer or Operating Non-Federal Entity(ies) may

767     temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

768     provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

769     of the Project facilities or any part thereof necessary for the delivery of Project Water to the

770     Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

771     will give the Contractor due notice in advance of such temporary discontinuance or reduction,

772     except in case of emergency, in which case no notice need be given; *Provided, That* the United

773     States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

774     resumption of service after such discontinuance or reduction, and if requested by the Contractor,

775     the United States will, if possible, deliver the quantity of Project Water which would have been

776     delivered hereunder in the absence of such discontinuance or reduction.

777     (c)     The United States reserves the right to all seepage and return flow water

778     derived from Water Delivered to the Contractor hereunder which escapes or is discharged

779     beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

780     the United States any right to seepage or return flow being put to reasonable and beneficial use

781     pursuant to this Contract within the Contractor's Service Area by the Contractor or those

782     claiming by, through, or under the Contractor.

783               <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

784          12.     (a)     In its operation of the Project, the Contracting Officer will use all
785     reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
786     made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
787     determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
788     Contractor of said determination as soon as practicable.

789             (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting
790     or other similar operational errors affecting the Project; drought and other physical or natural
791     causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
792     to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
793     17 of this Contract, no liability shall accrue against the United States or any of its officers,
794     agents, or employees for any damage, direct or indirect, arising therefrom.

795             (c)     In any Year in which there may occur a Condition of Shortage for any of

796     the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

797     Article, the Contracting Officer will first allocate the available Project Water consistent with the

798     Project M&I Water Shortage Policy as finally adopted after environmental review for

799     determining the amount of Project Water Available for delivery to the Project Contractors.

800     Subject to the foregoing allocation, in any year in which there may occur a Condition of

801     Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

802     others entitled to Project Water from Delta Division Facilities under long-term water service or

803     repayment contracts (or renewals thereof or binding commitments therefore) in force on

804  February 28, 2005, as follows:

805  (1)  The Contracting Officer shall make an initial and subsequent

806  determination as necessary of the total quantity of Project Water estimated to be scheduled or

807  actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

808  renewal, long-term water service or repayment contracts then in force for the delivery of Project

809  Water by the United States from Delta Division Facilities during the relevant Year, the quantity

810  so determined being hereinafter referred to as the scheduled total;

811  (2)  A determination shall be made of the total quantity of Project

812  Water that is available for meeting the scheduled total, the quantity so determined being

813  hereinafter referred to as the available supply;

814  (3)  The total quantity of Project Water estimated to be scheduled or

815  actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

816  of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

817  hereinafter referred to as the Contractor's proportionate share; and

818  (4)  The available supply shall be multiplied by the Contractor's

819  proportionate share and the result shall be the quantity of Project Water made available by the

820  United States to the Contractor for the relevant Year in accordance with the schedule developed

821  by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

822  amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

823  that the Contracting Officer can increase or needs to decrease the available supply for delivery

824  from Delta Division Facilities to long-term water service and repayment contractors during the

825  relevant Year, such additions or reductions to the available supply shall be apportioned

38

826    consistent with subparagraphs (1) through (4), inclusive.

827    (d)    By entering into this Contract, the Contractor does not waive any legal

828    rights or remedies it may have to file or participate in any administrative or judicial proceeding

829    contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

830    such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

831    implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

832    *That* the Contractor has commenced any such judicial challenge or any administrative procedures

833    necessary to institute any judicial challenge within six months of the policy becoming final.  By

834    agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

835    that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

836    validate or invalidate the Project M&I Water Shortage Policy.

837    (e)    Notwithstanding any other provision of this Contract, Replacement Water

838    will bear shortages and be reduced in accordance with the terms of the Second Amended

839    Contract for Exchange of Water, dated February 14, 1968, between the United States and the

840    Central California Irrigation District, Columbia Canal Company, San Luis Canal Company, and

841    Firebaugh Canal Company, Contract No. I1r-1144

842    <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

843    13.    (a)    To the extent applicable, the Contractor shall not be deemed to have

844    delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

845    Contract if such lands are irrigated with groundwater that reaches the underground strata as an

846    unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

39

847         (b)     Upon complete payment of the Repayment Obligation by the Contractor,

848   this Article 13 shall no longer be applicable.

<u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

850      14.     The parties agree that the delivery of Irrigation Water or use of Federal facilities
851   pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
852   Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
853   the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
854   law.

<u>PROTECTION OF WATER AND AIR QUALITY</u>

856      15.   (a)     Omitted

857         (b)     The United States will care for, operate and maintain reserved works in a
858   manner that preserves the quality of the water at the highest level possible as determined by the
859   Contracting Officer. The United States does not warrant the quality of the water delivered to the
860   Contractor and is under no obligation to furnish or construct water treatment facilities to
861   maintain or improve the quality of water delivered to the Contractor.

862         (c)     The Contractor will comply with all applicable water and air pollution
863   laws and regulations of the United States and the State of California; and will obtain all required
864   permits or licenses from the appropriate Federal, State, or local authorities necessary for the
865   delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
866   State, and local water quality standards applicable to surface and subsurface drainage and/or
867   discharges generated through the use of Federal or Contractor facilities or Project Water
868   provided by the Contractor within its Service Area.

869         (d)     This Article shall not affect or alter any legal obligations of the Secretary
870   to provide drainage or other discharge services.

871         (e)     Omitted

<u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
STATES</u>

874      16.   (a)     Water or water rights now owned or hereafter acquired by the Contractor

875   other than from the United States and Irrigation Water furnished pursuant to the terms of this

876   Contract may be simultaneously transported through the same distribution facilities of the

877    Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

878    and non-Project water were constructed without funds made available pursuant to Federal

879    Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

880    Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

881    Irrigation Water must be established through the certification requirements as specified in the

882    Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

883    Eligible Lands within the Contractor's Service Area can be established and the quantity of

884    Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

885    Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

886    Project water are (were) constructed with funds made available pursuant to Federal Reclamation

887    law, the non-Project water will be subject to the acreage limitation provisions of Federal

888    Reclamation law, unless the Contractor pays to the United States the incremental fee described in

889    43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

890    annually the cost to the Federal Government, including interest, of storing or delivering non-

891    Project water, which for purposes of this Contract shall be determined as follows: The quotient

892    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

893    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

894    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

895    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

896    within the Contractor's Service Area that receives non-Project water through Federally financed

897    or constructed facilities. The incremental fee calculation methodology will continue during the

898    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

899    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

900    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

901    adopted, it shall supersede this provision.

902          (b)    Water or water rights now owned or hereafter acquired by the Contractor,

903    other than from the United States may be stored, conveyed, and/or diverted through Project

904    facilities, subject to the completion of appropriate environmental documentation, with the

905    approval of the Contracting Officer and the execution of any contract determined by the

906    Contracting Officer to be necessary, consistent with the following provisions:

907          (1)    The Contractor may introduce non-Project water into Project

908    facilities and deliver said water to lands within the Contractor's Service Area, including

909    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

910    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

911    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

912    use power policy is applicable, each as amended, modified, or superseded from time to time.

913          (2)    Delivery of such non-Project water in and through Project facilities

914    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

915    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

916    available to other Project Contractors; (iii) interfere with the delivery of contractual water

917    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

918    the Project facilities.

919          (3)    Neither the United States nor the Operating Non-Federal

920    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

921   is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

922   releases and agrees to defend and indemnify the United States and the Operating Non-Federal

923   Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

924   persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

925   employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

926   (ii) diverting such non-Project water into Project facilities.

927               (4)     Diversion of such non-Project water into Project facilities shall be

928   consistent with all applicable laws, and if involving groundwater, consistent with any applicable

929   groundwater management plan for the area from which it was extracted.

930               (5)     After Project purposes are met, as determined by the Contracting

931   Officer, the United States and Project Contractors entitled to Project Water from Delta Division

932   Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

933   available by the Contracting Officer for conveyance and transportation of non-Project water prior

934   to any such remaining capacity being made available to non-Project contractors.  Other Project

935   Contractors shall have a second priority to any remaining capacity of facilities declared to be

936   available by the Contracting Officer for conveyance and transportation of non-Project water prior

937   to any such remaining capacity being made available to non-Project contractors.

938           (c)     Upon complete payment of the Repayment Obligation by the Contractor,

939   subdivision (a) of this Article 16 shall no longer be applicable.

940                     OPINIONS AND DETERMINATIONS

941      17.    (a)     Where the terms of this Contract provide for actions to be based upon the

942   opinion or determination of either party to this Contract, said terms shall not be construed as

943     permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

944     determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

945     reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

946     or unreasonable opinion or determination. Each opinion or determination by either party shall be

947     provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

948     affect or alter the standard of judicial review applicable under Federal law to any opinion or

949     determination implementing a specific provision of Federal law embodied in statute or

950     regulation.

951           (b)     The Contracting Officer shall have the right to make determinations

952     necessary to administer this Contract that are consistent with the provisions of this Contract, the

953     laws of the United States and of the State of California, and the rules and regulations

954     promulgated by the Secretary. Such determinations shall be made in consultation with the

955     Contractor to the extent reasonably practicable.

956                <u>COORDINATION AND COOPERATION</u>

957     18.    (a)     In order to further their mutual goals and objectives, the Contracting

958     Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

959     with other affected Project Contractors, in order to improve the O&M of the Project. The

960     communication, coordination, and cooperation regarding O&M shall include, but not be limited

961     to, any action which will or may materially affect the quantity or quality of Project Water supply,

962     the allocation of Project Water supply, and Project financial matters including, but not limited to,

963     budget issues. The communication, coordination, and cooperation provided for hereunder shall

964     extend to all provisions of this Contract. Each party shall retain exclusive decision making

44

965     authority for all actions, opinions, and determinations to be made by the respective party.

966           (b)       Within 120 days following the Effective Date, the Contractor, other

967     affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

968     Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

969     amended as necessary separate and apart from this Contract. The goal of this process shall be to

970     provide, to the extent practicable, the means of mutual communication and interaction regarding

971     significant decisions concerning Project O&M on a real-time basis.

972           (c)       In light of the factors referred to in subdivision (b) of Article 3 of this

973     Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

974     intent:

975                   (1)       The Contracting Officer will, at the request of the Contractor,

976     assist in the development of integrated resource management plans for the Contractor. Further,

977     the Contracting Officer will, as appropriate, seek authorizations for implementation of

978     partnerships to improve water supply, water quality, and reliability.

979                   (2)       The Secretary will, as appropriate, pursue program and project

980     implementation and authorization in coordination with Project Contractors to improve the water

981     supply, water quality, and reliability of the Project for all Project purposes.

982                   (3)       The Secretary will coordinate with Project Contractors and the

983     State of California to seek improved water resource management.

984                   (4)       The Secretary will coordinate actions of agencies within the

985     Department of the Interior that may impact the availability of water for Project purposes.

986                   (5)       The Contracting Officer shall periodically, but not less than

987    annually, hold division-level meetings to discuss Project operations, division-level water

988    management activities, and other issues as appropriate.

989        (d)    Without limiting the contractual obligations of the Contracting Officer

990    under the other Articles of this Contract, nothing in this Article shall be construed to limit or

991    constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

992    Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

993    protect health, safety, or the physical integrity of structures or facilities.

994                  CHARGES FOR DELINQUENT PAYMENTS

995    19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
996    charges on delinquent payments. If a payment is not received by the due date, the Contractor
997    shall pay an interest charge on the delinquent payment for each day the payment is delinquent
998    beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
999    addition to the interest charge, an administrative charge to cover additional costs of billing and
1000   processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
1001   shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
1002   payment is delinquent beyond the due date, based on the remaining balance of the payment due
1003   at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
1004   collection services associated with a delinquent payment.

1005        (b)    The interest rate charged shall be the greater of either the rate prescribed
1006   quarterly in the Federal Register by the Department of the Treasury for application to overdue
1007   payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
1008   determined as of the due date and remain fixed for the duration of the delinquent period.

1009        (c)    When a partial payment on a delinquent account is received, the amount
1010   received shall be applied first to the penalty charges, second to the administrative charges, third
1011   to the accrued interest, and finally to the overdue payment.

1012                  EQUAL EMPLOYMENT OPPORTUNITY

1013   20.    During the performance of this Contract, the Contractor agrees as follows:

1014        (a)    The Contractor will not discriminate against any employee or applicant for
1015   employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1016   origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1017   that employees are treated during employment, without regard to their race, color, religion, sex,

1018 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1019 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1020 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1021 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1022 places, available to employees and applicants for employment, notices to be provided by the
1023 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1024       (b)    The Contractor will, in all solicitations or advertisements for employees
1025 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1026 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1027 gender identity, or national origin.

1028       (c)    The Contractor will not discharge or in any other manner discriminate
1029 against any employee or applicant for employment because such employee or applicant has
1030 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1031 employee or applicant. This provision shall not apply to instances in which an employee who
1032 has access to the compensation information of other employees or applicants as part of such
1033 employee's essential job functions discloses the compensation of such other employees or
1034 applicants to individuals who do not otherwise have access to such information, unless such
1035 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1036 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1037 consistent with the Contractor's legal duty to furnish information.

1038       (d)    The Contractor will send to each labor union or representative of workers
1039 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1040 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1041 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1042 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1043 applicants for employment.

1044       (e)    The Contractor will comply with all provisions of Executive Order No.
1045 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1046 Labor.

1047       (f)    The Contractor will furnish all information and reports required by
1048 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1049 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1050 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1051 compliance with such rules, regulations, and orders.

1052       (g)    In the event of the Contractor's noncompliance with the nondiscrimination
1053 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1054 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1055 ineligible for further Government contracts in accordance with procedures authorized in

1056 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1057 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1058 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1059          (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1060 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1061 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1062 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1063 will take such action with respect to any subcontract or purchase order as may be directed by the
1064 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1065 noncompliance: _Provided, however, That_ in the event the Contractor becomes involved in, or is
1066 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1067 Contractor may request the United States to enter into such litigation to protect the interests of
1068 the United States.

### GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1070     21.    (a)    The obligation of the Contractor to pay the United States as provided in
1071 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1072 obligation may be distributed among the Contractor's water users and notwithstanding the default
1073 of individual water users in their obligation to the Contractor.

1074          (b)    The payment of charges becoming due pursuant to this Contract is a
1075 condition precedent to receiving benefits under this Contract. The United States shall not make
1076 water available to the Contractor through Project facilities during any period in which the
1077 Contractor is in arrears in the advance payment of water rates due the United States. The
1078 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1079 parties that are in arrears in the advance payment of water rates as levied or established by the
1080 Contractor.

1081          (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1082 obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1084     22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1085 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1086 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1087 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1088 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1089 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1090 Interior and/or Bureau of Reclamation.

1091          (b)     These statutes prohibit any person in the United States from being
1092 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1093 discrimination under any program or activity receiving financial assistance from the Bureau of
1094 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1095 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1096 obligation, including permitting officials of the United States to inspect premises, programs, and
1097 documents.

1098          (c)  .   The Contractor makes this Contract in consideration of and for the
1099 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1100 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1101 Reclamation, including installment payments after such date on account of arrangements for
1102 Federal financial assistance which were approved before such date. The Contractor recognizes
1103 and agrees that such Federal assistance will be extended in reliance on the representations and
1104 agreements made in this Article and that the United States reserves the right to seek judicial
1105 enforcement thereof.

1106          (d)     Complaints of discrimination against the Contractor shall be investigated
1107 by the Contracting Officer's Office of Civil Rights.

1108                  PRIVACY ACT COMPLIANCE

1109    23.    (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1110 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1111 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1112 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1113 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1114 C.F.R. § 426.18.

1115          (b)     With respect to the application and administration of the criminal penalty
1116 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1117 employees who are responsible for maintaining the certification and reporting records referenced
1118 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1119 U.S.C. § 552a(m).

1120          (c)     The Contracting Officer or a designated representative shall provide the
1121 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1122 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1123 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1124 information contained in the Landholders' certification and reporting records.

1125          (d)     The Contracting Officer shall designate a full-time employee of the
1126 Bureau of Reclamation to be the System Manager responsible for making decisions on denials

1127 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1128 The Contractor is authorized to grant requests by individuals for access to their own records.

1129        (e)    The Contractor shall forward promptly to the System Manager each
1130 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1131 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1132 System Manager with information and records necessary to prepare an appropriate response to
1133 the requester. These requirements do not apply to individuals seeking access to their own
1134 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1135 the requester elects to cite the Privacy Act as an authority for the request.

1136        (f)    Upon complete payment of the Repayment Obligation by the Contractor,

1137 this Article 23 will no longer be applicable.

## CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS

1139     24.    In addition to all other payments to be made by the Contractor pursuant to this

1140 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1141 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1142 of direct cost incurred by the United States for work requested by the Contractor associated with

1143 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1144 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1145 to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1146 contract administration.

## WATER CONSERVATION

1148     25.    (a)    Prior to the delivery of water provided from or conveyed through
1149 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1150 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1151 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1152 Additionally, an effective water conservation and efficiency program shall be based on the

1153 Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1154 the conservation and efficiency criteria for evaluating water conservation plans established under

1155 Federal law. The water conservation and efficiency program shall contain definite water

1156 conservation objectives, appropriate economically feasible water conservation measures, and

1157 time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1158 Contract shall be contingent upon the Contractor's continued implementation of such water

1159 conservation program. In the event the Contractor's water conservation plan or any revised water

1160 conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1161 determined by the Contracting Officer to meet such criteria, due to circumstances which the

1162 Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1163 made under this Contract so long as the Contractor diligently works with the Contracting Officer

1164 to obtain such determination at the earliest practicable date, and thereafter the Contractor

1165 immediately begins implementing its water conservation and efficiency program in accordance

1166 with the time schedules therein.

1167    (b) Should the amount of M&I Water delivered pursuant to subdivision (a) of

1168 Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1169 Contractor shall implement the Best Management Practices identified by the time frames issued

1170 by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1171 Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1172 the Contractor.

1173    (c) The Contractor shall submit to the Contracting Officer a report on the

1174 status of its implementation of the water conservation plan on the reporting dates specified in the

1175 then-existing conservation and efficiency criteria established under Federal law.

<div align="center">51</div>

1176         (d)     At five (5)-year intervals, the Contractor shall revise its water

1177   conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1178   water conservation plans established under Federal law and submit such revised water

1179   management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1180   will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1181   existing conservation and efficiency criteria for evaluating water conservation plans established

1182   under Federal law.

1183         (e)     If the Contractor is engaged in direct groundwater recharge, such activity

1184   shall be described in the Contractor's water conservation plan.

1185                 <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1186     26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1187   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1188   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1189   Area. Any such water shall not be considered Project Water under this Contract. In addition,

1190   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1191   any water user within the Contractor's Service Area acquires or has available under any other

1192   contract pursuant to Federal Reclamation law.

1193   <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1194     27.   (a)     The O&M of a portion of the Project facilities which serve the Contractor,

1195   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1196   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1197   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1198  Luis & Delta-Mendota Water Authority.  That separate agreement shall not interfere with or

1199  affect the rights or obligations of the Contractor or the United States hereunder.

1200  (b)  The Contracting Officer has previously notified the Contractor in writing

1201  that the O&M of a portion of the Project facilities which serve the Contractor has been

1202  transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1203  therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1204  Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1205  the terms and conditions of the separate agreement between the United States and the Operating

1206  Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1207  this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1208  funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1209  such successor determines, sets, or establishes for the O&M of the portion of the Project

1210  facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1211  Mendota Water Authority or such successor.  Such direct payments to Operating Non-Federal

1212  Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1213  Contractor of its obligation to pay directly to the United States the Contractor's share of the

1214  Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1215  Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1216  United States in accordance with the separate agreement identified in subdivision (a) of this

1217  Article.

1218  (c)  For so long as the O&M of any portion of the Project facilities serving the

1219  Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1220 Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1221 Rates for Water Delivered under this Contract representing the cost associated with the activity

1222 being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority,

1223 or its successor.

1224       (d)    In the event the O&M of the Project facilities operated and maintained by

1225 the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1226 the United States during the term of this Contract, the Contracting Officer shall so notify the

1227 Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1228 the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1229 representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1230 The Contractor shall, thereafter, in the absence of written notification from the Contracting

1231 Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1232 revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1233       <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1234     28.    The expenditure or advance of any money or the performance of any obligation of
1235 the United States under this Contract shall be contingent upon appropriation or allotment of
1236 funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1237 obligations under this Contract. No liability shall accrue to the United States in case funds are
1238 not appropriated or allotted.

1239       <u>BOOKS, RECORDS, AND REPORTS</u>

1240     29.   (a)    The Contractor shall establish and maintain accounts and other books and
1241 records pertaining to administration of the terms and conditions of this Contract, including the
1242 Contractor's financial transactions; water supply data; project operations, maintenance, and
1243 replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1244 census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1245 Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1246 such date or dates as the Contracting Officer may require. Subject to applicable Federal laws

1247 and regulations, each party to this Contract shall have the right during office hours to examine
1248 and make copies of the other party's books and records relating to matters covered by this
1249 Contract.

1250        (b)        Notwithstanding the provisions of subdivision (a) of this Article, no

1251 books, records, or other information shall be requested from the Contractor by the Contracting

1252 Officer unless such books, records, or information are reasonably related to the administration or

1253 performance of this Contract.  Any such request shall allow the Contractor a reasonable period of

1254 time within which to provide the requested books, records, or information.

1255        (c)        At such time as the Contractor provides information to the Contracting

1256 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1257 to the Operating Non-Federal Entity(ies).

1258        <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1259 30.    (a)        The provisions of this Contract shall apply to and bind the successors and
1260 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1261 therein by either party shall be valid until approved in writing by the other party.

1262        (b)        The assignment of any right or interest in this Contract by either party

1263 shall not interfere with the rights or obligations of the other party to this Contract absent the

1264 written concurrence of said other party.

1265        (c)        The Contracting Officer shall not unreasonably condition or withhold

1266 approval of any proposed assignment.

1267        <u>SEVERABILITY</u>

1268 31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1269 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1270 an association or other form of organization whose primary function is to represent parties to

1271 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1272 enforceability of a provision included in this Contract and said person, entity, association, or

1273 organization obtains a final court decision holding that such provision is legally invalid or

1274 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1275 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1276 final court decision identify by mutual agreement the provisions in this Contract which must be

1277 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1278 The time periods specified above may be extended by mutual agreement of the parties. Pending

1279 the completion of the actions designated above, to the extent it can do so without violating any

1280 applicable provisions of law, the United States shall continue to make the quantities of Project

1281 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1282 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1283 <div align="center">RESOLUTION OF DISPUTES</div>

1284     32. Should any dispute arise concerning any provisions of this Contract, or the

1285 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1286 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1287 Officer referring any matter to the Department of Justice, the party shall provide to the other

1288 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1289 not be required where a delay in commencing an action would prejudice the interests of the party

1290 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1291 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1292     provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1293     or the United States may have.

1294                         OFFICIALS NOT TO BENEFIT

1295        33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of
1296     the Contractor shall benefit from this Contract other than as a water user or landowner in the
1297     same manner as other water users or landowners.

1298     CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA

1299        34.     (a)     While this Contract is in effect, no change may be made in the
1300     Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1301     changes which may affect the respective rights, obligations, privileges, and duties of either the
1302     United States or the Contractor under this Contract, including, but not limited to, dissolution,
1303     consolidation, or merger, except upon the Contracting Officer's written consent.

1304            (b)     Within 30 days of receipt of a request for such a change, the Contracting

1305     Officer will notify the Contractor of any additional information required by the Contracting

1306     Officer for processing said request, and both parties will meet to establish a mutually agreeable

1307     schedule for timely completion of the process. Such process will analyze whether the proposed

1308     change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1309     (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1310     to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1311     have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1312     Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1313     responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1314     be paid in accordance with Article 24 of this Contract.

1315 <div align="center">FEDERAL LAWS</div>

1316     35.    By entering into this Contract, the Contractor does not waive its rights to contest

1317 the validity or application in connection with the performance of the terms and conditions of this

1318 Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1319 the terms and conditions of this Contract unless and until relief from application of such Federal

1320 law or regulation to the implementing provision of the Contract is granted by a court of

1321 competent jurisdiction.

1322 <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1323     36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1324 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1325 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1326     (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1327 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1328 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1329 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1330 <div align="center">CERTIFICATION OF NONSEGREGATED FACILITIES</div>

1331     37.    The Contractor hereby certifies that it does not maintain or provide for its
1332 employees any segregated facilities at any of its establishments and that it does not permit its
1333 employees to perform their services at any location under its control where segregated facilities
1334 are maintained. It certifies further that it will not maintain or provide for its employees any
1335 segregated facilities at any of its establishments and that it will not permit its employees to
1336 perform their services at any location under its control where segregated facilities are
1337 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1338 Employment Opportunity clause in this Contract. As used in this certification, the term
1339 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1340 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1341 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing

<div align="center">58</div>

1342    facilities provided for employees which are segregated by explicit directive or are in fact
1343    segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1344    disability, or otherwise. The Contractor further agrees that (except where it has obtained
1345    identical certifications from proposed subcontractors for specific time periods) it will obtain
1346    identical certifications from proposed subcontractors prior to the award of subcontracts
1347    exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1348    Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1349    following notice to such proposed subcontractors (except where the proposed subcontractors
1350    have submitted identical certifications for specific time periods):

1351          NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1352                CERTIFICATIONS OF NONSEGREGATED FACILITIES

1353    A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1354    exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1355    Opportunity clause. The certification may be submitted either for each subcontract or for all
1356    subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1357    making false statements in offers is prescribed in 18 U.S.C. § 1001.

1358                     <u>NOTICES</u>

1359        38.    Any notice, demand, or request authorized or required by this Contract shall be
1360    deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1361    delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1362    California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1363    postage prepaid, or delivered to the Board of Directors of the Patterson Irrigation District, 948
1364    Orange Avenue, Patterson, California 95363. The designation of the addressee or the address
1365    may be changed by notice given in the same manner as provided in this Article for other notices.

1366               <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1367        39.   (a)    All payments from the Contractor to the United States under this Contract
1368    shall be by the medium requested by the United States on or before the date payment is due. The
1369    required method of payment may include checks, wire transfers, or other types of payment
1370    specified by the United States.

1371             (b)    Upon execution of this Contract, the Contractor shall furnish the
1372    Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1373    for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1374    out of the Contractor's relationship with the United States.

1375 <div align="center">CONTRACT DRAFTING CONSIDERATIONS</div>

1376      40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1377 each of whom is sophisticated in the matters to which this amended Contract pertains.  The
1378 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1379 the parties, and no one party shall be considered to have drafted the stated Articles.  Single-
1380 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1381 <div align="center">CONFIRMATION OF CONTRACT</div>

1382      41.    Promptly after the execution of this amended Contract, the Contractor will
1383 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1384 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1385 for the authorization of the execution of this amended Contract.  This amended Contract shall not
1386 be binding on the United States until the Contractor secures a final decree.

1387

1388        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1389    day and year first above written.

1390                         UNITED STATES OF AMERICA

1391                         By: _____
1392                              Regional Director
1393                              Interior Region 10: California-Great Basin
1394                              Bureau of Reclamation

1395                         PATTERSON IRRIGATION DISTRICT
1396    (SEAL)

1397                         By: _____
1398                              President of the Board of Directors

1399    Attest:

1400    By: _____
1401        Secretary of the Board of Directors

1388        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1389   day and year first above written.

1390                              UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND**
**SUFFICIENCY - REVIEWED BY:**
Digitally signed by BRIAN
HUGHES
Date: 2020.10.16 18:15:50
-07'00'
**OFFICE OF THE REGIONAL SOLICITOR**
**DEPARTMENT OF THE INTERIOR**
TIME STAMP: 1:37 pm, May 11 2020

1391                            By: _____
1392                                     Regional Director
1393                                     Interior Region 10: California-Great Basin
1394                                     Bureau of Reclamation

1395                              PATTERSON IRRIGATION DISTRICT
1396   (SEAL)

1397                            By: _____
1398                                     President of the Board of Directors

1399   Attest:

1400   By: _____
1401       Secretary of the Board of Directors



**Patterson Irrigation District**

Contract No. 14-06-200-3598A-LTR1-P

Exhibit A

District Boundary

Contractor's Service Area

Date: 4/1/2020
File Name: N:\Districts\Contracts\patterson\patterson_20200401.mxd

BUREAU OF
RECLAMATION

Miles
0    0.5    1

214-202-889

## EXHIBIT B
## PATTERSON IRRIGATION DISTRICT
### 2020 Rates and Charges
#### (Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $34.58 | |
| DMC Aqueduct Intertie | $1.10 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $62.66 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

## The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which equals a M&I Historic use average quantity of 0 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

| | |
|---|---|
| Contractor: | Patterson WD |
| Facility: | Delta Mendota Canal |
| Contract: | 14-06-200-3598A-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | | Discount |
|---|---|---|---|---|
| Construction Cost | ~ $ | 1,802,674 | | |
| 2019 Repayment (Estimate) ** | $ | 673,100 | | |
| Adjusted Construction Cost | $ | 1,129,574 | $ | 1,096,368 |
| Intertie Construction Cost (N/A): | $ | 228,745 | $ | 204,872 |
| Total | $ | 1,358,319 | $ | 1,301,239 |

| If Paid in Installments (Used 20 yr CMT) | | | | |
|---|---|---|---|---|
| | Due**** | | | |
| Payment 1 | 9/1/2020 | | $ | 329,386 |
| Payment 2 | 9/1/2021 | | $ | 329,386 |
| Payment 3 | 9/1/2022 | | $ | 329,386 |
| Payment 4 ~~ | 9/1/2023 | | $ | 329,386 |
| Total Installment Payments | | | $ | 1,317,545 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 1,129,574 | $ 102,689 | $ 102,137 | $ 228,745 | $ 5,199 | $ 5,171 | $ 107,308 |
| 2021 | $ 1,026,885 | $ 102,689 | $ 101,669 | $ 223,546 | $ 5,199 | $ 5,147 | $ 106,816 |
| 2022 | $ 924,197 | $ 102,689 | $ 101,163 | $ 218,348 | $ 5,199 | $ 5,122 | $ 106,285 |
| 2023 | $ 821,508 | $ 102,689 | $ 100,660 | $ 213,149 | $ 5,199 | $ 5,096 | $ 105,756 |
| 2024 | $ 718,820 | $ 102,689 | $ 100,159 | $ 207,950 | $ 5,199 | $ 5,071 | $ 105,230 |
| 2025 | $ 616,131 | $ 102,689 | $ 99,661 | $ 202,751 | $ 5,199 | $ 5,045 | $ 104,707 |
| 2026 | $ 513,443 | $ 102,689 | $ 99,165 | $ 197,553 | $ 5,199 | $ 5,020 | $ 104,186 |
| 2027 | $ 410,754 | $ 102,689 | $ 98,672 | $ 192,354 | $ 5,199 | $ 4,995 | $ 103,667 |
| 2028 | $ 308,066 | $ 102,689 | $ 98,181 | $ 187,155 | $ 5,199 | $ 4,971 | $ 103,152 |
| 2029 | $ 205,377 | $ 102,689 | $ 97,693 | $ 181,956 | $ 5,199 | $ 4,946 | $ 102,638 |
| 2030 | $ 102,689 | $ 102,689 | $ 97,206 | $ 176,758 | $ 5,199 | $ 4,921 | $ 102,128 |
| 2031-63 | | | | $ 171,559 | $ 171,559 | $ 149,366 | $ 149,366 |
| Total, Lump Sum Payment | | | $ 1,096,368 | | | $ 204,872 | $ 1,301,239 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amount of Reduction, Lump Sum | | | $ 33,206 | | | $ 23,873 | $ 57,080 |

* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

*** Excludes Interest to payment date as Interest will be computed as an annual expense as a later date.

****Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 5**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
James Irrigation District
8749 Ninth Street
San Joaquin CA 93660

Subject: Water Infrastructure Improvements for the Nation Act Contract No. 14-06-200-700-A-LTR1-P Between the United States and the James Irrigation District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of Reclamation appreciates the effort expended by the James Irrigation District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
JAMES IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 32 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 34 |
| 11. | Temporary Reductions – Return Flows | 35 |
| 12. | Constraints on the Availability of Water | 36 |
| 13. | Unavoidable Groundwater Percolation | 38 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 43 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 48 |
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 51 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 54 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
JAMES IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1      THIS CONTRACT, made this 22nd day of October , 20 22 , in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and JAMES IRRIGATION

12     DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13     duly organized, existing, and acting pursuant to the laws thereof;

14     WITNESSETH, That:

15 <div align="center">EXPLANATORY RECITALS</div>

16       [1st]    WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22       [2nd]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25       [3rd]    WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27       [4th]    WHEREAS, the United States and the Contractor entered into Contract

28 No. 14-06-200-700-A, dated December 23, 1963, which established terms for the delivery of

29 9,700 acre feet of Schedule 2 water as a permanent adjustment and settlement of the Contractor's

30 asserted claims of rights to water in Fresno Slough, tributary to the San Joaquin River in

31 fulfillment of such rights; and

32       [5th]    WHEREAS, Schedule 2 water is not the subject of this Contract and will

33 continue to be delivered and administered under the terms and conditions of Contract No. 14-06-

34 200-700-A; and

35       [6th]    WHEREAS, Contract No. 14-06-200-700-A also established the terms for

36 the delivery of 35,300 acre-feet of supplemental water, hereinafter referred to as Project Water,

<div align="center">2</div>

37  to the Contractor from Delta Division facilities from December 23, 1963 through December 23,

38  2003; and

39          [7th]    WHEREAS, the Contractor and the United States have pursuant to

40  Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

41  entered into interim renewal contract(s) identified as Contract No(s). 14-06-200-700-A-IR1 and

42  14-06-200-700-A-IR2, which provided for the delivery of Project Water to the Contractor from

43  March 1, 2004, through February 28, 2006; and

44          [8th]    WHEREAS, the United States and the Contractor entered into a long-term

45  contract identified as Contract No. 14-06-200-700-A-LTR1, hereinafter referred to as the

46  Existing Contract, which provided for the continued water service to the Contractor following

47  expiration of Contract No. 14 06 200 700 A IR2, and which was in effect the date the WIIN Act

48  was enacted; and

49          [9th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

50  States of America enacted the WIIN Act; and

51          [10th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

52  contractor, the Secretary of the Interior shall convert any water service contract in effect on the

53  date of enactment of this subtitle and between the United States and a water users' association

54  [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

55  mutually agreeable terms and conditions."; and

56          [11th]   WHEREAS, Section 4011(a)(1) further provides that "the manner of

57  conversion under this paragraph shall be as follows: (A) Water service contracts that were

58  entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

3

59    this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

60    1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

61    of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

62    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

63              [12th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

64    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

65    repayment, exchange and transfer contractual rights between the water users' association

66    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

67    water users' association [Contractor] and their landowners as provided under State law."; and

68              [13th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

69    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

70    service or repayment contractor to receive water; or (4) except as expressly provided in this

71    section, any obligations under the Federal Reclamation law, including the continuation of

72    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

73    repayment contractors making prepayments pursuant to this section."; and

74              [14th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

75    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

76    service contracts into repayment contracts, amend existing repayment contracts, and allow

77    contractors to prepay their construction cost obligations pursuant to applicable Federal

78    Reclamation law; and

79              [15th]   WHEREAS, the United States has determined that the Contractor has

80    fulfilled all of its obligations under the Existing Contract; and

4

81      [16th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

82  Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

83  reasonable and beneficial use and/or has demonstrated future demand for water use such that the

84  Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

85  quantity of Project Water to be made available to it pursuant to this Contract; and

86      [17th]   WHEREAS, water obtained from the Project has been relied upon by

87  urban and agricultural areas within California for more than 50 years, and is considered by the

88  Contractor as an essential portion of its water supply; and

89      [18th]   WHEREAS, the economies of regions within the Project, including the

90  Contractor's, depend upon the continued availability of water, including water service from the

91  Project; and

92      [19th]   WHEREAS, the Secretary intends through coordination, cooperation, and

93  partnerships to pursue measures to improve water supply, water quality, and reliability of the

94  Project for all Project purposes; and

95      [20th]   WHEREAS, the mutual goals of the United States and the Contractor

96  include: to provide for reliable Project Water supplies; to control costs of those supplies; to

97  achieve repayment of the Project as required by law; to guard reasonably against Project Water

98  shortages; to achieve a reasonable balance among competing demands for use of Project Water;

99  and to comply with all applicable environmental statutes, all consistent with the legal obligations

100  of the United States relative to the Project; and

101      [21st]   WHEREAS, the parties intend by this Contract to maintain a cooperative

102  relationship in order to achieve their mutual goals; and

103    [22nd] WHEREAS, the Contractor has utilized or may utilize transfers, contract

104 assignments, rescheduling, and conveyance of Project Water and non-Project water under this

105 Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

106 beneficial use of water; and

107    [23rd] WHEREAS, the parties desire and intend that this Contract not provide a

108 disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

109 Explanatory Recital immediately above; and

110    [25th] WHEREAS, the Contracting Officer and the Contractor agree that this

111 Contract complies with Section 4011 of the WIIN Act; and

112    [26th] WHEREAS, the Contracting Officer and the Contractor agree to amend

113 and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

114 Reclamation law on the terms and conditions set forth below.

115    NOW, THEREFORE, in consideration of the mutual and dependent covenants

116 herein contained, it is hereby mutually agreed by the parties hereto as follows:

117             <u>DEFINITIONS</u>

118   1.  When used herein unless otherwise distinctly expressed, or manifestly

119 incompatible with the intent of the parties as expressed in this Contract, the term:

120    (a)  "Additional Capital Obligation" shall mean construction costs or other

121 capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

122 Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

123 (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

124 Stat. 1628) ("WIIN Act");

125    (b) "Calendar Year" shall mean the period January 1 through December 31,

126 both dates inclusive;

127    (c) "Charges" shall mean the payments required by Federal Reclamation law

128 in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

129 annually by the Contracting Officer pursuant to this Contract;

130    (d) "Condition of Shortage" shall mean a condition respecting the Project

131 during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

132 Contract Total;

133    (e) "Contracting Officer" shall mean the Secretary of the Interior's duly

134 authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

135 or regulation;

136    (f) "Contract Total" shall mean the maximum amount of water to which the

137 Contractor is entitled under subdivision (a) of Article 3 of this Contract;

138    (g) "Contractor's Service Area" shall mean the area to which the Contractor is

139 permitted to provide Project Water under this Contract as described in Exhibit "A" attached

140 hereto, which may be modified from time to time in accordance with Article 34 of this Contract

141 without amendment of this Contract;

142    (h) "CVPIA" shall mean the Central Valley Project Improvement Act, Title

143 XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

144    (i) "Delta Division Facilities" shall mean those existing and future Project

145 facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

146 the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

147  Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

148  Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

149          (j)  "Eligible Lands" shall mean all lands to which Irrigation Water may be

150  delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

151  1263), as amended;

152          (k)  "Excess Lands" shall mean all lands in excess of the limitations contained

153  in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

154  acreage limitation under Federal Reclamation law;

155          (l)  "Existing Capital Obligation" shall mean the remaining amount of

156  construction costs or other capitalized costs allocable to the Contractor as described in Section

157  4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

158  Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

159  in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

160  Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

161  Exhibit "C", which is incorporated herein by reference;

162          (m)  "Full Cost Rate" shall mean an annual rate, as determined by the

163  Contracting Officer that shall amortize the expenditures for construction properly allocable to the

164  Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

165  deficits funded, less payments, over such periods as may be required under Federal Reclamation

166  law, or applicable contract provisions. Interest will accrue on both the construction expenditures

167  and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

168  date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

8

169    in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

170    The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

171    Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

172           (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

173    be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

174           (o)    "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

175    to the delivery of Irrigation Water;

176           (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
177    primarily for the production of commercial agricultural crops or livestock, and domestic and
178    other uses that are incidental thereto;

179           (q)    "Landholder" shall mean a party that directly or indirectly owns or leases

180    nonexempt land, as provided in 43 CFR 426.2;

181           (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
182    Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
183    of "Irrigation Water" or within another category of water use under an applicable Federal
184    authority;

185           (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

186    the delivery of M&I Water;

187           (t)    "Operation and Maintenance" or "O&M" shall mean normal and

188    reasonable care, control, operation, repair, replacement (other than capital replacement), and

189    maintenance of Project facilities;

190           (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

191    successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

192    the Delta Division Facilities pursuant to written agreement(s) with the United States.  When this

193     Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

194     Water Authority;

195             (v)     "Project" shall mean the Central Valley Project owned by the United

196     States and managed by the Department of the Interior, Bureau of Reclamation;

197             (w)     "Project Contractors" shall mean all parties who have contracts for water

198     service for Project Water from the Project with the United States pursuant to Federal

199     Reclamation law;

200             (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

201     delivered by the Secretary in accordance with the statutes authorizing the Project and in

202     accordance with the terms and conditions of water rights acquired pursuant to California law;

203     however, Schedule 2 Water shall not be considered Project Water for purposes of this Contract;

204             (y)     "Rates" shall mean the payments determined annually by the Contracting

205     Officer in accordance with the then-current applicable water ratesetting policies for the Project,

206     as described in subdivision (a) of Article 7 of this Contract;

207             (z)     "Recent Historic Average" shall mean the most recent five (5)-year

208     average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

209     or its preceding contract(s);

210            (aa)     "Repayment Obligation" for Water Delivered as Irrigation Water shall

211     mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

212     amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

213     Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

214     United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

215          (bb)   "Schedule 2 Water" shall mean that water as so defined under Contract

216    No. 14-06-200-700-A with the United States, which will continue to be delivered and

217    administered under said contract;

218          (cc)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

219    successor, or an authorized representative acting pursuant to any authority of the Secretary and

220    through any agency of the Department of the Interior;

221          (dd)   "Tiered Pricing Component" shall be the incremental amount to be paid

222    for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

223    for in Exhibit "B";

224          (ee)   "Water Delivered" or "Delivered Water" shall mean Project Water

225    diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

226    Officer;

227          (ff)   "Water Made Available" shall mean the estimated amount of Project

228    Water that can be delivered to the Contractor for the upcoming Year as declared by the

229    Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

230          (gg)   "Water Scheduled" shall mean Project Water made available to the

231    Contractor for which times and quantities for delivery have been established by the Contractor

232    and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

233          (hh)   "Year" shall mean the period from and including March 1 of each

234    Calendar Year through the last day of February of the following Calendar Year.

11

235 <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

236    2.    (a)    This Contract shall be effective November 1, 2020, hereinafter known as

237 the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

238 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

239 (53 Stat. 1195) as applicable, and applicable law;

240                         (1)    *Provided, That* the Contracting Officer shall not seek to terminate

241 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

242 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

243 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

244 or to diligently commence and maintain full curative payments satisfactory to the Contracting

245 Officer within the sixty (60) calendar days' notice period;

246                         (2)    *Provided, further, That* the Contracting Officer shall not seek to

247 suspend making water available or declaring Water Made Available pursuant to this Contract for

248 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

249 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

250 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

251 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

252 cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

253 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

254  satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

255  available and declaring Water Made Available pursuant to this Contract;

256  (3)  *Provided, further,* *That* this Contract may be terminated at any

257  time by mutual consent of the parties hereto.

258  (b)  Upon complete payment of the Repayment Obligation by the Contractor,

259  and notwithstanding any Additional Capital Obligation that may later be established, the acreage

260  limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

261  and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

262  this Contract shall no longer be applicable.

263  (c)  Notwithstanding any provision of this Contract, the Contractor reserves

264  and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

265  allowed by law.

266  (d)  Notwithstanding any provision of this Contract, the Contractor reserves

267  and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

268  allowed by law.

269  <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

270  3.  (a)  During each Year, consistent with all applicable State water rights permits,

271  and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

272  Contract, the Contracting Officer shall make available for delivery to the Contractor 35,300 acre-

273  feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

274  accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

275  Articles 4 and 7 of this Contract.  Schedule 2 Water shall continue to be delivered to the

276 Contractor at no cost pursuant to Contract No. 14-06-200-700-A, dated December 23, 1963, and

277 shall not be subject to the provisions of this Contract, and said Contract No. 14-06-200-700-A

278 shall be in full force and effect insofar as it pertains to the furnishing of Schedule 2 Water.

279       (b)      Because the capacity of the Project to deliver Project Water has been

280 constrained in recent years and may be constrained in the future due to many factors including

281 hydrologic conditions and implementation of Federal and State laws, the likelihood of the

282 Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

283 Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

284 programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

285 CVPIA projected that the Contract Total set forth in this Contract will not be available to the

286 Contractor in many years. During the most recent five years prior to execution of the Existing

287 Contract, the Recent Historic Average Water Made Available to the Contractor was 23,227 acre-

288 feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

289 parties under any provision of this Contract.

290       (c)      The Contractor shall utilize the Project Water in accordance with all

291 applicable legal requirements.

292          (1)      In the event any Project Contractor (other than a Cross Valley

293 Contractor) that receives Project Water through the Delta Division Facilities obtains a

294 contractual agreement that the Contracting Officer shall make Project Water available at a point

295 or points of delivery in or north of the Delta, at the request of the Contractor and upon

296 completion of any required environmental documentation, this Contract shall be amended to

297 provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

14

298    this Contract shall be limited solely to those changes made necessary by the addition of such

299    alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

300    of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

301    amendment.

302            (d)     The Contractor shall make reasonable and beneficial use of all water

303    furnished pursuant to this Contract.  Groundwater recharge programs (direct, indirect, or in lieu),

304    groundwater banking programs, surface water storage programs, and other similar programs

305    utilizing Project Water or other water furnished pursuant to this Contract conducted within the

306    Contractor's Service Area which are consistent with applicable State law and result in use

307    consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

308    program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

309    Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

310    sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

311    the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

312    compliance with Federal Reclamation law.  Groundwater recharge programs, groundwater

313    banking programs, surface water storage programs, and other similar programs utilizing Project

314    Water or other water furnished pursuant to this Contract conducted outside the Contractor's

315    Service Area may be permitted upon written approval of the Contracting Officer, which approval

316    will be based upon environmental documentation, Project Water rights, and Project operational

317    concerns.  The Contracting Officer will address such concerns in regulations, policies, or

318    guidelines.

319           (e)     The Contractor shall comply with requirements applicable to the

320    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

321    of any water service contract between the Contracting Officer and the Contractor in effect

322    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

323    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

324    implement.  The Existing Contract, which evidences in excess of 41 years of diversions for

325    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

326    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

327    required biological assessment(s) prepared pursuant to the ESA, and any other needed

328    environmental review.  Nothing herein shall be construed to prevent the Contractor from

329    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

330    biological opinion or other environmental documentation referred to in this Article.

331           (f)     Following the declaration of Water Made Available under Article 4 of this

332    Contract, the Contracting Officer will make a determination whether Project Water, or other

333    water available to the Project, can be made available to the Contractor in addition to the Contract

334    Total under this Article during the Year without adversely impacting other Project Contractors.

335    At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

336    making such a determination.  If the Contracting Officer determines that Project Water, or other

337    water available to the Project, can be made available to the Contractor, the Contracting Officer

338    will announce the availability of such water and shall so notify the Contractor as soon as

339    practical.  The Contracting Officer will thereafter meet with the Contractor and other Project

340    Contractors capable of taking such water to determine the most equitable and efficient allocation

341   of such water. If the Contractor requests the delivery of any quantity of such water, the

342   Contracting Officer shall make such water available to the Contractor in accordance with

343   applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

344   contractual commitments, water rights, and operational constraints, long-term Project

345   Contractors shall have a first right to acquire such water, including Project Water made available

346   pursuant to Section 215 of the Reclamation Reform Act of 1982.

347           (g)    The Contractor may request permission to reschedule for use during the

348   subsequent Year some or all of the Water Made Available to the Contractor during the current

349   Year, referred to as "rescheduled water." The Contractor may request permission to use during

350   the current Year a quantity of Project Water which may be made available by the United States

351   to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

352   written approval may permit such uses in accordance with applicable statutes, regulations,

353   guidelines, and policies.

354           (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

355   State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

356   shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

357   Rates and Charges under this Contract consistent with Section 9(d) or 9(e)(1) of the Act of

358   August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

359   sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

360   subdivision (b) of Article 12 of this Contract.

361           (i)    Project Water furnished to the Contractor pursuant to this Contract may be

362   delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

363  Contract upon written approval by the Contracting Officer in accordance with the terms and

364  conditions of such approval.

365      (j)      The Contracting Officer shall make reasonable efforts to protect the water

366  rights necessary for the Project and to provide the water available under this Contract.  The

367  Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

368  extent permitted by law, in administrative proceedings related to the Project Water rights;

369  *Provided, That* the Contracting Officer retains the right to object to the substance of the

370  Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

371  Contracting Officer shall recognize the Contractor has a legal right under the terms of this

372  Contract to use Project Water.

373                    <u>TIME FOR DELIVERY OF WATER</u>

374  4.    (a)      On or about February 20 each Calendar Year, the Contracting Officer shall

375  announce the Contracting Officer's expected declaration of the Water Made Available.  Such

376  declaration will be expressed in terms of Water Made Available and the Recent Historic Average

377  and will be updated monthly, and more frequently if necessary, based on the then-current

378  operational and hydrologic conditions and a new declaration with changes, if any, to the Water

379  Made Available will be made.  The Contracting Officer shall provide forecasts of Project

380  operations and the basis of the estimate, with relevant supporting information, upon the written

381  request of the Contractor.  Concurrently with the declaration of the Water Made Available, the

382  Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

383      (b)      On or before each March 1 and at such other times as necessary, the

384  Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

18

385   Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

386   United States to the Contractor pursuant to this Contract for the Year commencing on such

387   March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

388   according to the approved schedule for the Year commencing on such March 1.

389           (c)     The Contractor shall not schedule Project Water in excess of the quantity

390   of Project Water the Contractor intends to put to reasonable and beneficial use within the

391   Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

392   during any Year.

393           (d)     Subject to the conditions set forth in subdivision (a) of Article 3 of this

394   Contract, the United States shall deliver Project Water to the Contractor in accordance with the

395   initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

396   written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

397   time prior to the date(s) on which the requested change(s) is/are to be implemented.

398   <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

399     5.    (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

400   Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

401   any additional point or points of delivery either on Project facilities or another location or

402   locations mutually agreed to in writing by the Contracting Officer and the Contractor.

403           (b)     The Contracting Officer, either directly or indirectly through its written

404   agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

405   maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

406     the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

407     Article.

408             (c)     The Contractor shall deliver Irrigation Water in accordance with any

409     applicable land classification provisions of Federal Reclamation law and the associated

410     regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

411     Service Area unless approved in advance by the Contracting Officer.

412             (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

413     measured and recorded with equipment furnished, installed, operated, and maintained by the

414     Contracting Officer either directly or indirectly through its written agreements(s) with the

415     Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

416     Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

417     this Article. Upon the request of either party to this Contract, the Contracting Officer shall

418     investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

419     accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

420     therein. For any period of time when accurate measurements have not been made, the

421     Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

422     Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

423     of time.

424             (e)     Absent a separate contrary written agreement with the Contractor, neither

425     the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

426     control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

427     pursuant to this Contract beyond the point or points of delivery established pursuant to

428 subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

429 employees, agents, and assigns on account of damage or claim of damage of any nature

430 whatsoever for which there is legal responsibility, including property damage, personal injury, or

431 death arising out of or connected with the control, carriage, handling, use, disposal, or

432 distribution of such Water Delivered beyond such point or points of delivery except for any

433 damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

434 officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

435 the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

436 Contracting Officer or any of its officers, employees, agents, and assigns, including the

437 Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

438 officers, employees, agents, and assigns, including the Operating Non Federal Entity(ies); or (iv)

439 a malfunction of facilities owned and/or operated by the United States or the Operating Non-

440 Federal Entity(ies).

441 <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

442     6.     (a)     The Contractor has established a measuring program satisfactory to the

443 Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

444 purposes within the Contractor's Service Area is measured at each agricultural turnout and such

445 water delivered for M&I purposes is measured at each M&I service connection. The water

446 measuring devices or water measuring methods of comparable effectiveness must be acceptable

447 to the Contracting Officer. The Contractor shall be responsible for installing, operating,

448 maintaining, and repairing all such measuring devices and implementing all such water

449 measuring methods at no cost to the United States. The Contractor shall use the information

450     obtained from such water measuring devices or water measuring methods to ensure its proper

451     management of the water; to bill water users for water delivered by the Contractor; and, if

452     applicable, to record water delivered for M&I purposes by customer class as defined in the

453     Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

454     contained, however, shall preclude the Contractor from establishing and collecting any charges,

455     assessments, or other revenues authorized by California law. The Contractor shall include a

456     summary of all its annual surface water deliveries in the annual report described in subdivision

457     (c) of Article 25 of this Contract.

458          (b)      To the extent the information has not otherwise been provided, upon

459     execution of this Contract, the Contractor shall provide to the Contracting Officer a written

460     report describing the measurement devices or water measuring methods being used or to be used

461     to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

462     service connections or alternative measurement programs approved by the Contracting Officer,

463     at which such measurement devices or water measuring methods are being used, and, if

464     applicable, identifying the locations at which such devices and/or methods are not yet being used

465     including a time schedule for implementation at such locations. The Contracting Officer shall

466     advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

467     if any, of the measuring devices or water measuring methods identified in the Contractor's report

468     and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

469     the Contracting Officer notifies the Contractor that the measuring devices or methods are

470     inadequate, the parties shall within 60 days following the Contracting Officer's response,

471     negotiate in good faith the earliest practicable date by which the Contractor shall modify said

472 measuring devices and/or measuring methods as required by the Contracting Officer to ensure

473 compliance with subdivision (a) of this Article.

474        (c)     All new surface water delivery systems installed within the Contractor's

475 Service Area after the Effective Date shall also comply with the measurement provisions

476 described in subdivision (a) of this Article.

477        (d)     The Contractor shall inform the Contracting Officer and the State of

478 California in writing by April 30 of each Year of the monthly volume of surface water delivered

479 within the Contractor's Service Area during the previous Year.

480        (e)     The Contractor shall inform the Contracting Officer and the Operating

481 Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

482 Irrigation Water and M&I Water taken during the preceding month.

483                 RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
484                                REPAYMENT OF FACILITIES

485     7.    (a)     Notwithstanding the Contractor's full prepayment of the Repayment

486 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

487 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

488 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

489 Article, subsection (b), the Contractor's Project construction and other obligations shall be

490 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

491 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

492 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

493 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

494    rules and regulations, or policies, and (iii) other applicable provisions of this Contract. Payments

495    shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

496    agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

497    Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

498    forth in Exhibit "B", as may be revised annually.

499          (1)     The Contractor shall pay the United States as provided for in this

500    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

501    in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

502    be established to recover its estimated reimbursable costs included in the operation and

503    maintenance component of the Rate and amounts established to recover deficits and other

504    charges, if any, including construction costs as identified in the following subdivisions.

505          (2)     In accordance with the WIIN Act, the Contractor's allocable share

506    of Project construction costs will be repaid pursuant to the provisions of this Contract.

507          (A)     The amount due and payable to the United States, pursuant

508    to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

509    computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

510    as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

511    installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

512    set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

513    as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

514    Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

515    amount due using the lump sum alternative. If such notice is not provided by such date, the

516     Contractor shall be deemed to have elected the installment payment alternative, in which case,

517     the first such payment shall be made no later than December 30, 2020. The second payment

518     shall be made no later than the first anniversary of the first payment date. The third payment

519     shall be made no later than the second anniversary of the first payment date. The final payment

520     shall be made no later than November 1, 2023. If the installment payment option is elected by

521     the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

522     by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

523     Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

524     methodology as was used to compute the initial annual installment payment amount, which is

525     illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

526     established, receipt of the Contractor's payment of the Repayment Obligation to the United

527     States shall fully and permanently satisfy the Existing Capital Obligation.

528                 (B)      Additional Capital Obligations that are not reflected in, the

529     schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

530     prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

531     Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

532     Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

533     Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

534     the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

535     be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

536     however, will be considered under subdivision (b) of this Article. A separate agreement shall be

537     established by the Contractor and the Contracting Officer to accomplish repayment of the

538   Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

539   WIIN Act, subject to the following:

540                         (1)     If the collective Additional Capital Obligation

541   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

542   is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

543   to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

544   notifies the Contractor of the Additional Capital Obligation; *Provided,* *That* the reference to the

545   amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

546                         (2)     If the collective Additional Capital Obligation

547   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

548   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

549   properly assignable to the Contractor shall be repaid as provided by applicable Federal

550   Reclamation law and Project ratesetting policy; *Provided,* *That* the reference to the amount of

551   five million dollars ($5,000,000) shall not be a precedent in any other context.

552           (b)     In the event that the final cost allocation referenced in Section 4011(b) of

553   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

554   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

555   allocated costs.  The term of such additional repayment contract shall be not less than one (1)

556   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

557   of repayment of such amount may be developed by the Contractor and Contracting Officer.  In

558   the event that the final cost allocation indicates that the costs properly assignable to the

559   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

560 overpayment as an offset against any outstanding or future obligations of the Contractor, with the

561 exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

562        (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

563 and Tiered Pricing Component as follows:

564        (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

565 provide the Contractor an estimate of the Charges for Project Water that will be applied to the

566 period October 1, of the current Calendar Year, through September 30, of the following Calendar

567 Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

568 to review and comment on such estimates. On or before September 15 of each Calendar Year,

569 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

570 the period October 1 of the current Calendar Year, through September 30, of the following

571 Calendar Year, and such notification shall revise Exhibit "B."

572        (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

573 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

574 for Project Water for the following Year and the computations and cost allocations upon which

575 those Rates are based. The Contractor shall be allowed not less than two months to review and

576 comment on such computations and cost allocations. By December 31 of each Calendar Year,

577 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

578 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

579        (d)     At the time the Contractor submits the initial schedule for the delivery of

580 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

581 Contractor shall make an advance payment to the United States equal to the total amount payable

582    pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

583    scheduled to be delivered pursuant to this Contract during the first two calendar months of the

584    Year. Before the end of the first month and before the end of each calendar month thereafter, the

585    Contractor shall make an advance payment to the United States, at the Rate(s) set under

586    subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

587    during the second month immediately following. Adjustments between advance payments for

588    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

589    the following month; _Provided, That_ any revised schedule submitted by the Contractor pursuant

590    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

591    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

592    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

593    payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

594    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

595    additional Project Water shall be delivered to the Contractor unless and until an advance

596    payment at the Rates then in effect for such additional Project Water is made. Final adjustment

597    between the advance payments for the Water Scheduled and payments for the quantities of Water

598    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

599    later than April 30th of the following Year, or 60 days after the delivery of Project Water

600    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

601    the last day of February.

602            (e)      The Contractor shall also make a payment in addition to the Rate(s) in

603    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

28

604     appropriate Tiered Pricing Component then in effect, before the end of the month following the

605     month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

606     Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

607     consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

608     water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

609     there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

610     shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

611     for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

612     through the adjustment of payments due to the United States for Charges for the next month.

613     Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

614     be computed pursuant to Article 19 of this Contract.

615           (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

616     (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

617     applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

618     policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

619     Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

620     under subdivision (a) of this Article.

621           (g)     Payments to be made by the Contractor to the United States under this

622     Contract may be paid from any revenues available to the Contractor.

623           (h)     All revenues received by the United States from the Contractor relating to

624     the delivery of Project Water or the delivery of non-Project water through Project facilities shall

625     be allocated and applied in accordance with Federal Reclamation law and the associated rules or

626     regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

627            (i)      The Contracting Officer shall keep its accounts pertaining to the

628     administration of the financial terms and conditions of its long-term contracts, in accordance

629     with applicable Federal standards, so as to reflect the application of Project costs and revenues.

630     The Contracting Officer shall, each Year upon request of the Contractor, provide to the

631     Contractor a detailed accounting of all Project and Contractor expense allocations, the

632     disposition of all Project and Contractor revenues, and a summary of all water delivery

633     information. The Contracting Officer and the Contractor shall enter into good faith negotiations

634     to resolve any discrepancies or disputes relating to accountings, reports, or information.

635            (j)      The parties acknowledge and agree that the efficient administration of this

636     Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

637     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

638     and/or for making and allocating payments, other than those set forth in this Article may be in

639     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

640     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

641     this Contract is in effect without amending this Contract.

642            (k)     (1)      Beginning at such time as deliveries of Project Water in a Year

643     exceed 80 percent of the Contract Total, then before the end of the month following the month of

644     delivery the Contractor shall make an additional payment to the United States equal to the

645     applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

646     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

647     Contract Total, shall equal one-half of the difference between the Rate established under

648    subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

649    Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

650    Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

651    the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

652    Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

653    subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

654    Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

655    the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

656                    (2)    Subject to the Contracting Officer's written approval, the

657    Contractor may request and receive an exemption from such Tiered Pricing Component for

658    Project Water delivered to produce a crop which the Contracting Officer determines will provide

659    significant and quantifiable habitat values for waterfowl in fields where the water is used and the

660    crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

661    Irrigation Water shall apply only if such habitat values can be assured consistent with the

662    purposes of the CVPIA through binding agreements executed with or approved by the

663    Contracting Officer prior to use of such water.

664                    (3)    For purposes of determining the applicability of the Tiered Pricing

665    Component pursuant to this Article, Water Delivered shall include Project Water that the

666    Contractor transfers to others but shall not include Project Water transferred to the Contractor,

667    nor shall it include the additional water provided to the Contractor under the provisions of

668    subdivision (f) of Article 3 of this Contract.

669                    (l)    For the term of this Contract, Rates applied under the respective

31

670    ratesetting policies will be established to recover only reimbursable O&M (including any

671    deficits) and capital costs of the Project, as those terms are used in the then-current Project

672    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

673    applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

674    practices which implement the Contracting Officer's ratesetting policies will not be implemented

675    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

676    need, and impact of the proposed change.

677            (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

678    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

679    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

680    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

681    transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

682    lower Rates and Charges because of inability to pay and is transferring Project Water to another

683    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

684    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

685            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

686    Officer is authorized to adjust determinations of ability to pay every five years.

687            (o)    Omitted

688    <u>NON-INTEREST BEARING O&M DEFICITS</u>

689        8.    The Contractor and the Contracting Officer concur that, as of the Effective Date

690    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

691    therefore.

692 <u>SALES, TRANSFERS, OR EXCHANGES OF WATER</u>

693　　9.　　(a)　　The right to receive Project Water provided for in this Contract may be

694　sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

695　California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

696　and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

697　Water under this Contract may take place without the prior written approval of the Contracting

698　Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

699　exchanges shall be approved absent all appropriate environmental documentation, including, but

700　not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

701　documentation should include, as appropriate, an analysis of groundwater impacts and economic

702　and social effects, including environmental justice, of the proposed water transfers on both the

703　transferor and transferee.

704　　　　　(b)　　In order to facilitate efficient water management by means of water

705　transfers of the type historically carried out among Project Contractors located within the same

706　geographical area and to allow the Contractor to participate in an accelerated water transfer

707　program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

708　all necessary environmental documentation, including, but not limited to, documents prepared

709　pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

710　the Contracting Officer shall determine whether such transfers comply with applicable law.

711　Following the completion of the environmental documentation, such transfers addressed in such

712　documentation shall be conducted with advance notice to the Contracting Officer, but shall not

713　require prior written approval by the Contracting Officer.  Such environmental documentation

714 and the Contracting Officer's compliance determination shall be reviewed every five years and

715 updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

716 subsequent environmental documentation shall include an alternative to evaluate not less than the

717 quantity of Project Water historically transferred within the same geographical area.

718         (c)     For a water transfer to qualify under subdivision (b) of this Article, such

719 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

720 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

721 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

722 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

723 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

724 through existing facilities with no new construction or modifications to facilities and be between

725 existing Project Contractors and/or the Contractor and the United States, Department of the

726 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

727 requirements imposed for protection of the environment and Indian Trust Assets, as defined

728 under Federal law.

729                 <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

730      10.    (a)     The amount of any overpayment by the Contractor of the Contractor's

731 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

732 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

733 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

734 of such overpayment, at the option of the Contractor, may be credited against amounts to become

735 due to the United States by the Contractor. With respect to overpayment, such refund or

736  adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

737  have the right to the use of any of the Project Water supply provided for by this Contract. All

738  credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

739  obtaining direction as to how to credit or refund such overpayment in response to the notice to

740  the Contractor that it has finalized the accounts for the Year in which the overpayment was

741  made.

742  (b)  All advances for miscellaneous costs incurred for work requested by the

743  Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

744  when the work has been completed. If the advances exceed the actual costs incurred, the

745  difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

746  advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

747  Contract.

748  <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

749  11.  (a)  Subject to: (i) the authorized purposes and priorities of the Project and the

750  requirements of Federal law, and (ii) the obligations of the United States under existing

751  contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

752  Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

753  provided in this Contract.

754  (b)  The Contracting Officer or Operating Non-Federal Entity(ies) may

755  temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

756  provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

757  of the Project facilities or any part thereof necessary for the delivery of Project Water to the

758 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

759 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

760 except in case of emergency, in which case no notice need be given; *Provided, That* the United

761 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

762 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

763 the United States will, if possible, deliver the quantity of Project Water which would have been

764 delivered hereunder in the absence of such discontinuance or reduction.

765       (c)    The United States reserves the right to all seepage and return flow water

766 derived from Water Delivered to the Contractor hereunder which escapes or is discharged

767 beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

768 the United States any right to seepage or return flow being put to reasonable and beneficial use

769 pursuant to this Contract within the Contractor's Service Area by the Contractor or those

770 claiming by, through, or under the Contractor.

771            CONSTRAINTS ON THE AVAILABILITY OF WATER

772    12.   (a)    In its operation of the Project, the Contracting Officer will use all
773 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
774 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
775 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
776 Contractor of said determination as soon as practicable.

777       (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
778 or other similar operational errors affecting the Project; drought and other physical or natural
779 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
780 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
781 17 of this Contract, no liability shall accrue against the United States or any of its officers,
782 agents, or employees for any damage, direct or indirect, arising therefrom.

783       (c)    In any Year in which there may occur a Condition of Shortage for any of

784     the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

785     Article, the Contracting Officer will first allocate the available Project Water consistent with the

786     Project M&I Water Shortage Policy as finally adopted after environmental review for

787     determining the amount of Project Water Available for delivery to the Project Contractors.

788     Subject to the foregoing allocation, in any year in which there may occur a Condition of

789     Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

790     others entitled to Project Water from Delta Division Facilities under long-term water service or

791     repayment contracts (or renewals thereof or binding commitments therefore) in force on

792     February 28, 2005, as follows:

793             (1)     The Contracting Officer shall make an initial and subsequent

794     determination as necessary of the total quantity of Project Water estimated to be scheduled or

795     actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

796     renewal, long-term water service or repayment contracts then in force for the delivery of Project

797     Water by the United States from Delta Division Facilities during the relevant Year, the quantity

798     so determined being hereinafter referred to as the scheduled total;

799             (2)     A determination shall be made of the total quantity of Project

800     Water that is available for meeting the scheduled total, the quantity so determined being

801     hereinafter referred to as the available supply;

802             (3)     The total quantity of Project Water estimated to be scheduled or

803     actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

804     of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

805     hereinafter referred to as the Contractor's proportionate share; and

806          (4)     The available supply shall be multiplied by the Contractor's

807     proportionate share and the result shall be the quantity of Project Water made available by the

808     United States to the Contractor for the relevant Year in accordance with the schedule developed

809     by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

810     amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

811     that the Contracting Officer can increase or needs to decrease the available supply for delivery

812     from Delta Division Facilities to long-term water service and repayment contractors during the

813     relevant Year, such additions or reductions to the available supply shall be apportioned

814     consistent with subparagraphs (1) through (4), inclusive.

815          (d)     By entering into this Contract, the Contractor does not waive any legal

816     rights or remedies it may have to file or participate in any administrative or judicial proceeding

817     contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

818     such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

819     implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

820     *That* the Contractor has commenced any such judicial challenge or any administrative procedures

821     necessary to institute any judicial challenge within six months of the policy becoming final.  By

822     agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

823     that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

824     validate or invalidate the Project M&I Water Shortage Policy.

825          <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

826     13.     (a)     To the extent applicable, the Contractor shall not be deemed to have

827     delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

38

828 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

829 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

830   (b)   Upon complete payment of the Repayment Obligation by the Contractor,

831 this Article 13 shall no longer be applicable.

832 <div align="center">COMPLIANCE WITH FEDERAL RECLAMATION LAWS</div>

833   14.   The parties agree that the delivery of Irrigation Water or use of Federal facilities
834 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
835 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and supplemented, and
836 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
837 law.

838 <div align="center">PROTECTION OF WATER AND AIR QUALITY</div>

839   15.  (a)   Omitted

840   (b)   The United States will care for, operate and maintain reserved works in a
841 manner that preserves the quality of the water at the highest level possible as determined by the
842 Contracting Officer. The United States does not warrant the quality of the water delivered to the
843 Contractor and is under no obligation to furnish or construct water treatment facilities to
844 maintain or improve the quality of water delivered to the Contractor.

845 None of the foregoing affects or modifies the obligations of the United States under Contract No.

846 14-06-200-700-A, dated December 23, 1963, with respect to Schedule 2 Water, including but not

847 limited to, Article 10 of said contract.

848   (c)   The Contractor will comply with all applicable water and air pollution
849 laws and regulations of the United States and the State of California; and will obtain all required
850 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
851 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
852 State, and local water quality standards applicable to surface and subsurface drainage and/or
853 discharges generated through the use of Federal or Contractor facilities or Project Water
854 provided by the Contractor within its Service Area.

855   (d)   This Article shall not affect or alter any legal obligations of the Secretary
856 to provide drainage or other discharge services.

857   (e)   Omitted

<div align="center">39</div>

858
859

WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
STATES

860   16.   (a)   Water or water rights now owned or hereafter acquired by the Contractor

861 other than from the United States and Irrigation Water furnished pursuant to the terms of this

862 Contract may be simultaneously transported through the same distribution facilities of the

863 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

864 and non-Project water were constructed without funds made available pursuant to Federal

865 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

866 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

867 Irrigation Water must be established through the certification requirements as specified in the

868 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

869 Eligible Lands within the Contractor's Service Area can be established and the quantity of

870 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

871 Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

872 Project water are (were) constructed with funds made available pursuant to Federal Reclamation

873 law, the non-Project water will be subject to the acreage limitation provisions of Federal

874 Reclamation law, unless the Contractor pays to the United States the incremental fee described in

875 43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

876 annually the cost to the Federal Government, including interest, of storing or delivering non-

877 Project water, which for purposes of this Contract shall be determined as follows: The quotient

878 shall be the unpaid distribution system costs divided by the total irrigable acreage within the

879 Contractor's Service Area. The incremental fee per acre is the mathematical result of such

880    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

881    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

882    within the Contractor's Service Area that receives non-Project water through Federally financed

883    or constructed facilities. The incremental fee calculation methodology will continue during the

884    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

885    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

886    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

887    adopted, it shall supersede this provision.

888          (b)      Water or water rights now owned or hereafter acquired by the Contractor,

889    other than from the United States may be stored, conveyed, and/or diverted through Project

890    facilities, subject to the completion of appropriate environmental documentation, with the

891    approval of the Contracting Officer and the execution of any contract determined by the

892    Contracting Officer to be necessary, consistent with the following provisions:

893          (1)      The Contractor may introduce non-Project water into Project

894    facilities and deliver said water to lands within the Contractor's Service Area, including

895    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

896    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

897    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

898    use power policy is applicable, each as amended, modified, or superseded from time to time.

899          (2)      Delivery of such non-Project water in and through Project facilities

900    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

901    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

902 available to other Project Contractors; (iii) interfere with the delivery of contractual water

903 entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

904 the Project facilities.

905    (3) Neither the United States nor the Operating Non-Federal

906 Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

907 is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

908 releases and agrees to defend and indemnify the United States and the Operating Non-Federal

909 Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

910 persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

911 employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

912 (ii) diverting such non-Project water into Project facilities.

913    (4) Diversion of such non-Project water into Project facilities shall be

914 consistent with all applicable laws, and if involving groundwater, consistent with any applicable

915 groundwater management plan for the area from which it was extracted.

916    (5) After Project purposes are met, as determined by the Contracting

917 Officer, the United States and Project Contractors entitled to Project Water from Delta Division

918 Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

919 available by the Contracting Officer for conveyance and transportation of non-Project water prior

920 to any such remaining capacity being made available to non-Project contractors.  Other Project

921 Contractors shall have a second priority to any remaining capacity of facilities declared to be

922 available by the Contracting Officer for conveyance and transportation of non-Project water prior

923 to any such remaining capacity being made available to non-Project contractors.

924          (c)     Upon complete payment of the Repayment Obligation by the Contractor,

925   subdivision (a) of this Article 16 shall no longer be applicable.

926                  OPINIONS AND DETERMINATIONS

927      17.     (a)     Where the terms of this Contract provide for actions to be based upon the

928   opinion or determination of either party to this Contract, said terms shall not be construed as

929   permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

930   determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

931   reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

932   or unreasonable opinion or determination. Each opinion or determination by either party shall be

933   provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

934   affect or alter the standard of judicial review applicable under Federal law to any opinion or

935   determination implementing a specific provision of Federal law embodied in statute or

936   regulation.

937          (b)     The Contracting Officer shall have the right to make determinations

938   necessary to administer this Contract that are consistent with the provisions of this Contract, the

939   laws of the United States and of the State of California, and the rules and regulations

940   promulgated by the Secretary. Such determinations shall be made in consultation with the

941   Contractor to the extent reasonably practicable.

942                 COORDINATION AND COOPERATION

943      18.     (a)     In order to further their mutual goals and objectives, the Contracting

944   Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

945   with other affected Project Contractors, in order to improve the O&M of the Project. The

946     communication, coordination, and cooperation regarding O&M shall include, but not be limited

947     to, any action which will or may materially affect the quantity or quality of Project Water supply,

948     the allocation of Project Water supply, and Project financial matters including, but not limited to,

949     budget issues. The communication, coordination, and cooperation provided for hereunder shall

950     extend to all provisions of this Contract. Each party shall retain exclusive decision making

951     authority for all actions, opinions, and determinations to be made by the respective party.

952           (b)       Within 120 days following the Effective Date, the Contractor, other

953     affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

954     Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

955     amended as necessary separate and apart from this Contract. The goal of this process shall be to

956     provide, to the extent practicable, the means of mutual communication and interaction regarding

957     significant decisions concerning Project O&M on a real-time basis.

958           (c)       In light of the factors referred to in subdivision (b) of Article 3 of this

959     Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

960     intent:

961                 (1)       The Contracting Officer will, at the request of the Contractor,

962     assist in the development of integrated resource management plans for the Contractor. Further,

963     the Contracting Officer will, as appropriate, seek authorizations for implementation of

964     partnerships to improve water supply, water quality, and reliability.

965                 (2)       The Secretary will, as appropriate, pursue program and project

966     implementation and authorization in coordination with Project Contractors to improve the water

967     supply, water quality, and reliability of the Project for all Project purposes.

968           (3)    The Secretary will coordinate with Project Contractors and the

969  State of California to seek improved water resource management.

970           (4)    The Secretary will coordinate actions of agencies within the

971  Department of the Interior that may impact the availability of water for Project purposes.

972           (5)    The Contracting Officer shall periodically, but not less than

973  annually, hold division-level meetings to discuss Project operations, division-level water

974  management activities, and other issues as appropriate.

975         (d)    Without limiting the contractual obligations of the Contracting Officer

976  under the other Articles of this Contract, nothing in this Article shall be construed to limit or

977  constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

978  Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

979  protect health, safety, or the physical integrity of structures or facilities.

980  <div align="center">CHARGES FOR DELINQUENT PAYMENTS</div>

981      19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
982  charges on delinquent payments. If a payment is not received by the due date, the Contractor
983  shall pay an interest charge on the delinquent payment for each day the payment is delinquent
984  beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
985  addition to the interest charge, an administrative charge to cover additional costs of billing and
986  processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
987  shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
988  payment is delinquent beyond the due date, based on the remaining balance of the payment due
989  at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
990  collection services associated with a delinquent payment.

991         (b)    The interest rate charged shall be the greater of either the rate prescribed
992  quarterly in the Federal Register by the Department of the Treasury for application to overdue
993  payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
994  determined as of the due date and remain fixed for the duration of the delinquent period.

995          (c)     When a partial payment on a delinquent account is received, the amount
996   received shall be applied first to the penalty charges, second to the administrative charges, third
997   to the accrued interest, and finally to the overdue payment.

998                     <u>EQUAL EMPLOYMENT OPPORTUNITY</u>

999       20.     During the performance of this Contract, the Contractor agrees as follows:

1000          (a)     The Contractor will not discriminate against any employee or applicant for
1001   employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1002   origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1003   that employees are treated during employment, without regard to their race, color, religion, sex,
1004   sexual orientation, gender identity, or national origin. Such action shall include, but not be
1005   limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1006   recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1007   selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1008   places, available to employees and applicants for employment, notices to be provided by the
1009   Contracting Officer setting forth the provisions of this nondiscrimination clause.

1010          (b)     The Contractor will, in all solicitations or advertisements for employees
1011   placed by or on behalf of the Contractor, state that all qualified applicants will receive
1012   consideration for employment without regard to race, color, religion, sex, sexual orientation,
1013   gender identity, or national origin.

1014          (c)     The Contractor will not discharge or in any other manner discriminate
1015   against any employee or applicant for employment because such employee or applicant has
1016   inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1017   employee or applicant. This provision shall not apply to instances in which an employee who
1018   has access to the compensation information of other employees or applicants as part of such
1019   employee's essential job functions discloses the compensation of such other employees or
1020   applicants to individuals who do not otherwise have access to such information, unless such
1021   disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1022   proceeding, hearing, or action, including an investigation conducted by the employer, or is
1023   consistent with the Contractor's legal duty to furnish information.

1024          (d)     The Contractor will send to each labor union or representative of workers
1025   with which it has a collective bargaining agreement or other contract or understanding, a notice,
1026   to be provided by the Contracting Officer, advising the labor union or workers' representative of
1027   the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1028   24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1029   applicants for employment.

1030          (e)    The Contractor will comply with all provisions of Executive Order No.
1031  11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1032  Labor.

1033          (f)    The Contractor will furnish all information and reports required by
1034  Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1035  Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1036  by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1037  compliance with such rules, regulations, and orders.

1038          (g)    In the event of the Contractor's noncompliance with the nondiscrimination
1039  clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1040  canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1041  ineligible for further Government contracts in accordance with procedures authorized in
1042  Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1043  remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1044  regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1045          (h)    The Contractor will include the provisions of paragraphs (a) through (g) in
1046  every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1047  Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1048  1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1049  will take such action with respect to any subcontract or purchase order as may be directed by the
1050  Secretary of Labor as a means of enforcing such provisions, including sanctions for
1051  noncompliance: _Provided, however, That_ in the event the Contractor becomes involved in, or is
1052  threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1053  Contractor may request the United States to enter into such litigation to protect the interests of
1054  the United States.

1055       <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1056     21.    (a)    The obligation of the Contractor to pay the United States as provided in
1057  this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1058  obligation may be distributed among the Contractor's water users and notwithstanding the default
1059  of individual water users in their obligation to the Contractor.

1060          (b)    The payment of charges becoming due pursuant to this Contract is a
1061  condition precedent to receiving benefits under this Contract. The United States shall not make
1062  water available to the Contractor through Project facilities during any period in which the
1063  Contractor is in arrears in the advance payment of water rates due the United States. The
1064  Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1065  parties that are in arrears in the advance payment of water rates as levied or established by the
1066  Contractor.

1067         (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1068 obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1070     22.    (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1071 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1072 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1073 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1074 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1075 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1076 Interior and/or Bureau of Reclamation.

1077         (b)     These statutes prohibit any person in the United States from being
1078 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1079 discrimination under any program or activity receiving financial assistance from the Bureau of
1080 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1081 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1082 obligation, including permitting officials of the United States to inspect premises, programs, and
1083 documents.

1084         (c)     The Contractor makes this Contract in consideration of and for the
1085 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1086 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1087 Reclamation, including installment payments after such date on account of arrangements for
1088 Federal financial assistance which were approved before such date. The Contractor recognizes
1089 and agrees that such Federal assistance will be extended in reliance on the representations and
1090 agreements made in this Article and that the United States reserves the right to seek judicial
1091 enforcement thereof.

1092         (d)     Complaints of discrimination against the Contractor shall be investigated
1093 by the Contracting Officer's Office of Civil Rights.

### PRIVACY ACT COMPLIANCE

1095     23.    (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1096 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1097 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1098 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1099 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1100 C.F.R. § 426.18.

1101    (b)  With respect to the application and administration of the criminal penalty
1102 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1103 employees who are responsible for maintaining the certification and reporting records referenced
1104 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1105 U.S.C. § 552a(m).

1106    (c)  The Contracting Officer or a designated representative shall provide the
1107 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1108 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1109 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1110 information contained in the Landholders' certification and reporting records.

1111    (d)  The Contracting Officer shall designate a full-time employee of the
1112 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1113 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1114 The Contractor is authorized to grant requests by individuals for access to their own records.

1115    (e)  The Contractor shall forward promptly to the System Manager each
1116 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1117 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1118 System Manager with information and records necessary to prepare an appropriate response to
1119 the requester. These requirements do not apply to individuals seeking access to their own
1120 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1121 the requester elects to cite the Privacy Act as an authority for the request.

1122    (f)  Upon complete payment of the Repayment Obligation by the Contractor,

1123 this Article 23 will no longer be applicable.

1124    <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1125  24.  In addition to all other payments to be made by the Contractor pursuant to this

1126 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1127 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1128 of direct cost incurred by the United States for work requested by the Contractor associated with

1129 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1130 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1131    to in writing in advance by the Contractor.  This Article shall not apply to costs for routine

1132    contract administration.

1133    <u>WATER CONSERVATION</u>

1134    25.    (a)    Prior to the delivery of water provided from or conveyed through
1135    Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1136    shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1137    Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1138    Additionally, an effective water conservation and efficiency program shall be based on the

1139    Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1140    the conservation and efficiency criteria for evaluating water conservation plans established under

1141    Federal law.  The water conservation and efficiency program shall contain definite water

1142    conservation objectives, appropriate economically feasible water conservation measures, and

1143    time schedules for meeting those objectives.  Continued Project Water delivery pursuant to this

1144    Contract shall be contingent upon the Contractor's continued implementation of such water

1145    conservation program.  In the event the Contractor's water conservation plan or any revised water

1146    conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1147    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1148    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1149    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1150    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1151    immediately begins implementing its water conservation and efficiency program in accordance

1152    with the time schedules therein.

1153       (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1154    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1155    Contractor shall implement the Best Management Practices identified by the time frames issued

1156    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1157    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1158    the Contractor.

1159       (c)    The Contractor shall submit to the Contracting Officer a report on the

1160    status of its implementation of the water conservation plan on the reporting dates specified in the

1161    then-existing conservation and efficiency criteria established under Federal law.

1162       (d)    At five (5)-year intervals, the Contractor shall revise its water

1163    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1164    water conservation plans established under Federal law and submit such revised water

1165    management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1166    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1167    existing conservation and efficiency criteria for evaluating water conservation plans established

1168    under Federal law.

1169       (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1170    shall be described in the Contractor's water conservation plan.

1171    <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1172    26.    Except as specifically provided in Article 16 of this Contract, the provisions of

1173    this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1174    hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1175 Area. Any such water shall not be considered Project Water under this Contract. In addition,

1176 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1177 any water user within the Contractor's Service Area acquires or has available under any other

1178 contract pursuant to Federal Reclamation law.

1179 OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1180     27.   (a)   The O&M of a portion of the Project facilities which serve the Contractor,

1181 and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1182 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1183 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1184 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1185 affect the rights or obligations of the Contractor or the United States hereunder.

1186         (b)   The Contracting Officer has previously notified the Contractor in writing

1187 that the O&M of a portion of the Project facilities which serve the Contractor has been

1188 transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1189 therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1190 Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1191 the terms and conditions of the separate agreement between the United States and the Operating

1192 Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1193 this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1194 funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1195 such successor determines, sets, or establishes for the O&M of the portion of the Project

1196 facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1197 Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1198 Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1199 Contractor of its obligation to pay directly to the United States the Contractor's share of the

1200 Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1201 Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1202 United States in accordance with the separate agreement identified in subdivision (a) of this

1203 Article.

1204         (c)     For so long as the O&M of any portion of the Project facilities serving the

1205 Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1206 Authority or any successor thereto, the Contracting Officer shall adjust those components of the

1207 Rates for Water Delivered under this Contract representing the cost associated with the activity

1208 being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1209 or its successor.

1210         (d)     In the event the O&M of the Project facilities operated and maintained by

1211 the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1212 the United States during the term of this Contract, the Contracting Officer shall so notify the

1213 Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1214 the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1215 representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1216 The Contractor shall, thereafter, in the absence of written notification from the Contracting

1217 Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1218 revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1219 <div align="center">CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</div>

1220        28.    The expenditure or advance of any money or the performance of any obligation of
1221 the United States under this Contract shall be contingent upon appropriation or allotment of
1222 funds.  Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1223 obligations under this Contract.  No liability shall accrue to the United States in case funds are
1224 not appropriated or allotted.

1225 <div align="center">BOOKS, RECORDS, AND REPORTS</div>

1226        29.    (a)    The Contractor shall establish and maintain accounts and other books and
1227 records pertaining to administration of the terms and conditions of this Contract, including the
1228 Contractor's financial transactions; water supply data; project operations, maintenance, and
1229 replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1230 census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1231 Officer may require.  Reports shall be furnished to the Contracting Officer in such form and on
1232 such date or dates as the Contracting Officer may require.  Subject to applicable Federal laws
1233 and regulations, each party to this Contract shall have the right during office hours to examine
1234 and make copies of the other party's books and records relating to matters covered by this
1235 Contract.

1236        (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1237 books, records, or other information shall be requested from the Contractor by the Contracting

1238 Officer unless such books, records, or information are reasonably related to the administration or

1239 performance of this Contract.  Any such request shall allow the Contractor a reasonable period of

1240 time within which to provide the requested books, records, or information.

1241        (c)    At such time as the Contractor provides information to the Contracting

1242 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1243 to the Operating Non-Federal Entity(ies).

1244 <div align="center">ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</div>

1245        30.    (a)    The provisions of this Contract shall apply to and bind the successors and
1246 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1247 therein by either party shall be valid until approved in writing by the other party.

<div align="center">54</div>

1248        (b)     The assignment of any right or interest in this Contract by either party

1249    shall not interfere with the rights or obligations of the other party to this Contract absent the

1250    written concurrence of said other party.

1251        (c)     The Contracting Officer shall not unreasonably condition or withhold

1252    approval of any proposed assignment.

1253    <u>SEVERABILITY</u>

1254    31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1255    nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1256    an association or other form of organization whose primary function is to represent parties to

1257    Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1258    enforceability of a provision included in this Contract and said person, entity, association, or

1259    organization obtains a final court decision holding that such provision is legally invalid or

1260    unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1261    the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1262    final court decision identify by mutual agreement the provisions in this Contract which must be

1263    revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1264    The time periods specified above may be extended by mutual agreement of the parties.  Pending

1265    the completion of the actions designated above, to the extent it can do so without violating any

1266    applicable provisions of law, the United States shall continue to make the quantities of Project

1267    Water specified in this Contract available to the Contractor pursuant to the provisions of this

1268    Contract which were not found to be legally invalid or unenforceable in the final court decision.

1269 <div align="center">RESOLUTION OF DISPUTES</div>

1270    32.    Should any dispute arise concerning any provisions of this Contract, or the

1271 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1272 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1273 Officer referring any matter to the Department of Justice, the party shall provide to the other

1274 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1275 not be required where a delay in commencing an action would prejudice the interests of the party

1276 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1277 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1278 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1279 or the United States may have.

1280 <div align="center">OFFICIALS NOT TO BENEFIT</div>

1281    33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1282 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1283 same manner as other water users or landowners.

1284 <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1285    34.    (a)    While this Contract is in effect, no change may be made in the
1286 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1287 changes which may affect the respective rights, obligations, privileges, and duties of either the
1288 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1289 consolidation, or merger, except upon the Contracting Officer's written consent.

1290         (b)    Within 30 days of receipt of a request for such a change, the Contracting

1291 Officer will notify the Contractor of any additional information required by the Contracting

1292 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1293 schedule for timely completion of the process. Such process will analyze whether the proposed

1294     change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1295     (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1296     to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1297     have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1298     Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1299     responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1300     be paid in accordance with Article 24 of this Contract.

1301     <div align="center">FEDERAL LAWS</div>

1302     35.     By entering into this Contract, the Contractor does not waive its rights to contest

1303     the validity or application in connection with the performance of the terms and conditions of this

1304     Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1305     the terms and conditions of this Contract unless and until relief from application of such Federal

1306     law or regulation to the implementing provision of the Contract is granted by a court of

1307     competent jurisdiction.

1308     <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1309     36.    (a)     Upon a Contractor's compliance with and discharge of the Repayment

1310     Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1311     Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1312     (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1313     shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1314     the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1315     Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1316            <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

1317        37.     The Contractor hereby certifies that it does not maintain or provide for its
1318     employees any segregated facilities at any of its establishments and that it does not permit its
1319     employees to perform their services at any location under its control where segregated facilities
1320     are maintained. It certifies further that it will not maintain or provide for its employees any
1321     segregated facilities at any of its establishments and that it will not permit its employees to
1322     perform their services at any location under its control where segregated facilities are
1323     maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1324     Employment Opportunity clause in this Contract. As used in this certification, the term
1325     "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1326     restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1327     parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1328     facilities provided for employees which are segregated by explicit directive or are in fact
1329     segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1330     disability, or otherwise. The Contractor further agrees that (except where it has obtained
1331     identical certifications from proposed subcontractors for specific time periods) it will obtain
1332     identical certifications from proposed subcontractors prior to the award of subcontracts
1333     exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1334     Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1335     following notice to such proposed subcontractors (except where the proposed subcontractors
1336     have submitted identical certifications for specific time periods):

1337       NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1338             CERTIFICATIONS OF NONSEGREGATED FACILITIES

1339     A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1340     exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1341     Opportunity clause. The certification may be submitted either for each subcontract or for all
1342     subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1343     making false statements in offers is prescribed in 18 U.S.C. § 1001.

1344                         <u>NOTICES</u>

1345        38.     Any notice, demand, or request authorized or required by this Contract shall be
1346     deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1347     delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1348     California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1349     postage prepaid, or delivered to the Board of Directors of the James Irrigation District, 8749

1350 Ninth Street, San Joaquin, California 93660. The designation of the addressee or the address
1351 may be changed by notice given in the same manner as provided in this Article for other notices.

1352 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1353     39.    (a)    All payments from the Contractor to the United States under this Contract
1354 shall be by the medium requested by the United States on or before the date payment is due. The
1355 required method of payment may include checks, wire transfers, or other types of payment
1356 specified by the United States.

1357            (b)    Upon execution of this Contract, the Contractor shall furnish the
1358 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1359 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1360 out of the Contractor's relationship with the United States.

1361 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1362     40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1363 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1364 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1365 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1366 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1367 <u>CONFIRMATION OF CONTRACT</u>

1368     41.    Promptly after the execution of this amended Contract, the Contractor will
1369 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1370 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1371 for the authorization of the execution of this amended Contract. This amended Contract shall not
1372 be binding on the United States until the Contractor secures a final decree.

1373

1374    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375 day and year first above written.

1376           UNITED STATES OF AMERICA


1377          By: _____
1378            Regional Director
1379            Interior Region 10: California-Great Basin
1380            Bureau of Reclamation


1381          JAMES IRRIGATION DISTRICT
1382 (SEAL)


1383          By: _____
1384            President of the Board of Directors


1385 Attest:

1386 By: _____
1387   Secretary of the Board of Directors

1374         IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375    day and year first above written.

1376                              UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND**
**SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:18:24 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR**
**DEPARTMENT OF THE INTERIOR**

1377  TIME STAMP: [1:37 pm, May 11 2020]       By: _____

1378                               Regional Director

1379                               Interior Region 10: California-Great Basin

1380                               Bureau of Reclamation

1381                              JAMES IRRIGATION DISTRICT

1382    (SEAL)

1383                              By: _____

1384                               President of the Board of Directors

1385    Attest:

1386    By: _____

1387       Secretary of the Board of Directors



**James Irrigation District**
Contract No. 14-06-200-700A-LTR1-P
Exhibit A

District Boundary
Contractor's Service Area

BUREAU OF
RECLAMATION

Date: 4/1/2020
File Name: N:\Districts\Contracts\james\james_20200401.mxd

Miles
0    0.5    1

N

214-202-888

EXHIBIT B
JAMES IRRIGATION DISTRICT
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $36.25 | |
| DMC Aqueduct Intertie | $1.08 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| ARRA Cost | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $64.31 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

## The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

## Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

| Contractor: | James Irrigation District |
|---|---|
| Facility: | Delta-Mendota Pool |
| Contract: | 14-06-200-700-A-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | | Discount |
|---|---|---|---|---|
| Construction Cost | ~ $ | 4,317,075 | | |
| 2019 Repayment (Estimate) ** | $ | 1,623,158 | | |
| Adjusted Construction Cost | $ | 2,693,917 | $ | 2,614,724 |
| Intertie Construction Cost (N/A): | $ | 515,181 | $ | 461,413 |
| Total | $ | 3,209,098 | $ | 3,076,137 |

**If Paid in Installments (Used 20 yr CMT)**

| | Due**** | | | |
|---|---|---|---|---|
| Payment 1 | 9/1/2020 | | $ | 778,671 |
| Payment 2 | 9/1/2021 | | $ | 778,671 |
| Payment 3 | 9/1/2022 | | $ | 778,671 |
| Payment 4 ~~ | 9/1/2023 | | $ | 778,671 |
| Total Installment Payments | | | $ | 3,114,684 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 2,693,917 | $ 244,902 | $ 243,587 | $ 515,181 | $ 11,709 | $ 11,646 | $ 255,233 |
| 2021 | $ 2,449,015 | $ 244,902 | $ 242,471 | $ 503,472 | $ 11,709 | $ 11,592 | $ 254,063 |
| 2022 | $ 2,204,114 | $ 244,902 | $ 241,264 | $ 491,764 | $ 11,709 | $ 11,535 | $ 252,799 |
| 2023 | $ 1,959,212 | $ 244,902 | $ 240,064 | $ 480,055 | $ 11,709 | $ 11,477 | $ 251,541 |
| 2024 | $ 1,714,311 | $ 244,902 | $ 238,870 | $ 468,346 | $ 11,709 | $ 11,420 | $ 250,290 |
| 2025 | $ 1,469,409 | $ 244,902 | $ 237,681 | $ 456,638 | $ 11,709 | $ 11,363 | $ 249,045 |
| 2026 | $ 1,224,508 | $ 244,902 | $ 236,499 | $ 444,929 | $ 11,709 | $ 11,307 | $ 247,806 |
| 2027 | $ 979,606 | $ 244,902 | $ 235,322 | $ 433,220 | $ 11,709 | $ 11,251 | $ 246,573 |
| 2028 | $ 734,705 | $ 244,902 | $ 234,151 | $ 421,512 | $ 11,709 | $ 11,195 | $ 245,346 |
| 2029 | $ 489,803 | $ 244,902 | $ 232,987 | $ 409,803 | $ 11,709 | $ 11,139 | $ 244,126 |
| 2030 | $ 244,902 | $ 244,902 | $ 231,827 | $ 398,094 | $ 11,709 | $ 11,084 | $ 242,911 |
| 2031-63 | | | | $ 386,386 | $ 386,386 | $ 336,404 | $ 336,404 |
| Total, Lump Sum Payment | | | $ 2,614,724 | | | $ 461,413 | $ 3,076,137 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amount of Reduction, Lump Sum | | | $ 79,193 | | | $ 53,768 | $ 132,961 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need
   update, they are still required. Also, unpaid charges are still a requirement under contract.
\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.
\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.
\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.
~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.
[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.
~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 6**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
The West Side Irrigation District
P.O. Box 177
Tracy, CA 95378

Subject: Water Infrastructure Improvements for the Nation Act Contract No. 7-07-20-W0045-
LTR1-P Between the United States and The West Side Irrigation District Providing for
Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of
Reclamation appreciates the effort expended by The West Side Irrigation District and its
representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section
4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the
Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation
Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at
916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
THE WEST SIDE IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 7 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 14 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 34 |
| 9. | Sales, Transfers, or Exchanges of Water | 34 |
| 10. | Application of Payments and Adjustments | 36 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 40 |
| 14. | Compliance with Federal Reclamation Laws | 40 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 41 |
| 17. | Opinions and Determinations | 44 |
| 18. | Coordination and Cooperation | 45 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 47 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 49 |
| 23. | Privacy Act Compliance | 50 |

## Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 51 |
| 26. | Existing or Acquired Water or Water Rights | 53 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 53 |
| 28. | Contingent on Appropriation or Allotment of Funds | 55 |
| 29. | Books, Records, and Reports | 55 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 56 |
| 31. | Severability | 56 |
| 32. | Resolution of Disputes | 57 |
| 33. | Officials Not to Benefit | 57 |
| 34. | Changes in Contractor's Organization and/or Service Area | 57 |
| 35. | Federal Laws | 58 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 59 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 60 |
| 40. | Contract Drafting Considerations | 60 |
| 41. | Confirmation of Contract | 60 |
|  | Signature Page | 61 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
THE WEST SIDE IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1   THIS CONTRACT, made this 2nd day of October, 2020, in

2   pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3   supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4   as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5   July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6   October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7   (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8   (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9   collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10  OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11  this Contract, hereinafter referred to as the Contracting Officer, and THE WEST SIDE

12  IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13  of California, duly organized, existing, and acting pursuant to the laws thereof;

14      WITNESSETH, That:

15 <u>EXPLANATORY RECITALS</u>

16       [1st]    WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22       [2nd]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25       [3rd]    WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27       [4th]    WHEREAS, the United States and the Contractor entered into Contract

28 No. 7-07-20-W0045, as amended, which established terms for the delivery to the Contractor of

29 Project Water from the Delta Division facilities from June 29, 1977, through February 28, 1995;

30 and

31       [5th]    WHEREAS, the United States and the Contractor have pursuant to

32 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33 entered into interim renewal contract(s) identified as Contract No. 7-07-20-W0045-IR1 and

34 subsequent Interim Renewal Contracts 7-07-20-W0045-IR2 through 7-07-20-W0045-IR8, which

35 provided for water service to the Contractor from March 1, 1995 through February 28, 2006; and

36         [6$^{th}$]    WHEREAS, the United States and the Contractor entered into a long-term

37   contract identified as Contract No. 7-07-20-W0045-LTR1, hereinafter referred to as the Existing

38   Contract, which provided for the continued water service to the Contractor following expiration

39   of Contract No. 7-07-20-W0045-IR8, and which was in effect the date the WIIN Act was

40   enacted; and

41         [7$^{th}$]    WHEREAS, pursuant to a June 5, 2001, "Agreement for Assignment of

42   Entitlement to CVP Water Between the City of Tracy and The West Side Irrigation District," the

43   Contractor assigned to the City of Tracy 2,500 acre feet of the Contractor's entitlement to Project

44   Water under Contract No. 7-07-20-W0045-IR7, which assignment is reflected in the decreased

45   quantity of Water Made Available under subdivision (a) of Article 3 of this Contract; and

46         [8$^{th}$]    WHEREAS, on February 27, 2004, the Contractor, the United States and

47   the City of Tracy entered into an Agreement for Assignment of Portion of Water Service

48   Contract ("Assignment Agreement"), wherein the United States approved the initial assignment

49   of 2,500 acre-feet of water and the future assignment of an additional 2,500 acre-feet of Project

50   Water available to the Contractor under Contract No. 7-07-20-W0045, as then being

51   implemented through Contract No. 7-07-20-W0045-B, to the City of Tracy; and

52         [9$^{th}$]    WHEREAS, the Existing Contract reflects completion of the initial

53   assignment referenced in 7$^{th}$ recital above, by reducing the quantity of Project Water available to

54   the Contractor from 7,500 to 5,000 acre feet; and

55         [10$^{th}$]   WHEREAS, the Assignment Agreement also allows the City of Tracy to

56   exercises its right to obtain a future assignment of an additional 2,500 acre-feet of Project Water

57   available to the Contractor under the Existing Contract; and

58          [11th]   WHEREAS, on December 16, 2016, the 114th Congress of the United

59   States of America enacted the WIIN Act; and

60          [12th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

61   contractor, the Secretary of the Interior shall convert any water service contract in effect on the

62   date of enactment of this subtitle and between the United States and a water users' association

63   [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

64   mutually agreeable terms and conditions."; and

65          [13th]   WHEREAS, Section 4011(a)(1) further provides that "the manner of

66   conversion under this paragraph shall be as follows: (A) Water service contracts that were

67   entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

68   this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

69   1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

70   of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

71   converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

72          [14th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

73   into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

74   repayment, exchange and transfer contractual rights between the water users' association

75   [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

76   water users' association [Contractor] and their landowners as provided under State law."; and

77          [15th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

78   "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

79   service or repayment contractor to receive water; or (4) except as expressly provided in this

4

80    section, any obligations under the Federal Reclamation law, including the continuation of

81    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

82    repayment contractors making prepayments pursuant to this section."; and

83           [16th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

84    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

85    service contracts into repayment contracts, amend existing repayment contracts, and allow

86    contractors to prepay their construction cost obligations pursuant to applicable Federal

87    Reclamation law; and

88           [17th]   WHEREAS, the United States has determined that the Contractor has

89    fulfilled all of its obligations under the Existing Contract; and

90           [18th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

91    Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

92    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

93    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

94    quantity of Project Water to be made available to it pursuant to this Contract; and

95           [19th]   WHEREAS, water obtained from the Project has been relied upon by

96    urban and agricultural areas within California for more than 50 years, and is considered by the

97    Contractor as an essential portion of its water supply; and

98           [20th]   WHEREAS, the economies of regions within the Project, including the

99    Contractor's, depend upon the continued availability of water, including water service from the

100    Project; and

101    [21$^{st}$] WHEREAS, the Secretary intends through coordination, cooperation, and

102 partnerships to pursue measures to improve water supply, water quality, and reliability of the

103 Project for all Project purposes; and

104    [22$^{nd}$] WHEREAS, the mutual goals of the United States and the Contractor

105 include: to provide for reliable Project Water supplies; to control costs of those supplies; to

106 achieve repayment of the Project as required by law; to guard reasonably against Project Water

107 shortages; to achieve a reasonable balance among competing demands for use of Project Water;

108 and to comply with all applicable environmental statutes, all consistent with the legal obligations

109 of the United States relative to the Project; and

110    [23$^{rd}$] WHEREAS, the parties intend by this Contract to maintain a cooperative

111 relationship in order to achieve their mutual goals; and

112    [24$^{th}$] WHEREAS, the Contractor has utilized or may utilize transfers, contract

113 assignments, rescheduling, and conveyance of Project Water and non-Project water under this

114 Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

115 beneficial use of water; and

116    [25$^{th}$] WHEREAS, the parties desire and intend that this Contract not provide a

117 disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

118 Explanatory Recital immediately above; and

119    [26$^{th}$] WHEREAS, the Contracting Officer and the Contractor agree that this

120 Contract complies with Section 4011 of the WIIN Act; and

121        [27th] WHEREAS, the Contracting Officer and the Contractor agree to amend

122    and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

123    Reclamation law on the terms and conditions set forth below.

124        NOW, THEREFORE, in consideration of the mutual and dependent covenants

125    herein contained, it is hereby mutually agreed by the parties hereto as follows:

126                     <u>DEFINITIONS</u>

127    1.    When used herein unless otherwise distinctly expressed, or manifestly

128    incompatible with the intent of the parties as expressed in this Contract, the term:

129        (a)    "Additional Capital Obligation" shall mean construction costs or other

130    capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

131    Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

132    (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

133    Stat. 1628) ("WIIN Act");

134        (b)    "Calendar Year" shall mean the period January 1 through December 31,

135    both dates inclusive;

136        (c)    "Charges" shall mean the payments required by Federal Reclamation law

137    in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

138    annually by the Contracting Officer pursuant to this Contract;

139        (d)    "Condition of Shortage" shall mean a condition respecting the Project

140    during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

141    Contract Total;

142    (e)    "Contracting Officer" shall mean the Secretary of the Interior's duly

143    authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

144    or regulation;

145    (f)    "Contract Total" shall mean the maximum amount of water to which the

146    Contractor is entitled under subdivision (a) of Article 3 of this Contract;

147    (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

148    permitted to provide Project Water under this Contract as described in Exhibit "A" attached

149    hereto, which may be modified from time to time in accordance with Article 34 of this Contract

150    without amendment of this Contract;

151    (h)    "CVPIA" shall mean the Central Valley Project Improvement Act, Title

152    XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

153    (i)    "Delta Division Facilities" shall mean those existing and future Project

154    facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

155    the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

156    Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

157    Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

158    (j)    "Eligible Lands" shall mean all lands to which Irrigation Water may be

159    delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

160    1263), as amended;

161    (k)    "Excess Lands" shall mean all lands in excess of the limitations contained

162    in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

163    acreage limitation under Federal Reclamation law;

8

164          (l)      "Existing Capital Obligation" shall mean the remaining amount of

165   construction costs or other capitalized costs allocable to the Contractor as described in Section

166   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

167   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

168   in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

169   Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

170   Exhibit "C", which is incorporated herein by reference;

171          (m)     "Full Cost Rate" shall mean an annual rate, as determined by the

172   Contracting Officer that shall amortize the expenditures for construction properly allocable to the

173   Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

174   deficits funded, less payments, over such periods as may be required under Federal Reclamation

175   law, or applicable contract provisions.  Interest will accrue on both the construction expenditures

176   and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

177   date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

178   in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

179   The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

180   Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

181          (n)     "Ineligible Lands" shall mean all lands to which Irrigation Water may not

182   be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

183          (o)     "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

184   to the delivery of Irrigation Water;

185         (p)     "Irrigation Water" shall mean the use of Project Water to irrigate lands
186 primarily for the production of commercial agricultural crops or livestock, and domestic and
187 other uses that are incidental thereto;

188         (q)     "Landholder" shall mean a party that directly or indirectly owns or leases

189 nonexempt land, as provided in 43 CFR 426.2;

190         (r)     "Municipal and Industrial (M&I) Water" shall mean the use of Project
191 Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
192 of "Irrigation Water" or within another category of water use under an applicable Federal
193 authority;

194         (s)     "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

195 the delivery of M&I Water;

196         (t)     "Operation and Maintenance" or "O&M" shall mean normal and

197 reasonable care, control, operation, repair, replacement (other than capital replacement), and

198 maintenance of Project facilities;

199         (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

200 successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

201 the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

202 Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

203 Water Authority;

204         (v)     "Project" shall mean the Central Valley Project owned by the United

205 States and managed by the Department of the Interior, Bureau of Reclamation;

206         (w)     "Project Contractors" shall mean all parties who have contracts for water

207 service for Project Water from the Project with the United States pursuant to Federal

208 Reclamation law;

209          (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

210   delivered by the Secretary in accordance with the statutes authorizing the Project and in

211   accordance with the terms and conditions of water rights acquired pursuant to California law;

212          (y)     "Rates" shall mean the payments determined annually by the Contracting

213   Officer in accordance with the then-current applicable water ratesetting policies for the Project,

214   as described in subdivision (a) of Article 7 of this Contract;

215          (z)     "Recent Historic Average" shall mean the most recent five (5)-year

216   average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

217   or its preceding contract(s);

218          (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

219   mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

220   amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

221   Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

222   United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

223          (bb)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

224   successor, or an authorized representative acting pursuant to any authority of the Secretary and

225   through any agency of the Department of the Interior;

226          (cc)    "Tiered Pricing Component" shall be the incremental amount to be paid

227   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

228   for in Exhibit "B";

229     (dd) "Water Delivered" or "Delivered Water" shall mean Project Water

230 diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

231 Officer;

232     (ee) "Water Made Available" shall mean the estimated amount of Project

233 Water that can be delivered to the Contractor for the upcoming Year as declared by the

234 Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

235     (ff) "Water Scheduled" shall mean Project Water made available to the

236 Contractor for which times and quantities for delivery have been established by the Contractor

237 and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

238     (gg) "Year" shall mean the period from and including March 1 of each

239 Calendar Year through the last day of February of the following Calendar Year.

240     <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

241  2. (a) This Contract shall be effective November 1, 2020, hereinafter known as

242 the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

243 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

244 (53 Stat. 1195) as applicable, and applicable law;

245     (1) *Provided, That* the Contracting Officer shall not seek to terminate

246 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

247 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

248 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

249     or to diligently commence and maintain full curative payments satisfactory to the Contracting

250     Officer within the sixty (60) calendar days' notice period;

251             (2)      *Provided, further,* That the Contracting Officer shall not seek to

252     suspend making water available or declaring Water Made Available pursuant to this Contract for

253     non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

254     Contracting Officer has first provided at least thirty (30) calendar days written notice to the

255     Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

256     curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

257     cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

258     suspended making water available pursuant to this paragraph, upon cure of such non-compliance

259     satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

260     available and declaring Water Made Available pursuant to this Contract;

261             (3)      *Provided, further,* That this Contract may be terminated at any

262     time by mutual consent of the parties hereto.

263           (b)      Upon complete payment of the Repayment Obligation by the Contractor,

264     and notwithstanding any Additional Capital Obligation that may later be established, the acreage

265     limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

266     and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

267     this Contract shall no longer be applicable.

268           (c)      Notwithstanding any provision of this Contract, the Contractor reserves

269     and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

270     allowed by law.

13

271         (d)     Notwithstanding any provision of this Contract, the Contractor reserves

272  and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

273  allowed by law.

274         <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

275      3.     (a)     During each Year, consistent with all applicable State water rights permits,

276  and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

277  Contract, the Contracting Officer shall make available for delivery to the Contractor 5,000 acre-

278  feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

279  accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

280  Articles 4 and 7 of this Contract.

281         (b)     Because the capacity of the Project to deliver Project Water has been

282  constrained in recent years and may be constrained in the future due to many factors including

283  hydrologic conditions and implementation of Federal and State laws, the likelihood of the

284  Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

285  Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

286  programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

287  CVPIA projected that the Contract Total set forth in this Contract will not be available to the

288  Contractor in many years.  During the most recent five years prior to execution of the Existing

289  Contract, the Recent Historic Average Water Made Available to the Contractor was 3,290 acre-

290  feet.  Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

291  parties under any provision of this Contract.

292    (c)  The Contractor shall utilize the Project Water in accordance with all

293 applicable legal requirements.

294      (1)  In the event any Project Contractor (other than a Cross Valley

295 Contractor) that receives Project Water through the Delta Division Facilities obtains a

296 contractual agreement that the Contracting Officer shall make Project Water available at a point

297 or points of delivery in or north of the Delta, at the request of the Contractor and upon

298 completion of any required environmental documentation, this Contract shall be amended to

299 provide for deliveries in or north of the Delta on mutually agreeable terms.  Such amendments to

300 this Contract shall be limited solely to those changes made necessary by the addition of such

301 alternate points of delivery in or north of the Delta; _Provided, That_ the Contracting Officer's use

302 of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

303 amendment.

304    (d)  The Contractor shall make reasonable and beneficial use of all water

305 furnished pursuant to this Contract.  Groundwater recharge programs (direct, indirect, or in lieu),

306 groundwater banking programs, surface water storage programs, and other similar programs

307 utilizing Project Water or other water furnished pursuant to this Contract conducted within the

308 Contractor's Service Area which are consistent with applicable State law and result in use

309 consistent with Federal Reclamation law will be allowed; _Provided, That_ any direct recharge

310 program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

311 Article 25 of this Contract; _Provided, further, That_ such water conservation plan demonstrates

312 sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

313 the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

314    compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

315    banking programs, surface water storage programs, and other similar programs utilizing Project

316    Water or other water furnished pursuant to this Contract conducted outside the Contractor's

317    Service Area may be permitted upon written approval of the Contracting Officer, which approval

318    will be based upon environmental documentation, Project Water rights, and Project operational

319    concerns. The Contracting Officer will address such concerns in regulations, policies, or

320    guidelines.

321          (e)    The Contractor shall comply with requirements applicable to the

322    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

323    of any water service contract between the Contracting Officer and the Contractor in effect

324    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

325    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

326    implement. The Existing Contract, which evidences in excess of 26 years of diversions for

327    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

328    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

329    required biological assessment(s) prepared pursuant to the ESA, and any other needed

330    environmental review. Nothing herein shall be construed to prevent the Contractor from

331    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

332    biological opinion or other environmental documentation referred to in this Article.

333          (f)    Following the declaration of Water Made Available under Article 4 of this

334    Contract, the Contracting Officer will make a determination whether Project Water, or other

335    water available to the Project, can be made available to the Contractor in addition to the Contract

16

336  Total under this Article during the Year without adversely impacting other Project Contractors.

337  At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

338  making such a determination. If the Contracting Officer determines that Project Water, or other

339  water available to the Project, can be made available to the Contractor, the Contracting Officer

340  will announce the availability of such water and shall so notify the Contractor as soon as

341  practical. The Contracting Officer will thereafter meet with the Contractor and other Project

342  Contractors capable of taking such water to determine the most equitable and efficient allocation

343  of such water. If the Contractor requests the delivery of any quantity of such water, the

344  Contracting Officer shall make such water available to the Contractor in accordance with

345  applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

346  contractual commitments, water rights, and operational constraints, long-term Project

347  Contractors shall have a first right to acquire such water, including Project Water made available

348  pursuant to Section 215 of the Reclamation Reform Act of 1982.

349        (g)    The Contractor may request permission to reschedule for use during the

350  subsequent Year some or all of the Water Made Available to the Contractor during the current

351  Year, referred to as "rescheduled water." The Contractor may request permission to use during

352  the current Year a quantity of Project Water which may be made available by the United States

353  to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

354  written approval may permit such uses in accordance with applicable statutes, regulations,

355  guidelines, and policies.

356        (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

357  State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

17

358    shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

359    Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

360    August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

361    sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

362    subdivision (b) of Article 12 of this Contract.

363           (i)     Project Water furnished to the Contractor pursuant to this Contract may be

364    delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

365    Contract upon written approval by the Contracting Officer in accordance with the terms and

366    conditions of such approval.

367           (j)     The Contracting Officer shall make reasonable efforts to protect the water

368    rights necessary for the Project and to provide the water available under this Contract. The

369    Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

370    extent permitted by law, in administrative proceedings related to the Project Water rights;

371    *Provided, That* the Contracting Officer retains the right to object to the substance of the

372    Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

373    Contracting Officer shall recognize the Contractor has a legal right under the terms of this

374    Contract to use Project Water.

375                      TIME FOR DELIVERY OF WATER

376    4.    (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

377    announce the Contracting Officer's expected declaration of the Water Made Available. Such

378    declaration will be expressed in terms of Water Made Available and the Recent Historic Average

379    and will be updated monthly, and more frequently if necessary, based on the then-current

380 operational and hydrologic conditions and a new declaration with changes, if any, to the Water

381 Made Available will be made. The Contracting Officer shall provide forecasts of Project

382 operations and the basis of the estimate, with relevant supporting information, upon the written

383 request of the Contractor. Concurrently with the declaration of the Water Made Available, the

384 Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

385       (b) . On or before each March 1 and at such other times as necessary, the

386 Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

387 Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

388 United States to the Contractor pursuant to this Contract for the Year commencing on such

389 March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

390 according to the approved schedule for the Year commencing on such March 1.

391       (c) The Contractor shall not schedule Project Water in excess of the quantity

392 of Project Water the Contractor intends to put to reasonable and beneficial use within the

393 Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

394 during any Year.

395       (d) Subject to the conditions set forth in subdivision (a) of Article 3 of this

396 Contract, the United States shall deliver Project Water to the Contractor in accordance with the

397 initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

398 written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

399 time prior to the date(s) on which the requested change(s) is/are to be implemented.

400     <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

401     5.     (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

402     Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

403     any additional point or points of delivery either on Project facilities or another location or

404     locations mutually agreed to in writing by the Contracting Officer and the Contractor.

405     (b)     The Contracting Officer, either directly or indirectly through its written

406     agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

407     maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

408     the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

409     Article.

410     (c)     The Contractor shall deliver Irrigation Water in accordance with any

411     applicable land classification provisions of Federal Reclamation law and the associated

412     regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

413     Service Area unless approved in advance by the Contracting Officer.

414     (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

415     measured and recorded with equipment furnished, installed, operated, and maintained by the

416     Contracting Officer either directly or indirectly through its written agreements(s) with the

417     Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

418     Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

419     this Article. Upon the request of either party to this Contract, the Contracting Officer shall

420     investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

421     accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

422    therein. For any period of time when accurate measurements have not been made, the

423    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

424    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

425    of time.

426            (e)    Absent a separate contrary written agreement with the Contractor, neither

427    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

428    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

429    pursuant to this Contract beyond the point or points of delivery established pursuant to

430    subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

431    employees, agents, and assigns on account of damage or claim of damage of any nature

432    whatsoever for which there is legal responsibility, including property damage, personal injury, or

433    death arising out of or connected with  the control, carriage, handling, use, disposal, or

434    distribution of such Water Delivered beyond such point or points of delivery except for any

435    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

436    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

437    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

438    Contracting Officer or any of its officers, employees, agents, and assigns, including the

439    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

440    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

441    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

442    Federal Entity(ies).

443 <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

444     6.     (a)     The Contractor has established a measuring program satisfactory to the

445 Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

446 purposes within the Contractor's Service Area is measured at each agricultural turnout and such

447 water delivered for M&I purposes is measured at each M&I service connection. The water

448 measuring devices or water measuring methods of comparable effectiveness must be acceptable

449 to the Contracting Officer. The Contractor shall be responsible for installing, operating,

450 maintaining, and repairing all such measuring devices and implementing all such water

451 measuring methods at no cost to the United States. The Contractor shall use the information

452 obtained from such water measuring devices or water measuring methods to ensure its proper

453 management of the water; to bill water users for water delivered by the Contractor; and, if

454 applicable, to record water delivered for M&I purposes by customer class as defined in the

455 Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

456 contained, however, shall preclude the Contractor from establishing and collecting any charges,

457 assessments, or other revenues authorized by California law. The Contractor shall include a

458 summary of all its annual surface water deliveries in the annual report described in subdivision

459 (c) of Article 25 of this Contract.

460     (b)     To the extent the information has not otherwise been provided, upon

461 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

462 report describing the measurement devices or water measuring methods being used or to be used

463 to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

464 service connections or alternative measurement programs approved by the Contracting Officer,

22

465      at which such measurement devices or water measuring methods are being used, and, if

466      applicable, identifying the locations at which such devices and/or methods are not yet being used

467      including a time schedule for implementation at such locations.  The Contracting Officer shall

468      advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

469      if any, of the measuring devices or water measuring methods identified in the Contractor's report

470      and if the Contracting Officer does not respond in such time, they shall be deemed adequate.  If

471      the Contracting Officer notifies the Contractor that the measuring devices or methods are

472      inadequate, the parties shall within 60 days following the Contracting Officer's response,

473      negotiate in good faith the earliest practicable date by which the Contractor shall modify said

474      measuring devices and/or measuring methods as required by the Contracting Officer to ensure

475      compliance with subdivision (a) of this Article.

476               (c)      All new surface water delivery systems installed within the Contractor's

477      Service Area after the Effective Date shall also comply with the measurement provisions

478      described in subdivision (a) of this Article.

479               (d)      The Contractor shall inform the Contracting Officer and the State of

480      California in writing by April 30 of each Year of the monthly volume of surface water delivered

481      within the Contractor's Service Area during the previous Year.

482               (e)      The Contractor shall inform the Contracting Officer and the Operating

483      Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

484      Irrigation Water and M&I Water taken during the preceding month.

23

485         <u>RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED</u>
486                           <u>REPAYMENT OF FACILITIES</u>

487      7.      (a)      Notwithstanding the Contractor's full prepayment of the Repayment

488 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

489 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

490 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

491 Article, subsection (b), the Contractor's Project construction and other obligations shall be

492 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

493 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

494 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

495 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

496 rules and regulations, or policies, and (iii) other applicable provisions of this Contract. Payments

497 shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

498 agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

499 Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

500 forth in Exhibit "B", as may be revised annually.

501                (1)      The Contractor shall pay the United States as provided for in this

502 Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

503 in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

504 be established to recover its estimated reimbursable costs included in the operation and

505 maintenance component of the Rate and amounts established to recover deficits and other

506 charges, if any, including construction costs as identified in the following subdivisions.

507         (2)     In accordance with the WIIN Act, the Contractor's allocable share

508 of Project construction costs will be repaid pursuant to the provisions of this Contract.

509         (A)     The amount due and payable to the United States, pursuant

510 to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

511 computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

512 as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

513 installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

514 set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

515 as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

516 Officer in writing no later than thirty (30) days prior to the Effective Date if electing to repay the

517 amount due using the lump sum alternative. If such notice is not provided by such date, the

518 Contractor shall be deemed to have elected the installment payment alternative, in which case,

519 the first such payment shall be made no later than December 30, 2020. The second payment

520 shall be made no later than the first anniversary of the first payment date. The third payment

521 shall be made no later than the second anniversary of the first payment date. The final payment

522 shall be made no later than November 1, 2023. If the installment payment option is elected by

523 the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

524 by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

525 Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

526 methodology as was used to compute the initial annual installment payment amount, which is

527 illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

528 established, receipt of the Contractor's payment of the Repayment Obligation to the United

529 States shall fully and permanently satisfy the Existing Capital Obligation.

530         (B)     Additional Capital Obligations that are not reflected in, the

531 schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

532 prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

533 Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

534 Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

535 Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

536 the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

537 be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

538 however, will be considered under subdivision (b) of this Article. A separate agreement shall be

539 established by the Contractor and the Contracting Officer to accomplish repayment of the

540 Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

541 WIIN Act, subject to the following:

542         (1)     If the collective Additional Capital Obligation

543 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

544 is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

545 to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

546 notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

547 amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

26

548          (2)     If the collective Additional Capital Obligation

549   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

550   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

551   properly assignable to the Contractor shall be repaid as provided by applicable Federal

552   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

553   five million dollars ($5,000,000) shall not be a precedent in any other context.

554          (b)     In the event that the final cost allocation referenced in Section 4011(b) of

555   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

556   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

557   allocated costs. The term of such additional repayment contract shall be not less than one (1)

558   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

559   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

560   the event that the final cost allocation indicates that the costs properly assignable to the

561   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

562   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

563   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

564          (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

565   and Tiered Pricing Component as follows:

566          (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

567   provide the Contractor an estimate of the Charges for Project Water that will be applied to the

568   period October 1, of the current Calendar Year, through September 30, of the following Calendar

569   Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

27

570 to review and comment on such estimates. On or before September 15 of each Calendar Year,

571 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

572 the period October 1 of the current Calendar Year, through September 30, of the following

573 Calendar Year, and such notification shall revise Exhibit "B."

574            (2)      Prior to October 1 of each Calendar Year, the Contracting Officer

575 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

576 for Project Water for the following Year and the computations and cost allocations upon which

577 those Rates are based. The Contractor shall be allowed not less than two months to review and

578 comment on such computations and cost allocations. By December 31 of each Calendar Year,

579 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

580 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

581            (d)      At the time the Contractor submits the initial schedule for the delivery of

582 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

583 Contractor shall make an advance payment to the United States equal to the total amount payable

584 pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

585 scheduled to be delivered pursuant to this Contract during the first two calendar months of the

586 Year. Before the end of the first month and before the end of each calendar month thereafter, the

587 Contractor shall make an advance payment to the United States, at the Rate(s) set under

588 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

589 during the second month immediately following. Adjustments between advance payments for

590 Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

591 the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

592    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

593    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

594    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

595    payment.  In any month in which the quantity of Water Delivered to the Contractor pursuant to

596    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

597    additional Project Water shall be delivered to the Contractor unless and until an advance

598    payment at the Rates then in effect for such additional Project Water is made.  Final adjustment

599    between the advance payments for the Water Scheduled and payments for the quantities of Water

600    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

601    later than April 30th of the following Year, or 60 days after the delivery of Project Water

602    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

603    the last day of February.

604            (e)      The Contractor shall also make a payment in addition to the Rate(s) in

605    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

606    appropriate Tiered Pricing Component then in effect, before the end of the month following the

607    month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

608    Pricing Component pursuant to subdivision (k)(2) of this Article.  The payments shall be

609    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

610    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

611    there is no Operating Non-Federal Entity, by the Contracting Officer.  The water delivery report

612    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

613    for Water Delivered.  Adjustment for overpayment or underpayment of Charges shall be made

29

614     through the adjustment of payments due to the United States for Charges for the next month.

615     Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

616     be computed pursuant to Article 19 of this Contract.

617            (f)      The Contractor shall pay for any Water Delivered under subdivision (a),

618     (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

619     applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

620     policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

621     Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

622     under subdivision (a) of this Article.

623            (g)      Payments to be made by the Contractor to the United States under this

624     Contract may be paid from any revenues available to the Contractor.

625            (h)      All revenues received by the United States from the Contractor relating to

626     the delivery of Project Water or the delivery of non-Project water through Project facilities shall

627     be allocated and applied in accordance with Federal Reclamation law and the associated rules or

628     regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

629            (i)      The Contracting Officer shall keep its accounts pertaining to the

630     administration of the financial terms and conditions of its long-term contracts, in accordance

631     with applicable Federal standards, so as to reflect the application of Project costs and revenues.

632     The Contracting Officer shall, each Year upon request of the Contractor, provide to the

633     Contractor a detailed accounting of all Project and Contractor expense allocations, the

634     disposition of all Project and Contractor revenues, and a summary of all water delivery

635     information. The Contracting Officer and the Contractor shall enter into good faith negotiations

636     to resolve any discrepancies or disputes relating to accountings, reports, or information.

637          (j)     The parties acknowledge and agree that the efficient administration of this

638     Contract is their mutual goal.  Recognizing that experience has demonstrated that mechanisms,

639     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

640     and/or for making and allocating payments, other than those set forth in this Article may be in

641     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

642     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

643     this Contract is in effect without amending this Contract.

644          (k)     (1)     Beginning at such time as deliveries of Project Water in a Year

645     exceed 80 percent of the Contract Total, then before the end of the month following the month of

646     delivery the Contractor shall make an additional payment to the United States equal to the

647     applicable Tiered Pricing Component.  The Tiered Pricing Component for the amount of Water

648     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

649     Contract Total, shall equal one-half of the difference between the Rate established under

650     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

651     Rate, whichever is applicable.  The Tiered Pricing Component for the amount of Water

652     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

653     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

654     Rate or M&I Full Cost Water Rate, whichever is applicable.  For all Water Delivered pursuant to

655     subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

656     Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

657     the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

658        (2)    Subject to the Contracting Officer's written approval, the

659    Contractor may request and receive an exemption from such Tiered Pricing Component for

660    Project Water delivered to produce a crop which the Contracting Officer determines will provide

661    significant and quantifiable habitat values for waterfowl in fields where the water is used and the

662    crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

663    Irrigation Water shall apply only if such habitat values can be assured consistent with the

664    purposes of the CVPIA through binding agreements executed with or approved by the

665    Contracting Officer prior to use of such water.

666        (3)    For purposes of determining the applicability of the Tiered Pricing

667    Component pursuant to this Article, Water Delivered shall include Project Water that the

668    Contractor transfers to others but shall not include Project Water transferred to the Contractor,

669    nor shall it include the additional water provided to the Contractor under the provisions of

670    subdivision (f) of Article 3 of this Contract.

671        (l)    For the term of this Contract, Rates applied under the respective

672    ratesetting policies will be established to recover only reimbursable O&M (including any

673    deficits) and capital costs of the Project, as those terms are used in the then-current Project

674    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

675    applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

676    practices which implement the Contracting Officer's ratesetting policies will not be implemented

677    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

678    need, and impact of the proposed change.

679        (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

680    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

681    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

682    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

683    transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

684    lower Rates and Charges because of inability to pay and is transferring Project Water to another

685    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

686    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

687            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

688    Officer is authorized to adjust determinations of ability to pay every five years.

689            (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

690    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

691    of the date of this Contract or deficit-related interest charges thereon.  By entering into this

692    Contract, the Contractor does not waive any legal rights or remedies that it may have with

693    respect to such disputed issues.  Notwithstanding the execution of this Contract and payments

694    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

695    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

696    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

697    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

698    the Rates; (4) the application by the United States of payments made by the Contractor under its

699    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

700    application of such payments in the Rates.  The Contracting Officer agrees that the Contractor

701    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

702 M&I contractor on any of these issues, and credits for payments heretofore made, provided that

703 the basis for such ruling is applicable to the Contractor.

704 <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

705 8. The Contractor and the Contracting Officer concur that, as of the Effective Date

706 the Contractor has no non-interest bearing O&M deficits and shall have no further liability

707 therefore.

708 <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

709 9. (a) The right to receive Project Water provided for in this Contract may be

710 sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

711 California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

712 and applicable guidelines or regulations then in effect. No sale, transfer, or exchange of Project

713 Water under this Contract may take place without the prior written approval of the Contracting

714 Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

715 exchanges shall be approved absent all appropriate environmental documentation, including, but

716 not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

717 documentation should include, as appropriate, an analysis of groundwater impacts and economic

718 and social effects, including environmental justice, of the proposed water transfers on both the

719 transferor and transferee.

720 (b) In order to facilitate efficient water management by means of water

721 transfers of the type historically carried out among Project Contractors located within the same

722 geographical area and to allow the Contractor to participate in an accelerated water transfer

723 program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

<div align="center">34</div>

724    all necessary environmental documentation, including, but not limited to, documents prepared

725    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

726    the Contracting Officer shall determine whether such transfers comply with applicable law.

727    Following the completion of the environmental documentation, such transfers addressed in such

728    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

729    require prior written approval by the Contracting Officer.  Such environmental documentation

730    and the Contracting Officer's compliance determination shall be reviewed every five years and

731    updated, as necessary, prior to the expiration of the then existing five (5)-year period.  All

732    subsequent environmental documentation shall include an alternative to evaluate not less than the

733    quantity of Project Water historically transferred within the same geographical area.

734    (c)    For a water transfer to qualify under subdivision (b) of this Article, such

735    water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

736    years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

737    activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

738    be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

739    within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

740    through existing facilities with no new construction or modifications to facilities and be between

741    existing Project Contractors and/or the Contractor and the United States, Department of the

742    Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

743    requirements imposed for protection of the environment and Indian Trust Assets, as defined

744    under Federal law.

745 <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

746       10.    (a)    The amount of any overpayment by the Contractor of the Contractor's

747 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

748 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

749 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

750 of such overpayment, at the option of the Contractor, may be credited against amounts to become

751 due to the United States by the Contractor. With respect to overpayment, such refund or

752 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

753 have the right to the use of any of the Project Water supply provided for by this Contract. All

754 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

755 obtaining direction as to how to credit or refund such overpayment in response to the notice to

756 the Contractor that it has finalized the accounts for the Year in which the overpayment was

757 made.

758             (b)    All advances for miscellaneous costs incurred for work requested by the

759 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

760 when the work has been completed. If the advances exceed the actual costs incurred, the

761 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

762 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

763 Contract.

764 <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

765       11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

766 requirements of Federal law, and (ii) the obligations of the United States under existing

767 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

768 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

769 provided in this Contract.

770         (b)     The Contracting Officer or Operating Non-Federal Entity(ies) may

771 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

772 provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

773 of the Project facilities or any part thereof necessary for the delivery of Project Water to the

774 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

775 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

776 except in case of emergency, in which case no notice need be given; _Provided, That_ the United

777 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

778 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

779 the United States will, if possible, deliver the quantity of Project Water which would have been

780 delivered hereunder in the absence of such discontinuance or reduction.

781         (c)     The United States reserves the right to all seepage and return flow water

782 derived from Water Delivered to the Contractor hereunder which escapes or is discharged

783 beyond the Contractor's Service Area; _Provided, That_ this shall not be construed as claiming for

784 the United States any right to seepage or return flow being put to reasonable and beneficial use

785 pursuant to this Contract within the Contractor's Service Area by the Contractor or those

786 claiming by, through, or under the Contractor.

787                 CONSTRAINTS ON THE AVAILABILITY OF WATER

788     12.    (a)     In its operation of the Project, the Contracting Officer will use all

789 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
790 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
791 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
792 Contractor of said determination as soon as practicable.

793       (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
794 or other similar operational errors affecting the Project; drought and other physical or natural
795 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
796 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
797 17 of this Contract, no liability shall accrue against the United States or any of its officers,
798 agents, or employees for any damage, direct or indirect, arising therefrom.

799       (c)    In any Year in which there may occur a Condition of Shortage for any of

800 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

801 Article, the Contracting Officer will first allocate the available Project Water consistent with the

802 Project M&I Water Shortage Policy as finally adopted after environmental review for

803 determining the amount of Project Water Available for delivery to the Project Contractors.

804 Subject to the foregoing allocation, in any year in which there may occur a Condition of

805 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

806 others entitled to Project Water from Delta Division Facilities under long-term water service or

807 repayment contracts (or renewals thereof or binding commitments therefore) in force on

808 February 28, 2005, as follows:

809       (1)    The Contracting Officer shall make an initial and subsequent

810 determination as necessary of the total quantity of Project Water estimated to be scheduled or

811 actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

812 renewal, long-term water service or repayment contracts then in force for the delivery of Project

813 Water by the United States from Delta Division Facilities during the relevant Year, the quantity

814 so determined being hereinafter referred to as the scheduled total;

38

815         (2)     A determination shall be made of the total quantity of Project

816   Water that is available for meeting the scheduled total, the quantity so determined being

817   hereinafter referred to as the available supply;

818         (3)     The total quantity of Project Water estimated to be scheduled or

819   actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

820   of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

821   hereinafter referred to as the Contractor's proportionate share; and

822         (4)     The available supply shall be multiplied by the Contractor's

823   proportionate share and the result shall be the quantity of Project Water made available by the

824   United States to the Contractor for the relevant Year in accordance with the schedule developed

825   by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

826   amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

827   that the Contracting Officer can increase or needs to decrease the available supply for delivery

828   from Delta Division Facilities to long-term water service and repayment contractors during the

829   relevant Year, such additions or reductions to the available supply shall be apportioned

830   consistent with subparagraphs (1) through (4), inclusive.

831         (d)     By entering into this Contract, the Contractor does not waive any legal

832   rights or remedies it may have to file or participate in any administrative or judicial proceeding

833   contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

834   such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

835   implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

836   *That* the Contractor has commenced any such judicial challenge or any administrative procedures

837  necessary to institute any judicial challenge within six months of the policy becoming final.  By

838  agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

839  that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

840  validate or invalidate the Project M&I Water Shortage Policy.

841  <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

842  13.  (a)  To the extent applicable, the Contractor shall not be deemed to have

843  delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

844  Contract if such lands are irrigated with groundwater that reaches the underground strata as an

845  unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

846  (b)  Upon complete payment of the Repayment Obligation by the Contractor,

847  this Article 13 shall no longer be applicable.

848  <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

849  14.  The parties agree that the delivery of Irrigation Water or use of Federal facilities
850  pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
851  Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
852  the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
853  law.

854  <u>PROTECTION OF WATER AND AIR QUALITY</u>

855  15.  (a)  Omitted

856  (b)  The United States will care for, operate and maintain reserved works in a
857  manner that preserves the quality of the water at the highest level possible as determined by the
858  Contracting Officer.  The United States does not warrant the quality of the water delivered to the
859  Contractor and is under no obligation to furnish or construct water treatment facilities to
860  maintain or improve the quality of water delivered to the Contractor.

861  (c)  The Contractor will comply with all applicable water and air pollution
862  laws and regulations of the United States and the State of California; and will obtain all required
863  permits or licenses from the appropriate Federal, State, or local authorities necessary for the
864  delivery of water by the Contractor; and shall be responsible for compliance with all Federal,

865 State, and local water quality standards applicable to surface and subsurface drainage and/or
866 discharges generated through the use of Federal or Contractor facilities or Project Water
867 provided by the Contractor within its Service Area.

868     (d)    This Article shall not affect or alter any legal obligations of the Secretary
869 to provide drainage or other discharge services.

870     (e)    Omitted

871 <u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
872 STATES</u>

873     16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

874 other than from the United States and Irrigation Water furnished pursuant to the terms of this

875 Contract may be simultaneously transported through the same distribution facilities of the

876 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

877 and non-Project water were constructed without funds made available pursuant to Federal

878 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

879 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

880 Irrigation Water must be established through the certification requirements as specified in the

881 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

882 Eligible Lands within the Contractor's Service Area can be established and the quantity of

883 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

884 Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

885 Project water are (were) constructed with funds made available pursuant to Federal Reclamation

886 law, the non-Project water will be subject to the acreage limitation provisions of Federal

887 Reclamation law, unless the Contractor pays to the United States the incremental fee described in

888 43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

889    annually the cost to the Federal Government, including interest, of storing or delivering non-

890    Project water, which for purposes of this Contract shall be determined as follows: The quotient

891    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

892    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

893    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

894    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

895    within the Contractor's Service Area that receives non-Project water through Federally financed

896    or constructed facilities. The incremental fee calculation methodology will continue during the

897    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

898    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

899    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

900    adopted, it shall supersede this provision.

901           (b)    Water or water rights now owned or hereafter acquired by the Contractor,

902    other than from the United States may be stored, conveyed, and/or diverted through Project

903    facilities, subject to the completion of appropriate environmental documentation, with the

904    approval of the Contracting Officer and the execution of any contract determined by the

905    Contracting Officer to be necessary, consistent with the following provisions:

906           (1)    The Contractor may introduce non-Project water into Project

907    facilities and deliver said water to lands within the Contractor's Service Area, including

908    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

909    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

910    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

42

911    use power policy is applicable, each as amended, modified, or superseded from time to time.

912               (2)      Delivery of such non-Project water in and through Project facilities

913    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

914    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

915    available to other Project Contractors; (iii) interfere with the delivery of contractual water

916    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

917    the Project facilities.

918               (3)      Neither the United States nor the Operating Non-Federal

919    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

920    is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

921    releases and agrees to defend and indemnify the United States and the Operating Non-Federal

922    Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

923    persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

924    employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

925    (ii) diverting such non-Project water into Project facilities.

926               (4)      Diversion of such non-Project water into Project facilities shall be

927    consistent with all applicable laws, and if involving groundwater, consistent with any applicable

928    groundwater management plan for the area from which it was extracted.

929               (5)      After Project purposes are met, as determined by the Contracting

930    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

931    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

932    available by the Contracting Officer for conveyance and transportation of non-Project water prior

933 to any such remaining capacity being made available to non-Project contractors. Other Project

934 Contractors shall have a second priority to any remaining capacity of facilities declared to be

935 available by the Contracting Officer for conveyance and transportation of non-Project water prior

936 to any such remaining capacity being made available to non-Project contractors.

937         (c)     Upon complete payment of the Repayment Obligation by the Contractor,

938 subdivision (a) of this Article 16 shall no longer be applicable.

<div align="center">OPINIONS AND DETERMINATIONS</div>

940     17.    (a)    Where the terms of this Contract provide for actions to be based upon the

941 opinion or determination of either party to this Contract, said terms shall not be construed as

942 permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

943 determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

944 reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

945 or unreasonable opinion or determination. Each opinion or determination by either party shall be

946 provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

947 affect or alter the standard of judicial review applicable under Federal law to any opinion or

948 determination implementing a specific provision of Federal law embodied in statute or

949 regulation.

950         (b)     The Contracting Officer shall have the right to make determinations

951 necessary to administer this Contract that are consistent with the provisions of this Contract, the

952 laws of the United States and of the State of California, and the rules and regulations

953 promulgated by the Secretary. Such determinations shall be made in consultation with the

954 Contractor to the extent reasonably practicable.

955 <u>COORDINATION AND COOPERATION</u>

956     18.    (a)    In order to further their mutual goals and objectives, the Contracting

957 Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

958 with other affected Project Contractors, in order to improve the O&M of the Project. The

959 communication, coordination, and cooperation regarding O&M shall include, but not be limited

960 to, any action which will or may materially affect the quantity or quality of Project Water supply,

961 the allocation of Project Water supply, and Project financial matters including, but not limited to,

962 budget issues. The communication, coordination, and cooperation provided for hereunder shall

963 extend to all provisions of this Contract. Each party shall retain exclusive decision making

964 authority for all actions, opinions, and determinations to be made by the respective party.

965     (b)    Within 120 days following the Effective Date, the Contractor, other

966 affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

967 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

968 amended as necessary separate and apart from this Contract. The goal of this process shall be to

969 provide, to the extent practicable, the means of mutual communication and interaction regarding

970 significant decisions concerning Project O&M on a real-time basis.

971     (c)    In light of the factors referred to in subdivision (b) of Article 3 of this

972 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

973 intent:

974         (1)    The Contracting Officer will, at the request of the Contractor,

975 assist in the development of integrated resource management plans for the Contractor. Further,

976 the Contracting Officer will, as appropriate, seek authorizations for implementation of

45

977 partnerships to improve water supply, water quality, and reliability.

978       (2)      The Secretary will, as appropriate, pursue program and project

979 implementation and authorization in coordination with Project Contractors to improve the water

980 supply, water quality, and reliability of the Project for all Project purposes.

981       (3)      The Secretary will coordinate with Project Contractors and the

982 State of California to seek improved water resource management.

983       (4)      The Secretary will coordinate actions of agencies within the

984 Department of the Interior that may impact the availability of water for Project purposes.

985       (5)      The Contracting Officer shall periodically, but not less than

986 annually, hold division-level meetings to discuss Project operations, division-level water

987 management activities, and other issues as appropriate.

988       (d)      Without limiting the contractual obligations of the Contracting Officer

989 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

990 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

991 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

992 protect health, safety, or the physical integrity of structures or facilities.

993 <div align="center">CHARGES FOR DELINQUENT PAYMENTS</div>

994     19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
995 charges on delinquent payments. If a payment is not received by the due date, the Contractor
996 shall pay an interest charge on the delinquent payment for each day the payment is delinquent
997 beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
998 addition to the interest charge, an administrative charge to cover additional costs of billing and
999 processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
1000 shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
1001 payment is delinquent beyond the due date, based on the remaining balance of the payment due

1002    at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
1003    collection services associated with a delinquent payment.

1004            (b)    The interest rate charged shall be the greater of either the rate prescribed
1005    quarterly in the Federal Register by the Department of the Treasury for application to overdue
1006    payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
1007    determined as of the due date and remain fixed for the duration of the delinquent period.

1008            (c)    When a partial payment on a delinquent account is received, the amount
1009    received shall be applied first to the penalty charges, second to the administrative charges, third
1010    to the accrued interest, and finally to the overdue payment.

1011                     EQUAL EMPLOYMENT OPPORTUNITY

1012        20.    During the performance of this Contract, the Contractor agrees as follows:

1013            (a)    The Contractor will not discriminate against any employee or applicant for
1014    employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1015    origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1016    that employees are treated during employment, without regard to their race, color, religion, sex,
1017    sexual orientation, gender identity, or national origin. Such action shall include, but not be
1018    limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1019    recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1020    selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1021    places, available to employees and applicants for employment, notices to be provided by the
1022    Contracting Officer setting forth the provisions of this nondiscrimination clause.

1023            (b)    The Contractor will, in all solicitations or advertisements for employees
1024    placed by or on behalf of the Contractor, state that all qualified applicants will receive
1025    consideration for employment without regard to race, color, religion, sex, sexual orientation,
1026    gender identity, or national origin.

1027            (c)    The Contractor will not discharge or in any other manner discriminate
1028    against any employee or applicant for employment because such employee or applicant has
1029    inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1030    employee or applicant. This provision shall not apply to instances in which an employee who
1031    has access to the compensation information of other employees or applicants as part of such
1032    employee's essential job functions discloses the compensation of such other employees or
1033    applicants to individuals who do not otherwise have access to such information, unless such
1034    disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1035    proceeding, hearing, or action, including an investigation conducted by the employer, or is
1036    consistent with the Contractor's legal duty to furnish information.

1037          (d)      The Contractor will send to each labor union or representative of workers
1038 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1039 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1040 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1041 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1042 applicants for employment.

1043          (e)      The Contractor will comply with all provisions of Executive Order No.
1044 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1045 Labor.

1046          (f)      The Contractor will furnish all information and reports required by
1047 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1048 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1049 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1050 compliance with such rules, regulations, and orders.

1051          (g)      In the event of the Contractor's noncompliance with the nondiscrimination
1052 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1053 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1054 ineligible for further Government contracts in accordance with procedures authorized in
1055 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1056 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1057 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1058          (h)      The Contractor will include the provisions of paragraphs (a) through (g) in
1059 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1060 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1061 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1062 will take such action with respect to any subcontract or purchase order as may be directed by the
1063 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1064 noncompliance: _Provided, however, That_ in the event the Contractor becomes involved in, or is
1065 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1066 Contractor may request the United States to enter into such litigation to protect the interests of
1067 the United States.

1068        <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1069      21.      (a)      The obligation of the Contractor to pay the United States as provided in
1070 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1071 obligation may be distributed among the Contractor's water users and notwithstanding the default
1072 of individual water users in their obligation to the Contractor.

1073        (b)    The payment of charges becoming due pursuant to this Contract is a
1074 condition precedent to receiving benefits under this Contract. The United States shall not make
1075 water available to the Contractor through Project facilities during any period in which the
1076 Contractor is in arrears in the advance payment of water rates due the United States. The
1077 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1078 parties that are in arrears in the advance payment of water rates as levied or established by the
1079 Contractor.

1080        (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1081 obligation to require advance payment for water rates which it levies.

## COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1083    22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1084 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1085 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1086 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1087 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1088 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1089 Interior and/or Bureau of Reclamation.

1090        (b)    These statutes prohibit any person in the United States from being
1091 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1092 discrimination under any program or activity receiving financial assistance from the Bureau of
1093 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1094 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1095 obligation, including permitting officials of the United States to inspect premises, programs, and
1096 documents.

1097        (c)    The Contractor makes this Contract in consideration of and for the
1098 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1099 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1100 Reclamation, including installment payments after such date on account of arrangements for
1101 Federal financial assistance which were approved before such date. The Contractor recognizes
1102 and agrees that such Federal assistance will be extended in reliance on the representations and
1103 agreements made in this Article and that the United States reserves the right to seek judicial
1104 enforcement thereof.

1105        (d)    Complaints of discrimination against the Contractor shall be investigated
1106 by the Contracting Officer's Office of Civil Rights.

1107                 <u>PRIVACY ACT COMPLIANCE</u>

1108       23.      (a)      The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1109 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1110 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1111 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1112 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1113 C.F.R. § 426.18.

1114             (b)      With respect to the application and administration of the criminal penalty
1115 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1116 employees who are responsible for maintaining the certification and reporting records referenced
1117 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1118 U.S.C. § 552a(m).

1119             (c)      The Contracting Officer or a designated representative shall provide the
1120 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1121 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1122 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1123 information contained in the Landholders' certification and reporting records.

1124             (d)      The Contracting Officer shall designate a full-time employee of the
1125 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1126 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1127 The Contractor is authorized to grant requests by individuals for access to their own records.

1128             (e)      The Contractor shall forward promptly to the System Manager each
1129 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1130 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1131 System Manager with information and records necessary to prepare an appropriate response to
1132 the requester. These requirements do not apply to individuals seeking access to their own
1133 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1134 the requester elects to cite the Privacy Act as an authority for the request.

1135             (f)      Upon complete payment of the Repayment Obligation by the Contractor,

1136 this Article 23 will no longer be applicable.

1137           <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1138       24.      In addition to all other payments to be made by the Contractor pursuant to this

1139 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1140    detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1141    of direct cost incurred by the United States for work requested by the Contractor associated with

1142    this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1143    and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1144    to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1145    contract administration.

1146    <u>WATER CONSERVATION</u>

1147       25.    (a)     Prior to the delivery of water provided from or conveyed through
1148    Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1149    shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1150    Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1151    Additionally, an effective water conservation and efficiency program shall be based on the

1152    Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1153    the conservation and efficiency criteria for evaluating water conservation plans established under

1154    Federal law. The water conservation and efficiency program shall contain definite water

1155    conservation objectives, appropriate economically feasible water conservation measures, and

1156    time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1157    Contract shall be contingent upon the Contractor's continued implementation of such water

1158    conservation program. In the event the Contractor's water conservation plan or any revised water

1159    conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1160    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1161    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1162    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1163    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1164    immediately begins implementing its water conservation and efficiency program in accordance

1165    with the time schedules therein.

1166            (b)      Should the amount of M&I Water delivered pursuant to subdivision (a) of

1167    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1168    Contractor shall implement the Best Management Practices identified by the time frames issued

1169    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1170    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1171    the Contractor.

1172            (c)      The Contractor shall submit to the Contracting Officer a report on the

1173    status of its implementation of the water conservation plan on the reporting dates specified in the

1174    then-existing conservation and efficiency criteria established under Federal law.

1175            (d)      At five (5)-year intervals, the Contractor shall revise its water

1176    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1177    water conservation plans established under Federal law and submit such revised water

1178    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1179    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1180    existing conservation and efficiency criteria for evaluating water conservation plans established

1181    under Federal law.

1182            (e)      If the Contractor is engaged in direct groundwater recharge, such activity

1183    shall be described in the Contractor's water conservation plan.

1184 <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1185      26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1186 this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1187 hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1188 Area. Any such water shall not be considered Project Water under this Contract. In addition,

1189 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1190 any water user within the Contractor's Service Area acquires or has available under any other

1191 contract pursuant to Federal Reclamation law.

1192 <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1193      27.    (a)     The O&M of a portion of the Project facilities which serve the Contractor,

1194 and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1195 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1196 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1197 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1198 affect the rights or obligations of the Contractor or the United States hereunder.

1199           (b)     The Contracting Officer has previously notified the Contractor in writing

1200 that the O&M of a portion of the Project facilities which serve the Contractor has been

1201 transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1202 therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1203 Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1204 the terms and conditions of the separate agreement between the United States and the Operating

1205 Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1206    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1207    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1208    such successor determines, sets, or establishes for the O&M of the portion of the Project

1209    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1210    Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1211    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1212    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1213    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1214    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1215    United States in accordance with the separate agreement identified in subdivision (a) of this

1216    Article.

1217            (c)    For so long as the O&M of any portion of the Project facilities serving the

1218    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1219    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1220    Rates for Water Delivered under this Contract representing the cost associated with the activity

1221    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1222    or its successor.

1223            (d)    In the event the O&M of the Project facilities operated and maintained by

1224    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1225    the United States during the term of this Contract, the Contracting Officer shall so notify the

1226    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1227    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

54

1228     representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1229     The Contractor shall, thereafter, in the absence of written notification from the Contracting

1230     Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1231     revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1232     <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1233     28.     The expenditure or advance of any money or the performance of any obligation of
1234     the United States under this Contract shall be contingent upon appropriation or allotment of
1235     funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1236     obligations under this Contract. No liability shall accrue to the United States in case funds are
1237     not appropriated or allotted.

1238     <u>BOOKS, RECORDS, AND REPORTS</u>

1239     29.    (a)     The Contractor shall establish and maintain accounts and other books and
1240     records pertaining to administration of the terms and conditions of this Contract, including the
1241     Contractor's financial transactions; water supply data; project operations, maintenance, and
1242     replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1243     census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1244     Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1245     such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1246     and regulations, each party to this Contract shall have the right during office hours to examine
1247     and make copies of the other party's books and records relating to matters covered by this
1248     Contract.

1249     (b)     Notwithstanding the provisions of subdivision (a) of this Article, no

1250     books, records, or other information shall be requested from the Contractor by the Contracting

1251     Officer unless such books, records, or information are reasonably related to the administration or

1252     performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1253     time within which to provide the requested books, records, or information.

1254     (c)     At such time as the Contractor provides information to the Contracting

1255     Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1256     to the Operating Non-Federal Entity(ies).

1257 <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1258      30.    (a)    The provisions of this Contract shall apply to and bind the successors and
1259 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1260 therein by either party shall be valid until approved in writing by the other party.

1261          (b)    The assignment of any right or interest in this Contract by either party

1262 shall not interfere with the rights or obligations of the other party to this Contract absent the

1263 written concurrence of said other party.

1264          (c)    The Contracting Officer shall not unreasonably condition or withhold

1265 approval of any proposed assignment.

1266 <u>SEVERABILITY</u>

1267      31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1268 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1269 an association or other form of organization whose primary function is to represent parties to

1270 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1271 enforceability of a provision included in this Contract and said person, entity, association, or

1272 organization obtains a final court decision holding that such provision is legally invalid or

1273 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1274 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1275 final court decision identify by mutual agreement the provisions in this Contract which must be

1276 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1277 The time periods specified above may be extended by mutual agreement of the parties.  Pending

1278 the completion of the actions designated above, to the extent it can do so without violating any

1279 applicable provisions of law, the United States shall continue to make the quantities of Project

1280    Water specified in this Contract available to the Contractor pursuant to the provisions of this

1281    Contract which were not found to be legally invalid or unenforceable in the final court decision.

1282    <div align="center">RESOLUTION OF DISPUTES</div>

1283        32.    Should any dispute arise concerning any provisions of this Contract, or the

1284    parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1285    resolve the dispute.  Prior to the Contractor commencing any legal action, or the Contracting

1286    Officer referring any matter to the Department of Justice, the party shall provide to the other

1287    party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1288    not be required where a delay in commencing an action would prejudice the interests of the party

1289    that intends to file suit.  During the 30-day notice period, the Contractor and the Contracting

1290    Officer shall meet and confer in an attempt to resolve the dispute.  Except as specifically

1291    provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1292    or the United States may have.

1293    <div align="center">OFFICIALS NOT TO BENEFIT</div>

1294        33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1295    the Contractor shall benefit from this Contract other than as a water user or landowner in the
1296    same manner as other water users or landowners.

1297    <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1298        34.    (a)    While this Contract is in effect, no change may be made in the
1299    Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1300    changes which may affect the respective rights, obligations, privileges, and duties of either the
1301    United States or the Contractor under this Contract, including, but not limited to, dissolution,
1302    consolidation, or merger, except upon the Contracting Officer's written consent.

1303            (b)    Within 30 days of receipt of a request for such a change, the Contracting

1304    Officer will notify the Contractor of any additional information required by the Contracting

<div align="center">57</div>

1305 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1306 schedule for timely completion of the process. Such process will analyze whether the proposed

1307 change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1308 (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1309 to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1310 have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1311 Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1312 responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1313 be paid in accordance with Article 24 of this Contract.

1314 <u>FEDERAL LAWS</u>

1315     35. By entering into this Contract, the Contractor does not waive its rights to contest

1316 the validity or application in connection with the performance of the terms and conditions of this

1317 Contract of any Federal law or regulation; <u>*Provided, That*</u> the Contractor agrees to comply with

1318 the terms and conditions of this Contract unless and until relief from application of such Federal

1319 law or regulation to the implementing provision of the Contract is granted by a court of

1320 competent jurisdiction.

1321 <u>RECLAMATION REFORM ACT OF 1982</u>

1322     36. (a) Upon a Contractor's compliance with and discharge of the Repayment

1323 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1324 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1325     (b) The obligation of a Contractor to pay the Additional Capital Obligation

1326 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

58

1327 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1328 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1329 <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

1330   37. The Contractor hereby certifies that it does not maintain or provide for its
1331 employees any segregated facilities at any of its establishments and that it does not permit its
1332 employees to perform their services at any location under its control where segregated facilities
1333 are maintained. It certifies further that it will not maintain or provide for its employees any
1334 segregated facilities at any of its establishments and that it will not permit its employees to
1335 perform their services at any location under its control where segregated facilities are
1336 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1337 Employment Opportunity clause in this Contract. As used in this certification, the term
1338 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1339 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1340 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1341 facilities provided for employees which are segregated by explicit directive or are in fact
1342 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1343 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1344 identical certifications from proposed subcontractors for specific time periods) it will obtain
1345 identical certifications from proposed subcontractors prior to the award of subcontracts
1346 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1347 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1348 following notice to such proposed subcontractors (except where the proposed subcontractors
1349 have submitted identical certifications for specific time periods):

1350   NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1351     CERTIFICATIONS OF NONSEGREGATED FACILITIES

1352 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1353 exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1354 Opportunity clause. The certification may be submitted either for each subcontract or for all
1355 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1356 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1357 <u>NOTICES</u>

1358   38. Any notice, demand, or request authorized or required by this Contract shall be
1359 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1360 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1361 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1362 postage prepaid, or delivered to the Board of Directors of The West Side Irrigation District,

1363    P. O. Box 177, Tracy, California 95378. The designation of the addressee or the address may be
1364    changed by notice given in the same manner as provided in this Article for other notices.

1365                  MEDIUM FOR TRANSMITTING PAYMENT

1366        39.     (a)     All payments from the Contractor to the United States under this Contract
1367    shall be by the medium requested by the United States on or before the date payment is due. The
1368    required method of payment may include checks, wire transfers, or other types of payment
1369    specified by the United States.

1370             (b)     Upon execution of this Contract, the Contractor shall furnish the
1371    Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1372    for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1373    out of the Contractor's relationship with the United States.

1374                  CONTRACT DRAFTING CONSIDERATIONS

1375        40.     This amended Contract has been negotiated and reviewed by the parties hereto,
1376    each of whom is sophisticated in the matters to which this amended Contract pertains. The
1377    double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1378    the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1379    spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1380                  CONFIRMATION OF CONTRACT

1381        41.     Promptly after the execution of this amended Contract, the Contractor will
1382    provide to the Contracting Officer a certified copy of a final decree of a court of competent
1383    jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1384    for the authorization of the execution of this amended Contract. This amended Contract shall not
1385    be binding on the United States until the Contractor secures a final decree.

1386

1387    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1388  day and year first above written.

1389                                    UNITED STATES OF AMERICA


1390                                    By: _____
1391                                        Regional Director
1392                                        Interior Region 10: California-Great Basin
1393                                        Bureau of Reclamation


1394                                    THE WEST SIDE IRRIGATION DISTRICT
1395  (SEAL)


1396                                    By: _____
1397                                        President of the Board of Directors


1398  Attest:

1399  By: _____
1400      Secretary of the Board of Directors

1387      IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1388  day and year first above written.

1389                                          UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND**
**SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:17:34 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR**
**DEPARTMENT OF THE INTERIOR**

1390  TIME STAMP: [1:37 pm, May 11 2020]      By: _____
1391                                          Regional Director
1392                                          Interior Region 10: California-Great Basin
1393                                          Bureau of Reclamation


1394                                          THE WEST SIDE IRRIGATION DISTRICT
1395  (SEAL)


1396                                          By: _____
1397                                          President of the Board of Directors


1398  Attest:


1399  By: _____
1400      Secretary of the Board of Directors



1S 4E     1S 5E

2S 4E     2S 5E

I-205

California Aqueduct

Delta-Mendota Canal

Upper Main Canal

I-580

3S 4E     3S 5E

District Boundary
Contractor's Service Area

**The West Side Irrigation District**

Contract No. 7-07-20-W0045-LTR1-P

Exhibit A

BUREAU OF — RECLAMATION

Date: 4/1/2020
File Name: N:\Districts\Contracts\the_west_side\the_west_side_20200401.mxd

Miles
0    1    2

N

214-202-885

**EXHIBIT B**
**THE WEST SIDE IRRIGATION DISTRICT**
**2020 Rates and Charges**
**(Per Acre-Foot)**

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $50.35 | |
| DMC Aqueduct Intertie | $0.93 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $78.26 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

## The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which equals a M&I Historic use average quantity of 0 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

## Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

**Unpaid Construction Cost from the 2020 Water Rate Books***

| | |
|---|---|
| **Contractor:** | **The West Side Irrigation District** |
| **Facility:** | **Delta-Mendota Canal** |
| **Contract:** | **7-07-20-W0045-LTR1-P** |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 335,513 | |
| 2019 Repayment (Estimate) ** | | | |
| Adjusted Construction Cost | $ | 335,513 | $ 325,650 |
| Intertie Construction Cost (N/A): | $ | 24,850 | $ 22,256 |
| Total | $ | 360,363 | $ 347,906 |

| If Paid in Installments (Used 20 yr CMT) | | | |
|---|---|---|---|
| | Due**** | | |
| Payment 1 | 9/1/2020 | $ | 88,067 |
| Payment 2 | 9/1/2021 | $ | 88,067 |
| Payment 3 | 9/1/2022 | $ | 88,067 |
| Payment 4 ~~ | 9/1/2023 | $ | 88,067 |
| Total Installment Payments | | $ | 352,266 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 335,513 | $ 30,501 | $ 30,337 | $ 24,850 | $ 565 | $ 562 | $ 30,899 |
| 2021 | $ 305,012 | $ 30,501 | $ 30,198 | $ 24,285 | $ 565 | $ 559 | $ 30,758 |
| 2022 | $ 274,511 | $ 30,501 | $ 30,048 | $ 23,720 | $ 565 | $ 556 | $ 30,605 |
| 2023 | $ 244,009 | $ 30,501 | $ 29,899 | $ 23,156 | $ 565 | $ 554 | $ 30,452 |
| 2024 | $ 213,508 | $ 30,501 | $ 29,750 | $ 22,591 | $ 565 | $ 551 | $ 30,301 |
| 2025 | $ 183,007 | $ 30,501 | $ 29,602 | $ 22,026 | $ 565 | $ 548 | $ 30,150 |
| 2026 | $ 152,506 | $ 30,501 | $ 29,455 | $ 21,461 | $ 565 | $ 545 | $ 30,000 |
| 2027 | $ 122,005 | $ 30,501 | $ 29,308 | $ 20,897 | $ 565 | $ 543 | $ 29,851 |
| 2028 | $ 91,504 | $ 30,501 | $ 29,162 | $ 20,332 | $ 565 | $ 540 | $ 29,702 |
| 2029 | $ 61,002 | $ 30,501 | $ 29,017 | $ 19,767 | $ 565 | $ 537 | $ 29,555 |
| 2030 | $ 30,501 | $ 30,501 | $ 28,873 | $ 19,202 | $ 565 | $ 535 | $ 29,407 |
| 2031-63 | | | | $ 18,638 | $ 18,638 | $ 16,227 | $ 16,227 |
| Total, Lump Sum Payment | | $ 325,650 | | | | $ 22,256 | $ 347,906 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | $ 9,863 | | | | $ 2,594 | $ 12,457 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 7**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
Eagle Field Water District
51170 West Althea Avenue
Firebaugh, CA 93622

Subject: Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-7754-</u>
<u>LTR1-P</u> Between the United States and the Eagle Field Water District Providing for
Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of
Reclamation appreciates the effort expended by the Eagle Field Water District and its
representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section
4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the
Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation
Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at
916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
EAGLE FIELD WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 11 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 35 |
| 12. | Constraints on the Availability of Water | 36 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
EAGLE FIELD WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1      THIS CONTRACT, made this 22nd day of October, 2020, in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and EAGLE FIELD WATER

12     DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13     duly organized, existing, and acting pursuant to the laws thereof;

14     WITNESSETH, That:

<div align="center">EXPLANATORY RECITALS</div>

[1st]   WHEREAS, the United States has constructed and is operating the California Central Valley Project (Project), for diversion, storage, carriage, distribution, and beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife mitigation, protection and restoration, generation and distribution of electric energy, salinity control, navigation, and other beneficial uses, of waters of the Sacramento River, the American River, the Trinity River, and the San Joaquin River and their tributaries; and

[2nd]   WHEREAS, the United States constructed the Delta-Mendota Canal and related facilities, which will be used in part for the furnishing of water to the Contractor pursuant to the terms of this Contract; and

[3rd]   WHEREAS, the rights to Project Water were acquired by the United States pursuant to California law for operation of the Project; and

[4th]   WHEREAS, the United States and the Contractor entered into Contract No. 14-06-200-7754, as amended, which established terms for the delivery to the Contractor of Project Water from the Delta Division facilities from April 10, 1959, through February 28, 1995; and

[5th]   WHEREAS, the United States and the Contractor have pursuant to Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently entered into interim renewal contract(s) identified as Contract No. 14-06-200-7754-IR1 and subsequent Interim Renewal Contracts 14-06-200-7754-IR2 through 14-06-200-7754-IR8, which provided for water service to the Contractor from March 1, 1995 through February 28, 2006; and

<div align="center">2</div>

36          [6th]     WHEREAS, the United States and the Contractor entered into a long-term

37   contract identified as Contract No. 14-06-200-7754-LTR1, hereinafter referred to as the Existing

38   Contract, which provided for the continued water service to the Contractor following expiration

39   of Contract No. 14-06-200-7754-IR8, and which was in effect the date the WIIN Act was

40   enacted; and

41          [7th]     WHEREAS, on December 16, 2016, the 114th Congress of the United

42   States of America enacted the WIIN Act; and

43          [8th]     WHEREAS, Section 4011(a)(1) provides that "upon request of the

44   contractor, the Secretary of the Interior shall convert any water service contract in effect on the

45   date of enactment of this subtitle and between the United States and a water users' association

46   [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

47   mutually agreeable terms and conditions."; and

48          [9th]     WHEREAS, Section 4011(a)(1) further provides that "the manner of

49   conversion under this paragraph shall be as follows: (A) Water service contracts that were

50   entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

51   this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

52   1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

53   of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

54   converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

55          [10th]     WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

56   into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

57   repayment, exchange and transfer contractual rights between the water users' association

58 [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

59 water users' association [Contractor] and their landowners as provided under State law."; and

60   [11th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

61 "implementation of the provisions of this subtitle shall not alter...(3) the priority of a water

62 service or repayment contractor to receive water; or (4) except as expressly provided in this

63 section, any obligations under the Federal Reclamation law, including the continuation of

64 Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

65 repayment contractors making prepayments pursuant to this section."; and

66   [12th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

67 Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

68 service contracts into repayment contracts, amend existing repayment contracts, and allow

69 contractors to prepay their construction cost obligations pursuant to applicable Federal

70 Reclamation law; and

71   [13th] WHEREAS, the United States has determined that the Contractor has

72 fulfilled all of its obligations under the Existing Contract; and

73   [14th] WHEREAS, the Contractor has demonstrated to the satisfaction of the

74 Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

75 reasonable and beneficial use and/or has demonstrated future demand for water use such that the

76 Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

77 quantity of Project Water to be made available to it pursuant to this Contract; and

78           [15th] WHEREAS, water obtained from the Project has been relied upon by

79  urban and agricultural areas within California for more than 54 years, and is considered by the

80  Contractor as an essential portion of its water supply; and

81           [16th] WHEREAS, the economies of regions within the Project, including the

82  Contractor's, depend upon the continued availability of water, including water service from the

83  Project; and

84           [17th] WHEREAS, the Secretary intends through coordination, cooperation, and

85  partnerships to pursue measures to improve water supply, water quality, and reliability of the

86  Project for all Project purposes; and

87           [18th] WHEREAS, the mutual goals of the United States and the Contractor

88  include: to provide for reliable Project Water supplies; to control costs of those supplies; to

89  achieve repayment of the Project as required by law; to guard reasonably against Project Water

90  shortages; to achieve a reasonable balance among competing demands for use of Project Water;

91  and to comply with all applicable environmental statutes, all consistent with the legal obligations

92  of the United States relative to the Project; and

93           [19th] WHEREAS, the parties intend by this Contract to maintain a cooperative

94  relationship in order to achieve their mutual goals; and

95           [20th] WHEREAS, the Contractor has utilized or may utilize transfers, contract

96  assignments, rescheduling, and conveyance of Project Water and non-Project water under this

97  Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

98  beneficial use of water; and

99         [21st] WHEREAS, the parties desire and intend that this Contract not provide a

100    disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

101    Explanatory Recital immediately above; and

102        [22nd] WHEREAS, the Contracting Officer and the Contractor agree that this

103    Contract complies with Section 4011 of the WIIN Act; and

104        [23rd] WHEREAS, the Contracting Officer and the Contractor agree to amend

105    and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

106    Reclamation law on the terms and conditions set forth below.

107        NOW, THEREFORE, in consideration of the mutual and dependent covenants

108    herein contained, it is hereby mutually agreed by the parties hereto as follows:

109    <u>DEFINITIONS</u>

110    1.     When used herein unless otherwise distinctly expressed, or manifestly

111    incompatible with the intent of the parties as expressed in this Contract, the term:

112        (a)    "Additional Capital Obligation" shall mean construction costs or other

113    capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

114    Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

115    (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

116    Stat. 1628) ("WIIN Act");

117        (b)    "Calendar Year" shall mean the period January 1 through December 31,

118    both dates inclusive;

6

119         (c)     "Charges" shall mean the payments required by Federal Reclamation law

120   in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

121   annually by the Contracting Officer pursuant to this Contract;

122         (d)     "Condition of Shortage" shall mean a condition respecting the Project

123   during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

124   Contract Total;

125         (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

126   authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

127   or regulation;

128         (f)     "Contract Total" shall mean the maximum amount of water to which the

129   Contractor is entitled under subdivision (a) of Article 3 of this Contract;

130         (g)     "Contractor's Service Area" shall mean the area to which the Contractor is

131   permitted to provide Project Water under this Contract as described in Exhibit "A" attached

132   hereto, which may be modified from time to time in accordance with Article 34 of this Contract

133   without amendment of this Contract;

134         (h)     "CVPIA" shall mean the Central Valley Project Improvement Act, Title

135   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

136         (i)     "Delta Division Facilities" shall mean those existing and future Project

137   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

138   the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

139   Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

140   Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

141        (j)     "Eligible Lands" shall mean all lands to which Irrigation Water may be

142  delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

143  1263), as amended;

144        (k)     "Excess Lands" shall mean all lands in excess of the limitations contained

145  in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

146  acreage limitation under Federal Reclamation law;

147        (l)     "Existing Capital Obligation" shall mean the remaining amount of

148  construction costs or other capitalized costs allocable to the Contractor as described in section

149  4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

150  Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

151  in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule. The

152  Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

153  Exhibit "C", which is incorporated herein by reference;

154        (m)     "Full Cost Rate" shall mean an annual rate, as determined by the

155  Contracting Officer that shall amortize the expenditures for construction properly allocable to the

156  Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

157  deficits funded, less payments, over such periods as may be required under Federal Reclamation

158  law, or applicable contract provisions. Interest will accrue on both the construction expenditures

159  and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

160  date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

161  in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

162   The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

163   Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

164        (n)   "Ineligible Lands" shall mean all lands to which Irrigation Water may not

165   be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

166        (o)   "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

167   to the delivery of Irrigation Water;

168        (p)   "Irrigation Water" shall mean the use of Project Water to irrigate lands
169   primarily for the production of commercial agricultural crops or livestock, and domestic and
170   other uses that are incidental thereto;

171        (q)   "Landholder" shall mean a party that directly or indirectly owns or leases

172   nonexempt land, as provided in 43 CFR 426.2;

173        (r)   "Municipal and Industrial (M&I) Water" shall mean the use of Project
174   Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
175   of "Irrigation Water" or within another category of water use under an applicable Federal
176   authority;

177        (s)   "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

178   the delivery of M&I Water;

179        (t)   "Operation and Maintenance" or "O&M" shall mean normal and

180   reasonable care, control, operation, repair, replacement (other than capital replacement), and

181   maintenance of Project facilities;

182        (u)   "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

183   successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

184   the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

185    Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

186    Water Authority;

187          (v)     "Project" shall mean the Central Valley Project owned by the United

188    States and managed by the Department of the Interior, Bureau of Reclamation;

189          (w)    "Project Contractors" shall mean all parties who have contracts for water

190    service for Project Water from the Project with the United States pursuant to Federal

191    Reclamation law;

192          (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

193    delivered by the Secretary in accordance with the statutes authorizing the Project and in

194    accordance with the terms and conditions of water rights acquired pursuant to California law;

195          (y)     "Rates" shall mean the payments determined annually by the Contracting

196    Officer in accordance with the then-current applicable water ratesetting policies for the Project,

197    as described in subdivision (a) of Article 7 of this Contract;

198          (z)     "Recent Historic Average" shall mean the most recent five (5)-year

199    average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

200    or its preceding contract(s);

201          (aa)   "Repayment Obligation" for Water Delivered as Irrigation Water shall

202    mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

203    amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

204    Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

205    United States, pursuant to  Section 4011(a)(3)(A) of the WIIN Act;

206         (bb)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

207  successor, or an authorized representative acting pursuant to any authority of the Secretary and

208  through any agency of the Department of the Interior;

209         (cc)    "Tiered Pricing Component" shall be the incremental amount to be paid

210  for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

211  for in Exhibit "B";

212         (dd)    "Water Delivered" or "Delivered Water" shall mean Project Water

213  diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

214  Officer;

215         (ee)    "Water Made Available" shall mean the estimated amount of Project

216  Water that can be delivered to the Contractor for the upcoming Year as declared by the

217  Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

218         (ff)    "Water Scheduled" shall mean Project Water made available to the

219  Contractor for which times and quantities for delivery have been established by the Contractor

220  and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

221         (gg)    "Year" shall mean the period from and including March 1 of each

222  Calendar Year through the last day of February of the following Calendar Year.

223                    <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

224    2.    (a)    This Contract shall be effective November 1, 2020, hereinafter known as

225  the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

226 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

227 (53 Stat. 1195) as applicable, and applicable law;

228 (1) *Provided, That* the Contracting Officer shall not seek to terminate

229 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

230 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

231 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

232 or to diligently commence and maintain full curative payments satisfactory to the Contracting

233 Officer within the sixty (60) calendar days' notice period;

234 (2) *Provided, further, That* the Contracting Officer shall not seek to

235 suspend making water available or declaring Water Made Available pursuant to this Contract for

236 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

237 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

238 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

239 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

240 cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

241 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

242 satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

243 available and declaring Water Made Available pursuant to this Contract;

244 (3) *Provided, further, That* this Contract may be terminated at any

245 time by mutual consent of the parties hereto. ,

246 (b) Upon complete payment of the Repayment Obligation by the Contractor,

247 and notwithstanding any Additional Capital Obligation that may later be established, the acreage

248  limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

249  and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

250  this Contract shall no longer be applicable.

251          (c)      Notwithstanding any provision of this Contract, the Contractor reserves

252  and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

253  allowed by law.

254          (d)      Notwithstanding any provision of this Contract, the Contractor reserves

255  and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

256  allowed by law.

257      <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

258  3.      (a)      During each Year, consistent with all applicable State water rights permits,

259  and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

260  Contract, the Contracting Officer shall make available for delivery to the Contractor 4,550 acre-

261  feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

262  accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

263  Articles 4 and 7 of this Contract.

264          (b)      Because the capacity of the Project to deliver Project Water has been

265  constrained in recent years and may be constrained in the future due to many factors including

266  hydrologic conditions and implementation of Federal and State laws, the likelihood of the

267  Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

268  Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

269  programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

13

270   CVPIA projected that the Contract Total set forth in this Contract will not be available to the

271   Contractor in many years. During the most recent five years prior to execution of the Existing

272   Contract, the Recent Historic Average Water Made Available to the Contractor was 2,994 acre-

273   feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

274   parties under any provision of this Contract.

275         (c)    The Contractor shall utilize the Project Water in accordance with all

276   applicable legal requirements.

277             (1)    In the event any Project Contractor (other than a Cross Valley

278   Contractor) that receives Project Water through the Delta Division Facilities obtains a

279   contractual agreement that the Contracting Officer shall make Project Water available at a point

280   or points of delivery in or north of the Delta, at the request of the Contractor and upon

281   completion of any required environmental documentation, this Contract shall be amended to

282   provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

283   this Contract shall be limited solely to those changes made necessary by the addition of such

284   alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

285   of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

286   amendment.

287         (d)    The Contractor shall make reasonable and beneficial use of all water

288   furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

289   groundwater banking programs, surface water storage programs, and other similar programs

290   utilizing Project Water or other water furnished pursuant to this Contract conducted within the

291   Contractor's Service Area which are consistent with applicable State law and result in use

292  consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

293  program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

294  Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

295  sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

296  the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

297  compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

298  banking programs, surface water storage programs, and other similar programs utilizing Project

299  Water or other water furnished pursuant to this Contract conducted outside the Contractor's

300  Service Area may be permitted upon written approval of the Contracting Officer, which approval

301  will be based upon environmental documentation, Project Water rights, and Project operational

302  concerns. The Contracting Officer will address such concerns in regulations, policies, or

303  guidelines.

304          (e)      The Contractor shall comply with requirements applicable to the

305  Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

306  of any water service contract between the Contracting Officer and the Contractor in effect

307  immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

308  Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

309  implement. The Existing Contract, which evidences in excess of 45 years of diversions for

310  irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

311  Article 3 of this Contract, will be considered in developing an appropriate baseline for any

312  required biological assessment(s) prepared pursuant to the ESA, and any other needed

313  environmental review. Nothing herein shall be construed to prevent the Contractor from

15

314 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

315 biological opinion or other environmental documentation referred to in this Article.

316      (f)    Following the declaration of Water Made Available under Article 4 of this

317 Contract, the Contracting Officer will make a determination whether Project Water, or other

318 water available to the Project, can be made available to the Contractor in addition to the Contract

319 Total under this Article during the Year without adversely impacting other Project Contractors.

320 At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

321 making such a determination. If the Contracting Officer determines that Project Water, or other

322 water available to the Project, can be made available to the Contractor, the Contracting Officer

323 will announce the availability of such water and shall so notify the Contractor as soon as

324 practical. The Contracting Officer will thereafter meet with the Contractor and other Project

325 Contractors capable of taking such water to determine the most equitable and efficient allocation

326 of such water. If the Contractor requests the delivery of any quantity of such water, the

327 Contracting Officer shall make such water available to the Contractor in accordance with

328 applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

329 contractual commitments, water rights, and operational constraints, long-term Project

330 Contractors shall have a first right to acquire such water, including Project Water made available

331 pursuant to Section 215 of the Reclamation Reform Act of 1982.

332      (g)    The Contractor may request permission to reschedule for use during the

333 subsequent Year some or all of the Water Made Available to the Contractor during the current

334 Year, referred to as "rescheduled water." The Contractor may request permission to use during

335 the current Year a quantity of Project Water which may be made available by the United States

16

336 to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

337 written approval may permit such uses in accordance with applicable statutes, regulations,

338 guidelines, and policies.

339       (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

340 State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

341 shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

342 Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

343 August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

344 sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

345 subdivision (b) of Article 12 of this Contract.

346       (i)    Project Water furnished to the Contractor pursuant to this Contract may be

347 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

348 Contract upon written approval by the Contracting Officer in accordance with the terms and

349 conditions of such approval.

350       (j)    The Contracting Officer shall make reasonable efforts to protect the water

351 rights necessary for the Project and to provide the water available under this Contract. The

352 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

353 extent permitted by law, in administrative proceedings related to the Project Water rights;

354 *Provided, That* the Contracting Officer retains the right to object to the substance of the

355 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

356 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

357 Contract to use Project Water.

<div align="center">TIME FOR DELIVERY OF WATER</div>

358

359    4.    (a)    On or about February 20 each Calendar Year, the Contracting Officer shall

360    announce the Contracting Officer's expected declaration of the Water Made Available.  Such

361    declaration will be expressed in terms of Water Made Available and the Recent Historic Average

362    and will be updated monthly, and more frequently if necessary, based on the then-current

363    operational and hydrologic conditions and a new declaration with changes, if any, to the Water

364    Made Available will be made.  The Contracting Officer shall provide forecasts of Project

365    operations and the basis of the estimate, with relevant supporting information, upon the written

366    request of the Contractor.  Concurrently with the declaration of the Water Made Available, the

367    Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

368        (b)    On or before each March 1 and at such other times as necessary, the

369    Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

370    Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

371    United States to the Contractor pursuant to this Contract for the Year commencing on such

372    March 1.  The Contracting Officer shall use all reasonable means to deliver Project Water

373    according to the approved schedule for the Year commencing on such March 1.

374        (c)    The Contractor shall not schedule Project Water in excess of the quantity

375    of Project Water the Contractor intends to put to reasonable and beneficial use within the

376    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

377    during any Year.

378        (d)    Subject to the conditions set forth in subdivision (a) of Article 3 of this

379    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

<div align="center">18</div>

380 initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

381 written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

382 time prior to the date(s) on which the requested change(s) is/are to be implemented.

383 <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

384 5. (a) Project Water scheduled pursuant to subdivision (b) of Article 4 of this

385 Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

386 any additional point or points of delivery either on Project facilities or another location or

387 locations mutually agreed to in writing by the Contracting Officer and the Contractor.

388 (b) The Contracting Officer, either directly or indirectly through its written

389 agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

390 maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

391 the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

392 Article.

393 (c) The Contractor shall deliver Irrigation Water in accordance with any

394 applicable land classification provisions of Federal Reclamation law and the associated

395 regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

396 Service Area unless approved in advance by the Contracting Officer.

397 (d) All Water Delivered to the Contractor pursuant to this Contract shall be

398 measured and recorded with equipment furnished, installed, operated, and maintained by the

399 Contracting Officer either directly or indirectly through its written agreements(s) with the

400 Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

401 Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

402    this Article.  Upon the request of either party to this Contract, the Contracting Officer shall

403    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

404    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

405    therein.  For any period of time when accurate measurements have not been made, the

406    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

407    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

408    of time.

409           (e)    Absent a separate contrary written agreement with the Contractor, neither

410    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

411    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

412    pursuant to this Contract beyond the point or points of delivery established pursuant to

413    subdivision (a) of this Article.  The Contractor shall indemnify the United States, its officers,

414    employees, agents, and assigns on account of damage or claim of damage of any nature

415    whatsoever for which there is legal responsibility, including property damage, personal injury, or

416    death arising out of or connected with  the control, carriage, handling, use, disposal, or

417    distribution of such Water Delivered beyond such point or points of delivery except for any

418    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

419    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

420    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

421    Contracting Officer or any of its officers, employees, agents, and assigns, including the

422    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

423    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

424    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

425    Federal Entity(ies).

426    MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA

427    6.    (a)    The Contractor has established a measuring program satisfactory to the

428    Contracting Officer.  The Contractor shall ensure that all surface water delivered for irrigation

429    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

430    water delivered for M&I purposes is measured at each M&I service connection.  The water

431    measuring devices or water measuring methods of comparable effectiveness must be acceptable

432    to the Contracting Officer.  The Contractor shall be responsible for installing, operating,

433    maintaining, and repairing all such measuring devices and implementing all such water

434    measuring methods at no cost to the United States.  The Contractor shall use the information

435    obtained from such water measuring devices or water measuring methods to ensure its proper

436    management of the water; to bill water users for water delivered by the Contractor; and, if

437    applicable, to record water delivered for M&I purposes by customer class as defined in the

438    Contractor's water conservation plan provided for in Article 25 of this Contract.  Nothing herein

439    contained, however, shall preclude the Contractor from establishing and collecting any charges,

440    assessments, or other revenues authorized by California law.  The Contractor shall include a

441    summary of all its annual surface water deliveries in the annual report described in subdivision

442    (c) of Article 25 of this Contract.

443    (b)    To the extent the information has not otherwise been provided, upon

444    execution of this Contract, the Contractor shall provide to the Contracting Officer a written

445    report describing the measurement devices or water measuring methods being used or to be used

446    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

447    service connections or alternative measurement programs approved by the Contracting Officer,

448    at which such measurement devices or water measuring methods are being used, and, if

449    applicable, identifying the locations at which such devices and/or methods are not yet being used

450    including a time schedule for implementation at such locations.  The Contracting Officer shall

451    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

452    if any, of the measuring devices or water measuring methods identified in the Contractor's report

453    and if the Contracting Officer does not respond in such time, they shall be deemed adequate.  If

454    the Contracting Officer notifies the Contractor that the measuring devices or methods are

455    inadequate, the parties shall within 60 days following the Contracting Officer's response,

456    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

457    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

458    compliance with subdivision (a) of this Article.

459            (c)    All new surface water delivery systems installed within the Contractor's

460    Service Area after the Effective Date shall also comply with the measurement provisions

461    described in subdivision (a) of this Article.

462            (d)    The Contractor shall inform the Contracting Officer and the State of

463    California in writing by April 30 of each Year of the monthly volume of surface water delivered

464    within the Contractor's Service Area during the previous Year.

465            (e)    The Contractor shall inform the Contracting Officer and the Operating

466    Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

467    Irrigation Water and M&I Water taken during the preceding month.

468      RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
469      REPAYMENT OF FACILITIES

470     7.    (a)     Notwithstanding the Contractor's full prepayment of the Repayment

471   Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

472   Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

473   (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

474   Article, subsection (b), the Contractor's Project construction and other obligations shall be

475   determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

476   in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

477   WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

478   a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

479   rules and regulations, or policies, and (iii) other applicable provisions of this Contract. Payments

480   shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

481   agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

482   Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

483   forth in Exhibit "B", as may be revised annually.

484               (1)     The Contractor shall pay the United States as provided for in this

485   Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

486   in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

487   be established to recover its estimated reimbursable costs included in the operation and

488     maintenance component of the Rate and amounts established to recover deficits and other

489     charges, if any, including construction costs as identified in the following subdivisions.

490           (2)      In accordance with the WIIN Act, the Contractor's allocable share

491     of Project construction costs will be repaid pursuant to the provisions of this Contract.

492           (A)      The amount due and payable to the United States, pursuant

493     to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

494     computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

495     as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

496     installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

497     set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

498     as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

499     Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

500     amount due using the lump sum alternative. If such notice is not provided by such date, the

501     Contractor shall be deemed to have elected the installment payment alternative, in which case,

502     the first such payment shall be made no later than December 30, 2020. The second payment

503     shall be made no later than the first anniversary of the first payment date. The third payment

504     shall be made no later than the second anniversary of the first payment date. The final payment

505     shall be made no later than November 1, 2023. If the installment payment option is elected by

506     the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

507     by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

508     Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

509     methodology as was used to compute the initial annual installment payment amount, which is

510 illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

511 established, receipt of the Contractor's payment of the Repayment Obligation to the United

512 States shall fully and permanently satisfy the Existing Capital Obligation.

513     (B) Additional Capital Obligations that are not reflected in, the

514 schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

515 prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

516 Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

517 Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

518 Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

519 the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

520 be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

521 however, will be considered under subdivision (b) of this Article. A separate agreement shall be

522 established by the Contractor and the Contracting Officer to accomplish repayment of the

523 Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

524 WIIN Act, subject to the following:

525     (1) If the collective Additional Capital Obligation

526 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

527 is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

528 to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

529 notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

530 amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

25

531              (2)      If the collective Additional Capital Obligation

532 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

533 is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

534 properly assignable to the Contractor shall be repaid as provided by applicable Federal

535 Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

536 five million dollars ($5,000,000) shall not be a precedent in any other context.

537              (b)      In the event that the final cost allocation referenced in Section 4011(b) of

538 the WIIN Act determines that the costs properly assignable to the Contractor are greater than

539 what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

540 allocated costs. The term of such additional repayment contract shall be not less than one (1)

541 year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

542 of repayment of such amount may be developed by the Contractor and Contracting Officer. In

543 the event that the final cost allocation indicates that the costs properly assignable to the

544 Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

545 overpayment as an offset against any outstanding or future obligations of the Contractor, with the

546 exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

547              (c)      The Contracting Officer shall notify the Contractor of the Rates, Charges,

548 and Tiered Pricing Component as follows:

549              (1)      Prior to July 1 of each Calendar Year, the Contracting Officer shall

550 provide the Contractor an estimate of the Charges for Project Water that will be applied to the

551 period October 1, of the current Calendar Year, through September 30, of the following Calendar

552 Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

553 to review and comment on such estimates.  On or before September 15 of each Calendar Year,

554 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

555 the period October 1 of the current Calendar Year, through September 30, of the following

556 Calendar Year, and such notification shall revise Exhibit "B."

557                     (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

558 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

559 for Project Water for the following Year and the computations and cost allocations upon which

560 those Rates are based.  The Contractor shall be allowed not less than two months to review and

561 comment on such computations and cost allocations.  By December 31 of each Calendar Year,

562 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

563 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

564                     (d)     At the time the Contractor submits the initial schedule for the delivery of

565 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

566 Contractor shall make an advance payment to the United States equal to the total amount payable

567 pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

568 scheduled to be delivered pursuant to this Contract during the first two calendar months of the

569 Year.  Before the end of the first month and before the end of each calendar month thereafter, the

570 Contractor shall make an advance payment to the United States, at the Rate(s) set under

571 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

572 during the second month immediately following.  Adjustments between advance payments for

573 Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

574 the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

27

575    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

576    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

577    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

578    payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

579    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

580    additional Project Water shall be delivered to the Contractor unless and until an advance

581    payment at the Rates then in effect for such additional Project Water is made. Final adjustment

582    between the advance payments for the Water Scheduled and payments for the quantities of Water

583    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

584    later than April 30th of the following Year, or 60 days after the delivery of Project Water

585    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

586    the last day of February.

587             (e)      The Contractor shall also make a payment in addition to the Rate(s) in

588    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

589    appropriate Tiered Pricing Component then in effect, before the end of the month following the

590    month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

591    Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

592    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

593    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

594    there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

595    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

596    for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

597    through the adjustment of payments due to the United States for Charges for the next month.

598    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

599    be computed pursuant to Article 19 of this Contract.

600            (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

601    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

602    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

603    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

604    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

605    under subdivision (a) of this Article.

606            (g)     Payments to be made by the Contractor to the United States under this

607    Contract may be paid from any revenues available to the Contractor.

608            (h)     All revenues received by the United States from the Contractor relating to

609    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

610    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

611    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

612            (i)     The Contracting Officer shall keep its accounts pertaining to the

613    administration of the financial terms and conditions of its long-term contracts, in accordance

614    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

615    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

616    Contractor a detailed accounting of all Project and Contractor expense allocations, the

617    disposition of all Project and Contractor revenues, and a summary of all water delivery

618    information. The Contracting Officer and the Contractor shall enter into good faith negotiations

619 to resolve any discrepancies or disputes relating to accountings, reports, or information.

620         (j)     The parties acknowledge and agree that the efficient administration of this

621 Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

622 policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

623 and/or for making and allocating payments, other than those set forth in this Article may be in

624 the mutual best interest of the parties, it is expressly agreed that the parties may enter into

625 agreements to modify the mechanisms, policies, and procedures for any of those purposes while

626 this Contract is in effect without amending this Contract.

627         (k)   (1)    Beginning at such time as deliveries of Project Water in a Year

628 exceed 80 percent of the Contract Total, then before the end of the month following the month of

629 delivery the Contractor shall make an additional payment to the United States equal to the

630 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

631 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

632 Contract Total, shall equal one-half of the difference between the Rate established under

633 subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

634 Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

635 Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

636 the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

637 Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

638 subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

639 Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

640 the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

641            (2)     Subject to the Contracting Officer's written approval, the

642     Contractor may request and receive an exemption from such Tiered Pricing Component for

643     Project Water delivered to produce a crop which the Contracting Officer determines will provide

644     significant and quantifiable habitat values for waterfowl in fields where the water is used and the

645     crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

646     Irrigation Water shall apply only if such habitat values can be assured consistent with the

647     purposes of the CVPIA through binding agreements executed with or approved by the

648     Contracting Officer prior to use of such water.

649            (3)     For purposes of determining the applicability of the Tiered Pricing

650     Component pursuant to this Article, Water Delivered shall include Project Water that the

651     Contractor transfers to others but shall not include Project Water transferred to the Contractor,

652     nor shall it include the additional water provided to the Contractor under the provisions of

653     subdivision (f) of Article 3 of this Contract.

654            (l)     For the term of this Contract, Rates applied under the respective

655     ratesetting policies will be established to recover only reimbursable O&M (including any

656     deficits) and capital costs of the Project, as those terms are used in the then-current Project

657     ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

658     applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

659     practices which implement the Contracting Officer's ratesetting policies will not be implemented

660     until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

661     need, and impact of the proposed change.

662            (m)     Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

31

663    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

664    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

665    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

666    transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

667    lower Rates and Charges because of inability to pay and is transferring Project Water to another

668    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

669    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

670            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

671    Officer is authorized to adjust determinations of ability to pay every five years.

672            (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

673    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

674    of the date of this Contract or deficit-related interest charges thereon.  By entering into this

675    Contract, the Contractor does not waive any legal rights or remedies that it may have with

676    respect to such disputed issues.  Notwithstanding the execution of this Contract and payments

677    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

678    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

679    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

680    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

681    the Rates; (4) the application by the United States of payments made by the Contractor under its

682    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

683    application of such payments in the Rates.  The Contracting Officer agrees that the Contractor

684    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

685  M&I contractor on any of these issues, and credits for payments heretofore made, provided that

686  the basis for such ruling is applicable to the Contractor.

687  <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

688  8.  The Contractor and the Contracting Officer concur that, as of the Effective Date

689  the Contractor has no non-interest bearing O&M deficits and shall have no further liability

690  therefore.

691  <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

692  9.  (a)  The right to receive Project Water provided for in this Contract may be

693  sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

694  California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

695  and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

696  Water under this Contract may take place without the prior written approval of the Contracting

697  Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

698  exchanges shall be approved absent all appropriate environmental documentation, including, but

699  not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

700  documentation should include, as appropriate, an analysis of groundwater impacts and economic

701  and social effects, including environmental justice, of the proposed water transfers on both the

702  transferor and transferee.

703  (b)  In order to facilitate efficient water management by means of water

704  transfers of the type historically carried out among Project Contractors located within the same

705  geographical area and to allow the Contractor to participate in an accelerated water transfer

706  program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

<div align="center">33</div>

707 all necessary environmental documentation, including, but not limited to, documents prepared

708 pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

709 the Contracting Officer shall determine whether such transfers comply with applicable law.

710 Following the completion of the environmental documentation, such transfers addressed in such

711 documentation shall be conducted with advance notice to the Contracting Officer, but shall not

712 require prior written approval by the Contracting Officer. Such environmental documentation

713 and the Contracting Officer's compliance determination shall be reviewed every five years and

714 updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

715 subsequent environmental documentation shall include an alternative to evaluate not less than the

716 quantity of Project Water historically transferred within the same geographical area.

717    (c) For a water transfer to qualify under subdivision (b) of this Article, such

718 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

719 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

720 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

721 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

722 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

723 through existing facilities with no new construction or modifications to facilities and be between

724 existing Project Contractors and/or the Contractor and the United States, Department of the

725 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

726 requirements imposed for protection of the environment and Indian Trust Assets, as defined

727 under Federal law.

728 ## APPLICATION OF PAYMENTS AND ADJUSTMENTS

729       10.    (a)    The amount of any overpayment by the Contractor of the Contractor's

730 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

731 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

732 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

733 of such overpayment, at the option of the Contractor, may be credited against amounts to become

734 due to the United States by the Contractor. With respect to overpayment, such refund or

735 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

736 have the right to the use of any of the Project Water supply provided for by this Contract. All

737 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

738 obtaining direction as to how to credit or refund such overpayment in response to the notice to

739 the Contractor that it has finalized the accounts for the Year in which the overpayment was

740 made.

741            (b)    All advances for miscellaneous costs incurred for work requested by the

742 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

743 when the work has been completed. If the advances exceed the actual costs incurred, the

744 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

745 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

746 Contract.

747 ## TEMPORARY REDUCTIONS – RETURN FLOWS

748       11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

749 requirements of Federal law, and (ii) the obligations of the United States under existing

750     contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

751     Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

752     provided in this Contract.

753             (b)      The Contracting Officer or Operating Non-Federal Entity(ies) may

754     temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

755     provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

756     of the Project facilities or any part thereof necessary for the delivery of Project Water to the

757     Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

758     will give the Contractor due notice in advance of such temporary discontinuance or reduction,

759     except in case of emergency, in which case no notice need be given; *Provided, That* the United

760     States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

761     resumption of service after such discontinuance or reduction, and if requested by the Contractor,

762     the United States will, if possible, deliver the quantity of Project Water which would have been

763     delivered hereunder in the absence of such discontinuance or reduction.

764             (c)      The United States reserves the right to all seepage and return flow water

765     derived from Water Delivered to the Contractor hereunder which escapes or is discharged

766     beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

767     the United States any right to seepage or return flow being put to reasonable and beneficial use

768     pursuant to this Contract within the Contractor's Service Area by the Contractor or those

769     claiming by, through, or under the Contractor.

770                  <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

771        12.    (a)      In its operation of the Project, the Contracting Officer will use all

772 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
773 made available to the Contractor pursuant to this Contract.  In the event the Contracting Officer
774 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
775 Contractor of said determination as soon as practicable.

776         (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting
777 or other similar operational errors affecting the Project; drought and other physical or natural
778 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
779 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
780 17 of this Contract, no liability shall accrue against the United States or any of its officers,
781 agents, or employees for any damage, direct or indirect, arising therefrom.

782         (c)     In any Year in which there may occur a Condition of Shortage for any of

783 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

784 Article, the Contracting Officer will first allocate the available Project Water consistent with the

785 Project M&I Water Shortage Policy as finally adopted after environmental review for

786 determining the amount of Project Water Available for delivery to the Project Contractors.

787 Subject to the foregoing allocation, in any year in which there may occur a Condition of

788 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

789 others entitled to Project Water from Delta Division Facilities under long-term water service or

790 repayment contracts (or renewals thereof or binding commitments therefore) in force on

791 February 28, 2005, as follows:

792         (1)     The Contracting Officer shall make an initial and subsequent

793 determination as necessary of the total quantity of Project Water estimated to be scheduled or

794 actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

795 renewal, long-term water service or repayment contracts then in force for the delivery of Project

796 Water by the United States from Delta Division Facilities during the relevant Year, the quantity

797 so determined being hereinafter referred to as the scheduled total;

798                    (2)      A determination shall be made of the total quantity of Project

799      Water that is available for meeting the scheduled total, the quantity so determined being

800      hereinafter referred to as the available supply;

801                    (3)      The total quantity of Project Water estimated to be scheduled or

802      actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

803      of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

804      hereinafter referred to as the Contractor's proportionate share; and

805                    (4)      The available supply shall be multiplied by the Contractor's

806      proportionate share and the result shall be the quantity of Project Water made available by the

807      United States to the Contractor for the relevant Year in accordance with the schedule developed

808      by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

809      amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

810      that the Contracting Officer can increase or needs to decrease the available supply for delivery

811      from Delta Division Facilities to long-term water service and repayment contractors during the

812      relevant Year, such additions or reductions to the available supply shall be apportioned

813      consistent with subparagraphs (1) through (4), inclusive.

814                    (d)      By entering into this Contract, the Contractor does not waive any legal

815      rights or remedies it may have to file or participate in any administrative or judicial proceeding

816      contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

817      such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

818      implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

819      *That* the Contractor has commenced any such judicial challenge or any administrative procedures

38

820     necessary to institute any judicial challenge within six months of the policy becoming final. By

821     agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

822     that it may have to assert in such a proceeding. Nothing contained herein shall be interpreted to

823     validate or invalidate the Project M&I Water Shortage Policy.

824     <div align="center">UNAVOIDABLE GROUNDWATER PERCOLATION</div>

825     13.     (a)     To the extent applicable, the Contractor shall not be deemed to have

826     delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

827     Contract if such lands are irrigated with groundwater that reaches the underground strata as an

828     unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

829     (b)     Upon complete payment of the Repayment Obligation by the Contractor,

830     this Article 13 shall no longer be applicable.

831     <div align="center">COMPLIANCE WITH FEDERAL RECLAMATION LAWS</div>

832     14.     The parties agree that the delivery of Irrigation Water or use of Federal facilities
833     pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
834     Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
835     the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
836     law.

837     <div align="center">PROTECTION OF WATER AND AIR QUALITY</div>

838     15.     (a)     Omitted

839     (b)     The United States will care for, operate and maintain reserved works in a
840     manner that preserves the quality of the water at the highest level possible as determined by the
841     Contracting Officer. The United States does not warrant the quality of the water delivered to the
842     Contractor and is under no obligation to furnish or construct water treatment facilities to
843     maintain or improve the quality of water delivered to the Contractor.

844     (c)     The Contractor will comply with all applicable water and air pollution
845     laws and regulations of the United States and the State of California; and will obtain all required
846     permits or licenses from the appropriate Federal, State, or local authorities necessary for the
847     delivery of water by the Contractor; and shall be responsible for compliance with all Federal,

848    State, and local water quality standards applicable to surface and subsurface drainage and/or
849    discharges generated through the use of Federal or Contractor facilities or Project Water
850    provided by the Contractor within its Service Area.

851            (d)     This Article shall not affect or alter any legal obligations of the Secretary
852    to provide drainage or other discharge services.

853            (e)     Omitted

854        WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
855                          STATES

856       16.    (a)     Water or water rights now owned or hereafter acquired by the Contractor

857    other than from the United States and Irrigation Water furnished pursuant to the terms of this

858    Contract may be simultaneously transported through the same distribution facilities of the

859    Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

860    and non-Project water were constructed without funds made available pursuant to Federal

861    Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

862    Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

863    Irrigation Water must be established through the certification requirements as specified in the

864    Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

865    Eligible Lands within the Contractor's Service Area can be established and the quantity of

866    Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

867    Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

868    Project water are (were) constructed with funds made available pursuant to Federal Reclamation

869    law, the non-Project water will be subject to the acreage limitation provisions of Federal

870    Reclamation law, unless the Contractor pays to the United States the incremental fee described in

871    43 CFR 426.15.  In determining the incremental fee, the Contracting Officer will calculate

872 annually the cost to the Federal Government, including interest, of storing or delivering non-

873 Project water, which for purposes of this Contract shall be determined as follows: The quotient

874 shall be the unpaid distribution system costs divided by the total irrigable acreage within the

875 Contractor's Service Area. The incremental fee per acre is the mathematical result of such

876 quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

877 (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

878 within the Contractor's Service Area that receives non-Project water through Federally financed

879 or constructed facilities. The incremental fee calculation methodology will continue during the

880 term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

881 regulation, or policy adopted after the Contractor has been afforded the opportunity to review

882 and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

883 adopted, it shall supersede this provision.

884        (b)    Water or water rights now owned or hereafter acquired by the Contractor,

885 other than from the United States may be stored, conveyed, and/or diverted through Project

886 facilities, subject to the completion of appropriate environmental documentation, with the

887 approval of the Contracting Officer and the execution of any contract determined by the

888 Contracting Officer to be necessary, consistent with the following provisions:

889        (1)    The Contractor may introduce non-Project water into Project

890 facilities and deliver said water to lands within the Contractor's Service Area, including

891 Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

892 Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

893 policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

894     use power policy is applicable, each as amended, modified, or superseded from time to time.

895           (2)      Delivery of such non-Project water in and through Project facilities

896     shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

897     purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

898     available to other Project Contractors; (iii) interfere with the delivery of contractual water

899     entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

900     the Project facilities.

901           (3)      Neither the United States nor the Operating Non-Federal

902     Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

903     is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

904     releases and agrees to defend and indemnify the United States and the Operating Non-Federal

905     Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

906     persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

907     employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

908     (ii) diverting such non-Project water into Project facilities.

909           (4)      Diversion of such non-Project water into Project facilities shall be

910     consistent with all applicable laws, and if involving groundwater, consistent with any applicable

911     groundwater management plan for the area from which it was extracted.

912           (5)      After Project purposes are met, as determined by the Contracting

913     Officer, the United States and Project Contractors entitled to Project Water from Delta Division

914     Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

915     available by the Contracting Officer for conveyance and transportation of non-Project water prior

916    to any such remaining capacity being made available to non-Project contractors.  Other Project

917    Contractors shall have a second priority to any remaining capacity of facilities declared to be

918    available by the Contracting Officer for conveyance and transportation of non-Project water prior

919    to any such remaining capacity being made available to non-Project contractors.

920           (c)      Upon complete payment of the Repayment Obligation by the Contractor,

921    subdivision (a) of this Article 16 shall no longer be applicable.

922    <div align="center">OPINIONS AND DETERMINATIONS</div>

923        17.    (a)      Where the terms of this Contract provide for actions to be based upon the

924    opinion or determination of either party to this Contract, said terms shall not be construed as

925    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

926    determinations.  Both parties, notwithstanding any other provisions of this Contract, expressly

927    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

928    or unreasonable opinion or determination.  Each opinion or determination by either party shall be

929    provided in a timely manner.  Nothing in this subdivision (a) of this Article is intended to or shall

930    affect or alter the standard of judicial review applicable under Federal law to any opinion or

931    determination implementing a specific provision of Federal law embodied in statute or

932    regulation.

933           (b)      The Contracting Officer shall have the right to make determinations

934    necessary to administer this Contract that are consistent with the provisions of this Contract, the

935    laws of the United States and of the State of California, and the rules and regulations

936    promulgated by the Secretary.  Such determinations shall be made in consultation with the

937    Contractor to the extent reasonably practicable.

<div align="center">43</div>

938                    COORDINATION AND COOPERATION

939        18.    (a)        In order to further their mutual goals and objectives, the Contracting

940    Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

941    with other affected Project Contractors, in order to improve the O&M of the Project. The

942    communication, coordination, and cooperation regarding O&M shall include, but not be limited

943    to, any action which will or may materially affect the quantity or quality of Project Water supply,

944    the allocation of Project Water supply, and Project financial matters including, but not limited to,

945    budget issues. The communication, coordination, and cooperation provided for hereunder shall

946    extend to all provisions of this Contract. Each party shall retain exclusive decision making

947    authority for all actions, opinions, and determinations to be made by the respective party.

948            (b)        Within 120 days following the Effective Date, the Contractor, other

949    affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

950    Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

951    amended as necessary separate and apart from this Contract. The goal of this process shall be to

952    provide, to the extent practicable, the means of mutual communication and interaction regarding

953    significant decisions concerning Project O&M on a real-time basis.

954            (c)        In light of the factors referred to in subdivision (b) of Article 3 of this

955    Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

956    intent:

957                (1)        The Contracting Officer will, at the request of the Contractor,

958    assist in the development of integrated resource management plans for the Contractor. Further,

959    the Contracting Officer will, as appropriate, seek authorizations for implementation of

44

960    partnerships to improve water supply, water quality, and reliability.

961           (2)    The Secretary will, as appropriate, pursue program and project

962    implementation and authorization in coordination with Project Contractors to improve the water

963    supply, water quality, and reliability of the Project for all Project purposes.

964           (3)    The Secretary will coordinate with Project Contractors and the

965    State of California to seek improved water resource management.

966           (4)    The Secretary will coordinate actions of agencies within the

967    Department of the Interior that may impact the availability of water for Project purposes.

968           (5)    The Contracting Officer shall periodically, but not less than

969    annually, hold division-level meetings to discuss Project operations, division-level water

970    management activities, and other issues as appropriate.

971         (d)    Without limiting the contractual obligations of the Contracting Officer

972    under the other Articles of this Contract, nothing in this Article shall be construed to limit or

973    constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

974    Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

975    protect health, safety, or the physical integrity of structures or facilities.

976                        <u>CHARGES FOR DELINQUENT PAYMENTS</u>

977       19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
978    charges on delinquent payments. If a payment is not received by the due date, the Contractor
979    shall pay an interest charge on the delinquent payment for each day the payment is delinquent
980    beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
981    addition to the interest charge, an administrative charge to cover additional costs of billing and
982    processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
983    shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
984    payment is delinquent beyond the due date, based on the remaining balance of the payment due

985 at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
986 collection services associated with a delinquent payment.

987         (b)    The interest rate charged shall be the greater of either the rate prescribed
988 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
989 payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
990 determined as of the due date and remain fixed for the duration of the delinquent period.

991         (c)    When a partial payment on a delinquent account is received, the amount
992 received shall be applied first to the penalty charges, second to the administrative charges, third
993 to the accrued interest, and finally to the overdue payment.

994 <div align="center"><u>EQUAL EMPLOYMENT OPPORTUNITY</u></div>

995     20.    During the performance of this Contract, the Contractor agrees as follows:

996         (a)    The Contractor will not discriminate against any employee or applicant for
997 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
998 origin. The Contractor will take affirmative action to ensure that applicants are employed, and
999 that employees are treated during employment, without regard to their race, color, religion, sex,
1000 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1001 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1002 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1003 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1004 places, available to employees and applicants for employment, notices to be provided by the
1005 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1006         (b)    The Contractor will, in all solicitations or advertisements for employees
1007 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1008 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1009 gender identity, or national origin.

1010         (c)    The Contractor will not discharge or in any other manner discriminate
1011 against any employee or applicant for employment because such employee or applicant has
1012 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1013 employee or applicant. This provision shall not apply to instances in which an employee who
1014 has access to the compensation information of other employees or applicants as part of such
1015 employee's essential job functions discloses the compensation of such other employees or
1016 applicants to individuals who do not otherwise have access to such information, unless such
1017 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1018 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1019 consistent with the Contractor's legal duty to furnish information.

1020         (d)    The Contractor will send to each labor union or representative of workers
1021 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1022 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1023 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1024 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1025 applicants for employment.

1026         (e)    The Contractor will comply with all provisions of Executive Order No.
1027 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1028 Labor.

1029         (f)    The Contractor will furnish all information and reports required by
1030 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1031 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1032 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1033 compliance with such rules, regulations, and orders.

1034         (g)    In the event of the Contractor's noncompliance with the nondiscrimination
1035 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1036 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1037 ineligible for further Government contracts in accordance with procedures authorized in
1038 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1039 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1040 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1041         (h)    The Contractor will include the provisions of paragraphs (a) through (g) in
1042 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1043 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1044 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1045 will take such action with respect to any subcontract or purchase order as may be directed by the
1046 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1047 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1048 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1049 Contractor may request the United States to enter into such litigation to protect the interests of
1050 the United States.

1051       <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1052     21.    (a)    The obligation of the Contractor to pay the United States as provided in
1053 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1054 obligation may be distributed among the Contractor's water users and notwithstanding the default
1055 of individual water users in their obligation to the Contractor.

1056         (b)     The payment of charges becoming due pursuant to this Contract is a
1057 condition precedent to receiving benefits under this Contract. The United States shall not make
1058 water available to the Contractor through Project facilities during any period in which the
1059 Contractor is in arrears in the advance payment of water rates due the United States. The
1060 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1061 parties that are in arrears in the advance payment of water rates as levied or established by the
1062 Contractor.

1063         (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1064 obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1066     22.     (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1067 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1068 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1069 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1070 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1071 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1072 Interior and/or Bureau of Reclamation.

1073         (b)     These statutes prohibit any person in the United States from being
1074 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1075 discrimination under any program or activity receiving financial assistance from the Bureau of
1076 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1077 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1078 obligation, including permitting officials of the United States to inspect premises, programs, and
1079 documents.

1080         (c)     The Contractor makes this Contract in consideration of and for the
1081 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1082 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1083 Reclamation, including installment payments after such date on account of arrangements for
1084 Federal financial assistance which were approved before such date. The Contractor recognizes
1085 and agrees that such Federal assistance will be extended in reliance on the representations and
1086 agreements made in this Article and that the United States reserves the right to seek judicial
1087 enforcement thereof.

1088         (d)     Complaints of discrimination against the Contractor shall be investigated
1089 by the Contracting Officer's Office of Civil Rights.

1090                         PRIVACY ACT COMPLIANCE

1091        23.    (a)    The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1092    (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1093    (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1094    to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1095    Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1096    C.F.R. § 426.18.

1097               (b)    With respect to the application and administration of the criminal penalty
1098    provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1099    employees who are responsible for maintaining the certification and reporting records referenced
1100    in paragraph (a) above are considered to be employees of the Department of the Interior.  See 5
1101    U.S.C. § 552a(m).

1102               (c)    The Contracting Officer or a designated representative shall provide the
1103    Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1104    Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1105    31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1106    information contained in the Landholders' certification and reporting records.

1107               (d)    The Contracting Officer shall designate a full time employee of the
1108    Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1109    pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1110    The Contractor is authorized to grant requests by individuals for access to their own records.

1111               (e)    The Contractor shall forward promptly to the System Manager each
1112    proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1113    filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1114    System Manager with information and records necessary to prepare an appropriate response to
1115    the requester.  These requirements do not apply to individuals seeking access to their own
1116    certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1117    the requester elects to cite the Privacy Act as an authority for the request.

1118               (f)    Upon complete payment of the Repayment Obligation by the Contractor,

1119    this Article 23 will no longer be applicable.

1120                   CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS

1121        24.    In addition to all other payments to be made by the Contractor pursuant to this

1122    Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

                                        49

1123    detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1124    of direct cost incurred by the United States for work requested by the Contractor associated with

1125    this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1126    and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1127    to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1128    contract administration.

1129    <u>WATER CONSERVATION</u>

1130    25.    (a)    Prior to the delivery of water provided from or conveyed through
1131    Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1132    shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1133    Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1134    Additionally, an effective water conservation and efficiency program shall be based on the

1135    Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1136    the conservation and efficiency criteria for evaluating water conservation plans established under

1137    Federal law. The water conservation and efficiency program shall contain definite water

1138    conservation objectives, appropriate economically feasible water conservation measures, and

1139    time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1140    Contract shall be contingent upon the Contractor's continued implementation of such water

1141    conservation program. In the event the Contractor's water conservation plan or any revised water

1142    conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1143    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1144    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1145    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1146    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1147    immediately begins implementing its water conservation and efficiency program in accordance

1148    with the time schedules therein.

1149            (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1150    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1151    Contractor shall implement the Best Management Practices identified by the time frames issued

1152    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1153    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1154    the Contractor.

1155            (c)    The Contractor shall submit to the Contracting Officer a report on the

1156    status of its implementation of the water conservation plan on the reporting dates specified in the

1157    then-existing conservation and efficiency criteria established under Federal law.

1158            (d)    At five (5)-year intervals, the Contractor shall revise its water

1159    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1160    water conservation plans established under Federal law and submit such revised water

1161    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1162    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1163    existing conservation and efficiency criteria for evaluating water conservation plans established

1164    under Federal law.

1165            (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1166    shall be described in the Contractor's water conservation plan.

51

1167                 <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1168        26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1169   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1170   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1171   Area. Any such water shall not be considered Project Water under this Contract. In addition,

1172   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1173   any water user within the Contractor's Service Area acquires or has available under any other

1174   contract pursuant to Federal Reclamation law.

1175   <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1176        27.    (a)     The O&M of a portion of the Project facilities which serve the Contractor,

1177   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1178   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1179   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1180   Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1181   affect the rights or obligations of the Contractor or the United States hereunder.

1182           (b)     The Contracting Officer has previously notified the Contractor in writing

1183   that the O&M of a portion of the Project facilities which serve the Contractor has been

1184   transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1185   therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1186   Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1187   the terms and conditions of the separate agreement between the United States and the Operating

1188   Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1189    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1190    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1191    such successor determines, sets, or establishes for the O&M of the portion of the Project

1192    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1193    Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1194    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1195    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1196    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1197    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1198    United States in accordance with the separate agreement identified in subdivision (a) of this

1199    Article.

1200          (c)    For so long as the O&M of any portion of the Project facilities serving the

1201    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1202    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1203    Rates for Water Delivered under this Contract representing the cost associated with the activity

1204    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1205    or its successor.

1206          (d)    In the event the O&M of the Project facilities operated and maintained by

1207    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1208    the United States during the term of this Contract, the Contracting Officer shall so notify the

1209    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1210    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

53

1211 representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1212 The Contractor shall, thereafter, in the absence of written notification from the Contracting

1213 Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1214 revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1215 <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1216     28.    The expenditure or advance of any money or the performance of any obligation of
1217 the United States under this Contract shall be contingent upon appropriation or allotment of
1218 funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1219 obligations under this Contract. No liability shall accrue to the United States in case funds are
1220 not appropriated or allotted.

1221 <u>BOOKS, RECORDS, AND REPORTS</u>

1222     29.   (a)    The Contractor shall establish and maintain accounts and other books and
1223 records pertaining to administration of the terms and conditions of this Contract, including the
1224 Contractor's financial transactions; water supply data; project operations, maintenance, and
1225 replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1226 census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1227 Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1228 such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1229 and regulations, each party to this Contract shall have the right during office hours to examine
1230 and make copies of the other party's books and records relating to matters covered by this
1231 Contract.

1232     (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1233 books, records, or other information shall be requested from the Contractor by the Contracting

1234 Officer unless such books, records, or information are reasonably related to the administration or

1235 performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1236 time within which to provide the requested books, records, or information.

1237     (c)    At such time as the Contractor provides information to the Contracting

1238 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1239 to the Operating Non-Federal Entity(ies).

1240    ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED

1241    30.    (a)    The provisions of this Contract shall apply to and bind the successors and
1242    assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1243    therein by either party shall be valid until approved in writing by the other party.

1244    (b)    The assignment of any right or interest in this Contract by either party

1245    shall not interfere with the rights or obligations of the other party to this Contract absent the

1246    written concurrence of said other party.

1247    (c)    The Contracting Officer shall not unreasonably condition or withhold

1248    approval of any proposed assignment.

1249    SEVERABILITY

1250    31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1251    nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1252    an association or other form of organization whose primary function is to represent parties to

1253    Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1254    enforceability of a provision included in this Contract and said person, entity, association, or

1255    organization obtains a final court decision holding that such provision is legally invalid or

1256    unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1257    the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1258    final court decision identify by mutual agreement the provisions in this Contract which must be

1259    revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1260    The time periods specified above may be extended by mutual agreement of the parties.  Pending

1261    the completion of the actions designated above, to the extent it can do so without violating any

1262    applicable provisions of law, the United States shall continue to make the quantities of Project

55

1263 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1264 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1265                               RESOLUTION OF DISPUTES

1266        32.     Should any dispute arise concerning any provisions of this Contract, or the

1267 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1268 resolve the dispute.  Prior to the Contractor commencing any legal action, or the Contracting

1269 Officer referring any matter to the Department of Justice, the party shall provide to the other

1270 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1271 not be required where a delay in commencing an action would prejudice the interests of the party

1272 that intends to file suit.  During the 30-day notice period, the Contractor and the Contracting

1273 Officer shall meet and confer in an attempt to resolve the dispute.  Except as specifically

1274 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1275 or the United States may have.

1276                               OFFICIALS NOT TO BENEFIT

1277        33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of
1278 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1279 same manner as other water users or landowners.

1280        CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA

1281        34.     (a)      While this Contract is in effect, no change may be made in the
1282 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1283 changes which may affect the respective rights, obligations, privileges, and duties of either the
1284 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1285 consolidation, or merger, except upon the Contracting Officer's written consent.

1286                     (b)      Within 30 days of receipt of a request for such a change, the Contracting

1287 Officer will notify the Contractor of any additional information required by the Contracting

1288   Officer for processing said request, and both parties will meet to establish a mutually agreeable

1289   schedule for timely completion of the process.  Such process will analyze whether the proposed

1290   change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1291   (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1292   to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1293   have an impact on any Project Water rights applications, permits, or licenses.  In addition, the

1294   Contracting Officer shall comply with the NEPA and the ESA.  The Contractor will be

1295   responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1296   be paid in accordance with Article 24 of this Contract.

1297   <div align="center">FEDERAL LAWS</div>

1298        35.     By entering into this Contract, the Contractor does not waive its rights to contest

1299   the validity or application in connection with the performance of the terms and conditions of this

1300   Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1301   the terms and conditions of this Contract unless and until relief from application of such Federal

1302   law or regulation to the implementing provision of the Contract is granted by a court of

1303   competent jurisdiction.

1304   <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1305        36.    (a)     Upon a Contractor's compliance with and discharge of the Repayment

1306   Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1307   Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1308             (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1309   shall not affect the Contractor's status as having repaid all of the construction costs assignable to

<div align="center">57</div>

1310 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1311 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1312 <div align="center">CERTIFICATION OF NONSEGREGATED FACILITIES</div>

1313     37.    The Contractor hereby certifies that it does not maintain or provide for its
1314 employees any segregated facilities at any of its establishments and that it does not permit its
1315 employees to perform their services at any location under its control where segregated facilities
1316 are maintained. It certifies further that it will not maintain or provide for its employees any
1317 segregated facilities at any of its establishments and that it will not permit its employees to
1318 perform their services at any location under its control where segregated facilities are
1319 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1320 Employment Opportunity clause in this Contract. As used in this certification, the term
1321 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1322 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1323 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1324 facilities provided for employees which are segregated by explicit directive or are in fact
1325 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1326 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1327 identical certifications from proposed subcontractors for specific time periods) it will obtain
1328 identical certifications from proposed subcontractors prior to the award of subcontracts
1329 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1330 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1331 following notice to such proposed subcontractors (except where the proposed subcontractors
1332 have submitted identical certifications for specific time periods):

1333 <div align="center">NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1334 CERTIFICATIONS OF NONSEGREGATED FACILITIES</div>

1335 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1336 exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1337 Opportunity clause. The certification may be submitted either for each subcontract or for all
1338 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1339 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1340 <div align="center">NOTICES</div>

1341     38.    Any notice, demand, or request authorized or required by this Contract shall be
1342 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1343 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1344 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1345 postage prepaid, or delivered to the Board of Directors of the Eagle Field Water District, 51170
1346 West Althea Avenue, Firebaugh, California 93622. The designation of the addressee or the

1347 address may be changed by notice given in the same manner as provided in this Article for other
1348 notices.

## MEDIUM FOR TRANSMITTING PAYMENT

1350      39.    (a)    All payments from the Contractor to the United States under this Contract
1351 shall be by the medium requested by the United States on or before the date payment is due. The
1352 required method of payment may include checks, wire transfers, or other types of payment
1353 specified by the United States.

1354           (b)    Upon execution of this Contract, the Contractor shall furnish the
1355 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1356 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1357 out of the Contractor's relationship with the United States.

## CONTRACT DRAFTING CONSIDERATIONS

1359      40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1360 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1361 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1362 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1363 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

## CONFIRMATION OF CONTRACT

1365      41.    Promptly after the execution of this amended Contract, the Contractor will
1366 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1367 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1368 for the authorization of the execution of this amended Contract. This amended Contract shall not
1369 be binding on the United States until the Contractor secures a final decree.

1370

1371        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1372    day and year first above written.

1373                      UNITED STATES OF AMERICA

1374                      By: _____
1375                            Regional Director
1376                            Interior Region 10: California-Great Basin
1377                            Bureau of Reclamation

1378                      EAGLE FIELD WATER DISTRICT
1379    (SEAL)

1380                      By: _____
1381                            President of the Board of Directors

1382    Attest:

1383    By: _____
1384        Secretary of the Board of Directors

1371        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1372    day and year first above written.

1373

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:21:09 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**
TIME STAMP:  1:37 pm, May 11 2020

UNITED STATES OF AMERICA

1374                       By: _____
1375                            Regional Director
1376                            Interior Region 10: California-Great Basin
1377                            Bureau of Reclamation

1378                       EAGLE FIELD WATER DISTRICT
1379    (SEAL)

1380                       By: _____
1381                            President of the Board of Directors

1382    Attest:

1383    By: _____
1384          Secretary of the Board of Directors



**Eagle Field Water District**

Contract No. 14-06-200-7754-LTR1-P

Exhibit A

District Boundary

Contractor's Service Area

Outside Canal

Main Canal

Delta-Mendota Canal

Merced County
Fresno County

11S 11E

11S 12E

12S 11E

12S 12E

Date: 4/2/2020
File Name: N:\Districts\Contracts\eagle_field\eagle_field_20200401.mxd

0    0.25    0.5    Miles

BUREAU OF RECLAMATION

N

214-202-882

### EXHIBIT B
### EAGLE FIELD WATER DISTRICT
### 2020 Rates and Charges
### (Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $36.09 | |
| DMC Aqueduct Intertie | $1.08 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost (ARRA Cost included) | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $64.15 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

### EXPLANATORY NOTES

\# The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which equals a M&I Historic use average quantity of 0 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

Unpaid Construction Cost from the 2020 Water Rate Books*

| | |
|---|---|
| **Contractor:** | **Eagle Field WD** |
| **Facility:** | **Delta Mendota Canal** |
| **Contract:** | **14-06-200-7754-LTR1-P** |

| Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba | | | | |
|---|---|---|---|---|
| | | Unpaid Cost | | Discount |
| Construction Cost | ~ $ | 515,151 | | |
| 2019 Repayment (Estimate) ** | $ | 118,184 | | |
| Adjusted Construction Cost | $ | 396,967 | $ | 385,297 |
| Intertie Construction Cost (N/A): | $ | 61,615 | $ | 55,184 |
| Total | $ | 458,582 | $ | 440,481 |

If Paid in Installments (Used 20 yr CMT)

| | Due**** | | | |
|---|---|---|---|---|
| Payment 1 | 9/1/2020 | | $ | 111,500 |
| Payment 2 | 9/1/2021 | | $ | 111,500 |
| Payment 3 | 9/1/2022 | | $ | 111,500 |
| Payment 4 ~~ | 9/1/2023 | | $ | 111,500 |
| Total Installment Payments | | | $ | 446,001 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

| M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba) | | |
|---|---|---|
| | | Unpaid Cost |
| Construction Cost: | ~ $ | – |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| | | |
|---|---|---|
| **Calculation Support:** | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 396,967 | $ 36,088 | $ 35,894 | $ 61,615 | $ 1,400 | $ 1,393 | $ 37,287 |
| 2021 | $ 360,879 | $ 36,088 | $ 35,730 | $ 60,215 | $ 1,400 | $ 1,386 | $ 37,116 |
| 2022 | $ 324,791 | $ 36,088 | $ 35,552 | $ 58,814 | $ 1,400 | $ 1,380 | $ 36,931 |
| 2023 | $ 288,703 | $ 36,088 | $ 35,375 | $ 57,414 | $ 1,400 | $ 1,373 | $ 36,748 |
| 2024 | $ 252,615 | $ 36,088 | $ 35,199 | $ 56,014 | $ 1,400 | $ 1,366 | $ 36,565 |
| 2025 | $ 216,527 | $ 36,088 | $ 35,024 | $ 54,613 | $ 1,400 | $ 1,359 | $ 36,383 |
| 2026 | $ 180,439 | $ 36,088 | $ 34,850 | $ 53,213 | $ 1,400 | $ 1,352 | $ 36,202 |
| 2027 | $ 144,351 | $ 36,088 | $ 34,676 | $ 51,813 | $ 1,400 | $ 1,346 | $ 36,022 |
| 2028 | $ 108,264 | $ 36,088 | $ 34,504 | $ 50,412 | $ 1,400 | $ 1,339 | $ 35,843 |
| 2029 | $ 72,176 | $ 36,088 | $ 34,332 | $ 49,012 | $ 1,400 | $ 1,332 | $ 35,664 |
| 2030 | $ 36,088 | $ 36,088 | $ 34,161 | $ 47,612 | $ 1,400 | $ 1,326 | $ 35,487 |
| 2031-63 | | | | $ 46,211 | $ 46,211 | $ 40,233 | $ 40,233 |
| Total, Lump Sum Payment | | | $ 385,297 | | | $ 55,184 | $ 440,481 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | $ 11,670 | | | | $ 6,431 | $ 18,100 |

* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

****Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 8**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 7 |
| 2. | Term of Contract – Right to Use of Water | 13 |
| 3. | Water to be Made Available and Delivered to the Contractor | 14 |
| 4. | Time for Delivery of Water | 19 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 34 |
| 9. | Sales, Transfers, or Exchanges of Water | 34 |
| 10. | Application of Payments and Adjustments | 36 |
| 11. | Temporary Reductions – Return Flows | 37 |
| 12. | Constraints on the Availability of Water | 38 |
| 13. | Unavoidable Groundwater Percolation | 40 |
| 14. | Compliance with Federal Reclamation Laws | 40 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 41 |
| 17. | Opinions and Determinations | 44 |
| 18. | Coordination and Cooperation | 45 |
| 19. | Charges for Delinquent Payments | 47 |
| 20. | Equal Employment Opportunity | 47 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 49 |
| 22. | Compliance with Civil Rights Laws and Regulations | 49 |
| 23. | Privacy Act Compliance | 50 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 51 |
| 25. | Water Conservation | 51 |
| 26. | Existing or Acquired Water or Water Rights | 53 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 53 |
| 28. | Contingent on Appropriation or Allotment of Funds | 55 |
| 29. | Books, Records, and Reports | 55 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 56 |
| 31. | Severability | 56 |
| 32. | Resolution of Disputes | 57 |
| 33. | Officials Not to Benefit | 57 |
| 34. | Changes in Contractor's Organization and/or Service Area | 57 |
| 35. | Federal Laws | 58 |
| 36. | Reclamation Reform Act of 1982 | 59 |
| 37. | Certification of Nonsegregated Facilities | 59 |
| 38. | Notices | 60 |
| 39. | Medium for Transmitting Payment | 60 |
| 40. | Contract Drafting Considerations | 60 |
| 41. | Confirmation of Contract | 60 |
|  | Signature Page | 61 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1      THIS CONTRACT, made this _29_ day of _September_____, 20 _20_ , in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and DEL PUERTO WATER

12     DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13     duly organized, existing, and acting pursuant to the laws thereof;

14     WITNESSETH, That:

15    <u>EXPLANATORY RECITALS</u>

16    [1<sup>st</sup>]    WHEREAS, the United States has constructed and is operating the

17    California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18    beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19    mitigation, protection and restoration, generation and distribution of electric energy, salinity

20    control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21    River, the Trinity River, and the San Joaquin River and their tributaries; and

22    [2<sup>nd</sup>]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23    related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24    to the terms of this Contract; and

25    [3<sup>rd</sup>]    WHEREAS, the rights to Project Water were acquired by the United

26    States pursuant to California law for operation of the Project; and

27    [4<sup>th</sup>]    WHEREAS, the United States and the Contractor entered into Contract

28    No. 14-06-200-922, as amended, which established terms for the delivery to the Contractor of

29    Project Water from the Delta Division facilities from June 10, 1953, though February 28, 1994;

30    and

31    [5<sup>th</sup>]    WHEREAS, the United States and the following water districts entered

32    into long-term water service contracts, which provided those districts Project Water from the

33    Delta Division through the date of contract expiration listed below:

| 34 | <u>District</u> | <u>Contract No.</u> | <u>Execution Date</u> | <u>Expiration Date</u> |
|----|----------|-------------|----------------|-----------------|
| 35 | Davis Water District | 14-06-200-1458 | 10/03/53 | 02/28/94 |
| 36 | Hospital Water District | 14-06-200-923 | 06/10/53 | 02/28/94 |
| 37 | Kem Canon Water District | 14-06-200-924 | 06/10/53 | 02/28/94 |

2

| 38 | Salada Water District | 14-06-200-925 | 06/10/53 | 02/28/94 |
| 39 | Sunflower Water District | 14-06-200-1804 | 11/12/53 | 02/28/94 |
| 40 | Mustang Water District | 14-06-200-8103 | 12/07/59 | 02/28/95 |
| 41 | Orestimba Water District | 14-06-200-8091 | 11/27/59 | 02/28/95 |
| 42 | Quinto Water District | 14-06-200-8899 | 01/24/61 | 02/28/95 |
| 43 | Romero Water District | 14-06-200-7758 | 05/11/59 | 02/28/95 |
| 44 | Foothill Water District | 14-06-200-4323 | 05/31/55 | 02/29/96 |
| 45 | ; and | | | |

46    [6th]    WHEREAS, the long-term water service contracts between the United

47    States and Davis, Del Puerto, Hospital, Kern Canon, Salada, and Sunflower Water Districts

48    provided for water service through February 28, 1994, and for which one-year interim renewal

49    contracts were entered into providing for continued water service through February 28, 1995;

50    and

51    [7th]    WHEREAS, all ten water districts including Davis, Foothill, Hospital,

52    Kern Canon, Mustang, Orestimba, Quinto, Romero, Salada, and Sunflower Water Districts were

53    assigned to the Contractor by separate "Assignments of Water Service Contract", dated February

54    13, 1995; and

55    [8th]    WHEREAS, the Contractor and the United States entered into the interim

56    renewal contract identified as Contract No. 14-06-200-922-IR2, which consolidated all of the

57    Water Districts that were assigned to the Contractor, except Foothill Water District, and provided

58    for the continued water service from March 1, 1995, through February 28, 1997; and

59    [9th]    WHEREAS, the long-term water service contract between Foothill Water

60    District (Foothill) and the United States identified as Contract No. 14-06-200-4323, that was

61    assigned to the Contractor, provided for water service through February 28, 1996, and for which

62    a one-year interim renewal contract identified as Contract No. 14-06-200-4323-IR1, provided

63    water service from March 1, 1996, through February 28, 1997; and

64               [10th]   WHEREAS, the Contractor requested subsequent renewal and

65    consolidation of Contract No(s). 14-06-200-922-IR2 and 14-06-200-4323-IR1 pursuant to,

66    Federal Reclamation law, and the laws of the State of California, for water service from the

67    Central Valley Project; and

68               [11th]   WHEREAS, the United States and the Contractor have pursuant to

69    Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

70    entered into interim renewal contract(s) identified as Contract No. 14-06-200-922-IR3 and

71    subsequent Interim Renewal Contracts 14-06-200-922-IR4 through 14-06-200-922-IR10, which

72    provided for water service to the Contractor from March 1, 1997 through February 28, 2006; and

73               [12th]   WHEREAS, the United States and the Contractor entered into a long-term

74    contract identified as Contract No. 14-06-200-922-LTR1, hereinafter referred to as the Existing

75    Contract, which provided for the continued water service to the Contractor following expiration

76    of Contract No. 14-06-200-922-IR10, and which was in effect the date the WIIN Act was

77    enacted; and

78               [13th]   WHEREAS, on December 16, 2016, the 114th Congress of the United

79    States of America enacted the WIIN Act; and

80               [14th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

81    contractor, the Secretary of the Interior shall convert any water service contract in effect on the

82    date of enactment of this subtitle and between the United States and a water users' association

83 [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

84 mutually agreeable terms and conditions."; and

85       [15th] WHEREAS, Section 4011(a)(1) further provides that "the manner of

86 conversion under this paragraph shall be as follows: (A) Water service contracts that were

87 entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

88 this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

89 1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

90 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

91 converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

92       [16th] WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

93 into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

94 repayment, exchange and transfer contractual rights between the water users' association

95 [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

96 water users' association [Contractor] and their landowners as provided under State law."; and

97       [17th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

98 "implementation of the provisions of this subtitle shall not alter...(3) the priority of a water

99 service or repayment contractor to receive water; or (4) except as expressly provided in this

100 section, any obligations under the Federal Reclamation law, including the continuation of

101 Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

102 repayment contractors making prepayments pursuant to this section."; and

103       [18th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

104 Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

105    service contracts into repayment contracts, amend existing repayment contracts, and allow

106    contractors to prepay their construction cost obligations pursuant to applicable Federal

107    Reclamation law; and

108            [19th]   WHEREAS, the United States has determined that the Contractor has

109    fulfilled all of its obligations under the Existing Contract; and

110            [20th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

111    Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

112    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

113    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

114    quantity of Project Water to be made available to it pursuant to this Contract; and

115            [21st]   WHEREAS, water obtained from the Project has been relied upon by

116    urban and agricultural areas within California for more than 50 years, and is considered by the

117    Contractor as an essential portion of its water supply; and

118            [22nd]   WHEREAS, the economies of regions within the Project, including the

119    Contractor's, depend upon the continued availability of water, including water service from the

120    Project; and

121            [23rd]   WHEREAS, the Secretary intends through coordination, cooperation, and

122    partnerships to pursue measures to improve water supply, water quality, and reliability of the

123    Project for all Project purposes; and

124            [24th]   WHEREAS, the mutual goals of the United States and the Contractor

125    include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

126    achieve repayment of the Project as required by law; to guard reasonably against Project Water

127   shortages; to achieve a reasonable balance among competing demands for use of Project Water;

128   and to comply with all applicable environmental statutes, all consistent with the legal obligations

129   of the United States relative to the Project; and

130            [25th] WHEREAS, the parties intend by this Contract to maintain a cooperative

131   relationship in order to achieve their mutual goals; and

132            [26th] WHEREAS, the Contractor has utilized or may utilize transfers, contract

133   assignments, rescheduling, and conveyance of Project Water and non-Project water under this

134   Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

135   beneficial use of water; and

136            [27th] WHEREAS, the parties desire and intend that this Contract not provide a

137   disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

138   Explanatory Recital immediately above; and

139            [28th] WHEREAS, the Contracting Officer and the Contractor agree that this

140   Contract complies with Section 4011 of the WIIN Act; and

141            [29th] WHEREAS, the Contracting Officer and the Contractor agree to amend

142   and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

143   Reclamation law on the terms and conditions set forth below.

144            NOW, THEREFORE, in consideration of the mutual and dependent covenants

145   herein contained, it is hereby mutually agreed by the parties hereto as follows:

146                           <u>DEFINITIONS</u>

147       1.     When used herein unless otherwise distinctly expressed, or manifestly

148   incompatible with the intent of the parties as expressed in this Contract, the term:

149     (a)     "Additional Capital Obligation" shall mean construction costs or other

150   capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

151   Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

152   (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

153   Stat. 1628) ("WIIN Act");

154     (b)     "Calendar Year" shall mean the period January 1 through December 31,

155   both dates inclusive;

156     (c)     "Charges" shall mean the payments required by Federal Reclamation law

157   in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

158   annually by the Contracting Officer pursuant to this Contract;

159     (d)     "Condition of Shortage" shall mean a condition respecting the Project

160   during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

161   Contract Total;

162     (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

163   authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

164   or regulation;

165     (f)     "Contract Total" shall mean the maximum amount of water to which the

166   Contractor is entitled under subdivision (a) of Article 3 of this Contract;

167     (g)     "Contractor's Service Area" shall mean the area to which the Contractor is

168   permitted to provide Project Water under this Contract as described in Exhibit "A" attached

169   hereto, which may be modified from time to time in accordance with Article 34 of this Contract

170   without amendment of this Contract;

171     (h)  "CVPIA" shall mean the Central Valley Project Improvement Act, Title

172 XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

173     (i)  "Delta Division Facilities" shall mean those existing and future Project

174 facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

175 the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

176 Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

177 Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

178     (j)  "Eligible Lands" shall mean all lands to which Irrigation Water may be

179 delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

180 1263), as amended;

181     (k)  "Excess Lands" shall mean all lands in excess of the limitations contained

182 in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

183 acreage limitation under Federal Reclamation law;

184     (l)  "Existing Capital Obligation" shall mean the remaining amount of

185 construction costs or other capitalized costs allocable to the Contractor as described in Section

186 4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

187 Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

188 in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

189 Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

190 Exhibit "C", which is incorporated herein by reference;

191     (m)  "Full Cost Rate" shall mean an annual rate, as determined by the

192 Contracting Officer that shall amortize the expenditures for construction properly allocable to the

193 Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

194 deficits funded, less payments, over such periods as may be required under Federal Reclamation

195 law, or applicable contract provisions. Interest will accrue on both the construction expenditures

196 and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

197 date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

198 in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

199 The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

200 Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

201 (n) "Ineligible Lands" shall mean all lands to which Irrigation Water may not

202 be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

203 (o) "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

204 to the delivery of Irrigation Water;

205 (p) "Irrigation Water" shall mean the use of Project Water to irrigate lands
206 primarily for the production of commercial agricultural crops or livestock, and domestic and
207 other uses that are incidental thereto;

208 (q) "Landholder" shall mean a party that directly or indirectly owns or leases

209 nonexempt land, as provided in 43 CFR 426.2;

210 (r) "Municipal and Industrial (M&I) Water" shall mean the use of Project
211 Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
212 of "Irrigation Water" or within another category of water use under an applicable Federal
213 authority;

214 (s) "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

215 the delivery of M&I Water;

10

216        (t)    "Operation and Maintenance" or "O&M" shall mean normal and

217    reasonable care, control, operation, repair, replacement (other than capital replacement), and

218    maintenance of Project facilities;

219        (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

220    successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

221    the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

222    Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

223    Water Authority;

224 .      (v)    "Project" shall mean the Central Valley Project owned by the United

225    States and managed by the Department of the Interior, Bureau of Reclamation;

226        (w)    "Project Contractors" shall mean all parties who have contracts for water

227    service for Project Water from the Project with the United States pursuant to Federal

228    Reclamation law;

229        (x)    "Project Water" shall mean all water that is developed, diverted, stored, or

230    delivered by the Secretary in accordance with the statutes authorizing the Project and in

231    accordance with the terms and conditions of water rights acquired pursuant to California law;

232        (y)    "Rates" shall mean the payments determined annually by the Contracting

233    Officer in accordance with the then-current applicable water ratesetting policies for the Project,

234    as described in subdivision (a) of Article 7 of this Contract;

235        (z)    "Recent Historic Average" shall mean the most recent five (5)-year

236    average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

237    or its preceding contract(s);

238       (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

239   mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

240   amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

241   Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

242   United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

243       (bb)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

244   successor, or an authorized representative acting pursuant to any authority of the Secretary and

245   through any agency of the Department of the Interior;

246       (cc)    "Tiered Pricing Component" shall be the incremental amount to be paid

247   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

248   for in Exhibit "B";

249       (dd)    "Water Delivered" or "Delivered Water" shall mean Project Water

250   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

251   Officer;

252       (ee)    "Water Made Available" shall mean the estimated amount of Project

253   Water that can be delivered to the Contractor for the upcoming Year as declared by the

254   Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

255       (ff)    "Water Scheduled" shall mean Project Water made available to the

256   Contractor for which times and quantities for delivery have been established by the Contractor

257   and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

258       (gg)    "Year" shall mean the period from and including March 1 of each

259   Calendar Year through the last day of February of the following Calendar Year.

260 <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

261     2.     (a)     This Contract shall be effective October 1, 2020, hereinafter known as the

262 "Effective Date", and shall continue so long as the Contractor pays applicable Rates and Charges

263 under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat.

264 1195) as applicable, and applicable law;

265             (1)     *Provided, That* the Contracting Officer shall not seek to terminate

266 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

267 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

268 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

269 or to diligently commence and maintain full curative payments satisfactory to the Contracting

270 Officer within the sixty (60) calendar days' notice period;

271             (2)     *Provided, further, That* the Contracting Officer shall not seek to

272 suspend making water available or declaring Water Made Available pursuant to this Contract for

273 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

274 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

275 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

276 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

277 cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

278 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

279    satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

280    available and declaring Water Made Available pursuant to this Contract;

281              (3)    *Provided, further,* That this Contract may be terminated at any

282    time by mutual consent of the parties hereto.

283              (b)    Upon complete payment of the Repayment Obligation by the Contractor,

284    and notwithstanding any Additional Capital Obligation that may later be established, the acreage

285    limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

286    and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

287    this Contract shall no longer be applicable.

288              (c)    Notwithstanding any provision of this Contract, the Contractor reserves

289    and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

290    allowed by law.

291              (d)    Notwithstanding any provision of this Contract, the Contractor reserves

292    and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

293    allowed by law.

294    <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

295    3.    (a)    During each Year, consistent with all applicable State water rights permits,

296    and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

297    Contract, the Contracting Officer shall make available for delivery to the Contractor 140,210

298    acre-feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

299    accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

300    Articles 4 and 7 of this Contract.

14

301        (b)      Because the capacity of the Project to deliver Project Water has been

302    constrained in recent years and may be constrained in the future due to many factors including

303    hydrologic conditions and implementation of Federal and State laws, the likelihood of the

304    Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

305    Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

306    programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

307    CVPIA projected that the Contract Total set forth in this Contract will not be available to the

308    Contractor in many years.  During the most recent five years prior to execution of the Existing

309    Contract, the Recent Historic Average Water Made Available to the Contractor was 92,258 acre-

310    feet.  Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

311    parties under any provision of this Contract.

312        (c)      The Contractor shall utilize the Project Water in accordance with all

313    applicable legal requirements.

314           (1)     In the event any Project Contractor (other than a Cross Valley

315    Contractor) that receives Project Water through the Delta Division Facilities obtains a

316    contractual agreement that the Contracting Officer shall make Project Water available at a point

317    or points of delivery in or north of the Delta, at the request of the Contractor and upon

318    completion of any required environmental documentation, this Contract shall be amended to

319    provide for deliveries in or north of the Delta on mutually agreeable terms.  Such amendments to

320    this Contract shall be limited solely to those changes made necessary by the addition of such

321    alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

322  of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

323  amendment.

324          (d)      The Contractor shall make reasonable and beneficial use of all water

325  furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

326  groundwater banking programs, surface water storage programs, and other similar programs

327  utilizing Project Water or other water furnished pursuant to this Contract conducted within the

328  Contractor's Service Area which are consistent with applicable State law and result in use

329  consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

330  program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

331  Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

332  sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

333  the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

334  compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

335  banking programs, surface water storage programs, and other similar programs utilizing Project

336  Water or other water furnished pursuant to this Contract conducted outside the Contractor's

337  Service Area may be permitted upon written approval of the Contracting Officer, which approval

338  will be based upon environmental documentation, Project Water rights, and Project operational

339  concerns. The Contracting Officer will address such concerns in regulations, policies, or

340  guidelines.

341          (e)      The Contractor shall comply with requirements applicable to the

342  Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

343  of any water service contract between the Contracting Officer and the Contractor in effect

16

344 immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

345 Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

346 implement. The Existing Contract, which evidences in excess of 51 years of diversions for

347 irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

348 Article 3 of this Contract, will be considered in developing an appropriate baseline for any

349 required biological assessment(s) prepared pursuant to the ESA, and any other needed

350 environmental review. Nothing herein shall be construed to prevent the Contractor from

351 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

352 biological opinion or other environmental documentation referred to in this Article.

353       (f)     Following the declaration of Water Made Available under Article 4 of this

354 Contract, the Contracting Officer will make a determination whether Project Water, or other

355 water available to the Project, can be made available to the Contractor in addition to the Contract

356 Total under this Article during the Year without adversely impacting other Project Contractors.

357 At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

358 making such a determination. If the Contracting Officer determines that Project Water, or other

359 water available to the Project, can be made available to the Contractor, the Contracting Officer

360 will announce the availability of such water and shall so notify the Contractor as soon as

361 practical. The Contracting Officer will thereafter meet with the Contractor and other Project

362 Contractors capable of taking such water to determine the most equitable and efficient allocation

363 of such water. If the Contractor requests the delivery of any quantity of such water, the

364 Contracting Officer shall make such water available to the Contractor in accordance with

365 applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

17

366      contractual commitments, water rights, and operational constraints, long-term Project

367      Contractors shall have a first right to acquire such water, including Project Water made available

368      pursuant to Section 215 of the Reclamation Reform Act of 1982.

369             (g)     The Contractor may request permission to reschedule for use during the

370      subsequent Year some or all of the Water Made Available to the Contractor during the current

371      Year, referred to as "rescheduled water." The Contractor may request permission to use during

372      the current Year a quantity of Project Water which may be made available by the United States

373      to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

374      written approval may permit such uses in accordance with applicable statutes, regulations,

375      guidelines, and policies.

376             (h)     The Contractor's right pursuant to Federal Reclamation law and applicable

377      State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

378      shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

379      Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

380      August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

381      sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

382      subdivision (b) of Article 12 of this Contract.

383             (i)     Project Water furnished to the Contractor pursuant to this Contract may be

384      delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

385      Contract upon written approval by the Contracting Officer in accordance with the terms and

386      conditions of such approval.

387   (j)   The Contracting Officer shall make reasonable efforts to protect the water

388   rights necessary for the Project and to provide the water available under this Contract.  The

389   Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

390   extent permitted by law, in administrative proceedings related to the Project Water rights;

391   *Provided, That* the Contracting Officer retains the right to object to the substance of the

392   Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

393   Contracting Officer shall recognize the Contractor has a legal right under the terms of this

394   Contract to use Project Water.

395   <center>TIME FOR DELIVERY OF WATER</center>

396   4.   (a)   On or about February 20 each Calendar Year, the Contracting Officer shall

397   announce the Contracting Officer's expected declaration of the Water Made Available.  Such

398   declaration will be expressed in terms of Water Made Available and the Recent Historic Average

399   and will be updated monthly, and more frequently if necessary, based on the then-current

400   operational and hydrologic conditions and a new declaration with changes, if any, to the Water

401   Made Available will be made.  The Contracting Officer shall provide forecasts of Project

402   operations and the basis of the estimate, with relevant supporting information, upon the written

403   request of the Contractor.  Concurrently with the declaration of the Water Made Available, the

404   Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

405   (b)   On or before each March 1 and at such other times as necessary, the

406   Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

407   Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

408   United States to the Contractor pursuant to this Contract for the Year commencing on such

<center>19</center>

409    March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

410    according to the approved schedule for the Year commencing on such March 1.

411          (c)    The Contractor shall not schedule Project Water in excess of the quantity

412    of Project Water the Contractor intends to put to reasonable and beneficial use within the

413    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

414    during any Year.

415          (d)    Subject to the conditions set forth in subdivision (a) of Article 3 of this

416    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

417    initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

418    written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

419    time prior to the date(s) on which the requested change(s) is/are to be implemented.

420    <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

421    5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

422    Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

423    any additional point or points of delivery either on Project facilities or another location or

424    locations mutually agreed to in writing by the Contracting Officer and the Contractor.

425          (b)    The Contracting Officer, either directly or indirectly through its written

426    agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

427    maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

428    the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

429    Article.

430        (c)     The Contractor shall deliver Irrigation Water in accordance with any

431  applicable land classification provisions of Federal Reclamation law and the associated

432  regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

433  Service Area unless approved in advance by the Contracting Officer.

434        (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

435  measured and recorded with equipment furnished, installed, operated, and maintained by the

436  Contracting Officer either directly or indirectly through its written agreements(s) with the

437  Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

438  Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

439  this Article. Upon the request of either party to this Contract, the Contracting Officer shall

440  investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

441  accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

442  therein. For any period of time when accurate measurements have not been made, the

443  Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

444  Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

445  of time.

446        (e)     Absent a separate contrary written agreement with the Contractor, neither

447  the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

448  control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

449  pursuant to this Contract beyond the point or points of delivery established pursuant to

450  subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

451  employees, agents, and assigns on account of damage or claim of damage of any nature

21

452    whatsoever for which there is legal responsibility, including property damage, personal injury, or

453    death arising out of or connected with the control, carriage, handling, use, disposal, or

454    distribution of such Water Delivered beyond such point or points of delivery except for any

455    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

456    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

457    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

458    Contracting Officer or any of its officers, employees, agents, and assigns, including the

459    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

460    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

461    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

462    Federal Entity(ies).

463    <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

464    6.    (a)    The Contractor has established a measuring program satisfactory to the

465    Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

466    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

467    water delivered for M&I purposes is measured at each M&I service connection. The water

468    measuring devices or water measuring methods of comparable effectiveness must be acceptable

469    to the Contracting Officer. The Contractor shall be responsible for installing, operating,

470    maintaining, and repairing all such measuring devices and implementing all such water

471    measuring methods at no cost to the United States. The Contractor shall use the information

472    obtained from such water measuring devices or water measuring methods to ensure its proper

473    management of the water; to bill water users for water delivered by the Contractor; and, if

474     applicable, to record water delivered for M&I purposes by customer class as defined in the

475     Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

476     contained, however, shall preclude the Contractor from establishing and collecting any charges,

477     assessments, or other revenues authorized by California law. The Contractor shall include a

478     summary of all its annual surface water deliveries in the annual report described in subdivision

479     (c) of Article 25 of this Contract.

480            (b)     To the extent the information has not otherwise been provided, upon

481     execution of this Contract, the Contractor shall provide to the Contracting Officer a written

482     report describing the measurement devices or water measuring methods being used or to be used

483     to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

484     service connections or alternative measurement programs approved by the Contracting Officer,

485     at which such measurement devices or water measuring methods are being used, and, if

486     applicable, identifying the locations at which such devices and/or methods are not yet being used

487     including a time schedule for implementation at such locations. The Contracting Officer shall

488     advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

489     if any, of the measuring devices or water measuring methods identified in the Contractor's report

490     and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

491     the Contracting Officer notifies the Contractor that the measuring devices or methods are

492     inadequate, the parties shall within 60 days following the Contracting Officer's response,

493     negotiate in good faith the earliest practicable date by which the Contractor shall modify said

494     measuring devices and/or measuring methods as required by the Contracting Officer to ensure

495     compliance with subdivision (a) of this Article.

496         (c)     All new surface water delivery systems installed within the Contractor's

497   Service Area after the Effective Date shall also comply with the measurement provisions

498   described in subdivision (a) of this Article.

499         (d)     The Contractor shall inform the Contracting Officer and the State of

500   California in writing by April 30 of each Year of the monthly volume of surface water delivered

501   within the Contractor's Service Area during the previous Year.

502         (e)     The Contractor shall inform the Contracting Officer and the Operating

503   Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

504   Irrigation Water and M&I Water taken during the preceding month.

505                         **RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED**
506                                   **REPAYMENT OF FACILITIES**

507   7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

508   Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

509   Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

510   (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

511   Article, subsection (b), the Contractor's Project construction and other obligations shall be

512   determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

513   in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

514   WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

515   a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

516   rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

517   shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

518    agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

519    Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

520    forth in Exhibit "B", as may be revised annually.

521            (1)    The Contractor shall pay the United States as provided for in this

522    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

523    in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

524    be established to recover its estimated reimbursable costs included in the operation and

525    maintenance component of the Rate and amounts established to recover deficits and other

526    charges, if any, including construction costs as identified in the following subdivisions.

527            (2)    In accordance with the WIIN Act, the Contractor's allocable share

528    of Project construction costs will be repaid pursuant to the provisions of this Contract.

529            (A)    The amount due and payable to the United States, pursuant

530    to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

531    computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

532    as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

533    installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

534    set forth in Exhibit "C". The Repayment Obligation is due in lump sum by November 30, 2020

535    as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

536    Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

537    amount due using the lump sum alternative. If such notice is not provided by such date, the

538    Contractor shall be deemed to have elected the installment payment alternative, in which case,

539    the first such payment shall be made no later than November 30, 2020. The second payment

540    shall be made no later than the first anniversary of the first payment date. The third payment

541    shall be made no later than the second anniversary of the first payment date. The final payment

542    shall be made no later than October 1, 2023. If the installment payment option is elected by the

543    Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation by

544    giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

545    Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

546    methodology as was used to compute the initial annual installment payment amount, which is

547    illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

548    established, receipt of the Contractor's payment of the Repayment Obligation to the United

549    States shall fully and permanently satisfy the Existing Capital Obligation.

550                    (B)    Additional Capital Obligations that are not reflected in, the

551    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

552    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

553    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

554    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

555    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

556    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

557    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

558    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

559    established by the Contractor and the Contracting Officer to accomplish repayment of the

560    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

561    WIIN Act, subject to the following:

562          (1)    If the collective Additional Capital Obligation

563   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

564   is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

565   to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

566   notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

567   amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

568          (2)    If the collective Additional Capital Obligation

569   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

570   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

571   properly assignable to the Contractor shall be repaid as provided by applicable Federal

572   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

573   five million dollars ($5,000,000) shall not be a precedent in any other context.

574          (b)    In the event that the final cost allocation referenced in Section 4011(b) of

575   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

576   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

577   allocated costs. The term of such additional repayment contract shall be not less than one (1)

578   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

579   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

580   the event that the final cost allocation indicates that the costs properly assignable to the

581   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

582   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

583   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

584          (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

585    and Tiered Pricing Component as follows:

586          (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

587    provide the Contractor an estimate of the Charges for Project Water that will be applied to the

588    period October 1, of the current Calendar Year, through September 30, of the following Calendar

589    Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

590    to review and comment on such estimates. On or before September 15 of each Calendar Year,

591    the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

592    the period October 1 of the current Calendar Year, through September 30, of the following

593    Calendar Year, and such notification shall revise Exhibit "B."

594          (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

595    shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

596    for Project Water for the following Year and the computations and cost allocations upon which

597    those Rates are based. The Contractor shall be allowed not less than two months to review and

598    comment on such computations and cost allocations. By December 31 of each Calendar Year,

599    the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

600    Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

601          (d)     At the time the Contractor submits the initial schedule for the delivery of

602    Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

603    Contractor shall make an advance payment to the United States equal to the total amount payable

604    pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

605    scheduled to be delivered pursuant to this Contract during the first two calendar months of the

606    Year.  Before the end of the first month and before the end of each calendar month thereafter, the

607    Contractor shall make an advance payment to the United States, at the Rate(s) set under

608    subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

609    during the second month immediately following.  Adjustments between advance payments for

610    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

611    the following month; _Provided, That_ any revised schedule submitted by the Contractor pursuant

612    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

613    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

614    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

615    payment.  In any month in which the quantity of Water Delivered to the Contractor pursuant to

616    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

617    additional Project Water shall be delivered to the Contractor unless and until an advance

618    payment at the Rates then in effect for such additional Project Water is made.  Final adjustment

619    between the advance payments for the Water Scheduled and payments for the quantities of Water

620    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

621    later than April 30th of the following Year, or 60 days after the delivery of Project Water

622    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

623    the last day of February.

624            (e)     The Contractor shall also make a payment in addition to the Rate(s) in

625    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

626    appropriate Tiered Pricing Component then in effect, before the end of the month following the

627    month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

628 Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

629 consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

630 water delivery report for the subject month prepared by the Operating Non-Federal Entity(ies) or,

631 if there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery

632 report shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing

633 Component for Water Delivered. Adjustment for overpayment or underpayment of Charges

634 shall be made through the adjustment of payments due to the United States for Charges for the

635 next month. Any amount to be paid for past due payment of Charges and the Tiered Pricing

636 Component shall be computed pursuant to Article 19 of this Contract.

637         (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

638 (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

639 applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

640 policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

641 Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

642 under subdivision (a) of this Article.

643         (g)     Payments to be made by the Contractor to the United States under this

644 Contract may be paid from any revenues available to the Contractor.

645         (h)     All revenues received by the United States from the Contractor relating to

646 the delivery of Project Water or the delivery of non-Project water through Project facilities shall

647 be allocated and applied in accordance with Federal Reclamation law and the associated rules or

648 regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

649         (i)     The Contracting Officer shall keep its accounts pertaining to the

30

650     administration of the financial terms and conditions of its long-term contracts, in accordance

651     with applicable Federal standards, so as to reflect the application of Project costs and revenues.

652     The Contracting Officer shall, each Year upon request of the Contractor, provide to the

653     Contractor a detailed accounting of all Project and Contractor expense allocations, the

654     disposition of all Project and Contractor revenues, and a summary of all water delivery

655     information. The Contracting Officer and the Contractor shall enter into good faith negotiations

656     to resolve any discrepancies or disputes relating to accountings, reports, or information.

657           (j)      The parties acknowledge and agree that the efficient administration of this

658     Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

659     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

660     and/or for making and allocating payments, other than those set forth in this Article may be in

661     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

662     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

663     this Contract is in effect without amending this Contract.

664           (k)     (1)      Beginning at such time as deliveries of Project Water in a Year

665     exceed 80 percent of the Contract Total, then before the end of the month following the month of

666     delivery the Contractor shall make an additional payment to the United States equal to the

667     applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

668     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

669     Contract Total, shall equal one-half of the difference between the Rate established under

670     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

671     Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

672 Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

673 the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

674 Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

675 subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

676 Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

677 the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

678         (2)     Subject to the Contracting Officer's written approval, the

679 Contractor may request and receive an exemption from such Tiered Pricing Component for

680 Project Water delivered to produce a crop which the Contracting Officer determines will provide

681 significant and quantifiable habitat values for waterfowl in fields where the water is used and the

682 crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

683 Irrigation Water shall apply only if such habitat values can be assured consistent with the

684 purposes of the CVPIA through binding agreements executed with or approved by the

685 Contracting Officer prior to use of such water.

686         (3)     For purposes of determining the applicability of the Tiered Pricing

687 Component pursuant to this Article, Water Delivered shall include Project Water that the

688 Contractor transfers to others but shall not include Project Water transferred to the Contractor,

689 nor shall it include the additional water provided to the Contractor under the provisions of

690 subdivision (f) of Article 3 of this Contract.

691         (l)     For the term of this Contract, Rates applied under the respective

692 ratesetting policies will be established to recover only reimbursable O&M (including any

693 deficits) and capital costs of the Project, as those terms are used in the then-current Project

694    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

695    applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

696    practices which implement the Contracting Officer's ratesetting policies will not be implemented

697    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

698    need, and impact of the proposed change.

699            (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

700    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

701    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

702    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

703    transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

704    lower Rates and Charges because of inability to pay and is transferring Project Water to another

705    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

706    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

707            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

708    Officer is authorized to adjust determinations of ability to pay every five years.

709            (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

710    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

711    of the date of this Contract or deficit-related interest charges thereon. By entering into this

712    Contract, the Contractor does not waive any legal rights or remedies that it may have with

713    respect to such disputed issues. Notwithstanding the execution of this Contract and payments

714    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

715    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

716    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

717    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

718    the Rates; (4) the application by the United States of payments made by the Contractor under its

719    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

720    application of such payments in the Rates.  The Contracting Officer agrees that the Contractor

721    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

722    M&I contractor on any of these issues, and credits for payments heretofore made, provided that

723    the basis for such ruling is applicable to the Contractor.

724                    <u>NON-INTEREST BEARING O&M DEFICITS</u>

725         8.      The Contractor and the Contracting Officer concur that, as of the Effective Date

726    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

727    therefore.

728                <u>SALES, TRANSFERS, OR EXCHANGES OF WATER</u>

729         9.     (a)      The right to receive Project Water provided for in this Contract may be

730    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

731    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

732    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

733    Water under this Contract may take place without the prior written approval of the Contracting

734    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

735    exchanges shall be approved absent all appropriate environmental documentation, including, but

736    not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

737    documentation should include, as appropriate, an analysis of groundwater impacts and economic

34

738 and social effects, including environmental justice, of the proposed water transfers on both the

739 transferor and transferee.

740        (b)    In order to facilitate efficient water management by means of water

741 transfers of the type historically carried out among Project Contractors located within the same

742 geographical area and to allow the Contractor to participate in an accelerated water transfer

743 program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

744 all necessary environmental documentation, including, but not limited to, documents prepared

745 pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

746 the Contracting Officer shall determine whether such transfers comply with applicable law.

747 Following the completion of the environmental documentation, such transfers addressed in such

748 documentation shall be conducted with advance notice to the Contracting Officer, but shall not

749 require prior written approval by the Contracting Officer. Such environmental documentation

750 and the Contracting Officer's compliance determination shall be reviewed every five years and

751 updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

752 subsequent environmental documentation shall include an alternative to evaluate not less than the

753 quantity of Project Water historically transferred within the same geographical area.

754        (c)    For a water transfer to qualify under subdivision (b) of this Article, such

755 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

756 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

757 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

758 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

759 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

760  through existing facilities with no new construction or modifications to facilities and be between

761  existing Project Contractors and/or the Contractor and the United States, Department of the

762  Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

763  requirements imposed for protection of the environment and Indian Trust Assets, as defined

764  under Federal law.

765  <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

766  10.  (a)  The amount of any overpayment by the Contractor of the Contractor's

767  O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

768  liabilities of the Contractor arising out of this Contract then due and payable.  Overpayments of

769  more than $1,000 shall be refunded at the Contractor's request.  In lieu of a refund, any amount

770  of such overpayment, at the option of the Contractor, may be credited against amounts to become

771  due to the United States by the Contractor.  With respect to overpayment, such refund or

772  adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

773  have the right to the use of any of the Project Water supply provided for by this Contract.  All

774  credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

775  obtaining direction as to how to credit or refund such overpayment in response to the notice to

776  the Contractor that it has finalized the accounts for the Year in which the overpayment was

777  made.

778  (b)  All advances for miscellaneous costs incurred for work requested by the

779  Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

780  when the work has been completed.  If the advances exceed the actual costs incurred, the

781  difference will be refunded to the Contractor.  If the actual costs exceed the Contractor's

782    advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

783    Contract.

784    <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

785    11.    (a)    Subject to:  (i) the authorized purposes and priorities of the Project and the

786    requirements of Federal law, and (ii) the obligations of the United States under existing

787    contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

788    Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

789    provided in this Contract.

790    (b)    The Contracting Officer or Operating Non-Federal Entity(ies) may

791    temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

792    provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

793    of the Project facilities or any part thereof necessary for the delivery of Project Water to the

794    Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

795    will give the Contractor due notice in advance of such temporary discontinuance or reduction,

796    except in case of emergency, in which case no notice need be given; <u>*Provided,*</u> *That* the United

797    States shall use its best efforts to avoid any discontinuance or reduction in such service.  Upon

798    resumption of service after such discontinuance or reduction, and if requested by the Contractor,

799    the United States will, if possible, deliver the quantity of Project Water which would have been

800    delivered hereunder in the absence of such discontinuance or reduction.

801    (c)    The United States reserves the right to all seepage and return flow water

802    derived from Water Delivered to the Contractor hereunder which escapes or is discharged

803    beyond the Contractor's Service Area; <u>*Provided,*</u> *That* this shall not be construed as claiming for

804 the United States any right to seepage or return flow being put to reasonable and beneficial use

805 pursuant to this Contract within the Contractor's Service Area by the Contractor or those

806 claiming by, through, or under the Contractor.

807 <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

808 12. (a) In its operation of the Project, the Contracting Officer will use all
809 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
810 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
811 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
812 Contractor of said determination as soon as practicable.

813 (b) If there is a Condition of Shortage because of inaccurate runoff forecasting
814 or other similar operational errors affecting the Project; drought and other physical or natural
815 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
816 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
817 17 of this Contract, no liability shall accrue against the United States or any of its officers,
818 agents, or employees for any damage, direct or indirect, arising therefrom.

819 (c) In any Year in which there may occur a Condition of Shortage for any of

820 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

821 Article, the Contracting Officer will first allocate the available Project Water consistent with the

822 Project M&I Water Shortage Policy as finally adopted after environmental review for

823 determining the amount of Project Water Available for delivery to the Project Contractors.

824 Subject to the foregoing allocation, in any year in which there may occur a Condition of

825 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

826 others entitled to Project Water from Delta Division Facilities under long-term water service or

827 repayment contracts (or renewals thereof or binding commitments therefore) in force on

828 February 28, 2005, as follows:

829 (1) The Contracting Officer shall make an initial and subsequent

38

830      determination as necessary of the total quantity of Project Water estimated to be scheduled or

831      actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

832      renewal, long-term water service or repayment contracts then in force for the delivery of Project

833      Water by the United States from Delta Division Facilities during the relevant Year, the quantity

834      so determined being hereinafter referred to as the scheduled total;

835                   (2)      A determination shall be made of the total quantity of Project

836      Water that is available for meeting the scheduled total, the quantity so determined being

837      hereinafter referred to as the available supply;

838                   (3)      The total quantity of Project Water estimated to be scheduled or

839      actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

840      of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

841      hereinafter referred to as the Contractor's proportionate share; and

842                   (4)      The available supply shall be multiplied by the Contractor's

843      proportionate share and the result shall be the quantity of Project Water made available by the

844      United States to the Contractor for the relevant Year in accordance with the schedule developed

845      by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

846      amount exceed the Contract Total. In the event the Contracting Officer subsequently determines

847      that the Contracting Officer can increase or needs to decrease the available supply for delivery

848      from Delta Division Facilities to long-term water service and repayment contractors during the

849      relevant Year, such additions or reductions to the available supply shall be apportioned

850      consistent with subparagraphs (1) through (4), inclusive.

851                   (d)      By entering into this Contract, the Contractor does not waive any legal

852 rights or remedies it may have to file or participate in any administrative or judicial proceeding

853 contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

854 such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

855 implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

856 *That* the Contractor has commenced any such judicial challenge or any administrative procedures

857 necessary to institute any judicial challenge within six months of the policy becoming final. By

858 agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

859 that it may have to assert in such a proceeding. Nothing contained herein shall be interpreted to

860 validate or invalidate the Project M&I Water Shortage Policy.

861 <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

862 13. (a) To the extent applicable, the Contractor shall not be deemed to have

863 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

864 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

865 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

866 (b) Upon complete payment of the Repayment Obligation by the Contractor,

867 this Article 13 shall no longer be applicable.

868 <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

869 14. The parties agree that the delivery of Irrigation Water or use of Federal facilities
870 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
871 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
872 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
873 law.

874 <u>PROTECTION OF WATER AND AIR QUALITY</u>

875 15. (a) Omitted

40

876           (b)     The United States will care for, operate and maintain reserved works in a
877 manner that preserves the quality of the water at the highest level possible as determined by the
878 Contracting Officer. The United States does not warrant the quality of the water delivered to the
879 Contractor and is under no obligation to furnish or construct water treatment facilities to
880 maintain or improve the quality of water delivered to the Contractor.

881           (c)     The Contractor will comply with all applicable water and air pollution
882 laws and regulations of the United States and the State of California; and will obtain all required
883 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
884 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
885 State, and local water quality standards applicable to surface and subsurface drainage and/or
886 discharges generated through the use of Federal or Contractor facilities or Project Water
887 provided by the Contractor within its Service Area.

888           (d)     This Article shall not affect or alter any legal obligations of the Secretary
889 to provide drainage or other discharge services.

890           (e)     Omitted

891     WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
892                                  STATES

893     16.     (a)     Water or water rights now owned or hereafter acquired by the Contractor

894 other than from the United States and Irrigation Water furnished pursuant to the terms of this

895 Contract may be simultaneously transported through the same distribution facilities of the

896 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

897 and non-Project water were constructed without funds made available pursuant to Federal

898 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

899 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

900 Irrigation Water must be established through the certification requirements as specified in the

901 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

902 Eligible Lands within the Contractor's Service Area can be established and the quantity of

903 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

904    Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

905    Project water are (were) constructed with funds made available pursuant to Federal Reclamation

906    law, the non-Project water will be subject to the acreage limitation provisions of Federal

907    Reclamation law, unless the Contractor pays to the United States the incremental fee described in

908    43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

909    annually the cost to the Federal Government, including interest, of storing or delivering non-

910    Project water, which for purposes of this Contract shall be determined as follows: The quotient

911    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

912    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

913    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

914    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

915    within the Contractor's Service Area that receives non-Project water through Federally financed

916    or constructed facilities. The incremental fee calculation methodology will continue during the

917    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

918    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

919    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

920    adopted, it shall supersede this provision.

921             (b)      Water or water rights now owned or hereafter acquired by the Contractor,

922    other than from the United States may be stored, conveyed, and/or diverted through Project

923    facilities, subject to the completion of appropriate environmental documentation, with the

924    approval of the Contracting Officer and the execution of any contract determined by the

925    Contracting Officer to be necessary, consistent with the following provisions:

926          (1)     The Contractor may introduce non-Project water into Project

927   facilities and deliver said water to lands within the Contractor's Service Area, including

928   Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

929   Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

930   policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

931   use power policy is applicable, each as amended, modified, or superseded from time to time.

932          (2)     Delivery of such non-Project water in and through Project facilities

933   shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

934   purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

935   available to other Project Contractors; (iii) interfere with the delivery of contractual water

936   entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

937   the Project facilities.

938          (3)     Neither the United States nor the Operating Non-Federal

939   Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

940   is introduced into or after it is delivered from the Project facilities. The Contractor hereby

941   releases and agrees to defend and indemnify the United States and the Operating Non-Federal

942   Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

943   persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

944   employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

945   (ii) diverting such non-Project water into Project facilities.

946          (4)     Diversion of such non-Project water into Project facilities shall be

947   consistent with all applicable laws, and if involving groundwater, consistent with any applicable

948    groundwater management plan for the area from which it was extracted.

949                    (5)      After Project purposes are met, as determined by the Contracting

950    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

951    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

952    available by the Contracting Officer for conveyance and transportation of non-Project water prior

953    to any such remaining capacity being made available to non Project contractors.  Other Project

954    Contractors shall have a second priority to any remaining capacity of facilities declared to be

955    available by the Contracting Officer for conveyance and transportation of non-Project water prior

956    to any such remaining capacity being made available to non-Project contractors.

957                    (c)      Upon complete payment of the Repayment Obligation by the Contractor,

958    subdivision (a) of this Article 16 shall no longer be applicable.

959                            OPINIONS AND DETERMINATIONS

960        17.    (a)      Where the terms of this Contract provide for actions to be based upon the

961    opinion or determination of either party to this Contract, said terms shall not be construed as

962    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

963    determinations.  Both parties, notwithstanding any other provisions of this Contract, expressly

964    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

965    or unreasonable opinion or determination.  Each opinion or determination by either party shall be

966    provided in a timely manner.  Nothing in this subdivision (a) of this Article is intended to or shall

967    affect or alter the standard of judicial review applicable under Federal law to any opinion or

968    determination implementing a specific provision of Federal law embodied in statute or

969    regulation.

44

970       (b)     The Contracting Officer shall have the right to make determinations

971  necessary to administer this Contract that are consistent with the provisions of this Contract, the

972  laws of the United States and of the State of California, and the rules and regulations

973  promulgated by the Secretary. Such determinations shall be made in consultation with the

974  Contractor to the extent reasonably practicable.

975                <u>COORDINATION AND COOPERATION</u>

976     18.   (a)     In order to further their mutual goals and objectives, the Contracting

977  Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

978  with other affected Project Contractors, in order to improve the O&M of the Project. The

979  communication, coordination, and cooperation regarding O&M shall include, but not be limited

980  to, any action which will or may materially affect the quantity or quality of Project Water supply,

981  the allocation of Project Water supply, and Project financial matters including, but not limited to,

982  budget issues. The communication, coordination, and cooperation provided for hereunder shall

983  extend to all provisions of this Contract. Each party shall retain exclusive decision making

984  authority for all actions, opinions, and determinations to be made by the respective party.

985       (b)     Within 120 days following the Effective Date, the Contractor, other

986  affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

987  Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

988  amended as necessary separate and apart from this Contract. The goal of this process shall be to

989  provide, to the extent practicable, the means of mutual communication and interaction regarding

990  significant decisions concerning Project O&M on a real-time basis.

991       (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

992     Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

993     intent:

994     (1)     The Contracting Officer will, at the request of the Contractor,

995     assist in the development of integrated resource management plans for the Contractor. Further,

996     the Contracting Officer will, as appropriate, seek authorizations for implementation of

997     partnerships to improve water supply, water quality, and reliability.

998     (2)     The Secretary will, as appropriate, pursue program and project

999     implementation and authorization in coordination with Project Contractors to improve the water

1000     supply, water quality, and reliability of the Project for all Project purposes.

1001     (3)     The Secretary will coordinate with Project Contractors and the

1002     State of California to seek improved water resource management.

1003     (4)     The Secretary will coordinate actions of agencies within the

1004     Department of the Interior that may impact the availability of water for Project purposes.

1005     (5)     The Contracting Officer shall periodically, but not less than

1006     annually, hold division-level meetings to discuss Project operations, division-level water

1007     management activities, and other issues as appropriate.

1008     (d)     Without limiting the contractual obligations of the Contracting Officer

1009     under the other Articles of this Contract, nothing in this Article shall be construed to limit or

1010     constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

1011     Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

1012     protect health, safety, or the physical integrity of structures or facilities.

## CHARGES FOR DELINQUENT PAYMENTS

19.  (a)  The Contractor shall be subject to interest, administrative, and penalty charges on delinquent payments. If a payment is not received by the due date, the Contractor shall pay an interest charge on the delinquent payment for each day the payment is delinquent beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in addition to the interest charge, an administrative charge to cover additional costs of billing and processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor shall pay, in addition to the interest and administrative charges, a penalty charge for each day the payment is delinquent beyond the due date, based on the remaining balance of the payment due at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt collection services associated with a delinquent payment.

(b)  The interest rate charged shall be the greater of either the rate prescribed quarterly in the Federal Register by the Department of the Treasury for application to overdue payments, or the interest rate of 0.5 percent per month. The interest rate charged will be determined as of the due date and remain fixed for the duration of the delinquent period.

(c)  When a partial payment on a delinquent account is received, the amount received shall be applied first to the penalty charges, second to the administrative charges, third to the accrued interest, and finally to the overdue payment.

## EQUAL EMPLOYMENT OPPORTUNITY

20.  During the performance of this Contract, the Contractor agrees as follows:

(a)  The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this nondiscrimination clause.

(b)  The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

(c)  The Contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has

1049 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1050 employee or applicant. This provision shall not apply to instances in which an employee who
1051 has access to the compensation information of other employees or applicants as part of such
1052 employee's essential job functions discloses the compensation of such other employees or
1053 applicants to individuals who do not otherwise have access to such information, unless such
1054 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1055 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1056 consistent with the Contractor's legal duty to furnish information.

1057 (d) The Contractor will send to each labor union or representative of workers
1058 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1059 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1060 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1061 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1062 applicants for employment.

1063 (e) The Contractor will comply with all provisions of Executive Order No.
1064 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1065 Labor.

1066 (f) The Contractor will furnish all information and reports required by
1067 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1068 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1069 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1070 compliance with such rules, regulations, and orders.

1071 (g) In the event of the Contractor's noncompliance with the nondiscrimination
1072 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1073 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1074 ineligible for further Government contracts in accordance with procedures authorized in
1075 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1076 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1077 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1078 (h) The Contractor will include the provisions of paragraphs (a) through (g) in
1079 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1080 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1081 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1082 will take such action with respect to any subcontract or purchase order as may be directed by the
1083 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1084 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1085 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1086 Contractor may request the United States to enter into such litigation to protect the interests of
1087 the United States.

1088        <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1089        21.    (a)    The obligation of the Contractor to pay the United States as provided in
1090    this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1091    obligation may be distributed among the Contractor's water users and notwithstanding the default
1092    of individual water users in their obligation to the Contractor.

1093            (b)    The payment of charges becoming due pursuant to this Contract is a
1094    condition precedent to receiving benefits under this Contract.  The United States shall not make
1095    water available to the Contractor through Project facilities during any period in which the
1096    Contractor is in arrears in the advance payment of water rates due the United States.  The
1097    Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1098    parties that are in arrears in the advance payment of water rates as levied or established by the
1099    Contractor.

1100            (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1101    obligation to require advance payment for water rates which it levies.

1102        <u>COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS</u>

1103        22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1104    (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1105    amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1106    III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1107    336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1108    applicable implementing regulations and any guidelines imposed by the U.S.  Department of the
1109    Interior and/or Bureau of Reclamation.

1110            (b)    These statutes prohibit any person in the United States from being
1111    excluded from participation in, being denied the benefits of, or being otherwise subjected to
1112    discrimination under any program or activity receiving financial assistance from the Bureau of
1113    Reclamation on the grounds of race, color, national origin, disability, or age.  By executing this
1114    Contract, the Contractor agrees to immediately take any measures necessary to implement this
1115    obligation, including permitting officials of the United States to inspect premises, programs, and
1116    documents.

1117            (c)    The Contractor makes this Contract in consideration of and for the
1118    purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1119    Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1120    Reclamation, including installment payments after such date on account of arrangements for
1121    Federal financial assistance which were approved before such date.  The Contractor recognizes
1122    and agrees that such Federal assistance will be extended in reliance on the representations and

1123    agreements made in this Article and that the United States reserves the right to seek judicial
1124    enforcement thereof.

1125          (d)      Complaints of discrimination against the Contractor shall be investigated
1126    by the Contracting Officer's Office of Civil Rights.

1127                             PRIVACY ACT COMPLIANCE

1128      23.    (a)      The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1129    (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1130    (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1131    to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1132    Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1133    C.F.R. § 426.18.

1134          (b)      With respect to the application and administration of the criminal penalty
1135    provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1136    employees who are responsible for maintaining the certification and reporting records referenced
1137    in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1138    U.S.C. § 552a(m).

1139          (c)      The Contracting Officer or a designated representative shall provide the
1140    Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1141    Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1142    31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1143    information contained in the Landholders' certification and reporting records.

1144          (d)      The Contracting Officer shall designate a full-time employee of the
1145    Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1146    pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1147    The Contractor is authorized to grant requests by individuals for access to their own records.

1148          (e)      The Contractor shall forward promptly to the System Manager each
1149    proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1150    filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1151    System Manager with information and records necessary to prepare an appropriate response to
1152    the requester. These requirements do not apply to individuals seeking access to their own
1153    certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1154    the requester elects to cite the Privacy Act as an authority for the request.

1155          (f)      Upon complete payment of the Repayment Obligation by the Contractor,

1156    this Article 23 will no longer be applicable.

1157 <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1158   24.   In addition to all other payments to be made by the Contractor pursuant to this

1159 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1160 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1161 of direct cost incurred by the United States for work requested by the Contractor associated with

1162 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1163 and procedures.  All such amounts referred to in this Article shall not exceed the amount agreed

1164 to in writing in advance by the Contractor.  This Article shall not apply to costs for routine

1165 contract administration.

1166   <u>WATER CONSERVATION</u>

1167   25.   (a)   Prior to the delivery of water provided from or conveyed through
1168 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1169 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1170 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1171 Additionally, an effective water conservation and efficiency program shall be based on the

1172 Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1173 the conservation and efficiency criteria for evaluating water conservation plans established under

1174 Federal law.  The water conservation and efficiency program shall contain definite water

1175 conservation objectives, appropriate economically feasible water conservation measures, and

1176 time schedules for meeting those objectives.  Continued Project Water delivery pursuant to this

1177 Contract shall be contingent upon the Contractor's continued implementation of such water

1178 conservation program.  In the event the Contractor's water conservation plan or any revised water

1179 conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

51

1180    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1181    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1182    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1183    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1184    immediately begins implementing its water conservation and efficiency program in accordance

1185    with the time schedules therein.

1186           (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1187    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1188    Contractor shall implement the Best Management Practices identified by the time frames issued

1189    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1190    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1191    the Contractor.

1192           (c)    The Contractor shall submit to the Contracting Officer a report on the

1193    status of its implementation of the water conservation plan on the reporting dates specified in the

1194    then-existing conservation and efficiency criteria established under Federal law.

1195           (d)    At five (5)-year intervals, the Contractor shall revise its water

1196    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1197    water conservation plans established under Federal law and submit such revised water

1198    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1199    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1200    existing conservation and efficiency criteria for evaluating water conservation plans established

1201    under Federal law.

1202        (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1203  shall be described in the Contractor's water conservation plan.

1204                 EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1205     26.    Except as specifically provided in Article 16 of this Contract, the provisions of

1206  this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1207  hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1208  Area. Any such water shall not be considered Project Water under this Contract. In addition,

1209  this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1210  any water user within the Contractor's Service Area acquires or has available under any other

1211  contract pursuant to Federal Reclamation law.

1212  OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1213     27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1214  and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1215  San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1216  agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1217  Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1218  affect the rights or obligations of the Contractor or the United States hereunder.

1219        (b)    The Contracting Officer has previously notified the Contractor in writing

1220  that the O&M of a portion of the Project facilities which serve the Contractor has been

1221  transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1222  therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1223  Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1224    the terms and conditions of the separate agreement between the United States and the Operating

1225    Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1226    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1227    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1228    such successor determines, sets, or establishes for the O&M of the portion of the Project

1229    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1230    Mendota Water Authority or such successor.  Such direct payments to Operating Non-Federal

1231    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1232    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1233    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1234    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1235    United States in accordance with the separate agreement identified in subdivision (a) of this

1236    Article.

1237            (c)     For so long as the O&M of any portion of the Project facilities serving the

1238    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1239    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1240    Rates for Water Delivered under this Contract representing the cost associated with the activity

1241    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1242    or its successor.

1243            (d)     In the event the O&M of the Project facilities operated and maintained by

1244    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1245    the United States during the term of this Contract, the Contracting Officer shall so notify the

1246    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1247    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1248    representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1249    The Contractor shall, thereafter, in the absence of written notification from the Contracting

1250    Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1251    revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1252    <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1253    28.    The expenditure or advance of any money or the performance of any obligation of
1254    the United States under this Contract shall be contingent upon appropriation or allotment of
1255    funds.  Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1256    obligations under this Contract.  No liability shall accrue to the United States in case funds are
1257    not appropriated or allotted.

1258    <u>BOOKS, RECORDS, AND REPORTS</u>

1259    29.    (a)    The Contractor shall establish and maintain accounts and other books and
1260    records pertaining to administration of the terms and conditions of this Contract, including the
1261    Contractor's financial transactions; water supply data; project operations, maintenance, and
1262    replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1263    census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1264    Officer may require.  Reports shall be furnished to the Contracting Officer in such form and on
1265    such date or dates as the Contracting Officer may require.  Subject to applicable Federal laws
1266    and regulations, each party to this Contract shall have the right during office hours to examine
1267    and make copies of the other party's books and records relating to matters covered by this
1268    Contract.

1269    (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1270    books, records, or other information shall be requested from the Contractor by the Contracting

1271    Officer unless such books, records, or information are reasonably related to the administration or

1272    performance of this Contract.  Any such request shall allow the Contractor a reasonable period of

1273    time within which to provide the requested books, records, or information.

1274        (c)     At such time as the Contractor provides information to the Contracting

1275    Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1276    to the Operating Non-Federal Entity(ies).

1277           ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED

1278       30.    (a)     The provisions of this Contract shall apply to and bind the successors and
1279    assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1280    therein by either party shall be valid until approved in writing by the other party.

1281        (b)     The assignment of any right or interest in this Contract by either party

1282    shall not interfere with the rights or obligations of the other party to this Contract absent the

1283    written concurrence of said other party.

1284        (c)     The Contracting Officer shall not unreasonably condition or withhold

1285    approval of any proposed assignment.

1286                    SEVERABILITY

1287       31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1288    nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1289    an association or other form of organization whose primary function is to represent parties to

1290    Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1291    enforceability of a provision included in this Contract and said person, entity, association, or

1292    organization obtains a final court decision holding that such provision is legally invalid or

1293    unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1294    the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1295    final court decision identify by mutual agreement the provisions in this Contract which must be

1296    revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1297     The time periods specified above may be extended by mutual agreement of the parties. Pending

1298     the completion of the actions designated above, to the extent it can do so without violating any

1299     applicable provisions of law, the United States shall continue to make the quantities of Project

1300     Water specified in this Contract available to the Contractor pursuant to the provisions of this

1301     Contract which were not found to be legally invalid or unenforceable in the final court decision.

1302                            RESOLUTION OF DISPUTES

1303         32.     Should any dispute arise concerning any provisions of this Contract, or the

1304     parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1305     resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1306     Officer referring any matter to the Department of Justice, the party shall provide to the other

1307     party 30 days' written notice of the intent to take such action; _Provided, That_ such notice shall

1308     not be required where a delay in commencing an action would prejudice the interests of the party

1309     that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1310     Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1311     provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1312     or the United States may have.

1313                            OFFICIALS NOT TO BENEFIT

1314         33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of
1315     the Contractor shall benefit from this Contract other than as a water user or landowner in the
1316     same manner as other water users or landowners.

1317           CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA

1318         34.     (a)     While this Contract is in effect, no change may be made in the
1319     Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1320     changes which may affect the respective rights, obligations, privileges, and duties of either the

1321 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1322 consolidation, or merger, except upon the Contracting Officer's written consent.

1323      (b)    Within 30 days of receipt of a request for such a change, the Contracting

1324 Officer will notify the Contractor of any additional information required by the Contracting

1325 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1326 schedule for timely completion of the process. Such process will analyze whether the proposed

1327 change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1328 (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1329 to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1330 have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1331 Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1332 responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1333 be paid in accordance with Article 24 of this Contract.

1334 <div align="center">FEDERAL LAWS</div>

1335     35.    By entering into this Contract, the Contractor does not waive its rights to contest

1336 the validity or application in connection with the performance of the terms and conditions of this

1337 Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1338 the terms and conditions of this Contract unless and until relief from application of such Federal

1339 law or regulation to the implementing provision of the Contract is granted by a court of

1340 competent jurisdiction.

1341 <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1342      36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1343 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1344 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1345           (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1346 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1347 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1348 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1349 <div align="center">CERTIFICATION OF NONSEGREGATED FACILITIES</div>

1350      37.    The Contractor hereby certifies that it does not maintain or provide for its
1351 employees any segregated facilities at any of its establishments and that it does not permit its
1352 employees to perform their services at any location under its control where segregated facilities
1353 are maintained. It certifies further that it will not maintain or provide for its employees any
1354 segregated facilities at any of its establishments and that it will not permit its employees to
1355 perform their services at any location under its control where segregated facilities are
1356 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1357 Employment Opportunity clause in this Contract. As used in this certification, the term
1358 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1359 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1360 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1361 facilities provided for employees which are segregated by explicit directive or are in fact
1362 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1363 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1364 identical certifications from proposed subcontractors for specific time periods) it will obtain
1365 identical certifications from proposed subcontractors prior to the award of subcontracts
1366 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1367 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1368 following notice to such proposed subcontractors (except where the proposed subcontractors
1369 have submitted identical certifications for specific time periods):

1370 <div align="center">NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1371 CERTIFICATIONS OF NONSEGREGATED FACILITIES</div>

1372 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1373 exceeding $10,000 which is not exempt from the provisions of the Equal Employment

<div align="center">59</div>

1374    Opportunity clause. The certification may be submitted either for each subcontract or for all
1375    subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1376    making false statements in offers is prescribed in 18 U.S.C. § 1001.

1377                 <u>NOTICES</u>

1378       38.     Any notice, demand, or request authorized or required by this Contract shall be
1379    deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1380    delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1381    California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1382    postage prepaid, or delivered to the Board of Directors of the Del Puerto Water District, P. O.
1383    Box 1596, Patterson, California 95363-1596. The designation of the addressee or the address
1384    may be changed by notice given in the same manner as provided in this Article for other notices.

1385         <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1386       39.    (a)     All payments from the Contractor to the United States under this Contract
1387    shall be by the medium requested by the United States on or before the date payment is due. The
1388    required method of payment may include checks, wire transfers, or other types of payment
1389    specified by the United States.

1390            (b)     Upon execution of this Contract, the Contractor shall furnish the
1391    Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1392    for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1393    out of the Contractor's relationship with the United States.

1394         <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1395       40.     This amended Contract has been negotiated and reviewed by the parties hereto,
1396    each of whom is sophisticated in the matters to which this amended Contract pertains. The
1397    double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1398    the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1399    spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1400           <u>CONFIRMATION OF CONTRACT</u>

1401       41.     Promptly after the execution of this amended Contract, the Contractor will
1402    provide to the Contracting Officer a certified copy of a final decree of a court of competent
1403    jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1404    for the authorization of the execution of this amended Contract. This amended Contract shall not
1405    be binding on the United States until the Contractor secures a final decree.

1406

1407        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1408    day and year first above written.

1409                         UNITED STATES OF AMERICA

1410                         By: _____
1411                                Regional Director
1412                                Interior Region 10: California-Great Basin
1413                                Bureau of Reclamation

1414                         DEL PUERTO WATER DISTRICT
1415    (SEAL)

1416                         By: _____
1417                                  President of the Board of Directors

1418    Attest:

1419    By: _____
1420          Secretary of the Board of Directors

1407         IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1408    day and year first above written.

1409                         UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.09.25
13:30:54 -07'00'

**OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**

1410   TIME STAMP: [1:37 pm, May 11 2020]      By: _____

1411                            Regional Director

1412                            Interior Region 10: California-Great Basin

1413                            Bureau of Reclamation

1414                          DEL PUERTO WATER DISTRICT

1415   (SEAL)

1416                        By: _____

1417                            President of the Board of Directors

1418   Attest:

1419   By: _____

1420        Secretary of the Board of Directors



Legend:
☐ District Boundary
◇ Contractor's Service Area

**Del Puerto Water District**

Contract No. 14-06-200-922-LTR1-P
EXHIBIT A

BUREAU OF RECLAMATION

Date: 4/1/2020
N:\Districts\Contracts\del_puerto\delpuerto_20200401.mxd

Miles
0            5            10

N

214-202-881

**EXHIBIT B**
**DEL PUERTO WATER DISTRICT**
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $43.99 | |
| DMC Aqueduct Intertie | $1.06 | |
| O&M Components | | |
| Water Marketing | $8.97 | $6.12 |
| Storage | $18.01 | $14.99 |
| Deficit Cost | $0.00 | $0.00 |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $72.03 | $21.11 |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **M&I FULL COST RATE** | | TBD |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| **M&I** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [M&I Full Cost Rate - M&I COS Rate]/2 *(Amount to be Added to Tier 1 Rate)* | | TBD |
| *Tier 3 Rate* : >90% of Contract Total [M&I Full Cost Rate - M&I COS Rate] *(Amount to Be Added to Tier 1 Rate)* | | TBD |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge (Restoration Fund Payment)** [Section 3407(d)(2)(A)] | $10.91 | $21.82 |
| **P.L. 106-377 Assessment (Trinity Public Utilities District)** [Appendix B, Section 203] | $0.12 | $0.12 |

**EXPLANATORY NOTES**

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows:  2006 = 32 AF; 2011 = 21 AF; 2017 = 8 AF; which equals a M&I Historic use average quantity of 20 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

Contractor: **Del Puerto WD**
Facility: **Delta Mendota Canal**
Contract: **14-06-200-922-LTR1-P**

| Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba) | | | |
|---|---|---|---|
| | | Unpaid Cost | Discount |
| Construction Cost | ~ $ | 16,545,438 | |
| 2019 Repayment (Estimate) ** | $ | 3,370,196 | |
| Adjusted Construction Cost | $ | 13,175,242 | $ 12,735,870 |
| Intertie Construction Cost (N/A): | $ | 1,588,962 | $ 1,393,719 |
| Total | $ | 14,764,204 | $ 14,129,589 |

| If Paid in Installments (Used 20 yr CMT) | | | |
|---|---|---|---|
| | Due**** | | |
| Payment 1 | 10/1/2020 | $ | 3,586,430 |
| Payment 2 | 10/1/2021 | $ | 3,586,430 |
| Payment 3 | 10/1/2022 | $ | 3,586,430 |
| Payment 4 | 10/1/2023 | $ | 3,586,430 |
| Total Installment Payments | | $ | 14,345,720 |

| | |
|---|---|
| 20 yr CMT Rates - 09/17/2020 (to be adjusted to effective date of contract)[@] | 1.220% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.610% |

| M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba) | | |
|---|---|---|
| | | Unpaid Cost |
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

**Calculation Support:**  Irrigation Lump Sum or First Payment****  10/1/2020
Days Until the End of the Fiscal Year  364

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2021 | $ 13,175,242 | $ 1,317,524 | $ 1,301,618 | $ 1,588,962 | $ 36,953 | $ 36,506 | $ 1,338,124 |
| 2022 | $ 11,857,718 | $ 1,317,524 | $ 1,301,596 | $ 1,552,009 | $ 36,953 | $ 36,506 | $ 1,338,102 |
| 2023 | $ 10,540,194 | $ 1,317,524 | $ 1,293,705 | $ 1,515,057 | $ 36,953 | $ 36,285 | $ 1,329,989 |
| 2024 | $ 9,222,669 | $ 1,317,524 | $ 1,285,861 | $ 1,478,104 | $ 36,953 | $ 36,065 | $ 1,321,925 |
| 2025 | $ 7,905,145 | $ 1,317,524 | $ 1,278,065 | $ 1,441,152 | $ 36,953 | $ 35,846 | $ 1,313,911 |
| 2026 | $ 6,587,621 | $ 1,317,524 | $ 1,270,316 | $ 1,404,199 | $ 36,953 | $ 35,629 | $ 1,305,944 |
| 2027 | $ 5,270,097 | $ 1,317,524 | $ 1,262,614 | $ 1,367,246 | $ 36,953 | $ 35,413 | $ 1,298,026 |
| 2028 | $ 3,952,573 | $ 1,317,524 | $ 1,254,959 | $ 1,330,294 | $ 36,953 | $ 35,198 | $ 1,290,156 |
| 2029 | $ 2,635,048 | $ 1,317,524 | $ 1,247,350 | $ 1,293,341 | $ 36,953 | $ 34,984 | $ 1,282,334 |
| 2030 | $ 1,317,524 | $ 1,317,524 | $ 1,239,787 | $ 1,256,389 | $ 36,953 | $ 34,772 | $ 1,274,559 |
| 2031-63 | | | | $ 1,219,436 | $ 1,219,436 | $ 1,036,516 | $ 1,036,516 |
| Total, Lump Sum Payment | | | $ 12,735,870 | | | $ 1,393,719 | $ 14,129,589 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | | $ 439,372 | | | $ 195,243 | $ 634,615 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need
update, they are still required. Also, unpaid charges are still a requirement under contract.
\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.
\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.
\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.
~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.
[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 8 |
| 2. | Term of Contract – Right to Use of Water | 13 |
| 3. | Water to be Made Available and Delivered to the Contractor | 15 |
| 4. | Time for Delivery of Water | 19 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 21 |
| 6. | Measurement of Water Within the Contractor's Service Area | 23 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 25 |
| 8. | Non-Interest Bearing O&M Deficits | 35 |
| 9. | Sales, Transfers, or Exchanges of Water | 35 |
| 10. | Application of Payments and Adjustments | 37 |
| 11. | Temporary Reductions – Return Flows | 38 |
| 12. | Constraints on the Availability of Water | 39 |
| 13. | Unavoidable Groundwater Percolation | 41 |
| 14. | Compliance with Federal Reclamation Laws | 42 |
| 15. | Protection of Water and Air Quality | 42 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 43 |
| 17. | Opinions and Determinations | 46 |
| 18. | Coordination and Cooperation | 47 |
| 19. | Charges for Delinquent Payments | 49 |
| 20. | Equal Employment Opportunity | 49 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 51 |
| 22. | Compliance with Civil Rights Laws and Regulations | 51 |
| 23. | Privacy Act Compliance | 52 |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

<u>CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT</u>

1    THIS CONTRACT, made this ___ day of _____, 20XX, in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and DEL PUERTO WATER

12   DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13   duly organized, existing, and acting pursuant to the laws thereof;

14       WITNESSETH, That:

| | | | | |
|---|---|---|---|---|
| 37 | Hospital Water District | 14-06-200-923 | 06/10/53 | 02/28/94 |
| 38 | Kern Canon Water District | 14-06-200-924 | 06/10/53 | 02/28/94 |
| 39 | Salada Water District | 14-06-200-925 | 06/10/53 | 02/28/94 |
| 40 | Sunflower Water District | 14-06-200-1804 | 11/12/53 | 02/28/94 |
| 41 | Mustang Water District | 14-06-200-8103 | 12/07/59 | 02/28/95 |
| 42 | Orestimba Water District | 14-06-200-8091 | 11/27/59 | 02/28/95 |
| 43 | Quinto Water District | 14-06-200-8899 | 01/24/61 | 02/28/95 |
| 44 | Romero Water District | 14-06-200-7758 | 05/11/59 | 02/28/95 |
| 45 | Foothill Water District | 14-06-200-4323 | 05/31/55 | 02/29/96 |
| 46 | ; and | | | |

47 [6th] WHEREAS, the long-term water service contracts between the United

48 States and Davis, Del Puerto, Hospital, Kern Canon, Salada, and Sunflower Water Districts

49 provided for water service through February 28, 1994, and for which one-year interim renewal

50 contracts were entered into providing for continued water service through February 28, 1995;

51 and

52 [7th] WHEREAS, all ten water districts including Davis, Foothill, Hospital,

53 Kern Canon, Mustang, Orestimba, Quinto, Romero, Salada, and Sunflower Water Districts were

54 assigned to the Contractor by separate "Assignments of Water Service Contract", dated February

55 13, 1995; and

56 [8th] WHEREAS, the Contractor and the United States entered into the interim

57 renewal contract identified as Contract No. 14-06-200-922-IR2, which consolidated all of the

58 Water Districts that were assigned to the Contractor, except Foothill Water District, and provided

59 for the continued water service from March 1, 1995, through February 28, 1997; and

60 [9th] WHEREAS, the long-term water service contract between Foothill Water

61 District (Foothill) and the United States identified as Contract No. 14-06-200-4323, that was

62 assigned to the Contractor, provided for water service through February 28, 1996, and for which

85  [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

86  mutually agreeable terms and conditions."; and

87  [15th] WHEREAS, Section 4011(a)(1) further provides that "the manner of

88  conversion under this paragraph shall be as follows: (A) Water service contracts that were

89  entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

90  this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

91  1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

92  of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

93  converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

94  [16th] WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

95  into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

96  repayment, exchange and transfer contractual rights between the water users' association

97  [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

98  water users' association [Contractor] and their landowners as provided under State law."; and

99  [17th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

100  "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

101  service or repayment contractor to receive water; or (4) except as expressly provided in this

102  section, any obligations under the Federal Reclamation law, including the continuation of

103  Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

104  repayment contractors making prepayments pursuant to this section."; and

105  [18th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

106  Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

5

129 to achieve repayment of the Project as required by law; to guard reasonably against Project

130 Water shortages; to achieve a reasonable balance among competing demands for use of

131 Project Water; and to comply with all applicable environmental statutes, all consistent with

132 the legal obligations of the United States relative to the Project; and

133 [25th] WHEREAS, the parties intend by this Contract to maintain a cooperative

134 relationship in order to achieve their mutual goals; and

135 [26th] WHEREAS, the Contractor has utilized or may utilize transfers, contract

136 assignments, rescheduling, and conveyance of Project Water and non-Project water under this

137 Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

138 beneficial use of water; and

139 [27th] WHEREAS, the parties desire and intend that this Contract not provide a

140 disincentive to the Contractor in continuing to carry out the beneficial activities set out in

141 the Explanatory Recital immediately above; and

142 [28th] WHEREAS, the Contracting Officer and the Contractor agree that this

143 Contract complies with Section 4011 of the WIIN Act; and

144 [29th] WHEREAS, the Contracting Officer and the Contractor agree to amend

145 and convert the Existing Contract pursuant to section 4011 of the WIIN Act and other Federal

146 Reclamation law on the terms and conditions set forth below;

147 NOW, THEREFORE, in consideration of the mutual and dependent covenants

148 herein contained, it is hereby mutually agreed by the parties hereto as follows:

7

170         (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

171   permitted to provide Project Water under this Contract as described in Exhibit "A"

172   attached hereto, which may be modified from time to time in accordance with Article 34

173   of this Contract without amendment of this Contract;

174         (h)    "CVPIA" shall mean the Central Valley Project Improvement Act, Title

175   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

176         (i)    "Delta Division Facilities" shall mean those existing and future Project

177   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not

178   limited to, the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill

179   Pumping/Generating Plant, and the San Luis Reservoir, used to divert, store, and convey

180   water to those Project Contractors entitled to receive water conveyed through the Delta-

181   Mendota Canal;

182         (j)    "Eligible Lands" shall mean all lands to which Irrigation Water may be

183   delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

184   1263), as amended;

185         (k)    "Excess Lands" shall mean all lands in excess of the limitations

186   contained in Section 204 of the Reclamation Reform Act of 1982, other than those lands

187   exempt from acreage limitation under Federal Reclamation law;

188         (l)    "Existing Capital Obligation" shall mean the remaining amount of

189   construction costs or other capitalized costs allocable to the Contractor as described in section

190   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

191   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

214          (q)    "Landholder" shall mean a party that directly or indirectly owns or

215   leases nonexempt land, as provided in 43 CFR 426.2;

216          (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
217   Water for municipal, industrial, and miscellaneous other purposes not falling under the
218   definition of "Irrigation Water" or within another category of water use under an
219   applicable Federal authority;

220          (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate

221   applicable to the delivery of M&I Water;

222          (t)    "Operation and Maintenance" or "O&M" shall mean normal and

223   reasonable care, control, operation, repair, replacement (other than capital replacement),

224   and maintenance of Project facilities;

225          (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

226   successors or assigns, which has (have) the obligation to operate and maintain all or a

227   portion of the Delta Division Facilities pursuant to written agreement(s) with the United

228   States. When this Contract was entered into, the Operating Non-Federal Entity was the

229   San Luis & Delta-Mendota Water Authority;

230          (v)    "Project" shall mean the Central Valley Project owned by the United

231   States and managed by the Department of the Interior, Bureau of Reclamation;

232          (w)    "Project Contractors" shall mean all parties who have contracts for

233   water service for Project Water from the Project with the United States pursuant to Federal

234   Reclamation law;

235          (x)    "Project Water" shall mean all water that is developed, diverted,

236   stored, or delivered by the Secretary in accordance with the statutes authorizing the

259          (ee)     "Water Made Available" shall mean the estimated amount of

260  Project Water that can be delivered to the Contractor for the upcoming Year as declared

261  by the Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

262          (ff)     "Water Scheduled" shall mean Project Water made available to the

263  Contractor for which times and quantities for delivery have been established by the

264  Contractor and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract;

265  and

266          (gg)     "Year" shall mean the period from and including March 1 of each

267  Calendar Year through the last day of February of the following Calendar Year.

268                    <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

269  2.     (a)     This Contract shall be effective [Effective Date], hereinafter known as the

270  "Effective Date", and shall continue so long as the Contractor pays applicable Rates and Charges

271  under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat.

272  1195) as applicable, and applicable law;

273          (1)     <u>*Provided, That*</u> the Contracting Officer shall not seek to terminate

274  this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

275  unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

276  to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

277  or to diligently commence and maintain full curative payments satisfactory to the Contracting

278  Officer within the sixty (60) calendar days' notice period;

279          (2)     <u>*Provided, further, That*</u> the Contracting Officer shall not seek to

280  suspend making water available or declaring Water Made Available pursuant to this Contract for

302 <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

303   3.   (a)   During each Year, consistent with all applicable State water rights

304 permits, and licenses, Federal law, and subject to the provisions set forth in Articles 11 and

305 12 of this Contract, the Contracting Officer shall make available for delivery to the

306 Contractor 140,210 acre-feet of Project Water for irrigation and M&I purposes.  Water

307 Delivered to the Contractor in accordance with this subdivision shall be scheduled and

308 paid for pursuant to the provisions of Articles 4 and 7 of this Contract.

309       (b)   Because the capacity of the Project to deliver Project Water has been

310 constrained in recent years and may be constrained in the future due to many factors

311 including hydrologic conditions and implementation of Federal and State laws, the

312 likelihood of the Contractor actually receiving the amount of Project Water set out in

313 subdivision (a) of this Article in any given Year is uncertain.  The Contracting Officer's

314 modeling referenced in the programmatic environmental impact statement prepared

315 pursuant to Section 3404(c) of the CVPIA projected that the Contract Total set forth in

316 this Contract will not be available to the Contractor in many years.  During the most recent five

317 years prior to execution of the Existing Contract, the Recent Historic Average Water Made

318 Available to the Contractor was 92,258 acre-feet.  Nothing in this subdivision (b) of this Article

319 shall affect the rights and obligations of the parties under any provision of this Contract.

320       (c)   The Contractor shall utilize the Project Water in accordance with all

321 applicable legal requirements.

322         (1)   In the event any Project Contractor (other than a Cross Valley

323 Contractor) that receives Project Water through the Delta Division Facilities obtains a

15

346    Contractor's Service Area may be permitted upon written approval of the Contracting

347    Officer, which approval will be based upon environmental documentation, Project Water

348    rights, and Project operational concerns. The Contracting Officer will address such

349    concerns in regulations, policies, or guidelines.

350            (e)      The Contractor shall comply with requirements applicable to the

351    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

352    of any water service contract between the Contracting Officer and the Contractor in effect

353    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

354    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

355    implement. The Existing Contract, which evidences in excess of 51 years of diversions for

356    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

357    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

358    required biological assessment(s) prepared pursuant to the ESA, and any other needed

359    environmental review. Nothing herein shall be construed to prevent the Contractor from

360    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

361    biological opinion or other environmental documentation referred to in this Article.

362            (f)      Following the declaration of Water Made Available under Article 4 of

363    this Contract, the Contracting Officer will make a determination whether Project Water, or

364    other water available to the Project, can be made available to the Contractor in addition to

365    the Contract Total under this Article during the Year without adversely impacting other

366    Project Contractors. At the request of the Contractor, the Contracting Officer will

367    consult with the Contractor prior to making such a determination. If the Contracting

390  9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat. 1195) as applicable, and applicable

391  law. Nothing in the preceding sentence shall affect the Contracting Officer's ability to impose

392  shortages under Article 11 or subdivision (b) of Article 12 of this Contract.

393  (i)  Project Water furnished to the Contractor pursuant to this Contract

394  may be delivered for purposes other than those described in subdivisions (p) and (r) of

395  Article 1 of this Contract upon written approval by the Contracting Officer in

396  accordance with the terms and conditions of such approval.

397  (j)  The Contracting Officer shall make reasonable efforts to protect the

398  water rights necessary for the Project and to provide the water available under this Contract.

399  The Contracting Officer shall not object to participation by the Contractor, in the capacity

400  and to the extent permitted by law, in administrative proceedings related to the Project

401  Water rights; *Provided, That* the Contracting Officer retains the right to object to the

402  substance of the Contractor's position in such a proceeding; *Provided, further, That* in

403  such proceedings the Contracting Officer shall recognize the Contractor has a legal right

404  under the terms of this Contract to use Project Water.

405  TIME FOR DELIVERY OF WATER

406  4.  (a)  On or about February 20 each Calendar Year, the Contracting Officer

407  shall announce the Contracting Officer's expected declaration of the Water Made

408  Available. Such declaration will be expressed in terms of Water Made Available and

409  the Recent Historic Average and will be updated monthly, and more frequently if

410  necessary, based on the then-current operational and hydrologic conditions and a new

411  declaration with changes, if any, to the Water Made Available will be made. The

19

434    POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER

435    5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

436    Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota

437    Canal and any additional point or points of delivery either on Project facilities or another

438    location or locations mutually agreed to in writing by the Contracting Officer and the

439    Contractor.

440        (b)    The Contracting Officer, either directly or indirectly through its

441    written agreements(s) with the Operating Non-Federal Entity(ies), shall make all

442    reasonable efforts to maintain sufficient flows and levels of water in the Project facilities

443    to deliver Project Water to the Contractor at the point or points of delivery established

444    pursuant to subdivision (a) of this Article.

445        (c)    The Contractor shall deliver Irrigation Water in accordance with any

446    applicable land classification provisions of Federal Reclamation law and the associated

447    regulations.  The Contractor shall not deliver Project Water to land outside the

448    Contractor's Service Area unless approved in advance by the Contracting Officer.

449        (d)    All Water Delivered to the Contractor pursuant to this Contract shall

450    be measured and recorded with equipment furnished, installed, operated, and maintained

451    by the Contracting Officer either directly or indirectly through its written agreements(s)

452    with the Operating Non-Federal Entity(ies), unless undertaken by the Contractor with

453    the consent of the Contracting Officer at the point or points of delivery established

454    pursuant to subdivision (a) of this Article.  Upon the request of either party to this

455    Contract, the Contracting Officer shall investigate, or cause to be investigated by the

21

477 (iv) a malfunction of facilities owned and/or operated by the United States or the Operating

478 Non-Federal Entity(ies).

479 MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA

480     6.     (a)     The Contractor has established a measuring program satisfactory to

481 the Contracting Officer. The Contractor shall ensure that all surface water delivered for

482 irrigation purposes within the Contractor's Service Area is measured at each agricultural

483 turnout and such water delivered for M&I purposes is measured at each M&I service

484 connection. The water measuring devices or water measuring methods of comparable

485 effectiveness must be acceptable to the Contracting Officer. The Contractor shall be

486 responsible for installing, operating, maintaining, and repairing all such measuring devices

487 and implementing all such water measuring methods at no cost to the United States. The

488 Contractor shall use the information obtained from such water measuring devices or

489 water measuring methods to ensure its proper management of the water; to bill water users for

490 water delivered by the Contractor; and, if applicable, to record water delivered for M&I

491 purposes by customer class as defined in the Contractor's water conservation plan

492 provided for in Article 25 of this Contract. Nothing herein contained, however, shall

493 preclude the Contractor from establishing and collecting any charges, assessments, or

494 other revenues authorized by California law. The Contractor shall include a summary of

495 all its annual surface water deliveries in the annual report described in subdivision (c) of

496 Article 25 of this Contract.

497     (b)     To the extent the information has not otherwise been provided, upon

498 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

520    (e)    The Contractor shall inform the Contracting Officer and the Operating

521    Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity

522    of Irrigation Water and M&I Water taken during the preceding month.

523    <u>RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED</u>
524    <u>REPAYMENT OF FACILITIES</u>

525    7.    (a)    Notwithstanding the Contractor's full prepayment of the

526    Repayment Obligation pursuant to section 4011, subsection (a)(2)(A) and subsection

527    (a)(3)(A) of the WIIN Act, as set forth in Exhibit "C", and any payments required

528    pursuant to section 4011, subsection (b) of the WIIN Act, to reflect the adjustment for

529    the final cost allocation as described in this Article, subsection (b), the Contractor's

530    Project construction and other obligations shall be determined in accordance with:  (i)

531    the Secretary's ratesetting policy for Irrigation Water adopted in 1988 and the Secretary's

532    then-existing ratesetting policy for M&I Water, consistent with the WIIN Act; and such

533    ratesetting policies shall be amended, modified, or superseded only through a public

534    notice and comment procedure; (ii) applicable Federal Reclamation law and associated

535    rules and regulations, or policies, and (iii) other applicable provisions of this Contract.

536    Payments shall be made by cash transaction, electronic funds transfers, or any other

537    mechanism as may be agreed to in writing by the Contractor and the Contracting Officer.

538    The Rates, Charges, and Tiered Pricing Component applicable to the Contractor upon

539    execution of this Contract are set forth in Exhibit "B", as may be revised annually.

540    (1)    The Contractor shall pay the United States as provided for in this

541    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing

564    first payment date. The final payment shall be made no later than **[Month Day, Year] [no later**

565    **than the third anniversary of the effective date of the contract].** If the installment payment

566    option is elected by the Contractor, the Contractor may pre-pay the remaining portion of the

567    Repayment Obligation by giving the Contracting Officer sixty (60) days written notice, in which

568    case, the Contracting Officer shall re-compute the remaining amount due to reflect the pre-

569    payment using the same methodology as was used to compute the initial annual installment

570    payment amount, which is illustrated in Exhibit "C". Notwithstanding any Additional Capital

571    Obligation that may later be established, receipt of the Contractor's payment of the Repayment

572    Obligation to the United States shall fully and permanently satisfy the Existing Capital

573    Obligation.

574              (B)     Additional Capital Obligations that are not reflected in, the

575    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

576    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

577    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

578    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

579    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

580    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

581    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

582    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

583    established by the Contractor and the Contracting Officer to accomplish repayment of the

584    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

585    WIIN Act, subject to the following:

608         (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

609 and Tiered Pricing Component as follows:

610         (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

611 provide the Contractor an estimate of the Charges for Project Water that will be applied

612 to the period October 1, of the current Calendar Year, through September 30, of the

613 following Calendar Year, and the basis for such estimate. The Contractor shall be

614 allowed not less than two months to review and comment on such estimates. On or

615 before September 15 of each Calendar Year, the Contracting Officer shall notify the

616 Contractor in writing of the Charges to be in effect during the period October 1 of the current

617 Calendar Year, through September 30, of the following Calendar Year, and such

618 notification shall revise Exhibit "B."

619         (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

620 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

621 for Project Water for the following Year and the computations and cost allocations upon which

622 those Rates are based. The Contractor shall be allowed not less than two months to review and

623 comment on such computations and cost allocations. By December 31 of each Calendar Year,

624 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

625 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

626         (d)     At the time the Contractor submits the initial schedule for the delivery of

627 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

628 Contractor shall make an advance payment to the United States equal to the total amount

629 payable pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the

652     subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

653     appropriate Tiered Pricing Component then in effect, before the end of the month following the

654     month of delivery; *Provided, That* the Contractor may be granted an exception from the

655     Tiered Pricing Component pursuant to subdivision (k)(2) of this Article. The payments

656     shall be consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in

657     the water delivery report for the subject month prepared by the Operating Non-Federal

658     Entity(ies) or, if there is no Operating Non-Federal Entity, by the Contracting Officer. The water

659     delivery report shall be deemed a bill for the payment of Charges and the applicable Tiered

660     Pricing Component for Water Delivered. Adjustment for overpayment or underpayment of

661     Charges shall be made through the adjustment of payments due to the United States for Charges

662     for the next month. Any amount to be paid for past due payment of Charges and the Tiered

663     Pricing Component shall be computed pursuant to Article 19 of this Contract.

664          (f)     The Contractor shall pay for any Water Delivered under subdivision

665     (a), (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer

666     pursuant to applicable statutes, associated regulations, any applicable provisions of

667     guidelines or ratesetting policies; *Provided, That* the Rate for Water Delivered under

668     subdivision (f) of Article 3 of this Contract shall be no more than the otherwise

669     applicable Rate for Irrigation Water or M&I Water under subdivision (a) of this Article.

670          (g)     Payments to be made by the Contractor to the United States under this

671     Contract may be paid from any revenues available to the Contractor.

672          (h)     All revenues received by the United States from the Contractor

673     relating to the delivery of Project Water or the delivery of non-Project water through

696 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

697 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

698 Contract Total, shall equal one-half of the difference between the Rate established under

699 subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

700 Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

701 Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

702 the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

703 Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

704 subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

705 Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

706 the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

707         (2)     Subject to the Contracting Officer's written approval, the

708 Contractor may request and receive an exemption from such Tiered Pricing Component for

709 Project Water delivered to produce a crop which the Contracting Officer determines will provide

710 significant and quantifiable habitat values for waterfowl in fields where the water is used and the

711 crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

712 Irrigation Water shall apply only if such habitat values can be assured consistent with the

713 purposes of the CVPIA through binding agreements executed with or approved by the

714 Contracting Officer prior to use of such water.

715         (3)     For purposes of determining the applicability of the Tiered Pricing

716 Component pursuant to this Article, Water Delivered shall include Project Water that the

717 Contractor transfers to others but shall not include Project Water transferred to the Contractor,

33

740 not legally obligated to pay any Project deficits claimed by the United States to have accrued as

741 of the date of this Contract or deficit-related interest charges thereon. By entering into this

742 Contract, the Contractor does not waive any legal rights or remedies that it may have with

743 respect to such disputed issues. Notwithstanding the execution of this Contract and payments

744 made hereunder, the Contractor may challenge in the appropriate administrative or judicial

745 forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

746 term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

747 interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

748 the Rates; (4) the application by the United States of payments made by the Contractor under its

749 Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

750 application of such payments in the Rates. The Contracting Officer agrees that the Contractor

751 shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

752 M&I contractor on any of these issues, and credits for payments heretofore made, provided that

753 the basis for such ruling is applicable to the Contractor.

## NON-INTEREST BEARING O&M DEFICITS

755       8.     The Contractor and the Contracting Officer concur that, as of the Effective Date

756 the Contractor has no non-interest bearing O&M deficits and shall have no further

757 liability therefore.

## SALES, TRANSFERS, OR EXCHANGES OF WATER

759       9.    (a)    The right to receive Project Water provided for in this Contract may be

760 sold, transferred, or exchanged to others for reasonable and beneficial uses within the

761 State of California if such sale, transfer, or exchange is authorized by applicable Federal

35

784   environmental documentation shall include an alternative to evaluate not less than the quantity of

785   Project Water historically transferred within the same geographical area.

786          (c)      For a water transfer to qualify under subdivision (b) of this Article, such

787   water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

788   years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

789   activities, surface water storage, or fish and wildlife resources; not lead to land

790   conversion; and be delivered to established cropland, wildlife refuges, groundwater basins, or

791   M&I use; (ii) occur within a single Year; (iii) occur between a willing seller and a willing

792   buyer; (iv) convey water through existing facilities with no new construction or

793   modifications to facilities and be between existing Project Contractors and/or the Contractor

794   and the United States, Department of the Interior; and (v) comply with all applicable

795   Federal, State, and local or tribal laws and requirements imposed for protection of the

796   environment and Indian Trust Assets, as defined under Federal law.

797                  APPLICATION OF PAYMENTS AND ADJUSTMENTS

798      10.     (a)      The amount of any overpayment by the Contractor of the Contractor's

799   O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

800   liabilities of the Contractor arising out of this Contract then due and payable.

801   Overpayments of more than $1,000 shall be refunded at the Contractor's request. In lieu of a

802   refund, any amount of such overpayment, at the option of the Contractor, may be credited

803   against amounts to become due to the United States by the Contractor. With respect to

804   overpayment, such refund or adjustment shall constitute the sole remedy of the Contractor or

805   anyone having or claiming to have the right to the use of any of the Project Water supply

828 discontinuance or reduction, except in case of emergency, in which case no notice need be

829 given; *Provided,* That the United States shall use its best efforts to avoid any

830 discontinuance or reduction in such service. Upon resumption of service after such

831 discontinuance or reduction, and if requested by the Contractor, the United States will, if

832 possible, deliver the quantity of Project Water which would have been delivered

833 hereunder in the absence of such discontinuance or reduction.

834     (c)    The United States reserves the right to all seepage and return flow

835 water derived from Water Delivered to the Contractor hereunder which escapes or is

836 discharged beyond the Contractor's Service Area; *Provided,* That this shall not be construed

837 as claiming for the United States any right to seepage or return flow being put to

838 reasonable and beneficial use pursuant to this Contract within the Contractor's Service

839 Area by the Contractor or those claiming by, through, or under the Contractor.

## CONSTRAINTS ON THE AVAILABILITY OF WATER

841     12.    (a)    In its operation of the Project, the Contracting Officer will use all
842 reasonable means to guard against a Condition of Shortage in the quantity of Project
843 Water to be made available to the Contractor pursuant to this Contract. In the event the
844 Contracting Officer determines that a Condition of Shortage appears probable, the
845 Contracting Officer will notify the Contractor of said determination as soon as practicable.

846     (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
847 or other similar operational errors affecting the Project; drought and other physical or natural
848 causes beyond the control of the Contracting Officer; or actions taken by the Contracting
849 Officer to meet current and future legal obligations, then, except as provided in subdivision (a) of
850 Article 17 of this Contract, no liability shall accrue against the United States or any of its
851 officers, agents, or employees for any damage, direct or indirect, arising therefrom.

852     (c)    In any Year in which there may occur a Condition of Shortage for any of

853 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

854 Article, the Contracting Officer will first allocate the available Project Water consistent

877 proportionate share and the result shall be the quantity of Project Water made available

878 by the United States to the Contractor for the relevant Year in accordance with the

879 schedule developed by the Contracting Officer under subdivision (c)(1) of this Article 12,

880 but in no event shall such amount exceed the Contract Total.  In the event the

881 Contracting Officer subsequently determines that the Contracting Officer can increase or

882 needs to decrease the available supply for delivery from Delta Division Facilities to

883 long-term water service- and repayment contractors during the relevant Year, such

884 additions or reductions to the available supply shall be apportioned consistent with

885 subparagraphs (1) through (4), inclusive.

886         (d)    By entering into this Contract, the Contractor does not waive any legal

887 rights or remedies it may have to file or participate in any administrative or judicial

888 proceeding contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii)

889 the substance of such a policy; (iii) the applicability of such a policy; or (iv) the manner in

890 which such policy is implemented in order to allocate Project Water between M&I and

891 irrigation purposes; _Provided, That_ the Contractor has commenced any such judicial

892 challenge or any administrative procedures necessary to institute any judicial challenge

893 within six months of the policy becoming final.  By agreeing to the foregoing, the

894 Contracting Officer does not waive any legal defenses or remedies that it may have to

895 assert in such a proceeding.  Nothing contained herein shall be interpreted to validate or

896 invalidate the Project M&I Water Shortage Policy.

897                 UNAVOIDABLE GROUNDWATER PERCOLATION

898     13.    (a)    To the extent applicable, the Contractor shall not be deemed to have

41

928
929

## WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED STATES

930    16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

931 other than from the United States and Irrigation Water furnished pursuant to the terms of

932 this Contract may be simultaneously transported through the same distribution facilities

933 of the Contractor subject to the following: (i) if the facilities utilized for commingling

934 Irrigation Water and non-Project water were constructed without funds made available

935 pursuant to Federal Reclamation law, the provisions of Federal Reclamation law will be

936 applicable only to the Landholders of lands which receive Irrigation Water; (ii) the

937 eligibility of land to receive Irrigation Water must be established through the certification

938 requirements as specified in the Acreage Limitation Rules and Regulations (43 CFR Part

939 426); (iii) the water requirements of Eligible Lands within the Contractor's Service Area

940 can be established and the quantity of Irrigation Water to be utilized is less than or equal to

941 the quantity necessary to irrigate such Eligible Lands; and (iv) if the facilities utilized for

942 commingling Irrigation Water and non-Project water are (were) constructed with funds

943 made available pursuant to Federal Reclamation law, the non-Project water will be

944 subject to the acreage limitation provisions of Federal Reclamation law, unless the

945 Contractor pays to the United States the incremental fee described in 43 CFR 426.15. In

946 determining the incremental fee, the Contracting Officer will calculate annually the cost

947 to the Federal Government, including interest, of storing or delivering non-Project water,

948 which for purposes of this Contract shall be determined as follows: The quotient shall

949 be the unpaid distribution system costs divided by the total irrigable acreage within the

972 superseded from time to time.

973        (2)    Delivery of such non-Project water in and through Project

974 facilities shall only be allowed to the extent such deliveries do not: (i) interfere with

975 other Project purposes as determined by the Contracting Officer; (ii) reduce the quantity or

976 quality of water available to other Project Contractors; (iii) interfere with the delivery of

977 contractual water entitlements to any other Project Contractors; or (iv) interfere with the

978 physical maintenance of the Project facilities.

979        (3)    Neither the United States nor the Operating Non-Federal

980 Entity(ies) shall be responsible for control, care, or distribution of the non-Project water

981 before it is introduced into or after it is delivered from the Project facilities. The

982 Contractor hereby releases and agrees to defend and indemnify the United States and the

983 Operating Non-Federal Entity(ies), and their respective officers, agents, and employees,

984 from any claim for damage to persons or property, direct or indirect, resulting from the

985 act(s) of the Contractor, its officers, employees, agents, or assigns, in (i) extracting or

986 diverting non-Project water from any source, or (ii) diverting such non-Project water into

987 Project facilities.

988        (4)    Diversion of such non-Project water into Project facilities shall

989 be consistent with all applicable laws, and if involving groundwater, consistent with any

990 applicable groundwater management plan for the area from which it was extracted.

991        (5)    After Project purposes are met, as determined by the

992 Contracting Officer, the United States and Project Contractors entitled to Project Water

993 from Delta Division Facilities shall share priority to utilize the remaining capacity of the

45

1016 regulations promulgated by the Secretary. Such determinations shall be made in

1017 consultation with the Contractor to the extent reasonably practicable.

1018 <u>COORDINATION AND COOPERATION</u>

1019     18.   (a)    In order to further their mutual goals and objectives, the Contracting

1020 Officer and the Contractor shall communicate, coordinate, and cooperate with each other,

1021 and with other affected Project Contractors, in order to improve the O&M of the

1022 Project. The communication, coordination, and cooperation regarding O&M shall

1023 include, but not be limited to, any action which will or may materially affect the quantity

1024 or quality of Project Water supply, the allocation of Project Water supply, and Project

1025 financial matters including, but not limited to, budget issues. The communication,

1026 coordination, and cooperation provided for hereunder shall extend to all provisions of

1027 this Contract. Each party shall retain exclusive decision making authority for all actions,

1028 opinions, and determinations to be made by the respective party.

1029       (b)    Within 120 days following the Effective Date, the Contractor, other

1030 affected Project Contractors, and the Contracting Officer shall arrange to meet with

1031 interested Project Contractors to develop a mutually agreeable, written Project-wide

1032 process, which may be amended as necessary separate and apart from this Contract. The

1033 goal of this process shall be to provide, to the extent practicable, the means of mutual

1034 communication and interaction regarding significant decisions concerning Project O&M

1035 on a real-time basis.

1036       (c)    In light of the factors referred to in subdivision (b) of Article 3 of this

1037 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out

47

1058 ## CHARGES FOR DELINQUENT PAYMENTS

1059      19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
1060 charges on delinquent payments. If a payment is not received by the due date, the
1061 Contractor shall pay an interest charge on the delinquent payment for each day the payment
1062 is delinquent beyond the due date. If a payment becomes 60 days delinquent, the
1063 Contractor shall pay, in addition to the interest charge, an administrative charge to
1064 cover additional costs of billing and processing the delinquent payment. If a payment is
1065 delinquent 90 days or more, the Contractor shall pay, in addition to the interest and
1066 administrative charges, a penalty charge for each day the payment is delinquent beyond the
1067 due date, based on the remaining balance of the payment due at the rate of 6 percent per
1068 year. The Contractor shall also pay any fees incurred for debt collection services associated
1069 with a delinquent payment.

1070         (b)    The interest rate charged shall be the greater of either the rate prescribed
1071 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to
1072 overdue payments, or the interest rate of 0.5 percent per month. The interest rate charged
1073 will be determined as of the due date and remain fixed for the duration of the delinquent
1074 period.

1075         (c)    When a partial payment on a delinquent account is received, the amount
1076 received shall be applied first to the penalty charges, second to the administrative charges,
1077 third to the accrued interest, and finally to the overdue payment.

1078 ## EQUAL EMPLOYMENT OPPORTUNITY

1079      20.    During the performance of this Contract, the Contractor agrees as follows:

1080         (a)    The Contractor will not discriminate against any employee or applicant
1081 for employment because of race, color, religion, sex, sexual orientation, gender identity, or
1082 national origin. The Contractor will take affirmative action to ensure that applicants are
1083 employed, and that employees are treated during employment, without regard to their race,
1084 color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall
1085 include, but not be limited to, the following: employment, upgrading, demotion, or
1086 transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other
1087 forms of compensation; and selection for training, including apprenticeship. The Contractor
1088 agrees to post in conspicuous places, available to employees and applicants for employment,
1089 notices to be provided by the Contracting Officer setting forth the provisions of this
1090 nondiscrimination clause.

1091         (b)    The Contractor will, in all solicitations or advertisements for employees
1092 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1093 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1094 gender identity, or national origin.

1134 becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a
1135 result of such direction, the Contractor may request the United States to enter into such
1136 litigation to protect the interests of the United States.

1137     GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1138     21.    (a)    The obligation of the Contractor to pay the United States as provided in
1139 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1140 obligation may be distributed among the Contractor's water users and notwithstanding the default
1141 of individual water users in their obligation to the Contractor.

1142            (b)    The payment of charges becoming due pursuant to this Contract is a
1143 condition precedent to receiving benefits under this Contract. The United States shall not make
1144 water available to the Contractor through Project facilities during any period in which the
1145 Contractor is in arrears in the advance payment of water rates due the United States. The
1146 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1147 parties that are in arrears in the advance payment of water rates as levied or established by the
1148 Contractor.

1149            (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1150 obligation to require advance payment for water rates which it levies.

1151     COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1152     22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1153 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1154 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1155 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1156 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1157 applicable implementing regulations and any guidelines imposed by the U.S.
1158 Department of the Interior and/or Bureau of Reclamation.

1159            (b)    These statutes prohibit any person in the United States from being
1160 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1161 discrimination under any program or activity receiving financial assistance from the Bureau
1162 of Reclamation on the grounds of race, color, national origin, disability, or age. By
1163 executing this Contract, the Contractor agrees to immediately take any measures necessary
1164 to implement this obligation, including permitting officials of the United States to inspect
1165 premises, programs, and documents.

1166            (c)    The Contractor makes this Contract in consideration of and for the
1167 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1168 Federal financial assistance extended after the date hereof to the Contractor by the Bureau

1205 pursuant to 43 C.F.R. § 426.18 unless the requester elects to cite the Privacy Act as an
1206 authority for the request.

1207     (f)    Upon complete payment of the Repayment Obligation by the

1208 Contractor, this Article 23 will no longer be applicable.

1209 <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1210     24.    In addition to all other payments to be made by the Contractor pursuant to this

1211 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill

1212 and detailed statement submitted by the Contracting Officer to the Contractor for such

1213 specific items of direct cost incurred by the United States for work requested by the

1214 Contractor associated with this Contract plus indirect costs in accordance with applicable

1215 Bureau of Reclamation policies and procedures. All such amounts referred to in this

1216 Article shall not exceed the amount agreed to in writing in advance by the Contractor.

1217 This Article shall not apply to costs for routine contract administration.

1218 <u>WATER CONSERVATION</u>

1219     25.   (a)    Prior to the delivery of water provided from or conveyed through
1220 Federally constructed or Federally financed facilities pursuant to this Contract, the
1221 Contractor shall develop a water conservation plan, as required by subsection 210(b) of the
1222 Reclamation Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and
1223 Regulations).

1224 Additionally, an effective water conservation and efficiency program shall be based on the

1225 Contractor's water conservation plan that has been determined by the Contracting Officer to

1226 meet the conservation and efficiency criteria for evaluating water conservation plans

1227 established under Federal law. The water conservation and efficiency program shall

1228 contain definite water conservation objectives, appropriate economically feasible water

1229 conservation measures, and time schedules for meeting those objectives. Continued

1252 management plan to the Contracting Officer for review and evaluation. The Contracting Officer
1253 will then determine if the water conservation plan meets the Bureau of Reclamation's then-
1254 existing conservation and efficiency criteria for evaluating water conservation plans established
1255 under Federal law.

1256         (e)     If the Contractor is engaged in direct groundwater recharge, such activity
1257 shall be described in the Contractor's water conservation plan.

1258 <div align="center">EXISTING OR ACQUIRED WATER OR WATER RIGHTS</div>

1259     26.     Except as specifically provided in Article 16 of this Contract, the provisions
1260 of this Contract shall not be applicable to or affect non-Project water or water rights now owned
1261 or hereafter acquired by the Contractor or any user of such water within the Contractor's Service
1262 Area. Any such water shall not be considered Project Water under this Contract. In addition,
1263 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or
1264 any water user within the Contractor's Service Area acquires or has available under any other
1265 contract pursuant to Federal Reclamation law.

1266 <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1267     27.   (a)     The O&M of a portion of the Project facilities which serve the Contractor,
1268 and responsibility for funding a portion of the costs of such O&M, have been transferred to the
1269 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate
1270 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San
1271 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or
1272 affect the rights or obligations of the Contractor or the United States hereunder.

shall adjust those components of the Rates for Water Delivered under this Contract representing the cost associated with the activity being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, or its successor.

(d)　　In the event the Operation and Maintenance of the Project facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by the United States during the term of this Contract, the Contracting Officer shall so notify the Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include the portion of the Rates to be paid by the Contractor for Project Water under this Contract representing the Operation and Maintenance costs of the portion of such Project facilities which have been re-assumed. The Contractor shall, thereafter, in the absence of written notification from the Contracting Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

## CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS

28.　　The expenditure or advance of any money or the performance of any obligation of the United States under this Contract shall be contingent upon appropriation or allotment of funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any obligations under this Contract. No liability shall accrue to the United States in case funds are not appropriated or allotted.

## BOOKS, RECORDS, AND REPORTS

29.　　(a)　　The Contractor shall establish and maintain accounts and other books and records pertaining to administration of the terms and conditions of this Contract, including the Contractor's financial transactions; water supply data; project operations, maintenance, and replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting Officer may require. Reports shall be furnished to the Contracting Officer in such form and on such date or dates as the Contracting Officer may require. Subject to applicable Federal laws and regulations, each party to this Contract shall have the right during

1347    Project contracts, brings an action in a court of competent jurisdiction challenging the

1348    legality or enforceability of a provision included in this Contract and said person, entity,

1349    association, or organization obtains a final court decision holding that such provision is

1350    legally invalid or unenforceable and the Contractor has not intervened in that lawsuit in

1351    support of the plaintiff(s), the parties to this Contract shall use their best efforts to (i)

1352    within 30 days of the date of such final court decision identify by mutual agreement the

1353    provisions in this Contract which must be revised and (ii) within three months thereafter

1354    promptly agree on the appropriate revision(s). The time periods specified above may be

1355    extended by mutual agreement of the parties. Pending the completion of the actions

1356    designated above, to the extent it can do so without violating any applicable provisions of

1357    law, the United States shall continue to make the quantities of Project Water specified in this

1358    Contract available to the Contractor pursuant to the provisions of this Contract which were not

1359    found to be legally invalid or unenforceable in the final court decision.

1360                                    <u>RESOLUTION OF DISPUTES</u>

1361            32.    Should any dispute arise concerning any provisions of this Contract, or the

1362    parties' rights and obligations thereunder, the parties shall meet and confer in an attempt

1363    to resolve the dispute. Prior to the Contractor commencing any legal action, or the

1364    Contracting Officer referring any matter to the Department of Justice, the party shall

1365    provide to the other party 30 days' written notice of the intent to take such action;

1366    *Provided, That* such notice shall not be required where a delay in commencing an action

1367    would prejudice the interests of the party that intends to file suit. During the 30-day

1368    notice period, the Contractor and the Contracting Officer shall meet and confer in an

1392                    FEDERAL LAWS

1393    35.    By entering into this Contract, the Contractor does not waive its rights to contest

1394    the validity or application in connection with the performance of the terms and

1395    conditions of this Contract of any Federal law or regulation; *Provided. That* the

1396    Contractor agrees to comply with the terms and conditions of this Contract unless and

1397    until relief from application of such Federal law or regulation to the implementing

1398    provision of the Contract is granted by a court of competent jurisdiction.

1399                    RECLAMATION REFORM ACT OF 1982

1400    36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1401    Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1402    Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1403            (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1404    shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1405    the Contractor or the applicability of subsections (a) and (b) of section 213 of the Reclamation

1406    Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1407            CERTIFICATION OF NONSEGREGATED FACILITIES

1408    37.    The Contractor hereby certifies that it does not maintain or provide for its
1409    employees any segregated facilities at any of its establishments and that it does not permit its
1410    employees to perform their services at any location under its control where segregated facilities
1411    are maintained.  It certifies further that it will not maintain or provide for its employees any
1412    segregated facilities at any of its establishments and that it will not permit its employees to
1413    perform their services at any location under its control where segregated facilities are
1414    maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal
1415    Employment Opportunity clause in this Contract.  As used in this certification, the term
1416    "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1417    restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1418    parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1419    facilities provided for employees which are segregated by explicit directive or are in fact

1456 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1457 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1458                                CONFIRMATION OF CONTRACT

1459        41.     Promptly after the execution of this amended Contract, the Contractor will
1460 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1461 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1462 for the authorization of the execution of this amended Contract. This amended Contract shall not
1463 be binding on the United States until the Contractor secures a final decree.

1464

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

Exhibits

Exhibit A – Map of Contractor's Service Area

*This Exhibit is unchanged from current Contract..*

Exhibit B – Rates and Charges

*This Exhibit template is unchanged from current Contract and is updated annually. Rate Schedules may be found at:* https://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

Exhibit C – Repayment Obligation

*This Exhibit template was developed during the WIIN Act Negotiations. Relevant data will be incorporated upon contract execution.*



# Del Puerto Water District

Contract No. 14-06-200-922-LTR1-P

EXHIBIT A

Legend:
- District Boundary
- Contractor's Service Area



Date: 4/1/2020
N:\Districts\Contracts\del_puerto\delpuerto_20200401.mxd



BUREAU OF RECLAMATION

214-202-881

**EXHIBIT B**
**DEL PUERTO WATER DISTRICT**
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $43.99 | |
| DMC Aqueduct Intertie | $1.06 | |
| O&M Components | | |
| Water Marketing | $8.97 | $6.12 |
| Storage | $18.01 | $14.99 |
| Deficit Cost | $0.00 | $0.00 |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $72.03 | $21.11 |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | $106.72 | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | $131.82 | |
| **M&I FULL COST RATE** | | $21.11 |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate*: >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | $17.35 | |
| *Tier 3 Rate*: >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | $34.69 | |
| **M&I** | | |
| *Tier 2 Rate*: >80% <=90% of Contract Total [M&I Full Cost Rate - M&I COS Rate]/2 *(Amount to be Added to Tier 1 Rate)* | | $0.00 |
| *Tier 3 Rate*: >90% of Contract Total [M&I Full Cost Rate - M&I COS Rate] *(Amount to Be Added to Tier 1 Rate)* | | $0.00 |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| P.L. 102-575 Surcharge (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | $21.82 |
| P.L. 106-377 Assessment (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | $0.12 |

**EXPLANATORY NOTES**

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 32 AF; 2011 = 21 AF; 2017 = 8 AF; which equals a M&I Historic use average quantity of 20 AF.

Additional detail of rate components is available on the Internet at:
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

JL 3/20/20

# Exhibit C[@]

## Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

**Unpaid Construction Cost from the 2020 Water Rate Books\***

| | |
|---|---|
| Contractor: | Del Puerto WD |
| Facility: | Delta Mendota Canal |
| Contract: | 14-06-200-922-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba)

| | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 16,546,588 | |
| 2019 Repayment (Estimate) ** | $ | 3,305,770 | |
| Adjusted Construction Cost | $ | 13,240,818 | $ 12,851,579 |
| Intertie Construction Cost (N/A): | $ | 1,588,962 | $ 1,423,126 |
| Total | $ | 14,829,780 | $ 14,274,705 |

| If Paid in Installments (Used 20 yr CMT) | | | |
|---|---|---|---|
| | Due**** | | |
| Payment 1 | 9/1/2020 | $ | 3,613,396 |
| Payment 2 | 9/1/2021 | $ | 3,613,396 |
| Payment 3 | 9/1/2022 | $ | 3,613,396 |
| Payment 4 ~~ | 9/1/2023 | $ | 3,613,396 |
| Total Installment Payments | | $ | 14,453,584 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[#] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 13,240,818 | $ 1,203,711 | $ 1,197,249 | $ 1,588,962 | $ 36,113 | $ 35,919 | $ 1,233,168 |
| 2021 | $ 12,037,107 | $ 1,203,711 | $ 1,191,763 | $ 1,552,849 | $ 36,113 | $ 35,754 | $ 1,227,518 |
| 2022 | $ 10,833,397 | $ 1,203,711 | $ 1,185,834 | $ 1,516,736 | $ 36,113 | $ 35,576 | $ 1,221,411 |
| 2023 | $ 9,629,686 | $ 1,203,711 | $ 1,179,934 | $ 1,480,624 | $ 36,113 | $ 35,399 | $ 1,215,334 |
| 2024 | $ 8,425,975 | $ 1,203,711 | $ 1,174,064 | $ 1,444,511 | $ 36,113 | $ 35,223 | $ 1,209,287 |
| 2025 | $ 7,222,264 | $ 1,203,711 | $ 1,168,223 | $ 1,408,398 | $ 36,113 | $ 35,048 | $ 1,203,271 |
| 2026 | $ 6,018,554 | $ 1,203,711 | $ 1,162,411 | $ 1,372,285 | $ 36,113 | $ 34,874 | $ 1,197,285 |
| 2027 | $ 4,814,843 | $ 1,203,711 | $ 1,156,628 | $ 1,336,173 | $ 36,113 | $ 34,700 | $ 1,191,328 |
| 2028 | $ 3,611,132 | $ 1,203,711 | $ 1,150,873 | $ 1,300,060 | $ 36,113 | $ 34,528 | $ 1,185,401 |
| 2029 | $ 2,407,421 | $ 1,203,711 | $ 1,145,148 | $ 1,263,947 | $ 36,113 | $ 34,356 | $ 1,179,504 |
| 2030 | $ 1,203,711 | $ 1,203,711 | $ 1,139,450 | $ 1,227,834 | $ 36,113 | $ 34,185 | $ 1,173,635 |
| 2031-63 | | | | $ 1,191,722 | $ 1,191,722 | $ 1,037,563 | $ 1,037,563 |
| Total, Lump Sum Payment | | | $ 12,851,579 | | | $ 1,423,126 | $ 14,274,705 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amount of Reduction, Lump Sum | | $ 389,240 | | | $ 165,836 | $ 555,075 |

* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

****Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[#]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

EXHIBIT "B"
NOTICE OF EXEMPTION

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 8 |
| 2. | Term of Contract – Right to Use of Water | 13 |
| 3. | Water to be Made Available and Delivered to the Contractor | 15 |
| 4. | Time for Delivery of Water | 19 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 21 |
| 6. | Measurement of Water Within the Contractor's Service Area | 23 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 25 |
| 8. | Non-Interest Bearing O&M Deficits | 35 |
| 9. | Sales, Transfers, or Exchanges of Water | 35 |
| 10. | Application of Payments and Adjustments | 37 |
| 11. | Temporary Reductions – Return Flows | 38 |
| 12. | Constraints on the Availability of Water | 39 |
| 13. | Unavoidable Groundwater Percolation | 41 |
| 14. | Compliance with Federal Reclamation Laws | 42 |
| 15. | Protection of Water and Air Quality | 42 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 43 |
| 17. | Opinions and Determinations | 46 |
| 18. | Coordination and Cooperation | 47 |
| 19. | Charges for Delinquent Payments | 49 |
| 20. | Equal Employment Opportunity | 49 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 51 |
| 22. | Compliance with Civil Rights Laws and Regulations | 51 |
| 23. | Privacy Act Compliance | 52 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 53 |
| 25. | Water Conservation | 53 |
| 26. | Existing or Acquired Water or Water Rights | 55 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 55 |
| 28. | Contingent on Appropriation or Allotment of Funds | 57 |
| 29. | Books, Records, and Reports | 57 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 58 |
| 31. | Severability | 58 |
| 32. | Resolution of Disputes | 59 |
| 33. | Officials Not to Benefit | 60 |
| 34. | Changes in Contractor's Organization and/or Service Area | 60 |
| 35. | Federal Laws | 61 |
| 36. | Reclamation Reform Act of 1982 | 61 |
| 37. | Certification of Nonsegregated Facilities | 61 |
| 38. | Notices | 62 |
| 39. | Medium for Transmitting Payment | 62 |
| 40. | Contract Drafting Considerations | 62 |
| 41. | Confirmation of Contract | 63 |
| | Signature Page | 64 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1    THIS CONTRACT, made this ___ day of _____, 20XX, in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and DEL PUERTO WATER

12   DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13   duly organized, existing, and acting pursuant to the laws thereof;

14   WITNESSETH, That:

## EXPLANATORY RECITALS

[1st]    WHEREAS, the United States has constructed and is operating the California Central Valley Project (Project), for diversion, storage, carriage, distribution, and beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife mitigation, protection and restoration, generation and distribution of electric energy, salinity control, navigation, and other beneficial uses, of waters of the Sacramento River, the American River, the Trinity River, and the San Joaquin River and their tributaries; and

[2nd]    WHEREAS, the United States constructed the Delta-Mendota Canal and related facilities, which will be used in part for the furnishing of water to the Contractor pursuant to the terms of this Contract; and

[3rd]    WHEREAS, the rights to Project Water were acquired by the United States pursuant to California law for operation of the Project; and

[4th]    WHEREAS, the United States and the Contractor entered into Contract No. 14-06-200-922, as amended, which established terms for the delivery to the Contractor of Project Water from the Delta Division facilities from June 10, 1953, though February 28, 1994; and

[5th]    WHEREAS, the United States and the following water districts entered into long-term water service contracts, which provided those districts Project Water from the Delta Division through the date of contract expiration listed below:

| District | Contract No. | Execution Date | Expiration Date |
|---|---|---|---|
| Davis Water District | 14-06-200-1458 | 10/03/53 | 02/28/94 |

| | | | |
|---|---|---|---|
| 37 | Hospital Water District | 14-06-200-923 | 06/10/53 | 02/28/94 |
| 38 | Kem Canon Water District | 14-06-200-924 | 06/10/53 | 02/28/94 |
| 39 | Salada Water District | 14-06-200-925 | 06/10/53 | 02/28/94 |
| 40 | Sunflower Water District | 14-06-200-1804 | 11/12/53 | 02/28/94 |
| 41 | Mustang Water District | 14-06-200-8103 | 12/07/59 | 02/28/95 |
| 42 | Orestimba Water District | 14-06-200-8091 | 11/27/59 | 02/28/95 |
| 43 | Quinto Water District | 14-06-200-8899 | 01/24/61 | 02/28/95 |
| 44 | Romero Water District | 14-06-200-7758 | 05/11/59 | 02/28/95 |
| 45 | Foothill Water District | 14-06-200-4323 | 05/31/55 | 02/29/96 |

46 ; and

47       [6th]    WHEREAS, the long-term water service contracts between the United

48 States and Davis, Del Puerto, Hospital, Kern Canon, Salada, and Sunflower Water Districts

49 provided for water service through February 28, 1994, and for which one-year interim renewal

50 contracts were entered into providing for continued water service through February 28, 1995;

51 and

52       [7th]    WHEREAS, all ten water districts including Davis, Foothill, Hospital,

53 Kern Canon, Mustang, Orestimba, Quinto, Romero, Salada, and Sunflower Water Districts were

54 assigned to the Contractor by separate "Assignments of Water Service Contract", dated February

55 13, 1995; and

56       [8th]    WHEREAS, the Contractor and the United States entered into the interim

57 renewal contract identified as Contract No. 14-06-200-922-IR2, which consolidated all of the

58 Water Districts that were assigned to the Contractor, except Foothill Water District, and provided

59 for the continued water service from March 1, 1995, through February 28, 1997; and

60       [9th]    WHEREAS, the long-term water service contract between Foothill Water

61 District (Foothill) and the United States identified as Contract No. 14-06-200-4323, that was

62 assigned to the Contractor, provided for water service through February 28, 1996, and for which

3

63     a one-year interim renewal contract identified as Contract No. 14-06-200-4323-IR1, provided

64     water service from March 1, 1996, through February 28, 1997; and

65             [10th]   WHEREAS, the Contractor requested subsequent renewal and

66     consolidation of Contract No(s). 14-06-200-922-IR2 and 14-06-200-4323-IR1 pursuant to,

67     Federal Reclamation law, and the laws of the State of California, for water service from the

68     Central Valley Project; and

69             [11th]   WHEREAS, the United States and the Contractor have pursuant to

70     Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA),

71     subsequently entered into interim renewal contract(s) identified as Contract No. 14-06-

72     200-922-IR3 and subsequent Interim Renewal Contracts 14-06-200-922-IR4 through 14-06-

73     200-922-IR10, which provided for water service to the Contractor from March 1, 1997

74     through February 28, 2006; and

75             [12th]   WHEREAS, the United States and the Contractor entered into a long-term

76     contract identified as Contract No. 14-06-200-922-LTR1, hereinafter referred to as the Existing

77     Contract, which provided for the continued water service to the Contractor following expiration

78     of Contract No. 14-06-200-922-IR10, and which was in effect the date the WIIN Act was

79     enacted; and

80             [13th]   WHEREAS, on December 16, 2016, the 114th Congress of the United

81     States of America enacted the WIIN Act; and

82             [14th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

83     contractor, the Secretary of the Interior shall convert any water service contract in effect on the

84     date of enactment of this subtitle and between the United States and a water users' association

85    [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

86    mutually agreeable terms and conditions."; and

87            [15th]  WHEREAS, Section 4011(a)(1) further provides that "the manner of

88    conversion under this paragraph shall be as follows:  (A) Water service contracts that were

89    entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

90    this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

91    1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

92    of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

93    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

94            [16th]  WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

95    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

96    repayment, exchange and transfer contractual rights between the water users' association

97    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

98    water users' association [Contractor] and their landowners as provided under State law."; and

99            [17th]  WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

100    "implementation of the provisions of this subtitle shall not alter...(3) the priority of a water

101    service or repayment contractor to receive water; or (4) except as expressly provided in this

102    section, any obligations under the Federal Reclamation law, including the continuation of

103    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

104    repayment contractors making prepayments pursuant to this section."; and

105           [18th]  WHEREAS, upon the request of the Contractor, the WIIN Act directs the

106    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

5

107   service contracts into repayment contracts, amend existing repayment contracts, and allow

108   contractors to prepay their construction cost obligations pursuant to applicable Federal

109   Reclamation law; and

110          [19th] WHEREAS, the United States has determined that the Contractor

111   has fulfilled all of its obligations under the Existing Contract; and

112          [20th] WHEREAS, the Contractor has demonstrated to the satisfaction of the

113   Contracting Officer that the Contractor has utilized the Project Water supplies available

114   to it for reasonable and beneficial use and/or has demonstrated future demand for water

115   use such that the Contractor has the capability and expects to utilize fully for reasonable

116   and beneficial use the quantity of Project Water to be made available to it pursuant to

117   this Contract; and

118          [21st] WHEREAS, water obtained from the Project has been relied upon by

119   urban and agricultural areas within California for more than 50 years, and is considered

120   by the Contractor as an essential portion of its water supply; and

121          [22nd] WHEREAS, the economies of regions within the Project, including the

122   Contractor's, depend upon the continued availability of water, including water service

123   from the Project; and

124          [23rd] WHEREAS, the Secretary intends through coordination, cooperation, and

125   partnerships to pursue measures to improve water supply, water quality, and reliability of the

126   Project for all Project purposes; and

127          [24th] WHEREAS, the mutual goals of the United States and the Contractor

128   include: to provide for reliable Project Water supplies; to control costs of those supplies;

129    to achieve repayment of the Project as required by law; to guard reasonably against Project

130    Water shortages; to achieve a reasonable balance among competing demands for use of

131    Project Water; and to comply with all applicable environmental statutes, all consistent with

132    the legal obligations of the United States relative to the Project; and

133               [25th] WHEREAS, the parties intend by this Contract to maintain a cooperative

134    relationship in order to achieve their mutual goals; and

135               [26th] WHEREAS, the Contractor has utilized or may utilize transfers, contract

136    assignments, rescheduling, and conveyance of Project Water and non-Project water under this

137    Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

138    beneficial use of water; and

139               [27th] WHEREAS, the parties desire and intend that this Contract not provide a

140    disincentive to the Contractor in continuing to carry out the beneficial activities set out in

141    the Explanatory Recital immediately above; and

142               [28th] WHEREAS, the Contracting Officer and the Contractor agree that this

143    Contract complies with Section 4011 of the WIIN Act; and

144               [29th] WHEREAS, the Contracting Officer and the Contractor agree to amend

145    and convert the Existing Contract pursuant to section 4011 of the WIIN Act and other Federal

146    Reclamation law on the terms and conditions set forth below;

147               NOW, THEREFORE, in consideration of the mutual and dependent covenants

148    herein contained, it is hereby mutually agreed by the parties hereto as follows:

<div align="center">

DEFINITIONS

</div>

149

150     1.     When used herein unless otherwise distinctly expressed, or manifestly

151 incompatible with the intent of the parties as expressed in this Contract, the term:

152         (a)     "Additional Capital Obligation" shall mean construction costs or other

153 capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

154 Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

155 (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

156 Stat. 1628) ("WIIN Act");

157         (b)     "Calendar Year" shall mean the period January 1 through December 31,

158 both dates inclusive;

159         (c)     "Charges" shall mean the payments required by Federal Reclamation law

160 in addition to the Rates and Tiered Pricing Component specified in this Contract as

161 determined annually by the Contracting Officer pursuant to this Contract;

162         (d)     "Condition of Shortage" shall mean a condition respecting the Project

163 during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

164 Contract Total;

165         (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

166 authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

167 or regulation;

168         (f)     "Contract Total" shall mean the maximum amount of water to which the

169 Contractor is entitled under subdivision (a) of Article 3 of this Contract;

170   (g)   "Contractor's Service Area" shall mean the area to which the Contractor is

171   permitted to provide Project Water under this Contract as described in Exhibit "A"

172   attached hereto, which may be modified from time to time in accordance with Article 34

173   of this Contract without amendment of this Contract;

174   (h)   "CVPIA" shall mean the Central Valley Project Improvement Act, Title

175   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

176   (i)   "Delta Division Facilities" shall mean those existing and future Project

177   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not

178   limited to, the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill

179   Pumping/Generating Plant, and the San Luis Reservoir, used to divert, store, and convey

180   water to those Project Contractors entitled to receive water conveyed through the Delta-

181   Mendota Canal;

182   (j)   "Eligible Lands" shall mean all lands to which Irrigation Water may be

183   delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

184   1263), as amended;

185   (k)   "Excess Lands" shall mean all lands in excess of the limitations

186   contained in Section 204 of the Reclamation Reform Act of 1982, other than those lands

187   exempt from acreage limitation under Federal Reclamation law;

188   (l)   "Existing Capital Obligation" shall mean the remaining amount of

189   construction costs or other capitalized costs allocable to the Contractor as described in section

190   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

191   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

192 dated Month/Day/Year **[specify ratebook year for all contractors.] [contractor specific to**

193 **address the intertie]**, as adjusted to reflect payments not reflected in such schedule. The

194 Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

195 Exhibit "C", which is incorporated herein by reference;

196         (m)   "Full Cost Rate" shall mean an annual rate, as determined by the

197 Contracting Officer that shall amortize the expenditures for construction properly

198 allocable to the Project irrigation or M&I functions, as appropriate, of facilities in

199 service including all O&M deficits funded, less payments, over such periods as may be

200 required under Federal Reclamation law, or applicable contract provisions. Interest will

201 accrue on both the construction expenditures and funded O&M deficits from October 12,

202 1982, on costs outstanding at that date, or from the date incurred in the case of costs

203 arising subsequent to October 12 1982, and shall be calculated in accordance with

204 subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982. The Full Cost

205 Rate includes actual operation, maintenance, and replacement costs consistent with

206 Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

207         (n)   "Ineligible Lands" shall mean all lands to which Irrigation Water may

208 not be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

209         (o)   "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate

210 applicable to the delivery of Irrigation Water;

211         (p)   "Irrigation Water" shall mean the use of Project Water to irrigate
212 lands primarily for the production of commercial agricultural crops or livestock, and
213 domestic and other uses that are incidental thereto;

214         (q)    "Landholder" shall mean a party that directly or indirectly owns or

215   leases nonexempt land, as provided in 43 CFR 426.2;

216         (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
217   Water for municipal, industrial, and miscellaneous other purposes not falling under the
218   definition of "Irrigation Water" or within another category of water use under an
219   applicable Federal authority;

220         (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate

221   applicable to the delivery of M&I Water;

222         (t)    "Operation and Maintenance" or "O&M" shall mean normal and

223   reasonable care, control, operation, repair, replacement (other than capital replacement),

224   and maintenance of Project facilities;

225         (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

226   successors or assigns, which has (have) the obligation to operate and maintain all or a

227   portion of the Delta Division Facilities pursuant to written agreement(s) with the United

228   States. When this Contract was entered into, the Operating Non-Federal Entity was the

229   San Luis & Delta-Mendota Water Authority;

230         (v)    "Project" shall mean the Central Valley Project owned by the United

231   States and managed by the Department of the Interior, Bureau of Reclamation;

232         (w)    "Project Contractors" shall mean all parties who have contracts for

233   water service for Project Water from the Project with the United States pursuant to Federal

234   Reclamation law;

235         (x)    "Project Water" shall mean all water that is developed, diverted,

236   stored, or delivered by the Secretary in accordance with the statutes authorizing the

237 Project and in accordance with the terms and conditions of water rights acquired

238 pursuant to California law;

239       (y)   "Rates" shall mean the payments determined annually by the

240 Contracting Officer in accordance with the then-current applicable water ratesetting

241 policies for the Project, as described in subdivision (a) of Article 7 of this Contract;

242       (z)   "Recent Historic Average" shall mean the most recent five (5)-year

243 average of the final forecast of Water Made Available to the Contractor pursuant to this

244 Contract or its preceding contract(s);

245       (aa)   "Repayment Obligation" for Water Delivered as Irrigation Water shall

246 mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

247 amount due and payable to the United States, pursuant to section 4011(a)(2)(A) of the WIIN Act;

248 and for Water Delivered as M&I Water shall mean the amount due and payable to the United

249 States, pursuant to section 4011(a)(3)(A) of the WIIN Act;

250       (bb)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

251 successor, or an authorized representative acting pursuant to any authority of the

252 Secretary and through any agency of the Department of the Interior;

253       (cc)   "Tiered Pricing Component" shall be the incremental amount to be

254 paid for each acre-foot of Water Delivered as described in Article 7 of this Contract and

255 as provided for in Exhibit "B";

256       (dd)   "Water Delivered" or "Delivered Water" shall mean Project Water

257 diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

258 Officer;

259            (ee)    "Water Made Available" shall mean the estimated amount of

260 Project Water that can be delivered to the Contractor for the upcoming Year as declared

261 by the Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

262            (ff)    "Water Scheduled" shall mean Project Water made available to the

263 Contractor for which times and quantities for delivery have been established by the

264 Contractor and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract;

265 and

266            (gg)    "Year" shall mean the period from and including March 1 of each

267 Calendar Year through the last day of February of the following Calendar Year.

268 <div align="center">TERM OF CONTRACT – RIGHT TO USE OF WATER</div>

269    2.    (a)    This Contract shall be effective [Effective Date], hereinafter known as the

270 "Effective Date", and shall continue so long as the Contractor pays applicable Rates and Charges

271 under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat.

272 1195) as applicable, and applicable law;

273            (1)    *Provided, That* the Contracting Officer shall not seek to terminate

274 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

275 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

276 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

277 or to diligently commence and maintain full curative payments satisfactory to the Contracting

278 Officer within the sixty (60) calendar days' notice period;

279            (2)    *Provided, further, That* the Contracting Officer shall not seek to

280 suspend making water available or declaring Water Made Available pursuant to this Contract for

<div align="center">13</div>

281  non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

282  Contracting Officer has first provided at least thirty (30) calendar days written notice to the

283  Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

284  curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

285  cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

286  suspended making water available pursuant to this paragraph, upon cure of such non-compliance

287  satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

288  available and declaring Water Made Available pursuant to this Contract;

289          (3)    *Provided, further, That* this Contract may be terminated at any

290  time by mutual consent of the parties hereto.

291       (b)    Upon complete payment of the Repayment Obligation by the Contractor,

292  and notwithstanding any Additional Capital Obligation that may later be established, the acreage

293  limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

294  and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

295  this Contract shall no longer be applicable.

296       (c)    Notwithstanding any provision of this Contract, the Contractor reserves

297  and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

298  allowed by law.

299       (d)    Notwithstanding any provision of this Contract, the Contractor reserves

300  and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

301  allowed by law.

302    WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR

303    3.    (a)    During each Year, consistent with all applicable State water rights

304    permits, and licenses, Federal law, and subject to the provisions set forth in Articles 11 and

305    12 of this Contract, the Contracting Officer shall make available for delivery to the

306    Contractor 140,210 acre-feet of Project Water for irrigation and M&I purposes.  Water

307    Delivered to the Contractor in accordance with this subdivision shall be scheduled and

308    paid for pursuant to the provisions of Articles 4 and 7 of this Contract.

309         (b)    Because the capacity of the Project to deliver Project Water has been

310    constrained in recent years and may be constrained in the future due to many factors

311    including hydrologic conditions and implementation of Federal and State laws, the

312    likelihood of the Contractor actually receiving the amount of Project Water set out in

313    subdivision (a) of this Article in any given Year is uncertain.  The Contracting Officer's

314    modeling referenced in the programmatic environmental impact statement prepared

315    pursuant to Section 3404(c) of the CVPIA projected that the Contract Total set forth in

316    this Contract will not be available to the Contractor in many years.  During the most recent five

317    years prior to execution of the Existing Contract, the Recent Historic Average Water Made

318    Available to the Contractor was 92,258 acre-feet.  Nothing in this subdivision (b) of this Article

319    shall affect the rights and obligations of the parties under any provision of this Contract.

320         (c)    The Contractor shall utilize the Project Water in accordance with all

321    applicable legal requirements.

322              (1)    In the event any Project Contractor (other than a Cross Valley

323    Contractor) that receives Project Water through the Delta Division Facilities obtains a

15

324    contractual agreement that the Contracting Officer shall make Project Water available at

325    a point or points of delivery in or north of the Delta, at the request of the Contractor and

326    upon completion of any required environmental documentation, this Contract shall be

327    amended to provide for deliveries in or north of the Delta on mutually agreeable terms.

328    Such amendments to this Contract shall be limited solely to those changes made necessary by

329    the addition of such alternate points of delivery in or north of the Delta; *Provided, That*

330    the Contracting Officer's use of the Harvey O. Banks Pumping Plant to deliver Project

331    Water does not trigger this right of amendment.

332            (d)     The Contractor shall make reasonable and beneficial use of all water

333    furnished pursuant to this Contract.  Groundwater recharge programs (direct, indirect, or

334    in lieu), groundwater banking programs, surface water storage programs, and other

335    similar programs utilizing Project Water or other water furnished pursuant to this

336    Contract conducted within the Contractor's Service Area which are consistent with

337    applicable State law and result in use consistent with Federal Reclamation law will be

338    allowed; *Provided, That* any direct recharge program(s) is (are) described in the

339    Contractor's water conservation plan submitted pursuant to Article 25 of this Contract;

340    *Provided, further, That* such water conservation plan demonstrates sufficient lawful uses

341    exist in the Contractor's Service Area so that using a long-term average, the quantity of

342    Delivered Water is demonstrated to be reasonable for such uses and in compliance with

343    Federal Reclamation law.  Groundwater recharge programs, groundwater banking

344    programs, surface water storage programs, and other similar programs utilizing Project

345    Water or other water furnished pursuant to this Contract conducted outside the

346 Contractor's Service Area may be permitted upon written approval of the Contracting

347 Officer, which approval will be based upon environmental documentation, Project Water

348 rights, and Project operational concerns. The Contracting Officer will address such

349 concerns in regulations, policies, or guidelines.

350         (e)     The Contractor shall comply with requirements applicable to the

351 Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

352 of any water service contract between the Contracting Officer and the Contractor in effect

353 immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

354 Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

355 implement. The Existing Contract, which evidences in excess of 51 years of diversions for

356 irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

357 Article 3 of this Contract, will be considered in developing an appropriate baseline for any

358 required biological assessment(s) prepared pursuant to the ESA, and any other needed

359 environmental review. Nothing herein shall be construed to prevent the Contractor from

360 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

361 biological opinion or other environmental documentation referred to in this Article.

362         (f)     Following the declaration of Water Made Available under Article 4 of

363 this Contract, the Contracting Officer will make a determination whether Project Water, or

364 other water available to the Project, can be made available to the Contractor in addition to

365 the Contract Total under this Article during the Year without adversely impacting other

366 Project Contractors. At the request of the Contractor, the Contracting Officer will

367 consult with the Contractor prior to making such a determination. If the Contracting

17

368 Officer determines that Project Water, or other water available to the Project, can be

369 made available to the Contractor, the Contracting Officer will announce the availability of

370 such water and shall so notify the Contractor as soon as practical. The Contracting

371 Officer will thereafter meet with the Contractor and other Project Contractors capable of

372 taking such water to determine the most equitable and efficient allocation of such water.

373 If the Contractor requests the delivery of any quantity of such water, the Contracting

374 Officer shall make such water available to the Contractor in accordance with applicable

375 statutes, regulations, guidelines, and policies. Subject to existing long-term contractual

376 commitments, water rights, and operational constraints, long-term Project Contractors shall

377 have a first right to acquire such water, including Project Water made available pursuant

378 to Section 215 of the Reclamation Reform Act of 1982.

379 (g) The Contractor may request permission to reschedule for use during

380 the subsequent Year some or all of the Water Made Available to the Contractor during

381 the current Year, referred to as "rescheduled water." The Contractor may request

382 permission to use during the current Year a quantity of Project Water which may be

383 made available by the United States to the Contractor during the subsequent Year referred

384 to as "preuse." The Contracting Officer's written approval may permit such uses in

385 accordance with applicable statutes, regulations, guidelines, and policies.

386 (h) The Contractor's right pursuant to Federal Reclamation law and

387 applicable State law to the reasonable and beneficial use of the Water Delivered pursuant to

388 this Contract shall not be disturbed, and this Contract shall continue so long as the

389 Contractor pays applicable Rates and Charges under this Contract consistent with Section

390   9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat. 1195) as applicable, and applicable

391   law. Nothing in the preceding sentence shall affect the Contracting Officer's ability to impose

392   shortages under Article 11 or subdivision (b) of Article 12 of this Contract.

393         (i)     Project Water furnished to the Contractor pursuant to this Contract

394   may be delivered for purposes other than those described in subdivisions (p) and (r) of

395   Article 1 of this Contract upon written approval by the Contracting Officer in

396   accordance with the terms and conditions of such approval.

397         (j)     The Contracting Officer shall make reasonable efforts to protect the

398   water rights necessary for the Project and to provide the water available under this Contract.

399   The Contracting Officer shall not object to participation by the Contractor, in the capacity

400   and to the extent permitted by law, in administrative proceedings related to the Project

401   Water rights; *Provided. That* the Contracting Officer retains the right to object to the

402   substance of the Contractor's position in such a proceeding; *Provided, further, That* in

403   such proceedings the Contracting Officer shall recognize the Contractor has a legal right

404   under the terms of this Contract to use Project Water.

405                  TIME FOR DELIVERY OF WATER

406   4.    (a)     On or about February 20 each Calendar Year, the Contracting Officer

407   shall announce the Contracting Officer's expected declaration of the Water Made

408   Available. Such declaration will be expressed in terms of Water Made Available and

409   the Recent Historic Average and will be updated monthly, and more frequently if

410   necessary, based on the then-current operational and hydrologic conditions and a new

411   declaration with changes, if any, to the Water Made Available will be made. The

412  Contracting Officer shall provide forecasts of Project operations and the basis of the

413  estimate, with relevant supporting information, upon the written request of the

414  Contractor.  Concurrently with the declaration of the Water Made Available, the

415  Contracting Officer shall provide the Contractor with the updated Recent Historic

416  Average.

417        (b)     On or before each March 1 and at such other times as necessary, the

418  Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

419  Contracting Officer, showing the monthly quantities of Project Water to be delivered by

420  the United States to the Contractor pursuant to this Contract for the Year commencing

421  on such March 1.  The Contracting Officer shall use all reasonable means to deliver

422  Project Water according to the approved schedule for the Year commencing on such

423  March 1.

424        (c)     The Contractor shall not schedule Project Water in excess of the

425  quantity of Project Water the Contractor intends to put to reasonable and beneficial use

426  within the Contractor's Service Area or to sell, transfer, or exchange pursuant to Article

427  9 of this Contract during any Year.

428        (d)     Subject to the conditions set forth in subdivision (a) of Article 3 of this

429  Contract, the United States shall deliver Project Water to the Contractor in accordance

430  with the initial schedule submitted by the Contractor pursuant to subdivision (b) of this

431  Article, or any written revision(s) thereto satisfactory to the Contracting Officer, submitted

432  within a reasonable time prior to the date(s) on which the requested change(s) is‡are‡ to

433  be implemented.

434     <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

435     5.     (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

436   Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota

437   Canal and any additional point or points of delivery either on Project facilities or another

438   location or locations mutually agreed to in writing by the Contracting Officer and the

439   Contractor.

440     (b)     The Contracting Officer, either directly or indirectly through its

441   written agreements(s) with the Operating Non-Federal Entity(ies), shall make all

442   reasonable efforts to maintain sufficient flows and levels of water in the Project facilities

443   to deliver Project Water to the Contractor at the point or points of delivery established

444   pursuant to subdivision (a) of this Article.

445     (c)     The Contractor shall deliver Irrigation Water in accordance with any

446   applicable land classification provisions of Federal Reclamation law and the associated

447   regulations. The Contractor shall not deliver Project Water to land outside the

448   Contractor's Service Area unless approved in advance by the Contracting Officer.

449     (d)     All Water Delivered to the Contractor pursuant to this Contract shall

450   be measured and recorded with equipment furnished, installed, operated, and maintained

451   by the Contracting Officer either directly or indirectly through its written agreements(s)

452   with the Operating Non-Federal Entity(ies), unless undertaken by the Contractor with

453   the consent of the Contracting Officer at the point or points of delivery established

454   pursuant to subdivision (a) of this Article. Upon the request of either party to this

455   Contract, the Contracting Officer shall investigate, or cause to be investigated by the

456 appropriate Operating Non-Federal Entity(ies), the accuracy of such measurements and

457 shall take any necessary steps to adjust any errors appearing therein. For any period of

458 time when accurate measurements have not been made, the Contracting Officer shall

459 consult with the Contractor and the appropriate Operating Non-Federal Entity(ies), if any,

460 prior to making a final determination of the quantity delivered for that period of time.

461      (e)    Absent a separate contrary written agreement with the Contractor,

462 neither the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be

463 responsible for the control, carriage, handling, use, disposal, or distribution of Water

464 Delivered to the Contractor pursuant to this Contract beyond the point or points of

465 delivery established pursuant to subdivision (a) of this Article. The Contractor shall

466 indemnify the United States, its officers, employees, agents, and assigns on account of

467 damage or claim of damage of any nature whatsoever for which there is legal

468 responsibility, including property damage, personal injury, or death arising out of or

469 connected with the control, carriage, handling, use, disposal, or distribution of such Water

470 Delivered beyond such point or points of delivery except for any damage or claim arising

471 out of: (i) acts or omissions of the Contracting Officer or any of its officers, employees,

472 agents, and assigns, including the Operating Non-Federal Entity(ies) with the intent of

473 creating the situation resulting in any damage or claim; (ii) willful misconduct of the

474 Contracting Officer or any of its officers, employees, agents, and assigns, including the

475 Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

476 officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or

477 (iv) a malfunction of facilities owned and/or operated by the United States or the Operating

478 Non-Federal Entity(ies).

479 MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA

480     6.     (a)     The Contractor has established a measuring program satisfactory to

481 the Contracting Officer. The Contractor shall ensure that all surface water delivered for

482 irrigation purposes within the Contractor's Service Area is measured at each agricultural

483 turnout and such water delivered for M&I purposes is measured at each M&I service

484 connection. The water measuring devices or water measuring methods of comparable

485 effectiveness must be acceptable to the Contracting Officer. The Contractor shall be

486 responsible for installing, operating, maintaining, and repairing all such measuring devices

487 and implementing all such water measuring methods at no cost to the United States. The

488 Contractor shall use the information obtained from such water measuring devices or

489 water measuring methods to ensure its proper management of the water; to bill water users for

490 water delivered by the Contractor; and, if applicable, to record water delivered for M&I

491 purposes by customer class as defined in the Contractor's water conservation plan

492 provided for in Article 25 of this Contract. Nothing herein contained, however, shall

493 preclude the Contractor from establishing and collecting any charges, assessments, or

494 other revenues authorized by California law. The Contractor shall include a summary of

495 all its annual surface water deliveries in the annual report described in subdivision (c) of

496 Article 25 of this Contract.

497     (b)     To the extent the information has not otherwise been provided, upon

498 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

499 report describing the measurement devices or water measuring methods being used or to

500 be used to implement subdivision (a) of this Article and identifying the agricultural

501 turnouts and the M&I service connections or alternative measurement programs

502 approved by the Contracting Officer, at which such measurement devices or water

503 measuring methods are being used, and, if applicable, identifying the locations at which

504 such devices and/or methods are not yet being used including a time schedule for

505 implementation at such locations. The Contracting Officer shall advise the Contractor

506 in writing within 60 days as to the adequacy and necessary modifications, if any, of the

507 measuring devices or water measuring methods identified in the Contractor's report and

508 if the Contracting Officer does not respond in such time, they shall be deemed adequate.

509 If the Contracting Officer notifies the Contractor that the measuring devices or methods

510 are inadequate, the parties shall within 60 days following the Contracting Officer's

511 response, negotiate in good faith the earliest practicable date by which the Contractor shall

512 modify said measuring devices and/or measuring methods as required by the Contracting

513 Officer to ensure compliance with subdivision (a) of this Article.

514      (c)    All new surface water delivery systems installed within the Contractor's

515 Service Area after the Effective Date shall also comply with the measurement

516 provisions described in subdivision (a) of this Article.

517      (d)    The Contractor shall inform the Contracting Officer and the State of

518 California in writing by April 30 of each Year of the monthly volume of surface water

519 delivered within the Contractor's Service Area during the previous Year.

520         (e)     The Contractor shall inform the Contracting Officer and the Operating

521 Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity

522 of Irrigation Water and M&I Water taken during the preceding month.

523                 RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
524                             REPAYMENT OF FACILITIES

525     7.     (a)     Notwithstanding the Contractor's full prepayment of the

526 Repayment Obligation pursuant to section 4011, subsection (a)(2)(A) and subsection

527 (a)(3)(A) of the WIIN Act, as set forth in Exhibit "C", and any payments required

528 pursuant to section 4011, subsection (b) of the WIIN Act, to reflect the adjustment for

529 the final cost allocation as described in this Article, subsection (b), the Contractor's

530 Project construction and other obligations shall be determined in accordance with: (i)

531 the Secretary's ratesetting policy for Irrigation Water adopted in 1988 and the Secretary's

532 then-existing ratesetting policy for M&I Water, consistent with the WIIN Act; and such

533 ratesetting policies shall be amended, modified, or superseded only through a public

534 notice and comment procedure; (ii) applicable Federal Reclamation law and associated

535 rules and regulations, or policies, and (iii) other applicable provisions of this Contract.

536 Payments shall be made by cash transaction, electronic funds transfers, or any other

537 mechanism as may be agreed to in writing by the Contractor and the Contracting Officer.

538 The Rates, Charges, and Tiered Pricing Component applicable to the Contractor upon

539 execution of this Contract are set forth in Exhibit "B", as may be revised annually.

540             (1)     The Contractor shall pay the United States as provided for in this

541 Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing

542     Component in accordance with policies for Irrigation Water and M&I Water.  The Contractor's

543     Rates shall be established to recover its estimated reimbursable costs included in the operation

544     and maintenance component of the Rate and amounts established to recover deficits and other

545     charges, if any, including construction costs as identified in the following subdivisions.

546     (2)     In accordance with the WIIN Act, the Contractor's allocable share

547     of Project construction costs will be repaid pursuant to the provisions of this Contract.

548     (A)     The amount due and payable to the United States, pursuant

549     to the WIIN Act, shall be the Repayment Obligation.  The Repayment Obligation has been

550     computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

551     as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

552     installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

553     set forth in Exhibit "C".  **There could be one or two exhibits in most cases due to more than**

554     **one service area [For Irrigation contractors and M&I contractors]** The Repayment

555     Obligation is due in lump sum by **[Month Day, Year]** as provided by the WIIN Act.  The

556     Contractor must provide appropriate notice to the Contracting Officer in writing no later than

557     thirty (30) days prior to **[Month Day, Year] [Division Level:  consider the effective date of**

558     **the contract being converted]** if electing to repay the amount due using the lump sum

559     alternative.  If such notice is not provided by such date, the Contractor shall be deemed to have

560     elected the installment payment alternative, in which case, the first such payment shall be made

561     no later than **[Month Day, Year] [Division Level:  consider the effective date of the contract**

562     **being converted].**  The second payment shall be made no later than the first anniversary of the

563     first payment date.  The third payment shall be made no later than the second anniversary of the

564    first payment date. The final payment shall be made no later than **[Month Day, Year] [no later**

565    **than the third anniversary of the effective date of the contract].** If the installment payment

566    option is elected by the Contractor, the Contractor may pre-pay the remaining portion of the

567    Repayment Obligation by giving the Contracting Officer sixty (60) days written notice, in which

568    case, the Contracting Officer shall re-compute the remaining amount due to reflect the pre-

569    payment using the same methodology as was used to compute the initial annual installment

570    payment amount, which is illustrated in Exhibit "C". Notwithstanding any Additional Capital

571    Obligation that may later be established, receipt of the Contractor's payment of the Repayment

572    Obligation to the United States shall fully and permanently satisfy the Existing Capital

573    Obligation.

574             (B)      Additional Capital Obligations that are not reflected in, the

575    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

576    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

577    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

578    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

579    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

580    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

581    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

582    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

583    established by the Contractor and the Contracting Officer to accomplish repayment of the

584    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

585    WIIN Act, subject to the following:

586                        (1)     If the collective Additional Capital Obligation

587 properly assignable to the contractors exercising conversion under section 4011 of the WIIN Act

588 is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

589 to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

590 notifies the Contractor of the Additional Capital Obligation; *Provided. That* the reference to the

591 amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

592                        (2)     If the collective Additional Capital Obligation

593 properly assignable to the contractors exercising conversion under section 4011 of the WIIN Act

594 is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

595 properly assignable to the Contractor shall be repaid as provided by applicable Federal

596 Reclamation law and Project ratesetting policy; *Provided. That* the reference to the amount of

597 five million dollars ($5,000,000) shall not be a precedent in any other context.

598                      (b)     In the event that the final cost allocation referenced in Section 4011(b) of

599 the WIIN Act determines that the costs properly assignable to the Contractor are greater than

600 what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

601 allocated costs. The term of such additional repayment contract shall be not less than one (1)

602 year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

603 of repayment of such amount may be developed by the Contractor and Contracting Officer. In

604 the event that the final cost allocation indicates that the costs properly assignable to the

605 Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

606 overpayment as an offset against any outstanding or future obligations of the Contractor, with the

607 exception of Restoration Fund charges pursuant to section 3407(d) of Pub. L. 102-575.

608    (c)  The Contracting Officer shall notify the Contractor of the Rates, Charges,
609 and Tiered Pricing Component as follows:

610      (1)  Prior to July 1 of each Calendar Year, the Contracting Officer shall
611 provide the Contractor an estimate of the Charges for Project Water that will be applied
612 to the period October 1, of the current Calendar Year, through September 30, of the
613 following Calendar Year, and the basis for such estimate. The Contractor shall be
614 allowed not less than two months to review and comment on such estimates. On or
615 before September 15 of each Calendar Year, the Contracting Officer shall notify the
616 Contractor in writing of the Charges to be in effect during the period October 1 of the current
617 Calendar Year, through September 30, of the following Calendar Year, and such
618 notification shall revise Exhibit "B."

619      (2)  Prior to October 1 of each Calendar Year, the Contracting Officer
620 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component
621 for Project Water for the following Year and the computations and cost allocations upon which
622 those Rates are based. The Contractor shall be allowed not less than two months to review and
623 comment on such computations and cost allocations. By December 31 of each Calendar Year,
624 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing
625 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

626    (d)  At the time the Contractor submits the initial schedule for the delivery of
627 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the
628 Contractor shall make an advance payment to the United States equal to the total amount
629 payable pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the

630    Project Water scheduled to be delivered pursuant to this Contract during the first two

631    calendar months of the Year. Before the end of the first month and before the end of

632    each calendar month thereafter, the Contractor shall make an advance payment to the

633    United States, at the Rate(s) set under subdivision (a) of this Article, for the Water

634    Scheduled to be delivered pursuant to this Contract during the second month

635    immediately following. Adjustments between advance payments for Water Scheduled

636    and payments at Rates due for Water Delivered shall be made before the end of the

637    following month; _Provided, That_ any revised schedule submitted by the Contractor

638    pursuant to Article 4 of this Contract which increases the amount of Water Delivered

639    pursuant to this Contract during any month shall be accompanied with appropriate

640    advance payment, at the Rates then in effect, to assure that Project Water is not

641    delivered to the Contractor in advance of such payment. In any month in which the

642    quantity of Water Delivered to the Contractor pursuant to this Contract equals the

643    quantity of Water Scheduled and paid for by the Contractor, no additional Project Water

644    shall be delivered to the Contractor unless and until an advance payment at the Rates

645    then in effect for such additional Project Water is made. Final adjustment between the

646    advance payments for the Water Scheduled and payments for the quantities of Water

647    Delivered during each Year pursuant to this Contract shall be made as soon as

648    practicable but no later than April 30th of the following Year, or 60 days after the

649    delivery of Project Water rescheduled under subdivision (g) of Article 3 of this Contract

650    if such water is not delivered by the last day of February.

651             (e)      The Contractor shall also make a payment in addition to the Rate(s) in

652    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

653    appropriate Tiered Pricing Component then in effect, before the end of the month following the

654    month of delivery; *Provided, That* the Contractor may be granted an exception from the

655    Tiered Pricing Component pursuant to subdivision (k)(2) of this Article. The payments

656    shall be consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in

657    the water delivery report for the subject month prepared by the Operating Non-Federal

658    Entity(ies) or, if there is no Operating Non-Federal Entity, by the Contracting Officer. The water

659    delivery report shall be deemed a bill for the payment of Charges and the applicable Tiered

660    Pricing Component for Water Delivered. Adjustment for overpayment or underpayment of

661    Charges shall be made through the adjustment of payments due to the United States for Charges

662    for the next month. Any amount to be paid for past due payment of Charges and the Tiered

663    Pricing Component shall be computed pursuant to Article 19 of this Contract.

664    (f)    The Contractor shall pay for any Water Delivered under subdivision

665    (a), (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer

666    pursuant to applicable statutes, associated regulations, any applicable provisions of

667    guidelines or ratesetting policies; *Provided, That* the Rate for Water Delivered under

668    subdivision (f) of Article 3 of this Contract shall be no more than the otherwise

669    applicable Rate for Irrigation Water or M&I Water under subdivision (a) of this Article.

670    (g)    Payments to be made by the Contractor to the United States under this

671    Contract may be paid from any revenues available to the Contractor.

672    (h)    All revenues received by the United States from the Contractor

673    relating to the delivery of Project Water or the delivery of non-Project water through

674 Project facilities shall be allocated and applied in accordance with Federal Reclamation

675 law and the associated rules or regulations, and the then-current Project ratesetting policies

676 for M&I Water or Irrigation Water.

677         (i)      The Contracting Officer shall keep its accounts pertaining to the

678 administration of the financial terms and conditions of its long-term contracts, in accordance

679 with applicable Federal standards, so as to reflect the application of Project costs and

680 revenues. The Contracting Officer shall, each Year upon request of the Contractor,

681 provide to the Contractor a detailed accounting of all Project and Contractor expense

682 allocations, the disposition of all Project and Contractor revenues, and a summary of all

683 water delivery information. The Contracting Officer and the Contractor shall enter into

684 good faith negotiations to resolve any discrepancies or disputes relating to accountings,

685 reports, or information.

686         (j)      The parties acknowledge and agree that the efficient administration of this

687 Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

688 policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

689 and/or for making and allocating payments, other than those set forth in this Article may be in

690 the mutual best interest of the parties, it is expressly agreed that the parties may enter into

691 agreements to modify the mechanisms, policies, and procedures for any of those purposes while

692 this Contract is in effect without amending this Contract.

693         (k)    (1)     Beginning at such time as deliveries of Project Water in a Year

694 exceed 80 percent of the Contract Total, then before the end of the month following the month of

695 delivery the Contractor shall make an additional payment to the United States equal to the

696 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

697 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

698 Contract Total, shall equal one-half of the difference between the Rate established under

699 subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

700 Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

701 Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

702 the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

703 Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

704 subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

705 Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

706 the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

707 (2) Subject to the Contracting Officer's written approval, the

708 Contractor may request and receive an exemption from such Tiered Pricing Component for

709 Project Water delivered to produce a crop which the Contracting Officer determines will provide

710 significant and quantifiable habitat values for waterfowl in fields where the water is used and the

711 crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

712 Irrigation Water shall apply only if such habitat values can be assured consistent with the

713 purposes of the CVPIA through binding agreements executed with or approved by the

714 Contracting Officer prior to use of such water.

715 (3) For purposes of determining the applicability of the Tiered Pricing

716 Component pursuant to this Article, Water Delivered shall include Project Water that the

717 Contractor transfers to others but shall not include Project Water transferred to the Contractor,

33

718 nor shall it include the additional water provided to the Contractor under the provisions of

719 subdivision (f) of Article 3 of this Contract.

720       (l)     For the term of this Contract, Rates applied under the respective

721 ratesetting policies will be established to recover only reimbursable O&M (including any

722 deficits) and capital costs of the Project, as those terms are used in the then-current Project

723 ratesetting policies, and interest, where appropriate, except in instances where a minimum

724 Rate is applicable in accordance with the relevant Project ratesetting policy.  Changes of

725 significance in practices which implement the Contracting Officer's ratesetting policies will

726 not be implemented until the Contracting Officer has provided the Contractor an opportunity

727 to discuss the nature, need, and impact of the proposed change.

728       (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

729 CVPIA, the Rates for Project Water transferred by the Contractor shall be the

730 Contractor's Rates, in accordance with the applicable Project ratesetting policy, adjusted

731 upward or downward to reflect the changed costs, if any, incurred by the Contracting Officer

732 in the delivery of the transferred Project Water to the transferee's point of delivery.  If the

733 Contractor is receiving lower Rates and Charges because of inability to pay and is

734 transferring Project Water to another entity whose Rates and Charges are not adjusted

735 due to inability to pay, the Rates and Charges for transferred Project Water shall not be

736 adjusted to reflect the Contractor's inability to pay.

737       (n)     Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

738 Officer is authorized to adjust determinations of ability to pay every five years.

739       (o)     With respect to the Rates for M&I Water, the Contractor asserts that it is

740     not legally obligated to pay any Project deficits claimed by the United States to have accrued as

741     of the date of this Contract or deficit-related interest charges thereon. By entering into this

742     Contract, the Contractor does not waive any legal rights or remedies that it may have with

743     respect to such disputed issues. Notwithstanding the execution of this Contract and payments

744     made hereunder, the Contractor may challenge in the appropriate administrative or judicial

745     forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

746     term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

747     interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

748     the Rates; (4) the application by the United States of payments made by the Contractor under its

749     Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

750     application of such payments in the Rates. The Contracting Officer agrees that the Contractor

751     shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

752     M&I contractor on any of these issues, and credits for payments heretofore made, provided that

753     the basis for such ruling is applicable to the Contractor.

754                   NON-INTEREST BEARING O&M DEFICITS

755         8.     The Contractor and the Contracting Officer concur that, as of the Effective Date

756     the Contractor has no non-interest bearing O&M deficits and shall have no further

757     liability therefore.

758                SALES, TRANSFERS, OR EXCHANGES OF WATER

759         9.    (a)     The right to receive Project Water provided for in this Contract may be

760     sold, transferred, or exchanged to others for reasonable and beneficial uses within the

761     State of California if such sale, transfer, or exchange is authorized by applicable Federal

762  and State laws, and applicable guidelines or regulations then in effect. No sale, transfer,

763  or exchange of Project Water under this Contract may take place without the prior

764  written approval of the Contracting Officer, except as provided for in subdivision (b) of

765  this Article, and no such sales, transfers, or exchanges shall be approved absent all

766  appropriate environmental documentation, including, but not limited to, documents

767  prepared pursuant to the NEPA and ESA. Such environmental documentation should

768  include, as appropriate, an analysis of groundwater impacts and economic and social

769  effects, including environmental justice, of the proposed water transfers on both the

770  transferor and transferee.

771        (b)    In order to facilitate efficient water management by means of water

772  transfers of the type historically carried out among Project Contractors located within the

773  same geographical area and to allow the Contractor to participate in an accelerated water

774  transfer program during the term of this Contract, the Contracting Officer shall prepare, as

775  appropriate, all necessary environmental documentation, including, but not limited to,

776  documents prepared pursuant to the NEPA and ESA, analyzing annual transfers within

777  such geographical areas and the Contracting Officer shall determine whether such

778  transfers comply with applicable law. Following the completion of the environmental

779  documentation, such transfers addressed in such documentation shall be conducted with

780  advance notice to the Contracting Officer, but shall not require prior written approval by

781  the Contracting Officer. Such environmental documentation and the Contracting

782  Officer's compliance determination shall be reviewed every five years and updated, as

783  necessary, prior to the expiration of the then existing five (5)-year period. All subsequent

784 environmental documentation shall include an alternative to evaluate not less than the quantity of

785 Project Water historically transferred within the same geographical area.

786         (c)    For a water transfer to qualify under subdivision (b) of this Article, such

787 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

788 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

789 activities, surface water storage, or fish and wildlife resources; not lead to land

790 conversion; and be delivered to established cropland, wildlife refuges, groundwater basins, or

791 M&I use; (ii) occur within a single Year; (iii) occur between a willing seller and a willing

792 buyer; (iv) convey water through existing facilities with no new construction or

793 modifications to facilities and be between existing Project Contractors and/or the Contractor

794 and the United States, Department of the Interior; and (v) comply with all applicable

795 Federal, State, and local or tribal laws and requirements imposed for protection of the

796 environment and Indian Trust Assets, as defined under Federal law.

797                         <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

798     10.   (a)    The amount of any overpayment by the Contractor of the Contractor's

799 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

800 liabilities of the Contractor arising out of this Contract then due and payable.

801 Overpayments of more than $1,000 shall be refunded at the Contractor's request. In lieu of a

802 refund, any amount of such overpayment, at the option of the Contractor, may be credited

803 against amounts to become due to the United States by the Contractor. With respect to

804 overpayment, such refund or adjustment shall constitute the sole remedy of the Contractor or

805 anyone having or claiming to have the right to the use of any of the Project Water supply

806 provided for by this Contract. All credits and refunds of overpayments shall be made

807 within 30 days of the Contracting Officer obtaining direction as to how to credit or

808 refund such overpayment in response to the notice to the Contractor that it has finalized the

809 accounts for the Year in which the overpayment was made.

810     (b)    All advances for miscellaneous costs incurred for work requested by the

811 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual

812 costs when the work has been completed. If the advances exceed the actual costs incurred, the

813 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

814 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

815 Contract.

816         <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

817   11.   (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

818 requirements of Federal law, and (ii) the obligations of the United States under existing

819 contracts, or renewals thereof, providing for water deliveries from the Project, the

820 Contracting Officer shall make all reasonable efforts to optimize Project Water deliveries to

821 the Contractor as provided in this Contract.

822     (b)    The Contracting Officer or Operating Non-Federal Entity(ies) may

823 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as

824 herein provided for the purposes of investigation, inspection, maintenance, repair, or

825 replacement of any of the Project facilities or any part thereof necessary for the delivery of

826 Project Water to the Contractor, but so far as feasible the Contracting Officer or Operating

827 Non-Federal Entity(ies) will give the Contractor due notice in advance of such temporary

38

828 discontinuance or reduction, except in case of emergency, in which case no notice need be

829 given; _Provided. That_ the United States shall use its best efforts to avoid any

830 discontinuance or reduction in such service. Upon resumption of service after such

831 discontinuance or reduction, and if requested by the Contractor, the United States will, if

832 possible, deliver the quantity of Project Water which would have been delivered

833 hereunder in the absence of such discontinuance or reduction.

834        (c)     The United States reserves the right to all seepage and return flow

835 water derived from Water Delivered to the Contractor hereunder which escapes or is

836 discharged beyond the Contractor's Service Area; _Provided. That_ this shall not be construed

837 as claiming for the United States any right to seepage or return flow being put to

838 reasonable and beneficial use pursuant to this Contract within the Contractor's Service

839 Area by the Contractor or those claiming by, through, or under the Contractor.

840 <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

841     12.    (a)     In its operation of the Project, the Contracting Officer will use all
842 reasonable means to guard against a Condition of Shortage in the quantity of Project
843 Water to be made available to the Contractor pursuant to this Contract. In the event the
844 Contracting Officer determines that a Condition of Shortage appears probable, the
845 Contracting Officer will notify the Contractor of said determination as soon as practicable.

846        (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
847 or other similar operational errors affecting the Project; drought and other physical or natural
848 causes beyond the control of the Contracting Officer; or actions taken by the Contracting
849 Officer to meet current and future legal obligations, then, except as provided in subdivision (a) of
850 Article 17 of this Contract, no liability shall accrue against the United States or any of its
851 officers, agents, or employees for any damage, direct or indirect, arising therefrom.

852        (c)    In any Year in which there may occur a Condition of Shortage for any of

853 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

854 Article, the Contracting Officer will first allocate the available Project Water consistent

855 with the Project M&I Water Shortage Policy as finally adopted after environmental review for

856 determining the amount of Project Water Available for delivery to the Project

857 Contractors. Subject to the foregoing allocation, in any year in which there may occur a

858 Condition of Shortage, the Contracting Officer shall then apportion Project Water among

859 the Contractor and others entitled to Project Water from Delta Division Facilities under

860 long-term water service or repayment contracts (or renewals thereof or binding

861 commitments therefore) in force on February 28, 2005, as follows:

862     (1)    The Contracting Officer shall make an initial and subsequent

863 determination as necessary of the total quantity of Project Water estimated to be

864 scheduled or actually scheduled under subdivision (b) of Article 4 of this Contract and

865 under all other interim renewal, long-term water service or repayment contracts then in

866 force for the delivery of Project Water by the United States from Delta Division Facilities

867 during the relevant Year, the quantity so determined being hereinafter referred to as the

868 scheduled total;

869     (2)    A determination shall be made of the total quantity of Project

870 Water that is available for meeting the scheduled total, the quantity so determined being

871 hereinafter referred to as the available supply;

872     (3)    The total quantity of Project Water estimated to be scheduled or

873 actually scheduled by the Contractor during the relevant Year, under subdivision (b) of

874 Article 4 of this Contract, shall be divided by the scheduled total, the quotient thus

875 obtained being hereinafter referred to as the Contractor's proportionate share; and

876     (4)    The available supply shall be multiplied by the Contractor's

877 proportionate share and the result shall be the quantity of Project Water made available

878 by the United States to the Contractor for the relevant Year in accordance with the

879 schedule developed by the Contracting Officer under subdivision (c)(1) of this Article 12,

880 but in no event shall such amount exceed the Contract Total. In the event the

881 Contracting Officer subsequently determines that the Contracting Officer can increase or

882 needs to decrease the available supply for delivery from Delta Division Facilities to

883 long-term water service- and repayment contractors during the relevant Year, such

884 additions or reductions to the available supply shall be apportioned consistent with

885 subparagraphs (1) through (4), inclusive.

886 (d) By entering into this Contract, the Contractor does not waive any legal

887 rights or remedies it may have to file or participate in any administrative or judicial

888 proceeding contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii)

889 the substance of such a policy; (iii) the applicability of such a policy; or (iv) the manner in

890 which such policy is implemented in order to allocate Project Water between M&I and

891 irrigation purposes; *Provided, That* the Contractor has commenced any such judicial

892 challenge or any administrative procedures necessary to institute any judicial challenge

893 within six months of the policy becoming final. By agreeing to the foregoing, the

894 Contracting Officer does not waive any legal defenses or remedies that it may have to

895 assert in such a proceeding. Nothing contained herein shall be interpreted to validate or

896 invalidate the Project M&I Water Shortage Policy.

897 UNAVOIDABLE GROUNDWATER PERCOLATION

898 13. (a) To the extent applicable, the Contractor shall not be deemed to have

41

899 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

900 Contract if such lands are irrigated with groundwater that reaches the underground strata

901 as an unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible

902 Lands.

903     (b)    Upon complete payment of the Repayment Obligation by the Contractor,

904 this Article 13 shall no longer be applicable.

905 <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

906     14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
907 pursuant to this Contract is subject to Federal Reclamation law, including but not limited
908 to, the Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and
909 supplemented, and the rules and regulations promulgated by the Secretary of the Interior
910 under Federal Reclamation law.

911 <u>PROTECTION OF WATER AND AIR QUALITY</u>

912     15.    (a)    Omitted

913     (b)    The United States will care for, operate and maintain reserved works in a
914 manner that preserves the quality of the water at the highest level possible as determined by the
915 Contracting Officer. The United States does not warrant the quality of the water delivered to the
916 Contractor and is under no obligation to furnish or construct water treatment facilities to
917 maintain or improve the quality of water delivered to the Contractor.

918     (c)    The Contractor will comply with all applicable water and air pollution
919 laws and regulations of the United States and the State of California; and will obtain all required
920 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
921 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
922 State, and local water quality standards applicable to surface and subsurface drainage and/or
923 discharges generated through the use of Federal or Contractor facilities or Project Water
924 provided by the Contractor within its Service Area.

925     (d)    This Article shall not affect or alter any legal obligations of the Secretary
926 to provide drainage or other discharge services.

927     (e)    Omitted

928 <u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED</u>
929 <u>STATES</u>

930    16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

931 other than from the United States and Irrigation Water furnished pursuant to the terms of

932 this Contract may be simultaneously transported through the same distribution facilities

933 of the Contractor subject to the following:  (i) if the facilities utilized for commingling

934 Irrigation Water and non-Project water were constructed without funds made available

935 pursuant to Federal Reclamation law, the provisions of Federal Reclamation law will be

936 applicable only to the Landholders of lands which receive Irrigation Water; (ii) the

937 eligibility of land to receive Irrigation Water must be established through the certification

938 requirements as specified in the Acreage Limitation Rules and Regulations (43 CFR Part

939 426); (iii) the water requirements of Eligible Lands within the Contractor's Service Area

940 can be established and the quantity of Irrigation Water to be utilized is less than or equal to

941 the quantity necessary to irrigate such Eligible Lands; and (iv) if the facilities utilized for

942 commingling Irrigation Water and non-Project water are (were) constructed with funds

943 made available pursuant to Federal Reclamation law, the non-Project water will be

944 subject to the acreage limitation provisions of Federal Reclamation law, unless the

945 Contractor pays to the United States the incremental fee described in 43 CFR 426.15.  In

946 determining the incremental fee, the Contracting Officer will calculate annually the cost

947 to the Federal Government, including interest, of storing or delivering non-Project water,

948 which for purposes of this Contract shall be determined as follows:  The quotient shall

949 be the unpaid distribution system costs divided by the total irrigable acreage within the

950  Contractor's Service Area.  The incremental fee per acre is the mathematical result of

951  such quotient times the interest rate determined using Section 202 (3) of the Act of

952  October 12, 1982 (96 Stat. 1263).  Such incremental fee will be charged to each acre of

953  excess or full-cost land within the Contractor's Service Area that receives non-Project

954  water through Federally financed or constructed facilities.  The incremental fee calculation

955  methodology will continue during the term of this Contract absent the promulgation of a

956  contrary Bureau of Reclamation-wide rule, regulation, or policy adopted after the

957  Contractor has been afforded the opportunity to review and comment on the proposed

958  rule, regulation, or policy.  If such rule, regulation, or policy is adopted, it shall supersede

959  this provision.

960          (b)     Water or water rights now owned or hereafter acquired by the

961  Contractor, other than from the United States may be stored, conveyed, and/or diverted

962  through Project facilities, subject to the completion of appropriate environmental

963  documentation, with the approval of the Contracting Officer and the execution of any

964  contract determined by the Contracting Officer to be necessary, consistent with the

965  following provisions:

966          (1)     The Contractor may introduce non-Project water into Project

967  facilities and deliver said water to lands within the Contractor's Service Area, including

968  Ineligible Lands, subject to payment to the United States and/or to any applicable

969  Operating Non-Federal Entity of an appropriate rate as determined by the applicable

970  Project ratesetting policy, the Reclamation Reform Act of 1982, and the Project use

971  power policy, if such Project use power policy is applicable, each as amended, modified, or

972     superseded from time to time.

973             (2)      Delivery of such non-Project water in and through Project

974     facilities shall only be allowed to the extent such deliveries do not:  (i) interfere with

975     other Project purposes as determined by the Contracting Officer; (ii) reduce the quantity or

976     quality of water available to other Project Contractors; (iii) interfere with the delivery of

977     contractual water entitlements to any other Project Contractors; or (iv) interfere with the

978     physical maintenance of the Project facilities.

979             (3)      Neither the United States nor the Operating Non-Federal

980     Entity(ies) shall be responsible for control, care, or distribution of the non-Project water

981     before it is introduced into or after it is delivered from the Project facilities.  The

982     Contractor hereby releases and agrees to defend and indemnify the United States and the

983     Operating Non-Federal Entity(ies), and their respective officers, agents, and employees,

984     from any claim for damage to persons or property, direct or indirect, resulting from the

985     act(s) of the Contractor, its officers, employees, agents, or assigns, in (i) extracting or

986     diverting non-Project water from any source, or (ii) diverting such non-Project water into

987     Project facilities.

988             (4)      Diversion of such non-Project water into Project facilities shall

989     be consistent with all applicable laws, and if involving groundwater, consistent with any

990     applicable groundwater management plan for the area from which it was extracted.

991             (5)      After Project purposes are met, as determined by the

992     Contracting Officer, the United States and Project Contractors entitled to Project Water

993     from Delta Division Facilities shall share priority to utilize the remaining capacity of the

994 facilities declared to be available by the Contracting Officer for conveyance and

995 transportation of non-Project water prior to any such remaining capacity being made

996 available to non-Project contractors.  Other Project Contractors shall have a second priority

997 to any remaining capacity of facilities declared to be available by the Contracting Officer

998 for conveyance and transportation of non-Project water prior to any such remaining

999 capacity being made available to non-Project contractors.

1000       (c)     Upon complete payment of the Repayment Obligation by the Contractor,

1001 subdivision (a) of this Article 16 shall no longer be applicable.

1002 <u>OPINIONS AND DETERMINATIONS</u>

1003     17.   (a)    Where the terms of this Contract provide for actions to be based upon

1004 the opinion or determination of either party to this Contract, said terms shall not be

1005 construed as permitting such action to be predicated upon arbitrary, capricious, or

1006 unreasonable opinions or determinations.  Both parties, notwithstanding any other

1007 provisions of this Contract, expressly reserve the right to seek relief from and appropriate

1008 adjustment for any such arbitrary, capricious, or unreasonable opinion or determination.

1009 Each opinion or determination by either party shall be provided in a timely manner.

1010 Nothing in this subdivision (a) of this Article is intended to or shall affect or alter the

1011 standard of judicial review applicable under Federal law to any opinion or determination

1012 implementing a specific provision of Federal law embodied in statute or regulation.

1013       (b)    The Contracting Officer shall have the right to make determinations

1014 necessary to administer this Contract that are consistent with the provisions of this

1015 Contract, the laws of the United States and of the State of California, and the rules and

1016 regulations promulgated by the Secretary. Such determinations shall be made in

1017 consultation with the Contractor to the extent reasonably practicable.

1018 <div align="center">COORDINATION AND COOPERATION</div>

1019     18.   (a)    In order to further their mutual goals and objectives, the Contracting

1020 Officer and the Contractor shall communicate, coordinate, and cooperate with each other,

1021 and with other affected Project Contractors, in order to improve the O&M of the

1022 Project. The communication, coordination, and cooperation regarding O&M shall

1023 include, but not be limited to, any action which will or may materially affect the quantity

1024 or quality of Project Water supply, the allocation of Project Water supply, and Project

1025 financial matters including, but not limited to, budget issues. The communication,

1026 coordination, and cooperation provided for hereunder shall extend to all provisions of

1027 this Contract. Each party shall retain exclusive decision making authority for all actions,

1028 opinions, and determinations to be made by the respective party.

1029       (b)    Within 120 days following the Effective Date, the Contractor, other

1030 affected Project Contractors, and the Contracting Officer shall arrange to meet with

1031 interested Project Contractors to develop a mutually agreeable, written Project-wide

1032 process, which may be amended as necessary separate and apart from this Contract. The

1033 goal of this process shall be to provide, to the extent practicable, the means of mutual

1034 communication and interaction regarding significant decisions concerning Project O&M

1035 on a real-time basis.

1036       (c)    In light of the factors referred to in subdivision (b) of Article 3 of this

1037 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out

1038 this intent:

1039           (1)     The Contracting Officer will, at the request of the Contractor,
1040 assist in the development of integrated resource management plans for the Contractor.
1041 Further, the Contracting Officer will, as appropriate, seek authorizations for implementation
1042 of partnerships to improve water supply, water quality, and reliability.

1043           (2)     The Secretary will, as appropriate, pursue program and project
1044 implementation and authorization in coordination with Project Contractors to improve the
1045 water supply, water quality, and reliability of the Project for all Project purposes.

1046           (3)     The Secretary will coordinate with Project Contractors and the
1047 State of California to seek improved water resource management.

1048           (4)     The Secretary will coordinate actions of agencies within the
1049 Department of the Interior that may impact the availability of water for Project purposes.

1050           (5)     The Contracting Officer shall periodically, but not less than
1051 annually, hold division-level meetings to discuss Project operations, division-level water
1052 management activities, and other issues as appropriate.

1053           (d)     Without limiting the contractual obligations of the Contracting Officer
1054 under the other Articles of this Contract, nothing in this Article shall be construed to limit
1055 or constrain the Contracting Officer's ability to communicate, coordinate, and cooperate
1056 with the Contractor or other interested stakeholders or to make decisions in a timely fashion
1057 as needed to protect health, safety, or the physical integrity of structures or facilities.

1058
## CHARGES FOR DELINQUENT PAYMENTS

1059    19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
1060 charges on delinquent payments.  If a payment is not received by the due date, the
1061 Contractor shall pay an interest charge on the delinquent payment for each day the payment
1062 is delinquent beyond the due date.  If a payment becomes 60 days delinquent, the
1063 Contractor shall pay, in addition to the interest charge, an administrative charge to
1064 cover additional costs of billing and processing the delinquent payment.  If a payment is
1065 delinquent 90 days or more, the Contractor shall pay, in addition to the interest and
1066 administrative charges, a penalty charge for each day the payment is delinquent beyond the
1067 due date, based on the remaining balance of the payment due at the rate of 6 percent per
1068 year.  The Contractor shall also pay any fees incurred for debt collection services associated
1069 with a delinquent payment.

1070        (b)    The interest rate charged shall be the greater of either the rate prescribed
1071 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to
1072 overdue payments, or the interest rate of 0.5 percent per month.  The interest rate charged
1073 will be determined as of the due date and remain fixed for the duration of the delinquent
1074 period.

1075        (c)    When a partial payment on a delinquent account is received, the amount
1076 received shall be applied first to the penalty charges, second to the administrative charges,
1077 third to the accrued interest, and finally to the overdue payment.

1078
## EQUAL EMPLOYMENT OPPORTUNITY

1079    20.    During the performance of this Contract, the Contractor agrees as follows:

1080        (a)    The Contractor will not discriminate against any employee or applicant
1081 for employment because of race, color, religion, sex, sexual orientation, gender identity, or
1082 national origin.  The Contractor will take affirmative action to ensure that applicants are
1083 employed, and that employees are treated during employment, without regard to their race,
1084 color, religion, sex, sexual orientation, gender identity, or national origin.  Such action shall
1085 include, but not be limited to, the following:  employment, upgrading, demotion, or
1086 transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other
1087 forms of compensation; and selection for training, including apprenticeship.  The Contractor
1088 agrees to post in conspicuous places, available to employees and applicants for employment,
1089 notices to be provided by the Contracting Officer setting forth the provisions of this
1090 nondiscrimination clause.

1091        (b)    The Contractor will, in all solicitations or advertisements for employees
1092 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1093 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1094 gender identity, or national origin.

1095           (c)     The Contractor will not discharge or in any other manner discriminate
1096 against any employee or applicant for employment because such employee or applicant has
1097 inquired about, discussed, or disclosed the compensation of the employee or applicant or
1098 another employee or applicant. This provision shall not apply to instances in which an
1099 employee who has access to the compensation information of other employees or applicants as
1100 part of such employee's essential job functions discloses the compensation of such other
1101 employees or applicants to individuals who do not otherwise have access to such information,
1102 unless such disclosure is in response to a formal complaint or charge, in furtherance of an
1103 investigation, proceeding, hearing, or action, including an investigation conducted by the
1104 employer, or is consistent with the Contractor's legal duty to furnish information.

1105           (d)     The Contractor will send to each labor union or representative of
1106 workers with which it has a collective bargaining agreement or other contract or understanding,
1107 a notice, to be provided by the Contracting Officer, advising the labor union or workers'
1108 representative of the Contractor's commitments under section 202 of Executive Order No.
1109 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places
1110 available to employees and applicants for employment.

1111           (e)     The Contractor will comply with all provisions of Executive Order No.
1112 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary
1113 of Labor.

1114           (f)     The Contractor will furnish all information and reports required by
1115 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of
1116 the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and
1117 accounts by the Contracting Agency and the Secretary of Labor for purposes of investigation
1118 to ascertain compliance with such rules, regulations, and orders.

1119           (g)     In the event of the Contractor's noncompliance with the
1120 nondiscrimination clauses of this Contract or with any of such rules, regulations, or orders, this
1121 Contract may be canceled, terminated, or suspended in whole or in part and the Contractor may
1122 be declared ineligible for further Government contracts in accordance with procedures
1123 authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may
1124 be imposed and remedies invoked as provided in Executive Order No. 11246 of Sept. 24,
1125 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by
1126 law.

1127           (h)     The Contractor will include the provisions of paragraphs (a) through (g)
1128 in every subcontract or purchase order unless exempted by the rules, regulations, or orders
1129 of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of Sept.
1130 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The
1131 Contractor will take such action with respect to any subcontract or purchase order as may be
1132 directed by the Secretary of Labor as a means of enforcing such provisions, including
1133 sanctions for noncompliance: *Provided, however, That* in the event the Contractor

1134 becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a
1135 result of such direction, the Contractor may request the United States to enter into such
1136 litigation to protect the interests of the United States.

### GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1138     21.     (a)     The obligation of the Contractor to pay the United States as provided in
1139 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1140 obligation may be distributed among the Contractor's water users and notwithstanding the default
1141 of individual water users in their obligation to the Contractor.

1142     (b)     The payment of charges becoming due pursuant to this Contract is a
1143 condition precedent to receiving benefits under this Contract. The United States shall not make
1144 water available to the Contractor through Project facilities during any period in which the
1145 Contractor is in arrears in the advance payment of water rates due the United States. The
1146 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1147 parties that are in arrears in the advance payment of water rates as levied or established by the
1148 Contractor.

1149     (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1150 obligation to require advance payment for water rates which it levies.

### COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1152     22.     (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1153 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1154 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1155 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1156 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1157 applicable implementing regulations and any guidelines imposed by the U.S.
1158 Department of the Interior and/or Bureau of Reclamation.

1159     (b)     These statutes prohibit any person in the United States from being
1160 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1161 discrimination under any program or activity receiving financial assistance from the Bureau
1162 of Reclamation on the grounds of race, color, national origin, disability, or age. By
1163 executing this Contract, the Contractor agrees to immediately take any measures necessary
1164 to implement this obligation, including permitting officials of the United States to inspect
1165 premises, programs, and documents.

1166     (c)     The Contractor makes this Contract in consideration of and for the
1167 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1168 Federal financial assistance extended after the date hereof to the Contractor by the Bureau

1169 of Reclamation, including installment payments after such date on account of
1170 arrangements for Federal financial assistance which were approved before such date.
1171 The Contractor recognizes and agrees that such Federal assistance will be extended in
1172 reliance on the representations and agreements made in this Article and that the United
1173 States reserves the right to seek judicial enforcement thereof.

1174    (d)    Complaints of discrimination against the Contractor shall be investigated
1175 by the Contracting Officer's Office of Civil Rights.

1176                              PRIVACY ACT COMPLIANCE

1177    23.    (a)    The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1178 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy
1179 Act (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting
1180 records required to be submitted to the Contractor for compliance with Sections 206,
1181 224(c), and 228 of the Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and
1182 390zz), and pursuant to 43 C.F.R. § 426.18.

1183    (b)    With respect to the application and administration of the criminal penalty
1184 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1185 employees who are responsible for maintaining the certification and reporting records
1186 referenced in paragraph (a) above are considered to be employees of the Department of the
1187 Interior. See 5 U.S.C. § 552a(m).

1188    (c)    The Contracting Officer or a designated representative shall provide the
1189 Contractor with current copies of the Department of the Interior Privacy Act regulations
1190 and the Bureau of Reclamation Federal Register Privacy Act System of Records Notice
1191 (Interior/WBR-31, Acreage Limitation) which govern the maintenance, safeguarding,
1192 and disclosure of information contained in the Landholders' certification and reporting
1193 records.

1194    (d)    The Contracting Officer shall designate a full-time employee of the
1195 Bureau of Reclamation to be the System Manager responsible for making decisions on
1196 denials pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43
1197 C.F.R. § 2.72. The Contractor is authorized to grant requests by individuals for access to
1198 their own records.

1199    (e)    The Contractor shall forward promptly to the System Manager each
1200 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of
1201 records filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral;
1202 and provide the System Manager with information and records necessary to prepare an
1203 appropriate response to the requester. These requirements do not apply to individuals
1204 seeking access to their own certification and reporting forms filed with the Contractor

1205 pursuant to 43 C.F.R. § 426.18 unless the requester elects to cite the Privacy Act as an
1206 authority for the request.

1207       (f)     Upon complete payment of the Repayment Obligation by the

1208 Contractor, this Article 23 will no longer be applicable.

1209 <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1210     24.     In addition to all other payments to be made by the Contractor pursuant to this

1211 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill

1212 and detailed statement submitted by the Contracting Officer to the Contractor for such

1213 specific items of direct cost incurred by the United States for work requested by the

1214 Contractor associated with this Contract plus indirect costs in accordance with applicable

1215 Bureau of Reclamation policies and procedures. All such amounts referred to in this

1216 Article shall not exceed the amount agreed to in writing in advance by the Contractor.

1217 This Article shall not apply to costs for routine contract administration.

1218 <u>WATER CONSERVATION</u>

1219     25.    (a)    Prior to the delivery of water provided from or conveyed through
1220 Federally constructed or Federally financed facilities pursuant to this Contract, the
1221 Contractor shall develop a water conservation plan, as required by subsection 210(b) of the
1222 Reclamation Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and
1223 Regulations).

1224 Additionally, an effective water conservation and efficiency program shall be based on the

1225 Contractor's water conservation plan that has been determined by the Contracting Officer to

1226 meet the conservation and efficiency criteria for evaluating water conservation plans

1227 established under Federal law. The water conservation and efficiency program shall

1228 contain definite water conservation objectives, appropriate economically feasible water

1229 conservation measures, and time schedules for meeting those objectives. Continued

1230     Project Water delivery pursuant to this Contract shall be contingent upon the

1231     Contractor's continued implementation of such water conservation program. In the

1232     event the Contractor's water conservation plan or any revised water conservation plan

1233     completed pursuant to subdivision (d) of this Article 25 have not yet been determined by

1234     the Contracting Officer to meet such criteria, due to circumstances which the

1235     Contracting Officer determines are beyond the control of the Contractor, water deliveries

1236     shall be made under this Contract so long as the Contractor diligently works with the

1237     Contracting Officer to obtain such determination at the earliest practicable date, and

1238     thereafter the Contractor immediately begins implementing its water conservation and

1239     efficiency program in accordance with the time schedules therein.

1240     (b)     Should the amount of M&I Water delivered pursuant to subdivision

1241     (a) of Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year,

1242     the Contractor shall implement the Best Management Practices identified by the time

1243     frames issued by the Mid-Pacific Region's then-existing conservation and efficiency

1244     criteria for such M&I Water unless any such practice is determined by the Contracting

1245     Officer to be inappropriate for the Contractor.

1246     (c)     The Contractor shall submit to the Contracting Officer a report on the

1247     status of its implementation of the water conservation plan on the reporting dates specified in the

1248     then-existing conservation and efficiency criteria established under Federal law.

1249     (d)     At five (5)-year intervals, the Contractor shall revise its water

1250     conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1251     water conservation plans established under Federal law and submit such revised water

1252 management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1253 will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1254 existing conservation and efficiency criteria for evaluating water conservation plans established

1255 under Federal law.

1256　　　　　　　(e)　　If the Contractor is engaged in direct groundwater recharge, such activity

1257 shall be described in the Contractor's water conservation plan.

1258　　　　　　　　　EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1259　　　26.　　Except as specifically provided in Article 16 of this Contract, the provisions

1260 of this Contract shall not be applicable to or affect non-Project water or water rights now owned

1261 or hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1262 Area. Any such water shall not be considered Project Water under this Contract. In addition,

1263 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1264 any water user within the Contractor's Service Area acquires or has available under any other

1265 contract pursuant to Federal Reclamation law.

1266　　OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1267　　　27.　　(a)　　The O&M of a portion of the Project facilities which serve the Contractor,

1268 and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1269 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1270 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1271 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1272 affect the rights or obligations of the Contractor or the United States hereunder.

1273         (b)    The Contracting Officer has previously notified the Contractor in

1274 writing that the Operation and Maintenance of a portion of the Project facilities which

1275 serve the Contractor has been transferred to the Operating Non-Federal Entity San Luis &

1276 Delta-Mendota Water Authority, and therefore, the Contractor shall pay directly to the

1277 Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, or to any

1278 successor approved by the Contracting Officer under the terms and conditions of the

1279 separate agreement between the United States and the Operating Non-Federal Entity San

1280 Luis & Delta-Mendota Water Authority described in subdivision (a) of this Article, all rates,

1281 charges, or assessments of any kind, including any assessment for reserve funds, which the

1282 Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or such successor

1283 determines, sets, or establishes for the Operation and Maintenance of the portion of the Project

1284 facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1285 Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1286 Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1287 Contractor of its obligation to pay directly to the United States the Contractor's share of

1288 the Project Rates, Charges, and Tiered Pricing Component except to the extent the

1289 Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority collects payments

1290 on behalf of the United States in accordance with the separate agreement identified in

1291 subdivision (a) of this Article.

1292         (c)    For so long as the O&M of any portion of the Project facilities

1293 serving the Contractor is performed by Operating Non-Federal Entity San Luis &

1294 Delta-Mendota Water Authority, or any successor thereto, the Contracting Officer

1295  shall adjust those components of the Rates for Water Delivered under this Contract

1296  representing the cost associated with the activity being performed by Operating Non-

1297  Federal Entity San Luis & Delta-Mendota Water Authority, or its successor.

1298        (d)    In the event the Operation and Maintenance of the Project facilities

1299  operated and maintained by the Operating Non-Federal Entity San Luis & Delta-Mendota

1300  Water Authority is re-assumed by the United States during the term of this Contract, the

1301  Contracting Officer shall so notify the Contractor, in writing, and present to the

1302  Contractor a revised Exhibit "B" which shall include the portion of the Rates to be paid

1303  by the Contractor for Project Water under this Contract representing the Operation and

1304  Maintenance costs of the portion of such Project facilities which have been re-assumed. The

1305  Contractor shall, thereafter, in the absence of written notification from the Contracting Officer to

1306  the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the revised

1307  Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1308  ## CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS

1309      28.    The expenditure or advance of any money or the performance of any obligation of
1310  the United States under this Contract shall be contingent upon appropriation or allotment
1311  of funds. Absence of appropriation or allotment of funds shall not relieve the Contractor
1312  from any obligations under this Contract. No liability shall accrue to the United States in case
1313  funds are not appropriated or allotted.

1314  ## BOOKS, RECORDS, AND REPORTS

1315      29.    (a)    The Contractor shall establish and maintain accounts and other books and
1316  records pertaining to administration of the terms and conditions of this Contract, including
1317  the Contractor's financial transactions; water supply data; project operations, maintenance, and
1318  replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1319  census), land-ownership, land-leasing, and water-use data; and other matters that the
1320  Contracting Officer may require. Reports shall be furnished to the Contracting Officer
1321  in such form and on such date or dates as the Contracting Officer may require. Subject to
1322  applicable Federal laws and regulations, each party to this Contract shall have the right during

1323 office hours to examine and make copies of the other party's books and records relating to
1324 matters covered by this Contract.

1325       (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1326 books, records, or other information shall be requested from the Contractor by the

1327 Contracting Officer unless such books, records, or information are reasonably related to the

1328 administration or performance of this Contract. Any such request shall allow the Contractor a

1329 reasonable period of time within which to provide the requested books, records, or

1330 information.

1331       (c)    At such time as the Contractor provides information to the Contracting

1332 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1333 to the Operating Non-Federal Entity(ies).

1334       <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1335 30.   (a)    The provisions of this Contract shall apply to and bind the successors and
1336 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1337 therein by either party shall be valid until approved in writing by the other party.

1338       (b)    The assignment of any right or interest in this Contract by either party

1339 shall not interfere with the rights or obligations of the other party to this Contract absent the

1340 written concurrence of said other party.

1341       (c)    The Contracting Officer shall not unreasonably condition or withhold

1342 approval of any proposed assignment.

1343                                 <u>SEVERABILITY</u>

1344 31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1345 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1346 an association or other form of organization whose primary function is to represent parties to

1347     Project contracts, brings an action in a court of competent jurisdiction challenging the

1348     legality or enforceability of a provision included in this Contract and said person, entity,

1349     association, or organization obtains a final court decision holding that such provision is

1350     legally invalid or unenforceable and the Contractor has not intervened in that lawsuit in

1351     support of the plaintiff(s), the parties to this Contract shall use their best efforts to (i)

1352     within 30 days of the date of such final court decision identify by mutual agreement the

1353     provisions in this Contract which must be revised and (ii) within three months thereafter

1354     promptly agree on the appropriate revision(s). The time periods specified above may be

1355     extended by mutual agreement of the parties. Pending the completion of the actions

1356     designated above, to the extent it can do so without violating any applicable provisions of

1357     law, the United States shall continue to make the quantities of Project Water specified in this

1358     Contract available to the Contractor pursuant to the provisions of this Contract which were not

1359     found to be legally invalid or unenforceable in the final court decision.

1360                           RESOLUTION OF DISPUTES

1361        32.     Should any dispute arise concerning any provisions of this Contract, or the

1362     parties' rights and obligations thereunder, the parties shall meet and confer in an attempt

1363     to resolve the dispute. Prior to the Contractor commencing any legal action, or the

1364     Contracting Officer referring any matter to the Department of Justice, the party shall

1365     provide to the other party 30 days' written notice of the intent to take such action;

1366     *Provided. That* such notice shall not be required where a delay in commencing an action

1367     would prejudice the interests of the party that intends to file suit. During the 30-day

1368     notice period, the Contractor and the Contracting Officer shall meet and confer in an

1369    attempt to resolve the dispute. Except as specifically provided, nothing herein is intended

1370    to waive or abridge any right or remedy that the Contractor or the United States may have.

1371 <div align="center">OFFICIALS NOT TO BENEFIT</div>

1372    33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1373    the Contractor shall benefit from this Contract other than as a water user or landowner in the
1374    same manner as other water users or landowners.

1375 <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1376    34.    (a)    While this Contract is in effect, no change may be made in the
1377    Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1378    changes which may affect the respective rights, obligations, privileges, and duties of either the
1379    United States or the Contractor under this Contract, including, but not limited to, dissolution,
1380    consolidation, or merger, except upon the Contracting Officer's written consent.

1381    (b)    Within 30 days of receipt of a request for such a change, the Contracting

1382    Officer will notify the Contractor of any additional information required by the Contracting

1383    Officer for processing said request, and both parties will meet to establish a mutually agreeable

1384    schedule for timely completion of the process. Such process will analyze whether the proposed

1385    change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1386    (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1387    to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1388    have an impact on any Project Water rights applications, permits, or licenses. In addition,

1389    the Contracting Officer shall comply with the NEPA and the ESA. The Contractor will

1390    be responsible for all costs incurred by the Contracting Officer in this process, and such

1391    costs will be paid in accordance with Article 24 of this Contract.

1392 ## FEDERAL LAWS

1393     35.     By entering into this Contract, the Contractor does not waive its rights to contest

1394 the validity or application in connection with the performance of the terms and

1395 conditions of this Contract of any Federal law or regulation; *Provided, That* the

1396 Contractor agrees to comply with the terms and conditions of this Contract unless and

1397 until relief from application of such Federal law or regulation to the implementing

1398 provision of the Contract is granted by a court of competent jurisdiction.

1399 ## RECLAMATION REFORM ACT OF 1982

1400     36.     (a)     Upon a Contractor's compliance with and discharge of the Repayment

1401 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1402 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1403     (b)     The obligation of a Contractor to pay the Additional Capital Obligation

1404 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1405 the Contractor or the applicability of subsections (a) and (b) of section 213 of the Reclamation

1406 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1407 ## CERTIFICATION OF NONSEGREGATED FACILITIES

1408     37.     The Contractor hereby certifies that it does not maintain or provide for its
1409 employees any segregated facilities at any of its establishments and that it does not permit its
1410 employees to perform their services at any location under its control where segregated facilities
1411 are maintained. It certifies further that it will not maintain or provide for its employees any
1412 segregated facilities at any of its establishments and that it will not permit its employees to
1413 perform their services at any location under its control where segregated facilities are
1414 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1415 Employment Opportunity clause in this Contract. As used in this certification, the term
1416 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1417 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1418 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1419 facilities provided for employees which are segregated by explicit directive or are in fact

1420 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1421 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1422 identical certifications from proposed subcontractors for specific time periods) it will obtain
1423 identical certifications from proposed subcontractors prior to the award of subcontracts
1424 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1425 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1426 following notice to such proposed subcontractors (except where the proposed subcontractors
1427 have submitted identical certifications for specific time periods):

1428 NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1429 CERTIFICATIONS OF NONSEGREGATED FACILITIES

1430 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1431 exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1432 Opportunity clause. The certification may be submitted either for each subcontract or for all
1433 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1434 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1435 <u>NOTICES</u>

1436     38.    Any notice, demand, or request authorized or required by this Contract shall be
1437 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1438 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1439 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1440 postage prepaid, or delivered to the Board of Directors of the Del Puerto Water District, P. O.
1441 Box 1596, Patterson, California 95363-1596. The designation of the addressee or the address
1442 may be changed by notice given in the same manner as provided in this Article for other notices.

1443 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1444     39.   (a)    All payments from the Contractor to the United States under this Contract
1445 shall be by the medium requested by the United States on or before the date payment is due. The
1446 required method of payment may include checks, wire transfers, or other types of payment
1447 specified by the United States.

1448         (b)    Upon execution of this Contract, the Contractor shall furnish the
1449 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1450 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1451 out of the Contractor's relationship with the United States.

1452 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1453     40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1454 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1455 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by

1456   the parties, and no one party shall be considered to have drafted the stated Articles.  Single-
1457   spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1458                             CONFIRMATION OF CONTRACT

1459        41.     Promptly after the execution of this amended Contract, the Contractor will
1460   provide to the Contracting Officer a certified copy of a final decree of a court of competent
1461   jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1462   for the authorization of the execution of this amended Contract.  This amended Contract shall not
1463   be binding on the United States until the Contractor secures a final decree.

1464

1465    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1466    day and year first above written.

1467                                UNITED STATES OF AMERICA

1468                                By: _____
1469                                    Regional Director
1470                                    Interior Region 10: California-Great Basin
1471                                    Bureau of Reclamation

1472                                DEL PUERTO WATER DISTRICT
1473    (SEAL)

1474                                By: _____
1475                                    President of the Board of Directors

1476    Attest:

1477    By: _____
1478        Secretary of the Board of Directors

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
DEL PUERTO WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

Exhibits

Exhibit A – Map of Contractor's Service Area

*This Exhibit is unchanged from current Contract..*

Exhibit B – Rates and Charges

*This Exhibit template is unchanged from current Contract and is updated annually. Rate Schedules may be found at:* https://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

Exhibit C – Repayment Obligation

*This Exhibit template was developed during the WIIN Act Negotiations. Relevant data will be incorporated upon contract execution.*



**Del Puerto Water District**

Contract No. 14-06-200-922-LTR1-P

EXHIBIT A

Legend:
- District Boundary
- Contractor's Service Area

Date: 4/1/2020
N:\Districts\Contracts\del_puerto\delpuerto_20200401.mxd


Miles
0   5   10


BUREAU OF
RECLAMATION

N

214-202-881

**EXHIBIT B**
**DEL PUERTO WATER DISTRICT**
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $43.99 | |
| DMC Aqueduct Intertie | $1.06 | |
| O&M Components | | |
| Water Marketing | $8.97 | $6.12 |
| Storage | $18.01 | $14.99 |
| Deficit Cost | $0.00 | $0.00 |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $72.03 | $21.11 |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | $106.72 | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | $131.82 | |
| **M&I FULL COST RATE** | | $21.11 |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate:* >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | $17.35 | |
| *Tier 3 Rate:* >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | $34.69 | |
| **M&I** | | |
| *Tier 2 Rate:* >80% <=90% of Contract Total [M&I Full Cost Rate - M&I COS Rate]/2 *(Amount to be Added to Tier 1 Rate)* | | $0.00 |
| *Tier 3 Rate:* >90% of Contract Total [M&I Full Cost Rate - M&I COS Rate] *(Amount to Be Added to Tier 1 Rate)* | | $0.00 |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| P.L. 102-575 Surcharge (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | $21.82 |
| P.L. 106-377 Assessment (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | $0.12 |

**EXPLANATORY NOTES**

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 32 AF; 2011 = 21 AF; 2017 = 8 AF; which equals a M&I Historic use average quantity of 20 AF.

Additional detail of rate components is available on the Internet at:
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

JL 3/20/20

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

| | |
|---|---|
| Contractor: | **Del Puerto WD** |
| Facility: | **Delta Mendota Canal** |
| Contract: | **14-06-200-922-LTR1-P** |

## Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba)

| | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 16,546,588 | |
| 2019 Repayment (Estimate) ** | $ | 3,305,770 | |
| Adjusted Construction Cost | $ | 13,240,818 | $ 12,851,579 |
| Intertie Construction Cost (N/A): | $ | 1,588,962 | $ 1,423,126 |
| Total | $ | 14,829,780 | $ 14,274,705 |

**If Paid in Installments (Used 20 yr CMT)**

| | Due**** | | |
|---|---|---|---|
| Payment 1 | 9/1/2020 | $ | 3,613,396 |
| Payment 2 | 9/1/2021 | $ | 3,613,396 |
| Payment 3 | 9/1/2022 | $ | 3,613,396 |
| Payment 4 ~~ | 9/1/2023 | $ | 3,613,396 |
| Total Installment Payments | | $ | 14,453,584 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

## M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 $ | 13,240,818 | $ 1,203,711 | $ 1,197,249 | 1,588,962 | $ 36,113 | $ 35,919 | $ 1,233,168 |
| 2021 $ | 12,037,107 | $ 1,203,711 | $ 1,191,763 | 1,552,849 | $ 36,113 | $ 35,754 | $ 1,227,518 |
| 2022 $ | 10,833,397 | $ 1,203,711 | $ 1,185,834 | 1,516,736 | $ 36,113 | $ 35,576 | $ 1,221,411 |
| 2023 $ | 9,629,686 | $ 1,203,711 | $ 1,179,934 | 1,480,624 | $ 36,113 | $ 35,399 | $ 1,215,334 |
| 2024 $ | 8,425,975 | $ 1,203,711 | $ 1,174,064 | 1,444,511 | $ 36,113 | $ 35,223 | $ 1,209,287 |
| 2025 $ | 7,222,264 | $ 1,203,711 | $ 1,168,223 | 1,408,398 | $ 36,113 | $ 35,048 | $ 1,203,271 |
| 2026 $ | 6,018,554 | $ 1,203,711 | $ 1,162,411 | 1,372,285 | $ 36,113 | $ 34,874 | $ 1,197,285 |
| 2027 $ | 4,814,843 | $ 1,203,711 | $ 1,156,628 | 1,336,173 | $ 36,113 | $ 34,700 | $ 1,191,328 |
| 2028 $ | 3,611,132 | $ 1,203,711 | $ 1,150,873 | 1,300,060 | $ 36,113 | $ 34,528 | $ 1,185,401 |
| 2029 $ | 2,407,421 | $ 1,203,711 | $ 1,145,148 | 1,263,947 | $ 36,113 | $ 34,356 | $ 1,179,504 |
| 2030 $ | 1,203,711 | $ 1,203,711 | $ 1,139,450 | 1,227,834 | $ 36,113 | $ 34,185 | $ 1,173,635 |
| 2031-63 | | | | 1,191,722 | $ 1,191,722 | $ 1,037,563 | $ 1,037,563 |
| Total, Lump Sum Payment | | | $ 12,851,579 | | | $ 1,423,126 | $ 14,274,705 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amount of Reduction, Lump Sum | | $ 389,240 | | | | $ 165,836 | $ 555,075 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 9**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
Fresno Slough Water District
P.O. Box 689
Tranquility, CA 93668

Subject: Water Infrastructure Improvements for the Nation Act Contract No. 14-06-200-4019A-
LTR1-P Between the United States and the Fresno Slough Water District Providing for
Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of
Reclamation appreciates the effort expended by the Fresno Slough Water District and its
representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section
4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the
Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation
Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at
916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
FRESNO SLOUGH WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 14 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 57 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
|  | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
FRESNO SLOUGH WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1      THIS CONTRACT, made this 22nd day of October , 20 21 , in

2      pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3      supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4      as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5      July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6      October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7      (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8      (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9      collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10     OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11     this Contract, hereinafter referred to as the Contracting Officer, and FRESNO SLOUGH

12     WATER DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of

13     California, duly organized, existing, and acting pursuant to the laws thereof;

14     WITNESSETH, That:

15  <u>EXPLANATORY RECITALS</u>

16       [1<sup>st</sup>]    WHEREAS, the United States has constructed and is operating the

17  California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18  beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19  mitigation, protection and restoration, generation and distribution of electric energy, salinity

20  control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21  River, the Trinity River, and the San Joaquin River and their tributaries; and

22       [2<sup>nd</sup>]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23  related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24  to the terms of this Contract; and

25       [3<sup>rd</sup>]    WHEREAS, the rights to Project Water were acquired by the United

26  States pursuant to California law for operation of the Project; and

27       [4<sup>th</sup>]    WHEREAS, the United States and the Contractor entered into Contract

28  No. 14-06-200-4019A, dated July 30, 1968, which established terms for the delivery of 866 acre

29  feet of Schedule 2 water as a permanent adjustment and settlement of the Contractor's asserted

30  claims of rights to water in Fresno Slough, tributary to the San Joaquin River in fulfillment of

31  such rights; and

32       [5<sup>th</sup>]    WHEREAS, Schedule 2 water is not the subject of this Contract and will

33  continue to be delivered and administered under the terms and conditions of Contract No. 14-06-

34  200-4019A; and

35    [6th]    WHEREAS, Contract No. 14-06-200-4019A also established the terms for

36 the delivery of 4,000 acre-feet of supplemental water, hereinafter referred to as Project Water, to

37 the Contractor from Delta Division facilities from July 30, 1968 through December 23, 2003;

38 and

39    [7th]    WHEREAS, the United States and the Contractor have pursuant to

40 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

41 entered into interim renewal contract(s) identified as Contract No(s). 14-06-200-4019A-IR1 and

42 14-06-200-A-IR2, which provided for the delivery of Project Water to the Contractor from

43 March 1, 2004, through February 28, 2006; and

44    [8th]    WHEREAS, the United States and the Contractor entered into a long-term

45 contract identified as Contract No. 14-06-200-4019A-LTR1, hereinafter referred to as the

46 Existing Contract, which provided for the continued water service to the Contractor following

47 expiration of Contract No. 14-06-200-4019A-IR2, and which was in effect the date the WIIN Act

48 was enacted; and

49    [9th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

50 States of America enacted the WIIN Act; and

51    [10th]    WHEREAS, Section 4011(a)(1) provides that "upon request of the

52 contractor, the Secretary of the Interior shall convert any water service contract in effect on the

53 date of enactment of this subtitle and between the United States and a water users' association

54 [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

55 mutually agreeable terms and conditions."; and

56         [11th]   WHEREAS, Section 4011(a)(1) further provides that "the manner of

57 conversion under this paragraph shall be as follows: (A) Water service contracts that were

58 entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

59 this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

60 1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

61 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

62 converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

63         [12th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

64 into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

65 repayment, exchange and transfer contractual rights between the water users' association

66 [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

67 water users' association [Contractor] and their landowners as provided under State law."; and

68         [13th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

69 "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

70 service or repayment contractor to receive water; or (4) except as expressly provided in this

71 section, any obligations under the Federal Reclamation law, including the continuation of

72 Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

73 repayment contractors making prepayments pursuant to this section."; and

74         [14th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

75 Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

76 service contracts into repayment contracts, amend existing repayment contracts, and allow

77  contractors to prepay their construction cost obligations pursuant to applicable Federal

78  Reclamation law; and

79      [15th]  WHEREAS, the United States has determined that the Contractor has

80  fulfilled all of its obligations under the Existing Contract; and

81      [16th]  WHEREAS, the Contractor has demonstrated to the satisfaction of the

82  Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

83  reasonable and beneficial use and/or has demonstrated future demand for water use such that the

84  Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

85  quantity of Project Water to be made available to it pursuant to this Contract; and

86      [17th]  WHEREAS, water obtained from the Project has been relied upon by

87  urban and agricultural areas within California for more than 50 years, and is considered by the

88  Contractor as an essential portion of its water supply; and

89      [18th]  WHEREAS, the economies of regions within the Project, including the

90  Contractor's, depend upon the continued availability of water, including water service from the

91  Project; and

92      [19th]  WHEREAS, the Secretary intends through coordination, cooperation, and

93  partnerships to pursue measures to improve water supply, water quality, and reliability of the

94  Project for all Project purposes; and

95      [20th]  WHEREAS, the mutual goals of the United States and the Contractor

96  include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

97  achieve repayment of the Project as required by law; to guard reasonably against Project Water

98  shortages; to achieve a reasonable balance among competing demands for use of Project Water;

99   and to comply with all applicable environmental statutes, all consistent with the legal obligations

100   of the United States relative to the Project; and

101         [21st]   WHEREAS, the parties intend by this Contract to maintain a cooperative

102   relationship in order to achieve their mutual goals; and

103         [22nd]   WHEREAS, the Contractor has utilized or may utilize transfers, contract

104   assignments, rescheduling, and conveyance of Project Water and non-Project water under this

105   Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

106   beneficial use of water; and

107         [23rd]   WHEREAS, the parties desire and intend that this Contract not provide a

108   disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

109   Explanatory Recital immediately above; and

110         [25th]   WHEREAS, the Contracting Officer and the Contractor agree that this

111   Contract complies with Section 4011 of the WIIN Act; and

112         [26th]   WHEREAS, the Contracting Officer and the Contractor agree to amend

113   and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

114   Reclamation law on the terms and conditions set forth below.

115         NOW, THEREFORE, in consideration of the mutual and dependent covenants

116   herein contained, it is hereby mutually agreed by the parties hereto as follows:

117                              <u>DEFINITIONS</u>

118     1.     When used herein unless otherwise distinctly expressed, or manifestly

119   incompatible with the intent of the parties as expressed in this Contract, the term:

120        (a)    "Additional Capital Obligation" shall mean construction costs or other

121    capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

122    Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

123    (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

124    Stat. 1628) ("WIIN Act");

125        (b)    "Calendar Year" shall mean the period January 1 through December 31,

126    both dates inclusive;

127        (c)    "Charges" shall mean the payments required by Federal Reclamation law

128    in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

129    annually by the Contracting Officer pursuant to this Contract;

130        (d)    "Condition of Shortage" shall mean a condition respecting the Project

131    during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

132    Contract Total;

133        (e)    "Contracting Officer" shall mean the Secretary of the Interior's duly

134    authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

135    or regulation;

136        (f)    "Contract Total" shall mean the maximum amount of water to which the

137    Contractor is entitled under subdivision (a) of Article 3 of this Contract;

138        (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

139    permitted to provide Project Water under this Contract as described in Exhibit "A" attached

140    hereto, which may be modified from time to time in accordance with Article 34 of this Contract

141    without amendment of this Contract;

142        (h)    "CVPIA" shall mean the Central Valley Project Improvement Act, Title

143    XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

144        (i)    "Delta Division Facilities" shall mean those existing and future Project

145    facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

146    the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

147    Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

148    Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

149        (j)    "Eligible Lands" shall mean all lands to which Irrigation Water may be

150    delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

151    1263), as amended;

152        (k)    "Excess Lands" shall mean all lands in excess of the limitations contained

153    in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

154    acreage limitation under Federal Reclamation law;

155        (l)    "Existing Capital Obligation" shall mean the remaining amount of

156    construction costs or other capitalized costs allocable to the Contractor as described in Section

157    4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

158    Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

159    in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

160    Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

161    Exhibit "C", which is incorporated herein by reference;

162        (m)    "Full Cost Rate" shall mean an annual rate, as determined by the

163    Contracting Officer that shall amortize the expenditures for construction properly allocable to the

8

164    Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

165    deficits funded, less payments, over such periods as may be required under Federal Reclamation

166    law, or applicable contract provisions. Interest will accrue on both the construction expenditures

167    and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

168    date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

169    in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

170    The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

171    Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

172            (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

173    be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

174            (o)    "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

175    to the delivery of Irrigation Water;

176            (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
177 primarily for the production of commercial agricultural crops or livestock, and domestic and
178 other uses that are incidental thereto;

179            (q)    "Landholder" shall mean a party that directly or indirectly owns or leases

180    nonexempt land, as provided in 43 CFR 426.2;

181            (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
182 Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
183 of "Irrigation Water" or within another category of water use under an applicable Federal
184 authority;

185            (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

186    the delivery of M&I Water;

187        (t)     "Operation and Maintenance" or "O&M" shall mean normal and

188   reasonable care, control, operation, repair, replacement (other than capital replacement), and

189   maintenance of Project facilities;

190        (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

191   successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

192   the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

193   Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

194   Water Authority;

195        (v)     "Project" shall mean the Central Valley Project owned by the United

196   States and managed by the Department of the Interior, Bureau of Reclamation;

197        (w)    "Project Contractors" shall mean all parties who have contracts for water

198   service for Project Water from the Project with the United States pursuant to Federal

199   Reclamation law;

200        (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

201   delivered by the Secretary in accordance with the statutes authorizing the Project and in

202   accordance with the terms and conditions of water rights acquired pursuant to California law;

203   however, Schedule 2 Water shall not be considered Project Water for purposes of this Contract;

204        (y)     "Rates" shall mean the payments determined annually by the Contracting

205   Officer in accordance with the then-current applicable water ratesetting policies for the Project,

206   as described in subdivision (a) of Article 7 of this Contract;

207        (z)     "Recent Historic Average" shall mean the most recent five (5)-year

208   average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

209   or its preceding contract(s);

210        (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

211   mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

212   amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

213   Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

214   United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

215        (bb)    "Schedule 2 Water" shall mean that water as so defined under Contract

216   No. 14-06-200-4019A with the United States, which will continue to be delivered and

217   administered under said contract;

218        (cc)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

219   successor, or an authorized representative acting pursuant to any authority of the Secretary and

220   through any agency of the Department of the Interior;

221        (dd)    "Tiered Pricing Component" shall be the incremental amount to be paid

222   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

223   for in Exhibit "B";

224        (ee)    "Water Delivered" or "Delivered Water" shall mean Project Water

225   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

226   Officer;

227         (ff)   "Water Made Available" shall mean the estimated amount of Project

228  Water that can be delivered to the Contractor for the upcoming Year as declared by the

229  Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

230         (gg)   "Water Scheduled" shall mean Project Water made available to the

231  Contractor for which times and quantities for delivery have been established by the Contractor

232  and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

233         (hh)   "Year" shall mean the period from and including March 1 of each

234  Calendar Year through the last day of February of the following Calendar Year.

235                <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

236   2.    (a)    This Contract shall be effective November 1, 2020, hereinafter known as

237  the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

238  Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

239  (53 Stat. 1195) as applicable, and applicable law;

240         (1)    *Provided, That* the Contracting Officer shall not seek to terminate

241  this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

242  unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

243  to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

244  or to diligently commence and maintain full curative payments satisfactory to the Contracting

245  Officer within the sixty (60) calendar days' notice period;

246         (2)    *Provided, further, That* the Contracting Officer shall not seek to

247  suspend making water available or declaring Water Made Available pursuant to this Contract for

248  non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

249      Contracting Officer has first provided at least thirty (30) calendar days written notice to the

250      Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

251      curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

252      cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

253      suspended making water available pursuant to this paragraph, upon cure of such non-compliance

254      satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

255      available and declaring Water Made Available pursuant to this Contract;

256                  (3)      *Provided, further, That* this Contract may be terminated at any

257      time by mutual consent of the parties hereto.

258             (b)      Upon complete payment of the Repayment Obligation by the Contractor,

259      and notwithstanding any Additional Capital Obligation that may later be established, the acreage

260      limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

261      and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

262      this Contract shall no longer be applicable.

263             (c)      Notwithstanding any provision of this Contract, the Contractor reserves

264      and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

265      allowed by law.

266             (d)      Notwithstanding any provision of this Contract, the Contractor reserves

267      and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

268      allowed by law.

269    WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR

270    3.    (a)    During each Year, consistent with all applicable State water rights permits,

271    and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

272    Contract, the Contracting Officer shall make available for delivery to the Contractor 4,000 acre-

273    feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

274    accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

275    Articles 4 and 7 of this Contract.  Schedule 2 Water shall continue to be delivered to the

276    Contractor at no cost pursuant to Contract No. 14-06-200-4019A, dated July 30, 1968, and shall

277    not be subject to the provisions of this Contract, and said Contract No. 14-06-200-4019A shall be

278    in full force and effect insofar as it pertains to the furnishing of Schedule 2 Water.

279            (b)    Because the capacity of the Project to deliver Project Water has been

280    constrained in recent years and may be constrained in the future due to many factors including

281    hydrologic conditions and implementation of Federal and State laws, the likelihood of the

282    Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

283    Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

284    programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

285    CVPIA projected that the Contract Total set forth in this Contract will not be available to the

286    Contractor in many years.  During the most recent five years prior to execution of the Existing

287    Contract, the Recent Historic Average Water Made Available to the Contractor was 2,632 acre-

288    feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

289    parties under any provision of this Contract.

290          (c)     The Contractor shall utilize the Project Water in accordance with all

291   applicable legal requirements.

292               (1)     In the event any Project Contractor (other than a Cross Valley

293   Contractor) that receives Project Water through the Delta Division Facilities obtains a

294   contractual agreement that the Contracting Officer shall make Project Water available at a point

295   or points of delivery in or north of the Delta, at the request of the Contractor and upon

296   completion of any required environmental documentation, this Contract shall be amended to

297   provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

298   this Contract shall be limited solely to those changes made necessary by the addition of such

299   alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

300   of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

301   amendment.

302          (d)     The Contractor shall make reasonable and beneficial use of all water

303   furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

304   groundwater banking programs, surface water storage programs, and other similar programs

305   utilizing Project Water or other water furnished pursuant to this Contract conducted within the

306   Contractor's Service Area which are consistent with applicable State law and result in use

307   consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

308   program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

309   Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

310   sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

311   the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

15

312    compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

313    banking programs, surface water storage programs, and other similar programs utilizing Project

314    Water or other water furnished pursuant to this Contract conducted outside the Contractor's

315    Service Area may be permitted upon written approval of the Contracting Officer, which approval

316    will be based upon environmental documentation, Project Water rights, and Project operational

317    concerns. The Contracting Officer will address such concerns in regulations, policies, or

318    guidelines.

319            (e)     The Contractor shall comply with requirements applicable to the

320    Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

321    of any water service contract between the Contracting Officer and the Contractor in effect

322    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

323    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

324    implement. The Existing Contract, which evidences in excess of 36 years of diversions for

325    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

326    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

327    required biological assessment(s) prepared pursuant to the ESA, and any other needed

328    environmental review. Nothing herein shall be construed to prevent the Contractor from

329    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

330    biological opinion or other environmental documentation referred to in this Article.

331            (f)     Following the declaration of Water Made Available under Article 4 of this

332    Contract, the Contracting Officer will make a determination whether Project Water, or other

333    water available to the Project, can be made available to the Contractor in addition to the Contract

16

334     Total under this Article during the Year without adversely impacting other Project Contractors.

335     At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

336     making such a determination. If the Contracting Officer determines that Project Water, or other

337     water available to the Project, can be made available to the Contractor, the Contracting Officer

338     will announce the availability of such water and shall so notify the Contractor as soon as

339     practical. The Contracting Officer will thereafter meet with the Contractor and other Project

340     Contractors capable of taking such water to determine the most equitable and efficient allocation

341     of such water. If the Contractor requests the delivery of any quantity of such water, the

342     Contracting Officer shall make such water available to the Contractor in accordance with

343     applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

344     contractual commitments, water rights, and operational constraints, long term Project

345     Contractors shall have a first right to acquire such water, including Project Water made available

346     pursuant to Section 215 of the Reclamation Reform Act of 1982.

347           (g)     The Contractor may request permission to reschedule for use during the

348     subsequent Year some or all of the Water Made Available to the Contractor during the current

349     Year, referred to as "rescheduled water." The Contractor may request permission to use during

350     the current Year a quantity of Project Water which may be made available by the United States

351     to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

352     written approval may permit such uses in accordance with applicable statutes, regulations,

353     guidelines, and policies.

354           (h)     The Contractor's right pursuant to Federal Reclamation law and applicable

355     State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

17

356 shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

357 Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

358 August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

359 sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

360 subdivision (b) of Article 12 of this Contract.

361       (i)     Project Water furnished to the Contractor pursuant to this Contract may be

362 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

363 Contract upon written approval by the Contracting Officer in accordance with the terms and

364 conditions of such approval.

365       (j)     The Contracting Officer shall make reasonable efforts to protect the water

366 rights necessary for the Project and to provide the water available under this Contract. The

367 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

368 extent permitted by law, in administrative proceedings related to the Project Water rights;

369 *Provided, That* the Contracting Officer retains the right to object to the substance of the

370 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

371 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

372 Contract to use Project Water.

373                     <u>TIME FOR DELIVERY OF WATER</u>

374    4.   (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

375 announce the Contracting Officer's expected declaration of the Water Made Available. Such

376 declaration will be expressed in terms of Water Made Available and the Recent Historic Average

377 and will be updated monthly, and more frequently if necessary, based on the then-current

378 operational and hydrologic conditions and a new declaration with changes, if any, to the Water

379 Made Available will be made. The Contracting Officer shall provide forecasts of Project

380 operations and the basis of the estimate, with relevant supporting information, upon the written

381 request of the Contractor. Concurrently with the declaration of the Water Made Available, the

382 Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

383    (b) On or before each March 1 and at such other times as necessary, the

384 Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

385 Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

386 United States to the Contractor pursuant to this Contract for the Year commencing on such

387 March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

388 according to the approved schedule for the Year commencing on such March 1

389    (c) The Contractor shall not schedule Project Water in excess of the quantity

390 of Project Water the Contractor intends to put to reasonable and beneficial use within the

391 Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

392 during any Year.

393    (d) Subject to the conditions set forth in subdivision (a) of Article 3 of this

394 Contract, the United States shall deliver Project Water to the Contractor in accordance with the

395 initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

396 written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

397 time prior to the date(s) on which the requested change(s) is/are to be implemented.

19

398      POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER

399      5.      (a)      Project Water scheduled pursuant to subdivision (b) of Article 4 of this

400      Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

401      any additional point or points of delivery either on Project facilities or another location or

402      locations mutually agreed to in writing by the Contracting Officer and the Contractor.

403      (b)      The Contracting Officer, either directly or indirectly through its written

404      agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

405      maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

406      the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

407      Article.

408      (c)      The Contractor shall deliver Irrigation Water in accordance with any

409      applicable land classification provisions of Federal Reclamation law and the associated

410      regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

411      Service Area unless approved in advance by the Contracting Officer.

412      (d)      All Water Delivered to the Contractor pursuant to this Contract shall be

413      measured and recorded with equipment furnished, installed, operated, and maintained by the

414      Contracting Officer either directly or indirectly through its written agreements(s) with the

415      Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

416      Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

417      this Article. Upon the request of either party to this Contract, the Contracting Officer shall

418      investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

419      accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

420    therein. For any period of time when accurate measurements have not been made, the

421    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

422    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

423    of time.

424            (e)    Absent a separate contrary written agreement with the Contractor, neither

425    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

426    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

427    pursuant to this Contract beyond the point or points of delivery established pursuant to

428    subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

429    employees, agents, and assigns on account of damage or claim of damage of any nature

430    whatsoever for which there is legal responsibility, including property damage, personal injury, or

431    death arising out of or connected with the control, carriage, handling, use, disposal, or

432    distribution of such Water Delivered beyond such point or points of delivery except for any

433    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

434    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

435    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

436    Contracting Officer or any of its officers, employees, agents, and assigns, including the

437    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

438    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

439    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

440    Federal Entity(ies).

441 <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

442    6.    (a)    The Contractor has established a measuring program satisfactory to the

443 Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

444 purposes within the Contractor's Service Area is measured at each agricultural turnout and such

445 water delivered for M&I purposes is measured at each M&I service connection. The water

446 measuring devices or water measuring methods of comparable effectiveness must be acceptable

447 to the Contracting Officer. The Contractor shall be responsible for installing, operating,

448 maintaining, and repairing all such measuring devices and implementing all such water

449 measuring methods at no cost to the United States. The Contractor shall use the information

450 obtained from such water measuring devices or water measuring methods to ensure its proper

451 management of the water; to bill water users for water delivered by the Contractor; and, if

452 applicable, to record water delivered for M&I purposes by customer class as defined in the

453 Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

454 contained, however, shall preclude the Contractor from establishing and collecting any charges,

455 assessments, or other revenues authorized by California law. The Contractor shall include a

456 summary of all its annual surface water deliveries in the annual report described in subdivision

457 (c) of Article 25 of this Contract.

458        (b)    To the extent the information has not otherwise been provided, upon

459 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

460 report describing the measurement devices or water measuring methods being used or to be used

461 to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

462 service connections or alternative measurement programs approved by the Contracting Officer,

463    at which such measurement devices or water measuring methods are being used, and, if

464    applicable, identifying the locations at which such devices and/or methods are not yet being used

465    including a time schedule for implementation at such locations. The Contracting Officer shall

466    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

467    if any, of the measuring devices or water measuring methods identified in the Contractor's report

468    and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

469    the Contracting Officer notifies the Contractor that the measuring devices or methods are

470    inadequate, the parties shall within 60 days following the Contracting Officer's response,

471    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

472    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

473    compliance with subdivision (a) of this Article.

474            (c)     All new surface water delivery systems installed within the Contractor's

475    Service Area after the Effective Date shall also comply with the measurement provisions

476    described in subdivision (a) of this Article.

477            (d)     The Contractor shall inform the Contracting Officer and the State of

478    California in writing by April 30 of each Year of the monthly volume of surface water delivered

479    within the Contractor's Service Area during the previous Year.

480            (e)     The Contractor shall inform the Contracting Officer and the Operating

481    Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

482    Irrigation Water and M&I Water taken during the preceding month.

RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
REPAYMENT OF FACILITIES

483
484

485     7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

486 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

487 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

488 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

489 Article, subsection (b), the Contractor's Project construction and other obligations shall be

490 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

491 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

492 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

493 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

494 rules and regulations, or policies, and (iii) other applicable provisions of this Contract. Payments

495 shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

496 agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

497 Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

498 forth in Exhibit "B", as may be revised annually.

499     (1)     The Contractor shall pay the United States as provided for in this

500 Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

501 in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

502 be established to recover its estimated reimbursable costs included in the operation and

503    maintenance component of the Rate and amounts established to recover deficits and other

504    charges, if any, including construction costs as identified in the following subdivisions.

505             (2)    In accordance with the WIIN Act, the Contractor's allocable share

506    of Project construction costs will be repaid pursuant to the provisions of this Contract.

507             (A)    The amount due and payable to the United States, pursuant

508    to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

509    computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

510    as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

511    installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

512    set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020,

513    as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

514    Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

515    amount due using the lump sum alternative. If such notice is not provided by such date, the

516    Contractor shall be deemed to have elected the installment payment alternative, in which case,

517    the first such payment shall be made no later than December 30, 2020. The second payment

518    shall be made no later than the first anniversary of the first payment date. The third payment

519    shall be made no later than the second anniversary of the first payment date. The final payment

520    shall be made no later than November 1, 2023. If the installment payment option is elected by

521    the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

522    by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

523    Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

524    methodology as was used to compute the initial annual installment payment amount, which is

525 illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

526 established, receipt of the Contractor's payment of the Repayment Obligation to the United

527 States shall fully and permanently satisfy the Existing Capital Obligation.

528 (B) Additional Capital Obligations that are not reflected in, the

529 schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

530 prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

531 Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

532 Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

533 Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

534 the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

535 be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

536 however, will be considered under subdivision (b) of this Article. A separate agreement shall be

537 established by the Contractor and the Contracting Officer to accomplish repayment of the

538 Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

539 WIIN Act, subject to the following:

540 (1) If the collective Additional Capital Obligation

541 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

542 is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

543 to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

544 notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

545 amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

546                         (2)      If the collective Additional Capital Obligation

547   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

548   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

549   properly assignable to the Contractor shall be repaid as provided by applicable Federal

550   Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

551   five million dollars ($5,000,000) shall not be a precedent in any other context.

552                    (b)      In the event that the final cost allocation referenced in Section 4011(b) of

553   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

554   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

555   allocated costs. The term of such additional repayment contract shall be not less than one (1)

556   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

557   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

558   the event that the final cost allocation indicates that the costs properly assignable to the

559   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

560   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

561   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

562                    (c)      The Contracting Officer shall notify the Contractor of the Rates, Charges,

563   and Tiered Pricing Component as follows:

564                        (1)      Prior to July 1 of each Calendar Year, the Contracting Officer shall

565   provide the Contractor an estimate of the Charges for Project Water that will be applied to the

566   period October 1, of the current Calendar Year, through September 30, of the following Calendar

567   Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

568   to review and comment on such estimates.  On or before September 15 of each Calendar Year,

569   the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

570   the period October 1 of the current Calendar Year, through September 30, of the following

571   Calendar Year, and such notification shall revise Exhibit "B."

572            (2)    Prior to October 1 of each Calendar Year, the Contracting Officer

573   shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

574   for Project Water for the following Year and the computations and cost allocations upon which

575   those Rates are based.  The Contractor shall be allowed not less than two months to review and

576   comment on such computations and cost allocations.  By December 31 of each Calendar Year,

577   the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

578   Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

579            (d)    At the time the Contractor submits the initial schedule for the delivery of

580   Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

581   Contractor shall make an advance payment to the United States equal to the total amount payable

582   pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

583   scheduled to be delivered pursuant to this Contract during the first two calendar months of the

584   Year.  Before the end of the first month and before the end of each calendar month thereafter, the

585   Contractor shall make an advance payment to the United States, at the Rate(s) set under

586   subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

587   during the second month immediately following.  Adjustments between advance payments for

588   Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

589   the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

590   to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

591   Contract during any month shall be accompanied with appropriate advance payment, at the Rates

592   then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

593   payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

594   this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

595   additional Project Water shall be delivered to the Contractor unless and until an advance

596   payment at the Rates then in effect for such additional Project Water is made. Final adjustment

597   between the advance payments for the Water Scheduled and payments for the quantities of Water

598   Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

599   later than April 30th of the following Year, or 60 days after the delivery of Project Water

600   rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

601   the last day of February.

602          (e)     The Contractor shall also make a payment in addition to the Rate(s) in

603   subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

604   appropriate Tiered Pricing Component then in effect, before the end of the month following the

605   month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

606   Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

607   consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

608   water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

609   there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

610   shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

611   for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

612   through the adjustment of payments due to the United States for Charges for the next month.

613   Any amount to be paid for past due payment of Charges and the Tiered Pricing shall be

614   computed pursuant to Article 19 of this Contract.

615          (f)     The Contractor shall pay for any Water Delivered under subdivision (a),

616   (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

617   applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

618   policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

619   Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

620   under subdivision (a) of this Article.

621          (g)     Payments to be made by the Contractor to the United States under this

622   Contract may be paid from any revenues available to the Contractor.

623          (h)     All revenues received by the United States from the Contractor relating to

624   the delivery of Project Water or the delivery of non-Project water through Project facilities shall

625   be allocated and applied in accordance with Federal Reclamation law and the associated rules or

626   regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

627          (i)     The Contracting Officer shall keep its accounts pertaining to the

628   administration of the financial terms and conditions of its long-term contracts, in accordance

629   with applicable Federal standards, so as to reflect the application of Project costs and revenues.

630   The Contracting Officer shall, each Year upon request of the Contractor, provide to the

631   Contractor a detailed accounting of all Project and Contractor expense allocations, the

632   disposition of all Project and Contractor revenues, and a summary of all water delivery

633   information. The Contracting Officer and the Contractor shall enter into good faith negotiations

634     to resolve any discrepancies or disputes relating to accountings, reports, or information.

635          (j)      The parties acknowledge and agree that the efficient administration of this

636     Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

637     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

638     and/or for making and allocating payments, other than those set forth in this Article may be in

639     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

640     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

641     this Contract is in effect without amending this Contract.

642          (k)     (1)      Beginning at such time as deliveries of Project Water in a Year

643     exceed 80 percent of the Contract Total, then before the end of the month following the month of

644     delivery the Contractor shall make an additional payment to the United States equal to the

645     applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

646     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

647     Contract Total, shall equal one-half of the difference between the Rate established under

648     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

649     Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

650     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

651     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

652     Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

653     subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

654     Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

655     the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

656         (2)     Subject to the Contracting Officer's written approval, the

657   Contractor may request and receive an exemption from such Tiered Pricing Component for

658   Project Water delivered to produce a crop which the Contracting Officer determines will provide

659   significant and quantifiable habitat values for waterfowl in fields where the water is used and the

660   crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

661   Irrigation Water shall apply only if such habitat values can be assured consistent with the

662   purposes of the CVPIA through binding agreements executed with or approved by the

663   Contracting Officer prior to use of such water.

664         (3)     For purposes of determining the applicability of the Tiered Pricing

665   Component pursuant to this Article, Water Delivered shall include Project Water that the

666   Contractor transfers to others but shall not include Project Water transferred to the Contractor,

667   nor shall it include the additional water provided to the Contractor under the provisions of

668   subdivision (f) of Article 3 of this Contract.

669         (l)     For the term of this Contract, Rates applied under the respective

670   ratesetting policies will be established to recover only reimbursable O&M (including any

671   deficits) and capital costs of the Project, as those terms are used in the then-current Project

672   ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

673   applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

674   practices which implement the Contracting Officer's ratesetting policies will not be implemented

675   until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

676   need, and impact of the proposed change.

677         (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

678    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

679    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

680    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

681    transferred Project Water to the transferee's point of delivery.  If the Contractor is receiving

682    lower Rates and Charges because of inability to pay and is transferring Project Water to another

683    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

684    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

685            (n)     Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

686    Officer is authorized to adjust determinations of ability to pay every five years.

687            (o)     Omitted

688                    NON-INTEREST BEARING O&M DEFICITS

689       8.     The Contractor and the Contracting Officer concur that, as of the Effective Date

690    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

691    therefore.

692              SALES, TRANSFERS, OR EXCHANGES OF WATER

693       9.    (a)     The right to receive Project Water provided for in this Contract may be

694    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

695    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

696    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

697    Water under this Contract may take place without the prior written approval of the Contracting

698    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

699    exchanges shall be approved absent all appropriate environmental documentation, including, but

700    not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

701    documentation should include, as appropriate, an analysis of groundwater impacts and economic

702    and social effects, including environmental justice, of the proposed water transfers on both the

703    transferor and transferee.

704           (b)    In order to facilitate efficient water management by means of water

705    transfers of the type historically carried out among Project Contractors located within the same

706    geographical area and to allow the Contractor to participate in an accelerated water transfer

707    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

708    all necessary environmental documentation, including, but not limited to, documents prepared

709    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

710    the Contracting Officer shall determine whether such transfers comply with applicable law.

711    Following the completion of the environmental documentation, such transfers addressed in such

712    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

713    require prior written approval by the Contracting Officer. Such environmental documentation

714    and the Contracting Officer's compliance determination shall be reviewed every five years and

715    updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

716    subsequent environmental documentation shall include an alternative to evaluate not less than the

717    quantity of Project Water historically transferred within the same geographical area.

718           (c)    For a water transfer to qualify under subdivision (b) of this Article, such

719    water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

720    years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

721    activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

722    be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

723    within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

724    through existing facilities with no new construction or modifications to facilities and be between

725    existing Project Contractors and/or the Contractor and the United States, Department of the

726    Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

727    requirements imposed for protection of the environment and Indian Trust Assets, as defined

728    under Federal law.

729    <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

730    10.    (a)    The amount of any overpayment by the Contractor of the Contractor's

731    O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

732    liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

733    more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

734    of such overpayment, at the option of the Contractor, may be credited against amounts to become

735    due to the United States by the Contractor. With respect to overpayment, such refund or

736    adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

737    have the right to the use of any of the Project Water supply provided for by this Contract. All

738    credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

739    obtaining direction as to how to credit or refund such overpayment in response to the notice to

740    the Contractor that it has finalized the accounts for the Year in which the overpayment was

741    made.

742    (b)    All advances for miscellaneous costs incurred for work requested by the

743    Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

744 when the work has been completed. If the advances exceed the actual costs incurred, the

745 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

746 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

747 Contract.

748 <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

749     11.   (a)   Subject to: (i) the authorized purposes and priorities of the Project and the

750 requirements of Federal law, and (ii) the obligations of the United States under existing

751 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

752 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

753 provided in this Contract.

754     (b)   The Contracting Officer or Operating Non-Federal Entity(ies) may

755 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

756 provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

757 of the Project facilities or any part thereof necessary for the delivery of Project Water to the

758 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

759 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

760 except in case of emergency, in which case no notice need be given; *Provided, That* the United

761 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

762 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

763 the United States will, if possible, deliver the quantity of Project Water which would have been

764 delivered hereunder in the absence of such discontinuance or reduction.

765     (c)   The United States reserves the right to all seepage and return flow water

766     derived from Water Delivered to the Contractor hereunder which escapes or is discharged

767     beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

768     the United States any right to seepage or return flow being put to reasonable and beneficial use

769     pursuant to this Contract within the Contractor's Service Area by the Contractor or those

770     claiming by, through, or under the Contractor.

771           <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

772         12.     (a)     In its operation of the Project, the Contracting Officer will use all
773 reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
774 made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
775 determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
776 Contractor of said determination as soon as practicable.

777            (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting
778 or other similar operational errors affecting the Project; drought and other physical or natural
779 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
780 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
781 17 of this Contract, no liability shall accrue against the United States or any of its officers,
782 agents, or employees for any damage, direct or indirect, arising therefrom.

783            (c)     In any Year in which there may occur a Condition of Shortage for any of

784     the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

785     Article, the Contracting Officer will first allocate the available Project Water consistent with the

786     Project M&I Water Shortage Policy as finally adopted after environmental review for

787     determining the amount of Project Water Available for delivery to the Project Contractors.

788     Subject to the foregoing allocation, in any year in which there may occur a Condition of

789     Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

790     others entitled to Project Water from Delta Division Facilities under long-term water service or

791     repayment contracts (or renewals thereof or binding commitments therefore) in force on

792     February 28, 2005, as follows:

793                     (1)      The Contracting Officer shall make an initial and subsequent

794     determination as necessary of the total quantity of Project Water estimated to be scheduled or

795     actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

796     renewal, long-term water service or repayment contracts then in force for the delivery of Project

797     Water by the United States from Delta Division Facilities during the relevant Year, the quantity

798     so determined being hereinafter referred to as the scheduled total;

799                     (2)      A determination shall be made of the total quantity of Project

800     Water that is available for meeting the scheduled total, the quantity so determined being

801     hereinafter referred to as the available supply;

802                     (3)      The total quantity of Project Water estimated to be scheduled or

803     actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

804     of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

805     hereinafter referred to as the Contractor's proportionate share; and

806                     (4)      The available supply shall be multiplied by the Contractor's

807     proportionate share and the result shall be the quantity of Project Water made available by the

808     United States to the Contractor for the relevant Year in accordance with the schedule developed

809     by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

810     amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

811     that the Contracting Officer can increase or needs to decrease the available supply for delivery

812     from Delta Division Facilities to long-term water service and repayment contractors during the

813     relevant Year, such additions or reductions to the available supply shall be apportioned

38

814 consistent with subparagraphs (1) through (4), inclusive.

815        (d)     By entering into this Contract, the Contractor does not waive any legal

816 rights or remedies it may have to file or participate in any administrative or judicial proceeding

817 contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

818 such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

819 implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

820 *That* the Contractor has commenced any such judicial challenge or any administrative procedures

821 necessary to institute any judicial challenge within six months of the policy becoming final. By

822 agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

823 that it may have to assert in such a proceeding. Nothing contained herein shall be interpreted to

824 validate or invalidate the Project M&I Water Shortage Policy.

825 <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

826     13.    (a)     To the extent applicable, the Contractor shall not be deemed to have

827 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

828 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

829 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

830        (b)     Upon complete payment of the Repayment Obligation by the Contractor,

831 this Article 13 shall no longer be applicable.

832 <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

833     14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
834 pursuant to this Contract is subject to Federal Reclamation law, including but not limited·to, the
835 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
836 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
837 law.

838 <div align="center">PROTECTION OF WATER AND AIR QUALITY</div>

839     15.    (a)    Omitted

840              (b)    The United States will care for, operate and maintain reserved works in a
841 manner that preserves the quality of the water at the highest level possible as determined by the
842 Contracting Officer. The United States does not warrant the quality of the water delivered to the
843 Contractor and is under no obligation to furnish or construct water treatment facilities to
844 maintain or improve the quality of water delivered to the Contractor.

845 None of the foregoing affects or modifies the obligations of the United States under Contract No.

846 14-06-200-4019A, dated July 30, 1968, with respect to Schedule 2 Water, including but not

847 limited to, Article 10 of said contract.

848              (c)    The Contractor will comply with all applicable water and air pollution
849 laws and regulations of the United States and the State of California; and will obtain all required
850 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
851 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
852 State, and local water quality standards applicable to surface and subsurface drainage and/or
853 discharges generated through the use of Federal or Contractor facilities or Project Water
854 provided by the Contractor within its Service Area.

855              (d)    This Article shall not affect or alter any legal obligations of the Secretary
856 to provide drainage or other discharge services.

857              (e)    Omitted

858 <div align="center">WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
859 STATES</div>

860     16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

861 other than from the United States and Irrigation Water furnished pursuant to the terms of this

862 Contract may be simultaneously transported through the same distribution facilities of the

863 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

864 and non-Project water were constructed without funds made available pursuant to Federal

865 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

<div align="center">40</div>

866    Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

867    Irrigation Water must be established through the certification requirements as specified in the

868    Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

869    Eligible Lands within the Contractor's Service Area can be established and the quantity of

870    Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

871    Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

872    Project water are (were) constructed with funds made available pursuant to Federal Reclamation

873    law, the non-Project water will be subject to the acreage limitation provisions of Federal

874    Reclamation law, unless the Contractor pays to the United States the incremental fee described in

875    43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

876    annually the cost to the Federal Government, including interest, of storing or delivering non-

877    Project water, which for purposes of this Contract shall be determined as follows: The quotient

878    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

879    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

880    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

881    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

882    within the Contractor's Service Area that receives non-Project water through Federally financed

883    or constructed facilities. The incremental fee calculation methodology will continue during the

884    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

885    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

886    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

887    adopted, it shall supersede this provision.

888         (b)      Water or water rights now owned or hereafter acquired by the Contractor,

889   other than from the United States may be stored, conveyed, and/or diverted through Project

890   facilities, subject to the completion of appropriate environmental documentation, with the

891   approval of the Contracting Officer and the execution of any contract determined by the

892   Contracting Officer to be necessary, consistent with the following provisions:

893         (1)      The Contractor may introduce non-Project water into Project

894   facilities and deliver said water to lands within the Contractor's Service Area, including

895   Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

896   Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

897   policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

898   use power policy is applicable, each as amended, modified, or superseded from time to time.

899         (2)      Delivery of such non-Project water in and through Project facilities

900   shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

901   purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

902   available to other Project Contractors; (iii) interfere with the delivery of contractual water

903   entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

904   the Project facilities.

905         (3)      Neither the United States nor the Operating Non-Federal

906   Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

907   is introduced into or after it is delivered from the Project facilities. The Contractor hereby

908   releases and agrees to defend and indemnify the United States and the Operating Non-Federal

909   Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

42

910 persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

911 employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

912 (ii) diverting such non-Project water into Project facilities.

913                     (4)      Diversion of such non-Project water into Project facilities shall be

914 consistent with all applicable laws, and if involving groundwater, consistent with any applicable

915 groundwater management plan for the area from which it was extracted.

916                     (5)      After Project purposes are met, as determined by the Contracting

917 Officer, the United States and Project Contractors entitled to Project Water from Delta Division

918 Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

919 available by the Contracting Officer for conveyance and transportation of non-Project water prior

920 to any such remaining capacity being made available to non-Project contractors. Other Project

921 Contractors shall have a second priority to any remaining capacity of facilities declared to be

922 available by the Contracting Officer for conveyance and transportation of non-Project water prior

923 to any such remaining capacity being made available to non-Project contractors.

924              (c)      Upon complete payment of the Repayment Obligation by the Contractor,

925 subdivision (a) of this Article 16 shall no longer be applicable.

926 <u>OPINIONS AND DETERMINATIONS</u>

927      17.    (a)      Where the terms of this Contract provide for actions to be based upon the

928 opinion or determination of either party to this Contract, said terms shall not be construed as

929 permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

930 determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

931 reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

43

932   or unreasonable opinion or determination. Each opinion or determination by either party shall be

933   provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

934   affect or alter the standard of judicial review applicable under Federal law to any opinion or

935   determination implementing a specific provision of Federal law embodied in statute or

936   regulation.

937         (b)     The Contracting Officer shall have the right to make determinations

938   necessary to administer this Contract that are consistent with the provisions of this Contract, the

939   laws of the United States and of the State of California, and the rules and regulations

940   promulgated by the Secretary. Such determinations shall be made in consultation with the

941   Contractor to the extent reasonably practicable.

942                   COORDINATION AND COOPERATION

943      18.    (a)     In order to further their mutual goals and objectives, the Contracting

944   Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

945   with other affected Project Contractors, in order to improve the O&M of the Project. The

946   communication, coordination, and cooperation regarding O&M shall include, but not be limited

947   to, any action which will or may materially affect the quantity or quality of Project Water supply,

948   the allocation of Project Water supply, and Project financial matters including, but not limited to,

949   budget issues. The communication, coordination, and cooperation provided for hereunder shall

950   extend to all provisions of this Contract. Each party shall retain exclusive decision making

951   authority for all actions, opinions, and determinations to be made by the respective party.

952         (b)     Within 120 days following the Effective Date, the Contractor, other

953   affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

44

954 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

955 amended as necessary separate and apart from this Contract. The goal of this process shall be to

956 provide, to the extent practicable, the means of mutual communication and interaction regarding

957 significant decisions concerning Project O&M on a real-time basis.

958 (c) In light of the factors referred to in subdivision (b) of Article 3 of this

959 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

960 intent:

961 (1) The Contracting Officer will, at the request of the Contractor,

962 assist in the development of integrated resource management plans for the Contractor. Further,

963 the Contracting Officer will, as appropriate, seek authorizations for implementation of

964 partnerships to improve water supply, water quality, and reliability.

965 (2) The Secretary will, as appropriate, pursue program and project

966 implementation and authorization in coordination with Project Contractors to improve the water

967 supply, water quality, and reliability of the Project for all Project purposes.

968 (3) The Secretary will coordinate with Project Contractors and the

969 State of California to seek improved water resource management.

970 (4) The Secretary will coordinate actions of agencies within the

971 Department of the Interior that may impact the availability of water for Project purposes.

972 (5) The Contracting Officer shall periodically, but not less than

973 annually, hold division-level meetings to discuss Project operations, division-level water

974 management activities, and other issues as appropriate.

975 (d) Without limiting the contractual obligations of the Contracting Officer

976 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

977 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

978 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

979 protect health, safety, or the physical integrity of structures or facilities.

980 <u>CHARGES FOR DELINQUENT PAYMENTS</u>

981     19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
982 charges on delinquent payments. If a payment is not received by the due date, the Contractor
983 shall pay an interest charge on the delinquent payment for each day the payment is delinquent
984 beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
985 addition to the interest charge, an administrative charge to cover additional costs of billing and
986 processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
987 shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
988 payment is delinquent beyond the due date, based on the remaining balance of the payment due
989 at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
990 collection services associated with a delinquent payment.

991     (b)    The interest rate charged shall be the greater of either the rate prescribed
992 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
993 payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
994 determined as of the due date and remain fixed for the duration of the delinquent period.

995     (c)    When a partial payment on a delinquent account is received, the amount
996 received shall be applied first to the penalty charges, second to the administrative charges, third
997 to the accrued interest, and finally to the overdue payment.

998 <u>EQUAL EMPLOYMENT OPPORTUNITY</u>

999     20.    During the performance of this Contract, the Contractor agrees as follows:

1000     (a)    The Contractor will not discriminate against any employee or applicant for
1001 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1002 origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1003 that employees are treated during employment, without regard to their race, color, religion, sex,
1004 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1005 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1006 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1007 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1008 places, available to employees and applicants for employment, notices to be provided by the
1009 Contracting Officer setting forth the provisions of this nondiscrimination clause.

46

1010         (b)     The Contractor will, in all solicitations or advertisements for employees
1011 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1012 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1013 gender identity, or national origin.

1014         (c)     The Contractor will not discharge or in any other manner discriminate
1015 against any employee or applicant for employment because such employee or applicant has
1016 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1017 employee or applicant. This provision shall not apply to instances in which an employee who
1018 has access to the compensation information of other employees or applicants as part of such
1019 employee's essential job functions discloses the compensation of such other employees or
1020 applicants to individuals who do not otherwise have access to such information, unless such
1021 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1022 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1023 consistent with the Contractor's legal duty to furnish information.

1024         (d)     The Contractor will send to each labor union or representative of workers
1025 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1026 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1027 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1028 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1029 applicants for employment.

1030         (e)     The Contractor will comply with all provisions of Executive Order No.
1031 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1032 Labor.

1033         (f)     The Contractor will furnish all information and reports required by
1034 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1035 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1036 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1037 compliance with such rules, regulations, and orders.

1038         (g)     In the event of the Contractor's noncompliance with the nondiscrimination
1039 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1040 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1041 ineligible for further Government contracts in accordance with procedures authorized in
1042 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1043 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1044 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1045         (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1046 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1047 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,

1048 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1049 will take such action with respect to any subcontract or purchase order as may be directed by the
1050 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1051 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1052 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1053 Contractor may request the United States to enter into such litigation to protect the interests of
1054 the United States.

## GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1056      21.    (a)    The obligation of the Contractor to pay the United States as provided in
1057 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1058 obligation may be distributed among the Contractor's water users and notwithstanding the default
1059 of individual water users in their obligation to the Contractor.

1060            (b)    The payment of charges becoming due pursuant to this Contract is a
1061 condition precedent to receiving benefits under this Contract. The United States shall not make
1062 water available to the Contractor through Project facilities during any period in which the
1063 Contractor is in arrears in the advance payment of water rates due the United States. The
1064 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1065 parties that are in arrears in the advance payment of water rates as levied or established by the
1066 Contractor.

1067            (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1068 obligation to require advance payment for water rates which it levies.

## COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1070      22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1071 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1072 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1073 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1074 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1075 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1076 Interior and/or Bureau of Reclamation.

1077            (b)    These statutes prohibit any person in the United States from being
1078 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1079 discrimination under any program or activity receiving financial assistance from the Bureau of
1080 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1081 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1082 obligation, including permitting officials of the United States to inspect premises, programs, and
1083 documents.

1084         (c)     The Contractor makes this Contract in consideration of and for the
1085 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1086 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1087 Reclamation, including installment payments after such date on account of arrangements for
1088 Federal financial assistance which were approved before such date. The Contractor recognizes
1089 and agrees that such Federal assistance will be extended in reliance on the representations and
1090 agreements made in this Article and that the United States reserves the right to seek judicial
1091 enforcement thereof.

1092         (d)     Complaints of discrimination against the Contractor shall be investigated
1093 by the Contracting Officer's Office of Civil Rights.

1094 <u>PRIVACY ACT COMPLIANCE</u>

1095     23.    (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1096 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1097 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1098 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1099 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1100 C.F.R. § 426.18.

1101         (b)     With respect to the application and administration of the criminal penalty
1102 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1103 employees who are responsible for maintaining the certification and reporting records referenced
1104 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1105 U.S.C. § 552a(m).

1106         (c)     The Contracting Officer or a designated representative shall provide the
1107 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1108 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1109 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1110 information contained in the Landholders' certification and reporting records.

1111         (d)     The Contracting Officer shall designate a full-time employee of the
1112 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1113 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1114 The Contractor is authorized to grant requests by individuals for access to their own records.

1115         (e)     The Contractor shall forward promptly to the System Manager each
1116 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1117 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1118 System Manager with information and records necessary to prepare an appropriate response to
1119 the requester. These requirements do not apply to individuals seeking access to their own

1120    certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1121    the requester elects to cite the Privacy Act as an authority for the request.

1122             (f)      Upon complete payment of the Repayment Obligation by the Contractor,

1123    this Article 23 will no longer be applicable.

## CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS

1125       24.      In addition to all other payments to be made by the Contractor pursuant to this

1126    Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1127    detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1128    of direct cost incurred by the United States for work requested by the Contractor associated with

1129    this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1130    and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1131    to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1132    contract administration.

## WATER CONSERVATION

1134       25.     (a)      Prior to the delivery of water provided from or conveyed through
1135    Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1136    shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1137    Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1138    Additionally, an effective water conservation and efficiency program shall be based on the

1139    Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1140    the conservation and efficiency criteria for evaluating water conservation plans established under

1141    Federal law. The water conservation and efficiency program shall contain definite water

1142    conservation objectives, appropriate economically feasible water conservation measures, and

1143    time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1144     Contract shall be contingent upon the Contractor's continued implementation of such water

1145     conservation program. In the event the Contractor's water conservation plan or any revised water

1146     conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1147     determined by the Contracting Officer to meet such criteria, due to circumstances which the

1148     Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1149     made under this Contract so long as the Contractor diligently works with the Contracting Officer

1150     to obtain such determination at the earliest practicable date, and thereafter the Contractor

1151     immediately begins implementing its water conservation and efficiency program in accordance

1152     with the time schedules therein.

1153             (b)      Should the amount of M&I Water delivered pursuant to subdivision (a) of

1154     Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1155     Contractor shall implement the Best Management Practices identified by the time frames issued

1156     by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1157     Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1158     the Contractor.

1159             (c)      The Contractor shall submit to the Contracting Officer a report on the

1160     status of its implementation of the water conservation plan on the reporting dates specified in the

1161     then-existing conservation and efficiency criteria established under Federal law.

1162             (d)      At five (5)-year intervals, the Contractor shall revise its water

1163     conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1164     water conservation plans established under Federal law and submit such revised water

1165     management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1166   will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1167   existing conservation and efficiency criteria for evaluating water conservation plans established

1168   under Federal law.

1169           (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1170   shall be described in the Contractor's water conservation plan.

1171                EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1172      26.    Except as specifically provided in Article 16 of this Contract, the provisions of

1173   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1174   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1175   Area. Any such water shall not be considered Project Water under this Contract. In addition,

1176   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1177   any water user within the Contractor's Service Area acquires or has available under any other

1178   contract pursuant to Federal Reclamation law.

1179   OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1180      27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1181   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1182   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1183   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1184   Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1185   affect the rights or obligations of the Contractor or the United States hereunder.

1186           (b)    The Contracting Officer has previously notified the Contractor in writing

1187   that the O&M of a portion of the Project facilities which serve the Contractor has been

1188  transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1189  therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1190  Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1191  the terms and conditions of the separate agreement between the United States and the Operating

1192  Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1193  this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1194  funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1195  such successor determines, sets, or establishes for the O&M of the portion of the Project

1196  facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1197  Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1198  Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1199  Contractor of its obligation to pay directly to the United States the Contractor's share of the

1200  Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1201  Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1202  United States in accordance with the separate agreement identified in subdivision (a) of this

1203  Article.

1204         (c)    For so long as the O&M of any portion of the Project facilities serving the

1205  Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1206  Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1207  Rates for Water Delivered under this Contract representing the cost associated with the activity

1208  being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1209  or its successor.

1210         (d)     In the event the O&M of the Project facilities operated and maintained by

1211  the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1212  the United States during the term of this Contract, the Contracting Officer shall so notify the

1213  Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1214  the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1215  representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1216  The Contractor shall, thereafter, in the absence of written notification from the Contracting

1217  Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1218  revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1219        <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1220     28.     The expenditure or advance of any money or the performance of any obligation of
1221 the United States under this Contract shall be contingent upon appropriation or allotment of
1222 funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1223 obligations under this Contract. No liability shall accrue to the United States in case funds are
1224 not appropriated or allotted.

1225             <u>BOOKS, RECORDS, AND REPORTS</u>

1226     29.   (a)     The Contractor shall establish and maintain accounts and other books and
1227 records pertaining to administration of the terms and conditions of this Contract, including the
1228 Contractor's financial transactions; water supply data; project operations, maintenance, and
1229 replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1230 census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1231 Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1232 such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1233 and regulations, each party to this Contract shall have the right during office hours to examine
1234 and make copies of the other party's books and records relating to matters covered by this
1235 Contract.

1236         (b)     Notwithstanding the provisions of subdivision (a) of this Article, no

1237  books, records, or other information shall be requested from the Contractor by the Contracting

1238  Officer unless such books, records, or information are reasonably related to the administration or

1239     performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1240     time within which to provide the requested books, records, or information.

1241           (c)     At such time as the Contractor provides information to the Contracting

1242     Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1243     to the Operating Non-Federal Entity(ies).

1244          <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1245        30.     (a)     The provisions of this Contract shall apply to and bind the successors and
1246     assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1247     therein by either party shall be valid until approved in writing by the other party.

1248           (b)     The assignment of any right or interest in this Contract by either party

1249     shall not interfere with the rights or obligations of the other party to this Contract absent the

1250     written concurrence of said other party.

1251           (c)     The Contracting Officer shall not unreasonably condition or withhold

1252     approval of any proposed assignment.

1253                      <u>SEVERABILITY</u>

1254        31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1255     nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1256     an association or other form of organization whose primary function is to represent parties to

1257     Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1258     enforceability of a provision included in this Contract and said person, entity, association, or

1259     organization obtains a final court decision holding that such provision is legally invalid or

1260     unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1261     the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1262 final court decision identify by mutual agreement the provisions in this Contract which must be

1263 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1264 The time periods specified above may be extended by mutual agreement of the parties. Pending

1265 the completion of the actions designated above, to the extent it can do so without violating any

1266 applicable provisions of law, the United States shall continue to make the quantities of Project

1267 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1268 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1269 <u>RESOLUTION OF DISPUTES</u>

1270     32.    Should any dispute arise concerning any provisions of this Contract, or the

1271 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1272 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1273 Officer referring any matter to the Department of Justice, the party shall provide to the other

1274 party 30 days' written notice of the intent to take such action; *<u>Provided,</u> That* such notice shall

1275 not be required where a delay in commencing an action would prejudice the interests of the party

1276 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1277 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1278 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1279 or the United States may have.

1280 <u>OFFICIALS NOT TO BENEFIT</u>

1281     33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1282 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1283 same manner as other water users or landowners.

1284 ## CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA

1285     34.    (a)    While this Contract is in effect, no change may be made in the
1286 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1287 changes which may affect the respective rights, obligations, privileges, and duties of either the
1288 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1289 consolidation, or merger, except upon the Contracting Officer's written consent.

1290     (b)    Within 30 days of receipt of a request for such a change, the Contracting

1291 Officer will notify the Contractor of any additional information required by the Contracting

1292 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1293 schedule for timely completion of the process.  Such process will analyze whether the proposed

1294 change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1295 (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1296 to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1297 have an impact on any Project Water rights applications, permits, or licenses.  In addition, the

1298 Contracting Officer shall comply with the NEPA and the ESA.  The Contractor will be

1299 responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1300 be paid in accordance with Article 24 of this Contract.

1301 ## FEDERAL LAWS

1302     35.    By entering into this Contract, the Contractor does not waive its rights to contest

1303 the validity or application in connection with the performance of the terms and conditions of this

1304 Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1305 the terms and conditions of this Contract unless and until relief from application of such Federal

1306 law or regulation to the implementing provision of the Contract is granted by a court of

1307 competent jurisdiction.

1308 ## RECLAMATION REFORM ACT OF 1982

1309    36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1310 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1311 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1312    (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1313 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1314 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1315 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1316 ## CERTIFICATION OF NONSEGREGATED FACILITIES

1317    37.    The Contractor hereby certifies that it does not maintain or provide for its
1318 employees any segregated facilities at any of its establishments and that it does not permit its
1319 employees to perform their services at any location under its control where segregated facilities
1320 are maintained. It certifies further that it will not maintain or provide for its employees any
1321 segregated facilities at any of its establishments and that it will not permit its employees to
1322 perform their services at any location under its control where segregated facilities are
1323 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1324 Employment Opportunity clause in this Contract. As used in this certification, the term
1325 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1326 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1327 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1328 facilities provided for employees which are segregated by explicit directive or are in fact
1329 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1330 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1331 identical certifications from proposed subcontractors for specific time periods) it will obtain
1332 identical certifications from proposed subcontractors prior to the award of subcontracts
1333 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1334 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1335 following notice to such proposed subcontractors (except where the proposed subcontractors
1336 have submitted identical certifications for specific time periods):

1337 ## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1338 ## CERTIFICATIONS OF NONSEGREGATED FACILITIES

1339 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1340 exceeding $10,000 which is not exempt from the provisions of the Equal Employment

1341 Opportunity clause. The certification may be submitted either for each subcontract or for all
1342 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1343 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1344 <u>NOTICES</u>

1345     38.    Any notice, demand, or request authorized or required by this Contract shall be
1346 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1347 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1348 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1349 postage prepaid, or delivered to the Board of Directors of the Fresno Slough Water District, P.O.
1350 Box 689, Tranquillity, California 93668. The designation of the addressee or the address may be
1351 changed by notice given in the same manner as provided in this Article for other notices.

1352 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1353     39.    (a)    All payments from the Contractor to the United States under this Contract
1354 shall be by the medium requested by the United States on or before the date payment is due. The
1355 required method of payment may include checks, wire transfers, or other types of payment
1356 specified by the United States.

1357     (b)    Upon execution of this Contract, the Contractor shall furnish the
1358 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1359 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1360 out of the Contractor's relationship with the United States.

1361 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1362     40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1363 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1364 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1365 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1366 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1367 <u>CONFIRMATION OF CONTRACT</u>

1368     41.    Promptly after the execution of this amended Contract, the Contractor will
1369 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1370 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1371 for the authorization of the execution of this amended Contract. This amended Contract shall not
1372 be binding on the United States until the Contractor secures a final decree.

1373

1374        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375    day and year first above written.

1376                      UNITED STATES OF AMERICA

1377                      By: _____
1378                            Regional Director
1379                            Interior Region 10: California-Great Basin
1380                            Bureau of Reclamation

1381                      FRESNO SLOUGH WATER DISTRICT
1382    (SEAL)

1383                      By: _____
1384                          President of the Board of Directors

1385    Attest:

1386    By: _____
1387          Secretary of the Board of Directors

1374    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1375    day and year first above written.

1376                                          UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND**
**SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:19:17 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR**
**DEPARTMENT OF THE INTERIOR**

1377    **TIME STAMP:** 1:37 pm, May 11 2020      By: _____
1378                                              Regional Director
1379                                              Interior Region 10: California-Great Basin
1380                                              Bureau of Reclamation


1381                                          FRESNO SLOUGH WATER DISTRICT
1382    (SEAL)



1383                                          By: _____
1384                                              President of the Board of Directors


1385    Attest:


1386    By: _____
1387        Secretary of the Board of Directors



## Fresno Slough Water District

Contract No. 14-06-200-4019A-LTR1-P
Exhibit A

Legend:
- District Boundary
- Contractor's Service Area

Date: 4/1/2020
File Name: N:\Districts\Contracts\fresno_slough\fresno_slough_20200401.mxd

Miles
0    0.5    1


BUREAU OF
RECLAMATION

N

214-202-887

## EXHIBIT B
## FRESNO SLOUGH WATER DISTRICT
### 2020 Rates and Charges
### (Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $10.18 | |
|   DMC Aqueduct Intertie | $1.17 | |
| O&M Components | | |
|   Water Marketing | $8.97 | |
|   Storage | $18.01 | |
|   ARRA Cost | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $38.33 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

##     The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

Unpaid Construction Cost from the 2020 Water Rate Books*

| | |
|---|---|
| **Contractor:** | Fresno Slough Water District |
| **Facility:** | Delta-Mendota Pool |
| **Contract:** | 14-06-200-4019A-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | | Discount |
|---|---|---|---|---|
| Construction Cost | ~ $ | 134,383 | | |
| 2019 Repayment (Estimate) ** | $ | 141,090 | | |
| Adjusted Construction Cost | $ | (6,707) | $ | (6,510) |
| Intertie Construction Cost (N/A): | $ | 61,640 | $ | 55,207 |
| Total | $ | 54,933 | $ | 48,697 |

| If Paid in Installments (Used 20 yr CMT) | | | | |
|---|---|---|---|---|
| | Due**** | | | |
| Payment 1 | 9/1/2020 | | $ | 12,327 |
| Payment 2 | 9/1/2021 | | $ | 12,327 |
| Payment 3 | 9/1/2022 | | $ | 12,327 |
| Payment 4 ~~ | 9/1/2023 | | $ | 12,327 |
| Total Installment Payments | | | $ | 49,307 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) **. | | |
| Adjusted Construction Cost***. | $ | - |

| **Calculation Support:** | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ (6,707) | $ (610) | $ (606) | $ 61,640 | $ 1,401 | $ 1,393 | $ 787 |
| 2021 | $ (6,098) | $ (610) | $ (604) | $ 60,239 | $ 1,401 | $ 1,387 | $ 783 |
| 2022 | $ (5,488) | $ (610) | $ (601) | $ 58,838 | $ 1,401 | $ 1,380 | $ 779 |
| 2023 | $ (4,878) | $ (610) | $ (598) | $ 57,437 | $ 1,401 | $ 1,373 | $ 776 |
| 2024 | $ (4,268) | $ (610) | $ (595) | $ 56,036 | $ 1,401 | $ 1,366 | $ 772 |
| 2025 | $ (3,659) | $ (610) | $ (592) | $ 54,635 | $ 1,401 | $ 1,360 | $ 768 |
| 2026 | $ (3,049) | $ (610) | $ (589) | $ 53,235 | $ 1,401 | $ 1,353 | $ 764 |
| 2027 | $ (2,439) | $ (610) | $ (586) | $ 51,834 | $ 1,401 | $ 1,346 | $ 760 |
| 2028 | $ (1,829) | $ (610) | $ (583) | $ 50,433 | $ 1,401 | $ 1,339 | $ 756 |
| 2029 | $ (1,220) | $ (610) | $ (580) | $ 49,032 | $ 1,401 | $ 1,333 | $ 753 |
| 2030 | $ (610) | $ (610) | $ (577) | $ 47,631 | $ 1,401 | $ 1,326 | $ 749 |
| 2031-63 | | | | $ 46,230 | $ 46,230 | $ 40,250 | $ 40,250 |
| Total, Lump Sum Payment | | $ (6,510) | | | | $ 55,207 | $ 48,697 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | $ (197) | | | | $ 6,433 | $ 6,236 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need
   update, they are still required. Also, unpaid charges are still a requirement under contract.
\** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.
\*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.
\**** Contractor has 60 days from the effective date of the contract or installment dates to make payment.
~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.
[@] To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.
~~ Final Payment made in installments must be repaid by this date.

# EXHIBIT 10



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:

CGB-440
2.2.4.23

Board of Directors
Mercy Springs Water District
52027 West Althea Avenue
Firebaugh, CA 93622

Subject: Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-3365A-LTR1-P</u> Between the United States and the Mercy Springs Water District Providing for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of Reclamation appreciates the effort expended by the Mercy Springs Water District and its representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section 4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at 916-978-5246, or sdata@usbr.gov.

Sincerely,

Sheri A. Looper

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

<u>CONTRACT BETWEEN THE UNITED STATES</u>
<u>AND</u>
<u>MERCY SPRINGS WATER DISTRICT</u>
<u>PROVIDING FOR PROJECT WATER SERVICE</u>
<u>FROM DELTA DIVISION AND FACILITIES REPAYMENT</u>

<u>TABLE OF CONTENTS</u>

| <u>Article No.</u> | <u>Title</u> | <u>Page No.</u> |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
MERCY SPRINGS WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1    THIS CONTRACT, made this 22nd day of October , 2020 , in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and MERCY SPRINGS WATER

12   DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13   duly organized, existing, and acting pursuant to the laws thereof;

14   WITNESSETH, That:

15 <u>EXPLANATORY RECITALS</u>

16 [1<sup>st</sup>] WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22 [2<sup>nd</sup>] WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25 [3<sup>rd</sup>] WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27 [4<sup>th</sup>] WHEREAS, the United States and the Contractor entered into Contract

28 No. 14-06-200-3365A, as amended, which established terms for the delivery to the Contractor of

29 Project Water from the Delta Division facilities from July 21, 1967, through February 28, 1995;

30 and

31 [5<sup>th</sup>] WHEREAS, the United States and the Contractor have pursuant to

32 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33 entered into interim renewal contract(s) identified as Contract No. 14-06-200-3365A-IR1 and

34 subsequent Interim Renewal Contracts 14-06-200-3365A-IR2 through 14-06-200-3365A-IR8,

35 which provided for water service to the Contractor from March 1, 1995 through February 28,

36 2006; and

2

37           [6th]     WHEREAS, the United States and the Contractor entered into a long-term

38   contract identified as Contract No. 14-06-200-3365A-LTR1, hereinafter referred to as the

39   Existing Contract, which provided for the continued water service to the Contractor following

40   expiration of Contract No. 14-06-200-3365A-IR8, and which was in effect the date the WIIN Act

41   was enacted; and

42           [7th]     WHEREAS, the Contractor entered into the "Assignment for Partial

43   Assignment of Water Service Contract" dated May 14, 1999, assigning 6,260 acre-feet of its

44   Contract water supply to Pajaro Valley Water Management Agency, Westlands Water District,

45   and Santa Clara Valley Water District; leaving a balance of 7,040 acre-feet of such supply

46   subject to this Contract; and

47           [8th]     WHEREAS, the Contractor entered into a subsequent agreement entitled

48   "Agreement for Partial Assignment of Water Service Contract" dated March 1, 2003, assigning

49   4,198 acre-feet of its Contract Supply to Westlands Water District Distribution District No. 2

50   leaving a balance of 2,842 acre-feet of such supply subject to this Contract; and

51           [9th]     WHEREAS, on December 16, 2016, the 114th Congress of the United

52   States of America enacted the WIIN Act; and

53           [10th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

54   contractor, the Secretary of the Interior shall convert any water service contract in effect on the

55   date of enactment of this subtitle and between the United States and a water users' association

56   [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

57   mutually agreeable terms and conditions."; and

3

58       [11th] WHEREAS, Section 4011(a)(1) further provides that "the manner of

59   conversion under this paragraph shall be as follows: (A) Water service contracts that were

60   entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

61   this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

62   1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

63   of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

64   converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

65       [12th] WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

66   into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

67   repayment, exchange and transfer contractual rights between the water users' association

68   [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

69   water users' association [Contractor] and their landowners as provided under State law."; and

70       [13th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

71   "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

72   service or repayment contractor to receive water; or (4) except as expressly provided in this

73   section, any obligations under the Federal Reclamation law, including the continuation of

74   Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

75   repayment contractors making prepayments pursuant to this section."; and

76       [14th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

77   Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

78   service contracts into repayment contracts, amend existing repayment contracts, and allow

79    contractors to prepay their construction cost obligations pursuant to applicable Federal

80    Reclamation law; and

81                [15th]   WHEREAS, the United States has determined that the Contractor has

82    fulfilled all of its obligations under the Existing Contract; and

83                [16th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

84    Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

85    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

86    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

87    quantity of Project Water to be made available to it pursuant to this Contract; and

88                [17th]   WHEREAS, water obtained from the Project has been relied upon by

89    urban and agricultural areas within California for more than 50 years, and is considered by the

90    Contractor as an essential portion of its water supply; and

91                [18th]   WHEREAS, the economies of regions within the Project, including the

92    Contractor's, depend upon the continued availability of water, including water service from the

93    Project; and

94                [19th]   WHEREAS, the Secretary intends through coordination, cooperation, and

95    partnerships to pursue measures to improve water supply, water quality, and reliability of the

96    Project for all Project purposes; and

97                [20th]   WHEREAS, the mutual goals of the United States and the Contractor

98    include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

99    achieve repayment of the Project as required by law; to guard reasonably against Project Water

100    shortages; to achieve a reasonable balance among competing demands for use of Project Water;

101  and to comply with all applicable environmental statutes, all consistent with the legal obligations

102  of the United States relative to the Project; and

103  [21st]  WHEREAS, the parties intend by this Contract to maintain a cooperative

104  relationship in order to achieve their mutual goals; and

105  [22nd]  WHEREAS, the Contractor has utilized or may utilize transfers, contract

106  assignments, rescheduling, and conveyance of Project Water and non-Project water under this

107  Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

108  beneficial use of water; and

109  [23rd]  WHEREAS, the parties desire and intend that this Contract not provide a

110  disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

111  Explanatory Recital immediately above; and

112  [24th]  WHEREAS, the Contracting Officer and the Contractor agree that this

113  Contract complies with Section 4011 of the WIIN Act; and

114  [25th]  WHEREAS, the Contracting Officer and the Contractor agree to amend

115  and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

116  Reclamation law on the terms and conditions set forth below.

117  NOW, THEREFORE, in consideration of the mutual and dependent covenants

118  herein contained, it is hereby mutually agreed by the parties hereto as follows:

<div align="center">

DEFINITIONS

</div>

120  1.  When used herein unless otherwise distinctly expressed, or manifestly

121  incompatible with the intent of the parties as expressed in this Contract, the term:

122         (a)    "Additional Capital Obligation" shall mean construction costs or other

123    capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

124    Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

125    (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

126    Stat. 1628) ("WIIN Act");

127         (b)    "Calendar Year" shall mean the period January 1 through December 31,

128    both dates inclusive;

129         (c)    "Charges" shall mean the payments required by Federal Reclamation law

130    in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

131    annually by the Contracting Officer pursuant to this Contract;

132         (d)    "Condition of Shortage" shall mean a condition respecting the Project

133    during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

134    Contract Total;

135         (e)    "Contracting Officer" shall mean the Secretary of the Interior's duly

136    authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

137    or regulation;

138         (f)    "Contract Total" shall mean the maximum amount of water to which the

139    Contractor is entitled under subdivision (a) of Article 3 of this Contract;

140         (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

141    permitted to provide Project Water under this Contract as described in Exhibit "A" attached

142    hereto, which may be modified from time to time in accordance with Article 34 of this Contract

143    without amendment of this Contract;

144    (h) "CVPIA" shall mean the Central Valley Project Improvement Act, Title

145 XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

146    (i) "Delta Division Facilities" shall mean those existing and future Project

147 facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

148 the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

149 Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

150 Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

151    (j) "Eligible Lands" shall mean all lands to which Irrigation Water may be

152 delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

153 1263), as amended;

154    (k) "Excess Lands" shall mean all lands in excess of the limitations contained

155 in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

156 acreage limitation under Federal Reclamation law;

157    (l) "Existing Capital Obligation" shall mean the remaining amount of

158 construction costs or other capitalized costs allocable to the Contractor as described in Section

159 4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

160 Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

161 in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

162 Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

163 Exhibit "C", which is incorporated herein by reference;

164    (m) "Full Cost Rate" shall mean an annual rate, as determined by the

165 Contracting Officer that shall amortize the expenditures for construction properly allocable to the

166  Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

167  deficits funded, less payments, over such periods as may be required under Federal Reclamation

168  law, or applicable contract provisions.  Interest will accrue on both the construction expenditures

169  and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

170  date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

171  in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

172  The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

173  Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

174  (n)  "Ineligible Lands" shall mean all lands to which Irrigation Water may not

175  be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

176  (o)  "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

177  to the delivery of Irrigation Water;

178  (p)  "Irrigation Water" shall mean the use of Project Water to irrigate lands
179  primarily for the production of commercial agricultural crops or livestock, and domestic and
180  other uses that are incidental thereto;

181  (q)  "Landholder" shall mean a party that directly or indirectly owns or leases

182  nonexempt land, as provided in 43 CFR 426.2;

183  (r)  "Municipal and Industrial (M&I) Water" shall mean the use of Project
184  Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
185  of "Irrigation Water" or within another category of water use under an applicable Federal
186  authority;

187  (s)  "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

188  the delivery of M&I Water;

189         (t)     "Operation and Maintenance" or "O&M" shall mean normal and

190  reasonable care, control, operation, repair, replacement (other than capital replacement), and

191  maintenance of Project facilities;

192         (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

193  successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

194  the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

195  Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

196  Water Authority;

197         (v)     "Project" shall mean the Central Valley Project owned by the United

198  States and managed by the Department of the Interior, Bureau of Reclamation;

199         (w)     "Project Contractors" shall mean all parties who have contracts for water

200  service for Project Water from the Project with the United States pursuant to Federal

201  Reclamation law;

202         (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

203  delivered by the Secretary in accordance with the statutes authorizing the Project and in

204  accordance with the terms and conditions of water rights acquired pursuant to California law;

205         (y)     "Rates" shall mean the payments determined annually by the Contracting

206  Officer in accordance with the then-current applicable water ratesetting policies for the Project,

207  as described in subdivision (a) of Article 7 of this Contract;

208         (z)     "Recent Historic Average" shall mean the most recent five (5)-year

209  average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

210  or its preceding contract(s);

211       (aa)   "Repayment Obligation" for Water Delivered as Irrigation Water shall

212   mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

213   amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

214   Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

215   United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

216       (bb)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

217   successor, or an authorized representative acting pursuant to any authority of the Secretary and

218   through any agency of the Department of the Interior;

219       (cc)   "Tiered Pricing Component" shall be the incremental amount to be paid

220   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

221   for in Exhibit "B";

222       (dd)   "Water Delivered" or "Delivered Water" shall mean Project Water

223   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

224   Officer;

225       (ee)   "Water Made Available" shall mean the estimated amount of Project

226   Water that can be delivered to the Contractor for the upcoming Year as declared by the

227   Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

228       (ff)   "Water Scheduled" shall mean Project Water made available to the

229   Contractor for which times and quantities for delivery have been established by the Contractor

230   and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

231       (gg)   "Year" shall mean the period from and including March 1 of each

232   Calendar Year through the last day of February of the following Calendar Year.

233 <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

234     2.     (a)     This Contract shall be effective November 1, 2020, hereinafter known as

235 the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

236 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

237 (53 Stat. 1195) as applicable, and applicable law;

238     (1)     *Provided, That* the Contracting Officer shall not seek to terminate

239 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

240 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

241 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

242 or to diligently commence and maintain full curative payments satisfactory to the Contracting

243 Officer within the sixty (60) calendar days' notice period;

244     (2)     *Provided, further, That* the Contracting Officer shall not seek to

245 suspend making water available or declaring Water Made Available pursuant to this Contract for

246 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

247 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

248 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

249 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

250 cured within the thirty (30) calendar days' notice period. If the Contracting Officer has

251 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

252 satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

253 available and declaring Water Made Available pursuant to this Contract;

254                     (3)    *Provided, further, That* this Contract may be terminated at any

255 time by mutual consent of the parties hereto.

256             (b)    Upon complete payment of the Repayment Obligation by the Contractor,

257 and notwithstanding any Additional Capital Obligation that may later be established, the acreage

258 limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

259 and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

260 this Contract shall no longer be applicable.

261             (c)    Notwithstanding any provision of this Contract, the Contractor reserves

262 and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

263 allowed by law.

264             (d)    Notwithstanding any provision of this Contract, the Contractor reserves

265 and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

266 allowed by law.

267       <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

268    3.    (a)    During each Year, consistent with all applicable State water rights permits,

269 and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

270 Contract, the Contracting Officer shall make available for delivery to the Contractor 2,842 acre-

271 feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

272 accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

273 Articles 4 and 7 of this Contract.

274          (b)     Because the capacity of the Project to deliver Project Water has been

275     constrained in recent years and may be constrained in the future due to many factors including

276     hydrologic conditions and implementation of Federal and State laws, the likelihood of the

277     Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

278     Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

279     programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

280     CVPIA projected that the Contract Total set forth in this Contract will not be available to the

281     Contractor in many years.  During the most recent five years prior to execution of the Existing

282     Contract, the Recent Historic Average Water Made Available to the Contractor was 1,870 acre-

283     feet.  Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

284     parties under any provision of this Contract.

285          (c)     The Contractor shall utilize the Project Water in accordance with all

286     applicable legal requirements.

287               (1)     In the event any Project Contractor (other than a Cross Valley

288     Contractor) that receives Project Water through the Delta Division Facilities obtains a

289     contractual agreement that the Contracting Officer shall make Project Water available at a point

290     or points of delivery in or north of the Delta, at the request of the Contractor and upon

291     completion of any required environmental documentation, this Contract shall be amended to

292     provide for deliveries in or north of the Delta on mutually agreeable terms.  Such amendments to

293     this Contract shall be limited solely to those changes made necessary by the addition of such

294     alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

295   of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

296   amendment.

297         (d)      The Contractor shall make reasonable and beneficial use of all water

298   furnished pursuant to this Contract.  Groundwater recharge programs (direct, indirect, or in lieu),

299   groundwater banking programs, surface water storage programs, and other similar programs

300   utilizing Project Water or other water furnished pursuant to this Contract conducted within the

301   Contractor's Service Area which are consistent with applicable State law and result in use

302   consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

303   program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

304   Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

305   sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

306   the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

307   compliance with Federal Reclamation law.  Groundwater recharge programs, groundwater

308   banking programs, surface water storage programs, and other similar programs utilizing Project

309   Water or other water furnished pursuant to this Contract conducted outside the Contractor's

310   Service Area may be permitted upon written approval of the Contracting Officer, which approval

311   will be based upon environmental documentation, Project Water rights, and Project operational

312   concerns.  The Contracting Officer will address such concerns in regulations, policies, or

313   guidelines.

314         (e)      The Contractor shall comply with requirements applicable to the

315   Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

316   of any water service contract between the Contracting Officer and the Contractor in effect

15

317    immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

318    Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

319    implement. The Existing Contract, which evidences in excess of 38 years of diversions for

320    irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

321    Article 3 of this Contract, will be considered in developing an appropriate baseline for any

322    required biological assessment(s) prepared pursuant to the ESA, and any other needed

323    environmental review. Nothing herein shall be construed to prevent the Contractor from

324    challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

325    biological opinion or other environmental documentation referred to in this Article.

326           (f)      Following the declaration of Water Made Available under Article 4 of this

327    Contract, the Contracting Officer will make a determination whether Project Water, or other

328    water available to the Project, can be made available to the Contractor in addition to the Contract

329    Total under this Article during the Year without adversely impacting other Project Contractors.

330    At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

331    making such a determination. If the Contracting Officer determines that Project Water, or other

332    water available to the Project, can be made available to the Contractor, the Contracting Officer

333    will announce the availability of such water and shall so notify the Contractor as soon as

334    practical. The Contracting Officer will thereafter meet with the Contractor and other Project

335    Contractors capable of taking such water to determine the most equitable and efficient allocation

336    of such water. If the Contractor requests the delivery of any quantity of such water, the

337    Contracting Officer shall make such water available to the Contractor in accordance with

338    applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

339 contractual commitments, water rights, and operational constraints, long-term Project

340 Contractors shall have a first right to acquire such water, including Project Water made available

341 pursuant to Section 215 of the Reclamation Reform Act of 1982.

342        (g)    The Contractor may request permission to reschedule for use during the

343 subsequent Year some or all of the Water Made Available to the Contractor during the current

344 Year, referred to as "rescheduled water." The Contractor may request permission to use during

345 the current Year a quantity of Project Water which may be made available by the United States

346 to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

347 written approval may permit such uses in accordance with applicable statutes, regulations,

348 guidelines, and policies.

349        (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

350 State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

351 shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

352 Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

353 August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

354 sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

355 subdivision (b) of Article 12 of this Contract.

356        (i)    Project Water furnished to the Contractor pursuant to this Contract may be

357 delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

358 Contract upon written approval by the Contracting Officer in accordance with the terms and

359 conditions of such approval.

360        (j)      The Contracting Officer shall make reasonable efforts to protect the water

361    rights necessary for the Project and to provide the water available under this Contract. The

362    Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

363    extent permitted by law, in administrative proceedings related to the Project Water rights;

364    *Provided, That* the Contracting Officer retains the right to object to the substance of the

365    Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

366    Contracting Officer shall recognize the Contractor has a legal right under the terms of this

367    Contract to use Project Water.

368                      TIME FOR DELIVERY OF WATER

369    4.    (a)      On or about February 20 each Calendar Year, the Contracting Officer shall

370    announce the Contracting Officer's expected declaration of the Water Made Available. Such

371    declaration will be expressed in terms of Water Made Available and the Recent Historic Average

372    and will be updated monthly, and more frequently if necessary, based on the then-current

373    operational and hydrologic conditions and a new declaration with changes, if any, to the Water

374    Made Available will be made. The Contracting Officer shall provide forecasts of Project

375    operations and the basis of the estimate, with relevant supporting information, upon the written

376    request of the Contractor. Concurrently with the declaration of the Water Made Available, the

377    Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

378        (b)      On or before each March 1 and at such other times as necessary, the

379    Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

380    Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

381    United States to the Contractor pursuant to this Contract for the Year commencing on such

382    March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

383    according to the approved schedule for the Year commencing on such March 1.

384    (c)    The Contractor shall not schedule Project Water in excess of the quantity

385    of Project Water the Contractor intends to put to reasonable and beneficial use within the

386    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

387    during any Year.

388    (d)    Subject to the conditions set forth in subdivision (a) of Article 3 of this

389    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

390    initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

391    written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

392    time prior to the date(s) on which the requested change(s) is/are to be implemented.

393    <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

394    5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

395    Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

396    any additional point or points of delivery either on Project facilities or another location or

397    locations mutually agreed to in writing by the Contracting Officer and the Contractor.

398    (b)    The Contracting Officer, either directly or indirectly through its written

399    agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

400    maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

401    the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

402    Article.

403         (c)     The Contractor shall deliver Irrigation Water in accordance with any

404    applicable land classification provisions of Federal Reclamation law and the associated

405    regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

406    Service Area unless approved in advance by the Contracting Officer.

407         (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

408    measured and recorded with equipment furnished, installed, operated, and maintained by the

409    Contracting Officer either directly or indirectly through its written agreements(s) with the

410    Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

411    Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

412    this Article. Upon the request of either party to this Contract, the Contracting Officer shall

413    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

414    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

415    therein. For any period of time when accurate measurements have not been made, the

416    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

417    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

418    of time.

419         (e)     Absent a separate contrary written agreement with the Contractor, neither

420    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

421    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

422    pursuant to this Contract beyond the point or points of delivery established pursuant to

423    subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

424    employees, agents, and assigns on account of damage or claim of damage of any nature

425    whatsoever for which there is legal responsibility, including property damage, personal injury, or

426    death arising out of or connected with the control, carriage, handling, use, disposal, or

427    distribution of such Water Delivered beyond such point or points of delivery except for any

428    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

429    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

430    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

431    Contracting Officer or any of its officers, employees, agents, and assigns, including the

432    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

433    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

434    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

435    Federal Entity(ies).

436    <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

437    6.    (a)    The Contractor has established a measuring program satisfactory to the

438    Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

439    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

440    water delivered for M&I purposes is measured at each M&I service connection. The water

441    measuring devices or water measuring methods of comparable effectiveness must be acceptable

442    to the Contracting Officer. The Contractor shall be responsible for installing, operating,

443    maintaining, and repairing all such measuring devices and implementing all such water

444    measuring methods at no cost to the United States. The Contractor shall use the information

445    obtained from such water measuring devices or water measuring methods to ensure its proper

446    management of the water; to bill water users for water delivered by the Contractor; and, if

447    applicable, to record water delivered for M&I purposes by customer class as defined in the

448    Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

449    contained, however, shall preclude the Contractor from establishing and collecting any charges,

450    assessments, or other revenues authorized by California law. The Contractor shall include a

451    summary of all its annual surface water deliveries in the annual report described in subdivision

452    (c) of Article 25 of this Contract.

453            (b)     To the extent the information has not otherwise been provided, upon

454    execution of this Contract, the Contractor shall provide to the Contracting Officer a written

455    report describing the measurement devices or water measuring methods being used or to be used

456    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

457    service connections or alternative measurement programs approved by the Contracting Officer,

458    at which such measurement devices or water measuring methods are being used, and, if

459    applicable, identifying the locations at which such devices and/or methods are not yet being used

460    including a time schedule for implementation at such locations. The Contracting Officer shall

461    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

462    if any, of the measuring devices or water measuring methods identified in the Contractor's report

463    and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

464    the Contracting Officer notifies the Contractor that the measuring devices or methods are

465    inadequate, the parties shall within 60 days following the Contracting Officer's response,

466    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

467    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

468    compliance with subdivision (a) of this Article.

469    (c)  All new surface water delivery systems installed within the Contractor's

470 Service Area after the Effective Date shall also comply with the measurement provisions

471 described in subdivision (a) of this Article.

472    (d)  The Contractor shall inform the Contracting Officer and the State of

473 California in writing by April 30 of each Year of the monthly volume of surface water delivered

474 within the Contractor's Service Area during the previous Year.

475    (e)  The Contractor shall inform the Contracting Officer and the Operating

476 Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

477 Irrigation Water and M&I Water taken during the preceding month.

478     <u>RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED</u>
479         <u>REPAYMENT OF FACILITIES</u>

480   7.  (a)  Notwithstanding the Contractor's full prepayment of the Repayment

481 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

482 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

483 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

484 Article, subsection (b), the Contractor's Project construction and other obligations shall be

485 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

486 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

487 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

488 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

489 rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

490 shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

491    agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

492    Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

493    forth in Exhibit "B", as may be revised annually.

494            (1)    The Contractor shall pay the United States as provided for in this

495    Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

496    in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

497    be established to recover its estimated reimbursable costs included in the operation and

498    maintenance component of the Rate and amounts established to recover deficits and other

499    charges, if any, including construction costs as identified in the following subdivisions.

500            (2)    In accordance with the WIIN Act, the Contractor's allocable share

501    of Project construction costs will be repaid pursuant to the provisions of this Contract.

502            (A)    The amount due and payable to the United States, pursuant

503    to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

504    computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

505    as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

506    installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

507    set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

508    as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

509    Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

510    amount due using the lump sum alternative. If such notice is not provided by such date, the

511    Contractor shall be deemed to have elected the installment payment alternative, in which case,

512    the first such payment shall be made no later than December 30, 2020. The second payment

513 shall be made no later than the first anniversary of the first payment date. The third payment

514 shall be made no later than the second anniversary of the first payment date. The final payment

515 shall be made no later than November 1, 2023. If the installment payment option is elected by

516 the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

517 by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

518 Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

519 methodology as was used to compute the initial annual installment payment amount, which is

520 illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

521 established, receipt of the Contractor's payment of the Repayment Obligation to the United

522 States shall fully and permanently satisfy the Existing Capital Obligation.

523         (B)    Additional Capital Obligations that are not reflected in, the

524 schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

525 prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

526 Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

527 Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

528 Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

529 the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

530 be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

531 however, will be considered under subdivision (b) of this Article. A separate agreement shall be

532 established by the Contractor and the Contracting Officer to accomplish repayment of the

533 Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

534 WIIN Act, subject to the following:

535                          (1)       If the collective Additional Capital Obligation

536   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

537   is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

538   to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

539   notifies the Contractor of the Additional Capital Obligation; _Provided, That_ the reference to the

540   amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

541                          (2)       If the collective Additional Capital Obligation

542   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

543   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

544   properly assignable to the Contractor shall be repaid as provided by applicable Federal

545   Reclamation law and Project ratesetting policy; _Provided, That_ the reference to the amount of

546   five million dollars ($5,000,000) shall not be a precedent in any other context.

547            (b)       In the event that the final cost allocation referenced in Section 4011(b) of

548   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

549   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

550   allocated costs. The term of such additional repayment contract shall be not less than one (1)

551   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

552   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

553   the event that the final cost allocation indicates that the costs properly assignable to the

554   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

555   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

556   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

557                   (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

558    and Tiered Pricing Component as follows:

559                   (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

560    provide the Contractor an estimate of the Charges for Project Water that will be applied to the

561    period October 1, of the current Calendar Year, through September 30, of the following Calendar

562    Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

563    to review and comment on such estimates. On or before September 15 of each Calendar Year,

564    the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

565    the period October 1 of the current Calendar Year, through September 30, of the following

566    Calendar Year, and such notification shall revise Exhibit "B."

567                   (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

568    shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

569    for Project Water for the following Year and the computations and cost allocations upon which

570    those Rates are based. The Contractor shall be allowed not less than two months to review and

571    comment on such computations and cost allocations. By December 31 of each Calendar Year,

572    the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

573    Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

574                 (d)     At the time the Contractor submits the initial schedule for the delivery of

575    Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

576    Contractor shall make an advance payment to the United States equal to the total amount payable

577    pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

578    scheduled to be delivered pursuant to this Contract during the first two calendar months of the

579 Year. Before the end of the first month and before the end of each calendar month thereafter, the

580 Contractor shall make an advance payment to the United States, at the Rate(s) set under

581 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

582 during the second month immediately following. Adjustments between advance payments for

583 Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

584 the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

585 to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

586 Contract during any month shall be accompanied with appropriate advance payment, at the Rates

587 then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

588 payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

589 this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

590 additional Project Water shall be delivered to the Contractor unless and until an advance

591 payment at the Rates then in effect for such additional Project Water is made. Final adjustment

592 between the advance payments for the Water Scheduled and payments for the quantities of Water

593 Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

594 later than April 30th of the following Year, or 60 days after the delivery of Project Water

595 rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

596 the last day of February.

597    (e)  The Contractor shall also make a payment in addition to the Rate(s) in

598 subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

599 appropriate Tiered Pricing Component then in effect, before the end of the month following the

600 month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

601    Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

602    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

603    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

604    there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

605    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

606    for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

607    through the adjustment of payments due to the United States for Charges for the next month.

608    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

609    be computed pursuant to Article 19 of this Contract.

610          (f)      The Contractor shall pay for any Water Delivered under subdivision (a),

611    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

612    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

613    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

614    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

615    under subdivision (a) of this Article.

616          (g)      Payments to be made by the Contractor to the United States under this

617    Contract may be paid from any revenues available to the Contractor.

618          (h)      All revenues received by the United States from the Contractor relating to

619    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

620    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

621    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

622          (i)      The Contracting Officer shall keep its accounts pertaining to the

623 administration of the financial terms and conditions of its long-term contracts, in accordance

624 with applicable Federal standards, so as to reflect the application of Project costs and revenues.

625 The Contracting Officer shall, each Year upon request of the Contractor, provide to the

626 Contractor a detailed accounting of all Project and Contractor expense allocations, the

627 disposition of all Project and Contractor revenues, and a summary of all water delivery

628 information. The Contracting Officer and the Contractor shall enter into good faith negotiations

629 to resolve any discrepancies or disputes relating to accountings, reports, or information.

630         (j)     The parties acknowledge and agree that the efficient administration of this

631 Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

632 policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

633 and/or for making and allocating payments, other than those set forth in this Article may be in

634 the mutual best interest of the parties, it is expressly agreed that the parties may enter into

635 agreements to modify the mechanisms, policies, and procedures for any of those purposes while

636 this Contract is in effect without amending this Contract.

637         (k)    (1)    Beginning at such time as deliveries of Project Water in a Year

638 exceed 80 percent of the Contract Total, then before the end of the month following the month of

639 delivery the Contractor shall make an additional payment to the United States equal to the

640 applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

641 Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

642 Contract Total, shall equal one-half of the difference between the Rate established under

643 subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

644 Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

30

645    Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

646    the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

647    Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

648    subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

649    Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

650    the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

651               (2)      Subject to the Contracting Officer's written approval, the

652    Contractor may request and receive an exemption from such Tiered Pricing Component for

653    Project Water delivered to produce a crop which the Contracting Officer determines will provide

654    significant and quantifiable habitat values for waterfowl in fields where the water is used and the

655    crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

656    Irrigation Water shall apply only if such habitat values can be assured consistent with the

657    purposes of the CVPIA through binding agreements executed with or approved by the

658    Contracting Officer prior to use of such water.

659               (3)      For purposes of determining the applicability of the Tiered Pricing

660    Component pursuant to this Article, Water Delivered shall include Project Water that the

661    Contractor transfers to others but shall not include Project Water transferred to the Contractor,

662    nor shall it include the additional water provided to the Contractor under the provisions of

663    subdivision (f) of Article 3 of this Contract.

664               (l)      For the term of this Contract, Rates applied under the respective

665    ratesetting policies will be established to recover only reimbursable O&M (including any

666    deficits) and capital costs of the Project, as those terms are used in the then-current Project

667    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

668    applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

669    practices which implement the Contracting Officer's ratesetting policies will not be implemented

670    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

671    need, and impact of the proposed change.

672            (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

673    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

674    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

675    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

676    transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

677    lower Rates and Charges because of inability to pay and is transferring Project Water to another

678    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

679    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

680            (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

681    Officer is authorized to adjust determinations of ability to pay every five years.

682            (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

683    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

684    of the date of this Contract or deficit-related interest charges thereon. By entering into this

685    Contract, the Contractor does not waive any legal rights or remedies that it may have with

686    respect to such disputed issues. Notwithstanding the execution of this Contract and payments

687    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

688    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

32

689    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

690    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

691    the Rates; (4) the application by the United States of payments made by the Contractor under its

692    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

693    application of such payments in the Rates.  The Contracting Officer agrees that the Contractor

694    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

695    M&I contractor on any of these issues, and credits for payments heretofore made, provided that

696    the basis for such ruling is applicable to the Contractor.

697    <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

698    8.    The Contractor and the Contracting Officer concur that, as of the Effective Date

699    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

700    therefore.

701    <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

702    9.    (a)    The right to receive Project Water provided for in this Contract may be

703    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

704    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

705    and applicable guidelines or regulations then in effect.  No sale, transfer, or exchange of Project

706    Water under this Contract may take place without the prior written approval of the Contracting

707    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

708    exchanges shall be approved absent all appropriate environmental documentation, including, but

709    not limited to, documents prepared pursuant to the NEPA and ESA.  Such environmental

710    documentation should include, as appropriate, an analysis of groundwater impacts and economic

<div align="center">33</div>

711     and social effects, including environmental justice, of the proposed water transfers on both the

712     transferor and transferee.

713           (b)      In order to facilitate efficient water management by means of water

714     transfers of the type historically carried out among Project Contractors located within the same

715     geographical area and to allow the Contractor to participate in an accelerated water transfer

716     program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

717     all necessary environmental documentation, including, but not limited to, documents prepared

718     pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

719     the Contracting Officer shall determine whether such transfers comply with applicable law.

720     Following the completion of the environmental documentation, such transfers addressed in such

721     documentation shall be conducted with advance notice to the Contracting Officer, but shall not

722     require prior written approval by the Contracting Officer. Such environmental documentation

723     and the Contracting Officer's compliance determination shall be reviewed every five years and

724     updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

725     subsequent environmental documentation shall include an alternative to evaluate not less than the

726     quantity of Project Water historically transferred within the same geographical area.

727           (c)      For a water transfer to qualify under subdivision (b) of this Article, such

728     water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

729     years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

730     activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

731     be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

732     within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

733 through existing facilities with no new construction or modifications to facilities and be between

734 existing Project Contractors and/or the Contractor and the United States, Department of the

735 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

736 requirements imposed for protection of the environment and Indian Trust Assets, as defined

737 under Federal law.

738                    APPLICATION OF PAYMENTS AND ADJUSTMENTS

739          10.     (a)      The amount of any overpayment by the Contractor of the Contractor's

740 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

741 liabilities of the Contractor arising out of this Contract then due and payable.  Overpayments of

742 more than $1,000 shall be refunded at the Contractor's request.  In lieu of a refund, any amount

743 of such overpayment, at the option of the Contractor, may be credited against amounts to become

744 due to the United States by the Contractor.  With respect to overpayment, such refund or

745 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

746 have the right to the use of any of the Project Water supply provided for by this Contract.  All

747 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

748 obtaining direction as to how to credit or refund such overpayment in response to the notice to

749 the Contractor that it has finalized the accounts for the Year in which the overpayment was

750 made.

751          (b)      All advances for miscellaneous costs incurred for work requested by the

752 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

753 when the work has been completed.  If the advances exceed the actual costs incurred, the

754 difference will be refunded to the Contractor.  If the actual costs exceed the Contractor's

35

755 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

756 Contract.

<div align="center">TEMPORARY REDUCTIONS – RETURN FLOWS</div>

757

758     11.   (a)     Subject to: (i) the authorized purposes and priorities of the Project and the

759 requirements of Federal law, and (ii) the obligations of the United States under existing

760 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

761 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

762 provided in this Contract.

763     (b)     The Contracting Officer or Operating Non-Federal Entity(ies) may

764 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

765 provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

766 of the Project facilities or any part thereof necessary for the delivery of Project Water to the

767 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

768 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

769 except in case of emergency, in which case no notice need be given; _Provided, That_ the United

770 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

771 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

772 the United States will, if possible, deliver the quantity of Project Water which would have been

773 delivered hereunder in the absence of such discontinuance or reduction.

774     (c)     The United States reserves the right to all seepage and return flow water

775 derived from Water Delivered to the Contractor hereunder which escapes or is discharged

776 beyond the Contractor's Service Area; _Provided, That_ this shall not be construed as claiming for

<div align="center">36</div>

777    the United States any right to seepage or return flow being put to reasonable and beneficial use

778    pursuant to this Contract within the Contractor's Service Area by the Contractor or those

779    claiming by, through, or under the Contractor.

780                    CONSTRAINTS ON THE AVAILABILITY OF WATER

781        12.    (a)    In its operation of the Project, the Contracting Officer will use all
782    reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
783    made available to the Contractor pursuant to this Contract.  In the event the Contracting Officer
784    determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
785    Contractor of said determination as soon as practicable.

786                (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
787    or other similar operational errors affecting the Project; drought and other physical or natural
788    causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
789    to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
790    17 of this Contract, no liability shall accrue against the United States or any of its officers,
791    agents, or employees for any damage, direct or indirect, arising therefrom.

792                (c)    In any Year in which there may occur a Condition of Shortage for any of

793    the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

794    Article, the Contracting Officer will first allocate the available Project Water consistent with the

795    Project M&I Water Shortage Policy as finally adopted after environmental review for

796    determining the amount of Project Water Available for delivery to the Project Contractors.

797    Subject to the foregoing allocation, in any year in which there may occur a Condition of

798    Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

799    others entitled to Project Water from Delta Division Facilities under long-term water service or

800    repayment contracts (or renewals thereof or binding commitments therefore) in force on

801    February 28, 2005, as follows:

802                (1)    The Contracting Officer shall make an initial and subsequent

37

803    determination as necessary of the total quantity of Project Water estimated to be scheduled or

804    actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

805    renewal, long-term water service or repayment contracts then in force for the delivery of Project

806    Water by the United States from Delta Division Facilities during the relevant Year, the quantity

807    so determined being hereinafter referred to as the scheduled total;

808                (2)    A determination shall be made of the total quantity of Project

809    Water that is available for meeting the scheduled total, the quantity so determined being

810    hereinafter referred to as the available supply;

811                (3)    The total quantity of Project Water estimated to be scheduled or

812    actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

813    of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

814    hereinafter referred to as the Contractor's proportionate share; and

815                (4)    The available supply shall be multiplied by the Contractor's

816    proportionate share and the result shall be the quantity of Project Water made available by the

817    United States to the Contractor for the relevant Year in accordance with the schedule developed

818    by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

819    amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

820    that the Contracting Officer can increase or needs to decrease the available supply for delivery

821    from Delta Division Facilities to long-term water service and repayment contractors during the

822    relevant Year, such additions or reductions to the available supply shall be apportioned

823    consistent with subparagraphs (1) through (4), inclusive.

824                (d)    By entering into this Contract, the Contractor does not waive any legal

825     rights or remedies it may have to file or participate in any administrative or judicial proceeding

826     contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

827     such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

828     implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

829     *That* the Contractor has commenced any such judicial challenge or any administrative procedures

830     necessary to institute any judicial challenge within six months of the policy becoming final.  By

831     agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

832     that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

833     validate or invalidate the Project M&I Water Shortage Policy.

834     <u>UNAVOIDABLE GROUNDWATER PERCOLATION</u>

835     13.    (a)    To the extent applicable, the Contractor shall not be deemed to have

836     delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

837     Contract if such lands are irrigated with groundwater that reaches the underground strata as an

838     unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

839     (b)    Upon complete payment of the Repayment Obligation by the Contractor,

840     this Article 13 shall no longer be applicable.

841     <u>COMPLIANCE WITH FEDERAL RECLAMATION LAWS</u>

842     14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
843     pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
844     Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
845     the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
846     law.

847     <u>PROTECTION OF WATER AND AIR QUALITY</u>

848     15.    (a)    Omitted

849     (b)  The United States will care for, operate and maintain reserved works in a
850 manner that preserves the quality of the water at the highest level possible as determined by the
851 Contracting Officer. The United States does not warrant the quality of the water delivered to the
852 Contractor and is under no obligation to furnish or construct water treatment facilities to
853 maintain or improve the quality of water delivered to the Contractor.

854     (c)  The Contractor will comply with all applicable water and air pollution
855 laws and regulations of the United States and the State of California; and will obtain all required
856 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
857 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
858 State, and local water quality standards applicable to surface and subsurface drainage and/or
859 discharges generated through the use of Federal or Contractor facilities or Project Water
860 provided by the Contractor within its Service Area.

861     (d)  This Article shall not affect or alter any legal obligations of the Secretary
862 to provide drainage or other discharge services.

863     (e)  Omitted

864    <u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED</u>
865               <u>STATES</u>

866   16.  (a)  Water or water rights now owned or hereafter acquired by the Contractor

867 other than from the United States and Irrigation Water furnished pursuant to the terms of this

868 Contract may be simultaneously transported through the same distribution facilities of the

869 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

870 and non-Project water were constructed without funds made available pursuant to Federal

871 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

872 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

873 Irrigation Water must be established through the certification requirements as specified in the

874 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

875 Eligible Lands within the Contractor's Service Area can be established and the quantity of

876 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

877   Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

878   Project water are (were) constructed with funds made available pursuant to Federal Reclamation

879   law, the non-Project water will be subject to the acreage limitation provisions of Federal

880   Reclamation law, unless the Contractor pays to the United States the incremental fee described in

881   43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

882   annually the cost to the Federal Government, including interest, of storing or delivering non-

883   Project water, which for purposes of this Contract shall be determined as follows: The quotient

884   shall be the unpaid distribution system costs divided by the total irrigable acreage within the

885   Contractor's Service Area. The incremental fee per acre is the mathematical result of such

886   quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

887   (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

888   within the Contractor's Service Area that receives non-Project water through Federally financed

889   or constructed facilities. The incremental fee calculation methodology will continue during the

890   term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

891   regulation, or policy adopted after the Contractor has been afforded the opportunity to review

892   and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

893   adopted, it shall supersede this provision.

894              (b)      Water or water rights now owned or hereafter acquired by the Contractor,

895   other than from the United States may be stored, conveyed, and/or diverted through Project

896   facilities, subject to the completion of appropriate environmental documentation, with the

897   approval of the Contracting Officer and the execution of any contract determined by the

898   Contracting Officer to be necessary, consistent with the following provisions:

899    (1)    The Contractor may introduce non-Project water into Project

900    facilities and deliver said water to lands within the Contractor's Service Area, including

901    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

902    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

903    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

904    use power policy is applicable, each as amended, modified, or superseded from time to time.

905    (2)    Delivery of such non-Project water in and through Project facilities

906    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

907    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

908    available to other Project Contractors; (iii) interfere with the delivery of contractual water

909    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

910    the Project facilities.

911    (3)    Neither the United States nor the Operating Non-Federal

912    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

913    is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

914    releases and agrees to defend and indemnify the United States and the Operating Non-Federal

915    Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

916    persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

917    employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

918    (ii) diverting such non-Project water into Project facilities.

919    (4)    Diversion of such non-Project water into Project facilities shall be

920    consistent with all applicable laws, and if involving groundwater, consistent with any applicable

921 groundwater management plan for the area from which it was extracted.

922         (5)     After Project purposes are met, as determined by the Contracting

923 Officer, the United States and Project Contractors entitled to Project Water from Delta Division

924 Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

925 available by the Contracting Officer for conveyance and transportation of non-Project water prior

926 to any such remaining capacity being made available to non-Project contractors. Other Project

927 Contractors shall have a second priority to any remaining capacity of facilities declared to be

928 available by the Contracting Officer for conveyance and transportation of non-Project water prior

929 to any such remaining capacity being made available to non-Project contractors.

930         (c)     Upon complete payment of the Repayment Obligation by the Contractor,

931 subdivision (a) of this Article 16 shall no longer be applicable.

932 <div align="center">OPINIONS AND DETERMINATIONS</div>

933     17.   (a)     Where the terms of this Contract provide for actions to be based upon the

934 opinion or determination of either party to this Contract, said terms shall not be construed as

935 permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

936 determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

937 reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

938 or unreasonable opinion or determination. Each opinion or determination by either party shall be

939 provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

940 affect or alter the standard of judicial review applicable under Federal law to any opinion or

941 determination implementing a specific provision of Federal law embodied in statute or

942 regulation.

943       (b)     The Contracting Officer shall have the right to make determinations

944 necessary to administer this Contract that are consistent with the provisions of this Contract, the

945 laws of the United States and of the State of California, and the rules and regulations

946 promulgated by the Secretary. Such determinations shall be made in consultation with the

947 Contractor to the extent reasonably practicable.

948               <u>COORDINATION AND COOPERATION</u>

949     18.   (a)     In order to further their mutual goals and objectives, the Contracting

950 Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

951 with other affected Project Contractors, in order to improve the O&M of the Project. The

952 communication, coordination, and cooperation regarding O&M shall include, but not be limited

953 to, any action which will or may materially affect the quantity or quality of Project Water supply,

954 the allocation of Project Water supply, and Project financial matters including, but not limited to,

955 budget issues. The communication, coordination, and cooperation provided for hereunder shall

956 extend to all provisions of this Contract. Each party shall retain exclusive decision making

957 authority for all actions, opinions, and determinations to be made by the respective party.

958       (b)     Within 120 days following the Effective Date, the Contractor, other

959 affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

960 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

961 amended as necessary separate and apart from this Contract. The goal of this process shall be to

962 provide, to the extent practicable, the means of mutual communication and interaction regarding

963 significant decisions concerning Project O&M on a real-time basis.

964       (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

965 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

966 intent:

967             (1)      The Contracting Officer will, at the request of the Contractor,

968 assist in the development of integrated resource management plans for the Contractor. Further,

969 the Contracting Officer will, as appropriate, seek authorizations for implementation of

970 partnerships to improve water supply, water quality, and reliability.

971             (2)      The Secretary will, as appropriate, pursue program and project

972 implementation and authorization in coordination with Project Contractors to improve the water

973 supply, water quality, and reliability of the Project for all Project purposes.

974             (3)      The Secretary will coordinate with Project Contractors and the

975 State of California to seek improved water resource management.

976             (4)      The Secretary will coordinate actions of agencies within the

977 Department of the Interior that may impact the availability of water for Project purposes.

978             (5)      The Contracting Officer shall periodically, but not less than

979 annually, hold division-level meetings to discuss Project operations, division-level water

980 management activities, and other issues as appropriate.

981         (d)      Without limiting the contractual obligations of the Contracting Officer

982 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

983 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

984 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

985 protect health, safety, or the physical integrity of structures or facilities.

| | |
|---|---|
| 986 | CHARGES FOR DELINQUENT PAYMENTS |

987      19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
988    charges on delinquent payments. If a payment is not received by the due date, the Contractor
989    shall pay an interest charge on the delinquent payment for each day the payment is delinquent
990    beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
991    addition to the interest charge, an administrative charge to cover additional costs of billing and
992    processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
993    shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
994    payment is delinquent beyond the due date, based on the remaining balance of the payment due
995    at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
996    collection services associated with a delinquent payment.

997          (b)    The interest rate charged shall be the greater of either the rate prescribed
998    quarterly in the Federal Register by the Department of the Treasury for application to overdue
999    payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
1000   determined as of the due date and remain fixed for the duration of the delinquent period.

1001        (c)    When a partial payment on a delinquent account is received, the amount
1002   received shall be applied first to the penalty charges, second to the administrative charges, third
1003   to the accrued interest, and finally to the overdue payment.

| | |
|---|---|
| 1004 | EQUAL EMPLOYMENT OPPORTUNITY |

1005    20.    During the performance of this Contract, the Contractor agrees as follows:

1006        (a)    The Contractor will not discriminate against any employee or applicant for
1007   employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1008   origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1009   that employees are treated during employment, without regard to their race, color, religion, sex,
1010   sexual orientation, gender identity, or national origin. Such action shall include, but not be
1011   limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1012   recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1013   selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1014   places, available to employees and applicants for employment, notices to be provided by the
1015   Contracting Officer setting forth the provisions of this nondiscrimination clause.

1016        (b)    The Contractor will, in all solicitations or advertisements for employees
1017   placed by or on behalf of the Contractor, state that all qualified applicants will receive
1018   consideration for employment without regard to race, color, religion, sex, sexual orientation,
1019   gender identity, or national origin.

1020        (c)    The Contractor will not discharge or in any other manner discriminate
1021   against any employee or applicant for employment because such employee or applicant has

1022 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1023 employee or applicant. This provision shall not apply to instances in which an employee who
1024 has access to the compensation information of other employees or applicants as part of such
1025 employee's essential job functions discloses the compensation of such other employees or
1026 applicants to individuals who do not otherwise have access to such information, unless such
1027 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1028 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1029 consistent with the Contractor's legal duty to furnish information.

1030         (d)     The Contractor will send to each labor union or representative of workers
1031 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1032 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1033 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1034 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1035 applicants for employment.

1036         (e)     The Contractor will comply with all provisions of Executive Order No.
1037 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1038 Labor.

1039         (f)     The Contractor will furnish all information and reports required by
1040 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1041 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1042 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1043 compliance with such rules, regulations, and orders.

1044         (g)     In the event of the Contractor's noncompliance with the nondiscrimination
1045 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1046 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1047 ineligible for further Government contracts in accordance with procedures authorized in
1048 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1049 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1050 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1051         (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1052 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1053 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1054 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1055 will take such action with respect to any subcontract or purchase order as may be directed by the
1056 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1057 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1058 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1059 Contractor may request the United States to enter into such litigation to protect the interests of
1060 the United States.

1061 GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

1062    21.    (a)    The obligation of the Contractor to pay the United States as provided in
1063 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1064 obligation may be distributed among the Contractor's water users and notwithstanding the default
1065 of individual water users in their obligation to the Contractor.

1066    (b)    The payment of charges becoming due pursuant to this Contract is a
1067 condition precedent to receiving benefits under this Contract. The United States shall not make
1068 water available to the Contractor through Project facilities during any period in which the
1069 Contractor is in arrears in the advance payment of water rates due the United States. The
1070 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1071 parties that are in arrears in the advance payment of water rates as levied or established by the
1072 Contractor.

1073    (c)    With respect to subdivision (b) of this Article, the Contractor shall have no

1074 obligation to require advance payment for water rates which it levies.

1075 COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS

1076    22.    (a)    The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1077 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1078 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1079 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1080 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1081 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1082 Interior and/or Bureau of Reclamation.

1083    (b)    These statutes prohibit any person in the United States from being
1084 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1085 discrimination under any program or activity receiving financial assistance from the Bureau of
1086 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1087 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1088 obligation, including permitting officials of the United States to inspect premises, programs, and
1089 documents.

1090    (c)    The Contractor makes this Contract in consideration of and for the
1091 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1092 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1093 Reclamation, including installment payments after such date on account of arrangements for
1094 Federal financial assistance which were approved before such date. The Contractor recognizes
1095 and agrees that such Federal assistance will be extended in reliance on the representations and

1096    agreements made in this Article and that the United States reserves the right to seek judicial
1097    enforcement thereof.

1098            (d)      Complaints of discrimination against the Contractor shall be investigated
1099    by the Contracting Officer's Office of Civil Rights.

1100                               <u>PRIVACY ACT COMPLIANCE</u>

1101        23.    (a)      The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1102    (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1103    (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1104    to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1105    Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1106    C.F.R. § 426.18.

1107            (b)      With respect to the application and administration of the criminal penalty
1108    provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1109    employees who are responsible for maintaining the certification and reporting records referenced
1110    in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1111    U.S.C. § 552a(m).

1112            (c)      The Contracting Officer or a designated representative shall provide the
1113    Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1114    Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1115    31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1116    information contained in the Landholders' certification and reporting records.

1117            (d)      The Contracting Officer shall designate a full-time employee of the
1118    Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1119    pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1120    The Contractor is authorized to grant requests by individuals for access to their own records.

1121            (e)      The Contractor shall forward promptly to the System Manager each
1122    proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1123    filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1124    System Manager with information and records necessary to prepare an appropriate response to
1125    the requester. These requirements do not apply to individuals seeking access to their own
1126    certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1127    the requester elects to cite the Privacy Act as an authority for the request.

1128            (f)      Upon complete payment of the Repayment Obligation by the Contractor,

1129    this Article 23 will no longer be applicable.

1130 <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1131       24.    In addition to all other payments to be made by the Contractor pursuant to this

1132 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1133 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1134 of direct cost incurred by the United States for work requested by the Contractor associated with

1135 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1136 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1137 to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1138 contract administration.

1139 <u>WATER CONSERVATION</u>

1140       25.    (a)    Prior to the delivery of water provided from or conveyed through
1141 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1142 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1143 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1144 Additionally, an effective water conservation and efficiency program shall be based on the

1145 Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1146 the conservation and efficiency criteria for evaluating water conservation plans established under

1147 Federal law. The water conservation and efficiency program shall contain definite water

1148 conservation objectives, appropriate economically feasible water conservation measures, and

1149 time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1150 Contract shall be contingent upon the Contractor's continued implementation of such water

1151 conservation program. In the event the Contractor's water conservation plan or any revised water

1152 conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1153    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1154    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1155    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1156    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1157    immediately begins implementing its water conservation and efficiency program in accordance

1158    with the time schedules therein.

1159            (b)      Should the amount of M&I Water delivered pursuant to subdivision (a) of

1160    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1161    Contractor shall implement the Best Management Practices identified by the time frames issued

1162    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1163    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1164    the Contractor.

1165            (c)      The Contractor shall submit to the Contracting Officer a report on the

1166    status of its implementation of the water conservation plan on the reporting dates specified in the

1167    then-existing conservation and efficiency criteria established under Federal law.

1168            (d)      At five (5)-year intervals, the Contractor shall revise its water

1169    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1170    water conservation plans established under Federal law and submit such revised water

1171    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1172    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1173    existing conservation and efficiency criteria for evaluating water conservation plans established

1174    under Federal law.

1175       (e)     If the Contractor is engaged in direct groundwater recharge, such activity

1176   shall be described in the Contractor's water conservation plan.

1177                <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1178      26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1179   this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1180   hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1181   Area. Any such water shall not be considered Project Water under this Contract. In addition,

1182   this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1183   any water user within the Contractor's Service Area acquires or has available under any other

1184   contract pursuant to Federal Reclamation law.

1185   <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1186      27.    (a)     The O&M of a portion of the Project facilities which serve the Contractor,

1187   and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1188   San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1189   agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1190   Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1191   affect the rights or obligations of the Contractor or the United States hereunder.

1192         (b)     The Contracting Officer has previously notified the Contractor in writing

1193   that the O&M of a portion of the Project facilities which serve the Contractor has been

1194   transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1195   therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1196   Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1197    the terms and conditions of the separate agreement between the United States and the Operating

1198    Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1199    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1200    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1201    such successor determines, sets, or establishes for the O&M of the portion of the Project

1202    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1203    Mendota Water Authority or such successor.  Such direct payments to Operating Non-Federal

1204    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1205    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1206    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1207    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1208    United States in accordance with the separate agreement identified in subdivision (a) of this

1209    Article.

1210            (c)     For so long as the O&M of any portion of the Project facilities serving the

1211    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1212    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1213    Rates for Water Delivered under this Contract representing the cost associated with the activity

1214    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1215    or its successor.

1216            (d)     In the event the O&M of the Project facilities operated and maintained by

1217    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1218    the United States during the term of this Contract, the Contracting Officer shall so notify the

53

1219     Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1220     the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1221     representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1222     The Contractor shall, thereafter, in the absence of written notification from the Contracting

1223     Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1224     revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1225     <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1226         28.     The expenditure or advance of any money or the performance of any obligation of
1227     the United States under this Contract shall be contingent upon appropriation or allotment of
1228     funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1229     obligations under this Contract. No liability shall accrue to the United States in case funds are
1230     not appropriated or allotted.

1231     <u>BOOKS, RECORDS, AND REPORTS</u>

1232         29.     (a)     The Contractor shall establish and maintain accounts and other books and
1233     records pertaining to administration of the terms and conditions of this Contract, including the
1234     Contractor's financial transactions; water supply data; project operations, maintenance, and
1235     replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1236     census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1237     Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1238     such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1239     and regulations, each party to this Contract shall have the right during office hours to examine
1240     and make copies of the other party's books and records relating to matters covered by this
1241     Contract.

1242         (b)     Notwithstanding the provisions of subdivision (a) of this Article, no

1243     books, records, or other information shall be requested from the Contractor by the Contracting

1244     Officer unless such books, records, or information are reasonably related to the administration or

1245     performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1246     time within which to provide the requested books, records, or information.

1247         (c)     At such time as the Contractor provides information to the Contracting

1248   Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1249   to the Operating Non-Federal Entity(ies).

1250         ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED

1251       30.   (a)     The provisions of this Contract shall apply to and bind the successors and
1252   assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1253   therein by either party shall be valid until approved in writing by the other party.

1254         (b)     The assignment of any right or interest in this Contract by either party

1255   shall not interfere with the rights or obligations of the other party to this Contract absent the

1256   written concurrence of said other party.

1257         (c)     The Contracting Officer shall not unreasonably condition or withhold

1258   approval of any proposed assignment.

1259                     SEVERABILITY

1260       31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1261   nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1262   an association or other form of organization whose primary function is to represent parties to

1263   Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1264   enforceability of a provision included in this Contract and said person, entity, association, or

1265   organization obtains a final court decision holding that such provision is legally invalid or

1266   unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1267   the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1268   final court decision identify by mutual agreement the provisions in this Contract which must be

1269   revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1270 The time periods specified above may be extended by mutual agreement of the parties. Pending

1271 the completion of the actions designated above, to the extent it can do so without violating any

1272 applicable provisions of law, the United States shall continue to make the quantities of Project

1273 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1274 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1275 <div align="center">RESOLUTION OF DISPUTES</div>

1276      32.    Should any dispute arise concerning any provisions of this Contract, or the

1277 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1278 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1279 Officer referring any matter to the Department of Justice, the party shall provide to the other

1280 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1281 not be required where a delay in commencing an action would prejudice the interests of the party

1282 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1283 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1284 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1285 or the United States may have.

1286 <div align="center">OFFICIALS NOT TO BENEFIT</div>

1287      33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1288 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1289 same manner as other water users or landowners.

1290 <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1291      34.    (a)    While this Contract is in effect, no change may be made in the
1292 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1293 changes which may affect the respective rights, obligations, privileges, and duties of either the

1294  United States or the Contractor under this Contract, including, but not limited to, dissolution,
1295  consolidation, or merger, except upon the Contracting Officer's written consent.

1296        (b)    Within 30 days of receipt of a request for such a change, the Contracting

1297  Officer will notify the Contractor of any additional information required by the Contracting

1298  Officer for processing said request, and both parties will meet to establish a mutually agreeable

1299  schedule for timely completion of the process. Such process will analyze whether the proposed

1300  change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1301  (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1302  to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1303  have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1304  Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1305  responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1306  be paid in accordance with Article 24 of this Contract.

1307                         FEDERAL LAWS

1308      35.    By entering into this Contract, the Contractor does not waive its rights to contest

1309  the validity or application in connection with the performance of the terms and conditions of this

1310  Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1311  the terms and conditions of this Contract unless and until relief from application of such Federal

1312  law or regulation to the implementing provision of the Contract is granted by a court of

1313  competent jurisdiction.

RECLAMATION REFORM ACT OF 1982

1314

1315     36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1316 Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1317 Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1318     (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1319 shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1320 the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1321 Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

CERTIFICATION OF NONSEGREGATED FACILITIES

1322

1323     37.    The Contractor hereby certifies that it does not maintain or provide for its
1324 employees any segregated facilities at any of its establishments and that it does not permit its
1325 employees to perform their services at any location under its control where segregated facilities
1326 are maintained. It certifies further that it will not maintain or provide for its employees any
1327 segregated facilities at any of its establishments and that it will not permit its employees to
1328 perform their services at any location under its control where segregated facilities are
1329 maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1330 Employment Opportunity clause in this Contract. As used in this certification, the term
1331 "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1332 restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1333 parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1334 facilities provided for employees which are segregated by explicit directive or are in fact
1335 segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1336 disability, or otherwise. The Contractor further agrees that (except where it has obtained
1337 identical certifications from proposed subcontractors for specific time periods) it will obtain
1338 identical certifications from proposed subcontractors prior to the award of subcontracts
1339 exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1340 Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1341 following notice to such proposed subcontractors (except where the proposed subcontractors
1342 have submitted identical certifications for specific time periods):

1343     NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1344     CERTIFICATIONS OF NONSEGREGATED FACILITIES

1345 A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1346 exceeding $10,000 which is not exempt from the provisions of the Equal Employment

1347   Opportunity clause. The certification may be submitted either for each subcontract or for all
1348   subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1349   making false statements in offers is prescribed in 18 U.S.C. § 1001.

1350   <div align="center">NOTICES</div>

1351        38.   Any notice, demand, or request authorized or required by this Contract shall be
1352   deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1353   delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1354   California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1355   postage prepaid, or delivered to the Board of Directors of the Mercy Springs Water District,
1356   52027 West Althea Avenue, Firebaugh, California 93622. The designation of the addressee or
1357   the address may be changed by notice given in the same manner as provided in this Article for
1358   other notices.

1359   <div align="center">MEDIUM FOR TRANSMITTING PAYMENT</div>

1360        39.   (a)   All payments from the Contractor to the United States under this Contract
1361   shall be by the medium requested by the United States on or before the date payment is due. The
1362   required method of payment may include checks, wire transfers, or other types of payment
1363   specified by the United States.

1364            (b)   Upon execution of this Contract, the Contractor shall furnish the
1365   Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1366   for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1367   out of the Contractor's relationship with the United States.

1368   <div align="center">CONTRACT DRAFTING CONSIDERATIONS</div>

1369        40.   This amended Contract has been negotiated and reviewed by the parties hereto,
1370   each of whom is sophisticated in the matters to which this amended Contract pertains. The
1371   double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1372   the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1373   spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1374   <div align="center">CONFIRMATION OF CONTRACT</div>

1375        41.   Promptly after the execution of this amended Contract, the Contractor will
1376   provide to the Contracting Officer a certified copy of a final decree of a court of competent
1377   jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1378   for the authorization of the execution of this amended Contract. This amended Contract shall not
1379   be binding on the United States until the Contractor secures a final decree.

1380

1381        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1382   day and year first above written.

1383                             UNITED STATES OF AMERICA


1384                         By: _____
1385                               Regional Director
1386                               Interior Region 10: California-Great Basin
1387                               Bureau of Reclamation

1388                         MERCY SPRINGS WATER DISTRICT
1389   (SEAL)


1390                         By: _____
1391                               President of the Board of Directors


1392   Attest:

1393   By: _____
1394       Secretary of the Board of Directors

1381      IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1382    day and year first above written.

1383                                  UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:14:47 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR**

1384    **DEPARTMENT OF THE INTERIOR**    By: _____
       **TIME STAMP:** 1:37 pm, May 11 2020
1385                                    Regional Director
1386                                    Interior Region 10: California-Great Basin
1387                                    Bureau of Reclamation

1388                                  MERCY SPRINGS WATER DISTRICT
1389    (SEAL)

1390                                  By: _____
1391                                      President of the Board of Directors

1392    Attest:

1393    By: _____
1394         Secretary of the Board of Directors



**Mercy Springs Water District**

Contract No. 14-06-200-3365A-A-LTR1-P

Exhibit A

District Boundary

Contractor's Service Area

Date: 4/1/2020
File Name: N:\Districts\Contracts\mercy_springs\mercy_springs_20200401.mxd

0    0.5    1 Miles

BUREAU OF RECLAMATION

N

214-202-883

## EXHIBIT B
### MERCY SPRINGS WATER DISTRICT
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water[1] |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $30.91 | |
| DMC Aqueduct Intertie | $1.17 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Deficit Cost (ARRA Cost) | $0.00 | |
| **TOTAL COS RATE** *(Tier 1 Rate)* | $59.06 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| **P.L. 102-575 Surcharge** (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| **P.L. 106-377 Assessment** (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

\#\# The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; which equals a M&I Historic use average quantity of 0 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

## Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

**Unpaid Construction Cost from the 2020 Water Rate Books***

| | |
|---|---|
| Contractor: | **Mercy Springs WD** |
| Facility: | **Delta Mendota Canal** |
| Contract: | **14-06-200-3365A-LTR1-P** |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 271,770 | |
| 2019 Repayment (Estimate) ** | $ | 91,914 | |
| Adjusted Construction Cost | $ | 179,856 | $ 174,569 |
| Intertie Construction Cost (N/A): | $ | 41,312 | $ 37,000 |
| Total | $ | 221,168 | $ 211,569 |

| If Paid in Installments (Used 20 yr CMT) | | | | |
|---|---|---|---|---|
| | Due**** | | | |
| Payment 1 | 9/1/2020 | | $ | 53,555 |
| Payment 2 | 9/1/2021 | | $ | 53,555 |
| Payment 3 | 9/1/2022 | | $ | 53,555 |
| Payment 4 ~~ | 9/1/2023 | | $ | 53,555 |
| Total Installment Payments | | | $ | 214,220 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | - |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | - |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 | $ 179,856 | $ 16,351 | $ 16,263 | $ 41,312 | $ 939 | $ 934 | $ 17,197 |
| 2021 | $ 163,505 | $ 16,351 | $ 16,188 | $ 40,373 | $ 939 | $ 930 | $ 17,118 |
| 2022 | $ 147,155 | $ 16,351 | $ 16,108 | $ 39,434 | $ 939 | $ 925 | $ 17,033 |
| 2023 | $ 130,804 | $ 16,351 | $ 16,028 | $ 38,495 | $ 939 | $ 920 | $ 16,948 |
| 2024 | $ 114,454 | $ 16,351 | $ 15,948 | $ 37,556 | $ 939 | $ 916 | $ 16,864 |
| 2025 | $ 98,103 | $ 16,351 | $ 15,868 | $ 36,617 | $ 939 | $ 911 | $ 16,780 |
| 2026 | $ 81,753 | $ 16,351 | $ 15,790 | $ 35,679 | $ 939 | $ 907 | $ 16,696 |
| 2027 | $ 65,402 | $ 16,351 | $ 15,711 | $ 34,740 | $ 939 | $ 902 | $ 16,613 |
| 2028 | $ 49,052 | $ 16,351 | $ 15,633 | $ 33,801 | $ 939 | $ 898 | $ 16,531 |
| 2029 | $ 32,701 | $ 16,351 | $ 15,555 | $ 32,862 | $ 939 | $ 893 | $ 16,448 |
| 2030 | $ 16,351 | $ 16,351 | $ 15,478 | $ 31,923 | $ 939 | $ 889 | $ 16,366 |
| 2031-63 | | | | $ 30,984 | $ 30,984 | $ 26,976 | $ 26,976 |
| Total, Lump Sum Payment | | $ 174,569 | | | | $ 37,000 | $ 211,569 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | $ 5,287 | | | | $ 4,312 | $ 9,599 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 11**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
WESTLANDS WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|

| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 11 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 34 |
| 11. | Temporary Reductions – Return Flows | 35 |
| 12. | Constraints on the Availability of Water | 36 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 43 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 48 |

## Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 51 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 54 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
WESTLANDS WATER DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1   THIS CONTRACT, made this 28 day of September , 2022 , in

2   pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3   supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4   as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5   July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6   October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7   (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8   (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9   collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10  OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11  this Contract, hereinafter referred to as the Contracting Officer, and WESTLANDS WATER

12  DISTRICT, hereinafter referred to as the Contractor, a public agency of the State of California,

13  duly organized, existing, and acting pursuant to the laws thereof;

14      WITNESSETH, That:

15 <u>EXPLANATORY RECITALS</u>

16       [1$^{st}$]    WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22       [2$^{nd}$]    WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25       [3$^{rd}$]    WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27       [4$^{th}$]    WHEREAS, the Oro Loma Water District (District) and the United States

28 entered into Contract No. 14-06-200-7823, as amended, which established terms for the delivery

29 to the District of Project Water from the Delta Division facilities from April 7, 1959 to February

30 28, 1995; and

31       [5$^{th}$]    WHEREAS, the United States and the District have pursuant to

32 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33 entered into interim renewal contract(s) identified as Contract No. 14-06-200-7823-IR1 and

34 subsequent Interim Renewal Contracts 14-06-200-7823-IR2 through 14-06-200-7823-IR8, which

35 provided for water service to the District from March 1, 1995 through February 28, 2006; and

2

36         [6th]    WHEREAS, the United States and the District entered into a long-term

37 contract identified as Contract No. 14-06-200-7823-LTR1, hereinafter referred to as the Long-

38 Term Contract, which provided for the continued water service to the District following

39 expiration of Contract No. 14-06-200-7823-IR8; and

40         [7th]    WHEREAS, the Contractor and the District executed an agreement on

41 March 1, 2012, to provide for the partial assignment of 4,000 acre-feet of Project Water under

42 the District's Long-Term Contract 14-06-200-7823-LTR1; and

43         [8th]    WHEREAS, the United States and the Contractor entered into Contract

44 No. 14-06-200-7823J as amended, hereinafter referred to as the Existing Contract, which

45 provided the Contractor Project Water from the Project facilities from March 1, 2012, through

46 February 28, 2030, and which was in effect the date the WIIN Act was enacted; and

47         [9th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

48 States of America enacted the WIIN Act; and

49         [10th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

50 contractor, the Secretary of the Interior shall convert any water service contract in effect on the

51 date of enactment of this subtitle and between the United States and a water users' association

52 [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

53 mutually agreeable terms and conditions."; and

54         [11th]   WHEREAS, Section 4011(a)(1) further provides that "the manner of

55 conversion under this paragraph shall be as follows: (A) Water service contracts that were

56 entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

57 this section shall be converted to repayment contracts under section 9(d) of that Act

3

58    (53 Stat. 1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of

59    section 9 of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

60    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

61               [12th]   WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

62    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

63    repayment, exchange and transfer contractual rights between the water users' association

64    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

65    water users' association [Contractor] and their landowners as provided under State law."; and

66               [13th]   WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

67    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

68    service or repayment contractor to receive water; or (4) except as expressly provided in this

69    section, any obligations under the Federal Reclamation law, including the continuation of

70    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

71    repayment contractors making prepayments pursuant to this section."; and

72               [14th]   WHEREAS, upon the request of the Contractor, the WIIN Act directs the

73    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

74    service contracts into repayment contracts, amend existing repayment contracts, and allow

75    contractors to prepay their construction cost obligations pursuant to applicable Federal

76    Reclamation law; and

77               [15th]   WHEREAS, the United States has determined that the Contractor has

78    fulfilled all of its obligations under the Existing Contract; and

79           [16th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

80   Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

81   reasonable and beneficial use and/or has demonstrated future demand for water use such that the

82   Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

83   quantity of Project Water to be made available to it pursuant to this Contract; and

84           [17th]   WHEREAS, water obtained from the Project has been relied upon by

85   urban and agricultural areas within California for more than 50 years, and is considered by the

86   Contractor as an essential portion of its water supply; and

87           [18th]   WHEREAS, the economies of regions within the Project, including the

88   Contractor's, depend upon the continued availability of water, including water service from the

89   Project; and

90           [19th]   WHEREAS, the Secretary intends through coordination, cooperation, and

91   partnerships to pursue measures to improve water supply, water quality, and reliability of the

92   Project for all Project purposes; and

93           [20th]   WHEREAS, the mutual goals of the United States and the Contractor

94   include:  to provide for reliable Project Water supplies; to control costs of those supplies; to

95   achieve repayment of the Project as required by law; to guard reasonably against Project Water

96   shortages; to achieve a reasonable balance among competing demands for use of Project Water;

97   and to comply with all applicable environmental statutes, all consistent with the legal obligations

98   of the United States relative to the Project; and

99           [21st]   WHEREAS, the parties intend by this Contract to maintain a cooperative

100   relationship in order to achieve their mutual goals; and

101         [22nd] WHEREAS, the Contractor has utilized or may utilize transfers, contract

102 assignments, rescheduling, and conveyance of Project Water and non-Project water under this

103 Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

104 beneficial use of water; and

105         [23rd] WHEREAS, the parties desire and intend that this Contract not provide a

106 disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

107 Explanatory Recital immediately above; and

108         [24th] WHEREAS, the Contracting Officer and the Contractor agree that this

109 Contract complies with Section 4011 of the WIIN Act; and

110         [25th] WHEREAS, the Contracting Officer and the Contractor agree to amend

111 and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

112 Reclamation law on the terms and conditions set forth below.

113         NOW, THEREFORE, in consideration of the mutual and dependent covenants

114 herein contained, it is hereby mutually agreed by the parties hereto as follows:

115 <div align="center">DEFINITIONS</div>

116     1.     When used herein unless otherwise distinctly expressed, or manifestly

117 incompatible with the intent of the parties as expressed in this Contract, the term:

118         (a)     "Additional Capital Obligation" shall mean construction costs or other

119 capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

120 Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

121 (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

122 Stat. 1628) ("WIIN Act");

123    (b)    "Calendar Year" shall mean the period January 1 through December 31,

124    both dates inclusive;

125    (c)    "Charges" shall mean the payments required by Federal Reclamation law

126    in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

127    annually by the Contracting Officer pursuant to this Contract;

128    (d)    "Condition of Shortage" shall mean a condition respecting the Project

129    during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

130    Contract Total;

131    (e)    "Contracting Officer" shall mean the Secretary of the Interior's duly

132    authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

133    or regulation;

134    (f)    "Contract Total" shall mean the maximum amount of water to which the

135    Contractor is entitled under subdivision (a) of Article 3 of this Contract;

136    (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

137    permitted to provide Project Water under this Contract as described in Exhibit "A" attached

138    hereto, which may be modified from time to time in accordance with Article 34 of this Contract

139    without amendment of this Contract;

140    (h)    "CVPIA" shall mean the Central Valley Project Improvement Act, Title

141    XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

142    (i)    "Delta Division Facilities" shall mean those existing and future Project

143    facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

144    the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

145    Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

146    Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

147            (j)      "Eligible Lands" shall mean all lands to which Irrigation Water may be

148    delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

149    1263), as amended;

150            (k)      "Excess Lands" shall mean all lands in excess of the limitations contained

151    in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

152    acreage limitation under Federal Reclamation law;

153            (l)      "Existing Capital Obligation" shall mean the remaining amount of

154    construction costs or other capitalized costs allocable to the Contractor as described in Section

155    4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

156    Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

157    in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule. The

158    Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

159    Exhibit "C", which is incorporated herein by reference;

160            (m)      "Full Cost Rate" shall mean an annual rate, as determined by the

161    Contracting Officer that shall amortize the expenditures for construction properly allocable to the

162    Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

163    deficits funded, less payments, over such periods as may be required under Federal Reclamation

164    law, or applicable contract provisions. Interest will accrue on both the construction expenditures

165    and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

166    date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

8

167    in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

168    The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

169    Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

170            (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

171    be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

172            (o)    "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

173    to the delivery of Irrigation Water;

174            (p)    "Irrigation Water" shall mean the use of Project Water to irrigate lands
175    primarily for the production of commercial agricultural crops or livestock, and domestic and
176    other uses that are incidental thereto;

177            (q)    "Landholder" shall mean a party that directly or indirectly owns or leases

178    nonexempt land, as provided in 43 CFR 426.2;

179            (r)    "Municipal and Industrial (M&I) Water" shall mean the use of Project
180    Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
181    of "Irrigation Water" or within another category of water use under an applicable Federal
182    authority;

183            (s)    "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

184    the delivery of M&I Water;

185            (t)    "Operation and Maintenance" or "O&M" shall mean normal and

186    reasonable care, control, operation, repair, replacement (other than capital replacement), and

187    maintenance of Project facilities;

188            (u)    "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

189    successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

190    the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

191     Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

192     Water Authority;

193           (v)     "Project" shall mean the Central Valley Project owned by the United

194     States and managed by the Department of the Interior, Bureau of Reclamation;

195           (w)     "Project Contractors" shall mean all parties who have contracts for water

196     service for Project Water from the Project with the United States pursuant to Federal

197     Reclamation law;

198           (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

199     delivered by the Secretary in accordance with the statutes authorizing the Project and in

200     accordance with the terms and conditions of water rights acquired pursuant to California law;

201           (y)     "Rates" shall mean the payments determined annually by the Contracting

202     Officer in accordance with the then-current applicable water ratesetting policies for the Project,

203     as described in subdivision (a) of Article 7 of this Contract;

204           (z)     "Recent Historic Average" shall mean the most recent five- (5) year

205     average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

206     or its preceding contract(s);

207           (aa)     "Repayment Obligation" for Water Delivered as Irrigation Water shall

208     mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

209     amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

210     Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

211     United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

212         (bb)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

213   successor, or an authorized representative acting pursuant to any authority of the Secretary and

214   through any agency of the Department of the Interior;

215         (cc)   "Tiered Pricing Component" shall be the incremental amount to be paid

216   for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

217   for in Exhibit "B";

218         (dd)   "Water Delivered" or "Delivered Water" shall mean Project Water

219   diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

220   Officer;

221         (ee)   "Water Made Available" shall mean the estimated amount of Project

222   Water that can be delivered to the Contractor for the upcoming Year as declared by the

223   Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

224         (ff)   "Water Scheduled" shall mean Project Water made available to the

225   Contractor for which times and quantities for delivery have been established by the Contractor

226   and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

227         (gg)   "Year" shall mean the period from and including March 1 of each

228   Calendar Year through the last day of February of the following Calendar Year.

229         <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

230     2.    (a)    This Contract shall be effective October 1, 2020, hereinafter known as the

231   "Effective Date", and shall continue so long as the Contractor pays applicable Rates and Charges

232  under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat.

233  1195) as applicable, and applicable law;

234          (1) *Provided, That* the Contracting Officer shall not seek to terminate

235  this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

236  unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

237  to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

238  or to diligently commence and maintain full curative payments satisfactory to the Contracting

239  Officer within the sixty (60) calendar days' notice period;

240          (2) *Provided, further, That* the Contracting Officer shall not seek to

241  suspend making water available or declaring Water Made Available pursuant to this Contract for

242  non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

243  Contracting Officer has first provided at least thirty (30) calendar days written notice to the

244  Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

245  curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

246  cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

247  suspended making water available pursuant to this paragraph, upon cure of such non-compliance

248  satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

249  available and declaring Water Made Available pursuant to this Contract;

250          (3) *Provided, further, That* this Contract may be terminated at any

251  time by mutual consent of the parties hereto.

252      (b)    Upon complete payment of the Repayment Obligation by the Contractor,

253  and notwithstanding any Additional Capital Obligation that may later be established, the acreage

254    limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

255    and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

256    this Contract shall no longer be applicable.

257             (c)      Notwithstanding any provision of this Contract, the Contractor reserves

258    and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

259    allowed by law.

260             (d)      Notwithstanding any provision of this Contract, the Contractor reserves

261    and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

262    allowed by law.

263    <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

264    3.    (a)      During each Year, consistent with all applicable State water rights permits,

265    and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

266    Contract, the Contracting Officer shall make available for delivery to the Contractor 4,000 acre-

267    feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

268    accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

269    Articles 4 and 7 of this Contract.

270             (b)      Because the capacity of the Project to deliver Project Water has been

271    constrained in recent years and may be constrained in the future due to many factors including

272    hydrologic conditions and implementation of Federal and State laws, the likelihood of the

273    Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

274    Article in any given Year is uncertain.  The Contracting Officer's modeling referenced in the

275    programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

13

276  CVPIA projected that the Contract Total set forth in this Contract will not be available to the

277  Contractor in many years. During the most recent five years prior to execution of Contract No.

278  14-06-200-7823-LTR1, the Recent Historic Average Water Made Available to the District was

279  3,027 acre-feet. Nothing in this subdivision (b) of this Article shall affect the rights and

280  obligations of the parties under any provision of this Contract.

281           (c)    The Contractor shall utilize the Project Water in accordance with all

282  applicable legal requirements.

283                  (1)    In the event any Project Contractor (other than a Cross Valley

284  Contractor) that receives Project Water through the Delta Division Facilities obtains a

285  contractual agreement that the Contracting Officer shall make Project Water available at a point

286  or points of delivery in or north of the Delta, at the request of the Contractor and upon

287  completion of any required environmental documentation, this Contract shall be amended to

288  provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

289  this Contract shall be limited solely to those changes made necessary by the addition of such

290  alternate points of delivery in or north of the Delta; _Provided, That_ the Contracting Officer's use

291  of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

292  amendment.

293           (d)    The Contractor shall make reasonable and beneficial use of all water

294  furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

295  groundwater banking programs, surface water storage programs, and other similar programs

296  utilizing Project Water or other water furnished pursuant to this Contract conducted within the

297  Contractor's Service Area which are consistent with applicable State law and result in use

14

298 consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

299 program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

300 Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

301 sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

302 the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

303 compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

304 banking programs, surface water storage programs, and other similar programs utilizing Project

305 Water or other water furnished pursuant to this Contract conducted outside the Contractor's

306 Service Area may be permitted upon written approval of the Contracting Officer, which approval

307 will be based upon environmental documentation, Project Water rights, and Project operational

308 concerns. The Contracting Officer will address such concerns in regulations, policies, or

309 guidelines.

310   (e) The Contractor shall comply with requirements applicable to the

311 Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

312 of any water service contract between the Contracting Officer and the Contractor in effect

313 immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

314 Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

315 implement. The Existing Contract, which evidences in excess of 45 years of diversions for

316 irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

317 Article 3 of this Contract, will be considered in developing an appropriate baseline for any

318 required biological assessment(s) prepared pursuant to the ESA, and any other needed

319 environmental review. Nothing herein shall be construed to prevent the Contractor from

320 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

321 biological opinion or other environmental documentation referred to in this Article.

322     (f)     Following the declaration of Water Made Available under Article 4 of this

323 Contract, the Contracting Officer will make a determination whether Project Water, or other

324 water available to the Project, can be made available to the Contractor in addition to the Contract

325 Total under this Article during the Year without adversely impacting other Project Contractors.

326 At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

327 making such a determination. If the Contracting Officer determines that Project Water, or other

328 water available to the Project, can be made available to the Contractor, the Contracting Officer

329 will announce the availability of such water and shall so notify the Contractor as soon as

330 practical. The Contracting Officer will thereafter meet with the Contractor and other Project

331 Contractors capable of taking such water to determine the most equitable and efficient allocation

332 of such water. If the Contractor requests the delivery of any quantity of such water, the

333 Contracting Officer shall make such water available to the Contractor in accordance with

334 applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

335 contractual commitments, water rights, and operational constraints, long-term Project

336 Contractors shall have a first right to acquire such water, including Project Water made available

337 pursuant to Section 215 of the Reclamation Reform Act of 1982.

338     (g)     The Contractor may request permission to reschedule for use during the

339 subsequent Year some or all of the Water Made Available to the Contractor during the current

340 Year, referred to as "rescheduled water." The Contractor may request permission to use during

341 the current Year a quantity of Project Water which may be made available by the United States

16

342    to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

343    written approval may permit such uses in accordance with applicable statutes, regulations,

344    guidelines, and policies.

345           (h)     The Contractor's right pursuant to Federal Reclamation law and applicable

346    State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

347    shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

348    Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

349    August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

350    sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

351    subdivision (b) of Article 12 of this Contract.

352           (i)      Project Water furnished to the Contractor pursuant to this Contract may be

353    delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

354    Contract upon written approval by the Contracting Officer in accordance with the terms and

355    conditions of such approval.

356           (j)      The Contracting Officer shall make reasonable efforts to protect the water

357    rights necessary for the Project and to provide the water available under this Contract. The

358    Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

359    extent permitted by law, in administrative proceedings related to the Project Water rights;

360    *Provided, That* the Contracting Officer retains the right to object to the substance of the

361    Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

362    Contracting Officer shall recognize the Contractor has a legal right under the terms of this

363    Contract to use Project Water.

364        <u>TIME FOR DELIVERY OF WATER</u>

365        4.      (a)      On or about February 20 each Calendar Year, the Contracting Officer shall

366    announce the Contracting Officer's expected declaration of the Water Made Available.  Such

367    declaration will be expressed in terms of Water Made Available and the Recent Historic Average

368    and will be updated monthly, and more frequently if necessary, based on the then-current

369    operational and hydrologic conditions and a new declaration with changes, if any, to the Water

370    Made Available will be made.  The Contracting Officer shall provide forecasts of Project

371    operations and the basis of the estimate, with relevant supporting information, upon the written

372    request of the Contractor.  Concurrently with the declaration of the Water Made Available, the

373    Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

374                 (b)      On or before each March 1 and at such other times as necessary, the

375    Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

376    Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

377    United States to the Contractor pursuant to this Contract for the Year commencing on such

378    March 1.  The Contracting Officer shall use all reasonable means to deliver Project Water

379    according to the approved schedule for the Year commencing on such March 1.

380                 (c)      The Contractor shall not schedule Project Water in excess of the quantity

381    of Project Water the Contractor intends to put to reasonable and beneficial use within the

382    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

383    during any Year.

384                 (d)      Subject to the conditions set forth in subdivision (a) of Article 3 of this

385    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

386    initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

387    written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

388    time prior to the date(s) on which the requested change(s) is/are to be implemented.

389    POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER

390    5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

391    Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

392    any additional point or points of delivery either on Project facilities or another location or

393    locations mutually agreed to in writing by the Contracting Officer and the Contractor.

394        (b)    The Contracting Officer, either directly or indirectly through its written

395    agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

396    maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

397    the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

398    Article.

399        (c)    The Contractor shall deliver Irrigation Water in accordance with any

400    applicable land classification provisions of Federal Reclamation law and the associated

401    regulations.  The Contractor shall not deliver Project Water to land outside the Contractor's

402    Service Area unless approved in advance by the Contracting Officer.

403        (d)    All Water Delivered to the Contractor pursuant to this Contract shall be

404    measured and recorded with equipment furnished, installed, operated, and maintained by the

405    Contracting Officer either directly or indirectly through its written agreements(s) with the

406    Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

407    Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

19

408    this Article. Upon the request of either party to this Contract, the Contracting Officer shall

409    investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

410    accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

411    therein. For any period of time when accurate measurements have not been made, the

412    Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

413    Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

414    of time.

415            (e)    Absent a separate contrary written agreement with the Contractor, neither

416    the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

417    control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

418    pursuant to this Contract beyond the point or points of delivery established pursuant to

419    subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

420    employees, agents, and assigns on account of damage or claim of damage of any nature

421    whatsoever for which there is legal responsibility, including property damage, personal injury, or

422    death arising out of or connected with the control, carriage, handling, use, disposal, or

423    distribution of such Water Delivered beyond such point or points of delivery except for any

424    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

425    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

426    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

427    Contracting Officer or any of its officers, employees, agents, and assigns, including the

428    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

429    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

430 a malfunction of facilities owned and/or operated by the United States or the Operating Non-

431 Federal Entity(ies).

432        <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

433       6.    (a)    The Contractor has established a measuring program satisfactory to the

434 Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

435 purposes within the Contractor's Service Area is measured at each agricultural turnout and such

436 water delivered for M&I purposes is measured at each M&I service connection. The water

437 measuring devices or water measuring methods of comparable effectiveness must be acceptable

438 to the Contracting Officer. The Contractor shall be responsible for installing, operating,

439 maintaining, and repairing all such measuring devices and implementing all such water

440 measuring methods at no cost to the United States. The Contractor shall use the information

441 obtained from such water measuring devices or water measuring methods to ensure its proper

442 management of the water; to bill water users for water delivered by the Contractor; and, if

443 applicable, to record water delivered for M&I purposes by customer class as defined in the

444 Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

445 contained, however, shall preclude the Contractor from establishing and collecting any charges,

446 assessments, or other revenues authorized by California law. The Contractor shall include a

447 summary of all its annual surface water deliveries in the annual report described in subdivision

448 (c) of Article 25 of this Contract.

449         (b)    To the extent the information has not otherwise been provided, upon

450 execution of this Contract, the Contractor shall provide to the Contracting Officer a written

451 report describing the measurement devices or water measuring methods being used or to be used

21

452   to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

453   service connections or alternative measurement programs approved by the Contracting Officer,

454   at which such measurement devices or water measuring methods are being used, and, if

455   applicable, identifying the locations at which such devices and/or methods are not yet being used

456   including a time schedule for implementation at such locations. The Contracting Officer shall

457   advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

458   if any, of the measuring devices or water measuring methods identified in the Contractor's report

459   and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

460   the Contracting Officer notifies the Contractor that the measuring devices or methods are

461   inadequate, the parties shall within 60 days following the Contracting Officer's response,

462   negotiate in good faith the earliest practicable date by which the Contractor shall modify said

463   measuring devices and/or measuring methods as required by the Contracting Officer to ensure

464   compliance with subdivision (a) of this Article.

465         (c)     All new surface water delivery systems installed within the Contractor's

466   Service Area after the Effective Date shall also comply with the measurement provisions

467   described in subdivision (a) of this Article.

468         (d)     The Contractor shall inform the Contracting Officer and the State of

469   California in writing by April 30 of each Year of the monthly volume of surface water delivered

470   within the Contractor's Service Area during the previous Year.

471         (e)     The Contractor shall inform the Contracting Officer and the Operating

472   Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

473   Irrigation Water and M&I Water taken during the preceding month.

474 <u>RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED REPAYMENT OF</u>
475 <u>FACILITIES</u>

476        7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

477 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

478 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

479 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

480 Article, subsection (b), the Contractor's Project construction and other obligations shall be

481 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

482 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

483 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

484 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

485 rules and regulations, or policies, and (iii) other applicable provisions of this Contract. Payments

486 shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

487 agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

488 Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

489 forth in Exhibit "B", as may be revised annually.

490               (1)     The Contractor shall pay the United States as provided for in this

491 Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

492 in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

493 be established to recover its estimated reimbursable costs included in the operation and

494 maintenance component of the Rate and amounts established to recover deficits and other

495 charges, if any, including construction costs as identified in the following subdivisions.

496         (2)     In accordance with the WIIN Act, the Contractor's allocable share

497   of Project construction costs will be repaid pursuant to the provisions of this Contract.

498         (A)     The amount due and payable to the United States, pursuant

499   to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

500   computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

501   as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

502   installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

503   set forth in Exhibit "C". The Repayment Obligation is due in lump sum by November 30, 2020

504   as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

505   Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

506   amount due using the lump sum alternative. If such notice is not provided by such date, the

507   Contractor shall be deemed to have elected the installment payment alternative, in which case,

508   the first such payment shall be made no later than November 30, 2020. The second payment

509   shall be made no later than the first anniversary of the first payment date. The third payment

510   shall be made no later than the second anniversary of the first payment date. The final payment

511   shall be made no later than October 1, 2023. If the installment payment option is elected by the

512   Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation by

513   giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

514   Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

515   methodology as was used to compute the initial annual installment payment amount, which is

516   illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

24

517 established, receipt of the Contractor's payment of the Repayment Obligation to the United

518 States shall fully and permanently satisfy the Existing Capital Obligation.

519 (B) Additional Capital Obligations that are not reflected in, the

520 schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

521 prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

522 Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

523 Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

524 Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

525 the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

526 be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

527 however, will be considered under subdivision (b) of this Article. A separate agreement shall be

528 established by the Contractor and the Contracting Officer to accomplish repayment of the

529 Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

530 WIIN Act, subject to the following:

531 (1) If the collective Additional Capital Obligation

532 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

533 is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

534 to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

535 notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

536 amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

537 (2) If the collective Additional Capital Obligation

538 properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

539 is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

540 properly assignable to the Contractor shall be repaid as provided by applicable Federal

541 Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

542 five million dollars ($5,000,000) shall not be a precedent in any other context.

543         (b)      In the event that the final cost allocation referenced in Section 4011(b) of

544 the WIIN Act determines that the costs properly assignable to the Contractor are greater than

545 what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

546 allocated costs. The term of such additional repayment contract shall be not less than one (1)

547 year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

548 of repayment of such amount may be developed by the Contractor and Contracting Officer. In

549 the event that the final cost allocation indicates that the costs properly assignable to the

550 Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

551 overpayment as an offset against any outstanding or future obligations of the Contractor, with the

552 exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

553         (c)      The Contracting Officer shall notify the Contractor of the Rates, Charges,

554 and Tiered Pricing Component as follows:

555         (1)      Prior to July 1 of each Calendar Year, the Contracting Officer shall

556 provide the Contractor an estimate of the Charges for Project Water that will be applied to the

557 period October 1, of the current Calendar Year, through September 30, of the following Calendar

558 Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

559 to review and comment on such estimates. On or before September 15 of each Calendar Year,

560 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

561    the period October 1 of the current Calendar Year, through September 30, of the following

562    Calendar Year, and such notification shall revise Exhibit "B."

563              (2)      Prior to October 1 of each Calendar Year, the Contracting Officer

564    shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

565    for Project Water for the following Year and the computations and cost allocations upon which

566    those Rates are based.  The Contractor shall be allowed not less than two months to review and

567    comment on such computations and cost allocations.  By December 31 of each Calendar Year,

568    the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

569    Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

570              (d)      At the time the Contractor submits the initial schedule for the delivery of

571    Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

572    Contractor shall make an advance payment to the United States equal to the total amount payable

573    pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

574    scheduled to be delivered pursuant to this Contract during the first two calendar months of the

575    Year.  Before the end of the first month and before the end of each calendar month thereafter, the

576    Contractor shall make an advance payment to the United States, at the Rate(s) set under

577    subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

578    during the second month immediately following.  Adjustments between advance payments for

579    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

580    the following month; _Provided, That_ any revised schedule submitted by the Contractor pursuant

581    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

582    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

27

583 then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

584 payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

585 this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

586 additional Project Water shall be delivered to the Contractor unless and until an advance

587 payment at the Rates then in effect for such additional Project Water is made. Final adjustment

588 between the advance payments for the Water Scheduled and payments for the quantities of Water

589 Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

590 later than April 30th of the following Year, or 60 days after the delivery of Project Water

591 rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

592 the last day of February.

593     (e)    The Contractor shall also make a payment in addition to the Rate(s) in

594 subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

595 appropriate Tiered Pricing Component then in effect, before the end of the month following the

596 month of delivery; _Provided, That_ the Contractor may be granted an exception from the Tiered

597 Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

598 consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

599 water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

600 there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

601 shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

602 for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

603 through the adjustment of payments due to the United States for Charges for the next month.

604 Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

28

605    be computed pursuant to Article 19 of this Contract.

606    (f)    The Contractor shall pay for any Water Delivered under subdivision (a),

607    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

608    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

609    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

610    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

611    under subdivision (a) of this Article.

612    (g)    Payments to be made by the Contractor to the United States under this

613    Contract may be paid from any revenues available to the Contractor.

614    (h)    All revenues received by the United States from the Contractor relating to

615    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

616    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

617    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

618    (i)    The Contracting Officer shall keep its accounts pertaining to the

619    administration of the financial terms and conditions of its long-term contracts, in accordance

620    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

621    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

622    Contractor a detailed accounting of all Project and Contractor expense allocations, the

623    disposition of all Project and Contractor revenues, and a summary of all water delivery

624    information. The Contracting Officer and the Contractor shall enter into good faith negotiations

625    to resolve any discrepancies or disputes relating to accountings, reports, or information.

626    (j)    The parties acknowledge and agree that the efficient administration of this

29

627    Contract is their mutual goal.  Recognizing that experience has demonstrated that mechanisms,

628    policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

629    and/or for making and allocating payments, other than those set forth in this Article may be in

630    the mutual best interest of the parties, it is expressly agreed that the parties may enter into

631    agreements to modify the mechanisms, policies, and procedures for any of those purposes while

632    this Contract is in effect without amending this Contract.

633            (k)     (1)     Beginning at such time as deliveries of Project Water in a Year

634    exceed 80 percent of the Contract Total, then before the end of the month following the month of

635    delivery the Contractor shall make an additional payment to the United States equal to the

636    applicable Tiered Pricing Component.  The Tiered Pricing Component for the amount of Water

637    Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

638    Contract Total, shall equal one-half of the difference between the Rate established under

639    subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

640    Rate, whichever is applicable.  The Tiered Pricing Component for the amount of Water

641    Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

642    the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

643    Rate or M&I Full Cost Water Rate, whichever is applicable.  For all Water Delivered pursuant to

644    subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

645    Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

646    the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

647            (2)     Subject to the Contracting Officer's written approval, the

648    Contractor may request and receive an exemption from such Tiered Pricing Component for

649    Project Water delivered to produce a crop which the Contracting Officer determines will provide

650    significant and quantifiable habitat values for waterfowl in fields where the water is used and the

651    crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

652    Irrigation Water shall apply only if such habitat values can be assured consistent with the

653    purposes of the CVPIA through binding agreements executed with or approved by the

654    Contracting Officer prior to use of such water.

655             (3)    For purposes of determining the applicability of the Tiered Pricing

656    Component pursuant to this Article, Water Delivered shall include Project Water that the

657    Contractor transfers to others but shall not include Project Water transferred to the Contractor,

658    nor shall it include the additional water provided to the Contractor under the provisions of

659    subdivision (f) of Article 3 of this Contract.

660             (l)    For the term of this Contract, Rates applied under the respective

661    ratesetting policies will be established to recover only reimbursable O&M (including any

662    deficits) and capital costs of the Project, as those terms are used in the then-current Project

663    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

664    applicable in accordance with the relevant Project ratesetting policy.  Changes of significance in

665    practices which implement the Contracting Officer's ratesetting policies will not be implemented

666    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

667    need, and impact of the proposed change.

668             (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

669    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

670    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

671     reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

672     transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

673     lower Rates and Charges because of inability to pay and is transferring Project Water to another

674     entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

675     for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

676             (n)      Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

677     Officer is authorized to adjust determinations of ability to pay every five years.

678             (o)      With respect to the Rates for M&I Water, the Contractor asserts that it is

679     not legally obligated to pay any Project deficits claimed by the United States to have accrued as

680     of the date of this Contract or deficit-related interest charges thereon. By entering into this

681     Contract, the Contractor does not waive any legal rights or remedies that it may have with

682     respect to such disputed issues. Notwithstanding the execution of this Contract and payments

683     made hereunder, the Contractor may challenge in the appropriate administrative or judicial

684     forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

685     term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

686     interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

687     the Rates; (4) the application by the United States of payments made by the Contractor under its

688     Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

689     application of such payments in the Rates. The Contracting Officer agrees that the Contractor

690     shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

691     M&I contractor on any of these issues, and credits for payments heretofore made, provided that

692     the basis for such ruling is applicable to the Contractor.

32

693 <u>NON-INTEREST BEARING O&M DEFICITS</u>

694     8.      The Contractor and the Contracting Officer concur that, as of the Effective Date

695 the Contractor has no non-interest bearing O&M deficits and shall have no further liability

696 therefore.

697               <u>SALES, TRANSFERS, OR EXCHANGES OF WATER</u>

698     9.    (a)     The right to receive Project Water provided for in this Contract may be

699 sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

700 California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

701 and applicable guidelines or regulations then in effect. No sale, transfer, or exchange of Project

702 Water under this Contract may take place without the prior written approval of the Contracting

703 Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

704 exchanges shall be approved absent all appropriate environmental documentation, including, but

705 not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

706 documentation should include, as appropriate, an analysis of groundwater impacts and economic

707 and social effects, including environmental justice, of the proposed water transfers on both the

708 transferor and transferee.

709         (b)     In order to facilitate efficient water management by means of water

710 transfers of the type historically carried out among Project Contractors located within the same

711 geographical area and to allow the Contractor to participate in an accelerated water transfer

712 program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

713 all necessary environmental documentation, including, but not limited to, documents prepared

714 pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

33

715 the Contracting Officer shall determine whether such transfers comply with applicable law.

716 Following the completion of the environmental documentation, such transfers addressed in such

717 documentation shall be conducted with advance notice to the Contracting Officer, but shall not

718 require prior written approval by the Contracting Officer. Such environmental documentation

719 and the Contracting Officer's compliance determination shall be reviewed every five years and

720 updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

721 subsequent environmental documentation shall include an alternative to evaluate not less than the

722 quantity of Project Water historically transferred within the same geographical area.

723   (c) For a water transfer to qualify under subdivision (b) of this Article, such

724 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

725 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

726 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

727 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

728 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

729 through existing facilities with no new construction or modifications to facilities and be between

730 existing Project Contractors and/or the Contractor and the United States, Department of the

731 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

732 requirements imposed for protection of the environment and Indian Trust Assets, as defined

733 under Federal law.

734   <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

735  10. (a) The amount of any overpayment by the Contractor of the Contractor's

736 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

737 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

738 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

739 of such overpayment, at the option of the Contractor, may be credited against amounts to become

740 due to the United States by the Contractor. With respect to overpayment, such refund or

741 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

742 have the right to the use of any of the Project Water supply provided for by this Contract. All

743 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

744 obtaining direction as to how to credit or refund such overpayment in response to the notice to

745 the Contractor that it has finalized the accounts for the Year in which the overpayment was

746 made.

747     (b)    All advances for miscellaneous costs incurred for work requested by the

748 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

749 when the work has been completed. If the advances exceed the actual costs incurred, the

750 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

751 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

752 Contract.

753         TEMPORARY REDUCTIONS – RETURN FLOWS

754     11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

755 requirements of Federal law, and (ii) the obligations of the United States under existing

756 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

757 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

758 provided in this Contract.

759            (b)     The Contracting Officer or Operating Non-Federal Entity(ies) may

760   temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

761   provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

762   of the Project facilities or any part thereof necessary for the delivery of Project Water to the

763   Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

764   will give the Contractor due notice in advance of such temporary discontinuance or reduction,

765   except in case of emergency, in which case no notice need be given; *Provided, That* the United

766   States shall use its best efforts to avoid any discontinuance or reduction in such service.  Upon

767   resumption of service after such discontinuance or reduction, and if requested by the Contractor,

768   the United States will, if possible, deliver the quantity of Project Water which would have been

769   delivered hereunder in the absence of such discontinuance or reduction.

770            (c)     The United States reserves the right to all seepage and return flow water

771   derived from Water Delivered to the Contractor hereunder which escapes or is discharged

772   beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

773   the United States any right to seepage or return flow being put to reasonable and beneficial use

774   pursuant to this Contract within the Contractor's Service Area by the Contractor or those

775   claiming by, through, or under the Contractor.

776                 CONSTRAINTS ON THE AVAILABILITY OF WATER

777       12.    (a)     In its operation of the Project, the Contracting Officer will use all
778   reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
779   made available to the Contractor pursuant to this Contract.  In the event the Contracting Officer
780   determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
781   Contractor of said determination as soon as practicable.

782            (b)     If there is a Condition of Shortage because of inaccurate runoff forecasting

783 or other similar operational errors affecting the Project; drought and other physical or natural
784 causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
785 to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
786 17 of this Contract, no liability shall accrue against the United States or any of its officers,
787 agents, or employees for any damage, direct or indirect, arising therefrom.

788       (c)     In any Year in which there may occur a Condition of Shortage for any of

789 the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

790 Article, the Contracting Officer will first allocate the available Project Water consistent with the

791 Project M&I Water Shortage Policy as finally adopted after environmental review for

792 determining the amount of Project Water Available for delivery to the Project Contractors.

793 Subject to the foregoing allocation, in any year in which there may occur a Condition of

794 Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

795 others entitled to Project Water from Delta Division Facilities under long-term water service or

796 repayment contracts (or renewals thereof or binding commitments therefore) in force on

797 February 28, 2005, as follows:

798       (1)     The Contracting Officer shall make an initial and subsequent

799 determination as necessary of the total quantity of Project Water estimated to be scheduled or

800 actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

801 renewal, long-term water service or repayment contracts then in force for the delivery of Project

802 Water by the United States from Delta Division Facilities during the relevant Year, the quantity

803 so determined being hereinafter referred to as the scheduled total;

804       (2)     A determination shall be made of the total quantity of Project

805 Water that is available for meeting the scheduled total, the quantity so determined being

806 hereinafter referred to as the available supply;

807         (3)     The total quantity of Project Water estimated to be scheduled or

808   actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

809   of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

810   hereinafter referred to as the Contractor's proportionate share; and

811         (4)     The available supply shall be multiplied by the Contractor's

812   proportionate share and the result shall be the quantity of Project Water made available by the

813   United States to the Contractor for the relevant Year in accordance with the schedule developed

814   by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

815   amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

816   that the Contracting Officer can increase or needs to decrease the available supply for delivery

817   from Delta Division Facilities to long-term water service and repayment contractors during the

818   relevant Year, such additions or reductions to the available supply shall be apportioned

819   consistent with subparagraphs (1) through (4), inclusive.

820         (d)     By entering into this Contract, the Contractor does not waive any legal

821   rights or remedies it may have to file or participate in any administrative or judicial proceeding

822   contesting:  (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

823   such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

824   implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

825   *That* the Contractor has commenced any such judicial challenge or any administrative procedures

826   necessary to institute any judicial challenge within six months of the policy becoming final.  By

827   agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

828   that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

829 validate or invalidate the Project M&I Water Shortage Policy.

## UNAVOIDABLE GROUNDWATER PERCOLATION

831       13.    (a)      To the extent applicable, the Contractor shall not be deemed to have

832 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

833 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

834 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

835             (b)      Upon complete payment of the Repayment Obligation by the Contractor,

836 this Article 13 shall no longer be applicable.

## COMPLIANCE WITH FEDERAL RECLAMATION LAWS

838       14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
839 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
840 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq*.), as amended and supplemented, and
841 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
842 law.

## PROTECTION OF WATER AND AIR QUALITY

844       15.    (a)      Omitted

845             (b)      The United States will care for, operate and maintain reserved works in a
846 manner that preserves the quality of the water at the highest level possible as determined by the
847 Contracting Officer. The United States does not warrant the quality of the water delivered to the
848 Contractor and is under no obligation to furnish or construct water treatment facilities to
849 maintain or improve the quality of water delivered to the Contractor.

850             (c)      The Contractor will comply with all applicable water and air pollution
851 laws and regulations of the United States and the State of California; and will obtain all required
852 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
853 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
854 State, and local water quality standards applicable to surface and subsurface drainage and/or
855 discharges generated through the use of Federal or Contractor facilities or Project Water
856 provided by the Contractor within its Service Area.

857             (d)      This Article shall not affect or alter any legal obligations of the Secretary
858 to provide drainage or other discharge services.

859          (e)     Omitted

860     WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
861                                        STATES

862        16.     (a)     Water or water rights now owned or hereafter acquired by the Contractor

863   other than from the United States and Irrigation Water furnished pursuant to the terms of this

864   Contract may be simultaneously transported through the same distribution facilities of the

865   Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

866   and non-Project water were constructed without funds made available pursuant to Federal

867   Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

868   Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

869   Irrigation Water must be established through the certification requirements as specified in the

870   Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

871   Eligible Lands within the Contractor's Service Area can be established and the quantity of

872   Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

873   Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

874   Project water are (were) constructed with funds made available pursuant to Federal Reclamation

875   law, the non-Project water will be subject to the acreage limitation provisions of Federal

876   Reclamation law, unless the Contractor pays to the United States the incremental fee described in

877   43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

878   annually the cost to the Federal Government, including interest, of storing or delivering non-

879   Project water, which for purposes of this Contract shall be determined as follows: The quotient

880   shall be the unpaid distribution system costs divided by the total irrigable acreage within the

40

881     Contractor's Service Area. The incremental fee per acre is the mathematical result of such

882     quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

883     (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

884     within the Contractor's Service Area that receives non-Project water through Federally financed

885     or constructed facilities. The incremental fee calculation methodology will continue during the

886     term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

887     regulation, or policy adopted after the Contractor has been afforded the opportunity to review

888     and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

889     adopted, it shall supersede this provision.

890          (b)     Water or water rights now owned or hereafter acquired by the Contractor,

891     other than from the United States may be stored, conveyed, and/or diverted through Project

892     facilities, subject to the completion of appropriate environmental documentation, with the

893     approval of the Contracting Officer and the execution of any contract determined by the

894     Contracting Officer to be necessary, consistent with the following provisions:

895          (1)     The Contractor may introduce non-Project water into Project

896     facilities and deliver said water to lands within the Contractor's Service Area, including

897     Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

898     Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

899     policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

900     use power policy is applicable, each as amended, modified, or superseded from time to time.

901          (2)     Delivery of such non-Project water in and through Project facilities

902     shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

903 purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

904 available to other Project Contractors; (iii) interfere with the delivery of contractual water

905 entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

906 the Project facilities.

907    (3) Neither the United States nor the Operating Non-Federal

908 Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

909 is introduced into or after it is delivered from the Project facilities. The Contractor hereby

910 releases and agrees to defend and indemnify the United States and the Operating Non-Federal

911 Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

912 persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

913 employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

914 (ii) diverting such non-Project water into Project facilities.

915    (4) Diversion of such non-Project water into Project facilities shall be

916 consistent with all applicable laws, and if involving groundwater, consistent with any applicable

917 groundwater management plan for the area from which it was extracted.

918    (5) After Project purposes are met, as determined by the Contracting

919 Officer, the United States and Project Contractors entitled to Project Water from Delta Division

920 Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

921 available by the Contracting Officer for conveyance and transportation of non-Project water prior

922 to any such remaining capacity being made available to non-Project contractors. Other Project

923 Contractors shall have a second priority to any remaining capacity of facilities declared to be

924 available by the Contracting Officer for conveyance and transportation of non-Project water prior

925    to any such remaining capacity being made available to non-Project contractors.

926           (c)       Upon complete payment of the Repayment Obligation by the Contractor,

927    subdivision (a) of this Article 16 shall no longer be applicable.

928                    OPINIONS AND DETERMINATIONS

929      17.     (a)       Where the terms of this Contract provide for actions to be based upon the

930    opinion or determination of either party to this Contract, said terms shall not be construed as

931    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

932    determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

933    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

934    or unreasonable opinion or determination. Each opinion or determination by either party shall be

935    provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

936    affect or alter the standard of judicial review applicable under Federal law to any opinion or

937    determination implementing a specific provision of Federal law embodied in statute or

938    regulation.

939           (b)       The Contracting Officer shall have the right to make determinations

940    necessary to administer this Contract that are consistent with the provisions of this Contract, the

941    laws of the United States and of the State of California, and the rules and regulations

942    promulgated by the Secretary. Such determinations shall be made in consultation with the

943    Contractor to the extent reasonably practicable.

944                   COORDINATION AND COOPERATION

945      18.     (a)       In order to further their mutual goals and objectives, the Contracting

946    Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

947    with other affected Project Contractors, in order to improve the O&M of the Project. The

948    communication, coordination, and cooperation regarding O&M shall include, but not be limited

949    to, any action which will or may materially affect the quantity or quality of Project Water supply,

950    the allocation of Project Water supply, and Project financial matters including, but not limited to,

951    budget issues. The communication, coordination, and cooperation provided for hereunder shall

952    extend to all provisions of this Contract. Each party shall retain exclusive decision making

953    authority for all actions, opinions, and determinations to be made by the respective party.

954          (b)    Within 120 days following the Effective Date, the Contractor, other

955    affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

956    Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

957    amended as necessary separate and apart from this Contract. The goal of this process shall be to

958    provide, to the extent practicable, the means of mutual communication and interaction regarding

959    significant decisions concerning Project O&M on a real-time basis.

960          (c)    In light of the factors referred to in subdivision (b) of Article 3 of this

961    Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

962    intent:

963               (1)    The Contracting Officer will, at the request of the Contractor,

964    assist in the development of integrated resource management plans for the Contractor. Further,

965    the Contracting Officer will, as appropriate, seek authorizations for implementation of

966    partnerships to improve water supply, water quality, and reliability.

967               (2)    The Secretary will, as appropriate, pursue program and project

968    implementation and authorization in coordination with Project Contractors to improve the water

969   supply, water quality, and reliability of the Project for all Project purposes.

970                    (3)   The Secretary will coordinate with Project Contractors and the

971   State of California to seek improved water resource management.

972                    (4)   The Secretary will coordinate actions of agencies within the

973   Department of the Interior that may impact the availability of water for Project purposes.

974                    (5)   The Contracting Officer shall periodically, but not less than

975   annually, hold division-level meetings to discuss Project operations, division-level water

976   management activities, and other issues as appropriate.

977            (d)   Without limiting the contractual obligations of the Contracting Officer

978   under the other Articles of this Contract, nothing in this Article shall be construed to limit or

979   constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

980   Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

981   protect health, safety, or the physical integrity of structures or facilities.

982                    CHARGES FOR DELINQUENT PAYMENTS

983   19.   (a)   The Contractor shall be subject to interest, administrative, and penalty
984   charges on delinquent payments.  If a payment is not received by the due date, the Contractor
985   shall pay an interest charge on the delinquent payment for each day the payment is delinquent
986   beyond the due date.  If a payment becomes 60 days delinquent, the Contractor shall pay, in
987   addition to the interest charge, an administrative charge to cover additional costs of billing and
988   processing the delinquent payment.  If a payment is delinquent 90 days or more, the Contractor
989   shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
990   payment is delinquent beyond the due date, based on the remaining balance of the payment due
991   at the rate of 6 percent per year.  The Contractor shall also pay any fees incurred for debt
992   collection services associated with a delinquent payment.

993            (b)   The interest rate charged shall be the greater of either the rate prescribed
994   quarterly in the Federal Register by the Department of the Treasury for application to overdue
995   payments, or the interest rate of 0.5 percent per month.  The interest rate charged will be
996   determined as of the due date and remain fixed for the duration of the delinquent period.

45

997           (c)    When a partial payment on a delinquent account is received, the amount
998 received shall be applied first to the penalty charges, second to the administrative charges, third
999 to the accrued interest, and finally to the overdue payment.

1000                           <u>EQUAL EMPLOYMENT OPPORTUNITY</u>

1001         20.    During the performance of this Contract, the Contractor agrees as follows:

1002           (a)    The Contractor will not discriminate against any employee or applicant for
1003 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1004 origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1005 that employees are treated during employment, without regard to their race, color, religion, sex,
1006 sexual orientation, gender identity, or national origin. Such action shall include, but not be
1007 limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1008 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1009 selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1010 places, available to employees and applicants for employment, notices to be provided by the
1011 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1012           (b)    The Contractor will, in all solicitations or advertisements for employees
1013 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1014 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1015 gender identity, or national origin.

1016           (c)    The Contractor will not discharge or in any other manner discriminate
1017 against any employee or applicant for employment because such employee or applicant has
1018 inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1019 employee or applicant. This provision shall not apply to instances in which an employee who
1020 has access to the compensation information of other employees or applicants as part of such
1021 employee's essential job functions discloses the compensation of such other employees or
1022 applicants to individuals who do not otherwise have access to such information, unless such
1023 disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1024 proceeding, hearing, or action, including an investigation conducted by the employer, or is
1025 consistent with the Contractor's legal duty to furnish information.

1026           (d)    The Contractor will send to each labor union or representative of workers
1027 with which it has a collective bargaining agreement or other contract or understanding, a notice,
1028 to be provided by the Contracting Officer, advising the labor union or workers' representative of
1029 the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1030 24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1031 applicants for employment.

1032         (e)      The Contractor will comply with all provisions of Executive Order No.
1033 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1034 Labor.

1035         (f)      The Contractor will furnish all information and reports required by
1036 Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1037 Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1038 by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1039 compliance with such rules, regulations, and orders.

1040         (g)      In the event of the Contractor's noncompliance with the nondiscrimination
1041 clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1042 canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1043 ineligible for further Government contracts in accordance with procedures authorized in
1044 Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1045 remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1046 regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1047         (h)      The Contractor will include the provisions of paragraphs (a) through (g) in
1048 every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1049 Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1050 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1051 will take such action with respect to any subcontract or purchase order as may be directed by the
1052 Secretary of Labor as a means of enforcing such provisions, including sanctions for
1053 noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1054 threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1055 Contractor may request the United States to enter into such litigation to protect the interests of
1056 the United States.

1057         <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1058      21.    (a)      The obligation of the Contractor to pay the United States as provided in
1059 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1060 obligation may be distributed among the Contractor's water users and notwithstanding the default
1061 of individual water users in their obligation to the Contractor.

1062         (b)      The payment of charges becoming due pursuant to this Contract is a
1063 condition precedent to receiving benefits under this Contract. The United States shall not make
1064 water available to the Contractor through Project facilities during any period in which the
1065 Contractor is in arrears in the advance payment of water rates due the United States. The
1066 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1067 parties that are in arrears in the advance payment of water rates as levied or established by the
1068 Contractor.

1069         (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1070   obligation to require advance payment for water rates which it levies.

1071                 <u>COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS</u>

1072      22.    (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1073   (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1074   amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1075   III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L.
1076   101-336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1077   applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1078   Interior and/or Bureau of Reclamation.

1079         (b)     These statutes prohibit any person in the United States from being
1080   excluded from participation in, being denied the benefits of, or being otherwise subjected to
1081   discrimination under any program or activity receiving financial assistance from the Bureau of
1082   Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1083   Contract, the Contractor agrees to immediately take any measures necessary to implement this
1084   obligation, including permitting officials of the United States to inspect premises, programs, and
1085   documents.

1086         (c)     The Contractor makes this Contract in consideration of and for the
1087   purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1088   Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1089   Reclamation, including installment payments after such date on account of arrangements for
1090   Federal financial assistance which were approved before such date. The Contractor recognizes
1091   and agrees that such Federal assistance will be extended in reliance on the representations and
1092   agreements made in this Article and that the United States reserves the right to seek judicial
1093   enforcement thereof.

1094         (d)     Complaints of discrimination against the Contractor shall be investigated
1095   by the Contracting Officer's Office of Civil Rights.

1096                        <u>PRIVACY ACT COMPLIANCE</u>

1097      23.    (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1098   (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1099   (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1100   to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1101   Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to
1102   43 C.F.R. § 426.18.

1103         (b)     With respect to the application and administration of the criminal penalty
1104 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1105 employees who are responsible for maintaining the certification and reporting records referenced
1106 in paragraph (a) above are considered to be employees of the Department of the Interior. See
1107 5 U.S.C. § 552a(m).

1108         (c)     The Contracting Officer or a designated representative shall provide the
1109 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1110 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1111 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1112 information contained in the Landholders' certification and reporting records.

1113         (d)     The Contracting Officer shall designate a full-time employee of the
1114 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1115 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1116 The Contractor is authorized to grant requests by individuals for access to their own records.

1117         (e)     The Contractor shall forward promptly to the System Manager each
1118 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1119 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1120 System Manager with information and records necessary to prepare an appropriate response to
1121 the requester. These requirements do not apply to individuals seeking access to their own
1122 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1123 the requester elects to cite the Privacy Act as an authority for the request.

1124         (f)     Upon complete payment of the Repayment Obligation by the Contractor,

1125 this Article 23 will no longer be applicable.

1126         <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1127     24.     In addition to all other payments to be made by the Contractor pursuant to this

1128 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1129 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1130 of direct cost incurred by the United States for work requested by the Contractor associated with

1131 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1132 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1133 to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1134 contract administration.

1135 <u>WATER CONSERVATION</u>

1136     25.    (a)     Prior to the delivery of water provided from or conveyed through
1137 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1138 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1139 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1140 Additionally, an effective water conservation and efficiency program shall be based on the

1141 Contractor's water conservation plan that has been determined by the Contracting Officer to

1142 meet the conservation and efficiency criteria for evaluating water conservation plans established

1143 under Federal law. The water conservation and efficiency program shall contain definite water

1144 conservation objectives, appropriate economically feasible water conservation measures, and

1145 time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1146 Contract shall be contingent upon the Contractor's continued implementation of such water

1147 conservation program. In the event the Contractor's water conservation plan or any revised

1148 water conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet

1149 been determined by the Contracting Officer to meet such criteria, due to circumstances which the

1150 Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1151 made under this Contract so long as the Contractor diligently works with the Contracting Officer

1152 to obtain such determination at the earliest practicable date, and thereafter the Contractor

1153 immediately begins implementing its water conservation and efficiency program in accordance

1154 with the time schedules therein.

50

1155         (b)     Should the amount of M&I Water delivered pursuant to subdivision (a) of

1156    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1157    Contractor shall implement the Best Management Practices identified by the time frames issued

1158    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1159    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1160    the Contractor.

1161         (c)     The Contractor shall submit to the Contracting Officer a report on the

1162    status of its implementation of the water conservation plan on the reporting dates specified in the

1163    then-existing conservation and efficiency criteria established under Federal law.

1164         (d)     At five (5)-year intervals, the Contractor shall revise its water

1165    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1166    water conservation plans established under Federal law and submit such revised water

1167    management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1168    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1169    existing conservation and efficiency criteria for evaluating water conservation plans established

1170    under Federal law.

1171         (e)     If the Contractor is engaged in direct groundwater recharge, such activity

1172    shall be described in the Contractor's water conservation plan.

1173                 EXISTING OR ACQUIRED WATER OR WATER RIGHTS

1174    26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1175    this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1176    hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1177    Area. Any such water shall not be considered Project Water under this Contract. In addition,

1178    this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1179    any water user within the Contractor's Service Area acquires or has available under any other

1180    contract pursuant to Federal Reclamation law.

1181    OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY

1182    27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1183    and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1184    San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1185    agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1186    Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1187    affect the rights or obligations of the Contractor or the United States hereunder.

1188    (b)    The Contracting Officer has previously notified the Contractor in writing

1189    that the O&M of a portion of the Project facilities which serve the Contractor has been

1190    transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1191    therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1192    Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1193    the terms and conditions of the separate agreement between the United States and the Operating

1194    Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1195    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1196    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1197    such successor determines, sets, or establishes for the O&M of the portion of the Project

1198    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1199   Mendota Water Authority or such successor.  Such direct payments to Operating Non-Federal

1200   Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1201   Contractor of its obligation to pay directly to the United States the Contractor's share of the

1202   Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1203   Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1204   United States in accordance with the separate agreement identified in subdivision (a) of this

1205   Article.

1206         (c)    For so long as the O&M of any portion of the Project facilities serving the

1207   Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1208   Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1209   Rates for Water Delivered under this Contract representing the cost associated with the activity

1210   being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1211   or its successor.

1212         (d)    In the event the O&M of the Project facilities operated and maintained by

1213   the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1214   the United States during the term of this Contract, the Contracting Officer shall so notify the

1215   Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1216   the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1217   representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1218   The Contractor shall, thereafter, in the absence of written notification from the Contracting

1219   Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1220   revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

53

1221             <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1222          28.      The expenditure or advance of any money or the performance of any obligation of
1223 the United States under this Contract shall be contingent upon appropriation or allotment of
1224 funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1225 obligations under this Contract. No liability shall accrue to the United States in case funds are
1226 not appropriated or allotted.

1227                  <u>BOOKS, RECORDS, AND REPORTS</u>

1228          29.     (a)      The Contractor shall establish and maintain accounts and other books and
1229 records pertaining to administration of the terms and conditions of this Contract, including the
1230 Contractor's financial transactions; water supply data; project operations, maintenance, and
1231 replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1232 census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1233 Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1234 such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1235 and regulations, each party to this Contract shall have the right during office hours to examine
1236 and make copies of the other party's books and records relating to matters covered by this
1237 Contract.

1238            (b)      Notwithstanding the provisions of subdivision (a) of this Article, no

1239 books, records, or other information shall be requested from the Contractor by the Contracting

1240 Officer unless such books, records, or information are reasonably related to the administration or

1241 performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1242 time within which to provide the requested books, records, or information.

1243            (c)      At such time as the Contractor provides information to the Contracting

1244 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1245 to the Operating Non-Federal Entity(ies).

1246           <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1247          30.     (a)      The provisions of this Contract shall apply to and bind the successors and
1248 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1249 therein by either party shall be valid until approved in writing by the other party.

1250         (b)     The assignment of any right or interest in this Contract by either party

1251 shall not interfere with the rights or obligations of the other party to this Contract absent the

1252 written concurrence of said other party.

1253         (c)     The Contracting Officer shall not unreasonably condition or withhold

1254 approval of any proposed assignment.

1255 <div align="center">SEVERABILITY</div>

1256      31.     In the event that a person or entity who is neither (i) a party to a Project contract,

1257 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1258 an association or other form of organization whose primary function is to represent parties to

1259 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1260 enforceability of a provision included in this Contract and said person, entity, association, or

1261 organization obtains a final court decision holding that such provision is legally invalid or

1262 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1263 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1264 final court decision identify by mutual agreement the provisions in this Contract which must be

1265 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1266 The time periods specified above may be extended by mutual agreement of the parties. Pending

1267 the completion of the actions designated above, to the extent it can do so without violating any

1268 applicable provisions of law, the United States shall continue to make the quantities of Project

1269 Water specified in this Contract available to the Contractor pursuant to the provisions of this

1270 Contract which were not found to be legally invalid or unenforceable in the final court decision.

1271 <u>RESOLUTION OF DISPUTES</u>

1272      32.     Should any dispute arise concerning any provisions of this Contract, or the

1273 parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1274 resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1275 Officer referring any matter to the Department of Justice, the party shall provide to the other

1276 party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1277 not be required where a delay in commencing an action would prejudice the interests of the party

1278 that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1279 Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1280 provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1281 or the United States may have.

1282 <u>OFFICIALS NOT TO BENEFIT</u>

1283      33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of
1284 the Contractor shall benefit from this Contract other than as a water user or landowner in the
1285 same manner as other water users or landowners.

1286 <u>CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</u>

1287      34.     (a)     While this Contract is in effect, no change may be made in the
1288 Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1289 changes which may affect the respective rights, obligations, privileges, and duties of either the
1290 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1291 consolidation, or merger, except upon the Contracting Officer's written consent.

1292          (b)     Within 30 days of receipt of a request for such a change, the Contracting

1293 Officer will notify the Contractor of any additional information required by the Contracting

1294 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1295 schedule for timely completion of the process. Such process will analyze whether the proposed

1296   change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1297   (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1298   to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1299   have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1300   Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1301   responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1302   be paid in accordance with Article 24 of this Contract.

1303   <div align="center">FEDERAL LAWS</div>

1304   35.    By entering into this Contract, the Contractor does not waive its rights to contest

1305   the validity or application in connection with the performance of the terms and conditions of this

1306   Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1307   the terms and conditions of this Contract unless and until relief from application of such Federal

1308   law or regulation to the implementing provision of the Contract is granted by a court of

1309   competent jurisdiction.

1310   <div align="center">RECLAMATION REFORM ACT OF 1982</div>

1311   36.  (a)    Upon a Contractor's compliance with and discharge of the Repayment

1312   Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1313   Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1314   (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1315   shall not affect the Contractor's status as having repaid all of the construction costs assignable to

<div align="center">57</div>

1316     the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1317     Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1318                 <u>CERTIFICATION OF NONSEGREGATED FACILITIES</u>

1319         37.      The Contractor hereby certifies that it does not maintain or provide for its
1320     employees any segregated facilities at any of its establishments and that it does not permit its
1321     employees to perform their services at any location under its control where segregated facilities
1322     are maintained. It certifies further that it will not maintain or provide for its employees any
1323     segregated facilities at any of its establishments and that it will not permit its employees to
1324     perform their services at any location under its control where segregated facilities are
1325     maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1326     Employment Opportunity clause in this Contract. As used in this certification, the term
1327     "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1328     restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1329     parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1330     facilities provided for employees which are segregated by explicit directive or are in fact
1331     segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1332     disability, or otherwise. The Contractor further agrees that (except where it has obtained
1333     identical certifications from proposed subcontractors for specific time periods) it will obtain
1334     identical certifications from proposed subcontractors prior to the award of subcontracts
1335     exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1336     Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1337     following notice to such proposed subcontractors (except where the proposed subcontractors
1338     have submitted identical certifications for specific time periods):

1339            NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1340               CERTIFICATIONS OF NONSEGREGATED FACILITIES

1341     A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1342     exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1343     Opportunity clause. The certification may be submitted either for each subcontract or for all
1344     subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1345     making false statements in offers is prescribed in 18 U.S.C. § 1001.

1346                            <u>NOTICES</u>

1347         38.      Any notice, demand, or request authorized or required by this Contract shall be
1348     deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1349     delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1350     California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1351     postage prepaid, or delivered to the Board of Directors of the Westlands Water District, P. O.

58

1352 Box 6056, Fresno, California 93703-6056.  The designation of the addressee or the address may
1353 be changed by notice given in the same manner as provided in this Article for other notices.

1354 ## MEDIUM FOR TRANSMITTING PAYMENT

1355     39.    (a)    All payments from the Contractor to the United States under this Contract
1356 shall be by the medium requested by the United States on or before the date payment is due.  The
1357 required method of payment may include checks, wire transfers, or other types of payment
1358 specified by the United States.

1359     (b)    Upon execution of this Contract, the Contractor shall furnish the
1360 Contracting Officer with the Contractor's taxpayer's identification number (TIN).  The purpose
1361 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1362 out of the Contractor's relationship with the United States.

1363 ## CONTRACT DRAFTING CONSIDERATIONS

1364     40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1365 each of whom is sophisticated in the matters to which this amended Contract pertains.  The
1366 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1367 the parties, and no one party shall be considered to have drafted the stated Articles.  Single-
1368 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1369 ## CONFIRMATION OF CONTRACT

1370     41.    Promptly after the execution of this amended Contract, the Contractor will
1371 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1372 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1373 for the authorization of the execution of this amended Contract.  This amended Contract shall not
1374 be binding on the United States until the Contractor secures a final decree.

1375

1376        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1377   day and year first above written.

1378                            UNITED STATES OF AMERICA


1379                   By: _____
1380                          Regional Director
1381                          Interior Region 10: California-Great Basin
1382                          Bureau of Reclamation

1383                   WESTLANDS WATER DISTRICT
1384

1385                   By: _____
1386                          President of the Board of Directors

1387   Attest:

1388   By: _____
1389            Secretary of the Board of Directors

1376    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1377 day and year first above written.

1378          UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**

Digitally signed by
BRIAN HUGHES
Date: 2020.09.25
13:32:49 -07'00'

1379 **OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**  By: _____
1380 **TIME STAMP:** 1:37 pm, May 11 2020   Regional Director
1381            Interior Region 10: California-Great Basin
1382            Bureau of Reclamation

1383          WESTLANDS WATER DISTRICT
1384 (SEAL)

1385          By: _____
1386            President of the Board of Directors

1387 Attest:

1388 By: _____
1389    Secretary of the Board of Directors



**Agreement for Partial Assignment of Oro Loma W.D.
Water Service Contract to Westlands W.D.**

Contract No. 14-06-200-7823J-LTR1-P

Exhibit A

District Boundary
Contractor's Service Area

BUREAU OF
RECLAMATION

Date: 6/26/2020
File Name: N:\Districts\Contracts\westlands\WestlandsAssignOroLoma_20200626.mxd

214-202-894

EXHIBIT B
WESTLANDS WATER DISTRICT
(PARTIAL ASSIGNMENT OF ORO LOMA WATER DISTRICT)
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water SLC | M&I [3] Water SLC |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $63.95 | |
| DMC Aqueduct Intertie | $1.15 | |
| O&M Components | | |
| Water Marketing | $8.97 | |
| Storage | $18.01 | |
| Credit for other PUE Remittance [1] | ($2.28) | |
| Direct Pumping | | |
| American Recovery and Reinvestment Act (ARRA) | $0.00 | |
| **TOTAL COS RATE** | $89.80 | |
| | | |
| **Project Use Energy Payment [2]** | | |
| Direct Pumping | $11.35 | |
| Other PUE Remittance | $2.28 | |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **M&I FULL COST RATE** | | |
| (Above) | | |
| **IRRIGATION** | | |
| Tier 2 Rate: >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 (Amount to be added to Tier 1 Rate) | TBD | |
| Tier 3 Rate: >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] (Amount to be added to Tier 1 Rate) | TBD | |
| **M&I** | | |
| Tier 2 Rate: >80% <=90% of Contract Total [M&I Full Cost Rate - M&I COS Rate]/2 (Amount to be Added to Tier 1 Rate) | | |
| Tier 3 Rate: >90% of Contract Total [M&I Full Cost Rate - M&I COS Rate] (Amount to Be Added to Tier 1 Rate) | | |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| P.L. 102-575 Surcharge (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | |
| P.L. 106-377 Assessment (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | |

**EXPLANATORY NOTES**

1
Project Use Energy payment is being remitted to Western Area Power Authority for storage and direct pumping based on the deliveries of a select few contractors. The rates for the select few contractors are reduced as a credit in the O&M rates. All Contractors will ultimately pay for the storage and direct pumping service but as an offset to the amount paid by the select few.

2 Project Use Energy payment is in addition to the Contract Rate and Full-Cost Water Rates. Refer to the water rate books for more information.

3 The Contractor has not projected any delivery of M&I Water for the 2020 contract year. A temporary M&I Rate will be applied upon any M&I water delivery.

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are: 2006 = 0 AF; 2011 = 0 AF; 2017 = 0 AF; equals a M&I Historic use average quantity of 0 AF.

Additional detail of rate components is available on the Internet at:
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C@

## Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)

**Unpaid Construction Cost from the 2020 Water Rate Books\***

| | |
|---|---|
| Contractor: | **Westlands Water District from Oro Loma WD** |
| Facility: | **San Luis Canal** |
| Contract: | **14-06-200-7823J-LTR1-P** |

| Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba | Unpaid Cost | Discount |
|---|---|---|
| Construction Cost | $ 309,069 | |
| 2019 Repayment (Estimate) ** | $ - | |
| Adjusted Construction Cost | $ 309,069 | $ 298,844 |
| Intertie Construction Cost (N/A): | $ 22,245 | $ 19,532 |
| Total | $ 331,314 | $ 318,376 |

| If Paid in Installments (Used 20 yr CMT) | Due**** | | |
|---|---|---|---|
| Payment 1 | 10/1/2020 | $ | 80,802 |
| Payment 2 | 10/1/2021 | $ | 80,802 |
| Payment 3 | 10/1/2022 | $ | 80,802 |
| Payment 4 | 10/1/2023 | $ | 80,802 |
| Total Installment Payments | | $ | 323,206 |

| | |
|---|---|
| 20 yr CMT Rates - 09/14/2020 (to be adjusted to effective date of contract)@ | 1.210% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.605% |

| M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba) | Unpaid Cost |
|---|---|
| Construction Cost: | ~ - |
| 2019 Repayment (Estimate) ** | $ - |
| Adjusted Construction Cost***: | $ - |

| **Calculation Support:** | Irrigation Lump Sum or First Payment**** | 10/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 364 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2021 | $ 309,069 | $ 30,907 | $ 30,537 | $ 22,245 | $ 517 | $ 511 | $ 31,048 |
| 2022 | $ 278,162 | $ 30,907 | $ 30,536 | $ 21,728 | $ 517 | $ 511 | $ 31,047 |
| 2023 | $ 247,255 | $ 30,907 | $ 30,353 | $ 21,210 | $ 517 | $ 508 | $ 30,861 |
| 2024 | $ 216,348 | $ 30,907 | $ 30,170 | $ 20,693 | $ 517 | $ 505 | $ 30,675 |
| 2025 | $ 185,441 | $ 30,907 | $ 29,989 | $ 20,176 | $ 517 | $ 502 | $ 30,491 |
| 2026 | $ 154,534 | $ 30,907 | $ 29,808 | $ 19,658 | $ 517 | $ 499 | $ 30,307 |
| 2027 | $ 123,627 | $ 30,907 | $ 29,629 | $ 19,141 | $ 517 | $ 496 | $ 30,125 |
| 2028 | $ 92,721 | $ 30,907 | $ 29,451 | $ 18,624 | $ 517 | $ 493 | $ 29,944 |
| 2029 | $ 61,814 | $ 30,907 | $ 29,274 | $ 18,106 | $ 517 | $ 490 | $ 29,764 |
| 2030 | $ 30,907 | $ 30,907 | $ 29,098 | $ 17,589 | $ 517 | $ 487 | $ 29,585 |
| 2031-63 | | | | $ 17,072 | $ 17,072 | $ 14,530 | $ 14,530 |
| Total, Lump Sum Payment | | | $ 298,844 | | | $ 19,532 | $ 318,376 |
| Amount of Reduction, Lump Sum | | | $ 10,224 | | | $ 2,713 | $ 12,937 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need
update, they are still required. Also, unpaid charges are still a requirement under contract.

\** 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

\*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\****Contractor has 60 days from the effective date of the contract or installment dates to make payment.

@To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

**EXHIBIT 12**



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO:
CGB-440
2.2.4.23

Board of Directors
Byron Bethany Irrigation District
7995 Bruns Road
Byron, CA 94514

Subject: Water Infrastructure Improvements for the Nation Act Contract No. <u>14-06-200-785-</u>
<u>LTR1-P</u> Between the United States and the Byron Bethany Irrigation District Providing
for Project Water Service – Central Valley Project, California

Dear Board of Directors:

Enclosed is an executed original of the subject contract for your records. The Bureau of
Reclamation appreciates the effort expended by the Byron Bethany Irrigation District and its
representatives relative to this contract.

The exhibit titled, "Repayment Obligation – Current Calculation Under the WIIN Act, Section
4011 (a) (2)", for the Contract Amendment will be finalized on the Effective Date of the
Contract Amendment, in accordance with the Water Infrastructure Improvements for the Nation
Act of 2016 (Public Law 114-322).

If there are any questions, please contact Mr. Stanley Data, Repayment Specialist, at
916-978-5246, or sdata@usbr.gov.

Sincerely,

*Sheri A. Looper*

Sheri A. Looper
Deputy Regional Resources Manager

Enclosure

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
BYRON BETHANY IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 6 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 13 |
| 4. | Time for Delivery of Water | 18 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 19 |
| 6. | Measurement of Water Within the Contractor's Service Area | 21 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 23 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 39 |
| 15. | Protection of Water and Air Quality | 39 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 46 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 48 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |

## Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 24. | Contractor to Pay Certain Miscellaneous Costs | 50 |
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 58 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 59 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
| | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
BYRON BETHANY IRRIGATION DISTRICT
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

1    THIS CONTRACT, made this ___ day of October ___, 20__, in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and BYRON BETHANY

12   IRRIGATION DISTRICT, hereinafter referred to as the Contractor, a public agency of the State

13   of California, duly organized, existing, and acting pursuant to the laws thereof;

14       WITNESSETH, That:

15 <u>EXPLANATORY RECITALS</u>

16 [1ˢᵗ] WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22 [2ⁿᵈ] WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25 [3ʳᵈ] WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27 [4ᵗʰ] WHEREAS, the United States and the Contractor entered into Contract

28 No. 14-06-200-785, as amended, which in Part A thereof, established terms for the delivery to

29 the Contractor of Project Water from the Delta Division facilities from May 22, 1953, through

30 February 28, 1994; and

31 [5ᵗʰ] WHEREAS, the United States and the Contractor have pursuant to

32 Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

33 entered into interim renewal contract(s) identified as Contract No. 14-06-200-785-IR1 and

34 subsequent Interim Renewal Contracts 14-06-200-785-IR2 through 14-06-200-785-IR10, which

35 provided for water service to the Contractor from March 1, 1994 through February 28, 2006; and

2

36        [6th]   WHEREAS, the United States and the Contractor entered into a long-term

37    contract identified as Contract No. 14-06-200-785-LTR1, hereinafter referred to as the Existing

38    Contract, which provided for the continued water service to the Contractor following expiration

39    of Contract No. 14-06-200-785-IR10, and which was in effect the date the WIIN Act was

40    enacted; and

41        [7th]   WHEREAS, Plain View Water District and Byron Bethany Irrigation

42    District determined that consolidation of the two districts would improve the administrative

43    efficiency of the districts and enhance the districts' stability; and

44        [8th]   WHEREAS, San Joaquin Local Agency Formation Commission approved

45    consolidation of Plain View Water District and Byron Bethany Irrigation District on August 12,

46    2004, by dissolving Plain View Water District and reorganizing the territory to Byron Bethany

47    Irrigation District; and

48        [9th]   WHEREAS, the consolidation referred to in the preceding two

49    explanatory recitals did not, in any manner, change the area to which the Project Water may be

50    delivered pursuant to the Existing Contract; and

51        [10th]   WHEREAS, on December 16, 2016, the 114th Congress of the United

52    States of America enacted the WIIN Act; and

53        [11th]   WHEREAS, Section 4011(a)(1) provides that "upon request of the

54    contractor, the Secretary of the Interior shall convert any water service contract in effect on the

55    date of enactment of this subtitle and between the United States and a water users' association

56    [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

57    mutually agreeable terms and conditions."; and

58    [12th] WHEREAS, Section 4011(a)(1) further provides that "the manner of

59    conversion under this paragraph shall be as follows: (A) Water service contracts that were

60    entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

61    this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

62    1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

63    of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

64    converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

65    [13th] WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

66    into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

67    repayment, exchange and transfer contractual rights between the water users' association

68    [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

69    water users' association [Contractor] and their landowners as provided under State law."; and

70    [14th] WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

71    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

72    service or repayment contractor to receive water; or (4) except as expressly provided in this

73    section, any obligations under the Federal Reclamation law, including the continuation of

74    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

75    repayment contractors making prepayments pursuant to this section."; and

76    [15th] WHEREAS, upon the request of the Contractor, the WIIN Act directs the

77    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

78    service contracts into repayment contracts, amend existing repayment contracts, and allow

4

79     contractors to prepay their construction cost obligations pursuant to applicable Federal

80     Reclamation law; and

81                  [16th]   WHEREAS, the United States has determined that the Contractor has

82     fulfilled all of its obligations under the Existing Contract; and

83                  [17th]   WHEREAS, the Contractor has demonstrated to the satisfaction of the

84     Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

85     reasonable and beneficial use and/or has demonstrated future demand for water use such that the

86     Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

87     quantity of Project Water to be made available to it pursuant to this Contract; and

88                  [18th]   WHEREAS, water obtained from the Project has been relied upon by

89     urban and agricultural areas within California for more than 50 years, and is considered by the

90     Contractor as an essential portion of its water supply; and

91                  [19th]   WHEREAS, the economies of regions within the Project, including the

92     Contractor's, depend upon the continued availability of water, including water service from the

93     Project; and

94                  [20th]   WHEREAS, the Secretary intends through coordination, cooperation, and

95     partnerships to pursue measures to improve water supply, water quality, and reliability of the

96     Project for all Project purposes; and

97                  [21st]   WHEREAS, the mutual goals of the United States and the Contractor

98     include: to provide for reliable Project Water supplies; to control costs of those supplies; to

99     achieve repayment of the Project as required by law; to guard reasonably against Project Water

100     shortages; to achieve a reasonable balance among competing demands for use of Project Water;

101  and to comply with all applicable environmental statutes, all consistent with the legal obligations

102  of the United States relative to the Project; and

103  [22nd] WHEREAS, the parties intend by this Contract to maintain a cooperative

104  relationship in order to achieve their mutual goals; and

105  [23rd] WHEREAS, the Contractor has utilized or may utilize transfers, contract

106  assignments, rescheduling, and conveyance of Project Water and non-Project water under this

107  Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

108  beneficial use of water; and

109  [24th] WHEREAS, the parties desire and intend that this Contract not provide a

110  disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

111  Explanatory Recital immediately above; and

112  [25th] WHEREAS, the Contracting Officer and the Contractor agree that this

113  Contract complies with Section 4011 of the WIIN Act; and

114  [26th] WHEREAS, the Contracting Officer and the Contractor agree to amend

115  and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

116  Reclamation law on the terms and conditions set forth below.

117  NOW, THEREFORE, in consideration of the mutual and dependent covenants

118  herein contained, it is hereby mutually agreed by the parties hereto as follows:

119  <u>DEFINITIONS</u>

120  1.  When used herein unless otherwise distinctly expressed, or manifestly

121  incompatible with the intent of the parties as expressed in this Contract, the term:

122        (a)     "Additional Capital Obligation" shall mean construction costs or other

123  capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

124  Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

125  (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

126  Stat. 1628) ("WIIN Act");

127        (b)     "Calendar Year" shall mean the period January 1 through December 31,

128  both dates inclusive;

129        (c)     "Charges" shall mean the payments required by Federal Reclamation law

130  in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

131  annually by the Contracting Officer pursuant to this Contract;

132        (d)     "Condition of Shortage" shall mean a condition respecting the Project

133  during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

134  Contract Total;

135        (e)     "Contracting Officer" shall mean the Secretary of the Interior's duly

136  authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

137  or regulation;

138        (f)     "Contract Total" shall mean the maximum amount of water to which the

139  Contractor is entitled under subdivision (a) of Article 3 of this Contract;

140        (g)     "Contractor's Service Area" shall mean the area to which the Contractor is

141  permitted to provide Project Water under this Contract as described in Exhibit "A" attached

142  hereto, which may be modified from time to time in accordance with Article 34 of this Contract

143  without amendment of this Contract;

144            (h)     "CVPIA" shall mean the Central Valley Project Improvement Act, Title

145   XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

146            (i)     "Delta Division Facilities" shall mean those existing and future Project

147   facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

148   the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

149   Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

150   Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

151            (j)     "Eligible Lands" shall mean all lands to which Irrigation Water may be

152   delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

153   1263), as amended;

154            (k)     "Excess Lands" shall mean all lands in excess of the limitations contained

155   in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

156   acreage limitation under Federal Reclamation law;

157            (l)     "Existing Capital Obligation" shall mean the remaining amount of

158   construction costs or other capitalized costs allocable to the Contractor as described in Section

159   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

160   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

161   in the Final 2020 Ratebooks, as adjusted to reflect payments not reflected in such schedule.  The

162   Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

163   Exhibit "C", which is incorporated herein by reference;

164            (m)     "Full Cost Rate" shall mean an annual rate, as determined by the

165   Contracting Officer that shall amortize the expenditures for construction properly allocable to the

166 Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

167 deficits funded, less payments, over such periods as may be required under Federal Reclamation

168 law, or applicable contract provisions.  Interest will accrue on both the construction expenditures

169 and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

170 date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

171 in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

172 The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

173 Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

174 (n)  "Ineligible Lands" shall mean all lands to which Irrigation Water may not

175 be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

176 (o)  "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

177 to the delivery of Irrigation Water;

178 (p)  "Irrigation Water" shall mean the use of Project Water to irrigate lands
179 primarily for the production of commercial agricultural crops or livestock, and domestic and
180 other uses that are incidental thereto;

181 (q)  "Landholder" shall mean a party that directly or indirectly owns or leases

182 nonexempt land, as provided in 43 CFR 426.2;

183 (r)  "Municipal and Industrial (M&I) Water" shall mean the use of Project
184 Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
185 of "Irrigation Water" or within another category of water use under an applicable Federal
186 authority;

187 (s)  "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

188 the delivery of M&I Water;

189        (t)     "Operation and Maintenance" or "O&M" shall mean normal and

190   reasonable care, control, operation, repair, replacement (other than capital replacement), and

191   maintenance of Project facilities;

192        (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

193   successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

194   the Delta Division Facilities pursuant to written agreement(s) with the United States. When this

195   Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

196   Water Authority;

197        (v)     "Project" shall mean the Central Valley Project owned by the United

198   States and managed by the Department of the Interior, Bureau of Reclamation;

199        (w)     "Project Contractors" shall mean all parties who have contracts for water

200   service for Project Water from the Project with the United States pursuant to Federal

201   Reclamation law;

202        (x)     "Project Water" shall mean all water that is developed, diverted, stored, or

203   delivered by the Secretary in accordance with the statutes authorizing the Project and in

204   accordance with the terms and conditions of water rights acquired pursuant to California law;

205        (y)     "Rates" shall mean the payments determined annually by the Contracting

206   Officer in accordance with the then-current applicable water ratesetting policies for the Project,

207   as described in subdivision (a) of Article 7 of this Contract;

208        (z)     "Recent Historic Average" shall mean the most recent five (5)-year

209   average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

210   or its preceding contract(s);

211    (aa)   "Repayment Obligation" for Water Delivered as Irrigation Water shall

212 mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

213 amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

214 Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

215 United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

216    (bb)   "Secretary" shall mean the Secretary of the Interior, a duly appointed

217 successor, or an authorized representative acting pursuant to any authority of the Secretary and

218 through any agency of the Department of the Interior;

219    (cc)   "Tiered Pricing Component" shall be the incremental amount to be paid

220 for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

221 for in Exhibit "B";

222    (dd)   "Water Delivered" or "Delivered Water" shall mean Project Water

223 diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

224 Officer;

225    (ee)   "Water Made Available" shall mean the estimated amount of Project

226 Water that can be delivered to the Contractor for the upcoming Year as declared by the

227 Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

228    (ff)   "Water Scheduled" shall mean Project Water made available to the

229 Contractor for which times and quantities for delivery have been established by the Contractor

230 and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

231    (gg)   "Year" shall mean the period from and including March 1 of each

232 Calendar Year through the last day of February of the following Calendar Year.

233 <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

234     2.     (a)     This Contract shall be effective November 1, 2020, hereinafter known as

235 the "Effective Date", and shall continue so long as the Contractor pays applicable Rates and

236 Charges under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939

237 (53 Stat. 1195) as applicable, and applicable law;

238                     (1)     *Provided, That* the Contracting Officer shall not seek to terminate

239 this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

240 unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

241 to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

242 or to diligently commence and maintain full curative payments satisfactory to the Contracting

243 Officer within the sixty (60) calendar days' notice period;

244                     (2)     *Provided, further, That* the Contracting Officer shall not seek to

245 suspend making water available or declaring Water Made Available pursuant to this Contract for

246 non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

247 Contracting Officer has first provided at least thirty (30) calendar days written notice to the

248 Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

249 curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

250 cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

251 suspended making water available pursuant to this paragraph, upon cure of such non-compliance

252  satisfactory to the to the Contracting Officer, the Contracting Officer shall resume making water

253  available and declaring Water Made Available pursuant to this Contract;

254  (3)  *Provided, further, That* this Contract may be terminated at any

255  time by mutual consent of the parties hereto.

256  (b)  Upon complete payment of the Repayment Obligation by the Contractor,

257  and notwithstanding any Additional Capital Obligation that may later be established, the acreage

258  limitations, reporting, and Full Cost pricing provisions of the Reclamation Reform Act of 1982,

259  and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

260  this Contract shall no longer be applicable.

261  (c)  Notwithstanding any provision of this Contract, the Contractor reserves

262  and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

263  allowed by law.

264  (d)  Notwithstanding any provision of this Contract, the Contractor reserves

265  and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

266  allowed by law.

267  <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

268  3.  (a)  During each Year, consistent with all applicable State water rights permits,

269  and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

270  Contract, the Contracting Officer shall make available for delivery to the Contractor 20,600 acre-

271  feet of Project Water for irrigation and M&I purposes.  Water Delivered to the Contractor in

272  accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

273  Articles 4 and 7 of this Contract.

274        (b)    Because the capacity of the Project to deliver Project Water has been

275   constrained in recent years and may be constrained in the future due to many factors including

276   hydrologic conditions and implementation of Federal and State laws, the likelihood of the

277   Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

278   Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

279   programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

280   CVPIA projected that the Contract Total set forth in this Contract will not be available to the

281   Contractor in many years. During the most recent five years prior to execution of the Existing

282   Contract, the Recent Historic Average Water Made Available to the Contractor was 13,555 acre-

283   feet. Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the

284   parties under any provision of this Contract.

285        (c)    The Contractor shall utilize the Project Water in accordance with all

286   applicable legal requirements.

287            (1)    In the event any Project Contractor (other than a Cross Valley

288   Contractor) that receives Project Water through the Delta Division Facilities obtains a

289   contractual agreement that the Contracting Officer shall make Project Water available at a point

290   or points of delivery in or north of the Delta, at the request of the Contractor and upon

291   completion of any required environmental documentation, this Contract shall be amended to

292   provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

293   this Contract shall be limited solely to those changes made necessary by the addition of such

294   alternate points of delivery in or north of the Delta; *Provided, That* the Contracting Officer's use

295　of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

296　amendment.

297　　　　　(d)　　The Contractor shall make reasonable and beneficial use of all water

298　furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

299　groundwater banking programs, surface water storage programs, and other similar programs

300　utilizing Project Water or other water furnished pursuant to this Contract conducted within the

301　Contractor's Service Area which are consistent with applicable State law and result in use

302　consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

303　program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

304　Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

305　sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

306　the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

307　compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

308　banking programs, surface water storage programs, and other similar programs utilizing Project

309　Water or other water furnished pursuant to this Contract conducted outside the Contractor's

310　Service Area may be permitted upon written approval of the Contracting Officer, which approval

311　will be based upon environmental documentation, Project Water rights, and Project operational

312　concerns. The Contracting Officer will address such concerns in regulations, policies, or

313　guidelines.

314　　　　　(e)　　The Contractor shall comply with requirements applicable to the

315　Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

316　of any water service contract between the Contracting Officer and the Contractor in effect

15

317 immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

318 Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

319 implement. The Existing Contract, which evidences in excess of 50 years of diversions for

320 irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

321 Article 3 of this Contract, will be considered in developing an appropriate baseline for any

322 required biological assessment(s) prepared pursuant to the ESA, and any other needed

323 environmental review. Nothing herein shall be construed to prevent the Contractor from

324 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

325 biological opinion or other environmental documentation referred to in this Article.

326    (f)  Following the declaration of Water Made Available under Article 4 of this

327 Contract, the Contracting Officer will make a determination whether Project Water, or other

328 water available to the Project, can be made available to the Contractor in addition to the Contract

329 Total under this Article during the Year without adversely impacting other Project Contractors.

330 At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

331 making such a determination. If the Contracting Officer determines that Project Water, or other

332 water available to the Project, can be made available to the Contractor, the Contracting Officer

333 will announce the availability of such water and shall so notify the Contractor as soon as

334 practical. The Contracting Officer will thereafter meet with the Contractor and other Project

335 Contractors capable of taking such water to determine the most equitable and efficient allocation

336 of such water. If the Contractor requests the delivery of any quantity of such water, the

337 Contracting Officer shall make such water available to the Contractor in accordance with

338 applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

16

339    contractual commitments, water rights, and operational constraints, long-term Project

340    Contractors shall have a first right to acquire such water, including Project Water made available

341    pursuant to Section 215 of the Reclamation Reform Act of 1982.

342            (g)    The Contractor may request permission to reschedule for use during the

343    subsequent Year some or all of the Water Made Available to the Contractor during the current

344    Year, referred to as "rescheduled water." The Contractor may request permission to use during

345    the current Year a quantity of Project Water which may be made available by the United States

346    to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

347    written approval may permit such uses in accordance with applicable statutes, regulations,

348    guidelines, and policies.

349            (h)    The Contractor's right pursuant to Federal Reclamation law and applicable

350    State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

351    shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

352    Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

353    August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

354    sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

355    subdivision (b) of Article 12 of this Contract.

356            (i)    Project Water furnished to the Contractor pursuant to this Contract may be

357    delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

358    Contract upon written approval by the Contracting Officer in accordance with the terms and

359    conditions of such approval.

360         (j)     The Contracting Officer shall make reasonable efforts to protect the water

361 rights necessary for the Project and to provide the water available under this Contract. The

362 Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

363 extent permitted by law, in administrative proceedings related to the Project Water rights;

364 *Provided, That* the Contracting Officer retains the right to object to the substance of the

365 Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

366 Contracting Officer shall recognize the Contractor has a legal right under the terms of this

367 Contract to use Project Water.

368 <u>TIME FOR DELIVERY OF WATER</u>

369     4.     (a)     On or about February 20 each Calendar Year, the Contracting Officer shall

370 announce the Contracting Officer's expected declaration of the Water Made Available. Such

371 declaration will be expressed in terms of Water Made Available and the Recent Historic Average

372 and will be updated monthly, and more frequently if necessary, based on the then-current

373 operational and hydrologic conditions and a new declaration with changes, if any, to the Water

374 Made Available will be made. The Contracting Officer shall provide forecasts of Project

375 operations and the basis of the estimate, with relevant supporting information, upon the written

376 request of the Contractor. Concurrently with the declaration of the Water Made Available, the

377 Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

378         (b)     On or before each March 1 and at such other times as necessary, the

379 Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

380 Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

381 United States to the Contractor pursuant to this Contract for the Year commencing on such

382    March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

383    according to the approved schedule for the Year commencing on such March 1.

384            (c)    The Contractor shall not schedule Project Water in excess of the quantity

385    of Project Water the Contractor intends to put to reasonable and beneficial use within the

386    Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

387    during any Year.

388            (d)    Subject to the conditions set forth in subdivision (a) of Article 3 of this

389    Contract, the United States shall deliver Project Water to the Contractor in accordance with the

390    initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

391    written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

392    time prior to the date(s) on which the requested change(s) is/are to be implemented.

393    <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

394    5.    (a)    Project Water scheduled pursuant to subdivision (b) of Article 4 of this

395    Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

396    any additional point or points of delivery either on Project facilities or another location or

397    locations mutually agreed to in writing by the Contracting Officer and the Contractor.

398            (b)    The Contracting Officer, either directly or indirectly through its written

399    agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

400    maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

401    the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

402    Article.

403           (c)     The Contractor shall deliver Irrigation Water in accordance with any

404 applicable land classification provisions of Federal Reclamation law and the associated

405 regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

406 Service Area unless approved in advance by the Contracting Officer.

407           (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

408 measured and recorded with equipment furnished, installed, operated, and maintained by the

409 Contracting Officer either directly or indirectly through its written agreements(s) with the

410 Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

411 Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

412 this Article. Upon the request of either party to this Contract, the Contracting Officer shall

413 investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

414 accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

415 therein. For any period of time when accurate measurements have not been made, the

416 Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

417 Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

418 of time.

419           (e)     Absent a separate contrary written agreement with the Contractor, neither

420 the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

421 control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

422 pursuant to this Contract beyond the point or points of delivery established pursuant to

423 subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

424 employees, agents, and assigns on account of damage or claim of damage of any nature

20

425    whatsoever for which there is legal responsibility, including property damage, personal injury, or

426    death arising out of or connected with the control, carriage, handling, use, disposal, or

427    distribution of such Water Delivered beyond such point or points of delivery except for any

428    damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

429    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

430    the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

431    Contracting Officer or any of its officers, employees, agents, and assigns, including the

432    Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

433    officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

434    a malfunction of facilities owned and/or operated by the United States or the Operating Non-

435    Federal Entity(ies).

436    <u>MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA</u>

437    6.    (a)    The Contractor has established a measuring program satisfactory to the

438    Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

439    purposes within the Contractor's Service Area is measured at each agricultural turnout and such

440    water delivered for M&I purposes is measured at each M&I service connection. The water

441    measuring devices or water measuring methods of comparable effectiveness must be acceptable

442    to the Contracting Officer. The Contractor shall be responsible for installing, operating,

443    maintaining, and repairing all such measuring devices and implementing all such water

444    measuring methods at no cost to the United States. The Contractor shall use the information

445    obtained from such water measuring devices or water measuring methods to ensure its proper

446    management of the water; to bill water users for water delivered by the Contractor; and, if

447      applicable, to record water delivered for M&I purposes by customer class as defined in the

448      Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

449      contained, however, shall preclude the Contractor from establishing and collecting any charges,

450      assessments, or other revenues authorized by California law. The Contractor shall include a

451      summary of all its annual surface water deliveries in the annual report described in subdivision

452      (c) of Article 25 of this Contract.

453               (b)      To the extent the information has not otherwise been provided, upon

454      execution of this Contract, the Contractor shall provide to the Contracting Officer a written

455      report describing the measurement devices or water measuring methods being used or to be used

456      to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

457      service connections or alternative measurement programs approved by the Contracting Officer,

458      at which such measurement devices or water measuring methods are being used, and, if

459      applicable, identifying the locations at which such devices and/or methods are not yet being used

460      including a time schedule for implementation at such locations. The Contracting Officer shall

461      advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

462      if any, of the measuring devices or water measuring methods identified in the Contractor's report

463      and if the Contracting Officer does not respond in such time, they shall be deemed adequate. If

464      the Contracting Officer notifies the Contractor that the measuring devices or methods are

465      inadequate, the parties shall within 60 days following the Contracting Officer's response,

466      negotiate in good faith the earliest practicable date by which the Contractor shall modify said

467      measuring devices and/or measuring methods as required by the Contracting Officer to ensure

468      compliance with subdivision (a) of this Article.

469          (c)     All new surface water delivery systems installed within the Contractor's

470    Service Area after the Effective Date shall also comply with the measurement provisions

471    described in subdivision (a) of this Article.

472          (d)     The Contractor shall inform the Contracting Officer and the State of

473    California in writing by April 30 of each Year of the monthly volume of surface water delivered

474    within the Contractor's Service Area during the previous Year.

475          (e)     The Contractor shall inform the Contracting Officer and the Operating

476    Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of

477    Irrigation Water and M&I Water taken during the preceding month.

478                        RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
479                                    REPAYMENT OF FACILITIES

480    7.     (a)     Notwithstanding the Contractor's full prepayment of the Repayment

481    Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN

482    Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection

483    (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this

484    Article, subsection (b), the Contractor's Project construction and other obligations shall be

485    determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted

486    in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the

487    WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through

488    a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated

489    rules and regulations, or policies, and (iii) other applicable provisions of this Contract.  Payments

490    shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be

491 agreed to in writing by the Contractor and the Contracting Officer. The Rates, Charges, and

492 Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set

493 forth in Exhibit "B", as may be revised annually.

494 (1) The Contractor shall pay the United States as provided for in this

495 Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

496 in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

497 be established to recover its estimated reimbursable costs included in the operation and

498 maintenance component of the Rate and amounts established to recover deficits and other

499 charges, if any, including construction costs as identified in the following subdivisions.

500 (2) In accordance with the WIIN Act, the Contractor's allocable share

501 of Project construction costs will be repaid pursuant to the provisions of this Contract.

502 (A) The amount due and payable to the United States, pursuant

503 to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

504 computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

505 as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

506 installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

507 set forth in Exhibit "C". The Repayment Obligation is due in lump sum by December 30, 2020

508 as provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

509 Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

510 amount due using the lump sum alternative. If such notice is not provided by such date, the

511 Contractor shall be deemed to have elected the installment payment alternative, in which case,

512 the first such payment shall be made no later than December 30, 2020. The second payment

513      shall be made no later than the first anniversary of the first payment date. The third payment

514      shall be made no later than the second anniversary of the first payment date. The final payment

515      shall be made no later than November 1, 2023. If the installment payment option is elected by

516      the Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation

517      by giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

518      Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

519      methodology as was used to compute the initial annual installment payment amount, which is

520      illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

521      established, receipt of the Contractor's payment of the Repayment Obligation to the United

522      States shall fully and permanently satisfy the Existing Capital Obligation.

523                      (B)      Additional Capital Obligations that are not reflected in, the

524      schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

525      prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

526      Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

527      Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

528      Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

529      the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

530      be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

531      however, will be considered under subdivision (b) of this Article. A separate agreement shall be

532      established by the Contractor and the Contracting Officer to accomplish repayment of the

533      Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

534      WIIN Act, subject to the following:

535    (1)    If the collective Additional Capital Obligation

536    properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

537    is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

538    to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

539    notifies the Contractor of the Additional Capital Obligation; *Provided, That* the reference to the

540    amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

541    (2)    If the collective Additional Capital Obligation

542    properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

543    is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

544    properly assignable to the Contractor shall be repaid as provided by applicable Federal

545    Reclamation law and Project ratesetting policy; *Provided, That* the reference to the amount of

546    five million dollars ($5,000,000) shall not be a precedent in any other context.

547    (b)    In the event that the final cost allocation referenced in Section 4011(b) of

548    the WIIN Act determines that the costs properly assignable to the Contractor are greater than

549    what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

550    allocated costs.  The term of such additional repayment contract shall be not less than one (1)

551    year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

552    of repayment of such amount may be developed by the Contractor and Contracting Officer.  In

553    the event that the final cost allocation indicates that the costs properly assignable to the

554    Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

555    overpayment as an offset against any outstanding or future obligations of the Contractor, with the

556    exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

557         (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

558  and Tiered Pricing Component as follows:

559              (1)     Prior to July 1 of each Calendar Year, the Contracting Officer shall

560  provide the Contractor an estimate of the Charges for Project Water that will be applied to the

561  period October 1, of the current Calendar Year, through September 30, of the following Calendar

562  Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

563  to review and comment on such estimates. On or before September 15 of each Calendar Year,

564  the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

565  the period October 1 of the current Calendar Year, through September 30, of the following

566  Calendar Year, and such notification shall revise Exhibit "B."

567              (2)     Prior to October 1 of each Calendar Year, the Contracting Officer

568  shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

569  for Project Water for the following Year and the computations and cost allocations upon which

570  those Rates are based. The Contractor shall be allowed not less than two months to review and

571  comment on such computations and cost allocations. By December 31 of each Calendar Year,

572  the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

573  Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

574         (d)     At the time the Contractor submits the initial schedule for the delivery of

575  Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

576  Contractor shall make an advance payment to the United States equal to the total amount payable

577  pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

578  scheduled to be delivered pursuant to this Contract during the first two calendar months of the

579    Year. Before the end of the first month and before the end of each calendar month thereafter, the

580    Contractor shall make an advance payment to the United States, at the Rate(s) set under

581    subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

582    during the second month immediately following. Adjustments between advance payments for

583    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

584    the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

585    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

586    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

587    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

588    payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

589    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

590    additional Project Water shall be delivered to the Contractor unless and until an advance

591    payment at the Rates then in effect for such additional Project Water is made. Final adjustment

592    between the advance payments for the Water Scheduled and payments for the quantities of Water

593    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

594    later than April 30th of the following Year, or 60 days after the delivery of Project Water

595    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

596    the last day of February.

597             (e)    The Contractor shall also make a payment in addition to the Rate(s) in

598    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

599    appropriate Tiered Pricing Component then in effect, before the end of the month following the

600    month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

601    Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

602    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

603    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

604    there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

605    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

606    for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

607    through the adjustment of payments due to the United States for Charges for the next month.

608    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

609    be computed pursuant to Article 19 of this Contract.

610           (f)    The Contractor shall pay for any Water Delivered under subdivision (a),

611    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

612    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

613    policies; *Provided, That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

614    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

615    under subdivision (a) of this Article.

616           (g)    Payments to be made by the Contractor to the United States under this

617    Contract may be paid from any revenues available to the Contractor.

618           (h)    All revenues received by the United States from the Contractor relating to

619    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

620    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

621    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

622           (i)    The Contracting Officer shall keep its accounts pertaining to the

623    administration of the financial terms and conditions of its long-term contracts, in accordance

624    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

625    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

626    Contractor a detailed accounting of all Project and Contractor expense allocations, the

627    disposition of all Project and Contractor revenues, and a summary of all water delivery

628    information. The Contracting Officer and the Contractor shall enter into good faith negotiations

629    to resolve any discrepancies or disputes relating to accountings, reports, or information.

630            (j)      The parties acknowledge and agree that the efficient administration of this

631    Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

632    policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

633    and/or for making and allocating payments, other than those set forth in this Article may be in

634    the mutual best interest of the parties, it is expressly agreed that the parties may enter into

635    agreements to modify the mechanisms, policies, and procedures for any of those purposes while

636    this Contract is in effect without amending this Contract.

637            (k)    (1)    Beginning at such time as deliveries of Project Water in a Year

638    exceed 80 percent of the Contract Total, then before the end of the month following the month of

639    delivery the Contractor shall make an additional payment to the United States equal to the

640    applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

641    Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

642    Contract Total, shall equal one-half of the difference between the Rate established under

643    subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

644    Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

645     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

646     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

647     Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

648     subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

649     Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

650     the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

651             (2)      Subject to the Contracting Officer's written approval, the

652     Contractor may request and receive an exemption from such Tiered Pricing Component for

653     Project Water delivered to produce a crop which the Contracting Officer determines will provide

654     significant and quantifiable habitat values for waterfowl in fields where the water is used and the

655     crops are produced; *Provided, That* the exemption from the Tiered Pricing Component for

656     Irrigation Water shall apply only if such habitat values can be assured consistent with the

657     purposes of the CVPIA through binding agreements executed with or approved by the

658     Contracting Officer prior to use of such water.

659             (3)      For purposes of determining the applicability of the Tiered Pricing

660     Component pursuant to this Article, Water Delivered shall include Project Water that the

661     Contractor transfers to others but shall not include Project Water transferred to the Contractor,

662     nor shall it include the additional water provided to the Contractor under the provisions of

663     subdivision (f) of Article 3 of this Contract.

664             (l)      For the term of this Contract, Rates applied under the respective

665     ratesetting policies will be established to recover only reimbursable O&M (including any

666     deficits) and capital costs of the Project, as those terms are used in the then-current Project

667    ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

668    applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

669    practices which implement the Contracting Officer's ratesetting policies will not be implemented

670    until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

671    need, and impact of the proposed change.

672    (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

673    CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

674    in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

675    reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

676    transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

677    lower Rates and Charges because of inability to pay and is transferring Project Water to another

678    entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

679    for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

680    (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

681    Officer is authorized to adjust determinations of ability to pay every five years.

682    (o)    With respect to the Rates for M&I Water, the Contractor asserts that it is

683    not legally obligated to pay any Project deficits claimed by the United States to have accrued as

684    of the date of this Contract or deficit-related interest charges thereon. By entering into this

685    Contract, the Contractor does not waive any legal rights or remedies that it may have with

686    respect to such disputed issues. Notwithstanding the execution of this Contract and payments

687    made hereunder, the Contractor may challenge in the appropriate administrative or judicial

688    forums; (1) the existence, computation, or imposition of any deficit charges accruing during the

32

689    term of the Existing Contract and any preceding interim renewal contracts, if applicable; (2)

690    interest accruing on any such deficits; (3) the inclusion of any such deficit charges or interest in

691    the Rates; (4) the application by the United States of payments made by the Contractor under its

692    Existing Contract and any preceding interim renewal contracts if applicable; and (5) the

693    application of such payments in the Rates. The Contracting Officer agrees that the Contractor

694    shall be entitled to the benefit of any administrative or judicial ruling in favor of any Project

695    M&I contractor on any of these issues, and credits for payments heretofore made, provided that

696    the basis for such ruling is applicable to the Contractor.

697    <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

698    8.    The Contractor and the Contracting Officer concur that, as of the Effective Date

699    the Contractor has no non-interest bearing O&M deficits and shall have no further liability

700    therefore.

701    <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

702    9.    (a)    The right to receive Project Water provided for in this Contract may be

703    sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

704    California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

705    and applicable guidelines or regulations then in effect. No sale, transfer, or exchange of Project

706    Water under this Contract may take place without the prior written approval of the Contracting

707    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

708    exchanges shall be approved absent all appropriate environmental documentation, including, but

709    not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

710    documentation should include, as appropriate, an analysis of groundwater impacts and economic

<div align="center">33</div>

711    and social effects, including environmental justice, of the proposed water transfers on both the

712    transferor and transferee.

713            (b)    In order to facilitate efficient water management by means of water

714    transfers of the type historically carried out among Project Contractors located within the same

715    geographical area and to allow the Contractor to participate in an accelerated water transfer

716    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

717    all necessary environmental documentation, including, but not limited to, documents prepared

718    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

719    the Contracting Officer shall determine whether such transfers comply with applicable law.

720    Following the completion of the environmental documentation, such transfers addressed in such

721    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

722    require prior written approval by the Contracting Officer.  Such environmental documentation

723    and the Contracting Officer's compliance determination shall be reviewed every five years and

724    updated, as necessary, prior to the expiration of the then existing five (5)-year period.  All

725    subsequent environmental documentation shall include an alternative to evaluate not less than the

726    quantity of Project Water historically transferred within the same geographical area.

727            (c)    For a water transfer to qualify under subdivision (b) of this Article, such

728    water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

729    years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

730    activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

731    be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

732    within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

733 through existing facilities with no new construction or modifications to facilities and be between

734 existing Project Contractors and/or the Contractor and the United States, Department of the

735 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

736 requirements imposed for protection of the environment and Indian Trust Assets, as defined

737 under Federal law.

738 <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

739      10.    (a)    The amount of any overpayment by the Contractor of the Contractor's

740 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

741 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

742 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

743 of such overpayment, at the option of the Contractor, may be credited against amounts to become

744 due to the United States by the Contractor. With respect to overpayment, such refund or

745 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

746 have the right to the use of any of the Project Water supply provided for by this Contract. All

747 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

748 obtaining direction as to how to credit or refund such overpayment in response to the notice to

749 the Contractor that it has finalized the accounts for the Year in which the overpayment was

750 made.

751         (b)    All advances for miscellaneous costs incurred for work requested by the

752 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

753 when the work has been completed. If the advances exceed the actual costs incurred, the

754 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

755    advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

756    Contract.

TEMPORARY REDUCTIONS – RETURN FLOWS

758    11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

759    requirements of Federal law, and (ii) the obligations of the United States under existing

760    contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

761    Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

762    provided in this Contract.

763    (b)    The Contracting Officer or Operating Non-Federal Entity(ies) may

764    temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

765    provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

766    of the Project facilities or any part thereof necessary for the delivery of Project Water to the

767    Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

768    will give the Contractor due notice in advance of such temporary discontinuance or reduction,

769    except in case of emergency, in which case no notice need be given; *Provided, That* the United

770    States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

771    resumption of service after such discontinuance or reduction, and if requested by the Contractor,

772    the United States will, if possible, deliver the quantity of Project Water which would have been

773    delivered hereunder in the absence of such discontinuance or reduction.

774    (c)    The United States reserves the right to all seepage and return flow water

775    derived from Water Delivered to the Contractor hereunder which escapes or is discharged

776    beyond the Contractor's Service Area; *Provided, That* this shall not be construed as claiming for

36

777    the United States any right to seepage or return flow being put to reasonable and beneficial use

778    pursuant to this Contract within the Contractor's Service Area by the Contractor or those

779    claiming by, through, or under the Contractor.

780    <div align="center"><u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u></div>

781        12.    (a)    In its operation of the Project, the Contracting Officer will use all
782    reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
783    made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
784    determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
785    Contractor of said determination as soon as practicable.

786            (b)    If there is a Condition of Shortage because of inaccurate runoff forecasting
787    or other similar operational errors affecting the Project; drought and other physical or natural
788    causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
789    to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
790    17 of this Contract, no liability shall accrue against the United States or any of its officers,
791    agents, or employees for any damage, direct or indirect, arising therefrom.

792            (c)    In any Year in which there may occur a Condition of Shortage for any of

793    the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

794    Article, the Contracting Officer will first allocate the available Project Water consistent with the

795    Project M&I Water Shortage Policy as finally adopted after environmental review for

796    determining the amount of Project Water Available for delivery to the Project Contractors.

797    Subject to the foregoing allocation, in any year in which there may occur a Condition of

798    Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

799    others entitled to Project Water from Delta Division Facilities under long-term water service or

800    repayment contracts (or renewals thereof or binding commitments therefore) in force on

801    February 28, 2005, as follows:

802            (1)    The Contracting Officer shall make an initial and subsequent

803      determination as necessary of the total quantity of Project Water estimated to be scheduled or

804      actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

805      renewal, long-term water service or repayment contracts then in force for the delivery of Project

806      Water by the United States from Delta Division Facilities during the relevant Year, the quantity

807      so determined being hereinafter referred to as the scheduled total;

808                (2)      A determination shall be made of the total quantity of Project

809      Water that is available for meeting the scheduled total, the quantity so determined being

810      hereinafter referred to as the available supply;

811                (3)      The total quantity of Project Water estimated to be scheduled or

812      actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

813      of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

814      hereinafter referred to as the Contractor's proportionate share; and

815                (4)      The available supply shall be multiplied by the Contractor's

816      proportionate share and the result shall be the quantity of Project Water made available by the

817      United States to the Contractor for the relevant Year in accordance with the schedule developed

818      by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

819      amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

820      that the Contracting Officer can increase or needs to decrease the available supply for delivery

821      from Delta Division Facilities to long-term water service and repayment contractors during the

822      relevant Year, such additions or reductions to the available supply shall be apportioned

823      consistent with subparagraphs (1) through (4), inclusive.

824                (d)      By entering into this Contract, the Contractor does not waive any legal

825 rights or remedies it may have to file or participate in any administrative or judicial proceeding

826 contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

827 such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

828 implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

829 *That* the Contractor has commenced any such judicial challenge or any administrative procedures

830 necessary to institute any judicial challenge within six months of the policy becoming final.  By

831 agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

832 that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

833 validate or invalidate the Project M&I Water Shortage Policy.

834 <div align="center">UNAVOIDABLE GROUNDWATER PERCOLATION</div>

835       13.    (a)     To the extent applicable, the Contractor shall not be deemed to have

836 delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

837 Contract if such lands are irrigated with groundwater that reaches the underground strata as an

838 unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

839           (b)     Upon complete payment of the Repayment Obligation by the Contractor,

840 this Article 13 shall no longer be applicable.

841 <div align="center">COMPLIANCE WITH FEDERAL RECLAMATION LAWS</div>

842       14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
843 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
844 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and supplemented, and
845 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
846 law.

847 <div align="center">PROTECTION OF WATER AND AIR QUALITY</div>

848       15.    (a)     Omitted

<div align="center">39</div>

849         (b)     The United States will care for, operate and maintain reserved works in a
850 manner that preserves the quality of the water at the highest level possible as determined by the
851 Contracting Officer. The United States does not warrant the quality of the water delivered to the
852 Contractor and is under no obligation to furnish or construct water treatment facilities to
853 maintain or improve the quality of water delivered to the Contractor.

854         (c)     The Contractor will comply with all applicable water and air pollution
855 laws and regulations of the United States and the State of California; and will obtain all required
856 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
857 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
858 State, and local water quality standards applicable to surface and subsurface drainage and/or
859 discharges generated through the use of Federal or Contractor facilities or Project Water
860 provided by the Contractor within its Service Area.

861         (d)     This Article shall not affect or alter any legal obligations of the Secretary
862 to provide drainage or other discharge services.

863         (e)     Omitted

864 <u>WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED</u>
865 <u>STATES</u>

866     16.    (a)     Water or water rights now owned or hereafter acquired by the Contractor

867 other than from the United States and Irrigation Water furnished pursuant to the terms of this

868 Contract may be simultaneously transported through the same distribution facilities of the

869 Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

870 and non-Project water were constructed without funds made available pursuant to Federal

871 Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

872 Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

873 Irrigation Water must be established through the certification requirements as specified in the

874 Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

875 Eligible Lands within the Contractor's Service Area can be established and the quantity of

876 Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

877    Eligible Lands; and (iv) if the facilities utilized for commingling Irrigation Water and non-

878    Project water are (were) constructed with funds made available pursuant to Federal Reclamation

879    law, the non-Project water will be subject to the acreage limitation provisions of Federal

880    Reclamation law, unless the Contractor pays to the United States the incremental fee described in

881    43 CFR 426.15. In determining the incremental fee, the Contracting Officer will calculate

882    annually the cost to the Federal Government, including interest, of storing or delivering non-

883    Project water, which for purposes of this Contract shall be determined as follows: The quotient

884    shall be the unpaid distribution system costs divided by the total irrigable acreage within the

885    Contractor's Service Area. The incremental fee per acre is the mathematical result of such

886    quotient times the interest rate determined using Section 202 (3) of the Act of October 12, 1982

887    (96 Stat. 1263). Such incremental fee will be charged to each acre of excess or full-cost land

888    within the Contractor's Service Area that receives non-Project water through Federally financed

889    or constructed facilities. The incremental fee calculation methodology will continue during the

890    term of this Contract absent the promulgation of a contrary Bureau of Reclamation-wide rule,

891    regulation, or policy adopted after the Contractor has been afforded the opportunity to review

892    and comment on the proposed rule, regulation, or policy. If such rule, regulation, or policy is

893    adopted, it shall supersede this provision.

894            (b)    Water or water rights now owned or hereafter acquired by the Contractor,

895    other than from the United States may be stored, conveyed, and/or diverted through Project

896    facilities, subject to the completion of appropriate environmental documentation, with the

897    approval of the Contracting Officer and the execution of any contract determined by the

898    Contracting Officer to be necessary, consistent with the following provisions:

899          (1)          The Contractor may introduce non-Project water into Project

900     facilities and deliver said water to lands within the Contractor's Service Area, including

901     Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

902     Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

903     policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

904     use power policy is applicable, each as amended, modified, or superseded from time to time.

905          (2)          Delivery of such non-Project water in and through Project facilities

906     shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

907     purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

908     available to other Project Contractors; (iii) interfere with the delivery of contractual water

909     entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

910     the Project facilities.

911          (3)          Neither the United States nor the Operating Non-Federal

912     Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

913     is introduced into or after it is delivered from the Project facilities.  The Contractor hereby

914     releases and agrees to defend and indemnify the United States and the Operating Non-Federal

915     Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

916     persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

917     employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

918     (ii) diverting such non-Project water into Project facilities.

919          (4)          Diversion of such non-Project water into Project facilities shall be

920     consistent with all applicable laws, and if involving groundwater, consistent with any applicable

921    groundwater management plan for the area from which it was extracted.

922           (5)    After Project purposes are met, as determined by the Contracting

923    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

924    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

925    available by the Contracting Officer for conveyance and transportation of non-Project water prior

926    to any such remaining capacity being made available to non-Project contractors.  Other Project

927    Contractors shall have a second priority to any remaining capacity of facilities declared to be

928    available by the Contracting Officer for conveyance and transportation of non-Project water prior

929    to any such remaining capacity being made available to non-Project contractors.

930           (c)    Upon complete payment of the Repayment Obligation by the Contractor,

931    subdivision (a) of this Article 16 shall no longer be applicable.

932    <u>OPINIONS AND DETERMINATIONS</u>

933    17.    (a)    Where the terms of this Contract provide for actions to be based upon the

934    opinion or determination of either party to this Contract, said terms shall not be construed as

935    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

936    determinations.  Both parties, notwithstanding any other provisions of this Contract, expressly

937    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

938    or unreasonable opinion or determination.  Each opinion or determination by either party shall be

939    provided in a timely manner.  Nothing in this subdivision (a) of this Article is intended to or shall

940    affect or alter the standard of judicial review applicable under Federal law to any opinion or

941    determination implementing a specific provision of Federal law embodied in statute or

942    regulation.

43

943          (b)     The Contracting Officer shall have the right to make determinations

944   necessary to administer this Contract that are consistent with the provisions of this Contract, the

945   laws of the United States and of the State of California, and the rules and regulations

946   promulgated by the Secretary.  Such determinations shall be made in consultation with the

947   Contractor to the extent reasonably practicable.

948                  COORDINATION AND COOPERATION

949      18.    (a)     In order to further their mutual goals and objectives, the Contracting

950   Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

951   with other affected Project Contractors, in order to improve the O&M of the Project.  The

952   communication, coordination, and cooperation regarding O&M shall include, but not be limited

953   to, any action which will or may materially affect the quantity or quality of Project Water supply,

954   the allocation of Project Water supply, and Project financial matters including, but not limited to,

955   budget issues.  The communication, coordination, and cooperation provided for hereunder shall

956   extend to all provisions of this Contract.  Each party shall retain exclusive decision making

957   authority for all actions, opinions, and determinations to be made by the respective party.

958          (b)     Within 120 days following the Effective Date, the Contractor, other

959   affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

960   Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

961   amended as necessary separate and apart from this Contract.  The goal of this process shall be to

962   provide, to the extent practicable, the means of mutual communication and interaction regarding

963   significant decisions concerning Project O&M on a real-time basis.

964          (c)     In light of the factors referred to in subdivision (b) of Article 3 of this

44

965 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

966 intent:

967         (1)     The Contracting Officer will, at the request of the Contractor,

968 assist in the development of integrated resource management plans for the Contractor. Further,

969 the Contracting Officer will, as appropriate, seek authorizations for implementation of

970 partnerships to improve water supply, water quality, and reliability.

971         (2)     The Secretary will, as appropriate, pursue program and project

972 implementation and authorization in coordination with Project Contractors to improve the water

973 supply, water quality, and reliability of the Project for all Project purposes.

974         (3)     The Secretary will coordinate with Project Contractors and the

975 State of California to seek improved water resource management.

976         (4)     The Secretary will coordinate actions of agencies within the

977 Department of the Interior that may impact the availability of water for Project purposes.

978         (5)     The Contracting Officer shall periodically, but not less than

979 annually, hold division-level meetings to discuss Project operations, division-level water

980 management activities, and other issues as appropriate.

981         (d)     Without limiting the contractual obligations of the Contracting Officer

982 under the other Articles of this Contract, nothing in this Article shall be construed to limit or

983 constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

984 Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

985 protect health, safety, or the physical integrity of structures or facilities.

986 <u>CHARGES FOR DELINQUENT PAYMENTS</u>

987  19.  (a)  The Contractor shall be subject to interest, administrative, and penalty
988 charges on delinquent payments.  If a payment is not received by the due date, the Contractor
989 shall pay an interest charge on the delinquent payment for each day the payment is delinquent
990 beyond the due date.  If a payment becomes 60 days delinquent, the Contractor shall pay, in
991 addition to the interest charge, an administrative charge to cover additional costs of billing and
992 processing the delinquent payment.  If a payment is delinquent 90 days or more, the Contractor
993 shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
994 payment is delinquent beyond the due date, based on the remaining balance of the payment due
995 at the rate of 6 percent per year.  The Contractor shall also pay any fees incurred for debt
996 collection services associated with a delinquent payment.

997  (b)  The interest rate charged shall be the greater of either the rate prescribed
998 quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
999 payments, or the interest rate of 0.5 percent per month.  The interest rate charged will be
1000 determined as of the due date and remain fixed for the duration of the delinquent period.

1001  (c)  When a partial payment on a delinquent account is received, the amount
1002 received shall be applied first to the penalty charges, second to the administrative charges, third
1003 to the accrued interest, and finally to the overdue payment.

1004 <u>EQUAL EMPLOYMENT OPPORTUNITY</u>

1005  20.  During the performance of this Contract, the Contractor agrees as follows:

1006  (a)  The Contractor will not discriminate against any employee or applicant for
1007 employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1008 origin.  The Contractor will take affirmative action to ensure that applicants are employed, and
1009 that employees are treated during employment, without regard to their race, color, religion, sex,
1010 sexual orientation, gender identity, or national origin.  Such action shall include, but not be
1011 limited to, the following:  employment, upgrading, demotion, or transfer; recruitment or
1012 recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1013 selection for training, including apprenticeship.  The Contractor agrees to post in conspicuous
1014 places, available to employees and applicants for employment, notices to be provided by the
1015 Contracting Officer setting forth the provisions of this nondiscrimination clause.

1016  (b)  The Contractor will, in all solicitations or advertisements for employees
1017 placed by or on behalf of the Contractor, state that all qualified applicants will receive
1018 consideration for employment without regard to race, color, religion, sex, sexual orientation,
1019 gender identity, or national origin.

1020  (c)  The Contractor will not discharge or in any other manner discriminate
1021 against any employee or applicant for employment because such employee or applicant has

1022     inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1023     employee or applicant. This provision shall not apply to instances in which an employee who
1024     has access to the compensation information of other employees or applicants as part of such
1025     employee's essential job functions discloses the compensation of such other employees or
1026     applicants to individuals who do not otherwise have access to such information, unless such
1027     disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1028     proceeding, hearing, or action, including an investigation conducted by the employer, or is
1029     consistent with the Contractor's legal duty to furnish information.

1030     (d)     The Contractor will send to each labor union or representative of workers
1031     with which it has a collective bargaining agreement or other contract or understanding, a notice,
1032     to be provided by the Contracting Officer, advising the labor union or workers' representative of
1033     the Contractor's commitments under Section 202 of Executive Order No. 11246 of September
1034     24, 1965, and shall post copies of the notice in conspicuous places available to employees and
1035     applicants for employment.

1036     (e)     The Contractor will comply with all provisions of Executive Order No.
1037     11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of
1038     Labor.

1039     (f)     The Contractor will furnish all information and reports required by
1040     Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the
1041     Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts
1042     by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain
1043     compliance with such rules, regulations, and orders.

1044     (g)     In the event of the Contractor's noncompliance with the nondiscrimination
1045     clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be
1046     canceled, terminated, or suspended in whole or in part and the Contractor may be declared
1047     ineligible for further Government contracts in accordance with procedures authorized in
1048     Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and
1049     remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule,
1050     regulation, or order of the Secretary of Labor, or as otherwise provided by law.

1051     (h)     The Contractor will include the provisions of paragraphs (a) through (g) in
1052     every subcontract or purchase order unless exempted by the rules, regulations, or orders of the
1053     Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24,
1054     1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor
1055     will take such action with respect to any subcontract or purchase order as may be directed by the
1056     Secretary of Labor as a means of enforcing such provisions, including sanctions for
1057     noncompliance: *Provided, however, That* in the event the Contractor becomes involved in, or is
1058     threatened with, litigation with a subcontractor or vendor as a result of such direction, the
1059     Contractor may request the United States to enter into such litigation to protect the interests of
1060     the United States.

1061         <u>GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT</u>

1062         21.     (a)     The obligation of the Contractor to pay the United States as provided in
1063 this Contract is a general obligation of the Contractor notwithstanding the manner in which the
1064 obligation may be distributed among the Contractor's water users and notwithstanding the default
1065 of individual water users in their obligation to the Contractor.

1066         (b)     The payment of charges becoming due pursuant to this Contract is a
1067 condition precedent to receiving benefits under this Contract. The United States shall not make
1068 water available to the Contractor through Project facilities during any period in which the
1069 Contractor is in arrears in the advance payment of water rates due the United States. The
1070 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1071 parties that are in arrears in the advance payment of water rates as levied or established by the
1072 Contractor.

1073         (c)     With respect to subdivision (b) of this Article, the Contractor shall have no

1074 obligation to require advance payment for water rates which it levies.

1075         <u>COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS</u>

1076         22.     (a)     The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1077 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1078 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1079 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-
1080 336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1081 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1082 Interior and/or Bureau of Reclamation.

1083         (b)     These statutes prohibit any person in the United States from being
1084 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1085 discrimination under any program or activity receiving financial assistance from the Bureau of
1086 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1087 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1088 obligation, including permitting officials of the United States to inspect premises, programs, and
1089 documents.

1090         (c)     The Contractor makes this Contract in consideration of and for the
1091 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1092 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1093 Reclamation, including installment payments after such date on account of arrangements for
1094 Federal financial assistance which were approved before such date. The Contractor recognizes
1095 and agrees that such Federal assistance will be extended in reliance on the representations and

48

1096     agreements made in this Article and that the United States reserves the right to seek judicial
1097     enforcement thereof.

1098          (d)     Complaints of discrimination against the Contractor shall be investigated
1099     by the Contracting Officer's Office of Civil Rights.

1100                      <u>PRIVACY ACT COMPLIANCE</u>

1101       23.     (a)     The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1102     (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1103     (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1104     to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1105     Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1106     C.F.R. § 426.18.

1107          (b)     With respect to the application and administration of the criminal penalty
1108     provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1109     employees who are responsible for maintaining the certification and reporting records referenced
1110     in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1111     U.S.C. § 552a(m).

1112          (c)     The Contracting Officer or a designated representative shall provide the
1113     Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1114     Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1115     31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1116     information contained in the Landholders' certification and reporting records.

1117          (d)     The Contracting Officer shall designate a full-time employee of the
1118     Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1119     pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1120     The Contractor is authorized to grant requests by individuals for access to their own records.

1121          (e)     The Contractor shall forward promptly to the System Manager each
1122     proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1123     filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1124     System Manager with information and records necessary to prepare an appropriate response to
1125     the requester. These requirements do not apply to individuals seeking access to their own
1126     certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1127     the requester elects to cite the Privacy Act as an authority for the request.

1128          (f)     Upon complete payment of the Repayment Obligation by the Contractor,

1129     this Article 23 will no longer be applicable.

1130                 <u>CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</u>

1131          24.      In addition to all other payments to be made by the Contractor pursuant to this

1132   Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

1133   detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1134   of direct cost incurred by the United States for work requested by the Contractor associated with

1135   this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1136   and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1137   to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1138   contract administration.

1139                          <u>WATER CONSERVATION</u>

1140          25.     (a)      Prior to the delivery of water provided from or conveyed through
1141   Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1142   shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1143   Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1144   Additionally, an effective water conservation and efficiency program shall be based on the

1145   Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1146   the conservation and efficiency criteria for evaluating water conservation plans established under

1147   Federal law. The water conservation and efficiency program shall contain definite water

1148   conservation objectives, appropriate economically feasible water conservation measures, and

1149   time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1150   Contract shall be contingent upon the Contractor's continued implementation of such water

1151   conservation program. In the event the Contractor's water conservation plan or any revised water

1152   conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1153    determined by the Contracting Officer to meet such criteria, due to circumstances which the

1154    Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1155    made under this Contract so long as the Contractor diligently works with the Contracting Officer

1156    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1157    immediately begins implementing its water conservation and efficiency program in accordance

1158    with the time schedules therein.

1159           (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1160    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1161    Contractor shall implement the Best Management Practices identified by the time frames issued

1162    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1163    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1164    the Contractor.

1165           (c)    The Contractor shall submit to the Contracting Officer a report on the

1166    status of its implementation of the water conservation plan on the reporting dates specified in the

1167    then-existing conservation and efficiency criteria established under Federal law.

1168           (d)    At five (5)-year intervals, the Contractor shall revise its water

1169    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1170    water conservation plans established under Federal law and submit such revised water

1171    management plan to the Contracting Officer for review and evaluation.  The Contracting Officer

1172    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1173    existing conservation and efficiency criteria for evaluating water conservation plans established

1174    under Federal law.

1175          (e)     If the Contractor is engaged in direct groundwater recharge, such activity

1176 shall be described in the Contractor's water conservation plan.

<div align="center"><u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u></div>

1177

1178      26.     Except as specifically provided in Article 16 of this Contract, the provisions of

1179 this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1180 hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1181 Area. Any such water shall not be considered Project Water under this Contract. In addition,

1182 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1183 any water user within the Contractor's Service Area acquires or has available under any other

1184 contract pursuant to Federal Reclamation law.

1185 <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1186      27.    (a)     The O&M of a portion of the Project facilities which serve the Contractor,

1187 and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1188 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1189 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1190 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1191 affect the rights or obligations of the Contractor or the United States hereunder.

1192         (b)     The Contracting Officer has previously notified the Contractor in writing

1193 that the O&M of a portion of the Project facilities which serve the Contractor has been

1194 transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1195 therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1196 Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

<div align="center">52</div>

1197    the terms and conditions of the separate agreement between the United States and the Operating

1198    Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

1199    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1200    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1201    such successor determines, sets, or establishes for the O&M of the portion of the Project

1202    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1203    Mendota Water Authority or such successor. Such direct payments to Operating Non-Federal

1204    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1205    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1206    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1207    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1208    United States in accordance with the separate agreement identified in subdivision (a) of this

1209    Article.

1210    (c)    For so long as the O&M of any portion of the Project facilities serving the

1211    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1212    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1213    Rates for Water Delivered under this Contract representing the cost associated with the activity

1214    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1215    or its successor.

1216    (d)    In the event the O&M of the Project facilities operated and maintained by

1217    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1218    the United States during the term of this Contract, the Contracting Officer shall so notify the

1219   Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1220   the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1221   representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1222   The Contractor shall, thereafter, in the absence of written notification from the Contracting

1223   Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1224   revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1225   <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1226     28.    The expenditure or advance of any money or the performance of any obligation of
1227   the United States under this Contract shall be contingent upon appropriation or allotment of
1228   funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1229   obligations under this Contract. No liability shall accrue to the United States in case funds are
1230   not appropriated or allotted.

1231   <u>BOOKS, RECORDS, AND REPORTS</u>

1232     29.   (a)    The Contractor shall establish and maintain accounts and other books and
1233   records pertaining to administration of the terms and conditions of this Contract, including the
1234   Contractor's financial transactions; water supply data; project operations, maintenance, and
1235   replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1236   census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1237   Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1238   such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1239   and regulations, each party to this Contract shall have the right during office hours to examine
1240   and make copies of the other party's books and records relating to matters covered by this
1241   Contract.

1242     (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1243   books, records, or other information shall be requested from the Contractor by the Contracting

1244   Officer unless such books, records, or information are reasonably related to the administration or

1245   performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1246   time within which to provide the requested books, records, or information.

1247         (c)     At such time as the Contractor provides information to the Contracting

1248 Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1249 to the Operating Non-Federal Entity(ies).

1250         <u>ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED</u>

1251     30.    (a)     The provisions of this Contract shall apply to and bind the successors and
1252 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1253 therein by either party shall be valid until approved in writing by the other party.

1254         (b)     The assignment of any right or interest in this Contract by either party

1255 shall not interfere with the rights or obligations of the other party to this Contract absent the

1256 written concurrence of said other party.

1257         (c)     The Contracting Officer shall not unreasonably condition or withhold

1258 approval of any proposed assignment.

1259                               <u>SEVERABILITY</u>

1260     31.    In the event that a person or entity who is neither (i) a party to a Project contract,

1261 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1262 an association or other form of organization whose primary function is to represent parties to

1263 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1264 enforceability of a provision included in this Contract and said person, entity, association, or

1265 organization obtains a final court decision holding that such provision is legally invalid or

1266 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1267 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1268 final court decision identify by mutual agreement the provisions in this Contract which must be

1269 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1270   The time periods specified above may be extended by mutual agreement of the parties. Pending

1271   the completion of the actions designated above, to the extent it can do so without violating any

1272   applicable provisions of law, the United States shall continue to make the quantities of Project

1273   Water specified in this Contract available to the Contractor pursuant to the provisions of this

1274   Contract which were not found to be legally invalid or unenforceable in the final court decision.

1275   <div align="center">RESOLUTION OF DISPUTES</div>

1276       32.    Should any dispute arise concerning any provisions of this Contract, or the

1277   parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1278   resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1279   Officer referring any matter to the Department of Justice, the party shall provide to the other

1280   party 30 days' written notice of the intent to take such action; _Provided, That_ such notice shall

1281   not be required where a delay in commencing an action would prejudice the interests of the party

1282   that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1283   Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1284   provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1285   or the United States may have.

1286   <div align="center">OFFICIALS NOT TO BENEFIT</div>

1287       33.    No Member of or Delegate to the Congress, Resident Commissioner, or official of
1288   the Contractor shall benefit from this Contract other than as a water user or landowner in the
1289   same manner as other water users or landowners.

1290   <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1291       34.   (a)    While this Contract is in effect, no change may be made in the
1292   Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1293   changes which may affect the respective rights, obligations, privileges, and duties of either the

<div align="center">56</div>

1294 United States or the Contractor under this Contract, including, but not limited to, dissolution,
1295 consolidation, or merger, except upon the Contracting Officer's written consent.

1296         (b)     Within 30 days of receipt of a request for such a change, the Contracting

1297 Officer will notify the Contractor of any additional information required by the Contracting

1298 Officer for processing said request, and both parties will meet to establish a mutually agreeable

1299 schedule for timely completion of the process. Such process will analyze whether the proposed

1300 change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1301 (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1302 to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1303 have an impact on any Project Water rights applications, permits, or licenses. In addition, the

1304 Contracting Officer shall comply with the NEPA and the ESA. The Contractor will be

1305 responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1306 be paid in accordance with Article 24 of this Contract.

1307 <div align="center">FEDERAL LAWS</div>

1308     35.     By entering into this Contract, the Contractor does not waive its rights to contest

1309 the validity or application in connection with the performance of the terms and conditions of this

1310 Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1311 the terms and conditions of this Contract unless and until relief from application of such Federal

1312 law or regulation to the implementing provision of the Contract is granted by a court of

1313 competent jurisdiction.

RECLAMATION REFORM ACT OF 1982

1314

1315    36.    (a)    Upon a Contractor's compliance with and discharge of the Repayment

1316    Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1317    Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1318    (b)    The obligation of a Contractor to pay the Additional Capital Obligation

1319    shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1320    the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1321    Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1322    CERTIFICATION OF NONSEGREGATED FACILITIES

1323    37.    The Contractor hereby certifies that it does not maintain or provide for its
1324    employees any segregated facilities at any of its establishments and that it does not permit its
1325    employees to perform their services at any location under its control where segregated facilities
1326    are maintained.  It certifies further that it will not maintain or provide for its employees any
1327    segregated facilities at any of its establishments and that it will not permit its employees to
1328    perform their services at any location under its control where segregated facilities are
1329    maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal
1330    Employment Opportunity clause in this Contract.  As used in this certification, the term
1331    "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1332    restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1333    parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1334    facilities provided for employees which are segregated by explicit directive or are in fact
1335    segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1336    disability, or otherwise.  The Contractor further agrees that (except where it has obtained
1337    identical certifications from proposed subcontractors for specific time periods) it will obtain
1338    identical certifications from proposed subcontractors prior to the award of subcontracts
1339    exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1340    Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1341    following notice to such proposed subcontractors (except where the proposed subcontractors
1342    have submitted identical certifications for specific time periods):

1343    NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1344    CERTIFICATIONS OF NONSEGREGATED FACILITIES

1345    A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1346    exceeding $10,000 which is not exempt from the provisions of the Equal Employment

58

1347 Opportunity clause. The certification may be submitted either for each subcontract or for all
1348 subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1349 making false statements in offers is prescribed in 18 U.S.C. § 1001.

1350 <u>NOTICES</u>

1351     38.     Any notice, demand, or request authorized or required by this Contract shall be
1352 deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1353 delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1354 California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1355 postage prepaid, or delivered to the Board of Directors of the Byron Bethany Irrigation District,
1356 7995 Bruns Road, Byron, California 94514. The designation of the addressee or the address may
1357 be changed by notice given in the same manner as provided in this Article for other notices.

1358 <u>MEDIUM FOR TRANSMITTING PAYMENT</u>

1359     39.     (a)     All payments from the Contractor to the United States under this Contract
1360 shall be by the medium requested by the United States on or before the date payment is due. The
1361 required method of payment may include checks, wire transfers, or other types of payment
1362 specified by the United States.

1363             (b)     Upon execution of this Contract, the Contractor shall furnish the
1364 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1365 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1366 out of the Contractor's relationship with the United States.

1367 <u>CONTRACT DRAFTING CONSIDERATIONS</u>

1368     40.     This amended Contract has been negotiated and reviewed by the parties hereto,
1369 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1370 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1371 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1372 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1373 <u>CONFIRMATION OF CONTRACT</u>

1374     41.     Promptly after the execution of this amended Contract, the Contractor will
1375 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1376 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1377 for the authorization of the execution of this amended Contract. This amended Contract shall not
1378 be binding on the United States until the Contractor secures a final decree.

1379

1380        IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1381    day and year first above written.

1382                    UNITED STATES OF AMERICA

1383                    By: _____
1384                            Regional Director
1385                            Interior Region 10: California-Great Basin
1386                            Bureau of Reclamation

1387                    BYRON BETHANY IRRIGATION DISTRICT
1388    (SEAL)

1389                    By: _____
1390                        President of the Board of Directors

1391    Attest:

1392    By: _____
1393          Secretary of the Board of Directors

1380    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1381    day and year first above written.

1382    UNITED STATES OF AMERICA

**APPROVED AS TO LEGAL FORM AND
SUFFICIENCY - REVIEWED BY:**
Digitally signed by
BRIAN HUGHES
Date: 2020.10.16
18:16:44 -07'00'
**OFFICE OF THE REGIONAL SOLICITOR
DEPARTMENT OF THE INTERIOR**

1383    **TIME STAMP:** 1:37 pm, May 11 2020        By: _____
1384                                                  Regional Director
1385                                                  Interior Region 10: California-Great Basin
1386                                                  Bureau of Reclamation


1387                                              BYRON BETHANY IRRIGATION DISTRICT
1388    (SEAL)


1389                                              By: _____
1390                                                  President of the Board of Directors


1391    Attest:


1392    By: _____
1393        Secretary of the Board of Directors

60



**Byron Bethany Irrigation District**

Contract No. 14-06-200-785-LTR1-P
EXHIBIT A

Legend:
- District Boundary
- Contractor's Service Area

BUREAU OF RECLAMATION

Date: 4/2/2020
N:\Districts\Contracts\byron_bethany\byron_bethany_785_20200401.mxd

0   2.5   5 Miles

N

214-202-879

**EXHIBIT B**
**BYRON BETHANY IRRIGATION DISTRICT**
2020 Rates and Charges
(Per Acre-Foot)

| | Irrigation Water | M&I Water Water |
|---|---|---|
| **COST-OF-SERVICE (COS) RATE** | | |
| Construction Costs | $71.17 | $0.72 |
| DMC Aqueduct Intertie | $0.99 | |
| O&M Components | | |
| Water Marketing | $8.97 | $6.12 |
| Storage | $18.01 | $14.99 |
| Deficit Cost | $0.00 | |
| **TOTAL COS RATE** | $99.14 | $21.83 |
| | | |
| **IRRIGATION FULL-COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | |
| | | |
| **M&I FULL COST RATE** | | TBD |
| | | |
| **TIERED PRICING COMPONENTS** *(In Addition to Total COS Rate Above)* | | |
| **IRRIGATION** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate* : >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate - Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| **M&I** | | |
| *Tier 2 Rate* : >80% <=90% of Contract Total [M&I Full Cost Rate - M&I COS Rate]/2 *(Amount to be Added to Tier 1 Rate)* | | TBD |
| *Tier 3 Rate* : >90% of Contract Total [M&I Full Cost Rate - M&I COS Rate] *(Amount to Be Added to Tier 1 Rate)* | | TBD |
| | | |
| **CHARGES AND ASSESSMENTS** *(Payments in addition to Rates)* | | |
| P.L. 102-575 Surcharge (Restoration Fund Payment) [Section 3407(d)(2)(A)] | $10.91 | $21.82 |
| P.L. 106-377 Assessment (Trinity Public Utilities District) [Appendix B, Section 203] | $0.12 | $0.12 |

**EXPLANATORY NOTES**

The CVP M&I Water Shortage Policy per EIS/EIR dated August 2015 and Record of Decision dated November 2015 defines the M&I Historic Use as the average quantity of CVP water put to beneficial use during the last three years of water deliveries, unconstrained (100% allocation) by the availability of CVP water for South of the Delta. Contractor's last three years in acre feet (AF) are revised as follows: 2006 = 853 AF; 2011 = 907 AF; 2017 = 1,002 AF; which equals a M&I Historic use average quantity of 921 AF.

**Additional detail of rate components is available on the Internet at:**
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

# Exhibit C[@]

**Repayment Obligation - Current Calculation under the WIIN Act, Section 4011 (a) (2)**

| | |
|---|---|
| Contractor: | Byron Bethany ID |
| Facility: | Delta Mendota Canal |
| Contract: | 14-06-200-785-LTR1-P |

### Irrigation Construction Cost (2020 Irrigation Ratebook, Schedule A-2Ba

| | | Unpaid Cost | Discount |
|---|---|---|---|
| Construction Cost | ~ $ | 2,409,570 | |
| 2019 Repayment (Estimate) ** | $ | 255,198 | |
| Adjusted Construction Cost | $ | 2,154,372 | $ 2,091,040 |
| Intertie Construction Cost (N/A): | $ | 133,419 | $ 119,494 |
| Total | $ | 2,287,791 | $ 2,210,535 |

If Paid in Installments (Used 20 yr CMT)

| | Due**** | | |
|---|---|---|---|
| Payment 1 | 9/1/2020 | $ | 559,559 |
| Payment 2 | 9/1/2021 | $ | 559,559 |
| Payment 3 | 9/1/2022 | $ | 559,559 |
| Payment 4 ~~ | 9/1/2023 | $ | 559,559 |
| Total Installment Payments | | $ | 2,238,235 |

| | |
|---|---|
| 20 yr CMT Rates - 04/28/2020 (to be adjusted to effective date of contract)[@] | 1.000% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | 0.500% |

### M&I Construction Cost (2020 M&I Ratebook, Sch A-2Ba)

| | | Unpaid Cost |
|---|---|---|
| Construction Cost: | ~ $ | 6,212 |
| 2019 Repayment (Estimate) ** | | |
| Adjusted Construction Cost***: | $ | 6,212 |

| Calculation Support: | Irrigation Lump Sum or First Payment**** | 9/1/2020 |
|---|---|---|
| | Days Until the End of the Fiscal Year | 29 |

| | Unpaid Allocated Construction Cost | | | Unpaid Intertie Construction Cost | | | Total |
|---|---|---|---|---|---|---|---|
| Fiscal Yr | Beginning Balance | Straight Line Repayment | Present Value | Beginning Balance | Straight Line Repayment | Present Value | Present Values |
| 2020 $ | 2,154,372 | $ 195,852 | $ 194,801 | $ 133,419 | $ 3,032 | $ 3,016 | $ 197,817 |
| 2021 $ | 1,958,520 | $ 195,852 | $ 193,908 | $ 130,387 | $ 3,032 | $ 3,002 | $ 196,910 |
| 2022 $ | 1,762,668 | $ 195,852 | $ 192,943 | $ 127,355 | $ 3,032 | $ 2,987 | $ 195,931 |
| 2023 $ | 1,566,816 | $ 195,852 | $ 191,983 | $ 124,322 | $ 3,032 | $ 2,972 | $ 194,956 |
| 2024 $ | 1,370,964 | $ 195,852 | $ 191,028 | $ 121,290 | $ 3,032 | $ 2,958 | $ 193,986 |
| 2025 $ | 1,175,112 | $ 195,852 | $ 190,078 | $ 118,258 | $ 3,032 | $ 2,943 | $ 193,021 |
| 2026 $ | 979,260 | $ 195,852 | $ 189,132 | $ 115,226 | $ 3,032 | $ 2,928 | $ 192,060 |
| 2027 $ | 783,408 | $ 195,852 | $ 188,191 | $ 112,193 | $ 3,032 | $ 2,914 | $ 191,105 |
| 2028 $ | 587,556 | $ 195,852 | $ 187,255 | $ 109,161 | $ 3,032 | $ 2,899 | $ 190,154 |
| 2029 $ | 391,704 | $ 195,852 | $ 186,323 | $ 106,129 | $ 3,032 | $ 2,885 | $ 189,208 |
| 2030 $ | 195,852 | $ 195,852 | $ 185,396 | $ 103,097 | $ 3,032 | $ 2,870 | $ 188,267 |
| 2031-63 | | | | $ 100,064 | $ 100,064 | $ 87,120 | $ 87,120 |
| Total, Lump Sum Payment | | | $ 2,091,040 | | | $ 119,494 | $ 2,210,535 |
| | | | | | | | |
| Amount of Reduction, Lump Sum | | $ 63,332 | | | | $ 13,925 | $ 77,257 |

\* Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.

\*\* 2019 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.

\*\*\* Excludes Interest to payment date as Interest will be computed as an annual expense as usual.

\*\*\*\*Contractor has 60 days from the effective date of the contract or installment dates to make payment.

~ M&I Credit from Schedule A-2Ba has been applied to Irrigation Unpaid Amount.

[@]To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

~~Final Payment made in installments must be repaid by this date.

**EXHIBIT 13**

**CERTIFICATION OF TRUST**
**Pursuant to California Probate Code Section 18100.5**

The undersigned certifies to the United States Department of the Interior, Bureau of Reclamation, Mid-Pacific Region (the "**Bureau**"), the following:

1.    The Coelho Family Trust (the "**Trust**") is currently in existence.

2.    The current trustees (the "**Trustee**" or "**Trustees**") of the Trust are Jerald Coelho, John Coelho, and Joe Coelho, Jr.

3.    The powers of the Trustees of the Trust include:

The power to enter into contracts and other agreements for the benefit of the Trust and perform all acts and execute and deliver all documents necessary for the benefit of the Trust.

The power to borrow money, mortgage, encumber, pledge, convey, grant, assign, or otherwise transfer all or any part of the Trust's real or personal property for the purpose of securing the payment of any of the promissory notes, contracts, instruments and other evidences of indebtedness.

4.    Each Trustee has the authority to execute contracts and other agreements for the benefit of the Trust, so long as the Trustees are in agreement regarding a particular contract or other agreement being in the best interest of the Trust.

5.    The Trustees believe it to be in the best interest of the Trust to convert the Trust's existing long-term renewal contract with the Bureau to a repayment contract under Section 4011 of the Water Infrastructure Improvements for the Nation Act (a "**WIIN Act Contract**").

6.    The Trustees believe it to be in the best interest of the Trust to authorize both the execution of this Certification and the WIIN Act Contract by Jerald Coelho, Trustee, in furtherance of the timely execution of the WIIN Act Contract.

7.    The Trust has not been revoked, modified, or amended in any manner, which would cause the representations in this Certification to be incorrect.

This Certification is being executed in accordance with California Probate Code Section 18100.5. The undersigned declare(s) under penalty of perjury under the laws of the

State of California that all of the information contained in this Certification is true and correct.

_Jerald Coelho_, Trustee
Jerald Coelho, Trustee

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
) ss    See attached
COUNTY OF _____)

On _____ before me, _____, Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

**CALIFORNIA ACKNOWLEDGMENT**

CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____Fresno_____ }

On __12/8/2021__ before me, _James O. Petty Jr, Notary Public_,
 _Date_                      _Here Insert Name and Title of the Officer_

personally appeared _Jerald Coelho, Joe F. Coelho, John Coelho_
 _Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

JAMES O. PETTY JR
Notary Public - California
Fresno County
Commission # 2257426
My Comm. Expires Oct 4, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _James O. Petty Jr_
 _Signature of Notary Public_

*Place Notary Seal and/or Stamp Above*

───────────────── **OPTIONAL** ─────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual       ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual       ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

©2019 National Notary Association

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

CONTRACT BETWEEN THE UNITED STATES
AND
COELHO FAMILY TRUST
PROVIDING FOR PROJECT WATER SERVICE
FROM DELTA DIVISION AND FACILITIES REPAYMENT

TABLE OF CONTENTS

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 2 |
| 1. | Definitions | 7 |
| 2. | Term of Contract – Right to Use of Water | 12 |
| 3. | Water to be Made Available and Delivered to the Contractor | 14 |
| 4. | Time for Delivery of Water | 19 |
| 5. | Point of Diversion and Responsibility for Distribution of Water | 20 |
| 6. | Measurement of Water Within the Contractor's Service Area | 22 |
| 7. | Rates, Method of Payment for Water and Accelerated Repayment of Facilities | 24 |
| 8. | Non-Interest Bearing O&M Deficits | 33 |
| 9. | Sales, Transfers, or Exchanges of Water | 33 |
| 10. | Application of Payments and Adjustments | 35 |
| 11. | Temporary Reductions – Return Flows | 36 |
| 12. | Constraints on the Availability of Water | 37 |
| 13. | Unavoidable Groundwater Percolation | 39 |
| 14. | Compliance with Federal Reclamation Laws | 40 |
| 15. | Protection of Water and Air Quality | 40 |
| 16. | Water Acquired by the Contractor Other Than From the United States | 40 |
| 17. | Opinions and Determinations | 43 |
| 18. | Coordination and Cooperation | 44 |
| 19. | Charges for Delinquent Payments | 45 |
| 20. | Equal Employment Opportunity | 46 |
| 21. | General Obligation – Benefits Conditioned Upon Payment | 47 |
| 22. | Compliance with Civil Rights Laws and Regulations | 48 |
| 23. | Privacy Act Compliance | 49 |
| 24. | Contractor to Pay Certain Miscellaneous Costs | 49 |

Table of Contents – continued

| Article No. | Title | Page No. |
|---|---|---|
| 25. | Water Conservation | 50 |
| 26. | Existing or Acquired Water or Water Rights | 52 |
| 27. | Operation and Maintenance by the Operating Non-Federal Entity | 52 |
| 28. | Contingent on Appropriation or Allotment of Funds | 54 |
| 29. | Books, Records, and Reports | 54 |
| 30. | Assignment Limited – Successors and Assigns Obligated | 55 |
| 31. | Severability | 55 |
| 32. | Resolution of Disputes | 56 |
| 33. | Officials Not to Benefit | 56 |
| 34. | Changes in Contractor's Organization and/or Service Area | 56 |
| 35. | Federal Laws | 57 |
| 36. | Reclamation Reform Act of 1982 | 57 |
| 37. | Certification of Nonsegregated Facilities | 58 |
| 38. | Notices | 58 |
| 39. | Medium for Transmitting Payment | 59 |
| 40. | Contract Drafting Considerations | 59 |
| 41. | Confirmation of Contract | 59 |
|  | Signature Page | 60 |

Exhibit A – Map of Contractor's Service Area
Exhibit B – Rates and Charges
Exhibit C – Repayment Obligation

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Central Valley Project, California

<u>CONTRACT BETWEEN THE UNITED STATES</u>
<u>AND</u>
<u>COELHO FAMILY TRUST</u>
<u>PROVIDING FOR PROJECT WATER SERVICE</u>
<u>FROM DELTA DIVISION AND FACILITIES REPAYMENT</u>

1    THIS CONTRACT, made this 15<sup>TH</sup> day of _DECEMBER_____, 2021, in

2    pursuance generally of the Act of June 17, 1902, (32 Stat. 388), and acts amendatory thereof or

3    supplementary thereto, including but not limited to, the Acts of August 26, 1937 (50 Stat. 844),

4    as amended and supplemented, August 4, 1939 (53 Stat. 1187), as amended and supplemented,

5    July 2, 1956 (70 Stat. 483), June 21, 1963 (77 Stat. 68), October 12, 1982 (96 Stat. 1263),

6    October 27, 1986 (100 Stat. 3050), as amended, Title XXXIV of the Act of October 30, 1992

7    (106 Stat. 4706), as amended, and the Water Infrastructure Improvements for the Nation Act

8    (Public Law (Pub. L.) 114-322, 130 Stat. 1628), Section 4011 (a-d) and (f) ("WIIN Act"), all

9    collectively hereinafter referred to as Federal Reclamation law, between the UNITED STATES

10   OF AMERICA, hereinafter referred to as the United States, represented by the officer executing

11   this Contract, hereinafter referred to as the Contracting Officer, and COELHO FAMILY

12   TRUST, hereinafter referred to as the Contractor, duly organized, existing, and acting pursuant

13   to the laws thereof;

14       WITNESSETH, That:

15        <u>EXPLANATORY RECITALS</u>

16      [1<sup>st</sup>] WHEREAS, the United States has constructed and is operating the

17 California Central Valley Project (Project), for diversion, storage, carriage, distribution, and

18 beneficial use, for flood control, irrigation, municipal, domestic, industrial, fish and wildlife

19 mitigation, protection and restoration, generation and distribution of electric energy, salinity

20 control, navigation, and other beneficial uses, of waters of the Sacramento River, the American

21 River, the Trinity River, and the San Joaquin River and their tributaries; and

22      [2<sup>nd</sup>] WHEREAS, the United States constructed the Delta-Mendota Canal and

23 related facilities, which will be used in part for the furnishing of water to the Contractor pursuant

24 to the terms of this Contract; and

25      [3<sup>rd</sup>] WHEREAS, the rights to Project Water were acquired by the United

26 States pursuant to California law for operation of the Project; and

27      [4<sup>th</sup>] WHEREAS, the Mason Loundy Trust and the United States entered into

28 Contract No. 14-06-200-7859A, dated August 20, 1974, which established terms for the delivery

29 of 5,200 acre feet of supplemental water, hereinafter referred to as Project Water, from August

30 20, 1974, through December 31, 2003, and 2,653 acre-feet of Schedule 2 water as a permanent

31 adjustment and settlement of Mason Loundy Trust's asserted claims of rights to water in Fresno

32 Slough, tributary to the San Joaquin River in fulfillment of such rights to the Mason Loundy

33 Trust from Delta Division Facilities; and

34      [5<sup>th</sup>] WHEREAS, the Mason Loundy Trust entered into "Partial Assignment of

35 Contract and Consent Thereto" dated December 16, 1986, assigning 1,321 acre-feet of Schedule

36 2 water and 3,120 acer-feet of Project Water of Contract No. 14-06-200-7859A to the State of

37     California Department of Fish & Game, Wildlife Conservation Board, leaving a balance of 1.332

38     acre-feet of Schedule 2 water and 2,080 acre-feet of Project Water available to the Mason

39     Loundy Trust under Contract No. 14-06-200-7859A; and

40             [6th]     WHEREAS, to the Mason Loundy Trust entered into "Assignment of

41     Contract, Consent Thereto and Assumption - Thereof" dated August 22, 1995, assigning 1,332

42     acre-feet of Schedule 2 water and 2,080 acre-feet of Project Water remaining available under

43     Contract No. 14-06-200-7859A to the Contractor; and

44             [7th]     WHEREAS, Schedule 2 water is not the subject of this Contract and will

45     continue to be delivered and administered under the terms and conditions of Contract No.

46     14-06-200-7859A; and

47             [8th]     WHEREAS, Contract No. 14-06-200-7859A also established the terms for

48     the delivery of 2,080 acre-feet of supplemental water, hereinafter referred to as Project Water, to

49     the Contractor from Delta Division facilities from August 20, 1974 through December 31, 2003;

50     and

51             [9th]     WHEREAS, the United States and the Contractor have pursuant to

52     Subsection 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA), subsequently

53     entered into interim renewal contract(s) identified as Contract No(s). 14-06-200-7859A-IR1 and

54     14-06-200-7859A-IR2, which provided for the delivery of Project Water to the Contractor from

55     March 1, 2004, through February 28, 2006; and

56            [10th]     WHEREAS, the United States and the Contractor entered into a long-term

57     contract identified as Contract No. 14-06-200-7859A-LTR1, hereinafter referred to as the

58     Existing Contract, which provided for the continued water service to the Contractor following

3

59     expiration of Contract No. 14-06-200-7859A-IR2, and which was in effect the date the WIIN Act

60     was enacted; and

61         [11th]    WHEREAS, on December 16, 2016, the 114th Congress of the United

62     States of America enacted the WIIN Act; and

63         [12th]    WHEREAS, Section 4011(a)(1) provides that "upon request of the

64     contractor, the Secretary of the Interior shall convert any water service contract in effect on the

65     date of enactment of this subtitle and between the United States and a water users' association

66     [Contractor] to allow for prepayment of the repayment contract pursuant to paragraph (2) under

67     mutually agreeable terms and conditions."; and

68         [13th]    WHEREAS, Section 4011(a)(1) further provides that "the manner of

69     conversion under this paragraph shall be as follows: (A) Water service contracts that were

70     entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196), to be converted under

71     this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat.

72     1195)"; and "(B) Water service contracts that were entered under subsection (c)(2) of section 9

73     of the Act of August 4, 1939 (53 Stat. 1194), to be converted under this section shall be

74     converted to a contract under subsection (c)(1) of section 9 of that Act (53 Stat. 1195)."; and

75         [14th]    WHEREAS, Section 4011(a)(4)(C) further provides all contracts entered

76     into pursuant to Section 4011(a)(1), (2), and (3) shall "not modify other water service,

77     repayment, exchange and transfer contractual rights between the water users' association

78     [Contractor], and the Bureau of Reclamation, or any rights, obligations, or relationships of the

79     water users' association [Contractor] and their landowners as provided under State law."; and

80        [15<sup>th</sup>]  WHEREAS, Section 4011(d)(3) and (4) of the WIIN Act provides that

81    "implementation of the provisions of this subtitle shall not alter…(3) the priority of a water

82    service or repayment contractor to receive water; or (4) except as expressly provided in this

83    section, any obligations under the Federal Reclamation law, including the continuation of

84    Restoration Fund charges pursuant to section 3407(d) (Pub. L. 102-575), of the water service and

85    repayment contractors making prepayments pursuant to this section."; and

86        [16<sup>th</sup>]  WHEREAS, upon the request of the Contractor, the WIIN Act directs the

87    Secretary to convert irrigation water service contracts and municipal and industrial (M&I) water

88    service contracts into repayment contracts, amend existing repayment contracts, and allow

89    contractors to prepay their construction cost obligations pursuant to applicable Federal

90    Reclamation law; and

91        [17<sup>th</sup>]  WHEREAS, the United States has determined that the Contractor has

92    fulfilled all of its obligations under the Existing Contract; and

93        [18<sup>th</sup>]  WHEREAS, the Contractor has demonstrated to the satisfaction of the

94    Contracting Officer that the Contractor has utilized the Project Water supplies available to it for

95    reasonable and beneficial use and/or has demonstrated future demand for water use such that the

96    Contractor has the capability and expects to utilize fully for reasonable and beneficial use the

97    quantity of Project Water to be made available to it pursuant to this Contract; and

98        [19<sup>th</sup>]  WHEREAS, water obtained from the Project has been relied upon by

99    urban and agricultural areas within California for more than 50 years, and is considered by the

100   Contractor as an essential portion of its water supply; and

101          [20th]    WHEREAS, the economies of regions within the Project, including the

102   Contractor's, depend upon the continued availability of water, including water service from the

103   Project; and

104          [21st]    WHEREAS, the Secretary intends through coordination, cooperation, and

105   partnerships to pursue measures to improve water supply, water quality, and reliability of the

106   Project for all Project purposes; and

107          [22nd]    WHEREAS, the mutual goals of the United States and the Contractor

108   include: to provide for reliable Project Water supplies; to control costs of those supplies; to

109   achieve repayment of the Project as required by law; to guard reasonably against Project Water

110   shortages; to achieve a reasonable balance among competing demands for use of Project Water;

111   and to comply with all applicable environmental statutes, all consistent with the legal obligations

112   of the United States relative to the Project; and

113          [23rd]    WHEREAS, the parties intend by this Contract to maintain a cooperative

114   relationship in order to achieve their mutual goals; and

115          [24th]    WHEREAS, the Contractor has utilized or may utilize transfers, contract

116   assignments, rescheduling, and conveyance of Project Water and non-Project water under this

117   Contract as tools to minimize the impacts of a Condition of Shortage and to maximize the

118   beneficial use of water; and

119          [25th]    WHEREAS, the parties desire and intend that this Contract not provide a

120   disincentive to the Contractor in continuing to carry out the beneficial activities set out in the

121   Explanatory Recital immediately above; and

122    [26th]  WHEREAS, the Contracting Officer and the Contractor agree that this

123  Contract complies with Section 4011 of the WIIN Act; and

124    [27th]  WHEREAS, the Contracting Officer and the Contractor agree to amend

125  and convert the Existing Contract pursuant to Section 4011 of the WIIN Act and other Federal

126  Reclamation law on the terms and conditions set forth below.

127    NOW, THEREFORE, in consideration of the mutual and dependent covenants

128  herein contained, it is hereby mutually agreed by the parties hereto as follows:

<u>DEFINITIONS</u>

130    1.    When used herein unless otherwise distinctly expressed, or manifestly

131  incompatible with the intent of the parties as expressed in this Contract, the term:

132    (a)    "Additional Capital Obligation" shall mean construction costs or other

133  capitalized costs incurred after the Effective Date or not reflected in the Existing Capital

134  Obligation as defined herein and in accordance with Section 4011, subsection (a)(2)(B) and

135  (a)(3)(B) of the Water Infrastructure Improvements for the Nation Act (Pub. L. 114-322, 130

136  Stat. 1628) ("WIIN Act");

137    (b)    "Calendar Year" shall mean the period January 1 through December 31,

138  both dates inclusive;

139    (c)    "Charges" shall mean the payments required by Federal Reclamation law

140  in addition to the Rates and Tiered Pricing Component specified in this Contract as determined

141  annually by the Contracting Officer pursuant to this Contract;

142        (d)    "Condition of Shortage" shall mean a condition respecting the Project

143  during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the

144  Contract Total;

145        (e)    "Contracting Officer" shall mean the Secretary of the Interior's duly

146  authorized representative acting pursuant to this Contract or applicable Federal Reclamation law

147  or regulation;

148        (f)    "Contract Total" shall mean the maximum amount of water to which the

149  Contractor is entitled under subdivision (a) of Article 3 of this Contract;

150        (g)    "Contractor's Service Area" shall mean the area to which the Contractor is

151  permitted to provide Project Water under this Contract as described in Exhibit "A" attached

152  hereto, which may be modified from time to time in accordance with Article 34 of this Contract

153  without amendment of this Contract;

154        (h)    "CVPIA" shall mean the Central Valley Project Improvement Act, Title

155  XXXIV of the Act of October 30, 1992 (106 Stat. 4706);

156        (i)    "Delta Division Facilities" shall mean those existing and future Project

157  facilities in and south of the Sacramento-San Joaquin Rivers Delta, including, but not limited to,

158  the C.W. "Bill" Jones Pumping Plant, the O'Neill Forebay, the O'Neill Pumping/Generating

159  Plant, and the San Luis Reservoir, used to divert, store, and convey water to those Project

160  Contractors entitled to receive water conveyed through the Delta-Mendota Canal;

161        (j)    "Eligible Lands" shall mean all lands to which Irrigation Water may be

162  delivered in accordance with Section 204 of the Reclamation Reform Act of 1982 (96 Stat.

163  1263), as amended;

164         (k)    "Excess Lands" shall mean all lands in excess of the limitations contained

165   in Section 204 of the Reclamation Reform Act of 1982, other than those lands exempt from

166   acreage limitation under Federal Reclamation law;

167         (l)    "Existing Capital Obligation" shall mean the remaining amount of

168   construction costs or other capitalized costs allocable to the Contractor as described in Section

169   4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central

170   Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively,

171   in the Final 2021 Ratebooks, as adjusted to reflect payments not reflected in such schedule. The

172   Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in

173   Exhibit "C", which is incorporated herein by reference;

174         (m)   "Full Cost Rate" shall mean an annual rate, as determined by the

175   Contracting Officer that shall amortize the expenditures for construction properly allocable to the

176   Project irrigation or M&I functions, as appropriate, of facilities in service including all O&M

177   deficits funded, less payments, over such periods as may be required under Federal Reclamation

178   law, or applicable contract provisions. Interest will accrue on both the construction expenditures

179   and funded O&M deficits from October 12, 1982, on costs outstanding at that date, or from the

180   date incurred in the case of costs arising subsequent to October 12 1982, and shall be calculated

181   in accordance with subsections 202(3)(B) and (3)(C) of the Reclamation Reform Act of 1982.

182   The Full Cost Rate includes actual operation, maintenance, and replacement costs consistent with

183   Section 426.2 of the Rules and Regulations for the Reclamation Reform Act of 1982;

184         (n)    "Ineligible Lands" shall mean all lands to which Irrigation Water may not

185   be delivered in accordance with Section 204 of the Reclamation Reform Act of 1982;

9

186               (o)     "Irrigation Full Cost Water Rate" shall mean the Full Cost Rate applicable

187   to the delivery of Irrigation Water;

188               (p)     "Irrigation Water" shall mean the use of Project Water to irrigate lands
189   primarily for the production of commercial agricultural crops or livestock, and domestic and
190   other uses that are incidental thereto;

191               (q)     "Landholder" shall mean a party that directly or indirectly owns or leases

192   nonexempt land, as provided in 43 CFR 426.2;

193               (r)     "Municipal and Industrial (M&I) Water" shall mean the use of Project
194   Water for municipal, industrial, and miscellaneous other purposes not falling under the definition
195   of "Irrigation Water" or within another category of water use under an applicable Federal
196   authority;

197               (s)     "M&I Full Cost Water Rate" shall mean the Full Cost Rate applicable to

198   the delivery of M&I Water;

199               (t)     "Operation and Maintenance" or "O&M" shall mean normal and

200   reasonable care, control, operation, repair, replacement (other than capital replacement), and

201   maintenance of Project facilities;

202               (u)     "Operating Non-Federal Entity" shall mean the entity(ies), its (their)

203   successors or assigns, which has (have) the obligation to operate and maintain all or a portion of

204   the Delta Division Facilities pursuant to written agreement(s) with the United States.  When this

205   Contract was entered into, the Operating Non-Federal Entity was the San Luis & Delta-Mendota

206   Water Authority;

207               (v)     "Project" shall mean the Central Valley Project owned by the United

208   States and managed by the Department of the Interior, Bureau of Reclamation;

209        (w)    "Project Contractors" shall mean all parties who have contracts for water

210  service for Project Water from the Project with the United States pursuant to Federal

211  Reclamation law;

212        (x)    "Project Water" shall mean all water that is developed, diverted, stored, or

213  delivered by the Secretary in accordance with the statutes authorizing the Project and in

214  accordance with the terms and conditions of water rights acquired pursuant to California law;

215  however, Schedule 2 Water shall not be considered Project Water for purposes of this Contract;

216        (y)    "Rates" shall mean the payments determined annually by the Contracting

217  Officer in accordance with the then-current applicable water ratesetting policies for the Project,

218  as described in subdivision (a) of Article 7 of this Contract;

219        (z)    "Recent Historic Average" shall mean the most recent five (5)-year

220  average of the final forecast of Water Made Available to the Contractor pursuant to this Contract

221  or its preceding contract(s);

222        (aa)    "Repayment Obligation" for Water Delivered as Irrigation Water shall

223  mean the Existing Capital Obligation discounted by ½ of the Treasury rate, which shall be the

224  amount due and payable to the United States, pursuant to Section 4011(a)(2)(A) of the WIIN

225  Act; and for Water Delivered as M&I Water shall mean the amount due and payable to the

226  United States, pursuant to Section 4011(a)(3)(A) of the WIIN Act;

227        (bb)    "Schedule 2 Water" shall mean that water as so defined under Contract

228  No. 14-06-200-7859A with the United States, which will continue to be delivered and

229  administered under said contract;

230            (cc)    "Secretary" shall mean the Secretary of the Interior, a duly appointed

231  successor, or an authorized representative acting pursuant to any authority of the Secretary and

232  through any agency of the Department of the Interior;

233            (dd)    "Tiered Pricing Component" shall be the incremental amount to be paid

234  for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided

235  for in Exhibit "B";

236            (ee)    "Water Delivered" or "Delivered Water" shall mean Project Water

237  diverted for use by the Contractor at the point(s) of delivery approved by the Contracting

238  Officer;

239            (ff)    "Water Made Available" shall mean the estimated amount of Project

240  Water that can be delivered to the Contractor for the upcoming Year as declared by the

241  Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract;

242            (gg)    "Water Scheduled" shall mean Project Water made available to the

243  Contractor for which times and quantities for delivery have been established by the Contractor

244  and Contracting Officer, pursuant to subdivision (b) of Article 4 of this Contract; and

245            (hh)    "Year" shall mean the period from and including March 1 of each

246  Calendar Year through the last day of February of the following Calendar Year.

247                        <u>TERM OF CONTRACT – RIGHT TO USE OF WATER</u>

248     2.     (a)    This Contract shall be effective January 1, 2022, hereinafter known as the

249  "Effective Date", and shall continue so long as the Contractor pays applicable Rates and Charges

250    under this Contract, consistent with Section 9(d) or 9(c)(1) of the Act of August 4, 1939 (53 Stat.

251    1195) as applicable, and applicable law;

252          (1)    *Provided, That* the Contracting Officer shall not seek to terminate

253    this Contract for failure to fully or timely pay applicable Rates and Charges by the Contactor,

254    unless the Contracting Officer has first provided at least sixty (60) calendar days written notice

255    to the Contractor of such failure to pay and the Contractor has failed to cure such failure to pay,

256    or to diligently commence and maintain full curative payments satisfactory to the Contracting

257    Officer within the sixty (60) calendar days' notice period;

258          (2)    *Provided, further, That* the Contracting Officer shall not seek to

259    suspend making water available or declaring Water Made Available pursuant to this Contract for

260    non-compliance by the Contractor with the terms of this Contract or Federal law, unless the

261    Contracting Officer has first provided at least thirty (30) calendar days written notice to the

262    Contractor and the Contractor has failed to cure such non-compliance, or to diligently commence

263    curative actions satisfactory to the Contracting Officer for a non-compliance that cannot be fully

264    cured within the thirty (30) calendar days' notice period.  If the Contracting Officer has

265    suspended making water available pursuant to this paragraph, upon cure of such non-compliance

266    satisfactory to the Contracting Officer, the Contracting Officer shall resume making water

267    available and declaring Water Made Available pursuant to this Contract;

268          (3)    *Provided, further, That* this Contract may be terminated at any

269    time by mutual consent of the parties hereto.

270        (b)    Upon complete payment of the Repayment Obligation by the Contractor,

271    and notwithstanding any Additional Capital Obligation that may later be established, the acreage

272   limitations, reporting, and full cost pricing provisions of the Reclamation Reform Act of 1982,

273   and subdivisions (j) Eligible Lands, (k) Excess Lands, and (n) Ineligible Lands, of Article 1 of

274   this Contract shall no longer be applicable.

275          (c)     Notwithstanding any provision of this Contract, the Contractor reserves

276   and shall have all rights and benefits under the Act of July 2, 1956 (70 Stat. 483), to the extent

277   allowed by law.

278          (d)     Notwithstanding any provision of this Contract, the Contractor reserves

279   and shall have all rights and benefits under the Act of June 21, 1963 (77 Stat. 68), to the extent

280   allowed by law.

281   <u>WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR</u>

282   3.     (a)     During each Year, consistent with all applicable State water rights permits,

283   and licenses, Federal law, and subject to the provisions set forth in Articles 11 and 12 of this

284   Contract, the Contracting Officer shall make available for delivery to the Contractor 2,080 acre-

285   feet of Project Water for irrigation and M&I purposes. Water Delivered to the Contractor in

286   accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of

287   Articles 4 and 7 of this Contract. Schedule 2 Water shall continue to be delivered to the

288   Contractor at no cost pursuant to Contract No. 14-06-200-7859A, dated August 20, 1974, and

289   shall not be subject to the provisions of this Contract, and said Contract No. 14-06-200-7859A

290   shall be in full force and effect insofar as it pertains to the furnishing of Schedule 2 Water.

291          (b)     Because the capacity of the Project to deliver Project Water has been

292   constrained in recent years and may be constrained in the future due to many factors including

293   hydrologic conditions and implementation of Federal and State laws, the likelihood of the

294   Contractor actually receiving the amount of Project Water set out in subdivision (a) of this

295   Article in any given Year is uncertain. The Contracting Officer's modeling referenced in the

296   programmatic environmental impact statement prepared pursuant to Section 3404(c) of the

297   CVPIA projected that the Contract Total set forth in this Contract will not be available to the

298   Contractor in many years. During the most recent five years prior to execution of the Existing

299   Contract, the Recent Historic Average Water Made Available to the Contractor was 47 acre-feet.

300   Nothing in this subdivision (b) of this Article shall affect the rights and obligations of the parties

301   under any provision of this Contract.

302         (c)    The Contractor shall utilize the Project Water in accordance with all

303   applicable legal requirements.

304         (1)    In the event any Project Contractor (other than a Cross Valley

305   Contractor) that receives Project Water through the Delta Division Facilities obtains a

306   contractual agreement that the Contracting Officer shall make Project Water available at a point

307   or points of delivery in or north of the Delta, at the request of the Contractor and upon

308   completion of any required environmental documentation, this Contract shall be amended to

309   provide for deliveries in or north of the Delta on mutually agreeable terms. Such amendments to

310   this Contract shall be limited solely to those changes made necessary by the addition of such

311   alternate points of delivery in or north of the Delta; _Provided, That_ the Contracting Officer's use

312   of the Harvey O. Banks Pumping Plant to deliver Project Water does not trigger this right of

313   amendment.

314         (d)    The Contractor shall make reasonable and beneficial use of all water

315   furnished pursuant to this Contract. Groundwater recharge programs (direct, indirect, or in lieu),

15

316 groundwater banking programs, surface water storage programs, and other similar programs

317 utilizing Project Water or other water furnished pursuant to this Contract conducted within the

318 Contractor's Service Area which are consistent with applicable State law and result in use

319 consistent with Federal Reclamation law will be allowed; *Provided, That* any direct recharge

320 program(s) is (are) described in the Contractor's water conservation plan submitted pursuant to

321 Article 25 of this Contract; *Provided, further, That* such water conservation plan demonstrates

322 sufficient lawful uses exist in the Contractor's Service Area so that using a long-term average,

323 the quantity of Delivered Water is demonstrated to be reasonable for such uses and in

324 compliance with Federal Reclamation law. Groundwater recharge programs, groundwater

325 banking programs, surface water storage programs, and other similar programs utilizing Project

326 Water or other water furnished pursuant to this Contract conducted outside the Contractor's

327 Service Area may be permitted upon written approval of the Contracting Officer, which approval

328 will be based upon environmental documentation, Project Water rights, and Project operational

329 concerns. The Contracting Officer will address such concerns in regulations, policies, or

330 guidelines.

331         (e)    The Contractor shall comply with requirements applicable to the

332 Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution

333 of any water service contract between the Contracting Officer and the Contractor in effect

334 immediately prior to the Effective Date undertaken pursuant to Section 7 of the Endangered

335 Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to

336 implement. The Existing Contract, which evidences in excess of 37 years of diversions for

337 irrigation and/or M&I purposes of the quantities of Project Water provided in subdivision (a) of

338 Article 3 of this Contract, will be considered in developing an appropriate baseline for any

339 required biological assessment(s) prepared pursuant to the ESA, and any other needed

340 environmental review. Nothing herein shall be construed to prevent the Contractor from

341 challenging or seeking judicial relief in a court of competent jurisdiction with respect to any

342 biological opinion or other environmental documentation referred to in this Article.

343         (f)     Following the declaration of Water Made Available under Article 4 of this

344 Contract, the Contracting Officer will make a determination whether Project Water, or other

345 water available to the Project, can be made available to the Contractor in addition to the Contract

346 Total under this Article during the Year without adversely impacting other Project Contractors.

347 At the request of the Contractor, the Contracting Officer will consult with the Contractor prior to

348 making such a determination. If the Contracting Officer determines that Project Water, or other

349 water available to the Project, can be made available to the Contractor, the Contracting Officer

350 will announce the availability of such water and shall so notify the Contractor as soon as

351 practical. The Contracting Officer will thereafter meet with the Contractor and other Project

352 Contractors capable of taking such water to determine the most equitable and efficient allocation

353 of such water. If the Contractor requests the delivery of any quantity of such water, the

354 Contracting Officer shall make such water available to the Contractor in accordance with

355 applicable statutes, regulations, guidelines, and policies. Subject to existing long-term

356 contractual commitments, water rights, and operational constraints, long-term Project

357 Contractors shall have a first right to acquire such water, including Project Water made available

358 pursuant to Section 215 of the Reclamation Reform Act of 1982.

359         (g)     The Contractor may request permission to reschedule for use during the

360    subsequent Year some or all of the Water Made Available to the Contractor during the current

361    Year, referred to as "rescheduled water." The Contractor may request permission to use during

362    the current Year a quantity of Project Water which may be made available by the United States

363    to the Contractor during the subsequent Year referred to as "preuse." The Contracting Officer's

364    written approval may permit such uses in accordance with applicable statutes, regulations,

365    guidelines, and policies.

366         (h)     The Contractor's right pursuant to Federal Reclamation law and applicable

367    State law to the reasonable and beneficial use of the Water Delivered pursuant to this Contract

368    shall not be disturbed, and this Contract shall continue so long as the Contractor pays applicable

369    Rates and Charges under this Contract consistent with Section 9(d) or 9(c)(1) of the Act of

370    August 4, 1939 (53 Stat. 1195) as applicable, and applicable law. Nothing in the preceding

371    sentence shall affect the Contracting Officer's ability to impose shortages under Article 11 or

372    subdivision (b) of Article 12 of this Contract.

373         (i)     Project Water furnished to the Contractor pursuant to this Contract may be

374    delivered for purposes other than those described in subdivisions (p) and (r) of Article 1 of this

375    Contract upon written approval by the Contracting Officer in accordance with the terms and

376    conditions of such approval.

377         (j)     The Contracting Officer shall make reasonable efforts to protect the water

378    rights necessary for the Project and to provide the water available under this Contract. The

379    Contracting Officer shall not object to participation by the Contractor, in the capacity and to the

380    extent permitted by law, in administrative proceedings related to the Project Water rights;

381     *Provided, That* the Contracting Officer retains the right to object to the substance of the

382     Contractor's position in such a proceeding; *Provided, further, That* in such proceedings the

383     Contracting Officer shall recognize the Contractor has a legal right under the terms of this

384     Contract to use Project Water.

385                 <u>TIME FOR DELIVERY OF WATER</u>

386       4.      (a)      On or about February 20 each Calendar Year, the Contracting Officer shall

387     announce the Contracting Officer's expected declaration of the Water Made Available. Such

388     declaration will be expressed in terms of Water Made Available and the Recent Historic Average

389     and will be updated monthly, and more frequently if necessary, based on the then-current

390     operational and hydrologic conditions and a new declaration with changes, if any, to the Water

391     Made Available will be made. The Contracting Officer shall provide forecasts of Project

392     operations and the basis of the estimate, with relevant supporting information, upon the written

393     request of the Contractor. Concurrently with the declaration of the Water Made Available, the

394     Contracting Officer shall provide the Contractor with the updated Recent Historic Average.

395           (b)      On or before each March 1 and at such other times as necessary, the

396     Contractor shall submit to the Contracting Officer a written schedule, satisfactory to the

397     Contracting Officer, showing the monthly quantities of Project Water to be delivered by the

398     United States to the Contractor pursuant to this Contract for the Year commencing on such

399     March 1. The Contracting Officer shall use all reasonable means to deliver Project Water

400     according to the approved schedule for the Year commencing on such March 1.

401           (c)      The Contractor shall not schedule Project Water in excess of the quantity

402     of Project Water the Contractor intends to put to reasonable and beneficial use within the

403 Contractor's Service Area or to sell, transfer, or exchange pursuant to Article 9 of this Contract

404 during any Year.

405       (d)     Subject to the conditions set forth in subdivision (a) of Article 3 of this

406 Contract, the United States shall deliver Project Water to the Contractor in accordance with the

407 initial schedule submitted by the Contractor pursuant to subdivision (b) of this Article, or any

408 written revision(s) thereto satisfactory to the Contracting Officer, submitted within a reasonable

409 time prior to the date(s) on which the requested change(s) is/are to be implemented.

410     <u>POINT OF DIVERSION AND RESPONSIBILITY FOR DISTRIBUTION OF WATER</u>

411     5.    (a)     Project Water scheduled pursuant to subdivision (b) of Article 4 of this

412 Contract shall be delivered to the Contractor at a point or points on the Delta-Mendota Canal and

413 any additional point or points of delivery either on Project facilities or another location or

414 locations mutually agreed to in writing by the Contracting Officer and the Contractor.

415       (b)     The Contracting Officer, either directly or indirectly through its written

416 agreements(s) with the Operating Non-Federal Entity(ies), shall make all reasonable efforts to

417 maintain sufficient flows and levels of water in the Project facilities to deliver Project Water to

418 the Contractor at the point or points of delivery established pursuant to subdivision (a) of this

419 Article.

420       (c)     The Contractor shall deliver Irrigation Water in accordance with any

421 applicable land classification provisions of Federal Reclamation law and the associated

422 regulations. The Contractor shall not deliver Project Water to land outside the Contractor's

423 Service Area unless approved in advance by the Contracting Officer.

424          (d)     All Water Delivered to the Contractor pursuant to this Contract shall be

425     measured and recorded with equipment furnished, installed, operated, and maintained by the

426     Contracting Officer either directly or indirectly through its written agreements(s) with the

427     Operating Non-Federal Entity(ies), unless undertaken by the Contractor with the consent of the

428     Contracting Officer at the point or points of delivery established pursuant to subdivision (a) of

429     this Article. Upon the request of either party to this Contract, the Contracting Officer shall

430     investigate, or cause to be investigated by the appropriate Operating Non-Federal Entity(ies), the

431     accuracy of such measurements and shall take any necessary steps to adjust any errors appearing

432     therein. For any period of time when accurate measurements have not been made, the

433     Contracting Officer shall consult with the Contractor and the appropriate Operating Non-Federal

434     Entity(ies), if any, prior to making a final determination of the quantity delivered for that period

435     of time.

436          (e)     Absent a separate contrary written agreement with the Contractor, neither

437     the Contracting Officer nor any Operating Non-Federal Entity(ies) shall be responsible for the

438     control, carriage, handling, use, disposal, or distribution of Water Delivered to the Contractor

439     pursuant to this Contract beyond the point or points of delivery established pursuant to

440     subdivision (a) of this Article. The Contractor shall indemnify the United States, its officers,

441     employees, agents, and assigns on account of damage or claim of damage of any nature

442     whatsoever for which there is legal responsibility, including property damage, personal injury, or

443     death arising out of or connected with the control, carriage, handling, use, disposal, or

444     distribution of such Water Delivered beyond such point or points of delivery except for any

445     damage or claim arising out of: (i) acts or omissions of the Contracting Officer or any of its

446  officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies) with

447  the intent of creating the situation resulting in any damage or claim; (ii) willful misconduct of the

448  Contracting Officer or any of its officers, employees, agents, and assigns, including the

449  Operating Non-Federal Entity(ies); (iii) negligence of the Contracting Officer or any of its

450  officers, employees, agents, and assigns, including the Operating Non-Federal Entity(ies); or (iv)

451  a malfunction of facilities owned and/or operated by the United States or the Operating Non-

452  Federal Entity(ies).

453  MEASUREMENT OF WATER WITHIN THE CONTRACTOR'S SERVICE AREA

454  6.  (a)  The Contractor has established a measuring program satisfactory to the

455  Contracting Officer. The Contractor shall ensure that all surface water delivered for irrigation

456  purposes within the Contractor's Service Area is measured at each agricultural turnout and such

457  water delivered for M&I purposes is measured at each M&I service connection. The water

458  measuring devices or water measuring methods of comparable effectiveness must be acceptable

459  to the Contracting Officer. The Contractor shall be responsible for installing, operating,

460  maintaining, and repairing all such measuring devices and implementing all such water

461  measuring methods at no cost to the United States. The Contractor shall use the information

462  obtained from such water measuring devices or water measuring methods to ensure its proper

463  management of the water; to bill water users for water delivered by the Contractor; and, if

464  applicable, to record water delivered for M&I purposes by customer class as defined in the

465  Contractor's water conservation plan provided for in Article 25 of this Contract. Nothing herein

466  contained, however, shall preclude the Contractor from establishing and collecting any charges,

467  assessments, or other revenues authorized by California law. The Contractor shall include a

22

468    summary of all its annual surface water deliveries in the annual report described in subdivision

469    (c) of Article 25 of this Contract.

470          (b)    To the extent the information has not otherwise been provided, upon

471    execution of this Contract, the Contractor shall provide to the Contracting Officer a written

472    report describing the measurement devices or water measuring methods being used or to be used

473    to implement subdivision (a) of this Article and identifying the agricultural turnouts and the M&I

474    service connections or alternative measurement programs approved by the Contracting Officer,

475    at which such measurement devices or water measuring methods are being used, and, if

476    applicable, identifying the locations at which such devices and/or methods are not yet being used

477    including a time schedule for implementation at such locations.  The Contracting Officer shall

478    advise the Contractor in writing within 60 days as to the adequacy and necessary modifications,

479    if any, of the measuring devices or water measuring methods identified in the Contractor's report

480    and if the Contracting Officer does not respond in such time, they shall be deemed adequate.  If

481    the Contracting Officer notifies the Contractor that the measuring devices or methods are

482    inadequate, the parties shall within 60 days following the Contracting Officer's response,

483    negotiate in good faith the earliest practicable date by which the Contractor shall modify said

484    measuring devices and/or measuring methods as required by the Contracting Officer to ensure

485    compliance with subdivision (a) of this Article.

486          (c)    All new surface water delivery systems installed within the Contractor's

487    Service Area after the Effective Date shall also comply with the measurement provisions

488    described in subdivision (a) of this Article.

23

489   (d)   The Contractor shall inform the Contracting Officer and the State of
490 California in writing by April 30 of each Year of the monthly volume of surface water delivered
491 within the Contractor's Service Area during the previous Year.

492   (e)   The Contractor shall inform the Contracting Officer and the Operating
493 Non-Federal Entity(ies) on or before the 20th calendar day of each month of the quantity of
494 Irrigation Water and M&I Water taken during the preceding month.

495   <u>RATES, METHOD OF PAYMENT FOR WATER AND ACCELERATED
496   REPAYMENT OF FACILITIES</u>

497   7.   (a)   Notwithstanding the Contractor's full prepayment of the Repayment
498 Obligation pursuant to Section 4011, subsection (a)(2)(A) and subsection (a)(3)(A) of the WIIN
499 Act, as set forth in Exhibit "C", and any payments required pursuant to Section 4011, subsection
500 (b) of the WIIN Act, to reflect the adjustment for the final cost allocation as described in this
501 Article, subsection (b), the Contractor's Project construction and other obligations shall be
502 determined in accordance with: (i) the Secretary's ratesetting policy for Irrigation Water adopted
503 in 1988 and the Secretary's then-existing ratesetting policy for M&I Water, consistent with the
504 WIIN Act; and such ratesetting policies shall be amended, modified, or superseded only through
505 a public notice and comment procedure; (ii) applicable Federal Reclamation law and associated
506 rules and regulations, or policies; and (iii) other applicable provisions of this Contract.  Payments
507 shall be made by cash transaction, electronic funds transfers, or any other mechanism as may be
508 agreed to in writing by the Contractor and the Contracting Officer.  The Rates, Charges, and
509 Tiered Pricing Component applicable to the Contractor upon execution of this Contract are set
510 forth in Exhibit "B", as may be revised annually.

511         (1)     The Contractor shall pay the United States as provided for in this

512   Article of this Contract for all Delivered Water at Rates, Charges, and Tiered Pricing Component

513   in accordance with policies for Irrigation Water and M&I Water. The Contractor's Rates shall

514   be established to recover its estimated reimbursable costs included in the operation and

515   maintenance component of the Rate and amounts established to recover deficits and other

516   charges, if any, including construction costs as identified in the following subdivisions.

517         (2)     In accordance with the WIIN Act, the Contractor's allocable share

518   of Project construction costs will be repaid pursuant to the provisions of this Contract.

519         (A)     The amount due and payable to the United States, pursuant

520   to the WIIN Act, shall be the Repayment Obligation. The Repayment Obligation has been

521   computed by the Contracting Officer in a manner consistent with the WIIN Act and is set forth

522   as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual

523   installments (Irrigation Only) to be repaid no later than three (3) years after the Effective Date as

524   set forth in Exhibit "C". The Repayment Obligation is due in lump sum by March 1, 2022 as

525   provided by the WIIN Act. The Contractor must provide appropriate notice to the Contracting

526   Officer in writing no later than thirty (30) days prior to the Effective Date, if electing to repay the

527   amount due using the lump sum alternative. If such notice is not provided by such date, the

528   Contractor shall be deemed to have elected the installment payment alternative, in which case,

529   the first such payment shall be made no later than March 1, 2022. The second payment shall be

530   made no later than the first anniversary of the first payment date. The third payment shall be

531   made no later than the second anniversary of the first payment date. The final payment shall be

532   made no later than January 1, 2025. If the installment payment option is elected by the

533    Contractor, the Contractor may pre-pay the remaining portion of the Repayment Obligation by

534    giving the Contracting Officer sixty (60) days written notice, in which case, the Contracting

535    Officer shall re-compute the remaining amount due to reflect the pre-payment using the same

536    methodology as was used to compute the initial annual installment payment amount, which is

537    illustrated in Exhibit "C". Notwithstanding any Additional Capital Obligation that may later be

538    established, receipt of the Contractor's payment of the Repayment Obligation to the United

539    States shall fully and permanently satisfy the Existing Capital Obligation.

540                   (B)      Additional Capital Obligations that are not reflected in, the

541    schedules referenced in Exhibit "C" and properly assignable to the Contractor, shall be repaid as

542    prescribed by the WIIN Act without interest except as required by law. Consistent with Federal

543    Reclamation law, interest shall continue to accrue on the M&I portion of the Additional Capital

544    Obligation assigned to the Contractor until such costs are paid. Increases or decreases in the

545    Additional Capital Obligation assigned to the Contractor caused solely by annual adjustment of

546    the Additional Capital Obligation assigned to each Project contractor by the Secretary shall not

547    be considered in determining the amounts to be paid pursuant to this subdivision (a)(2)(B),

548    however, will be considered under subdivision (b) of this Article. A separate agreement shall be

549    established by the Contractor and the Contracting Officer to accomplish repayment of the

550    Additional Capital Obligation assigned to the Contractor within the timeframe prescribed by the

551    WIIN Act, subject to the following:

552                   (1)      If the collective Additional Capital Obligation

553    properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

554    is less than five million dollars ($5,000,000), then the portion of such costs properly assignable

26

555   to the Contractor shall be repaid not more than five (5)-years after the Contracting Officer

556   notifies the Contractor of the Additional Capital Obligation; _Provided. That_ the reference to the

557   amount of five million dollars ($5,000,000) shall not be a precedent in any other context.

558                          (2)      If the collective Additional Capital Obligation

559   properly assignable to the contractors exercising conversion under Section 4011 of the WIIN Act

560   is equal to or greater than five million dollars ($5,000,000), then the portion of such costs

561   properly assignable to the Contractor shall be repaid as provided by applicable Federal

562   Reclamation law and Project ratesetting policy; _Provided. That_ the reference to the amount of

563   five million dollars ($5,000,000) shall not be a precedent in any other context.

564              (b)     In the event that the final cost allocation referenced in Section 4011(b) of

565   the WIIN Act determines that the costs properly assignable to the Contractor are greater than

566   what has been paid by the Contractor, the Contractor shall be obligated to pay the remaining

567   allocated costs. The term of such additional repayment contract shall be not less than one (1)

568   year and not more than ten (10) years, however, mutually agreeable provisions regarding the rate

569   of repayment of such amount may be developed by the Contractor and Contracting Officer. In

570   the event that the final cost allocation indicates that the costs properly assignable to the

571   Contractor are less than what the Contractor has paid, the Contracting Officer shall credit such

572   overpayment as an offset against any outstanding or future obligations of the Contractor, with the

573   exception of Restoration Fund charges pursuant to Section 3407(d) of Pub. L. 102-575.

574            (c)     The Contracting Officer shall notify the Contractor of the Rates, Charges,

575   and Tiered Pricing Component as follows:

576                           (1)      Prior to July 1 of each Calendar Year, the Contracting Officer shall

27

577 provide the Contractor an estimate of the Charges for Project Water that will be applied to the

578 period October 1, of the current Calendar Year, through September 30, of the following Calendar

579 Year, and the basis for such estimate. The Contractor shall be allowed not less than two months

580 to review and comment on such estimates. On or before September 15 of each Calendar Year,

581 the Contracting Officer shall notify the Contractor in writing of the Charges to be in effect during

582 the period October 1 of the current Calendar Year, through September 30, of the following

583 Calendar Year, and such notification shall revise Exhibit "B."

584       (2)    Prior to October 1 of each Calendar Year, the Contracting Officer

585 shall make available to the Contractor an estimate of the Rates and Tiered Pricing Component

586 for Project Water for the following Year and the computations and cost allocations upon which

587 those Rates are based. The Contractor shall be allowed not less than two months to review and

588 comment on such computations and cost allocations. By December 31 of each Calendar Year,

589 the Contracting Officer shall provide the Contractor with the final Rates and Tiered Pricing

590 Component to be in effect for the upcoming Year, and such notification shall revise Exhibit "B."

591       (d)    At the time the Contractor submits the initial schedule for the delivery of

592 Project Water for each Year pursuant to subdivision (b) of Article 4 of this Contract, the

593 Contractor shall make an advance payment to the United States equal to the total amount payable

594 pursuant to the applicable Rate(s) set under subdivision (a) of this Article, for the Project Water

595 scheduled to be delivered pursuant to this Contract during the first two calendar months of the

596 Year. Before the end of the first month and before the end of each calendar month thereafter, the

597 Contractor shall make an advance payment to the United States, at the Rate(s) set under

598 subdivision (a) of this Article, for the Water Scheduled to be delivered pursuant to this Contract

28

599    during the second month immediately following. Adjustments between advance payments for

600    Water Scheduled and payments at Rates due for Water Delivered shall be made before the end of

601    the following month; *Provided, That* any revised schedule submitted by the Contractor pursuant

602    to Article 4 of this Contract which increases the amount of Water Delivered pursuant to this

603    Contract during any month shall be accompanied with appropriate advance payment, at the Rates

604    then in effect, to assure that Project Water is not delivered to the Contractor in advance of such

605    payment. In any month in which the quantity of Water Delivered to the Contractor pursuant to

606    this Contract equals the quantity of Water Scheduled and paid for by the Contractor, no

607    additional Project Water shall be delivered to the Contractor unless and until an advance

608    payment at the Rates then in effect for such additional Project Water is made. Final adjustment

609    between the advance payments for the Water Scheduled and payments for the quantities of Water

610    Delivered during each Year pursuant to this Contract shall be made as soon as practicable but no

611    later than April 30th of the following Year, or 60 days after the delivery of Project Water

612    rescheduled under subdivision (g) of Article 3 of this Contract if such water is not delivered by

613    the last day of February.

614          (e)     The Contractor shall also make a payment in addition to the Rate(s) in

615    subdivision (d) of this Article to the United States for Water Delivered, at the Charges and the

616    appropriate Tiered Pricing Component then in effect, before the end of the month following the

617    month of delivery; *Provided, That* the Contractor may be granted an exception from the Tiered

618    Pricing Component pursuant to subdivision (k)(2) of this Article. The payments shall be

619    consistent with the quantities of Irrigation Water and M&I Water Delivered as shown in the

620    water delivery report for the subject month prepared by the Operating Non-Federal Entity or, if

621    there is no Operating Non-Federal Entity, by the Contracting Officer. The water delivery report

622    shall be deemed a bill for the payment of Charges and the applicable Tiered Pricing Component

623    for Water Delivered. Adjustment for overpayment or underpayment of Charges shall be made

624    through the adjustment of payments due to the United States for Charges for the next month.

625    Any amount to be paid for past due payment of Charges and the Tiered Pricing Component shall

626    be computed pursuant to Article 19 of this Contract.

627             (f)    The Contractor shall pay for any Water Delivered under subdivision (a),

628    (f), or (g) of Article 3 of this Contract as determined by the Contracting Officer pursuant to

629    applicable statutes, associated regulations, any applicable provisions of guidelines or ratesetting

630    policies; *Provided. That* the Rate for Water Delivered under subdivision (f) of Article 3 of this

631    Contract shall be no more than the otherwise applicable Rate for Irrigation Water or M&I Water

632    under subdivision (a) of this Article.

633             (g)    Payments to be made by the Contractor to the United States under this

634    Contract may be paid from any revenues available to the Contractor.

635             (h)    All revenues received by the United States from the Contractor relating to

636    the delivery of Project Water or the delivery of non-Project water through Project facilities shall

637    be allocated and applied in accordance with Federal Reclamation law and the associated rules or

638    regulations, and the then-current Project ratesetting policies for M&I Water or Irrigation Water.

639             (i)    The Contracting Officer shall keep its accounts pertaining to the

640    administration of the financial terms and conditions of its long-term contracts, in accordance

641    with applicable Federal standards, so as to reflect the application of Project costs and revenues.

642    The Contracting Officer shall, each Year upon request of the Contractor, provide to the

643     Contractor a detailed accounting of all Project and Contractor expense allocations, the

644     disposition of all Project and Contractor revenues, and a summary of all water delivery

645     information. The Contracting Officer and the Contractor shall enter into good faith negotiations

646     to resolve any discrepancies or disputes relating to accountings, reports, or information.

647     (j)     The parties acknowledge and agree that the efficient administration of this

648     Contract is their mutual goal. Recognizing that experience has demonstrated that mechanisms,

649     policies, and procedures used for establishing Rates, Charges, and Tiered Pricing Component,

650     and/or for making and allocating payments, other than those set forth in this Article may be in

651     the mutual best interest of the parties, it is expressly agreed that the parties may enter into

652     agreements to modify the mechanisms, policies, and procedures for any of those purposes while

653     this Contract is in effect without amending this Contract.

654     (k)     (1)     Beginning at such time as deliveries of Project Water in a Year

655     exceed 80 percent of the Contract Total, then before the end of the month following the month of

656     delivery the Contractor shall make an additional payment to the United States equal to the

657     applicable Tiered Pricing Component. The Tiered Pricing Component for the amount of Water

658     Delivered in excess of 80 percent of the Contract Total, but less than or equal to 90 percent of the

659     Contract Total, shall equal one-half of the difference between the Rate established under

660     subdivision (a) of this Article and the Irrigation Full Cost Water Rate or M&I Full Cost Water

661     Rate, whichever is applicable. The Tiered Pricing Component for the amount of Water

662     Delivered which exceeds 90 percent of the Contract Total shall equal the difference between (i)

663     the Rate established under subdivision (a) of this Article and (ii) the Irrigation Full Cost Water

664     Rate or M&I Full Cost Water Rate, whichever is applicable. For all Water Delivered pursuant to

665   subdivision (a) of Article 3 of this Contract which is in excess of 80 percent of the Contract

666   Total, this increment shall be deemed to be divided between Irrigation Water and M&I Water in

667   the same proportion as actual deliveries of each bear to the cumulative total Water Delivered.

668              (2)    Subject to the Contracting Officer's written approval, the

669   Contractor may request and receive an exemption from such Tiered Pricing Component for

670   Project Water delivered to produce a crop which the Contracting Officer determines will provide

671   significant and quantifiable habitat values for waterfowl in fields where the water is used and the

672   crops are produced; _Provided, That_ the exemption from the Tiered Pricing Component for

673   Irrigation Water shall apply only if such habitat values can be assured consistent with the

674   purposes of the CVPIA through binding agreements executed with or approved by the

675   Contracting Officer prior to use of such water.

676              (3)    For purposes of determining the applicability of the Tiered Pricing

677   Component pursuant to this Article, Water Delivered shall include Project Water that the

678   Contractor transfers to others but shall not include Project Water transferred to the Contractor,

679   nor shall it include the additional water provided to the Contractor under the provisions of

680   subdivision (f) of Article 3 of this Contract.

681              (l)    For the term of this Contract, Rates applied under the respective

682   ratesetting policies will be established to recover only reimbursable O&M (including any

683   deficits) and capital costs of the Project, as those terms are used in the then-current Project

684   ratesetting policies, and interest, where appropriate, except in instances where a minimum Rate is

685   applicable in accordance with the relevant Project ratesetting policy. Changes of significance in

686   practices which implement the Contracting Officer's ratesetting policies will not be implemented

687 until the Contracting Officer has provided the Contractor an opportunity to discuss the nature,

688 need, and impact of the proposed change.

689         (m)    Except as provided in subsections 3405(a)(1)(B) and 3405(f) of the

690 CVPIA, the Rates for Project Water transferred by the Contractor shall be the Contractor's Rates,

691 in accordance with the applicable Project ratesetting policy, adjusted upward or downward to

692 reflect the changed costs, if any, incurred by the Contracting Officer in the delivery of the

693 transferred Project Water to the transferee's point of delivery. If the Contractor is receiving

694 lower Rates and Charges because of inability to pay and is transferring Project Water to another

695 entity whose Rates and Charges are not adjusted due to inability to pay, the Rates and Charges

696 for transferred Project Water shall not be adjusted to reflect the Contractor's inability to pay.

697         (n)    Pursuant to the Act of October 27, 1986 (100 Stat. 3050), the Contracting

698 Officer is authorized to adjust determinations of ability to pay every five years.

699         (o)    Omitted.

700 <div align="center">NON-INTEREST BEARING O&M DEFICITS</div>

701     8.    The Contractor and the Contracting Officer concur that, as of the Effective Date

702 the Contractor has no non-interest bearing O&M deficits and shall have no further liability

703 therefore.

704 <div align="center">SALES, TRANSFERS, OR EXCHANGES OF WATER</div>

705     9.    (a)    The right to receive Project Water provided for in this Contract may be

706 sold, transferred, or exchanged to others for reasonable and beneficial uses within the State of

707 California if such sale, transfer, or exchange is authorized by applicable Federal and State laws,

708 and applicable guidelines or regulations then in effect. No sale, transfer, or exchange of Project

709    Water under this Contract may take place without the prior written approval of the Contracting

710    Officer, except as provided for in subdivision (b) of this Article, and no such sales, transfers, or

711    exchanges shall be approved absent all appropriate environmental documentation, including, but

712    not limited to, documents prepared pursuant to the NEPA and ESA. Such environmental

713    documentation should include, as appropriate, an analysis of groundwater impacts and economic

714    and social effects, including environmental justice, of the proposed water transfers on both the

715    transferor and transferee.

716           (b)     In order to facilitate efficient water management by means of water

717    transfers of the type historically carried out among Project Contractors located within the same

718    geographical area and to allow the Contractor to participate in an accelerated water transfer

719    program during the term of this Contract, the Contracting Officer shall prepare, as appropriate,

720    all necessary environmental documentation, including, but not limited to, documents prepared

721    pursuant to the NEPA and ESA, analyzing annual transfers within such geographical areas and

722    the Contracting Officer shall determine whether such transfers comply with applicable law.

723    Following the completion of the environmental documentation, such transfers addressed in such

724    documentation shall be conducted with advance notice to the Contracting Officer, but shall not

725    require prior written approval by the Contracting Officer. Such environmental documentation

726    and the Contracting Officer's compliance determination shall be reviewed every five years and

727    updated, as necessary, prior to the expiration of the then existing five (5)-year period. All

728    subsequent environmental documentation shall include an alternative to evaluate not less than the

729    quantity of Project Water historically transferred within the same geographical area.

730           (c)     For a water transfer to qualify under subdivision (b) of this Article, such

34

731 water transfer must: (i) be for irrigation purposes for lands irrigated within the previous three

732 years, for M&I use, groundwater recharge, groundwater banking, or similar groundwater

733 activities, surface water storage, or fish and wildlife resources; not lead to land conversion; and

734 be delivered to established cropland, wildlife refuges, groundwater basins, or M&I use; (ii) occur

735 within a single Year; (iii) occur between a willing seller and a willing buyer; (iv) convey water

736 through existing facilities with no new construction or modifications to facilities and be between

737 existing Project Contractors and/or the Contractor and the United States, Department of the

738 Interior; and (v) comply with all applicable Federal, State, and local or tribal laws and

739 requirements imposed for protection of the environment and Indian Trust Assets, as defined

740 under Federal law.

741 <u>APPLICATION OF PAYMENTS AND ADJUSTMENTS</u>

742     10.   (a)    The amount of any overpayment by the Contractor of the Contractor's

743 O&M, capital, and deficit (if any) obligations for the Year shall be applied first to any current

744 liabilities of the Contractor arising out of this Contract then due and payable. Overpayments of

745 more than $1,000 shall be refunded at the Contractor's request. In lieu of a refund, any amount

746 of such overpayment, at the option of the Contractor, may be credited against amounts to become

747 due to the United States by the Contractor. With respect to overpayment, such refund or

748 adjustment shall constitute the sole remedy of the Contractor or anyone having or claiming to

749 have the right to the use of any of the Project Water supply provided for by this Contract. All

750 credits and refunds of overpayments shall be made within 30 days of the Contracting Officer

751 obtaining direction as to how to credit or refund such overpayment in response to the notice to

752 the Contractor that it has finalized the accounts for the Year in which the overpayment was

753 made.

754       (b)    All advances for miscellaneous costs incurred for work requested by the

755 Contractor pursuant to Article 24 of this Contract shall be adjusted to reflect the actual costs

756 when the work has been completed. If the advances exceed the actual costs incurred, the

757 difference will be refunded to the Contractor. If the actual costs exceed the Contractor's

758 advances, the Contractor will be billed for the additional costs pursuant to Article 24 of this

759 Contract.

760                 <u>TEMPORARY REDUCTIONS – RETURN FLOWS</u>

761     11.    (a)    Subject to: (i) the authorized purposes and priorities of the Project and the

762 requirements of Federal law, and (ii) the obligations of the United States under existing

763 contracts, or renewals thereof, providing for water deliveries from the Project, the Contracting

764 Officer shall make all reasonable efforts to optimize Project Water deliveries to the Contractor as

765 provided in this Contract.

766       (b)    The Contracting Officer or Operating Non-Federal Entity(ies) may

767 temporarily discontinue or reduce the quantity of Water Delivered to the Contractor as herein

768 provided for the purposes of investigation, inspection, maintenance, repair, or replacement of any

769 of the Project facilities or any part thereof necessary for the delivery of Project Water to the

770 Contractor, but so far as feasible the Contracting Officer or Operating Non-Federal Entity(ies)

771 will give the Contractor due notice in advance of such temporary discontinuance or reduction,

772 except in case of emergency, in which case no notice need be given; *Provided, That* the United

773 States shall use its best efforts to avoid any discontinuance or reduction in such service. Upon

774 resumption of service after such discontinuance or reduction, and if requested by the Contractor,

775    the United States will, if possible, deliver the quantity of Project Water which would have been

776    delivered hereunder in the absence of such discontinuance or reduction.

777           (c)      The United States reserves the right to all seepage and return flow water

778    derived from Water Delivered to the Contractor hereunder which escapes or is discharged

779    beyond the Contractor's Service Area; _Provided, That_ this shall not be construed as claiming for

780    the United States any right to seepage or return flow being put to reasonable and beneficial use

781    pursuant to this Contract within the Contractor's Service Area by the Contractor or those

782    claiming by, through, or under the Contractor.

783                     <u>CONSTRAINTS ON THE AVAILABILITY OF WATER</u>

784      12.     (a)      In its operation of the Project, the Contracting Officer will use all
785    reasonable means to guard against a Condition of Shortage in the quantity of Project Water to be
786    made available to the Contractor pursuant to this Contract. In the event the Contracting Officer
787    determines that a Condition of Shortage appears probable, the Contracting Officer will notify the
788    Contractor of said determination as soon as practicable.

789           (b)      If there is a Condition of Shortage because of inaccurate runoff forecasting
790    or other similar operational errors affecting the Project; drought and other physical or natural
791    causes beyond the control of the Contracting Officer; or actions taken by the Contracting Officer
792    to meet current and future legal obligations, then, except as provided in subdivision (a) of Article
793    17 of this Contract, no liability shall accrue against the United States or any of its officers,
794    agents, or employees for any damage, direct or indirect, arising therefrom.

795           (c)      In any Year in which there may occur a Condition of Shortage for any of

796    the reasons specified in subdivision (b) of this Article, and subject to subdivision (d) of this

797    Article, the Contracting Officer will first allocate the available Project Water consistent with the

798    Project M&I Water Shortage Policy as finally adopted after environmental review for

799    determining the amount of Project Water Available for delivery to the Project Contractors.

800    Subject to the foregoing allocation, in any year in which there may occur a Condition of

801    Shortage, the Contracting Officer shall then apportion Project Water among the Contractor and

802    others entitled to Project Water from Delta Division Facilities under long-term water service or

803    repayment contracts (or renewals thereof or binding commitments therefore) in force on

804    February 28, 2005, as follows:

805    (1)    The Contracting Officer shall make an initial and subsequent

806    determination as necessary of the total quantity of Project Water estimated to be scheduled or

807    actually scheduled under subdivision (b) of Article 4 of this Contract and under all other interim

808    renewal, long-term water service or repayment contracts then in force for the delivery of Project

809    Water by the United States from Delta Division Facilities during the relevant Year, the quantity

810    so determined being hereinafter referred to as the scheduled total;

811    (2)    A determination shall be made of the total quantity of Project

812    Water that is available for meeting the scheduled total, the quantity so determined being

813    hereinafter referred to as the available supply;

814    (3)    The total quantity of Project Water estimated to be scheduled or

815    actually scheduled by the Contractor during the relevant Year, under subdivision (b) of Article 4

816    of this Contract, shall be divided by the scheduled total, the quotient thus obtained being

817    hereinafter referred to as the Contractor's proportionate share; and

818    (4)    The available supply shall be multiplied by the Contractor's

819    proportionate share and the result shall be the quantity of Project Water made available by the

820    United States to the Contractor for the relevant Year in accordance with the schedule developed

821    by the Contracting Officer under subdivision (c)(1) of this Article 12, but in no event shall such

822    amount exceed the Contract Total.  In the event the Contracting Officer subsequently determines

823    that the Contracting Officer can increase or needs to decrease the available supply for delivery

824    from Delta Division Facilities to long-term water service and repayment contractors during the

825    relevant Year, such additions or reductions to the available supply shall be apportioned

826    consistent with subparagraphs (1) through (4), inclusive.

827           (d)    By entering into this Contract, the Contractor does not waive any legal

828    rights or remedies it may have to file or participate in any administrative or judicial proceeding

829    contesting: (i) the sufficiency of the Project M&I Water Shortage Policy; (ii) the substance of

830    such a policy; (iii) the applicability of such a policy; or (iv) the manner in which such policy is

831    implemented in order to allocate Project Water between M&I and irrigation purposes; *Provided,*

832    *That* the Contractor has commenced any such judicial challenge or any administrative procedures

833    necessary to institute any judicial challenge within six months of the policy becoming final.  By

834    agreeing to the foregoing, the Contracting Officer does not waive any legal defenses or remedies

835    that it may have to assert in such a proceeding.  Nothing contained herein shall be interpreted to

836    validate or invalidate the Project M&I Water Shortage Policy.

837    <div align="center">UNAVOIDABLE GROUNDWATER PERCOLATION</div>

838        13.    (a)    To the extent applicable, the Contractor shall not be deemed to have

839    delivered Irrigation Water to Excess Lands or Ineligible Lands within the meaning of this

840    Contract if such lands are irrigated with groundwater that reaches the underground strata as an

841    unavoidable result of the delivery of Irrigation Water by the Contractor to Eligible Lands.

842           (b)    Upon complete payment of the Repayment Obligation by the Contractor,

843    this Article 13 shall no longer be applicable.

844 ## COMPLIANCE WITH FEDERAL RECLAMATION LAWS

845     14.    The parties agree that the delivery of Irrigation Water or use of Federal facilities
846 pursuant to this Contract is subject to Federal Reclamation law, including but not limited to, the
847 Reclamation Reform Act of 1982 (43 U.S.C. 390aa *et seq.*), as amended and supplemented, and
848 the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation
849 law.

850 ## PROTECTION OF WATER AND AIR QUALITY

851     15.    (a)    Omitted

852           (b)    The United States will care for, operate and maintain reserved works in a
853 manner that preserves the quality of the water at the highest level possible as determined by the
854 Contracting Officer. The United States does not warrant the quality of the water delivered to the
855 Contractor and is under no obligation to furnish or construct water treatment facilities to
856 maintain or improve the quality of water delivered to the Contractor.

857 None of the foregoing affects or modifies the obligations of the United States under Contract No.

858 14-06-200-7859A, dated August 20, 1974, with respect to Schedule 2 Water, including but not

859 limited to, Article 10 of said contract.

860           (c)    The Contractor will comply with all applicable water and air pollution
861 laws and regulations of the United States and the State of California; and will obtain all required
862 permits or licenses from the appropriate Federal, State, or local authorities necessary for the
863 delivery of water by the Contractor; and shall be responsible for compliance with all Federal,
864 State, and local water quality standards applicable to surface and subsurface drainage and/or
865 discharges generated through the use of Federal or Contractor facilities or Project Water
866 provided by the Contractor within its Service Area.

867           (d)    This Article shall not affect or alter any legal obligations of the Secretary
868 to provide drainage or other discharge services.

869           (e)    Omitted

870 ## WATER ACQUIRED BY THE CONTRACTOR OTHER THAN FROM THE UNITED
871 ## STATES

872     16.    (a)    Water or water rights now owned or hereafter acquired by the Contractor

873 other than from the United States and Irrigation Water furnished pursuant to the terms of this

874    Contract may be simultaneously transported through the same distribution facilities of the

875    Contractor subject to the following: (i) if the facilities utilized for commingling Irrigation Water

876    and non-Project water were constructed without funds made available pursuant to Federal

877    Reclamation law, the provisions of Federal Reclamation law will be applicable only to the

878    Landholders of lands which receive Irrigation Water; (ii) the eligibility of land to receive

879    Irrigation Water must be established through the certification requirements as specified in the

880    Acreage Limitation Rules and Regulations (43 CFR Part 426); (iii) the water requirements of

881    Eligible Lands within the Contractor's Service Area can be established and the quantity of

882    Irrigation Water to be utilized is less than or equal to the quantity necessary to irrigate such

883    Eligible Lands. The Contractor and the Contracting Officer concur that, as the Effective Date,

884    the Contractor has a distribution system that was constructed without the use of Federally

885    financed funds.

886            (b)     Water or water rights now owned or hereafter acquired by the Contractor,

887    other than from the United States may be stored, conveyed, and/or diverted through Project

888    facilities, subject to the completion of appropriate environmental documentation, with the

889    approval of the Contracting Officer and the execution of any contract determined by the

890    Contracting Officer to be necessary, consistent with the following provisions:

891            (1)     The Contractor may introduce non-Project water into Project

892    facilities and deliver said water to lands within the Contractor's Service Area, including

893    Ineligible Lands, subject to payment to the United States and/or to any applicable Operating

894    Non-Federal Entity of an appropriate rate as determined by the applicable Project ratesetting

895    policy, the Reclamation Reform Act of 1982, and the Project use power policy, if such Project

896    use power policy is applicable, each as amended, modified, or superseded from time to time.

897           (2)    Delivery of such non-Project water in and through Project facilities

898    shall only be allowed to the extent such deliveries do not: (i) interfere with other Project

899    purposes as determined by the Contracting Officer; (ii) reduce the quantity or quality of water

900    available to other Project Contractors; (iii) interfere with the delivery of contractual water

901    entitlements to any other Project Contractors; or (iv) interfere with the physical maintenance of

902    the Project facilities.

903           (3)    Neither the United States nor the Operating Non-Federal

904    Entity(ies) shall be responsible for control, care, or distribution of the non-Project water before it

905    is introduced into or after it is delivered from the Project facilities. The Contractor hereby

906    releases and agrees to defend and indemnify the United States and the Operating Non-Federal

907    Entity(ies), and their respective officers, agents, and employees, from any claim for damage to

908    persons or property, direct or indirect, resulting from the act(s) of the Contractor, its officers,

909    employees, agents, or assigns, in (i) extracting or diverting non-Project water from any source, or

910    (ii) diverting such non-Project water into Project facilities.

911           (4)    Diversion of such non-Project water into Project facilities shall be

912    consistent with all applicable laws, and if involving groundwater, consistent with any applicable

913    groundwater management plan for the area from which it was extracted.

914           (5)    After Project purposes are met, as determined by the Contracting

915    Officer, the United States and Project Contractors entitled to Project Water from Delta Division

916    Facilities shall share priority to utilize the remaining capacity of the facilities declared to be

917    available by the Contracting Officer for conveyance and transportation of non-Project water prior

42

918    to any such remaining capacity being made available to non-Project contractors. Other Project

919    Contractors shall have a second priority to any remaining capacity of facilities declared to be

920    available by the Contracting Officer for conveyance and transportation of non-Project water prior

921    to any such remaining capacity being made available to non-Project contractors.

922        (c)    Upon complete payment of the Repayment Obligation by the Contractor,

923    subdivision (a) of this Article 16 shall no longer be applicable.

924    <u>OPINIONS AND DETERMINATIONS</u>

925    17.    (a)    Where the terms of this Contract provide for actions to be based upon the

926    opinion or determination of either party to this Contract, said terms shall not be construed as

927    permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or

928    determinations. Both parties, notwithstanding any other provisions of this Contract, expressly

929    reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious,

930    or unreasonable opinion or determination. Each opinion or determination by either party shall be

931    provided in a timely manner. Nothing in this subdivision (a) of this Article is intended to or shall

932    affect or alter the standard of judicial review applicable under Federal law to any opinion or

933    determination implementing a specific provision of Federal law embodied in statute or

934    regulation.

935        (b)    The Contracting Officer shall have the right to make determinations

936    necessary to administer this Contract that are consistent with the provisions of this Contract, the

937    laws of the United States and of the State of California, and the rules and regulations

938    promulgated by the Secretary. Such determinations shall be made in consultation with the

939    Contractor to the extent reasonably practicable.

940 <u>COORDINATION AND COOPERATION</u>

941    18.    (a)    In order to further their mutual goals and objectives, the Contracting

942 Officer and the Contractor shall communicate, coordinate, and cooperate with each other, and

943 with other affected Project Contractors, in order to improve the O&M of the Project. The

944 communication, coordination, and cooperation regarding O&M shall include, but not be limited

945 to, any action which will or may materially affect the quantity or quality of Project Water supply,

946 the allocation of Project Water supply, and Project financial matters including, but not limited to,

947 budget issues. The communication, coordination, and cooperation provided for hereunder shall

948 extend to all provisions of this Contract. Each party shall retain exclusive decision making

949 authority for all actions, opinions, and determinations to be made by the respective party.

950    (b)    Within 120 days following the Effective Date, the Contractor, other

951 affected Project Contractors, and the Contracting Officer shall arrange to meet with interested

952 Project Contractors to develop a mutually agreeable, written Project-wide process, which may be

953 amended as necessary separate and apart from this Contract. The goal of this process shall be to

954 provide, to the extent practicable, the means of mutual communication and interaction regarding

955 significant decisions concerning Project O&M on a real-time basis.

956    (c)    In light of the factors referred to in subdivision (b) of Article 3 of this

957 Contract, it is the intent of the Secretary to improve water supply reliability. To carry out this

958 intent:

959    (1)    The Contracting Officer will, at the request of the Contractor,

960 assist in the development of integrated resource management plans for the Contractor. Further,

961 the Contracting Officer will, as appropriate, seek authorizations for implementation of

962    partnerships to improve water supply, water quality, and reliability.

963    (2)    The Secretary will, as appropriate, pursue program and project

964    implementation and authorization in coordination with Project Contractors to improve the water

965    supply, water quality, and reliability of the Project for all Project purposes.

966    (3)    The Secretary will coordinate with Project Contractors and the

967    State of California to seek improved water resource management.

968    (4)    The Secretary will coordinate actions of agencies within the

969    Department of the Interior that may impact the availability of water for Project purposes.

970    (5)    The Contracting Officer shall periodically, but not less than

971    annually, hold division-level meetings to discuss Project operations, division-level water

972    management activities, and other issues as appropriate.

973    (d)    Without limiting the contractual obligations of the Contracting Officer

974    under the other Articles of this Contract, nothing in this Article shall be construed to limit or

975    constrain the Contracting Officer's ability to communicate, coordinate, and cooperate with the

976    Contractor or other interested stakeholders or to make decisions in a timely fashion as needed to

977    protect health, safety, or the physical integrity of structures or facilities.

978    <u>CHARGES FOR DELINQUENT PAYMENTS</u>

979    19.    (a)    The Contractor shall be subject to interest, administrative, and penalty
980    charges on delinquent payments. If a payment is not received by the due date, the Contractor
981    shall pay an interest charge on the delinquent payment for each day the payment is delinquent
982    beyond the due date. If a payment becomes 60 days delinquent, the Contractor shall pay, in
983    addition to the interest charge, an administrative charge to cover additional costs of billing and
984    processing the delinquent payment. If a payment is delinquent 90 days or more, the Contractor
985    shall pay, in addition to the interest and administrative charges, a penalty charge for each day the
986    payment is delinquent beyond the due date, based on the remaining balance of the payment due

45

987    at the rate of 6 percent per year. The Contractor shall also pay any fees incurred for debt
988    collection services associated with a delinquent payment.

989           (b)    The interest rate charged shall be the greater of either the rate prescribed
990    quarterly in the <u>Federal Register</u> by the Department of the Treasury for application to overdue
991    payments, or the interest rate of 0.5 percent per month. The interest rate charged will be
992    determined as of the due date and remain fixed for the duration of the delinquent period.

993           (c)    When a partial payment on a delinquent account is received, the amount
994    received shall be applied first to the penalty charges, second to the administrative charges, third
995    to the accrued interest, and finally to the overdue payment.

996                    <u>EQUAL EMPLOYMENT OPPORTUNITY</u>

997    20.    During the performance of this Contract, the Contractor agrees as follows:

998           (a)    The Contractor will not discriminate against any employee or applicant for
999    employment because of race, color, religion, sex, sexual orientation, gender identity, or national
1000    origin. The Contractor will take affirmative action to ensure that applicants are employed, and
1001    that employees are treated during employment, without regard to their race, color, religion, sex,
1002    sexual orientation, gender identity, or national origin. Such action shall include, but not be
1003    limited to, the following: employment, upgrading, demotion, or transfer; recruitment or
1004    recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and
1005    selection for training, including apprenticeship. The Contractor agrees to post in conspicuous
1006    places, available to employees and applicants for employment, notices to be provided by the
1007    Contracting Officer setting forth the provisions of this nondiscrimination clause.

1008           (b)    The Contractor will, in all solicitations or advertisements for employees
1009    placed by or on behalf of the Contractor, state that all qualified applicants will receive
1010    consideration for employment without regard to race, color, religion, sex, sexual orientation,
1011    gender identity, or national origin.

1012           (c)    The Contractor will not discharge or in any other manner discriminate
1013    against any employee or applicant for employment because such employee or applicant has
1014    inquired about, discussed, or disclosed the compensation of the employee or applicant or another
1015    employee or applicant. This provision shall not apply to instances in which an employee who
1016    has access to the compensation information of other employees or applicants as part of such
1017    employee's essential job functions discloses the compensation of such other employees or
1018    applicants to individuals who do not otherwise have access to such information, unless such
1019    disclosure is in response to a formal complaint or charge, in furtherance of an investigation,
1020    proceeding, hearing, or action, including an investigation conducted by the employer, or is
1021    consistent with the Contractor's legal duty to furnish information.

(d)     The Contractor will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Contracting Officer, advising the labor union or workers' representative of the Contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965 and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(e)     The Contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(f)     The Contractor will furnish all information and reports required by Executive Order No. 11246 of Sept. 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the Contracting Agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(g)     In the event of the Contractor's noncompliance with the nondiscrimination clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of Sept. 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(h)     The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of Sept. 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The Contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions, including sanctions for noncompliance: _Provided_, _however_, _That_ in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

## GENERAL OBLIGATION – BENEFITS CONDITIONED UPON PAYMENT

21.     (a)     The obligation of the Contractor to pay the United States as provided in this Contract is a general obligation of the Contractor notwithstanding the manner in which the obligation may be distributed among the Contractor's water users and notwithstanding the default of individual water users in their obligation to the Contractor.

1058    (b)  The payment of charges becoming due pursuant to this Contract is a
1059 condition precedent to receiving benefits under this Contract. The United States shall not make
1060 water available to the Contractor through Project facilities during any period in which the
1061 Contractor is in arrears in the advance payment of water rates due the United States. The
1062 Contractor shall not deliver water under the terms and conditions of this Contract for lands or
1063 parties that are in arrears in the advance payment of water rates as levied or established by the
1064 Contractor.

1065    (c)  With respect to subdivision (b) of this Article, the Contractor shall have no

1066 obligation to require advance payment for water rates which it levies.

1067    <u>COMPLIANCE WITH CIVIL RIGHTS LAWS AND REGULATIONS</u>

1068  22.  (a)  The Contractor shall comply with Title VI of the Civil Rights Act of 1964
1069 (Pub. L. 88-352; 42 U.S.C. § 2000d), the Rehabilitation Act of 1973 (Pub. L. 93-112, Title V, as
1070 amended; 29 U.S.C. § 791, et seq.), the Age Discrimination Act of 1975 (Pub. L. 94-135, Title
1071 III; 42 U.S.C. 6101, et seq.), Title II of the Americans with Disabilities Act of 1990 (Pub. L.
1072 101-336; 42 U.S.C. § 12131, et seq.), and any other applicable civil rights laws, and with the
1073 applicable implementing regulations and any guidelines imposed by the U.S. Department of the
1074 Interior and/or Bureau of Reclamation.

1075    (b)  These statutes prohibit any person in the United States from being
1076 excluded from participation in, being denied the benefits of, or being otherwise subjected to
1077 discrimination under any program or activity receiving financial assistance from the Bureau of
1078 Reclamation on the grounds of race, color, national origin, disability, or age. By executing this
1079 Contract, the Contractor agrees to immediately take any measures necessary to implement this
1080 obligation, including permitting officials of the United States to inspect premises, programs, and
1081 documents.

1082    (c)  The Contractor makes this Contract in consideration of and for the
1083 purpose of obtaining any and all Federal grants, loans, contracts, property discounts, or other
1084 Federal financial assistance extended after the date hereof to the Contractor by the Bureau of
1085 Reclamation, including installment payments after such date on account of arrangements for
1086 Federal financial assistance which were approved before such date. The Contractor recognizes
1087 and agrees that such Federal assistance will be extended in reliance on the representations and
1088 agreements made in this Article and that the United States reserves the right to seek judicial
1089 enforcement thereof.

1090    (d)  Complaints of discrimination against the Contractor shall be investigated
1091 by the Contracting Officer's Office of Civil Rights.

1092 <div align="center">PRIVACY ACT COMPLIANCE</div>

1093     23.    (a)    The Contractor shall comply with the Privacy Act of 1974 (Privacy Act)
1094 (5 U.S.C. § 552a) and the Department of the Interior rules and regulations under the Privacy Act
1095 (43 C.F.R. § 2.45, et seq.) in maintaining Landholder certification and reporting records required
1096 to be submitted to the Contractor for compliance with Sections 206, 224(c), and 228 of the
1097 Reclamation Reform Act of 1982 (43 U.S.C. §§ 390ff, 390ww, and 390zz), and pursuant to 43
1098 C.F.R. § 426.18.

1099     (b)    With respect to the application and administration of the criminal penalty
1100 provisions of the Privacy Act (5 U.S.C. § 552a(i)), the Contractor and the Contractor's
1101 employees who are responsible for maintaining the certification and reporting records referenced
1102 in paragraph (a) above are considered to be employees of the Department of the Interior. See 5
1103 U.S.C. § 552a(m).

1104     (c)    The Contracting Officer or a designated representative shall provide the
1105 Contractor with current copies of the Department of the Interior Privacy Act regulations and the
1106 Bureau of Reclamation Federal Register Privacy Act System of Records Notice (Interior/WBR-
1107 31, Acreage Limitation) which govern the maintenance, safeguarding, and disclosure of
1108 information contained in the Landholders' certification and reporting records.

1109     (d)    The Contracting Officer shall designate a full-time employee of the
1110 Bureau of Reclamation to be the System Manager responsible for making decisions on denials
1111 pursuant to 43 C.F.R. §§ 2.61 and 2.64 and amendment requests pursuant to 43 C.F.R. § 2.72.
1112 The Contractor is authorized to grant requests by individuals for access to their own records.

1113     (e)    The Contractor shall forward promptly to the System Manager each
1114 proposed denial of access under 43 C.F.R. § 2.64 and each request for amendment of records
1115 filed under 43 C.F.R. § 2.71; notify the requester accordingly of such referral; and provide the
1116 System Manager with information and records necessary to prepare an appropriate response to
1117 the requester. These requirements do not apply to individuals seeking access to their own
1118 certification and reporting forms filed with the Contractor pursuant to 43 C.F.R. § 426.18 unless
1119 the requester elects to cite the Privacy Act as an authority for the request.

1120     (f)    Upon complete payment of the Repayment Obligation by the Contractor,

1121 this Article 23 will no longer be applicable.

1122 <div align="center">CONTRACTOR TO PAY CERTAIN MISCELLANEOUS COSTS</div>

1123     24.    In addition to all other payments to be made by the Contractor pursuant to this

1124 Contract, the Contractor shall pay to the United States, within 60 days after receipt of a bill and

<div align="center">49</div>

1125 detailed statement submitted by the Contracting Officer to the Contractor for such specific items

1126 of direct cost incurred by the United States for work requested by the Contractor associated with

1127 this Contract plus indirect costs in accordance with applicable Bureau of Reclamation policies

1128 and procedures. All such amounts referred to in this Article shall not exceed the amount agreed

1129 to in writing in advance by the Contractor. This Article shall not apply to costs for routine

1130 contract administration.

1131 <u>WATER CONSERVATION</u>

1132 25. (a) Prior to the delivery of water provided from or conveyed through
1133 Federally constructed or Federally financed facilities pursuant to this Contract, the Contractor
1134 shall develop a water conservation plan, as required by subsection 210(b) of the Reclamation
1135 Reform Act of 1982 and 43 C.F.R. 427.1 (Water Conservation Rules and Regulations).

1136 Additionally, an effective water conservation and efficiency program shall be based on the

1137 Contractor's water conservation plan that has been determined by the Contracting Officer to meet

1138 the conservation and efficiency criteria for evaluating water conservation plans established under

1139 Federal law. The water conservation and efficiency program shall contain definite water

1140 conservation objectives, appropriate economically feasible water conservation measures, and

1141 time schedules for meeting those objectives. Continued Project Water delivery pursuant to this

1142 Contract shall be contingent upon the Contractor's continued implementation of such water

1143 conservation program. In the event the Contractor's water conservation plan or any revised water

1144 conservation plan completed pursuant to subdivision (d) of this Article 25 have not yet been

1145 determined by the Contracting Officer to meet such criteria, due to circumstances which the

1146 Contracting Officer determines are beyond the control of the Contractor, water deliveries shall be

1147 made under this Contract so long as the Contractor diligently works with the Contracting Officer

1148    to obtain such determination at the earliest practicable date, and thereafter the Contractor

1149    immediately begins implementing its water conservation and efficiency program in accordance

1150    with the time schedules therein.

1151            (b)    Should the amount of M&I Water delivered pursuant to subdivision (a) of

1152    Article 3 of this Contract equal or exceed two thousand (2,000) acre-feet per Year, the

1153    Contractor shall implement the Best Management Practices identified by the time frames issued

1154    by the Mid-Pacific Region's then-existing conservation and efficiency criteria for such M&I

1155    Water unless any such practice is determined by the Contracting Officer to be inappropriate for

1156    the Contractor.

1157            (c)    The Contractor shall submit to the Contracting Officer a report on the

1158    status of its implementation of the water conservation plan on the reporting dates specified in the

1159    then-existing conservation and efficiency criteria established under Federal law.

1160            (d)    At five (5)-year intervals, the Contractor shall revise its water

1161    conservation plan to reflect the then-existing conservation and efficiency criteria for evaluating

1162    water conservation plans established under Federal law and submit such revised water

1163    management plan to the Contracting Officer for review and evaluation. The Contracting Officer

1164    will then determine if the water conservation plan meets the Bureau of Reclamation's then-

1165    existing conservation and efficiency criteria for evaluating water conservation plans established

1166    under Federal law.

1167            (e)    If the Contractor is engaged in direct groundwater recharge, such activity

1168    shall be described in the Contractor's water conservation plan.

1169 <u>EXISTING OR ACQUIRED WATER OR WATER RIGHTS</u>

1170    26.    Except as specifically provided in Article 16 of this Contract, the provisions of

1171 this Contract shall not be applicable to or affect non-Project water or water rights now owned or

1172 hereafter acquired by the Contractor or any user of such water within the Contractor's Service

1173 Area. Any such water shall not be considered Project Water under this Contract. In addition,

1174 this Contract shall not be construed as limiting or curtailing any rights which the Contractor or

1175 any water user within the Contractor's Service Area acquires or has available under any other

1176 contract pursuant to Federal Reclamation law.

1177 <u>OPERATION AND MAINTENANCE BY THE OPERATING NON-FEDERAL ENTITY</u>

1178    27.    (a)    The O&M of a portion of the Project facilities which serve the Contractor,

1179 and responsibility for funding a portion of the costs of such O&M, have been transferred to the

1180 San Luis & Delta-Mendota Water Authority, an Operating Non-Federal Entity by separate

1181 agreement (8-07-20-X0354-X) between the United States and Operating Non-Federal Entity San

1182 Luis & Delta-Mendota Water Authority. That separate agreement shall not interfere with or

1183 affect the rights or obligations of the Contractor or the United States hereunder.

1184        (b)    The Contracting Officer has previously notified the Contractor in writing

1185 that the O&M of a portion of the Project facilities which serve the Contractor has been

1186 transferred to the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority, and

1187 therefore, the Contractor shall pay directly to the Operating Non-Federal Entity San Luis &

1188 Delta-Mendota Water Authority, or to any successor approved by the Contracting Officer under

1189 the terms and conditions of the separate agreement between the United States and the Operating

1190 Non-Federal Entity San Luis & Delta-Mendota Water Authority described in subdivision (a) of

52

1191    this Article, all rates, charges, or assessments of any kind, including any assessment for reserve

1192    funds, which the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority or

1193    such successor determines, sets, or establishes for the O&M of the portion of the Project

1194    facilities operated and maintained by the Operating Non-Federal Entity San Luis & Delta-

1195    Mendota Water Authority or such successor.  Such direct payments to Operating Non-Federal

1196    Entity San Luis & Delta-Mendota Water Authority or such successor shall not relieve the

1197    Contractor of its obligation to pay directly to the United States the Contractor's share of the

1198    Project Rates, Charges, and Tiered Pricing Component except to the extent the Operating Non-

1199    Federal Entity San Luis & Delta-Mendota Water Authority collects payments on behalf of the

1200    United States in accordance with the separate agreement identified in subdivision (a) of this

1201    Article.

1202          (c)    For so long as the O&M of any portion of the Project facilities serving the

1203    Contractor is performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water

1204    Authority, or any successor thereto, the Contracting Officer shall adjust those components of the

1205    Rates for Water Delivered under this Contract representing the cost associated with the activity

1206    being performed by Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority

1207    or its successor.

1208          (d)    In the event the O&M of the Project facilities operated and maintained by

1209    the Operating Non-Federal Entity San Luis & Delta-Mendota Water Authority is re-assumed by

1210    the United States during the term of this Contract, the Contracting Officer shall so notify the

1211    Contractor, in writing, and present to the Contractor a revised Exhibit "B" which shall include

1212    the portion of the Rates to be paid by the Contractor for Project Water under this Contract

1213    representing the O&M costs of the portion of such Project facilities which have been re-assumed.

1214    The Contractor shall, thereafter, in the absence of written notification from the Contracting

1215    Officer to the contrary, pay the Rates, Charges, and Tiered Pricing Component specified in the

1216    revised Exhibit "B" directly to the United States in compliance with Article 7 of this Contract.

1217    <u>CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS</u>

1218    28.    The expenditure or advance of any money or the performance of any obligation of
1219    the United States under this Contract shall be contingent upon appropriation or allotment of
1220    funds. Absence of appropriation or allotment of funds shall not relieve the Contractor from any
1221    obligations under this Contract. No liability shall accrue to the United States in case funds are
1222    not appropriated or allotted.

1223    <u>BOOKS, RECORDS, AND REPORTS</u>

1224    29.    (a)    The Contractor shall establish and maintain accounts and other books and
1225    records pertaining to administration of the terms and conditions of this Contract, including the
1226    Contractor's financial transactions; water supply data; project operations, maintenance, and
1227    replacement logs; project land and rights-of-way use agreements; the water users' land-use (crop
1228    census), land-ownership, land-leasing, and water-use data; and other matters that the Contracting
1229    Officer may require. Reports shall be furnished to the Contracting Officer in such form and on
1230    such date or dates as the Contracting Officer may require. Subject to applicable Federal laws
1231    and regulations, each party to this Contract shall have the right during office hours to examine
1232    and make copies of the other party's books and records relating to matters covered by this
1233    Contract.

1234    (b)    Notwithstanding the provisions of subdivision (a) of this Article, no

1235    books, records, or other information shall be requested from the Contractor by the Contracting

1236    Officer unless such books, records, or information are reasonably related to the administration or

1237    performance of this Contract. Any such request shall allow the Contractor a reasonable period of

1238    time within which to provide the requested books, records, or information.

1239    (c)    At such time as the Contractor provides information to the Contracting

1240    Officer pursuant to subdivision (a) of this Article, a copy of such information shall be provided

1241    to the Operating Non-Federal Entity(ies).

ASSIGNMENT LIMITED – SUCCESSORS AND ASSIGNS OBLIGATED

1242

1243   30.   (a)   The provisions of this Contract shall apply to and bind the successors and
1244 assigns of the parties hereto, but no assignment or transfer of this Contract or any right or interest
1245 therein by either party shall be valid until approved in writing by the other party.

1246        (b)   The assignment of any right or interest in this Contract by either party

1247 shall not interfere with the rights or obligations of the other party to this Contract absent the

1248 written concurrence of said other party.

1249        (c)   The Contracting Officer shall not unreasonably condition or withhold

1250 approval of any proposed assignment.

SEVERABILITY

1251

1252   31.   In the event that a person or entity who is neither (i) a party to a Project contract,

1253 nor (ii) a person or entity that receives Project Water from a party to a Project contract, nor (iii)

1254 an association or other form of organization whose primary function is to represent parties to

1255 Project contracts, brings an action in a court of competent jurisdiction challenging the legality or

1256 enforceability of a provision included in this Contract and said person, entity, association, or

1257 organization obtains a final court decision holding that such provision is legally invalid or

1258 unenforceable and the Contractor has not intervened in that lawsuit in support of the plaintiff(s),

1259 the parties to this Contract shall use their best efforts to (i) within 30 days of the date of such

1260 final court decision identify by mutual agreement the provisions in this Contract which must be

1261 revised and (ii) within three months thereafter promptly agree on the appropriate revision(s).

1262 The time periods specified above may be extended by mutual agreement of the parties.  Pending

1263 the completion of the actions designated above, to the extent it can do so without violating any

1264 applicable provisions of law, the United States shall continue to make the quantities of Project

55

1265     Water specified in this Contract available to the Contractor pursuant to the provisions of this

1266     Contract which were not found to be legally invalid or unenforceable in the final court decision.

1267     <div align="center">RESOLUTION OF DISPUTES</div>

1268     32.     Should any dispute arise concerning any provisions of this Contract, or the

1269     parties' rights and obligations thereunder, the parties shall meet and confer in an attempt to

1270     resolve the dispute. Prior to the Contractor commencing any legal action, or the Contracting

1271     Officer referring any matter to the Department of Justice, the party shall provide to the other

1272     party 30 days' written notice of the intent to take such action; *Provided, That* such notice shall

1273     not be required where a delay in commencing an action would prejudice the interests of the party

1274     that intends to file suit. During the 30-day notice period, the Contractor and the Contracting

1275     Officer shall meet and confer in an attempt to resolve the dispute. Except as specifically

1276     provided, nothing herein is intended to waive or abridge any right or remedy that the Contractor

1277     or the United States may have.

1278     <div align="center">OFFICIALS NOT TO BENEFIT</div>

1279     33.     No Member of or Delegate to the Congress, Resident Commissioner, or official of
1280     the Contractor shall benefit from this Contract other than as a water user or landowner in the
1281     same manner as other water users or landowners.

1282     <div align="center">CHANGES IN CONTRACTOR'S ORGANIZATION AND/OR SERVICE AREA</div>

1283     34.     (a)     While this Contract is in effect, no change may be made in the
1284     Contractor's Service Area or organization, by inclusion or exclusion of lands or by any other
1285     changes which may affect the respective rights, obligations, privileges, and duties of either the
1286     United States or the Contractor under this Contract, including, but not limited to, dissolution,
1287     consolidation, or merger, except upon the Contracting Officer's written consent.

1288     (b)     Within 30 days of receipt of a request for such a change, the Contracting

1289     Officer will notify the Contractor of any additional information required by the Contracting

1290      Officer for processing said request, and both parties will meet to establish a mutually agreeable

1291      schedule for timely completion of the process.  Such process will analyze whether the proposed

1292      change, is likely to: (i) result in the use of Project Water contrary to the terms of this Contract;

1293      (ii) impair the ability of the Contractor to pay for Project Water furnished under this Contract or

1294      to pay for any Federally-constructed facilities for which the Contractor is responsible; and (iii)

1295      have an impact on any Project Water rights applications, permits, or licenses.  In addition, the

1296      Contracting Officer shall comply with the NEPA and the ESA.  The Contractor will be

1297      responsible for all costs incurred by the Contracting Officer in this process, and such costs will

1298      be paid in accordance with Article 24 of this Contract.

## FEDERAL LAWS

1299

1300      35.      By entering into this Contract, the Contractor does not waive its rights to contest

1301      the validity or application in connection with the performance of the terms and conditions of this

1302      Contract of any Federal law or regulation; *Provided, That* the Contractor agrees to comply with

1303      the terms and conditions of this Contract unless and until relief from application of such Federal

1304      law or regulation to the implementing provision of the Contract is granted by a court of

1305      competent jurisdiction.

## RECLAMATION REFORM ACT OF 1982

1306

1307      36.      (a)      Upon a Contractor's compliance with and discharge of the Repayment

1308      Obligation pursuant to this Contract, subsections (a) and (b) of Section 213 of the Reclamation

1309      Reform Act of 1982 (96 Stat. 1269) shall apply to affected lands.

1310      (b)      The obligation of a Contractor to pay the Additional Capital Obligation

1311      shall not affect the Contractor's status as having repaid all of the construction costs assignable to

1312     the Contractor or the applicability of subsections (a) and (b) of Section 213 of the Reclamation

1313     Reform Act of 1982 (96 Stat. 1269) once the Repayment Obligation is paid.

1314     <div align="center">CERTIFICATION OF NONSEGREGATED FACILITIES</div>

1315        37.    The Contractor hereby certifies that it does not maintain or provide for its
1316     employees any segregated facilities at any of its establishments and that it does not permit its
1317     employees to perform their services at any location under its control where segregated facilities
1318     are maintained. It certifies further that it will not maintain or provide for its employees any
1319     segregated facilities at any of its establishments and that it will not permit its employees to
1320     perform their services at any location under its control where segregated facilities are
1321     maintained. The Contractor agrees that a breach of this certification is a violation of the Equal
1322     Employment Opportunity clause in this Contract. As used in this certification, the term
1323     "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms,
1324     restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas,
1325     parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing
1326     facilities provided for employees which are segregated by explicit directive or are in fact
1327     segregated on the basis of race, creed, color, or national origin, because of habit, local custom,
1328     disability, or otherwise. The Contractor further agrees that (except where it has obtained
1329     identical certifications from proposed subcontractors for specific time periods) it will obtain
1330     identical certifications from proposed subcontractors prior to the award of subcontracts
1331     exceeding $10,000 which are not exempt from the provisions of the Equal Employment
1332     Opportunity clause; that it will retain such certifications in its files; and that it will forward the
1333     following notice to such proposed subcontractors (except where the proposed subcontractors
1334     have submitted identical certifications for specific time periods):

1335           NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
1336                CERTIFICATIONS OF NONSEGREGATED FACILITIES

1337     A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract
1338     exceeding $10,000 which is not exempt from the provisions of the Equal Employment
1339     Opportunity clause. The certification may be submitted either for each subcontract or for all
1340     subcontracts during a period (i.e., quarterly, semiannually, or annually). Note: The penalty for
1341     making false statements in offers is prescribed in 18 U.S.C. § 1001.

1342     <div align="center">NOTICES</div>

1343        38.    Any notice, demand, or request authorized or required by this Contract shall be
1344     deemed to have been given, on behalf of the Contractor, when mailed, postage prepaid, or
1345     delivered to the Area Manager, South-Central California Area Office, 1243 N Street, Fresno,
1346     California 93721, Bureau of Reclamation, and on behalf of the United States, when mailed,
1347     postage prepaid, or delivered to Mr. Jerry Coelho, Coelho Family Trust, 5494 West Mount

<div align="center">58</div>

1348 Whitney, Avenue, Riverdale, California 93656. The designation of the addressee or the address
1349 may be changed by notice given in the same manner as provided in this Article for other notices.

1350                                MEDIUM FOR TRANSMITTING PAYMENT

1351        39.    (a)    All payments from the Contractor to the United States under this Contract
1352 shall be by the medium requested by the United States on or before the date payment is due. The
1353 required method of payment may include checks, wire transfers, or other types of payment
1354 specified by the United States.

1355              (b)    Upon execution of this Contract, the Contractor shall furnish the
1356 Contracting Officer with the Contractor's taxpayer's identification number (TIN). The purpose
1357 for requiring the Contractor's TIN is for collecting and reporting any delinquent amounts arising
1358 out of the Contractor's relationship with the United States.

1359                                CONTRACT DRAFTING CONSIDERATIONS

1360        40.    This amended Contract has been negotiated and reviewed by the parties hereto,
1361 each of whom is sophisticated in the matters to which this amended Contract pertains. The
1362 double-spaced Articles of this amended Contract have been drafted, negotiated, and reviewed by
1363 the parties, and no one party shall be considered to have drafted the stated Articles. Single-
1364 spaced Articles are standard Articles pursuant to Bureau of Reclamation policy.

1365                                CONFIRMATION OF CONTRACT

1366        41.    Promptly after the execution of this amended Contract, the Contractor will
1367 provide to the Contracting Officer a certified copy of a final decree of a court of competent
1368 jurisdiction in the State of California, confirming the proceedings on the part of the Contractor
1369 for the authorization of the execution of this amended Contract. This amended Contract shall not
1370 be binding on the United States until the Contractor secures a final decree.

1371    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the

1372  day and year first above written.

1373  **APPROVED AS TO LEGAL FORM AND**  UNITED STATES OF AMERICA
    **SUFFICIENCY - REVIEWED BY:**

    **OFFICE OF THE REGIONAL SOLICITOR**
    **DEPARTMENT OF THE INTERIOR**

1374          By: _____
1375            Regional Director
1376            Interior Region 10: California-Great Basin
1377            Bureau of Reclamation

1378          COELHO FAMILY TRUST
1379  (SEAL)

1380          By: _____
1381            Trustee

1371 IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and

1372 year first above written.

1373                          UNITED STATES OF AMERICA

1374                          By: _____
1375                                 Regional Director
1376                                 Interior Region 10: California-Great Basin
1377                                 Bureau of Reclamation

1378                          COEHLO FAMILY TRUST
1379 (SEAL)

1380                          By: _____
1381                             Trustee



District Boundary
Contractor's Service Area
Riparian Lands

## Coelho Family Trust
Contract No. 14-06-200-7859A-LTR1-P
EXHIBIT A

 — BUREAU OF —
RECLAMATION

Date: 4/7/2021
File Name: N:\440\Contracts\coelho_trust\coelho_20210406.mxd

0        1        2
Miles


N

214-202-901

**EXHIBIT B**
**COELHO FAMILY TRUST**
**2021 Rates and Charges**
**(Per Acre-Foot)**

| Description | Irrigation Water | M&I Water (1) |
|---|---|---|
| **COST-OF-SERVICE (COS) RATES** | | |
| Construction Cost | 0 | 0 |
|   DMC Aqueduct Intertie | 0 | 0 |
| O&M Components | | |
|   Water Marketing | $ 11.68 | 0 |
|   Storage | $ 16.70 | 0 |
| Deficit Cost | 0 | 0 |
| **TOTAL COS RATE** | $28.38 | 0 |
| **IRRIGATION FULL COST RATE** | | |
| Section 202(3) Rate is applicable to a Qualified Recipient or to a Limited Recipient receiving irrigation water on or before October 1, 1981. | TBD | 0 |
| Section 205(a)(3) Rate is applicable to a Limited Recipient that did not receive irrigation water on or before October 1, 1981. | TBD | 0 |
| **TIERED PRICING COMPONENTS** (In Addition to Total COS Rate Above) | | |
| **IRRIGATION** | | |
| *Tier 2 Rate:* >80% <=90% of Contract Total [Section 202(3) Irrigation Full Cost – Irrigation COS Rate]/2 *(Amount to be added to Tier 1 Rate)* | TBD | |
| *Tier 3 Rate:* >90% of Contract Total [Section 202(3) Irrigation Full Cost Rate – Irrigation COS Rate] *(Amount to be added to Tier 1 Rate)* | TBD | |
| **CHARGES AND ASSESSMENTS** (Payment in addition to COS rates) | | |
| P.L. 102-575 Surcharges | | |
|   Restoration Fund Payment [Section 3407(d)(2)(A)] | $ 11.23 | 0 |
| P.L. 106-377 Assessments | | |
|   Trinity Public Utilities District [Appendix B, Section 203] | $ 0.15 | 0 |

EXPLANATORY NOTES

(1) The Contractor has not projected any delivery of M&I Water for the 2021 contract year. A temporary M&I Rate will be applied upon any M&I water delivey.

Additional details of the rate components are available on the Internet at
http://www.usbr.gov/mp/cvpwaterrates/ratebooks/index.html

**EXHIBIT C**
**Repayment Obligation - Current Calculation under the WIIN Act,**
**Section 4011 (a) (2)**

Unpaid Construction Cost from the 2021 Water Rate Books*

Contractor:   Coelho Family Trust
Facility:       Delta-Mendota Pool
Contract:      14-06-200-7859A-LTR1-P

Irrigation Construction Cost (2021 Irrigation Ratebook, Schedule A-2Ba)

| Description | Unpaid Cost | Discount |
|---|---|---|
| Construction Cost | $ 322,239 | 0 |
| 2020 Repayment (Estimate) ** | $ 28,025 | 0 |
| Adjusted Construction Cost | $ 294,214 | $ 279,280 |
| Intertie Construction Cost (N/A): | $ 25,657 | $ 21,000 |
| Total | $ 319,871 | $ 300,279 |
| | | |
| If Paid in Installments (Used 20 yr CMT) | | |
| Payment 1, Due 1/1/2022**** | | $ 76,852 |
| Payment 2, Due 1/1/2023**** | | $ 76,852 |
| Payment 3, Due 1/1/2024**** | | $ 76,852 |
| Payment 4, Due 1/1/2025**** | | $ 76,852 |
| Total Installment Payments | | $ 307,407 |
| 20 yr CMT Rates - 11/26/2021 (to be adjusted to effective date of contract)@ | | 1.890% |
| Discount Rate (1/2 of the Treasury Rate per the WIIN Act, Section 4011(a)(2)(A)) | | 0.945% |

2

M&I Construction Cost (2021 M&I Ratebook, Sch A-2Ba)

| Description | Unpaid Cost |
|---|---|
| Construction Cost | $ 0 |
| 2020 Repayment (Estimate) ** | $ 0 |
| Adjusted Construction Cost***: | $ 0 |

Calculation Support: Irrigation Lump Sum or First Payment**** 1/1/2022
Days Until the End of the Fiscal Year 272

**Unpaid Allocated Construction Cost = UACC**

**Unpaid Intertie Construction Cost = UICC**

| UACC Fiscal Year | UACC Beginning Balance | UACC Straight Line Repayment | UACC Present Value | UICC Beginning Balance | UICC Straight Line Repayment | UICC Present Value | Total Present Value |
|---|---|---|---|---|---|---|---|
| 2021 | $ 294,214 | $ 29,421 | $ 28,942 | $ 25,657 | $ 597 | $ 587 | $ 29,529 |
| 2022 | $ 264,793 | $ 29,421 | $ 28,873 | $ 25,060 | $ 597 | $ 586 | $ 29,459 |
| 2023 | $ 235,371 | $ 29,421 | $ 28,603 | $ 24,464 | $ 597 | $ 580 | $ 29,183 |
| 2024 | $ 205,950 | $ 29,421 | $ 28,335 | $ 23,867 | $ 597 | $ 575 | $ 28,910 |
| 2025 | $ 176,529 | $ 29,421 | $ 28,070 | $ 23,270 | $ 597 | $ 569 | $ 28,639 |
| 2026 | $ 147,107 | $ 29,421 | $ 27,807 | $ 22,674 | $ 597 | $ 564 | $ 28,371 |
| 2027 | $ 117,686 | $ 29,421 | $ 27,547 | $ 22,077 | $ 597 | $ 559 | $ 28,105 |
| 2028 | $ 88,264 | $ 29,421 | $ 27,289 | $ 21,480 | $ 597 | $ 553 | $ 27,842 |
| 2029 | $ 58,843 | $ 29,421 | $ 27,033 | $ 20,884 | $ 597 | $ 548 | $ 27,323 |
| 2030 | $ 29,421 | $ 29,421 | $ 26,780 | $ 20,287 | $ 597 | $ 543 | $ 15,336 |
| 2031-2063 | - | - | - | $ 19,690 | $ 19,690 | $ 15,336 | $ 15,336 |
| Total Lump Sum Payment | | | $ 279,280 | | | $ 21,000 | $ 300,279 |
| Amount of Reduction, Lump Sum | | | $ 14,935 | | | $ 4,657 | $ 19,592 |

*Costs are assumed to be paid and all charges are assumed to be accurate. If at a later date charges are determined to need update, they are still required. Also, unpaid charges are still a requirement under contract.
** 2020 Repayment is based on a conservative estimate. If not sufficient, the remainder will be billed.
*** Excludes Interest to payment date as Interest will be computed as an annual expense as usual.
****Contractor has 60 days from the effective date of the contract or installment dates to make payment.
@To be updated. The WIIN Act requires us to have a Constant Maturity Treasury rate based on the effective date of the contract.

**EXHIBIT 14**

# BIOLOGICAL OPINION
# For the Reinitiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project

**Service File No.  08FBTD00-2019-F-0164**



**U.S. Fish and Wildlife Service**
**Sacramento, California**

Paul Souza, Director, Pacific Southwest Region

Signed October 21, 2019

# TABLE OF CONTENTS

List of Tables ............................................................................................. 5
List of Figures ............................................................................................ 6
List of Acronyms ........................................................................................ 12

Introduction ............................................................................................... 15
Consultation History .................................................................................. 15
Species and Critical Habitat Not Likely to be Adversely Affected ........................ 24
1.0    Consultation Approach ..................................................................... 24
2.0    Description of the Proposed Action .................................................... 27
3.0    Action Area ..................................................................................... 59
4.0    Analytical Framework ....................................................................... 59
        4.1 Analytical Framework for the Jeopardy Determination .......................... 59
        4.2 Analytical Framework for the Adverse Modification Determination...... 60
5.0    Delta Smelt and Critical Habitat ....................................................... 61
        5.1 Environmental Baseline ...................................................................... 62
        5.2 Effects to Delta Smelt from the Proposed Action................................... 135
        5.3 Effects to Delta Smelt Critical Habitat from the Proposed Action .......... 177
        5.4 Effects to Recovery ............................................................................ 199
        5.5 Cumulative Effects............................................................................. 204
        5.6 Effects of the Aggregate on Species and Critical Habitat....................... 210
        5.7 Conclusion ........................................................................................ 220
        5.8 Delta Smelt Literature Cited ................................................................ 222
6.0    California Clapper Rail
        6.1 Status of the Species .......................................................................... 248
        6.2 Environmental Baseline ...................................................................... 251
        6.3 Effects of the Proposed Action ............................................................ 252
        6.4 Effects to Recovery ............................................................................ 253
        6.5 Cumulative Effects............................................................................. 254
        6.6 Summary of the Effects from the Action ............................................... 254
        6.7 Conclusion ........................................................................................ 255
        6.8 California Clapper Rail Literature Cited................................................ 256
7.0    California Least Tern
        7.1 Status of the Species .......................................................................... 258
        7.2 Environmental Baseline ...................................................................... 264
        7.3 Effects of the Proposed Action ............................................................ 264
        7.4 Effects to Recovery ............................................................................ 265
        7.5 Cumulative Effects............................................................................. 266
        7.6 Summary of the Effects from the Action ............................................... 266
        7.7 Conclusion ........................................................................................ 267
        7.8 California Least Tern Literature Cited................................................... 268

8.0  Giant Garter Snake
    8.1 Status of the Species ...................................................................................272
    8.2 Environmental Baseline ..............................................................................274
    8.3 Effects of the Proposed Action ..................................................................277
    8.4 Effects to Recovery....................................................................................280
    8.5 Cumulative Effects.....................................................................................280
    8.6 Summary of the Effects from the Action...................................................280
    8.7 Conclusion .................................................................................................281
    8.8 Giant Garter Snake Literature Cited .........................................................282

9.0  Least Bell's Vireo
    9.1 Status of the Species ..................................................................................287
    9.2 Environmental Baseline ..............................................................................291
    9.3 Effects of the Proposed Action ..................................................................296
    9.4 Effects to Recovery....................................................................................301
    9.5 Cumulative Effects.....................................................................................301
    9.6 Summary of the Effects of the Action .......................................................302
    9.7 Conclusion .................................................................................................303
    9.8 Least Bell's Vireo Literature Cited............................................................304

10.0 Salt Marsh Harvest Mouse
    10.1 Status of the Species ................................................................................307
    10.2 Environmental Baseline ...........................................................................308
    10.3 Effects of the Proposed Action ...............................................................309
    10.4 Effects to Recovery.................................................................................311
    10.5 Cumulative Effects..................................................................................311
    10.6 Summary of the Effects from the Action.................................................311
    10.7 Conclusion ..............................................................................................312
    10.6 Salt Marsh Harvest Mouse Literature Cited ..........................................313

11.0 Soft Bird's Beak and Suisun Thistle
    11.1 Status of the Species' ..............................................................................314
    11.2 Environmental Baseline ...........................................................................316
    11.3 Effects of the Proposed Action ...............................................................317
    11.4 Effects to Recovery.................................................................................318
    11.5 Cumulative Effects..................................................................................318
    11.6 Summary of the Effects from the Action.................................................318
    11.7 Critical Habitat........................................................................................320
    11.8 Conclusion ..............................................................................................323
    11.9 Soft Bird's Beak and Suisun Thistle Literature Cited ............................324

12.0 Valley Elderberry Longhorn Beetle
    12.1 Status of the Species ................................................................................326
    12.2 Environmental Baseline ...........................................................................330
    12.3 Effects of the Proposed Action ...............................................................331
    12.4 Effects to Recovery.................................................................................339
    12.5 Cumulative Effects..................................................................................340
    12.6 Summary of the Effects from the Action.................................................340
    12.7 Conclusion ..............................................................................................341
    12.8 Valley Elderberry Longhorn Beetle Literature Cited ............................342

13.0    Riparian Brush Rabbit
            13.1 Status of the Species ................................................................344
            13.2 Environmental Baseline .............................................................347
            13.3 Effects of the Proposed Action ...................................................348
            13.4 Effects to Recovery..................................................................351
            13.5 Cumulative Effects..................................................................351
            13.6 Summary of the Effects of the Proposed Action ...................................351
            13.7 Conclusion .........................................................................352
            13.8 Riparian Brush Rabbit Literature Cited ..........................................353
14.0    Riparian Woodrat
            14.1 Status of the Species ..............................................................354
            14.2 Environmental Baseline .............................................................356
            14.3 Effects of the Proposed Action ....................................................357
            14.4 Effects to Recovery...................................................................359
            14.5 Cumulative Effects..................................................................360
            14.6 Summary of the Effects of the Proposed Action ...................................360
            14.7 Conclusion .........................................................................361
            14.8 Riparian Woodrat Literature Cited .................................................361
15.0    Western Yellow-Billed Cuckoo
            15.1 Status of the Species ..............................................................363
            15.2 Environmental Baseline .............................................................371
            15.3 Effects of the Proposed Action ....................................................377
            15.4 Effects to Recovery.................................................................381
            15.5 Cumulative Effects..................................................................382
            15.6 Summary of the Effects of the Proposed Action ...................................382
            15.7 Conclusion .........................................................................383
            15.8 Western Yellow-Billed Cuckoo Literature Cited ...................................385
16.0    Incidental Take Statement................................................................393
17.0    Conservation Recommendations ............................................................402
18.0    Reinitiation-Closing Statement..........................................................404

**Appendix 1.** DSM TN 40. Changes in delta smelt population parameters since the inception of the Formal Endangered Species Act Consultation on the Proposed Coordinated Operations of the Central Valley Project (CVP) and State Water Project (SWP). Version 6, September 24, 2019, Leo Polansky.

**Appendix 2.** Exploration of the sensitivity of proportional entrainment calculations for larval-juvenile Delta Smelt and a simple method for effects comparisons in the Reinitiation of Consultation (ROC) for the Long-term Operations of the CVP and SWP. Matt Nobriga, June 2019.

# LIST OF TABLES

**Table 1-1**  Consultation Approach for Programmatic Components of the Proposed Action

**Table 2-1**  Components of the Proposed Action

**Table 5-1**  Comparison of delta smelt primary constituent elements of critical habitat between the 1994 publication of the rule and the present.

**Table 5-2**  Estimates of adult delta smelt population size during January-February of 2002 through 2019 with 95% confidence intervals.

**Table 5-3**  Summary of habitat attribute conditions for delta smelt in six regions of the estuary that are permanently or seasonally occupied in most years.

**Table 5-4**  Summary of select projects and consultations for the delta smelt that are part of the Environmental Baseline for this consultation.

**Table 5-5**  Factors affecting delta smelt entrainment and salvage.

**Table 5-6**  Key differences between PA modeling assumptions and PA implementation language.

**Table 5-7**  Proposed management actions for the Summer-Fall Habitat component by Water Year Type (WYT).

**Table 5-8**  Summary of effects of the PA on critical habitat by life stage as compared to the COS.

**Table 5-9**  Delta counties and California population, 2000–2050.

**Table 5-10**  Delta communities population, 2000 and 2010.

**Table 7-1**  California least terns observed at Montezuma Wetlands dredge disposal site.

**Table 9-1**  Estimated number of territorial male least Bell's Vireos based on survey data compiled by the Riparian Birds Working Group (Kus *et al.* 2017).

**Table 9-2**  Summary of records of least Bell's vireo in counties in or abutting the Action Area since 1985.

**Table 15-1**  Estimated range-wide cuckoo territory numbers (Service 2013)

**Table 15-2**  Watersheds occupied by western yellow-billed cuckoo based on recent records in counties in or abutting the Action Area since 1960.

**LIST OF FIGURES**

**Figure 5-1**. Delta smelt range map. Waterways colored in purple depict the delta smelt distribution described by Merz *et al.* (2011). The Service has used newer information to expand the transient range of delta smelt further up the Napa and Sacramento rivers than indicated by Merz *et al.* (2011). The red polygon depicts the boundary of delta smelt's designated critical habitat. The inset map shows the region known as the North Delta Arc shaded light green.

**Figure 5-2.** Schematic representation of the delta smelt life cycle. This conceptual model crosswalks delta smelt life stages with calendar months and current monitoring programs (prior to EDSM) used to evaluate the species' status. Source: Moyle *et al.* 2016

**Figure 5-3.** The circa 1850 Delta as depicted in the version of the UnTRIM 3-D hydrodynamic model described by Andrews *et al.* (2017). The model depicts an expansive tidal marsh area of approximately 2,200 km$^2$ or 850 square miles. Source: Andrews *et al.* (2017).

**Figure 5-4.** Boxplots of estimated Delta outflow by month for a pre-development Bay-Delta (circa 1850; red boxes), a pre-Central Valley Project and State Water Project Bay-Delta (circa 1920; green boxes), and a contemporary Bay-Delta (blue boxes; precise year not stated by the authors). Source: Gross *et al.* (2018). The inset labeled "Annual" on the x-axis is the boxplot summary of the sum of monthly outflows. Gross *et al.* (2018) attributed the higher outflow in the pre-project era relative to the pre-development era to the levees that had been constructed in the system by 1920.

**Figure 5-5.** The northern reach of the Bay-Delta as depicted in the UnTRIM 3-D contemporary Bay-Delta model; greener colors represent shallower water and bluer colors represent deeper areas. The yellow lines depict the transect along which the location of X2 is estimated in the model and the associated red circles depict selected km distances from the Golden Gate Bridge along the northern axis of the estuary into the Sacramento and San Joaquin rivers for use in interpreting the variable locations of X2. Source: MacWilliams *et al.* (2015).

**Figure 5-6.** Maps of the Delta showing years of initial land reclamation attempts on the left and major land reclamation efforts on the right. Note that a large majority of the major reclamation efforts were underway by 1915 and the last efforts in the vicinity of Liberty Island began in 1925. Source: Whipple *et al.* (2012).

**Figure 5-7.** Time series of Central Valley Project and State Water Project exports from the Delta for 1952 through 2018. State Water Project exports began in water year 1968. Source: DAYFLOW data base.

**Figure 5-8.** Time series (1922-2015) of statistical trend outputs of annual Delta outflow (top panel), Delta exports treated as depletions so increasing exports are represented by more negative values (middle panel), and water diversions from the Sacramento River basin upstream of the Delta (bottom panel). Black symbols and lines are for years in which the eight river index, a measure of water availability in the Bay-Delta watershed, was greater than 20 million acre-feet

6

(MAF). Red symbols and lines are for years in which the eight river index was less than or equal to 20 MAF. Source: Hutton *et al.* (2017b).

**Figure 5-9**. Time series of estimates of unimpaired (upper panel) and actual (lower panel) Delta outflow (February-June) color-coded according to six water year types, 1930-2018. The water year types based on basin precipitation are shown in the upper panel. In the lower panel, the water year types were re-assessed based on their fraction of the estimated unimpaired outflow. The long-term trend in this fraction as "% of unimpaired" is shown on the second y-axis of the bottom panel. Source: Reis *et al.* (2019).

**Figure 5-10.** Time series of juvenile and larval delta smelt relative abundance as depicted by the California Department of Fish and Wildlife's Summer Townet Survey and 20-mm Survey, respectively. The townet survey began in 1959 and the 20-mm Survey began in 1995. The second y-axis was scaled to better align the indices which are calculated on different numeric scales.

**Figure 5-11.** Time series of juvenile and larval delta smelt relative abundance as depicted by the California Department of Fish and Wildlife's Fall Midwater Trawl Survey and Spring Kodiak Trawl Survey, respectively. The midwater trawl survey began in 1967 and the Kodiak trawl survey began in 2002. The second y-axis was scaled to better align the indices which are calculated on different numeric scales.

**Figure 5-12.** Estimated adult delta smelt abundance indices (on a natural log scale) for 2002-2017 (black circles; Appendix 1). The solid lines are predictions of the abundance indices from the three models described above (black=stage structured, red=annual model without a change-point, and green=annual model with a 2009 change-point). The solid lines are the mean prediction and the dashed lines represent the limits of the 95% central Bayesian credible intervals. Source: Service unpublished data analysis (Appendix 1).

**Figure 5-13.** Scatterplots of mean population growth rate (λ) from the three population trend models described above. Data points are labelled by the cohort year. Source: Service unpublished data analysis.

**Figure 5-14.** Median future abundance index predictions for delta smelt based on two of the three models described above: black=stage-structured, and green=annual model with a 2009 change-point. Solid lines reflect predictions made using pre-2009 vital rates and dashed lines reflect predictions made using ≥ 2009 vital rates. Source: Service unpublished data analysis.

**Figure 5-15.** Plots of median, maximum, and minimum number of days each year with an estimated average daily water temperature greater than or equal to 24°C (75°F) at selected sites in the Delta by decade for the 21st century. The water temperature threshold reflects one chosen by the authors to represent near lethal conditions for delta smelt. Source: Brown *et al.* (2016a).

**Figure 5-16.** Maps of multi-year average distributions of delta smelt collected in four monitoring programs. The sampling regions covered by each survey are outlined. The areas with dark shading surround sampling stations in which 90 percent of the delta smelt collections occurred,

the areas with light shading surround sampling stations in which the next 9 percent of delta smelt collections occurred. Note the lack of sampling sites in Suisun Bay and marsh for the beach seine (upper right panel). Source: Murphy and Hamilton (2013).

**Figure 5-17.** Partial residual plots for a regression model that accounts for variability in annual average concentration of suspended particulate matter at IEP station D8 in Suisun Bay as a result of its long-term trend (left panel) and its relationship to annual average Delta outflow (right panel). The blue lines are loess smoothers and the gray shading is the 95% confidence interval around the line. Source: Cloern and Jassby (2012).

**Figure 5-18**. Boxplot time series of Secchi disk depth measurements taken during the California Department of Fish and Wildlife Fall Midwater Trawl Survey, 1967-2017. The boxes depict the central 50% of observations; the line through each box is the median. The black circles are observations outside the central 95% of observations. The data have been grouped into four salinity bins based on statistical summaries of delta smelt data (Kimmerer *et al.* 2013). The salinity range graphed is reported on each panel as is the predicted fraction of FMWT delta smelt catch. Source: Service unpublished data analysis using a specific conductance to salinity conversion described by Schemel (2001) and generalized additive model results provided by W. Kimmerer.

**Figure 5-19.** Diet compositions of delta smelt collected by the Summer Townet Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are *not* copepods are Cladocerans, Mysids, Corophium spp., Fish, Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock *et al.* (2017).

**Figure 5-20.** Diet compositions of delta smelt collected by the Fall Midwater Trawl Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are *not* copepods are Cladocerans, Mysids, Corophium spp., Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock *et al.* (2017).

**Figure 5-21.** Diet compositions of delta smelt collected by the Spring Kodiak Trawl Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are *not* copepods are Cladocerans, Mysids, Corophium spp., Fish, Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock *et al.* (2017).

**Figure 5-22.** Time series (1922-2009) of statistical trend outputs of annual cross Delta flows (XGEO), net flow at Rio Vista (RIO), net flow at Jersey Point on the San Joaquin River (WEST), and net flow in Old and Middle rivers (OMR). For XGEO net north to south flows have positive values. For RIO and WEST, net seaward (downstream) flows have positive values. For OMR, which seldom has positive values, net north to south flows are depicted as negative values. The colored lines reflect the statistical trend in the time series with the different colors reflecting the relative contributions of the sources listed in the legend. Source Hutton *et al.* (2019).

**Figure 5-23.** Daily frequency that the Net Delta Outflow Index (NDOI) was at least as high as the steady-state thresholds for the D-1641 'X2 standard' for January 1 to December 31, 1968-1994 (pre-Bay Delta Accord; blue symbols) and 1995-2017 (post Bay Delta Accord; orange symbols). The X2 standards outlined in the Bay Delta Accord were adopted into D-1641. The steady-state NDOI thresholds used to calculate the frequencies were Roe Island ≥ 27,200 cfs, Chipps Island ≥ 11,400 cfs, and Collinsville ≥ 7,100 cfs. For reference, a frequency of 0.5 means an NDOI at least as high as the threshold occurred half of the time on a given day. Note that this plot is intended to provide a concise view of the seasonality of Delta outflow. It is not intended to reflect anything about compliance or non-compliance with D-1641, which can be based on Delta outflow, salinity, or X2. Source: Service unpublished analysis of the DAYFLOW database.

**Figure 5-24.** Salinity distributions of Fall Midwater Trawl catch for six pelagic San Francisco Estuary fishes, summarized by pre-overbite clam invasion years (1967-1986) and post-invasion years (1987-2017). Each Fall Midwater Trawl sample was associated with a specific conductance measurement, which was converted to practical salinity units. Annual frequencies of positive catches for each species, binned into one salinity unit increments, were divided by the total positive catch for each year-species combination, to yield proportional positive catch by salinity. Proportions represented annual distributions along the salinity gradient. Within each salinity bin and across years, the distributions of proportional catches were summarized with boxplots.

**Figure 5-25.** Annual salvage of delta smelt (all life stages) at the Skinner Fish Facility (SDFPF) and the TFCF. (Aasen and Morinaka 2018).

**Figure 5-26.** Modeled OMR flow from January to December. (Source: ROC BA 2019).

**Figure 5-27.** Mean Modeled Old and Middle River Flows, December (ROC BA 2019)

**Figure 5-28.** Mean Modeled Old and Middle River Flows, January. (ROC BA 2019)

**Figure 5-30.** Mean Modeled Old and Middle River Flows, March. (ROC BA 2019)

**Figure 5-31.** Scatterplot of monthly average OMR flow versus predicted particle entrainment 30 days after release from the four locations listed in the legend. Prisoner's Point and Stockton represent particle release sites on the main stem of the San Joaquin River. Holland Cut and Mildred Island represent particle release sites in Old and Middle rivers, respectively. Data points above the solid blue line reflect model runs in which particles were more likely than not to be entrained into the Banks and Jones pumping plants, whereas data points below the line reflect model runs in which particles were more likely than not to avoid being entrained. Data source: Service unpublished summary of data provided by CH2M Hill. Service staff queried the results from a comprehensive database of DSM-2 PTM runs for month-year combinations that bracketed an OMR range of -2,000 to -3,500 cfs; the -2,000 cfs trigger was proposed as a threshold in the ROC on LTO BA as part of the winter pulse protection action (see Table 5-6). For each release site, results are presented for 31 month-year combinations.

**Figure 5-32.** Mean Modeled Old and Middle River Flows, April. (ROC BA 2019)

**Figure 5-33.** Mean Modeled Old and Middle River Flows, May. (ROC BA 2019)

**Figure 5-34.** Mean Modeled Old and Middle River Flows, June. (ROC BA 2019)

**Figure 5-35.** Summer Electrical Conductivity at Belden's Landing. (Source: ROC BA 2019)

**Figure 5-36.** The delta smelt station-based habitat index proposed by Bever *et al.* (2016) in the Suisun Bay region at an X2 of 80 km (top panel) and at 81 km (bottom panel). Source: Effects Analysis in support of 2017 Fall X2 modification request.

**Figure 5-37.** Average annual Delta sediment budget based on water years 1999–2002, except for Threemile Slough (TMS), which is based on water years 2001 and 2002 only. Numbers are the annual suspended-sediment flux and the estimated error in thousand metric tons. Arrow thickness indicates relative magnitude of the suspended-sediment flux. Sediment deposition accounts for the decreased sediment fluxes from east to west. Additional sites are Sacramento River at Freeport (FPT), Yolo Bypass (YOL), Delta Cross Channel (DCC), Sacramento River at Rio Vista (RVS), Mallard Island (MAL), Eastside tributaries (EAST), San Joaquin River at Vernalis (VNS), San Joaquin River at Stockton (STN), exports from the State and Federal water projects (EXP), Dutch Slough (DCH), and San Joaquin River at Jersey Point (JPT). Source: Wright and Schoellhamer 2004.

**Figure 5-38.** Daily-averaged depth-average salinity in psu (practical salinity units) between Carquinez Strait and the western Delta for X2 located at 84 and 85 km (Delta Modeling Associates 2012).

**Figure 5-39.** Difference in the position of X2 in kilometer between the PA and the COS for all Junes based on 82 years of CalSim II modeling.

**Figure 5-40.** Difference in the position of X2 in kilometer between the PA and the COS for all Julys based on 82 years of CalSim II modeling.

**Figure 5-41.** Difference in the position of X2 in kilometer between the PA and the COS for all Augusts based on 82 years of CalSim II modeling.

**Figure 5-42.** Difference in the position of X2 in kilometer between the PA and the COS for all Septembers based on 82 years of CalSim II modeling.

**Figure 5-43** Difference in the position of X2 in kilometer between the PA and the COS for all Octobers based on 82 years of CalSim II modeling.

**Figure 5-44.** Difference in the position of X2 in kilometer between the PA and the COS for all Novembers based on 82 years of CalSim II modeling.

**Figure 5-45.** Difference in the position of X2 in kilometer between the PA and the COS for all Decembers based on 82 years of CalSim II modeling.

**Figure 5-46.** Comparison of the frequency of months (June-December) for the COS and PA that CalSim II modeling (n=82) indicates that X2 is at or above 85 km from the Golden Gate Bridge (no overlap of the low-salinity zone with Suisun Bay).

**Figure 5-47.** Comparison of the frequency of months that the PA and COS were modeled to meet the OMR flow threshold of -5000 cfs during the adult delta smelt dispersal period (December through March). Each month was modeled 82 times for a potential maximum frequency of 82 months times a four-month period or 328 on the y-axis. The CalSim II modeling cannot fully capture real-time operations decisions that affect OMR flow for either scenario.

**Figure 6-1.** Known current distribution of California clapper rail (Service 2013b).

**Figure 7-1**. United States nesting areas of the California least tern (*Sternula antillarum browni*), 2016. Multiple nest sites may be used within the depicted nesting areas.

**Figure 7-2.** 2016 Distribution of California least tern (*Sternula antillarum browni*) nesting pairs by region. Data derived from minimum pair estimates in Frost 2016. Southern California includes San Diego, Orange, and Los Angeles Counties.

**Figure 7-3.** Minimum and maximum estimations of breeding pairs and fledglings produced for the California least tern (*Sternula antillarum browni*) in the United States.

**Figure 12-1.** Presumed extant occurrences of the valley elderberry longhorn beetle (Service 2014). Based on observations (adult beetles and exit holes) between 1997 and 2014 within its presumed historical range. CNDDB occurrence rank of "fair, good, or excellent." Data sources: Collinge *et al.* 2001; River Partners 2007, 2010, 2011; Holyoak and Graves 2010; CDFW 2013; Collinge 2014, pers. comm.; Talley, 2014, pers. comm.; DOD 2014.

**Figure 15-1.** Current Breeding Range of the Western Yellow-Billed Cuckoo. Source: Reclamation (2018) Lower Rio Grande Yellow-billed Cuckoo Survey Results 2017. Note: Figure 15-1 depicts the most recently published map of the western yellow-billed cuckoo breeding range, but that map is based on 1987 data. Current data for New Mexico confirm a cuckoo population on the Lower Rio Grande that is not depicted on this map.

**Figure 15-2.** Modeled western yellow-billed cuckoo distribution responses to climate change. Source: California Avian Data Center (PRBO 2012).

**Figure 15-3.** Yellow-billed cuckoo pairs per survey effort on California statewide surveys 1977-2000. Source: Proposed Threatened Status for the Western Population Segment of the Yellow-billed Cuckoo (Service 2013).

**Figure 15-4.** Yellow-billed cuckoo detections during surveys on the Sacramento River on 10 separate years from 1972 to 2010. Source: Proposed Threated Status for the Western Population Segment of the Yellow-billed Cuckoo (Service 2013).

# LIST OF ACRONYMS

| | |
|---|---|
| Act | Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq*.) |
| af | acre feet |
| AFRP | Anadromous Fish Restoration Program |
| AG | agricultural |
| AMM | Avoidance and Minimization Measure |
| AMP | Adaptive Management Program |
| BA | Biological Assessment |
| BCDC | Bay Conservation and Development Commission |
| BDFWO | San Francisco Bay-Delta Fish and Wildlife Office |
| BiOp | Biological Opinion |
| BMP | Best Management Practice |
| CAMT | Collaborative Adaptive Management Team |
| CCF | Clifton Court Forebay |
| CCPP | Clifton Court Pumping Plant |
| CDFW | California Department of Fish and Wildlife |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| CHNSR | spring-run Chinook salmon |
| CHNWR | winter-run Chinook salmon |
| CNDDB | California Natural Diversity Database |
| CNOR | Candidate Notice of Review |
| COA | Coordinated Operation Agreement |
| Corps | U.S. Army Corps of Engineers |
| COS | Current Operations Scenario |
| CSAMP | Collaborative Science and Adaptive Management Program |
| CVFPB | Central Valley Flood Protection Board |
| CVP | Central Valley Project |
| CVPIA | Central Valley Project Improvement Act |
| DCC | Delta Cross Channel |
| DHCCP | Delta Habitat and Conservation Conveyance Program |
| DJFMP | Delta Juvenile Fish Monitoring Program |
| DOI | Department of the Interior |
| DRERIP | Delta Regional Ecosystem Restoration Implementation Plan |
| DSM2 | Delta Simulation Model II |
| DSP | Delta Science Program |
| DWR | Department of Water Resources |
| E/I | [Delta] export/inflow |
| EC | electrical conductivity |
| ECOS | Environmental Conservation Online System |
| EDSM | Enhanced Delta Smelt Monitoring |
| EPA | Environmental Protection Agency |
| ERP | Ecosystem Restoration Program |
| ESA | Endangered Species Act |
| FAST | Fishery Agency Strategy Team |

| | |
|---|---|
| FCCL | Fish Conservation and Culture Laboratory |
| FMWT | Fall Midwater Trawl |
| ft | feet or foot |
| FR | Federal Register |
| FRP | Fish Restoration Program |
| H | horizontal |
| ha | hectares |
| HCP | habitat conservation plan |
| HOR | Head of Old River |
| HORB | Head of Old River Barrier |
| I/E | [San Joaquin River] inflow/export |
| IEP | Interagency Ecological Program |
| IICG | Interagency Implementation and Coordination Group |
| ITS | Incidental Take Statement |
| LAA | Likely to Adversely Affect |
| LSZ | Low-Salinity Zone |
| LTO | Long-Term Operation |
| m | meter |
| MAF | million acre feet |
| MIDS | Morrow Island Distribution System |
| MHHW | Mean High Water |
| MLLW | Mean Low Water |
| MI | municipal and industrial |
| mg/L | milligrams per liter |
| mm | millimeter |
| $m^3/s$ | cubic meters per second |
| NDOI | Net Delta Outflow Index |
| NLAA | Not Likely to Adversely Affect |
| NMFS | National Marine Fisheries Service |
| No. | number |
| NPDES | National Pollutant Discharge Elimination System |
| NRDC | Natural Resources Defense Council |
| NWR | National Wildlife Refuge |
| OMR | Old and Middle river |
| PA | Proposed Action |
| PCE | Primary Constituent Elements |
| PP | pumping plant |
| ppt | parts per thousand |
| PRBO | Point Reyes Bird Observatory |
| Reclamation | U.S. Bureau of Reclamation |
| RM | river mile |
| ROC | Reinitiation of Consultation |
| RPA | Reasonable and Prudent Alternative |
| RRDS | Roaring River Distribution System |
| RTO | real-time operations |
| SBFNC | Suisun Bay Federal Navigation Channels |

| | |
|---|---|
| SCCF | South Clifton Court Forebay |
| SDWSC | Stockton Deep Water Ship Channel |
| Secretary | Secretary of the Interior |
| SERP | Small Erosion Repair Program |
| Service | U.S. Fish and Wildlife Service |
| SKT | Spring Kodiak Trawl |
| SLC | California State Lands Commission |
| SMSCG | Suisun Marsh Salinity Control Gates |
| SMUD | Sacramento Municipal Utility District |
| SPL | sound pressure level |
| sq | square feet |
| SR | State Route |
| SRDWSC | Sacramento River Deep Water Ship Channel |
| SRWTP | Sacramento Regional Wastewater Treatment Plant |
| Strategy | Delta Smelt Resiliency Strategy |
| SWP | State Water Project |
| SWPPP | Stormwater Pollution Prevention Plan |
| SWRCB | California State Water Resources Control Board |
| TAF | thousand acre feet |
| TNS | [Summer] Townet Survey |
| U.S. | United States |
| U.S.C. | United States Code |
| USGS | United States Geological Survey |
| V | vertical |
| Western | Western Area Power Administration |
| WIIN Act | Water Infrastructure Improvements for the Nation Act |
| WREM | Water Resources Engineering Memorandum |
| WQCP | Water Quality Control Plan |
| WSE | Water Surface Elevation |
| WY | water year |
| YBWA | Yolo Bypass Wildlife Area |

# INTRODUCTION

On August 2, 2016, the Bureau of Reclamation (Reclamation) and the California Department of Water Resources (DWR) jointly requested the Reinitiation of Consultation on the Coordinated Long-Term Operation of the Central Valley Project (CVP) and State Water Project (SWP) (Project). The Service accepted the reinitiation request on August 3, 2016, and the National Marine Fisheries Service (NMFS) accepted the reinitiation request on August 17, 2016.

The reasons stated in Reclamation's August 2, 2016 request for reinitiation of consultation included "new information related to multiple years of drought and recent data demonstrating low delta smelt populations, and new information available and expected to become available as a result of ongoing work through collaborative science processes." On August 3, 2016, the Service agreed with the request citing "multiple dry years and new information. We recognize that this new information is demonstrating the increasingly imperiled state of the delta smelt and its designated critical habitat, and that emerging science shows the importance of outflows to all life stages of delta smelt and to maintaining the primary constituent elements of designated critical habitat."

On January 31, 2019, Reclamation transmitted the Reinitiation of Consultation (ROC) Biological Assessment (BA) to the Service. As stated in the BA, the purpose of this action is "…to continue the coordinated long-term operation of the CVP and SWP to maximize water supply delivery and optimize power generation consistent with applicable laws, contractual obligations, and agreements; and to increase operational flexibility by focusing on nonoperational measures to avoid significant adverse effects."

Updates to the regulations governing interagency consultation (50 CFR part 402) will become effective on October 28, 2019 [84 FR 44976]. Because this consultation was pending and will be completed prior to that time, we are applying the previous regulations to the consultation. However, as the preamble to the final rule adopting the new regulations noted, "[t]his final rule does not lower or raise the bar on section 7 consultations, and it does not alter what is required or analyzed during a consultation. Instead, it improves clarity and consistency, streamlines consultations, and codifies existing practice." Thus, had this BiOp been completed under the revised regulations, it would not have altered our analysis.

# CONSULTATION HISTORY

The history of section 7 consultation on long-term operations of the CVP and SWP began in the early 1990's. Biological Opinions (BiOps) were issued by the Service in February 1994, March 1995 and July 2004, a reinitiation of the 2004 BiOp in February 2005, and the most recent BiOp was from December 2008. The consultation history up until December 2008 is hereby incorporated by reference from the December 15, 2008 *Formal Endangered Species Act Consultation on the Proposed Coordinated Operations of the Central Valley Project (CVP) and State Water Project (SWP)* (2008 BiOp). Additionally, the Service participated in Long-term Operations Biological Opinions (LOBO) Biennial Science Reviews, Collaborative Science and Adaptive Management Program (CSAMP)/Collaboration Adaptive Management Team (CAMT), 2008 BiOp Remand, Fish Restoration Program (FRP), Fishery Agency Strategy Team (FAST),

and real-time operations meetings, too numerous to include in the itemized Consultation History, since the issuance of the 2008 BiOp.

The following is the Consultation History of long-term operations of the CVP and SWP since the 2008 BiOp was issued:

February 13, 2009: Reclamation requested reinitiation of consultation on the 2008 Service BiOp to temporarily modify D-1641 based on the forecast of a critically dry water year.

February 17, 2009: The Service responded to Reclamation's request that the proposed temporary modification to D-1641 is within the range of effects analyzed in the 2008 Service BiOp.

March 3, 2009: The Westlands Water District, San Luis and Delta Mendota Water Authority, DWR, Metropolitan Water District of Southern California, Kern County Water Agency, and a number of other water agencies and other entities filed a complaint in the U.S. District Court of the Eastern District of California (District Court) seeking to have the court set aside the 2008 BiOp.

December 14, 2010: The District Court issued a decision on motions for summary judgment, finding the 2008 BiOp arbitrary and capricious and remanding it to the Service for further consideration.

May 4, 2011: The District Court issued an amended Final Judgment, ordering the Service to complete a draft revised BiOp by October 1, 2011, and a final revised BiOp by December 1, 2013.

July 22, 2011: The Service accepted Reclamation's proposed operations consistent with Component 3, Action 4 of the 2008 BiOp Reasonable and Prudent Alternative (RPA).

August 22 through September 2, 2011: Reclamation provided the Service with updated project description information.

September 29, 2011: Reclamation issued a memorandum to the Service describing planned operations for the fall of 2011. The Service issued a memorandum to Reclamation stating that projected operations for the Fall of 2011 were expected to be consistent with Component 3 of the 2008 BiOp RPA.

December 13, 2011: Reclamation transmitted a memorandum to the Service outlining a process by which they intend to develop a new project description, including actions intended to protect listed species, through a National Environmental Policy Act (NEPA) process.

December 14, 2011: The Service transmitted a first draft BiOp to Reclamation to assist in their development of a BA.

February 12, 2013: Reclamation requested reinitiation of consultation as a precautionary measure on the incidental take of adult delta smelt.

February 13, 2013: The Service agreed to reinitiate the consultation with Reclamation.

February 22, 2013: The Service issued a memorandum to Reclamation correcting the incidental take statement for adult and larval/juvenile delta smelt.

April 19, 2013: Reclamation withdrew their request for reinitiation to address possible exceedance of the incidental take limit for adult delta smelt for that water year.

January 31, 2014: Reclamation requested concurrence that February 2014 drought response actions would not result in additional adverse effects to delta smelt or its critical habitat. The Service concurred with Reclamation's determination.

February 20, 2014: Reclamation requested concurrence that implementation of the proposed Old and Middle River Index Demonstration Project would result is no additional adverse effects to delta smelt or its critical habitat.

February 25, 2014: The Service acknowledged Reclamation's "no effect" determination on the proposed Old and Middle River Index Demonstration Project.

February 27, 2014: Reclamation requested concurrence that March 2014 drought response actions would not result in additional adverse effects to delta smelt or its critical habitat.

February 28, 2014: The Service concurred with Reclamation's February 27 determination.

March 13, 2014: The Ninth Circuit Court of Appeals reversed the District Court's decision and upheld the 2008 BiOp on ESA grounds, finding that it was not arbitrary and capricious.

April 8, 2014: Reclamation reinitiated consultation to address drought response actions for the remainder of that water year. The Service concurred that April and May 2014 actions would not result in additional adverse effects beyond those previously analyzed in the 2008 BiOp but requested additional information for the June through November 2014 actions.

May 1, 2014: Reclamation requested reinitiation of consultation to address drought response actions for June through November 2014. The Service concurred that the proposed changes would have no additional adverse effects on delta smelt or its critical habitat.

September 26, 2014: Reclamation requested reinitiation of consultation to address modified drought response actions for the beginning of Water Year 2015.

October 1, 2014: The Service concurred with Reclamation's September 26 determination that the proposed modified drought response actions would have no additional adverse effects on delta smelt or its critical habitat.

January 9, 2015: Reclamation requested reinitiation of consultation on the incidental take of adult delta smelt because the concern level was nearly reached. The Service completed reinitiation approving an interim methodology for calculating incidental take until it could be replaced with a proportional entrainment method.

January 27, 2015: Reclamation submitted additional information to their January 9, 2015 request seeking concurrence that drought response actions would result in no additional adverse effects on delta smelt or its critical habitat for the months of February and March 2015.

January 30, 2015: The Service accepted Reclamation's January 27 determination.

February 9, 2015: Reclamation requested reinitiation of consultation in response to a second consecutive year of dry or critically dry conditions.

February 10, 2015: The Service responded to Reclamation's February 9 reinitiation request. The Service concurred that Reclamation's drought response actions were not likely to result in additional adverse effects beyond what was analyzed in the 2008 BiOp.

March 24, 2015: Reclamation requested concurrence that the drought response modifications would result in no additional adverse effects on delta smelt or its critical habitat for April to September 2015.

March 27, 2015: The Service accepted Reclamation's March 24 determination.

May 22, 2015: Reclamation requested concurrence that the revised drought response modifications superseding and extending the March 24, 2015 request to November 2015 are consistent with the range of effects analyzed in the 2008 BiOp.

June 25, 2015: Reclamation submitted revised drought response modifications and requested concurrence that the modifications are consistent with the range of effects analyzed in the 2008 BiOp.

June 26, 2015: The Service accepted Reclamation's May 22 and June 25 determinations.

February 10, 2016: The U.S. Army Corps of Engineers (Corps) requested formal consultation on the Tule Red Tidal Restoration Project, a project proposed to partially fulfill RPA Component 4 of the 2008 BiOp.

February 22, 2016: The Corps requested formal consultation on the Yolo Flyway Farms Restoration Project, a project proposed to partially fulfill RPA Component 4 of the 2008 BiOp.

August 1, 2016: The Service issued a BiOp on the Tule Red Tidal Restoration Project to the Corps. When constructed the project would partially fulfill RPA Component 4 of the 2008 BiOp.

August 2, 2016: Reclamation requested reinitiation of consultation on long-term operations of the CVP and SWP.

August 3, 2016: The Service responded to Reclamation's August 2, 2016 request agreeing that reinitiation of consultation was warranted.

November 21, 2016: The Corps requested formal consultation on the Decker Island Tidal Habitat Restoration Project, a project proposed to partially fulfill RPA Component 4 of the 2008 BiOp.

December 16, 2016: The Water Infrastructure Improvements for the Nation Act (WIIN Act) was signed into law, including Section 4004(a) which provided that agencies cooperate with State and local agencies in reconsultation on coordinated operations of the CVP and the SWP.

December 19, 2016: Reclamation provided the Service a draft Annotated outline of a draft Biological Assessment for ROC on LTO.

December 30, 2016: The Service, NMFS, Reclamation, California Department of Fish and Wildlife (CDFW), and DWR entered into a Memorandum of Understanding. The purposes of this Memorandum were to describe the expected tasks, processes (including schedule development), and participants for the ROC on Long-Term Operation (LTO).

February 14, 2017: Reclamation convened a meeting with stakeholders and agencies to discuss the objectives, scope, and process for the ROC on LTO.

July 17, 2017: By this date, several water agencies requested and were granted Designated Non-Federal Representative status for the ROC on LTO consultation and to review and comment on the draft biological opinions and peer review process.

February 2017 through August 2018: Reclamation, the Service, NMFS, DWR, and CDFW held a series of agency meetings to discuss multiple topics related to the ROC on LTO. Topics included, but are not limited to, relationship to other consultations, scope, baseline, Proposed Action, technical teams, effects analyses, and the NEPA and California Environmental Quality Act processes. During this time, multiple geographic and topic-specific technical teams were also meeting to discuss ideas for proposed operations of the CVP and SWP and conservation measures.

March 8, 2017: The Service received a request from Reclamation for concurrence that the extension of the Corps permit for years 2017, 2018, 2019, and 2020, increasing the maximum diversion rate into Clifton Court Forebay (CCF) during the months of July, August, and September does not require a separate section 7 consultation.

March 16, 2017: Reclamation requested reinitiation as a precautionary measure to address increasing the incidental take threshold of adult delta smelt for 2017.

March 17, 2017: The Service acknowledged Reclamation's request and agreed to further analyze potential effects.

April 10, 2017: The Service issued a memorandum to Reclamation authorizing additional incidental take of adult delta smelt for the remainder of that water year.

June 7, 2017: The Service responded to Reclamation's March 8, 2017 request that the extension of the Corps permit does not require a separate consultation or reinitiation of the 2008 BiOp.

August 24, 2017: The Service issued a BiOp on the Yolo Flyway Farms Restoration Project to the Corps. When constructed the project would partially fulfill RPA Component 4 of the 2008 BiOp.

September 7, 2017: Reclamation requested reinitiation to address implementation of a one-month modification to Component 3, Action 4 of the 2008 BiOp.

September 26, 2017: The Service issued a memorandum to Reclamation concerning effects resulting from a proposed one-month modification to the Component 3, Action 4 of the RPA of the 2008 BiOp.

November 29, 2017: The Corps requested formal consultation on the Prospect Island Tidal Restoration Project, a project proposed to partially fulfill RPA Component 4 of the 2008 BiOp.

December 12, 2017: Reclamation, the Service, and NMFS met with representatives of the Yurok and Hoopa tribes to discuss issues and considerations for the ROC on LTO.

December 27, 2017: The Service received a request from Reclamation to modify the CCF Aquatic Weed Program under the 2008 BiOp.

January 19, 2018: Reclamation convened a Delta Technical Brainstorming Workshop for multiple stakeholders and agencies.

February 14, 2018: The Service issued a BiOp on the Decker Island Tidal Habitat Restoration Project to the Corps. When constructed the project would partially fulfill RPA Component 4 of the 2008 BiOp.

March 2, 2018: Reclamation convened a Track 1 discussion for multiple stakeholders and agencies.

March 5, 2018: The Service acknowledged Reclamation's request to modify the CCF Aquatic Weed Program and determined it did not result in effects not previously analyzed in the 2008 BiOp. The Service also acknowledged Reclamation's expectation that the modifications would be incorporated in the ROC.

May 7, 2018: The Service issued a BiOp on the Prospect Island Tidal Restoration Project to the Corps. When constructed the project would partially fulfill RPA Component 4 of the 2008 BiOp.

June 14, 2018: Reclamation requested reinitiation to address a proposed operation of the Suisun Marsh Salinity Control Gates in August 2018.

June 29, 2018: The Service determined that the August 2018 proposed operation of the Suisun Marsh Salinity Control Gates would not likely result in additional adverse effects to delta smelt or its critical habitat.

October 19, 2018: The Presidential Memorandum on Promoting the Reliable Supply and Delivery of Water in the West directed the Secretaries of Interior and Commerce to streamline regulatory processes involving western water infrastructure.

November 19, 2018: The Department of the Interior and the Department of Commerce issued a reply pursuant to the October 19, 2018, Presidential Memorandum outlining the plans and deadlines for meeting several project-specific ESA and NEPA compliance requirements, including for the CVP.

November 2018 through January 2019: The Service participated in multi-agency meetings to discuss development of the BA.

January 28, 2019: The Service received the Corps request for formal consultation on the Winter Island Tidal Habitat Restoration Project, a project proposed to partially fulfill RPA Component 4 of the 2008 BiOp.

January 30, 2019: The Service issued a memorandum revising the incidental take statement for the 2008 BiOp.

January 31, 2019: Reclamation transmitted the BA for ROC on LTO.

February through October 2019: Per the WIIN Act, various meetings were held to discuss the Proposed Action and effects analyses between Reclamation, the Service, NMFS, CDFW, DWR, and stakeholders.

April 1, 2019: Reclamation transmitted revisions to Chapter 4 of the BA to the Service, NMFS, and stakeholders, which reflected changes to the Proposed Action.

April 12, 2019: The Service transmitted draft sections of the delta smelt and critical habitat analysis to the independent peer review panel, Reclamation, and DWR for review and comment. Reclamation transmitted the documents to stakeholders.

April 26, 2019 and May 3, 2019: Reclamation transmitted to the Service comments including comments from water users on the April 12, 2019 draft sections of the delta smelt and critical habitat analysis.

April 27 through 29, 2019: The Service received reports from the independent peer review reports on the draft sections of the delta smelt and critical habitat analysis.

April 30, 2019: Reclamation transmitted revisions to Chapter 4 of the BA to the Service and NMFS, which reflected changes to the Proposed Action.

June 6, 2019: The Service transmitted to Reclamation and DWR the draft sections of the analysis for delta smelt, delta smelt critical habitat, California clapper rail, California least tern, giant garter snake, least Bell's vireo, salt marsh harvest mouse, soft bird's-beak, soft bird's-beak critical habitat, Suisun thistle critical habitat, valley elderberry longhorn beetle, riparian brush rabbit, riparian woodrat. Reclamation transmitted the documents to stakeholders.

June 12, 2019: The Service received information to be considered in the development of the BiOp from a non-governmental organization.

June 14, 2019: Reclamation and DWR transmitted to the Service comments including comments from water users on the June 6, 2019 draft sections.

June 15, 2019: Reclamation transmitted revisions to Chapter 4 of the BA to the Service and NMFS, which reflected changes to the Proposed Action.

June 20, 2019: The Service met with Reclamation to discuss the draft Incidental Take Statement of this BiOp.

June 20 and 24, 2019: The Service received comments from DWR on the BiOp.

June 21, 2019: The Service transmitted the draft Incidental Take Statement to Reclamation.

July 9 through October 10, 2019: The Service participated in multi-agency meetings to discuss refinements to the Proposed Action and the Service's and NMFS' BiOps.

July 30, 2019: The Service transmitted the partial draft BiOp to an independent peer review panel, along with supplemental materials such as the revised Proposed Action and questions for which we were seeking input on our draft analysis. Reclamation shared these documents with stakeholders.

August 7, 2019: A conference call was held between the Service, other agency representatives, and the independent peer review panel to discuss their initial questions and comments.

August 9, 2019: Reclamation and the Service received comments from water users on the partial draft BiOp.

August 12, 2019: The Service received comments from the independent peer review panel on the partial draft BiOp.

September 18, 2019: The Service issued a memorandum to Reclamation concerning effects resulting from a proposed modification for part of September and all of October 2019 to the Component 3, Action 4 of the RPA of the 2008 BiOp. In a letter dated October 1, 2019, Reclamation stated that it would not implement the proposed modification.

October 3, 2019: Reclamation transmitted revisions to Chapter 4 of the BA to the Service and NMFS, which reflected changes to the Proposed Action.

October 17, 2019: Reclamation transmitted the Final BA to the Service and NMFS.

**Peer Review**

The Service obtained two separate peer reviews of its draft BiOp. The Service transmitted draft sections of the delta smelt and critical habitat analyses to independent peer review panels on April 12, 2019 through a contract with Anchor QEA, and on July 30, 2019 through a contract with Atkins. For the April review, three reviewers, Dr. Ron Kneib (Professor Emeritus, University of Georgia Marine Institute), Dr. Ernst Peebles (Professor, University of South Florida College of Marine Science), and Dr. Joe Merz (President, Principal Scientist, Cramer Fish Sciences), were selected from a pool of 33 potential reviewers, based on availability, knowledge, and experience. The reviews of these three experts were provided to the Service on April 29, 2019. The same three reviewers and a fourth reviewer (Dr. Mike Chotkowski, Science Coordinator, USGS) reviewed a second draft of the delta smelt portions of the BiOp in early August 2019 and the Service received these four expert reviews on August 12, 2019. In both April and August, the reviewers received relevant background information and supplemental materials to consider in their reviews. The Service was available during both reviews to respond to questions or address clarification needs during the reviews. This BiOp, and its supporting administrative record, considered all of the substantive recommendations from both peer reviews, as appropriate.

## SPECIES AND CRITICAL HABITAT NOT LIKELY TO BE ADVERSELY AFFECTED

The Service concurs with Reclamation's determination that the Proposed Action (PA) may affect but is not likely to adversely affect (NLAA) the California red-legged frog, California tiger salamander and its critical habitat, vernal pool fairy shrimp, and vernal pool tadpole shrimp. The PA occurs within the current and historic range of the California red-legged frog, California tiger salamander, vernal pool fairy shrimp, and vernal pool tadpole shrimp; however, the major components of the PA occur within riparian habitat along major rivers that are unlikely to support these species. For restoration projects associated with the PA that have known occurrences of the California red-legged frog, California tiger salamander, vernal pool fairy shrimp, and vernal pool tadpole shrimp, Reclamation has proposed to avoid suitable habitat that support these species with a minimum 250-foot non-disturbance buffer. Reclamation will also either conduct protocol-level surveys to assess whether habitat is occupied or will assume presence of the species. Reclamation will avoid affecting any of the primary constituent elements of critical habitat for the California tiger salamander within any designated critical habitat units located in the Action Area.

## 1.0 CONSULTATION APPROACH

The purpose of this section 7 consultation is to evaluate the effects of the PA on listed species and designated critical habitat. After reviewing the PA with site specific and programmatic actions as proposed by Reclamation, the Service has determined that the PA presents a mixed programmatic action, as defined in 50 CFR 402.02. The Service's consultation includes a mix of standard consultation (which includes an Incidental Take Statement [ITS]) and programmatic consultation (for which an ITS is not required at the programmatic stage). An analysis and conclusion of whether or not the PA is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of their critical habitat is included in this BiOp. It is recognized that subsequent site-specific actions authorized, funded, or carried out under the programmatic actions addressed in this BiOp will be subject to subsequent section 7 consultation and ITSs, as appropriate. Changes to the site-specific actions in the standard consultation of this BiOp may require reinitiation of consultation.

Some of the project elements are described at a site-specific level with no future Federal action required. For other project elements, the PA describes activities in on-going programs, some of which can tier to or append to existing programmatic consultations, and other activities which will require subsequent consultations prior to implementation. This BiOp uses a framework programmatic approach to discuss the process for future project-specific consultations. The remainder of the project elements not addressed programmatically are addressed as a standard, project-level consultation because they are not subject to future Federal approvals. For framework programmatic actions, an ITS is not required at the program (framework) level for those actions falling within the definition of framework programmatic action (50 CFR 402.02). Therefore, this BiOp contains an ITS for those standard, site-specific consultation elements for which incidental take is reasonably certain to occur for an individual species.

Programmatic portions of the PA will require separate section 7 consultations as part of the subsequent approval. These portions of the PA are not authorized to commence until these separate consultations are completed.

For components of the PA that are defined as programmatic, this BiOp provides a framework for future, site-specific actions that are subject to section 7 consultations and ITSs. Subsequent consultations associated with these programmatic actions will develop the necessary site-specific information to inform an assessment of where, when, and how listed species are likely to be affected. Many of these programmatic components are part of larger programs that have existing programmatic consultations or previously analyzed activities within these programs that have stand-alone consultations. Future components of the PA, such as tidal marsh restoration, will be developed and implemented in a manner that is consistent with on-going planning efforts and the framework established within the existing programmatic consultations and stand-alone consultations. Measures will be included to minimize adverse effects to listed species consistent with or better than existing consultations within the programs. For example, future tidal marsh restoration projects intended to enhance food web for delta smelt to minimize the effects of the CVP and SWP will be developed within the existing FRP/FAST process. A restoration project within the Suisun Marsh will be appended to the Suisun Marsh Plan Programmatic Biological Opinion and will adhere to the process and conservation measures of that consultation. An Anadromous Fish Restoration Program (AFRP) project will continue to utilize the existing planning and consultation process. Species under the Service's jurisdiction that may be affected by programmatic components of the PA that will be addressed through existing programmatic consultations or subsequent consultation consistent with the framework in this BiOp are listed below in Table 1-1.

**Table 1-1: Consultation Approach for Programmatic Components of the Proposed Action**

| Component | Existing Programmatic | Subsequent Consultation to this BiOp |
|---|---|---|
| Upper Sacramento Spawning and Rearing Habitat Restoration | Upper Sacramento River AFHRP Programmatic | Not necessary if utilizing the existing programmatic |
| Yellow-billed Cuckoo Surveys | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this activity |
| American River Spawning and Rearing Habitat Restoration | American River AFHRP Programmatic | Not necessary if utilizing the existing programmatic |
| Small Screen Program | Installation of Small Fish Screens Programmatic Biological Opinion | Not necessary if utilizing the existing programmatic |
| Stanislaus River Spawning and Rearing Habitat Restoration | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this activity |

| | | |
|---|---|---|
| Lower San Joaquin River Habitat Restoration | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this activity |
| Sacramento Deepwater Ship Channel Food Study | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this study |
| North Delta Food Subsidies/Colusa Basin Drain Study | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this study |
| Suisun Marsh Roaring River Distribution System Food Subsidies Study | None | Reclamation will complete subsequent consultation when more details are developed for implementation of this study |
| Tidal Habitat Restoration (Complete 8,000 acres from 2008 BiOp) | Suisun Marsh Plan Programmatic Biological Opinion | For areas outside Suisun Marsh Plan Programmatic Action Area, Reclamation will ensure that subsequent consultation will occur when more details are developed through the existing FRP/FAST process |
| Predator Hot Spot Removal in the Bay-Delta | None | Reclamation will complete subsequent consultation when more details are developed for this activity |
| Delta Fish Species Conservation Hatchery | None | Subsequent consultation will be completed when more details are developed for this activity |

## 2.0 DESCRIPTION OF THE PROPOSED ACTION

Reclamation and DWR propose to store, divert, and convey water in accordance with existing water contracts and agreements, including water service and repayment contracts, settlement contracts, exchange contracts, and refuge deliveries, consistent with water rights and applicable laws and regulations. Operations are in accordance with the Coordinated Operations Agreement, as amended (COA), between Reclamation and DWR. Chapter 4 of the BA describes in more detail how these two agencies work together to carry out storage, diversion, and conveyance of water through the CVP and SWP. Reclamation has proposed the term of this consultation to be through the year 2030. This BiOp evaluates Reclamation's final PA transmitted to the Service on October 4, 2019. The Service recognizes that Reclamation is continuing to evaluate the PA and other alternatives pursuant to the National Environmental Policy Act (NEPA). If the PA is modified through the NEPA process, the Service expects that Reclamation will reinitiate consultation on the modified proposed action as appropriate.

Table 4-6 of the BA includes all components of the PA that may affect listed species and critical habitat under the jurisdiction of both the Service and NMFS. Table 2-1 below is a summary of this table from the BA but removes components that only affect NMFS species and/or critical habitat and are therefore not relevant to this BiOp. Table 2-1 includes only those components of the PA which affect or are proposed to minimize the effect to Service listed species and critical habitat. Therefore, the effects analysis of this biological opinion only addresses effects of the PA components in Table 2-1.

There are several components of the PA that have already been addressed in previous consultations. There are also components of the PA that Reclamation is not authorizing, funding, or carrying out as part of this consultation. These were included in the PA because they are factors in long-term operations of the CVP and SWP. These components are listed in Section 4.10 of the BA but are not included in Table 2-1 below. Components of the PA that have already been analyzed in previous consultations are included in the Environmental Baseline as Federal actions that have already undergone consultation that contribute to the current condition of the species and critical habitat in the Action Area pursuant to the section 7 of the ESA. Those components will be addressed in the jeopardy and adverse modification analyses in this biological opinion pursuant to the *Analytical Framework for the Jeopardy Determination* and the *Analytical Framework for the Adverse Modification Determination*.

The PA includes avoidance and minimization measures (Appendix E of the BA) that will be implemented as necessary and appropriate for components of the PA. For the components addressed programmatically, a determination of which measures will be implemented will be made during the subsequent consultations. The Implementation Approach for each of the PA components are included in Table 2-1 below and described in Section 4.12 of the BA. All of these sections are hereby incorporated by reference from the BA into this BiOp.

The three proposed implementation approaches are generally described as follows (further details are provided in the BA):

- "Core" – the action is part of the Core Water Operations of the CVP and SWP.
- "Scheduling" – agencies and water users provide recommendations to Reclamation on scheduling and shaping specific flow actions.
- "Collaborative Planning" – agencies and water users work collaboratively to define, plan, and implement an action.

**Table 2-1: Components of the Proposed Action**

| Project Component | Standard or Programmatic Consultation | Implementation Approach | Species that may be affected (NLAA and Likely to Adversely Affect [LAA]) |
|---|---|---|---|
| **CVP/SWP-Wide** | | | |
| Divert and store water consistent with obligations under water rights and decisions by the State Water Resources Control Board | Standard | Core | Delta smelt, western yellow-billed cuckoo, valley elderberry longhorn beetle |
| **Related Action** | | | |
| Shasta Critical Determinations and Allocations to Water Service and Water Repayment Contractors and Agreements with Settlement and Exchange Contractors (see section 4.4 of the ROC BA for additional details of the PA as it relates to the Sacramento River Settlement Contracts) | | | |
| **Upper Sacramento** | | | |
| **Seasonal Operations** Reclamation proposes to operate Shasta according to general seasonal objectives (see BA for details). Winter operations will focus on flood control and maintaining minimum flows while building storage. Operations in the spring are focused on meeting instream demands along with Delta requirements such as outflow. During the summer, operational considerations include flows required for Delta outflows, instream demands, temperature control, and exports. Fall operations are dominated by temperature control and provision of fish spawning habitat. | Standard | Core | Western yellow-billed cuckoo, valley elderberry longhorn beetle |
| **Spring Pulse Flows** Reclamation would release spring pulse flows when the projected total May 1 Shasta Reservoir storage indicates a likelihood of sufficient cold water to support summer cold water pool management. Total storage provides a surrogate for the likely cold water pool and would inform the decision in addition | Standard | Scheduling | Western yellow-billed cuckoo, valley elderberry longhorn beetle |

| | | | |
|---|---|---|---|
| to monthly winter reservoir temperature measurements and climate forecasts. Reclamation would evaluate the projected May 1 Shasta Reservoir storage at the time of the February forecast to determine whether a spring pulse would be allowed in March, and would evaluate the projected May 1 Shasta Reservoir storage at the time of the March forecast to determine whether a spring pulse would be allowed in April. Reclamation anticipates that a projected May 1 storage greater than 4 MAF provides sufficient cold water pool management for Tier 1 and may release the spring pulse if it does not impact the ability to meet project objectives. Reclamation could also determine, in coordination with the Upper Sacramento scheduling team, that while the reservoir is less than 4 MAF, there is sufficient water to do a pulse of up to 150 TAF. The Upper Sacramento scheduling team could also determine that the benefits of a spring pulse flow do not outweigh the potential negative impacts on the system, in which case Reclamation would not release one. Reclamation would also not make a spring pulse release if the release would cause Reclamation to drop into a Tier 4 Shasta summer cold water pool management (i.e., the additional flow releases would decrease cold water pool such that summer Shasta temperature management drops in Tier 4), would interfere with meeting performance objectives, or would interfere with the ability to meet other anticipated demands on the reservoir. The Upper Sacramento Scheduling Team would determine the timing, duration, and frequency of the spring pulse within the 150 TAF volume. Wet hydrology downstream of Keswick Dam may meet the need for pulse flows without increased releases. | | | |
| **Operation of a Shasta Dam Raise**<br>There is a separate process and environmental impact statement for the Shasta Dam Raise, for which a Record of Decision and Biological Opinions have not been completed. Reclamation would not change operations described in the PA until the Shasta Dam Raise ROD and separate ESA consultations are completed. In the interim, Reclamation would operate the enlarged reservoir consistent with the operations and requirements of the PA. | Standard | Core | Western yellow-billed cuckoo, valley elderberry longhorn beetle |

| | | | |
|---|---|---|---|
| **Salmonid Spawning and Rearing Habitat Restoration**<br>Reclamation proposes to create additional spawning habitat by injecting approximately 15,000 – 40,000 tons of gravel annually into Sacramento River to 2030. An additional 40-60 acres of side channel and floodplain habitat would be created by 2030. Refer to the BA for specific restoration sites. | Programmatic | Collaborative Planning | Western yellow-billed cuckoo, valley elderberry longhorn beetle |
| **Yellow-billed Cuckoo Surveys**<br>Reclamation will coordinate with the Service to develop a baseline survey for the Western yellow-billed cuckoo. The survey for this action would focus on the critical habitat areas, associated project sites, and occupied habitat within the action area. In addition, the baseline survey would incorporate the efforts from the Yolo Restoration Project and other related projects when conducting protocol-level surveys for the Western yellow-billed Cuckoo in the over-lapping project areas. In addition, Reclamation will follow the nesting bird protocols during construction activities and consider the needs of Western yellow-billed cuckoo when designing and implementing salmonid habitat restoration projects. Results of Western yellow-billed cuckoo surveys and findings from ecological surrogate models shall be shared with the U.S. Fish and Wildlife Service Bay-Delta Fish and Wildlife Office no later than 120 days after completion. Additional details are incorporated by reference to the BA. | Programmatic | Collaborative Planning | Western yellow-billed cuckoo |
| **American River** | | | |
| **Seasonal Operations**<br>Reclamation proposes to operate the American River Division according to general seasonal objectives (see BA for details). Winter operations will focus on flood control and maintaining minimum flows while building storage. Operations in the spring are focused on flood control and meeting Delta requirements. During the summer, operational considerations include summer releases for instream temperature control, Delta outflow, and exports, typically above the planning minimum flows. | Standard | Core | Valley elderberry longhorn beetle, western yellow-billed cuckoo |

| Related Action | | | |
|---|---|---|---|
| **2017 Flow Management Standard Releases and "Planning Minimum"** Reclamation proposes to utilize a "planning minimum" forecast to preserve storage and build cold water pool while making adjustments to limit redd dewatering. This action includes a spring pulse flow from March 15- April 15 if no such flow event has occurred from February 1- March 1. | | | |
| **Salmonid Spawning and Rearing Habitat Restoration** Project activities include primarily side channel and floodplain creation, expansion, and grading, spawning gravel and large cobble additions, and woody material additions. Pursuant to CVPIA 3406(b)(13), Reclamation proposes to implement the following projects: Paradise Beach, Howe Avenue to Watt Avenue rearing habitat, William Pond Outlet, Upper River Bend, Ancil Hoffman, El Manto, Sacramento Bar North, Sacramento Bar South, Lower Sunrise, Sunrise, Upper Sunrise, Lower Sailor Bar, Upper Sailor Bar, Nimbus main channel and side channel, Discovery Park, Cordova Creek Phase II, Carmichael Creek Restoration and Sunrise Stranding Reduction. Additional sites are identified in the BA. | Programmatic | Collaborative Planning | Valley elderberry longhorn beetle, western yellow-billed cuckoo |
| **Yellow-billed Cuckoo Surveys** Reclamation will coordinate with the Service to develop a baseline survey for the Western yellow-billed cuckoo. The survey for this action would focus on the critical habitat areas, associated project sites, and occupied habitat within the action area. In addition, the baseline survey would incorporate the efforts from the Yolo Restoration Project and other related projects when conducting protocol-level surveys for the Western yellow-billed Cuckoo in the over-lapping project areas. In addition, Reclamation will follow the nesting bird protocols during construction activities and consider the needs of Western yellow-billed cuckoo when designing and implementing salmonid habitat restoration projects. Results of Western yellow-billed cuckoo surveys and findings from ecological surrogate models shall be shared with the U.S. Fish and Wildlife Service Bay-Delta Fish and Wildlife Office no later than 120 days after | Programmatic | Collaborative Planning | Western yellow-billed cuckoo |

| completion. Additional details are incorporated by reference to the BA. | | | |
|---|---|---|---|
| **Stanislaus** | | | |
| **Seasonal Operations**<br>Reclamation proposes to meet water rights, contracts, and agreements that are specific to the East Side Division and Stanislaus River. Senior water right holders (OID and SSJID) will receive annual water deliveries consistent with the 1988 Agreement and Stipulation, and water will be made available to CVP contractors in accordance with their contracts and applicable shortage provisions. Seasonal operations will vary according to water year type and follow the Stepped Release Plan, described below. | Standard | Core | Western yellow-billed cuckoo, least Bell's vireo, valley elderberry longhorn beetle, riparian brush rabbit |
| **Related action** | | | |
| **Stanislaus Stepped Release Plan**<br>Reclamation proposes to operate New Melones Reservoir in accordance with a Stepped Release Plan that varies by hydrologic condition/water year type. Annual release volumes range from 184.3 TAF to 476.3 TAF from critical year types up to wet year types, respectively (see BA for details). The Stanislaus Watershed Team will provide input on shaping the flows. | | | |
| **Salmonid Spawning and Rearing Habitat Restoration**<br>Reclamation will continue to carry out CVPIA(b)(13) program goals of placing 4,500 tons of gravel annually in the Stanislaus River and construct 50 acres of rearing habitat by 2030. | Programmatic | Collaborative Planning | Western yellow-billed cuckoo, least Bell's vireo, valley elderberry longhorn beetle, riparian brush rabbit |
| **Yellow-billed Cuckoo Surveys**<br>Reclamation will coordinate with the Service to develop a baseline survey for the Western yellow-billed cuckoo. The survey for this action would focus on the critical habitat areas, associated project sites, and occupied habitat within the action area. In addition, the baseline survey would incorporate the efforts from the Yolo Restoration Project and other related projects when conducting protocol-level surveys for the Western | Programmatic | Collaborative Planning | Western yellow-billed cuckoo |

| yellow-billed Cuckoo in the over-lapping project areas. In addition, Reclamation will follow the nesting bird protocols during construction activities and consider the needs of Western yellow-billed cuckoo when designing and implementing salmonid habitat restoration projects. Results of Western yellow-billed cuckoo surveys and findings from ecological surrogate models shall be shared with the U.S. Fish and Wildlife Service Bay-Delta Fish and Wildlife Office no later than 120 days after completion. Additional details are incorporated by reference to the BA. | | | |
|---|---|---|---|
| **San Joaquin** | | | |
| **Lower San Joaquin River Habitat**<br>Reclamation may work with private landowners to create a bottom-up, locally driven regional partnership to define and implement a large-scale floodplain habitat restoration effort in the Lower San Joaquin River. The resulting restoration could include thousands of acres of interconnected (or closely spaced) floodplain areas with coordinated and/or collaborative funding and management. Such a large-scale effort along this corridor would require significant support from a variety of stakeholders, which could be facilitated through a regional partnership. | Programmatic | Collaborative Planning | Riparian brush rabbit, riparian woodrat, western yellow-billed cuckoo, valley elderberry longhorn beetle |
| **Yellow-billed Cuckoo Surveys**<br>Reclamation will coordinate with the Service to develop a baseline survey for the Western yellow-billed cuckoo. The survey for this action would focus on the critical habitat areas, associated project sites, and occupied habitat within the action area. In addition, the baseline survey would incorporate the efforts from the Yolo Restoration Project and other related projects when conducting protocol-level surveys for the Western yellow-billed Cuckoo in the over-lapping project areas. In addition, Reclamation will follow the nesting bird protocols during construction activities and consider the needs of Western yellow-billed cuckoo when designing and implementing salmonid habitat restoration projects. Results of Western yellow-billed cuckoo surveys and findings from ecological surrogate models shall be shared with the U.S. Fish and Wildlife Service Bay-Delta Fish and Wildlife Office no later than 120 days after | Programmatic | Collaborative Planning | Western yellow-billed cuckoo |

| | | | |
|---|---|---|---|
| completion. Additional details are incorporated by reference to the BA. | | | |
| **Bay-Delta** | | | |
| **Seasonal Operations**<br>Reclamation proposes to operate facilities in the Delta according to general seasonal objectives (see BA for details). Winter and spring pumping operations generally maximize exports of excess, unregulated, and unstored water to help meet project demands later in the season and for Delta water quality. Summer is generally a period of higher export potential. During the summer the CVP and SWP typically operate to convey previously stored water across the Delta for exporting at the Project pumps or other Delta Facilities. Fall Delta operations typically begin as demands decrease, accretions increase within the system, and reservoir releases are decreasing to start conserving water. Exports are typically maximized to export available water in the system and may decrease if the fall remains dry. As precipitation begins to fall within the Sacramento and San Joaquin Basins, the reservoirs focus on building storage and managing for flood control. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **Minimum Export Rate**<br>Water rights, contracts, and agreements specific to the Delta include D-1641, COA and other related agreements pertaining to CVP and SWP operations and Delta watershed users. In order to meet health and safety needs, critical refuge supplies, and obligations to senior water rights holders, the combined CVP and SWP export rates at Jones Pumping Plant and Banks Pumping Plant will not be required to drop below 1,500 cfs. Reclamation and DWR propose to use the Sacramento River, San Joaquin River, and Delta channels to transport water to export pumping plants located in the south Delta. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **Delta Cross Channel Operations**<br>Reclamation operates the DCC gates in the open position to (1) improve the movement of water from the Sacramento River to the export facilities at the Banks and Jones Pumping Plants; (2) improve water quality in the central and southern Delta; and (3) | Standard | Core | Delta smelt, delta smelt critical habitat |

| | | | |
|---|---|---|---|
| reduce salinity intrusion rates in the western Delta. Reclamation will operate the DCC gates to reduce juvenile salmonid entrainment risk from Oct 1 to May 20. Reclamation and DWR will form a risk assessment to determine whether or not to open the DCC. Whenever flows in the Sacramento River at Sacramento reach 20,000 to 25,000 cfs (on a sustained basis), the gates are closed to reduce potential scouring and flooding that might occur in the channels on the downstream side of the gates. From October 1 to November 30, if the Knights Landing Catch Index or Sacramento Catch Index are greater than three fish per day Reclamation proposes to operate in accordance with Table 4-13 and Table 4-14 in the BA to determine whether to close the DCC gates and for how long. From December 1 to January 31, the DCC gates will be closed. If drought conditions are observed (i.e. fall inflow conditions are less than 90% of historic flows) Reclamation and DWR will consider opening the DCC gates for up to 5 days for up to two events within this period to avoid D-1641 water quality exceedances. Reclamation and DWR will coordinate with the Service, NMFS and the SWRCB on how to balance D-1641 water quality and ESA-listed fish requirements. If the risk assessment determines that survival, route entrainment, or behavior change to create a new adverse effect, or a greater range of an adverse effect, not considered under this proposed action, Reclamation will not open the DCC. During a DCC gates opening between December 1 and January 31, the CVP and SWP will divert at Health and Safety pumping levels. From February 1 to May 20, the DCC gates will be closed consistent with D-1641. From May 21 to June 15, Reclamation will close the DCC gates for 14 days during this period, consistent with D-1641. | | | |
| **Agricultural Barriers**<br>DWR proposes to continue to install three agricultural barriers at the Old River at Tracy, Middle River, and Grant Line Canal each year when necessary. The barriers are installed between April to July and removed in November. Barriers would include at least one culvert open to allow for fish migration when water temperatures are less than 71.6°F. | Standard | Core | Delta smelt, delta smelt critical habitat |

| | | | |
|---|---|---|---|
| **Contra Costa Water District Rock Slough Operations** CCWD intakes and Los Vaqueros Reservoir operations are under biological opinions separate from ROC on LTO (see Section 4.10.5.6 of the BA). Reclamation has included all diversions at the Rock Slough Intake (350 cfs capacity for the maximum annual diversion of 195 TAF) as part of the PA. CCWD's operations in the PA are consistent with the separate biological opinions and remain unchanged from the current operations scenario. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **North Bay Aqueduct** The North Bay Aqueduct (NBA) and Barker Slough Pumping Plant (BSPP) will operate under applicable regulatory requirements with a 125 TAF maximum annual diversion through the NBA. The maximum daily diversion rate for the Pumping Plant is 175 cfs. Reclamation and DWR will work with the Service to develop delta smelt minimization measures by the end of the 2019 calendar year to address the increased diversion volume. These minimization measures will aim to protect larval delta smelt from entrainment through the BSPP and will consider reduction in diversion through the NBA at the appropriate spring period and appropriate water year types by using effective detection measures or an appropriate proxy. Maintenance operations include sediment build-up removal and aquatic weed removal at the fish screens. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **Suisun Marsh Salinity Control Gates** The SMSCG are located on Montezuma Slough about 2 miles downstream from the confluence of the Sacramento and San Joaquin Rivers, near Collinsville. The objective of Suisun Marsh Salinity Control Gate operation is to decrease the salinity of the water in Montezuma Slough. The gates control salinity by restricting the flow of higher salinity water from Grizzly Bay into Montezuma Slough during incoming tides and retaining lower salinity Sacramento River water from the previous ebb tide. Operation of the gates in this fashion lowers salinity in Suisun Marsh channels and results in a net movement of water from east to west through Suisun Marsh. | Standard | Core | Delta smelt, delta smelt critical habitat |

| | | | |
|---|---|---|---|
| The SMSCG are operated on an as needed basis to meet D-1641 water quality standards in Montezuma Slough. The water quality standard include the period between October through May. Operations are determined from data at D-1641 compliance stations, hydrologic conditions, weather, Delta outflow, tide, fishery considerations, and other factors. The duration of gate operation may range from no use to full use for the entire October through May period. Assuming no significant long-term changes in the operational data mentioned above, it is expected that gate operations (outside of additional actions described under Delta Smelt Summer-Fall Habitat Action) will remain at current levels (17-69 days) necessary to meet D-1641 standards. During drought conditions, gate operations are more likely to span the entire October through May period to meet D-1641 standards. | | | |
| **Roaring River Distribution System**<br>The Roaring River Distribution System (RRDS) was constructed to provide lower salinity water to 5,000 acres of private and 3,000 acres of CDFW managed wetlands on Simmons, Hammond, Van Sickle, Wheeler, and Grizzly Islands. The RRDS includes a 40-acre intake pond that supplies water to Roaring River Slough. Water is diverted through a bank of eight 60-inch-diameter culverts equipped with fish screens into the Roaring River intake pond on high tides to raise the water surface elevation in RRDS above the adjacent managed wetlands. The intake to the RRDS is screened to prevent entrainment of fish larger than approximately 25 mm. After the listing of Delta Smelt, RRDS diversion rates have been controlled to maintain a maximum approach velocity of 0.2 ft/second at the intake fish screen except during mid-September – mid October, when RRDS diversion rates are controlled to maintain a maximum approach velocity of 0.7 ft/second for fall flood up operations. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **Morrow Island Distribution System**<br>The Morrow Island Distribution System (MIDS) allows Reclamation and DWR to provide water to the ownerships so that lands may be managed according to approved local | Standard | Core | Delta smelt, delta smelt critical habitat |

| | | | |
|---|---|---|---|
| management plans. The system was constructed primarily to channel drainage water from the adjacent managed wetlands for discharge into Suisun Slough and Grizzly Bay. This approach increases circulation and reduces salinity in Goodyear Slough. The MIDS is used year-round, but most intensively from September through June. When managed wetlands are filling and circulating, water is tidally diverted from Goodyear Slough just south of Pierce Harbor.<br><br>The Goodyear Slough Outfall (GYSO) connects the south end of Goodyear Slough to Suisun Bay. Prior to construction of the outfall, Goodyear Slough was a dead-end run slough. The GYSO was designed to increase circulation and reduce salinity in Goodyear Slough so as to provide higher water quality to the wetland managers who flood their ponds with Goodyear Slough water. GYSO has a series of four passive intakes that drain to Suisun bay. The outfall is equipped with slide gates on the interior of the outfall structure to allow DWR to close the system as needed for maintenance or repairs. The intakes and outfall of GYSO are unscreened but are equipped with trash racks to prevent damage. GYSO is an open system and it is possible that fish that enter the system could leave via the intake or the outfall. | | | |
| **Water Transfers**<br>Water transfers would occur from July 1 through November 30 in total annual volumes up to those described in Table 4-15 of the BA, up to 600 TAF for Critical and Dry (following Critical and Dry years), and up to 360 TAF in all other years. | Standard | Core | Delta smelt, delta smelt critical habitat |
| **Clifton Court Aquatic Weed Removal**<br>DWR will apply herbicides or will use mechanical harvesters on an as-needed basis to control aquatic weeds and algal blooms in CCF. DWR will apply herbicides after CCF water temperatures are above 25 degrees Celsius or after June 28. Mechanical harvest will occur as needed. Details provided in the BA are incorporated by reference. | Standard | Core | Delta smelt |

| | | | |
|---|---|---|---|
| **OMR Management**<br>From the onset of OMR management to June, Reclamation and DWR will operate to an OMR index no more negative than a 14-day moving average of -5,000 cfs unless a storm event occurs (described below). OMR could be more positive than -5,000 cfs if additional real-time OMR restrictions are triggered as (described below) or constraints other than OMR control exports. Reclamation and DWR propose to operate to an OMR index computed using an equation. An OMR index allows for shorter-term operational planning and real-time adjustments. Reclamation and DWR will make a change to exports within 3 days of the trigger when monitoring, modeling, and criteria indicate protection for fish is necessary. The 3-day trigger allows for efficient power scheduling.<br>**Onset of OMR Management:**<br>Reclamation and DWR shall start OMR management when one or more of the following conditions have occurred:<br>• Integrated Early Winter Pulse Protection ("First Flush" Turbidity Event): To minimize project influence on migration (or dispersal) of delta smelt, Reclamation and DWR propose to reduce exports for 14 consecutive days so that the 14-day averaged OMR index for the period shall not be more negative than -2,000 cfs, in response to "First Flush" conditions in the Delta. The population-scale migration of delta smelt is believed to occur quickly in response to inflowing freshwater and turbidity (Grimaldo *et al*. 2009; Sommer *et al.* 2011). Thereafter, the best available scientific information suggests that fish make local movements, but there is no evidence for further population-scale migration (Polanksy *et al*. 2018). "First Flush" conditions may be triggered between December 1 and January 31 and include:<br>    o running 3-day average of the daily flows at Freeport is greater than 25,000 cfs and<br>    o running 3-day average of the daily turbidity at Freeport is 50 Nephelometric Turbidity Units (NTU) or greater, or | Standard | Core | Delta smelt, delta smelt critical habitat |

- - real-time monitoring indicates a high risk of migration and dispersal into areas at high risk of future entrainment.
- This "First Flush" may only be initiated once during the December through January period and will not be required if:
  - spent female delta smelt are collected in monitoring surveys.
- Salmonids Presence: After January 1, if more than 5 percent of any one or more salmonid species (wild young-of-year Winter-Run, wild young-of-year Spring-Run, or wild Central Valley Steelhead) are estimated to be present in the Delta as determined by their appropriate monitoring working group based on available real-time data, historical information, and modeling.

**Additional Real-Time OMR Restrictions and Performance Objectives:**

Reclamation and DWR shall manage to a more positive OMR than -5,000 cfs based on the following conditions:

- Turbidity Bridge Avoidance ("South Delta Turbidity"): After the Integrated Early Winter Pulse Protection (above) or February 1, whichever comes first, and until a ripe or spent female is detected or April 1 (whichever comes first), Reclamation and DWR propose to manage exports in order to maintain daily average turbidity in Old River at Bacon Island (OBI) at a level of less than 12 NTU. The purpose of this action is to minimize the risk to adult delta smelt in the Old and Middle River corridor, where they are subject to higher entrainment risks. This action seeks to avoid the formation of a turbidity bridge from the San Joaquin River shipping channel to the south Delta fish facilities, which historically has been associated with elevated salvage of pre-spawning adult delta smelt. If the daily average turbidity at Bacon Island cannot be maintained less than 12 NTU, Reclamation and DWR will manage exports to achieve an OMR no more negative than -

| | | | |
|---|---|---|---|
| 2,000 cfs until the daily average turbidity at Bacon Island drops below 12 NTU. However, if 5 consecutive days of OMR less negative than -2,000 cfs do not reduce turbidity at Bacon Island below a daily average 12 NTU in a given month, Reclamation and DWR may determine that additional OMR restrictions to manage turbidity are infeasible, and will instead implement an OMR target that is deemed protective, based on turbidity, adult Delta smelt distribution and salvage, but not a more negative OMR than -5,000 cfs. To avoid triggering an OMR flow action during a sensor error or a localized turbidity spike that might be caused by local flows or a wind-driven event, Reclamation and DWR will consider and review data from other locations. In the event that the daily average turbidity at OBI is 12 NTU (or greater) and Reclamation and DWR determine that a Turbidity Bridge Avoidance action is not warranted based on additional data sources (isolated and/or wind-driven turbidity event at OBI), Reclamation and DWR will take no additional action and provide the supporting information to the Service within 24 hours.<br>• Larval and Juvenile Delta Smelt: Reclamation and DWR will use results produced by USFWS approved life cycle models to manage the annual entrainment levels of larval/juvenile Delta Smelt. The Service's models will be publicly vetted and peer reviewed prior to March 15, 2020. The USFWS will coordinate with the Delta Fish Monitoring Working Group to identify a Delta smelt recruitment level that Reclamation and DWR can use in OMR management. The life cycle models statistically link environmental conditions to recruitment, including factors related to loss as a result of entrainment such as OMR flows. In this context, recruitment is defined as the estimated number of post-larval delta smelt in June per number of spawning adults the prior February-March. | | | |

Reclamation and DWR, in coordination with the Service will operationalize the life cycle model results through the use of real-time monitoring for the spatial distribution of Delta Smelt. On or after March 15 of each year, if QWEST is negative, and larval or juvenile delta smelt are within the entrainment zone of the pumps based on real-time sampling of spawning adults or young of year life stages, Reclamation and/or DWR will run hydrodynamic models and forecasts of entrainment, informed by the EDSM or other relevant survey data to estimate the percentage of larval and juvenile delta smelt that could be entrained. If necessary, Reclamation will manage exports to limit entrainment to be protective based on the modeled recruitment levels. Reclamation and DWR will re-run hydrodynamic models when operational changes or new sampling data indicate a potential change in entrainment risk. This process will continue until the offramp criteria have been met as described in the "End of OMR Management" below. In the event the life cycle models cannot be operationalized in a manner that can be used to inform real-time operations then Reclamation, DWR and the Service will coordinate to develop an alternative plan to provide operational actions protective of this life stage.

- Cumulative Loss Threshold:
  - Reclamation and DWR propose to avoid exceeding cumulative loss thresholds over the duration of the Biological Opinions for wild Winter-Run Chinook Salmon, hatchery Winter-Run Chinook Salmon, wild Central Valley Steelhead from December through March, and wild Central Valley Steelhead from April 1 through June 15th. Wild Central Valley Steelhead are separated into two time periods to protect San Joaquin Origin fish that historically appear in the Mossdale trawls later than Sacramento origin fish. The loss threshold and loss tracking for hatchery

| | | | |
|---|---|---|---|
| Winter-Run Chinook Salmon does not include releases into Battle Creek. Loss (for development of thresholds and ongoing tracking) for Chinook salmon are based on length-at-date criteria.<br>o The cumulative loss thresholds shall be based on cumulative historical loss from 2010 through 2018. Reclamation's and DWR's performance objectives will set a trajectory such that this cumulative loss threshold (measured as the 2010-2018 average cumulative loss multiplied by 10 years) will not be exceeded by 2030.<br>o If, at any time prior to 2024, Reclamation and DWR exceed 50% of the cumulative loss threshold, Reclamation and DWR will convene an independent panel to review the actions contributing to this loss trajectory and make recommendations on modifications or additional actions to stay within the cumulative loss threshold, if any.<br>o In the year 2024, Reclamation and DWR will convene an independent panel to review the first five years of actions and determine whether continuing these actions are likely to reliably maintain the trajectory associated with this performance objective for the duration of the period.<br>o If, during real-time operations, Reclamation and DWR exceed the cumulative loss threshold, Reclamation and DWR would immediately seek technical assistance from the Service and NMFS, as appropriate, on the coordinated operation of the CVP and SWP for the remainder of the OMR management period. In addition, Reclamation and DWR shall, prior to the next OMR management season, charter an independent panel to review the OMR Management Action consistent with | | | |

| | | | |
|---|---|---|---|
| "Chartering of Independent Panels"* under the "Governance" section of the BA. The purpose of the independent review shall be to evaluate the efficacy of actions to reduce the adverse effects on listed species under OMR management and the non-flow measures to improve survival in the south Delta and for San Joaquin origin fish.<br>• Single-Year Loss Threshold:<br>  o In each year, Reclamation and DWR propose to avoid exceeding an annual loss threshold equal to 90% of the greatest annual loss that occurred in the historical record from 2010 through 2018 for each of wild Winter-Run Chinook Salmon, hatchery Winter-Run Chinook Salmon, wild Central Valley Steelhead from December through March, and wild Central Valley Steelhead from April through June 15. Wild Central Valley Steelhead are separated into two time periods to protect San Joaquin Origin fish that historically appear in the Mossdale trawls later than Sacramento origin fish. The loss threshold and loss tracking for hatchery Winter-Run Chinook Salmon does not include releases into Battle Creek. Loss (for development of thresholds and ongoing tracking) for Chinook salmon are based on length-at-date criteria.<br>  o During the year, if Reclamation and DWR exceed the average annual loss from 2010 through 2018, Reclamation and DWR will review recent fish distribution information and operations with the fisheries agencies at WOMT and seek technical assistance on future planned operations. Any agency may elevate from WOMT to a Directors discussion, as appropriate. | | | |

| | | | |
|---|---|---|---|
| o During the year, if Reclamation and DWR exceed 50% of the annual loss threshold, Reclamation and DWR will restrict OMR to a 14-day moving average OMR index of no more negative than -3,500 cfs, unless Reclamation and DWR determine that further OMR restrictions are not required to benefit fish movement because a risk assessment shows that the risk is no longer present based on real-time information.<br>o The -3500 OMR operational criteria adjusted and informed by this risk assessment will remain in effect for the rest of the season. Reclamation and DWR will seek NMFS technical assistance on the risk assessment and real-time operations.<br>o During the year, if Reclamation and DWR exceed 75% of the annual loss threshold, Reclamation and DWR will restrict OMR to a 14-day moving average OMR index of no more negative than -2,500 cfs, unless Reclamation and DWR determine that further OMR restrictions are not required to benefit fish movement because a risk assessment shows that the risk is no longer present based on real-time information.<br>o The -2500 OMR operational criteria adjusted and informed by this risk assessment will remain in effect for the rest of the season. Reclamation and DWR will seek NMFS technical assistance on the risk assessment and real-time operations.<br>o Risk assessment: Reclamation and DWR will evaluate and adjust OMR restrictions under this section by preparing a risk assessment that considers several factors including, but not limited to, real-time monitoring, historical trends of salmonids exiting the delta, entering the south Delta, and fish detected in salvage. | | | |

| | | | |
|---|---|---|---|
| Risks will be measured against the potential to exceed the next single-year loss threshold. Reclamation and DWR will share its technical analysis and supporting documentation with the Service and NMFS, seek their technical assistance, discuss the risk assessment and future operations with WOMT at its next meeting, and elevate to the Directors as appropriate.<br><br>    o   If, during real-time operations, Reclamation and DWR exceed the single-year loss threshold, Reclamation and DWR would immediately seek technical assistance from the Service and NMFS, as appropriate, on the coordinated operation of the CVP and SWP for the remainder of the OMR management period. In addition, Reclamation and DWR shall, prior to the next OMR management season, charter an independent panel to review the OMR Management Action consistent with "Chartering of Independent Panels"* under the "Governance" section of the BA. The purpose of the independent review shall be to evaluate the efficacy of actions to reduce the adverse effects on listed species under OMR management and the non-flow measures to improve survival in the south Delta and for San Joaquin origin fish.<br><br>Reclamation and DWR propose to continue monitoring and reporting the salvage at the Tracy Fish Collection Facility and Skinner Delta Fish Protection Facility. Reclamation and DWR propose to continue the release and monitoring of yearling Coleman National Fish Hatchery late-fall run as yearling Spring-Run Chinook Salmon surrogates.<br><br>**Storm-Related OMR Flexibility:**<br>Reclamation and DWR may operate to a more negative OMR up to a maximum (otherwise permitted) export rate at Banks and Jones Pumping Plants of 14,900 cfs (which could result in a | | | |

range of OMR values) to capture peak flows during storm-related events. A storm related event occurs when precipitation falls in the Central Valley and Delta watersheds and Reclamation and DWR determine that the Delta outflow index indicates a higher level of flow available for diversion. Reclamation and DWR will define storm-related events in the first year of implementation of this proposed action. Reclamation and DWR will continue to monitor fish in real-time and will operate in accordance with "Additional Real-time OMR Restrictions," above. Under the following conditions, Reclamation and DWR shall not pursue storm-related OMR flexibility for capturing peak flows from storm-related events if:

- Integrated Early Winter Pulse Protection (above) or Additional Real-time OMR Restrictions (above) are triggered. Under such conditions, Reclamation and DWR have already determined that more restrictive OMR is required.
- An evaluation of environmental and biological conditions indicates more negative OMR would likely cause Reclamation and DWR to trigger an Additional Real-time OMR Restriction (above).
- Salvage of yearling Coleman National Fish Hatchery late fall run as yearling Spring-Run Chinook Salmon surrogates exceeds 0.5% within any of the release groups.
- Reclamation and DWR identify changes in spawning, rearing, foraging, sheltering, or migration behavior beyond those anticipated to occur under OMR management.

Reclamation and DWR will continue to monitor conditions and may resume management of OMR to no more negative than -5,000 cfs if conditions indicate the above offramps are necessary to avoid additional adverse effects. If storm-related flexibility causes the conditions in "Additional Real-Time OMR Restrictions", Reclamation and DWR will implement additional real-time OMR restrictions.

| | | | |
|---|---|---|---|
| **End of OMR Management:**<br>OMR criteria may control operations until June 30 (for delta smelt and Chinook salmon), until June 15 (for steelhead/rainbow trout), or when the following species-specific offramps have occurred, whichever is earlier:<br>● Delta smelt: when the daily mean water temperature at CCF reaches 77°F for 3 consecutive days;<br>● Salmonids:<br>    ○ when more than 95 percent of salmonids have migrated past Chipps Island, as determined by their monitoring working group, or<br>    ○ after daily average water temperatures at Mossdale exceed 71.6°F for 7 days during June (the 7 days do not have to be consecutive).<br><br>**Real-Time Decision Making and Salvage Thresholds**<br>When real-time monitoring demonstrates that criteria in "Additional Real-Time OMR Restrictions and Performance Objectives" are not supported, then Reclamation and DWR may confer with the Directors of NMFS, the Service, and CDFW if they desire to operate to a more negative OMR than what is specified in "Additional Real-Time OMR Restrictions". Upon mutual agreement, the Directors of NMFS and the Service may authorize Reclamation and DWR to operate to a more negative OMR than the Additional Real-Time OMR Restrictions, but no more negative than -5000 cfs. This process would be separate from the risk analysis process referenced above. | | | |
| **Tracy Fish Collection Facility**<br>Reclamation proposes to continue to screen fish from Jones Pumping Plant with the TFCF. The TFCF uses behavioral louvers in the primary channel and four traveling screens in the secondary channel, to guide entrained fish into holding tanks before transport by truck to release sites within the Delta. Hauling trucks used to transport salvaged fish to release sites inject compressed air and/or oxygen and contain an eight parts per thousand salt solution to reduce stress. The CVP uses two release sites, one on the Sacramento River at Emmaton and the | Standard | Core | Delta smelt |

| | | | |
|---|---|---|---|
| other on the San Joaquin River immediately upstream of the Antioch Bridge. Fish passing through the facility are sampled at intervals of 30 minutes every 2 hours year-round. Larval smelt sampling at the TFCF commences once a trigger is met (detection of a spent female at CVP and SWP being one of three triggers). Fish count screen with a 2.4 mm mesh size opening is replaced with one that has a mesh size of 0.5 mm to retain larval fish. Sampling is done four times a day (04:00, 10:00, 16:00, 22:00) and all larval smelt are identified to species and reported the day after collection. Section 4.10.5.12.1 of the BA contains additional details about louver cleaning and fish salvage and hauling procedures. | | | |
| **Skinner Fish Facility** DWR proposes to continue to screen fish from Banks Pumping Plant with the Skinner Fish Facility. The Skinner Fish Facility has behavioral barriers to keep fish away from the pumps that lift water into the California Aqueduct. Large fish and debris are directed away from the facility by a 388-foot-long trash rack. Smaller fish are diverted from the intake channel into bypasses by a series of behavioral barriers (metal louvers), while the main flow of water continues through the louvers and toward the pumps. These fish pass through a secondary system of louvers or screens and pipes into seven holding tanks, where a subsample is counted and recorded. The salvaged fish are then returned to the Delta in oxygenated tank trucks. The sampling frequency at TFCF will be maintained at the Skinner Fish Facility | Standard | Core | Delta smelt |
| **Delta Cross Channel Gate Improvements** Reclamation proposes to evaluate improvements to automate and streamline operation of the DCC gates. Reclamation would modernize DCC's gate materials and mechanics to include adding industrial control systems, increasing additional staff time, and improve physical and biological monitoring associated with the DCC daily and/or tidal operations as necessary to maximize water supply deliveries. | Programmatic | Collaborative Planning | Giant garter snake |

| | | | |
|---|---|---|---|
| **Delta Smelt Summer-Fall Habitat Action**<br>Reclamation and DWR propose to use structured decision making to implement Delta Smelt habitat actions. In the summer and fall (June through October) of Below Normal, Above Normal, and Wet years, based on the Sacramento Valley Index, the environmental and biological goals are, to the extent practicable, the following:<br>● Maintain low salinity habitat in Suisun Marsh and Grizzly Bay when water temperatures are suitable;<br>● Manage the low salinity zone to overlap with turbid water and available food supplies; and<br>● Establish contiguous low salinity habitat from Cache Slough Complex to the Suisun Marsh.<br>The action will initially include modifying project operations to maintain a monthly average 2 ppt isohaline (X2) at 80 km from the Golden Gate in Above Normal and Wet water years in September and October. Reclamation and DWR will also implement additional measures that are expected to achieve additional benefits. These measures include, but are not limited to:<br>● Suisun Marsh Salinity Control Gate (SMSCG) operations for up to 60 days (not necessarily consecutive) from June 1 through October 31 of Below Normal and Above Normal years. This action may also be implemented in Wet years if preliminary analysis shows expected benefits;<br>● Food enhancement actions, e.g., those included in the Delta Smelt Resiliency Plan to enhance food supply. These projects include the North Delta Food Subsidies/Colusa Basin Drain Study, Sacramento River Deepwater Ship Channel Food Study, and Suisun Marsh and Roaring River Distribution System Food Subsidies Study. Reclamation proposed these food enhancement actions as programmatic components of the PA; therefore, they are addressed programmatically in this consultation. Reclamation and DWR will monitor dissolved oxygen at Roaring River Distribution System drain location(s) during Delta Smelt food distribution actions to ensure compliance with Water | Standard | Collaborative Planning | Delta smelt, delta smelt critical habitat |

Quality Objectives established in the San Francisco Bay Basin Plan.

If the measures above (or others developed through collaborative science processes) result in benefits that are determined to provide similar or better protection than the 80 km X2 salinity management action, Reclamation and DWR will work with the Service to modify this component of the PA to implement the new actions in lieu of the salinity management action. When determining whether or not the measures above provide similar or better protection, Reclamation and DWR will consider, at minimum, the following:
- habitat acreages in Suisun Marsh, Grizzly Bay, and other adjacent areas available to support delta smelt recruitment (e.g. 0-6 ppt at Belden's Landing, non-lethal temperatures, etc.),
- recruitment projections based on Service-approved life cycle modeling and/or monitoring to evaluate the expected trend in delta smelt with and without the 80 km X2 salinity management action, and
- The presence (or absence) of delta smelt in both target areas (main Delta channels and Suisun Marsh) and other areas (such as Montezuma Slough and Cache Slough), including information from monitoring, presence/absence modeling, or similar tools.

These considerations (listed above) and examples of implementation of other actions will be more fully defined and developed through the structured decision making or other review process. The review will include selection of appropriate models, sampling programs, and other information to be used. The process will be completed prior to implementation and may be improved in subsequent years as additional information is synthesized and reviewed as described below.

| | | | |
|---|---|---|---|
| Reclamation and DWR will develop a Summer-Fall Habitat Action Plan to meet the environmental and biological goals in years when Summer-Fall Habitat Actions are triggered. In Above Normal and Wet years, operating to a monthly average X2 of 80 km in September and October is the initial operation to provide a specific acreage of low salinity habitat. In every action year, Reclamation and DWR may propose, based on discussions with the Service, a suite of actions that would meet the action's environmental and biological goals.<br><br>Although Reclamation and DWR agree to treat the Delta Smelt Summer-Fall Habitat Action as an in-basin use, Reclamation intends to meet Delta outflow augmentation in the fall primarily through export reductions as they are the operational control with the most flexibility in September and October. Storage releases from upstream reservoirs may be used to initiate the action by pushing the salinity out further in August and early September; however, the need for this initial action will depend on the particular hydrologic, tidal, storage, and demand conditions at the time. In addition, storage releases may be made in combination with export reductions during the fall period during high storage scenarios where near-term flood releases to meet flood-control limitations are expected. In these scenarios, Reclamation will make releases in a manner that minimizes redd dewatering where possible. In the event that Reclamation determines the Delta outflow augmentation necessary to meet 2 ppt isohaline at 80 km from the Golden Gate as described above cannot be met through primarily export reductions and is expected to have a high storage cost, Reclamation will still implement the rest of this action, and will meet with NMFS and the Service to discuss alternate potential approaches that improve habitat conditions.<br><br>Collaborative Planning Process<br><br>Reclamation shall form a Delta Coordination Group (Reclamation, DWR, the Service, NMFS, CDFW, and representatives from federal and state water contractors). The Group will utilize one of the existing structured decision-making | | | |

| | | | |
|---|---|---|---|
| models, or adopt a new model, to analyze the proposed Summer-Fall Habitat Action. Through the Delta Coordination Group, Reclamation and DWR shall develop a multi-year science and monitoring plan consistent with the structured decision-making models within 9 months of signing the National Environmental Policy Act Record of Decision (ROD). The Delta Coordination Group may use the IEP or CSAMP (or similar entity) to review project design and the science and monitoring plan. Within six months of signing the ROD, the Delta Coordination Group shall meet to select a structured decision making model; and complete model runs testing various approaches to satisfying the environmental and biological goals, utilizing the available tool box of approaches. The Delta Coordination Group shall provide the initial results of its modeling exercise in a memorandum to Reclamation, DWR, and the Service. The process for Delta Smelt Summer-Fall Habitat Action development and approval is incorporated by reference from the BA.<br><br>The Delta Smelt Summer-Fall Habitat Section will be incorporated into the "Four Year Reviews" under the "Governance" section of the BA, and all reasonable and practical recommendations shall be incorporated into the Delta Smelt Summer-Fall Habitat Action. The structured decision-making model and the multi-year science and monitoring plan will be part of this Peer Review. | | | |
| **Clifton Court Predator Management**<br>DWR plans to continue implementation of projects to reduce mortality of ESA listed fish species in response to the NMFS letter dated April 9, 2015, requiring that DWR immediately implement interim measures to improve predator control until an acceptable alternative can be implemented. These interim measures that could be implemented include: (a) continued evaluation of predator relocation methods; (b) controlling aquatic weeds; and (c) exploration of additional predation reduction measures. | Standard | Core | Delta smelt |

| | | | |
|---|---|---|---|
| **Sediment Supplementation Feasibility Study** Reclamation proposes to develop and implement a sediment supplementation feasibility study. The goal of this study will be to determine methods to reintroduce sediment in the Delta to increase turbidity which would provide better habitat conditions for all life stages of delta smelt, including increased cover for juveniles and feeding facilitation for larval smelt. This study will include, at minimum, consideration of sediment placement upstream of the Delta during low flow periods in the spring, summer and/or fall, followed by sediment remobilization following inundation during seasonal high flows. Reclamation will coordinate with the Service and other agencies to address necessary permitting for this study. Reclamation will coordinate with the Service on the design and findings of this study, including monitoring measures to assess its effectiveness and feasibility as a long-term management program, a method to phase implementation if required for permitting and other compliance needs. | Standard | Collaborative Planning | Delta smelt, delta smelt critical habitat |
| **Sacramento Deepwater Ship Channel Food Study** Reclamation proposes to repair or replace the West Sacramento lock system to hydraulically reconnect the ship channel with the mainstem of the Sacramento River. The ship channel has the potential to flush food production into the north Delta for delta smelt when paired with an ongoing food study. This is the topic of an in-progress study of phyto- and zooplankton production in the ship channel. | Programmatic | Collaborative Planning | Delta smelt, delta smelt critical habitat |
| **North Delta Food Subsidies/Colusa Basin Drain Study** DWR, Reclamation, and water users propose to increase food entering the north Delta by moving nutrient-rich water from the Colusa Basin into the Yolo Bypass and north Delta in July and/or September. Reclamation would work with DWR and partners to augment flow in the Yolo Bypass in July and/or September by closing Knights Landing Outfall Gates and routing water from Colusa Basin into Yolo Bypass to promote fish food production. | Programmatic | Collaborative Planning | Delta smelt, delta smelt critical habitat, least Bell's vireo, valley elderberry longhorn beetle, giant garter snake |

| | | | |
|---|---|---|---|
| **Suisun Marsh and Roaring River Distribution System Food Subsidies Study**<br>Water users propose to add fish food to Suisun Marsh through coordinating managed wetland flood and drain operations in Suisun Marsh, Roaring River Distribution System food production, and reoperation of the Suisun Marsh Salinity Control Gates. As noted in the Delta Smelt Resiliency Strategy, this management action may attract Delta Smelt into the high-quality Suisun Marsh habitat in greater numbers, reducing use of the less food-rich Suisun Bay habitat (California Natural Resources Agency 2016). Infrastructure in the Roaring River Distribution System may help drain food-rich water from the canal into Grizzly Bay to augment Delta Smelt food supplies in that area. In addition, managed wetland flood and drain operations can promote food export from the managed wetlands to adjacent tidal sloughs and bays. Reclamation and DWR will monitor dissolved oxygen at Roaring River Distribution System drain location(s) to ensure compliance with Water Quality Objectives established in the San Francisco Bay Basin Plan when Delta Smelt food actions are being taken. | Programmatic | Collaborative Planning | Delta smelt, delta smelt critical habitat |
| **Intertidal and Associated Subtidal Habitat Restoration (Complete 8,000 acres from 2008 Service BiOp)**<br>Reclamation and DWR propose to complete the remaining 8,000 acres of tidal habitat restoration in the Delta by 2030. Reclamation and/or DWR would monitor, operate, and maintain the restoration sites, including obtaining permanent land rights. Consistent with the current regulatory process, future separate consultations would address the effects to listed species from habitat restoration. | Programmatic | Collaborative Planning | Delta smelt, delta smelt critical habitat, salt marsh harvest mouse, California clapper rail, giant garter snake, valley elderberry longhorn beetle, soft bird's beak, soft bird's beak critical habitat, Suisun thistle, Suisun thistle critical habitat, vernal pool fairy shrimp, vernal pool tadpole shrimp, California least tern, least Bell's vireo, western yellow-billed cuckoo |
| **Predator Hot Spot Removal**<br>Reclamation would coordinate with water users to remove predator hot spots in the Bay-Delta. This includes minimizing lighting at fish screens and bridges, and possibly removing abandoned structures. | Programmatic | Collaborative Planning | Delta smelt |
| **Reintroduction Efforts for Delta Smelt**<br>Reclamation proposes to fund a two phase process that would lead to annual supplementation of the wild delta smelt | Standard | Collaborative Planning | Delta smelt |

| | | | |
|---|---|---|---|
| population with propagated fish within 3-5 years from issuance of the biological opinion. The first step in this process will be the development of a supplementation strategy within one year of the issuance of the BiOp that will describe the capacity needed at hatchery facilities to accommodate the delta smelt production needed to meet genetic and other hatchery considerations with a goal of increasing production to a number and the life stages necessary to effectively augment the population. The Service will be the lead on the development of this supplementation strategy. The strategy will include identification of regulatory processes to address, science studies to complete, potential facility expansion and improvements, and schedules and deliverables to support the second phases and the larger Conservation Hatchery, described below.<br><br>The second step will involve using the existing UC Davis Fish Conservation and Culture Laboratory (FCCL). Reclamation and DWR are the primary funding sources for FCCL, which maintains the refugial population of delta smelt and generates additional captive-bred fish for research. The FCCL has maintained a continuous refugial population since 2008. The FCCL has closed the life cycle of delta smelt meaning that they can produce new generations of fish at their facility with or without the addition of new wild spawners, and keep enough progeny alive to repeat the process for multiple generations. Annually, the FCCL exports approximately 33,000 fish of different life stages for use in research. Additionally, approximately 32,000 adults are reared in the refuge population. To achieve these production levels, the FCCL frequently removes fish at the egg and juvenile stages. Additional funding will support expansion of facilities to maintain these fish and increase rearing capacity to provide up to approximately 125,000 adults within 3 years. By 2030, Reclamation proposes to support a larger Conservation Hatchery, described below, to take over the role of supplementing the wild population. | | | |
| **Delta Fish Species Conservation Hatchery**<br>Reclamation proposes to partner with DWR to construct and operate a conservation hatchery for Delta Smelt, by 2030. The | Programmatic | Collaborative Planning | Delta smelt |

| conservation hatchery would breed and propagate a stock of fish with equivalent genetic resources of the native stock and at sufficient quantities to effectively augment the existing wild population, so that they can be returned to the wild to reproduce naturally in their habitat. | | | |
|---|---|---|---|

*The PA includes the following language in section 4.12.6 *Chartering of Independent Panels*: "Reclamation and DWR agree to charter independent panels to review actions as described in certain components of the Proposed Action. Independent panels shall review actions consistent with the standards of the Delta Stewardship Council and applicable Reclamation and DWR guidance. Experts on the panel shall provide information and recommendations but shall not make consensus recommendations to Reclamation. NMFS and the Service may provide technical assistance and input in the development of the charter. Reclamation and DWR shall provide the results of the independent review to NMFS and the Service. Reclamation shall coordinate with DWR to document a response to the independent review including whether implementation of alternative strategies would require reinitiation consistent with the reinitiation triggers provided by 50 CFR 402.16. Nothing the chartering of and responding to independent panels precludes NMFS nor the Service from exercising its statutory responsibilities under the ESA."

# 3.0  ACTION AREA

The Action Area is defined as all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 CFR 402.02). The Action Area for this biological opinion is based on the descriptions of the components of the PA as described in the BA, including some for which the locations and extent of effects are not yet known. These components are addressed programmatically, and will either rely on existing consultations or will be subject to subsequent consultation. This definition of the Action Area is based on our current understanding of the extent of activities proposed by Reclamation. This encompasses areas in which effects to Service-jurisdictional species and critical habitat may occur, and excludes areas described in the BA where only effects to NMFS-jurisdictional species and critical habitat may occur.

The Action Area encompasses the following reservoirs, rivers, and the land between the levees adjacent to the rivers: (1) Sacramento River from Shasta Lake downstream to and including the Sacramento–San Joaquin Delta; (2) Clear Creek from Whiskeytown Reservoir to its confluence with the Sacramento River; (3) Feather River from the FERC boundary downstream to its confluence with the Sacramento River; (4) American River from Folsom Reservoir downstream to its confluence with the Sacramento River; (5) Stanislaus River from New Melones Reservoir to its confluence with the San Joaquin River; (6) San Joaquin River from Friant Dam downstream to and including the Sacramento–San Joaquin Delta; and (7) San Francisco Bay and Suisun Marsh.

# 4.0  ANALYTICAL FRAMEWORK

## 4.1  Analytical Framework for the Jeopardy Determination

Section 7(a)(2) of the Act requires that Federal agencies ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of listed species. "Jeopardize the continued existence of" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 402.02).

The jeopardy analysis in this BiOp considers the effects of the proposed Federal action, along with effects from baseline conditions and any cumulative effects, on the range-wide survival and recovery of the listed species. It relies on four components: (1) the *Status of the Species*, which describes the range-wide condition of the species, the factors responsible for that condition, and its survival and recovery needs, (2) the *Environmental Baseline*, which analyzes the condition of the species in the Action Area, the factors responsible for that condition, and the relationship of the Action Area to the survival and recovery of the species, (3) the *Effects of the Action*, which determines the direct and indirect impacts of the proposed Federal action and the effects of any interrelated or interdependent activities on the species, and (4) the *Cumulative Effects*, which evaluates the effects of future, non-Federal activities in the Action Area on the species.

The Action Area for this consultation encompasses the entire range of delta smelt. Therefore, we did not include a separate range-wide status of species section for delta smelt in this biological opinion because the *Status of the Species Within the Action Area* section for delta smelt, below, fully addresses the range-wide status.

## 4.2 Analytical Framework for the Adverse Modification Determination

Section 7(a)(2) of the Act requires that Federal agencies insure that any action they authorize, fund, or carry out is not likely to destroy or to adversely modify designated critical habitat. "Destruction or adverse modification" means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species.

The destruction or adverse modification analysis in this BiOp considers the effects of the proposed Federal action, along with effects from baseline conditions and any cumulative effects, on the range-wide value of critical habitat for the conservation of the listed species. It relies on four components: (1) the *Status of Critical Habitat*, which describes the range-wide condition of the critical habitat in terms of the key components (*i.e.*, the primary constituent elements described in the delta smelt critical habitat rule) that provide for the conservation of the listed species, the factors responsible for that condition, and the intended value of the critical habitat overall for the conservation of the listed species, (2) the *Environmental Baseline*, which analyzes the condition of the critical habitat in the Action Area, the factors responsible for that condition, and the value of the critical habitat in the Action Area for the conservation of the listed species, (3) the *Effects of the Action*, which determines the direct and indirect impacts of the proposed Federal action and the effects of any interrelated and interdependent activities on the key components of critical habitat that provide for the conservation of the listed species, and how those impacts are likely to influence the conservation value of the affected critical habitat, and (4) *Cumulative Effects*, which evaluate the effects of future non-Federal activities that are reasonably certain to occur in the Action Area on the key components of critical habitat that provide for the conservation of the listed species and how those impacts are likely to influence the conservation value of the affected critical habitat.

The Action Area for this consultation encompasses all of the designated critical habitat for delta smelt. Therefore, we did not include a separate section to address the status of the entire critical habitat designation for delta smelt in this biological opinion because the *Status of the Critical Habitat Within the Action Area* section below fully addresses the designation-wide status of delta smelt critical habitat.

# 5.0 DELTA SMELT

**Approach for Analyzing the Proposed Action**

Modeling

The analysis provided by Reclamation is supported by CalSim II modeling. CalSim II is a monthly time-step model that predicts conditions throughout the CVP and SWP systems based on operational inputs over an 82-year 'synthetic' hydrology, which includes multiple examples of all water year types. Most operational actions included in the PA to provide protections for species will occur on a time-step shorter than the model's one-month intervals. For instance, real-time operations and re-assessment of them most often occur at time steps of 5 to 14 days. Because of this, assumptions are made for inputs to the model to try to best reflect how Reclamation expects short-term actions will play out on a monthly time scale. The monthly averages output by CalSim II may not capture the conditions that species experience in the Delta at any given time. Thus, the CalSim II operating assumptions and results are not fully reflective of conditions in the Delta in any given time period, but are helpful to guide our comparative analysis of expected differences among scenarios.

Reclamation prepared the CalSim II analyses for the Biological Assessment that was transmitted on January 31, 2019. The three CalSim II scenarios that were completed at the time were intended to reflect the Without Action scenario (WOA), the Current Operating Scenario (COS) and the Proposed Action (PA). Since that time, Reclamation has made substantial changes to the PA which are not reflected in the CalSim II modeling run for the PA. We report results from the model run for the PA in our analysis, but we have limited our use of quantitative comparisons among model runs and we have identified where we expect actual conditions to be different than what is reflected in the modeling. This focus on qualitative analysis is used to capture changes from the PA model run to the PA as proposed, as well as changes to the PA and potential real-time conditions that could not be modeled accurately using a monthly time-step.

Regulatory Context

The ESA requires action agencies to ensure that actions they authorize, fund or carry out are not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. This is done through consultation with the Service and/or the National Marine Fisheries Service, which results in the Service providing an opinion on the proposed action and its effects on listed species and designated critical habitat. 16 USC § 1536. When an action agency modifies an ongoing action in a manner that has effects to listed species or designated critical habitat that were not previously analyzed in a biological opinion, the action agency must reinitiate consultation with the consulting agency. 43 CFR §402.16.

Previous Consultation

This biological opinion is prepared as a reinitiation of consultation on the coordinated operations of the CVP and SWP. There have been a series of biological opinions that have been prepared on ongoing operations. Each time, Reclamation and DWR have described their proposed action

which has varied from the previous proposed action for consultation to some degree. The proposed action may include new activities proposed, or remove activities that are no longer undertaken or considered part of CVP and SWP operations.

During the last full reevaluation of the coordinated operations of the CVP and SWP in 2008, Reclamation and DWR's proposed action had adverse effects to delta smelt and designated critical habitat, such as high levels of entrainment leading to take of delta smelt in the south delta export facilities and habitat loss. The Service concluded these operations were likely to jeopardize delta smelt and adversely modify designated critical habitat. The Service developed a Reasonable and Prudent Alternative (RPA) to the proposed action that included actions to reduce entrainment, provide for increased high quality low-salinity zone habitat in certain year types, create additional subtidal habitat, and monitor ongoing operations. Reclamation provisionally accepted the RPA and began operating consistent with it in December 2008.

In the current PA, Reclamation has taken lessons learned from implementation of the 2008 RPA over the past 10 years and has proposed actions that are different from, but similar to, those included in the RPA. These actions continue to address entrainment risk, reduced habitat quality, and habitat restoration. In the current PA, Reclamation and DWR are proposing to operate the CVP and SWP in a manner that is intended to provide protection for delta smelt and other species. This was not the case in the action proposed for consultation in 2008. For this reason, the current PA is more protective of delta smelt than the action proposed in the 2008 Biological Assessment, and provides a very different analytical context for the Service's jeopardy and adverse modification determinations than was provided in 2008.

## 5.1 Environmental Baseline

The Environmental Baseline describes the past and present impacts of all Federal, State, or private actions and other human activities in the Action Area, the anticipated impacts of all proposed Federal projects in the Action Area that have already undergone formal or early section 7 consultation, and the impact of State or private actions, which are contemporaneous with the consultation in process (50 CFR 402.02). The key purpose of the Environmental Baseline is to describe the condition of the listed species and its critical habitat that exists in the Action Area in the absence of the action subject to this consultation. In this way, it provides a starting point for identifying effects of the action.

The Action Area for this consultation encompasses the entire range of delta smelt including all of the designated critical habitat for this species. Therefore, we did not include range-wide status of species and critical habitat sections in this biological opinion because the *Status of the Species within the Action Area* and *Status of the Critical Habitat Within the Action Area* sections below fully address the range-wide status. The purpose of discussing the status of the species and critical habitat is to present the appropriate information on the species' life history, its habitat and distribution, and other data on factors necessary to its survival and recovery, which provide important background necessary for formulating the biological opinion on the effects of the PA.

The Environmental Baseline does not include the effects of the action under review in the consultation. In this case, the effects of the action are those resulting from the coordinated

operations of the CVP and SWP from now until 2030, as proposed by Reclamation in the BA, and are, therefore, not included in the Environmental Baseline for this consultation. Reclamation established a without action scenario as part of the Environmental Baseline to isolate and define potential effects of the Proposed Action apart from effects of non-Proposed Action causes. The model run representing this scenario does not include CVP and SWP operations, but does include the operations of non-CVP and non-SWP facilities, such as operation of public and private reservoirs on the Yuba, Tuolumne, and Merced rivers. The without action scenario plays a role in the effects analysis of establishing the likelihood of species survival and recovery under the Environmental Baseline (i.e., the effects on survival and recovery from all non-Proposed Action causes). The additional metrics of habitat restoration, predation and other ecological changes stemming from long-established and more recently established non-native species, water quality degradation, and other effects on species from Federal, State, and private actions are also part of the baseline because they represent beneficial and detrimental influences on the delta smelt that exist at this time.

Like the hydrodynamic modeling studies reviewed in the effects analyses below, this without action scenario provides context for how the existence of the CVP and SWP facilities have affected and continue to affect the Environmental Baseline, including habitat conditions for species and critical habitat in the Action Area. Unlike the hydrodynamic modeling studies reviewed below, this without action scenario includes the existence of the dams and south Delta facilities, but removes operations of these facilities, because the action under this consultation is operations. Reclamation provided quantitative modeling and data and qualitative conceptual models of this scenario in their BA, which help support this context. Consistent with past consultations on the operations of the CVP and SWP, the dams and other existing project facilities are included in the Environmental Baseline.

The effects of past CVP/SWP operations are also part of the Environmental Baseline. Those effects have undergone consultation and contributed to the current condition of the species and critical habitat in the Action Area. Other past, present, and ongoing impacts of human and natural factors (including proposed Federal projects that have already undergone section 7 consultation) contributing to the current condition of the species and critical habitat in the Action Area are included in the Environmental Baseline for section 7 consultation purposes. A description of previous actions that have contributed to these current conditions are described below in *Factors Affecting Delta Smelt and Critical Habitat Within the Action Area*.

Under ESA section 7, each time the operations of the CVP and SWP are consulted on (e.g., 2005, 2008, and current), a new Federal action is proposed, and the previous consultation and the impacts of past and present operations of the CVP and SWP become part of the Environmental Baseline. The operation of the CVP and SWP since the water projects' inception is not one continuous Federal action in the context of ESA compliance. The CVP and SWP proposed action covered in the 2005 biological opinion was different from the proposed action consulted on in 2008, which is different from the Proposed Action analyzed in this biological opinion. Each had proposed action-specific components and operating criteria, so they are separate Federal actions with completed separate ESA section 7 consultations and analyses that are now part of the Environmental Baseline.

As described in our *Analytical Framework for the Jeopardy Determination* and *Analytical Framework for the Adverse Modification Determination* for this consultation, our analysis includes factors responsible for the range-wide condition (fully encompassed within the Action Area) of delta smelt and critical habitat. To determine the Environmental Baseline we considered the without action scenario, and the Current Operations scenario provided in the BA. As discussed above, the without action scenario provides context for how the existence of the CVP and SWP facilities shape the Environmental Baseline, including habitat conditions for species and critical habitat in the Action Area. A Current Operations scenario was also incorporated into the BA to provide context for how past and present operations have also shaped the Environmental Baseline, as well as to aid in identifying future effects of the PA. To provide a comprehensive description of the Environmental Baseline, a qualitative look at current operations of the CVP and SWP is added to the without action scenario to further inform the current condition of the species and critical habitat in the Action Area, along with all of the other factors contributing to the current condition. The Environmental Baseline provides the basis to determine the current range-wide status of the species and critical habitat in the Action Area to provide a complete picture for delta smelt and critical habitat at the time of this consultation. As stated above, the status of the delta smelt and its critical habitat within the Action Area also represents the range-wide status of the species and its critical habitat. The cumulative effects and effects of the Proposed Action are then added to this status and baseline to inform whether or not the Proposed Action is likely to jeopardize delta smelt and/or destroy or adversely modify delta smelt critical habitat.

*Species Legal Status and Life Cycle Summary*

The Service proposed to list the delta smelt (*Hypomesus transpacificus*) as threatened with proposed critical habitat on October 3, 1991 (Service 1991). The Service listed the delta smelt as threatened on March 5, 1993 (Service 1993), and designated critical habitat for the species on December 19, 1994 (Service 1994). The delta smelt was one of eight fish species addressed in the Recovery Plan for the Sacramento–San Joaquin Delta Native Fishes (Service 1996). A 5-year status review of the delta smelt was completed on March 31, 2004 (Service 2004). The review concluded that delta smelt remained a threatened species. A subsequent 5-year status review recommended uplisting delta smelt from threatened to endangered (Service 2010a). A 12-month finding on a petition to reclassify the delta smelt as an endangered species was completed on April 7, 2010 (Service 2010b). After reviewing all available scientific and commercial information, the Service determined that re-classifying the delta smelt from a threatened to an endangered species was warranted but precluded by other higher priority listing actions (Service 2010c). The Service reviews the status and uplisting recommendation for delta smelt during its Candidate Notice of Review (CNOR) process. Each year it has been published, the CNOR has recommended the uplisting from threatened to endangered. Electronic copies of these documents are available at https://ecos.fws.gov/ecp0/profile/speciesProfile?sId=321.

The delta smelt is a small fish of the family Osmeridae. In the wild, very few individuals reach lengths over 3.5 inches (90 mm; Damon *et al.* 2016). At the time of its ESA listing, only the basics of the species' life history were known (Moyle *et al.* 1992). In the intervening 26 years, it has become one of the most studied fishes in the United States. Enough has been learned about the delta smelt to support its propagation in captivity over multiple generations (Lindberg *et al.* 2013), to support the development of complex conceptual models of the species life history (IEP 2015), and mathematical simulation models of its life cycle (Rose *et al.* 2013a). Any synthesis of the now extensive literature on the delta smelt requires drawing conclusions across studies that had disparate objectives, but several syntheses have been compiled from existing information (Moyle *et al.* 1992; Bennett 2005; IEP 2015; Moyle *et al.* 2016). In this BiOp, the Service relied on these previous syntheses where it remains appropriate to do so. We also relied on source study results and analyses of our own to synthesize across a rapidly growing body of scientific information.

The delta smelt has a fairly simple life history because a large majority of individuals live only one year (Bennett 2005; Moyle *et al.* 2016) and because it is an endemic species (Moyle 2002), comprising only one genetic population (Fisch *et al.* 2011), that completes its full life cycle in the northern reaches of the San Francisco Bay-Delta (Merz *et al.* 2011; Figure 5-1). The schematic of this simple life cycle developed by Moyle *et al.* (2016) and published again by Moyle *et al.* (2018) is shown in Figure 5-2. As described in detail in the *Status of the Critical Habitat in the Action Area*, most spawning occurs from February through May in various places from the Napa River and locations to the east including much of the Sacramento-San Joaquin Delta. Larvae hatch and enter the plankton primarily from March through May, and most individuals have metamorphosed into the juvenile life stage by June or early July. Most of the

juvenile fish continue to rear in habitats from Suisun Bay and marsh and locations east principally along the Sacramento River-Cache Slough corridor (recently dubbed the 'North Delta Arc'; Moyle *et al.* 2010). The juvenile fish (or 'sub-adults') begin to develop into maturing adults in the late fall. Thereafter, the population spatial distribution expands with the onset of early winter storms and the first individuals begin to reach sexual maturity by January in some years, but most often in February (Damon *et al.* 2016; Kurobe *et al.* 2016). Delta smelt do not reach sexual maturity until they grow to at least 55 mm in length (~ 2 inches) and 50% of individuals are sexually mature at 60 to 65 mm in length (Rose *et al.* 2013b). In captivity delta smelt can survive to spawn at two years of age (Lindberg *et al.* 2013), but this appears to be rare in the wild (Bennett 2005; Damon *et al.* 2016; Figure 5-2). The spawning microhabitats of the delta smelt are unknown, but based on adult distribution data (Damon *et al.* 2016; Polansky *et al.* 2018) and the evaluation of otolith microchemistry (Hobbs *et al.* 2007a; Bush 2017), most delta smelt spawn in freshwater to slightly brackish-water habitats under tidal influence. Most individuals die after spawning, but as is typical for annual fishes, when conditions allow, some individuals can spawn more than once during their single spawning season (Damon *et al.* 2016). In a recent study spanning 2 to 3 months, captive males held at a constant water temperature of 12°C (54°F) spawned an average of 2.8 times and females spawned an average of 1.7 times (LaCava *et al.* 2015).



**Figure 5-1. Delta smelt range map. Waterways colored in purple depict the delta smelt distribution described by Merz *et al.* (2011). The Service has used newer information to expand the transient range of delta smelt further up the Napa and Sacramento rivers than indicated by Merz *et al.* (2011). The red polygon depicts the boundary of delta smelt's designated critical habitat. The inset map shows the region known as the North Delta Arc shaded light green.**



**Figure 5-2. Schematic representation of the delta smelt life cycle. This conceptual model crosswalks delta smelt life stages with calendar months and current monitoring programs (prior to EDSM) used to evaluate the species' status. Source: Moyle *et al*. 2016**

**Table 5-1. Comparison of delta smelt primary constituent elements of critical habitat between the 1994 publication of the rule and the present.**

| Primary Constituent Element | 1994 critical habitat rule | 2019 state of scientific understanding |
|---|---|---|
| Spawning Habitat | Shallow fresh or slightly brackish edge-waters | No change |
| | Backwater sloughs | Possible, never confirmed. Potentially spawning sites have sandy substrates (Bennett 2005) and need not occur in sloughs. Backwater sloughs in particular tend to have silty substrates that would suffocate the eggs. |
| | Low concentrations of pollutants | No change |
| | Submerged tree roots, branches, emergent vegetation (tules) | Not likely. Unpublished observations of spawning by captive delta smelt suggest spawning on substrates oriented horizontally and a preference for gravel or sand that is more consistent with observations of other fishes in the family Osmeridae. |
| | Key spawning locations: Sacramento River "in the Delta", Barker Slough, Lindsey Slough, Cache Slough, Prospect Slough, Georgiana Slough, Beaver Slough, Hog Slough, Sycamore Slough, Suisun Marsh | All of the locations listed in 1994 may be suitable for spawning, but based on better monitoring from the Spring Kodiak Trawl Survey, most adult fish have since been observed to aggregate around Grizzly Island, Sherman Island, and in the Cache Slough complex including the subsequently flooded Liberty Island (Polansky *et al.* 2018). |
| | Adults could spawn from December-July. | Adults are virtually never fully ripe and ready to spawn before February and most spawning is completed by May (Damon *et al.* 2016). |

| Larval and juvenile transport | Larvae require adequate river flows to transport them from spawning habitats in backwater sloughs to rearing habitats in the open waters of the low-salinity zone | Not likely. Most delta smelt that survive to the juvenile life stage do eventually inhabit water that is in the 0.5 to 6 ppt range, due to either or both of downstream movement or decreasing outflow (Bush 2017). However, delta smelt larvae can feed in the same habitats they were hatched in and both larval and juvenile fish can rear in water with a salinity lower than 0.5 ppt (Nobriga 2002; Hammock *et al.* 2017). |
|---|---|---|
| | Larvae require adequate flow to prevent entrainment | No change |
| | Larval and juvenile transport needs to be protected from physical disturbances like sand and gravel mining, diking, dredging, rip-rapping | No change, but seems likely to have more impact on spawning habitat than larval transport, which was subsequently shown to be related to swimming behavior timed to tidal flows (Bennett *et al.* 2002). |
| | 2 ppt isohaline (X2) must be west of the Sacramento-San Joaquin River confluence to support sufficient larval and juvenile transport | Subsequent research showed the larvae distribute similarly relative to X2 regardless of where it resides (Dege and Brown 2004). X2 is generally west of the river confluence during February-June due to State Water Resources Control Board X2 standard; however, the standard does have a drought off-ramp. |
| | Maturation must not be impaired by pollutant concentrations | No change |
| | Additional flows might be required in the July-August period to protect delta smelt that were present in the south and central Delta from being entrained in export pumps. | July-August outflow augmentations may be helpful, but not to mitigate entrainment because delta smelt were subsequently shown to no longer occupy the south Delta during July-August (Kimmerer 2008). Habitat changes in the central and south Delta have rendered it seasonally unsuitable to delta smelt during the summer (Nobriga *et al.* 2008); entrainment is seldom observed past June and the |

| | | 2008 Service BiOp RPA has a 25 degree Celsius off-ramp that usually triggers in June. |
|---|---|---|
| Rearing habitat | 2 ppt isohaline (X2) should remain between Carquinez Strait in the west, Three-Mile Slough on the Sacramento River and Big Break on the San Joaquin River in the east. This was determined to be a historical range for 2 ppt salinity (including its tidal time scale excursion into the Delta). | Recent research has suggested that the 1994 description of seasonal X2 movement is considerably less than what occurred pre-development (Gross *et al.* 2018). That said, X2 is generally in the specified region during February-June due to the State Water Resources Control Board X2 standard; however, the standard does have a drought off-ramp. Most juvenile delta smelt still rear in the low-salinity zone in the summer and fall, but it is now recognized that a few remain in the Cache Slough complex as well (Sommer and Mejia 2013; Bush 2017). |
| Adult migration | Adults require unrestricted access to spawning habitat from December-July | Adults disperse faster than was recognized in 1994; most of it is finished by the time Spring Kodiak Trawls start in January (Polansky *et al.* 2018), though local movements and possibly rapid longer distance dispersal occurs throughout the spawning season, which as mentioned above is usually February-May. The only known 'barriers' to adult dispersal are water diversions. |
| | Unrestricted access results from adequate flow, suitable water quality, and protection from physical disturbance | No change |

*Environmental Setting and History of Ecological Change in the Bay-Delta*

This section briefly reviews environmental changes that have occurred since 1850; i.e., the California Gold Rush to the present. This section is subdivided into three parts. The first describes the condition that is believed to have existed in 1850. The second covers a period from about 1920 to 1967, which is the year prior to the initiation of SWP water exports from the Delta. The third sub-section covers 1968, the first year of CVP and SWP dual operations, to the present.

Over the past few years, the scientific information developed to understand pre- and post-water project changes to the estuary's landscape and flow regime has grown substantially. However, as with most scientific endeavors, there are some discrepancies that may affect some conclusions. For instance, Whipple *et al.* (2012) showed the difference between contemporary estimates of unimpaired Delta outflow that were used in the modeling studies reviewed below and measured data from the latter 19th century. These discrepancies can affect the conclusions about the natural hydrograph of the Bay-Delta ecosystem and should be kept in mind when reviewing what follows. The information on ecosystem changes that have accrued through time provides context for the current status of the delta smelt. We follow this review of historical ecosystem changes with reviews of relevant science – both old and new related to the status of delta smelt and the Service's current understanding of the primary constituent elements of its designated critical habitat (Table 5-1).

The 1850 Bay-Delta estuary: The historical Delta ecosystem was a large tidal marsh at the confluence of two floodplain river systems (Whipple *et al.* 2012; Andrews *et al.* 2017; Gross *et al.* 2018; Figure 5-3). The Delta itself experienced flooding over spring-neap tidal time scales and seasonal river runoff time scales. This variability in freshwater input to the estuary was likely important to seasonal and interannual variability in the productivity of the ecosystem for the same reasons that smaller-scale tidal marsh plain and floodplain inundation are today. Specifically, these flood cycles deliver organic carbon, but also increase the production of lower trophic levels due to lengthened water residence times and greater shallow, wetted surface areas (Sommer *et al.* 2004; Grosholz and Gallo 2006; Howe and Simenstad 2011; Enright *et al*. 2013). When freshwater flows out of the Delta and into the estuary, it can generate currents that aggregate particulate matter like sediment and phytoplankton (Monismith *et al.* 1996; 2002; MacWilliams *et al.* 2015) – and presumably also did so in the pre-development ecosystem. Prior to the invasion of the overbite clam, these sediment and phytoplankton aggregations, which occurred near the 2 ppt isohaline, demarcated an important fish nursery region (Turner and Chadwick 1972; Jassby *et al*. 1995; Bennett *et al*. 2002).

The estuary's natural hydrograph reached its annual base flows (annual minimum inputs of fresh water) in August or September toward the end of California's dry summers (Figure 5-4). Freshwater inputs would generally increase during the fall as precipitation in the watershed resumed. Delta outflow reached a broad winter through spring peak fueled first by precipitation followed by additional contributions from melting snow. The annual peak of Delta outflow often spanned January through May before declining back to base flow conditions by the late summer. The year-to-year variation in Delta outflow was considerable, often varying by about an order of magnitude during each month of the year. Water flowing from the Delta mixed into larger open-water habitats in Suisun and San Pablo bays, which themselves were fringed with marshes and

tidal creeks. This pre-development ecosystem was shallower than the modern system. As a result, salinity responded more rapidly to changes in freshwater flow than it does now and less freshwater flow was needed to move salinity isohalines than is presently the case (Andrews *et al.* 2017; Gross *et al.* 2018). Like most native fish, the delta smelt evolved its life history to take advantage of this flow regime (Moyle 2002). In particular, its spawning period and early life stages overlap the months in which historical marsh-floodplain inundation and freshwater inputs to the estuary were highest, and water temperatures were cool, but not as cold as they are in the winter before spawning commences (see *Status of the Critical Habitat in the Action Area* for details of what is known about spawning and early life stages of delta smelt).



**Figure 5-3. The circa 1850 Delta as depicted in the version of the UnTRIM 3-D hydrodynamic model described by Andrews *et al*. (2017). The model depicts an expansive tidal marsh area of approximately 2,200 km² or 850 square miles. Source: Andrews *et al*. (2017).**



**Figure 5-4. Boxplots of estimated Delta outflow by month for a pre-development Bay-Delta (circa 1850; red boxes), a pre-Central Valley Project and State Water Project Bay-Delta (circa 1920; green boxes), and a contemporary Bay-Delta (blue boxes; precise year not stated by the authors). Source: Gross *et al.* (2018). The inset labeled "Annual" on the x-axis is the boxplot summary of the sum of monthly outflows. Gross *et al.* (2018) attributed the higher outflow in the pre-project era relative to the pre-development era to the levees that had been constructed in the system by 1920.**

Many tidal river estuaries form frontal zones where inflowing fresh water begins mixing with seawater (Peterson 2003). In the Bay-Delta, a frontal zone of biological importance is the low-salinity zone (LSZ) (Jassby *et al.* 1995). The LSZ is a mobile and variable habitat region that frequently overlaps the parts of the estuary where many delta smelt reside (see *Status of the Critical Habitat in the Action Area* for details). In the Bay-Delta the location and associated function of the LSZ have historically been indexed using a statistic called X2, which is the geographic location of 2 ppt salinity near the bottom of the water column measured as a distance from the Golden Gate Bridge (Jassby *et al.* 1995; MacWilliams *et al.* 2015; Figure 5-5). When Delta outflow is high, saline water is pushed closer to the Golden Gate, resulting in a smaller distance from the Golden Gate Bridge to X2. Conversely, when Delta outflow is low, salinity intrudes further into the estuary resulting in a larger distance from the Golden Gate Bridge to X2.

These changes in how salinity is distributed affect numerous physical and biological processes in the estuary (Jassby *et al.* 1995; Kimmerer 2002a,b; Kimmerer 2004; MacWilliams *et al.* 2015).

X2, rather than another salinity isohaline, was chosen as the low-salinity zone habitat metric because it is a frontal zone or boundary upstream of which, salinity tends to be the same from the surface of the water to the bottom, and downstream of which, salinity varies from top to bottom (Jassby *et al.* 1995). That variability in the vertical distribution of salinity is indicative of currents that help to aggregate sinking particles like sediment and phytoplankton, and as recently modeled, zooplankton (Kimmerer *et al.* 2014a), near X2.



Figure 5-5. The northern reach of the Bay-Delta as depicted in the UnTRIM 3-D contemporary Bay-Delta model; greener colors represent shallower water and bluer colors represent deeper areas. The yellow lines depict the transect along which the location of X2 is estimated in the model and the associated red circles depict selected km distances from the Golden Gate Bridge along the northern axis of the estuary into the Sacramento and San Joaquin rivers for use in interpreting the variable locations of X2. Source: MacWilliams *et al.* (2015).

Pre-development outflows from the Delta were higher in the winter and spring than they are now while summer and fall outflows may have been lower (Andrews *et al.* 2017; Gross *et al.* 2018; Figure 5-4). Thus, X2 also varied more within years in the circa 1850 estuary than it now does. In the pre-development estuary, X2 would remain in San Pablo Bay for months at a time in the winter-spring of Above Normal and wetter water year types before retreating landward (upstream) in the summer-fall. In the contemporary estuary, X2 spends nearly all of its wet

season time in Suisun Bay (landward or 'upstream' of historical) and dry season time between Collinsville and Rio Vista (~ 80 to 95 km; Figure 5-5). These contemporary dry season locations of X2 may be seaward or 'downstream' of historical locations (Gross *et al.* 2018).

There are no data on the timing and magnitude of biological productivity in the circa 1850 Bay-Delta, nor are we aware of any information on how delta smelt used the estuary at the time. However, inferences can be made based on general ecosystem function in the northern hemisphere temperate zone and contemporary information. The input of basal food web materials like nutrients and detritus likely co-varied with the timing, duration, and magnitude of freshwater flows (e.g., Delta inflow; Jassby and Cloern 2000), which would likewise have affected the timing, magnitude, and duration of inundation of the system's expansive floodplains (e.g., Whipple *et al.* 2012; Figure 5-3). The production of planktonic and epibenthic invertebrates from floodplains, tidal wetlands, and open-water habitats that fuel the production of juvenile fishes that feed in open waters may have generally increased during the spring and peaked during the summer in concert with seasonal variation in water temperature (e.g., Heubach 1969; Orsi and Mecum 1986; Merz *et al.* 2016). The summer months are the warmest months in the Bay-Delta region and thus, they support the highest *average* metabolic rates of invertebrates and fish, which rely on water temperature to control their body temperature and metabolic rates. However, there was likely to have been considerable species-specificity to this generalization (e.g., Ambler *et al.* 1985; Gewant and Bollens 2005) because the Bay-Delta's native biotic community includes numerous cold-water adapted species.

The seasonal timing of delta smelt reproduction (February-May; detailed below) would have more broadly coincided with the general timing of peak freshwater flow into the Bay-Delta (Figure 5-4). The higher outflow and shallower average depth of the system resulted in frequent occurrence of the LSZ in San Pablo Bay during the wet season. Thus, it is likely that delta smelt reared in San Pablo Bay, taking advantage of its greatly expanded low-salinity habitat area (see MacWilliams *et al.* 2015), to much greater extent prior to development of the system than they are able to now. Lower flows in the summer-fall likely caused delta smelt distribution to seasonally retract back into Suisun Bay/marsh and the Delta; ecosystems which were likely much more productive at the time due to the expansive tidal marshes and greater connection between land and water (Whipple *et al.* 2012). Delta smelt's population-level demand for prey annually peaks at some combination of water temperature and growth of the population's biomass. This timing could be estimated from the model developed by Rose *et al.* (2013a), but we are not aware that such a calculation exists.

<u>1920-1967</u>: By 1920, most of the Delta's tidal wetlands had been reclaimed (Whipple *et al.* 2012; Figure 5-6). The data provided by Gross *et al.* (2018; Figure 5-4) suggest that Delta outflow may have been a little higher circa 1920 than it had been circa 1850 due to levee construction. However, this may (Hutton and Roy 2019) or may not be consistent with historical observations (Whipple *et al.* 2012). Regardless, Delta outflow and several other net flow metrics from within the Delta did begin to decline between the early 1920s and 1967 (Hutton *et al.* 2017a; 2019). These changes occurred because of four factors: (1) water storage in the Bay-Delta watershed increased from about 4 MAF to about 40 MAF because of the construction of dams upstream of the Delta, (2) the CVP began exporting water from the Delta in 1951, (3) non-project water diversions within and upstream of the Delta increased, and (4) shipping channels

were dredged through the estuary and into the Sacramento and San Joaquin rivers. These changes facilitated a general water management strategy in California to store water during the wet season and re-distribute it during the dry season to provide a more reliable supply than was available naturally. In addition, the CVP and SWP have had to offset a considerable summertime water deficit to protect the quality of their exported water and to protect water quality for senior water rights holders in the Delta. These uses would be highly impaired without water released from CVP and SWP reservoirs during the summer and fall (Hutton *et al.* 2017b).

During the 1930s to 1960s, the navigation channels were dredged deeper (~12 m) to accommodate shipping traffic from the Pacific Ocean and San Francisco Bay to ports in Sacramento and Stockton and to increase the capacity of the Delta to convey floodwaters. Channel deepening interacted with the simultaneously increasing water storage to change the Bay-Delta ecosystem into one in which Suisun Bay and the Sacramento-San Joaquin River confluence region became the largest and most depth-varying places in the typical range of the LSZ. Even with these changes, the LSZ remained a highly productive fish nursery habitat for many decades (Stevens and Miller 1983; Moyle *et al.* 1992; Jassby *et al.* 1995).



**Figure 5-6. Maps of the Delta showing years of initial land reclamation attempts on the left and major land reclamation efforts on the right. Note that a large majority of the major reclamation efforts were underway by 1915 and the last efforts in the vicinity of Liberty Island began in 1925. Source: Whipple *et al.* (2012).**

<u>1968-present</u>: The SWP began exporting water from the Delta in 1968 and its exports generally increased until about 1989 (Figure 5-7). CVP exports reached present-day levels by the end of the 1970s. During the 1980s water storage capacity in the Bay-Delta watershed reached its present-day level of a little over 50 MAF (Cloern and Jassby 2012; Hutton *et al.* 2017a). Thereafter, combined CVP-SWP exports began to increase in year-to-year variability, which increased the uncertainty about how much water would be supplied south of the Delta annually. This has combined with the increasing human demand for fresh water to result in a conflict between human water demand and environmental water uses, including the maintenance of the

hydraulic salinity barrier needed to protect exported water and other in-Delta water users from salinity intrusion (Hutton *et al.* 2017b; Reis *et al.* 2019).



**Figure 5-7. Time series of Central Valley Project and State Water Project exports from the Delta for 1952 through 2018. State Water Project exports began in water year 1968. Source: DAYFLOW data base.**

The changes discussed above have continued to lower Delta outflow (Hutton *et al.* 2017a,b; Reis *et al.* 2019; Figures 5-8 and 5-9), though D-1641 appears to have halted the trend for years in which the eight river index is lower than 20 MAF (middle panel of Figure 5-8). In Figure 5-8, exports were modeled as depletions of water from the system, so the more negative the number on the y-axis of the middle panel, the higher the exports. Thus, the graphic shows that in years when the eight river index is more than 20 MAF, exports continue to increase, but in years when the eight river index is lower than 20 MAF, exports have been trending lower. Both of these trends cause the higher year-to-year variability in water exports shown in Figure 5-7.

In general, major changes to the flow regime of an aquatic ecosystem are expected to be accompanied by ecological change (Benson 1981; Bunn and Arthington 2002; Poff and Zimmerman 2010; Gillson 2011), and that is what has been observed over time in the Bay and Delta (e.g., Matern *et al.* 2002; Moyle and Bennett 2008; Winder *et al.* 2011; Feyrer *et al.* 2015; Conrad *et al.* 2016). Delta outflow is a driver of many ecological mechanisms in the Bay-Delta

and an indicator of several others (Kimmerer 2002a). Thus, the changes to the estuary's freshwater flow regime have likely interacted with the changes to the estuary's landscape, specifically its deeper channels and greatly reduced land-water connections (Andrews *et al.* 2017), to lower the total biological productivity of the estuary. In addition, changes to the freshwater flow regime detailed above appear to have affected the reproductive success of fishes that use the Delta and Suisun Bay as rearing habitats. The evidence for this is that the native fish assemblage had reproductive seasons timed to winter-spring peak flows, whereas currently dominant non-native species generally spawn later in the spring and into the summer when inflows to the Delta are generally high to support human water use, but outflow from the Delta is generally low (Moyle 2002; Moyle and Bennett 2008). Reis *et al.* (2019) recently described super-critical water years with respect to Delta outflow. Several studies have indicated that low flow years and droughts in particular result in low native fish production in the Bay-Delta (Meng *et al.* 1994; Jassby *et al.* 1995; Kimmerer 2002b; Feyrer *et al.* 2015). Droughts recur and may contribute to cumulative impacts to native fishes like delta smelt. For instance, recent droughts have been particularly problematic for delta smelt (Moyle *et al.* 2018). Thus, the frequency of these super-critical water years, which has been much higher since 1968 than it was from 1920-1967 (Figure 5-9), is a conservation challenge that the Service and its partners have to contend with.

There are several fish species in the Bay-Delta that have historically been shown to have demonstrable positive population responses to freshwater flows into or out of the Delta. These include the well-described relationships for the survival of emigrating Sacramento basin Chinook salmon (*Oncorhynchus tschawytscha*) smolts with Sacramento River inflows (Kjelson and Brandes 1989; Perry *et al.* 2010), the relationship of Sacramento splittail (*Pogonichthys macrolepidotus*) production to Yolo Bypass flow (Moyle *et al.* 2004; Feyrer *et al.* 2006), and the 'fish-X2' relationships for striped bass, longfin smelt, and starry flounder (Turner and Chadwick 1972; Jassby *et al.* 1995; Kimmerer 2002b). The life-history of delta smelt with its affinity for fresh and low-salinity waters seems consistent with that of a fish one could expect to respond similarly to variation in Delta outflow or X2. Researchers searched for some form of analogous relationship for the delta smelt for several decades, but no persistent relationship was found (Stevens and Miller 1983; Moyle *et al.* 1992; Jassby *et al.* 1995; Kimmerer 2002b; Bennett 2005; Mac Nally *et al.* 2010; Thomson *et al.* 2010; Miller *et al.* 2012). Further, Rose *et al.* (2013a,b) did not find salinity variation *per se* to have much impact on predictions of delta smelt population growth rate. The larger predicted impact in their individual-based model related to flow was due to simulated entrainment in exported water (Rose *et al.* 2013b; Kimmerer and Rose 2018). Although entrainment was predicted to lower the population growth rate, in and of itself, it could not convert a strongly positive growing population into a declining one without at least one additional factor impacting survival at the same time.

The Interagency Ecological Program (IEP) (2015) reported a correlation between February-May X2 and ratios of the 20-mm Survey index for delta smelt and either the Spring Kodiak Trawl (SKT) or Fall Midwater Trawl (FMWT) indices of the parental stock that produced the 20-mm fish. This relationship emerged in data beginning at the time of the pelagic organism decline (POD) in 2002. This relationship is stronger when considered in terms of salinity at Chipps Island (He and Nobriga 2018), possibly because salinity can be measured more accurately than Delta outflow when net freshwater flow is very low (Monismith 2016). Castillo *et al.* (2018)

used a simulation based on SKT data to suggest a link between Delta outflow and adult delta smelt abundance. In addition, several teams have reported statistical associations of delta smelt spatial distribution and salinity that imply the population spatial distribution co-varies with Delta outflow, X2, or similar indices of freshwater input to the estuary (Feyrer *et al.* 2007; 2011; Nobriga *et al.* 2008; Kimmerer *et al.* 2009; 2013; Bever *et al.* 2016; Polanksy *et al.* 2018; Simonis and Merz 2019). The strength of this covariation and its management utility have been contested (e.g., Murphy and Hamilton 2013; Manly *et al.* 2015; Latour 2016; Polanksy *et al.* 2018) and supported (Sommer *et al.* 2011; Bever *et al.* 2016; Feyrer *et al.* 2016; Mahardja *et al.* 2017a) in several recently published papers.



**Figure 5-8. Time series (1922-2015) of statistical trend outputs of annual Delta outflow (top panel), Delta exports treated as depletions so increasing exports are represented by more negative values (middle panel), and water diversions from the Sacramento River basin upstream of the Delta (bottom panel). Black symbols and lines are for years in which the eight river index, a measure of water availability in the Bay-Delta watershed, was greater than 20 million acre-feet (MAF). Red symbols and lines are for years in which the eight river index was less than or equal to 20 MAF. Source: Hutton *et al.* (2017b).**



**Figure 5-9. Time series of estimates of unimpaired (upper panel) and actual (lower panel) Delta outflow (February-June) color-coded according to six water year types, 1930-2018. The water year types based on basin precipitation are shown in the upper panel. In the lower panel, the water year types were re-assessed based on their fraction of the estimated unimpaired outflow. The long-term trend in this fraction as "% of unimpaired" is shown on the second y-axis of the bottom panel. Source: Reis *et al.* (2019).**

*Delta Smelt Population Trend*

The California Department of Fish and Wildlife's (CDFW) Summer Townet Survey (TNS) (http://www.dfg.ca.gov/delta/data/townet/indices.asp?species=3) and FMWT Survey (http://www.dfg.ca.gov/delta/data/fmwt/indices.asp) are the two longest running indicators of the delta smelt's abundance trend. Indices of delta smelt relative abundance from these surveys date to 1959 and 1967, respectively (Figures 5-10 and 5-11). The FMWT index has traditionally been the primary indicator of delta smelt trend because it samples later in the life cycle, providing a better indicator of annual recruitment than the TNS (Service 1996). It has also sampled more consistently and more intensively than the TNS. The FMWT deploys more than 400 net tows per year over its four-month sampling season (September through December). The highest FMWT index for delta smelt (1,673) was recorded in 1970 and a comparably high index (1,654) was reported in 1980 (Figure 5-11). The last FMWT index exceeding 1,000 was reported in 1993. The last FMWT indices exceeding 100 were reported in 2003 and 2011. In 2018, the FMWT index was zero for the first time. The TNS index for delta smelt has been zero four times since 2015. Thus, the TNS and FMWT have recorded a 40-50 year decline in which delta smelt went

from a minor (but common) species to essentially undetectable by these long-term surveys (Figures 5-10 and 5-11).

Following the ESA listing of the delta smelt, the CDFW launched a 20-mm Survey (1995) and a SKT Survey (SKT; 2002) to monitor the distribution and relative abundance of late larval stage and adult delta smelt, respectively. These newer indices have generally corroborated the trends implied by the TNS and the FMWT (Figures 5-10 and 5-11). The CDFW methods generate abundance indices from each survey but each index is on a different numeric scale. This means the index number generated by a given survey only has quantitative meaning relative to other indices generated by the same survey. Further, the CDFW indices lack estimates of uncertainty (variability) which limits interpretation of abundance changes from year to year even within each sampling program. The Service recently completed a new delta smelt abundance indexing procedure using data from all four of these surveys (Polansky *et al.* 2019). The Service method improves upon the CDFW method because it generates abundance indices in units of numbers of fish, including attempts to correct for different sampling efficiencies among surveys, and the method includes measures of uncertainty. Service indices of spawner abundance based on combined January and February SKT sampling are listed with their confidence intervals in Table 5-2. The estimates show the most recent 18 years of the delta smelt's longer-term decline in numbers of fish as best as they can be approximated with currently available information. The 2019 abundance estimate of 5,610 is the lowest on record, though the upper confidence limit for the 2019 estimate overlaps the lower confidence limits from 2016 and 2018. This indicates there is more than a five percent chance that the 2019 abundance index is not different from 2016 and 2018. Regardless of this recent year uncertainty, the 2019 abundance index is much lower than peak abundance estimates in Table 5-2 which themselves are all based on data streams that started after the species had already declined considerably (Figures 5-10 and 5-11).



**Figure 5-10. Time series of juvenile and larval delta smelt relative abundance as depicted by the California Department of Fish and Wildlife's Summer Townet Survey and 20-mm Survey, respectively. The townet survey began in 1959 and the 20-mm Survey began in 1995. The second y-axis was scaled to better align the indices which are calculated on different numeric scales.**



**Figure 5-11. Time series of juvenile and larval delta smelt relative abundance as depicted by the California Department of Fish and Wildlife's Fall Midwater Trawl Survey and Spring Kodiak Trawl Survey, respectively. The midwater trawl survey began in 1967 and the Kodiak trawl survey began in 2002. The second y-axis was scaled to better align the indices which are calculated on different numeric scales.**

**Table 5-2. Estimates of adult delta smelt population size during January-February of 2002 through 2019 with 95% confidence intervals.**

| Year | Abundance Estimate | Standard Error | 95% Confidence Interval | | Number of Delta Smelt Caught in the SKT Survey | | Year-to-Year Ratio |
|------|------|------|------|------|------|------|------|
| | | | Lower Bound | Upper Bound | January | February | |
| 2002 | 1,093,244 | 195,329 | 760,332 | 1,523,294 | 262 | 394 | NA |
| 2003 | 996,055 | 261,205 | 581,197 | 1,597,198 | NA | 232 | 0.91 |
| 2004 | 966,981 | 262,190 | 553,729 | 1,573,002 | 380 | 300 | 0.97 |
| 2005 | 715,858 | 147,190 | 470,572 | 1,044,828 | 220 | 218 | 0.74 |
| 2006 | 272,327 | 42,400 | 198,681 | 364,438 | 44 | 84 | 0.38 |
| 2007 | 449,466 | 128,731 | 249,216 | 749,168 | 109 | 107 | 1.65 |
| 2008 | 509,428 | 188,396 | 236,859 | 963,839 | 132 | 36 | 1.13 |
| 2009 | 1,166,145 | 523,856 | 459,083 | 2,464,804 | 579 | 61 | 2.29 |
| 2010 | 251,863 | 54,580 | 161,753 | 374,582 | 88 | 57 | 0.22 |
| 2011 | 461,599 | 202,547 | 185,712 | 962,088 | 177 | 128 | 1.83 |
| 2012 | 1,177,201 | 328,682 | 662,728 | 1,939,836 | 320 | 287 | 2.55 |
| 2013 | 333,682 | 89,809 | 191,886 | 541,064 | 100 | 125 | 0.28 |
| 2014 | 308,972 | 91,474 | 167,858 | 522,884 | 148 | 55 | 0.93 |
| 2015 | 213,345 | 76,639 | 101,434 | 397,439 | 21 | 68 | 0.69 |
| 2016 | 25,445 | 9,584 | 11,661 | 48,622 | 7 | 6 | 0.12 |
| 2017 | 73,331 | 23,342 | 38,010 | 128,459 | 18 | 8 | 2.88 |
| 2018 | 26,649 | 21,397 | 5,215 | 82,805 | 10 | 4 | 0.36 |
| 2019 | 5,610 | 4,395 | 1,138 | 17,135 | 1 | 1 | 0.21 |

Under the without action scenario described in the BA, the status of the delta smelt would be improved because there would be no entrainment or salvage loss, OMR flows would generally be positive, Delta outflow would likely be higher in the spring but lower in the summer and fall, the location of X2 and the LSZ would likely be more favorable for delta smelt during some seasons and hydrologic year types, more sediment supply in the winter and spring would increase turbidity, and there would be more spawning substrate during the high-flow winter/spring period. However, this without action condition is considered with the current condition of the species (which is a result of all factors that have impacted the species within the Action Area) to provide the "snapshot" of the species' health at this point in time. As discussed above, the current status of delta smelt is poor. The anticipated status between now and 2030 is also relevant to this BiOp to consider when addressing effects of the action in the aggregate. The Service developed three mathematical models to explore expected delta smelt population trends between now and the latter 2020s (Appendix 1). All three models are 'state-space models' that statistically separate the uncertainty (or variability) caused by imprecise sampling (observation error) from variability caused by other sources, often referred to as process noise. State-space models propagate both sources of uncertainty throughout the time series of their calculations.

The first model predicts delta smelt abundance at more than one life stage. Here this model is referred to as a multiple life stage model. Note that Table 5-2 presents estimates of adult abundance from January-February surveys because these months have been the focus of regulatory efforts over the past few years. In contrast, all three models described in this section use estimates of adult abundance from February-March. Thus, the abundance indices used in this model exploration are not the same ones listed in the table, though they are correlated (r=0.78). The multiple life stage model also estimated survival of each new generation of recruits at three subsequent points in their life cycle. The model was fit to abundance data for each life stage for the years 1995-2017, and allowed a change in either the expected survival or recruitment beginning in December 2008 to coincide with issuance of the previous delta smelt water operations BiOp.

The other two models are variations of an annual time-step model, i.e., they are models in which delta smelt abundance was only estimated at the adult life stage each year. One of the annual time-step models used a change-point for years ≥ 2009 and the other did not. This change-point is a statistical term reflecting that the model has a different expected population growth rate and a separate estimate of uncertainty for 1995-2008 than it does for 2009-2017. The rationale for exploring two alternative annual time-step models was (1) to determine whether there was evidence for a change in population growth rate coincident with the delta smelt and anadromous fish biological opinions, and (2) whether such a change would affect predictions of future abundances. The annual time-step models were fit to adult abundance data for 2002-2017. One of the metrics evaluated below is the delta smelt's population growth rate (and its predicted future population growth rates). These are denoted by the Greek letter lambda ($\lambda$). When the population growth rate was higher than 1 (meaning that a given year's adult population was larger than the prior year), the population had increased (or was predicted to increase), and when $\lambda < 1$, it had decreased (or was predicted to decrease). Because the delta smelt population was declining over the modeled period, the average and median $\lambda$ were lower than 1. Further details are provided in Appendix 1. These models take into account population trends based on abundance indices which are informed by long-term monitoring data for periods before and after the 2008 BiOp was issued. This information is useful to understand the effects of the PA because it provides context for how past and current operations have shaped the Environmental Baseline and contributed to the current condition of delta smelt in the Action Area.

All three models fit the 2002-2017 adult abundance data well (Figure 5-12). The multiple life stage model indicated that winter survival increased during 2009-2017, but that summer and fall survival have likely decreased since 2008 (Appendix 1). The annual time-step models were noisier and, therefore, results were less clear. This is somewhat expected since the annual time-step models fit to fewer life stages and therefore cannot capture variation that affects recruitment and survival at a time step shorter than the full life span of the delta smelt.



**Figure 5-12. Estimated adult delta smelt abundance indices (on a natural log scale) for 2002-2017 (black circles; Appendix 1). The solid lines are predictions of the abundance indices from the three models described above (black=stage structured, red=annual model without a change-point, and green=annual model with a 2009 change-point). The solid lines are the mean prediction and the dashed lines represent the limits of the 95% central Bayesian credible intervals. Source: Service unpublished data analysis (Appendix 1).**

Despite the differences in signal to noise ratio in the alternative model constructs, Figure 5-13 shows that all three generated similar predictions of the population growth rate λ, though the annual model lacking a 2009 change point did not track the multiple life stage model predictions as well as the annual model that included the change point. Regardless, Figures 5-12 and 5-13 confirm that each of the three models would on average be expected to generate similar future projections of population growth rate, and by extension, abundance.



**Figure 5-13. Scatterplots of mean population growth rate (λ) from the three population trend models described above. Data points are labelled by the cohort year. Source: Service unpublished data analysis.**

Projections of delta smelt abundance indices over a 10-year period were made using the multiple life stage model and the annual model with a 2009 change point (Figure 5-14). Both models tend to predict continued decline whether or not pre-2009 or post-2008 vital rates were used to make the projections. This provides evidence that the delta smelt population has a high chance of continuing to decline.



**Figure 5-14. Median future abundance index predictions for delta smelt based on two of the three models described above: black=stage-structured, and green=annual model with a 2009 change-point. Solid lines reflect predictions made using pre-2009 vital rates and dashed lines reflect predictions made using ≥ 2009 vital rates. Source: Service unpublished data analysis.**

*Climate Change*

Climate projections for the San Francisco Bay-Delta and its watershed indicate that changes will be substantial by mid-century and considerable by the year 2100. Climate models broadly agree that average annual air temperatures will rise by about 2°C at mid-century and about 4°C by 2100 if current atmospheric carbon emissions accelerate as currently forecasted (Dettinger *et al.* 2016). It remains highly uncertain whether annual precipitation in the Bay-Delta watershed will trend wetter or drier (Dettinger 2005; Dettinger *et al.* 2016). The warmer air temperature projections suggest more precipitation will fall as rain rather than snow and that storms may increase in intensity, but will have more dry weather in between them (Knowles and Cayan 2002; Dettinger 2005; Dettinger *et al.* 2016). The expected consequences are less water stored in spring snowpacks, increased flooding and an associated decrease in runoff for the remainder of the year (Hayhoe *et al.* 2004). Changes in storm tracks may lead to increased frequency of flood and drought cycles during the 21st century (Dettinger *et al.* 2015).

As of 2009, sea level rise had not had much effect on X2 (Hutton *et al.* 2017b). However, additional sea level rise is another anticipated consequence of a warming global climate and if it

is not mitigated, sea level rise will likely increase saltwater intrusion into the Bay-Delta (Rath *et al.* 2017). For instance, the 6 inches of sea level rise modeled in CalSim II for the 2030 condition in the Proposed Action would be expected to move X2 about 1 km landward without higher outflow to compensate (Rath *et al.* 2017). Thus, it is likely that CalSim II had to add more outflow to meet D-1641 standards at times during the 82-year Proposed Action simulation than it would have had to if an older baseline were being modeled. During the summer of 2015, variation in sea level interacted with very low Delta inflows to cause frequent recurrence of net negative Delta outflow (Monismith 2016).

Since the early 1980s, climate change is thought to have increased wind speed along the central California coast, resulting in a more frequent and longer lasting upwelling season (Garcia-Reyes and Largier 2010). Coastal upwelling causes colder deep water to rise to the ocean surface, bringing with it nutrients that stimulate the coastal food web. One effect of wind blowing over the estuary is that it resuspends sediment deposited in shallow areas like San Pablo Bay, Grizzly Bay, and Honker Bay (Ruhl *et al*. 2001). Thus, higher wind speeds blowing onto the coast might be expected to result in higher turbidity of the water in parts of the estuary. In contrast to this expectation, Bever *et al*. (2018) reported a recent reduction in wind speed over the Bay-Delta during 1995-2015, which these authors associated with lower turbidity in Suisun Bay. The Service notes these contrasting results for completeness but we cannot reconcile these opposing trends in wind speed at this time. We show below that Secchi disk depth (an indicator of water turbidity) have not increased since the mid-1980s near the (mobile) location of X2 even though suspended sediment concentrations in Suisun Bay have decreased since about 2000 (Schoellhamer 2011; Bever *et al*. 2018).

Central California's warm summers are already a source of energetic stress for delta smelt and warm springs can already severely compress the duration of their spawning season (Rose *et al.* 2013a,b). We expect warmer estuary temperatures to present a significant conservation challenge for delta smelt in the coming decades (Brown *et al.* 2013; 2016a; Figure 5-15). Feyrer *et al.* (2011) and Brown *et al.* (2013; 2016a) have evaluated the anticipated effects of projected climate change on several delta smelt habitat metrics. Collectively, these studies indicate the future will bring chronically compressed fall habitat, fewer 'good' turbidity days (defined by the authors as a mean turbidity greater than or equal to 18 NTU), a spawning window of similar duration but that is shifted 2 to 3 weeks earlier in the year, and a substantial increase in the number of days delta smelt will need to endure lethal or near lethal summer water temperatures.

The delta smelt lives at the southern limit of the inland distribution of the family Osmeridae along the Pacific coast of North America. The anticipated effects of a warming climate are expected to create increasing temperature related challenges for delta smelt at some future point. The amount of anticipated change to the regional climate expected in the near term is lower than it is for the latter half of the century (Figure 5-15). Therefore, it is less certain that any measurable change from current conditions will occur in the next approximately 10 years than by 2050 or 2100. For the time being, water temperatures are stressful to delta smelt, but not of themselves lethal in most of the upper estuary (Komoroske *et al.* 2015).



**Figure 5-15.** **P**lots of median, maximum, and minimum number of days each year with an estimated average daily water temperature greater than or equal to 24°C (75°F) at selected sites in the Delta by decade for the 21st century. The water temperature threshold reflects one chosen by the authors to represent near lethal conditions for delta smelt. Source: Brown *et al.* (2016a).

*Recovery and Management*

Following Moyle *et al.* (1992), the Service (1993) indicated that SWP and CVP exports were the primary factors contributing to the decline of delta smelt due to entrainment of larvae and juveniles and the effects of low flow on the location and function of the estuary mixing zone

(now called the low-salinity zone). In addition, prolonged drought during 1987-1992, in-Delta water diversions, reduction in food supplies by nonindigenous aquatic species (specifically overbite clam and nonnative copepods), and toxicity due to agricultural and industrial chemicals were also factors considered to be threatening the delta smelt. In the Service's 2008 BiOp, the RPA required protection of all life stages from entrainment and augmentation of Delta outflow during the fall of Wet and Above-Normal years as classified by the State of California (Service 2008). The expansion of entrainment protection for delta smelt in the 2008 BiOp was in response to large increases in juvenile and adult salvage in the early 2000s (Kimmerer 2008; Brown *et al.* 2009). The fall X2 requirement in the 2008 RPA was in response to increased fall exports that had reduced variability in Delta outflow and lowered habitat suitability during the fall months and the 2008 proposed action was anticipated to reduce it further (Feyrer *et al.* 2011).

The Service's (2010c) recommendation to uplist delta smelt from threatened to endangered included a discussion of threats related to reservoir operations and water diversions upstream of the estuary as additional water operations mechanisms interacting with exports from the Delta to restrict the LSZ and concentrate delta smelt with competing and predatory fish species. In addition, Brazilian waterweed (*Egeria densa*) and increasing water transparency were considered new detrimental habitat changes. Predation was considered a low-level threat linked to increasing waterweed abundance and increasing water transparency. Additional threats considered potentially significant by the Service in 2010 were entrainment into power plant diversions, contaminants, and reproductive problems that can stem from small population sizes. Conservation recommendations included: establish Delta outflows proportionate to unimpaired flows to set outflow targets as fractions of runoff in the Central Valley watersheds; minimize reverse flows in Old and Middle rivers; and, establish a genetic management plan for captive-reared delta smelt with the goals of minimizing the loss of genetic diversity and limiting risk of extinction caused by unpredictable catastrophic events. The Service (2012) recently added climate change to the list of threats to the delta smelt.

Maintaining protection of the delta smelt from excessive entrainment, improving the estuary's flow regime, suppression of nonnative species, increasing zooplankton abundance, and improving water quality are among the actions the Service has previously indicated are needed to recover the delta smelt.

There have been several recent papers suggesting it is time to consider supplementation of the wild delta smelt population with captive-bred fish as part of a broad-based conservation strategy to avoid extinction in the wild, also known as extirpation (Moyle *et al.* 2016; 2018; Hobbs *et al.* 2017; Lessard *et al.* 2018). This year, pilot research conducted by DWR has demonstrated that captive-bred delta smelt held within steel enclosures can survive in the Delta for at least 30 days. This is long enough to show that the fish can feed themselves and did not die from acute water toxicity in either of two locations tested thus far. The fish will be evaluated for chronic toxic exposure, but that work is not finished. These results are promising and similar research is planned for later this year and next.

The status of the delta smelt is poor as is the status of their critical habitat (see *Status of the Critical Habitat Within the Action Area*). The current estimated delta smelt population sizes are so low that it seems unlikely the species can be habitat- or food-limited even though both

physical and food web-related habitat attributes have degraded over time. It is more likely that delta smelt have been marginalized by non-native fishes and invertebrates that compete with and prey on them. When fish populations reach very low levels, they can fall victim to demographic problems (often termed Allee effects in the scientific literature). These include problems concentrating enough individuals in particular locations for successful spawning, successful feeding, or maintaining large enough egg supplies, or shoals and schools of juvenile and adult fish to provide effective protection from predators (Liermann and Hilborn 2001; Keith and Hutchings 2012). Supplementation may help the Service and its partners reach delta smelt abundance levels that help to mitigate demographic problems. The Service anticipates that this will be an aspect of ongoing research into meeting the near term supplementation goal described in the PA.

*Summary of the Status of Delta Smelt*

Under the without action scenario described in the BA, the status of the delta smelt would be improved because the threats caused by or exacerbated by operations of the CVP and SWP would be lessened. For instance, there would be no entrainment, and the seasonal contraction of the LSZ would not be as pronounced. This without action condition is considered with the current condition of the species (which is a result of all factors impacting the species within the Action Area) to provide the "snapshot" of the species' health at this point in time. The relative abundance of delta smelt has reached very low numbers for a small forage fish in an ecosystem the size of the Bay-Delta and the species is approaching extinction in the wild (Moyle *et al.* 2016; 2018; Hobbs *et al.* 2017). The extremely low 2018-2019 abundance indices reflect decades of habitat change and marginalization by non-native species that prey on and out-compete delta smelt. The anticipated effects of climate change on the Bay-Delta and its watershed such as warmer water temperatures, greater salinity intrusion, lower snowpack contribution to spring outflow, and the potential for frequent extreme drought, indicate challenges to delta smelt survival will increase.

## 5.1.2  Status of the Critical Habitat Within the Action Area

*Legal Status*

The Service designated critical habitat for the delta smelt on December 19, 1994 (Service 1994). The geographic area encompassed by the designation includes all water and all submerged lands below ordinary high water and the entire water column bounded by and contained in Suisun Bay (including the contiguous Grizzly and Honker Bays); the length of Goodyear, Suisun, Cutoff, First Mallard (Spring Branch), and Montezuma sloughs; and the existing contiguous waters contained within the legal Delta (as defined in section 12220 of the California Water Code) (Service 1994).

*Conservation Role of Delta Smelt Critical Habitat*

The Service's primary objective in designating critical habitat was to identify the key components of delta smelt habitat that support successful completion of the life cycle, including spawning, larval and juvenile transport, rearing, and adult migration back to spawning sites.

Delta smelt are endemic to the Bay-Delta and the vast majority only live one year. Thus, regardless of annual hydrology, the Bay-Delta estuary must provide suitable habitat all year, every year. The primary constituent elements considered essential to the conservation of the delta smelt as they were characterized in 1994 are physical habitat, water, river flow, and salinity concentrations required to maintain delta smelt habitat for spawning, larval and juvenile transport, rearing, and adult migration (Service 1994). The Service recommended in its designation of critical habitat for the delta smelt that salinity in Suisun Bay should vary according to WY type, which it does. For the months of February through June, this element was codified by the State Water Resources Control Board's (SWRCB) "X2 standard" described in D-1641 and the SWRCB's current Water Quality Control Plan.

*Detailed Review of the Reproductive Biology of Delta Smelt*

Delta smelt spawn in the estuary and have one spawning season for each generation, which makes the timing and duration of the spawning season important every year. Delta smelt are believed to spawn in fresh and low-salinity water (Hobbs *et al.* 2007a; Bush 2017). Therefore, freshwater flow affects how much of the estuary is available for delta smelt to spawn (Hobbs *et al.* 2007a). This is one mechanism in which interannual variation in Delta outflow could play a role in the population dynamics of delta smelt. Given the timing of delta smelt reproduction, Delta outflow during February through May would be most important for this mechanism. During this time of year, variation in Delta outflow is largely driven by weather variation and regulated by the SWRCB D-1641.

The locations of delta smelt spawning are thought to be influenced by salinity (Hobbs *et al.* 2007a), but the duration of the spawning season is thought to be driven mainly by water temperature (Bennett 2005; Damon *et al.* 2016), which is largely a function of regional air temperature (Wagner *et al.* 2011). Thus, the spawning season duration does not appear to be a freshwater flow mechanism, but rather, a climate-driven mechanism (Brown *et al.* 2016a). Delta smelt can start spawning when water temperatures reach about 10°C (50°F) and can continue until temperatures reach about 20°C (68°F; Bennett 2005; Damon *et al.* 2016). The ideal spawning condition occurs when water temperatures remain between 10°C and 20°C throughout February through May. Few delta smelt ≤ 55 mm in length are sexually mature and 50% of delta smelt reach sexual maturity at 60 to 65 mm in length (Rose *et al.* 2013b). During January and February, many delta smelt are still smaller than these size thresholds (Damon *et al.* 2016). Thus, if water temperatures rise much above 10°C in January, the "spawning season" can start before many individuals are mature enough to actually spawn. If temperatures continue to warm rapidly toward 20°C in early spring, that can end the spawning season with only a small fraction of 'adult' fish having had an opportunity to spawn, and perhaps only one opportunity to do so. Delta smelt were initially believed to spawn only once before dying (Moyle *et al.* 1992). It has since been confirmed that delta smelt can spawn more than once if water temperatures remain suitable for a long enough time, and if the adults find enough food to support the production of another batch of eggs (Lindberg *et al.* 2013; Damon *et al.* 2016; Kurobe *et al.* 2016). In a recent study spanning 2 to 3 months, captive males held at a constant water temperature of 12°C (54°F) spawned an average of 2.8 times and females spawned an average of 1.7 times (LaCava *et al.* 2015). As a result, the longer water temperatures remain cool, the more fish have time to mature

and the more times individual fish can spawn. Most adults disappear from monitoring programs by May, suggesting they have died (Damon *et al.* 2016; Polansky *et al.* 2018).

The reproductive behavior of delta smelt is only known from captive specimens spawned in artificial environments and most of the information has never been published, but is currently being revisited in new research. Spawning likely occurs mainly at night with several males attending a female that broadcasts her eggs onto bottom substrate (Bennett 2005). Although preferred spawning substrate is unknown, spawning habits of delta smelt's closest relative, the Surf smelt (*Hypomesus pretiosus*), are sand or small gravel (Hirose and Kawaguchi 1998; Quinn *et al.* 2012).

The duration of the egg stage is temperature-dependent and averages about 10 days before the embryos hatch into larvae (Bennett 2005). It takes the fish about 30-70 days to reach 20-mm in length (Bennett 2005; Hobbs *et al.* 2007b). Similarly, Rose *et al.* (2013b) estimated that it takes delta smelt an average of slightly over 60 days to reach the juvenile life stage. Metamorphosing "post-larvae" appear in monitoring surveys from April into July of most years. By July, most delta smelt have reached the juvenile life stage. Thus, subtracting 60 days from April and July indicates that most spawning occurs from February-May.

Hatching success is highest at temperatures of 15-16°C (59-61°F) and lower at cooler and warmer temperatures and hatching success nears zero percent as water temperatures exceed 20°C (Bennett 2005). Water temperatures suitable for spawning occur most frequently during the months of February-May, but ripe female delta smelt have been observed as early as January and larvae have been collected as late as July, suggesting that spawning itself may extend into June in years with exceptionally cool spring weather.

*Detailed Review of the Habitat Use and Distribution of Delta Smelt*

Because the delta smelt only lives in one part of one comprehensively monitored estuary, its general distribution and habitat use are well understood (Moyle *et al.* 1992; Bennett 2005; Hobbs *et al.* 2006; 2007b; Feyrer *et al.* 2007; Nobriga *et al.* 2008; Kimmerer *et al.* 2009; Merz *et al.* 2011; Murphy and Hamilton 2013; Sommer and Mejia 2013; Mahardja *et al.* 2017a; Simonis and Merz 2019). The delta smelt has been characterized as a semi-anadromous species (Bennett 2005; Hammock *et al.* 2017) and Sommer *et al.* (2011) characterized the species as a partial diadromous migrant, recognizing individual variation in its life-history. However, both terms emphasize a life cycle in which delta smelt spawn in freshwater and volitionally move 'downstream' into brackish water habitat, which is only one endpoint among several individual life cycle strategies that have recently been confirmed through the use of otolith microchemical analyses (Bush 2017). In addition, semi-anadromy and partial diadromy are scale-dependent terms which have caused confusion among researchers and managers alike. For instance, some individual delta smelt clearly migrate between fresh and brackish water during their lives (Bush 2017). Other individuals could appear to have done so based on otolith microchemistry but in reality have moved very little and simply experienced annual salinity variation, which can be very high in much of the range of delta smelt (see Hammock *et al.* 2019). Other individual delta smelt are clearly freshwater and brackish-water resident throughout their lives (Bush 2017). As a result, there are both location-based (*e.g.*, Sacramento River around Decker Island) and

conditions-based (low-salinity zone) habitats that delta smelt permanently occupy. There are habitats that some delta smelt occupy seasonally (*e.g.*, for spawning), and there are habitats that a few delta smelt occupy transiently, which we define here as occasional use. Transient habitats include distribution extremes from which delta smelt have occasionally been collected, but were not historically collected every year or even in most years. Thus, the Service suggests the delta smelt may be best characterized as an upper estuary resident species with a population-scale distribution that expands and contracts as freshwater flow seasonally (and interannually) decreases and increases, respectively. This influence of freshwater flow inputs on delta smelt distribution could in turn influence mechanisms that affect the species' population dynamics when those mechanisms are linked to where the fish reside or how they are distributed in the estuary. We note that water temperature, turbidity, water diversion rates, prey availability, and possibly other factors would also affect these spatial recruitment and survival mechanisms.

Delta smelt have been observed as far west as San Francisco Bay near the City of Berkeley, as far north as Knight's Landing on the Sacramento River, as far east as Woodbridge on the Mokelumne River and Stockton on the Calaveras River, and as far south as Mossdale on the San Joaquin River (Merz *et al.* 2011; Figure 5-1). These extremes of the species' distribution extend beyond the geographic boundaries specified in the critical habitat rule. However, most delta smelt have been collected from locations within the critical habitat boundaries. In other words, observations of delta smelt outside of the critical habitat boundaries reflect transient habitat use rather than permanent or seasonal habitat use. The Napa River is the only location outside of the critical habitat boundaries that may be used often enough to be considered a seasonal habitat rather than a transient one.

The fixed-location habitats that delta smelt permanently occupy span from the Cache Slough complex down into Suisun Bay and Suisun Marsh (Figure 5-16). The reasons delta smelt are believed to permanently occupy this part of the estuary are the presence of fresh- to low-salinity water year round that is comparatively turbid and of a tolerable water temperature. These appropriate water quality conditions overlap an underwater landscape featuring variation in depth, tidal current velocities, edge habitats, and food production (Nobriga *et al.* 2008; Feyrer *et al.* 2011; Murphy and Hamilton 2013; Sommer and Mejia 2013; Hammock *et al.* 2015; 2017; 2019; Bever *et al.* 2016; Mahardja *et al.* 2019; Simonis and Merz 2019). Field observations are increasingly being supported by laboratory research that explains how delta smelt respond physiologically and behaviorally to variation in water quality that can vary with changes in climate, freshwater flow and estuarine bathymetry (e.g., Hasenbein *et al.* 2013; 2016b; Komoroske *et al.* 2014; 2016).

The principal variable-location habitat that delta smelt permanently occupy is the LSZ (Moyle *et al.* 1992; Bennett 2005). The LSZ is a dynamic habitat with size and location that respond to changes in tidal and river flows (Jassby *et al.* 1995; Kimmerer *et al.* 2013; MacWilliams *et al.* 2015; 2016; Bever *et al.* 2016). The LSZ generally expands and moves downstream as river flows into the estuary increase, placing low-salinity water over a larger and more diverse set of nominal habitat types than occurs under lower flow conditions. As river flows decrease, the LSZ contracts and moves upstream. This is perhaps the most frequently assumed freshwater flow mechanism in discussions about X2 regulations, but as shown by Kimmerer *et al.* (2009; 2013), it does not appear to be a major explanatory mechanism for most fishes including the delta smelt.

The LSZ often encompasses many of the permanently occupied fixed locations discussed above. It is treated separately here because delta smelt distribution tracks the movement of the LSZ somewhat (Moyle *et al.* 1992; Dege and Brown 2004; Feyrer *et al.* 2007; 2011; Nobriga *et al.* 2008; Sommer *et al.* 2011; Bever *et al.* 2016; Manly *et al.* 2015; Polansky *et al.* 2018; Simonis and Merz 2019). Due to its historical importance as a fish nursery habitat, there is a long research history into the physics and biology of the LSZ. The LSZ is frequently defined as waters with a salinity range of about 0.5 to 6 ppt (Kimmerer 2004). This and similar salinity ranges reported by different authors were chosen based on analyses of historical peaks in chlorophyll concentration and zooplankton abundance. Most delta smelt collected in the 20-mm Survey and TNS have been collected at salinities of near 0 ppt to 2 ppt and most of the (older) delta smelt in the FMWT have been collected from a salinity range of about 1 to 5 ppt (Kimmerer *et al.* 2013). These fish of different life stages do not tend to be in dramatically different places (Murphy and Hamilton 2013; Figure 5-16), suggesting that some of the change in occupied salinity with age is due to the seasonal increases in salinity that accompany lower outflow in the summer and fall.

Each year, the distribution of delta smelt seasonally expands when adults disperse in response to winter flow increases that also coincide with seasonal increases in turbidity and decreases in water temperature (Sommer *et al.* 2011; Figure 5-16). The annual range expansion of adult delta smelt extends up the Sacramento River to about Garcia Bend in the Pocket neighborhood of Sacramento, up the San Joaquin River from Antioch to areas near Stockton, up the lower Mokelumne River system, and west throughout Suisun Bay and the larger sloughs of Suisun Marsh. Some delta smelt seasonally and transiently occupy Old and Middle rivers in the south Delta each year, but face a high risk of entrainment when they do (Kimmerer 2008; Grimaldo *et al.* 2009). The expanded adult distribution initially affects the distribution of the next generation because delta smelt eggs are adhesive and not believed to be highly mobile once they are spawned (Mager *et al.* 2004). Thus, the distribution of larvae reflects a combination of where spawning occurred and freshwater flow when the eggs hatch.

In summary, the delta smelt population spreads out in the winter and then retracts by summer into what is presently a bi-modal spatial distribution with a peak in the LSZ and a separate peak in the Cache Slough complex. Most individuals occur in the LSZ at some point in their life cycle and the use of the Cache Slough complex diminishes in years with warm summers (Bush 2017).

*Microhabitat Use*: The delta smelt has been historically characterized as a pelagic fish, meaning one with a spatial distribution that is skewed away from shorelines (Moyle *et al.* 1992; Sommer *et al.* 2007). This has led to some confusion among researchers and managers alike – usually perpetuating a strawman argument that delta smelt either occupy deep-water habitats or shallow-water habitats. Then, catch data from shallow habitats get used to refute the pelagic characterization, but catches in shallow-water say nothing more about a pelagic tendency than catches in deep water would say about a nearshore habitat tendency. The long-term monitoring programs used to characterize delta smelt status and trend are offshore sampling programs – meaning pelagic sampling programs, and surface-trawling appears to be particularly effective at capturing delta smelt away from shorelines (Mitchell *et al.* 2017). However, numerous studies have reported collecting delta smelt from nearshore environments using fishing gear like beach seines and fyke nets from locations that often had a water depth less than or equal to 1 meter

(just over three feet) (e.g., Matern *et al.* 2002; Nobriga *et al.* 2005; Gewant and Bollens 2012; Mahardja *et al.* 2017b). Further, it has been established that onshore-offshore movements are one behavior option delta smelt and other fishes can use to maintain position or move upstream in a tidal-flow influenced estuary (Bennett *et al.* 2002; Feyrer *et al.* 2013; Bennett and Burau 2015). Captive delta smelt have been shown to avoid in-water structure like submerged aquatic vegetation (SAV) (Ferrari *et al.* 2014). SAV tends to grow where tidal current velocities are low, which is a habitat attribute that has also been associated with wild delta smelt (Hobbs *et al.* 2006; Bever *et al.* 2016). Thus, the proliferation of SAV in areas that might otherwise be attractive to delta smelt represents a significant habitat degradation, not only because it creates structure in the water column, but also because it is associated with higher water transparency (Hestir *et al.* 2016), and a fish fauna that delta smelt does not seem to be able to coexist with (Nobriga *et al.* 2005; Conrad *et al.* 2016). Based on our review, the Service suggests that the characterization of delta smelt as an open-water fish appears to be accurate and does not imply occupation of a particular water column depth. The species does appear to have some affinity for surface waters (Burau and Bennett 2015; Mitchell *et al.* 2017), but like any microhabitat descriptor, this is not intended to reflect the location of all individuals because delta smelt are not limited to surface waters (Feyrer *et al.* 2013).

Although the delta smelt is generally an open-water fish, depth variation of open-water habitats is an important habitat attribute (Moyle *et al.* 1992; Hobbs *et al.* 2006; Bever *et al.* 2016). In the wild, delta smelt are most frequently collected in water that is somewhat shallow (4-15 ft deep) where turbidity is often elevated and tidal currents exist, but are not excessive (Moyle *et al.* 1992; Bever *et al.* 2016). For instance, in Suisun Bay, the deep shipping channels are poor quality habitat because tidal velocity is very high (Hobbs *et al.* 2006; Bever *et al.* 2016), but in the Delta where tidal velocity is slower, offshore habitat in Cache Slough and the Sacramento Deepwater Shipping Channel is used to a greater extent (Feyrer *et al.* 2013; CDFW unpublished data).



**Figure 5-16. Maps of multi-year average distributions of delta smelt collected in four monitoring programs. The sampling regions covered by each survey are outlined. The areas with dark shading surround sampling stations in which 90 percent of the delta smelt collections occurred, the areas with light shading surround sampling stations in which the next 9 percent of delta smelt collections occurred. Note the lack of sampling sites in Suisun Bay and marsh for the beach seine (upper right panel). Source: Murphy and Hamilton (2013).**

*Description of the Primary Constituent Elements (PCE)*

The original descriptions of the primary constituent elements are compared and contrasted with current scientific understanding in Table 5-1. According to the BA, the status of the delta smelt critical habitat would be improved under the without action scenario with respect to PCE 1-Physical Habitat because there would be a higher supply of spawning substrate during the winter and spring and with respect to PCE 2-Water because there would be higher winter-spring inflow and accompanying sediment into the Delta resulting in increased turbidity during winter and spring, and the potential for higher resuspension of sediment as well as during summer and fall through resuspension of sediment (Schoellhamer 2011), though this would be affected somewhat by wind speeds (Bever *et al.* 2018). The location of X2 would on average be further

westward/downstream in the months that larval and juvenile delta smelt would be rearing (June through November). However, this without action condition is considered with the current condition of the critical habitat (which is a result of all factors impacting the critical habitat within the Action Area) to provide the "snapshot" of the critical habitat's health at this point in time.

Primary Constituent Element 1: "Physical habitat" is defined as the structural components of habitat (Service 1994). As reviewed above, physical habitat in the Bay-Delta has been substantially changed with many of the changes having occurred many decades ago (Andrews *et al.* 2017; Gross *et al.* 2018). Physical habitat attributes are important in terms of spawning substrate, rearing habitat in terms of how geographic location and bathymetry affect tidal current velocities (Bever *et al.* 2016), and possibly, foraging opportunities near the edges of emergent marshes (Whitley and Bollens 2014; Hammock *et al.* 2019a). Information on spawning habitat is incomplete. Eggs of delta smelt are demersal and adhesive and therefore could be attached to any number of substrates. It is difficult to protect spawning habitat without knowing what it is.

Primary Constituent Element 2: "Water" is defined as water of suitable quality to support various delta smelt life stages that allow for survival and reproduction (Service 1994). Certain conditions of turbidity, water temperature, and food availability characterize suitable habitat for delta smelt and are discussed in detail below. Contaminant exposure can degrade this primary constituent element even when the basic habitat components of water quality are otherwise suitable (Hammock *et al.* 2015).

*Turbidity*: Turbidity is the measure of relative clarity of a liquid. It is an optical characteristic of water and is a measurement of the amount of light scattered by material in the water when a light is shined through the water sample. The higher the intensity of scattered light, the higher the turbidity. Material that causes water to be turbid can include clay, silt, particulate organic matter, algae, dissolved colored organic compounds, and other microscopic organisms. In the Bay-Delta, turbidity results mainly from sediment suspended in the water column and to a lesser degree phytoplankton (Cloern and Jassby 2012). Turbidity can play an important role in structuring fish communities; one mechanism by which this can occur is the scale dependence in how fish of different sizes can have their prey detection enhanced or impaired (Utne-Palm 2002). Turbidity typically lowers the reactive distance of fishes feeding on zooplankton or each other. However, if the turbidity increases prey contrast (which it often does for fish larvae and planktivorous species), then it can enhance the feeding of these small fishes while still impairing the ability of their predators to see them.

The delivery of suspended sediment to the estuary increased substantially following the era of hydraulic gold mining in the watershed (Schoellhamer 2011). It increased again during rapid regional population growth and development after World War II. Since then, the delivery of new sediment to the estuary has declined (Wright and Schoellhamer 2004; Schoellhamer 2011). In addition, summertime phytoplankton production has been greatly diminished (Cloern and Jassby 2012). These changes have resulted in a general clearing of the estuary's waters (Figure 5-17); however, the clearing trend has been strongest in the Delta where expansive beds of SAV further filter fine sediment from the water (Kimmerer 2004; Feyrer *et al*. 2007; Nobriga *et al*. 2008; Hestir *et al*. 2016). Water exports from the south Delta may also have contributed to the trend

toward clearer estuary water by removing suspended sediment in exported water (Arthur *et al.* 1996); however, the contribution of exports to the total suspended sediment budget in the estuary is small (Schoellhamer 2012).



**Figure 5-17. Partial residual plots for a regression model that accounts for variability in annual average concentration of suspended particulate matter at IEP station D8 in Suisun Bay as a result of its long-term trend (left panel) and its relationship to annual average Delta outflow (right panel). The blue lines are loess smoothers and the gray shading is the 95% confidence interval around the line. Source: Cloern and Jassby (2012).**

The available catch data for delta smelt imply the species has an affinity for turbid water throughout most, if not all, of its free-swimming life (e.g., Nobriga *et al.* 2005; 2008; Feyrer *et al.* 2007; 2011; Grimaldo *et al.* 2009; Kimmerer *et al.* 2009; Mahardja *et al.* 2017a; Polansky *et al.* 2018; Simonis and Merz 2019), but there have been some recent suggestions that turbidity in the water affects the ability of fishing gears to catch delta smelt perhaps more than it is an actual habitat attribute (Latour 2016). The aquaculture techniques developed for delta smelt include rearing in black tanks under low light conditions because the fish are sensitive to highly lit circumstances (Lindberg *et al.* 2013; Hasenbein *et al.* 2016a). In addition, the tanks are circular and kept free of in-water structures. These captive rearing techniques are consistent with inhabitation of low visibility environments in the wild such as maintaining a spatial association with turbid water.

Below, we review process-based laboratory research that supports the 'turbidity as habitat' hypothesis. Then, we summarize long-term data on Secchi disk depths to demonstrate how water has remained relatively turbid where estuarine physics (Monismith *et al.* 1996; 2002) interacting with shallow water wind wave mixing (Ruhl *et al.* 2001; Bever *et al.* 2016) may contribute to an important refuge for delta smelt even though the biological productivity of this region has been substantially diminished (i.e., that phytoplankton currently contributes less to the turbidity than it once did). This turbid-water refuge occurs in the LSZ and is one of only two remaining in the range of the delta smelt. Turbid water may be a needed present-day habitat attribute because it provides cover for foraging delta smelt (Ferrari *et al.* 2014). By extension, it may be a factor

modulating feeding success; one recent study found histopathologic evidence of elevated delta smelt feeding success in the turbid Cache Slough Complex and Suisun Marsh (Hammock *et al.* 2015); a follow-up study found elevated stomach fullness of delta smelt inhabiting the LSZ even though they were spatially disconnected from where zooplankton density was highest (Hammock *et al.* 2017). These findings are also qualitatively consistent with a more macroscopic study of the Delta's fish assemblages that found most native fishes, including delta smelt, to be more common in lower productivity turbid habitats than higher productivity SAV habitats (Nobriga *et al.* 2005). For these reasons, the Service believes delta smelt's association with turbid water, which in the present state of the Bay-Delta system is mainly caused by sediment suspended in the water, is a true habitat association.

It has been shown experimentally that delta smelt larvae require particles in the water to see their transparent prey (Baskerville-Bridges *et al.* 2004). Thus, without some kind of turbidity in the water, delta smelt larvae will starve to death. Another recent laboratory study using late larval stage delta smelt found that feeding success and survival varied across a gradient of turbidity (Hasenbein *et al.* 2016a). The results implied bell-shaped response curves in which both survival and feeding success were highest at intermediate values, though the results among treatment levels were only significantly different in a few cases. A similar experiment using 120-day-old juvenile delta smelt produced different results (Hasenbein *et al.* 2013). In this experiment, the authors reported that feeding success decreased as turbidity was increased; however, their results indicate that statistically speaking, turbidity had no effect except at the highest treatment level. The highest treatment level was 250 NTU which is exceptionally turbid water. It is worth noting two things about these studies. First, the turbidity in the tanks was created using algae, which is not the dominant source of water turbidity in the estuary. Second, in the studies described by Hasenbein *et al.* (2013; 2016b), the experiments were conducted under low light conditions even when turbidity was low (~ 1 lux). In the wild, a surface-oriented fish might have the benefit of both turbidity and high light conditions similar to those that experimentally optimized successful first feeding (Baskerville-Bridges *et al.* 2004).

In another laboratory experiment, the vulnerability of delta smelt to predation by largemouth bass was lower in a circa 3 NTU treatment (again, using algae) than a clear-water treatment (Ferrari *et al.* 2014). In a DNA-based diet study of field-caught predators, the predation of delta smelt larvae was strongly affected by water turbidity (Schreier *et al.* 2016). Thus, the available evidence suggests that delta smelt require turbid water to succeed in the contemporary Bay-Delta food web.

In fish survey data, the longest-term indicator of water turbidity is Secchi disk depth measurements that for several decades have accompanied most individual net tows. Secchi disk depths are basically inverses of turbidity because the less turbid the water is, the deeper into the water column a Secchi disk remains visible. The FMWT Secchi disk depth data set summarized below dates to 1967 (Figure 5-18).

The Secchi disk depth information suggests the increasing water clarity trends discussed above are not uniform across the upper estuary (Figure 5-18). From a regional perspective, they have been most pronounced in the San Joaquin River half of the Delta where SAV proliferation has been most expansive (Feyrer *et al.* 2007; Nobriga *et al.* 2008; Hestir *et al.* 2016). Consistent with

this, boxplots depicting the time series of Secchi disk depth measurements from the FMWT show the previously reported increasing trend is most pronounced when and where the Secchi disk depths were taken in fresh water (upper left panel of Figure 5-18). In this upper left panel for which the Secchi disk depth data were summarized only when and where salinity was lower than 1.25 ppt, the previously reported trend of increasing water transparency is apparent; median Secchi disk depths have increased from about 0.5 meters with extreme values seldom exceeding 1 meter early in the time series to medians typically exceeding 1 meter and extreme values near 4 meters in recent years. When data summaries include these freshwater samples along with samples from the LSZ, the trend and extreme data points remain (upper right panel of Figure 5-18). This could lead to the erroneous conclusion that Secchi disk depths have been similarly increasing in the LSZ.

However, it is also important to consider the hydrodynamic aspect of water turbidity in the estuary. As mentioned above, X2 is a boundary upstream of which salinity tends to be the same from the surface of the water to the bottom, and downstream of which salinity varies from top to bottom (Jassby *et al.* 1995). That variability in salinity from surface to bottom waters is indicative of a front that helps to aggregate turbidity near X2. This does not mean it all aggregates precisely at X2; tidal dispersion results in a spatially complex distribution of sinking particles widely distributed in the LSZ (Kimmerer *et al.* 2014a). Thus, when the FMWT Secchi disk depth data set are constrained to brackish water samples, the long-term trend looks very different (lower panels of Figure 5-18). There is still an increasing trend over time, but it is much more modest. In particular, at a salinity near 2 to 5 ppt, Secchi disk depths have not consistently increased since the mid-1980s and observations exceeding 1 meter are still rare. Thus, there is a turbid water refuge for delta smelt that persists in the LSZ similar to the one that persists in the Cache Slough Complex.



**Figure 5-18.** Boxplot time series of Secchi disk depth measurements taken during the California Department of Fish and Wildlife Fall Midwater Trawl Survey, 1967-2017. The boxes depict the central 50% of observations; the line through each box is the median. The black circles are observations outside the central 95% of observations. The data have been grouped into four salinity bins based on statistical summaries of delta smelt data (Kimmerer *et al.* 2013). The salinity range graphed is reported on each panel as is the predicted fraction of FMWT delta smelt catch. Source: Service unpublished data analysis using a specific conductance to salinity conversion described by Schemel (2001) and generalized additive model results provided by W. Kimmerer.

*Water temperature*: Water temperature is the primary driver of the timing and duration of the delta smelt spawning season (Bennett 2005). Water temperature also affects delta smelt's metabolic and growth rates which in turn can affect their susceptibility to contaminants (Fong *et al.* 2016), food limitation (Rose *et al.* 2013a), and readiness to spawn (Hobbs *et al.* 2007b). Water temperature is not strongly affected by variation in Delta inflows or outflows except at the margins of the Delta where these inflows enter (Kimmerer 2004). The primary driver of water temperature variation in the delta smelt critical habitat is air temperature (Wagner *et al.* 2011). Very high flows can transiently cool the upper estuary (*e.g.,* flows in the upper 10th percentile, Kimmerer 2004), but the system rapidly re-equilibrates once air temperatures begin to warm. Thus, like duration of the spawning season, other water temperature-driven mechanisms affecting recruitment and survival are not freshwater flow mechanisms.

Research initially suggested an upper water temperature limit for delta smelt of about 25°C, or 77°F (Swanson *et al.* 2000). Newer research suggests delta smelt temperature tolerance decreases as the fish get older, but is a little higher than previously reported, ranging from nearly 30°C or 86°F in the larval life stage down to about 25°C in post-spawn adults (Komoroske *et al.* 2014). These are upper *acute* water temperature limits meaning these temperatures will kill, on average, one of every two fish. Subsequent research into delta smelt's thermal tolerances indicated that molecular stress response begins to occur at temperatures at least 4°C cooler than the acute thermal maxima (Komoroske *et al.* 2015).

In the laboratory and the wild, delta smelt appear to have a physiological optimum at temperatures of about 16-20°C or 61-68°F (Nobriga *et al.* 2008; Rose *et al.* 2013a; Eder *et al.* 2014; Jeffries *et al.* 2016). Most of the upper estuary exceeds this water temperature from May or June through September (Komoroske *et al.* 2015). Thus, during summer, many parts of the estuary are energetically costly and physiologically stressful to delta smelt (Komoroske *et al.* 2014). Generally speaking, spring and summer water temperatures are cooler to the west and warmer to the east due to the differences in overlying air temperatures between the Bay Area and the warmer Central Valley (Kimmerer 2004). In addition, there is a strong water temperature gradient across the Delta with cooler water in the north and warmer water in the south. The much higher summer inflows from the Sacramento River probably explain this north-south gradient. Note that water temperatures in the north Delta near Liberty Island and the lower Yolo Bypass where summer inflows are low to non-existent, are also typically warmer than they are along the Sacramento River. This may have consequences for the survival of freshwater-resident delta smelt during comparatively warm summers (Bush 2017).

*Food*: Food and water temperature are strongly interacting components of the "Water" element of delta smelt critical habitat because the warmer the water, the more food delta smelt require (Rose *et al.* 2013a). If the water gets too warm, then no amount of food is sufficient. The more food delta smelt eat (or must try to eat) the more they will be exposed to predators and contaminants.

The open-water habitat use of delta smelt is reflected in their diet composition, which is largely made up of planktonic and epibenthic crustaceans (Moyle *et al.* 1992; Nobriga 2002; Hobbs *et al.* 2006; Slater and Baxter 2014). Some of the epibenthic crustaceans discussed below (e.g.,

amphipods and mysids) ascend into the water column at times (Kimmerer *et al.* 2002) and are therefore available to predators foraging in the open water. A large majority of the identifiable prey of delta smelt larvae is copepods, particularly the early life stages of copepods (Nobriga 2002; Hobbs *et al.* 2006; Slater and Baxter 2014). Juvenile delta smelt feeding in the summer months also have copepod-dominated diets, but these larger individuals tend to eat adult copepods and also begin to include prey taxa in their diets that grow larger than copepods (Slater and Baxter 2014; Figure 5-19). The older juveniles and adults continue to prey on copepods, but have less reliance on them and greater diet diversity (Moyle *et al.* 1992; Slater and Baxter 2014; Whitley and Bollens 2014; Figures 5-20 and 5-21). All of the delta smelt's major prey taxa (e.g., copepods, amphipods) are ubiquitously distributed, but which prey species are present at particular times and locations changes from early morning to mid-day, season to season, and has changed dramatically over time (Kimmerer *et al.* 2002; Winder and Jassby 2011; Kratina *et al.* 2014). The latter two have likely affected delta smelt feeding success (Kimmerer and Rose 2018).



**Figure 5-19. Diet compositions of delta smelt collected by the Summer Townet Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are *not* copepods are Cladocerans, Mysids, Corophium spp., Fish, Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock *et al.* (2017).**



Figure 5-20. Diet compositions of delta smelt collected by the Fall Midwater Trawl Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are *not* copepods are Cladocerans, Mysids, Corophium spp., Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock *et al.* (2017).



**Figure 5-21. Diet compositions of delta smelt collected by the Spring Kodiak Trawl Survey upper panel for stations with a salinity lower than 0.55 ppt and lower panel for stations with a salinity greater than or equal to 0.55 ppt. Of the prey taxa listed on the x-axis, the ones that are _not_ copepods are Cladocerans, Mysids, Corophium spp., Fish, Other Amphipods, Cumaceans, and Gammarus spp. Source: supplemental material for Hammock _et al._ (2017).**

An influence of copepod production on the production of delta smelt has been a common finding in quantitative modeling research on delta smelt's population dynamics (Mac Nally _et al._ 2010; Maunder and Deriso 2011; Miller _et al._ 2012; Rose _et al._ 2013a; Hamilton and Murphy 2018; Kimmerer and Rose 2018). In response, the PA includes several project elements intended to increase food supplies for the delta smelt. Thus, comprehensive review of historical changes in the Bay-Delta food web is warranted for this BiOp to assist the reader in understanding the

Service's conclusions in the Effects Analyses for the species and its critical habitat in this biological opinion.

The earliest published paper on a freshwater flow influence on fish production in the Bay-Delta posited that the mechanisms producing striped bass worked primarily through the LSZ food web (Turner and Chadwick 1972). Specifically, these authors suggested that higher Delta inflow stimulated the food web that supported striped bass and increased turbidity which hid them from their predators. Because IEP monitoring was originally set up to better understand striped bass recruitment, the IEP has monitored the pelagic food web extensively since the 1970s (Brown *et al.* 2016b).

The varied sources of primary productivity that fuel estuarine fish production are an area of active research in the Bay-Delta (Sobczak *et al.* 2002; 2005; Grimaldo *et al.* 2009; Howe and Simenstad 2011; Schroeter *et al.* 2015). As is the general case in open-water food webs of estuaries and coastal marine systems, diatoms are the dominant source of primary productivity supporting open-water fish production (Sobczak *et al.* 2002; 2005; Grimaldo *et al.* 2009). Phytoplankton-based and submerged aquatic vegetation-based food webs can be separated on the basis of stable isotopes of carbon and nitrogen, but phytoplankton-based food web paths cannot be clearly separated from pathways based on terrestrial vegetation using these isotopes (Grimaldo *et al.* 2009; Schroeter *et al.* 2015). Sulfur isotopes may provide greater ability to discern among sources within and near tidal marsh environments, but to date, have not been extensively evaluated in the Bay-Delta (Howe and Simenstad 2011). The production of littoral and bottom-feeding fishes is supported by a greater fraction of non-planktonic primary producer sources (Grimaldo *et al.* 2009; Schroeter *et al.* 2015). These non-planktonic food web pathways likely have some importance to delta smelt (Whitley and Bollens 2014; Hammock *et al.* 2019).

There may be tremendous potential for benthic and epiphytic processes to periodically subsidize delta smelt's food supply, and these subsidies may occur at critical times of need, yet such pathways remain underemphasized and understudied. It is common for estuarine amphipods to rise into the water column to relocate to newly formed depositional areas, where they feed on deposited detritus and other organic materials; their successive landward movements via repeated use of selective tidal stream transport (STST, or "tidal surfing") diminish in terms of distance of upstream travel, but ultimately place them within depositional habitats (Hough and Naylor 1992; Forward and Tankersley 2001; Naylor 2006). This behavior results in the amphipods spending a great deal of time in the water column, especially when the water is dimly lit. Being in the water column may make the amphipods more available as prey for delta smelt, but the amphipods are nevertheless energetically tied to benthic basal resources, despite their spending a great deal of time in the water column (i.e., they are still energetically tied to primary production that is bottom-associated: vascular plant detritus, phytodetritus, or benthic microalgae, as opposed to phytoplankton). Mysids, on the other hand, are harder to generalize, as some species are herbivorous, some are predatory, and some are omnivorous. They also use STST, which likely increases their availability to (adult) delta smelt (Wooldridge and Erasmus 1980; Orsi 1986). Thus, depending on mysid species, they may or may not link delta smelt to benthically driven energy pathways.

Jassby *et al*. (1993) estimated benthic microalgae to be responsible for nearly 30% of the primary production in upper San Francisco Bay, inclusive of delta smelt habitat. Light penetration has since improved as turbidity has decreased (Parker *et al*. 2012), and so this ~30% contribution may have increased dramatically. Jassby *et al*. (1993) provided no estimate for epiphytic microalgae associated with SAV and the zones of emergent grass stems (in marshes) that are near the surface and within the photic zone. Even if the photic zone is just a few centimeters deep, these substrates, when added together, can provide very large surface areas for epiphytic production.

There are two clam species that affect phyto- and zooplankton biomass within the distribution of the delta smelt population. The freshwater *Corbicula fluminea*, which has been in the Delta and its tributary rivers since the 1940s, and the estuarine overbite clam *Potamocorbula amurensis*, which started invading the estuary in 1986 and was well-established within a year (Alpine and Cloern 1992). The freshwater clam can suppress diatom production in shallow freshwater habitats (Lucas *et al*. 2002; Lopez *et al*. 2006). However, the overbite clam appears to have a larger impact on the food web than the freshwater clam (Alpine and Cloern 1992; Jassby *et al*. 2002; Kimmerer and Thompson 2014), so the focus of this review will be on the overbite clam.

In the 1970s and early 1980s, scientists had learned that year-to-year variation in Delta inflow (or salinity at Chipps Island) - especially during the spring and summer - drove the year-to-year variation in the productivity of the low-salinity zone food web (Cloern *et al*. 1983; Knutson and Orsi 1983). In wet years, the flow brought a lot of nutrients and organic carbon into the low-salinity zone (Jassby and Cloern 2000) where it fueled food web production as Delta outflow seasonally decreased into an optimal range estimated by Cloern *et al*. (1983) to be about 100 to 350 cubic meters per second (about 3,500 to 12,400 cfs). In dry years, elevated salinity allowed a marine clam (*Mya arenaria*) to colonize Suisun Bay and graze the diatoms down to low levels. This in turn lowered the production of the mysid shrimp (*Neomysis mercedis*), which was a key food source for several fish species, particularly striped bass (Knutson and Orsi 1983; Orsi and Mecum 1996; Feyrer *et al*. 2003). This stimulation of mysid shrimp production was one of the food web mechanisms that Turner and Chadwick (1972) had hypothesized led to higher striped bass production in higher flow years. Similar 'fish-flow' relationships were later established for longfin smelt (*Spirinchus thaleichthys*) and starry flounder (*Platyichthys stellatus*); both of these fish are also mysid shrimp predators and were shown to have step-declines in their abundance indices associated with the overbite clam invasion (Kimmerer 2002b).

The overbite clam, once established (~ 1987), resulted in a permanent source of loss to diatoms and copepods in the LSZ that resulted in rapid step-declines in the abundance of the most important historical food web components: diatoms, mysid shrimp, and *Eurytemora affinis*; the latter is a copepod that was a major prey for both the opossum shrimp (Knutson and Orsi 1983) and delta smelt (Moyle *et al*. 1992). Unlike striped bass, longfin smelt, and starry flounder, no change in delta smelt abundance occurred coincident with the establishment of the overbite clam (Stevens and Miller 1983; Jassby *et al*. 1995; Kimmerer 2002b; Mac Nally *et al*. 2010; Thomson *et al*. 2010). However, the average size of delta smelt declined somewhat (Sweetnam 1999; Bennett 2005).

Some scientists have hypothesized that the diatom decline was caused by wastewater treatment plant inputs of ammonium or changes in the ratios of dissolved forms of nitrogen that support aquatic plant growth more than by overbite clams (Glibert *et al.* 2011; Dugdale *et al.* 2012; Parker *et al.* 2012; Wilkerson *et al.* 2015). One piece of evidence used to support this hypothesis is an observation that ammonium was frequently crossing a critical 4 micro-molar threshold concentration for diatom growth at about the same time the overbite clam became established. These researchers have established that uptake of dissolved ammonium inhibits the growth rate of diatoms in the Bay-Delta. However, diatoms can still grow on ammonium, and actually take it into their cells preferentially over nitrate; they just grow more slowly using ammonium as their cellular nitrogen source (Glibert *et al.* 2015). This means that 'but for' the overbite clam, the diatom population in the LSZ would eventually build up enough biomass each year to metabolize ambient ammonium concentrations to levels below the 4 micro-molar threshold and then increase their growth rate using the nitrate that is also in the water. Thus, although nitrogen chemistry could be a problem, a more fundamental one is that as Delta outflow declines during the spring into early summer to levels that could enable diatom blooms, the water temperature is rising and that supports reproduction of the overbite clam. With help from a few other abundant grazers (Kimmerer and Thompson 2014), the growing overbite clam population depletes diatoms faster than they can metabolize the ammonium in the water. Thus, clam grazing is the fundamental reason that summer-fall diatom blooms no longer occur (Cloern and Jassby 2012; Kimmerer and Thompson 2014; Cloern 2019). During spring when Delta outflow is higher, outflow can interact with other factors to limit diatom accumulation as well (Dugdale *et al.* 2012; 2016). Note that Dugdale *et al.* (2016) suggested that available estimates of the overbite clam grazing rate were over-estimates, but this assertion has been contested (Kimmerer and Thompson 2014; Cloern 2019).

The largest source of dissolved ammonium is the Sacramento Regional Wastewater Treatment Plant. Upgrades to the facility are expected to occur in 2021-2023, which will result in reductions in dissolved ammonium concentrations in the Delta. It is scheduled to significantly reduce its nitrogen effluent concentrations beginning in 2023. Once that happens, it should become apparent within a few years how important ammonium ratios are in limiting diatom production in the Bay-Delta.

Because the overbite clam repressed the production of historically dominant diatoms and zooplankton, there were numerous successful invertebrate species invasions and changes in plant communities that followed for a decade or so thereafter (Kimmerer and Orsi 1996; Bouley and Kimmerer 2006; Winder and Jassby 2011). Changing nutrient ratios (including the forms of nitrogen and the ratios of nitrogen and phosphorus) necessary for plant growth may also have contributed to changing phytoplankton and plant communities (Glibert *et al.* 2015; Dahm *et al.* 2016). In addition, extreme drought and propagule pressure are also thought to have directly contributed to the zooplankton species changes (Winder *et al.* 2011). The most important changes for delta smelt have been changes to the copepod community. The copepod invasions of the late 1980s and early 1990s actually helped stem (but not recover the system from) what had been a major decline in copepod abundance (Winder and Jassby 2011). Prior to the overbite clam, delta smelt had diets dominated by *E. affinis* from the time the larvae started feeding in the spring until at least the following fall (Moyle *et al.* 1992). The overbite clam suppressed the production of *E. affinis* (Kimmerer *et al.* 1994; Kimmerer and Orsi 1996) and that seems to have

opened the door for several non-native copepods including *Pseudodiaptomus forbesi*, which became the new main prey of delta smelt from late spring into the fall (Moyle *et al.* 1992; Nobriga 2002; Hobbs *et al.* 2006; Slater and Baxter 2014; Hammock *et al.* 2017; Figures 5-19 and 5-20).

There is general agreement among quantitative delta smelt models that the production of copepods including *P. forbesi* are important to recruitment and survival (Kimmerer 2008; Maunder and Deriso 2011; Miller *et al.* 2012; Hamilton and Murphy 2018; Kimmerer and Rose 2018; Simonis and Merz 2019). Recognition of *P. forbesi*'s importance to delta smelt led to substantial research into this non-native copepod's population dynamics (Kimmerer and Gould 2010; Sullivan *et al.* 2013; Kimmerer *et al.* 2014b; Kayfetz *et al.* 2017; Kimmerer *et al.* 2018a,b). The delta smelt's primary historical prey (*E. affinis*) bloomed from within the LSZ and had peak abundance near X2 (Orsi and Mecum 1986). This copepod still blooms each spring, but disappears by summer due to overbite clam grazing (Kimmerer *et al.* 1994). The same thing happens to *P. forbesi* in the LSZ (Kayfetz *et al.* 2017). However, the *P. forbesi* population survives the summer because its center of reproduction is in freshwater habitats landward of the LSZ. It would disappear from the LSZ altogether were it not for a constant replenishment (or subsidy) from upstream where the overbite clam and a predatory non-native copepod are less abundant. It is the combination of tidal mixing and Delta outflow that seems to provide this subsidy (Kimmerer *et al.* 2018a,b). Thus, this subsidy of *P. forbesi* to delta smelt inhabiting the turbid water refuge of the LSZ appears to be of substantial importance – particularly during the summer and fall.

The most obvious test of whether the overbite clam affected delta smelt is a before-after comparison. As mentioned above, this has been tested several times and no obvious effect like the ones reported for striped bass, longfin smelt, and starry flounder has been established. Rather, the first big decline in delta smelt abundance occurred prior to the overbite clam invasion and the second one about 15 years afterward. Thus, if copepod production limits delta smelt production, it is either a part-time limit (e.g., Hamilton and Murphy 2018), or (a) it was a limiting factor prior to the overbite clam, and (b) it did not become a further limit until sometime thereafter. These are not mutually exclusive hypotheses.

*Contaminants*: Research conducted over the past 10 years suggests that delta smelt are fairly susceptible to contaminants (e.g., Connon *et al.* 2009; 2011a,b; Hasenbein *et al.* 2014; Jeffries *et al.* 2015; Jin *et al.* 2018). The effects of ambient Sacramento River water, pyrethroid pesticides, several herbicides, copper, and ammonium have all been examined and all of these compounds have shown at least sub-lethal effects represented by changes in gene expression. In some cases, delta smelt were exposed to higher than observed concentrations of some compounds in order to estimate their $LC_{50}$, the estimated concentration that kills half of the test fish over the study duration. Exposure durations have varied widely among studies (4 hour to 1 week), which limits the ability to quantitatively compare toxicity among studies. The loading of some contaminants into the habitats occupied by delta smelt can be functions of freshwater flow inputs (e.g., Kuivila and Moon 2004; Weston *et al.* 2014; 2015) so in some instances, the impacts of contaminants can be freshwater flow mechanisms. However, the impacts of others may be related to where individuals are located (Hammock *et al.* 2015), what delta smelt eat, or water temperature-based

demand for prey, all of which could affect the quantities of biomagnifying substances that get ingested over the life span of the fish.

Primary Constituent Element 3: "River flow" was originally believed to be critical as transport flow to facilitate an extended spawning migration by adult fish and the transport of offspring to LSZ rearing habitats (Service 1994). However, it has since been shown that although some individual fish may embark on what could be considered a short spawning migration, there is no population-scale spawning migration *per se*, and that most transport and retention mechanisms for delta smelt (and their prey) involve the selective use of tidal currents rather than net flows (Kimmerer *et al.* 1998; 2002; Bennett *et al.* 2002; Kimmerer *et al.* 2014a; Bennett and Burau 2015). River flow includes both inflow to and outflow from the Delta, both of which influence the net movements of water through the Delta and further into the estuary (Kimmerer and Nobriga 2008). As mentioned above, these variations in freshwater flow affect the spatial distribution of salinity including X2, which in turn exert some influence on the distribution of delta smelt (Sweetnam 1999; Dege and Brown 2004; Feyrer *et al.* 2007; Nobriga *et al.* 2008; Sommer *et al.* 2011; Manly *et al.* 2015; Polansky *et al.* 2018; Simonis and Merz 2019).

Net water movements in the Delta have recently been reconstructed and analyzed for long-term trend attribution (Hutton *et al.* 2019; Figure 5-22). This analysis demonstrated several net flow variables have experienced strong time trends since water exports from the Delta began. In particular, cross-Delta flows have increased during the summer and fall, Rio Vista flows have decreased in the winter and spring and increased in the summer, Jersey Point flow and Old and Middle river flow (OMR) have decreased year-around. The change attribution indicated that CVP and SWP operations were predominantly the source of these net flow changes except for Jersey Point flow in the spring, which is also strongly influenced by in-Delta irrigation demand. The net flow changes ultimately influence Delta outflow, which as discussed above, has been trending downward for more than 100 years.



**Figure 5-22. Time series (1922-2009) of statistical trend outputs of annual cross Delta flows (XGEO), net flow at Rio Vista (RIO), net flow at Jersey Point on the San Joaquin River (WEST), and net flow in Old and Middle rivers (OMR). For XGEO net north to south flows have positive values. For RIO and WEST, net seaward (downstream) flows have positive values. For OMR, which seldom has positive values, net north to south flows are depicted as negative values. The colored lines reflect the statistical trend in the time series with the different colors reflecting the relative contributions of the sources listed in the legend. Source Hutton *et al.* (2019).**

A concise summary of the contemporary Delta outflow hydrograph is shown in Figure 5-23. A value on the y-axis of 0.5 suggests that an outflow on a given day has had an equal chance of being at least as high as one or in some cases all three of the chosen thresholds. Delta outflow at

least as high as the Roe Island standard freshens the estuary enough for delta smelt to spawn in typically brackish regions like the Napa River and western Suisun Marsh, and tends to reduce the likelihood of entrainment. Delta outflows at least as high as the Chipps Island standard tend to generate LSZ coverage throughout much or all of Suisun Bay. Outflows near the Collinsville standard are associated with a typical X2 slightly upstream of the confluence of the Sacramento and San Joaquin rivers with low-salinity conditions extending into, but not throughout Suisun Bay and marsh. The water management response to D-1641 has been to increase the intra-annual variability in outflows. The greater intra-annual variability is related to the more frequent meeting of these flow thresholds in the winter and spring as required by D-1641, with lower frequency in the fall. This pattern is especially pronounced for outflows greater than or equal to 7,100 cfs ("Collinsville") and 11,400 cfs (Chipps Island; Figure 5-23). The same pattern is visible for 27,200 cfs ("Roe Island"; Figure 5-23), but with less change (mainly days 100-150 and 325-350, which correspond to April and the November-December transition). This does more closely mimic the timing and duration of the natural Delta outflow hydrograph than occurred during the 1968-1994 period, though the magnitude is considerably lower as discussed above (Figures 5-4, 5-8, and 5-9). Note that the DAYFLOW calculations used to make Figure 5-23 can be highly uncertain at values lower than about 10,000 cfs (Monismith 2016).

The tidal and net flow of water toward the south Delta pumping plants is frequently indexed using OMR (Grimaldo *et al.* 2009; Andrews *et al.* 2016; Figure 5-22). The tidal and net flows in Old and Middle rivers influence the vulnerability of delta smelt larvae, juveniles, and adults to entrainment at the Banks and Jones facilities (Kimmerer 2008; 2011; Grimaldo *et al.* 2009). Currently available information indicates that OMR is a very good indicator of larval delta smelt entrainment risk (Kimmerer 2008; 2011). When the fish reach the juvenile stage, they can leave the south Delta to avoid adverse water temperatures (Kimmerer 2008). When maturing adults disperse the following winter, their advection into the south Delta can be affected by OMR flow, but turbidity is also an important mediator of their entrainment risk (Grimaldo *et al.* 2009). The Service's experience, particularly since 2008, is that the risk of seeing entrained fish in CVP or SWP fish salvage is low if south Delta turbidity remains less than 12 NTU. This experience is reflected in the PA.



**Figure 5-23. Daily frequency that the Net Delta Outflow Index (NDOI) was at least as high as the steady-state thresholds for the D-1641 'X2 standard' for January 1 to December 31, 1968-1994 (pre-Bay Delta Accord; blue symbols) and 1995-2017 (post Bay Delta Accord; orange symbols). The X2 standards outlined in the Bay Delta Accord were adopted into D-1641. The steady-state NDOI thresholds used to calculate the frequencies were Roe Island ≥ 27,200 cfs, Chipps Island ≥ 11,400 cfs, and Collinsville ≥ 7,100 cfs. For reference, a frequency of 0.5 means an NDOI at least as high as the threshold occurred half of the time**

**on a given day. Note that this plot is intended to provide a concise view of the seasonality of Delta outflow. It is not intended to reflect anything about compliance or non-compliance with D-1641, which can be based on Delta outflow, salinity, or X2. Source: Service unpublished analysis of the DAYFLOW database.**

Primary Constituent Element 4 "Salinity": Fish assemblages are able to lessen competition among species and life stages by partitioning habitats. For instance, some fish species and life stages are more shoreline oriented whereas others are more offshore oriented. Some species are better adapted to midwater or surface waters, while others are more adapted to stay close to the substrate. Some fish are tolerant of turbidity, while others are not. In estuaries, salinity is often a dominant factor separating different groups of fishes (e.g., Bulger *et al.* 1993; Edgar *et al.* 1999). Similarly, in the Bay-Delta, dominant fishes replace one another at several places along the salinity gradient (Feyrer *et al.* 2015).

Delta smelt is part of the fish assemblage that uses the low-salinity waters of the estuary (Kimmerer *et al.* 2009; 2013). Thus, the Primary Constituent Element "Salinity" helps define its nursery habitat (Service 1994). Freshwater flow into the estuary, and Delta outflow in particular, is the most significant mechanism affecting the salinity distribution of the estuary (Jassby *et al.* 1995; MacWilliams *et al.* 2015). Thus any recruitment or survival mechanisms that change in intensity as functions of salinity, or where particular ranges of salinity are distributed, are ultimately freshwater flow mechanisms (see Kimmerer 2002a). As discussed above, these may include the spatial extent of spawning habitat (Hobbs *et al.* 2007a), the availability of low velocity water refuges that remain turbid (Bever *et al.* 2016), and population-scale entrainment in water diversions (Kimmerer and Nobriga 2008; Kimmerer 2008). Some contaminant exposure and dilution mechanisms are also related to changes in freshwater flow inputs. For instance, the toxicity of water in creeks flowing into Suisun Marsh and the Delta can increase when storms increase flows that mobilize contaminated sediment (Weston *et al.* 2014; 2015). At a larger spatial-temporal scale, water toxicity varies regionally and seasonally, and may on average, be higher in years with low winter-spring inflows (Werner *et al.* 2010).

Initial research indicated that delta smelt have an upper acute salinity tolerance of about 20 ppt (Swanson *et al.* 2000) which is about 60% of seawater's salt concentration of 32-34 ppt. Newer research suggests that some individual delta smelt can acclimate to seawater, but that about one in three juveniles and one in four adults die within a few days if they are rapidly transitioned from low-salinity water to marine salinity water (Komoroske *et al.* 2014). The survivors can live for at least several weeks in seawater, but lose weight (Komoroske *et al.* 2014; 2016). This clear evidence of physiological stress for delta smelt exposed to seawater has not been observed at lower salinity challenges – including salinities as high as 18-19 ppt. Different molecular responses have been observed, particularly at salinities higher than 6 ppt (Komoroske *et al.* 2016). These different molecular responses may reflect physiological stress, but this is not certain. There are currently several published studies that have examined aspects of delta smelt physiology at salinities in the 12-19 ppt range; none have found obvious evidence of an inability of the delta smelt to adjust its physiology to handle salinity in this range (Komoroske *et al.* 2014; 2016; Kammerer *et al.* 2016; Davis *et al.* 2019).

These findings are interesting because peak catches of early life stage wild delta smelt have occurred in fresh- or very low-salinity water and peak catches of juvenile and sub-adult fish have occurred at salinities that typify the LSZ. This contrast between where most wild delta smelt have been collected and what laboratory research indicates they can tolerate suggests one of three things. One possibility is there is a persistent laboratory artifact, though we are not aware of what such an artifact would be. A second possibility is that the analyses that have been done to date may not have accounted for change through time that has covaried with declining catches. For instance, in a recent analysis of the SKT Survey, Castillo *et al.* (2018) found that when salinity was higher during sampling (i.e., during periods of low outflow) delta smelt and other fishes were collected from a higher mean salinity. The third possibility is that a discrepancy between field salinity distribution and laboratory results may be evidence that delta smelt's distribution along the estuary salinity gradient is due to a factor or factors other than salinity *per se*. Historically, delta smelt's prey were most abundant in the LSZ, but that has not been the case for more than 30 years. One explanation that may better align with recent laboratory research is that turbidity is the more important physical habitat attribute. Relatively turbid waters occur as a mobile front within the LSZ (Figure 5-18), occur regularly in Grizzly and Honker bays (Bever *et al.* 2016), and the Cache Slough complex (Sommer and Mejia 2013), all of which are places delta smelt have frequently been collected. This could mean that hiding from predators or minimizing competition are the more relevant drivers of delta smelt distribution. The Service has permitted the use of cultured fish enclosures placed along the estuary salinity gradient to explore this possibility.

The Service used the FMWT data to re-evaluate delta smelt salinity distribution and included equivalent data for five other open-water species to provide context. We analyzed the data separately for pre- and post-overbite clam eras given the large changes in food web function and fish distribution that occurred following its invasion (e.g., Kimmerer 2002b; Kimmerer 2006). To generate Figure 5-24, we converted the specific conductance data recorded during FMWT sampling to salinity using the equation provided by Schemel (2001) and created salinity bins spanning 1 ppt. We normalized the catch of each species each year relative to salinity so that years of high abundance would not contribute to the results more than years of low abundance. We did this by setting each year's maximum catch of each species to one, and converting smaller catches to fractions of these annual maxima. We then summarized the results with boxplots that show the interannual variability in normalized catch relative to the salinity gradient. Note that catch data were converted to biomass estimates before normalizing.

Of the species summarized in Figure 5-24, the delta smelt showed the smallest change in distribution relative to salinity after the overbite clam invasion. This is partly because delta smelt is the only one that has never been recorded at a salinity higher than about 20 ppt, which is consistent with previous field data summaries and the laboratory results reviewed above. There are small modes in delta smelt biomass in the LSZ and a general tapering off (with occasional exceptions in particular 1 ppt bins) out to 20 ppt. The northern anchovy data show the skew toward more marine waters that was described by Kimmerer (2006). Longfin smelt and age-0 striped bass had a more even distribution relative to salinity after the overbite clam than they did before. In contrast, American shad had a relatively even distribution across the salinity gradient before the overbite clam, but its distribution has been skewed into somewhat fresher water since. Threadfin shad appear to have greater relative use of the LSZ since the overbite clam, and

perhaps higher salinity water more generally. Collectively, these data suggest some re-distribution of the upper estuary fish assemblage has occurred since the 1980s. We note that because mean salinity of the FMWT sampling grid has increased as well (Feyrer *et al.* 2007; 2011) some of these changes may also reflect that trend (e.g., northern anchovy, longfin smelt, striped bass, and threadfin shad). In contrast, the shift toward fresher water by American shad and the lack of major change by delta smelt suggest these species' spatial distribution has



**Figure 5-24. Salinity distributions of Fall Midwater Trawl catch for six pelagic San Francisco Estuary fishes, summarized by pre-overbite clam invasion years (1967-1986) and post-invasion years (1987-2017). Each Fall Midwater Trawl sample was associated with a**

**specific conductance measurement, which was converted to practical salinity units. Annual frequencies of positive catches for each species, binned into one salinity unit increments, were divided by the total positive catch for each year-species combination, to yield proportional positive catch by salinity. Proportions represented annual distributions along the salinity gradient. Within each salinity bin and across years, the distributions of proportional catches were summarized with boxplots.**

changed – if it had not, they would be distributed in more saline water like the other four species. For delta smelt, this distribution shift to the east is consistent with what has been reported previously (Feyrer *et al.* 2007; 2011; Sommer *et al.* 2011; Sommer and Mejia 2013).

*Summary of Status of Delta Smelt Critical Habitat*

The Service's primary objective in designating critical habitat was to identify the key components of delta smelt habitat that support successful completion of the life cycle, including spawning, larval and juvenile transport, rearing, and adult migration back to spawning sites. Since the implementation of the RPA in the Service's 2008 BiOp, there has been much lower likelihood of water operations that are highly detrimental to the spawning migration of adult delta smelt, the spawners themselves, or larval transport. Under the without action scenario described in the BA, the status of delta smelt critical habitat would be improved because there would be high winter-spring inflow and sediment into the Delta resulting in increased turbidity during winter and spring, as well as during summer and fall through resuspension of sediment, and there would be on average more low-salinity habitat available for rearing larval and juvenile smelt. This without action condition is considered with the current condition of the critical habitat (which is a result of all factors impacting the critical habitat within the Action Area) to provide the "snapshot" of the critical habitat's health at this point in time.

The delta smelt's critical habitat, which is synonymous with the downstream waters of the Action Area, is currently not adequately serving its intended conservation role and function because there are very few locations that consistently provide all the needed habitat attributes for larval and juvenile rearing at the same times and in the same places (Table 5-3). The Service's review indicates it is rearing habitat that remains most impacted by ecological changes in the estuary, both before and since the delta smelt's listing under the Act. As described above, those changes have stemmed from chronic low outflow, changes in the seasonal timing of Delta inflow, and lower flow variability, species invasions and associated changes in how the upper estuary food web functions, declining prey availability, high water temperatures, declining water turbidity, and localized contaminant exposure and accumulation by delta smelt.

**Table 5-3. Summary of habitat attribute conditions for delta smelt in six regions of the estuary that are permanently or seasonally occupied in most years.**

| | Landscape | Turbidity | Salinity | Temperature | Food |
|---|---|---|---|---|---|
| **Montezuma Slough** | Appropriate | Appropriate | Appropriate *when outflow is sufficient, or when the SMSCG are operated to lower salinity* | Usually appropriate | Appropriate |
| **Suisun Bay (including Honker and Grizzly bays)** | Appropriate except in shipping channel | Usually appropriate | Appropriate *when outflow is sufficient* | Usually appropriate | Depleted |
| **West Delta** | Limited area 4 to 15 feet deep | Marginal, declining | Appropriate | Can be too high during summer | Depleted |
| **North Delta (Cache Slough region)** | Appropriate | Appropriate | Appropriate | Can be too high during summer | Appropriate, but associated with elevated contaminant impacts |
| **Sacramento River above Cache Slough confluence** | Limited area 4 to 15 feet deep; swift currents | Marginal except during high flows, declining | Appropriate, but possibly lower than optimal | Usually appropriate | Likely low due to swift currents and wastewater inputs |
| **South Delta** | Appropriate except too much coverage by submerged plants | Too low | Appropriate | Too high in the summer | Appropriate |

### 5.1.3 Factors Affecting Delta Smelt and Critical Habitat Within the Action Area

The Environmental Baseline includes State, tribal, local, and private actions already affecting the species or that will occur contemporaneously with the consultation in progress. Unrelated Federal actions affecting the same species or critical habitat that have completed formal or informal consultations are also part of the Environmental Baseline, as are Federal and other actions within the Action Area that may benefit listed species or critical habitat.

There have been numerous consultations on effects to delta smelt and critical habitat completed since the species was listed in 1993. The previous partial and completed consultations related to CVP/SWP water operations are reviewed in the *Consultation History* section of this biological opinion. A summary of select projects and consultations that have played significant roles in shaping the current conditions of the delta smelt and its critical habitat are summarized in Table 5-4.

**Table 5-4. Summary of select projects and consultations for the delta smelt that are part of the Environmental Baseline for this consultation.**

| Consultation | Description |
|---|---|
| 2008 OCAP Biological Opinion | In December 2008, the Service issued a biological opinion that concluded the coordinated operations of the CVP and SWP was likely to jeopardize the continued existence of delta smelt and destroy or adversely modify its critical habitat. Key elements of the Service's 2008 RPA were:<br><br>RPA Component 1: The objective of Component 1 (comprised of Actions 1 and 2) is to reduce entrainment of pre-spawning adults by controlling OMR flows during periods of elevated entrainment risk. Action 1 is designed to protect migrating delta smelt. Action 2 is designed to protect adult delta smelt that are residing in the Delta prior to spawning. Overall, RPA Component 1 increases the suitability of spawning habitat for delta smelt by decreasing the amount of Delta habitat affected by the CVP and SWP export pumping plants' operations prior to, and during, the critical spawning period;<br><br>RPA Component 2: The objective of Component 2 (Action 3) is to limit entrainment of larval and juvenile delta smelt by reducing net negative flow conditions in the central and south Delta, so that larval and juvenile delta smelt can successfully rear in the Delta and move downstream when appropriate;<br><br>RPA Component 3: The objective of Component 3 (Acton 4) is to improve fall habitat conditions for delta smelt by increasing Delta outflow during fall of Wet and Above Normal years to re-establish variability in habitat conditions during this time of year;<br><br>RPA Component 4: The objective of Component 4 (Action 6) is to restore a minimum of 8,000 acres of intertidal and associated subtidal habitat in the Delta and Suisun Marsh to increase prey production for delta smelt; and<br><br>RPA Component 5: Component 5 provides for monitoring and reporting. Reclamation and DWR shall ensure that information is gathered and reported to ensure: (1) proper implementation of the restoration actions, (2) that the physical results of the restoration actions are achieved, and (3) that |

| | |
|---|---|
| | information is gathered to evaluate the effectiveness of these actions on the targeted life stages of delta smelt so that the actions can be refined, if needed.<br><br>For more information, the 2008 Service BiOp can be found at: https://www.fws.gov/sfbaydelta/documents/SWP-CVP_OPs_BO_12-15_final_signed.pdf |
| California EcoRestore | This State of California-led initiative proposes to restore at least 30,000 acres of tidal wetlands, floodplain, upland, riparian, and fish passage improvements in the Delta by 2020. This includes 8,000 acres of tidal habitat required under the 2008 BiOp. To date, the following tidal marsh restoration projects have begun construction: Tule Red, Yolo Flyway Farms, and Decker Island Tidal Marsh Restoration Projects. These projects have been designed to provide food web benefits to delta smelt. Although projects have been chosen to receive funding, no projects have been completed (fully constructed) to date. The ROC PA includes a commitment by Reclamation and DWR to complete the remainder of the 8,000 acres of tidal habitat restoration by 2030. |
| South Delta Temporary Barriers Project (SDTBP) | The SDTBP consists of three rock barriers that DWR uses to increase water levels, circulation, and water quality in the southern Delta for local diverters, and a fourth barrier at the head of Old River (HORB) intended to incentivize salmonid fishes to migrate through the Delta via the mainstem San Joaquin River. The three ag barriers are in place from April 15 to September 30 each year. The HORB has been seasonally installed most years since 1963 in the fall, and 1992 in the spring. Prior to explicit limits on OMR flows, the installation of the HORB during spring could increase juvenile delta smelt salvage because the barrier resulted in more negative OMR if exports were not reduced. The OMR flow limits in the ROC PA will continue to help minimize the entrainment risk associated with the south Delta barriers.<br><br>On March 7, 2018, the Service completed a biological opinion to the Corps and DWR on the seasonal installation of temporary barriers, including the HORB. Under the ROC PA, DWR and Reclamation propose to not install the HORB for the duration of this consultation. |
| NMFS 2009 Biological Opinion | NMFS issued its current coordinated operations of the CVP and SWP BiOp on June 4, 2009. The NMFS BiOp covers: Central California Coast steelhead and its critical habitat; Sacramento River winter-run Chinook salmon; Central Valley spring-run Chinook salmon; Central Valley steelhead; Southern Distinct Population Segment (DPS) of Northern American green sturgeon; and Southern resident DPS of killer whales. NMFS determined that the action was likely to jeopardize these species and destroy or adversely modify their critical habitat, except the Central California Coast steelhead, and included an RPA (NMFS 2009). |

| | Key elements of the NMFS RPA in the 2009 BiOp are:<br><br>• A new temperature management program for Shasta Reservoir and the Sacramento River below Keswick Dam;<br>• Long-term passage prescriptions at Shasta Dam to allow re-introduction of listed salmonids;<br>• Flow and temperature criteria in Clear Creek below Whiskeytown Dam;<br>• A new screened pumping plant in Red Bluff to replace the Red Bluff Diversion Dam (completed in 2012);<br>• Improved juvenile salmonid fish rearing habitat in the lower Sacramento River and Delta;<br>• Delta Cross Channel gate closure beyond the mandates of D-1641;<br>• An OMR flow limit of -5000 cfs from January 1 through June 30 with density-based triggers that can limit OMR flow to less negative values;<br>• A limit on the ratio of exports to San Joaquin River inflow during April and May;<br>• Required studies of acoustic tagged steelhead in the San Joaquin Basin to evaluate the effectiveness of the RPA and refinements as necessary;<br>• New flow management standard, temperature management plan, additional technological fixes to temperature control structures, and long-term fish passage above Folsom Dam for steelhead on the American River;<br>• New minimum flow regime for steelhead in the Stanislaus River and long-term fish passage evaluations above Goodwin, Tulloch, and New Melones Dam; and<br><br>A hatchery genetics management plan for Nimbus Hatchery for steelhead and fall-run Chinook salmon. |
|---|---|
| Water Quality Control Plan | The SWRCB has issued numerous orders and decisions regarding water quality and water right requirements. The current Water Quality Control Plan for the Bay-Delta (WQCP) including the water quality objectives in D-1641 (issued December 29, 1999) and subsequent revisions in 2000 and 2006. The various flow objectives and export limits in D-1641 are designed to protect the estuary ecosystem, in-Delta agriculture and regional municipal water quality. These objectives include salinity and minimum outflow requirements throughout the year, and an 'X2 standard' and export to inflow ratio limits in February through June. The water quality objectives vary within and between years according to the Sacramento Valley 40-30-30 WY Index. These water quality standards were incorporated into the ROC BA. |

| | |
|---|---|
| | The SWRCB is also in the process of updating the WQCP. The update has been broken into four phases, some of which are proceeding concurrently. Phases 1 and 2 are currently in progress; Phase 1 involves updating San Joaquin River flow and southern Delta water quality requirements. Phase 2 focuses on the Sacramento River basin and the Delta. Phase 3 will involve implementation of Phases 1 and 2 through changes to water rights and other measures. This phase will require a series of hearings to determine the appropriate allocation of responsibility between water rights holders within the scope of the Phase 1 and Phase 2 plans. Phase 4 will involve developing and implementing flow objectives for priority Delta tributaries upstream of the Delta. |
| Central Valley Project Improvement Act | In 1992, the CVP was reauthorized through the Central Valley Project Improvement Act (CVPIA) (Public Law 102-575, Title 34) adding mitigation, protection, and restoration of fish and wildlife as a project purpose. Further, the CVPIA specified that the dams and reservoirs of the CVP should now be used "first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration purposes; and, third, for power and fish and wildlife enhancement." <br><br> The CVPIA includes actions to benefit fish and wildlife. Section 3406(b)(1) is implemented through the Anadromous Fish Restoration Program (AFRP). Section 3406(b)(1) provides for modification of the CVP operations to meet the fishery restoration goals of the CVPIA, so long as the operations are not in conflict with the fulfillment of the Secretary's contractual obligations to provide CVP water for other authorized purposes. The DOI decision on Implementation of Section 3406(b)(2) of the CVPIA, dated May 9, 2003, provides for the dedication and management of 800,000 acre-feet of CVP-water each year. This water has been used to augment flows below CVP dams and to temporarily reduce CVP exports in the spring. DOI manages and accounts for (b)(2) water pursuant to its May 9, 2003 decision and court decisions, including *Bay Institute of San Francisco v. United States*, 66 Fed. Appx. 734 (9th Cir. 2003), as amended, 87 Fed. Appx. 637 (2004). Additionally, DOI is authorized to acquire water to supplement (b)(2) water, pursuant to Section 3406(b)(3), but has seldom done so. |
| 2014-2016 Drought Operations | The drought conditions during 2014-2016 resulted in low reservoir storages which limited the ability of the CVP and SWP to meet their obligations and comply with the WQCP. During 2014, 2015 and 2016, Reclamation and DWR petitioned the SWRCB on several occasions to temporarily modify the terms of their water rights permits. The SWRCB Executive Director approved Orders for temporary urgency changes to D-1641 standards to help Reclamation and DWR deliver minimum water |

| | |
|---|---|
| | supplies. The granted requests and information related to the drought workshops can be found online at: http://www.waterboards.ca.gov/waterrights/water_issues/programs/drought/tucp/index.shtml.<br><br>An emergency drought barrier was installed in False River between Jersey and Bradford Islands during May and June 2015 to prevent salinity intrusion into the central Delta during a period of extremely low (sometimes net negative) Delta outflow. The barrier allowed the CVP and SWP to meet salinity standards revised per the Temporary Urgency Change Petitions (TUCPs) while conserving limited water supply in the Project reservoirs. The barrier was removed in the fall of 2015. The barrier was installed during what is typically the peak of delta smelt larval density. The barrier may have prevented some delta smelt from utilizing False River for migration or dispersal, possibly increasing the risk of predation for fish in Franks Tract. Similar drought operations could be considered in the future when exceptionally dry conditions return to California. |
| Channel Maintenance Dredging and Sand Mining Projects | The Corps has consulted annually with the Service to conduct maintenance dredging in the Suisun Bay Federal Navigation Channels (SBFNC). The SBFNC include several reaches: Bulls Head Channel, Suisun Bay Main Channel and New York Slough. Maintenance activities have included the use of hydraulic suction dredging and mechanical clamshell dredging. Delta smelt have historically been entrained with the hydraulic suction dredging. Thus, the Corps has used clamshell dredging since 2015 to minimize its incidental take.<br><br>The Corps has also annually consulted with the Service to conduct its operations and maintenance dredging in the Sacramento River Deep Water Ship Channel (SRDWSC) and Stockton Deep Water Ship Channel (SDWSC). Portions of each channel are dredged annually to maintain the current navigational depths. The SRDWSC begins in the city of West Sacramento and extends southwest to Collinsville. The SDWSC extends from New York Slough near Pittsburg to Stockton along the San Joaquin River. The SRDWSC varies in width from 200 to 400 ft. The ship channel was proposed to be deepened and widened as authorized under the Water Resources Development Act of 1986 (Public Law 99-662). The channel was proposed to be deepened along its entire length and widened to bottom widths ranging from 250 to 400 ft. Due to funding and other constraints, this PA has not been completed. Since 2014, only the reach from river mile (RM) 35 to the turning basin of the SDWSC has been deepened and the only widening that occurred was that necessary to maintain a 1:3 side slope for the deeper channel segment. The shipping channel maintenance projects use a hydraulic cutter head suction dredge. In 2016, operational changes were made to reduce delta smelt |

| | |
|---|---|
| | entrainment. In 2015, the Service requested cessation of fish monitoring surveys associated with dredging to minimize incidental take of delta smelt.<br><br>Jerico Products, Hanson Marine Operations, and their joint-venture partnership Suisun Associates are commercial sand mining companies that have leases in Suisun Bay and the west Delta to collect sand for construction-related materials using hydraulic dredging methods. The Corps consulted with the Service in 2014 on their ten-year marine sand-mining lease project proposal. The amount and seasonal timing of sand mining are largely dictated by demand for sand and the weather. Generally, sand mining peaks in the summer and early fall when commercial and residential construction is also at its annual peak. July – October sand mining historically makes up over 43% of the total annual volume. The Service's biological opinion prohibits mining near the shoreline and in shallow areas, help protect delta smelt spawning habitat and fringing marsh habitats. Bathymetric surveys provide a basis for routine monitoring of subtidal conditions in areas where mining takes place and could be used to detect and assess biologically significant changes in subtidal habitat. This bathymetric monitoring is required as part of the Corps permit. Tracking mining locations serves to ensure that mining occurs only within designated lease areas. |
| Dredging Projects | The Service completed consultation with the Corps on the San Francisco Bay to Stockton Navigational Improvements Project on October 3, 2019. This project would deepen portions of the shipping channel in San Pablo Bay and Suisun Bay. The modeling analysis indicates that the change in channel depth will have effects to the size and location of the LSZ in some year types. The project will beneficially reuse dredge materials at habitat restoration sites. |
| Levee Projects | In March of 2015, the Corps completed a draft general reevaluation study of the American River Common Features project for the City of Sacramento and surrounding areas. This study addressed the flood risk management system for the American and Sacramento Rivers and five other smaller channels which are sources of potential flooding. These areas overlap the Action Area for the ROC PA. The Common Features project will remediate levee seepage along approximately 22 miles of the American River. It will also strengthen and raise 12 miles of Sacramento River levee in Natomas. Lastly, the authorization included seepage remediation and higher levees along four stretches of the American River and 5 miles of the Natomas Cross Canal levee.<br><br>The Small Erosion Repair Program (SERP) provides a streamlined process for DWR to identify, obtain regulatory authorization for, and construct minor levee repairs on levees maintained by DWR within the Sacramento River Flood Control Project area. The SERP covers approximately 300 miles |

| | |
|---|---|
| | of levees and represents an initial five-year effort. After the first phase, the Interagency Flood Management Collaborative Program's Group will evaluate the program's success and, if warranted, SERP may be expanded to include sites repaired by local agencies throughout the Sacramento-San Joaquin watershed. Similar to previous initiatives, these small levee repairs will slowly increase levee riprapping along the Sacramento River, further degrading the quality of habitat for delta smelt. |
| Aquatic Weed Control | The California Division of Boating and Waterways (DBW) is the lead agency for controlling aquatic weeds in the Delta, its tributaries, and Suisun Marsh. This includes controlling water hyacinth, Brazilian water weed, curly-leaf pondweed and Spongeplant. These programs are not intended to eradicate these species, rather they attempt to control their spread and to seasonally manage the intensity of infestations. Thus far, the program has not been successful. Herbicide treatments in the Delta are authorized to occur from March 1 through November 30. DBW is permitted to treat 15,000 acres in the following areas over a 5-year increment. Much of this acreage is within the critical habitat boundaries for delta smelt. |
| Suisun Marsh Plan | On June 10, 2013, the Service issued a biological opinion for the *Suisun Marsh Habitat Management, Preservation, and Restoration Plan* (Suisun Marsh Plan). This biological opinion covers the continued operation and maintenance of managed wetlands in the Suisun Marsh that are an important component of the Pacific Flyway and habitat for several resident ESA-listed plants and animals. The Suisun Marsh Plan also covered new managed wetland activities; dredging; bank protection, including new riprap; and the installation of fish screens. The opinion also included a programmatic restoration plan for restoring 5,000 to 7,000 acres of natural tidal marsh in the Suisun Marsh. Details of the project-level activities associated with the managed wetlands can be found online at: https://www.fws.gov/sfbaydelta/documents/2012-F-0602-2_Suisun_Marsh_Solano_County_Corps_programmatic.pdf. |
| Scientific Monitoring and Research | Numerous State and Federal agencies and their partners conduct scientific monitoring and research in the Bay-Delta. Most of the incidental take of delta smelt is covered under a biological opinion for the IEP. However, the IEP has for many years, limited its incidental take to much lower numbers that what was authorized under its biological opinion and works with the Service to set a take limit for its activities each year. The rest of the directed scientific take of delta smelt is covered via a few recovery permits held by other entities. Some sampling occurs year-around throughout the known range of the delta smelt and several IEP monitoring programs target delta smelt in particular. Other very long-running monitoring programs (described in more detail in the *Status of the Species* section) were not designed to target delta smelt but historically have routinely collected them and over time, they became foundational delta smelt abundance indexing programs. |

| Use of cultured delta smelt for scientific research purposes | On December 7, 2018, the Service issued a framework programmatic biological opinion on our issuance of a section 10(a)(1)(A) permit to the Fish Conservation and Culture Laboratory for providing cultured delta smelt for scientific studies in the Delta. These studies are designed to help answer questions about how delta smelt that were spawned and reared in captivity may fare upon being released into the wild for population augmentation purposes. |
| --- | --- |

## 5.2 Effects to Delta Smelt from the Proposed Action

This section analyzes components of the Proposed Action that are likely to affect delta smelt as denoted in Table 2-1: Components of the Proposed Action within the *Description of the Proposed Action* section. Most action elements occur within the Delta and are discussed below. The remaining action components not discussed in this section occur upstream of the Delta, where the operations have effects on delta smelt that are not realized until the flow reaches the Delta. The analyses below fully account for those upstream operational effects.

The analysis that follows is generally qualitative. Knowledge of currently available scientific information can provide basic information but may not enable prediction of how a species will respond to changes in its environment, particularly aggregate effects of multiple factors because aggregate and cumulative impacts are difficult to predict. This is because aggregate and cumulative impacts usually require a time component such as sequential exposure to a stressor. The cumulative nature of change in the Bay-Delta involving many pathways and decades of water operations layered on top of other stressors makes it difficult to distinguish the long-term effects of water operations from the effects that may arise from implementation of the PA. The Service acknowledges these interpretive limitations of this effects analysis.

The following CVP and SWP action elements are listed in Table 2-1: Components of the Proposed Action and included in the modeling results (except where indicated that the modeling does not reflect the PA): (1) Divert and store water consistent with the obligations under water rights and decisions by the State Water Resources Control Board, (2) Shasta critical determinations and allocations to water service and water repayment contractors and agreements with settlement and exchange contractors, and (3) Minimum export rate. The effects of these action elements are consistent with and included in the analysis for "Seasonal Operations of Banks and Jones" below; therefore, the effects of these project elements are not separately discussed in this effects analysis.

### 5.2.1 Seasonal Operations of Banks and Jones

*Effects of entrainment from seasonal operations and OMR management*

*Overview*

Effects that typically result from the operation of large water diversions are entrainment or injury of delta smelt that come in contact with the fish facility as water is being diverted (i.e., salvage). Other impacts are those associated with the actual diversion of large quantities of water from the river, which can affect flow patterns, hydrodynamics, and resulting habitat features and ecological processes that vary with changes in river flows into the estuary.

*Entrainment*

Entrainment is used to assess direct injury or loss of delta smelt from the diversion of water. Entrainment can occur whenever delta smelt are present in river (or estuary) water that is diverted (or exported), creating the opportunity for delta smelt and/or their food supply to follow

the flow of diverted water and become entrained (i.e., lost from the Bay-Delta ecosystem). The entrainment footprint in the south Delta extends beyond the CVP and SWP facilities into adjacent waterbodies (Kimmerer and Nobriga 2008; Andrews *et al.* 2016; Hutton *et al.* 2019).

The entrainment of delta smelt into the south Delta, the CVP and SWP fish facilities, and the Banks and Jones pumping plants is a direct effect of SWP and CVP operations. Salvage has historically been used as an index of entrainment resulting from CVP and SWP exports from the south Delta. However, because salvage has decreased with the decline in delta smelt abundance and shrinking populations become more difficult to detect, salvage may no longer accurately reflect the relative number of fish that become entrained in the south Delta or enter the fish facilities (Figure 5-25, Table 5-5). Because of this, salvage is no longer considered to be a reliable index of entrainment. Salvage is an extrapolated estimate of the number of fish at each fish facility and subsequently returned to the Delta through a truck and release operation. For a description of fish salvage operations, see Brown *et al.* (1996) and Morinaka (2013a,b) for a discussion of the Skinner Fish Facility.



**Figure 5-25. Annual salvage of delta smelt (all life stages) at the Skinner Fish Facility (SDFPF) and the Tracy Fish Collection Facility (TFCF). (Aasen and Morinaka 2018).**

Under ideal conditions, salvage estimates are indices of entrainment because most entrained fish are not observed in salvage (Table 5-5). Pre-screen loss, defined as fish mortality occurring prior to fish reaching the facilities, is believed to be high and as a result, most entrained fish do not survive to be observed at the fish facilities (Castillo *et al.* 2012). Bennett (2005) suggested that many, if not most, of the delta smelt that reach the fish facilities likely die due to handling stress and predation; however, recent studies suggest there may be relatively high survival of adult delta smelt during collection, handling, transport, and release when they are salvaged during cool

temperature conditions (Morinaka 2013b). There is no data on the survival of these fish post-release. Pre-screen loss due to predation near and within the CVP and SWP fish facilities is an additional cause of mortality for delta smelt. In one study, pre-screen loss of captive-reared delta smelt released into CCF ranged from about 90% to 100% for adults and nearly 100% in one trial using juveniles (Castillo *et al.* 2012). Please see the *Tracy Fish Collection Facility (TFCF) and Skinner Fish Facility* section below for a discussion of the effects of the fish facilities on delta smelt.

**Table 5-5. Factors affecting delta smelt entrainment and salvage.**

| Factor | Adults | Larvae < 20 mm | Larvae >20 mm and Juveniles | Source |
|---|---|---|---|---|
| Pre-screen loss (predation prior to encountering fish salvage facilities) | CVP: unquantified; SWP: 89.9–100% | Unquantified | CVP: unquantified; SWP: 99.9% (n=1) | SWP: (Castillo *et al.* 2012) |
| Fish facility efficiency | CVP: 13%; SWP: 43–89% | ~0% | CVP: likely < 13% at all sizes, << 13% below 30 mm (based on adult data); SWP: 24–30% | CVP (Kimmerer 2008), SWP: (Castillo *et al.* 2012) |
| Holding tank collection screens efficiency | ~100% | SWP: unknown; CVP: 60% for larvae 10-20 mm, 9% for larvae <10mm | SWP: <100% until at least 30 mm; CVP: 82% for larvae 20-30 mm | CVP: (Reyes *et. al.* 2012, Wu and Bridges 2014) |
| Identification protocols | Identified from subsamples, then expanded in salvage estimates | Identified, not expanded | Identified from subsamples, then expanded in salvage estimates | |
| Collection and handling | 48-hour experimental mean survival of 93.5% (not statistically different from control) in 2005; 88.3% in 2006 (significantly less than 99.8% of control) | Unquantified | 48-hour experimental mean survival of 61.3% in 2005 and 50.9% in 2006 (both significantly less than mean control survival of 82.0–85.9%) | (Morinaka 2013b) |
| Trucking and release (excluding post-release predation) | No significant additional mortality beyond collection and handling (above) | Unquantified | No significant additional mortality than collection and handling (above), although mean survival was 37.4% in 2005 | (Morinaka 2013b) |

Presently, the Service considers delta smelt to almost always be entrained (and therefore lost to the population) if they enter Old or Middle rivers except under extremely wet San Joaquin Basin conditions. Because salvage numbers have dropped to record lows and pre-screen losses are high at the facilities, the salvage process does not return meaningful numbers of delta smelt back into the Delta (Table 5-5). Thus, the particular source of mortality of delta smelt in the south Delta is not especially important like it is for fish species that are more effectively salvaged (*e.g.,* Chinook salmon and steelhead). Most delta smelt that enter the southern Delta via Old and Middle rivers are assumed to be eaten by predators before they reach the fish facilities. If not managed carefully, the more negative modeled OMR flows under the PA could increase the entrainment of delta smelt into Old and Middle rivers without that change being reflected in salvage. Generally speaking, increases in entrainment translate into higher mortality of individuals from predation and entrainment into canal systems in which they will not survive.



**Figure 5-26. Modeled OMR flow from January to December. (Source: ROC BA 2019).**

Larval, juvenile, and adult delta smelt are entrained into the south Delta during the migration, spawning, and transport periods of their life cycle (Kimmerer 2008; 2011; Grimaldo *et al.* 2009; Sommer *et al.* 2011). Delta smelt have been previously considered semi-anadromous and assumed to make a somewhat coordinated and generally eastward spawning migration into the Delta (Service 1993; Bennett 2005; Sommer *et al.* 2011). Newer research suggests that rather than a "migration", the fish disperse in multiple directions during winter storms (Murphy and Hamilton 2013; Polansky *et al.* 2018). This BiOp uses the term "dispersal" to describe the

wintertime movement toward spawning areas that appear to be fairly similar among years. Adult delta smelt show up in fish salvage counts typically during the winter dispersal period. Salvage of adults has mainly occurred from December through March (Kimmerer 2008; Grimaldo *et al.* 2009).

For adults, the risk of entrainment is influenced by net negative flow (stronger flood tides than ebb tides) and turbidity in the south Delta (Grimaldo *et al.* 2009; Figure 5-26). Project pumping (*i.e.,* the export of water from the Delta) can cause the tidally filtered or "net" flows in Old and Middle rivers and other south Delta channels to move "upstream" toward the facilities. This occurs when water removed by Banks and Jones, along with other diversions in the area, is back-filled by tidal and Sacramento River flows. This phenomenon is mathematically depicted as negative flow. The net OMR flows indicate how strongly the tidally averaged flows in these channels are moving toward Banks and Jones pumping plants. More net negative OMR flows and higher turbidity are often associated with adult delta smelt entrainment, but no particular OMR flow assures entrainment will or will not occur. Net flows themselves could be the mechanism that increases entrainment risk for young delta smelt that have poor swimming ability. However, high exports can also lead to strong tidal asymmetry in Old and Middle rivers where flood tides toward the pumps become much stronger than the ebb tides away from the pumps (Service 2008), so altered tidal flows are a second, covarying, mechanism that could increase risk of entrainment particularly of adult delta smelt if they are using tide-surfing behaviors to move (Sommer *et al.* 2011; Bennett and Burau 2015). The real-time management of adult delta smelt entrainment risk proposed in the PA is based on OMR flow and turbidity management.

Since 2008, turbidity management has become a widely accepted concept for reducing adult delta smelt salvage and proportional entrainment losses, following the concept that delta smelt population distribution expands in response to winter flow pulses that often coincide with higher turbidity (Sommer *et al.* 2011).

Given there are demonstrated relationships between delta smelt entrainment and salvage with OMR flows (Kimmerer 2008; Grimaldo *et al.* 2009), this effects analysis evaluates the differences between the PA and the current operations scenario (COS) as they are modeled using CalSim II. To analyze entrainment effects, we will examine the modeled OMR flows by each month during which delta smelt protections may be in place, from December through June. Important assumptions that were used in the CalSim II model that differ from what is described in the PA are depicted in the Table 5-6. The subsequent sections will describe how these differences were resolved for each specific time period in question. For the purposes of this analysis, the OMR index is an index of the combined flow in Old and Middle rivers calculated by DWR using a combination of data sources, including modeled data. Reclamation and DWR propose to use the OMR index as a management tool for real-time operations of the projects.

**Table 5-6: Key differences between PA modeling assumptions and PA implementation language.**

| OMR Management Action | CalSim II Modeling Assumptions for PA Scenario | PA Implementation Language |
|---|---|---|
| Integrated Early Winter Pulse Protection (for delta smelt) | After December 1, when the 3-day average turbidity is assumed to be 12 NTU or greater at Old River at Bacon Island (OBI), Prisoner's Point (PPT) and Victoria Canal (VCU) based on Sacramento River Index (sum of monthly flow at four stations on the Sacramento, Feather, Yuba and American Rivers, from 2003 to 2006) greater than or equal to 20,000 cfs, projects will operate to an OMR index of -2,000 cfs for 14 days. | From December 1 through January 31, when the running 3-day average of the daily flows at Freeport is greater than 25,000 cfs and the running 3-day average of the daily turbidity at Freeport is 50 NTU or greater, projects will reduce exports for 14 consecutive days to maintain a 14-day average OMR flow no more negative than -2,000 cfs (once per water year). |
| Turbidity Bridge Avoidance (for adult delta smelt) | If the Sacramento River Index is greater than or equal to 20,000 cfs, projects will operate to an OMR index of -2,000 cfs for five days in January and February of any water year type. For March through June of Wet and Above Normal years, it is assumed that there will be one event of turbidity bridge avoidance in each month (-2,000 cfs OMR for 5 days). | Projects will operate to maintain daily average turbidity at Old River at Bacon Island (OBI) to less than 12 NTU. If daily average turbidity cannot be maintained less than 12 NTU, the OMR index shall not be more negative than -2,000 cfs until the daily average turbidity at OBI drops below 12 NTU. After 5 days of operation to -2,000 cfs without OBI dropping below 12 NTU, projects will assess whether continued Additional Real-Time OMR Restrictions are necessary or effective for species protection. |
| Storm-Related OMR Flexibility | In Above Normal and Below Normal years, there will be one opportunity in January and one opportunity in February to operate to a monthly average OMR flow of -6,000 cfs when increased pumping due to a storm is possible. In Dry years, only one opportunity in January or February is modeled. In Wet years, no flexibility is modeled. | The maximum (otherwise-permitted) export rate of 14,900 cfs may be taken, if turbidity at Bacon Island does not exceed 12 NTU. This could result in a range of OMR flow values. A duration of action is not specified. |

| Species-specific single-year loss thresholds (for salmonid species) | In Above Normal and Below Normal years, OMR during April and May will be -3,500 cfs. | Projects will operate OMR to -3,500 cfs when 50% of the annual salmonid loss threshold is reached, and will operate OMR to -2,500 when 75% annual salmonid loss threshold is reached (unless Reclamation determines action no longer warranted). |
|---|---|---|

OMR flow can be modeled from CalSim II, but turbidity cannot. Because turbidity is an important factor influencing entrainment, the expected entrainment resulting from the PA cannot be estimated accurately and conditions have to be evaluated in real-time. The differences between modeling assumptions and how OMR management are described in the PA and the COS are important when considering the bounds of potential OMR flow scenarios during real-time implementation of the PA. For these four elements highlighted in Table 5-6, the PA modeling depicts a scenario that is different than the PA as written. Particularly, the Storm-Related OMR Flexibility and Single-Year Loss Threshold actions may be more protective than the PA modeling reflects. The technical working groups described in the PA will assist Reclamation and DWR in their assessment of the appropriate real-time OMR management response to these variables. Ultimately, implementation of the PA may fall closer to the PA as written, or closer to that depicted in the modeling, depending on real-time conditions. We have attempted throughout this effects analysis to provide context around the modeling results, particularly where we anticipate the modeling results to be less reflective of likely operations.

The analyses of the potential effects of the PA on different life stages of delta smelt that are presented in the sections below address direct effects of water exports (such as entrainment) and indirect effects (such as predation).

*Adult Entrainment*

According to the BA, the without action conditions of no south Delta exports would not entrain adult delta smelt into the facilities, but some delta smelt would still disperse into the south Delta and be subject to higher mortality rates associated with predation in habitats dominated by SAV. The lack of south Delta export pumping is reflected in OMR flows under the without action scenario generally being positive (BA Figures 5.16-41, 5.16-42, 5.16-43, 5.16-44).

In December, OMR flows described in the PA will be similar to current operational conditions (ROC BA 2019; Figure 5-27). OMR flow under current conditions is almost always more negative than -4,000 cfs in December, during which it is typical to see high rates of pumping. Under the PA, unless conditions trigger the Integrated Early Winter Pulse Protection of the OMR Management actions, OMR flows will be similar to current conditions, though the PA modeling does not reflect this action precisely.



**Figure 5-27. Mean Modeled Old and Middle River Flows, December (ROC BA 2019)**

Under the PA, average OMR flows may be slightly more negative than current operations in January, February, and March, but generally will not exceed -5,000 cfs due to the Additional Real-Time OMR Restrictions. As noted in Table 5-6, Storm-Related OMR Flexibility actions may be taken that were modeled in CalSim II at a monthly averaged OMR flow of -6,000 cfs, but described in the PA as potentially much more negative OMR flows than -6,000 cfs. During the adult delta smelt's winter dispersal, OMR flows in the PA are expected to be slightly more negative than the COS but generally bounded at -5,000 cfs by the implementation language in Table 5-6 (ROC BA 2019; Figures 5-28, 5-29, and 5-30).



**Figure 5-28. Mean Modeled Old and Middle River Flows, January. (ROC BA 2019)**



**Figure 5-29. Mean Modeled Old and Middle River Flows, February. (ROC BA 2019)**



**Figure 5-30. Mean Modeled Old and Middle River Flows, March. (ROC BA 2019)**

Given that projected OMR flow conditions overall are expected to become slightly more negative than current conditions while maturing adult fish are dispersing from January through March under the PA, it is important to consider entrainment risk during this time in the context of OMR and turbidity. While there is no OMR flow value that guarantees entrainment of delta smelt, the exploration of the effects of turbidity management actions since 2008 have shown promising results for reducing entrainment when initiated early.

The CalSim II modeling indicates that monthly average OMR flows may be more negative in the PA relative to the COS. This is consistent with the likelihood of storm-related increases in exports that could result in short-term OMR flow more negative than -5,000 cfs. However, the PA proposes to use a suite of protective actions, identified in the PA as "Additional Real-Time OMR Restrictions", to manage entrainment risk of delta smelt in real-time by managing OMR and turbidity together (see below). Entrainment risk may increase if the Directors of NMFS and the Service choose to authorize Reclamation and DWR to operate to a more negative OMR than what is specified in "Additional Real-Time OMR Restrictions", but even if they do, the projects have proposed to operate to no more negative than -5,000 cfs during these Director-guided periods of time.

A suite of OMR Management actions are proposed and described in Table 5-6. The Integrated Early Winter Pulse Protection action is meant to replace RPA Action 1 of the 2008 BiOp, which called for the projects to reduce negative OMR flows to -2,000 cfs for 14 consecutive days if a

turbidity trigger was met; the 2008 trigger was based on three-day averages being greater than or equal to 12 NTU at three separate stations in the south Delta. The Integrated Early Winter Pulse Protection action uses the Freeport station on the Sacramento River as an early indicator of turbidity dispersal into the Delta. The Freeport station is used because most of the sediment that enters the Delta is delivered by the Sacramento River (including the Yolo Bypass), and can provide advance warning that operational changes may be needed. If the Freeport inflow and turbidity triggers are met, the facilities would modify operations, including reducing exports if necessary, in order to reduce negative OMR flows to -2,000 cfs for 14 consecutive days.

As described in the *Status of the Species Within the Action Area* and *Status of the Critical Habitat Within the Action Area* sections, based on current information, the Service has determined that adult delta smelt disperse during early winter storms. The storms increase river inflows to the Delta, and therefore, net westward flows. When inflows increase enough, they can bring large quantities of sediment into the Delta and increase water turbidity. The tides and net flows then interact to disperse that turbidity. Delta smelt appear to respond to this seasonal change in their environment by spreading out (increasing their spatial distribution; Sommer *et al.* 2011; Murphy and Hamilton 2013). Not all of the delta smelt's movements during this seasonal dispersal are upstream. However, some individuals do move upstream and it is believed that net upstream movement against net downstream flow is facilitated by fish changing their distribution in the channel in response to tidal flows (Bennett and Burau 2015; Polansky *et al.* 2018).

Some of the delta smelt that disperse upstream move up the Sacramento River and some move up the San Joaquin River. Suitable spawning habitat is believed to be available in both primary channels. This seasonal re-distribution of adult delta smelt makes it clear that they can resist net flow directions and, therefore, modeling tools like DSM-2 PTM that provide information about tidal flow directions, which when evaluated over longer time frames provide information about net flows, will not be able to predict adult delta smelt movements. However, PTM modeling can provide information about the hydrodynamic influence of the Banks and Jones pumping plants on net water movement in the Delta (e.g., Kimmerer and Nobriga 2008) enabling an evaluation of how different OMR flows draw water off of potential spawning locations like the main stem of the San Joaquin River.

Under the Integrated Early Winter Pulse Protection action, the OMR flow target remains at -2,000 cfs, consistent with RPA Action 1 of the 2008 BiOp. Therefore, the effect of the operational change will remain largely the same between the COS and the PA scenarios to protect pre-spawning adult delta smelt from being entrained during the first major flush of the rainy season. Reclamation proposes to implement this protective action when specific Freeport flow and turbidity parameters are met, rather than relying on turbidity stations in the south Delta (Table 5-6). The Freeport station was selected to serve as an earlier, upstream indicator of high flow and turbid conditions that would likely reach the south Delta, ensuring the projects will have enough time to make the operational change to avoid an entrainment event. This new location trigger was recommended based on best professional judgment of biologists from Reclamation, DWR, the Service, and CDFW. No data was provided in the ROC BA to compare the historical frequencies of the trigger parameters being met and what, if any, differences there would be from the frequency of the 2008 RPA trigger parameter.

Our cursory analysis of available data from water years 2014-2019 indicates that the PA's Freeport flow and turbidity criteria were met in 4 out of 6 years, whereas the triggers under RPA Action 1 of the 2008 BiOp were not met in the same time period. The period of this analysis was limited by the availability of turbidity (NTU) information at Freeport, which only dates to 2014. This is a very limited comparative dataset of hydrological conditions, but it suggests that the Integrated Early Winter Pulse Protection action under the PA may be triggered more often than the previous RPA Action 1 under the COS. If the frequency of the Integrated Early Winter Pulse Protection action is greater than the RPA Action 1, we expect the projects will meet a 14-day - 2,000 cfs OMR target more often than under the COS. Therefore, the PA, including the proposed Additional Real-Time OMR Restrictions, has the potential to provide protection more frequently for adult delta smelt dispersing in the early winter months than the COS condition.

Adult delta smelt are expected to disperse in general proportion to how they have in the recent past (Polansky *et al.* 2018). These seasonal movements are believed to be in response to increasing inflows and turbidity, but facilitated by selective use of tidal currents as discussed above. The Service has summarized available DSM-2 PTM data to demonstrate that project operations will have limited influence on San Joaquin River hydrodynamics at the OMR flows proposed under turbid conditions (Figure 5-31). This contrasts the results for particles released into Old and Middle rivers, which have a high likelihood of being entrained even at -2,000 cfs OMR. This analysis shows that the projects should have minimal influence on the winter movements of delta smelt, affecting only individuals that swim into Old and Middle rivers.



**Figure 5-31. Scatterplot of monthly average OMR flow versus predicted particle entrainment 30 days after release from the four locations listed in the legend. Prisoner's Point and Stockton represent particle release sites on the main stem of the San Joaquin River. Holland Cut and Mildred Island represent particle release sites in Old and Middle rivers, respectively. Data points above the solid blue line reflect model runs in which particles were more likely than not to be entrained into the Banks and Jones pumping plants, whereas data points below the line reflect model runs in which particles were more likely than not to avoid being entrained. Data source: Service unpublished summary of data provided by CH2M Hill. Service staff queried the results from a comprehensive database of DSM-2 PTM runs for month-year combinations that bracketed an OMR range of -2,000 to -3,500 cfs; the -2,000 cfs trigger was proposed as a threshold in the ROC on LTO BA as part of the winter pulse protection action (see Table 5-6). For each release site, results are presented for 31 month-year combinations.**

Reclamation proposes to implement the Additional Real-Time OMR Restrictions identified in the PA by February 1 to manage OMR to more positive than -5,000 cfs based on the suite of actions. The first of these actions is Turbidity Bridge Avoidance. Under this action, the projects

will manage OMR to no more negative than -5,000 cfs beginning on February 1 even if turbidity in the south Delta remains low, with the exception of storm-related OMR flexibility actions. If the Integrated Early Winter Pulse Protection is triggered, Turbidity Bridge Avoidance would be implemented immediately following the end of the 14-day action. The objective of Turbidity Bridge Avoidance is to maintain OMR flow no more negative than -2,000 cfs if daily average turbidity at Old River at Bacon Island (OBI) station reaches 12 NTU. OBI was selected by the five agencies as the best available station to assess the formation of a turbidity bridge based on experience from the last 11 years of operations. It is located about halfway down the Old River corridor and Reclamation has proposed to redundantly telemeter this station to prevent lapses in data due to vandalism or malfunction. OMR flow of -2,000 cfs may prevent increases in proportional entrainment of adults under clear water conditions.

The Integrated Early Winter Pulse Protection and Turbidity Bridge Avoidance actions will both contribute to adult delta smelt protections during the dispersal and spawning periods by targeting a -2,000 cfs OMR flow. This is because more positive OMR flows will result in lower turbidity intrusion into the south Delta and subsequently reduce the likelihood of delta smelt moving towards the pumps.

Additionally, the single year loss thresholds for winter-run Chinook salmon and Central Valley steelhead are in place from December to March, overlapping with larval delta smelt emergence through the end of March. Single year loss thresholds for Central Valley steelhead are in place April 1 to June 15, overlapping with a significant portion of the larval/juvenile life stage. The single year loss thresholds could require OMR flow to be maintained at a 14-day moving average of -3500 cfs to -2500 cfs if a threshold is exceeded. These thresholds have not been included in the PA modeling run.

Overall, because Reclamation and DWR will manage to an OMR of -5,000 cfs or more positive based on Additional Real-Time OMR Restrictions described above, effects to adult delta smelt will be similar to the COS.

In the 2008 BiOp RPA, two actions were included to reduce adult entrainment. These were Action 1 (First Flush) and Action 2 (Adult Migration and Entrainment). Both actions were intended to reduce entrainment of adults, and help distribute spawning adults in areas where their progeny would not be subject to entrainment. Action 1 was intended to provide protection for pre-spawning delta smelt dispersing in the estuary associated with the first storm in the watershed providing a pulse of turbidity through the system. Action 1 had two parts for implementation, December 1 through 20 and for post December 20. The post December 20 action provided for automatic implementation of OMR at -2000 cfs for 14 days if turbidity at 3 selected monitoring stations was over a specific threshold.

Over time, we have determined that the three stations identified in the 2008 BiOp were not the best indicators of turbidity-linked entrainment associated with the first flush in the system. Newer stations that did not exist at the time the BiOp was written provide a better indication of when the first flush is occurring. As stated above, biologists from the Service, Reclamation, CDFW, and DWR worked collaboratively to develop new triggers to identify when a first flush of turbidity is moving through the watershed. These new triggers are incorporated into the

Integrated Early Winter Pulse Protection action proposed by Reclamation in the PA. When the action is triggered, OMR will be maintained at -2000 cfs for 14 days, equivalent to the action in the 2008 RPA. In addition, once OMR management begins, Reclamation and DWR will operate to an OMR index no more negative than a 14-day moving average of -5000 cfs, unless a storm event occurs, until that point in which OMR management ends in a season (when temperatures in south Delta become lethal or June 30, whichever is earlier). As stated above, based on analysis of available data collected at newer stations, we anticipate this action may occur more frequently than Action 1 in the 2008 RPA. For these reasons, we expect this action will provide equivalent or greater protection for adult delta smelt and their progeny as compared to Action 1 in the 2008 RPA.

Action 2 in the 2008 RPA either followed directly after Action 1, or in years when Action 1 was not triggered, when the Service determined there was entrainment risk to pre-spawning and spawning adults. When triggered, the Service made a determination setting OMR between -1250 cfs and -5000 cfs.

During the period of operation under the 2008 RPA, the CVP and SWP operators have gotten significantly better at reducing entrainment by managing turbidity, particularly in the Old and Middle River corridors. Those lessons learned demonstrate that when turbidities in Old and Middle rivers are higher, entrainment increases, while when turbidities in Old and Middle rivers are lower, entrainment decreases. The Turbidity Bridge Avoidance action in the PA is structured to manage Old and Middle River turbidity in a way that is protective of adults during the spawning period, and is also protective of larvae and juveniles, by reducing the likelihood of spawning in areas that will not contribute to the population. This action provides that OMR will be held at no more negative than -2000 cfs for up to 5 consecutive days to reduce turbidity in Old and Middle rivers, and longer should Reclamation and DWR determine it appropriate. Otherwise, OMR will be operated at no more negative than -5000 cfs. For these reasons, we expect this action will provide equivalent or greater protection for adult delta smelt and their progeny as compared to Action 2 in the 2008 RPA.

*Larval and Early Juvenile Entrainment*

According to the BA, under without action conditions of no south Delta export pumping, there would be no entrainment of larval/early juvenile delta smelt at the south Delta exports for the CVP and SWP.

Because larval fish begin to emerge in late March, we consider late March to have overlap in effects to adults and the larval/early juvenile life stages. Thus, this section also addresses effects to larvae emerging at the end of March. The PA provides for OMR flow to be no more negative than -5,000 cfs on a 14-day moving average once OMR Management has begun until the End of OMR Management offramps have occurred. Additionally, during this period, single year thresholds for protection of wild and hatchery winter-run Chinook salmon and wild Central Valley steelhead may be implemented to provide more positive OMR flow. The single year thresholds for winter-run Chinook salmon and Central Valley steelhead are in place from December to March, overlapping with larval delta smelt emergence through the end of March. Single year thresholds for Central Valley steelhead are in place April 1 to June 15, overlapping

with a significant portion of the larval/juvenile life stage. The single year loss thresholds could require OMR flow to be maintained at a 14-day moving average of -3500 cfs to -2500 cfs if a threshold is exceeded. These thresholds have not been included in the PA modeling run. In years that the loss threshold is triggered in March, March OMR flows may be more positive than those modeled in the PA.

Reclamation and DWR are proposing to use results produced by Service-approved life cycle models to manage annual entrainment levels of larval/juvenile delta smelt. The Service life cycle models will be peer reviewed and publicly vetted prior to March 15, 2020. The Service will coordinate with the Delta Fish Monitoring Working Group to identify a delta smelt recruitment level that Reclamation and DWR can use in OMR management. The life cycle models statistically link environmental conditions to recruitment, including factors related to loss as a result of entrainment such as OMR flows. In this context, recruitment is defined as the estimated number of post-larval delta smelt in June per number of spawning adults in the prior February-March.

We believe the life cycle models will provide a scientifically robust measure for maintaining OMR flow at a level appropriate to support recruitment. Reclamation and DWR, in coordination with the Service, will operationalize the life cycle model results through the use of real-time monitoring for the spatial distribution of delta smelt.

On or after March 15 of each year, if QWEST is negative, and larval or juvenile delta smelt are within the entrainment zone of the export pumps based on real-time sampling of spawning adults or young-of-year life stages, Reclamation and/or DWR will run hydrodynamic models and forecasts of entrainment informed by the EDSM or other relevant sampling information to estimate the percentage of larval and juvenile smelt that could be entrained. If necessary, Reclamation will manage exports to limit entrainment to be protective based on the modeled recruitment levels. Reclamation and DWR will re-run hydrodynamic models when operational changes or new sampling data indicate a potential change in entrainment risk. This process will continue until the offramp criteria have been met as described in the "End of OMR Management" section of the PA. In the event the life cycle results cannot be operationalized in a manner that can be used to inform real-time operations, Reclamation and DWR will work with the Service to develop an alternative plan to provide operational actions protective of this life stage.

Exports in all water year types will increase under the PA in comparison to the COS in April and May, as demonstrated in the exceedance plots from the modeling provided in the BA (Figures 5-32 and 5-33). This conclusion is more certain than the winter operations (December – March) model results because the PA does not include the San Joaquin River I:E ratio limits from the NMFS 2009 biological opinion. The PA modeling scenario includes the assumption of OMR flow of -3500 cfs during Above Normal and Below Normal years. For the purposes of this analysis, we assume that the PA as modeled will roughly represent the actions described above, as the larval/juvenile entrainment action and single-year loss thresholds may result in OMR flow more positive than -5000 cfs in years that it is triggered. The model predicts that exports and OMR conditions in June will be similar between the PA and COS.



**Figure 5-32. Mean Modeled Old and Middle River Flows, April. (ROC BA 2019)**



**Figure 5-33. Mean Modeled Old and Middle River Flows, May. (ROC BA 2019)**

As discussed in the *Adult Entrainment* section above, more negative flows modeled under the PA from the COS may result in greater entrainment into Old and Middle rivers. This remains the case for larval and early juvenile delta smelt during the months of April and May. Fish of these life stages are small, making them weak swimmers that tend to move along with transport flows within the Delta (Kimmerer 2008). PTM runs suggest that larvae hatching in the mainstem of the San Joaquin River just outside of the south Delta may be entrained at flows proposed under the PA modeling. With more negative OMR flows under the PA than the COS, any larvae hatching in the south Delta are more likely to be pulled south by net negative flows; however, the loss may be reduced if more positive flow than predicted in the PA scenario are realized. More positive OMR flow could be realized when the single-year loss threshold is triggered, or when provided for by the larval/juvenile protection action. Without a downstream flow mechanism to reach suitable rearing habitat, most larvae hatched in the south Delta are presumed to be lost to the population (Figure 5-31). In Appendix 2, we estimated the percentage of adult delta smelt spawning in the south Delta to be approximately 1-2.5 % of the population. This would correspond to an equivalent percentage loss of larval delta smelt to entrainment.

Based on the findings of Polansky *et al.* (2018), the adult spawner distribution remains much the same from year to year, but as shown in Appendix 2, even very modest differences in the assumption about spawning distribution can have a large effect on predictions of proportional entrainment. Given the uncertainty around spawning distribution in any given year, Reclamation should monitor and re-evaluate as needed as part of Reclamation's adaptive implementation of its water operations and to stay within the effects analyzed in this opinion.

In addition to the larval entrainment action described above and the commitment to operate at OMR of -5000 cfs or more positive throughout the time that larval and juvenile delta smelt may be subject to entrainment, unless a Storm-Related OMR Flexibility action is taken,  Reclamation and DWR are proposing to limit adult entrainment through OMR limitations described in the adult entrainment section. These actions to reduce entrainment risk to adults reduces the likelihood of adults spawning in areas that would make their progeny subject to entrainment. These operational actions are anticipated to keep larval and juvenile entrainment losses low.

Other PA elements that may help reduce overall entrainment effects to the population at all life stages include increasing cultured smelt production at the Fish Conservation and Culture Laboratory (FCCL). Supplementation is intended to create a more robust delta smelt population that can better tolerate stressors. These efforts to begin near-term supplementation of delta smelt in the wild will come prior to the construction of the Delta Fish Species Conservation Hatchery designed to facilitate increased supplementation over time, boosting the number of delta smelt in the wild. These PA elements are discussed in depth below, under Non-Operational Actions.



**Figure 5-34. Mean Modeled Old and Middle River Flows, June. (ROC BA 2019)**

Modeled flows in June are largely similar between the PA and the COS (Figure 5-34). Warming temperatures in the south Delta, typically beginning in June, create inhospitable conditions for hatched larvae and early juveniles and encourage their downstream movement to the LSZ (Moyle 2002; Kimmerer 2008). Based on similar modeled conditions, delta smelt larvae and early juveniles are not expected to experience greater rates of entrainment under the PA than from the COS in June.

Action 3 of the 2008 RPA, Entrainment Protection of Larval Smelt, begins with evidence of spawning and a Service determination that the action had been triggered. When triggered, the Service made a determination, setting OMR between -1250 cfs and -5000 cfs.

Under the PA, Reclamation and DWR will operate during this time period at no more negative than -5000 cfs. Additionally, Reclamation and DWR will use results produced by Service life cycle models to manage annual entrainment levels of larval/juvenile delta smelt. The Service will work with Reclamation and DWR to determine how best to operationalize the life cycle model results, taking into account consideration of real-time spatial distribution of delta smelt and operational actions described in the PA. During the period of larval/juvenile protection, Reclamation and DWR will also be implementing operations consistent with the single year loss thresholds to protect salmonids described in the PA. These protections are expected to provide equivalent or better protection than Action 3 in the 2008 RPA.

According to the BA, turbidity could be affected by the PA relative to the without action scenario. Potentially less sediment supply under the PA during the winter/spring could give less sediment for resuspension during the fall subadult period. With greater (more upstream) X2 under the PA (Figures 5.16-33, 5.16-34, 5.16-35 of the BA), the LSZ potentially could overlap areas with much higher channel to shoal ratios that support less wind-wave sediment resuspension (IEP 2015), which could then translate into greater predation risk for delta smelt. Thus, the eastward shift of location of the LSZ caused by the PA has the potential to cause mortality of delta smelt associated with increased predation risk.

Delta smelt entrained by negative OMR flow are subject to a greater likelihood of predation in the south Delta. This is because the channelized habitats and clearer water conditions in the south Delta provide favorable conditions for non-native fishes that prey on delta smelt (Moyle *et al.* 2016). These conditions are exacerbated by the presence of SAV in the south Delta, which functions to slow water movement and reduce turbidity, reducing the cover that helps mask delta smelt from likely predators like young largemouth bass (see Ferrari *et al.* 2014). As stated in the BA, available estimates of sediment removal by the south Delta export facilities are low, i.e., approximately 2% of sediment entering the Delta at Freeport in 1999–2002 under similar assumptions for south Delta export rates modeled under the PA (Wright and Schoellhamer 2004). While modeled OMR flow in the south Delta is expected to become slightly more negative under the PA than under the COS, turbidity levels are expected to remain similar to the COS in the south Delta due to the relatively small amount of sediment movement discussed above. Therefore, turbidity conditions are not expected to differ enough from the COS to provide an improvement or degradation in turbidity conditions for delta smelt. However, more negative OMR flow under the PA during April and May has the potential to entrain a greater fraction of the delta smelt population into the south Delta than has been occurring since 2009 (Appendix 2). The suite of OMR management actions previously discussed will help to minimize increases in proportional entrainment over the COS caused by the PA. Mortality associated with higher predation risk caused by entrainment is considered as part of the overall effects caused by entrainment due to operation of the CVP and SWP under the PA.

*Other Considerations*

Delta smelt abundance during the timeframe of this consultation could change due to a number of factors including, but not limited to, hydrological or weather conditions. Increases in abundance could result in higher levels of salvage.

One example of how delta smelt abundance could be affected is through supplementation. As discussed in more detail in the Non-Operational Actions section below, Reclamation proposes to support the FCCL supplementation efforts to develop necessary information to begin a supplementation program, focusing on capturing existing genetic diversity and expansion of FCCL to produce maximum numbers of delta smelt. The intent of this program is to begin supplementation of delta smelt in the wild with fish captively produced by FCCL within 3-5 years from the issuance of the BiOp. Reclamation also proposes to partner with DWR to construct and operate the Delta Fish Species Conservation Hatchery by 2030. The

supplementation action is expected to benefit delta smelt by augmenting a wild population so that it is more resilient to withstanding the effects of entrainment.

### 5.2.2  South Delta Fish Facilities and Clifton Court Forebay Activities

This section addresses elements of the PA that would be encountered after entrainment of individuals. Under the without action scenario, these PA elements would not affect delta smelt because the projects would not be operating. The entrainment of delta smelt into the south Delta by the Banks and Jones pumping plants is a direct effect of SWP and CVP operations. The only mechanism through which delta smelt could potentially survive the poor habitat conditions of the south Delta is through salvage at the fish facilities, but the reasons why few if any delta smelt survive the process under current conditions and operations protocol are discussed above. Therefore, the Service considers the effects of the elements of the PA that are encountered post-entrainment to have already been analyzed under entrainment effects in Section 5.2.1 in this BiOp including injury or mortality as a result of entrainment. If the delta smelt abundance increases in the future under the PA, including from expanding production at the FCCL to begin supplementation in the wild and associated development of the supplementation strategy, as well as from future operation of the Delta Fish Species Conservation Hatchery, it will lead to potential additional post-entrainment effects. Higher abundance is not expected to increase proportional entrainment, but may affect overall entrainment. The following is a brief discussion of activities under which delta smelt may be encountered after entrainment into the south Delta.

*Tracy Fish Collection Facility (TFCF) and Skinner Fish Facility*

Each of the pumping plants has a respective fish facility to manage fish salvage. The Tracy Fish Collection Facility screens fish before they reach the Jones Pumping Plant (CVP) and the Skinner Fish Facility screens fish before they reach the Banks Pumping Plant (SWP). The efficiency of each facility is described in Table 5-5. Each of these facilities uses behavioral barriers (louvers) to guide entrained fish into holding tanks from which they are loaded into trucks and transported to release sites in the Delta. The proposed salvage process for the fish facilities includes regular fish sampling of exported water for 30 minutes out of every 120 pumping minutes, though this sampling rate may vary based on debris load, mechanical failure, or other factors (ROC BA 2019). Using the subsampling rate at the time of collection, the facilities will apply the appropriate multiplier to estimate the total number of delta smelt salvaged during that time.

Due to low population numbers, it is likely that the 25% subsampling rate may not accurately depict the number of delta smelt that pass through the fish facilities. Especially under conditions when fish arrive at the fish screens along with large masses of aquatic weeds and debris that hinder operations and clog fish screens and other machinery, the sampling rate and efficiency may decrease significantly depending on the debris load and the effort required to clean the louvers. In some instances, exports continue without fish sampling due to mechanical issues and any fish present are not recorded. Salvage of delta smelt of any life stage has become increasingly rare in recent years, mirroring the overall decline of the population discussed in the *Status of the Species Within the Action Area* and *Status of the Critical Habitat Within the Action Area*. Total salvage for water year 2018 for both facilities was four delta smelt, a historic record

low. Given delta smelt's current degraded status, salvage is no longer a suitable indicator for entrainment.

The salvage of delta smelt does not return meaningful numbers of delta smelt back into the Delta and current TFCF and Skinner Fish Facility protocols dictate that delta smelt that are subsampled for fish counts are euthanized and retained in order to determine gender and sexual maturation of each individual. The information provided by these analyses can offer additional evidence of delta smelt spawning activity to supplement regular surveys designed to monitor the status of delta smelt. Additionally, most delta smelt that enter the south Delta via Old and Middle rivers are assumed to be eaten before they reach the fish facilities. Therefore, there are no additional effects to delta smelt of any life stage beyond what was described above in Section 5.2.1 from the operation of the salvage facilities.

*Clifton Court Forebay Aquatic Weed Program*

According to the BA, in the without action scenario, CCF gates are not operated and Banks Pumping Plant is not run and there would be no removal of aquatic weeds from CCF. Under the PA, DWR will apply herbicides or will use mechanical harvesters on an as-needed basis to control aquatic weeds and algal blooms in CCF. Extensive weed build-up in CCF can provide predator ambush habitat and reduce efficiency of fish salvage. Herbicides may include Komeen®, a chelated copper herbicide (copper-ethylenediamine complex and copper sulfate pentahydrate) and Nautique®, a copper carbonate compound. These products are used to control algal blooms that can degrade drinking water quality through tastes and odors and production of toxins. Because delta smelt within CCF are already entrained and have a nearly 100% mortality rate (Castillo *et al.* 2012), the application of herbicides does not change the overall impact of the PA on the species, though it could increase salvage if the herbicide treatments reduce predation losses across the forebay, or decrease observed salvage if the fish receive acutely toxic doses of these chemicals.

*Clifton Court Forebay Predator Removal*

Predator control efforts under the Proposed Action to reduce predation on listed fish species following entrainment into CCF could reduce pre-screen loss of delta smelt. Depending on the gear type used, predator control efforts may also catch or injure delta smelt. Because delta smelt within CCF are already entrained and have a nearly 100% mortality rate (Castillo *et al.* 2012), predator removal activities would not change the overall impact of the PA on delta smelt discussed in Section 5.2.1 above.

5.2.3 Other Delta and Suisun Marsh Operations

*Water Transfers*

Sometimes water rights holders in northern California sell some of their water to users south of the Delta. When extra pumping capacity is available, Reclamation and DWR will deliver these purchased water allotments to the purchaser through the South Delta pumping facilities. Reclamation's PA proposes to expand the transfer window from July 1-September 30 to July 1-

November 30, which could result in additional pumping of approximately 50 TAF per year in most water year types (ROC BA 2019).

From July to November, most delta smelt are rearing juveniles and are no longer distributed in habitats from which they can be entrained in exported water (Nobriga *et al*. 2008). The Service believes this is due to a combination of better OMR management in the spring and changing habitat conditions in the south Delta associated with SAV infestation, and possibly toxic impacts of *Microcystis* blooms. Salvage of delta smelt has not been observed in July since 2008, and salvage has not been reported during the months of August-November since 2000 (CDFW unpublished data). Thus, delta smelt are not anticipated to be present in the San Joaquin River east of Antioch or the OMR corridor during this expanded water transfer season. In addition, water transfers are associated with 'carriage water' which is small quantities of freshwater in addition to the transfer amount that are delivered to the Delta to help insure that salinity standards continue to be met as the water is moved through the system. Thus, the export of transfer water in this particular action should also not impact habitat suitability by lowering Delta outflow or changing the location of X2. Typically, movement back into the San Joaquin River and associated channels does not begin until December or January after the proposed transfer window will have ended. Thus, effects to the sub-adult life stage are also not anticipated.

*Delta Cross Channel*

Reclamation uses the DCC to divert Sacramento River water into the south Delta via the north and south forks of the Mokelumne River. Historical operation of the DCC was shown to route juvenile Chinook salmon smolts into the interior Delta, which lowered their survival (Newman and Rice 2002; Newman and Brandes 2010). In response to this research, SWRCB D-1641 required DCC gate closures that were expanded upon by NMFS (2009).

According to the BA, under without action conditions, DCC gates are permanently closed. Under the Proposed Action, the DCC gates would usually be closed during delta smelt's reproductive season; however, Reclamation has proposed to open the DCC gates during low inflow conditions to help meet D-1641 salinity requirements. Reclamation would use modeling to predict when D-1641 salinity standards would be exceeded and open the DCC to avoid the exceedances.

Adult delta smelt and their progeny have occasionally been collected in the vicinity of the DCC (Merz *et al*. 2011), but the Service considers this a transiently used area. Opening or closing the DCC gates may change the dispersal path of some delta smelt, but it is not known whether there is a consequence, such as a change in predation risk or likelihood of successful spawning. Given that Reclamation does not propose to operate the DCC gates very frequently and the Service does not have information indicating DCC operation impacts delta smelt, effects to the species are not anticipated for any life stage.

*Agricultural Barriers*

DWR will continue to install three agricultural barriers at the Old River at Tracy, Middle River, and Grant Line Canal each year when necessary for water quality purposes. The barriers are installed between April and July and removed in November. The effects of installation of these

three barriers are covered under a separate biological opinion with the Corps, where they are referred to as the Temporary Barrier Program (TBP) (Service file number: 08FBDT00-2018-F-0041). Installation activities under the TBP biological opinion are covered for a period of 5 years and expire after 2022. If section 7 coverage for the installation of the TBP lapses, reinitiation of consultation may be necessary to continue installing TBP facilities.

Under the Proposed Action, the operation of the TBP would not include the Head of Old River Barrier and the three remaining barriers would be operated at their respective locations. After TBP installation, adult delta smelt that have already been entrained into Old and Middle rivers may be trapped between the barriers and the fish facilities. The placement of the barriers would prevent these individuals from moving back downstream and they and any progeny spawned that far south would very likely not survive the summer. Given that the barriers are in poor habitat, delta smelt that have dispersed or been drawn this far south are already assumed not to survive per the description of entrainment above. As discussed in the TBP installation biological opinion, delta smelt occurring in the vicinity of the barriers could be subjected to predation because of predator species congregating by the barriers. However, because very few delta smelt can successfully reproduce as far into the south Delta as the location of these barriers, any effects of TBP operations above and beyond the entrainment effects related to the export of water from the Banks and Jones pumping plants are minimal.

*Contra Costa Water District Rock Slough Intake*

The CCWD water system includes the Mallard Slough, Rock Slough, Old River, and Middle River (on Victoria Canal) intakes; the Rock Slough Fish Screen (constructed in 2011 under the authority of CVPIA 3406(b)(5)); the Contra Costa Canal and shortcut pipeline; and the Los Vaqueros Reservoir. All CCWD facilities are subject to no-fill and no-diversion periods identified as March 15 through May 31 and April 1 through April 30, respectively, for fisheries protection. The no-fill and no-diversion periods may be modified with approval from the Service, NMFS, and CDFW. On average, CCWD diverts approximately 127 TAF per year. Approximately 110 TAF is CVP contract supply. No changes in operation criteria are proposed for the facilities. CCWD's operation of the diversion, storage, and conveyance facilities are covered under a separate biological opinion (Service file number: 1-1-93-F-35 and 1-1-07-F-0179). CCWD's operations in the PA are consistent with the separate biological opinions and remain unchanged from current operations; CCWD's average annual diversions are not expected to increase under the PA.

The intakes at Old River and Middle River have a maximum pumping capacity of 250 cfs each and are screened in accordance with delta smelt fish screening criteria (approach velocity of 0.2 ft/second). The Rock Slough intake, which has a maximum pumping capacity of 350 cfs, is screened to the same specifications. The Old and Middle rivers are poor habitat for delta smelt and as described above, they are assumed to already have been entrained once they enter Old and Middle rivers. Rock Slough is a dead-end slough off of Old River that is also poor habitat for delta smelt. The Service considers the effects of the Rock Slough Intake to delta smelt to have already been analyzed under entrainment effects in Section 5.2.1 in this BiOp including injury or mortality as a result of entrainment. Numbers of delta smelt collected at Rock Slough during sampling at the intake have been extremely low (only one larval delta smelt and one adult delta

smelt were collected in 20 years of monitoring). Except when flows are very high, few if any delta smelt can successfully reproduce as far into the south Delta as the Rock Slough intake. As discussed in the BA, the effects of Rock Slough diversions on velocity in the San Joaquin River are minimal and unlikely to affect the movement of delta smelt into the south Delta.

*North Bay Aqueduct (NBA)*

According to the BA, under the without action scenario, there would be no pumping at the Barker Slough Pumping Plant. Under the PA, the maximum annual diversion through the NBA would increase to 125 TAF. Operations will continue subject to existing regulatory requirements. Based on the CalSim II modeling period of record, the maximum total amount of water that the NBA has diverted in March through May is about 30 TAF.

The Barker Slough Pumping Plant diverts water from the Cache Slough Complex, which is one of several key delta smelt spawning and rearing regions. Adult and larval delta smelt densities in the greater Cache Slough Complex are among the highest observed, but historical catch data indicate that delta smelt numbers in Barker Slough are very low, indicating that a relatively small portion of the delta smelt population in this region is susceptible to historical levels of NBA diversions. Each of the ten Barker Slough Pumping Plant pump bays is individually screened with a positive barrier fish screen consisting of a series of flat, stainless steel, wedge-wire panels with a slot width of 3/32 inch. This configuration is designed to exclude fish approximately one inch or larger from being entrained. The bays tied to the two smaller units have an approach velocity of 0.2 ft/second. The larger units were designed for a 0.5 ft/second approach velocity, but actual approach velocity is about 0.44 ft/second. The fish screens should preclude 100% of adult delta smelt and juvenile delta smelt larger than 25 mm in length from being entrained, but it is not known how well they protect individuals < 25 mm in length.

The NBA diversions do not appear to have had a substantial effect on delta smelt (Service 2008). However, an increase in diversions, particularly if taken during the spring, may increase the entrainment of larval individuals less than 25 mm in length. Reclamation and DWR propose to work with the Service to develop NBA minimization measures by the end of the 2019 calendar year. These minimization measures will aim to protect larval delta smelt from entrainment to the NBA and will consider reduction in diversion through the NBA during the spring for appropriate water year types, when larval delta smelt begin to hatch and emerge. Along with the implementation of these measures to protect larval delta smelt, it is expected that the effects to delta smelt will continue to be minimal under the PA on an individual and population level. However, delta smelt <25mm in length that reach the fish screens are likely to be killed as a result of passing through the screens and into the pumping plant and/or aqueduct where they will not survive.

*Suisun Marsh Salinity Control Gates (SMSCG)*

The SMSCG are generally operated, as needed, from October through May to meet the SWRCB's D-1641 salinity standards in the Suisun Marsh. The number of days the SMSCG are operated in any given year varies depending on hydrology (*i.e.*, more days of SMSCG operation are generally required in drought years, and in wetter years. The SMSCG have historically been

operated for 60-120 days between October and May. The Delta Smelt Summer-Fall Habitat Action includes gate operations in June through September in addition to the historic October through May operation, and effects of this action are analyzed separately from the October through May operations.

Under current operations, delta smelt could be entrained into Montezuma Slough when the SMSCG is opened and then closed especially during the late summer and fall when the gates are most likely to be used. The degree to which movement of delta smelt around the LSZ is constrained by opening and closing the SMSCG and whether or not this harms delta smelt are unknown. Striped bass may aggregate near the SMSCG, which could elevate predation rates. Additionally, delta smelt may experience an increased risk of entrainment into the managed marshes where they would be unlikely to survive (Culberson *et al.* 2004; Service 2008). However a recent study found that the body condition of delta smelt collected from Suisun Marsh was better than at other locations (Hammock *et al.* 2015). The freshening of Montezuma Slough through gate operations could provide additional low salinity habitat for delta smelt to forage, spawn and rear.

*Roaring River Distribution System (RRDS)*

According to the BA, under the without action scenario, DWR would not operate the Roaring River Distribution System. Under the PA, the Roaring River Distribution System (RRDS) will maintain a maximum approach velocity of 0.2 ft/second at the intake fish screens. During mid-September through mid-October, water diversions into RRDS increase to support a fall flood-up of wetlands to ready them for the arrival of winter waterfowl. During this one-month period, DWR proposes to divert water into RRDS at rates that result in approach velocities up to 0.7 ft/second. The RRDS intakes are screened (3/32-inch opening, or 2.4 mm) and physically exclude fish greater than 30 mm in length from being entrained. Therefore operation of RRDS can entrain larvae and small juveniles in the spring and early summer. Once delta smelt grow to lengths greater than 30 mm, RRDS can only result in take if individuals are impinged onto the screens. It is not known whether this occurs. During March-June when delta smelt < 30 mm are present, any effects on delta smelt would be expected to be similar between the COS and PA.

The proposed maximum approach velocity of 0.7 ft/second operation during the fall flood up in mid-September through mid-October exceeds the CDFW-recommended design criterion of 0.2 ft/second, but has been approved on an annual basis to support fall flood up since 2009 through a variance of the 2008 BiOp. During September and October nearly all delta smelt exceed 30 mm in length and would therefore be very unlikely to be entrained and lost to the population. Impingement is a more likely take mechanism for these juvenile fish. The 0.7 ft/second approach velocity may result in greater impingement on the screens than the 0.2 ft/second approach velocity. However, the Service considers higher entrainment or impingement mortality to be unlikely because the RRDS intakes are positioned in a part of Montezuma Slough where the channel is about 300 to 350 feet wide and delta smelt would need to be within a few feet of the fish screens to have any vulnerability to variation in approach velocities through the screens. The information that we have available indicates that delta smelt generally avoid in-water structures and would therefore have little tendency to be in close proximity to the RRDS intakes, particularly given the substantial width of the adjacent channel.

*Morrow Island Distribution System (MIDS)*

According to the BA, under the without action scenario, DWR would not operate the Morrow Island Distribution System. Under the PA, the Morrow Island Distribution System (MIDS) will continue to operate as identified in the 2008 Service BiOp. No changes in operations are proposed.

Individual delta smelt could be entrained by the three unscreened 48-inch intakes that form the MIDS intake. However, Enos *et al.* (2007) noted that this would generally only occur in wet years, per Hobbs *et al.* (2005). Enos *et al.* (2007) noted that under normal operations, MIDS is often closed or diversions are limited during spring, which may provide some protection of fish that spawn or disperse at that time, particularly open-water fish like delta smelt that do not congregate around in-stream structures such as diversions. Enos *et al.* (2007) did not collect any delta smelt during sampling of the MIDS intake in 2004-2006, although they did capture adult delta smelt with purse seines during sampling in the adjacent Goodyear Slough. Based on this empirical research, it is expected that the effects to delta smelt for all life stages will continue to be minimal under the PA on an individual and population level. The Service expects that mortality is likely to occur when individual delta smelt enter the intakes.

## 5.2.4 Delta Smelt Summer-Fall Habitat

Availability of suitable habitat throughout the year is important for delta smelt to complete its life cycle. During the larval through sub-adult life stages, suitable habitat attributes to support delta smelt rearing include the combination of landscape, turbidity, salinity, temperature, and food co-occurring in the same area (Feyrer *et al.* 2007; 2011; Nobriga *et al.* 2008; Sommer and Mejia 2013; Bever *et al.* 2016; Simonis and Merz 2019). When these habitat attributes do not occur together delta smelt can suffer harm through physiological stress and contaminant exposures (Hammock *et al.* 2015; Komoroske *et al.* 2015; Hasenbein *et al.* 2016b), injury and/or mortality due to inadequate foraging and shelter habitat that together result in poor fish health (Hammock *et al.* 2015) and elevated vulnerability to predators (Ferrari *et al.* 2014; Schreier *et al.* 2016).

Most delta smelt use the LSZ at some point in their life cycle and the population distribution tracks the movement of the LSZ somewhat (Moyle *et al.* 1992; Dege and Brown 2004; Feyrer *et al.* 2007; 2011; Nobriga *et al.* 2008; Sommer *et al.* 2011; Bever *et al.* 2016; Manly *et al.* 2015; Polansky *et al.* 2018; Simonis and Merz 2019). The LSZ is frequently defined as waters with a salinity range of about 0.5 to 6 ppt. The LSZ generally expands and moves downstream as river flows into the estuary increase, placing low-salinity water over a larger and more diverse set of nominal habitat types than occurs under lower flow conditions (Jassby *et al.* 1995; MacWilliams *et al.* 2015). This expanded LSZ at higher outflow adds to habitat available in the Cache Slough Complex that is not affected by variation in Delta outflow (Sommer and Mejia 2013). Appropriate water quality conditions need to overlap an underwater landscape featuring variation in depth, tidal current velocities, edge habitats, and food production (Hobbs *et al.* 2006; Bever *et al.* 2016; Hammock *et al.* 2017; 2019). The LSZ and other adjacent tidally-influenced freshwater

habitats described in the Environmental Baseline section help to ensure that suitable habitat attributes listed above are present and available to delta smelt.

The influence of freshwater flow inputs on delta smelt distribution could in turn influence mechanisms that affect the species' population dynamics when those mechanisms are linked to where the fish reside or how they are distributed in the estuary (Moyle *et al.* 1992; Bennett 2005; Hobbs *et al.* 2006; Hammock *et al.* 2015; 2017; Bush 2017). Delta smelt seldom occur in the estuary at salinities that begin to cause physiological stress (Komoroske *et al.* 2016) and salinity increases linked to changes in Delta outflow tend to be associated with an eastward shift in the spatial distribution of the delta smelt population (Moyle *et al.* 1992; Dege and Brown 2004; Feyrer *et al.* 2007; 2011; Nobriga *et al.* 2008; Sommer *et al.* 2011; Bever *et al.* 2016; Manly *et al.* 2015; Polansky *et al.* 2018; Simonis and Merz 2019). We note that water temperature, turbidity, water diversion rates, prey availability, and possibly other factors would also affect these complex and inter-related spatial recruitment and survival mechanisms.

It is reasonable to deduce that these factors also affect delta smelt at the scale of individual fish. Delta smelt, particularly individuals at the edges of the population spatial distribution, may experience habitat conditions that are missing one or more of the habitat attributes that were described above (see Table 5-3). When these habitat attributes do not occur together, delta smelt can suffer harm through physiological stress and contaminant exposures, and mortality due to inadequate foraging and shelter habitat that together result in poor fish health (Hammock *et al.* 2015) and elevated vulnerability to predators (Ferrari *et al.* 2014; Schreier *et al.* 2016). One factor that can affect the habitat suitability experienced by individual fish is water operations, which by influencing the magnitude and net direction of freshwater flow in the Delta (Hutton *et al.* 2018), can affect the overlap of several of delta smelt's physical habitat attributes (Bever *et al.* 2016). Unfavorable conditions may include reduced prey production, which could affect how much biomass of key prey such as *P. forbesi* is available to be transported into the turbid water refuge of the LSZ during the summer and fall (Kimmerer *et al.* 2018a,b). Low outflow can also increase delta smelt's reliance on the Cache Slough Complex which can expose more fish to stressful water temperatures (Bush 2017). Summer water temperatures are typically cooler to the west and warmer to the east due to the differences in overlying air temperatures between the Bay Area and the warmer Central Valley (Kimmerer 2004). Thus, during summer, many parts of the estuary are energetically costly and physiologically stressful to delta smelt (Komoroske *et al.* 2015), underscoring the need for larger areas of low-salinity habitat to avoid or minimize localized habitat-based effects to delta smelt.

*Delta Smelt Summer-Fall Habitat Action*

According to the BA, under the without action scenario, DWR would not operate the SMSCG or Goodyear Slough Outfall, leading to a saltier Suisun Marsh and decreased delta smelt habitat suitability in the fall and early winter of drier water year types. However, during some fall seasons and most winter-spring seasons, the without action scenario would also result in higher Delta outflow than the PA and COS, resulting in overall increases in delta smelt habitat. In the without action scenario, X2 is at 86 km on average in September and 84 km on average in October. Under the current operations scenario, X2 is at 86 km on average in September and 87 km on average in October. In contrast, under the modeling provided for the PA, X2 was

predicted to be at 92 km on average in September and October. However, Reclamation has proposed the following Summer-Fall Habitat Action that is not reflected in the modeling and will move the average X2 westward of the model-predicted values.

The Delta Smelt Summer- Fall Habitat Action proposed in the PA is intended to improve delta smelt food supply and habitat, thereby contributing to the recruitment, growth, and survival of delta smelt. Reclamation and DWR propose to use structured decision making to implement delta smelt habitat actions. The Summer-Fall Habitat Action will initially include modifying project operations to maintain a monthly average 2 ppt isohaline at 80 km from the Golden Gate in above normal and wet water years in September and October. Reclamation and DWR will also implement additional measures that are expected to achieve additional benefits. These measures include operation of SMSCG for up to 60 additional days (not necessarily consecutive) from June 1 through October 31 of below normal and above normal years. SMSCG operation may also be implemented in wet years if preliminary analysis shows expected benefits. Food enhancement actions, e.g., those included in the Delta Smelt Resiliency Strategy to enhance food supply would also be implemented. These food enhancement actions include the North Delta food-web project, Sacramento River Deepwater Ship Channel lock reoperation, and Roaring River distribution system reoperation. Reclamation and DWR will monitor dissolved oxygen at Roaring River distribution system drain location(s) during delta smelt food distribution actions to ensure compliance with Water Quality Objectives established in the San Francisco Bay Basin Plan.

Reclamation has included considerations for implementation and has identified the potential for implementation of other actions that will be more fully defined and developed through the structured decision making or other review process. The annual process is described more fully in the PA. The process will involve a Delta Coordination Group that will make annual determinations on the actions to be implemented each year.

Reclamation has stated its intent to meet Delta outflow augmentation in the fall primarily through export reductions as they are the operational control with the most flexibility in September and October. Storage releases from upstream reservoirs may be used to initiate the action by pushing the salinity out further in August and early September; however, the need for this initial action will depend on the hydrologic, tidal, storage, and demand conditions at the time. In addition, storage releases may be made in combination with export reductions during the fall period during high storage scenarios where near-term flood releases to meet flood-control limitations are expected. In these scenarios, Reclamation will make releases in a manner that minimizes redd dewatering where possible. In the event that Reclamation determines the Delta outflow augmentation necessary to meet 2 ppt isohaline at 80 km from the Golden Gate as described above cannot be met through primarily export reductions and is expected to have a high storage cost, Reclamation will still implement the rest of this action, and will meet with NMFS and the Service to discuss alternate potential approaches that improve habitat conditions.

*SMSCG Operation and Outflow Action*

We described in Table 5-3 how the status of delta smelt critical habitat has limited overlap of the needed PCEs in many locations. Table 5-7 describes the operations Reclamation and DWR have

164

proposed through a Summer-Fall Habitat Action to increase the spatial overlap of delta smelt habitat attributes with a focus on Suisun Marsh. Reclamation and DWR propose to operate to a monthly average X2 location at 80 km in September and October in Above Normal and Wet years. The rationale for doing so is to lower the salinity of Montezuma Slough and the larger embayments of eastern Suisun Bay to improve the overlap of low-salinity water with the bay and marsh's turbid shoals and connecting channels. Reclamation and DWR propose to continue October – May SMSCG operations as necessary to meet D-1641 water quality requirements that protect the management of waterfowl habitats in Suisun Marsh's wetlands. The SMSCG can be opened on ebb tides to divert Sacramento River water into Montezuma Slough, which is subsequently diverted onto numerous hunting clubs and other managed wetlands in the marsh to grow freshwater and low salinity forage for various waterfowl species. The SMSCG are closed on flood tides to limit the influx of saltier water. Reclamation and DWR have proposed new operations of SMSCG for up to 60 additional days (may be non-consecutive) for portions of the June-October period in Below Normal and Above Normal years. This new action may also help wetlands but is intended to increase the use of Suisun Marsh by delta smelt where a recent study found the smelt had relatively high feeding success and relatively low contaminant exposure (Hammock *et al*. 2015). This new SMSCG action may also be implemented in Wet years if research indicates delta smelt receive benefits from doing so. This action continues a recent experimental approach to managing delta smelt habitat quality within the Suisun Marsh, where prey density is generally higher than in Suisun Bay, and turbidity is usually higher than it is in the Delta east of the Sacramento-San Joaquin river confluence.

**Table 5-7. Proposed management for the Delta Smelt Summer-Fall Habitat Action by Water Year Type (WYT).**

| Water Year Type | SMSCG action | Delta outflow operation |
|---|---|---|
| Below Normal | Operate up to 60 additional days June-October | D-1641 compliance |
| Above Normal | Operate up to 60 additional days June-October | D-1641 compliance plus meeting a monthly average X2 at 80 km during September and October. |
| Wet | Potential to operate up to 60 additional days June-October if preliminary analysis shows expected benefits | D-1641 compliance plus meeting a monthly average X2 at 80 km during September and October. |

Because the specific actions of this project element are to be determined annually by a Delta Coordination Group through a structured decision-making process, the specific actions taken in each water year may be unique based on evaluation of outcomes of prior actions and conditions for that year. The Delta Coordination Group will be comprised of representatives from the Service, Reclamation, DWR, CDFW, NMFS, and stakeholders. If implementation of this action cannot meet the goals and objectives of this program then reinitiation of consultation will be necessary.

Under current operations, the SMSCG is nearly always open so delta smelt can usually enter and leave Montezuma Slough whenever conditions compel them to. In lower flow conditions when Suisun Marsh needs to be freshened to meet D-1641 salinity standards, the gates can be operated tidally. This usually occurs rather sporadically, but when it does, it may impede movement of delta smelt for a few hours or redirect some fish further into the marsh. The degree to which movement of delta smelt around the LSZ is constrained by opening and closing the SMSCG is unknown. It is also unknown whether this harms those individual delta smelt. Operation of the SMSCG may cause individual delta smelt to face an increased risk of entrainment into the managed marshes where they would be unlikely to survive (Culberson *et al.* 2004; Service 2008). However, one recent study found that the body condition of delta smelt collected from Suisun Marsh was better than at other locations (Hammock *et al.* 2015), suggesting that there may be a net benefit to delta smelt through occupying larger channels of Suisun Marsh.

As noted above, the modeling conducted for the BA did not reflect the Delta outflow that accompanies this action in Wet and Above Normal years; rather it only estimated what may be needed to meet D-1641 salinity standards in the western Delta during the summer and fall. Thus, this effects analysis is largely qualitative because the BA modeling does not reflect the PA or the adaptive nature of the actions that will be implemented. The analysis focuses on effects to individuals and the population using available data from a 2018 SMSCG pilot study, BA modeling, and the modeling presented to the Service during reinitiation of the 2008 Fall X2 action in 2017 and 2019.

In the context of the PA, Figure 5-35 shows the predicted difference between the PA and the COS during the summer months at Belden's Landing in Montezuma Slough, which was identified as one potential compliance point for the Summer-Fall Habitat Action.



**Figure 5-35. Summer Electrical Conductivity at Belden's Landing. Electrical conductance (EC) on the Y-Axis is show µS/cm).(Source: ROC BA 2019)**

Generally, in Suisun Marsh, higher summer salinities were predicted to occur in about half of the water years compared with COS (Figure 5-35). However, the Delta Smelt Summer-Fall Habitat Action was not included in the modeling because the action was developed after the modeling was produced. The Summer-Fall Habitat Action will bring the salinity distribution at Belden's Landing closer to what was modeled under the COS. In Below Normal years, no additional outflow beyond that which is required to meet D-1641 water quality standards is proposed. However, it is the drier half of water year types where PA and COS modeling converge with regard to predicted salinity at Belden's Landing, so the model predictions are likely more accurate for these lower flow years. The proposed use of the SMSCG could reduce salinity at Belden's Landing in Below Normal water years. This means that the PA modeling overestimates the salinities in Suisun Marsh that will result from implementation of the PA.

A 2018 SMSCG pilot study, which occurred during a Below Normal year, showed potential benefits for delta smelt including lower salinity, higher (overall) habitat suitability in Suisun Marsh and a slight improvement in habitat suitability in Grizzly Bay - even with X2 as high as 84 km (Sommer *et al.* 2019). The EDSM survey had not been collecting delta smelt in Suisun Marsh prior to the experiment, but observed modest numbers in Montezuma Slough during the 30-day study period; however based on historical TNS results (CDFW 2019), it is not unusual to observe delta smelt in the marsh during the summer. It was posited that the 2018 SMSCG

operations would generate habitat conditions that were similar to Wet year conditions and allow delta smelt to access habitat within the marsh (ROC BA 2019). Preliminary results were mixed with regard to this hypothesis. Further results are forthcoming and may be able to guide the Delta Coordination Group in crafting future habitat actions.

In Above Normal and Wet water year types, the PA modeling does not reflect the proposed location of X2 at 80 km from the Golden Gate Bridge in September and October. Maintaining X2 at a monthly average 80 km in September and October would be expected to lower the salinity of Suisun Marsh and parts of Suisun Bay (MacWilliams *et al*. 2015; Reclamation 2017; 2019), which in turn could improve habitat for delta smelt because the low-salinity zone would more frequently occur in association with the comparatively turbid, low-velocity shoals of Grizzly and Honker bays, as well as Montezuma Slough in Suisun Marsh.

In 2017 and 2019 (the two most recent Wet water years), Reclamation reinitiated consultation proposing to modify the Fall X2 action from the Reasonable and Prudent Alternative of the 2008 BiOp. The 2008 RPA required X2 to be maintained at 74 km in Wet years for the months of September and October. In 2017, Reclamation proposed to maintain X2 at 74 km in September, but at 81 km in October. In 2019, Reclamation proposed to maintain X2 at 80 km in both months. To support each reinitiation, Reclamation provided an analysis of the effects on delta smelt habitat suitability and delta smelt next-year recruitment predicted to result from moving X2 to different locations bounded by 74 and 81 km. Reclamation concluded from its modeling that turbidity assumptions played a larger role in estimated habitat suitability than the salinity change in Suisun Bay that resulted from an X2 at 80 km in place of 74 km (Reclamation 2017). Reclamation noted that a large habitat suitability inflection point occurred if X2 averaged 80 versus 81 km because the salinity change associated with this particular 1-km X2 shift resulted in much higher frequencies of > 6 psu salinity waters occurring in Montezuma Slough and overlapping the turbid shoals of eastern Suisun Bay. Based on this finding, Reclamation amended its request to maintain X2 at 80 km in October 2017. The Service amended the 2008 BiOp to allow Reclamation to operate its facilities to achieve an average X2 location of no greater than 80 km in the month of October 2017 (Service 2017). The Service also modified the 2008 BiOp to allow operations consistent with Reclamation's 2019 proposal (Service 2019); however, Reclamation ultimately decided to operate consistent with Action 4 of the 2008 RPA in 2019.



**Figure 5-36. The delta smelt station-based habitat index proposed by Bever *et al.* (2016) in the Suisun Bay region at an X2 of 80 km (top panel) and at 81 km (bottom panel). Source: Effects Analysis in support of 2017 Fall X2 modification request (Reclamation 2017).**

*Food Enhancement Actions*

No food enhancement actions would occur under the without action scenario, but prey densities might be elevated due to higher spring and early summer outflow and the lack of water exports. Reclamation proposes to implement several food subsidy projects in conjunction with the Delta Smelt Summer-Fall Habitat Action because food limitation is a common conclusion of quantitative empirical and modeling studies of delta smelt (Kimmerer 2008; Maunder and Deriso 2011; Miller *et al*. 2012; Hammock *et al*. 2015; Hamilton and Murphy 2018; Kimmerer and Rose 2018). Reclamation's proposed coupling of an X2 action, new SMSCG actions and several food subsidy actions may improve the spatial overlap of delta smelt suitable habitat attributes in two locations where conditions can be managed with a comparatively lower water cost (Suisun Marsh and the Cache Slough complex). The Service acknowledges that it remains an untested assumption that food resources can be distributed to benefit delta smelt; superior competitors may benefit as well or more so, and there is a risk of redistributing contaminants with these actions in a manner that could offset benefits. The integrated timing of food enhancement projects involving re-operation of the RRDS is expected to provide food benefits to delta smelt that may be attracted to the fresher and more turbid conditions generated in the vicinity of Suisun Marsh. Other actions will attempt to augment prey resources in the turbid waterways of the North Delta. These actions are addressed programmatically in this consultation (see *Food Enhancement Actions* in Section 5.2.5 below*)*, so further detail about how these actions will be implemented and expected benefits will be addressed in subsequent consultation prior to implementation.

*Delta Smelt Summer-Fall Habitat Action Summary*

The 2008 BiOp recognized that due to high levels of exports in the fall over the 10-year period prior to the BiOp issuance, the fall months in the estuary resembled Critical years, regardless of year type. In fall of Critical years, the LSZ is located further upstream then in wetter years, resulting in changes to the composition of other habitat attributes co-occurring with the LSZ. In order to address this loss of co-occurring habitat attributes, the 2008 RPA called for Reclamation and DWR to operate to an X2 position of 74 km in September and October of Wet years and 81 in Above Normal years. In November, the action specified that the projects were to release any gained storage to allow the estuary benefit from any November storms. The Service used X2 position as a surrogate for the location of the LSZ.

Altogether, the spatial extent of high suitability rearing habitat will be somewhat lower under the PA in Wet years, and somewhat higher in Above Normal and Below Normal years than what it would be anticipated under the COS. This statement is largely limited to the months of September and October of Wet and Above Normal water years due to the explicit differences in operations rules between the PA and COS. The suite of management interventions in the Summer-Fall Habitat Action is intended to focus benefits into places like the Cache Slough Complex and Suisun Marsh where outcomes can be controlled and observed fairly carefully, and it will add actions to Below Normal water years, potentially increasing the frequency of years that the delta smelt population receives some helpful management intervention. The effects to individuals and to the population of this adaptive set of actions cannot be quantified at this time. However, the Service anticipates that the actions identified would continue to provide low-

salinity habitat in Honker and Grizzly Bays and Suisun Marsh in Above Normal and Wet years and increase its frequency in Suisun Marsh in Below Normal years. Additionally food enhancement actions, described at a programmatic level at this time, may provide better feeding conditions for delta smelt in Suisun Marsh and the Cache Slough Complex. The structured decision making process called for under this action will incorporate new results each year to help refine the potential benefits that may be realized.

## 5.2.5  Non-Operational Actions

Under the without action scenario, the non-operational actions proposed by Reclamation and DWR in the PA, and listed below, would not occur.

*Cultured Smelt Production from Fish Conservation and Culture Laboratory (FCCL)*

As discussed in the *Status of the Species Within the Action Area* and *Status of the Critical Habitat Within the Action Area*, the delta smelt faces a high risk of continued decline if the population is not supplemented. Reclamation proposes to fund a two-phase process that would lead to annual supplementation of the wild delta smelt population with propagated fish within 3-5 years from issuance of the biological opinion. The first step in this process will be the development of a supplementation strategy within one year of the issuance of the BiOp that will describe the capacity needed at hatchery facilities to accommodate the delta smelt production needed to meet genetic and other hatchery considerations with a goal of increasing production to a number and the life stages necessary to effectively augment the population. The Service will be the lead on the development of this supplementation strategy.

The FCCL has closed the life cycle of delta smelt, meaning that they can produce new generations of fish at their facility without the addition of new wild spawners and keep enough progeny alive to repeat the process for multiple generations. Annually, the FCCL provides approximately 33,000 fish of different life stages for use in research. Additionally, approximately 32,000 adults are reared in the refuge population. To achieve these production levels, the FCCL frequently removes fish at the egg and juvenile stages. Additional funding will support expansion of facilities to maintain these fish and increase rearing capacity to provide up to approximately 125,000 adults within 3 years.

The Service will work with partners to use this expanded delta smelt production at the FCCL to determine how a successful reintroduction program can be developed. This work will focus on production from FCCL in the near term, but the Service recognizes that expansion of the refugial population and propagation of additional fish for supplementation will require a new facility. The Service, with support from Reclamation, has been pursuing and will continue to pursue a Delta Fish Technology Center, which could house the Delta Fish Species Conservation Hatchery discussed below, to address these needs. The Service has already completed a BiOp for construction of the Delta Fish Technology Center (Service file number 08FBDT00-2017-F-0101). The effects of scientific research activities for use of cultured delta smelt in contained environments are addressed in the framework programmatic biological opinion on our issuance of a section 10(a)(1)(A) permit to FCCL (Service file number 08FBDT00-2018-F-0360).

Supplementation through the FCCL will increase the likelihood that the population of delta smelt will be sustained in the wild by achieving a robust, genetically diverse captive population. This will increase the likelihood of their ability to survive and reproduce in the wild to boost population numbers and maintain distribution throughout the species range and to be able to withstand the multiple factors that have led to its decline, including entrainment and associated predation resulting from seasonal operations of the Banks and Jones facilities.

No effects to delta smelt are anticipated from any construction associated with the expansion of FCCL because the expansion is not expected to be in delta smelt habitat. Fish hatcheries, including conservation-oriented hatcheries, can positively and negatively impact the populations being supplemented. The Service's desired positive impact is to provide delta smelt with insurance against extinction. We believe this is necessary because the species' recent abundance trends strongly suggest it is in the midst of demographic collapse and likely will require supplementation to persist (Moyle *et al*. 2016; Hobbs *et al*. 2017; Lessard *et al*. 2018). Negative impacts can occur when hatchery practices result in the loss of genetic variation that is adventitious for wild fish or when behavioral adaptation to captive conditions is maladaptive when fish are returned to the wild. The Service has considerable experience with fish propagation and will work to ensure that best practices are employed in the production and supplementation of delta smelt back into the estuary.

*Delta Fish Species Conservation Hatchery*

To support and expand supplementation into the future, Reclamation proposes to partner with DWR to construct and operate the Delta Fish Species Conservation Hatchery by 2030. The Delta Fish Species Conservation Hatchery would breed and propagate delta smelt with equivalent genetic resources as the contemporary stock and with the goal of raising delta smelt in sufficient numbers to effectively augment the existing wild population. Potential negative effects of releasing hatchery produced fish into the wild could include reduced fitness through domestication of hatchery fish that may breed with wild delta smelt. The agencies intend to address potential negative impacts through development of the hatchery program for delta smelt.

With increased populations from active supplementation of delta smelt through the FCCL program and the Delta Fish Conservation Hatchery, entrainment of supplemented delta smelt is reasonably certain to occur; however, the entrainment protection actions in the PA will reduce entrainment losses of supplemented delta smelt to numbers lower than the population increases associated with supplementation. The supplementation action is expected to benefit delta smelt by augmenting a wild population so that it is more resilient to withstanding the effects of entrainment. We do not expect supplemented delta smelt to be released into the south Delta. The net effect is a higher proportion of the overall population will be protected from being entrained, particularly with the Integrated Early Winter Pulse Protection and Turbidity Bridge Avoidance measures in place to avoid drawing delta smelt further south.

Since development of the Delta Fish Species Conservation Hatchery is being addressed programmatically in this consultation, further detail about adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

*Tidal Habitat Restoration (8,000 acres)*

Reclamation and DWR propose to complete construction of the remainder of the 8,000 acres of intertidal and associated subtidal habitat restoration in the Delta and Suisun Marsh by 2030. The objective of this activity as stated is to "improve habitat conditions for delta smelt by enhancing food production and availability" (Service 2008).

Primary production in tidal wetlands within the Bay Delta estuary have been shown to support high zooplankton growth (Mueller-Solger *et al*. 2002). These proposed restoration actions are therefore expected to enhance the food web on which delta smelt depend. Restoration will be designed to increase high quality primary and secondary production in the Delta and Suisun Marsh through increasing the quality and quantity of tidal wetlands on the landscape. Exchange of water between tidal wetlands and surrounding channels is expected to distribute primary and secondary production from the wetlands to adjacent pelagic habitats where delta smelt occur. Tidal exchange will be optimized through the intertidal habitat restoration design by incorporating extensive tidal channels supported by appropriately sized vegetative marsh plains. Data suggest that freshwater tidal wetlands can be an important habitat type to delta smelt with proper design and location.

Tidal restoration projects in the estuary have generally created fish feeding benefits very quickly (Cohen and Bollens 2008; Howe and Simenstad 2011). Following Herbold *et al*. (2014), the restoration projects that will be credited to this action in the coming decade will be sited and designed to locally increase food web production in a location that delta smelt should be able to access it. Reclamation and DWR commit to funding and ensuring that monitoring, operation, maintenance, and permanent protection occur on these restored lands. An overall monitoring program developed to focus on the effectiveness of the restoration actions will inform future actions undertaken for the intended food web benefit of delta smelt.

In 2010, DWR established the Fish Restoration Program (FRP), a coordinated effort between DWR and CDFW, which focuses on the planning, design, and permitting of individual restoration projects. Additionally, the Tidal Wetlands Monitoring Program (TWMP) was established in 2014 by DWR with assistance from CDFW to focus on the effectiveness of the restoration actions. The FAST, which includes Reclamation, CDFW, NMFS, and the Service, coordinates on the design and crediting of proposed restoration projects to ensure they meet the objective stated above. A MOA was signed in 2011 where these signatory agencies committed to collaborate in planning habitat projects (Reclamation *et al.* 2011). This process has facilitated streamlining and efficiencies in the planning and approval of these restoration projects. The FRP has made significant progress in overcoming hurdles which has created momentum in acquiring lands, designing, and constructing projects. Restoration projects that have broken ground on construction include Tule Red, Yolo Flyway Farms, and Decker Island. This momentum is expected to continue in the coming years in order to complete the remaining restoration acreage.

As described in the *Consultation Approach* section of this BiOp, subsequent consultations will occur for each tidal habitat restoration project, which will address effects at the site-specific level and will include Incidental Take Statements, as appropriate. Tidal restoration projects within the Suisun Marsh Plan Programmatic Biological Opinion coverage area could tier to this BiOp.

Based on consultations on previous tidal habitat restoration projects, we expect that the following types of activities are likely to affect delta smelt, but this list does not include all possible effect mechanisms: vegetation removal for site preparation, access routes, construction staging, earthwork, breaching of berms or levees, new berm construction, tidal network creation, pond creation, in-water construction activities, dredging, water quality and biological monitoring, and long-term management activities. The nature and magnitude of adverse effects of tidal habitat restoration will vary depending on project design, site location, and construction timing, magnitude, and duration.

Reclamation and DWR are proposing to complete the habitat restoration action called for in the 2008 BiOp. This action identifies restoration of 8000 acres of tidal and subtidal habitat. The intent of this action was to address losses due to entrainment in the south Delta and to create additional food to replace impacts to food supply by operation of the SWP.

This restoration was slow to be implemented given the need to find and procure appropriate restoration sites, and develop a crediting model to ensure projects could achieve desired benefits. The California EcoRestore program has been steadily implementing this RPA action and is beginning to move projects towards completion. This action is being analyzed at a programmatic level, with additional consultation necessary for individual projects. This action will provide the benefits that were indented to be achieved in the 2008 BiOp.

*Predator Hotspot Removal*

Available conceptual models suggest that predation on delta smelt is related to macroscopic drivers like water temperature (Nobriga *et al*. 2013), water turbidity (Ferrari *et al*. 2014; Schreier *et al*. 2016), and the degree of SAV infestation (Ferrari *et al*. 2014; IEP 2015). Under this model, predation losses of delta smelt are not likely to be greatly changed by removing predator hot spots as described in the PA because there will still be expansive beds of SAV, clearer waterways, and stressful summer water temperatures that affect how delta smelt can use available habitat. Widespread SAV in the south Delta stills the movement of water, which in turn decreases turbid–water cover for delta smelt, while providing ambush habitats for species like largemouth bass (Ferrari *et al*. 2014). Predator hot spot removal under the PA is primarily focused on providing positive effects to juvenile salmonids. The PA did not provide details about when, where, and how predator hotspot removal will be implemented. This project element is programmatic and will be addressed under future consultation when Reclamation identifies specific actions to be taken to reduce predator hot spots. Actions may include removal of structures and minimization of lighting near fish screens, bridges, and other infrastructure where predators congregate. While not expected to negatively impact delta smelt habitat, predator hot spot removal is not expected to have an appreciable positive effect on delta smelt of any life stage. The hot spots identified in Grossman *et al.* 2016 are mostly located in the south Delta, where the macroscopic conditions mentioned above contribute to high rates of pre-screen loss. The scale of implementation for this project element would likely make little difference on predation rates of delta smelt and effects are expected to be minimal. Subsequent consultation will address effects at the site-specific level.

*Food Enhancement Actions*

Reclamation proposes to pursue a series of food enhancement actions that may lead to overall increases in prey availability for delta smelt. These are intended to address the concept that limited food supply is negatively impacting delta smelt population numbers, which has been a common finding in quantitative studies of delta smelt population dynamics (Mac Nally *et al.* 2010; Maunder and Deriso 2011; Miller *et al.* 2012; Rose *et al.* 2013b; Hamilton and Murphy 2018; Kimmerer and Rose 2018). While there are no details on timing or frequency, an increase in food supply may be able to benefit rearing juvenile delta smelt and sub-adult delta smelt. Based on the locations of these projects, the influx of food would occur in desirable locations where delta smelt are typically found. Any actions to benefit the food web may also benefit competitors and predators of delta smelt. The magnitude of benefits cannot be estimated at this time without additional details. Since these activities are being addressed programmatically in this consultation, further detail about adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### Suisun Marsh and Roaring River Distribution System Food Subsidies Study

Infrastructure in the RRDS will drain water potentially containing zooplankton from the canal into Grizzly Bay to augment delta smelt food supplies in that area. In addition, managed wetland flood and drain operations can potentially promote food export from the managed wetlands to adjacent tidal sloughs and bays where delta smelt may be able to access it.

### Sacramento Deepwater Ship Channel Study

Reclamation proposes to reconnect the Deepwater Ship Channel to the Sacramento River. The reconnected Sacramento Deepwater Ship Channel has the potential to transport nutrients and zooplankton from the Sacramento River and Ship Channel into the north Delta. An increase in food supply has the potential to benefit delta smelt and their habitat in the Cache Slough complex. There is also the potential that experimental changes to the water volume and velocity down the Ship Channel would alter existing flow conditions and prey availability, conditions which are believed to already be favorable to delta smelt. The question of whether conditions in the Ship Channel can be improved are the topics of an in-progress study of phyto- and zooplankton production in the Ship Channel.

### North Delta Food Subsidies/Colusa Basin Drain Study

DWR, Reclamation, and water users propose to increase food in the north Delta by routing nutrient-rich water from the Colusa Basin into the Yolo Bypass and north Delta where it can stimulate phytoplankton blooms (Frantzich *et al*. 2018) that in turn can stimulate zooplankton blooms. The additional inflow also helps disperse the blooms into the north Delta. DWR, Reclamation, and water users would work with partners to route agricultural drain water (i.e., nutrients) from the Colusa Basin Drain through Knight's Landing Ridge Cut into the Tule Canal (Yolo Bypass Toe Drain) and from there it would flow into to Cache Slough, potentially supplementing the aquatic food web in the north

Delta for fish species. Reclamation would work with DWR and partners to use this mechanism to augment flow in the Yolo Bypass in July and/or September.

*Sediment Supplementation Feasibility Study*

The role of turbid water in improving delta smelt's ability to find prey and evade predators was discussed in section 5.1.2, *Status of Critical Habitat Within the Action Area*. Several factors have reduced the inflow of sediment into the estuary, which has lowered habitat suitability for delta smelt. Reclamation proposes to conduct a sediment supplementation feasibility study to determine whether there are actions they and DWR can take that would increase the turbidity of water in the Delta. There may be significant logistic and legal hurdles to implementing major sediment supplementation efforts, but a careful evaluation of this topic is warranted. This action proposes to conduct a study and therefore will not result in take of delta smelt.

## 5.3  Effects to Delta Smelt Critical Habitat from the Proposed Action

<u>5.3.1  Background</u>

The Service's primary objective in designating critical habitat was to identify the key components of delta smelt habitat that support successful completion of the life cycle, including spawning, larval and juvenile transport, rearing, and adult migration back to spawning sites. The intended conservation value of delta smelt critical habitat is to consistently provide all of the needed habitat attributes corresponding to where delta smelt reside during their life cycle. These habitat attributes often operate synergistically; that is, they need to overlap in order to provide suitable habitat for delta smelt to survive and successfully reproduce. In addition, the area of overlapping habitat attributes must be of a sufficient quantity and quality to support the population.

As described in the Environmental Baseline section, critical habitat is currently not serving its intended conservation role and function for all life stages. The Service's review indicates it is rearing habitat that remains most impacted by ecological changes in the estuary, both before and since the delta smelt's listing under the Act. Those changes have stemmed from chronic low outflow, changes in the seasonal timing of Delta inflow, lower flow variability, species invasions and associated changes in how the upper estuary food web functions, declining prey availability, high water temperatures, declining water turbidity, and localized contaminant exposure and accumulation by delta smelt.

The following are the delta smelt critical habitat Primary Constituent Elements (PCEs) as defined in the critical habitat rule (Service 1994):

*Primary Constituent Element 1:* "Physical habitat" is defined as the structural components of habitat. As reviewed in the *Status of Critical Habitat Within the Action Area*, physical habitat in the Bay-Delta has been substantially changed with many of the changes having occurred decades ago (Andrews *et al.* 2017; Gross *et al.* 2018). Important physical habitat attributes include substrate, water depth variation and channel morphology for spawning adults, and potentially foraging habitat for rearing juveniles along marsh edges (Bever *et al.* 2016; Hammock *et al.* 2019a). Information on spawning habitat is incomplete. Eggs of delta smelt are demersal and adhesive and therefore could be attached to any number of substrates. It is difficult to protect spawning habitat without knowing what it is.

*Primary Constituent Element 2:* "Water" is defined as water of suitable quality to support various delta smelt life stages with the abiotic elements that allow for survival and reproduction. Delta smelt inhabit open waters of the Delta and Suisun Bay. Certain conditions of temperature, turbidity, and food availability characterize suitable habitat for delta smelt. Factors such as high entrainment risk and contaminant exposure can degrade this PCE even when the basic water quality is consistent with suitable habitat (Hammock *et al.* 2015).

*Primary Constituent Element 3:* "River flow" was originally believed to be critical as transport flow to facilitate an extended spawning migration by adult fish and the transport of offspring to

low-salinity rearing habitats (Service 1994). However, it has since been shown that although some individual fish may embark on what could be considered a short spawning migration, there is no population-scale spawning migration *per se*, and most transport and retention mechanisms for delta smelt (and their prey) involve the selective use of tidal currents rather than net flows (Kimmerer *et al.* 1998; 2002; Bennett *et al.* 2002; Kimmerer *et al.* 2014a; Bennett and Burau 2015). River flow includes both inflow to and outflow from the Delta, both of which influence the net movements of water through the Delta and further into the estuary (Kimmerer and Nobriga 2008). As mentioned above, these variations in freshwater flow affect the spatial distribution of salinity including X2, which in turn exert some influence on the distribution of delta smelt (Sweetnam 1999; Dege and Brown 2004; Feyrer *et al.* 2007; Nobriga *et al.* 2008; Sommer *et al.* 2011; Manly *et al.* 2015; Polansky *et al.* 2018; Simonis and Merz 2019).

*Primary Constituent Element 4:* "Salinity" is defined as the LSZ nursery habitat. The LSZ is where freshwater transitions into brackish water; the LSZ is defined as 0.5–6.0 ppt (Kimmerer 2004; MacWilliams *et al.* 2015). The LSZ expands and moves downstream when river flows into the estuary are high. Similarly, it contracts and moves upstream when river flows are low. The 2 ppt isohaline (X2) is a specific point within the LSZ where the average daily salinity at the bottom of the water is 2 ppt (Jassby *et al.*1995). By local convention, the location of the LSZ is described in terms of the distance from X2 to the Golden Gate Bridge; X2 is an indicator of habitat suitability for many San Francisco Estuary organisms and is associated with variance in abundance of diverse components of the ecosystem (Jassby *et al.*1995; Kimmerer 2002b). During the past 40 years, the monthly average of the location of X2 has varied from as far downstream as San Pablo Bay (45 km) to as far upstream as Rio Vista on the Sacramento River (95 km), but as reviewed in the *Status of Critical Habitat Within the Action Area*, this is a smaller range than under pre-development conditions (Andrews *et al.* 2017; Gross *et al.* 2018). At all times of the year, the location of X2 influences both the area and quality of habitat available for delta smelt to successfully complete their life cycle. In general, the abiotic elements of delta smelt habitat quality and habitat surface area are greater when the LSZ is located in Suisun Bay than when it is located in the Delta (Feyrer *et al.* 2011; 2016; Bever *et al.* 2016). The density of delta smelt's primary prey is related to X2 in the spring (Kimmerer 2002b), but not in the summer and fall (Kimmerer 2002b; Kimmerer *et al.* 2018c). One recent study reported better metrics of delta smelt feeding success for fish within the Suisun Marsh (Hammock *et al.* 2015).

Due to the interrelationship between the PCEs and the intended conservation role they serve for different delta smelt life stages, some effects are similar and overlap across the PCEs. For instance, Delta outflow determines the extent and location of the LSZ and the areas of physical habitat delta smelt are able to utilize at all times of year. Therefore, many of the effects described below for the PCEs are difficult to separate so some effects are repeated for multiple PCEs.

As discussed in the *Status of the Critical Habitat Within the Action Area*, it was originally believed that delta smelt adults needed access to spawning habitat during the adult migration period from December through July (Service 1994). The current paradigm is that maturing adults do not migrate as much as disperse in response to winter storms which bring pulses of freshwater and turbidity into the estuary (Murphy and Hamilton 2013; Polansky *et al.* 2018). Thus, although the delta smelt critical habitat rule characterizes the spawning movement as a migration, we

analyze the effects of the PA on critical habitat for "dispersing" adults instead of the original conceptual model of a west to east "spawning migration" described in the rule (Service 1994).

Effects to each PCE were evaluated qualitatively and, when appropriate, using CalSim II modeling. The CalSim II model is used by Reclamation and DWR to simulate the operation of the major CVP and SWP water facilities in the Central Valley and generates monthly estimates of river flows, exports, reservoir storage, deliveries, and other parameters (PA modeling). The following PA components are encompassed in the analysis below as part of water operations and are represented in the hydrologic modeling. No additional effects are anticipated from: minimum export rate, DCC operations, agricultural barriers, Contra Costa Water District (Rock Slough) diversions, North Bay Aqueduct diversions, and Water Transfers. Additionally, the Service qualitatively evaluated the effects of operational and non-operational components of the PA to delta smelt critical habitat which were not included in the modeling (e.g., the Summer-Fall Habitat Action and food web enhancement actions). Table 5-8 summarizes where the effects to critical habitat from the PA are expected to occur for each PCE.

### 5.3.2  Effects to Critical Habitat for All Life Stages of Delta Smelt to PCE 2-Water

According to the BA, with respect to PCE 2-Water, relative to the without action scenario, reduced winter-spring inflow to the Delta under the PA may reduce sediment supply and therefore turbidity during winter-spring, as well as during summer/fall when resuspension of sediment supplied in the winter/spring is important to the suitability of rearing habitats. The BA also indicates that the PA will cause small changes in several components of water quality (PCE 2) needed to support delta smelt in all life stages, but such changes will have small to negligible effects compared to the COS, either for the component alone, or in combination with actions proposed as part of the PA.

- *Sediment load*: Turbidity produced by sediment suspended from the erodible sediment pool in the estuary from wind, river flow and tidal forces can contribute to cover for delta smelt needed to avoid predators and to facilitate successful feeding and predator avoidance by the larvae (Ferrari *et al.* 2014; Baskerville-Bridges *et al.* 2004; Hasenbein *et al.* 2016a; Schreier *et al.* 2016; Sullivan *et al.* 2016). While suspended phytoplankton can also contribute to turbidity, the estuarine turbidity maximum can be influenced by the available sediment pool which is hypothesized to be depleted following increases due to hydrologic mining in the mid 1850's to 1880's and lax regulation on sediment input during post-war urbanization in the 1940's to 1970's (Schoellhamer 2011). Currently, available science does not permit us to extrapolate turbidity concentrations from sediment load.

  The majority of suspended sediment entering the estuary comes from the Sacramento River and Yolo Bypass during high flows with a smaller proportion coming from the San Joaquin River at Vernalis and the Eastside tributaries. Previous studies have estimated that about 2% of the sediment discharge at Freeport was exported via the SWP (Schoellhamer *et al.* 2012) (Figure 5-37). According to the PA modeling, total exports (including SWP, CVP, CCWD and NBA facilities) would increase by an annual average of 12.5% (592.4 TAF) relative to the COS with increases in exports occurring in all months except December and July. Comparison between the PA and COS shows small differences in exports during the months

of January through March when precipitation-associated sediment loading would be the greatest. The highest increase in Delta exports occurs during April and May. OMR Management actions will work to prevent the draw of sediment-laden Sacramento River water into the central Delta thus minimizing the volume of sediment export. Based on our understanding of sediment transport timing and sources in the estuary, any changes resulting from the PA are expected to be negligible.

- *Food availability:* Primary production in the estuary varies annually due to several factors including consumption by the invasive overbite clam, a long-term decline in total suspended solids, nutrient inputs, and river flow (Jassby *et al.* 2002; Glibert *et al.* 2015). Water exports directly entrain phytoplankton and zooplankton (Arthur *et al.* 1996; Jassby and Cloern 2000). No estimates of food web loss to entrainment were provided in the BA. The PA proposes a 12.5% annual average increase in exports into the CVP and SWP as compared to the COS. Exports were modeled to increase in all months except December and July. Conceptually, we would expect a greater loss of food web organisms resulting from an increase in exports (Jassby and Cloern 2000) relative to the COS. However, modeling by Kimmerer *et al.* (2018b) suggests that exports do not affect the subsidy of the copepod, *P. forbesi*, to the LSZ in summer and fall during juvenile rearing. Thus, although zooplankton productivity might be higher if there were no exports, we do not expect that the rate that *P. forbesi* is exchanged between freshwater and the LSZ will be affected.

The PA includes several actions including habitat restoration, water management, and food enhancement actions which may provide information for food web management and/or augment delta smelt's food supply.

- *Habitat Restoration:* Reclamation and DWR have proposed to complete construction of the remainder of the 8,000 acres of intertidal and associated subtidal habitat in the Delta and Suisun Marsh by 2030 to increase estuary productivity including availability of delta smelt prey. Tidal restoration projects will be sited and designed to increase available food web production for delta smelt. Tidal marshes may act as nitrogen sources or sinks (Yang and Best 2015; Yang et al. 2015; Jasper *et al.* 2014; Lehman *et al.* 2010). Tidal habitat restoration of this magnitude, once complete, would be expected to improve the availability of food for delta smelt for all life stages. However, the magnitude of the effect of this component of the PA is unknown at this time. Reclamation and DWR commit to funding and ensuring that monitoring, operation, maintenance, and permanent protection occur on these restored lands. The monitoring program will evaluate the effectiveness of the restoration actions. DWR has established the Fish Restoration Program (FRP), a coordinated effort between DWR and CDFW, which focuses on the planning, design, and permitting of individual restoration projects. In addition, the FAST, which includes Reclamation, CDFW, NMFS, and the Service, coordinates on the design and crediting of proposed restoration projects to ensure they meet the objective stated above. The momentum that has been created in recent years to implement tidal marsh restoration is expected to continue in the coming years in order to complete the remaining restoration acreage. Since this activity is being addressed programmatically in this

consultation, further detail about effects including benefits to delta smelt critical habitat will be addressed in subsequent consultation prior to implementation.

o *Delta Smelt Summer-Fall Habitat:* Reclamation and DWR have proposed a suite of operational and food web stimulation actions as a Summer-Fall Habitat Action (Table 5-7). The purpose of the Summer-Fall Habitat Action is to increase the overlap of delta smelt habitat attributes in two places that tend to be turbid and have somewhat elevated or manageable prey concentrations (Suisun Marsh and the Cache Slough Complex). The net direction and magnitude of the effect of this element of the PA is unknown at this time. If effective, the Summer-Fall Habitat Action will improve a suite of rearing habitat attributes for juvenile delta smelt from June through October in and adjacent to Suisun Marsh and the Cache Slough Complex.

Overall, the scientific basis of the Summer-Fall Habitat Action is sound. Delta smelt are hypothesized to experience food limitation in summer and fall (Bennett and Moyle 1996) and summer-to-fall survival has been associated with zooplankton biomass (Kimmerer 2008). Kimmerer (2008) suggested that delta smelt management should include improved habitat or food supply. Reclamation and DWR may also operate the Roaring River Distribution System (RRDS) to distribute zooplankton by routing fresh water through the Distribution System where zooplankton can grow in the shallow wetlands and then move the water back into Montezuma Slough and Grizzly Bay where delta smelt can access it if updated science demonstrates benefits. The combined use of X2 management, SMSCG operation and RRDS water distribution would, in June through October, direct Sacramento River water and its accompanying food web into Montezuma Slough and its tributaries and direct organic carbon from the Marsh into Grizzly and Honker Bays. The PA posits that these actions will make more food available for rearing juvenile delta smelt in Suisun Marsh in 3 of 5 water year types (Below Normal, Above Normal, Wet).

o *Sacramento Deepwater Ship Channel Food Study:* The PA includes a partnership with the City of West Sacramento and West Sacramento Area Flood Control Agency to repair or replace the West Sacramento lock system to hydraulically reconnect the ship channel with the mainstem of the Sacramento River. The PA posits that the reconnected ship channel has the potential to transport phyto- and zooplankton growing in the channel into the north Delta to improve food availability in the Liberty Island/Cache Slough region. There is also the potential for transport of agriculture-associated contaminants (e.g. rice herbicides and fungicides) in Sacramento River water into the Ship Channel. Thus, the net direction and magnitude of the effect of this element of the PA is unknown at this time. All life stages of delta smelt are present at this location. The Service anticipates that changes in water quality parameters like turbidity will be monitored as part of the study. Since this activity is being addressed programmatically in this consultation, further detail about effects including

benefits to delta smelt critical habitat will be addressed in subsequent consultation prior to implementation.

o *North Delta Food Subsidies/Colusa Basin Drain Study:* DWR, Reclamation, and water users have proposed to locally stimulate a planktonic food web in the north Delta by routing nutrient-rich water from the Colusa Basin Drain into the Yolo Bypass and north Delta (Frantzich *et al.* 2018) if updated science demonstrates benefits. They propose to move agricultural drain water (i.e., water high in nutrients and perhaps phytoplankton) from the Colusa Basin Drain through Knight's Landing Ridge Cut and the Yolo Bypass Tule Canal/Toe Drain into Cache Slough where the BA posits it will stimulate a local zooplankton bloom. Reclamation has proposed to work with DWR and partners to augment flow in the Yolo Bypass in July and/or September by closing Knights Landing Outfall Gates and routing water from Colusa Basin into Yolo Bypass to stimulate phyto- and zooplankton production. There is also the potential for the concomitant distribution of contaminants along with the agricultural drainage water. All life stages of delta smelt may be present at this location, but the net direction and magnitude of the effect of this element of the PA is unknown at this time since the ability of the action to produce the intended phytoplankton bloom has thus far been mixed and the hypothesized zooplankton response has not yet been shown conclusively. Since this activity is being addressed programmatically in this consultation, further detail about effects including benefits to delta smelt critical habitat will be addressed in subsequent consultation prior to implementation.

o *Suisun Marsh and Roaring River Distribution System Food Subsidies Study:* DWR and Reclamation and water users have proposed to study and potentially manage to add nutrients, phytoplankton and invertebrates to Suisun Marsh through coordinating managed wetland flood and drain operations in Suisun Marsh, RRDS food production, and reoperation of the Suisun Marsh Salinity Control Gates if updated science demonstrates benefits. The RRDS was constructed to provide lower salinity water to 5,000 acres of private and 3,000 acres of CDFW-managed wetlands in Suisun Marsh. Because the RRDS intake is screened, adult delta smelt do not have access to the wetlands within the RRDS. However, the BA posits that this management action may attract delta smelt in greater numbers into adjacent parts of the marsh, specifically to the edge habitats where RRDS return flows are delivered. Reclamation believes this action can increase food availability for delta smelt occurring in Suisun Marsh and Bay. Discharges of water with high particulate and dissolved organic carbon may also contribute to depleted oxygen levels in the Marsh and Bay margins when water temperatures are high. Since this activity is being addressed programmatically in this consultation, further detail about effects including benefits to delta smelt critical habitat will be addressed in subsequent consultation prior to implementation.

The PA will cause small changes in several components of water quality (PCE 2) needed to support delta smelt in all life stages, but such changes will have small to negligible effects

compared to the COS, either for the component alone, or in combination with actions proposed as part of the PA. The benefits to water quality of habitat restoration, implementation of the Summer-Fall Habitat Action, and the food enhancement actions may help provide the needed habitat attributes in appropriate areas where delta smelt reside, particularly for rearing juvenile delta smelt. These benefits will depend on how and when these actions are implemented, and if other necessary habitat attributes are also present and of sufficient quality to support completion of the life cycle. Effects of the programmatic components (habitat restoration and food enhancement actions), including how these components contribute to water quality, will be addressed in more detail in subsequent consultation on these components.



**Figure 5-37. Average annual Delta sediment budget based on water years 1999–2002, except for Threemile Slough (TMS), which is based on water years 2001 and 2002 only. Numbers are the annual suspended-sediment flux and the estimated error in thousand metric tons. Arrow thickness indicates relative magnitude of the suspended-sediment flux. Sediment deposition accounts for the decreased sediment fluxes from east to west. Additional sites are Sacramento River at Freeport (FPT), Yolo Bypass (YOL), Delta Cross Channel (DCC), Sacramento River at Rio Vista (RVS), Mallard Island (MAL), Eastside tributaries (EAST), San Joaquin River at Vernalis (VNS), San Joaquin River at Stockton (STN), exports from the State and Federal water projects (EXP), Dutch Slough (DCH), and San Joaquin River at Jersey Point (JPT). Source: Wright and Schoellhamer 2004.**

**Table 5-8. Summary of effects of the PA on critical habitat by life stage as compared to the COS.**

| Life stage | PCE 1: Physical habitat | PCE 2: Water [quality] | PCE 3: River flow | PCE 4: Salinity [LSZ] |
|---|---|---|---|---|
| *Dispersing adults* *(Dec-March)* | Not Applicable | Negligible loss of sediment due to exports. Small contributions to prey production from restoration in unknown locations in the Delta and Suisun Marsh. | Modeled PA OMR flows are more negative than COS. OMR management (Table 2-1) is expected to result in water operations that are similarly protective of this PCE as the COS. | No change in effect |
| *Spawning adults* *(Feb-May)* | No change in effect | Negligible loss of sediment due to exports. Small contributions to food web from restoration in unknown locations in the Delta and Suisun. | Not Applicable | No change in effect |
| *Dispersing larvae and juveniles* *(March-June)* | Not Applicable | Negligible loss of sediment due to exports. Small contributions to food web from restoration in unknown locations in the Delta and Suisun. | Modeled PA OMR flows are more negative than COS. OMR management (Table 2-1) is expected to result in water operations that are similarly protective of this PCE as the COS. | No change in effect. |
| *Rearing larvae and juveniles* *(July-Dec)* | No change in water depth. Potential increase in marsh foraging from restoration and food enhancement in Suisun Marsh, Grizzly and Honker Bays. | Negligible loss of sediment due to exports. Small contributions to food web from restoration and potentially food web enhancement action in unknown locations in the Delta and Suisun. | The PA will lower river flow in some months and water years types. The lower river flow may contribute to lower habitat suitability of western parts of critical habitat by increasing the fraction of time in which the LSZ primarily encompasses deep channelized habitats. The Summer-Fall Habitat Action will seasonally improve conditions in Above Normal and Below Normal water years relative to the COS. | The PA will increase salinity in some months and water years types. The higher salinity will at times contribute to lower habitat suitability of western parts of critical habitat by increasing the fraction of time in which the LSZ primarily encompasses deep channelized habitats. The Summer-Fall Habitat Action will seasonally improve salinity conditions in Above Normal and Below Normal water years relative to the COS. |

### 5.3.3 Effects to Delta Smelt Critical Habitat by Life Stage

*Habitat conditions supporting larval and juvenile transport*

#### PCE 3 – River Flow

The operation of the CVP and SWP involves the storage, release and diversion of freshwater. Stored water is delivered to the Delta where some of it is exported, often along with runoff from other sources. These actions directly influence river flows in the Delta and Suisun Bay, which in turn affects aspects of habitat quality within the critical habitat boundaries (Service 1994; Bever *et al.* 2016). The PA provides a quantitatively modeled base condition and qualitative descriptions of real-time and seasonal management strategies that will be used to modify the modeled base condition to various degrees. The PA is expected to result in changes to river flows and net flows into and out of the Delta as compared to the COS (ROC BA 2019), which will in turn affect PCE 3.

It was once thought that delta smelt needed to be transported from "upstream" spawning habitats to "downstream" rearing habitats from December through July (Service 1994). Now we recognize most of the larval transport occurs from March through June. Delta smelt can likely begin feeding where they are hatched, and often rear close to where they are believed to have hatched. It is also recognized that larval fishes, including delta smelt, use swimming behavior changes timed to the tidal cycle and local bathymetry to maintain themselves in low-salinity habitats that often have large seaward net flows (Bennett *et al.* 2002). The primary remaining mechanism related to a transport flow for larvae and juveniles that is thought to be both pertinent to the critical habitat function, and under substantial CVP and SWP control, is the varying magnitudes of flood and ebb tidal flows in Old and Middle rivers that are indexed by OMR. The more negative the OMR flow, the greater the flood tide volume and velocity toward the south Delta pumping plants are relative to the ebb tide, and the more Sacramento River water back-fills for the diverted San Joaquin/south Delta water. This tidal asymmetry indexed by OMR can be associated with net southward transport of larval delta smelt into unsuitable habitat and ultimately into water diversions where they may be salvaged and have an extremely low likelihood of survival (Kimmerer 2008; 2011).

The CalSim II modeling in support of the PA caps OMR flow at -5,000 cfs (14-day running moving average) during March-May. However, the modeling predicts that OMR flow would typically be a little less negative than -5,000 cfs most of the time. Although the CalSim II modeling indicates that the projects are not anticipated to operate in a way that causes monthly mean OMR flow to reach as negative as -5,000 cfs in April and May, negative OMR flows (any value) are modeled to occur more frequently in April and May relative to the COS. The frequency of negative OMR flows (any value) is modeled to be about the same in March and June as in the COS. Thus, the model results suggest that relative to the COS, the PA will have some impact on the larval transport flow. The PA includes OMR management actions to reduce entrainment of larval and juvenile delta smelt. Reclamation and DWR are proposing to use results produced by Service life cycle models with other best available scientific tools and information to determine an OMR threshold that will not negatively impact delta smelt

recruitment. The Service expects that the actions in the PA will result in water operations with similar impact to the larval transport river flow PCE as those modeled in the COS.

*Habitat conditions supporting rearing*

<u>*PCE 1-Physical habitat*</u>

The PA will not result in changes to water depth beyond what results from habitat restoration. Habitat restoration will provide additional tidal wetland marsh edge which was suggested to be important foraging habitat by Hammock *et al.* 2019a. The magnitude of the effect of these activities are unknown at this time, but will be addressed in subsequent consultation. Since there will be no changes to water depth except what results from habitat restoration and habitat restoration is expected to provide additional physical habitat, the conservation value of this PCE to supporting successful completion of the life cycle of delta smelt is not likely to be diminished as a result of the PA.

<u>*PCE 4 – Salinity*</u>

The salinity of the estuary plays a key role in determining how delta smelt habitat attributes overlap (see 5.1.2, *Status of Critical Habitat Within the Action Area*). The LSZ expands and moves downstream when river flows are high (Jassby *et al.* 1995; Kimmerer *et al.* 2013; MacWilliams *et al.* 2015). By exporting river inflows (PCE 3), the PA can contribute to upstream movement and contraction of the LSZ (PCE 4) into the Delta shipping channels, which can in turn affect how PCE 4 interacts with the other three PCEs. Ideal rearing conditions for juvenile delta smelt occur when the location of the LSZ maximizes habitat quantity and quality by providing appropriate salinity, turbidity, water quality, temperature, and food availability. The location of the LSZ is important in determining the quality, both extent and suitability, of juvenile rearing habitat. When X2 is at 81 km or above, the upstream extent of the LSZ differs between the Sacramento and San Joaquin rivers. However, the portion of the LSZ that extends up the San Joaquin River in summer and fall is poor quality due to SAV, high water clarity and elevated temperature, thus the Service uses X2 on the Sacramento River (Hutton *et al.* 2015) as the habitat indicator. When X2 is located at or above 85 km, the entire LSZ is upstream of Chipps Island, east of the turbid shoals in Suisun Bay (i.e., Grizzly Bay and Honker Bay) and the more suitable habitat conditions that occur when the LSZ overlaps these embayments (Bever *et al.* 2016). Figure 5-38 shows the predicted difference in expanse and location of the LSZ under steady-state Delta outflow conditions when X2 is located at 84 km versus 85 km.

Figure 5-39 through Figure 5-45 show the difference between scenarios in kilometers over 82 years of modeling during each of the juvenile rearing months of June through December when, based on previous research, habitat suitability has declined over the past several decades and may limit the species' resilience (Feyrer *et al*. 2007; 2011; Nobriga *et al*. 2008; Bever *et al*. 2016; Castillo 2019). A positive difference indicates an X2 upstream or eastward of the location predicted by the CalSim II-modeled COS. For the summer months of June, July and August, PA conditions are similar to the COS (Figures 5-39 through 5-41). Historically, approximately half of years are classified as Wet or Above Normal. In Wet years and Above Normal years, the modeled X2 position in September and October are overestimated (more eastward) given

revisions to the PA to maintain a monthly average X2 of 80 km in September and October of Wet and Above Normal years (Figure 5-42 and Figure 5-43).

The PA modeling also predicted that X2 position in Novembers and Decembers following Wet and Above Normal water years would move farther upstream than the equivalent COS X2 positions (Figure 5-44 and Figure 5-45). The PA includes water operations changes to increase the upstream storage of water during November and December to improve cold-water pool for salmonid fishes; therefore, we would anticipate X2 to be further upstream under the PA than under current operations in these months. All published papers that have evaluated fall habitat conditions for delta smelt and its potential effect on their viability have relied on four-month averages (September-December) of X2 and other habitat indices (see Feyrer *et al*. 2007; 2011; 2016; Mac Nally *et al*. 2010; Thomson *et al*. 2010; Bever *et al*. 2016; Castillo 2019). There are two reasons for this choice. The first is that the FMWT abundance index is also calculated using September-December catch data; the second is that it is not possible to evaluate delta smelt mortality or factors driving its variation one month at a time during the fall because the data are too variable (i.e., 'noisy'). It is apparent from physical modeling that a change in X2 will affect the salinity of the critical habitat in November and December (e.g., MacWilliams *et al*. 2015). However, it is not clear how much this change will affect the conservation value of the critical habitat in these late fall months as water temperatures cool and seasonal storms and windier weather often return to the Bay-Delta region which may improve the suitable habitat when X2 is located further east.

The SMSCG are used to lower the salinity within Montezuma Slough and Suisun Marsh. Under D-1641, DWR can operate the gates from October-May; the frequency of SMSCG operations is a function of outflow. When outflow is low in the fall through the spring, the gates are operated more frequently to pump fresh water into the marsh. In wetter years, operations can be limited to a few days during the driest parts of the year. Historical operation of the gates consistent with D-1641 only slightly overlaps with the proposed Delta Smelt Summer-Fall Habitat Action which includes up to an additional 60 days of gate operation during June-October. SMSCG operation moves low salinity water into Montezuma Slough which is in turn directed into Suisun Marsh via the RRDS and other intakes. The operation of the SMSCG is expected to improve salinity conditions experienced by delta smelt inhabiting Suisun Marsh and coax additional delta smelt into Montezuma Slough where turbidity and prey densities can be higher at times. Gate operation can also result in upstream movement of X2; however, the PA states that the projects will meet their D-1641 salinity requirements even if that requires additional Delta outflow to offset salinity changes at compliance points caused by SMSCG operation.

Reclamation and DWR have proposed to incorporate operations of the SMSCG for up to 60 additional days (may be non-consecutive) in Below Normal and Above Normal water year types. This action may also be implemented in Wet water year types if information suggests there are benefits of doing so. The purpose of the action is to direct more fresh water into the Suisun Marsh to create and maintain low salinity habitat there and in adjacent shoals in Grizzly Bay. The goals of the Summer-Fall Habitat Action relevant to critical habitat are to manage the overlap of low-salinity water with localized turbid areas and copepod production that may be less affected by the overbite clam (Hammock *et al.* 2017; Baumsteiger *et al.* 2017) and establish contiguous low salinity habitat from the Cache Slough Complex to the Suisun Marsh (Moyle *et*

*al.* 2010; 2016). Specific actions will be informed each year by the use of structured decision making to achieve habitat goals which will try to overlap low salinity water (0 to 6 ppt at Belden's Landing from June to October), with turbid water (targeting at least 12 NTU) and highest available food supplies. The proposed management actions are described in Table 5-7.

The suite of management interventions in the Summer-Fall Habitat Action is intended to focus benefits into places like the Cache Slough Complex and Suisun Marsh where outcomes can be controlled and observed fairly carefully, and it will add actions to Below Normal water years, potentially increasing the frequency of years that the delta smelt population and critical habitat receives some helpful management intervention as compared to the COS. Altogether, the spatial extent of high suitability rearing habitat will be somewhat lower under the PA in Wet years, and somewhat higher in Above Normal and Below Normal years than what would be anticipated under the COS. This statement is largely limited to the months of September through October of Wet and Above Normal water years due to the explicit differences in operations rules between the PA and COS. The Service anticipates that the actions identified would continue to provide low-salinity habitat in Honker and Grizzly Bays and Suisun Marsh in Above Normal and Wet years and increase its frequency in Suisun Marsh in Below Normal years. Additionally food enhancement actions, described at a programmatic level at this time, may provide better feeding conditions for delta smelt in Suisun Marsh and the Cache Slough Complex. The structured decision making process called for under this action will incorporate new results each year to help refine the potential benefits that may be realized.





**Figure 5-38. Daily-averaged depth-average salinity in psu (practical salinity units) between Carquinez Strait and the western Delta for X2 located at 84 and 85 km (Delta Modeling Associates 2012).**



**Figure 5-39. Difference in the position of X2 in kilometer between the PA and the COS for all Junes based on 82 years of CalSim II modeling.**



**Figure 5-40. Difference in the position of X2 in kilometer between the PA and the COS for all Julys based on 82 years of CalSim II modeling.**



**Figure 5-41. Difference in the position of X2 in kilometer between the PA and the COS for all Augusts based on 82 years of CalSim II modeling.**



**Figure 5-42. Difference in the position of X2 in kilometer between the PA and the COS for all Septembers based on 82 years of CalSim II modeling.**



**OCTOBER**

■ 20190206 LTO BA PA minus 20190206 LTO BA COS

**Figure 5-43 Difference in the position of X2 in kilometer between the PA and the COS for all Octobers based on 82 years of CalSim II modeling.**

**Figure 5-44. Difference in the position of X2 in kilometer between the PA and the COS for all Novembers based on 82 years of CalSim II modeling.**



**Figure 5-45. Difference in the position of X2 in kilometer between the PA and the COS for all Decembers based on 82 years of CalSim II modeling.**



| Month | COS | PA |
|-------|-----|-----|
| June | 7 | 7 |
| July | 27 | 27 |
| August | 59 | 59 |
| September | 43 | 77 |
| October | 42 | 74 |
| November | 35 | 66 |
| December | 28 | 41 |

**Figure 5-46. Comparison of the frequency of months (June-December) for the COS and PA that CalSim II modeling (n=82) indicates that X2 is at or above 85 km from the Golden Gate Bridge (no overlap of the LSZ with Suisun Bay).**

*Habitat conditions supporting adult dispersal*

<u>PCE 3 – River Flow</u>

The adult dispersal period is defined in this biological opinion as December to March to coincide with most historical salvage of adult fish (Grimaldo *et al*. 2009). During this time, adult delta smelt need unrestricted access to suitable spawning habitat. These areas also should be protected from physical disturbance and flow disruption during adult dispersal. River flow includes inflow into the Delta and outflow from the Delta. Inflow, outflow, and OMR flow influence the vulnerability of delta smelt adults to entrainment at Banks and Jones Pumping Plants. As discussed in the *Status of the Species Within the Action Area* and *Status of the Critical Habitat Within the Action Area* sections, scientific understanding of factors affecting entrainment risk suggests that turbidity (PCE 2), in addition to river flow, plays an important role in attracting dispersing adults.

Freshwater flows in combination with increasing turbidity are cues for adult delta smelt to disperse to spawning habitat in December through March (Sommer *et al.* 2011). South Delta water exports could alter critical habitat by drawing turbid Sacramento River water into the central and south Delta, encouraging the dispersal of adult delta smelt further south and east, making them and their offspring vulnerable to entrainment. In the PA, OMR flows are proposed to be slightly more negative than the COS during December through March (Figure 5-46), but only if the water is not turbid. For the south Delta, net OMR flows of -5000 cfs or more positive are expected to be protective of a high fraction of dispersing adults because Sacramento River water flowing into the mainstem of the San Joaquin River is not being rapidly drawn into Old and Middle river under those conditions bringing the turbidity with it. This would indicate that more negative OMR flow conditions in critical habitat during adult spawning are not expected to result in disruption of turbidity cues for dispersing adults or altered transport flows.

OMR Management is proposed as part of the PA and includes short-term periods during which OMR flow may be more negative than -5,000 cfs during Storm-Related Flexibility actions but also includes a real-time decision process to limit the inflow of turbid water into the south Delta and pumping facilities during December through March. These actions include Integrated Early Winter Pulse Protection and Turbidity Bridge Avoidance. These management actions are expected to prevent turbid Sacramento River water from being drawn into the central and south Delta, and will restrict net OMR flows to be -5,000 or more positive. If conditions are conducive for turbidity to be drawn into the south Delta, then OMR flows would not be more negative than -2,000 cfs. As stated above, this is expected to be protective of a high fraction of dispersing adults.



**Figure 5-47. Comparison of the frequency of months that the PA and COS were modeled to meet the OMR flow threshold of -5000 cfs during the adult delta smelt dispersal period (December through March). Each month was modeled 82 times for a potential maximum frequency of 82 months times a four-month period or 328 on the y-axis. The CalSim II modeling cannot fully capture real-time operations decisions that affect OMR flow for either scenario.**

## 5.4 Effects to Recovery

The Service issued a *Recovery Plan for the Sacramento-San Joaquin Delta Native Fishes* (Recovery Plan) in 1996 (Service 1996). The Service has used the most up-to-date, best available information to outline the recovery needs of delta smelt. Sources used to develop the needs include, but are not limited to:

- the March 5, 1993 delta smelt listing and critical habitat rule;
- the 1996 Recovery Plan;
- the 2008 Service BiOp (Service 2008);
- the September 13, 2010 5-year status review (Service 2010a);
- the April 7, 2010 12- month finding (75 FR 17667; Service 2010b);
- the latest Candidate Notice of Review (Service 2016);
- the draft recovery plan for delta smelt (under development); and
- other resources available to the Service.

Based on available resources, the Service proposes that, in order to recover, delta smelt need a substantially more abundant population, an increase in the quantity and quality of habitat, and other needs as further outlined below:

**Abundance -** a substantially more abundant population, which is notably linked to the success of recruitment between life stages. Abundance is affected by entrainment, predation, feeding, competition, demographics, reproductive success, and fish condition and health.

### Entrainment and Impingement Risk
- A reduction in entrainment and impingement of adult, juvenile, and larval individuals and their food supply at CVP and SWP pumping facilities, over and above reductions achieved under real-time operations of the 2008 Service BiOp, to increase the abundance of the spawning adult population and the potential for recruitment of larvae and juveniles into the adult population. This can be done through OMR modified actions to increase protection among life stages.
- A reduction in entrainment and impingement from other water diversion-related structures within delta smelt critical habitat where delta smelt adults, larvae, or juveniles are known or are likely to be impinged or entrained to increase the adult population and the potential for recruitment of juveniles into the adult population.
- A reduction in entrained food supply within delta smelt critical habitat.

### Predation
- Increased escape cover (*i.e.*, sufficient habitat to reduce/avoid predation from observed increases in water clarity).
- Reduction in predators in the Bay-Delta ecosystem to increase survival of adults, larvae, and juveniles from an overall increase in relative abundance of predator species system-wide.

### Feeding
- Increased copepod production.

### Competition
- Reduction in competition and food web alteration from non-native fish and invertebrates.

### Demographic/Genetic
- Maintain or increase genetic diversity within the population and Allee effects (*e.g.*, reduced schooling ability, reduced ability to find mates).

### Reproductive Success
- Restoration of migratory and spawning cues from reductions in the spawning season window and modification of natural flow regimes.
- Increase the condition of spawning individuals, such as fish size (*e.g.*, weight, length), fat storage, sufficient calorie intake, and lipid energy.
- Improve delta smelt vital rates, including higher growth rates and higher fecundity levels.

- Improve the sex ratio (males to females) with recognition that there is uncertainty associated with this need and therefore is identified as needing additional research and monitoring.

**Fish Body Condition/Health**
- Improve physical health through a reduction in contaminants exposure and other pollutants (*e.g.,* metals, pesticides, CEC's [endocrine disruptors], etc.) within its habitat to increase survival of adults, larvae and juveniles.

**Habitat -** an increase in the quality and quantity of suitable migratory, spawning, and rearing habitat. Improved habitat quality within the Bay-Delta should enhance delta smelt reproduction and allow for recruitment success necessary to the species to survive. Suitable habitat conditions require habitat diversity, water quality, and flow.

**Habitat Diversity**
- Increase habitat complexity (*e.g.*, reduction in dead end sloughs) and heterogeneity.
- Increase in the quality and quantity of suitable spawning habitat and substrate (*i.e.*, sandy beaches with sufficient water velocities, available for direct use) due to reductions in sandy beaches system-wide.
- Maintain or increase (*i.e.*, protect, restore, create, or enhance) suitable habitat within designated critical habitat (*i.e.*, with PCEs), further preventing reductions in habitat.

**Water Quality**
- Improve water quality – suitable water quality constituents within optimal range (*i.e.*, turbidity, DO levels, water temperature, pH, salinity).

**Flow**
- Improve flow conditions – suitable flow conditions (*i.e.*, velocity, timing, [delta] freshwater outflow, salinity, tidal energy, flow suitable for spawning migration, to trigger movement to spawning areas, and egg incubation)

These can be achieved as a result of active or passive management of water and sediment processes in the San Francisco Bay-Delta ecosystem that mimics more natural (*i.e.,* pre-water development) conditions.

**Other needs –** Other factors that affect delta smelt include climate change, aquatic invasive macrophytes, harmful cyanobacteria blooms (*Microcystis*), disease, and exposure to in-water work activities.

**Climate Change**
- Maintain and increase sufficient suitable habitat from threats of ecosystem changes (community and habitat shifts).
- Prevent reductions/shifts in suitable habitat due to sea-level rise and increased droughts and temperatures.

- Maximize delta smelt population resilience in the face of the potential adverse effects of ongoing climate change that are occurring in the Bay-Delta ecosystem.

**Aquatic Invasive Macrophytes**
- Reduce aquatic invasive macrophytes due to increased predator habitat from changes in water quality as a result of increased water clarity, residence times, and flow reductions.

**Harmful Cyanobacteria Blooms (*i.e., Microcystis*)**
- Reduce harmful cyanobacteria blooms from increased water residence time/flow reductions and increased anthropogenic nutrient inputs.

**Disease**
- Reductions in disease to increase survival of adults, larvae, and juveniles.

**Risk to Individuals from Exposure to In-water Work Activities (*e.g*., dredging riprapping, suction dredging, agricultural diversions)**
- Reduce sources of harassment, harm, or mortality to delta smelt individuals, habitat loss, and effects to prey density (*i.e.*, modification of food supply).

**Supplementation** – The very low abundance of delta smelt has increased the urgency toward development of a program for supplementing the wild population of delta smelt (Lessard *et al*. 2018). Studies are currently underway to help develop a program for using cultured delta smelt for supplementation efforts. In order for a supplementation program to be fully successful, fish must be released into an environment that provides ample food, low levels of toxic compounds, and low entrainment losses (Service 1996).

5.4.1  Effects of the Proposed Action on Recovery

Reclamation and DWR are proposing measures to minimize the adverse effects of accumulating loss and degradation of habitat to promote the recovery of delta smelt. Habitat loss and degradation are contributing factors to the decline of delta smelt. The proposal to continue restoring intertidal and associated subtidal habitat in the Delta and Suisun Marsh is a reasonable means of minimizing the adverse effects of the loss of individuals, on the species as a whole, and may benefit the recovery of delta smelt. Tidal restoration projects in the estuary have generally created fish feeding benefits very quickly (Cohen and Bollens 2008; Howe and Simenstad 2011). Following Herbold *et al*. (2014), the restoration projects that will be credited to this action in the coming decade will be sited and designed to locally increase food web production in a location that delta smelt should be able to access it. Reclamation and DWR commit to funding and ensuring that monitoring, operation, maintenance, and permanent protection occur on these restored lands. An overall monitoring program developed to focus on the effectiveness of the restoration actions will inform future actions undertaken for the intended food web benefit of delta smelt. The Service leads the FAST, which assists DWR in designing the proposed restoration projects to increase food web production in appropriate locations to benefit delta smelt. DWR has made significant progress in overcoming hurdles which has created momentum in acquiring lands, designing, and constructing restoration projects. This momentum is expected

to continue in the coming years in order to complete the remaining restoration acreage to support the recovery need of improving feeding which contributes to increased abundance of delta smelt.

The proposed operation of the CVP and SWP is likely to result in a small increase in delta smelt entrainment risk as compared to the current operations scenario. Measures under Additional Real-Time OMR Restrictions in the PA are proposed to moderate this increase in the level of entrainment during the period when delta smelt may be dispersing (Integrated Early Winter Pulse Protection), dispersing and spawning (Turbidity Bridge Avoidance) and when larvae and juveniles are subject to entrainment by restricting how negative OMR flows can be during these life stage. The water management facilities (RRDS, Colusa Basin Drain, etc.) proposed to be utilized for food enhancement actions are located in areas where entrainment of those food subsidies is not expected to occur.

As discussed in the *Effects to Delta Smelt from the Proposed Action* section, based on the scale and locations of proposed predator hotspot removal, these activities are not expected to have an appreciable positive or negative effect to delta smelt. Subsequent consultations on these activities will more specifically address what effects are anticipated from these activities.

It is unknown if the Summer-Fall Habitat Action will contribute to recovery by improving habitat quality for delta smelt. Specific actions to be taken in applicable water years are to be determined by the Delta Coordination Group based on unique conditions for that year and results of previous implementation of SMSCG operations and food enhancement actions.

Reclamation proposes to support development of a delta smelt supplementation program, including capturing existing genetic diversity and maximizing numbers of delta smelt, and to begin supplementation. Reclamation has proposed to fund a process that would lead to supplementation of the wild delta smelt population with captive-bred fish from FCCL within 3-5 years. By 2030, Reclamation proposes to support a Delta Fish Species Conservation Hatchery to take over the role of supplementing the wild population. The first step in this process will be the development of a supplementation strategy within one year of the issuance of this BiOp that will include details about the capacity needed at FCCL to accommodate production of delta smelt needed to meet genetic and other hatchery considerations with a goal of increasing production to a number and the life stages necessary to effectively augment the population. The Service will be the lead on the development of this supplementation strategy, and will ensure the program is consistent with the recovery needs of delta smelt. This program will likely contribute to recovery by augmenting the population to the point that the wild population will be more resilient to threats, including effects associated with operations of the CVP and SWP.

Reclamation proposes to conduct a sediment supplementation feasibility study to determine whether there are actions they and DWR can take that would increase the turbidity of water in the Delta. There may be significant logistic and legal hurdles to implementing major sediment supplementation efforts, but  a careful evaluation of this topic is warranted. This action proposes to conduct a study and therefore will not of itself affect the recovery of delta smelt, but may, at a future date, lead to recovery actions.

As modeled, the PA may increase the level of entrainment of adult and larval delta smelt relative to the COS. However, the negative effect of this increase of entrainment will be minimized by real-time measures that are part of the PA to protect delta smelt. Additionally, supplementation is expected to improve abundance and distribution to help bolster the wild population and make it more resilient. It is unknown what effect to recovery some components of the PA will have, such as implementation of the Summer-Fall Habitat Action and predator hot spot removal. Habitat restoration efforts will contribute to the delta smelt food web once they are constructed and functioning, which is anticipated to contribute to the recovery need of increased abundance by improving food availability for delta smelt in areas where delta smelt should be able to access it. Therefore, the PA is not likely to preclude recovery of the delta smelt.

## 5.5 Cumulative Effects

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the Action Area considered in this BiOp. Future Federal actions that are unrelated to the proposed project are not considered in this section; they require separate consultation pursuant to Section 7 of the Act.

Major human interactions and uses of the landscape within the Action Area include: agricultural practices; recreational uses; urbanization, transportation, transcontinental shipping, and industrial uses. All of these major land uses contribute to greenhouse gas emissions.

### 5.5.1 Agriculture

Farming occurs throughout the Delta and its watershed, including on lands adjacent to many waterways used by delta smelt. Levees are reinforced with continual vegetation removal and over time, riprapping has accumulated as a commonly deployed method to stabilize the levees and protect the land behind the levees for agricultural purposes. Agricultural practices introduce nitrogen, phosphorous and other nutrients into the watershed, which then flow into receiving waters, adding to other inputs such as wastewater treatment (Lehman *et al.* 2014); however, urban wastewater treatment provides the bulk of ammonium loading (Jassby 2008). Stormwater and irrigation discharges related to both agricultural and urban activities contain numerous pesticides and herbicides that may negatively affect delta smelt reproductive success and survival rates (Dubrovsky *et al.*1998; Kuivila *et al.* 2004; Scholz *et al.* 2012). Discharges occurring outside the Action Area that flow into the Action Area also contribute to contaminant exposure.

Water diversions for irrigated agriculture, municipal and industrial use, and managed wetlands are found throughout the Action Area, and many of them remain unscreened. Depending on the size, location, and season of operation, these unscreened diversions have the potential to entrain many life stages of aquatic species, including delta smelt (Nobriga *et al*. 2004). Most diversions of any substantial size and cost along the Sacramento River have been screened, and in the Delta, newer municipal water diversions are and are routinely screened per existing BiOps. Private irrigation diversions in the Delta and Suisun Marsh are mostly unscreened, but the total amount of water diverted onto Delta farms and waterfowl clubs has remained stable for decades

(Culberson *et al.* 2008) so the cumulative impact should remain similar to baseline, and if anything, be lowered somewhat by habitat restoration projects.

5.5.2 Urbanization and Industry

The Delta Protection Commission's *Economic Sustainability Plan for the Delta* reported an urban growth rate of about 54% within the statutory Delta between 1990 and 2010, as compared with a 25% growth rate statewide during the same period (Delta Protection Commission 2012). The report also indicated that population growth had occurred in the Secondary Zone of the Delta but not in the Primary Zone and that population in the central and south Delta areas had decreased since 2000. Growth projections through 2050 indicate that all counties overlapping the Delta are projected to grow at a faster rate than the State as a whole. Total population in the Delta counties is projected to grow at an average annual rate of 1.2% through 2030 (California Department of Finance 2012). Table 5-9 illustrates past, current, and projected population trends for the five counties in the Delta. As of 2010, the combined population of the Delta counties was approximately 3.8 million. Sacramento County contributed 37.7% of the population of the Delta counties, and Contra Costa County contributed 27.8%. Yolo County had the smallest population (200,849 or 5.3%) of all the Delta counties.

**Table 5-9. Delta counties and California population, 2000–2050.**

| Area | 2000 Population (millions) | 2010 Population (millions) | 2020 Projected Population (millions) | 2025 Projected Population (millions) | 2050 Projected Population (millions) |
|---|---|---|---|---|---|
| Contra Costa County | 0.95 | 1.05 | 1.16 | 1.21 | 1.50 |
| Sacramento County | 1.23 | 1.42 | 1.56 | 1.64 | 2.09 |
| San Joaquin County | 0.57 | 0.69 | 0.80 | 0.86 | 1.29 |
| Solano County | 0.40 | 0.41 | 0.45 | 0.47 | 0.57 |
| Yolo County | 0.17 | 0.20 | 0.22 | 0.24 | 0.30 |
| Delta Counties | 3.32 | 3.77 | 4.18 | 4.42 | 5.75 |
| California | 34.00 | 37.31 | 40.82 | 42.72 | 51.01 |
| Sources: California Department of Finance 2012. | | | | | |

Table 5-10 presents more detailed information on populations of individual communities in the Delta. Growth rates from 2000 to 2010 were generally higher in the smaller communities than in larger cities such as Antioch and Sacramento. This is likely a result of these communities having lower property and housing prices, and their growth being less constrained by geography and adjacent communities.

**Table 5-10. Delta communities population, 2000 and 2010.**

| Community | 2000 | 2010 | Average Annual Growth Rate 2000–2010 |
|---|---|---|---|
| **Contra Costa County** | | | |
| **Incorporated Cities and Towns** | | | |
| Antioch | 90,532 | 102,372 | 1.3% |
| Brentwood | 23,302 | 51,481 | 12.1% |
| Oakley | 25,619 | 35,432 | 3.8% |
| Pittsburg | 56,769 | 63,264 | 1.1% |
| **Small or Unincorporated Communities** | | | |
| Bay Point | 21,415 | 21,349 | -0.0% |
| Bethel Island | 2,252 | 2,137 | -0.5% |
| Byron | 884 | 1,277 | 4.5% |
| Discovery Bay | 8,847 | 13,352 | 5.1% |
| Knightsen | 861 | 1,568 | 8.2% |
| **Sacramento County** | | | |
| **Incorporated Cities and Towns** | | | |
| Isleton | 828 | 804 | -0.3% |
| Sacramento | 407,018 | 466,488 | 1.5% |
| **Small or Unincorporated Communities** | | | |
| Courtland | 632 | 355 | -4.4% |
| Freeport and Hood | 467 | 309[a] | -3.4% |
| Locke | 1,003 | Not available | — |
| Walnut Grove | 646 | 1,542 | 13.9% |
| **San Joaquin County** | | | |
| **Incorporated Cities and Towns** | | | |
| Lathrop | 10,445 | 18,023 | 7.3% |
| Stockton | 243,771 | 291,707 | 2.0% |
| Tracy | 56,929 | 82,922 | 4.6% |
| **Small or Unincorporated Communities** | | | |
| Terminous | 1,576 | 381 | -7.6% |
| **Solano County** | | | |
| **Incorporated Cities and Towns** | | | |
| Rio Vista | 4,571 | 7,360 | 6.1% |
| **Yolo County** | | | |
| **Incorporated Cities and Towns** | | | |
| West Sacramento | 31,615 | 48,744 | 5.4% |
| **Small or Unincorporated Communities** | | | |
| Clarksburg | 681 | 418 | -3.9% |
| Sources: U.S. Census Bureau 2000; U.S. Census Bureau 2011. | | | |
| [a] Freeport had a population of 38; Hood had a population of 271. | | | |

Increases in urbanization and housing development can impact habitat by altering watershed characteristics, and changing both water use and stormwater runoff patterns. Increased growth will place additional burdens on resource allocations, including natural gas, and electricity, as well as on infrastructure such as wastewater sanitation plants, roads and highways, and public utilities. Some of these actions will not require consultation regarding delta smelt.

Adverse effects on delta smelt and its critical habitat may result from urbanization-induced point and non-point source chemical contaminant discharges within the Action Area. These contaminants include, but are not limited to, ammonia, numerous pesticides and herbicides, pharmaceuticals, vehicle and roadway-derived copper, and oil and gasoline product discharges. Oil and gasoline product discharges may be introduced into Delta waterways from shipping and boating activities and from urban activities and runoff. Implicated as potential stressors to delta smelt, these contaminants may adversely affect delta smelt reproductive success, survival rates, and food supply.

Upgrades to the Sacramento Regional Wastewater Treatment Plant are expected to occur in 2021-2023, which will result in reductions in dissolved ammonium concentrations in the Delta. It is scheduled to significantly reduce its nitrogen effluent concentrations beginning in 2023. Once that happens, it should become apparent within a few years how important ammonium ratios are limiting diatom production in the Bay-Delta.

Other future, non-Federal actions within the Action Area that are likely to occur and may adversely affect delta smelt and their critical habitat include: the dumping of domestic and industrial garbage that decreases water quality; oil and gas development and production that may affect aquatic habitat and may introduce pollutants into the water; and State or local levee maintenance that may also destroy or adversely affect habitat and interfere with natural, long-term habitat-maintaining processes.

### 5.5.3  Recreational Uses

Increased urbanization is also expected to result in increased recreational activities in the Action Area. The Delta and Suisun Marsh contain numerous parks, extensive public lands, and many interconnected rivers, sloughs, and other waterways that offer diverse recreation opportunities. Privately owned commercial marinas and resorts allow for boating access to the waterways and a variety of other recreational opportunities and services. Private lands also provide several recreational opportunities, particularly hunting.

The Delta is a regional destination for water-based recreationists because of its mild climate, sport fishing opportunities, large maze of navigable waterways, and favorable water levels during summer when most regional reservoirs experience substantial drawdown. Activities in the Delta include cruising, waterskiing, wakeboarding, using personal watercraft, sailing, windsurfing, and kiteboarding, as well as fishing and hunting (from land and by boat). Non-powered boating activities in the Delta include sailing, windsurfing, kiteboarding, canoeing, and kayaking.

Hunting has long been a recreational activity in the Delta, with waterfowl hunting being the primary type. Most of this hunting is concentrated in Suisun Marsh and the Yolo Bypass, with

lesser amounts also occurring in a few locations elsewhere in the Delta. Hunting by boat (typically used as a floating blind) is popular at the larger flooded islands, such as Franks Tract and Sherman Island, because hunters seek open, shallow waters and marsh areas where waterfowl congregate. Licenses and duck stamps to hunt waterfowl are required by the CDFW and the Service. CDFW manages hunting in California, including the public hunting programs at Sherman Island and other smaller wildlife areas. The California Department of Parks and Recreation allow hunting at Franks Tract, designated as Franks Tract State Recreation Area. Boat hunting is also allowed at Big Break, which is managed by the East Bay Regional Park District (Delta Protection Commission 1997). Late fall through early winter is the designated waterfowl hunting season; starting and ending dates vary each year by species and by hunting method.

## 5.5.4  Greenhouse Gas Emissions

There is an international scientific consensus that most of the warming observed has been caused by human activities (IPCC 2001; IPCC 2007a; IPCC. 2007b), and that it is "very likely" that it is largely due to man-made emissions of carbon dioxide and other greenhouse gases in the atmosphere as a result of human activities, particularly carbon dioxide emissions from use of fossil fuels (IPCC 2007b; Solomon *et al.* 2009). Further confirmation of the role of GHGs comes from analyses by Huber and Knutti (2012), who concluded it is extremely likely that approximately 75 percent of global warming since 1950 has been caused by human activities. Scientific measurements spanning several centuries demonstrate that changes in climate are occurring, and that the rate of change has increased since the 1950s. Examples include warming of the global climate system, and substantial increases in precipitation in some regions of the world and decreases in other regions (for these and other examples, see Solomon *et al.* 2009; IPCC 2014).

Scientists use a variety of climate models, which include consideration of natural processes and variability, as well as various scenarios of potential levels and timing of GHG emissions, to evaluate the causes of changes already observed and to project future changes in temperature and other climate conditions (Meehl *et al.* 2007; Ganguly *et al.* 2009). These approaches have been downscaled to the western U.S. (Dettinger *et al.* 2015) and to the Central Valley (Dettinger 2005; Dettinger *et al.* 2016). All combinations of models and emissions scenarios yield very similar projections of increases in the most common measure of climate change, average global surface temperature until about 2030. Although projections of the magnitude and rate of warming differ after about 2030, the overall trajectory of all the projections is one of increasing global warming through the end of this century, even for the projections based on scenarios that assume that GHG emissions will stabilize or decline. Thus, there is strong scientific support for projections that warming will continue through the 21st century, and that the magnitude and rate of change will be influenced substantially by the extent of GHG emissions (Meehl *et al.* 2007; Ganguly *et al.* 2009; IPCC 2014).

Ongoing climate change will likely adversely affect delta smelt (Brown *et al.* 2013; 2016a), since climate change will likely result in sea level changes and overall wet and dry cycles. The major factor is the anticipated warming which will increase physiological stress and may result in changes to availability and distribution of habitat and prey, and/or increase numbers of predators,

parasites, diseases, and non-native competitors. For additional information on climate change as it relates to delta smelt, see *Status of the Species Within the Action Area*.

### 5.5.5  Summary of the Cumulative Effects to Delta Smelt

The anticipated cumulative effects to delta smelt within the Action Area include additional urban and commercial development in the Bay-Delta watershed, and the increased stormwater runoff, road building, and changes to contaminant loading that accompany these land use changes. There may be small reductions in regional agriculture and in-Delta irrigation diversions due to the development of the 8,000 acres of habitat restoration and other habitat restoration initiatives like EcoRestore. The Service is not aware of any information that can be used to quantitatively predict what the cumulative effect of such changes would be. Qualitatively, habitat restoration and less irrigation water demand in the Delta have the potential to offset increased contaminant burdens associated with projected human population growth and urban/commercial land conversion. The amount of anticipated change to the regional climate expected in the near term is lower than it is for the latter half of the century. Therefore, it is less certain that any measurable change from current conditions will occur in the next approximately 10 years than by the latter half of the century. For the time being, water temperatures are stressful to delta smelt, but not of themselves lethal in most of the upper estuary (Komoroske *et al.* 2015).

### 5.5.6  Summary of the Cumulative Effects to Critical Habitat

Among the cumulative effects discussed in *Cumulative Effects* section, urbanization and climate change are most likely to affect critical habitat. PCE 2 (Water Quality) impairment is likely to continue or increase due to ongoing inputs of irrigation drain water, increased stormwater runoff and the pesticides associated with these inputs. Water temperatures, influenced by warming air temperatures from climate change, are expected to rise. Delta smelt is currently at the southern limit of the inland distribution of the family Osmeridae along the Pacific coast of North America and is living in an environment that is energetically stressful. Thus, any increase in summer water temperatures associated with climate change may present a significant conservation challenge. PCE 3 (River flow) reductions, and the associated PCE 4 (Salinity) intrusion will increase as human population growth places additional demands on water resources and less fresh water will be available to maintain the LSZ at a suitable location particularly for juvenile rearing habitat. Herren and Kawasaki (2001) documented over 2,500 water diversions in the Delta and Suisun Marsh, of which very few are screened. Unscreened diversions represent a risk of entrainment to delta smelt and reducing habitat suitability for all life stages especially larvae and juveniles when river flow is directed over levees onto fields or managed wetlands (Culberson *et al.* 2004). Of the 414 water diversions in Suisun Marsh approximately 98% were unscreened including DWR's Morrow Island Distribution Center. Climate change will also alter the timing and form of precipitation (rain or snow) in the watershed depending on latitude. Sea level rise could accelerate quickly depending on what happens in remote locations; if so, it will likely influence saltwater intrusion into the Bay-Delta. Elevated salinity could push X2 farther up the estuary with mean values increasing by about 7 km by 2100 (Brown *et al.* 2013). The status of critical habitat (PCEs 2, 3 and 4) will likely be degraded by each of these cumulative effects in the near term.

**5.6 Effects in the Aggregate to Species and Critical Habitat**

5.6.1 Effects of the Aggregate Status of the Species/Environmental Baseline, and Proposed Action for Delta Smelt

The purpose of the aggregate analysis is to evaluate the combined status of the species, the effects of the PA and the cumulative effects of non-Federal activities to determine their combined effects to the species. Reclamation has committed to implementing programmatic actions that will be subject to future consultation, so those effects have been analyzed at a general level since specific details about those activities (such as location, timing, and design) have not yet been developed. Subsequent consultation on those activities will include analyses of effects at a more specific level and will address incidental take of listed species if it is reasonably certain to occur.

As discussed in the *Environmental Baseline* section of this BiOp, the Environmental Baseline does not include the effects of the action under review in the consultation. In this case, the effects of the action are those resulting from the coordinated operations of the CVP and SWP from now until 2030, as proposed by Reclamation in the BA, and are therefore, not included in the Environmental Baseline section. The *Environmental Baseline* section describes the approach taken to inform the current condition of the delta smelt, including consideration of the without action scenario, past and current operations of the CVP and SWP, and the additional metrics of habitat restoration, predation from invasives, water quality, and other effects on species from Federal, State, and private actions.

*Summary of the Status of the Species Range-wide and in the Action Area*

The Action Area for this consultation encompasses the entire range of delta smelt including all of the designated critical habitat for this species, so for the purposes of this consultation, status of the species range-wide and in the Action Area are combined. The range-wide status of the delta smelt has been declining since the early 2000s, and is presently at its lowest level. Delta smelt have become almost undetectable in some surveys since 2012 (Moyle *et al.* 2016). The population is thought to be so small that stochastic factors, such as a multi-year drought, the loss of key spawning or rearing sites, or an increase in local abundance of competitors or predators could cause extinction in the wild in the near future (Moyle *et al.* 2016). For an annual species, factors affecting habitat conditions throughout its short life span are important to its success or failure. It is clear from published research that the delta smelt population has been observed to decline as physical aspects of its habitat have been reduced in extent and non-native species have increased (Bennett 2005; Feyrer *et al.* 2007; Nobriga *et al.* 2008; Mac Nally *et al.* 2010; Thomson *et al.* 2010; Maunder and Deriso 2011; Miller *et al.* 2012).

The relative abundance of delta smelt has reached very low numbers for a small forage fish in an ecosystem the size of the Bay-Delta and the species is now considered to be approaching extinction in the wild (Moyle *et al.* 2016; 2018; Hobbs *et al.* 2017). The extremely low 2018-2019 abundance indices reflect decades of habitat change and marginalization by non-native species that prey on and out-compete delta smelt. The anticipated effects of climate change on the Bay-Delta and its watershed such as warmer water temperatures, greater salinity intrusion,

lower snowpack contribution to spring outflow, and the potential for frequent extreme drought, indicate challenges to delta smelt survival will increase, though most of the climate-related habitat challenges are expected to accumulate to problem levels in the latter half of the century.

In the absence of the PA, as depicted under the without action scenario described in the BA, the status of the delta smelt would be somewhat improved because there would be no entrainment or loss of fish in the salvage process. OMR flows would generally be positive because the Banks and Jones pumping plants and their associated fish salvage facilities would not operate. Delta outflow would likely be higher in the spring but lower in the summer and fall relative to the PA, so the location of X2 and the LSZ would likely be more favorable for delta smelt. More sediment supply in the winter and spring could increase turbidity, and spawning substrate during the high-flow winter/spring period would not be reduced. However, as discussed previously, the Environmental Baseline also includes the effects of past and current ecosystem changes, including operations of the CVP and SWP, and the additional effects of habitat restoration, predation from invasives, water quality, and other effects on species from Federal, State, and private actions to inform the current condition of the delta smelt.

A Current Operations scenario has been incorporated into our effects analysis to aid in identifying aggregate effects (including identifying future effects of the PA components that have not changed from current operations, as well as identifying effects of the components of the PA). Where adverse effects of the PA are expected to increase relative to current operations, those increases and to which life stages they occur, have been explained in our effects analysis. Where it is currently unknown what effects will occur because of a lack of specific information about how the action will be implemented, those have also been noted. There have also been numerous other consultations and projects that have affected delta smelt in addition to past consultations on operations of the CVP and SWP. Additional factors such as habitat restoration, dredging activities, scientific monitoring and research, aquatic weed control, in-water construction projects, predation from non-native fishes, water quality, and other effects from Federal, State, and private actions are also factors that are part of the baseline. These past actions have contributed to the current condition of the species within the Action Area. Therefore, the summaries of aggregate effects to the delta smelt and its critical habitat described below for use in considering whether or not the PA is likely to jeopardize delta smelt or destroy or adversely modify critical habitat (pursuant to the *Analytical Framework for the Jeopardy Determination* and *Analytical Framework for the Adverse Modification Determination*) reflect our consideration of the effects of the PA in light of the without action scenario, the effects of past and current operations of the CVP and SWP, all other relevant factors, and cumulative effects.

*Summary of the Effects of the PA on the Reproduction, Numbers, and Distribution of Delta Smelt*

<u>Reproduction</u>

Operations of the CVP and SWP as described in the PA will have impacts to delta smelt reproduction. Favorable conditions in the winter and spring months are critical to successful adult delta smelt dispersal and spawning. Overall, modeling provided in the BA shows that under the PA scenario, OMR flows would, on average, be slightly more negative than the modeled COS. In addition, the Storm-Related OMR Flexibility action will allow for maximum exports to

be taken during storm events, which may result in OMR flows more negative than -5,000 cfs unless certain conditions are present, such as the risk of formation of a continuous turbidity bridge. However, OMR Management actions and Additional Real-Time OMR Restrictions are designed to provide adult protections to minimize entrainment and are expected to provide conditions similar to the COS. While appropriate spawning substrate exists in the lower San Joaquin River, reverse flows in Old and Middle rivers and a high abundance of predators are presumed to be a significant pressure on delta smelt survival in the south Delta, and few are presumed to survive to reproduce. Entrained adults that do survive to spawn will do so in an environment that subjects their progeny to pressures of entrainment and predation that may exceed those experienced by the adults. However, the majority of dispersing delta smelt adults in most years move up the Sacramento River or into Suisun Marsh as evidenced by historical surveys (Polansky *et al.* 2018), where individuals are much less likely to be entrained into the south Delta, and larvae are entrained from these distant locations at much lower rates than if they were spawned in the San Joaquin channels of the south Delta. In addition, a suite of protective OMR actions will generally keep OMR flow and turbidity within levels that are expected to be similarly protective of dispersing adult delta smelt as those that have occurred over the past decade. The proposed use of quantitative hydrodynamic and delta smelt life cycle models will help ensure that delta smelt recruitment is not impacted by entrainment losses.

The increased production at FCCL and near-term population supplementation will help conserve diversity and increase resilience, and begin to augment the reproduction of delta smelt in the wild. Greater numbers of successfully reproducing delta smelt will bolster the resilience of the population in poor recruitment years and allow the population to withstand conditions such as drought. Eventually, production and supplementation will be substantially increased through the Delta Fish Species Conservation Hatchery, providing additional benefits to delta smelt.

*Numbers*

By operating the existing CVP and SWP export facilities, there is ongoing potential risk to delta smelt individuals (especially larvae, juveniles, and adults) from entrainment or impingement and increased predation rates. Entrainment levels are expected to remain similar for adults but to slightly increase for larvae and juveniles under the modeled PA conditions relative to the COS. However, Reclamation proposes to implement a suite of protective OMR Management actions (for delta smelt and salmonids) and single-year loss thresholds (only for salmonids) that we anticipate will maintain conditions that are similarly protective for adult delta smelt as those that have been in place since 2009. The intent of actions slated from December to March will be to minimize the effect of entrainment to adult delta smelt dispersing into the south Delta, which will minimize the number of entrained individuals and their progeny that are subjected to entrainment, poor habitat conditions and predation. The proposed larval and juvenile delta smelt protective action is intended to limit entrainment of this life stage to a level that will not exceed the threshold identified by Service life cycle models through real-time management.

The spatial extent of high suitability rearing habitat will be somewhat lower under the PA in Wet years, and somewhat higher in Above Normal and Below Normal years than what would be anticipated under the COS. This statement is largely limited to the months of September and October of Wet and Above Normal water years due to the explicit differences in operations rules

between the PA and COS. The suite of management interventions in the Summer-Fall Habitat Action is intended to focus benefits into places like the Cache Slough Complex and Suisun Marsh where outcomes can be controlled and observed fairly carefully, and it will add actions to Below Normal water years, potentially increasing the frequency of years that the delta smelt population receives some helpful management intervention. The effects to individuals and to the population of this adaptive set of actions cannot be quantified at this time. However, the Service anticipates that the actions identified would continue to provide low-salinity habitat in Honker and Grizzly Bays and Suisun Marsh in Above Normal and Wet years and increase its frequency in Suisun Marsh in Below Normal years. Additionally food enhancement actions, described at a programmatic level at this time, may provide better feeding conditions for delta smelt in Suisun Marsh and the Cache Slough Complex. The structured decision making process called for under this action will incorporate new results each year to help refine the potential benefits that may be realized.

The proposed increased production at FCCL and near-term population supplementation will help to offset adverse effects from operations and begin to augment the numbers of delta smelt in the wild. Greater numbers of successfully reproducing delta smelt will bolster the resilience of the population in poor recruitment years and allow the population to withstand poor conditions such as drought. Eventually, production and supplementation will be substantially increased through the Delta Fish Species Conservation Hatchery. Another key component of the FCCL and conservation hatchery project elements is the development of a supplementation strategy and genetics plan. The implementation of a supplementation program will provide benefits by maintaining a genetic bank and reintroducing individuals to alleviate effects of further population decline. The Delta Fish Species Conservation Hatchery is a programmatic project element and will require future consultation.

DWR and Reclamation have committed to completing tidal habitat restoration efforts (8,000 acres) in the Delta by 2030 and the Service is closely involved in planning and permitting processes via the Fishery Agency Strategy Team. The goal of this restoration program is to provide food web benefits to delta smelt in the North Delta Arc. Momentum has been building recently in acquiring lands, designing, and constructing projects which is expected to continue to complete this important effort.

### *Distribution*

Under the PA, the distribution of adult delta smelt will remain largely similar to what would be expected based on the COS. Reclamation and DWR have proposed to manage OMR at the onset of adult dispersal and through the spawning period to minimize any reduction in habitat that might result from periods of higher exports. Larvae that hatch in these areas rely on net downstream transport flows in the spring to avoid eventual entrainment or predation within the large SAV beds in the channels and flooded islands of the south Delta (Appendix 2). Thus, the more negative OMR flow modeled in April and May under the PA relative to the COS may increase the southward transport and entrainment of young-of-the-year delta smelt, but OMR management is anticipated to keep loss of the larval and juvenile life stage within the threshold identified by the Service life cycle models.

Other factors that may affect delta smelt distribution include the operation of the agricultural barriers and the DCC. Dispersing adults may come into contact with these structures as they are moving upstream, but this possibility is low given that the agricultural barriers are put into place relatively late (April) to when delta smelt are no longer thought to be dispersing large distances. Larval distributions will be affected much more by OMR than the operation of the temporary barriers. Based on historical distribution, it is unlikely that this will affect a large number of individuals that were not already entrained into Old and Middle rivers. Individuals encountering the agricultural barriers may be precluded from moving within the channel and made more vulnerable to predators hovering around the barriers and gates, but these fish were already assumed to be entrained or lost to predators in our effects analysis. It is unknown what (if any) effects the DCC or SMSCG operations have on dispersing adults.

The implementation of the PA may lead to contraction of delta smelt distribution by shifting the LSZ east in Wet years relative to the COS during September through December. Maintenance of X2 at 80 km would have fewer effects on delta smelt distribution than the effects predicted based on the PA modeling. The proposed management actions for the Summer-Fall Habitat component include maintaining X2 at a monthly average 80 km in September and October of Wet and Above Normal years, operation of the SMSCG in Below Normal and Above Normal years, and potentially in Wet years, and commitment to food enhancement actions. The PA will provide more suitable rearing habitat for juvenile delta smelt in Honker and Grizzly bays than was predicted in the CalSim II modeling.

The increased production at FCCL and near-term population supplementation will help to offset adverse effects from the PA operations and begin to augment the numbers of delta smelt in the wild which is anticipated to increase distribution. Greater numbers of successfully reproducing delta smelt will bolster the resilience of the population in poor recruitment years and allow the population to withstand conditions such as drought. Eventually, production and supplementation will be substantially increased through the Delta Fish Species Conservation Hatchery.

Overall, while the PA will result in certain negative effects to the reproduction, numbers and distribution of delta smelt, it will also result in beneficial effects through protective real-time operations actions, habitat restoration, and the funding and implementation of a delta smelt supplementation program. Near-term population supplementation will help offset the negative effects of the PA. Augmentation of delta smelt in the wild will enhance the resiliency of the delta smelt population and make them less vulnerable to stochastic events.

### 5.6.2  Effects of the Aggregate Status of the Critical Habitat/Environmental Baseline, and Proposed Action on Critical Habitat for Delta Smelt

The purpose of the aggregate analysis is to evaluate the combined status of critical habitat, the effects of the PA and the cumulative effects of non-Federal activities to determine their combined effects to the conservation value of the critical habitat.

*Summary of the Status and Environmental Baseline for Critical Habitat*

As discussed in the *Status of the Critical Habitat Within the Action Area*, the status of the delta smelt critical habitat would be improved under the without action scenario with respect to PCE 1- Physical Habitat, and PCE 2-Water. For PCE 1-Physical Habitat, there would be greater supply of spawning habitat during the winter and spring because outflow is higher. For PCE 2-Water, there would be higher winter-spring inflow and accompanying sediment into the Delta resulting in increased turbidity during winter and spring, as well as the potential for higher resuspension of sediment during summer and fall (Schoellhamer 2011), though this would be affected somewhat by wind speeds (Bever *et al.* 2018). Under the COS, the location of X2 would on average be further westward/downstream in some of the months that juvenile smelt would be rearing (September-November). The status of delta smelt critical habitat is poor (Table 5-3). The major factors currently limiting the conservation value of critical habitat are:

<u>PCE 1 – Physical habitat</u>
Dredging and shipping channel maintenance maintain the estuary's current bathymetry (water depths and water depth variability), and the associated water supply demands needed to maintain the LSZ in Suisun Bay. Levees are covered in large riprap for erosion protection which over time may have reduced the availability of spawning habitat along channel margins in the Delta. By locking the channels in place, it limits or eliminates ecological processes that result from channel meander reducing sediment turnover and enabling SAV to form expansive beds. Over time, these mechanisms may have reduced the availability of spawning habitat along channel margins in the Delta. Although altered, spawning habitat appears to be suitable in parts of Suisun Bay, and the larger channels of Suisun Marsh, the lower Sacramento River to the I-Street bridge (including Cache Slough) and parts of the lower San Joaquin River to approximately the City of Stockton.

<u>PCE 2 – Water quality</u>
At the Cache Slough/Liberty Island and the upper Sacramento Deepwater Ship Channel where food availability appears to be adequate (Hammock *et al*. 2015), over-summer water temperatures are warm, increasing metabolic rates, and signs of contaminant exposure have been observed, with urban or agricultural pesticide runoff being likely sources (Weston *et al*. 2014). Perhaps due to the extended warm, low flow conditions that resulted from the recent drought, the proliferation of SAV is worsening in the Cache Slough Complex as well. Agricultural drain water and urban stormwater runoff result in the continual presence of low levels of herbicides, fungicides and insecticides throughout critical habitat. Sediment loading from the Sacramento River watershed continues to decline, reducing sediment load available for the resuspension needed to generate turbid conditions. This likely reduces cover from predators and the light scatter that larvae need to find prey (Baskerville-Bridges *et al*. 2004; Schreier *et al*. 2016). Although water temperatures are a little lower, food availability at the confluence of the Sacramento and San Joaquin and downstream into Suisun Bay is more limited in its ability to support rearing juveniles due to the removal of plankton by the invasive overbite clam (Hammock *et al.* 2015). The water quality PCE is most appropriate in the lower Sacramento River downstream of Rio Vista and in Suisun Bay and Marsh. Fish show less evidence of contaminant-related tissue damage in these areas.

*PCE 3 – River flow*

Increasing winter river flows, which serve as queues for adult dispersal prior to spawning are appropriate in the Sacramento River and less frequently in the San Joaquin River. In summer, the LSZ has been located upstream into the river channels away from the wind-driven turbidity found in the shallows of Suisun Bay and Marsh. The Delta, particularly since 2011, has seen a proliferation of non-native invasive aquatic vegetation possibly as a result of warmer temperatures, and lessened scour as a result of reduced outflow associated with drought (IEP 2018). Watershed sediment depletion, high summer inflows to the Delta that do not translate into high outflow, and invasive plants, have worked together to increase water clarity and favor non-native fishes (Moyle and Bennett 2008). Modifications to export operations by the 2008 BiOp RPA have resulted in improved larval and juvenile transport flows in the San Joaquin River via Old and Middle river flow, but there is still some entrainment risk to delta smelt adults, larvae and juveniles.

*PCE 4 – Salinity*

In the winter and spring salinities are suitable for adult dispersal, spawning and larval transport. For juvenile rearing, however, water storage, upstream diversions and reduced outflow have contributed to a more spatially restricted LSZ, which, in turn, has impacted the extent and quality of habitat (Feyrer *et al*. 2011; Bever *et al*. 2016). Currently, summer-fall salinities in Suisun Bay, Suisun Marsh and Montezuma Slough are within delta smelt salinity tolerance during the juvenile rearing period (Komoroske *et al.* 2016). However, delta smelt seldom occur in the estuary where salinities can begin to cause physiological stress, and salinity increases linked to changes in Delta outflow tend to be associated with an eastward shift in the spatial distribution of the delta smelt population (Nobriga *et al.* 2008; Feyrer *et al*. 2007; 2011; Sommer *et al*. 2011).

*Summary of the Effects of the Proposed Action on Delta Smelt Critical Habitat*

As discussed in the *Status of Critical Habitat Within the Action Area*, the status of the delta smelt population suggests that the current condition of critical habitat is poor. The PA targets appropriate actions to improve delta smelt habitat, although the magnitude and timing of any benefits to delta smelt from habitat restoration and food enhancement actions are uncertain. The PA will result in: (1) small reductions in the food web resulting from increases to exports, but which may be minimized by habitat restoration and food enhancement actions; (2) a Summer-Fall Habitat Action that will provide adequate salinity and possibly elevated food availability in Suisun Marsh in three of five water year types; and (3) improved critical habitat conditions in Wet and Above Normal years as compared to the CalSim II modeling, but generally less favorable critical habitat conditions in Wet years as compared to the COS, and in the months of November and December.

As compared to the COS, the PA concurrently provides adverse and beneficial effects to delta smelt critical habitat (Table 5-8). The PA will have small adverse effects to food web transport and negligible effects to sediment load (PCE 2) from increases in exports; however, these adverse effects are reduced when evaluated with other Proposed Action components (i.e., remainder of the 8,000 acres of tidal habitat restoration, food augmentation studies, Summer-Fall Habitat Action).

As indexed by OMR flows more negative than -5000, CalSim II modeling of the PA predicts a disruption of river flows during adult dispersal and larval and juvenile transport relative to the COS. Proposed OMR management includes short-term restrictions that should maintain this PCE via turbidity management during adult dispersal.

As indicated by hydrodynamic modeling, the PA would degrade salinity for juvenile rearing in Wet years in September through December with monthly average X2 predicted to be upstream of the COS X2 position. The PA would also increase the frequency of time in which the LSZ is located upstream of 85 km, east of the Suisun embayments and into the more uniformly deep river channels. Predicted adverse salinity conditions from water operations should be minimized by the Summer-Fall Habitat Action which will support contiguous low-salinity habitat from Cache Slough Complex to the Suisun Marsh from June to October through summer and fall SMSCG operations and outflow augmentation in conjunction with food actions to supplement the prey base for delta smelt. Because Reclamation and DWR would maintain X2 at a monthly average 80 km in September and October of Wet and Above Normal years, the action would provide appropriate rearing habitat in Honker Bay, upper Grizzly Bay, and Suisun Marsh. The modeling predicts degraded habitat conditions compared to the COS in November and December, which are consequential for an annual fish. Improved conditions beyond those modeled are likely to occur, primarily in Suisun Marsh, in November and December in the years following the Summer-Fall Habitat Action. In years without the action, conditions will be similar to those predicted by the modeling, which in Dry and Critical water years is the same as the COS.

The spatial extent of high suitability rearing habitat will be somewhat lower under the PA in Wet years, and somewhat higher in Above Normal and Below Normal years than under the COS. This statement is largely limited to the months of September and October of Wet and Above Normal water years due to the explicit differences in operations rules between the PA and COS. The suite of management interventions in the Summer-Fall Habitat Action is intended to focus benefits into places like the Cache Slough Complex and Suisun Marsh where outcomes can be controlled and observed fairly carefully, and it will add actions to Below Normal water years, potentially increasing the frequency of years that the delta smelt population and its critical habitat receive some helpful management intervention. The Service anticipates that the actions identified would continue to provide low-salinity habitat in Honker and Grizzly Bays and Suisun Marsh in Above Normal and Wet years and increase its frequency in Suisun Marsh in Below Normal years. Additionally food enhancement actions, described at a programmatic level at this time, may provide better feeding conditions for delta smelt in Suisun Marsh and the Cache Slough Complex. The structured decision making process called for under this action will incorporate new results each year to help refine the potential benefits that may be realized.

The effects to water quality resulting from the PA are likely to be negligible for all delta smelt life stages, and effects to river flow for larval and juvenile transport and adult dispersal are anticipated to be overall similar to the COS. For rearing delta smelt, the conservation value of physical habitat may improve as a result of restored tidal marsh habitat. The frequency of years that actions will occur that are designed to reduce salinity intrusion may increase, although the spatial extent of suitable low-salinity rearing habitat varies depending on water year type.

Conditions in November and December would be less favorable in all water year types. Food enhancement may provide better feeding conditions for rearing delta smelt.

5.6.3 Summary of Effects in the Aggregate to Species and Critical Habitat

The abundance of delta smelt has been declining for many years. There are many causes for this decline, including the effects of past water operations. All indications are that this decline will continue into the future without intervention, such as supplementation of the wild population. Various factors have contributed to the current condition of delta smelt, including projects that have caused reduced water quality, habitat loss or modification, and direct mortality of delta smelt. It is likely that effects of ongoing and future factors, such as climate change, will contribute to continuation of the decline. There are some actions that have been or are planned with the intention of making delta smelt more resilient to the ongoing threats (e.g. Delta Smelt Resiliency Strategy). Restoration efforts have been completed or are underway which are designed to contribute to the food web for delta smelt. Reclamation and DWR have also proposed to conduct a sediment supplementation feasibility study to determine methods to reintroduce sediment in the Delta to increase turbidity which would provide better habitat conditions for all life stages of delta smelt, including increased cover for juveniles and feeding facilitation for larval smelt.

It is anticipated that the PA will have negative, positive, and uncertain effects on delta smelt. Overall, modeling provided in the BA predicts that under the PA scenario, OMR flows would, on average, be slightly more negative than the modeled COS, particularly in April and May when larvae that are spawned in to the south Delta will be most susceptible. However, the majority of dispersing delta smelt adults in most years move up the Sacramento River as evidenced by historical surveys, where individuals (including eggs and larvae) will not be entrained to the pumps. A suite of protective OMR actions will generally keep OMR flow and turbidity within levels that are expected to be protective of dispersing adult delta smelt. The model predicts that operations will alter and contract the suitable habitat for juvenile rearing delta smelt and increase the frequency and duration of years that the LSZ is located in areas less favorable for delta smelt. The Summer-Fall Habitat Action would improve habitat conditions from those modeled as X2 will be at 80 km during Wet and Above Normal years, the SMSCG will be operated to create fresher conditions in the marsh, and food enhancement actions will be implemented. The Summer-Fall Habitat Action relies on a yearly structured decision-making process that will consider conditions for that year and determine what actions to implement to protect rearing delta smelt.

According to the PA modeling, OMR flows would be slightly more negative than the COS. Real-time OMR management actions are expected to help obviate this effect, which will provide similar protections to the COS for dispersing and spawning adults and their progeny. Habitat conditions for rearing delta smelt vary depending on year type, but the frequency of actions designed to improve salinity conditions may increase from the COS. Habitat restoration and supplementation will help to minimize the effects of the PA on numbers of delta smelt. The overall distribution of delta smelt is expected to remain largely similar as a result of the PA to its current distribution. There may be changes in extent and location in some seasons or water year types, depending on how some of the proposed activities are implemented.

The increased production at FCCL and the Delta Fish Species Conservation Hatchery and subsequent supplementation of the wild population will help to offset adverse effects from the operations. This may broaden the distribution of delta smelt depending on the life-stages and subsequent release locations for hatchery fish. Greater numbers of successfully reproducing delta smelt will bolster the resilience of the population in poor recruitment years and allow the population to withstand poor conditions such as drought.

As discussed in the *Status of Critical Habitat Within the Action Area*, the status of the delta smelt population suggests that the current condition of critical habitat is poor. The PA targets appropriate actions to improve delta smelt habitat, although the magnitude and timing of any benefits of habitat restoration and food web studies to delta smelt are uncertain. The PA will result in: (1) small reductions in the food web resulting from increases to exports, but which may be compensated for by habitat restoration and food web supplementation actions; (2) improved salinity and possibly food availability in Suisun Marsh and the LSZ in three of five water year types as a result of implementation of the Summer-Fall Habitat Action; and (3) improved critical habitat conditions in Wet and Above Normal years as compared to the modeling, but generally less favorable critical habitat conditions in Wet years as compared to the COS, and in the months of November and December in all water year types.

Critical habitat was designated to support delta smelt to successfully complete their life cycle. The intended conservation value of delta smelt critical habitat is to consistently provide all of the needed habitat attributes corresponding to where delta smelt reside during their life cycle. These habitat attributes need to overlap in order to provide suitable habitat for delta smelt to survive and successfully reproduce. In addition, the area of overlapping habitat attributes must be of a sufficient quantity and quality to support the population. The effects to water quality resulting from the PA are likely to be negligible for all delta smelt life stages, and effects to river flow for larval and juvenile transport and adult dispersal are anticipated to be overall similar to the COS. For rearing delta smelt, the conservation value of physical habitat may improve as a result of restored tidal marsh habitat. The frequency of years that actions will occur that are designed to reduce salinity intrusion may increase, although the spatial extent of suitable low-salinity rearing habitat varies depending on water type. Conditions in November and December would generally be less favorable in all water year types; however, it is not clear how much this change will affect the conservation value of the critical habitat in these late fall months as water temperatures cool and seasonal storms and windier weather often return to the Bay-Delta region which may improve the suitable habitat when X2 is located further east. Food enhancement may provide better feeding conditions for rearing delta smelt.

5.6.4  Summary of the Effects of the PA on the Recovery of Delta Smelt

Implementation of the PA is anticipated to contribute in various ways to the recovery needs of increased abundance, better quality and quantity of habitat, or other needs. Under the without action scenario, these PA elements would not affect delta smelt because there would be no entrainment. As compared to the current operations scenario, the entrainment risk for adult delta smelt, related to exports from the south Delta, would remain relatively the same under the PA due to the suite of protective OMR actions designed to keep OMR flow and turbidity within

levels that are expected to be protective of dispersing adult delta smelt. Larval and juvenile entrainment may increase under the PA. The effect to the species of this increased risk is likely to be minimized by the larval/juvenile entrainment action and supplementation efforts. Reclamation has proposed to fund a program that will result in supplementation of the wild delta smelt population with captive-bred fish from FCCL within 3-5 years. By 2030, Reclamation proposes to support a Delta Fish Species Conservation Hatchery to take over the role of supplementing the wild population. The Service will ensure that the supplementation program is consistent with the recovery needs of the delta smelt. Overall, the operation and expansion of the FCCL and a Delta Fish Species Conservation Hatchery will support our work to stabilize and improve delta smelt population health.

The effects to recovery of other components of the PA, including the Summer-Fall Habitat Action, predator hotspot removal, and food subsidy activities, are unknown at this time. Further information will be developed through additional study and considerations and used to inform decisions about how to implement those actions. For the programmatic elements of the PA, subsequent consultation will be completed which will consider the effects to recovery of delta smelt.

Continuation of the habitat restoration efforts will contribute to the delta smelt food web once they are constructed and functioning, which is anticipated to increase abundance by improving food availability. The momentum that has been generated in acquiring lands, designing, and constructing restoration projects is expected to continue in order to complete the proposed habitat restoration acreage. This habitat restoration is a reasonable means of minimizing the adverse effects of the loss of individuals, on the species as a whole, and may benefit the recovery of delta smelt.

As modeled, the PA may increase the level of entrainment of adult and larval delta smelt relative to the COS. However, the negative effect of this increase of entrainment will be minimized by real-time measures that are part of the PA to protect delta smelt. Additionally, supplementation is expected to improve abundance and distribution to help bolster the wild population and make it more resilient. Habitat restoration efforts will contribute to the delta smelt food web once they are constructed and functioning, which is anticipated to contribute to the recovery need of increased abundance by improving food availability for delta smelt in areas where delta smelt should be able to access it. Therefore, the PA is not likely to preclude recovery of the delta smelt.


## 5.7 Conclusion

After reviewing the current status of the delta smelt and its critical habitat, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. Additionally, it is the Service's biological opinion that the PA is not likely to destroy or adversely modify delta smelt critical habitat. We have reached these conclusions because:

Implementation of the following protective actions in the PA are designed to minimize impacts to delta smelt and its critical habitat.

1. The PA includes OMR Management actions that will be implemented to provide protections to minimize entrainment of dispersing adult delta smelt and their progeny. This will also minimize the number of delta smelt subject to poor habitat conditions and predation. These protective actions are designed to prevent conditions which are conducive to entrainment, such as formation of turbidity bridges, and maintain the intended conservation value of critical habitat.

2. The PA includes a Summer-Fall Habitat Action that would improve habitat conditions from those modeled, including maintaining a monthly average X2 at 80 km during Wet and Above Normal years, operating the SMSCG in Below Normal and Above Normal years and potentially in Wet years (if preliminary analysis shows expected benefits) to create fresher conditions in the marsh and implementing food enhancement actions which will provide suitable rearing habitat for juvenile delta smelt in Honker and Grizzly bays, Suisun Marsh and Cache Slough.

3. The PA includes increased production at FCCL and near-term population supplementation that will help conserve diversity and increase resilience, and begin to augment the reproduction of delta smelt in the wild. Greater numbers of successfully reproducing delta smelt will bolster the resilience of the population in poor recruitment years and allow the population to withstand conditions such as drought.

4. The PA includes completion of 8,000 acres of habitat restoration for delta smelt, with the goal of providing food web benefits to delta smelt in the North Delta Arc. Momentum has been building and is expected to continue to fulfill this important measure.

The 2008 BiOp RPA included actions to reduce entrainment, provide for increased high quality low-salinity habitat in certain year types, create additional subtidal habitat and monitor ongoing operations. The current PA includes similar actions to the RPA to address entrainment risk, reduced habitat quality, and habitat restoration as articulated in the Effects Analysis. The PA addresses the stressors identified in 2008 RPA and in the Effects Analysis in a manner that is protective of delta smelt.

## 5.8 Delta Smelt Literature Cited

Aasen, G. and J. Morinaka. 2018. Status and Trends: Fish Salvage at the State Water Project's and Central Valley Project's Fish Facilities during the 2017 Water Year. IEP Status and Trends Newsletter 31(1):7. California Department of Water Resources.

Alpine, A.E. and J.E. Cloern. 1992. Trophic interactions and direct physical effects control phytoplankton biomass and production in an estuary. Limnology and Oceanography 37(5):946-955.

Ambler, J.W., J.E. Cloern, and A. Hutchinson. 1985. Seasonal cycles of zooplankton from San Francisco Bay. Hydrobiologia 129:177-197.

Andrews, S.W., E.S. Gross and P.H. Hutton. 2016. A water balance model to estimate flow through the Old and Middle River corridor. San Francisco Estuary and Watershed Science 14(2).

Andrews, S.W., E.S. Gross and P. H. Hutton. 2017. Modeling salt intrusion in the Bay-Delta prior to anthropogenic influence. Continental Shelf Research 146:58-81.

Arthur, J.F., M.D. Ball and S.Y. Baughman. 1996. Summary of federal and state water project environmental impacts in the San Francisco Bay–Delta Estuary, California. Pages 445–495 In: Hollibaugh, J.T. (ed). San Francisco Bay: The ecosystem. Pacific Division, American Association for the Advancement of Science.

Baskerville-Bridges, B., C. Lindberg and S.L. Doroshov. 2004. The effect of light intensity, alga concentration, and prey density on the feeding behavior of delta smelt larvae. Pages 219-228 In: Feyrer, F., L.R. Brown, R.L. Brown, J.J. Orsi (eds.). Early life history of fishes in the San Francisco Estuary and Watershed. AFS Symposium 39, Bethesda (MD): American Fisheries Society.

Baumsteiger, J., and P.B. Moyle, 2017. Assessing extinction. BioScience 67(4):357-366.

Bennett, W.A. 2005. Critical assessment of the delta smelt population in the San Francisco Estuary, California. San Francisco Estuary and Watershed Science 3(2). doi: http://escholarship.org/uc/item/0725n5vk

Bennett, W.A. and J.R. Burau. 2015. Riders on the storm: selective tidal movements facilitate the spawning migration of threatened Delta Smelt in the San Francisco Estuary. Estuaries and Coasts 38(3):826-835. doi: http://dx.doi.org/10.1007/s12237-014-9877-3

Bennett, W.A., W.J. Kimmerer and J.R. Burau. 2002. Plasticity in vertical migration by native and exotic estuarine fishes in a dynamic low-salinity zone. Limnology and Oceanography 47(5):1496-1507. doi: http://dx.doi.org/10.4319/lo.2002.47.5.1496

Bennett, W. A. and P.B. Moyle. 1996. Where have all the fishes gone?: interactive factors producing fish declines in the Sacramento-San Joaquin Estuary. San Francisco Bay: The Ecosystem. San Francisco State University.

Benson, N.G. 1981. The freshwater-inflow-to-estuaries issue. Fisheries 6(5):8-10.

Bever, A.J., M.L. MacWilliams, and D.K. Fullerton. 2018. Influence of an observed decadal decline in wind speed on turbidity in the San Francisco Estuary. Estuaries and Coasts 41(7):1943-1967. https://doi.org/10.1007/s12237-018-0403-x

Bever, A.J., M.L. MacWilliams, B. Herbold, L.R. Brown and F.V. Feyrer. 2016. Linking hydrodynamic complexity to delta smelt (*Hypomesus transpacificus*) distribution in the San Francisco Estuary, USA. San Francisco Estuary and Watershed Science 14(1). doi: http://dx.doi.org/10.15447/sfews.2016v14iss1art3

Bouley, P. and W. J. Kimmerer. 2006. Ecology of a highly abundant, introduced cyclopoid copepod in a temperate estuary. Marine Ecology Progress Series 324: 219-228.

Brown, L.R., W.A. Bennett, R.W. Wagner, T. Morgan-King, N. Knowles, F. Feyrer, D.H. Schoellhamer, M.T. Stacy, and M. Dettinger. 2013. Implications for future survival of Delta smelt from four climate change scenarios for the Sacramento-San Joaquin Delta, California. Estuaries and Coasts 36(4):754-774. doi: http://dx.doi.org/10.1007/s12237-013-9585-4

Brown, L.R., W. Kimmerer and R. Brown. 2009. Managing water to protect fish: a review of California's environmental water account, 2001–2005. Environmental management 43(2):357-368.

Brown, L.R., W. Kimmerer, J.L. Conrad, S. Lesmeister and A. Mueller–Solger. 2016b. Food webs of the Delta, Suisun Bay, and Suisun Marsh: an update on current understanding and possibilities for management. San Francisco Estuary and Watershed Science 14(3).

Brown, L.R., L:M. Komoroske, R.W. Wagner, T. Morgan-King, J.T. May, R.E. Connon, R.E. and N.A. Fangue. 2016a. Coupled downscaled climate models and ecophysiological metrics forecast habitat compression for an endangered estuarine fish. PloS one 11(1):e0146724.

Bulger, A.J., B.P. Hayden, M.E. Monaco, D.M. Nelson, and M.G. McCormick-Ray. 1993. Biologically-based estuarine salinity zones derived from a multivariate analysis. Estuaries 16:311-322.

Bunn, S.E., and A.H. Arthington. 2002. Basic principles and ecological consequences of altered flow regimes for aquatic biodiversity. Environmental Management 30:492-507.

Bush, E.E. 2017. Migratory life histories and early growth of the endangered estuarine Delta Smelt (*Hypomesus transpacificus*). University of California, Davis.

California Department of Finance. 2012. California county population and housing demographics. Department of Finance, State of California. http://www.dof.ca.gov/Forecasting/Demographics/Estimates/

Castillo, G., J. Morinaka, J. Lindberg, R. Fujimura, B. Baskerville-Bridges, J. Hobbs, G. Tigan and L. Ellison. 2012. Pre-Screen Loss and Fish Facility Efficiency for Delta Smelt at the South Delta's State Water Project, California. San Francisco Estuary and Watershed Science 10(4). https://escholarship.org/uc/item/28m595k4

Castillo, G. C., Sandford, M. E., Hung, T. C., Tigan, G., Lindberg, J. C., Yang, W. R., and Van Nieuwenhuyse, E. E. 2018. Using natural marks to identify individual cultured adult Delta Smelt. North American Journal of Fisheries Management 38(3):698-705.

Cloern, J.E. 2019. Patterns, pace, and processes of water quality variability in a long-studied estuary. Limnology and Oceanography 64:S192-S208. doi: 10.1002/lno.10958

Cloern, J.E., A.E. Alpine, B.E. Cole, R.L. Wong, J.F. Arthur and M.D. Ball. 1983. River discharge controls phytoplankton dynamics in the northern San Francisco Bay estuary. Estuarine, Coastal and Shelf Science 16(4):415-429.

Cloern, J.E., and A.D. Jassby. 2012. Drivers of change in estuarine-coastal ecosystems: Discoveries from four decades of study in San Francisco Bay. Reviews of Geophysics, 50(4).

Cohen, S.E., and S.M. Bollens. 2008. Diet and growth of non-native Mississippi silversides and yellowfin gobies in restored and natural wetlands in the San Francisco Estuary. Marine Ecology Progress Series 368:241-254. doi: 10.3354/meps07561

Connon, R. E., J. Geist, J. Pfeiff, A.V. Loguinov, L.S. D'Abronzo, H. Wintz, C.D. Vulpe and I. Werner. 2009. Linking mechanistic and behavioral responses to sublethal esfenvalerate exposure in the endangered delta smelt; *Hypomesus transpacificus* (Fam. Osmeridae). BMC Genomics 10:608. http://bmcgenomics.biomedcentral.com/articles/10.1186/1471-2164-10-608

Connon, R.E., S. Beggel, L.S. D'Abronzo, J.P. Geist, J. Pfeiff, A.V. Loguinov, C.D. Vulpe and I. Werner. 2011a. Linking molecular biomarkers with higher level condition indicators to identify effects of copper exposures on the endangered delta smelt (*Hypomesus transpacificus*). Environmental Toxicology and Chemistry 30(2):290-300. doi: http://dx.doi.org/10.1002/etc.400

Connon, R.E., L.A. Deanovic, E.B. Fritsch, L.S. D'Abronzo and I. Werner. 2011b. Sublethal responses to ammonia exposure in the endangered delta smelt; *Hypomesus transpacificus* (Fam. Osmeridae). Aquatic Toxicology 105(3):369-377. doi: https://doi.org/10.1016/j.aquatox.2011.07.002

Conrad, J. L., A.J. Bibian, K.L. Weinersmith, D. De Carion, M.J. Young, P. Crain, E.L. Hestir, M.J. Santos and A. Sih. 2016. Novel Species Interactions in a Highly Modified Estuary: Association of Largemouth Bass with Brazilian Waterweed *Egeria densa*. Transactions of the American Fisheries Society 145(2):249-263.
doi: http://dx.doi.org/10.1080/00028487.2015.1114521

Culberson, S., L. Bottorff, M. Roberson, and E. Soderstrom. 2008. Geophysical Setting and Consequences of Management in the Bay-Delta. Pages 37-54 In: Healey, M.C., M.D. Dettinger and R.B. Norgaard (eds.). The State of Bay-Delta Science, 2008. Sacramento, CA: CALFED Science Program.
http://meteora.ucsd.edu/cap/pdffiles/sbds_2008_final_report_101508.pdf#page=45

Culberson, S.D., T.C. Foin, and J.N. Collins. 2004. The role of sedimentation in estuarine marsh development within the San Francisco Estuary, California, USA. Journal of Coastal Research 970-979. doi**:** http://dx.doi.org/10.2112/03-0033.1

Dahm, C. N., Parker, A. E., Adelson, A. E., Christman, M. A., and Bergamaschi, B. A. 2016. Nutrient dynamics of the Delta: Effects on primary producers. San Francisco Estuary and Watershed Science 14(4).

Damon, L.J., S.B. Slater, R.D. Baxter and R.W. Fujimura. 2016. Fecundity and reproductive potential of wild female delta smelt in the upper San Francisco Estuary, California. California Fish and Game 102(4):188-210.

Davis, B.E., D.E. Cocherell, T. Sommer, R.D. Baxter, T.C. Hung, A.E. Todgham and N.A. Fangue. 2019. Sensitivities of an endemic, endangered California smelt and two non-native fishes to serial increases in temperature and salinity: implications for shifting community structure with climate change. Conservation Physiology 7(1):coy076.

Dege, M. and L.R. Brown. 2004. Effect of outflow on spring and summertime distribution and abundance of larval and juvenile fishes in the upper San Francisco estuary. Pages 49-66 In: Feyrer, F., Brown, L.R., Brown, R.L., Orsi J.J. (eds.). Early life history of fishes in the San Francisco Estuary and Watershed. American Fisheries Society Symposium 39.

Delta Protection Commission. 2012. Economic Sustainability Plan for the Sacramento-San Joaquin Delta. Prepared by Business Forecast Center, University of the Pacific. January 19, 2012.
http://www.delta.ca.gov/files/2016/10/Final_ESP_w_Appendices_2012.pdf

Delta Modeling Associates. 2012. Low salinity zone flipbook. Version 0.9, June 15, 2012. Pages 15-42 In: U. S. EPA letter to the California State Water Resources Control Board. April 17, 2012. RE: Bay-Delta Workshop 1 – Ecosystem Changes and the Low Salinity Zone.
http://www.waterboards.ca.gov/waterrights/water_issues/programs/bay_delta/docs/cmnt081712/karen_schwinn.pdf

Dettinger, M.D. 2005. From Climate-change Spaghetti to Climate-change Distributions for 21st-Century California. San Francisco Estuary and Watershed Science 3(1). http://repositories.cdlib.org/jmie/sfews/vol3/iss1/art4

Dettinger, M., J. Anderson, M. Anderson, L.R. Brown, D, Cayan and E. Maurer. 2016. Climate change and the Delta. San Francisco Estuary and Watershed Science 14(3) http://escholarship.org/uc/item/2r71j15r

Dettinger, M., B. Udall and A. Georgakakos. 2015. Western water and climate change. Ecological Applications 25(8):2069-2093. doi: http://dx.doi.org/10.1890/15-0938.1

Dubrovsky, N.M., C.R. Kratzer, L.R. Brown, J.M. Gronberg and K.R. Burow. 1998. Water Quality in the San Joaquin-Tulare Basins, California, 1992–95. US Geological Survey, Sacramento, CA. https://pubs.usgs.gov/circ/circ1159/circ1159.pdf

Dugdale, R., F. Wilkerson, A.E. Parker. A. Marchi, and K. Taberski. 2012. River flow and ammonium discharge determine spring phytoplankton blooms in an urbanized estuary. Estuarine, Coastal and Shelf Science 115:187-199.

Dugdale, R. C., F.P. Wilkerson and A.E. Parker. 2016. The effect of clam grazing on phytoplankton spring blooms in the low-salinity zone of the San Francisco Estuary: A modelling approach. Ecological Modelling 340:1-16. doi: http://dx.doi.org/10.1016/j.ecolmodel.2016.08.018

(DWR) California Department of Water Resources. 2016. Delta Smelt Resiliency Strategy. California Department of Water Resources, California Natural Resources Agency. Sacramento, CA. http://resources.ca.gov/docs/Delta-Smelt-Resiliency-Strategy-FINAL070816.pdf

(DWR) California Department of Water Resources. 2000. Suisun Marsh Monitoring Program Reference Guide. Version 2. June. Environmental Services Office. Sacramento, CA. http://www.water.ca.gov/suisun/dataReports/docs/SMSCGReferenceGuide_Version02.pdf

Eder, K.J., R.C. Kaufman, D.E. Cocherell, J.C. Lindberg, N.A. Fangue, and F.J. Loge. 2014. Longfin and delta smelt food consumption and bioenergetics assessments. Report to U.S. Bureau of Reclamation for grant R10AC20107.

Edgar, G.J., N.S. Barrett, and P.R. Last. 1999. The distribution of macroinvertebrates and fishes in Tasmanian estuaries. Journal of Biogeography 26:1169-1189.

Enos, C., J. Sutherland and M.L. Nobriga. 2007. Results of a two-year fish entrainment study at Morrow Island Distribution System in Suisun Marsh. Interagency Ecological Program Newsletter 20(1):10-19. http://www.water.ca.gov/iep/newsletters/2007/IEPNewsletterfinal3_winter2007.pdf

Enright, C., S.D. Culberson, and J.R. Burau. 2013. Broad timescale forcing and geomorphic mediation of tidal marsh flow and temperature dynamics. Estuaries and Coasts 36(6): 1319-1339. DOI 10.1007/s12237-013-9639-7

Ferrari, M.C.O., L. Ranåker, K.L. Weinersmith, M.J. Young, A. Sih and J.L. Conrad. 2014. Effects of turbidity and an invasive waterweed on predation by introduced largemouth bass. Environmental Biology of Fishes 97(1):79-90. doi: http://dx.doi.org/10.1007/s10641-013-0125-7

Feyrer, F., J.E. Cloern, L.R. Brown, M.A. Fish, K.A. Hieb and R.D. Baxter. 2015. Estuarine fish communities respond to climate variability over both river and ocean basins. Global change biology 21(10):3608-3619.

Feyrer, F., B. Herbold, S.A. Matern and P.B. Moyle. 2003. Dietary shifts in a stressed fish assemblage: consequences of a bivalve invasion in the San Francisco Estuary. Environmental Biology of Fishes 67(3):277-288.

Feyrer F., K. Newman, M. Nobriga, T. Sommer. 2011. Modeling the effects of future outflow on the abiotic habitat of an imperiled estuarine fish. Estuaries and Coasts 34(1):120-128. doi: http://dx.doi.org/10.1007/s12237-010-9343-9

Feyrer, F., K. Newman, M. Nobriga and T. Sommer. 2016. Delta Smelt Habitat in the San Francisco Estuary: A Reply to Manly, Fullerton, Hendrix, and Burnham's "Comments on Feyrer *et al.* Modeling the Effects of Future Outflow on the Abiotic Habitat of an Imperiled Estuarine Fish". Estuaries and Coasts 39(1):287-289.

Feyrer, F, M.L. Nobriga and T.R. Sommer. 2007. Multidecadal trends for three declining fish species: habitat patterns and mechanisms in the San Francisco Estuary, California, USA. Canadian Journal of Fisheries and Aquatic Science 64(4):723-734. doi: http://dx.doi.org/10.1139/f07-048

Feyrer, F., D. Portz, D. Odum, K.B. Newman, T. Sommer, D. Contreras, R. Baxter, S. Slater, D. Sereno and E. Van Nieuwenhuyse. 2013. SmeltCam: Underwater video codend for trawled nets with an application to the distribution of the imperiled delta smelt. PLoS ONE 8(7). doi: http://dx.doi.org/10.1371/journal.pone.0067829

Feyrer, F., T. Sommer and W. Harrell, W. 2006. Managing floodplain inundation for native fish: production dynamics of age-0 splittail (*Pogonichthys macrolepidotus*) in California's Yolo Bypass. Hydrobiologia 573(1):213-226.

Fisch, K.M., J.M. Henderson, R.S. Burton and B. May. 2011. Population genetics and conservation implications for the endangered delta smelt in the San Francisco Bay-Delta. Conservation genetics 12(6):1421-1434.

Fong, S., Louie, S., Werner, I., Davis, J., and Connon, R. E. 2016. Contaminant effects on California Bay–Delta species and human health. San Francisco Estuary and Watershed Science 14(4).

Forward, R.B. and R.A. Tankersley. 2001. Selective tidal-stream transport of marine animals. Pages 305-353 In Gibson, R.N., M. Barnes and R.J. Atkinson (eds). Oceanography and Marine Biology: An Annual Review 39.

Frantzich, J., T. Sommer, T. and B. Schreier. 2018. Physical and biological responses to flow in a tidal freshwater slough complex. San Francisco Estuary and Watershed Science 16(1).

Ganguly, A.R., K. Steinhaeuser, D.J. Erikson, M. Branstetter, E.S. Parish, N. Singh, J.B. Drake and L. Buja. 2009. Higher trends but larger uncertainty and geographic variability in 21$^{st}$ century temperature and heat waves. Proceedings of the National Academy of Science of the United States of America 106(37):15555-15559. doi: http://dx.doi.org/10.1073/pnas.0904495106

Gewant, D.S., and S.M. Bollens. 2005. Macrozooplankton and micronekton of the lower San Francisco Estuary: seasonal, interannual, and regional variation in relation to environmental conditions. Estuaries 28:473-485.

Gewant, D. and S.M. Bollens. 2012. Fish assemblages of interior tidal marsh channels in relation to environmental variables in the upper San Francisco Estuary. Environmental biology of fishes 94(2):483-499. doi: http://dx.doi.org/10.1007/s10641-011-9963-3

Gillson, J. 2011. Freshwater flow and fisheries production in estuarine and coastal systems: where a drop of rain is not lost. Reviews in Fisheries Science 19:168-186.

Glibert, P.M, D. Fullerton, J.M. Burkholder, J. C. Cornwell and T. M. Kana. 2011. Ecological Stoichiometry, Biogeochemical Cycling, Invasive Species, and Aquatic Food Webs: San Francisco Estuary and Comparative Systems. Reviews in Fisheries Science 19(4):358-417. doi: http://dx.doi.org/10.1080/10641262.2011.611916

Glibert, P.M., F.P. Wilkerson, R.C. Dugdale, J.A. Raven, C.L. Dupont, P.R. Leavitt, A.E. Parker, J.M. Burkholder, and T.M. Kana. 2015. Pluses and minuses of ammonium and nitrate uptake and assimilation by phytoplankton and implications for productivity and community composition, with emphasis on nitrogen-enriched conditions. Limnology and Oceanography 61:165-197.

Grimaldo, L. F., T. Sommer, N. Van Ark, G. Jones, E. Holland, P.B. Moyle, B. Herbold and P. Smith. 2009. Factors affecting fish entrainment into massive water diversions in a tidal freshwater estuary: can fish losses be managed? North American Journal of Fisheries Management 29(5):1253-1270. doi: http://dx.doi.org/10.1577/M08-062.1

Grosholz, E., and E. Gallo. 2006. The influence of flood cycle and fish predation on invertebrate production on a restored California floodplain. Hydrobiologia 568(1):91-109.

Gross, E.S., P.H. Hutton and A.J. Draper. 2018. A Comparison of Outflow and Salt Intrusion in the Pre-Development and Contemporary San Francisco Estuary. San Francisco Estuary San Francisco Estuary and Watershed Science 16(3).

Grossman, G. D. 2016. Predation on fishes in the Sacramento–San Joaquin Delta: current knowledge and future directions. San Francisco Estuary and Watershed Science 14(2).

Hamilton, S.A. and D.D. Murphy. 2018. Analysis of limiting factors across the life cycle of Delta smelt (*Hypomesus transpacificus*). Environmental management 62(2):365-382.

Hammock, B.G., Hartman, R., Slater, S.B., Hennessy, A. and Teh, S.J., 2019a. Tidal Wetlands Associated with Foraging Success of Delta Smelt. Estuaries and Coasts:1-11.

Hammock, B.G., J.A. Hobbs, S.B. Slater, S. Acuña and S.J. Teh. 2015. Contaminant and food limitation stress in an endangered estuarine fish. Science of the Total Environment 532:316-326. doi: http://dx.doi.org/10.1016/j.scitotenv.2015.06.018

Hammock, B.G., Slater, S.B., Baxter, R.D., Fangue, N.A., Cocherell, D., Hennessy, A., Kurobe, T., Tai, C.Y. and Teh, S.J., 2017. Foraging and metabolic consequences of semi-anadromy for an endangered estuarine fish. PloS ONE 12(3):p.e0173497. https://doi.org/10.1371/journal.pone.0173497

Hasenbein, M., N.A. Fangue, J.P. Geist, L.M. Komoroske, and R.E. Connon. 2016a. Physiological stress biomarkers reveal stocking density effects in late larval delta smelt (*Hypomesus transpacificus*). Aquaculture 450:108-115.

Hasenbein, M., N.A. Fangue, J. Geist, L.M. Komoroske, J. Truong, R. McPherson R.E. and Connon. 2016b. Assessments at multiple levels of biological organization allow for an integrative determination of physiological tolerances to turbidity in an endangered fish species. Conservation physiology 4(1) cow004.

Hasenbein, M., L.M. Komoroske, R.E. Connon, J. Geist and N.A. Fangue. 2013. Turbidity and salinity affect feeding performance and physiological stress in the endangered delta smelt. Integrative and Comparative Biology 53(4):620-634. doi: http://dx.doi.org/10.1093/icb/ict082

Hasenbein, M., I. Werner, L.A. Deanovic, J. Geist, E.B. Fritsch, A. Javidmehr, C, Foe, N.A. Fangue and R.E. Connon. 2014. Transcriptomic profiling permits the identification of pollutant sources and effects in ambient water samples. Science of the Total Environment 468:688-698. doi: http://dx.doi.org/10.1016/j.scitotenv.2013.08.081

Hayhoe, K., D. Cayan, C.B. Field, P.C. Frumhoff, E.P. Maurer, N.L. Miller, S.C. Moser, S.H. Schneideri, K.N. Cahill, E.E. Cleland, L. Dale, R. Drapek, R.M. Hanemann, L.S. Kalkstein, J. Lenihan, C.K. Lunch, R.P. Neilson, S.C. Sheridan and J.H. Verville. 2004. Emissions pathways, climate change, and impacts on California. Proceedings of the National Academy of Sciences of the United States of America 101(34):12422-12427. doi: http://dx.doi.org/10.1073/pnas.0404500101

He, L., and M. Nobriga. 2018. Revisiting relationships between salinity and delta smelt abundance. Presentation at the 2018 San Francisco Bay Delta Science Conference, Sacramento, CA.

Herbold, B., D.M. Baltz, L. Brown, R. Grossinger, W. Kimmerer, P. Lehman, P.B. Moyle, C.A. Simenstad, and M. Nobriga. 2014. The role of tidal marsh restoration in fish management in the San Francisco Estuary. San Francisco Estuary and Watershed Science 12(1). https://escholarship.org/content/qt1147j4nz/qt1147j4nz.pdf

Herren, J. R. and S.S. Kawasaki. 2001. Inventory of water diversions in four geographic areas in California's Central Valley. Fish Bulletin 179: 343-355. ftp://ftp.pcouncil.org/pub/Salmon%20EFH/151_Herren_and_Kawasaki_2001.pdf

Hestir, E. L., D.H. Schoellhamer, J. Greenberg, T. Morgan-King and S.L. Ustin. 2016. The effect of submerged aquatic vegetation expansion on a declining turbidity trend in the Sacramento-San Joaquin River Delta. Estuaries and Coasts 1-13. doi: http://dx.doi.org/10.1007/s12237-015-0055-z

Heubach, W. 1969. *Neomysis awatschensis* in the Sacramento-San Joaquin River Estuary. Limnology and Oceanography 14: 533-546.

Hirose, T. and K. Kawaguchi. 1998. Spawning ecology of Japanese surf smelt, *Hypomesus pretiosus japonicus* (Osmeridae), in Otsuchi Bay, northeastern Japan. Environmental biology of fishes 52(1-3):213-223.

Hobbs, J.A., W.A. Bennett and J.E. Burton. 2006. Assessing nursery habitat quality for native smelts (Osmeridae) in the low-salinity zone of the San Francisco estuary. Journal of Fish Biology 69(3):907-922. doi: http://dx.doi.org/10.1577/T06-087.1

Hobbs, J. A., Bennett, W. A., Burton, J., & Baskerville-Bridges, B. 2007b. Modification of the biological intercept model to account for ontogenetic effects in laboratory-reared delta smelt (Hypomesus transpacificus). U.S. Fishery Bulletin 105(1):30-38.

Hobbs, J.A., W.A. Bennett, J. Burton and M. Gras. 2007a. Classification of larval and adult delta smelt to nursery areas by use of trace elemental fingerprinting. Transactions of the American Fisheries Society 136(2):518-527. doi: http://dx.doi.org/10.1577/T06-087.1

Hobbs, J., P.B. Moyle, N. Fangue and R.E. Connon. 2017. Is extinction inevitable for Delta Smelt and Longfin Smelt? An opinion and recommendations for recovery. San Francisco Estuary and Watershed Science 15(2).

Hough, A.R. and E. Naylor. 1992. Biological and physical aspects of migration in the estuarine amphipod *Gammarus zaddachi*. Marine biology 112(3):437-443.

Howe, E. R., & Simenstad, C. A. 2011. Isotopic determination of food web origins in restoring and ancient estuarine wetlands of the San Francisco Bay and Delta. Estuaries and Coasts 34:597-617. DOI 10.1007/s12237-011-9376-8

Huber, M. and R. Knutti. 2012. Anthropogenic and natural warming inferred from changes in Earth's energy balance. Nature Geoscience 5(1):31-36. doi: http://dx.doi.org/10.1038/ngeo1327

Hutton, P.H., Chen, L., Rath, J.S. and Roy, S.B., 2019. Tidally-averaged flows in the interior Sacramento–San Joaquin River Delta: Trends and change attribution. Hydrological Processes 33(2):230-243.

Hutton, P. H., Rath, J. S., Chen, L., Ungs, M. J., & Roy, S. B. 2015. Nine decades of salinity observations in the San Francisco Bay and Delta: Modeling and trend evaluations. Journal of Water Resources Planning and Management 142(3), 04015069.

Hutton, P.H., J.S. Rath, S.B. Roy. 2017a. Freshwater flow to the San Francisco Bay-Delta estuary over nine decades (Part 1): Trend evaluation. Hydrological Processes 31(14):2500-2515.

Hutton, P. H., Rath, J. S., and Roy, S. B. 2017b. Freshwater flow to the San Francisco Bay-Delta estuary over nine decades (Part 2): Change attribution. Hydrological processes 31(14):2516-2529.

Hutton, P.H. and S.B. Roy. 2019. Characterizing Early 20th Century Outflow and Salinity Intrusion in the San Francisco Estuary. San Francisco Estuary and Watershed Science 17(2). https://escholarship.org/content/qt5jn0f55k/qt5jn0f55k.pdf

(IEP) Interagency Ecological Program. 2015. An updated conceptual model of Delta Smelt biology: our evolving understanding of an estuarine fish. IEP Management, Analysis and Synthesis Team. Interagency Ecological Program for the San Francisco Bay/Delta Estuary. Technical Report 90. California Department of Water Resources. http://www.water.ca.gov/iep/docs/Delta_Smelt_MAST_Synthesis_Report_January%202015.pdf

(IEP) Interagency Ecological Program. 2018. Framework for Aquatic Vegetation Monitoring in the Delta Aquatic Vegetation Monitoring Subcommittee, Interagency Ecological Program Aquatic Vegetation Project Work Team. July 2018.

(IPCC) Intergovernmental Panel on Climate Change. 2001: Climate Change 2001: The Scientific Basis. Contribution of Working Group I to the Third Assessment Report of the Intergovernmental Panel on Climate Change, Houghton, J.T., Y. Ding, D.J. Griggs, M. Noguer, P.J. van der Linden, X. Dai, K. Maskell, and C.A. Johnson (eds.). Cambridge University Press, Cambridge, UK.
http://www.ipcc.ch/ipccreports/tar/wg1/index.php?idp=0

(IPCC) Intergovernmental Panel on Climate Change. 2007a. Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Solomon, S., D. Qin, M. Manning, Z. Chen, M. Marquis, K.B. Averyt, M. Tignor and H.L. Miller (eds.). Cambridge University Press, Cambridge, UK.
http://www.ipcc.ch/publications_and_data/publications_ipcc_fourth_assessment_report_wg1_report_the_physical_science_basis.htm

(IPCC) Intergovernmental Panel on Climate Change. 2007b: Climate Change 2007: Impacts, Adaptation and Vulnerability. Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, M.L. Parry, O.F. Canziani, J.P. Palutikof, P.J. van der Linden and C.E. Hanson (eds.). Cambridge University Press, Cambridge, UK.
http://www.ipcc.ch/pdf/assessment-report/ar4/wg2/ar4_wg2_full_report.pdf

(IPCC) Intergovernmental Panel on Climate Change. 2014. Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. IPCC, Geneva, Switzerland.
http://www.ipcc.ch/pdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full_wcover.pdf

Jasper, J. T., Z.L. Jones, J.O. Sharp and D.L. Sedlak. 2014. Nitrate removal in shallow, open-water treatment wetlands. Environmental Science & Technology 48(19):11512-11520.

Jassby, A. 2008. Phytoplankton in the upper San Francisco Estuary: recent biomass trends, their causes, and their trophic significance. San Francisco Estuary and Watershed Science 6(1).
https://escholarship.org/uc/item/71h077r1

Jassby, A.D. and J.E. Cloern. 2000. Organic matter sources and rehabilitation of the Sacramento-San Joaquin Delta (California, USA). Aquatic Conservation: Marine and Freshwater Ecosystems 10(5):323-352.
https://sfbay.wr.usgs.gov/publications/pdf/jassby_2000_organic.pdf

Jassby, A.D., J.E. Cloern and B.E. Cole. 2002. Annual primary production: Patterns and mechanisms of change in a nutrient-rich tidal ecosystem. Limnology and Oceanography 47(3):698-712. doi: http://dx.doi.org/10.4319/lo.2002.47.3.0698

Jassby, A.D., J.E. Cloern, and T.M. Powell. 1993. Organic carbon sources and sinks in San Francisco Bay: variability induced by river flow. Marine Ecology Progress Series 1993:39-54.

Jassby, A.D., W.J. Kimmerer, S.G. Monismith, C. Armor, J.E. Cloern, T.M. Powell, J.R. Schubel, and T.J. Vendlinski. 1995. Isohaline position as a habitat indicator for estuarine populations. Ecological Applications 5(1): 272-289. doi: http://dx.doi.org/10.2307/1942069

Jeffries, K.M., R.E. Connon, B.E. Davis, L.M. Komoroske, M.T. Britton, T. Sommer, A. Todgham and N.A. Fangue. 2016. Effects of high temperatures on threatened estuarine fishes during periods of extreme drought. Journal of Experimental Biology 219(11):1705-1716. doi: http://dx.doi.org/10.1242/jeb.134528

Jeffries, K.M., L.M. Komoroske, J. Truong, I. Werner, M. Hasenbein, S. Hasenbein, N.A. Fangue and R.E. Connon. 2015. The transcriptome-wide effects of exposure to a pyrethroid pesticide on the Critically Endangered delta smelt Hypomesus transpacificus. Endangered Species Research 28(1):43-60.

Jin, J., T. Kurobe, W.F. Ramírez-Duarte, M.B. Bolotaolo, C.H. Lam, P.K. Pandey, T.C. Hung, M.E. Stillway, L. Zweig, J. Caudill and L. Lin. 2018. Sub-lethal effects of herbicides penoxsulam, imazamox, fluridone and glyphosate on Delta Smelt (*Hypomesus transpacificus*). Aquatic toxicology 197:79-88.

Kammerer, B.D., T.C. Hung, R.D. Baxter, and S.J. Teh. 2016. Physiological effects of salinity on Delta Smelt, Hypomesus transpacificus. Fish physiology and biochemistry 42(1):219-232.

Kayfetz, K., and W. Kimmerer. 2017. Abiotic and biotic controls on the copepod *Pseudodiaptomus forbesi* in the upper San Francisco Estuary. Marine Ecology Progress Series 581:85-101.

Keith, D.M., and J.A. Hutchings. 2012. Population dynamics of marine fishes at low abundance. Canadian Journal of Fisheries and Aquatic Sciences 69:1150-1163.

Kjelson, M.A., and P.L. Brandes. 1989. The use of smolt survival estimates to quantify the effects of habitat changes on salmonid stocks in the Sacramento-San Joaquin rivers, California. Canadian special publication of fisheries and aquatic sciences/Publication speciale canadienne des sciences halieutiques et aquatiques.

Kimmerer, W.J. 2002a. Physical, biological, and management responses to variable freshwater flow into the San Francisco Estuary. Estuaries 25(6):1275-1290. doi: http://dx.doi.org/10.1007/BF02692224

Kimmerer, W.J. 2002b. Effects of freshwater flow on abundance of estuarine organisms: physical effects or trophic linkages? Marine Ecology Progress Series 243:39-55. doi: http://dx.doi.org/10.3354/meps243039

Kimmerer, W.J. 2004. Open water processes of the San Francisco Estuary: from physical forcing to biological responses. San Francisco Estuary and Watershed Science 2(1). http://escholarship.org/uc/item/9bp499mv

Kimmerer, W.J. 2008. Losses of Sacramento River Chinook salmon and delta smelt to entrainment in water diversions in the Sacramento-San Joaquin Delta. San Francisco Estuary and Watershed Science 6(2). http://escholarship.org/uc/item/7v92h6fs

Kimmerer, W.J., 2011. Modeling Delta Smelt losses at the south Delta export facilities. San Francisco Estuary and Watershed Science 9(1).

Kimmerer, W.J., J.R. Burau and W.A. Bennett. 1998. Tidally oriented vertical migration and position maintenance of zooplankton in a temperate estuary. Limnology and Oceanography 43(7):1697-1709.

Kimmerer, W.J., E. Gartside and J.J. Orsi. 1994. Predation by an introduced clam as the likely cause of substantial declines in zooplankton of San Francisco Bay. Marine ecology progress series 113:81-93.

Kimmerer, W.J., E.S. Gross and M.L. MacWilliams. 2014. Tidal migration and retention of estuarine zooplankton investigated using a particle-tracking model. Limnology and Oceanography 59(3):901-916.

Kimmerer, W. J., E.S. Gross and M.L MacWilliams. 2009. Is the response of estuarine nekton to freshwater flow in the San Francisco Estuary explained by variation in habitat volume? Estuaries and Coasts 32(2):375. http://www.jstor.org/stable/40663547

Kimmerer, W.J., E.S. Gross, A.M. Slaughter and J.R. Durand. 2018a. Spatial Subsidies and Mortality of an Estuarine Copepod Revealed Using a Box Model. Estuaries and Coasts 42(1):218-236.

Kimmerer, W. and A. Gould. 2010. A Bayesian approach to estimating copepod development times from stage frequency data. Limnology and Oceanography: Methods 8(4):118-126.

Kimmerer, W.J., T.R. Ignoffo. A.M. Slaughter and A.L. Gould. 2014. Food-limited reproduction and growth of three copepod species in the low-salinity zone of the San Francisco Estuary. Journal of Plankton Research 36(3):722-735.

Kimmerer, W., T.R. Ignoffo, B. Bemowski, J. Modéran, A. Holmes and B. Bergamaschi. 2018b. Zooplankton Dynamics in the Cache Slough Complex of the Upper San Francisco Estuary. San Francisco Estuary and Watershed Science 16(3).

Kimmerer, W.J., T.R. Ignoffo, K.R. Kayfetz and A.M. Slaughter. 2018c. Effects of freshwater flow and phytoplankton biomass on growth, reproduction, and spatial subsidies of the estuarine copepod *Pseudodiaptomus forbesi*. Hydrobiologia 807(1):113-130.

Kimmerer, W.J., M.L. MacWilliams and E.S. Gross. 2013. Variation of fish habitat and extent of the low-salinity zone with freshwater flow in the San Francisco Estuary. San Francisco Estuary and Watershed Science 11(4). http://escholarship.org/uc/item/3pz7x1x8

Kimmerer, W.J. and M.L. Nobriga. 2008. Investigating Particle Transport and Fate in the Sacramento–San Joaquin Delta Using a Particle-Tracking Model. San Francisco Estuary and Watershed Science 6(1). https://escholarship.org/uc/item/547917gn

Kimmerer, W.J. and J.J. Orsi. 1996. Changes in the zooplankton of the San Francisco Bay Estuary since the introduction of the clam *Potamocorbula amurensis*. San Francisco Bay: The Ecosystem:403-424.

Kimmerer, W.J. and K.A. Rose. 2018. Individual-Based Modeling of Delta Smelt Population Dynamics in the Upper San Francisco Estuary III. Effects of Entrainment Mortality and Changes in Prey. Transactions of the American Fisheries Society 147(1):223-243.

Kimmerer, WJ, J.K. Thompson. 2014. Phytoplankton growth balanced by clam and zooplankton grazing and net transport into the low-salinity zone of the San Francisco Estuary. Estuaries and Coasts 37(5):1202-1218. doi: http://dx.doi.org/10.1007/s12237-013-9753-6

Knowles, N. and D.R. Cayan. 2002. Potential effects of global warming on the Sacramento/San Joaquin watershed and the San Francisco estuary. Geophysical Research Letters 29(18). doi: http://dx.doi.org/10.1029/2001GL014339

Knutson, Jr., A.C. and J.J. Orsi. 1983. Factors regulating abundance and distribution of the shrimp *Neomysis mercedis* in the Sacramento-San Joaquin Estuary. Transactions of the American Fisheries Society 112(4):476-485.

Komoroske, L.M., R.E. Connon, K.M. Jeffries and N.A. Fangue. 2015. Linking transcriptional responses to organismal tolerance reveals mechanisms of thermal sensitivity in a mesothermal endangered fish. Molecular ecology 24(19):4960-4981.

Komoroske, L.M., R.E. Connon, J. Lindberg, B.S. Cheng, G. Castillo, M. Hasenbein, and N. A. Fangue. 2014. Ontogeny influences sensitivity to climate change stressors in an endangered fish. Conservation Physiology 2. http://conphys.oxfordjournals.org/content/2/1/cou008.short

Komoroske, M., K.M. Jeffries, R.E. Connon, J. Dexter, M. Hasenbein, C. Verhille and N.A. Fangue. 2016. Sublethal salinity stress contributes to habitat limitation in an endangered estuarine fish. Evolutionary Applications. doi: http://dx.doi.org/10.1111/eva.12385

Kratina, P., R. Mac Nally, W.J. Kimmerer, J.R. Thomson and M. Winder. 2014. Human-induced biotic invasions and changes in plankton interaction networks. Journal of Applied Ecology 51(4):1066-1074. doi: http://dx.doi.org/10.1111/1365-2664.12266

Kuivila, K.M. and G.E. Moon. 2004. Potential exposure of larval and juvenile delta smelt to dissolved pesticides in the Sacramento-San Joaquin Delta, California. Pages 229-242 In: Feyrer, F., Brown L.R., Brown R.L., Orsi J.J. (eds.). Early life history of fishes in the San Francisco Estuary and watershed. American Fisheries Society Symposium 39. Bethesda (MD): American Fisheries Society. https://wwwrcamnl.wr.usgs.gov/tracel/references/pdf/AmFishSocSymp_v39p229.pdf

Kurobe, T., M.O. Park, A. Javidmehr, F.C. Teh, S.C. Acuña, C.J. Corbin, A.J. Conley, W.A. Bennett and S.J. Teh. 2016. Assessing oocyte development and maturation in the threatened Delta Smelt, *Hypomesus transpacificus*. Environmental Biology of Fishes 99(4):423-432. doi: http://dx.doi.org/10.1007/s10641-016-0483-z

LaCava, M., K. Fisch, M. Nagel, J.C. Lindberg, B. May, and A.J. Finger. 2015. Spawning behavior of cultured delta smelt in a conservation hatchery. North American Journal of Aquaculture 77:255-266. http://dx.doi.org/10.1080/15222055.2015.1007192

Latour, R.J. 2016. Explaining Patterns of Pelagic Fish Abundance in the Sacramento-San Joaquin Delta. Estuaries and Coasts 39(1):233-247. doi: http://dx.doi.org/10.1007/s12237-015-9968-9

Lehman, P.W., C. Kendall, M.A. Guerin, M.B. Young, S.R. Silva, G.L. Boyer, and S.J. Teh. 2014. Characterization of the *Microcystis* bloom and Its nitrogen supply in San Francisco estuary using stable isotopes. Estuaries and Coasts 38:165-178. doi: http://dx.doi.org/10.1007/s12237-014-9811-8

Lehman, P. W., Mayr, S., Mecum, L., and Enright, C. 2010. The freshwater tidal wetland Liberty Island, CA was both a source and sink of inorganic and organic material to the San Francisco Estuary. Aquatic Ecology 44(2):359-372.

Lessard, J., B. Cavallo, P. Anders, T. Sommer, B. Schreier, D. Gille, A. Schreier, A. Finger, T-C. Hung, J. Hobbs, B. May, A. Schultz, O. Burgess, and R. Clarke. 2018. Considerations for the use of captive-reared delta smelt for species recovery and research. San Francisco Estuary and Watershed Science 16(3): https://doi.org/10.15447/sfews.2018v16iss3art3

Liermann, M., and R. Hilborn. 2001. Depensation: evidence, models, and implications. Fish and Fisheries 2:33-58.

Lindberg, J.C., G. Tigan, L. Ellison, T. Rettinghouse, M.M. Nagel and K.M. Fisch. 2013. Aquaculture methods for a genetically managed population of endangered Delta Smelt. North American Journal of Aquaculture 75(2):186-196. doi: http://dx.doi.org/10.1080/15222055.2012.751942

Lopez, C.B., J.E. Cloern, T.S. Schraga, A.J. Little, L.V. Lucas, J.K. Thompson and J.R. Burau. 2006. Ecological values of shallow-water habitats: implications for the restoration of disturbed ecosystems. Ecosystems 9(3):422-440.

Lucas, L.V., J.E. Cloern, J.K. Thompson and N.E. Monsen. 2002. Functional variability of habitats within the Sacramento–San Joaquin Delta: restoration implications. Ecological Applications 12(5):1528-1547.
doi: http://dx.doi.org/10.1890/1051-0761(2002)012[1528:FVOHWT]2.0.CO;2

Mac Nally, R., J.R. Thomson, W.J. Kimmerer, F. Feyrer, K.B. Newman, A. Sih, W.A. Bennett, L. Brown, E. Fleishman, S.D. Culberson and G. Castillo. 2010. Analysis of pelagic species decline in the upper San Francisco Estuary using multivariate autoregressive modeling (MAR). Ecological Applications 20(5):1417-1430.

MacWilliams, M., A.J. Bever and E. Foresman. 2016. 3-D simulations of the Bay-Delta with subgrid bathymetry to explore long-term trends in salinity distribution and fish abundance. Bay-Delta and Watershed Science 14(2).

MacWilliams, M.L., A.J. Bever, E.S. Gross, G.S. Ketefian, W.J. Kimmerer. 2015. Three-dimensional modeling of hydrodynamics and salinity in the Bay-Delta: An evaluation of model accuracy, X2, and the low–salinity zone. Bay-Delta and Watershed Science 13(1).

Mager, R.C., S.I. Doroshov, J.P. Van Eenennaam and R.L. Brown. 2004. Early life stages of delta smelt. Pages 169-180 in Feyrer, F., Brown, L.R., Brown, R.L., and Orsi, J.J. (eds.). Early life history of fishes in the San Francisco Estuary and Watershed. American Fisheries Society Symposium 39, Bethesda, MD.

Mahardja, B., J.A. Hobbs, N. Ikemiyagi, A. Benjamin and A.J. Finger. 2019. Role of freshwater floodplain-tidal slough complex in the persistence of the endangered delta smelt. PloS ONE 14(1):e0208084.

Mahardja, B., M.J. Young, B. Schreier, and T. Sommer. 2017a. Understanding imperfect detection in a San Francisco Estuary long-term larval and juvenile fish monitoring programme. Fisheries Management and Ecology 24:488-503.

Mahardja, B., M.J. Farruggia, B. Schreier, and T. Sommer. 2017b. Evidence of a shift in the littoral fish community in the Sacramento-San Joaquin Delta. PLOS One 12(1):e0170683. doi:10.1371/journal.pone.0170683

Manly, B.F.J., D. Fullerton, A.N. Hendrix and K.P. Burnham. 2015. Comments on Feyrer *et al.* "modeling the effects of future outflow on the abiotic habitat of an imperiled estuarine fish". Estuaries and coasts 38(5):1815-1820.

Matern, S.A., P.B. Moyle and L.C. Pierce. 2002. Native and alien fishes in a California estuarine marsh: twenty-one years of changing assemblages. Transactions of the American Fisheries Society 131(5):797-816.
doi: http://dx.doi.org/10.1577/1548-8659(2002)131<0797:NAAFIA>2.0.CO;2

Maunder, M.N. and R.B. Deriso. 2011. A state-space multistage life cycle model to evaluate population impacts in the presence of density dependence: illustrated with application to Delta Smelt (*Hypomesus transpacificus*). Canadian Journal of Fisheries and Aquatic Sciences 68:1285-1306. doi: http://dx.doi.org/10.1139/F2011-071

Meehl, G.A., C. Covey, T. Delworth, M. Latif, B. McAvaney, J. Mitchell, R. Stouffer and K. Taylor. 2007. The WCRP CMIP3 multi-model dataset: A new era in climate change research. Bulletin of the American Meteorological Society 88:1383-1394. doi: http://dx.doi.org/10.1175/BAMS-88-9-1383

Meng, L., P.B. Moyle, and B. Herbold. 1994. Changes in abundance and distribution of native and introduced fishes of Suisun Marsh. Transactions of the American Fisheries Society 123:498-507.

Merz, J.E., P.S. Bergman, J.L. Simonis, D. Delaney, J. Pierson, and P. Anders. 2016. Long-term seasonal trends in the prey community of delta smelt (*Hypomesus transpacificus*) within the Sacramento-San Joaquin Delta, California. Estuaries and Coasts 39:1526-1536.

Merz, J.E., S. Hamilton, P.S. Bergman and B. Cavallo. 2011. Spatial perspective for delta smelt: a summary of contemporary survey data. California Fish and Game 97(4):164-189. https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=46489

Miller, W.J., B.F.J. Manly, D.D. Murphy, D. Fullerton and R.R. Ramey. 2012. An investigation of factors affecting the decline of delta smelt (*Hypomesus transpacificus*) in the Sacramento-San Joaquin Estuary. Reviews in Fisheries Science (20)1:1-19. doi: http://dx.doi.org/10.1080/10641262.2011.634930

Mitchell, L., Newman, K., & Baxter, R. 2017. A Covered Cod-End and Tow-Path Evaluation of Midwater Trawl Gear Efficiency for Catching Delta Smelt (Hypomesus transpacificus). San Francisco Estuary and Watershed Science 15(4).

Monismith, S.G. 2016. A note on Delta outflow. San Francisco Estuary and Watershed Science 14(3).

Monismith, S., J.R. Burau, and M. Stacey. 1996. Stratification dynamics and gravitational circulation in northern San Francisco Bay. Pages 123-153 In: Hollibaugh, J.T. (ed). San Francisco Bay: The ecosystem. Pacific Division, American Association for the Advancement of Science.

Monismith, S.G., W. Kimmerer, J.R. Burau, and M.T. Stacey. 2002. Structure and flow-induced variability of the subtidal salinity field in northern San Francisco Bay. Journal of Physical Oceanography 32(11):3003-3019.

Morinaka, J. 2013. Acute Mortality and Injury of Delta Smelt Associated With Collection, Handling, Transport, and Release at the State Water Project Fish Salvage Facility. Technical Report 89. November. Interagency Ecological Program, Sacramento. http://www.water.ca.gov/iep/docs/tech_rpts/TR89.IEP_Tech_Report_89_CHTR_AMI_ja morinaka_02-25-14.pdf

Moyle, P.B., 2002. Inland fishes of California: revised and expanded. Univ of California Press.

Moyle, P.B., Baxter, R.D., Sommer, T., Foin, T.C. and Matern, S.A., 2004. Biology and population dynamics of Sacramento splittail (*Pogonichthys macrolepidotus*) in the San Francisco Estuary: a review. San Francisco Estuary and Watershed Science *2*(2).

Moyle, P.B., and W.A. Bennett. 2008. The future of the Delta ecosystem and its fish. Technical Appendix D in Hanak, E., W. Fleenor, and J. Lund, Comparing futures for the Sacramento-San Joaquin Delta. University of California Press.

Moyle, P.B., L.R. Brown and J.R. Durand and J.A. Hobbs. 2016. Delta smelt: life history and decline of a once-abundant species in the San Francisco Estuary. San Francisco Estuary and Watershed Science 14(2). http://escholarship.org/uc/item/09k9f76s

Moyle, P.B., B. Herbold, D.E. Stevens and L.W. 1992. Life history and status of delta smelt in the Sacramento-San Joaquin Estuary, California. Transactions of the American Fisheries Society 121(1):67-77. doi: http://dx.doi.org/10.1577/1548-8659(1992)121<0067:LHASOD>2.3.CO;2

Moyle, P. B., Hobbs, J. A., & Durand, J. R. 2018. Delta Smelt and water politics in California. Fisheries 43(1):42-50.

Moyle, P. B., Lund, J. R., Bennett, W. A., and W.E. Fleenor. 2010. Habitat variability and complexity in the upper San Francisco Estuary. San Francisco Estuary and Watershed Science 8(3).

Mueller-Solger, A.B., Jassby, A.D., Mueller-Navarra, D.C. 2002. Nutritional quality of food resources for zooplankton (Daphnia) in a tidal freshwater system (Sacramento-San Joaquin River Delta). Limnol. Oceanogr. 47(5): 1468- 1476.

Murphy, D.D. and S.A. Hamilton. 2013. Eastern migration or marshward dispersal: exercising survey data to elicit an understanding of seasonal movement of delta smelt. San Francisco Estuary and Watershed Science 11(3). https://escholarship.org/uc/item/4jf862qz

Naylor, E. 2006. Orientation and navigation in coastal and estuarine zooplankton. Marine and Freshwater Behaviour and Physiology 39(1):13-24.

Newman, K.B. and P.L. Brandes. 2010. Hierarchical modeling of juvenile Chinook salmon survival as a function of Sacramento–San Joaquin Delta water exports. North American Journal of Fisheries Management 30(1):157-169.

Newman, K.B. and J. Rice. 2002. Modeling the survival of Chinook salmon smolts outmigrating through the lower Sacramento River system. Journal of the American Statistical Association 97(460):983-993.

(NMFS) National Marine Fisheries Service. 2009. Biological Opinion and Conference Opinion in the Long-Term Operations of the Central Valley Project and State Water Project. National Marine Fisheries Service, Southwest Region, Sacramento, CA. http://www.westcoast.fisheries.noaa.gov/central_valley/water_operations/ocap.html

Nobriga, M.L. 2002. Larval delta smelt diet composition and feeding incidence: environmental and ontogenetic influences. California Fish and Game 88(4):149-164. http://water.ca.gov/aes/docs/Nobriga_2002.pdf

Nobriga, M.L., F. Feyrer, R.D. Baxter and M. Chotkowski. 2005. Fish community ecology in an altered river delta: spatial patterns in species composition, life history strategies, and biomass. Estuaries 28(5):776-785. doi: http://dx.doi.org/10.1007/BF02732915

Nobriga, M.L., Z. Matica and Z.P. Hymanson. 2004. Evaluating entrainment vulnerability to agricultural irrigation diversions: a comparison among open-water fishes. Pp. 281-295 In: American Fisheries Society Symposium 39. American Fisheries Society. https://water.ca.gov/LegacyFiles/aes/docs/Nobriga_et_al_2004.pdf

Nobriga, M.L., T.R. Sommer, F. Feyrer and K. Fleming. 2008. Long-term trends in summertime habitat suitability for delta smelt. San Francisco Estuary and Watershed Science 6(1). http://escholarship.org/uc/item/5xd3q8tx

Orsi, J.J. 1986. Interaction between diel vertical migration of a mysidacean shrimp and two -layered estuarine flow. Hydrobiologia 137(1):79-87.

Orsi, J.J. and W.L. Mecum. 1986. Zooplankton distribution and abundance in the Sacramento-San Joaquin Delta in relation to certain environmental factors. Estuaries 9(4):326-339. doi: http://dx.doi.org/10.2307/1351412

Orsi, J.J. and W.L. Mecum. 1996. Food limitation as the probable cause of a long-term decline in the abundance of Neomysis mercedis the opossum shrimp in the Sacramento-San Joaquin estuary. San Francisco Bay: the ecosystem. American Association for the Advancement of Science, San Francisco, pp.375-401.

Parker, A.E., W.J. Kimmerer, and U.U. Lidström. 2012. Reevaluating the generality of an empirical model for light-limited primary production in the San Francisco Estuary. Estuaries and Coasts 35(4):930-942.

Parker, A.E., R.C. Dugdale and F.P. Wilkerson. 2012. Elevated ammonium concentrations from wastewater discharge depress primary productivity in the Sacramento River and the Northern San Francisco Estuary. Marine Pollution Bulletin 64(3):574-586.

doi: http://dx.doi.org/10.1016/j.marpolbul.2011.12.016

Perry, R.W., J.R. Skalski, P.L Brandes, P.T. Sandstrom, A.P. Klimley, A. Ammann and B. MacFarlane. 2010. Estimating survival and migration route probabilities of juvenile Chinook salmon in the Sacramento–San Joaquin River Delta. North American Journal of Fisheries Management 30(1):142-156.

Peterson, M.S. 2003. A conceptual view of environment-habitat-production linkages in tidal river estuaries. Reviews in Fisheries science 11(4):291-313. doi: https://doi.org/10.1080/10641260390255844

Poff, N.L., and J.K.H. Zimmerman. 2010. Ecological responses to altered flow regimes: a literature review to inform the science and management of environmental flows. Freshwater Biology 55:194-205.

Polansky, L., Mitchell, L., and Newman, K.B. 2019. Using multistage design-based methods to construct abundance indices and uncertainty measures for delta smelt. Transactions of the American Fisheries Society 148:710-724. https://afspubs.onlinelibrary.wiley.com/doi/full/10.1002/tafs.10166

Polansky, L., K.B. Newman, M.L. Nobriga and L. Mitchell. 2018. Spatiotemporal models of an estuarine fish species to identify patterns and factors impacting their distribution and abundance. Estuaries and Coasts 41(2):572-581. http://dx.doi.org/10.1007/s12237-017-0277-3

Quinn, T., Krueger, K., Pierce, K., Penttila, D., Perry, K., Hicks, T. and Lowry, D., 2012. Patterns of surf smelt, Hypomesus pretiosus, intertidal spawning habitat use in Puget Sound, Washington State. Estuaries and Coasts 35(5), pp.1214-1228.

Rath, J. S., Hutton, P. H., Chen, L., & Roy, S. B. 2017. A hybrid empirical-Bayesian artificial neural network model of salinity in the San Francisco Bay-Delta estuary. Environmental modelling and Software 93:193-208.

Reis, G.J., Howard, J.K. and J.A. Rosenfield. 2019. Clarifying Effects of Environmental Protections on Freshwater Flows to—and Water Exports from—the San Francisco Bay Estuary. San Francisco Estuary and Watershed Science 17(1).

(Reclamation et al.). United States Bureau of Reclamation, California Department of Water Resources, State and Federal Contractors Water Agency, California Department of Fish and Game, United States Fish and Wildlife Service, and National Marine Fisheries Service. 2011. Memorandum of Agreement Regarding the Early Implementation of Habitat Projects for the Central Valley Project and State Water Project Coordinated Operations and Bay Delta Conservation Plan. https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=40844

Reyes, R.C., Z.A. Sutphin and B.B. Bridges. 2012. Effectiveness of fine mesh screening a holding tank retaining larval and juvenile fish at the Tracy Fish Collection Facility. Tracy Fish Collection Facility Studies. Tracy Technical Bulletin 2012-1. U.S. Bureau of Reclamation, Mid-Pacific Region and Denver Technical Service Center.

(ROC BA) U.S. Bureau of Reclamation. 2019. Biological Assessment for the Reinitiation of Consultation on Coordinated Long-Term Operations of the Central Valley Project and State Water Project. Mid-Pacific Regional Office, Sacramento, CA.

Rose, K.A., W.J. Kimmerer, K.P. Edwards and W.A. Bennett. 2013a. Individual-based modeling of Delta Smelt population dynamics in the upper San Francisco Estuary: I. Model description and baseline results. Transactions of the American Fisheries Society 142(5):1238-1259. doi: http://dx.doi.org/10.1080/00028487.2013.799518

Rose, K.A., W.J. Kimmerer, K.P. Edwards and W.A. Bennett. 2013b. Individual-based modeling of Delta Smelt population dynamics in the upper San Francisco Estuary: II. Alternative baselines and good versus bad years. Transactions of the American Fisheries Society 142(5):1260-1272. doi: http://dx.doi.org/10.1080/00028487.2013.799519

Ruhl, C.A., D.H. Schoellhamer, R.P. Stumpf, and C.L. Lindsay. 2001. Combined use of remote sensing and continuous monitoring to analyse the variability of suspended-sediment concentrations in San Francisco Bay, California. Estuarine, Coastal, and Shelf Science 53:801-812.

Schemel, L. 2001. Simplified conversions between specific conductance and salinity units for use with data from monitoring stations. Interagency Ecological Program Newsletter 14(1):17-18.

Schoellhamer, D.H. 2011. Sudden clearing of estuarine waters upon crossing the threshold from transport to supply regulation of sediment transport as an erodible sediment pool is depleted: San Francisco Bay, 1999. Estuaries and Coasts 34(5):885-899. doi: http://dx.doi.org/10.1007/s12237-011-9382-x

Schoellhamer, D.H., Wright, S.A. and Drexler, J., 2012. A conceptual model of sedimentation in the Sacramento–San Joaquin Delta. San Francisco Estuary and Watershed Science 10(3).

Scholz, N.L., E. Fleishman, L. Brown, I. Werner, M.L. Johnson, M.L. Brooks, C.L. Mitchelmore, and D. Schlenk. 2012. A Perspective on Modern Pesticides, Pelagic Fish Declines, and Unknown Ecological Resilience in Highly Managed Ecosystems. BioScience 62(4):428–434. http://bioscience.oxfordjournals.org/content/62/4/428.full.pdf+html

Schreier, BM, M.R. Baerwald, J.L. Conrad, G. Schumer and B. May. 2016. Examination of predation on early life stage Delta Smelt in the San Francisco Estuary using DNA diet analysis. Transactions of the American Fisheries Society 145:723-733. doi: http://dx.doi.org/10.1080/00028487.2016.1152299

Schroeter, R. E., O'Rear, T. A., Young, M. J., & Moyle, P. B. 2015. The aquatic trophic ecology of Suisun Marsh, San Francisco Estuary, California, during autumn in a wet year. San Francisco Estuary and Watershed Science 13(3).

(Service) U.S. Fish and Wildlife Service. 1991. Endangered and threatened wildlife and plants; proposed threatened status for the delta smelt. Federal Register 56:50075-50082. http://ecos.fws.gov/docs/federal_register/fr1938.pdf

(Service) U.S. Fish and Wildlife Service. 1993. Endangered and threatened wildlife and plants; determination of threatened status for the delta smelt; final rule. Federal Register 58(42):12854-12864. https://ecos.fws.gov/docs/federal_register/fr2235.pdf

(Service) U.S. Fish and Wildlife Service. 1994. Endangered and threatened wildlife and plants; final rule critical habitat determination for the delta smelt. Federal Register 59:65256-65277. http://ecos.fws.gov/docs/federal_register/fr2751.pdf

(Service) U.S. Fish and Wildlife Service. 1996. Recovery Plan for the Sacramento-San Joaquin Delta Native Fishes. http://ecos.fws.gov/docs/recovery_plan/961126.pdf

(Service) U.S. Fish and Wildlife Service. 2004. 5-year review of the delta smelt. http://ecos.fws.gov/docs/five_year_review/doc3570.pdf

(Service) U.S. Fish and Wildlife Service. 2008. Formal Endangered Species Act Consultation on the Proposed Coordinated Operations of the Central Valley Project (CVP) and State Water Project (SWP). United States Fish and Wildlife Service, Sacramento, CA. https://www.fws.gov/sfbaydelta/documents/SWP-CVP_OPs_BO_12-15_final_OCR.pdf

(Service) U.S. Fish and Wildlife Service. 2010a. 5-year review delta smelt (*Hypomesus transpacificus*). http://ecos.fws.gov/docs/five_year_review/doc3570.pdf

(Service) U.S. Fish and Wildlife Service. 2010b. Endangered and threatened wildlife and plants; 12-month finding on a petition to reclassify the delta smelt from threatened to endangered throughout its range. Federal Register 75:17667-17680. https://www.gpo.gov/fdsys/pkg/FR-2010-04-07/pdf/2010-7904.pdf

(Service) U.S. Fish and Wildlife Service. 2010c. Notice of Findings on Delta Smelt uplisting. Federal Register 75:69222-69294. https://www.gpo.gov/fdsys/pkg/FR-2010-11-10/pdf/2010-27686.pdf#page=2

(Service) U.S. Fish and Wildlife Service. 2012. Candidate Notice of Review (CNOR) for Delta Smelt. November 21, 2012. Federal Register 77:69994-70060. https://www.gpo.gov/fdsys/pkg/FR-2012-11-21/pdf/2012-28050.pdf

(Service) U.S. Fish and Wildlife Service. 2016. Candidate Notice of Review (CNOR) for Delta Smelt. December 2, 2016. Federal Register 81:87246-87272. https://www.gpo.gov/fdsys/pkg/FR-2016-12-02/pdf/2016-28817.pdf

(Service) U.S. Fish and Wildlife Service. 2017. Memo to Area Manager, Bureau of Reclamation, Mid-Pacific Region, Bay Delta Office, from Regional Director, U.S. Fish and Wildlife Service, Pacific Southwest Regional Office, Subject: Proposed Change to Action 4 of the 2008 Biological Opinion for the Coordinated Long-Term Operation of the Central Valley Water Project and State Water Project.

(Service) U.S. Fish and Wildlife Service. 2019. Memo to Area Manager, Bureau of Reclamation, Mid-Pacific Region, Bay Delta Office, from Regional Director, U.S. Fish and Wildlife Service, Pacific Southwest Regional Office, Subject: Proposed Change to Action 4 of the 2008 Biological Opinion for the Coordinated Long-Term Operation of the Central Valley Water Project and State Water Project.

Simonis, J.L., and Merz, J.E. 2019. Prey availability, environmental constraints, and aggregation dictate population distribution of an imperiled fish. Ecosphere 10(3) info: doi/10.1002/ecs2.2634.

Slater, S.B. and R.D. Baxter. 2014. Diet, prey selection, and body condition of age-0 delta smelt, in the Upper San Francisco Estuary. San Francisco Estuary Watershed Science 12(3). doi: http://dx.doi.org/10.15447/sfews.2014v12iss3art1

Sobczak, W. V., Cloern, J. E., Jassby, A. D., Cole, B. E., Schraga, T. S., & Arnsberg, A. 2005. Detritus fuels ecosystem metabolism but not metazoan food webs in San Francisco estuary's freshwater Delta. Estuaries 28(1):124-137.

Sobczak, W. V., Cloern, J. E., Jassby, A. D., & Müller-Solger, A. B. 2002. Bioavailability of organic matter in a highly disturbed estuary: The role of detrital and algal resources. Proceedings of the National Academy of Sciences 99(12):8101-8105.

Solomon, S., G.K. Plattner, R. Knutti and P. Friedlingstein. 2009. Irreversible climate change due to carbon dioxide emissions. Proceedings of the National Academy of Sciences of the United States of America 106(6):1704-1709. doi: http://dx.doi.org/10.1073/pnas.0812721106

Sommer, T., L. Conrad and M. Koller 2019. Suisun Marsh Salinity Control Gate Study Slide Presentation to the Estuary Ecology Team. IEP. Department of Water Resources.

Sommer, T.R., W.C. Harrell, A. Mueller-Solger, B. Tom, and W.J. Kimmerer. 2004. Effects of flow variation on channel and floodplain biota and habitats of the Sacramento River, California, USA. Aquatic Conservation: Marine and Freshwater Ecosystems 14(3):247-261.

Sommer, T. and F. Mejia. 2013. A place to call home: a synthesis of Delta Smelt habitat in the

upper San Francisco Estuary. San Francisco Estuary and Watershed Science 11(2). https://escholarship.org/uc/item/32c8t244

Sommer, T., F.H. Mejia, M. Nobriga, F. Feyrer, and L. Grimaldo. 2011. The spawning migration of delta smelt in the upper San Francisco Estuary. Francisco Estuary and Watershed Science 9(2). https://escholarship.org/uc/item/86m0g5sz

Sommer, T.R., M.L. Nobriga, W.C. Harrell, W. Batham and W.J. Kimmerer. 2001. Floodplain rearing of juvenile Chinook salmon: evidence of enhanced growth and survival. Canadian Journal of Fisheries and Aquatic Science 58(2):325-333. doi: http://dx.doi.org/10.1139/f00-245

Stevens, D.E., L.W. Miller. 1983. Effects of river flow on abundance of young Chinook salmon, American shad, longfin smelt, and delta smelt in the Sacramento-San Joaquin River system. North American Journal of Fisheries Management 3(4):425-437. doi: http://dx.doi.org/10.1577/1548-8659(1983)3<425:EORFOA>2.0.CO;2

Sullivan, L.J. and Kimmerer, W.J., 2013. Egg development times of *Eurytemora affinis* and *Pseudodiaptomus forbesi* (Copepoda, Calanoida) from the upper San Francisco Estuary with notes on methods. Journal of plankton research 35(6):1331-1338.

Sullivan, L. J., T.R, Ignoffo, B. Baskerville-Bridges, D.J. Ostrach and W.J. Kimmerer. 2016. Prey selection of larval and juvenile planktivorous fish: impacts of introduced prey. Environmental Biology of Fishes 99(8-9):633-646. doi: http://dx.doi.org/10.1007/s10641-016-0505-x

Swanson, C., T. Reid, P.S. Young and J.J. Cech, Jr. 2000. Comparative environmental tolerances of threatened delta smelt (*Hypomesus transpacificus*) and introduced wakasagi (*H. nipponensis*) in an altered California estuary. Oecologia 123(3):384-390. doi: http://dx.doi.org/10.1007/s004420051025

Sweetnam, D.A. 1999. Status of delta smelt in the Sacramento-San Joaquin Estuary. California Fish and Game 85(1):22-27. https://www.wildlife.ca.gov/Publications/Journal

Thomson, J. R., W.J. Kimmerer, L.R. Brown, K.B. Newman, R. Mac Nally, W.A. Bennett, F. Feyrer and E. Fleishman. 2010. Bayesian change point analysis of abundance trends for pelagic fishes in the upper San Francisco Estuary. Ecological Applications 20(5):1431-1448. doi: http://dx.doi.org/10.1890/09-0998.1

Turner, J.L. and H.K. Chadwick. 1972. Distribution and abundance of young-of-the-year striped bass, *Morone saxatilis*, in relation to river flow in the Sacramento-San Joaquin estuary. Transactions of the American Fisheries Society 101(3):442-452. doi: http://dx.doi.org/10.1577/1548-8659(1972)101<442:DAAOYS>2.0.CO;2

Utne-Palm, A.C. 2002. Visual feeding of fish in a turbid environment: physical and behavioral aspects. Marine and Freshwater Behavioral Physiology 35: 111-128.

Wagner, R.W., M. Stacey, L.R. Brown and M. Dettinger. 2011. Statistical models of temperature in the Sacramento–San Joaquin Delta under climate-change scenarios and ecological implications. Estuaries and Coasts 34(3):544-556. doi: http://dx.doi.org/10.1007/s12237-010-9369-z

Waters, T.F. 1995. Sediment in streams: sources, biological effects and control. American Fisheries Society Monograph 7. American Fisheries Society. Bethesda, Maryland.

Werner, I., L.A. Deanovic, D. Markieweicz, M. Kamphanh, C.K. Reece, M. Stillway, and C. Reese. 2010. Monitoring acute and chronic water column toxicity in the northern Sacramento-San Joaquin Estuary, California, USA, using the euryhaline amphipod *Hyalella azteca*: 2006 to 2007. Environmental Toxicology and Chemistry 29: 2190-2199.

Werner, I., L.A. Deanovic, M. Stillway, and D. Markiwicz. 2010. Acute Toxicity of SRWTP Effluent to Delta Smelt and Surrogate Species. Final Report. Aquatic Toxicology Laboratory, School of Veterinary Medicine, University of California, Davis. http://www.water.ca.gov/iep/docs/pod/Werner_et_al_Delta_Smelt_Ammonia_2010_Final_Report.pdf

Weston, D.P., A.M. Asbell, S.A. Lesmeister, S.J. Teh, and M.J. Lydy. 2014. Urban and agricultural pesticide inputs to a critical habitat for the threatened delta smelt (*Hypomesus transpacificus*). Environmental Toxicology and Chemistry 33: 920-929.

Weston, D.P., D. Chen, and M.J. Lydy. 2015. Stormwater-related transport of the insecticides bifenthrin, fipronil, imidacloprid, and chlorpyrifos into a tidal wetland, San Francisco Bay, California. Science of the Total Environment 527-528:18-25.

Whipple, A.A., R.M. Grossinger, D. Rankin, B. Stanford and R.A. Askevold. 2012. Sacramento-San Joaquin Delta historical ecology investigation: Exploring pattern and process. Prepared for the California Department of Fish and Game and Ecosystem Restoration Program. A report of SFEIASC's Historical Ecology Program, publication# 672, San Francisco Estuary Institute-Aquatic Science Center, Richmond, CA. http://www.sfei.org/sites/default/files/biblio_files/Delta_HistoricalEcologyStudy_SFEI_ASC_2012_lowres.pdf

Whitley, S.N., and S.M. Bollens. 2014. Fish assemblages across a vegetation gradient in a restoring tidal freshwater wetland: diets and potential for resource competition. Environmental Biology of Fishes 97:659-674.

Wilkerson, F.P., R.C. Dugdale, A.E. Parker, S.B. Blaser and A. Pimenta. 2015. Nutrient uptake and primary productivity in an urban estuary: using rate measurements to evaluate phytoplankton response to different hydrological and nutrient conditions. Aquatic Ecology 49(2):211-233.

Winder, M. and A.D. Jassby. 2011. Shifts in zooplankton community structure: implications for food web processes in the upper San Francisco Estuary. Estuaries and Coasts 34(4):675-690. doi: http://dx.doi.org/10.1007/s12237-010-9342-x

Winder, M., Jassby, A.D. and Mac Nally, R., 2011. Synergies between climate anomalies and hydrological modifications facilitate estuarine biotic invasions. Ecology letters 14(8):749-757.

Wooldridge, T. and T. Erasmus. 1980. Utilization of tidal currents by estuarine zooplankton. Estuarine and coastal marine science 11(1):107-114.

Wright, S.A. and D.H. Schoellhamer. 2004. Trends in the sediment yield of the Sacramento River, California, 1957–2001. San Francisco Estuary and Watershed Science 2(2). https://escholarship.org/uc/item/891144f4

Wu, B.J. and B.B. Bridges. 2014. Retention efficiency of the Tracy Fish Collection Facility holding tank screens for 20-30 mm fork length juvenile Delta Smelt during 30-minute fish counts. Tracy Fish Collection Facility Studies. Tracy Technical Bulletin 2014-3. U.S. Bureau of Reclamation, Mid-Pacific Region and Denver Technical Service Center.

Yang, G., and E. P. Best. 2015. Spatial optimization of watershed management practices for nitrogen load reduction using a modeling-optimization framework. Journal of environmental management 161:252-260.

# 6.0 CALIFORNIA CLAPPER RAIL

## 6.1 Status of the Species

### 6.1.1 Legal Status

The California clapper rail (*Rallus longirostris obsoletus*) was federally listed as endangered in 1970 (35 FR 16047). The California clapper rail is a Fully Protected Species under California law (California Department of Fish and Wildlife Code §3511). Critical habitat has not been proposed or designated for this species.

### 6.1.2 Natural History/Biology

This subspecies is one of three in California listed as endangered under the Act. The other subspecies are the light-footed Clapper rail (*R. l. levipes*), which is found in tidal marshes in southern California and northwestern Baja California, and the Yuma Clapper rail (*R. l. yumanensis*), which is restricted to the Colorado River Basin. A detailed account of the taxonomy, ecology, and biology of the California clapper rail can be found in the *Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California* (Service 2013b).

California clapper rails occur almost exclusively in tidal salt and brackish marshes with unrestricted daily tidal flows, adequate invertebrate prey food supply, well-developed tidal channel networks, and suitable nesting and escape cover for refuge during extreme tides. They exhibit strong site fidelity and territorial defense and are considered sensitive to disturbance. They tend to have relatively small average home ranges of 4.7 hectares (11.6 acres) and core use areas of 0.9 hectare (2.2 acres).

### 6.1.3 Range-wide Status and Distribution

A five-year review was completed in 2013 (Service 2013c). Historically, the California clapper rail was abundant in all tidal salt and brackish marshes in the San Francisco Bay vicinity, as well as in all of the larger tidal estuaries from Marin to San Luis Obispo counties. Current distribution is restricted almost entirely to the marshes of the Bay Area and where the only known breeding populations occur (Figure 6-1).

California clapper rail population numbers have generally fluctuated over time and have never improved to a level warranting consideration for upgrading the status of the species since its original listing as endangered in 1970. Citing various sources, the 2013 five-year review of the California clapper rail reported a population estimated at 4,200 to 6,000 birds between 1971-1975, at only 1,500 birds between 1981-1987, and reaching an estimated all-time historical low of about 500 birds in 1991. The five-year review noted that California clapper rail numbers have rebounded slightly since the early 1990s, but that substantial increases in population may be difficult to achieve due to the current disjunct distribution of their habitat (Service 2013c).

The Invasive Spartina Project (ISP), a multi-partner, regional non-native Spartina control program, conducts annual San Francisco Bay Estuary-wide California clapper rail surveys at

program-associated sites. Annual ISP California clapper rail surveys at 30 sites across the estuary from 2005-2010 showed an increase from 80 birds in 2005, to 140 birds in 2007, before declining to below 60 birds in 2010 (McBroom *et al.* 2011). The ISP has expanded the number of sites included in its rail surveys, and for 158 sites across the estuary from 2010-2015, the project reported fluctuating numbers with 577 rails in 2010, a low of 498 in 2013, and a rebound to 670 birds in 2015 (McBroom 2016).



**Figure 6-1. Known current distribution of California clapper rail (Service 2013b).**

6.1.4  Threats

Threats to this species include, but are not limited to, habitat destruction and modification, low adult survivorship (ranging from 0.49 to 0.52), and predation of adults and eggs/nestlings (Service 2013b).

6.1.5  Recovery

Recovery of the California clapper rails requires a combination of interim and long-term actions. Interim actions are those necessary to maintain current populations, while long-term actions focus on recovering the species throughout its range. Interim actions involve monitoring current populations (number and distribution), non-native predator and invasive plant control, reducing human disturbance and protection of existing habitat. Long-term actions involve large-scale tidal marsh restoration and implementation of long-term management plans.

**6.2  Environmental Baseline**

On-going rail monitoring in the Suisun Marsh by the CDFW has shown sporadic detections of California clapper rails within the Action Area in the past 17 years (16 individuals sighted since 2002). This species has been detected at several locations in Suisun Marsh, including occurrences along Suisun Slough, Cutoff Slough, Hill Slough, Goodyear Slough, Rush Ranch, and Ryer Island (Service 2013a). Given the variable history of California clapper rail presence in Suisun Marsh, Suisun may represent crucial habitat for this critically endangered subspecies of clapper rail (CDFW 2016). Suisun Marsh has very limited high marsh vegetation which the California clapper rail require. According to the *Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California*, one of the criteria for California clapper rail to be downlisted is to have a minimum of 5,000 acres of contiguous high quality tidal marsh habitat with well-developed channel systems and high-tide refugial/escape cover at the high marsh/upland transition zone and or inner-marsh of the Western Grizzly and Suisun Bays and marshes of Suisun Hill and Cutoff Slough (within the Suisun Bay Recovery Unit) (Service 2013a, Service 2013b).

Tidal marshes are fragmented throughout Suisun. Out of 70,000 acres (28,330 hectares) of land in Suisun, about 63,260 acres (25,600 hectares) are managed or leveed marshes and 6,670 acres (2,700 hectares) are tidal or muted (restricted) tidal marshes (CDFW 2017). These tidal marshes are divided into several larger marshes, such as tidal portions of Solano Land Trust's Rush Ranch (1,040 acres, 420 hectares), CDFW's Hill Slough Wildlife Area (865 acres, 350 hectares), and CDFW's Peytonia Slough Ecological Reserve (520 acres, 210 hectares), as well as many smaller marsh fragments (CDFW 2017). The vast majority of California clapper rails do not move more than one kilometer, though post-breeding dispersal may occur in fall and early winter (Albertson & Evens 2000). The last time a California clapper rail was detected by CDFW surveys was in 2011 at Rush Ranch (CDFW 2017). The vast majority of the California clapper rails are found in the San Pablo and San Francisco Bay, downstream of Suisun Marsh, where water salinities are higher. Salinity influences other variables, such as vegetation and invertebrates. Suisun Marsh is generally too fresh to support vegetation, such as *Spartina foliosa*, which may also contribute to low California clapper rail densities.

The Service has consulted on numerous consultations in the Suisun Marsh in the Action Area with a majority of the consultations being related to on-going maintenance activities or conversion of managed marsh to another use, such as tidal marsh restoration. The June 2013, *Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and Project-Level Actions in Solano County, California* (08ESMF00-2012-F-0602-2) was issued to the Corps to cover projects that fall under the Corps' Regional General Permit, their Letters of Permission, or individual permits in the Suisun Marsh. Example tidal marsh restoration projects that have been consulted on in the Action Area include Tule Red (08FBDT00-2016-F-0071), Blacklock (1-1-06-I-1880), and Montezuma Wetlands (1-1-99-F-12).

## 6.3  Effects of the Proposed Action

### 6.3.1  Tidal Habitat Restoration in Suisun Marsh

Depending on the nature, scope, location, and timing of restoration actions associated with individual restoration projects, there is a potential to adversely affect California clapper rails during implementation of construction, long-term management, or monitoring activities. California clapper rails do not occupy managed seasonal wetlands; therefore flooding managed wetlands for the purpose of restoration would not affect California clapper rails. California clapper rails inhabit suitable tidal wetlands and tidal sloughs in the Suisun Marsh. Restoration activities in these areas could potentially disrupt California clapper rail breeding and foraging in tidal wetlands if conservation measures are not implemented properly or at all. Reclamation has proposed to implement restoration projects consistent with conservation measures identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp (Service 2013a). Conducting presence/absence pre-construction study surveys will identify any new nest locations and presence of breeding individuals prior to implementing proposed project activities. The surveys will focus on potential habitat that may be disturbed by construction activities during the breeding season to ensure that these species are not nesting in these locations. If presence is determined, construction activities, including vegetation clearing, would be limited to months outside the breeding season, and staging areas would be sited at least 100 feet from water bodies. No construction activities will occur within 700 feet of identified nests or until after the nesting season.

Restoration construction may require the use of heavy equipment such as excavators, back hoes, bulldozers, and dump trucks in order to reconstruct interior site elevations, create levees, and breach levees. Proposed ground disturbing activities may result in disturbance, harm, injury, or death of California clapper rails, nests, or their young through the loss or degradation of their habitat, crushing by equipment and machinery, loss of breeding activity, nest abandonment, or increased risk of predation. Individual clapper rails may be disturbed by noise and vibrations associated with the use of heavy equipment used within or adjacent to habitat disrupting feeding, sheltering, or breeding activities. California clapper rails that are disturbed may be flushed from protective cover or their territories exposing the rails to predators. The level of disturbance would be exacerbated if the construction activities occurred during the rail's breeding season resulting in loss of breeding activity or if the work occurred during an extreme high tide when the California clapper rails are most likely to escape into adjacent areas to seek upland refugia

cover. Displaced California clapper rails may have to compete for resources in occupied habitat, and may be more vulnerable to predators. Disturbance during the breeding season may disrupt breeding or cause nest abandonment resulting in the mortality of all the eggs and chicks in the nest. With implementation of the conservation measures, impacts to individuals will be minimized or avoided.

There could be a loss of foraging habitat throughout the Suisun Marsh as a result of construction-related activities. However, restoration activities are expected to be minor, temporary losses and not substantial given the amount of foraging habitat remaining. Conversion of managed wetlands to tidal wetlands would result in increased California clapper rail breeding and foraging habitat. As the restored areas evolve into a functioning, vegetated tidal wetland, it is expected to provide permanent, sustainable, suitable habitat for the California clapper rails. Habitat levees, if part of the restoration design, would provide refugia from high water events. Temporary disturbance of individual California clapper rails and their habitat would occur initially, but the long term effects would be increased suitable tidal marsh habitat which would benefit the entire California clapper rail population.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation. This could include tiering or appending to the existing Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

6.3.2 Suisun Marsh Salinity Control Gates (Proposed Flow Changes)

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. Depending on the timing of the proposed operations, SMSCG operations may overlap with the California clapper rail late breeding season and potential presence in the Suisun Marsh. California clapper rails hunt mussels, crabs, and clams (Service 2013b). SMSCG reoperations are expected to temporarily lower marsh salinities which may create a potential shift in their prey base availability and distribution in Suisun Marsh but this is unknown. Adverse effects to California clapper rails are not expected to occur. If through planning and implementation of the project-level activities, adverse effects to California clapper rails are realized and were not analyzed herein, reinitiation is required.

**6.4 Effects to Recovery**

Reclamation has proposed to minimize and avoid adverse effects from tidal marsh restoration by implementing conservation measures consistent with those identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp to promote the recovery of California clapper rails. Threats from habitat loss, reduction in habitat quality, predation, non-native plants, and human-related disturbances are contributing factors to the decline of this species. Implementation of restoration actions in the Suisun Marsh may result in short-term adverse effects to California clapper rails in order to gain an increase in long-term habitat benefits, thereby assisting in the recovery of this species. Therefore, we conclude that the PA will not negatively affect, and may contribute to, recovery of the California clapper rail.

## 6.5 Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect California clapper rail. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the California clapper rail.

## 6.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the California clapper rail.

### 6.6.1 Reproduction

Pre-construction surveys associated with an individual tidal marsh restoration project will inform new locations of California clapper rail nest sites in the Suisun Marsh. Consistent with the conservation measures identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp, if California clapper rails are detected in the immediate work area, the PA will avoid and minimize effects to nesting or breeding individuals and their nest through the implementation of daily work windows, work restrictions, and avoidance buffers. Therefore, the PA will not expected to negatively affect California clapper rail reproduction range-wide, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 6.6.2 Numbers

The vast majority of California clapper rails are found in the San Pablo Bay and San Francisco Bay, downstream of Suisun Marsh, where water salinities are higher (CDFW 2018). Salinity influences other variables, such as vegetation and invertebrates. Some studies have found two habitat variables of importance: youthful marshes (low stem densities and little residual vegetation produced by occasional scouring) and extensive *Spartina* (cordgrass) beds (Albertson & Evens 2000, Conway *et al.* 1993). More specifically, Zedler (2003) found that *Spartina foliosa* height and density characteristics were the most important habitat variables for predicting California clapper rail habitat suitability (CDFW 2018). Suisun Marsh is generally too fresh to support *Spartina foliosa*, which may also contribute to low California clapper rail densities (CDFW 2018).

With implementation of the PA, low to no mortality or injury of individuals are expected to occur from tidal marsh restoration if conservation measures are implemented fully and properly. Restoration actions would contribute to the recovery of California clapper rail by creating more suitable habitat for California clapper rails. Therefore, the PA is not expected to reduce the number of California clapper rails.

6.6.3  Distribution

The number of California clapper rails affected by restoration actions will be relatively low in relation to the species' population numbers range-wide. Although there is the potential to harm or disturb individuals in a way that may result in altered normal behavior, it is still expected that these activities will not cause substantial disturbance to California clapper rails. Implementation of conservation measures will minimize or avoid the potential for disturbing California clapper rails. Therefore, we do not expect the PA to reduce the species' distribution relative to its range-wide condition.

**6.7  Conclusion**

After reviewing the current status of California clapper rail, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of California clapper rails likely to be affected by the PA will be low relative to the number of California clapper rails range-wide.

2. Reclamation has proposed to implement the conservation measures proposed in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

3. The PA is being implemented in a manner that will restore and create more suitable, sustainable habitat for the California clapper rail long-term.

## 6.8 California Clapper Rail Literature Cited

Albertson, JD and JG Evens. 2000. California Clapper Rail in Goals Project. 2000. Baylands Ecosystem Species and Community Profiles: Life Histories and Environmental Requirements of Key Plants, Fish, and Wildlife. Prepared by the San Francisco Bay Area Wetlands Ecosystem Goals Project. P.R. Olofson, Editor. San Francisco Bay Regional Water Quality Control Board, Oakland, California.

(CDFW) California Department of Fish and Wildlife. 2016. California Ridgway's Rail and California Black Rail, Suisun Marsh, California. Report to: California Department of Water Resources. Agreement #4600011215. California Department of Fish and Wildlife Contract #R15300001

(CDFW) California Department of Fish and Wildlife. 2017. California Ridgway's Rail and California Black Rail, Suisun Marsh, California. Report to: California Department of Water Resources. Agreement #4600011215. California Department of Fish and Wildlife Contract #R15300001.

(CDFW) California Department of Fish and Wildlife. 2018. California Ridgway's Rail and California Black Rail, Suisun Marsh, California. Report to: California Department of Water Resources. Agreement #4600011215. California Department of Fish and Wildlife Contract #R15300001.

Conway, C.J., W.R. Eddleman, S.H. Anderson, and L.R. . 1993. Seasonal changes in Yuma clapper rail vocalization rate and habitat use. Journal of Wildlife Management 57(2): 282-290.

Liu, L., J. Wood, N. Nur, L. Salas, and D. Jongsomjit. 2012. California Clapper Rail (*Rallus longirostris obsoletus*) Population monitoring: 2005-2011. PRBO Technical Report to the California Department of Fish and Game.

McBroom, J., T. Rohmer, J. Hammond, W. Thornton, S. Chen, J. Stalker, and J. Lewis. 2011. California Clapper Rail Surveys for the San Francisco Estuary Invasive Spartina Project 2010. Report prepared for the State Coastal Conservancy, San Francisco Estuary Invasive Spartina Project, Oakland, California. Olofson Environmental, Inc. Berkeley, CA.

McBroom, J. 2016. California Ridgway's rail surveys for the San Francisco Estuary Invasive *Spartina* Project 2016. Report to The State Coastal Conservancy by Olofson Environmental, Inc. Oakland, California. Available at: www.spartina.org/documents/RIRAReport2016.pdf

(Service) U.S. Fish and Wildlife Service. 2013a. Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and the Project-level Actions in Solano County, California. June 10, 2013. Accessible at: <https://www.fws.gov/sfbaydelta/documents/2012-F-0602-2_Suisun_Marsh_Solano_County_Corps_programmatic.pdf>

(Service) U.S. Fish and Wildlife Service. 2013b. Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California. Sacramento Fish and Wildlife Office, Sacramento, California. Available on the internet at: https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume1_RP.pdf [Volume I] and https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume2_Appendices.pdf [Volume II].

(Service) U.S. Fish and Wildlife Service. 2013c. Five-year Review: Summary and Evaluation California clapper rail (*Rallus longirostris obsoletus*). U.S. Fish and Wildlife Service, Sacramento, California.

Zedler, J.B. 2003. Canopy architecture of natural and planted cordgrass marshes: selecting habitat evaluation criteria. Ecological Applications 3(1): 123-138.

# 7.0  CALIFORNIA LEAST TERN

## 7.1  Status of the Species

### 7.1.1  Legal Status

The Service listed the California least tern as endangered on June 2, 1970 (35 FR 8491 8498), and the species is a Fully Protected Species under California law (California Department of Fish and Wildlife Code, Section 3511). We issued a revised recovery plan for the species in 1985 (Service 1985). Critical habitat has not been proposed or designated for this species.

### 7.1.2  Natural History

The status of the California least tern can be found in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp (Service 2013). A detailed account of the taxonomy, ecology, and biology of the California least tern is presented in the approved recovery plan for this species (Service 1985).

California least terns forage in nearshore oceans, harbors, marina channels, tidal estuarine channels, and sheltered shallow bays (Atwood and Kelly 1984). Adults forage mostly within 2 miles of breeding colonies, and at many sites foraging is primarily in nearshore ocean waters less than 60 feet deep (Service 1985). They feed on small fish that they catch by plunging into the water from flight. In a study of fish dropped by California least tern at 10 nesting areas, researchers found 49 species of fish, all individuals less than 1 year old. Northern anchovy (*Engraulis mordax*) and silverside species (*Atherinidae*) represented 67 percent of the total sample (Atwood and Kelly 1984).

California least terns are migratory colonial nesters, usually arriving in breeding areas by late April and departing again in August (Massey 1974). After the initial nesting period that begins on their arrival in April, a second wave of nesting may occur from mid-June to early August. These are mainly re-nests after initial failures and second year birds nesting for the first time (Massey and Atwood 1981). Nesting California least terns usually occupy a sand-shell beach relatively free of plant growth (Massey 1974). The nest is typically a shallow, round depression, constructed by a bird sitting and kicking its feet backwards while rotating its body. This may occur several times before an egg is laid (Massey 1974; Wolk 1974). Terns may use "sideways building" after scrape construction, which consists of the sitting bird reaching out with its bill to pick up additional nest material, such as small shells and shell fragments, and depositing them into the nest (Wolk 1974).

Early in the breeding season, California least terns display night roosting behavior. Prior to incubation, terns will sleep at night at varying distances from the nesting sites. Once incubation begins, birds roost at night on the nest. Terns use roosting sites away from breeding colonies prior to egg laying, apparently for predator avoidance. By not sleeping within the colony until eggs are laid, the terns may delay the colony being discovered by a nocturnal predator by 2 to 3 weeks (Service 1985).

California least terns begin incubation after laying the first egg. Both parents participate in incubation, which lasts 20 to 25 days (Massey 1974). Clutch size ranges from one to three eggs, with two eggs being most common (Massey 1974; Ehrlich *et al.* 1988).

Least tern chicks are semi-precocial (capable of a high degree of independent activity from birth) and are fed small fish by parents within hours of hatching (Massey 1974; Ehrlich *et al.* 1988). Chicks will begin leaving the nest in one to two days (Massey 1974) and fledge at approximately 20 days. Juveniles and adults will fish, loaf, preen, and roost together for several weeks after fledging; adults will continue to feed juveniles during this period (Massey 1974).

California least terns leave nesting areas by August to spend winter months along the west coast of Baja California, the west coast of Mexico, and further south, possibly from the Gulf of California to Guatemala (American Ornithologists' Union (AOU) 1957; Service 1985; Thompson *et al.* 1997).

7.1.3  Range-wide Status and Distribution

For the most recent comprehensive assessment of the species' range-wide status and distribution, please refer to the California Least Tern (*Sterna antillarum browni*) 5-Year Review: Summary and Evaluation (Service 2006). Additionally, in 2009 the Service published a Spotlight Species Action Plan for the California least tern (Service 2009).

Least terns nest along the California coast and the Pacific coast of the Baja California Peninsula, Mexico (Figure 7-1). Approximately 98 percent of breeding least terns nest in the United States, and San Diego Counties, and 75% of the population occurred in these counties in 2016 (Figure 7-2). On the Baja California Peninsula, least terns nest at sites from Ensenada de la Paz in the north to San José del Cabo in the south (Patten and Erickson 1996).

Wintering grounds remain poorly described, but include coastal mainland Mexico, Guatamala, Baja California, Costa Rica, and possibly Peru (Atwood and Minsky 1983, Howell and Webb 1995, Vaucher 1988, Ridgely and Gwynne 1989, Schulenberg *et al.* 1987).

The least tern population has not been intensively studied in Mexico; however, surveys of the Pacific coast of the Baja California Peninsula between 2006 and 2008 did document breeding activity at eight colonies estimating 261 adults and 141 nests (Rosemartin and Van Riper III 2012).

United States surveys from 1971 to 1973 found 624 pairs of least terns at 19 nesting areas in California (Bender 1974a, 1974b). As conservation measures were implemented throughout the 1970s, 1980s, and into the 1990s, the number of least terns increased, peaking at an estimated 7,100 least tern pairs in 2009 (Marschalek 2010). An abundant food supply and active conservation measures, particularly predator management, likely contributed to the observed population growth. Between 2010 and 2016, there was a significant decline in the number of least terns observed. The estimated number of least terns decreased to 6,437 pairs in 2010 (Marschalek 2011), and by 2016 had dropped to estimated 3,989 to 4,661 pairs (Frost 2017), just

over half of the 2010 population estimate. The cause of the population decline appears to be reduced productivity, which had been reported beginning in approximately 2001 (Figure 7-3).



**Figure 7-1. United States nesting areas of the California least tern (*Sternula antillarum browni*), 2016. Multiple nest sites may be used within the depicted nesting areas.**



**Figure 7-2. 2016 Distribution of California least tern (*Sternula antillarum browni*) nesting pairs by region. Data derived from minimum pair estimates in Frost 2016. Southern California includes San Diego, Orange, and Los Angeles Counties.**



**Figure 7-3. Minimum and maximum estimations of breeding pairs and fledglings produced for the California least tern (*Sternula antillarum browni*) in the United States[1]**

7.1.4 Threats

---

[1] **Note:** Statewide surveys with unified methods began in 1973; reliable chick counts began in 1978. Data are from CDFW annual reports (Bender 1974a, 1974b; Atwood *et al.* 1977; Atwood *et al.* 1979; Gustafson 1986; Massey 1988, 1989; Johnston and Obst 1992; Obst and Johnston 1992; Caffrey 1993, 1994, 1995, 1997, 1998; Keane 1998, 2000, 2001; Patton 2002; Marschalek 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012; Frost 2014, 2015, 2016).

At the time of listing, scientists recognized destruction and degradation of nesting habitat as two of the primary threats facing the California least tern (Craig 1971). While many least tern nest sites are now afforded protection, some remain vulnerable to destruction associated with development pressure, and many suffer degradation as a result of close proximity to urbanization (Service 2006). Threats identified in the California Least Tern: 5-Year Review include coastal development, human population growth, and intensified use of beaches, which increase the potential for human activities and disruption in the vicinity of nest sites. The best available scientific and commercial data indicate that the magnitude of these threats will continue to increase as the population in California continues to grow. In addition, climate change, changes in vegetation cover on nesting sites, limited food availability, and predation can result in direct and indirect impacts to the least tern.

The Service's recommendation in the California Least Tern: 5-Year Review was that the California least tern be reclassified from endangered to threatened due to some reduction of impacts of threats and increase in population, recognizing that threats had not been reduced to the point that California least terns would be secure without intensive, site-specific management. We also recommended revisiting the recovery plan, continued management and monitoring of nesting sites, creation of new sites, and expansion of existing sites (Service 2006).

Additionally, since the issuance of the five-year status review, studies and observations continue to see the effects of lower forage fish supply and reduced numbers of breeding pairs and productivity due to El Niño Southern Oscillation Events. With larger storms and tides, loss of breeding areas and washed out nests are likely increase in the future.

7.1.5  Recovery

The primary goals outlined in the 1985 Recovery Plan for the California Least Tern are to prevent extinction and return the California least tern population to a stable, non-endangered status (Service 1985). We state that reclassification to threatened status may be considered if 1,200 breeding pairs in California occur in 15 secure management areas with a 3-year mean reproduction rate of 1.0 (one fledgling per breeding pair) (Service 1985). We also state that delisting may be considered if the population reaches 1,200 breeding pairs distributed in at least 20 of 23 coastal management areas with the following provisions:

- Sufficient habitat to support at least one viable colony (consisting of a minimum of 20 breeding pairs with a five-year mean reproductive rate of at least 1.0 young fledged per year, per breeding pair) at each of the 20 coastal management areas that are managed to conserve least terns (which must include San Francisco Bay, Mission Bay, and San Diego Bay); and
- Assured land ownership and management objectives for future habitat management for the benefit of California least terns, and the security and status of Baja California colonies are assessed for incorporation into recovery objectives (Service 1985).

## 7.2  Environmental Baseline

Nesting has occurred sporadically with an increase in inland sites from the bay area toward the Delta and Central Valley (Service 2006). Low detections of California least terns have been documented in the Action Area within Suisun Marsh (CDFW 2019). A breeding colony has been documented on the east side of Montezuma Slough near Collinsville in 2006, at a Montezuma Wetlands dredge disposal site. After initially being sighted at Montezuma in 2005, California least terns nested at the site in 2006 and 2007. In summer 2005, approximately 15 to 20 California least terns were observed on a shell mound in Cell 3/4. The next year, California least terns nested on another shell mound in Cell 3/4. The California least terns nested successfully at the project site in 2006 and have nested each year since then. Table 7-1 below presents the number of California least terns observed at the site.

**Table 7-1. California least terns observed at Montezuma Wetlands dredge disposal site.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| nests | 45 | 31 | 35 | 27 | 17 | 15 | 31 | 29 | 16 | 16 | 6 | 9 | 18 |
| chicks | not counted | 16 | 24 | 17 | 23 | 1 | 42 | 19 | 4 | 21 | 5 | 8 | 17 |
| fledglings | not counted | 6 | 11 | 7 | 5 | 0 | 18 | 2 | 1 | 0 | 1 | 5 | 0 |

The Service has consulted on numerous consultations in the Suisun Marsh in the Action Area with a majority of the consultations being related to on-going maintenance activities or conversion of managed marsh to another use, such as tidal marsh restoration. The June 2013, *Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and Project-Level Actions in Solano County, California* (08ESMF00-2012-F-0602-2) was issued to the Corps to cover projects that fall under the Corps' Regional General Permit, their Letters of Permission, or individual permits in the Suisun Marsh. Example tidal marsh restoration projects that have been consulted on in the Action Area include Tule Red (08FBDT00-2016-F-0071), Blacklock (1-1-06-I-1880), and Montezuma Wetlands (1-1-99-F-12).

## 7.3  Effects of the Proposed Action

### 7.3.1  Tidal Habitat Restoration in Suisun Marsh

Depending on the nature, scope, location, and timing of restoration actions associated with individual restoration projects, there is a potential to adversely affect California least terns during implementation of construction, long-term management, or monitoring activities. Reclamation has proposed to implement restoration projects consistent with conservation measures identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp. Based on implementation of these conservation measures, all construction-related activities during the breeding season in the vicinity of active nests would be avoided as described in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

Construction activities may disturb California least terns. If present, California least terns moving through the Suisun Marsh and surrounding areas seeking out suitable nesting habitat or

to forage in the bays, sloughs, and managed wetlands individuals may be affected or disturbed altering their normal behavior. Restoration construction may require the use of heavy equipment such as excavators, back hoes, bulldozers, and dump trucks in order to reconstruct interior site elevations, create levees, and breach levees. Noise and vibrations created by heavy equipment may also temporarily disturb individuals. However, due to their highly mobile nature and ability to forage in a variety of habitats it is unlikely that these activities will cause substantial disturbance to California least terns.

It is expected that construction activities would not significantly affect foraging habitat because open water habitat is abundant in the Suisun Marsh. Conversion of suitable habitat in managed wetlands to tidal wetlands would result in an increase in foraging habitat because the tidal wetland restoration areas would be subject to tidal action and therefore would be inundated permanently or more frequently than under existing managed wetlands. As the restored areas evolve into a functioning tidal wetland, it will continue to provide suitable habitat for the California least tern.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation. This could include tiering or appending to the existing Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

### 7.3.2  Suisun Marsh Salinity Control Gates (Proposed Flow Changes)

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. Depending on the timing of the proposed operations, SMSCG operations may overlap with the California least tern late breeding season and potential presence in the Suisun Marsh to forage. California least terns hunt smaller fish such as silversides, perch, anchovies, small crustaceans, and other smaller fish (Service 1985). SMSCG reoperations are expected to temporarily lower marsh salinities creating a potential shift in their prey base availability in Suisun Marsh. However, foraging is readily available in the Suisun Marsh and the restoration and enhancement projects are expected to increase food quality of habitat available to the California least tern. Adverse effects to California least terns are not expected to occur. If through planning and implementation of the project-level activities, adverse effects to the California least tern are realized and were not analyzed herein, reinitiation will occur.

## 7.4  Effects to Recovery

Reclamation has proposed to minimize and avoid adverse effects from tidal marsh restoration by implementing conservation measures consistent with those identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp to promote the recovery of California least terns. Implementation of restoration actions in the Suisun Marsh may result in short-term adverse effects to California least terns in order to gain an increase in long-term habitat benefits, thereby assisting in the recovery of this species. Therefore, we conclude that the PA would not negatively affect, and may contribute to, recovery of the California least tern.

## 7.5 Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect California least tern. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the California least tern.

## 7.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the California least tern.

### 7.6.1 Reproduction

California least terns are known to breed and nest at one location in the Suisun Marsh. Pre-construction surveys associated with an individual tidal marsh restoration project will inform other potential locations. Consistent with the conservation measures identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp, the PA will avoid effects to nesting or breeding individuals and their nest from restoration construction activities. Therefore, the PA is not expected to negatively affect California least tern reproduction range-wide, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 7.6.2 Numbers

With implementation of the PA, no mortality or injury of individuals are expected to occur from tidal marsh restoration. Restoration actions would contribute to the recovery of California least tern by creating more foraging habitat for California least terns. Therefore, the PA is not expected to reduce the number of California least terns.

### 7.6.3 Distribution

The number of California least terns in the Suisun Marsh are relatively low in relation to the species' population numbers range-wide. Although there is the potential to disturb individuals in a way that may result in altered normal behavior, it is still expected that these activities will not cause substantial disturbance to California least terns. California least terns are highly mobile birds with the ability to forage in a variety of habitats throughout the Suisun Marsh. Implementation of conservation measures will minimize the potential for disturbing California least terns. Therefore, we do not expect the PA to reduce the species' distribution relative to its range-wide condition.

**7.7 Conclusion**

After reviewing the current status of California least tern, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of California least terns likely to be affected by the PA will be low relative to the number of California least terns range-wide.

2. Reclamation has proposed to implement the conservation measures proposed in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

3. The PA is being implemented in a manner that will restore and create more suitable, sustainable habitat for the California least tern long-term.

## 7.8 California Least Tern Literature Cited

(AOU) American Ornithologists' Union. 1957. Checklist of North American birds. Am. Ornithol. Union, Baltimore, Md.

Atwood, J.L., P.D. Jorgensen, R.M. Jurek, and T.D. Manolis. 1977. California least tern census and nesting survey, 1977. California Department of Fish and Game, Nongame Wildl. Investigations, E-1-1, Final Report, Job V-2.11. 6 pp + app.

Atwood J.L., R.A. Erickson, P.R. Kelly, and P. Unitt. 1979. California least tern census and nesting survey, 1978. California Department of Fish and Game, Nongame Wildl. Investigations, E-W-2, Final Report, Job V-2.13. 6 pp + app.

Atwood, J.L. and Kelly, P.R., 1984. Fish dropped on breeding colonies as indicators of Least Tern food habits. *The Wilson Bulletin*, pp.34-47.

Atwood, IL. and D.E. Minsky. 1983. Least tern foraging ecology at three major California breeding colonies. Western Birds 14:57-72.

Bender, K. 1974a. California least tern census and nesting survey, 1973. California Department of Fish and Game, Spec. Wildl. Investigations, Proj. W-54-R-6, Prog Report, Job II-11. 7 pp + app.

Bender, K. 1974b. California least tern census and nesting survey, 1974. California Department of Fish and Game, Nongame. Wildl. Investigations, Proj. W-54-R-6, Final Report, Job I-1. 4 pp + app.

Caffrey, C. 1993. California least tern breeding survey, 1992 season. California Department of Fish and Game, Wildlife Management Division, Nongame Bird and Mammal Section Report 93-11, Sacramento, CA. 35 pp. 17

Caffrey, C. 1994. California least tern breeding survey, 1993 season. California Department of Fish and Game, Wildlife Management Division, Nongame Bird and Mammal Section Report 94-07, Sacramento, CA. 39 pp.

Caffrey, C. 1995. California least tern breeding survey, 1994 season. California Department of Fish and Game, Wildlife Management Division. Bird and Mammal Conservation Program Report 95-3, Sacramento, CA. 49 pp.

Caffrey, C. 1997. California least tern breeding survey, 1995 season. California Department of Fish and Game, Wildlife Management Division. Bird and Mammal Conservation Program Report 97-6, Sacramento, CA. 57 pp.

Caffrey, C. 1998. California least tern breeding survey, 1996 season. California Department of Fish and Game, Wildlife Management Division. Bird and Mammal Conservation Program Report 98-2, Sacramento, CA. 57 pp.

Ehrlich, P., D. Dobkin, and D. Wheye. 1988. The birder's handbook: a field guide to the natural history of North American birds. Simon and Schuster Inc. New York. 785 pp.

Frost, N. 2014. California least tern breeding survey, 2013 season. California Department of Fish and Wildlife, Wildlife Branch, Nongame Wildlife Program Report, 2014-06. Sacramento, CA. 20 pp + Appendices.

Frost, N. 2015. California least tern breeding survey, 2014 season. California Department of Fish and Wildlife, Wildlife Branch, Nongame Wildlife Program Report, 2015-01. Sacramento, CA. 23 pp + Appendices.

Frost, N. 2016. California least tern breeding survey, 2015 season. California Department of Fish and Wildlife, Wildlife Branch, Nongame Wildlife Program Report, 2016-01. Sacramento, CA. 24 pp + Appendices.

Frost, N. 2017. California least tern breeding survey, 2016 season. California Department of Fish and Wildlife, Wildlife Branch, Nongame Wildlife Program Report, 2017-03. Sacramento, CA. 20 pp + Appendices.

Gustafson, J. 1986. Summary of the California least tern seasons for 1979-83 (5 years). California Department of Fish and Game. Unpubl. Report. 7 pp.

Howell, S.N.G., & S. Webb. 1995. A guide to the birds of Mexico and northern Central America. Oxford, New York, New York, USA.

Johnston, S.M, and B.S. Obst. 1992. California least tern breeding survey, 1991 season. California Department of Fish and Game, Nongame Bird and Mammal Section Report, 92-06. 19 pp.

Keane, K. 1998. California least tern breeding survey, 1997 season. California Department of Fish and Game, Wildl. Manage. Div., Bird and Mammal Conservation Program Rep. 98-12, Sacramento, CA. 46 pp.

Keane, K. 2000. California least tern breeding survey, 1998 season. California Department of Fish and Game, Habitat Conservation and Planning Branch Rep., 2000-01, Sacramento, CA. 43 pp.

Keane, K. 2001. California least tern breeding survey, 1999 season. California Department of Fish and Game, Habitat Conservation and Planning Branch, Species Conservation and Recovery Program Rep., 2001-01, Sacramento, CA. 16 pp. + app.

Marschalek, D.A. 2005. California least tern breeding survey, 2004 season. California Department of Fish and Game, Habitat Conservation and Planning Branch, Species Conservation and Recovery Program Report, 2005-01. Sacramento, CA. 24 pp. + app. 19

Marschalek, D.A. 2006. California least tern breeding survey, 2005 season. California Department of Fish and Game, Habitat Conservation and Planning Branch, Species Conservation and Recovery Program Report, 2006-01. Sacramento, CA. 21 pp. + app.

Marschalek, D.A. 2007. California least tern breeding survey, 2006 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2007-01. Sacramento, CA. 22 pp. + app.

Marschalek, D.A. 2008. California least tern breeding survey, 2007 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2008-01. Sacramento, CA. 24 pp. + app.

Marschalek, D.A. 2009. California least tern breeding survey, 2008 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2009-02. Sacramento, CA. 23 pp. + app.

Marschalek, D.A. 2010. California least tern breeding survey, 2009 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2010-03. Sacramento, CA. 25 pp. + app.

Marschalek, D.A. 2011. California least tern breeding survey, 2010 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2011-06. Sacramento, CA. 28 pp. + app.

Marschalek, D.A. 2012. California least tern breeding survey, 2011 season. California Department of Fish and Game, Wildlife Branch, Nongame Wildlife Unit Report, 2012-01. Sacramento, CA. 25 pp. + app.

Massey, B.W. 1974. Breeding biology of the California Least Tern. Proc. Linn. Soc. N.Y. 72:1-24.

Massey, B.W. 1988. California least tern study, 1988 breeding season. California Department of Fish and Game, EW87 X-1, Contract FG 8553 Final Rep. 20 pp. + app.

Massey, B.W. 1989. California least tern study, 1989 breeding season. California Department of Fish and Game, EW88 X-1, Contract FG 7660 Final Rep. 22 pp.

Massey, B.W. and Atwood, J.L., 1981. Second-wave nesting of the California Least Tern: age composition and reproductive success. *The Auk*, pp.596-605.

Obst, B.S., and S.M. Johnston. 1992. California least tern breeding survey, 1990 season. California Department of Fish and Game, Nongame Bird and Mammal Section Report, 92-05. 13 pp.

Patten, M.A and RA Erickson. 1996. Subspecies of the least tern in Mexico. Condor 98:888-890.

Patton, R.T. 2002. California least tern breeding survey, 2000 season. California Department of Fish and Game, Species Conservation and Recovery Program Report, 2002-03. 24 pp. + app.

Ridgely, R.S., & J.A. Gwynne. 1989. A guide to the birds of Panama with Costa Rica, Nicaragua and Honduras. Princeton Univ. Press, Princeton.

Rosemartin, A. and Van Riper III, C., 2012. Breeding colonies of least terns (*Sternula antillarum*) in northern Sonora, Mexico, 2006—2008. *The Southwestern Naturalist*, pp.342-345.

Schulenberg, T. S., T. A Parker, III, R A Hughes. 1987. First records of Least Terns, *Sterna antillarum,* for Peru. Le Gerfaut 77: 271-273.

 [Service] U.S. Fish and Wildlife Service. 2013. Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and the Project-level Actions in Solano County, California. June 10, 2013. Accessible at: <https://www.fws.gov/sfbaydelta/documents/2012-F-0602-2_Suisun_Marsh_Solano_County_Corps_programmatic.pdf>

(Service) U.S. Fish and Wildlife Service. 2009. California least tern Spotlight Species Action Plan (2010-2014). Carlsbad Fish and Wildlife Office, Carlsbad, California.

(Service) U.S. Fish and Wildlife Service. 2006. California least tern (*Sternula antillarum browni*). 5-Year Review Summary and Evaluation. Carlsbad Fish and Wildlife Office, Carlsbad, California. Available on the internet at: <http://ecos.fws.gov/docs/five_year_review/doc775.pdf>.

(Service) U.S. Fish and Wildlife Service. 1985. Revised California least tern recovery plan. Portland, OR. Accessible at: http://ecos.fws.gov/docs/recovery_plan/850927.pdf

Thompson, B.C., J.A Jackson, J. Burger, L.A. Hill, E.M. Kirsch, and J.L. Atwood. 1997. Least Tern *(Sterna antillarum). In* The Birds of North America, No. 290 (A. Poole and F. Gill, eds.). The Academy of Natural Sciences, Philadelphia, PA, and The American Ornithologists' Union, Washington, D.C. https://birdsna.org/Species-Account/bna/species/leater1/distribution

Vaucher, G.L. 1988. Christmas count, Pacific Canal Area, RP. Panama. Amer. Birds 42(4):1154-1155.

Wolk, R.G., 1974. Reproductive behavior of the Least Tern.*Proc. Linn. Soc. NY 72*, pp. 44-62.

# 8.0 GIANT GARTER SNAKE

## 8.1 Status of the Species

The Service published a proposal to list the giant garter snake as an endangered species on December 27, 1991 (56 FR 67046). Critical habitat has not been designated for this species. The Service reevaluated the status of the snake before adopting the final listing rule, and it was listed as a threatened species on October 20, 1993 (58 FR 54053). A Draft Recovery Plan was proposed for the snake on July 2, 1999 (Service 1999) and revised in 2015 (Service 2015). A 5-year review was conducted in 2006 where no change of status was recommended (Service 2006). An additional 5-year review was conducted in 2012 where no change of status was recommended (Service 2012). In 2017, the Service issued the final *Recovery Plan for the Giant Garter Snake* (*Thamnophis gigas*) (Recovery Plan) (Service 2017). Please refer to the 2017 Recovery Plan for the species' description, habitat preference, and life history.

### 8.1.1  Habitat Loss

Historical records suggest that the giant garter snake inhabited freshwater marshes, streams, and wetlands along with their adjacent associated upland habitats throughout the length of the Sacramento and San Joaquin valleys in Central California. Today only about 5 percent of its historical wetland/upland habitat acreage remains. Nine populations are recognized in the Recovery Plan following an update of the thirteen populations described in the original listing. This change is based on recent surveys, which indicate that two populations were extirpated, and on genetic research, which led to the grouping together of some of the previously described populations.

The loss and subsequent fragmentation of habitat is the primary threat to the giant garter snake throughout the Central Valley of California. Habitat loss has occurred from urban expansion, agricultural conversion, and flood control. Habitat fragmentation has ultimately resulted in the snake being extirpated from the southern one-third of its range in the San Joaquin Valley.

### 8.1.2  Other Threats

In addition to large landscape level habitat conversion, the Sacramento/San Joaquin Delta populations of the giant garter snake are subject to a number of other existing and potential threats which include roads and vehicular traffic, climate change, and predation by non-native species. The recovery strategy is primarily focused on protecting existing, occupied habitat and identifying and protecting areas for habitat restoration, enhancement, or creation including areas that are needed to provide connectivity between populations. This strategy ultimately supports the recovery goal of establishing and protecting self-sustaining populations of the giant garter snake throughout the full ecological, geographical, and genetic range of the species.

Climate change has been linked to increases in the frequency and intensity of weather events, such as heat waves, droughts, and storms (Lenihan *et al.* 2003; California Climate Action Team 2006; IPCC 2007). Extreme events, in turn may cause mass mortality of individuals (by affecting habitat or ecosystem characteristics, for example) and significantly contribute to determining

which species will remain or occur in natural habitats (Whitfield *et al.* 2007). As California's average temperature and precipitation change, species ranges tied to climate dependent habitats are moving northward and upward, but in the future, range contractions are more likely than simple northward or upslope shifts (Loarie *et al.* 2008, 2009). Research has already revealed correlations between climate warming and declines in amphibians and reptiles in different parts of the world (Whitfield *et al.* 2007; McMenamin *et al.* 2008; Mitchell *et al.* 2008; Huey *et al.* 2010).

There are three habitat components that appear to be most important to the giant garter snake (G. Hansen 1982, 1986, 1988; Wylie *et al.* 1996, 1997; Halstead *et al.* 2010). A freshwater aquatic component with protective emergent vegetative cover that will allow foraging, an upland component near the aquatic habitat that can be used for thermoregulation and for summer shelter in burrows, and an upland refugia component that will serve as winter hibernacula. Further detailed descriptions of these habitat components can be found in the Recovery Plan.

The giant garter snake is considered a semi-aquatic species and due to its habitat preferences, giant garter snake is subject to the detrimental effects of floods and drought. This is likely to be exacerbated with the increase in frequency and intensity of flood and drought events due to climate change. Giant garter snakes may be displaced during a flood, buried by debris, exposed to predators, and subject to drowning when burrows and over-wintering sites become inundated with water. Giant garter snakes are not known to occupy the area within the Sutter Bypass which is flooded regularly (Wylie *et al.* 2005); although snakes are known to occupy the Yolo Bypass during the active season when flooding is unlikely (E. Hansen 2009). Snakes appear to survive at least some inundation of their burrows. Wylie observed snakes emerging from burrows after a period of inundation (G. Wylie pers comm. 2016).

Because of the giant garter snake's dependence upon permanent wetlands, water availability will play a significant role in its survival and recovery. In a state where much of the wetland habitat is maintained by managed water regimes, the lack of sufficient water supply may preclude consistent and timely delivery of water to sustain suitable habitat for giant garter snake. Drought conditions place additional strains on the water allocation system. Where populations currently persist on only marginal habitat, emergent drought or higher temperature conditions are likely to result in high rates of mortality in the short term with the effects of low fecundity and survivorship persisting after the drought has ceased (McMenamin *et al.* 2008; Mitchell *et al.* 2008). It is unknown how quickly giant garter snake populations may rebound after severe climatic conditions, particularly since these conditions might further exacerbate the impact from existing threats to giant garter snake, such as habitat loss and fragmentation, and small, isolated populations. Giant garter snake as a species has survived recorded historic droughts, but presumably under conditions where fewer cumulative threats existed.

Nearly all of the research on movement for the giant garter snake has been conducted on individuals in the Sacramento Valley; however, the geography in the Sacramento/San Joaquin Delta is comparably different to the Sacramento Valley due to the island structure of the Delta. These islands are surrounded by numerous large water bodies, large tributaries and experiences a significant tidal influence from the San Pablo and San Francisco Bays. Giant garter snakes have been found on the various islands in the Delta and utilization and/or the frequency to which they

use the large rivers and open tributaries surrounding these islands for dispersal is currently unknown. Giant garter snakes are apparently capable of long-distance movements, although less movement is observed when water is maintained on-site through the summer that supports their habitat (Wylie *et al.* 2002a,b). Movement statistics of giant garter snakes vary greatly and it is likely that their movement is different due to the geographical difference of the Delta to the Sacramento Valley. Based on the research conducted in the Sacramento Valley, Hansen (1986) reported that individuals move less than 100 ft (30.5 m) during the spring in favored habitat. At the Colusa Drain, distances between captures of individuals ranged from 0.7 to 3.3 km (Wylie 2003). Using radio telemetry at the same location in 2006, individual mean movement distance was 63 m/day (range of 3–173 m/day), with a corresponding individual movement rate of 104 m/day (range of 12–287 m) during the "active season" (Wylie and Amarello 2006). Mean maximum individual movement distance was 862 m (range of 34–2,791 m), and total movement over the time radio-tracked averaged 4,761 m (range of 107–16,995 m) Wylie and Amarello 2006). Active-season minimum total distance moved at the same site in 2004 ranged from 0.7 to 215 km (Wylie and Martin 2004c).

## 8.2 Environmental Baseline

Three populations described in the Recovery Plan occur in the Action Area.

*Yolo Bypass Population*. The Yolo Bypass is a leveed, 59,300-acre floodplain located about 5 miles west of Sacramento. It is California's largest contiguous floodplain and provides valuable habitat for a wide variety of aquatic and terrestrial species (Sommer *et al.* 2001). When flooded, the Yolo Bypass provides up to about 59,300 acres of shallow floodplain habitat, with a typical mean depth of 6.5 feet or less. Depending on the amount of flow, the size of the flooded area of the Yolo Bypass can range from 1.2 to 6 miles wide over its 41-mile length (Sommer *et al.* 2008). The 16,770-acre Yolo Bypass Wildlife Area (YBWA) is located in the Yolo Bypass from the railroad crossing just north of the I-80 causeway between West Sacramento and the City of Davis, California. The YBWA is managed by CDFW for recreation, hunting and environmental education. The YBWA is bounded to the west and east by the bypass levees with a small portion lying outside the western levee. Elevations vary with some areas remaining dry during all but the highest Yolo Bypass flood levels. The eastern bypass levee separates the Yolo Bypass from the Sacramento River Deep Water Ship Canal.

Portions of the YBWA are managed as prime farmland to grow crops that provide valuable habitat for a diversity of wildlife species. Rice crops provide habitat for a variety of waterfowl and giant garter snakes. The YBWA includes a variety of created and natural wetlands. Some of these wetlands are permanently flooded with islands and shallow underwater shelves while others are managed as seasonal wetlands that are flooded up during the waterfowl over-wintering and migration seasons and drained from April through August. These wetland systems are connected with agricultural fields through a variety of drainage facilities including pumps, delivery ditches, water control structures, and drainage systems.

There are 39 records in the California Natural Diversity Database (CNDDB) (CDFW 2018) of giant garter snakes in the Yolo Bypass with the majority of sightings located at the upper portion of the Bypass between Interstate 5 and Interstate 80 in a location known as Conaway Ranch. The

most recent occurrence was documented in 2017 in the Southern portion of the Bypass along Shag Slough near Liberty Island. Field research conducted by Brian Halstead of U.S. Geological Survey (USGS) - Western Ecological Research Center captured several giant garter snakes in the southern portion of the Bypass in Lookout Slough (B. Halstead pers. comm. 2019).

*Delta Basin Population*. The Action Area includes the sub-population in the Delta Basin Population and Recovery Unit as defined in the Recovery Plan for Giant Garter Snake (Service 2017). The Delta Basin includes portions of Sacramento, Yolo, Solano, Contra Costa, and San Joaquin counties. A large portion of the Sacramento-San Joaquin Delta area has not been comprehensively surveyed for the giant garter snake, primarily because the majority of land is privately owned. The population status of giant garter snakes in the Delta is relatively undetermined and likely underestimated because sightings are sporadic in time and distance. As an example, an individual giant garter snake was sighted on Sherman Island near the Antioch Bridge in 1987 with a single reoccurring sighting in 2012 (CDFW 2012) and a newer sighting in April of 2016 (Service 2016). A documented sighting of a dead individual was recorded around Empire Cut in the south Delta (CDFW 2010), a live individual was found at Webb Tract in the central Delta (CDFW 2014), and the most recent occurrences of several live and one dead individual were found in the riprap shoreline on Jersey Island with another possible individual sighted across the waterway by the landowner on Bradford Island during the installation of the 2015 rock drought barrier on False River (DWR 2015). Up to six confirmed sightings of individuals on Sherman Island, Twitchell Island, and Bradford Island have been documented since March of 2016 (Service 2016). Most recently, seven giant garter snakes were observed basking in the riprap shoreline of Jersey Island during a pre-construction survey on May 31, 2017. Seven giant garter snakes were again documented the following day on June 1, 2017. Ten snake skin sheds, presumed to be giant garter snakes from the visible faint stripe patterning, were also documented in the same vicinity (Stillwater Sciences 2017).

The recent sightings within the last seven years were mostly by chance and not part of focused surveys which in contrast have had difficulty detecting giant garter snakes in the Delta. Swaim Biological Consulting conducted a series of surveys for giant garter snakes from 2004 to 2005 near the City of Oakley in Contra Costa County, which comprises a large portion of the Hotchkiss Tract immediately south of Bethel Island. No giant garter snakes were found although the trapping effort included both aquatic and terrestrial trap-lines, and was conducted during the active season for the snake (Swaim 2004, 2005a, 2005b, 2005c, 2005d, 2006). DWR also conducted a trapping survey of various sites within the Delta including Sherman Island and Holland Tract that met habitat assessment criteria for giant garter snakes during the summer of 2009 (DWR 2010). No giant garter snakes were trapped or observed during those surveys either.

Currently, the only known source population for giant garter snakes in the Delta region is located in the Eastern Delta at Caldoni Marsh near the City of Stockton. However, it is unlikely that the recent occurrences of giant garter snakes found in the Central and Western Delta originated from Caldoni Marsh considering the distances of those occurrences from Caldoni Marsh, the distances between occurrences, and the estimated dispersal range from telemetry studies. The recent number of documented occurrences within close proximity of each other in the western portion of the Delta suggests there is likely a reproducing population of giant garter snakes in this region. It should also be noted that giant garter snakes in this area are evidently using a habitat

feature such as riprap along the edge of a large body of moving water like the San Joaquin River that other giant garter snakes have not been observed using with any frequency elsewhere.

Large (400 - 700 acres) non-tidal wetland restoration efforts were conducted both on Sherman Island through DWR and on Twitchell Island through a partnership of DWR and Ducks Unlimited. These non-tidal inter-island wetlands provide high quality habitat that could support a giant garter snake population. Otherwise, it is largely unknown whether other reproducing source populations of giant garter snakes occur within the various wetland habitats of the Central and Western Delta. Focused surveys in these areas are hindered either due to inaccessibility to privately owned lands or lack of resources.

*Colusa Basin Population.* The Action Area includes the sub-population in the Colusa Basin Population and Recovery Unit as defined in the Recovery Plan for Giant Garter Snake (Service 2017). The Colusa Basin Recovery Unit is comprised of mostly agriculture lands predominantly in rice production which also include the Sacramento National Wildlife Refuge (NWR), the Delevan NWR, Glenn-Colusa Canal, Colusa Trough, Colusa Drain, and several wetland habitats between the towns of Chico and Woodland from north to south and between the western edge of the Sacramento Valley to the Sacramento River from west to east.

There are 81 records in the CNDDB (CDFW 2018) of giant garter snakes in the Colusa Basin Recovery Unit. The USGS has conducted trapping surveys of giant garter snakes at the Sacramento NWR Complex (Wylie *et al.* 1997, 2000, 2002b). Wylie, in conjunction with Refuge staff, observed giant garter snakes at each of the Federal wildlife refuges (Colusa, Delevan, and Sacramento) that comprise the Sacramento NWR complex. Wylie *et al.* (2000a, 2002a) located 81 and 102 giant garter snakes, respectively, in the years 2000 and 2001 within the Colusa NWR. It is also documented that giant garter snakes occur outside of NWR lands in the adjacent rice production areas. The Colusa NWR represents a stable, relatively protected sub-population of snakes within the Colusa Basin Colusa NWR and continues to reflect a healthy population of giant garter snakes with successful recruitment of young (Wylie *et al.* 2004a, 2005).

Outside of protected areas, however, giant garter snakes in the Colusa Basin clusters are still subject to all threats identified in the final listing rule, including habitat loss due to development, fluctuations in the number of acres in rice production, maintenance of water channels, and secondary effects of urbanization. Restored areas that provided summer water were more effective in meeting the habitat needs of giant garter snakes; therefore, giant garter snakes did not have to venture as far as in previous years to find aquatic habitat during their active period. This was also found to be true for monitoring conducted during 2005. Sampling of the restored areas in Colusa NWR during the summers of 2002 and 2003 continued to document use of the restored wetland area as the habitat quality improves. The aquatic component of the habitat is important because the snake forages on frogs, tadpoles and fish. The 2005 Monitoring Report for the Colusa NWR (Wylie *et al.* 2005) concluded that, "The management of the Colusa Refuge for GGS, which began with the restoration of Tract 24, has clearly benefited the snakes in the restored wetlands and other habitats by maintaining and increasing stable summer water habitats for the snakes, maintaining connectivity among wetland habitats and carefully managing marsh vegetation."

Stony, Logan, Hunters, and Lurline Creeks, as well as the Colusa Drain, and Glenn-Colusa, Tehama Colusa, and Colusa Basin Drainage Canals, and associated wetlands, are important as snake habitat and movement corridors for giant garter snakes. These waterways and associated wetlands provide vital permanent aquatic and upland habitat for snakes in areas with otherwise limited habitat (Wylie *et al.* 2005).

There are three established giant garter snake conservation banks in the Action Area. The Colusa Basin Mitigation Bank has restored and conserved 163 acres for the giant garter snake, the Ridge Cut Giant Garter Snake Conservation Bank has restored and conserved 185.9 acres for the giant garter snake, and the Pope Ranch Conservation Bank (which all credits have been sold and is inactive) has restored and conserved 391 acres for the giant garter snake. Habitat has also been preserved, created, or restored in the Action Area as a result of section 7 consultations between the Service and other Federal agencies. Projects such as the Sherman Island Whale's Mouth Wetland Restoration Project (Service File No. 08FBDT00-2014-F-0027) restored approximately 600 acres of palustrine emergent wetlands and the Twitchell Island East End Habitat Restoration Project (Service File No. 08FBDT00-2013-I-0013) restored approximately 740 acres of palustrine emergent wetlands in the western portions of the Sacramento-San Joaquin Delta.

There are various section 7 consultations with biological opinions for giant garter snake that occur throughout the Action Area. Large scale habitat restoration projects such as the Prospect Island Habitat Restoration Project (Service File No. 08FBDT00-2018-F-0069) will convert portions of terrestrial habitat that could be utilized by giant garter snake to aquatic habitats for fish species. The Corps dredges the Sacramento and Stockton Deep Water Shipping Channels annually and deposits the dredged material into landside placement sites throughout the Delta that have or are near suitable habitat for giant garter snake (Service File Nos. 08FBDT00-2017-F-0098, 08FBDT00-2017-F-0099). CDFW was issued a grant from the Service to conduct routine vegetation maintenance and to manage wildlife habitat for waterfowl and other species that utilize emergent wetland habitats throughout the YBWA. This requires the use of mowers and other large equipment to operate within suitable habitat for giant garter snake (Service File No. 08FBDT00-2012-F-0011). Several flood protection projects such as the Twitchell Island Levee Improvement Project (08FBDT00-2015-F-0023) proposed to repair or build new levees that have or were near suitable giant garter snake habitat.

## 8.3  Effects of the Proposed Action

### 8.3.1  Seasonal Operations

Operations of the pumping facilities are not expected to affect giant garter snake; however, if aquatic habitat in the Delta may be affected by changing in-Delta land management (Colusa Basin Drain Food Web Routing) as a result of water quality changes by the PA, reinitiation may be necessary.

### 8.3.2  Colusa Basin Drain Food Web Routing

Reclamation determined that increasing flows into the Yolo Bypass during late summer and fall would be expected to increase surface water and improve habitat conditions for giant garter

snake in the Yolo Bypass; and therefore, would have a beneficial effect on giant garter snake. While some of this may be true in portions of the bypass, the BA did not specify where in the Colusa Drain or in the Yolo Bypass those effects would be beneficial or if there are potential adverse effects from increased flood flows. It is unknown how this proposed movement of water in late summer and fall will have an effect on foraging opportunities or affect cover for sheltering and the opportunity to evade predators. It is possible that flood flows in the late summer could create conditions that make the water too swift to allow for successful foraging, create more open water with reduced edge habitats from which giant garter snake forage, create more open water that encourages the recruitment of large predatory fish, and/or reduce upland habitats that giant garter snakes require for brumation/aestivation. It is also unknown how the increase in flood flows would affect the giant garter snake's prey base. Following the spring mating season, birthing for giant garter snake occurs from mid-July to early October with average litter size of 17 young (Halstead *et al.* 2011). The Proposed Action is proposed to occur during an important time for young of the year when they are actively foraging in order to grow quickly and increase their chances of surviving through the winter and into the following year. Gravid females are also actively foraging and the size of the young is heavily linked to availability of food resources in any given year (Halstead *et al.* 2011). It is possible that the Proposed Action could increase the giant garter snake's prey base and be beneficial. Conversely, it is also possible that the Proposed Action could adversely affect the giant garter snake's food base by decreasing food abundance or changing the prey base. These adverse effects, if they occur, are not expected to be of a significant magnitude and will likely be short-term.

This action is addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 8.3.3  Delta Cross Channel Improvements

Potentially suitable giant garter snake habitat is present in the vicinity of these gates. Assuming disturbance will occur within a 25-foot radius around the existing gates, the physical improvements of the Delta Cross Channel structure could result in loss of up to 0.2 acre of upland and 0.4 acre of aquatic habitat for giant garter snake. Effects for construction activities associated with the Delta Cross Channel are the same as described below in the Tidal Habitat Restoration. Because the footprint of any improvements would be very small, this is not expected to result in long-term negative impacts to this species.

This action is addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 8.3.4  Tidal Habitat Restoration

Construction and ground disturbing activities related to tidal habitat restoration are likely to adversely affect giant garter snake. Construction activities at each site will likely include ground clearing, grading, and vehicular use including transport of construction equipment and materials. Giant garter snake may be killed or injured by vehicles and heavy construction equipment used

as part of the restoration. This effect would be most likely to occur during site clearing (up to several days at each location). Vehicle strikes are a common threat to giant garter snake and several occurrence records of giant garter snake in CNDDB are from dead individuals found along roadsides which were struck by vehicles. Giant garter snakes commonly use roadside ditches for movement corridors or for foraging and are known to use roadsides for basking sites. The recent documented observations of giant garter snakes using riprap along major river levee banks also show that giant garter snakes can use this habitat for basking and sheltering and possibly for foraging or brumation/aestivation. This makes giant garter snakes highly vulnerable to vehicle strikes as giant garter snakes bask on the road or cross back and forth over roads from the various suitable aquatic and upland habitats.

Associated equipment noise, vibration, and increased human activity may interfere with normal behaviors. These behaviors include feeding, sheltering, movement between refugia and foraging habitats, and other essential behaviors of giant garter snake. Project related activities that occur in areas that have suitable habitat but create intolerable levels of disturbance may force individuals from cover and potentially subject them to circumstances that otherwise would not occur and could result in an increased threat to their survival such as predation.

Tidal habitat restoration may also result in conversion/loss of suitable aquatic and upland habitat into less suitable tidal wetlands. Natural food sources may also be reduced as a result of habitat disturbance and loss. Short-term temporal effects will occur when vegetative cover is removed within upland habitat during project implementation, which may also subject this species to an increased risk of predation. Since snakes use small mammal burrows, soil crevices, and/or rock crevices for shelter for brumation during the winter season and aestivation during extremely hot days during their active period, the PA will likely have some adverse effect by causing snakes to move away from suitable habitat or by disrupting brumation/aestivation if snakes are occupying a burrow or rock outcropping. As ground squirrel burrows can be deep and long, maintenance equipment may come into direct contact with an aestivating snake and a snake could be killed from ground disturbing activities. Snakes in terrestrial habitat may also become entombed under soil, crushed or damaged by equipment or personnel, thereby resulting in harm or mortality to individuals.

These actions associated with Tidal Habitat Restoration are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation. Reclamation is proposing to minimize the adverse effects of the loss of suitable habitat that cannot be avoided from these future restoration projects by implementing actions to promote the recovery of the affected species in a manner where the mitigation is commensurate with the adverse effect. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a rate of 3:1 as described in Appendix E Section E.2.4.1 of the BA.

## 8.4 Effects to Recovery

For a species like the giant garter snake that has lost much of its former habitat, recovery would necessitate the conservation of much of the remaining habitat that still supports it. For future habitat restoration projects associated with the Proposed Action, Reclamation is proposing to minimize the adverse effects of the loss of suitable habitat that cannot be avoided by implementing actions to promote the recovery of the affected species in a manner where the mitigation is commensurate with the adverse effect. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a rate of 3:1 as described in Appendix E Section E.2.4.1 of the BA. Habitat loss and degradation are contributing factors to the decline of giant garter snake; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the giant garter snake. Consequently, we conclude that the PA would not interfere with the recovery of the giant garter snake.

## 8.5 Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect giant garter snake. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the giant garter snake.

## 8.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to the reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the giant garter snake.

### 8.6.1 Reproduction

The giant garter snake is found in the Action Area and several occurrences have been documented from 2013 to 2018 in the western Delta (CDFW 2019; DWR 2015; Service 2019; Stillwater Sciences 2017) and giant garter snakes have been continuously documented throughout the Sacramento Valley (CDFW 2019; Service 2017). The Proposed Action may reduce local reproduction as disturbances from construction and the removal of habitat are likely to interfere with normal giant garter snake mating behaviors and fecundity. In areas that will experience construction actions, it is anticipated that disturbance would cause a reduction in reproductivity; however, this is anticipated to result in loss of a relatively small number of giant garter snakes and the Service anticipates that giant garter snakes will be able to recover the loss of reproduction potential in habitat areas that are not proposed to experience significant habitat loss (future restoration projects associated with the programmatic actions in the PA). It is anticipated that the effects will not reduce the range-wide reproductive capacity of the species.

*8.6.2 Numbers*

The bulk of the giant garter snake's population occurs in the Sacramento Valley with smaller populations located in the Delta and in the San Joaquin Valley (CDFW 2019; Service 2017). We anticipate the PA may result in adverse effects to the giant garter snake; however, it is unknown the extent or the number of giant garter snake that will be affected as the BA did not specify to what extent those effects would be from increased flood flows. Therefore, it is unknown if the PA would reduce the number of giant garter snakes within a portion of the Action Area. However, it is anticipated to reduce the giant garter snake's numbers outside of the Action Area and we conclude that the overall number of giant garter snakes throughout the species' range is not expected to decline.

*8.6.3 Distribution*

The number of giant garter snakes likely to be affected by Proposed Action activities is unknown as the BA did not specify to what extent those effects would be from increased flood flows; however, the Service anticipates that the PA will not alter the distribution of the giant garter snake and we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition because effects from the proposed flood flows would be confined to the Colusa Drain and YBWA within the Yolo and Delta Basin subpopulations. Any effects on distribution from future habitat restoration associated with the PA will be addressed separately as part of that specific project analysis.

## 8.7 Conclusion

After reviewing the current status of the giant garter snake, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of giant garter snakes likely to be affected by PA activities is proportionally small compared to the overall range-wide numbers.

2. Reclamation has proposed conservation measures to avoid and minimize potential effects for future habitat restoration or construction projects that are associated with the PA.

3. Reclamation proposes to restore or protect habitat that could support the giant garter snake as described in Appendix E Section E.2.4.1 of the BA.

## 8.8 Giant Garter Snake Literature Cited

California Environmental Protection Agency. 2006. Climate Action Team Report to Governor Schwarzenegger and the Legislature.

California Department of Fish and Wildlife. 2019. California Natural Diversity Database, https://www.wildlife.ca.gov/Data/CNDDB.

(DWR). 2010. Annual report for permit TE-835365-5, provided to the Sacramento Fish and Wildlife Office by Laura Patterson, DWR.

(DWR) California Department of Water Resources. 2015 Biological Assessment for the West False River Emergency Drought Barrier Project. Prepared by AECOM, July 2015. 36 pp. plus appendices.

Halstead, B.J., G.D. Wylie, and M.L. Casazza. 2010. Habitat suitability and conservation of the giant garter snake (*Thamnophis gigas*) at the landscape scale. Copeia 2010(4): 591-599.

Halstead, B.J., G.D. Wylie, M.L. Casazza, and P.S. Coates. 2011. Temporal and maternal effects on the reproductive ecology of the giant garter snake (*Thamnophis gigas*). Southwestern Naturalist 56(1): 29-34.

Hansen, E. 2009. Giant garter snake (*Thamnophis gigas*) surveys on the Capital Conservation Bank Site: Yolo County, CA. Draft report prepared by Eric Hansen. Dated October 15, 2009.

Hansen, G.E. 1982. Status of the giant garter snake *Thamnophis couchi gigas* along portions of Laguna and Elk Grove Creeks, Sacramento County, California. Report by George E. Hansen, Consulting Environmental Biologist.

Hansen, G. E. 1986. Status of the giant garter snake *Thamnophis couchi gigas* (Fitch) in the Southern San Joaquin Valley During 1986. Final report for California Department of Fish and Game, Standard Agreement No. C-1433. Unpublished. 31 pp.

Hansen, G. E. 1988. Review of the status of the giant garter snake (*Thamnophis couchi gigas*) and its supporting habitat during 1986-1987. Final report for California Department of Fish and Game, Contract C-2060. Unpublished. 31 pp.

Huey, R.B., Deutsch, C.A., Tewksbury, J.J., Vitt, L.J., Hertz, P.E., Pérez, H.J.Á. and Garland, T., 2009. Why tropical forest lizards are vulnerable to climate warming. Proceedings of the Royal Society of London B: Biological Sciences 276(1664):1939-1948.

(IPCC) Intergovernmental Panel on Climate Change. 2014. Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. IPCC, Geneva, Switzerland. http://www.ipcc.ch/pdfpdfpdfpdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full_wcover.pdf

Lenihan, J.M., Bachelet, D., Neilson, R.P. and Drapek, R., 2008. Response of vegetation distribution, ecosystem productivity, and fire to climate change scenarios for California. Climatic Change 87:215-230.

Loarie, S.R., B.E. Carter, K. Hayhoe, S. McMahon, R. Moe, C.A. Knight, D.D. Ackerly. 2008. Climate change and the future of California's endemic flora. PloS ONE 3(6): e2502 doi: http://dx.doi.org/10.1371/journal.pone 0002502.

McMenamin, S.K., Hadly, E.A. and Wright, C.K., 2008. Climatic change and wetland desiccation cause amphibian decline in Yellowstone National Park. Proceedings of the National Academy of Sciences 105(44):16988-16993.

Mitchell, K.M., Churcher, T.S., Garner, T.W., and Fisher, M.C., 2008. Persistence of the emerging infectious pathogen *Batrachochytrium dendrobatidis* outside the amphibian host greatly increases the probability of host extinction. Proceedings of the Royal Society of London, Series B, 275, 329– 334.

(Service) U.S. Fish and Wildlife Service. 1991. Endangered and threatened wildlife and plants: Proposed endangered status for the giant garter snake, December 27, 1991. Federal Register 56(249):67046-6705.

(Service) U.S. Fish and Wildlife Service. 1993. Endangered and threatened wildlife and plants; determination of threatened status for the giant garter snake; final rule. Federal Register 58(201):54053-54066.

(Service) U.S. Fish and Wildlife Service. 1999. Draft Recovery Plan for the Giant Garter Snake (*Thamnophis gigas*). U.S. Fish and Wildlife Service, Portland, Oregon. 192 pp.

(Service) U.S. Fish and Wildlife Service. 2006 Giant Garter Snake (*Thamnophis gigas*) 5 year review. U.S. Fish and Wildlife Sacramento Fish and Wildlife Office.

(Service) U.S. Fish and Wildlife Service. 2012 Giant Garter Snake (*Thamnophis gigas*) 5-year review. U.S. Fish and Wildlife Sacramento Fish and Wildlife Office.

(Service) U.S. Fish and Wildlife Service. 2015. Revised Draft Recovery Plan for the Giant Garter Snake (*Thamnophis gigas*). U.S. Fish and Wildlife Service, Sacramento, CA. 74 pp.

(Service) U.S. Fish and Wildlife Service. 2017. Recovery Plan for the Giant
Garter Snake (*Thamnophis gigas*). U.S. Fish and Wildlife Service, Pacific Southwest
Region Sacramento, CA. vii + 71 pp.

(Service) U.S. Fish and Wildlife Service. 2019. Records kept by the Service from various
sources of documented giant garter snake occurrences from Jan 2010 to April of 2019.

Sommer, T.R., M.L. Nobriga, W.C. Harrell, W. Batham and W.J. Kimmerer. 2001. Floodplain
rearing of juvenile Chinook salmon: evidence of enhanced growth and survival. Canadian
Journal of Fisheries and Aquatic Science 58(2):325-333.
doi: http://dx.doi.org/10.1139/f00-245

Sommer, T.R., W.C. Harrell, and T.J. Swift. 2008. Extreme hydrologic banding in a large-river
floodplain, California, U.S.A. Hydrobiologia 598: 409-415

Stillwater Sciences. 2017. Technical Memorandum: Jersey Island Levee Bank Protection Project:
pre-construction survey methods and results for stations 390+00 to 475+00. Prepared for
MBK Engineers. June 2, 2017.

Swaim, K. 2004. Results of surveys for the giant garter snake (*Thamnophis gigas*) in Marsh
Creek and the Contra Costa Canal, Northeast Contra Costa County, California. Prepared
for Sycamore Associates by Swaim Biological Inc. January 22, 2004.

Swaim, K. 2005a. Results of surveys for the giant garter snake (*Thamnophis gigas*) at the Lesher
Property in Contra Costa County, California. Prepared for Sycamore Associates by
Swaim Biological Inc. October 3, 2005.

Swaim, K. 2005b. Results of surveys for the giant garter snake (*Thamnophis gigas*) at the Biggs
Property in Contra Costa County, California. Prepared for Sycamore Associates by
Swaim Biological Inc. October 3, 2005.

Swaim, K. 2005c. Results of surveys for the giant garter snake (*Thamnophis gigas*) at the Dal
Porto North Property in Contra Costa County, California. Prepared for Sycamore
Associates by Swaim Biological Inc. October 3, 2005.

Swaim, K. 2005d. Results of surveys for the giant garter snake (*Thamnophis gigas*) at the Dal
Porto South Property in Contra Costa County, California. Prepared for Sycamore
Associates by Swaim Biological Inc. October 3, 2005.

Swaim, K. 2006. Survey results for the giant garter snake (*Thamnophis gigas*) at the Gilbert and
Burroughs properties in Contra Costa County, California. Prepared for Zentner and
Zentner by Swaim Biological Inc. February 27, 2006.

Whitfield, S.M., Bell, K.E., Philippi, T., Sasa, M., Bolaños, F., Chaves, G., Savage, J.M. and
Donnelly, M.A., 2007. Amphibian and reptile declines over 35 years at La Selva, Costa
Rica. Proceedings of the National Academy of Sciences 104(20):8352-8356.

Wylie, G. D., T. Graham, and M.L. Casazza. 1996. National Biological Service. Giant garter snake study progress report for the 1995 field season. Preliminary report, U. S. Geological Survey, Biological Resources Division, Dixon Field Station, Dixon, California.

Wylie, G. D., M. L. Casazza, and J. K. Daugherty. 1997. 1996 Progress report for the giant garter snake study. Preliminary report, U.S. Geological Survey, Biological Resources Division, Dixon Field Station, Dixon, California.

Wylie, G. D., M. L. Casazza, and N. M. Carpenter. 2000a. Monitoring giant garter snakes at Colusa NWR: 2000 report. Dixon Field Station, Biological Resources Survey, U.S. Geological Survey, Dixon, California.

Wylie, G. D., M. L. Casazza, L. Martin, and E. Hansen. 2000b. Investigations of giant garter snakes in the Natomas Basin: 2000 field season. Dixon Field Station, Biological Resources Survey, U.S. Geological Survey, Dixon, California. December 21, 2000.

Wylie, G. D., M. L. Casazza, and N. M. Carpenter. 2002a. Monitoring giant garter snakes at Colusa NWR: 2001 progress report. U.S. Geological Survey, Western Ecological Research Center, Dixon Field Station, Dixon, California.

Wylie, G. D., M. L. Casazza, and N. M. Carpenter. 2002b. Monitoring giant garter snakes at Colusa National Wildlife Refuge: 2001 progress report. Unpublished report. U.S. Geological Survey, Biological Resources Division, Dixon Field Station, Dixon, California. April 2002. 10 pp.

Wylie, G.D., 2003, Results of 2003 monitoring for giant garter snakes (Thamnophis gigas) for the bank protection project on the left bank of the Colusa Basin Drainage Canal in Reclamation District 108, Sacramento River Bank Protection Project, Phase II: Progress report prepared by U.S. Geological Survey Western Ecological Research Center, Dixon Field Station, for the U.S. Army Corps of Engineers and Reclamation District 108, Sacramento California, 14 p.

Wylie, G.D., and L. Martin. 2004. Results of 2004 monitoring for giant garter snakes (*Thamnophis gigas*) for the bank protection project on the left bank of the Colusa Basin Drainage Canal in Reclamation District 108. Sacramento River Bank Protection Project, Phase II. Progress report for the U.S. Army Corps of Engineers.

Wylie, G. D., M. L. Casazza, L. L. Martin, and N. M. Carpenter. 2005. Identification of key GGS habitats and use areas on the Sacramento NWR Complex. Prepared for the U.S. Fish and Wildlife Service and the U.S. Bureau of Reclamation by the U.S. Geological Survey, Western Ecological Research Center, Dixon Field Station, Dixon, California.

Wylie, G.D., and Amarello, M., 2006, Results of 2006 monitoring for giant gartersnakes (Thamnophis gigas) for the bank protection project on the left bank of the Colusa Basin Drainage Canal in Reclamation District 108, Sacramento River Bank Protection Project, Phase II: prepared by U.S. Geological Survey Western Ecological Research Center, Dixon Field Station, Dixon, California, for the U.S. Army Corps of Engineers, Sacramento, California, 20 p

Wylie, G. D., M. L. Casazza, L. L. Martin, and N. M. Carpenter. 2003. Monitoring giant garter snakes at Colusa National Wildlife Refuge: 2002 progress report. Unpublished report. U.S. Geological Survey, Biological Resources Division, Dixon Field Station, Dixon, California. 16 pp.

**8.8.1 Giant Garter Snake Personal Communication**

Wylie, Glenn. U.S. Geological Survey, Western Ecological Research Center, Dixon Field Station, personal communication. 2006, 2009.

Brian Halstead. U.S. Geological Survey, Western Ecological Research Center, Dixon Field Station, personal communication during presentation to the Service on results of unpublished surveys in Lookout Slough. 2019.

# 9.0  LEAST BELL'S VIREO

## 9.1  Status of the Species

Least Bell's vireo is one of four subspecies of Bell's vireo and is the only subspecies that breeds entirely in California and northern Baja California. All *Vireo bellii* individuals in California (aside from the far southeastern edge of the state) are reasonably certain to be members of the Federal and State protected least Bell's vireo subspecies (Klicka *et al.* 2016). The Service listed the least Bell's vireo as endangered on May 2, 1986 (51 FR 16474). Critical habitat was designated for least Bell's vireo on February 2, 1994, consisting of ten units across Santa Barbara, Ventura, Riverside, and San Diego counties (59 FR 4845). Critical habitat does not occur within the Action Area; therefore, it will not be addressed further in this BiOp.

Large-scale loss of habitat reduced the number of sites where it breeds and curtailed its numbers; nest parasitism by the brown-headed cowbird (*Molothrus ater*) reduced nesting success within much of the remaining breeding habitat. At the time of listing, the Service estimated that 300 territorial males remained in the United States.

### 9.1.1  Recovery Plan

The draft recovery plan for the least Bell's vireo (Service 1998) describes a strategy for securing and managing riparian habitat within its historical breeding range; the Service also recommended annual monitoring, range-wide surveys, and research to monitor and guide recovery. Specifically, the draft recovery plan recommends the criteria for achieving threatened status as stable or increasing populations or metapopulations, each consisting of several hundred or more breeding pairs that are protected and managed at 11 sites along the central and southern California coast and in the vicinity of Anza Borrego in the desert. Recommended delisting criteria include meeting the goal for threatened status, establishing increasing populations or metapopulations along the Salinas River and in the San Joaquin and Sacramento valleys, and a reduction or elimination of threats to the point where least Bell's vireo populations can persist without significant human intervention. Recovery Action 1 of the Recovery Plan directs the Service to "Protect and manage riparian and adjacent upland habitat within the least Bell's vireo's historical range" (Service 1998).

### 9.1.2  Five-Year Review

The Service completed a 5-year review of the status of the least Bell's vireo in 2006 (Service 2006c). We are incorporating the document by reference to provide additional information relevant to the status of the species. The following paragraphs provide a summary of the relevant information in the 5-year review; unless otherwise noted, all of the following information is from the 5-year review.

In our 5-year review, we recommended revising the status of the species from endangered to threatened because of a ten-fold increase in abundance since listing, expansion of breeding locations throughout southern California, and conservation and management of suitable breeding

habitat throughout its range. By 2005, the Service was aware of approximately 2,968 known territories in the United States with the greatest increases in San Diego and Riverside counties. The number of pairs in Orange, Ventura, San Bernardino, and Los Angeles counties also increased substantially; a few isolated individuals and breeding pairs have also been observed in Kern, Monterey, San Benito, and Stanislaus counties. Since publication of our 5-year review, surveys have detected breeding territories along the Amargosa River in the northern Mojave Desert (McCreedy and Warren 2015a) and Whitewater Canyon, Chino Canyon, and Mission Creek in the Coachella Valley (Hargrove *et al.* 2014). The increase in the abundance of least Bell's vireos since the listing is primarily due to efforts to reduce threats such as loss and degradation of riparian habitat and parasitism by brown-headed cowbirds. The control of invasive plants has also increased the amount of suitable habitat available for nesting.

The 5-year review also contained several recommendations for future management of the least Bell's vireo. These recommendations are to finalize a recovery plan for the least Bell's vireo with realistic, objectively based recovery goals; provide funding and technical support for further studies investigating continuing threats from parasitism by brown-headed cowbirds and invasion of riparian habitats by exotic plants, and potentially elevated predation pressures due to habitat fragmentation or presence of exotic predators; develop and implement a systematic program to survey the Salinas, San Joaquin, and Sacramento Valleys and inform future management; and develop systematic survey programs for watersheds in southern California that are not regularly surveyed within a given 5-year period.

Since the completion of the 5-year review, the Service has issued numerous biological opinions that addressed effects of Federal actions on the least Bell's vireo; the biological opinions concluded that the actions were not likely to jeopardize the continued existence of the least Bell's vireo primarily due to avoidance of construction impacts during the breeding season. Most of these biological opinions addressed effects from urban development, transportation, military readiness, and utility transmission projects. Five biological opinions addressed regional-scale habitat conservation plans regarding urban development and conservation of listed species using an ecosystem-level planning approach. These regional plans identify conservation targets, monitoring needs, and adaptive management strategies for the least Bell's vireo. These plans are expected to provide long-term protection, monitoring, and management of core occurrences of vireos in Kern, Riverside, Orange, and San Diego counties.

The 5-year review does not discuss water infrastructure projects such as dams, in-channel diversions, or flow alternation with regard to the threats it may pose to least Bell's vireos. The 5-year review noted that in many situations where riparian habitat is impacted by authorized Federal and State actions, an equal or greater amount of riparian habitat is restored (i.e., through active planting and maintenance of riparian habitat) or enhanced (i.e., through giant reed [*Arundo donax*] and other exotic plant removal) to offset the impacts. There have been many localized restoration efforts and improved condition overall of southern California's riparian habitats since the vireo was listed. However, development adjacent to riparian zones is a threat to the species. Vireo territories bordering on agricultural and urban areas are less successful in producing young than territories bordering on native upland plant communities (Kus 2002).

West Nile virus may affect some groups of birds disproportionately, either temporarily or persistently (George *et al.* 2015). For example, George *et al.* (2015) found that red-eyed vireos (*Vireo olivaceus*) "experienced significant declines in survival associated with the arrival of [West Nile virus], followed by recoveries to pre-[West Nile virus] levels. Conversely, warbling vireos (*Vireo gilvus*) experienced smaller annual declines in survival than red-eyed vireos after the arrival of West Nile virus but the survival rate continued to decline in subsequent years. We do not know how West Nile virus would affect the least Bell's vireo over time.

### 9.1.3  Reproduction

The main impediments to successful reproduction for least Bell's vireos are nest parasitism by brown-headed cowbirds and availability of suitable breeding habitat. We expect that the continued management of brown-headed cowbirds and restoration of riparian habitat is likely to allow for the continued successful reproduction of the least Bell's vireo within its current breeding range in southern California.

Brown headed cowbirds are abundant throughout the Central Valley where there is an ample supply of ruderal habitat and the nests of host bird species. Brown-headed cowbirds are an invasive species and were not recorded west of the Colorado River before 1870. Their range expanded west and north at a rapid rate through the early 1900's (Laymon 1987). The extent of cowbird management in the Central Valley and its effectiveness is unknown.

There are two necessary habitat features for least Bell's vireo to breed: (1) the presence of dense cover within 1-2 meters of the ground, where nests are typically placed; and (2) a dense, stratified canopy for foraging (Goldwasser 1981; Gray and Greaves 1981; Salata 1981; RECON 1989). Least Bell's vireo will nest in a variety of plant species, provided that the overall habitat structure is present. A major component of habitat structure is willow species of various ages across the landscape. Young willows and sandbar willows provide dense cover from the ground up to several meters. As Goodding's black willow (*Salix gooddingii*), red willow (*Salix laevigata*), and arroyo willow (*Salix lasiolepis*) grow, larger branches lift the canopy over California wild rose (*Rosa californica*), poison oak, California blackberry, and California grape creating a layered structure for nesting and foraging. Least Bell's vireo may attempt as many as five nests in a breeding season (March 15 to July 15), although most fledge young from only one or two nests. The likelihood of re-nesting depends on the time of season, the pair's previous reproductive effort, the success of previous efforts, and other factors. Few nests are initiated after mid-July.

The recent invasion of the polyphagous shot hole boring beetle (*Euwallacea fornicates*) into southern California riparian habitats is a new threat that could adversely affect the recovery of least Bell's vireo. The boring beetle and it's fungal associates in the genus *Fusarium* have decimated the structural component of least Bell's vireo habitat by targeting black willow, red willow, and arroyo willow stems over one-inch diameter. Sprouting willow shoots provide vireo habitat structure, but are recolonized by the beetle when stems resprout from the roots. Least Bell's vireo occupancy has declined in riparian habitats decimated by the shot hole boring beetle (Kus pers. comm. 2017). Birds were not previously banded in areas with significant habitat reduction, thus there is no record of where displaced vireos dispersed. Although the boring beetle

has impacted high quality riparian habitat throughout San Diego County, the least Bell's vireo population in southern California has remained somewhat stable.

9.1.4  Numbers

The Service does not conduct regular surveys throughout the range of the least Bell's vireo. The USGS collects data from biologists conducting surveys for the least Bell's vireo; various workers survey some areas regularly and other results are acquired from surveys that are conducted in support of other activities (e.g., monitoring, preparation of environmental documents for development reviews, etc.). Additionally, not all sites are surveyed every year and the precise locations of surveys may vary from year to year. Consequently, the numbers of territorial males in the following table (Table 9-1, adapted from Kus *et al.* 2017) do not represent a trend; they do, however, indicate that least Bell's vireos have greatly increased in abundance since the time of listing.

**Table 9-1. Estimated number of territorial male least Bell's Vireos based on survey data compiled by the Riparian Birds Working Group (Kus *et al.* 2017)**

| Year | Number of Territorial Males |
|------|------------------------------|
| 2003 | 1,604 |
| 2004 | 2,098 |
| 2005 | 2,068 |
| 2006 | 1,823 |
| 2007 | 2,088 |
| 2008 | 2,521 |
| 2009 | 3,075 |
| 2010 | 3,280 |
| 2011 | 2,917 |
| 2012 | 2,455 |
| 2013 | 2,597 |
| 2014 | 2,477 |
| 2015 | 2,833 |
| 2016 | 2,844 |

Extensive riparian habitat exists on private lands throughout the Sacramento River Watershed within the Central Valley that is not regularly monitored by avian ecologists; therefore, the numbers and distribution of least Bell's vireo in the Central Valley is relatively unknown. Vireos were observed nesting at the San Joaquin River National Wildlife Refuge in 2005 and 2006 (Wood *et al.* 2006; Howell *et al.* 2010), and were observed attempting to establish territory in lower Putah Creek in 2011 (CDFW 2013), but no populations are known to have established. Intensive surveys for least Bell's vireo have not been conducted across the Central Valley in recent years.

9.1.5  Distribution

Least Bell's vireo had a historical distribution that extended from coastal southern California through the San Joaquin and Sacramento Valleys as far north as Tehama County near Red Bluff (Kus 2002). The Sacramento and San Joaquin Valleys were the center of the historical breeding range supporting 60 to 80% of the population (51 FR 16474). At the time of Federal listing in 1986, over 99 percent of the least Bell's vireo population was found south of Santa Barbara County (Service 2006a) and limited to only 300 breeding pairs (Service 1998).

Historically, the least Bell's vireo was a common breeder in riparian habitat throughout coastal southern California and the Central Valley, including the San Joaquin Valley to the south and the Sacramento Valley to the north (Goldman 1908, Grinnell and Miller 1944). Although once one of the most abundant species in California, measurable population declines were observed in the Sacramento and San Joaquin valleys as early as the 1930s (Grinnell and Miller 1944). Data on least Bell's vireos from the 1940s through the 1960s are lacking, but extensive surveys of the Central Valley in the late 1970s did not detect a single individual (Goldwasser *et al.* 1980).

The current distribution of the least Bell's vireo has increased to some degree since its listing in 1986, although it remains absent from large parts of its former range in the Central Valley. Least Bell's vireos have spread through riparian habitat in southern California and small numbers of birds have begun to venture into central coastal California, the southern Central Valley, and the Mojave Desert. We expect that the distribution of least Bell's vireos is likely to continue to increase slowly in the future.

## 9.2  Environmental Baseline

The species is beginning to recolonize its historic range in central and northern California and is known to occupy habitat within the Action Area (Table 9-2). No surveys were conducted for the BA; however, Reclamation proposes to conduct surveys in suitable habitat.

The drastic decline of the species in the Action Area is likely a direct result of habitat loss. From the 1800s to the 1970s, there was a 95% loss of riparian habitat in the Central Valley (Smith 1977; Katibah 1984). Current estimates for riparian vegetation within the Central Valley are still fractions of historic totals despite restoration and enhancement projects. The Sacramento Valley region currently contains 67,897 acres (27,477 hectares) of riparian vegetation (15.9% of the pre-1900 riparian area). The Yolo-Delta region currently contains 32,870 acres (13,302 hectares) (13.9% of the pre-1900 area). The San Joaquin Valley region currently contains 24,948 acres (10,096 hectares) (12.6% of the pre-1900 area) (Dybala *et al.* 2017). Major contributing factors to the loss of riparian habitat throughout the Action Area include hydrologic regulation and decreased flows in rivers from dams, in-channel water diversions, and groundwater pumping, construction of flood control levees and bank protection, conversion of riparian zones to agriculture and grazing, timber harvest, mining, and urbanization (Katibah 1984; Strahan 1984; Scott and Marquiss 1984; Golet *et al.* 2001; Greco 2013; Fremier *et al.* 2014; Dybala *et al.* 2017).

The disturbances that led to the current state of riparian forests in the Action Area are not limited to discrete events resulting in immediate and drastic changes to the system, but also include actions that result in continuous, on-going effects with compounding impacts to riparian ecosystems. When the system has a long history of human alteration, the environment slides farther from historical conditions into the future. Without addressing these effects over time, environments with a long history of human alteration will incrementally lose natural attributes and move closer to a more completely human-dominated landscape that lacks the structure or function to support natural ecosystem processes (Fremier *et al.* 2014). This phenomena has been observed and modeled in rivers within the Action Area. While major changes were reported during the construction and initial operation of major CVP projects in the mid 1900's, continued shifts in vegetation community composition in terms of dominant species, age, canopy height, and patch sizes (Greco *et al.* 2007; Greco 2013) and changes in channel morphology (Michalková *et al.* 2010) have been documented in recent decades. The effects of dam-induced reduction of mean annual peak discharge flow (CALFED 2000), reduction of flood discharge volume (Greco 2013), reduction in stream power (Fremier 2007), sediment starvation (Michalková *et al.* 2010), and reduced bank erosion rates and overbank deposition (USDA 1999) all contribute to changes to successional riparian forest ecosystems. As the ability of the river channel to migrate laterally is restricted by reductions in stream power from dams and water diversions (Larsen *et al.* 2006; Fremier *et al.* 2014) and the quantity of new land production is continuously reduced, the amount of new pioneer riparian forests is subsequently decreased (Greco *et al.* 2007; Greco 2013; Dufour *et al.* 2014). This is evident by the lower fraction of early successional riparian vegetation, which the least Bell's vireo is dependent upon for breeding, along the Sacramento and San Joaquin Rivers in areas where restoration or active management actions have not been undertaken to maintain plant diversity (Strahan 1984; Howell *et al.* 2010; Greco 2013; Dufour *et al.* 2014).

In recent years, there have been a number of observations of adult least Bell's vireos and nesting activity in central and northern California, indicating the species is attempting to recolonize the Central Valley. Additionally, recent modeling of habitat suitability suggests that parts of the Central Valley are highly suitable for least Bell's vireos (Klicka *et al.* 2016). However, the least Bell's vireo population in Central and Northern California has remained very low. Limited suitable habitat between the species' stronghold in the riparian corridors of southern California and suitable restored habitats in the Central Valley may be limiting the ability of the species to disperse and recolonize the northern extent of its historic range.

From 1993 to 2016, there was an average of 1.3 least Bell's vireo observations in Central and Northern California per year (Howell *et al.* 2010). Table 9-2 contains a summary of all confirmed occurrences of least Bell's vireos within the counties included in the Action Area. The only place within the Action Area with confirmed successful nesting is the San Joaquin River National Wildlife Refuge (SJRNWR) in Stanislaus County. In restored riparian habitat in SJRNWR, there were successful nesting events by a pair of vireos in 2005 and 2006, along with an unsuccessful nesting attempt in 2007 (Howell *et al.* 2010). A single male exhibiting territorial breeding behavior was observed in the refuge on multiple occasions in 2012 and 2016. The bird observed in 2016 was documented utilizing both restored riparian habitat and non-restored habitat including the edges of a dirt road and almond orchard. Two singing males were detected in the YBWA in mid-April 2010, and again in 2011 (CDFW 2013). No least Bell's vireos were

detected in the Yolo Bypass Wildlife Area during surveys in 2012, however one bird was heard singing east of the Bypass along Putah Creek that summer (Ebird 2019). A singing male was detected in 2013 (Ebird 2019), but surveys were not conducted in 2014 (Whisler personal communication 2015). No least Bell's vireos have been detected in the Yolo Bypass since 2013. Based on these recent observations, the Service has updated the current mapped range of the species to include the breeding areas in Yolo County and the SJRNWR (Service 2019).

**Table 9-2. Summary of records of least Bell's vireo in counties in or abutting the Action Area since 1985.**

| County | Year | Count | Months Present | Notes | Source |
|--------|------|-------|----------------|-------|--------|
| Marin | 1985 | 1 | Non-breeding season | | Baily and Campbell 1985 |
| Sacramento | 1993 | 1 | Non-breeding season | | Bailey *et al.* 1994 |
| Sacramento | 1995 | 1 | Non-breeding season | | Bailey *et al.* 1996 |
| Santa Cruz | 1996 | 1 | May | | Ebird |
| Santa Clara | 1997 | 2 | Breeding season (April – August) | Breeding pair, success of nest unknown | Roberson *et al.* 1997 |
| Santa Clara | 2001 | 3 | May | Same area as 1997 observation | CDFW |
| Merced | 2004 | 1 | Non-breeding season | | Sterling 2004 |
| Solano | 2005 | 1 | Breeding season (April – August) | | Cole *et al.* 2005 |
| Stanislaus | 2005 | 4 | June | Breeding pair and two fledglings in SJRNWR | Howell *et al.* 2010 |
| Contra Costa | 2005 | 1 | May | | Ebird |
| San Francisco | 2005 | 1 | November | | Ebird |
| Stanislaus | 2006 | 5 | July | Breeding pair and three fledglings in SJRNWR | Howell *et al.* 2010 |
| Sacramento | 2006 | 1 | August | | Ebird |
| Fresno | 2006 | 1 | January | Lost Lake Recreation Area | Ebird (unpublished PRBO data) |
| Santa Clara | 2006 | 1 | May | Pajaro River estuary | Glover *et al.* 2007 |
| San Joaquin | 2006 | 1 | August | Dry Creek | Ebird |
| Stanislaus | 2007 | 1 | May | Unsuccessful breeding attempt in SJRNWR | Howell *et al.* 2010 |
| San Francisco | 2009 | 1 | June | Southest Farallon Island | Ebird |
| Merced | 2010 | 1-2 | May-July | San Luis NWR | Ebird |

| San Mateo | 2010 | 1-2 | May, June | Bedwell Bayfront Park-Menlo Park | Ebird |
|-----------|------|-----|-----------|----------------------------------|-------|
| Yolo | 2010 | 2 | April – August | Yolo Bypass Wildlife Area, Putah Creek. 2 singing males, birds observed carrying nesting materials. | Ebird, CDFW |
| Yolo | 2011 | 2-3 | May – June | Yolo Bypass Wildlife Area, Putah Creek | Ebird |
| Santa Cruz | 2011 | 1 | September | Natural Bridges State Park (coast) | Ebird |
| Merced | 2012 | 2 | May-July | Merced NWR | Ebird |
| Stanislaus | 2012 | 1 | May – July | SJRNWR | Ebird |
| Yolo | 2012 | 1 | May | Putah Creek east of Davis | Ebird |
| Sacramento | 2013 | 1 | April | Bufferlands-Upper Beach Lake | Ebird |
| Yolo | 2013 | 1 | May | Yolo Bypass Wildlife Area | Ebird |
| Sonoma | 2015 | 1 | October | Campbell Cove | Ebird |
| Kings | 2015 | 1 | May | Lockhart's Corner (next to canal) | Ebird |
| Santa Clara | 2016 | 1 | May | Gold Street Ponds (next to Bay) | Ebird |
| Stanislaus | 2016 | 1 | June | SJRNWR | Howell *et al.* 2010 |
| San Joaquin | 2017 | 1 | May | Near Mokelumne River | Ebird |
| Contra Costa | 2018 | 2 | June | Bradford Island, multiple sightings. Confirmed 1 male bird, sex of 2nd bird unconfirmed | Ebird |
| Merced | 2018 | 1 | May | Los Banos Waterfowl Management Area | Ebird |

Conservation actions have been undertaken within the Action Area to improve habitat for least Bell's vireos. The specific habitat needs of least Bell's vireos for nesting, including willow-dominated riparian woodland with dense understory vegetation maintained, in part, in a non-climax stage by periodic floods or other agents (Service 1994), are not addressed in all riparian restoration projects. A habitat suitability model developed for least Bell's vireos identified that

nesting birds typically use riparian vegetation with dense and layered canopy over 26 feet (8 meters) tall, with highest foliage density within 3-6 feet (1-2 meters) of the ground where they place their nests (Kus 1998). In evaluating riparian restoration sites in southern California, Kus (1998) found that many restoration sites only partially matched the habitat suitability model, including sites with patches that were suitably dense but failed to meet the canopy height requirement or sites where trees were suitably tall but lacked sufficient understory. Without active management (e.g. occasional mowing, burning, flooding, etc.) or restoration of natural ecological processes, such as hydrological and fire regimes, to maintain appropriate successional stages of riparian vegetation restoration projects may not provide suitable habitat for least Bell's vireos long-term (Howell *et al.* 2010; Dybala *et al.* 2016). The design and implementation of the restoration sites utilized for nesting by least Bell's vireos in SJRNWR incorporated recommendations from the Riparian Bird Conservation Plan (RHJV 2004), the Endangered Species Recovery Program (California State University–Stanislaus), and the SJRNWR comprehensive conservation plan (Service 2006) for providing suitable habitat for riparian nesting songbirds (Howell *et al.* 2010).

The least Bell's vireo is a priority species for the Central Valley Project Conservation Program (CVPCP). The CVPCP is managed by Reclamation to support projects to protect, restore, and enhance special-status species and their habitats affected by the CVP (Reclamation 2019). One example of a CVPCP funded restoration project designed to provide nesting habitat is Dos Rios Ranch, however no least Bell's vireos have been observed in the project area since implementation (Dybala *et al.* 2016). The Service also supports conservation efforts for least Bell's vireo with grants made from the Cooperative Endangered Species Conservation Fund's Endangered Species Act grants. At least one project within the Action Area has received grant funding through the Service to support least Bell's vireo recovery. In 2016, the Yolo County Habitat Conservation Plan (HCP) received a $820,660 Habitat Conservation Planning Assistance Grant from the Service to protect and enhance land within the Action Area for the conservation of least Bell's vireo, along with 11 other species (Service 2016). The Yolo County HCP was signed in 2018 and is now being implemented.

Riparian corridors within the Action Area currently have the potential to support populations of least Bell's vireo during breeding and migration (Howell *et al.* 2010; Klicka *et al.* 2016). Least Bell's vireos rarely over-winter in California and are not anticipated to regularly occupy habitat in the Action Area between November and March. Based on recent observations of attempted and successful breeding, restored and managed riparian habitats along the San Joaquin and Sacramento Rivers are currently playing an important role in the dispersal of the species from southern California back into its historic range in the Central Valley. While the species does not have a final recovery plan, the Service has established delisting criteria, including "stable or increasing least Bell's vireo populations/metapopulations, each consisting of several hundred or more breeding pairs, having become established and are protected and managed at the following sites: Salinas River, a San Joaquin metapopulation, and a Sacramento Valley metapopulation" (Service 1998, Service 2006). While it is possible that a few more least Bell's vireo breeding territories are dispersed across the region than what has been reported, this delisting criterion is far from being met. The Service has not yet completed a population viability analysis (PVA) for least Bell's vireo, nor a final recovery plan. However, researchers have attempted to model the potential response of the least Bell's vireo population within the Action Area to large-scale

riparian restoration. Dybala *et al.* (2017) estimated that the population of **least Bell's vireos** across the Sacramento Valley, San Joaquin Valley, Tulare Basin, and Yolo Basin-Delta could increase to between 1,000 and 10,000 individuals within 10 years if 31,923 acres (12,919 hectares) of riparian habitat were restored. The researchers also predicted the species could be become resilient within 100 years if 460,848 acres (186,499 hectares) were restored (Dybala *et al.* 2017). Within the Action Area, the least Bell's vireo is likely in the beginning phases of reoccupation of its Central Valley breeding habitat from which it has been extirpated since the 1970s. If existing and permitted (but not yet implemented) Federal actions to restore riparian habitat within the Central Valley are successful in creating and maintaining suitable habitat for the least Bell's vireo, the Service expects the species' numbers to increase in the Action Area during the timespan of the Proposed Action (2019-2030).

The Service has formally consulted on 27 projects within the Action Area since 2001. Six of these consultations were for projects within the Sacramento and American Rivers watersheds, and the remaining 21 were for projects within the San Joaquin and Stanislaus Rivers watersheds. These consultations were for a variety of different types of projects including transmission line maintenance, geotechnical investigations, bridge rehabilitation and repair, and restoration. One of these was the San Joaquin River Restoration Programmatic Biological Opinion (Service File Number 08ESMF00-2012-F-0125).

## 9.3  Effects of the Proposed Action

### 9.3.1  Sacramento River

*Seasonal Operations*

Least Bell's vireo do not currently occupy breeding habitat in the upper Sacramento River and are unlikely to recolonize the area during the timeframe of the PA. However, any changes to the riparian habitat throughout the vireo's historic breeding range in central California may adversely affect the population's ability to disperse and colonize new areas beyond the current breeding habitats occupied in southern California.

Reclamation's PA includes proposed flow changes in the Sacramento River resulting in less than 5% percent decrease in average flows in November and less than 5% increase in average flows in May and June. Reclamation stated in their BA that the proposed "changes are unlikely to produce any measurable change in quantity or quality of least Bell's vireo habitat in the upper Sacramento watershed, and there is no apparent mechanism by which these changes could result in harm to individual least Bell's vireos." Reclamation also determined that the PA would provide benefits to the species' habitat as compared to the without action scenario by increasing fall flows, avoiding drought stress in riparian or wetland vegetation, and by keeping more constant spring flows, avoiding erosion at restoration sites.

Periodic flooding and erosion are important to maintaining non-climax stage willow-dominated riparian woodlands. Additionally, mean modeled flows are presented in a monthly time-step - the averaging of flows over a month dampen the actual fluctuations that are critical for maintaining suitable riparian habitat. The Service assumes seasonal operations will maintain current

vegetation, contributing to the further reduction of natural successional processes that result in non-climax stage riparian woodlands and loss of suitable vireo habitat over time. Additionally, proposed seasonal operation may increase the likelihood that invasive riparian plants will survive dry summer and fall conditions and persist long-term. The changes in flow and operations may result in indirect impacts through changes in riparian habitats if vireo recolonize the Sacramento River Valley during the PA's timeframe.

*North Delta Food Subsidies/Colusa Basin Drain Study*

High water levels (flows of 200 to 500 cfs) are proposed to pass through the Yolo Bypass, which includes a disjunctive portion of the current range for this species. The proposed flows will not exceed local flooding levels and are unlikely to reach 3 feet above the ground where vireo are likely to nest. Flows are proposed in July, August and/or September for approximately 4 weeks, which would coincide with June through mid-September nesting although no adverse effects to individuals or habitat are anticipated. The proposed flows are unlikely to result in direct harm to individual viroes, and may result in indirect beneficial impacts through improvement in habitat conditions and prey base.

9.3.2  Stanislaus River

*Seasonal Operations*

Least Bell's vireo do not currently occupy breeding habitat in the Stanislaus River; however, the Service believes there is a moderate-to-high potential for the species to recolonize the area during the timeframe of the PA based on past successful breeding in the San Joaquin National Wildlife Refuge near the confluence of the San Joaquin and Stanislaus Rivers. Any changes to the riparian habitat throughout the vireo's historic breeding range in central California may adversely affect the population's ability to disperse and colonize new areas beyond the current breeding habitats occupied in southern California.

Reclamation's PA includes proposed flow changes in the Sacramento River resulting in less than 5% percent decrease in average flows in November and less than 5% increase in average flows in May and June. Reclamation stated in their BA that the proposed "changes are unlikely to produce any measurable change in quantity or quality of least Bell's vireo habitat in the upper Stanislaus watershed, and there is no apparent mechanism by which these changes could result in harm to individual least Bell's vireos." Reclamation also determined that the PA would provide benefits to the species' habitat as compared to the without action scenario by increasing fall flows, avoiding drought stress in riparian or wetland vegetation, and by keeping more constant spring flows, avoiding erosion at restoration sites.

However, lower flows in the spring under the PA could potentially result in less riparian vegetation recruitment. The PA will likely result in flows being generally more stable. Any changes in the natural flow regime of the river will likely result in an increase in non-native invasive plant species and a reduction of native riparian recruitment. This may reduce the amount of surrounding suitable non-climax stage willow-dominated riparian habitat over time. The Service agrees with Reclamation's determination that changes in flow and operations are

unlikely to result in direct harm to individual vireos. The changes in flow and operations may result in indirect impacts through changes in riparian habitats if vireo recolonize the Sacramento River Valley during the PA's timeframe.

*Salmonid Spawning and Rearing Habitat Restoration*

Reclamation did not provide an estimate of the area of riparian vireo habitat that may be removed to create side channel habitat. In their BA, Reclamation only mentions gravel placement in-stream when discussing effects to vireo. However, the Service anticipates that construction of side channels in the Stanislaus River will result in loss of up to 43 acres of potentially suitable vireo riparian habitat.

Construction-related effects on the vireo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction that may disrupt normal behavioral patterns. Reclamation proposes to avoid disturbance of occupied vireo habitat through implementation of AMM-LBV in Appendix E of the BA. Reclamation will conduct pre-construction surveys in potential suitable habitat. Subsequent avoidance and minimization measures will be implemented if vireo are detected including establishing 500-foot no-disturbance buffers around nest sites and limiting disturbance from construction noise, light, and vehicle operations within 1,200 feet of suitable habitat during migration and nesting seasons. However, the vireo occur in extremely low densities in the Action Area and may not be easily detected through pre-construction surveys. As such, potential adverse effects to vireo from construction may not be fully avoided by implementing the measures in AMM-LBV, but this measure serves to minimize the possibility of vireos being exposed to disturbance from construction.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 9.3.3  San Joaquin River

*Proposed Flow Changes*

In the lower San Joaquin watershed, the effects of the PA in terms of changes in quantity or quality of least Bell's vireo habitat from the current condition are almost nonexistent. While baseline conditions for vireo in the lower San Joaquin River are impaired by decades of hydrologic alteration, agricultural activities, and habitat loss, the Service does not foresee any subsequent harm to vireo in terms of changes in quantity or quality of least Bell's vireo habitat in the lower San Joaquin watershed during the PA timeframe.

*Lower San Joaquin River Habitat Restoration*

*Permanent Habitat Loss*

The restoration of floodplain habitat in the Lower San Joaquin River would result in the permanent removal of up to 28 acres of vireo habitat. Reclamation states that the habitat consists primarily of small patches but are in close in proximity to other areas of potentially suitable habitat along the San Joaquin River. Although much of this component would occur north of the San Joaquin River portion of the mapped range of least Bell's vireo, the southern extent could be as close as 5 miles from least Bell's vireo breeding occurrences from 2005-2007.

Under AMM-LBV, injury or mortality to nesting least Bell's vireos will be avoided through preconstruction surveys and establishment of 500-foot no-disturbance buffers around active nests.

*Temporary Habitat Loss*

If Reclamation incorporates multi-species restoration methods to create and maintain large patches of riverine and floodplain habitats (particularly willow-dominated riparian woodland with dense understory vegetation maintained, in part, in a non-climax stage by periodic floods or other agents) and adjacent buffers of coastal sage scrub, chaparral, or other upland plant communities (Service 1994) that provide for the breeding and foraging needs of vireo, the loss of 28 acres of vireo habitat due to construction could be minimized by the creation or restoration of suitable vireo habitat as part of this habitat restoration program. Under this potential scenario, what would otherwise be considered a permanent loss of habitat would be a temporary loss instead.

*Periodic Inundation*

Based on a hypothetical floodplain restoration, this activity will periodically inundate an estimated 148 acres of habitat for the least Bell's vireo. The floodplains will transition from areas that flood frequently (i.e., every 1 to 2 years) to areas that flood infrequently (i.e., every 10 years or more). Periodic inundation as a result of floodplain restoration is not expected to adversely affect the least Bell's vireo because flooding is unlikely to occur during the breeding season when the vireo could be present, and the potential effects of inundation on existing riparian vegetation are expected to be minimal. While frequent flooding in the lower elevation portions of the floodplain may result in scouring of some riparian vegetation, this is expected to have a beneficial rather than an adverse effect on the species by promoting vegetation succession.

*Construction-Related Effects*

Occurrences of least Bell's vireo in recent decades in the San Joaquin Valley suggest that the reestablishment of a breeding population is a possibility in this area. If the least Bell's vireo nest in construction areas, equipment operation for construction activities could result in injury or mortality of individuals. Risk will be greatest to eggs and nestlings that could be injured or killed through crushing by heavy equipment, nest abandonment, or increased exposure to the elements

or to predators. Injury to adults and fledged juveniles is unlikely, as these individuals are expected to avoid contact with construction equipment. Injury or mortality to nesting least Bell's vireos will be avoided through preconstruction surveys, establishment of 500-foot no-disturbance buffers around active nests, and limitation of disturbance from construction noise, light, and vehicle operations within 1,200 feet of suitable habitat during migration and nesting seasons, as described in AMM-LBV.

Construction activities may create noise up to 60 dBA at no more than 1,200 feet from the edge of the noise generating activity. While 60 dBA is the standard noise threshold for birds (Dooling and Popper 2007), this standard is generally applied during the nesting season, when birds are more vulnerable to behavioral modifications that can cause nest failure. There is evidence, however, that migrating birds will avoid noisy areas during migration (McClure *et al.* 2013). To minimize this effect, Reclamation will reduce noise in the vicinity of least Bell's vireo habitat as described in AMM-LBV. This will include surveying for least Bell's vireos within the 60 dBA noise contour around the construction footprint, and if a least Bell's vireo is found, limiting noise to less than 60 dBA where the bird occurs until it has left the area.

Night lighting may also affect least Bell's vireos. While there is no data on effects of night lighting on this species, studies show that other bird species are attracted to artificial lights and this may disrupt their behavioral patterns or cause collision-related fatalities (Gauthreaux and Belser 2006). To minimize this effect, Reclamation will screen all lights and direct them away from habitat as described in AMM-LBV. With this measure in effect, and given that least Bell's vireos are expected to occur in the vicinity of Proposed Action activities seldom if at all, residual lighting effects on the species are expected to be negligible.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 9.3.4  Bay-Delta

*Intertidal and Associated Subtidal Habitat Restoration*

Least Bell's vireos are not known to breed in tidal habitat in the Bay-Delta, however, they are commonly observed in coastal areas in Southern California. It is likely the species occasionally migrates through the Bay-Delta and may use riparian habitat in the area for resting and foraging during migration. Recent sightings in Contra Costa County on Bradford Island (Ebird 2019) may indicate the species is attempting to colonize riparian habitat within the delta for breeding.

Construction-related effects on the vireo include the potential for injury or mortality from noise and visual disturbance to individuals in the vicinity of construction. Reclamation proposes to avoid disturbance of occupied vireo habitat through implementation of AMM-LBV in Appendix E of the BA. Reclamation proposes to avoid disturbance of occupied vireo habitat through implementation of AMM-LBV. Reclamation will conduct pre-construction surveys in potential suitable habitat. Subsequent avoidance and minimization measures will be implemented if vireo are detected including establishing 500-foot no-disturbance buffers around nest sites and limiting

disturbance from construction noise, light, and vehicle operations within 1,200 feet of suitable habitat during migration and nesting seasons. Since vireo are not expected to nest in intertidal and subtidal habitats, the implementation of the measures in Appendix E of the BA should avoid impacts to vireo.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

## 9.4  Effects to Recovery

For a species like the least Bell's vireo that has lost much of its former known occupied habitat, recovery would necessitate the conservation of much of the remaining habitat that still supports it. Reclamation is proposing to minimize the adverse effects of the loss of suitable habitat from the Proposed Action by implementing actions to avoid impacts to the species.

Reclamation has not proposed to minimize the adverse effects from the loss of suitable habitat by implementing actions to promote the recovery of the affected species in a manner where the measures are completely commensurate with the adverse effects in the Action Area. Reclamation has also not proposed to restore or protect suitable habitat to offset the total loss of suitable habitat. Reclamation has proposed to avoid and minimize impacts from construction to occupied suitable habitat through implementation of AMM-LBV, however, these measures are unlikely to reduce potential effects from operations activities. Habitat loss and degradation are contributing factors to the decline of least Bell's vireo; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the least Bell's vireo. All habitat restoration included in the PA is focused on benefits to fish species. Proposed and on-going restoration actions included in the baseline are not sufficient to meet the estimated riparian habitat area needed to support the recovery of vireo in the Central Valley (Dybala *et al.* 2017). However, limited suitable habitat between the species' stronghold in the riparian corridors of southern California and suitable restored habitats in the Central Valley may be the primary limiting factor for the species to disperse and recolonize the northern extent of its historic range. Noise, lighting and vibration also have the potential to temporarily affect the least Bell's vireo. These threats will be minimized by Reclamation's proposal to avoid and minimize impacts suitable habitat for the least Bell's vireo through implementation of AMM-LBV. The relatively small amount of habitat that will be lost according to the BA will not appreciably alter conditions in the Action Area, and very few individuals are known or believed to occupy or expected to occupy the Action Area for the duration of the PA. Consequently, we conclude that the PA would not interfere with the recovery of the least Bell's vireo.

## 9.5  Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect least Bell's vireo. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the least Bell's vireo for the entire Action Area. In addition, the use of

agricultural pesticides decreases the quantity and quality of prep for insectivorous birds such as the least Bell's vireo. The continued use of pesticides is likely limiting the prey base available in migratory habitat and in breeding habitat near agricultural areas.

## 9.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the least Bell's vireo.

### 9.6.1 Reproduction

Breeding least Bell's vireos are relatively rare in the Action Area. If vireos do attempt to nest within areas of restoration activities, implementation of AMM-LBV is expected to result in avoidance of disturbance to breeding vireos or their young. Therefore, the PA is not expected to negatively affect least Bell's vireo reproduction, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 9.6.2 Numbers

As described in the Reproduction section above, the number of least Bell's vireos in the Action Area is relatively low, based on recent and past records. Also, Reclamation has proposed measures to avoid and minimize the effects of the PA on the species (AMM-LBV). Proposed Action components most likely to directly affect least Bell's vireos are the salmonid restoration projects which will be subject to subsequent consultations. These effects would only be likely to occur if vireos move into the area affected by these projects. Proposed pre-construction surveys may miss migratory birds or dispersing juveniles and construction-related activities could result in harm from the disruption of normal behavioral patterns. The proposed measures in AMM-LBV are expected to be adequate to avoid take from direct mortality.

Despite the proposed protection measures, we anticipate the PA may still result in effects to the least Bell's vireo; however, the number of least Bell's vireos affected would be low because of their rarity within the Action Area. This is especially true relative to the range-wide numbers. Therefore, the PA is not expected to reduce the number of least Bell's vireos range-wide.

### 9.6.3 Distribution

In recent years, there have been a number of observations of adult least Bell's vireos and nesting activity in or near the Action Area, indicating the species is attempting to recolonize the Central Valley. Additionally, recent modelling of habitat suitability suggests that parts of the Central Valley are highly suitable for least Bell's vireos (Klicka *et al.* 2016). Least Bell's vireo may attempt to breed and nest in willow-dominated riparian woodland habitat in the Action Area. However, the least Bell's vireo population in Central and Northern California has remained very low and is expected to remain low during the timeframe of the PA. With the implementation of

the proposed avoidance and minimization measures in the BA, there is unlikely to be a measurable effect on the species from loss of suitable habitat.

During migration, least Bell's vireos may stop to rest and forage in variety of vegetation types along rivers and streams affected by operations or construction of salmonid restoration sites; however, the reduction of this stop-over habitat will not have a measurable effect on the species.

The number of least Bell's vireos likely to be affected by Proposed Action activities will be very low. We do not expect that any least Bell's vireos will be directly killed by construction of restoration activities or by the proposed changes in operations, and that very few least Bell's vireos will be harmed by loss of habitat due to the PA activities. We also conclude that least Bell's vireos will continue to survive in the Action Area regardless of the activities. Consequently, the PA will not alter the distribution of the least Bell's vireo and we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition.

## 9.7 Conclusion

After reviewing the current status of least Bell's vireo, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of least Bell's vireos likely to be affected by the PA will be low relative to the number of least Bell's vireos range-wide.

2. The amount of least Bell's vireo habitat that is likely to be affected by the PA is relatively small compared to the amount of habitat range-wide.

3. Reclamation has proposed conservation measures, such as pre-construction surveys, to avoid or minimize direct effects to vireos from construction associated with restoration activities.

## 9.8 Least Bell's Vireo Literature Cited

Barlow, J. C. 1962. Natural history of the Bell vireo, *Vireo bellii*. Audubon. Univ. Kansas Publ. Mus. Nat. Hist. 12:241-296.

(CDFW) California Department of Fish and Wildlife. 2019. California Natural Diversity Database, https://www.wildlife.ca.gov/Data/CNDDB.

Dettling, M., Howell, C., and N. Seavy. 2012. Least Bell's Vireo Monitoring and Threat Assessment at the San Joaquin River National Wildlife Refuge 2007-2009 (PRBO Contribution #1854). Petaluma, California: PRBO Conservation Science.

Dooling, R.J. and A.J. Popper. 2007. The effects of highway noise on birds. Environmental BioAcoustics LLC. Rockville, MD. September 30, 2007. Prepared for the California Department of Transportation Division of Environmental Analysis, Sacramento, CA.

Dybala, K., Clipperton, N., Gardali, T., Golet, G., Kelsey, R. and S. Lorenzato. 2017. Population and Habitat Objectives for Avian Conservation in California's Central Valley Riparian Ecosystems. San Francisco Estuary and Watershed Science 15(1).

Dybala, K.E., Walsh, R.G. and N.E. Seavy. 2016. Monitoring Least Bell's Vireo (Vireo bellii pusillus) and comparing breeding landbird populations at the Dos Rios Ranch restoration site and San Joaquin River National Wildlife Refuge 2015-2016 (Point Blue Contribution No. 2101). Petaluma, California: Point Blue Conservation Science.

Franzreb, K. E. 1989. Ecology and Conservation of the Endangered Least Bell's Vireo. U.S. Fish and Wildlife Service Biological Report 89(1).

Gauthreaux, S.A. and C.G. Belser. 2006. Effects of artificial night lighting on migrating birds. Pages 67-93 In: Ecological consequences of artificial night lighting. C. Rich and T. Longcore (eds.). Island Press.

George, T.L., R.J. Harrigan, J.A. LaManna, D.F. DeSante, J.F. Saracco, and T.B. Smith. 2015. Persistent impacts of West Nile virus on North American bird populations. www.pnas.org/cgi/doi/10.1073/pnas.1507747112.

Goldwasser, S. 1981. Habitat Requirements of the Least Bell's Vireo. California Department of Fish and Game, Job IV-38.1.

Goldwasser, S., D. Gaines, and S. Wilbur. 1980. The Least Bell's Vireo in California: A de facto Endangered Race. American Birds 34:742–745.

Gray, M. V., and J. Greaves. 1984. The Riparian Forest as Habitat for the Least Bell's Vireo (*Vireo bellii pusillus*). Paper presented at the California Riparian Systems Conference, University of California, Davis; September 1981.

Greaves, J.M. 1987. Nest-site tenacity of Least Bell's Vireos. West. Birds 18:50-54.

Hargrove L., P. Unitt, K. Clark, and L. Squires. 2014. Status of riparian bird species in the Coachella Valley, final report. San Diego Natural History Museum. San Diego, California.

Howell, C. A., J. K. Wood, M. D. Dettling, K. Griggs, C. C. Otte, L. Lina, and T. Gardali. 2010. Least Bell's Vireo Breeding Records in the Central Valley Following Decades of Extirpation. Western North American Naturalist 70(1):105–113. doi:10.3398/064.070.0111

Katibah, E. F. 1984. A Brief History of the Riparian Forests in the Central Valley of California. In: R.E. Warner and K.M. Hendrix (eds.) California Riparian Systems: Ecology, Conservation, and Productive Management. University of California Press, Berkeley, California, pp. 51-58.

Klicka, L., Kus, B., Title, P., and K. Burns. 2016. Conservation genomics reveals multiple evolutionary units within bell's vireo (vireo bellii). Conservation Genetics 17(2):455-471. doi:10.1007/s10592-015-0796-z

Kus, B. E. 1998. Use of Restored Riparian Habitat by the Endangered Least Bell's Vireo. Restoration Ecology 6:75–82. Cited in Howell, C. A., J. K. Wood, M. D. Dettling, K. Griggs, C. C. Otte, L. Lina, and T. Gardali. 2010. Least Bell's Vireo Breeding Records in the Central Valley Following Decades of Extirpation. Western North American Naturalist 70(1):105–113.

Kus, B. E. 2002. Least Bell's Vireo (*Vireo bellii pusillus*). In The Riparian Bird Conservation Plan: A Strategy for Reversing the Decline of Riparian-Associated Birds in California. California Partners in Flight. http://www.prbo.org/calpif/htmldocs/species/riparian/least_bell_vireo.htm

Kus, B., Howell, S., Pottinger, R. and M. Treadwell. 2017. Recent Population Trends in Least Bell's Vireos and Southwestern Willow Flycatchers: 2016 Update. Riparian Birds Working Group. U.S. Geological Survey, Carlsbad, California, March 16, 2017.

Kus, B. E., and K. L. Miner. 1989. The Use of Non-Riparian Habitats by Least Bell's Vireo (*Vireo bellii pusillus*). Pages 299–303 cited in D. L. Abell (ed.), California Riparian Systems Conference: Protection, Management, and Restoration for the 1990s. 1988 September 22-24, Davis, CA. Pacific Northwest Forest and Range Experiment Station, Berkeley, CA; USDA Forest Service General Technical Report PSW-110.

Kus, B., S. L. Hopp, R. R. Johnson, and B. T. Brown. 2010. Bell's Vireo (Vireo bellii), version 2.0. In The Birds of North America (A. F. Poole, Editor). Cornell Lab of Ornithology, Ithaca, NY, USA. https://doi.org/10.2173/bna.35

Kus, B., S. Howell, R. Pottinger, K. Allen, and M. Madden. 2014. Recent population trends in least Bell's vireos and southwestern willow flycatchers: 2014 Update. San Diego Field Station, Western Ecological Research Center, U.S. Geological Survey. San Diego, California.

McClure1, J.W.C., Watre, H. E. Ware, J. Carlisle, G. Kaltenecker and J.R. Barber. 2013. An experimental investigation into the effects of traffic noise on distributions of birds: avoiding the phantom road. Proc R Soc B 280: 20132290. http://dx.doi.org/10.1098/rspb.2013.2290

McCreedy, C., and L.S. Warren. 2015. Amargosa Canyon songbird project: 2014 least Bell's vireo and southwestern willow flycatcher report. Point Blue Conservation No. 2020, Point Blue Conservation Science. Petaluma, California. Point Blue Conservation.

Nolan, V., Jr. 1960. Breeding behavior of the Bell vireo in southern Indiana. Condor 62:225-244.

RECON (Regional Environmental Consultants). 1989. Comprehensive species management plan for the least Bell's vireo (Vireo bellii pusillus). Prepared for San Diego Association of Governments, San Diego.

Riparian Habitat Joint Venture. 2004. The Riparian Bird Conservation Plan: A Strategy for Reversing the Decline of Riparian-associated Birds in California. Version 2.0. California. Partners in Flight. http://www.prbo.org/calpif/pdfs/riparian_v-2.pdf

Salata, L. 1983. Status of the Least Bell's Vireo on Camp Pendleton, California: Report on Research Done in 1983. Unpublished report. Laguna Niguel, CA: U.S. Fish and Wildlife Service.

(Service) U.S. Fish and Wildlife Service.1986. Determination of Endangered Status for the Least Bell's Vireo. Federal Register 51:16474-16481. May 2, 1986.

(Service) U.S. Fish and Wildlife Service. 1998. Draft recovery plan for the least Bell's vireo (Vireo bellii pusillus).

(Service) U.S. Fish and Wildlife Service. 2001. Least Bell's vireo survey guidelines. Carlsbad Fish and Wildlife Office, Carlsbad, California. 19 pp.

(Service) U.S. Fish and Wildlife Service. 2006. Least Bell's vireo (Vireo bellii pusillus) 5-year review summary and evaluation. Carlsbad Fish and Wildlife Office. Carlsbad, California.

Sterling, J. 2010. Central valley region bird highlights: March through May 2010. CVBC Bulletin 13(3):65-68.

Wood, J.K., Howell, C.A., and G.R. Geupel. 2006. Least Bell's Vireo Breeds in Restored Riparian at San Joaquin River National Wildlife Refuge - 2005 Final Report (PRBO Contribution #1511). Petaluma, California: PRBO Conservation Science.

# 10.0  SALT MARSH HARVEST MOUSE

## 10.1  Status of the Species

### 10.1.1  Legal Status

The salt marsh harvest mouse (*Reithrodontomys raviventris*) was federally listed as endangered in 1970 (35 FR 16047). The list at the species level includes two subspecies: the northern salt marsh harvest mouse (*R. r. halicoetes*), found in San Pablo and Suisun Bays, and the salt marsh harvest mouse (*R. r. raviventris*), found in the marshes of Corte Madera, Richmond, and South San Francisco Bay. The salt marsh harvest mouse is a Fully Protected Species under California law (California Department of Fish and Wildlife Code §4700). Critical habitat has not been proposed or designated for this species.

### 10.1.2  Natural History/Biology

A detailed account of the taxonomy, ecology, and biology of the salt marsh harvest mouse can be found in the *Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California* (Service 2013b).

The salt marsh harvest mouse is restricted to saline (salty) or brackish (somewhat salty) marsh habitats, with *Sarcocornia*-dominated (pickleweed) marsh plain middle zone, as well as and a high marsh zone being important features. Telemetry studies found mean home ranges to be approximately 0.21 hectare (0.52 acre) for the northern subspecies and approximately 0.15 hectare (0.37 acre) for the southern subspecies (Service 2010). Shellhammer (2009 in Service 2010) identified that generally salt marsh harvest mice do not cross large areas of open habitat (*i.e.*, open space or unvegetated habitat).

### 10.1.3  Range-wide Status/Distribution

Data are limited for estimating historical range-wide population and distribution. The salt marsh harvest mouse probably occupied most of the middle tidal, or *Sarcocornia*-dominated (pickleweed), marsh plains and high marsh zones of San Francisco Bay, San Pablo Bay, and Suisun Marsh prior to the significant marsh reclamation of the 1840s. However, by the time of listing, it is likely that populations of the species range-wide had fallen to low levels (Service 2010).

Survey data for the species is generally sparse, with most surveys having been site-specific and relatively short term. For the northern population, the fringing salt marshes along norther San Pablo Bay (Petaluma River to Mare Island Strait), particularly the Highway 37/Mare Island Marsh and additional tidal/microtidal marshes, do support fluctuating populations of salt marsh harvest mice. Due to its large size and deep (broad) suitable salt marsh habitat, Suisun Marsh is an important site for the northern subspecies population and may contain the largest population for the species in the entire remaining range (Service 2010). Standardized annual surveys conducted there since 1997 by CDFW and DWR, have demonstrated fluctuations, but have shown high and increasing capture efficiencies of 10.0-11.5%, which indicates the population

may be increasing. Surveys at other sites in the northern population's range have demonstrated similar capture efficiencies. Similarly, recent research about demography and habitat use in Suisun Marsh (Sustaita *et al.* 2011) captured 1,191 individual salt marsh harvest mice in 28,104 trap nights, for an estimated density of 2.5-3.4 mice/hectare.

In general, the status of the southern population is currently considered to be more precarious than the northern population. Few major, resilient, or secure populations persist and those that do are very small and isolated compared with the historical pattern of distribution and abundance (Service 2010). Studies by Shellhammer (Service 2010) indicate that population size is generally correlated with the depth of the Sarcocornia plain (*i.e.*, the middle zone of tidal marshes). Shellhammer further noted that most of the marshes of the South San Francisco Bay are strip-like marshes and, as such, support few salt marsh harvest mice.

## 10.1.4  Threats

The most fundamental reason for the decline of the salt marsh harvest mouse is loss of habitat through filling (*i.e.*, destruction), subsidence, and vegetation change (Service 1984, Shellhammer 2000). Predation has also been identified as an influential threat (Service 2013b).

## 10.1.5  Recovery

The basic strategy for recovery of the salt marsh harvest mouse is the protection, enhancement, and restoration of extensive, well-distributed habitat suitable for the species. There are short- and long-term components of the general recovery strategy, as well as specific geographic elements. Both interim and long-term components are necessary; neither alone is sufficient to recover the salt marsh harvest mouse. We have identified 5 recovery units: Suisun Bay Area, San Pablo Bay, Central/South San Francisco Bay, Central Coast, and Morro Bay. Recovery criteria comprise a combination of numerical demographic targets and measures that must be taken to directly ameliorate or eliminate threats to the species in the appropriate subset of the above recovery units.

## 10.2  Environmental Baseline

There are numerous documented CNDDB occurrences of salt marsh harvest mouse in the Suisun Marsh portion of the Action Area (CDFW 2019). This species has been observed in tidal wetlands and along sloughs as well as within managed wetlands. Salt marsh harvest mouse use of managed wetlands has been documented to be as high, or higher than, tidal wetland use (Sustaita *et al.* 2011). Wetlands in Suisun Marsh support patchy and unstable, but sometimes sizeable populations of salt marsh harvest mice with fairly high densities despite management activities occurring in the marsh (Service 2013b). Salt marsh harvest mice are also sometimes found in significant numbers in grasslands at the upper edge of diked marshes in the Suisun Bay (Zetterquist 1976; Shellhammer *et al.* 1988).

Perennial pepperweed (*Lepidium* latifolium) is an aggressive, non-native herbaceous weed displacing native vegetation in the Suisun Marsh and other locations throughout California. Pepperweed occurrence within the Action Area is high. Pepperweed can be problematic to

control because of its underground rhizomes that are difficult to kill with broad-spectrum herbicides. Limited success has occurred in the Action Area to control and manage the overtaking of pepperweed long-term. Pepperweed poses a serious threat to many native ecosystems and can displace threatened and endangered species, like the salt marsh harvest mouse, or interfere with the regeneration of important plant species.

Downlisting criteria of the salt marsh harvest mouse include achieving, within the Suisun Bay Recovery Unit, conservation of 1,000 or more acres of muted or tidal marsh in the Western Suisun/Hill Slough Marsh Complex, 1,000 or more acres of muted or tidal marsh in the Suisun Slough/Cutoff Slough Marsh Complex, 1,500 or more acres of diked or tidal marsh in the Grizzly Island Marsh Complex, 1,000 or more acres of muted or tidal marsh in the Nurse Slough/Denverton Slough Marsh Complex, and 500 or more acres of muted or tidal marsh in the Contra Costa County Marsh Complex. Currently, 2,500 acres of suitable habitat throughout the Marsh has been conserved as salt marsh harvest mouse habitat. The salt marsh harvest mouse Conservation Areas are Peytonia Slough; Hill Slough West Ponds 1, 2, 4, and 4A; Hill Slough East Areas 8 and 9; a portion of Joice Island. Crescent Unit, a portion of Lower Joice Island; Blacklock; and Grizzly Island Ponds 1 and 15. Mitigation areas are Island Slough Ponds 4 and 7 (Service 2013a).

The Service has consulted on numerous consultations in the Suisun Marsh in the Action Area with a majority of the consultations being related to on-going maintenance activities or conversion of managed marsh to another use, such as tidal marsh restoration. The June 2013, *Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and Project-Level Actions in Solano County, California* (08ESMF00-2012-F-0602-2) was issued to the Corps to cover projects that fall under the Corps' Regional General Permit, their Letters of Permission, or individual permits in the Suisun Marsh. Example tidal marsh restoration projects that have been consulted on in the Action Area include Tule Red (08FBDT00-2016-F-0071), Blacklock (1-1-06-I-1880), and Montezuma Wetlands (1-1-99-F-12).

## 10.3  Effects of the Proposed Action

### 10.3.1  Tidal Habitat Restoration in Suisun Marsh

Depending on the nature, scope, location, and timing of restoration actions associated with individual restoration projects, there is a potential to adversely affect salt marsh harvest mice during implementation of construction, long-term management, adaptive management, or monitoring activities. The salt marsh harvest mouse inhabits suitable vegetation communities in tidal and managed wetlands in the Suisun Marsh. The PA may result in harm, injury, or death of salt marsh harvest mice through the loss and degradation of their habitat from flooding and through crushing by equipment and machinery. Salt marsh harvest mouse habitat may be destroyed or fragmented by levee breaching, levee creation, and other activities that involve the movement of the soil or other material. Individual salt marsh harvest mice may also be disturbed by noise and vibrations associated with levee breaching, levee creation, and construction activities within or adjacent to salt marsh habitat resulting in the disruption of feeding, sheltering, or breeding activities. Salt marsh harvest mice that are disturbed may be flushed from protective cover or their territories exposing the mice to predators. Disturbance to females from March to

November may cause abandonment or failure of the current litter. Thus, displaced salt marsh harvest mice may suffer from increased predation, competition, mortality, and reduced reproductive success. The likelihood of disturbance of salt marsh harvest mice during construction activities increases if these activities occur during an extreme high tide event when the mice are likely to escape the adjacent flooded marsh to seek higher ground on the outboard levees. Salt marsh harvest mice are most vulnerable to disturbance and predation during extreme high tide events particularly if there is a lack of upland refugia cover. Construction activities will not occur during high tides, consistent with the conservation measures identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

Conversion of suitable habitat in managed wetlands to tidal wetlands would result in a temporary reduction in suitable habitat. As the restored area evolves into a functioning, vegetated tidal wetland, it is expected to provide permanent suitable and sustainable habitat for the salt marsh harvest mouse. Restoration activities likely would be located throughout the Suisun Marsh and would be implemented over a span of years, rather than concentrated in a small geographic area or time frame that would have a potentially greater effect on this species. It is expected that suitable adjacent areas would continue to provide habitat for salt marsh harvest mouse between breaching the levee and the establishment of a fully functioning tidal wetland. Temporary losses of suitable habitat would be compensated for by the creation of tidal wetlands and through the individual project restoration designs.

Construction activities related to tidal restoration actions could result in the introduction or spread of noxious weed species, which could displace native species, thereby changing the diversity of species or number of any species of plants. The non-native invasive, perennial pepperweed is common in Suisun Marsh. Perennial pepperweed establishes poor above-ground cover as it is leafless in the winter and provides little cover during high winter tides. Without suitable upland refugia cover, salt marsh harvest mice are vulnerable to predation during high tide events when the mice escape the flooded marsh to seek higher ground. Perennial pepperweed also interferes with the establishment of marsh gumplant, a tall native evergreen sub-shrub used by salt marsh harvest mice for high tide cover in the high marsh. Spreading rhizomatous and by seed, perennial pepperweed may also displace pickleweed and other native salt marsh vegetation essential to the salt marsh harvest mouse. As described in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp, several measures will be implemented to minimize the spread of nonnative plants as part of the restoration design and during project implementation. Additionally, proposed restoration sites will be managed to promote tidal wetland vegetation so when inundation occurs, there is minimal potential to support nonnative species.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation. This could include tiering or appending to the existing Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

<u>10.3.2  Suisun Marsh Salinity Control Gates (Proposed Flow Changes)</u>

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. Salt marsh harvest mice are assumed to be present during the times of the year in which operations will be occurring in the Suisun Marsh. SMSCG reoperations are expected to temporarily lower marsh channel salinities but effects to mouse habitat are unknown. If it is determined that a proposed change in Suisun Marsh Salinity Control Gates operation is likely to adversely affect salt marsh harvest mice, reinitiation pursuant to 50 CFR 402.16 is required.

## 10.4  Effects to Recovery

Reclamation has proposed to minimize and avoid adverse effects from tidal marsh restoration by implementing conservation measures consistent with those identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp to promote the recovery of salt marsh harvest mouse. Continued threats from habitat loss due to filling, diking, subsidence, changes in water salinity, non-native species invasions, sea level rise associated with global climate change, and contamination are contributing factors to the decline of this species. Habitat suitability of many marshes is further limited by small size, fragmentation, and lack of other vital features such as sufficient refugial habitat. Implementation of restoration actions in the Suisun Marsh may result in short-term adverse effects to salt marsh harvest mouse in order to gain long-term habitat benefits, thereby assisting in the recovery of this species. Therefore, we conclude that the PA would not negatively affect, and may contribute to, recovery of the salt marsh harvest mouse.

## 10.5  Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect salt marsh harvest mouse. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the salt marsh harvest mouse.

## 10.6  Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the salt marsh harvest mouse.

<u>10.6.1  Reproduction</u>

There is ample documentation of salt marsh harvest mice in tidal wetlands and along sloughs as well as within managed wetlands. While restoration activities may result in temporary adverse effects, implementation of conservation measures from the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp will minimize those effects and provide long-term

benefits to the species. Therefore, the PA is not expected to negatively affect salt marsh harvest mouse reproduction range-wide, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

## 10.6.2 Numbers

Patchy and unstable, though sometimes sizable populations of salt marsh harvest mouse occupy tidal marshes of Suisun Marsh. In the diked marshes areas of Suisun Marsh, there are relatively stable populations of fairly high densities (Service 2013b). With implementation of the PA, low mortality or injury of individuals are expected to occur from tidal marsh restoration in the Suisun Marsh area if conservation measures are implemented fully and properly. Restoration actions would contribute to the recovery of salt marsh harvest mice by creating more sustainable habitat for salt marsh harvest mice. Therefore, the PA is not expected to reduce the range-wide numbers of salt marsh harvest mice.

## 10.6.3 Distribution

We do not anticipate that the range-wide distribution of the salt marsh harvest will be reduced because effects to the species from restoration construction activities will be minimized by the implementation of conservation measures from the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp. As restored areas evolve into functioning, vegetated tidal wetland, they are expected to provide benefits by adding permanent suitable and sustainable habitat for the salt marsh harvest mouse. Therefore, we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition.

## 10.7 Conclusion

After reviewing the current status of the salt marsh harvest mouse, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of salt marsh harvest mice likely to be affected by the PA will be low relative to the number of salt marsh harvest mice range-wide.

2. Reclamation has proposed to implement the conservation measures proposed in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

3. The PA is being implemented in a manner that will restore and create more suitable, sustainable habitat for the salt marsh harvest mouse long-term.

## 10.7  Salt Marsh Harvest Mouse Literature Cited

(CDFW) California Department of Fish and Wildlife. 2019. California Natural Diversity Database. RareFind version 5. Natural Heritage Division. Sacramento, California. Accessible at: <https://map.dfg.ca.gov/bios/>.

Sustaita D., P. Finfrock Quickert, L. Patterson, L. Barthmann-Thompson, and S. Estrella. 2011. Salt marsh harvest mouse demography and habitat use in Suisun Marsh, California. *Journal of Wildlife Management* 75(6): 1498–1507.

(Service) U.S. Fish and Wildlife Service. 1984. Salt marsh harvest mouse and California clapper rail recovery plan. Portland, Oregon.

(Service) U.S. Fish and Wildlife Service. 2010. Salt marsh harvest mouse (*Reithrodontomys raviventris*), five-year review. U.S. Fish and Wildlife Service, Sacramento Fish and Wildlife Office, Sacramento, California. 61 pp.

(Service) U.S. Fish and Wildlife Service. 2013a. Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and the Project-level Actions in Solano County, California. June 10, 2013. Accessible at: <https://www.fws.gov/sfbaydelta/documents/2012-F-0602-2_Suisun_Marsh_Solano_County_Corps_programmatic.pdf>

(Service) U.S. Fish and Wildlife Service. 2013b. Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California. Sacramento Fish and Wildlife Office, Sacramento, California. Available on the internet at: https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume1_RP.pdf [Volume I] and https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume2_Appendices.pdf [Volume II].

Shellhammer, H.S, R. Jackson, W. Davilla, A. Gilroy, H.T. Harvey, and L. Simmons. 1982. Habitat preferences of salt marsh harvest mice (*Reithrodontomys raviventris*). Wasmann J. Biol. 40:102-114.

Shellhammer, H.S., R.R. Duke, H.T. Harvey, V. Jennings, V. Johnson, and M. Newcomer. 1988. Salt marsh harvest mice in the diked salt marshes of Southern San Francisco Bay. Wasmann J. Bio. 46: 89-103.

Shellhammer, H.S. 2000. Salt marsh harvest mouse. *in:* Olofson, P.R. (ed.). Baylands Ecosystem Species and Community Profiles: life histories and environmental requirements of key plants, fish, and wildlife. Goals Project (Baylands Ecosystem Habitat Goals), San Francisco Bay Regional Water Quality Control Board, Oakland, California.

Zetterquist, D. 1976. The salt marsh harvest mice in marginal habitats. Unpublished Master's Thesis. San Jose State University, San Jose, CA.

# 11.0  SOFT BIRD'S-BEAK AND SUISUN THISTLE

## 11.1  Status of the Species

### 11.1.1  Status of the Soft Bird's-beak

*Legal Status*

Soft bird's-beak (*Chloropyron molle* ssp. *molle*) was listed as endangered in its entire range on November 20, 1997 (Service 1997).

*Natural History/Biology*

The principal habitat of the soft bird's-beak is the high marsh zone or upper middle marsh zone of brackish marshes with full tidal range (Peinado *et al.* 1994). It is rarely found in non-tidal conditions. Abundance is usually greatest in or near the upper-marsh upland ecotone (Chuang and Heckard 1973, Ruygt 1994). Large, dense patches are sometimes found along the margins of emergent salt pans, or scalds (Ruygt 1994).

Soft bird's-beak is an annual plant that evidently regenerates from a persistent dormant seed bank. The longevity of the seed bank is unknown. However, some colonies have failed to emerge for several years and then reappeared. Population densities vary from isolated individuals (less than 0.5 per square meter to more than 450 per square meter), with densities of 100 to 200 per square meter common (Ruygt 1994).

Branching and flower development begin as early as May (Ruygt 1994) and continue throughout the summer. Flower production correlates with the degree of branching and plant size (Ruygt 1994, Grewell *et al.* 2003, Grewell 2004). Fruits and seeds mature from July to November. Flowering has been known to occur, however, as late as November, indicating a significant overlap between flowering and fruiting (seed production) time. Some fruits begin to mature around early July.

The status of the soft bird's-beak and information about its biology, ecology, distribution, and current threats are available in the *Recovery Plan for the Tidal Marsh Ecosystems of Northern and Central California* (Service 2013b).

*Range-wide Status and Distribution*

There are currently 11 populations with documented occurrences in nine general areas: Rush Ranch, Hill Slough, Joice Island, Benicia State Recreation Area, Point Pinole, Concord Naval Weapons Station, Fagan Slough, McAvoy Boat Harbor, and Denverton. Our understanding of the soft bird's-beak is based on limited and opportunistic survey data. No recent comprehensive range-wide status survey has been conducted for the soft bird's-beak. The largest populations today are located mostly in old relict tidal marshes in Suisun Marsh. The most recent near-comprehensive census was conducted in 2000 (Service 2013b). The census covered Hill Slough marsh and Rush Ranch, both in Suisun Marsh, Solano County. The largest population was found

at Hill Slough Wildlife Area and covered approximately 2 hectares (4.7 acres) (Service 2013b). Since then experimental reintroductions at Rush Ranch have occurred.

Population size and distribution are extremely variable among years for this species. Each population of soft bird's-beak is comprised of many shifting colonies or subpopulations. Because colonies may fail to emerge in some years, it can be difficult to determine with confidence when a population has become extirpated.

*Threats*

The Service's January 2009 five-year review for the soft bird's-beak recommended the soft bird's-beak remain listed as endangered due to the continuation of threats from muting (damping) of tides and salinity, invasive non-native plants, seed predation, sea level rise predicted to result from global climate change, mosquito abatement, oil spills, and (for these small populations) random events.

*Recovery*

None of the recovery units have met the *Recovery Plan for the Tidal Marsh Ecosystems of Northern and Central California* downlisting criteria for the protection, management, and restoration of suitable tidal marsh habitat (Service 2013b).

## 11.1.2  Status of the Suisun Thistle

*Legal Status*

Suisun thistle (*Cirsium hydrophilum* var. *hydrophilum*) was listed as endangered in its entire range on November 20, 1997 (Service 1997).

*Natural History/Biology*

Suisun thistle is associated with the upper intertidal marsh plain along the steep, peaty banks of natural, mature, small tidal creeks, banks, ditches, and marsh edges that are very infrequently flooded but generally not along gently sloping terrestrial edges (Service 2013b). All Suisun thistle populations today occur in peaty organic marsh soils, old bay muds of fine estuarine sediments (silty clays) with relatively high organic content in the upper horizons, and increasing mineral content with depth (Joice series soils).

Suisun thistle is known to be restricted to freshwater-influenced brackish marshes, and is absent in the freshwater tidal marshes of the west Delta and the tidal marshes of central San Pablo Bay to the west.

Suisun thistle is an annual plant, dying after one year of seed reproduction. Its vegetative period is usually one year (biennial), but if small vegetative plant size or unfavorable environmental conditions delay flowering, it may regenerate from the central root crown for more than one

year. Flowering occurs throughout the summer in most years, and continues through production of ripe seedheads (Service 2013b).

The status of the Suisun thistle and information about its biology, ecology, distribution, and current threats is available in the *Recovery Plan for the Tidal Marsh Ecosystems of Northern and Central California* (Service 2013b).

*Range-wide Status and Distribution*

There is scarce information on the historical distribution of the Suisun thistle. Since the time of listing and in the absence of recent surveys, the species is thought to be present at the two sites known prior to the listing (Peytonia Slough Ecological Reserve and Rush Ranch), plus upper Hill Slough and the Joice Island portion of Grizzly Island Wildlife Area, all in Suisun Marsh; however, the colonies at Rush Ranch and the colonies at Joice Island, which are at the eastern end of Rush Ranch have generally been interpreted as one population, for a total of three populations (Service 2013b). Potential habitat exists on private land directly adjacent to the three known populations on CDFW and Solano Land Trust properties. The status of the species on private land is unknown.

*Threats*

The soft bird's-beak and Suisun thistle are threatened by similar factors because they occupy the same tidal marsh ecosystem. These general threats are covered in the *Status of the Soft Bird's-beak*.

## 11.2  Environmental Baseline

### 11.2.1  Soft Bird's-beak Environmental Baseline

Soft bird's-beak is thought to be limited to three general locations in the Suisun Marsh portion of the Action Area: Rush Ranch, CDFW's Joice Island Unit of the Grizzly Island Wildlife Management Area, and the Hill Slough marsh (DWR 2001); however, this species also occurs on Luco Slough and east of Bradmoor Island (CDFW 2019). The Hill Slough population accounts for more than 80% of the occurrences of this species in the Action Area (Service 2013b).

### 11.2.2  Suisun Thistle Environmental Baseline

This species is known to exist only in Suisun Marsh and typically is found in the Action Area in the middle to high marsh zone along tidal channels and in irregularly flooded estuarine wetlands (DWR 2001). Three populations of Suisun thistle are known (DWR 2001), and there are four occurrences in the Action Area (CDFW 2019). One population occurs on CDFW's Peytonia Slough Ecological Reserve. The second population and the remaining occurrences are associated with the Cutoff Slough tidal marshes and CDFW's Joice Island Unit of the Grizzly Island Wildlife Management Area.

### 11.2.3  Previous Consultations in the Action Area

The Service has consulted on numerous consultations in the Suisun Marsh in the Action Area with a majority of the consultations being related to on-going maintenance activities or conversion of managed marsh to another use, such as tidal marsh restoration. The Service issued a biological opinion in June 2013, Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and Project-Level Actions in Solano County, California (08ESMF00-2012-F-0602-2), to the Corps to cover projects that fall under the Corps' Regional General Permit, their Letters of Permission, or individual permits in the Suisun Marsh. Example tidal marsh restoration projects that have been consulted on in the Action Area include Tule Red (08FBDT00-2016-F-0071), Blacklock (1-1-06-I-1880), and Montezuma Wetlands (1-1-99-F-12).

## 11.3  Effects of the Proposed Action

### 11.3.1 Tidal Habitat Restoration in Suisun Marsh

Soft bird's-beak and Suisun thistle are known to occur in the Action Area. Construction activities associated with tidal wetland restoration could affect these plant populations. Soft bird's-beak and Suisun thistle may be directly or indirectly affected by a restoration project; however, adequate buffer areas would be established to exclude activities that would directly remove or alter the habitat of an identified population or result in indirect adverse effects on the species' habitat. However, indirect effects related to restoration, such as scour adjacent to the breach location, could result in a loss of suitable habitat for soft bird's beak and Suisun thistle. Breach size and location would be selected to minimize the effects of scour on soft bird's-beak and Suisun thistle. Additionally, restoration of tidal marshes is expected to create a range of marsh elevation habitat that would support soft bird's beak and Suisun thistle. Long term effects of large scale tidal marsh restoration will result in increased habitat for these rare plants.

Construction activities related to tidal restoration actions could result in the introduction or spread of noxious weed species, which could displace native species, thereby changing the diversity of species or number of any species of plants. Soil-disturbing activities during construction could promote the introduction of plant species that currently are not found in the Action Area, including exotic pest plant species. Construction activities also could spread exotic pest plants that already occur in the Action Area. Individual restoration sites will be managed to promote tidal wetland vegetation so when inundation occurs, there is minimal potential to support nonnative species.

Tidal wetland restoration will occur by breaching and/or lowering exterior levees to restore tidal inundation to restoration sites. Breach locations will be chosen to minimize temporary upstream tidal muting. Restoration projects will be spread throughout the Suisun Marsh and implemented over several years. Interval implementation and the effect of sea level rise would minimize the potential for substantial tidal muting. Although tidal muting could result in a temporary reduction in the tidal water surface elevation range, the overall acreage of tidal wetlands in the Suisun Marsh would increase substantially as a result of restoration actions and provide for more suitable habitat for the soft bird's-beak and Suisun thistle.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits will be addressed in subsequent consultation prior to implementation. This could include tiering or appending to the existing Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

### 11.3.2  Suisun Marsh Salinity Control Gates (Proposed Flow Changes)

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. SMSCG reoperations are expected to lower marsh salinities creating a potential vegetation shift in Suisun Marsh. Changes in tidal stage, flow, or erosion were not analyzed in the ROC BA and therefore effects are uncertain at this time.

## 11.4  Effects to Recovery

Reclamation has proposed to minimize and avoid adverse effects from tidal marsh restoration by implementing conservation measures consistent with those identified in the Suisun Marsh Plan Programmatic Biological Opinion to promote the recovery of soft bird's-beak and Suisun thistle. Continued threats from muting (damping) of tides and salinity, invasive non-native plants, seed predation, sea level rise predicted to result from global climate change, mosquito abatement, oil spills, and (for these small populations) random events are contributing factors to the decline of soft bird's-beak (Service 2013b). Habitat loss is the primary cause of decline of the Suisun thistle (Service 2013b). Implementation of restoration actions in the Suisun Marsh may result in short-term adverse effects to the soft bird's-beak and Suisun thistle in order to increase long-term habitat benefits, thereby assisting in the recovery of this species.

## 11.5  Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect soft bird's-beak and Suisun thistle. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the soft bird's-beak and Suisun thistle.

## 11.6  Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the soft bird's-beak and Suisun thistle.

### 11.6.1  Reproduction

Suisun thistle is an annual plant, dying after one year of seed reproduction (Service 2013b). The reproductive output of individual plants and colonies of Suisun thistle has not been quantified.

No quantitative data are available on seed set, seed abortion, or seed predation. Individual branched plants may produce hundreds of seedheads. Soft bird's-beak is also an annual plant but will regenerate from a persistent dormant seed bank. The longevity of the seed bank is unknown; however, some colonies have failed to emerge for several years and then reappeared. Factors, such as predation, disease, and wind dispersal, can influence the seed production and impact plant species success (Service 2013b). While restoration activities may result in adverse effects, implementation of conservation measures identified in the Suisun Marsh Plan Programmatic Biological Opinion will avoid or minimize those effects and provide long-term benefits to the soft bird's-beak and Suisun thistle. Therefore, the PA is not expected to negatively affect the soft bird's-beak and Suisun thistle reproduction range-wide, and we conclude that the effects would not reduce the range-wide reproductive capacity for both species.

## 11.6.2  Numbers

Limited documented locations of soft bird's-beak and Suisun thistle exist in the Suisun Marsh. With implementation of the PA, a low amount of direct mortality or injury of individual plants and colonies are expected to occur from tidal marsh restoration or implementation of facilities like the Suisun Marsh Salinity Control Gates in the Suisun Marsh area if conservation measures are implemented properly and fully. Restoration actions would contribute to the recovery of soft bird's-beak and Suisun thistle by creating more sustainable habitat for these species and may result in increased numbers of both plants.

## 11.6.3  Distribution

We do not anticipate that the range-wide distribution of the soft bird's-beak and Suisun thistle will be reduced because the Proposed Action may have short-term adverse effects but is expected to have long-term benefits. Although the Action Area overlaps the entire Suisun thistle's range, the PA is not expected to reduce the distribution. The effect to these species from restoration construction activities will be minimized by the implementation of the conservation measures from the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp. Therefore, we do not expect Reclamation's actions will reduce the species' distribution of soft bird's-beak and Suisun thistle.

## 11.7  Conclusion

After reviewing the current status of the soft bird's-beak and Suisun thistle, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of these species. We have reached this conclusion because:

1. The low number of individuals likely to be affected by the PA will not appreciably reduce the likelihood of soft bird's-beak and Suisun thistle survival and recovery and restored wetlands may result in increased numbers of both plants species.

2. Reclamation has proposed to implement the conservation measures proposed in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

3. The PA is being implemented in a manner that will restore and create more suitable, sustainable habitat for the soft bird's-beak and Suisun thistle long-term.

## 11.8  Critical Habitat

### 11.8.1  Status of Soft Bird's-beak Critical Habitat

The Service designated critical habitat for soft bird's-beak on April 12, 2007 (Service 2007). The PCEs defined for soft bird's-beak were derived from its biological needs. Based on our current knowledge of the life history, biology, and ecology of the species, and the habitat requirements for sustaining the essential life-history functions of the species, the Service determined that the PCEs essential to the conservation of the soft bird's- beak are:

1. Persistent emergent, intertidal, estuarine wetland at or above the mean high-water line (as
2. extended directly across any intersecting channels);
3. Rarity or absence of plants that naturally die in late spring (winter annuals); and
4. Partially open spring canopy cover (approximately 790 nMol/m2/s) at ground level, with many small openings to facilitate seedling germination.

Five units have been designated as critical habitat for soft bird's-beak in Contra Costa, Napa, and Solano Counties, California. Contra Costa, Napa, and Solano Counties have approximately 22 acres, 384 acres, and 1,870 aces of critical habitat, respectively. Common threats that may require special management considerations or protections of the PCEs for soft bird's-beak in all five units include: (1) mosquito abatement activities (ditching, dredging, and chemical spray operations), which may damage the plants directly by trampling and soil disturbance, and indirectly by altering hydrologic processes and by providing relatively dry ground for additional foot and vehicular traffic; (2) general foot and off-road vehicle traffic through soft bird's beak populations that could result in their damage and loss in impacted areas; (3) increases in the proliferation of nonnative invasive plants from human-induced soil disturbances leading to the invasives outcompeting soft bird's beak; (4) control or removal of nonnative invasive plants, especially *Lepidium latifolium,* which, if not carefully managed, can damage soft bird's beak populations through the injudicious application of herbicides, by direct trampling, or through the accidental transport of invasive plant seeds to new areas; and (5) presence of *Lipographis fenestrella* (a moth) larvae that could reduce the reproductive potential of soft bird's beak through flower, fruit, and seed predation.

### 11.8.2  Status of Suisun Thistle Critical Habitat

The Service designated critical habitat for Suisun thistle on April 12, 2007 (Service 2007). The PCEs defined for Suisun thistle were derived from its biological needs. Based on our current knowledge of the life history, biology, and ecology of the species, and the habitat requirements for sustaining the essential life-history functions of the species, the Service determined that the PCEs essential to the conservation of the Suisun thistle are:

1. Persistent emergent, intertidal, estuarine wetland at or above the mean high-water line (as extended directly across any intersecting channels);

2. Open channels that periodically contain moving water with ocean derived salts in excess of 0.5 %; and

3. Gaps in surrounding vegetation to allow for seed germination and growth.

The three units designated as critical habitat for Suisun thistle comprise 2,052 acres of Solano County. Common threats that may require special management considerations or protections of the PCEs for Suisun thistle in all three units include: (1) alterations to channel water salinity and tidal regimes from the operation of the Suisun Marsh Salinity Control Gates that could affect the depth, duration, and frequency of tidal events and the degree of salinity in the channel water column; (2) mosquito abatement activities (dredging, and chemical spray operations), which may damage the plants directly by trampling and soil disturbance, and indirectly by altering hydrologic processes and by providing relatively dry ground for additional foot and vehicular traffic; (3) rooting, wallowing, trampling, and grazing impacts from livestock and feral pigs that could result in damage or loss to C. *hydrophilum* var. *hydrophilum* colonies, or in soil disturbance and compaction, leading to a disruption in natural marsh ecosystem processes; (4) the proliferation of nonnative invasive plants, especially *Lepidium latifolium,* leading to the invasives outcompeting C. *hydrophilum* var. *hydrophilum;* and (5) programs for the control or removal of non-native invasive plants, which, if not conducted carefully, can damage C. *hydrophilum* var. *hydrophilum* populations through the injudicious application of herbicides, by direct trampling, or through the accidental transport of invasive plant seeds to new areas. An additional threat that may require special management considerations or protection of the PCEs in Units 1 and 2 includes urban or residential encroachment from Suisun City to the north that could increase stormwater and wastewater runoff into these Units.

## 11.8.3 Soft Bird's-Beak Environmental Baseline

Three critical habitat units identified for soft bird's-beak occur in the Action Area. These units are Unit 2, Hill Slough Wildlife Management Area; Unit 4, Rush Ranch/Grizzly Island Wildlife Management Area; and Unit 5, Southampton Marsh. Soft bird's-beak occurs in each of these Units.

## 11.8.4  Suisun Thistle Environmental Baseline

Three critical habitat units have been identified for Suisun thistle in the Action Area. These units are Unit 1, Hill Slough Wildlife Management Area; Unit 2, Peytonia Slough Ecological Reserve; and Unit 3, Rush Ranch/Grizzly Island Wildlife Management Area. Suisun thistle occurs in each of these Units.

## 11.8.5  Previous Consultations in the Action Area

The Service has consulted on numerous consultations in the Suisun Marsh in the Action Area with a majority of the consultations being related to on-going maintenance activities or conversion of managed marsh to another use, such as tidal marsh restoration. The Service issued a biological opinion in June 2013, Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and Project-Level Actions in Solano County, California (08ESMF00-2012-F-0602-2), to the Corps to cover projects that fall under the Corps'

Regional General Permit, their Letters of Permission, or individual permits in the Suisun Marsh. Example tidal marsh restoration projects that have been consulted on in the Action Area include Tule Red (08FBDT00-2016-F-0071), Blacklock (1-1-06-I-1880), and Montezuma Wetlands (1-1-99-F-12).

### 11.8.6  Effects of the Proposed Action on Soft Bird's-beak and Suisun Thistle Critical Habitat

*Tidal Habitat Restoration in Suisun Marsh*

Within Suisun Marsh there are 2,052 acres of critical habitat designated for Suisun thistle in Units 1, 2, and 3, and 1,870 acres of critical habitat designated for soft bird's-beak in Units 2, 4, and 5. Reclamation has proposed to minimize and avoid adverse effects to individuals from tidal marsh restoration by implementing conservation measures consistent with those identified in the Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp, such as pre-construction surveys associated with each tidal marsh restoration project that will inform new locations of individuals. Indirect effects related to restoration, such as scour adjacent to the breach location, could result in a loss of critical habitat. Breach size and location would be selected to minimize the effects of scour on special-status species habitat. Creation of tidal marsh may create additional habitat within critical habitat units for these species. PCEs will remain intact, contributing to the high conservation value of the unit as a whole, and sustaining the unit's role in the conservation and recovery of the soft bird's-beak and Suisun thistle.

These actions are addressed programmatically in this consultation, so further detail about expected effects and benefits will be addressed in subsequent consultation prior to implementation. This could include tiering or appending to the existing Suisun Marsh Habitat Management, Preservation, and Restoration Plan BiOp.

*Suisun Marsh Salinity Control Gates (Proposed Flow Changes)*

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. SMSCG reoperations are expected to lower marsh salinities creating a potential shift vegetation in Suisun Marsh. Changes in tidal stage, flow, or erosion were not analyzed in the ROC BA and therefore effects are uncertain at this time.

### 11.8.7 Cumulative Effects for Soft Bird's-beak and Suisun Thistle Critical Habitat

The activities described in Section 5.5 for delta smelt critical habitat are also likely to affect soft bird's-beak and Suisun thistle critical habitat. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the soft bird's-beak and Suisun thistle critical habitat.

### 11.8.8  Conclusion

After reviewing the current status of the soft bird's-beak and Suisun thistle critical habitat, Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to destroy or adversely modify soft bird's-beak or Suisun thistle critical habitat. We have reached this conclusion because:

1. Creation of tidal marsh may create additional habitat within critical habitat units for these species.

2. PCEs will remain intact, contributing to the high conservation value of each critical habitat unit and each critical habitat as a whole, and sustaining each unit's role in the conservation and recovery of the soft bird's-beak and Suisun thistle.

## 11.9  Soft Bird's-beak and Suisun Thistle Literature Cited

(CDFW) California Department of Fish and Wildlife (CDFW). 2019. California Natural Diversity Database. RareFind version 5. Natural Heritage Division. Sacramento, California. Available: <https://map.dfg.ca.gov/bios/>.

(DWR) California Department of Water Resources. 2001. Suisun Ecological Workgroup. Final report to the State Water Resources Control Board. November. Sacramento, CA.

Grewell, B.J. 2004. Species diversity in northern California salt marshes: functional significance of parasitic plant interactions. Ph.D. Dissertation, University of California, Davis. 143 pp.

Grewell, B.J., DaPrato, M.A., Hyde, P.R., and E. Rejmankova. 2003. Reintroduction of endangered soft bird's-beak (*Cordylanthus mollis ssp. mollis*) to restored habitat in Suisun Marsh. Final report to CalFed Ecosystem Restoration Program, Contract 99-N05. April 10, 2003. 142 pp.

Peinado, M., F. Alcaraz, J. Delgadillo, M. De La Cruz, J. Alvarez, and J.L. Aguirre. 1994. The coastal salt marshes of California and Baja California: phytosociological typology and zonation. Vegetatio 110:55-66.

Ruygt, J. 1994. Ecological studies and demographic monitoring of soft bird's-beak, *Cordylanthus mollis ssp. mollis*, a California listed rare plant species, and habitat management recommendations. 120+ pp.

(Service) U.S. Fish and Wildlife Service. 1997. Endangered and threatened wildlife and plants; Determination of Endangered Satus for Two Tidal Marsh Plants—Cirsium hydrophilum va. hydrophilum (Suisun Thistle) and Cordylanthus mollis ssp. Mollis (Soft Bird's-Beak) from San Francisco Bay Area of California. Federal Register 62(224): 61916-61925.

(Service) U.S. Fish and Wildlife Service. 2007. Endangered and threatened wildlife and plants; Designation of critical habitat for *Cirsium hydrophilum* var. *hydrophilum* (Suisun thistle) and *Cordylanthus mollis ssp. mollis* (soft bird's-beak); Final Rule. Federal Register 72(70):18517-18553.

(Service) U.S. Fish and Wildlife Service. 2013a. Biological Opinion on the Proposed Suisun Marsh Habitat Management, Preservation, and Restoration Plan and the Project-level Actions in Solano County, California. June 10, 2013. Accessible at: <https://www.fws.gov/sfbaydelta/documents/2012-F-0602-2_Suisun_Marsh_Solano_County_Corps_programmatic.pdf>

(Service) U.S. Fish and Wildlife Service. 2013b. Recovery Plan for Tidal Marsh Ecosystems of Northern and Central California. Sacramento Fish and Wildlife Office, Sacramento, California. Available on the internet at: https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume1_RP.pdf [Volume I] and

https://www.fws.gov/sfbaydelta/EndangeredSpecies/RecoveryPlanning/Tidal_Marsh/Documents/TMRP_Volume2_Appendices.pdf [Volume II].

# 12.0  VALLEY ELDERBERRY LONGHORN BEETLE

## 12.1  Status of the Species

The valley elderberry longhorn beetle was listed as threatened throughout its range and critical habitat was designated on August 8, 1980 (45 FR 52803-52807). Critical habitat, designated at the time of listing in 1980 (45 FR 52803), includes two locations in Sacramento County along the American River where the densest known populations of the beetle occur. These areas are within the Action Area. However, in the BA Reclamation states that it is not consulting on valley elderberry longhorn beetle critical habitat because the Proposed Action will avoid effects to the critical habitat; therefore, it will not be addressed further in this BiOp.

The status of the valley elderberry longhorn beetle has been assessed in the *Recovery Plan Valley Elderberry Longhorn Beetle* (Service 1984) (Recovery Plan) and the 5-year review (Service 2006). For the most recent comprehensive assessment of the range-wide status of the valley elderberry longhorn beetle, refer to the *Withdrawal of the Proposed Rule To Remove the Valley Elderberry Longhorn Beetle From the Federal List of Endangered and Threatened Wildlife* (Service 2014; 79 FR 55874) (withdrawal notice).

In 2012, the Service recommended the delisting of the valley elderberry longhorn beetle (77 FR 60238). The proposal to delist the valley elderberry longhorn beetle was withdrawn on September 17, 2014 (79 FR 55874), and further analysis has resulted in a range modification for the species (Environmental Conservation Online System (ECOS) 2016), and prompted the Service to develop a new *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017)*.

### 12.1.1  Historical and Current Distribution and Abundance

The valley elderberry longhorn beetle is endemic to the Central Valley of California in moist valley oak woodlands along the margins of rivers and streams in the lower Sacramento and San Joaquin Valleys where its obligate larval host plant, elderberry (*Sambucus* spp.) grows (Service 1984). The historic distribution of the beetle closely matched the distribution of the elderberry host plant, which was patchily found throughout the Central Valley riparian forests and occasionally adjacent uplands (non-riparian). At the time of listing in 1980, the beetle was known from less than 10 locations on the American River, Putah Creek, and Merced PatterRiver (Service 2009). Subsequent surveys have documented a broader distribution of the species and now it is known to occur from southern Shasta County in the north to Fresno County in the south (Figure 12-1), including the valley floor and lower foothills, and is generally found below 500 feet (152 meters) above mean sea level (Service 2017).



**Figure 12-1. Presumed extant occurrences of the valley elderberry longhorn beetle (Service 2014). Based on observations (adult beetles and exit holes) between 1997 and 2014 within its presumed historical range. CNDDB occurrence rank of "fair, good, or excellent." Data sources: Collinge *et al.* 2001; River Partners 2007, 2010, 2011; Holyoak and Graves 2010; CDFW 2013; Collinge 2014, pers. comm.; Talley, 2014, pers. comm.; DOD 2014.**

In the withdrawal notice, we reevaluated all available spatial data and provided an updated historical distribution map based on surveys conducted since 1997. The Service described the species' distribution in the context of a metapopulation structure, or discrete subpopulations that exchange individuals through dispersal or migration, and fragmented habitat (Service 2017, Collinge *et al.* 2001). The subpopulations may shift spatially and temporally within riparian drainages, resulting in a patchwork of occupied and unoccupied habitat (Service 2017e). The valley elderberry longhorn beetle remains localized in its distribution (low local numbers within a population structure), with limited dispersal ability, and we estimate it occupies less than 25% of the remaining elderberry habitat found within fragmented riparian areas. There has been nearly 90% loss of riparian vegetation in the Central Valley, and the fragmentation of this habitat that has resulted in a locally uncommon or rare and patchy distribution (clustered in regional aggregations) of the valley elderberry longhorn beetle within its remaining presumed historical range in the Central Valley (patchy distribution from Tehama County to Fresno County).

In the withdrawal notice, we reevaluated the valley elderberry longhorn beetle occurrence records, location, and occupancy data described in our proposed rule, and incorporated new information received since the proposed delisting rule was published (77 FR 60238). The valley elderberry longhorn beetle is a habitat specialist, with limited dispersal ability and a short adult lifespan, and is found in low numbers within a population structure that has become fragmented within its historical range, and continues to be fragmented further by ongoing impacts to its habitat. The valley elderberry longhorn beetle's vulnerable developmental stages (*i.e.*, exposure of eggs and larvae) and its rarity (*i.e.*, low local numbers, low occupancy within its range) are important elements of the metapopulation structure of the species. We concluded that there are extant occurrences of the valley elderberry longhorn beetle at 36 geographical locations in the Central Valley (these locations are based in large part on observations of exit holes, which may not be an accurate depiction of occupancy). However, we acknowledge that there are no current estimates of population size or trends in population numbers for the valley elderberry longhorn beetle.

12.1.2  Reproduction and Habitat Requirements

The valley elderberry longhorn beetle is closely associated with elderberry, as these plants are an obligate host plant for larvae and are necessary for the completion of the life cycle (Eng 1984; Barr 1991; Collinge *et al.* 2001). Elderberry shrubs are common in the Central Valley where they grow naturally in a variety of riparian and non-riparian vegetative communities (Vaghti and Greco 2007). Most elderberry presence within the Central Valley is determined by broad scale hydrologic regimes such as the relative elevation of floodplain and floodplain width, and secondarily by sediment texture and topography (Fremier and Talley 2009). The two main species of elderberry used by this species are the blue elderberry (*Sambucus nigra* subsp. *caerulea,* formerly *S. mexicana*) and red elderberry (*S. racemosa*). Blue elderberry is a component of riparian habitats throughout the Central Valley. Elderberry shrubs are most common on higher and older riparian terraces, where the roots of the plant are able to reach the water table and where the plants are not inundated for long periods (Talley 2005; Vaghti *et al.* 2009). Elderberry shrubs supporting the greatest beetle densities are located in areas where the shrubs are abundant and interspersed in significant riparian zones (Talley *et al.* 2006). The Service recognizes habitat for beetle as including both riparian and nonriparian areas where elderberry shrubs are present.

Adult valley elderberry longhorn beetles live for a few days to a few weeks between mid-March and mid-May, and are most active from late April to mid-May. The adult beetles feed on the elderberry foliage and possibly its flowers. During this time of activity, the beetles mate, and the female lays eggs on the living elderberry plant host. The eggs are typically placed individually or in small clusters within crevices in the bark or junctions of the stem and trunk or leaf petiole and stem. Eggs hatch within a few days and soft-bodied larvae emerge. The larvae are on the surface of the elderberry from a few minutes to several hours or a day and then bore to the center of the elderberry stems where they create a feeding gallery in the pith at the center of the stem. The larvae develop for 1 to 2 years feeding on pith. The late instar larvae chew through the inner bark, all or most of the way to the surface, then return inside plugging the holes with wood shavings. The larvae move back down the feeding gallery to an enlarged pupal chamber packed

with frass. Here the larvae metamorphose into pupae between December and April (Talley *et al.* 2006).

The length of pupation is thought to be about one month with the emergent adult remaining in the chamber for up to several weeks. Adults complete the hole in the outer bark and emerge during the flowering season of elderberry shrubs. The exit holes are circular to oval and range in size from 4 to 10 millimeters in diameter (Talley *et al.* 2006).

Shrub characteristics and other environmental factors appear to have an influence on use by the valley elderberry longhorn beetle, with more exit holes found in shrubs in riparian than in nonriparian habitat types (Talley *et al.* 2006). Occupancy of elderberry shrubs varies based on elderberry condition, water availability, elderberry density, and the health of the riparian habitat, indicating that healthy riparian systems supporting dense elderberry clumps are the primary habitat of the beetle (Barr 1991; Talley *et al.* 2006; Talley *et al.* 2007). However, some studies have demonstrated that valley elderberry longhorn beetles prefer elderberry shrubs with low to moderate levels of damaged stems (Service 2014).

## 12.1.3  Limiting Factors, Threats, and Stressors

Threats, such as the loss of riparian habitat due to development, infrastructure construction and land conversion to agriculture, and the effects of nonnative invasive species were evaluated during the review and discussed in the final withdrawal notice, and continue to act on the valley elderberry longhorn beetle since the withdrawal notice was published. These factors have greatly contributed to the loss and fragmentation of the valley elderberry longhorn beetle metapopulations, including the construction of roads and pipelines.

During the last 150 years California's Central Valley riparian forests have experienced extensive vegetation loss due to expansive agricultural and urban development (Katibah 1984), and in many places, have dwindled to discontinuous, narrow corridors. In recent decades, riparian areas in the Central Valley have continued to decline as a result of ongoing agricultural conversion, urban development, stream channelization and channel hardening. Due to the beetle's limited physical dispersal capability, the fragmentation of riparian forests decreases the likelihood of successful colonization of unoccupied habitat (Collinge *et al.* 2001). As a consequence, the subpopulations are more vulnerable to stochastic events (e.g. removal of vegetation for construction projects, fires, large floods, pesticide applications) that may reduce or eliminate the subpopulation. The loss of multiple subpopulations can have an adverse impact on the long-term persistence and health of the metapopulation of beetles in the Central Valley. Therefore, maintaining contiguous areas of suitable habitat is critical for the survival of the species.

Habitat loss continues to exacerbate the highly fragmented distribution of the valley elderberry longhorn beetle. Direct habitat loss irreversibly damages riparian habitat, specifically to elderberry (*Sambucus* spp.) shrubs. The alteration and destruction of habitat surrounding riparian habitat may disrupt the physical processes conducive to functional riparian ecosystems and further fragment the habitat.

The Service finalized the recovery plan for the species in 1984. However, when the *Valley Elderberry Longhorn Beetle Recovery Plan* was developed, limited information regarding the beetle's life history, distribution, and habitat requirements was available to develop specific recovery objectives. The recovery plan did not include recovery criteria, but did include primary interim objectives that have since been at least partially met and include increased surveys, management of additional areas where the beetles have been identified, and some protections afforded to habitat areas (Service 2012). In 2012, the Service proposed delisting the beetle from its threatened status under the Act based on results of surveying efforts, as well as past and ongoing riparian vegetation restoration and the persistence of elderberry shrubs in restored areas. However, the Service withdrew the proposed delisting rule in 2014 (79 FR 55879) because continued data acquisition indicated that threats to the species and its habitat have not been reduced to the point where the species no longer meets the statutory definition of a threatened species. Specifically, the Service concluded that the species continues to be threatened by habitat loss or degradation (*Factor A*) and predation (*Factor C*) throughout all of its range. Additional environmental factors (e.g. additional habitat loss) and other stressors (e.g. effects related to pesticide use, competition to its host plant from invasive species) are likely to influence the species' distribution and likelihood of extinction in the foreseeable future. While many riparian habitat preservation and restoration effects have taken place throughout the Central Valley since the species' listing, based on the best available data, the species has not recovered in any part of its range (Service 2014).

In the riparian habitat along the Sacramento River, a lack of blue elderberry recruitment may be affecting the quality of habitat for the beetle. Vaghti *et al.* (2009) documented that in riparian habitats there are substantial problems caused by invasive species associated with blue elderberry and the lack of small elderberry plants along dammed rivers. In the absence of large-scale riverine process restoration, horticultural restoration of elderberry shrubs and the maintenance of healthy riparian woodland ecosystems are believed to be necessary to support the recovery of valley elderberry longhorn beetle (Vaghti *et al.* 2009). Extensive elderberry replanting efforts have taken place in the Sacramento River National Wildlife Refuge (River Partners 2004) and elderberry longhorn beetles have been found occupying these restored habitats (Golet *et al.* 2008, Gilbart 2009).

The majority of the beetle's essential habitat along the Lower American River has been protected as part of the American River Parkway (Service 2012), which is managed by Sacramento County Regional Parks and California State Parks and includes both designated critical habitat and essential habitat (Service 2012). Additionally, the Corps has designed and built six sites along the lower American River as habitat for the valley elderberry longhorn beetle between RM 0.9 up to RM 21 (Service 2014).

## 12.2  Environmental Baseline

The riparian range of the valley elderberry longhorn beetle largely overlaps with the Action Area. However, the current distribution of species in the Action Area is largely unknown. Comprehensive surveys for the species or its host plant, elderberry (*Sambucus* spp.), have not

been conducted and thus the population size and location of the species in the Action Area is unknown. Surveys to document elderberry shrubs within 165 feet (50 meters) of all Proposed Action activities will take place prior to the start of construction (Appendix E of the BA, AMM25).

The beetle's distribution is typically based on the occurrence of elderberry shrubs, which are known to occur along riparian corridors throughout the Action Area, including the Sacramento River, American River, Feather River, Stanislaus River, San Joaquin River, and along smaller natural and channelized drainages, as well as in upland habitats. Valley elderberry longhorn beetle is likely to occupy suitable habitat within the riparian areas of the Action Area. However, occupancy in the Bay-Delta watershed is anticipated to be low as few elderberry shrubs exist in the region aside from isolated patches where suitable conditions exist (Calflora 2019). There are no reported occurrences of valley elderberry longhorn beetle in the deltaic wetlands within the Action Area (CDFW 2019; Service 2014).

Valley elderberry longhorn beetle populations and their habitat within the Action Area face the same threats the species faces range-wide. Rapid and widespread development of the Central Valley beginning in the mid-19th century contributed to the loss of nearly 95% of the wooded riparian habitat in the region (Katibah 1984), resulting in the long-term loss and fragmentation of valley elderberry longhorn beetle habitat and decline of the species (Service 2017). Despite gaining protection under the Endangered Species Act in 1980, habitat loss continues to be a primary threat to survival of the species (Service 2014). The losses of riparian habitat due to development, infrastructure construction, land conversion to agriculture, stream channelization, channel hardening, and the effects of nonnative invasive species have greatly contributed to the direct loss of elderberry shrubs and the fragmentation of the valley elderberry longhorn beetle metapopulations along the major rivers of the Central Valley included in the Action Area. The alteration of riparian ecosystems due to damming and the introduction of invasive species has been found to impair blue elderberry recruitment along Action Area rivers (Vaghti *et al.* 2009).

The Service has formally consulted on 586 projects within the Action Area since 1994. These consultations were for projects within every watershed in the Action Area. These consultations were for a variety of projects, including flood control and levee improvements, transportation, utilities, housing development, and geotechnical investigation, transmission lines, and restoration.

## 12.3  Effects of the Proposed Action

Direct effects are the effects of the PA that directly affect the species; for example, those actions that immediately destroy or adversely affect habitat or displace animals and plants. Individual valley elderberry longhorn beetles and their larvae may be directly injured or killed by actions leading to the destruction of habitat (*i.e.*, the killing of or damage to elderberry plants) in which they live. The Service views that any ground disturbance within 20 feet of the dripline of an elderberry plant has the potential to adversely affect that plant and may cause mortality.

Indirect effects are caused by or result from a proposed action, are later in time, and are reasonably certain to occur. Implementation of species-specific conservation measures for valley

elderberry longhorn beetle included in the BA (described below) will minimize indirect effects that may occur outside of the 20 foot buffer around an elderberry plant. Elderberry shrubs may be indirectly affected by actions occurring within 165 feet of the of the elderberry plant's dripline. These may include dust accumulating on plants, soil compaction, inappropriate herbicide, and fuel spills.

The life cycle of the valley elderberry longhorn beetle is such that it may be impossible to know whether an elderberry plant is occupied by larvae or not. Without visual verification of adult valley elderberry longhorn beetles being present, the only other indication of occupation is the presence of exit holes in the stems of elderberry shrubs. The presence of exit holes in elderberry shrub stems does translate to a higher likelihood that the shrubs in the general area are occupied, but the lack of exit holes does not indicate a lack of presence of the valley elderberry longhorn beetle. For that reason, the Service assumes that any elderberry plant within the range of the valley elderberry longhorn beetle might be occupied by larvae.

## 12.3.1  Reclamation's Proposed Conservation Measures for Valley Elderberry Longhorn Beetle

Reclamation has proposed the following measures to section "AMM25 Valley Elderberry Longhorn Beetle" (AMM-VELB) of Appendix E of the BA to avoid, minimize, and mitigate for impacts to the valley elderberry longhorn beetle and its habitat (Reclamation 2019).

*Avoidance and Minimization Measures*

Reclamation proposes to locate activities with flexible locations to avoid or minimize disturbance of valley elderberry longhorn beetle suitable habitat within the species' range. The following measures will be required for project components unable to avoid valley elderberry longhorn beetle habitat.

Reclamation will avoid valley elderberry longhorn beetle critical habitat during implementation of the project components.

Preconstruction surveys for elderberry shrubs will be conducted within all activity footprints and areas within 165 feet by a biologist familiar with the appearance of valley elderberry longhorn beetle exit holes in elderberry shrubs. When possible, preconstruction surveys will be conducted in the calendar year prior to disturbance and will follow the guidance of the Services' *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017), herein referred to as the 2017 VELB Framework. Elderberry shrubs will be avoided to the greatest extent practicable. Complete avoidance (i.e., no adverse effects) may be assumed when activities occur in non-riparian habitat and elderberry shrubs are not present or within a 165-foot buffer of the activity. The Service will be consulted before any disturbances, including construction, within the 165-foot buffer area if it contains elderberry shrubs and/or riparian habitat.

- For elderberry shrubs not directly affected by construction but that occur between 20 feet and 165 feet from ground-disturbing activities, the following measures will be implemented:

- o *Fencing*. All areas to be avoided during construction activities will be fenced and/or flagged as close to construction limits as feasible.
- o *Avoidance area*. Activities that may damage or kill an elderberry shrub (e.g., trenching, paving, etc.) may need an avoidance area of at least 6 meters (20 feet) from the drip-line, depending on the type of activity.
- o *Worker education*. A qualified biologist will provide training for all contractors, work crews, and any onsite personnel on the status of the valley elder, its host plant and habitat, the need to avoid damaging the elderberry shrubs, and the possible penalties for non- compliance.
- o *Construction monitoring*. A qualified biologist will monitor the work area at project- appropriate intervals to assure that all avoidance and minimization measures are implemented. The amount and duration of monitoring will depend on the project specifics and should be discussed with the Service biologist.
- o *Timing*. As much as feasible, all activities that could occur within 50 meters (165 feet) of an elderberry shrub, will be conducted outside of the flight season of the valley elderberry longhorn beetle (March - July).
- o *Trimming*. Trimming may remove or destroy valley elderberry longhorn beetle eggs and/or larvae and may reduce the health and vigor of the elderberry shrub. In order to avoid and minimize adverse effects to valley elderberry longhorn beetle when trimming, trimming will occur between November and February and will avoid the removal of any branches or stems that are $\geq$ 1 inch in diameter. Measures to address regular and/or large-scale maintenance (trimming) should be established in consultation with the Service.
- o *Chemical Usage*. Herbicides will not be used within the drip-line of the shrub. Insecticides will not be used within 30 meters (98 feet) of an elderberry shrub. All chemicals will be applied using a backpack sprayer or similar direct application method.
- o *Mowing*. Mechanical weed removal within the drip-line of the shrub will be limited to the season when adults are not active (August - February) and will avoid damaging the elderberry.
- o *Erosion Control and Revegetation*. Erosion control will be implemented and the affected area will be revegetated with appropriate native plants.
- o *Dust Control*. The potential effects of dust on valley elderberry longhorn beetle will be minimized by applying water during construction activities or by presoaking work areas that will occur within 100 feet of any potential elderberry shrub habitat.
- Elderberry shrubs with stems greater than 1 inch that are directly affected by construction should be transplanted under the following conditions: 1) if the elderberry shrub cannot be avoided; 2) if indirect effects will result in the death of stems or the entire shrub.
  - o The removal may either include the roots or just the removal of the aboveground portion of the plant. When possible, the entire root ball will be retained and the elderberry shrub will be transplanted as close as possible to their original location. Elderberry shrubs will be relocated adjacent to the project footprint if: 1) the planting location is suitable for elderberry growth and reproduction; and 2) the project proponent is able to protect the shrub and ensure that the shrub becomes reestablished. If these criteria cannot be met, the shrub may be transplanted to an

appropriate Service-approved mitigation site. Any elderberry shrub that is unlikely to survive transplanting because of poor condition or location, or a shrub that would be extremely difficult to move because of access problems, may not be appropriate for transplanting. The following transplanting guidelines shall be used by Reclamation in developing their valley elderberry longhorn beetle conservation measures:

- o *Monitor*. A qualified biologist will be on-site for the duration of transplanting activities to assure compliance with avoidance and minimization measures and other conservation measures.
- o *Exit Holes*. Exit-hole surveys will be completed immediately before transplanting. The number of exit holes found, GPS location of the plant to be relocated, and the GPS location of where the plant is transplanted will be reported to the Service and to the CNDDB.
- o *Timing*. Elderberry shrubs will be transplanted when the shrubs are dormant (November through the first two weeks in February) and after they have lost their leaves. Transplanting during the non-growing season will reduce shock to the shrub and increase transplantation success.
- o *Transplanting Procedure*. Transplanting will follow the most current version of the ANSI A300 (Part 6) guidelines for transplanting (http://www.tcia.org/).
- o *Trimming Procedure*. Trimming will occur between November and February and should minimize the removal of branches or stems that exceed 1 inch in diameter.

*Compensation to Offset Unavoidable Impacts*

Reclamation proposes to coordinate with the Service to offset impacts on elderberry shrubs by either creating valley elderberry longhorn beetle habitat or by purchasing the equivalent credits at a Service approved conservation bank with a service area that overlaps with the Action Area. Compensatory mitigation will be coordinated with the Service to determine the appropriate type and amount of compensatory mitigation and follow criteria in the 2017 VELB Framework.

12.3.2  Sacramento River

*Seasonal Operations*

Implementation of the PA is unlikely to produce any measurable change in quantity or quality of valley elderberry longhorn beetle habitat in the upper Sacramento watershed. There is no apparent mechanism by which these changes could result in harm to individual valley elderberry longhorn beetles.

*Salmonid Spawning and Rearing Habitat Restoration*

During placement of gravel and other measures to enhance spawning habitat, Reclamation will avoid disturbance of elderberry shrubs consistent with AMM-VELB, including but not limited to, avoiding siting restoration projects in areas with elderberry shrubs to the extent practical, implementing avoidance areas and fencing around elderberry shrubs, and adjusting construction timing to avoid work within 165 feet of elderberry shrubs from March to July. Creation of side

channels will require removal of riparian habitat within the range of valley elderberry longhorn beetle, and although Reclamation will minimize disturbance associated with this activity, they may remove up to an estimated 58 acres of riparian habitat that could include elderberry shrubs supporting valley elderberry longhorn beetle. Assuming an estimated average of 0.9 shrubs per acre (from the Bay Delta Conservation Plan, Appendix 6B), rearing habitat restoration could result in removal of up to 52 elderberry shrubs. Reclamation will offset adverse effects on elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation consistent with *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017).

Habitat restoration may include use of heavy equipment for ground clearing, grading, excavation, and placement of gravel or habitat structures. Construction related actions could injure or kill valley elderberry longhorn beetles if individuals are present in shrubs to be transplanted, but the potential for this effect will be minimized as described AMM-VELB.

The operation of equipment during construction in the vicinity of occupied elderberry shrubs could also result in injury or mortality of valley elderberry longhorn beetles if they are actively dispersing between shrubs, which is generally between March 15th to June 15th; or if occupied shrubs are inadvertently damaged by construction activities. These effects will be avoided and minimized as described in AMM-VELB.

Temporary construction-related ground disturbances could generate dust that could adversely affect adjacent valley elderberry longhorn beetle habitat. Dust is listed in the valley elderberry longhorn beetle recovery plan as a threat to the species (Service 1984). However, one study indicated that dust deposition was not correlated with valley elderberry longhorn beetle presence (Talley *et al.* 2006), although dust was weakly correlated with elderberry stress symptoms (water stress, dead stems, smaller leaves). During times of drought, when elderberry shrubs are under stress, dust deposition could further stress the shrubs, potentially leading to their death. Such a loss of shrubs could adversely affect valley elderberry longhorn beetle (Talley and Holyoak 2006). The potential effects of dust on valley elderberry longhorn beetle will be minimized by applying water during construction activities or by presoaking work areas that will occur within 100 feet of any potential elderberry shrub habitat.

Exhaust from construction and maintenance vehicles may result in deposition of particulates, heavy metals, and mineral nutrients that could influence the quality and quantity of elderberry shrubs and thereby affect beetle presence and abundance. The results of a study by Talley and Holyoak (2006) showed no relationship, however, between the distance of the shrubs from highways and the presence or abundance of the beetle.

Temporary lighting from construction activities could adversely affect valley elderberry longhorn beetle. The effects of lighting on valley elderberry longhorn beetle are unknown, although insects are known to be subject to heavy predation when they are attracted to night lighting (Eisenbeis 2006). No construction activities will occur during nighttime hours in the vicinity of habitat for federally listed species.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

*North Delta Food Subsidies/Colusa Basin Drain Study*

High water levels (flows of 200 to 500 cfs) are proposed to pass through the Yolo Bypass. The proposed flows will not exceed current local flooding levels. Flows are proposed in July, August and/or September for approximately 4 weeks, which would potentially kill elderberry shrubs from excessive saturated soil conditions or competition from other plants that may benefit from the change in hydrology (Vaghti *et al.* 2009), although the extent to which these effects might occur is uncertain based on the information provided in the BA. If elderberry shrubs are damaged or die due to the proposed flows taking place in July at the end of breeding season, adult valley elderberry longhorn beetles may be injured or killed. Flows during the breeding season may also potentially affect the behavior of adult beetles. Flooding in July or August may result in killing eggs laid on elderberry leaves below the flood elevation. Flooding may result in the scouring of elderberry shrubs and breaking off limbs occupied by beetle larvae resulting in the death of those individuals. By transplanting elderberry shrubs likely to be killed or injured by the proposed flows or mitigating at a minimum of 3:1 for unavoidable adverse impacts in accordance with the measures in AMM-VELB and the Service's (2017) *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle*, Reclamation can minimize adverse effects from this activity.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 12.3.3  American River

*Seasonal Operations*

Implementation of the PA is unlikely to produce any measurable change in quantity or quality of valley elderberry longhorn beetle habitat in the American River watershed. There is no apparent mechanism by which these changes could result in harm to individual valley elderberry longhorn beetles.

*Salmonid Spawning and Rearing Habitat Restoration*

Creation of spawning habitat will avoid disturbance of valley elderberry longhorn beetle habitat, consistent with AMM-VELB by implementing such measures as establishing avoidance areas and fencing around elderberry shrubs for temporary construction access, educating workers, and adjusting the timing of work to avoid killing or injuring adult beetles. Creation of side channels will require removal of riparian habitat within the range of valley elderberry longhorn beetle. Although Reclamation will minimize removal of riparian habitat to the extent feasible through implementation of AMM-VELB, up to four acres of riparian habitat may be removed (approximately 3 to 4 elderberry shrubs). Reclamation will offset adverse effects on elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated

riparian vegetation consistent with *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017), or through the purchasing of mitigation credits. Construction-related effects associated with Spawning and Rearing Named Projects in the American River Watershed are similar to those effects described above for Spawning and Rearing Named Projects in the Upper Sacramento River Watershed.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

## 12.3.4 Stanislaus River

*Seasonal Operations*

Implementation of the PA is unlikely to produce any measurable change in quantity or quality of valley elderberry longhorn beetle habitat in the Stanislaus River watershed. There is no apparent mechanism by which these changes could result in harm to individual valley elderberry longhorn beetles.

*Salmonid Spawning and Rearing Habitat Restoration*

Creation of spawning habitat will avoid disturbance of valley elderberry longhorn beetle habitat, consistent with AMM-VELB by implementing such measures as establishing avoidance areas and fencing around elderberry shrubs for temporary construction access, educating workers, and adjusting the timing of work to avoid killing or injuring adult beetles. Creation of side channels will require removal of riparian habitat within the range of valley elderberry longhorn beetle. Although Reclamation will minimize removal of riparian habitat to the extent feasible through implementation of AMM-VELB, up to 43 acres of riparian habitat may be removed. Reclamation will offset adverse effects on elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation, consistent with *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017), or through the purchasing of mitigation credits.

Construction-related effects associated with Spawning and Rearing Named Projects in the Stanislaus River Watershed are similar to those effects described above for Spawning and Rearing Named Projects in the Upper Sacramento River Watershed.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

*Proposed Flow Changes*

In the lower San Joaquin watershed, the PA is unlikely to produce any measurable change in quantity or quality of valley elderberry longhorn beetle habitat in the San Joaquin River watershed. There is no apparent mechanism by which these changes could result in harm to individual valley elderberry longhorn beetles.

*Lower San Joaquin River Habitat Restoration*

Levee construction associated with floodplain restoration will result in the permanent removal of up to an estimated 52 acres of valley elderberry longhorn beetle habitat (an estimated 47 shrubs). Reclamation will offset adverse effects on elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation consistent with *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017).

Construction-related effects associated with *Lower San Joaquin Rearing Habitat Restoration* are as described above for *Spawning and Rearing Habitat Restoration* in the Upper Sacramento River Watershed.

Based on a hypothetical floodplain restoration, this activity will periodically inundate an estimated 226 acres of riparian habitat for the valley elderberry longhorn beetle. The area to be inundated will transition from areas that flood frequently (i.e., every 1 to 2 years) to areas that flood infrequently (i.e., every 10 years or more). While elderberry shrubs are not expected to be sustained in the lower elevation areas that frequently flood, the higher floodplain is expected to remain as high-value habitat for the species.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

12.3.6  Bay-Delta

*Intertidal and Associated Subtidal Habitat Restoration*

The component projects and approach used in Tidal Habitat Restoration have been described previously. Tidal Habitat Restoration could affect valley elderberry longhorn beetle via direct effects of construction, or through conversion of habitat, as described below. Incidental take of valley elderberry longhorn beetles resulting from restoration at these sites will be addressed in subsequent consultations for individual restoration projects.

Levee breaches performed during tidal wetland restoration will require removal of riparian and contiguous grassland habitat within the range of valley elderberry longhorn beetle. The number of shrubs and stems that would be affected would be determined during preconstruction surveys in suitable habitat as outlined in AMM-VELB. Reclamation will offset adverse effects on

elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation consistent with the *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017).

Tidal Habitat Restoration may include use of heavy equipment for ground clearing, grading, excavation, and placement of large wood. Construction related actions could injure or kill valley elderberry longhorn beetles if individuals are present in shrubs to be transplanted, but the potential for this effect will be minimized as described in AMM-VELB.

The operation of equipment during construction in the vicinity of occupied elderberry shrubs could also result in injury or mortality of valley elderberry longhorn beetles if they are actively dispersing between shrubs, which is generally between March 15th and June 15th; or if occupied shrubs are inadvertently damaged by construction activities. These effects will be avoided and minimized as described in AMM-VELB.

Temporary construction-related ground disturbances could generate dust that could adversely affect adjacent valley elderberry longhorn beetle habitat. Dust is listed in the valley elderberry longhorn beetle recovery plan as a threat to the species (Service 1984). Dust deposition is not correlated with valley elderberry longhorn beetle presence (Talley *et al.* 2006), but it is weakly correlated with signs of stress in elderberry plants (water stress, dead stems, smaller leaves). During times of drought, when elderberry shrubs are under stress, dust deposition could further stress the shrubs, potentially leading to their death. Such a loss of shrubs could adversely affect valley elderberry longhorn beetle (Talley and Holyoak 2006). The potential effects of dust on valley elderberry longhorn beetle will be minimized by applying water during construction activities or by presoaking work areas within 100 feet of any potential elderberry shrub habitat.

Exhaust from construction and maintenance vehicles might deposit particulates, heavy metals, and mineral nutrients that could influence the quality and quantity of elderberry shrubs and thereby affect beetle presence and abundance. A study by Talley and Holyoak (2006) showed no relationship, however, between the distance of the shrubs from highways and the presence or abundance of the beetle.

Temporary lighting from construction activities could adversely affect valley elderberry longhorn beetle. The effects of lighting on valley elderberry longhorn beetle are unknown, although insects are known to be subject to heavy predation when they are attracted to night lighting (Eisenbeis 2006). No restoration activity will occur during nighttime hours in the vicinity of habitat for federally listed species.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

## 12.4 Effects to Recovery

For a species like the valley elderberry longhorn beetle that has lost much of its former known occupied habitat, recovery would necessitate the conservation of much of the remaining habitat

that still supports it. Reclamation is proposing to minimize the adverse effects of the loss of suitable habitat by implementing actions to promote the recovery of the affected species in a manner where the conservation measures are commensurate with the adverse effect. Reclamation has proposed to preserve, create or enhance habitat to offset the total loss of suitable habitat associated with the Proposed Action. This habitat will be protected and managed for the conservation of the species in perpetuity and will provide habitat for breeding, feeding and sheltering and will help maintain the geographic distribution of the species and will contribute to the recovery of the species by increasing the amount of habitat that is secure from development threats and the other factors that threaten the species that can be addressed by habitat protection and management. Since habitat loss and degradation are contributing factors to the decline of the valley elderberry longhorn beetle; preservation, creation and enhancement of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the valley elderberry longhorn beetle.

## 12.5 Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect valley elderberry longhorn beetle throughout the Action Area. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis for the valley elderberry longhorn beetle.

## 12.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the valley elderberry longhorn beetle.

### 12.6.1 Reproduction

The valley elderberry longhorn beetle is closely associated with elderberry, as these plants are an obligate host plant for larvae and are necessary for the completion of the life cycle. Reclamation will offset adverse effects on elderberry shrubs through transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation consistent with *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017). Therefore, no permanent loss of habitat is anticipated. Therefore, the PA is not expected to negatively affect valley elderberry longhorn beetle reproduction, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 12.6.2 Numbers

Comprehensive population surveys for the valley elderberry longhorn beetle, or its host plant, have not been conducted and thus the population size and location of the species in the Action Area is unknown. Therefore, estimating the number of valley elderberry longhorn beetles in the

Action Area that may be affected by the PA is difficult. Reclamation has proposed to preserve, create and enhance suitable habitat that will provide habitat for breeding, feeding and sheltering and would implement AMMs to further reduce potential impacts to the species. Despite the proposed protection measures, we anticipate the PA may still result in effects to the valley elderberry longhorn beetle; however, the number of valley elderberry longhorn beetles affected would be low. This is especially true relative to the range-wide numbers. Therefore, the PA will not significantly reduce the number of valley elderberry longhorn beetles and we conclude the overall number of valley elderberry longhorn beetles throughout the species' range would not decline.

### 12.6.3  Distribution

The remaining presumed historical range of the valley elderberry longhorn beetle in the Central Valley consists of patchy distribution from Tehama County to Fresno County. The current distribution of valley elderberry longhorn beetles within the Action Area is largely unknown. The distribution that could be affected by the Proposed Action could be relatively large compared to the total range-wide distribution and the Proposed Action covers many of the rivers in the species' range. However, Reclamation is not proposing to implement activities expected to result in permanent loss of suitable habitat by implementing AMMs and the transplantation of affected shrubs and planting of new shrubs and associated riparian vegetation consistent with the *Framework for Assessing Impacts to the Valley Elderberry Longhorn Beetle* (Service 2017). We conclude that the valley elderberry longhorn beetles will continue to survive in the Action Area regardless of the activities. Consequently, the water operations and restoration activities will not alter the overall distribution of the valley elderberry longhorn beetle and we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition.

## 12.7  Conclusion

After reviewing the current status of the valley elderberry longhorn beetle, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The area of potential effect to the valley elderberry longhorn beetle is small and will not reduce the reproduction, numbers, and distribution of the species.

2. The number of valley elderberry longhorn beetles that will likely be affected is relatively small.

3. Reclamation has proposed measures to avoid and minimize potential effects.

4. Reclamation proposes to protect, create, and enhance habitat that could support the valley elderberry longhorn beetle.

5. The proposed action is being implemented in a manner that will minimize damage to areas that could support the valley elderberry longhorn beetle.

## 12.8 Valley Elderberry Longhorn Beetle Literature Cited

Barr, C. B. 1991. The distribution, habitat and status of the valley elderberry longhorn beetle, *Desmocerus californicus dimorphus*. U.S. Fish and Wildlife Service, Sacramento.

Calflora: Information on California plants for education, research and conservation, with data contributed by public and private institutions and individuals, including the Consortium of California Herbaria [web application]. 2019. Berkeley, California: The Calflora Database [a non-profit organization]. Available: https://www.calflora.org/ (Accessed: Apr 28, 2019).

(CDFW) California Department of Fish and Wildlife. 2019. California Natural Diversity Database, https://www.wildlife.ca.gov/Data/CNDDB.

Collinge, S.K., M. Holyoak, C.B. Barr, and J.T. Marty. 2001. Riparian habitat fragmentation and population persistence of the threatened valley elderberry longhorn beetle in central California. Biological Conservation 100:103-113.

Eisenbeis, G. 2006. Artificial night lighting and insects: Attraction of insects to streetlamps in a rural setting in Germany. In Ecological Consequences of Artificial Night Lighting, edited by C. Rich and T. Longcore, pp. 281–304. Washington, D.C.: Island Press.

Eng, L. L., 1984. Rare, threatened and endangered invertebrates in California riparian systems. In: R. E. Warner and K. M. Hendrix (eds.).California riparian systems Ecology, conservation, and productive management. University of California Press, Berkeley.

Fremier, A.K. and T.S. Talley. 2009. Scaling riparian conservation with river hydrology: lessons from blue elderberry along four California Rivers. WETLANDS 29:150–162.

Gilbart, M. 2009. The health of blue elderberry (*Sambucus mexicana*) and colonization by the valley elderberry longhorn beetle (Desmocerus californicus dimorphus) in restored riparian habitat. A thesis presented to the faculty of the California State University, Chico. Summer 2009.

Golet, G.H., Gardali, T., Howell, C.A., Hunt, J., Luster, R.A., Rainey, W., Roberts, M.D., Silveira, J., Swagerty, H. and N. Williams. 2008. Wildlife Response to Riparian Restoration on the Sacramento River. San Francisco Estuary and Watershed Science 6(2).

Jones & Stokes Associates, Inc. 1987. Survey of the Habitat and Populations of the Valley Elderberry Longhorn Beetle along the Sacramento River. Final Report. Prepared for the U.S. Fish and Wildlife Service, Sacramento Endangered Species Field Office, Sacramento, CA.

Katibah, E. F. 1984. A Brief History of the Riparian Forests in the Central Valley of California. In: R.E. Warner and K.M. Hendrix (eds.) California Riparian Systems: Ecology,

Conservation, and Productive Management. University of California Press, Berkeley, California, pp. 51-58.

(River Partners) Swagerty, H. 2004. VELB Colonization of Planted Riparian Restoration Projects along the Middle Sacramento River. CALFED Proposal Report. Prepared for the U.S Fish and Wildlife Service, Sacramento River National Wildlife Refuge. 54 pp.

Talley, T.S. 2005. Spatial ecology and conservation of the valley elderberry longhorn beetle. Dissertation submitted in partial satisfaction of the requirements for the degree of Doctor of Philosophy in Ecology. University of California; Davis, California. 105 pp.

Talley, T.S., D.A. Piechnik, and M. Holyoak. 2006. The effects of dust on the federally threatened Valley elderberry longhorn beetle. Environmental Management 37:647-658.

Talley, T.S., E. Fleishman, M. Holyoak, D.D. Murphy, and A. Ballard. 2007. Rethinking a rare species conservation strategy in an urban landscape: The case of the valley elderberry longhorn beetle. Biological Conservation 135:21–32.

(Service) U. S. Fish and Wildlife Service. 1980. Listing the valley elderberry longhorn beetle as threatened species with critical habitat. Friday, August 8, 1980. Sacramento, CA. Federal Register 45:52803-52807.

(Service) U. S. Fish and Wildlife Service. 1984. Recovery plan for the valley elderberry longhorn beetle. U.S. Fish and Wildlife Service, Portland, Oregon.

(Service) U. S. Fish and Wildlife Service. 2012. Removal of the Valley Elderberry Longhorn Beetle From the Federal List of Endangered and Threatened Wildlife. Tuesday, October 2, 2012. Sacramento, CA. Federal Register 77: 60238-60276.

(Service) U.S. Fish and Wildlife Service. 2014. Withdrawal of the Proposed Rule to Remove the Valley Elderberry Longhorn Beetle from the Federal List of Endangered and Threatened Wildlife. Wednesday, September 17, 2014. Sacramento, CA. Federal Register 79:55874-55917.

(Service) U.S. Fish and Wildlife Service. 2017. Framework for Assessing Impacts to Valley Elderberry Longhorn Beetle (*Desmocerus californicus dimorphus*). Sacramento, CA. 28 pp. https://www.fws.gov/sacramento/documents/VELB_Framework.pdf

Vaghti, M.G. and S.E. Greco. 2007. Riparian vegetation of the Great Valley. In: M. Barbour, T. Keeler-Wolf, and A. Schoenherr (eds.) Terrestrial Vegetation of California, 3rd edition. University of California Press, Berkeley, CA.

Vaghti, M.G., M. Holyoak, A. Williams, T.S. Talley, A.K. Fremier, and S.E. Greco. 2009. Understanding the ecology of blue elderberry to inform landscape restoration in semiarid river corridors. Environmental Management 43:28–37.

# 13.0  RIPARIAN BRUSH RABBIT

## 13.1  Status of the Species

The Service listed riparian brush rabbit (*Sylvilagus bachmani riparius*) as endangered on February 23, 2000. Currently, no critical habitat has been designated for the riparian brush rabbit. The *Final Rule to List the Riparian Brush Rabbit and the Riparian, or San Joaquin Valley, Woodrat as Endangered* (Federal Register 65: 8881-8890; https://www.gpo.gov/fdsys/pkg/FR-2000-02-23/pdf/00-4207.pdf#page=1) provides the most comprehensive assessment of the range-wide status of the riparian brush rabbit at the time of its listing. Since that time, additional private lands in San Joaquin County (referred to as the South Delta population) have been identified as having extant rabbit populations, and a re-introduced population has been established on the SJRNWR (Phillips *et al.* 2013). Currently, there are three known populations of riparian brush rabbits:

1.  Caswell Memorial State Park – Caswell Memorial State Park is located at the confluence of the Stanislaus River and the San Joaquin River;
2.  South Delta populations – these populations include the Paradise Cut, Faith Ranch, etc.; and,
3.  SJRNWR – the SJRNWR is south of the Legal Delta. The population that exists within the SJRNWR is primarily made up of re-introduced individuals and their progeny.

### 13.1.1  Historical and Current Distribution

One of eight subspecies of brush rabbit in California, the riparian brush rabbit occupies a range that is disjunct from other brush rabbits, near sea level on the northwestern floor of the San Joaquin Valley (Service 1998). Populations are known to have historically occurred in riparian forests on the valley floor along the San Joaquin and Stanislaus Rivers and some tributaries of the San Joaquin River (Service 1998).

There are two remaining populations of riparian brush rabbits in San Joaquin County. One population is present on approximately 258 acres (104 hectares) in Caswell Memorial State Park on the Stanislaus River, 147 acres of which are considered riparian habitat. The other population is located at several small, isolated or semi-isolated patches immediately west and southwest of Lathrop, totaling approximately 270 acres (109 hectares) along Paradise Cut and Tom Paine Slough, and channels of the San Joaquin River in the south Delta (Kelly 2015 pers comm. 2015; Kelly *et al.* 2011; Williams *et al.* 2002). In January of 1997, Caswell Memorial State Park flooded, submerging most of the habitat of the riparian brush rabbit. Evidence of only three riparian brush rabbits was seen immediately following this flooding episode (D. Williams 1997). In 1998, only one riparian brush rabbit was live-trapped (D. Williams 1998a,b). In addition, a captive breeding program has established a population on the Faith Ranch, which is owned by the wine-making Gallo family (Service 2007).

The SJRNWR encompasses approximately 7,000 acres in Stanislaus County located where the Tuolumne, Stanislaus, and San Joaquin Rivers join, creating a mix of habitats for terrestrial wildlife and plant species. Initially established to protect and manage habitat for the Aleutian

Cackling Goose, the refuge is currently managed to provide habitat for migratory birds and endangered wildlife species (Service 2012). River Partners have been working on increasing riparian brush rabbit population size; their restoration actions continue today and are expected to be completed in 2025. Over 500,000 native trees and shrubs such as willow, cottonwood, oak, blackberry, and rose have been planted across 2,200 acres of river floodplain within the San Joaquin River National Wildlife Refuge, creating the largest block of contiguous riparian woodland in the San Joaquin Valley. Endangered riparian brush rabbits have been reintroduced to this restored habitat from captive-reared populations. The goal is to have increased the available habitat for the riparian brush rabbit by more than 30 times its 1997 extent. The restored habitat will protect the population from nearing extinction in inevitable future flood events. Additionally, a wildfire event in 2004 and major flood events in 2006 and 2011 may have significantly affected the SJRNWR riparian brush rabbit population (Kelly *et al.* 2011).

The SJRNWR population of riparian brush rabbit is just outside of or adjacent to the Action Area with existing, but limited, connectivity. The most recent CNDDB record of riparian brush rabbits within the Action Area, dated 2008, was a result of trapping efforts located at Caswell Memorial State Park, between 1993 and 2008 (CDFW 2018). More recently, continued trapping efforts resulted in the capture of two rabbits in 2012 (Matocq *et al.* 2015). In addition, re-establishment efforts have been conducted south of the Delta on the SJRNWR, with 49 captive-bred rabbits released in 2002 and 187 released in 2003. The rabbit population on the SJRNWR was supplemented annually from 2005 to 2010. As a result of these re-establishment efforts as well as the on-site efforts to restore the contiguous riparian woodland habitat, the largest population of rabbit now resides on the SJRNWR.

13.1.2 General Life History and Habitat

Riparian brush rabbits prefer dense, brushy areas of valley riparian forests, marked by extensive thickets of wild rose (*Rosa* spp.), blackberries (*Rubus* spp.), and willows (*Salix* spp.). Riparian brush rabbits typically remain hidden under protective shrub cover and seldom venture more than a few feet from cover. Their response to a threat is to retreat back into cover rather than to be pursued in open areas (Service 1998).

Riparian brush rabbits feed at the edges of shrub cover rather than in large openings (e.g., along trails, fire breaks, edges of thickets). Their diet consists of herbaceous vegetation such as grasses, sedges, clover, forbs, buds, bark and leaves of woody plants, and vines (Service 1998). Kelt *et al.* (2014) found that rabbits on the SJRNWR consistently preferred vegetation communities dominated by sandbar willow (*Salix exigua*) and mixed with dense shrubs, such as California blackberry and rose, and exhibited secondary preferences for open grassland and dense riparian; home ranges of rabbits on the SJRNWR ranged from approximately 3.68 to 5.21 acres.

The approximate breeding season of riparian brush rabbits is from January to May. In favorable years, females may produce three or four litters. The young are born in a shallow burrow or cavity lined with grass and fur and covered by a plug of dried vegetation. Although these rabbits have a high reproductive rate, five out of six rabbits typically do not survive to the next breeding season (Service 1998).

### 13.1.3  Limiting Factors, Threats, and Stressors

The primary threats to the survival of riparian brush rabbit are the limited extent of its existing habitat, extremely low numbers of individual animals, and few extant populations. The small sizes of its remaining populations, the localization of the behavior of the subspecies, and the highly limited and fragmented nature of remaining habitat restrict natural dispersal and put the species at risk from a variety of environmental factors and stochastic events.

Flooding is a key issue for riparian brush rabbits and thought to be responsible for major population declines. Riparian brush rabbits are closely tied to brushy cover and will generally not cross large, open areas. Thus, they are unable to disperse beyond the dense brush, making them susceptible to mortality during flood events (Williams 1988; Service 1998). Climate change is likely to increase the severity of flooding, impacting riparian brush rabbit populations.

Periodic flooding events are likely to continue to occur along all major rivers in the Central Valley (Kindel 1984). With behavioral restrictions on its freedom of movement (low dispersal behavior) and the shortage of habitat that is suitably protected from frequent floods downstream of Caswell Memorial State Park, there are limited opportunities that individuals escaping drowning or predation would be able to find mates or reproduce successfully following dispersal events (Service 1998).

Wildfire poses a major threat. Long-term fire suppression combined with prolonged drought conditions can result in the buildup of high fuel loads from dead leaves, woody debris, and senescent flammable shrubs. The dense, brushy habitat to which the rabbits are restricted is thus highly susceptible to wildfire that would cause both high mortality and further loss of habitat.

The riparian brush rabbit is subject to a variety of contagious, and potentially fatal diseases that may be transmitted from neighboring populations of desert cottontails. For the small remnant brush rabbit populations, a disease event could result in extirpation of the entire population (Williams 1988; Service 1998).

A wide variety of aerial and terrestrial predators prey on riparian brush rabbit, including various raptors, coyote (*Canis latrans*), gray fox (*Urocyon cinereoargenteus*), bobcat (*Lynx rufus*), long-tailed weasel (*Mustela frenata*), mink (*Neovison vison*), raccoon (*Procyon lotor*), snakes, and feral dogs and cats (Kelly *et al.* 2011). A robust population of the riparian brush rabbit should be able to withstand predation, but habitat adjacent to residential properties or along public roads or waterways, or subject to human disturbance, can exacerbate predation risk (Kelly *et al.* 2011). The black rat (*Rattus rattus*) is an exotic invasive species that may be a threat to riparian brush rabbit populations by preying on offspring and competing for resources.

### 13.1.4  Recovery Considerations

The Service finalized the recovery plan for upland species of the San Joaquin Valley in 1998, which includes the riparian brush rabbit. Additionally, the riparian brush rabbit has limited coverage under the San Joaquin County Multi-Species Habitat Conservation and Open Space Plan.

The following are important components of riparian brush rabbit habitat when considering recovery actions:

- Large patches of dense brush composed of riparian vegetation such as blackberry, California wild rose, and low-growing willows, or other dense shrub species;
- Ecotone edges of brushy habitat to grasses and herbaceous forbs;
- Scaffolding plants (dead or alive) for blackberry and rose to grow tall enough to withstand flood events;
- A tree overstory that is not closed, if present; and,
- High-ground refugia from flooding.

13.1.5  Monitoring and Research Programs

River Partners have been working on the SJRNWR to establish a self-sustaining population of riparian brush rabbit on the SJRNWR. Their restoration actions are continuing and are expected to be completed in 2025. Over 500,000 native trees and shrubs such as willow, cottonwood, oak, blackberry, and rose have been planted across 2,200 acres of river floodplain within the SJRNWR, creating the largest block of contiguous riparian woodland in the San Joaquin Valley. Riparian brush rabbits have been reintroduced to this restored habitat from captive-reared populations. Matocq *et al.* (2017) found that the re-introduced population on the SJRNWR represented high levels of genetic diversity with a unique genetic composition, which was likely the result of its complex history of population declines, repeated translocations, and natural gene flow from nearby semi-isolated populations. The goal of the restoration effort is to increase the available habitat for the riparian brush rabbit by more than 30 times its 1997 extent. The restored habitat is intended to protect the population from inevitable future flood events.

In 2015, Reclamation provided additional funds to the River Partners to restore 175 acres of historic floodplain forest habitat at Dos Rios Ranch, in Stanislaus County, to benefit riparian brush rabbit, riparian woodrat, valley elderberry longhorn beetle, least Bell's vireo, and western yellow-billed cuckoo. After successful pilot studies, two berms were strategically notched and removed from the landscape in 2018, which reconnected the endangered riparian brush rabbit and nine other listed species to seasonally flooded land (River Partners 2018).

**13.2  Environmental Baseline**

The factors described in the *Status of the Species* section above, including habitat loss, fragmentation, and degradation due to urban and agricultural development, are factors which have in the past and still continue to affect the species within the Action Area.

The Caswell Memorial State Park population along the Stanislaus River is within the southern boundary of the Action Area. The south Delta populations of riparian brush rabbit, which includes Paradise Cut and Tom Paine Slough, are within the Action Area. There is little information available as to the status of these populations.

Although no rabbit surveys were conducted specifically for the Proposed Action, riparian woodland habitat is located within the Action Area and numerous sightings have been made in close proximity to the West Stanislaus Irrigation District intake canal. Approximately 0.84 acre

of riparian woodland with thickets of willows and shrubs occur within the Action Area, with ruderal habitat comprising the majority of the balance of the upland areas within the Action Area. It is reasonable to assume that the riparian woodland present overlaps the home range of at least one rabbit.

The Service has formally consulted on two projects within the Action Area since 2015 that may adversely affect the rabbit; the West Stanislaus Fish Screen Intake Project, in Stanislaus County, (08ESMF00-2018-F-0976) and the State Route 99 Ripon Bridge Rehabilitation Project in San Joaquin County (08ESMF00-2015-F-1164).

## 13.3 Effects of the Proposed Action

The riparian brush rabbit occurs in the Stanislaus River and San Joaquin River watershed, and Proposed Action components within these watersheds may affect this species as follows.

### 13.3.1 Stanislaus River Watershed

*Flow and Operations*

Operations under the Proposed Action will include hydrologic changes associated with water manipulation; topographic changes associated with flood control, agriculture, restoration site construction, and other causes; and biological changes associated with the introduction of non-native species caused by implementation of the PA. Implementation of the Proposed Action generally will result in minor changes to flow and likely will be small relative to normal month-to-month and year-to-year variability in the system. Any changes in the natural flow regime of the river will likely result in an increase in non-native and invasive plant species and a reduction in native riparian vegetation recruitment. Lower flows in the spring under the Proposed Action are likely to result in less riparian vegetation recruitment which could result over the duration of the PA in less habitat used for cover for riparian brush rabbit. The Proposed Action will likely result in flows being generally more stable timing-wise as compared to the current operations scenario. Lower flows in the spring and a more stable regime are likely to reduce the amount of surrounding suitable habitat over time. Any changes to the habitat surrounding existing populations of riparian brush rabbits may adversely affect their ability to disperse and colonize new areas beyond the current habitats occupied. The changes in flow and operations are unlikely to directly affect individual riparian brush rabbits, but may result in indirect impacts over time through negative changes in riparian habitat resulting in unsuitable habitat for the species. However, it is not expected that the magnitude and rate of this impact will affect breeding, feeding, or sheltering during the timeframe of the PA.

*Spawning and Rearing Habitat*

Spawning gravel placed in-stream will not result in loss or disturbance of riparian brush rabbit habitat. However, access to the enhancement site by vehicles, workers, and equipment may temporarily disturb habitat or disrupt normal behavioral patterns of riparian brush rabbits in the vicinity of the activity. Enhancement of salmonid rearing habitat along the lower Stanislaus River may involve modification of river banks or creation of side channels in or near riparian

habitat. This may result in loss of riparian brush rabbit habitat. This could also result in disruption of normal riparian brush rabbit behavioral patterns and injury or mortality of individuals through use of heavy equipment in occupied habitat. Reclamation proposes to implement AMM-RBR/RWR to avoid occupied riparian brush rabbit habitat. Reclamation proposes to remove no more than 10 acres of suitable, but unoccupied, riparian brush rabbit habitat, therefore minimizing the effect to the species by limiting the amount of suitable habitat that can be removed and reducing or avoiding direct injury or mortality to individual riparian brush rabbits. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a 3:1 ratio as described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian brush rabbit; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian brush rabbit.

Spawning and Rearing Habitat actions are addressed programmatically in this consultation, so further detail about effects and incidental take will be addressed in subsequent consultation prior to implementation.

### 13.3.2  Lower San Joaquin River Watershed

*Proposed Flow Changes*

The anticipated changes from the current operations scenario in flows resulting from the implementation of the Proposed Action in the lower San Joaquin watershed would be almost nonexistent and have little to no change in quantity or quality of riparian brush rabbit habitat in the lower San Joaquin watershed. Additionally, there is little to no risk that these changes will result in direct harm to individual riparian brush rabbits.

*Lower San Joaquin Spawning and Rearing Habitat*

*Permanent Habitat Loss*

The Proposed Action will include large-scale floodplain habitat restoration in the Lower San Joaquin River. Levee construction may result in removal or conversion of potential riparian brush rabbit habitat. Levee construction may result in the permanent removal of approximately 45 acres of riparian habitat and 25 acres of associated grassland habitat for the riparian brush rabbit along the lower San Joaquin River. Per the BA, "Reclamation will ensure that potential riparian brush rabbit habitat permanently removed does not exceed the maximum allowable habitat loss for this species." Reclamation did not define "maximum allowable habitat loss" but did quantify the acreage amounts described above in Appendix E of the BA. Reclamation's proposed conservation measure AMM-RBR/RWR requires avoidance of habitat occupied or assumed to be occupied by riparian brush rabbit. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a 3:1 ratio as described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian brush rabbit; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian brush rabbit.

_Temporary Habitat Loss_

Based on Reclamation's proposed draft floodplain restoration footprint, the construction of setback levees to restore seasonally inundated floodplain is expected to temporarily remove up to 35 acres of suitable riparian habitat and 20 acres of adjacent grassland habitat. Temporarily disturbed areas will be restored as riparian and grassland habitat within 1 year following completion of construction activities. Although the effects are considered temporary, a number of years will be required for restored riparian habitat to functionally replace habitat that has been affected. Most of the riparian vegetation within the species' range is early- to mid-successional, and this species prefers riparian scrub that is early successional; therefore, the replaced riparian vegetation is expected to meet habitat requirements for the riparian brush rabbit within the first few years after the initial restoration activities are complete.

_Periodic Inundation_

Existing levees will be breached for floodplain restoration and the newly constructed setback levees will allow inundation through seasonal flooding. The inundated areas may consist of suitable riparian brush rabbit habitat. Floodplain restoration will result in periodic inundation of riparian habitat and associated grassland habitat. These habitats that are proposed to be periodically inundated have the potential to provide habitat for the riparian brush rabbit. Although they consist of small patches and narrow bands of riparian vegetation, many of the areas potentially affected are in proximity to, or contiguous with, habitat with recorded occurrences of riparian brush rabbits. The restored floodplain will include a range of elevations from low-lying areas that flood frequently (i.e., every 1 to 2 years) to high-elevation areas that flood infrequently (i.e., every 10 years or more). Seasonal flooding in restored floodplains can result in injury or mortality of individuals if riparian brush rabbits occupy these areas and cannot escape flood waters.

The proposed AMM-RBR/RWR includes avoiding flooding in areas known to be occupied by riparian brush rabbit. The adverse effects of periodic inundation on the riparian brush rabbit in suitable habitat that may become occupied in the future will be further minimized through construction and maintenance of flood refugia to allow riparian brush rabbits to escape flood conditions through the creation of flood refugia mounds with thick cover vegetation and on the landward side of the newly constructed levees (Kelly _et al._ 2011).

_Construction-Related Effects_

Construction-related effects on the riparian brush rabbit include construction-related injury or mortality and indirect noise and visual disturbance to habitat in the vicinity of construction. Reclamation will avoid disturbance of occupied riparian brush rabbit habitat and therefore will avoid construction-related injury or mortality of this species. Construction of setback levees for floodplain restoration may result in noise and visual disturbance to the riparian brush rabbit. This effect will be avoided or minimized through establishment of buffers as described in AMM-RBR/RWR.

350

The use of mechanical equipment during construction might cause the accidental release of petroleum or other contaminants that will affect the riparian brush rabbit in adjacent habitat, if the species is present. The potential for this adverse effect will be avoided and minimized through best management practices (BMPs) under AMM2 Construction Best Management Practices and Monitoring.

These actions associated with the Lower San Joaquin Spawning and Rearing Habitat are addressed programmatically in this consultation, so further detail about expected benefits and adverse effects, and any incidental take, will be addressed in subsequent consultation prior to implementation.

## 13.4 Effects to Recovery

Reclamation is proposing to minimize the adverse effects from the loss of suitable habitat by implementing actions to promote the recovery of the affected species in a manner where the conservation measures are commensurate with the adverse effect. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat as described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian brush rabbit; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian brush rabbit. Therefore, we conclude that the Proposed Action will not interfere with the recovery of the riparian brush rabbit.

## 13.5 Cumulative Effects

Cumulative effects include the effects of future State, Tribal, local, or private actions that are reasonably certain to occur in the Action Area and are considered in this biological opinion. Future Federal actions unrelated to the Proposed Action are not considered in this section, because they require separate consultation pursuant to section 7 of the Act.

The overwhelmingly predominant land use within the Action Area is some form of agriculture, whether that be row crops, orchards, dry farming, livestock grazing, etc. It is reasonable to assume that all effects to federally listed species that are associated with the agricultural activities that currently occur in the Action Area will continue to occur. The Service assumes that these ongoing, background effects from agricultural practices within the Action Area will remain throughout the life of the Proposed Action and would be very difficult to quantify or predict the nature that they will take throughout the life of the Proposed Action. These agricultural practices do constitute a cumulative effect. Beyond these ongoing agricultural activities, we are unaware of any specific future State, Tribal, local, or private actions that may affect the riparian brush rabbit and are reasonably certain to occur in the Action Area.

## 13.6 Summary of the Effects from the Action

In determining whether a Proposed Action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to the reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the

species. In that context, the following paragraphs summarize the effects of the Proposed Action on the riparian brush rabbit.

### 13.6.1 Reproduction

The riparian brush rabbit is a secretive and hard-to detect species that is limited within the Action Area. There are no proposed actions within known occupied riparian brush rabbit habitat. Therefore, the Proposed Action is not expected to negatively affect riparian brush rabbit reproduction, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 13.6.2 Numbers

The number of riparian brush rabbits in the Action Area is relatively low, based on recent and past records (Kelly 2015; Kelly *et al.* 2011; Williams *et al.* 2002). Additionally, Reclamation has proposed measures to avoid and minimize the effects of the Proposed Action on the species. Despite the proposed protection measures, the Service anticipates that the Proposed Action may result in effects to the riparian brush rabbit; however, the number of riparian brush rabbits affected would be very low. This is especially true relative to the range-wide numbers. Therefore, the Proposed Action is not expected to reduce the number of riparian brush rabbits throughout the species' range.

### 13.6.3 Distribution

The Service anticipates the number of riparian brush rabbits likely to be affected by the Proposed Action will be very low. We do not expect that any riparian brush rabbits will be directly killed by any of the described restoration actions associated with the Proposed Action. We also conclude that riparian brush rabbits will continue to survive in the Action Area regardless of the activities. Consequently, the proposed restoration projects will not alter the distribution of the riparian brush rabbit and we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition.

## 13.7 Conclusion

After reviewing the current status of the riparian brush rabbit, the Environmental Baseline for the Action Area, the effects of the PA and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of riparian brush rabbits likely to be affected by the PA will be very low.

2. Reclamation has proposed adequate measures to avoid and minimize potential effects.

3. Reclamation proposes to restore or protect habitat that could support the riparian brush rabbit.

## 13.8  Riparian Brush Rabbit Literature Cited

Kelly, P.A., Edgarian, T.K., Lloyd, M.R., Phillips, S.E. 2011. Conservation Principles for the Riparian Brush Rabbit & Riparian Woodrat. California State University, Stanislaus, Turlock, California. Endangered Species Recovery Program.

Matocq, M., P. Kelly, J. Rippert, and S. Phillips. 2017. FINAL REPORT; Population Genetic Structure of the Riparian Brush Rabbit (*Sylvilagus bachmani riparius*): using multiple markers systems to gain insight into historic and ongoing genetic connectivity. CVPIA Habitat Restoration Program. 15 May 2017.

Phillips, S.E., L.P. Hamilton, and P.A. Kelly. 2005. Assessment of habitat conditions for the riparian brush rabbit on the San Joaquin River National Wildlife Refuge, California. Unpublished report prepared for the U.S. Fish and Wildlife Service Endangered Species

(Service) U.S. Fish and Wildlife Service . 1998. Recovery Plan for Upland Species of the San Joaquin Valley, California. Portland, Oregon. 319 pp.

Williams, D.F. 1988. Ecology and management of the riparian brush rabbit in Caswell Memorial State Park. California Dept. of Parks and Recreation, Lodi, CA. Final Report. Interagency Agreement 4-305-6108, 38 pp.

Williams, D.F. 1997. Calif. State Univ., Stanislaus. Letter on the flooding at Caswell Memorial State Park during January 1997, dated May 12, 1997 4pp.

Williams, D.F. 1998a. Calif. State Univ., Stanislaus. Comment letter ( electronic mail) updating the Service on the status of the riparian brush rabbit and riparian woodrat, dated May 28, 1998. 2pp.

Williams, D.F. 1998b. Calif. State Univ., Stanislaus. Telephone conversation record with service staff biologist Heather Bell, clarifying the May 28, 1998 comment letter, dated July 27, 1998.

Williams, D.F. and L.P. Hamilton. 2002. Riparian brush rabbit survey:  Paradise Cut along Stewart Tract, San Joaquin County, California, August 2001. Report prepared for Califia LCC Lathrop, CA, and California Department of Fish and Game Sacramento, CA. Endangered Species Recovery Program California State University Stanislaus, Turlock, California. 10pp.

## 13.8.1 Personal Communications

Kelly, P.A. 2015. Personal Communication. Riparian Brush Rabbit Range in South Delta. Email to Heather Swinney, forward to Rebecca Sloan. Dec. 18, 2015.

# 14.0 RIPARIAN WOODRAT

## 14.1 Status of the Species

The Service listed riparian woodrat (*Neotoma fuscipes riparia*) as an endangered species under the ESA on February 23, 2000 (65 FR 8881). No critical habitat has been designated for the riparian woodrat.

The *Final Rule to List the Riparian Brush Rabbit and the Riparian, or San Joaquin Valley, Woodrat as Endangered* (Federal Register 65: 8881-8890; https://www.gpo.gov/fdsys/pkg/FR-2000-02-23/pdf/00-4207.pdf#page=1) provides the most comprehensive assessment of the range-wide status of the riparian woodrat at the time of its listing. The most recent comprehensive assessment of the range-wide status of the woodrat is the *Riparian Woodrat 5-Year Review: Summary and Evaluation* (Service 2012). No change in the species' listing status was recommended in this 5-year review.

### 14.1.1  Historical and Current Distribution and Abundance

Historical records for the riparian woodrat are similarly distributed along the San Joaquin, Stanislaus, and Tuolumne Rivers, and Corral Hollow, in San Joaquin, Stanislaus, and Merced Counties (Hooper 1938; Williams 1988). Thus, prior to the statewide reduction of riparian communities by nearly 90 percent (Katibah 1984), the riparian woodrat probably ranged throughout the extensive riparian forests along major streams flowing onto the floor of the northern San Joaquin Valley.

The range of the riparian woodrat is far more restricted today than it was in 1938 (Williams 1986). There are two remaining extant populations. The first population is restricted to about 250 acres (100 hectares) of riparian forest on the Stanislaus River in Caswell Memorial State Park, and the second population is approximately five miles away within the SJRNWR (Kelly *et al.* 2009, Kelly *et al.* 2011). In 1993, Williams (1993) estimated the size of the Caswell Memorial State Park population at 437 individuals. In January of 1997, Caswell Memorial State Park flooded, submerging most of the habitat of the riparian woodrat. Evidence of only six riparian woodrats was seen immediately following this flooding episode (D. Williams 1997). In 1998, only nine riparian woodrats were live-trapped at Caswell Memorial State Park (D. Williams 1998a,b).

The Caswell Memorial State Park population along the Stanislaus River is within the southern boundary of the Action Area. No research has been conducted on the spatial distribution and habitat use of the riparian woodrat, but it likely has similar spatial distribution patterns of the dusky-footed woodrat, of which it is a subspecies. Territories of dusky-footed woodrats in the mixed conifer forests of the northern Sierra Nevada, California ranged from 0.14 to 18 acres (Innes *et al.* 2009).

The SJRNWR population may be quite vulnerable: only 34 individuals have been captured (at different times) and no stick lodges have been observed anywhere on the refuge, although riparian woodrats are known to use downed trees, snags, or even buildings in place of

constructing stick lodges (Kelly *et al.* 2011). Additionally, a wildfire event in 2004 and major flood events in 2006 and 2011 may have significantly reduced the SJRNWR riparian woodrat population (Kelly *et al.* 2011).

The specimens from which the subspecies designation was described were collected about 2 miles (3 km) northeast of Vernalis, west of Modesto in Stanislaus County, California, approximately 6 miles (10 km) from Caswell Memorial State Park. Analysis of DWR land use maps indicate that there were approximately 50 acres (20 hectares) of "natural vegetation" present along the San Joaquin River near the locality in 1988, though no woodrats have been seen in that area. Today there is no habitat for riparian woodrats around El Nido, which is located about 5.5 miles (8.9 km) east of the San Joaquin River.

## 14.1.2  General Life History and Habitat

Riparian woodrats are most numerous where shrub cover is dense and least abundant in open areas. In riparian areas, the highest densities of riparian woodrats and their houses are often encountered in willow thickets with an oak overstory. They are common where there are deciduous valley oaks, but few live oaks.

Mostly active at night, the riparian woodrat's diet is diverse and principally herbivorous. Their diet consists of leaves, fruits, and terminal shoots of twigs, flowers, nuts, and fungi (Service 2000).

Riparian woodrats are well known for their large terrestrial stick houses some of which can last for 20 or more years after being abandoned. At Caswell Memorial State Park, riparian woodrats construct houses of sticks and other litter. No woodrat houses have been found at SJRNWR (Kelly *et al.* 2011). Houses are usually placed on the ground or against/straddling a log or exposed roots of a standing tree, and typically located in dense brush. Houses also are placed in the crotches and cavities of trees and in hollow logs. Sometimes arboreal nests are constructed, but this behavior seems to be more common in habitat with evergreen trees such as live oak. With their general dependence on terrestrial stick houses, riparian woodrats can be vulnerable to flooding events.

Riparian woodrats live in loosely cooperative societies and have a matrilineal social structure. Unlike males, adjacent females are usually closely related and, unlike females, males disperse away from their birth den and are highly territorial and aggressive, especially during the breeding season. Consequently, populations are typically female-biased and, because of pronounced polygyny, the effective population size is generally much smaller than the actual population size. This breeding system in combination with the small size of the only known extant populations suggests that the riparian woodrat could be at an increased risk of extinction because of inbreeding depression.

## 14.1.3  Limiting Factors, Threats, and Stressors

Loss, fragmentation, and degradation of habitat are the principal reasons for the decline of the riparian woodrat (Service 2000). Threats evaluated in the 5-year review have continued to act on

the species, with effects of stochastic events, inbreeding, disease, and predation posing the most significant. The most immediate threats to the two, small populations include naturally occurring events, such as drought, flooding, and wildfires. The lack of remnant habitat also continues to restrict and isolate the remaining two populations of riparian woodrat. All of these environmental stressors are likely to increase in severity with climate change as California's snowpack decreases and watersheds move toward more rain driven hydrology. In addition, riparian woodrats are threatened by disease, predation, competition, clearing of riparian vegetation, use of rodenticide, and loss of genetic variability.

14.1.4  Recovery Considerations

The Service finalized the recovery plan for upland species of the San Joaquin Valley in 1998, which includes the riparian woodrat.

No specific conservation measures for the riparian woodrat are in place, but the species does receive some protection through the management plans for the riparian brush rabbit at the Caswell Memorial State Park and SJRNWR.

14.1.5  Monitoring and Research Programs

The California Department of Parks and Recreation has supported some general small-mammal studies and woodrat population studies at the Caswell Memorial State Park (Cook and Quinn1992; Williams 1993).

In 2000, San Joaquin County developed a multispecies habitat conservation plan that considers habitat for the riparian woodrat. Some of the measures suggested under the plan may benefit or minimize negative impacts on the riparian woodrat. A fire management plan has also been initiated for the Caswell Memorial State Park to protect habitat, but fires from outside sources still pose a threat.

In 2015, Reclamation provided additional funds to the River Partners to restore 175 acres of historic floodplain forest habitat at Dos Rios Ranch, in Stanislaus County, to benefit riparian brush rabbit, riparian woodrat, valley elderberry longhorn beetle, least Bell's vireo, and western yellow-billed cuckoo. After successful pilot studies, two berms were strategically notched and removed from the landscape in 2018, which reconnected the endangered riparian woodrat and nine other listed species to seasonally flooded land (River Partners 2018).

**14.2  Environmental Baseline**

The Caswell Memorial State Park population is within the Action Area. The factors described in the *Status of the Species* section above, including habitat loss, fragmentation, and degradation due to urban and agricultural development, are factors which have in the past and still continue to affect the species within the Action Area.

The Service has formally consulted on one project within the Action Area since 2015 that may adversely affect the riparian woodrat; the State Route 99 Ripon Bridge Rehabilitation Project in

San Joaquin County (08ESMF00-2015-F-1164). Surveys were not conducted for that project but presence was assumed due to high quality habitat along the banks of the Stanislaus River within dispersal distance to Caswell Memorial State Park.

## 14.3  Effects of the Proposed Action

The riparian woodrat occurs in the Stanislaus River and San Joaquin River watershed, and Proposed Action components within these watersheds may affect this species as follows.

### 14.3.1 Stanislaus River Watershed

*Flow and Operations*

Operations under the Proposed Action will include hydrologic changes associated with water manipulation; topographic changes associated with flood control, agriculture, restoration site construction, and other causes; and biological changes associated with the introduction of non-native species. Implementation of the Proposed Action generally will result in minor changes and likely will be small relative to normal month-to-month and year-to-year variability in the system. Any changes in the natural flow regime of the river will likely result in an increase in non-native and invasive plant species and a reduction in native riparian vegetation recruitment. Lower flows in the spring under the Proposed Action are likely to result in less riparian vegetation recruitment which could result over the duration of the PA in less habitat used for cover for riparian woodrat. The Proposed Action will likely result in flows being generally more stable timing-wise as compared to the current operations scenario. Any changes to the habitat surrounding existing populations of riparian woodrats may adversely affect the population's ability to disperse and colonize new areas beyond the current habitats occupied. The changes in flow and operations are unlikely to result in direct harm to individual riparian woodrats, but may result in indirect impacts through changes in riparian habitats resulting in unsuitable habitat for the species over time.

*Spawning and Rearing Habitat*

Spawning gravel placed in-stream, will not result in loss or disturbance of riparian woodrat habitat. However, access to the enhancement site by vehicles, workers, and equipment may disturb habitat or disrupt normal behavioral patterns of riparian woodrats in the vicinity of the activity. Enhancement of salmonid rearing habitat along the lower Stanislaus River may involve modification of river banks or creation of side channels in or near riparian habitat. This may result in loss of riparian woodrat habitat. This could also result in disruption of normal riparian woodrat behavioral patterns and injury or mortality of individuals through use of heavy equipment in occupied habitat. Reclamation proposes to implement AMM18 Riparian Woodrat and Riparian Brush Rabbit to assume presence or conduct protocol-level surveys in order to avoid occupied riparian woodrat habitat. According to the BA, Reclamation will remove no more than 10 acres of suitable, but unoccupied, riparian woodrat habitat, therefore minimizing the effect to the species by limiting the amount of suitable habitat that can be removed and reducing or avoiding direct injury or mortality to individual riparian woodrats. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a 3:1 ratio as

described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian woodrat; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian woodrat.

Spawning and Rearing Habitat actions are addressed programmatically in this consultation, so further detail about effects and incidental take will be addressed in subsequent consultation prior to implementation.

### 14.3.2  Lower San Joaquin River Watershed

*Proposed Flow Changes*

The anticipated changes from current conditions in flows resulting from the implementation of the Proposed Action in the lower San Joaquin watershed would be almost nonexistent and have little to no change in quantity or quality of riparian woodrat habitat in the lower San Joaquin watershed. Additionally, there is little to no risk that these changes will result in direct harm to individual riparian woodrats.

*Lower San Joaquin Spawning and Rearing Habitat*

<u>*Permanent Habitat Loss*</u>

This Proposed Action component will involve a large-scale floodplain habitat restoration effort in the Lower San Joaquin River. Levee construction could result in removal or conversion of riparian woodrat habitat. Levee construction may result in the permanent removal of approximately 41 acres of riparian woodrat habitat along the lower San Joaquin River. Per the BA, "Reclamation will ensure that riparian woodrat habitat permanently removed does not exceed the maximum allowable habitat loss for this species". Reclamation did not define "maximum allowable habitat loss" but did quantify an amount in Appendix E of the BA. Reclamation's proposed AMM18 Riparian Woodrat and Riparian Brush Rabbit requires avoidance of habitat occupied or assumed to be occupied by riparian woodrat. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat at a 3:1 ratio as described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian woodrat; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian woodrat.

<u>*Temporary Habitat Loss*</u>

Based on Reclamation's proposed draft floodplain restoration footprint, the construction of setback levees to restore seasonally inundated floodplain is expected to temporarily remove up to 35 acres of suitable riparian woodrat habitat. Temporarily disturbed areas will be restored as riparian habitat within 1 year following completion of construction activities. Although the effects are considered temporary, as much as 20 years may be required for ecological succession to occur and for restored riparian habitat to functionally replace habitat that has been affected.

Existing levees will be breached for floodplain restoration and the newly constructed setback levees will allow inundation through seasonal flooding. The inundated areas may consist of suitable riparian woodrat habitat. Floodplain restoration will result in periodic inundation of riparian woodrat habitat. The restored floodplain will include a range of elevations from low-lying areas that flood frequently (i.e., every 1 to 2 years) to high-elevation areas that flood infrequently (i.e., every 10 years or more). Seasonal flooding in restored floodplains can result in injury or mortality of individuals if riparian woodrats occupy these areas and cannot escape flood waters.

The proposed AMM18 Riparian Woodrat and Riparian Brush Rabbit includes avoiding flooding in areas known to be occupied by riparian woodrat. The adverse effects of periodic inundation on the riparian woodrat in suitable habitat that may become occupied in the future will be further minimized through construction and maintenance of flood refugia to allow riparian woodrats to escape flood conditions, with patches of riparian trees, as described in the *Draft Habitat Assessment Guidelines & Survey Protocol for the Riparian Brush Rabbit and the Riparian Woodrat* (Service undated, available at: https://www.fws.gov/sacramento/es/Survey-Protocols-Guidelines/).

*Construction-Related Effects*

Construction-related effects on the riparian woodrat include construction-related injury or mortality and indirect noise and visual disturbance to habitat in the vicinity of construction. Reclamation will avoid disturbance of occupied riparian woodrat habitat and therefore will avoid construction-related injury or mortality of this species. Construction of setback levees for floodplain restoration may result in noise and visual disturbance to the riparian woodrat. This effect will be avoided or minimized through establishment of buffers as described in AMM-RBR-RWR.

The use of mechanical equipment during construction might cause the accidental release of petroleum or other contaminants that will affect the riparian woodrat in adjacent habitat, if the species is present. The potential for this adverse effect will be avoided and minimized through best management practices (BMPs) under AMM2 Construction Best Management Practices and Monitoring.

These actions associated with the Lower San Joaquin Spawning and Rearing Habitat are addressed programmatically in this consultation, so further detail about expected benefits and adverse effects, and any incidental take, will be addressed in subsequent consultation prior to implementation.

## 14.4  Effects to Recovery

Reclamation is proposing to minimize the adverse effects from the loss of suitable habitat by implementing actions to promote the recovery of the affected species in a manner where the

conservation measures are commensurate with the adverse effect. Reclamation has proposed to restore or protect suitable habitat to offset the total loss of suitable habitat as described in Appendix E of the BA. Habitat loss and degradation are contributing factors to the decline of riparian woodrat; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the riparian woodrat. Therefore, we conclude that the Proposed Action will not interfere with the recovery of the riparian woodrat.

## 14.5 Cumulative Effects

Cumulative effects include the effects of future State, Tribal, local, or private actions that are reasonably certain to occur in the Action Area considered in this biological opinion. Future Federal actions unrelated to the Proposed Action are not considered in this section, because they require separate consultation pursuant to section 7 of the Act.

The overwhelmingly predominant land use within the Action Area is some form of agriculture, whether that be row crops, orchards, dry farming, livestock grazing, etc. It is reasonable to assume that all effects to federally listed species that are associated with the agricultural activities that currently occur in the Action Area will continue to occur. The Service assumes that these ongoing, background effects from agricultural practices within the Action Area will remain throughout the life of the Proposed Action and would be very difficult to quantify or predict the nature that they will take throughout the life of the Proposed Action. These agricultural practices do constitute a cumulative effect. Beyond these ongoing agricultural activities, we are unaware of any specific future State, Tribal, local, or private actions that may affect the riparian woodrat and are reasonably certain to occur in the Action Area.

## 14.6 Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to the reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the Proposed Action on the riparian woodrat.

### 14.6.1 Reproduction

The riparian woodrat is a secretive and hard-to detect species that is limited within the Action Area. Reclamation proposed to avoid occupied habitat (assumed or verified by surveys). Therefore, the Proposed Action is not expected to negatively affect riparian woodrat reproduction, and we conclude that the effects would not reduce the range-wide reproductive capacity of the species.

### 14.6.2 Numbers

The number of riparian woodrat in the Action Area is relatively low, based on recent and past records (Kelly *et al.* 2009; Kelly *et al.* 2011; Williams 1986). Additionally, Reclamation has

proposed measures to avoid and minimize the effects of the Proposed Action on the species. Despite the proposed protection measures, the Service anticipates that the Proposed Action may result in effects to the riparian woodrat; however, the number of riparian woodrats affected would be very low. This is especially true relative to the range-wide numbers. Therefore, the Proposed Action is not expected to reduce the number of riparian woodrats throughout the species' range.

14.6.3  Distribution

The Service anticipates the number of riparian woodrats likely to be affected by the Proposed Action will be very low. We do not expect that any riparian woodrats will be directly killed by any of the described restoration actions associated with the Proposed Action. We also conclude that riparian woodrats will continue to survive in the Action Area regardless of the activities. Consequently, the proposed restoration projects will not alter the distribution of the riparian woodrat and we do not expect Reclamation's actions will reduce the species' distribution relative to its range-wide condition.

**14.7  Conclusion**

After reviewing the current status of the riparian woodrat, the Environmental Baseline for the Action Area, the effects of the PA and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The number of riparian woodrats likely to be affected by the PA will be very low.

2. Reclamation has proposed adequate measures to avoid and minimize potential effects.

3. Reclamation proposes to restore or protect habitat that could support the riparian woodrat.

**14.8  Riparian Woodrat Literature Cited**

Cook, R. R. and J. F. Quinn. 1992. An inventory of the mammals of Caswell Memorial State Park. California Dept. Parks and Recreation, Lodi, Final Rep., 30 pp.

Hooper, E.T. 1938. Geographical variation in wood rats of the species Neotoma fuscipes. University of California Publications in Zoology 42:213-245.

Katibah, E. F. 1984. A brief history of riparian forests in the Central Valley of California. Pages 23-29 In California Riparian Systems: Ecology, Conservation, and productive management. Edited by R.E. Warner and K.M. Hendrix. Univ. of Cal. Press, California.

Kelly, P.A., Cypher, B.L., Williams, D.F., and Sproull, K. 2009. Community Ecology of Riparian Woodrats and Black Rats at Caswell Memorial State Park: Investigating the Role of an Exotic Species in the Decline of a Native Keystone Species. California State

University Stanislaus Endangered Species Recovery Program.

Kelly, P.A., Edgarian, T.K., Lloyd, M.R., Phillips, S.E. 2011. Conservation Principles for the Riparian Brush Rabbit & Riparian Woodrat. California State University, Stanislaus, Turlock, California. Endangered Species Recovery Program.

River Partners. 2018. Dos Rios Ranch Preserve. Website. Available: https://www.riverpartners.org/project/dos-rios-ranch/. Accessed: December 7, 2018.

(Service) U.S. Fish and Wildlife Service. 1998. Recovery Plan for Upland Species of the San Joaquin Valley, California. Region 1, Portland, OR.

(Service) U.S. Fish and Wildlife Service . 2000. Endangered and Threatened Wildlife and Plants; Final Rule to List the Riparian Brush Rabbit and the Riparian, or San Joaquin Valley, Woodrat as Endangered. Federal Register 65: 881-8890.

(Service) U.S. Fish and Wildlife Service. 2012. Riparian Woodrat 5-Year review: Summary and Evaluation. https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=A0FC

Williams, D. F. 1986. Mammalian species of special concern in California. California Dept. of Fish and Game, Wildl. Manage. Div. Admin. Report 86-1:1-112.

Williams, D.F. 1993. Population Censuses of Riparian Brush Rabbits and Riparian Woodrats at Caswell Memorial State Park during January 1993. Lodi, CA: California Department of Parks and Recreation.

Williams, D.F. 1997. Calif. State Univ., Stanislaus. Letter on the flooding at Caswell Memorial State Park during January 1997, dated May 12, 1997 4pp.

Williams, D.F. 1998a. Calif. State Univ., Stanislaus. Comment letter ( electronic mail) updating the Service on the status of the riparian brush rabbit and riparian woodrat, dated May 28, 1998. 2pp.

Williams, D.F. 1998b. Calif. State Univ., Stanislaus. Telephone conversation record with service staff biologist Heather Bell, clarifying the May 28, 1998 comment letter, dated July 27, 1998. lpp

# 15.0  WESTERN YELLOW-BILLED CUCKOO

## 15.1  Status of the Species

### 15.1.1  Current Legal Status

The Service listed the western distinct population segment (DPS) of the yellow-billed cuckoo as threatened on October 3, 2014 (79 FR 59992). Critical habitat was proposed on August 15, 2014 (79 FR 48547, Service 2014a), and the proposed rule identified sections of the Action Area along the Sacramento River from south of Red Bluff in Tehama County to Colusa, California. A final critical habitat determination has not been made for this species, and Reclamation did not request a conference opinion on the effects of the PA on proposed critical habitat. The Service initiated a 5-year status review of the species in June 2018, but it is not yet completed. The information in this section is from the final listing rule, the proposed critical habitat rule, review of the best available scientific and commercial information, and the ROC on LTO BA.

### 15.1.2  Description and Life History

The western yellow-billed cuckoo (cuckoo) is a medium sized bird (Family Cuculidea) measuring approximately 12 inches (30 centimeters) in length and weighing about 2.1 ounces (60 grams). The plumage consists of a grayish-brown back and white chest, the tail is black and quite long with white spots. The upper mandible is dark, and the lower is typically yellow with a black tip. Cuckoos are fairly secretive in nature and call infrequently with "kowlp", "coo", "kuk" or "knocking" vocalizations.

Cuckoos are Neotropical migrant birds that winter in South America east of the Andes, primarily south of the Amazon Basin in southern Brazil, Paraguay, Uruguay, eastern Bolivia, and northern Argentina (Service 2013). Following migration from South America, cuckoos arrive in the southwest United States and northwestern Mexico in late May/early June with some as late as early July. They move about their breeding range in search of a riparian habitat block of sufficient size that has an abundance of prey. Breeding occurs when prey is sufficiently abundant to feed and fledge their precocial chicks. Breeding can occur from June through August with most cuckoos migrating south by mid-September. Nesting activity typically occurs between late June and late July and nest clutch size is typically between two and four eggs (Halterman *et al.* 2015). Cuckoos have a very short breeding season (14 to 20 days from nest construction to fledge) that is based on the availability of large insects that provide nutrition for quick growth. Fledglings are dependent on adults until 28-32 days old.

### 15.1.3  Habitat

Throughout this section, the terms 'territory' and 'site' are used to help describe cuckoo population biology. A territory is the area occupied by a pair or a pair accompanied by an additional 'helper male' or juvenile male cuckoo throughout the breeding season. Territories are the unit of measurement used by the Service in determining population status and trends. Detections at a 'site' consist of individual locations where a cuckoo was identified either by aural or visual observation either during migration or during the breeding period. Such information

may not signify a breeding territory, but rather a location used for foraging, resting, or perhaps, breeding activities (Carstensen *et al.* 2015). Within an area of suitable or moderately suitable habitat cuckoo territories may overlap and are not typically defended. The term 'suitable or moderately suitable habitat' refers to habitat patches where cuckoos would be suspected to potentially use as a breeding or nesting area.

The Service's current estimates of territory size for cuckoo are based on telemetry studies and modeling from Arizona and New Mexico, which found 'suitable or moderately suitable habitat' used for breeding consists of a core area of dense cottonwood-willow vegetation of at least 12 acres (4.5 hectares) in area and surrounded by large expanses of vegetation of at least 178 acres (72 hectares) for foraging that may be of lower quality than the core area (Johnson *et al.* 2017; Halterman *et al.* 2015; Sechrist *et al*. 2009). Similar telemetry studies to determine the average size of core areas used for breeding by cuckoos in California have not been completed. Past studies in California found cuckoos are most likely to be found in patches of willow–cottonwood riparian habitat greater than 200 acres (80 hectares) in size (Service 2014a), and the species rarely uses small patches of habitat (under 50 acres [20 hectares] in size), particularly when patches were distant from other patches of riparian habitat (Laymon and Halterman 1989).

Breeding cuckoos are riparian obligates and nest in low to moderate elevation riparian woodlands with dense vegetation providing a thick canopy cover. Cuckoo habitat is dynamic and can change rapidly due to riverine processes of flooding, erosion, sediment deposition, and drought. Nesting habitat can mature as quickly as 2-3 years depending on conditions and vegetative species (Halterman *et al.* 2015). Cuckoos primarily use willow species such as Gooding's black willow (*Salix gooddingii*), red willow (*S. laevigata*), and coyote willow (*S. exigua*) for nesting and have open saucer type nests (similar to that of a Dove). Other tree species are occasionally used, including Fremont cottonwood (*Populus fremontii*) and alder. Along the Sacramento River, orchards of English walnut (*Juglans regia*), prune, and almond trees have also been reportedly used for nesting (Laymon 1980). Occupied habitat in Butte County was described by Halterman (1991) as great valley cottonwood riparian forest and great valley mixed riparian forest, including willows, box elder, and white alder. Potential habitat also occurs in valley marshland with willow riparian corridors, such as that found in the Llano Seco area of Butte County. Nests are built from 4 to 73 feet above the ground, and nest trees range from 10 to 98 feet in height (Service 2014a).

Although cuckoos nest primarily in willow trees, Fremont cottonwood trees are important foraging habitat, particularly as a source of insect prey. All studies indicate a highly significant association with relatively expansive stands of cottonwood-willow forests; however, cuckoos will occasionally occupy a variety of marginal habitats, particularly at the edges of their range (Laymon 1998). Cottonwood trees have specific habitat needs to successfully germinate and grow. Cottonwood seedling roots grow from between 0.2 to 0.4 inch (0.5 to 1.0 cm) per day (Mahoney and Rood 1998), to a maximum growth of 1 inch (2.5 cm) per day (Stella et al. 2010) under cultivation. At 1 inch (2.5 cm) per day, recruitment begins to diminish (Rood et al. 1988). Adequate flow recessions are necessary for cottonwood germination and seedling survival.

Continuing habitat succession has also been identified as important in sustaining breeding populations (Laymon 1998). Riparian vegetation succession is dependent upon dynamic riverine

processes (Service 2014a). It is important to recognize that in order to support or provide for dynamic riverine processes, riparian habitats must be dynamic, with natural processes that create, recycle, and maintain riparian habitat. Riparian habitat can quickly change and vary in suitability, location, use, and occupancy by cuckoo over time (Service 2014a). Meandering streams with regular riparian floodplain activation that allows for constant erosional and depositional processes creates habitat for new rapidly growing young stands of willow, which create preferred nesting habitat conditions for cuckoo. Lateral channel migration and point bar deposition that create new floodplains and channel bend cut-offs that create floodplain lakes are important processes that create viable cuckoo habitat (Greco 2013). Loss of riparian floodplain activation and other factors can destroy or degrade breeding habitat, such that any given breeding habitat cannot be expected to remain suitable in perpetuity. In order to manage breeding habitat over time, it is necessary to have additional suitable habitat available to which cuckoos, displaced by such habitat loss or change, can readily move into and breed. If short-term losses of habitat and floodplain activation were never to occur, habitat would simply senesce or over-mature and no longer have the structure and foliage cover to accommodate nesting activity (Service 2016a).

Cuckoos have a certain degree of breeding site fidelity. Where banding studies have taken place, returning cuckoos one or more years after initial capture were typically recaptured within 80 feet to 50 miles from their original banding location (McNeil *et al.* 2013; Halterman 2009; Halterman *et al.* 2015). Breeding pairs of banded cuckoos along the Lower Colorado River were found occupying the same territory for up to three years (Laymon 1998; Halterman *et al*. 2015). However, dramatic fluctuation in breeding pairs at long-term study sites at the South Fork Kern River and Bill Williams River indicates that year-to-year movement between potential breeding areas also occurs (Service 2013). Geolocator studies have found that cuckoos can make long-distance movements during the breeding season (Sechrist *et al.* 2012). Limited radio telemetry work has been conducted on the cuckoo populations in California and the findings were largely inconclusive. However, one cuckoo tagged in the Sacramento River Valley was later found breeding in the Kern River Valley (Seavy 2019, personal communication). It is likely that cuckoos return to sites of previous successful breeding, but if the conditions are not suitable that year, they move to other potential breeding sites (Service 2013). The maximum distance individual cuckoos will travel from their natal habitat to find a new suitable breeding site is uncertain given the limited number of studies conducted to date.

Cuckoos may be found in a variety of vegetation types during migration, including coastal scrub, secondary growth woodland, hedgerows, humid lowland forests, and forest edges from sea level to 8,125 feet in elevation (Hughes 2015). Additionally, during migration they may be found in smaller riparian patches than those in which they typically nest. This variety of vegetation types suggests that the habitat needs of the cuckoo during migration are not as restricted as their habitat needs when nesting and tending young.

15.1.4  Numbers

The number of cuckoos in the western United States has "declined by several orders of magnitude over the past 100 years" (Service 2013), coincident with the widespread loss of riverine riparian woodlands as a result of the construction of dams, mining of groundwater, and

development of urban and agricultural areas in the United States. This decline is continuing throughout the range of the species. Surveys over the past 15 years have documented losses of breeding pairs in smaller isolated sites and at core breeding areas. The Service estimated the current breeding population at 680 to 1,025 pairs, with 350 to 495 pairs north of the Mexican border and the remainder in Mexico. The estimated population in California once exceeded 15,000 pairs (Hughes 2015), declined to 122-163 pairs in 1977 (Gaines and Laymon 1984), further declined to an estimated 100 pairs in 2000 (Halterman *et al*. 2001), and was estimated to be 40-50 pairs state-wide in 2013 (Service 2013).

Limited information is available regarding the current distribution and abundance of cuckoos range-wide. The estimated range-wide cuckoo population was summarized by the Service in 2013 and is provided in Table 15-1 below. Since the publication of the proposed listing of the cuckoo (Service 2013), the number of cuckoo territories in Arizona and New Mexico is estimated to be higher than in 2013 (Ryan 2019, personal communication; Sferra 2019, personal communication). While the species is responding positively to habitat restoration efforts in some areas, populations in other areas have decreased in size. In California, population declines in the Sacramento River Valley (Dettling *et al.* 2015) and Kern River Valley (Southern Sierra Research Station 2018) have been documented.

**Table 15-1. Estimated range-wide cuckoo territory numbers (Service 2013)**

| State | Estimated number of territories |
|---|---|
| Arizona | 170-250 |
| California | 40-50 |
| Colorado | <10 |
| Idaho | 10-20 |
| Nevada | <10 |
| New Mexico | 100-155 |
| Northwestern Mexico | 330-530 |
| Utah | 10-20 |
| Western Texas | <10 |
| Wyoming | <5 |
| **Total** | **680-1025** |

## 15.1.5  Distribution

The cuckoo formerly bred in California, Arizona, New Mexico, Oregon, Washington, western Colorado, western Wyoming, Idaho, Nevada, Utah, northwestern Mexico, and probably southern British Columbia, Canada (Figure 15-1). The species is now absent through much of the western range, including British Columbia, Oregon, and Washington (Hughes 2015). Very few incidental sightings have occurred in the Pacific Northwest over the last 30 years (Toochin and Cecile 2014; Teachout and Wiles 2016). The possibility of a vestigial breeding population in Washington exists (Wahl *et al.* 2005); however, if cuckoos still breed in the state, their numbers are extremely low, with pairs numbering in the single digits (Service 2015).

The species' current confirmed breeding range reaches its northwestern limit in the Sacramento Valley, California (although a small, potentially breeding population exists in coastal northern California on the Eel River). The northeastern portion of the breeding range is in southeastern Idaho on the Snake River. They breed at several sites in California, Arizona, New Mexico, and Mexico. Arizona, New Mexico, and northwestern Mexico, where some cuckoo populations are stable or growing, are recognized as the current core breeding areas for the cuckoo (Sferra 2019, personal communication). While California historically hosted a large portion of the breeding population and the species nested at numerous sites primarily in coastal areas from San Diego to Sonoma County, the Central Valley from Kern County to Shasta County, and the lower Colorado River, the California population has decreased to less than 1 % of its estimated historical size (Service 2013). Today, there are only three regions in California with confirmed breeding populations: the Sacramento River between Red Bluff and Colusa, the Kern River immediately upstream of Lake Isabella, and the Lower Colorado River along the border between Arizona and California (Service 2013). The Lower Colorado River breeding population is relatively stable (McNeil *et al.* 2014; Parametrix and Southern Sierra Research Station 2018). The Kern River population is experiencing a drastic decline and the area may not currently support a viable breeding population (Southern Sierra Research Station 2017). While cuckoo still occupy the Sacramento River Valley, the population has declined by at least 80 percent over the last 40 years, with a major continuing decline in the most recent 10 years (Service 2013). In 2013, the Sacramento River Valley population was found to be between 27 and 28 breeding pairs (Dettling *et al.* 2015).



**Figure 15-1. Current Breeding Range of the Western Yellow-Billed Cuckoo. Source: Reclamation (2018)** *Lower Rio Grande Yellow-billed Cuckoo Survey Results 2017.* **Note: Figure 15-1 depicts the most recently published map of the western yellow-billed cuckoo breeding range, but that map is based on 1987 data. Current data for New Mexico confirm a cuckoo population on the Lower Rio Grande that is not depicted on this map.**

The metapopulation dynamics of the cuckoo are largely unknown at this time. Given the limited scope of banding and geolocator studies for cuckoo, it is unknown if the exchange of individuals among geographically separated populations is common, or if there is a core population from which individuals may disperse out into other populations.

The available information on the winter range of the western DPS of the cuckoo comes from two studies: Sechrist *et al.* 2012 and McNeil *et al.* 2015. A single cuckoo from the breeding population on the middle Rio Grande River in New Mexico wintered in eastern Bolivia, southwestern Brazil, Paraguay, and northeastern Argentina, spending 5 months from late November through late April moving around an area 1,243 miles in length and 373 miles in width (Sechrist *et al.* 2012). Another study documented a similar loop migration route in another cuckoo breeding in the lower Colorado River in Arizona, but reversed in direction from the New Mexico bird. During fall migration the bird flew ~5,903-5,959 miles (~9,500–9,900 km), passing through the Caribbean region. It wintered from mid-November to late April in the Gran Chaco of

central South America, around the junction of Paraguay, Bolivia, and Argentina. The more direct spring route back to the breeding grounds passed through Peru and Central America (McNeil *et al.* 2015).

15.1.6  Limiting Factors, Threats, and Stressors

The primary threats to cuckoos are the loss of extensive contiguous riparian habitat due to dams and the alteration of downstream channels by surface and groundwater diversion; encroachment of levees and flood control and bank stabilization structures into the river channel and floodplain; transportation systems; gravel mining; agriculture including ranching; and conversion to non-native invasive plant communities (Service 2014b). Other threats come from the use of pesticides that reduce or eliminate prey during the breeding season. Very little is known about threats to cuckoos and their wintering habitat in South and Central America.

Dams and their ongoing operations are a threat to the cuckoo over most of its range. The initial damming damages riparian structure and functioning due to habitat displacement from dam construction and permanent flooding of upstream riparian areas. Current and future releases of water downstream from dams at flow rates or timing that differ from preconstruction hydrologic circumstances may lead to flooding or desiccation beyond the tolerance limits of the native riparian vegetation, resulting in habitat loss. Downstream effects include changes in sediment transport due to sediment retention behind dams so that channels become increasingly "sediment starved." This situation causes vertical erosion (downcutting), which can lead to loss of river terraces that sustain riparian vegetation (Service 2014b).

The operation of dams result in a diminishment or loss of the natural hydrograph that provides the conditions needed for riparian vegetation growth, establishment, and succession. In California, winter and spring storms historically activated the riparian floodplain. The Sacramento River is lacking in the hydrograph components of winter mobilization flows, spring floodplain inundation, and spring snowmelt recession. The dampening of the magnitude of normal high flows can prevent cottonwood germination and the dewatering of downstream reaches causes declines of riparian forests. These impacts are happening now and are likely to continue without changes to water release strategies and management (Service 2014b).

Conversion of native or mixed native and nonnative riparian woodlands to nearly monotypic stands of saltcedar (*Tamarix* spp.) and other nonnative vegetation, coupled with the inability of native vegetation to regenerate under altered hydrological conditions, is a significant threat to the cuckoo (Service 2014b). Exotic vegetation does not appear to be preferred habitat by cuckoos, but will be utilized if available. From 2009-2014 along the Middle Rio Grande River, nearly 40% of the cuckoo detections were located in areas with canopy, understory or both dominated by 75% or more exotic species cover (Carstensen *et al.* 2015). However, in Arizona on the lower Colorado River, the odds of cuckoo occurrence decreased rapidly as saltcedar presence increased (Johnson *et al.* 2012). In central California, giant reed (*Arundo donax*), common edible fig (*Ficus carica*), and Himalayan blackberry (*Rubus discolor*) are some of the more conspicuous nonnative plants widely established along the Sacramento River. Cuckoo are far less likely to be detected in areas with an understory dominated by Himalayan blackberry and nesting has not

been documented in areas dominated by these species that lack at least some native canopy trees (Service 2014b).

Cuckoos prey on katydids, caterpillars, cicadas, and other large insects (Halterman *et al.* 2015). Targeted insecticide applications on agricultural land have reduced the cuckoo's preferred food resources such as sphinx moth caterpillars, giant grasshoppers, cicadas, and tree frogs. There have not been any studies directly linking cuckoo decline to the use of common pesticides. However, the global decline in insect biomass (Hallman *et al.* 2017) is a threat to many insectivorous bird species (Hallman *et al.* 2014). Pesticides, whether applied directly to riparian habitat or sprayed on adjacent areas, may affect the reproductive success of the cuckoo (Service 2014b). A reduction in the availability of suitably sized prey may lead to nest failure and the abandonment of nesting areas.

The proposed critical habitat rule described a study along the Snake River in Idaho and noted that, "compared to habitat patches surrounded by natural habitat, patches near agricultural lands supported more avian nest predators that prosper in human-altered landscapes and have a greater effect on the smaller, fragmented habitats" (Service 2014a). The increase in predators can result in an increase in the loss of nests; repeated nest failures may cause cuckoos to abandon suitable habitat.

Climate change also poses threats to the cuckoo through changes in the availability and distribution of suitable habitat. In the cuckoo's range, climate change is generally predicted to result in an overall warmer, drier climate, with periodic episodic precipitation events. California has a recurring drought cycle that can result in loss of riparian trees from reduced river flows and lowering water tables. The most recent drought is suspected to be a major contributing factor to the decline of the Kern River Valley cuckoo population (Stanek 2019, personal communication).

Long-term climate trends are likely to have an overall negative effect on the available habitat throughout the breeding range of the cuckoo (Service 2014b). However, there is a potential that future conditions in the major riparian corridors of California may result in better habitat suitability for cuckoo than future conditions in the species' current stronghold in the Southwest (Sferra 2019, personal communications; Point Reyes Bird Observatory (PRBO) 2012). In 2012, PRBO Conservation Science (now called Point Blue Conservation Science) produced distributional models for potential habitat for riparian birds, including cuckoo, under current conditions and two different climate scenarios (Figure 15-2). Despite potential changes in the frequency, timing, and severity of storm events in the future, the model predicted an increase in potential habitat for cuckoo. The models are coarse estimates of potential habitat availability and do not represent potential occupied habitat under potential future climate scenarios (Seavy 2019, personal communication).



| Projected Current Conditions | Projected Future Distribution: NCAR CCSM3.0 climate model | Projected Future Distribution: GFDL CM2.1 climate model |

**Probability of occurrence**   ☐ 0-20%   ☐ 20-40%   ☐ 40-60%   ☐ 60-80%   ☐ 80-100%

**Variables in order of importance for yellow-billed cuckoo:** 1. Precipitation seasonality, 2. Vegetation, 3. Precipitation of driest quarter, 4. Annual precipitation, 5. Distance to stream, 6. Mean temperature of the warmest quarter, 7. Temperature seasonality, 8. Annual mean temperature, 9. Mean diurnal range, 10. Isothermality.

**Figure 15-2. Modeled western yellow-billed cuckoo distribution responses to climate change. Source: California Avian Data Center (PRBO 2012).**

In the arid southwest, models based on projected climate change predict that saltcedar will become more dominant in this region over the next 100 years (Service 2014b). In degraded habitat with saltcedar the threat of fire may be greater. Saltcedar ignites quickly, further increasing the incidence of periodic fires. Wildfires are likely to become more common with climate change, further exacerbating the saltcedar problem in cuckoo habitat in places such as New Mexico and Arizona (Service 2014b).

## 15.1.7 Recovery and Management

A recovery plan has not yet been developed for this species. In the absence of a recovery plan, we default to the general conservation needs of the species. For a species like the cuckoo that has lost much of its former known occupied habitat, recovery would necessitate the conservation of much of the remaining habitat that supports the species. In addition, restoration of suitable habitat that has been disturbed, but otherwise remains undeveloped, would be a priority. Lastly, efforts to establish the species in unoccupied, but otherwise suitable habitat, would contribute to its recovery.

## 15.2 Environmental Baseline

The cuckoo is known to have been historically common in riparian habitat throughout the Central Valley, from Kern County north to Redding (Laymon 1998). While the species has been detected in multiple watersheds throughout the Action Area, only the Sacramento River Valley is believed to currently sustain breeding populations at isolated sites along the Sacramento River and Sutter Bypass between Red Bluff and Colusa (Laymon and Halterman 1989; Laymon 1998;

Halterman 2001; Hammond 2011; Dettling *et al.* 2014; Stanek 2014; Parametrix Inc. and Southern Sierra Research Station 2015). Table 15-2 contains a summary of occurrences at locations throughout the Action Area from the 1960s to the present. No surveys for cuckoo were conducted for the BA.

**Table 15-2. Watersheds occupied by western yellow-billed cuckoo based on recent records in counties in or abutting the Action Area since 1960.**

| Location | Dates | Notes | Source |
|---|---|---|---|
| Sacramento River (between Red Bluff and Colusa) | through 2018 | Believed to be the only active breeding location within the Central Valley. No large-scale surveying efforts since 2013. | CDFW, Ebird, Dettling *et al.* 2015 |
| Sutter Bypass and East Canal (Sacramento River Valley) | 1992, 1999, 2000, 2008, 2010, 2015, 2016, 2018 | Six pairs detected by Sutter NWR staff in 2000. | CDFW, Ebird, Service Sutter NWR staff |
| Feather River | 1976, 1977, 1985, 1986, 1987, 2016 | Occurrences near Yuba City and Lake of the Woods State Wildlife Area. PRBO surveys 2012 and 2013 detected no individuals in the watershed. | CDFW, Ebird |
| American River (between Nimbus Dam and convergence with Sacramento River) | August 2013, August 2015 | Two reports in 2013 of a single bird; one report in 2015 of a single bird. | Ebird |
| Stanislaus River (between Ripon and convergence with the San Joaquin River) | 1962, 1965, June 1973, July 1982, July 2018 | Numerous observations near the mouth of the Stanislaus River from 1962-1973. | CDFW, Ebird |
| San Joaquin River-Old River | June 2012 | Water Treatment Plant | Ebird |

| Bay-Delta (Lower Sacramento River) | July 2009, August 2010 | Snodgrass Slough | CDFW |
| Bay-Delta (Lower San Joaquin River) | June 2005 | Dow Wetlands Preserve | Ebird |

The cuckoo population within the Action Area has been in decline since the time when the first phases of the CVP were implemented, and likely prior to that time given the extensive loss of riparian habitat since the Gold Rush. The steep decline in the cuckoo population in the Sacramento Valley was first noted by Grinnell and Miller in 1944, who concluded that the loss of large areas of riparian forest was the cause of the decline. By the 1980s, 95% of riparian forest in California's Central Valley had been lost (Katibah 1984). The breeding cuckoo population throughout California was estimated to be approximately 15,000 pairs before extensive development (Hughes 2015). The Service estimates between 40 and 50 breeding pairs remain in California, down from approximately 280 pairs in 1977 (Service 2013). Approximately half of the statewide population in 2013 is within the Sacramento River Valley area. The most recent estimate of the breeding population within the Action Area is no more than 28 pairs in 2013 (Dettling *et al.* 2015) and may be less in 2019 given the ongoing downward trend. Since 1977, the number of cuckoos detected per survey hour has been declining (Figures 15-3 and 15-4). Detections per survey hour are an indication of the density of individual birds occupying a particular area. Trends in the detection rate of a species are indicative of the general trend in the species' population, supporting the conclusion that the population in the Sacramento River Valley continues to decline (see Figure 15-4).



**Figure 15-3. Yellow-billed cuckoo pairs per survey effort on California statewide surveys 1977-2000. Source: *Proposed Threatened Status for the Western Population Segment of the Yellow-billed Cuckoo* (Service 2013).**



**Figure 15-4. Yellow-billed cuckoo detections during surveys on the Sacramento River on 10 separate years from 1972 to 2010. Source:** ***Proposed Threated Status for the Western Population Segment of the Yellow-billed Cuckoo*** **(Service 2013).**

Cuckoo detections have occurred most frequently in the upper Sacramento River where levees are setback from the river or do not exist, allowing for larger patches of active floodplain riparian habitat. Additionally, the last 20 years has seen a large amount of riparian restoration occur in the upper Sacramento River (Gilot *et al.* 2008). The Sacramento River from Red Bluff to Colusa has a highly dynamic mosaic of habitat patches of varying ages that form, disappear, and re-form in response to active river channel processes that operate over decades (Greco 2008; Greco 2012). Although this section of the Sacramento River is affected by altered hydrology, it is far enough below Shasta Dam and below several major undammed tributaries, such as Cottonwood Creek and Battle Creek, that it still has flood events every few years that help support riparian habitat processes (Werner 2012, pers. comm.). The river provides habitat characteristics that Laymon (1998) indicated were important for the cuckoo in California, such as a meandering system with young riparian habitat that, compared to mature woodlands, provides preferred nesting sites, high productivity of invertebrate prey, and reduced predator abundance (Laymon 1998).

Most other riparian habitat in the Action Area tends to be more narrow and linear than in the mainstem Sacramento River between Red Bluff and Colusa. The American River has a wider floodplain due to levees being setback from the channel. There are some patches large enough to support nesting cuckoos, though cuckoos have not been observed nesting along the American River. In 2013, there were two unconfirmed audible occurrences along the American River Parkway approximately five miles from the Action Area. These two occurrences were less than five miles apart along the river and heard on the same day (EBird 2019). In 2015, there was a confirmed visual sighting along the American River located in proximity to both the 2013

occurrences and approximately five miles from the Action Area (EBird 2019). Insufficient prey base from extensive application of insecticides to control mosquitoes and disturbance from recreational activities and homeless encampments along the American River may deter cuckoos from nesting. Based on these sightings, cuckoos likely use locations throughout the Action Area as stop-over habitat for feeding, resting, and sheltering during their migration from Mexico to the Upper Sacramento River. These stop-over areas also include the Stanislaus River, San Joaquin River, the Delta, Yolo Bypass, and Sutter Bypass.

A habitat model developed by Gaines (1974) for the cuckoo in the Sacramento Valley includes the following elements: patch size of at least 25 acres, at least 330 feet wide and 990 feet long, within 330 feet of surface water, and dominated by cottonwood/willow gallery forest with a high-humidity microclimate. Laymon and Halterman (1989) further refined the model by classifying habitat patch sizes for suitability. A willow-cottonwood forest patch greater than 1,980 feet wide and greater than 200 acres (81 hectares) is classified as optimum habitat; a patch 660 to 1,980 feet wide and 102.5 to 200 acres (41.5 to 81 hectares) is suitable; a patch 330 to 660 feet wide and 50 to 100 acres (20 to 40 hectares) is marginal, and smaller patches are unsuitable. Most riparian corridors in the Action Area do not support sufficiently large riparian patches or the natural, geomorphic processes that provide suitable cuckoo breeding habitat (Greco 2013).

Largely due to restoration efforts, there is currently estimated to be a total of 20,100 acres (8,134 hectares) of potential cuckoo habitat along the Sacramento River and 5,070 acres (2,052 hectares) along the Feather River, for a total of 25,170 acres (10,186 hectares) in the species current breeding area in the Central Valley (Dettling *et al.* 2015). Despite the restoration efforts in the Sacramento River Valley, the amount of forest restored so far may not be enough to slow the decline of the species that was already in motion (Dettling *et al.* 2015). Dybala *et al.* (2017) determined an additional 8,377 acres (3,390 hectares) of riparian vegetation in the Sacramento River Valley would need to be restored within the next 10 years to stop the trend of steep population decline for cuckoo. A total of 151,670 acres (61,379) hectares would have to be restored within the next 100 years to make the cuckoo population resilient (Dybala *et al.* 2017).

The decline of the cuckoo is primarily the result of the loss and degradation of riparian habitat within its breeding range (Laymon 1984). The first major human disturbance to riparian habitat historically used by cuckoo within the Action Area came from hydraulic mining in the mid-1800s. The bed of the Sacramento River returned to its original elevation after the end of hydraulic mining in 1884. However, the plan view of the river was permanently altered. Before the river established a new pattern of stability, dams and levees were built to control floods and restricted the river's natural hydraulic processes. Levee construction and reclamation of levee lands further destroyed large amounts of riparian vegetation and began the conversion of riparian lands to croplands which continued through the 1980s (Scott and Marquiss 1984). The few remaining riparian areas used for breeding by the cuckoo within the Action Area were included in the proposed critical habitat rule (Service 2014a).

15.2.1  Factors Affecting Western Yellow-billed Cuckoo Within the Action Area

Many factors have contributed to the current status of the cuckoo in the Action Area. Agriculture, construction of flood control infrastructure, levee construction, and riprapping have contributed to historic loss of riparian and floodplain habitat, and which constrain or prevent

ecosystem function to allow for riparian habitat regeneration in the Action Area. Flood control efforts in the Sacramento Valley have a history dating back to the Gold Rush, and resulted in a fragmented system of levees and other structures (James and Singer 2008). Reclamation did not provide information on how past and current water operations has affected cuckoo, nor was habitat suitability modeling provided for the Action Area. Long-term operations of the CVP and SWP have been occurring for many decades and have contributed to the current condition of the species in the Action Area, along with the other factors listed above. The effects of the PA will be imposed on an already degraded, fragmented, and ecologically constrained riparian system.

The operation of large dams have significant downstream hydrologic and geomorphic effects on rivers (Graf 1999; Graf 2006), and recent studies have modeled the effects of dams and diversions on the Sacramento River (Fremier *et al.* 2014; Michalková *et al.* 2010). The changes in channel dynamics resulting from the operation of water storage and conveyance facilities in the Sacramento River are major factors in the reduction of suitable cuckoo habitat (Greco 2013). Multiple models have been developed to explain how water operations have changed hydrogeomorphic processes in the Sacramento River since the implementation of the CVP (Greco 1999, Greco 2013; Greco *et al.* 2007). Additionally, hydrologic and ecological models have been developed and tested to predict how proposed changes in flows may result in different degrees of hydrologic alteration (Richter *et al.* 1996), changes in channel migration potential (Fremier *et al.* 2014), floodplain activation (Bovee *et al.* 1998; Millsap and Gard 2017), general ecological health (Sommer *et al.* 2004; Alexander *et al.* 2014; The Nature Conservancy *et al.* 2008; Alexander *et al.* 2018), and particularly applicable to cuckoo habitat needs, Fremont cottonwood regeneration (ESSA 2017; Alexander *et al.* 2014).

The continued operation of dams and diversions will likely have compounding effects on riparian habitats into the future. Continued shifts in vegetation community composition in terms of dominant species, age, canopy height, and patch sizes (Greco *et al.* 2007; Greco 2013) and changes in channel morphology (Michalková *et al.* 2010) have been documented in recent decades. The effects of dam-induced reduction of mean annual peak discharge flow (CALFED 2000), reduction of flood discharge volume (Greco 2013), reduction in stream power (Fremier 2003), sediment starvation (Michalková *et al.* 2010), and reduced bank erosion rates and overbank deposition (Buer *et al.* 1989) all contribute to changes in successional riparian forest ecosystems. As the ability of the river channel to migrate laterally is restricted (Larsen *et al.* 2006) and the quantity of new land production reduces, the amount of new pioneer riparian forests is subsequently decreased (Greco *et al.* 2007).

In addition to the management of riparian habitat within the Service's wildlife refuges within the Action Area, there are restoration projects that have occurred or are planned to occur. Substantial riparian restoration and floodplain reestablishment through levee setbacks are occurring on the Sacramento and San Joaquin Rivers, and some major tributaries.

The Service has formally consulted on 32 projects within the Action Area. These include projects such as bridge replacements, river bank protection, channel rehabilitation, habitat restoration, Corps flood control manual updates, and transmission line installation. A consultation with the Corps was completed in 2018 for the Folsom Dam Water Control Manual Update. In this consultation, it was found that flood flows were expected to result in a reduction

in the amount of habitat, or lowering of the quality of the remaining habitat, but this reduction was deemed to be of insufficient duration, intensity, and severity to adversely affect the cuckoo. Another notable consultation is with the Corps on the construction of the Hamilton City Flood Damage Reduction and Ecosystem Restoration Project to setback the levee along the Sacramento River near Hamilton City, Glenn County. This project is expected to result in temporary adverse effects to cuckoo during construction, but will improve riparian habitat quality long-term. Once completed, the setback levee will allow for the return of dynamic riverine processes to 1,415 acres on the landside of the existing levee that will be reconnected to the active floodplain, and restoration of 420 acres of riparian forest suitable for cuckoo breeding.

## 15.3  Effects of the Proposed Action

As noted in the *Environmental Baseline* section above, the effects of the PA will be against a backdrop of a highly degraded, constrained riparian system. The following description of the effects of the PA is broken out by watershed and PA element.

### 15.3.1  Sacramento River

*Seasonal Operations*

Reclamation's PA includes proposed flow changes in the Sacramento River resulting in less than 5% percent decrease in average flows in November and less than 5% increase in average flows in May and June from the current condition. Reclamation stated in their BA that the proposed "changes are unlikely to produce any measurable change in quantity or quality of western yellow billed cuckoo habitat in the upper Sacramento watershed, and there is no apparent mechanism by which these changes could result in harm to individual western yellow billed cuckoos." Periodic flooding and erosion are important to maintaining successional riparian ecosystems. Without detailed ecological flow modeling, like SacEFT, it can be assumed that seasonal operations will on average maintain current vegetation, resulting in habitat similar to the current condition with limited floodplain activation to stimulate regeneration. Since the average flows are similar overall to the current operations scenario, it can be expected that implementation of the PA will result in similar habitat conditions from now until 2030.

*Spring Pulse Flows*

The spring pulse flows in the PA may benefit cuckoo by supporting the recruitment of important riparian tree species, primarily willows. The PA does not describe the incorporation of flow recession during the germination and seedling establishment for riparian over-story species (particularly Fremont cottonwood). Additionally, the BA did not include ecological flow modeling (such as SacEFT) that would support a quantitative assessment of how much these flows will actually benefit riparian plant communities and sustain cuckoo habitat. We assume that the proposed spring pulse flows could benefit the cuckoo to an unknown amount from now until 2030.

*Operations of a Shasta Dam Raise*

Reclamation does not propose to change the operations of Shasta Dam after construction of the dam raise and during the timeframe of the PA until 2030. If operational changes are proposed, Reclamation will reinitiate consultation. See the Reinitiation Notice (Section 18.0) at the end of this BiOp for more information.

*Salmonid Spawning and Rearing Habitat Restoration*

Reclamation proposes to restore 40-60 acres of side channel habitat at approximately 10 sites in Shasta and Tehama County by 2030. Although Reclamation will minimize removal of riparian habitat to the extent feasible through implementation of AMM24 (AMM-WYBC), up to 58 acres of cuckoo habitat may be removed. Removal of riparian vegetation, potential reduction in the size of intact patches of suitable riparian habitat, and potential fragmentation of habitat will result in injury to the cuckoo through the reduction of reproductive potential and recruitment associated with the loss of nesting and foraging habitat. Side channel habitat can serve as cuckoo habitat and habitat restoration projects may provide some benefit to cuckoos through improving habitat suitability. Reclamation will complete subsequent consultations on each of their proposed restoration projects individually as previously described in the *Consultation Approach* section of this BiOp.

Construction-related effects on the cuckoo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction. Reclamation proposes to avoid disturbance of occupied cuckoo habitat through implementation of AMM-WYBC. However, cuckoos are secretive birds and not easily detected through pre-construction surveys. As such, potential adverse effects to cuckoos from construction may not be fully avoided by implementing the measures in AMM-WYBC, but we expect implementation of these measures to minimize the likelihood of construction-related effects to the cuckoo.
These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

*North Delta Food Subsidies/Colusa Basin Drain Study*

High water levels (flows of 200 to 500 cfs) are proposed to pass through the Yolo Bypass which includes a disjunctive portion of the current range for this species. The proposed flows will not exceed local flooding levels and are unlikely to reach 3 feet above the ground where effects on cuckoo are likely. Flows are proposed in July, August and/or September for approximately 4 weeks, which would coincide with June through mid-September nesting although no adverse effects to individuals or habitat are anticipated. The proposed flows are unlikely to result in direct harm to individual cuckoos, and may result in indirect beneficial impacts through improvement in habitat conditions and prey base.

### 15.3.2  American River

*Seasonal Operations*

In the American River watershed, the PA will result in the potential of a few percent decrease in flow in December, February and March, and a few percent increase in July and September. Similar to the Sacramento River, it can be assumed that seasonal operations will on average maintain current vegetation, resulting in habitat similar to the current condition with limited floodplain activation to stimulate regeneration. Since the average flows are similar overall to the current operations scenario, it can be expected that implementation of the PA will result in similar habitat conditions from now until 2030.

*Salmonid Spawning and Rearing Habitat Restoration*

Construction-related effects on the cuckoo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction. Reclamation proposes to avoid disturbance of occupied cuckoo habitat through implementation of AMM-WYBC. However, the cuckoo are secretive birds and not easily detected through pre-construction surveys. As such, potential adverse effects to cuckoo from construction may not be fully avoided by implementing the measures in AMM-WYBC, but we expect implementation of these measures to minimize the likelihood of construction-related effects to the cuckoo.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 15.3.3  Stanislaus River

*Seasonal Operations*

Lower flows in the spring under the PA could potentially result in less riparian vegetation recruitment. The PA will likely result in flows being generally more stable, which will reduce riparian over-story tree regeneration. Since the average flows are similar overall to the current operations scenario, it can be expected that implementation of the PA will result in similar habitat conditions from now until 2030.

*Salmonid Spawning and Rearing Habitat Restoration*

Reclamation proposed to create side channels requiring the removal of riparian habitat within the range of cuckoo. Although Reclamation proposes to minimize removal of riparian habitat to the extent feasible through implementation of AMM-WYBC, up to 43 acres of riparian cuckoo habitat may be removed.

Construction-related effects on the cuckoo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction. Reclamation proposes to avoid disturbance of occupied cuckoo habitat through implementation of AMM-WYBC.

However, the cuckoo are secretive birds and not easily detected through pre-construction surveys. As such, potential adverse effects to cuckoo from construction may not be fully avoided by implementing the measures in AMM-WYBC, but we expect implementation of these measures to minimize the likelihood of construction-related effects to the cuckoo.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

### 15.3.4  San Joaquin River

*Proposed Flow Changes*

In the lower San Joaquin watershed, differences between the PA and COS are almost nonexistent. While baseline conditions for cuckoo in the lower San Joaquin River are impaired by decades of hydrologic alteration, agricultural activities, and habitat loss, the Service does not foresee any subsequent harm to cuckoos in terms of changes in quantity or quality of cuckoo habitat in the lower San Joaquin watershed during the PA timeframe.

*Lower San Joaquin River Habitat Restoration*

<u>Permanent Habitat Loss</u>

The restoration of floodplain habitat in the Lower San Joaquin River would result in the permanent removal of up to 11 acres of cuckoo habitat. Reclamation states the habitat is of moderate value as it consists primarily of small patches in proximity to other habitat along the San Joaquin River or adjacent to existing conservation lands and that when restoration sites are selected, they will be selected to minimize effects on cuckoo habitat.

<u>Temporary Habitat Loss</u>

If Reclamation incorporates multi-species restoration methods to create and maintain large patches of riparian forests that provide for the breeding and foraging needs of cuckoo, the loss of 11 acres of cuckoo habitat due to construction could be minimized by the creation or restoration of suitable cuckoo habitat as part of this habitat restoration program. Under this potential scenario, what would otherwise be considered a permanent loss of habitat would be a temporary loss instead.

<u>Periodic Inundation</u>

Based on a hypothetical floodplain restoration, this activity will periodically inundate an estimated 70 acres of habitat for the cuckoo. The floodplains will transition from areas that flood frequently (i.e., every 1 to 2 years) to areas that flood infrequently (i.e., every 10 years or more). While frequent intense flooding in the lower elevation portions of the floodplain may result in excessive scouring of riparian vegetation, occasional large floods are expected to have a beneficial rather than an adverse effect on the species by promoting vegetation succession. If

large floods are operated with a moderated recession flow of less than 1 inch per day, they could provide for better cottonwood and willow recruitment and seedling survival. However, the loss of semiannual floods may result in less understory vegetation, which responds positivity to low-intensity frequent flooding. Dense understory vegetation provides cover for cuckoo nest located in over-story trees and habitat for the large insects cuckoo prey upon. Therefore, periodic inundation is likely to result in some loss of prey base for the cuckoo.

*Construction-Related Effects*

Construction-related effects on the cuckoo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction. The threats of construction-related effects are greatest to eggs and nestlings that could be injured or killed through crushing by heavy equipment, nest abandonment, or increased exposure to the elements or to predators. Reclamation proposes to avoid disturbance of occupied cuckoo habitat through implementation of AMM-WYBC. However, the cuckoo are secretive birds and not easily detected through pre-construction surveys. As such, potential adverse effects to cuckoo from construction may not be fully avoided by implementing the measures in AMM-WYBC, but we expect implementation of these measures to minimize construction-related effects to the cuckoo.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

15.3.5 Bay-Delta

*Intertidal and Associated Subtidal Habitat Restoration*

Construction-related effects on the cuckoo include the potential for injury or mortality and noise and visual disturbance to individuals in the vicinity of construction. Reclamation proposes to avoid disturbance of occupied cuckoo habitat through implementation of AMM-WYBC. Since cuckoos are not expected to nest in intertidal and subtidal habitats, the implementation of the measures in Appendix E of the BA are expected to avoid impacts to cuckoo.

These actions are addressed programmatically in this consultation, so further detail about expected adverse effects and benefits, and any incidental take, will be addressed in subsequent consultation prior to implementation.

**15.4 Effects to Recovery**

A recovery plan has not been developed for the cuckoo. In the absence of a recovery plan, we default to the general conservation of the species. For a species like the cuckoo that has lost much of its habitat, recovery would necessitate the conservation of much of the remaining habitat that still supports breeding, feeding, and sheltering.

Reclamation and DWR have proposed to avoid and minimize impacts from construction to occupied suitable habitat; however, it is possible that their proposed avoidance and minimization measures will not prevent the loss of habitat and effects to individuals. Habitat loss and

degradation are contributing factors to the decline of the cuckoo; consequently, restoration or protection of additional suitable habitat is a reasonable means of offsetting the adverse effects and may benefit the recovery of the cuckoo. Multi-species habitat restoration methods could be employed that would result in additional suitable habitat for cuckoo. The PA contains no specific project elements, as described in the BA, likely to contribute to the recovery of the cuckoo, and there are no proposed measures in the PA to address the degraded condition of the habitat in the Action Area. Given the lack of information on metapopulation dynamics of this species, it is unknown how or if the effects of the PA will affect the recovery of the cuckoo range-wide.

## 15.5  Cumulative Effects

The activities described in Section 5.5 for delta smelt are also likely to affect cuckoo. These include agricultural practices, recreation, urbanization and industrialism, and greenhouse gas emissions, and are similar to activities occurring in the other parts of the Action Area outside of the Delta. Therefore, the effects described in Section 5.5 are incorporated by reference into this analysis of cumulative effects for the cuckoo throughout the Action Area.

Additional activities that are reasonably certain to occur in the Action Area include creation of recreation trails, conversion of riparian habitat to agriculture, and flood maintenance activities. Recreational trails can disturb or harass cuckoos when trails are located adjacent or within cuckoo breeding habitat. Construction equipment that is used for creation of the trail has the potential to disrupt nesting cuckoos. While a lot of the conversion of riparian to agriculture occurred early in the 20th century, there are still instances of landowners converting riparian habitat to agriculture, particularly when certain crops such as nuts become more profitable. Agriculture adjacent to riparian habitat that could be used by the cuckoo has the potential to affect the cuckoo and its habitat through the use of pesticides and drift of pesticides damaging both the riparian vegetation as well as the prey base of the cuckoo. Vector control activities in riparian habitat near urban areas that could be used by the cuckoo also has the potential to affect the cuckoo and its habitat through the use of mosquito-control pesticides and drift of those pesticides damaging both the riparian vegetation as well as the prey base of the cuckoo through the non-targeted killing other insect species. Flood maintenance activities that primarily affect cuckoo include vegetation removal and suppression. DWR is responsible for keeping the floodways clear and open to maintain capacity and will remove vegetation or suppress vegetation in areas of limited capacity. This will likely result in discontinuous riparian habitat throughout the river systems in the Action Area.

## 15.6  Summary of the Effects from the Action

In determining whether a proposed action is likely to jeopardize the continued existence of a species, we consider the effects of the action with respect to the reproduction, numbers, and distribution of the species. We also consider the effects of the action on the recovery of the species. In that context, the following paragraphs summarize the effects of the PA on the cuckoo.

### 15.6.1  Reproduction

The Sacramento River Valley between Red Bluff and Colusa is one of the few remaining riparian areas used for breeding by cuckoos in the western United States and the largest and

historically most productive breeding area in California. Other riparian areas within the Action Area may be used for nesting, but are certainly used during migration. It is unknown to what degree cuckoo populations recruit adults from other breeding locations or if the species is likely to recolonize breeding habitat if a population fails. Cuckoos are believed to have some level of site fidelity, with documented returns of birds to breeding grounds where they were raised or where they have nested in the past. There are no other known breeding populations of cuckoo in the Central Valley of California. The next closest population is located in the Kern River Valley over 300 miles away from Colusa; however, that population has declined drastically in recent years and may no longer support breeding cuckoos (Stanek 2019, personal communication). Maintaining multiple breeding populations is critical for the long-term resilience of species. Particularly given that cuckoo populations in Arizona, New Mexico, and Mexico may face greater threats from climate change through increased water demands, shifting weather patterns, and the resulting loss of suitable habitat than cuckoo populations in the California Central Valley (Sferra 2019; Douglas 2019, personal communications), maintaining the population along the Sacramento River would provide redundancy through multiple breeding populations across the range of the species to insure long-term reproductive success.

The quantity of riparian habitat in the Action Area and its suitability for cuckoo breeding has declined significantly in part due to the construction of dams and operation of CVP and SWP (Katibah 1984; Scott and Marquiss 1984; Greco *et al.* 2007; Greco 2008; Greco 2013). Other causes of riparian habitat decline include conversion to agriculture, residential development, and flood control infrastructure. This loss of suitable habitat has been paired with a decline of approximately 80% of the breeding cuckoo population in northern and central California in the last 40 years (Service 2013).

The effects of the PA are added to this highly degraded Environmental Baseline to determine effects to reproduction. The Sacramento River supports the only known breeding population of cuckoos in the Action Area. Reclamation's PA includes proposed flow changes in the Sacramento River resulting in less than 5% percent decrease in average flows in November and less than 5% increase in average flows in May and June. In the absence of a thorough analysis of breeding habitat suitability in the BA, the Service assumes the PA will continue operations that will not cause loss of breeding pairs over the course of the action (until 2030). Restoration activities could remove or modify riparian habitat, but this effect to occupied cuckoo habitat will be minimized through implementation of proposed conservation measures and ultimately may benefit breeding cuckoos through improved habitat over time. Therefore, no measurable effects of the PA on reproduction of cuckoo are expected to occur.

## 15.6.2  Numbers

The number of cuckoos in the Action Area is relatively high compared to the state-wide population estimate (approximately 50% of the population), but low compared to the range-wide numbers (approximately 2 – 4%). Based on the current degraded condition of the cuckoo's habitat in the Action Area and the overall declining trend of the species as described in the Status of the Species and Environmental Baseline and cumulative effects from a number of factors including agricultural activities, it is reasonable to conclude numbers will continue to decline in the Action Area and range-wide between now and 2030. Further declines in the Sacramento

River Valley breeding population are likely to reduce the range-wide resiliency of the species - its ability to maintain survival and reproduction in spite of stochastic disturbances.

Reclamation and DWR have proposed measures to avoid and minimize the effects of the PA on the species as they relate to construction of restoration projects. The proposed flow changes on the Sacramento and American rivers are, on average, comparable to flows under the current operations scenario. The remaining water courses are expected to also experience similar conditions under the PA. The North Delta Food Subsidies/Colusa Basin Drain Study may benefit cuckoos migrating through the Yolo Bypass and Delta by improving prey base. Therefore, the effects of the PA are not anticipated to measurably reduce the number of cuckoos.

### 15.6.3 Distribution

The distribution of the species has been greatly reduced throughout its entire range. The Action Area includes large areas of breeding, foraging, and migratory habitat for the cuckoo. The riparian corridors associated with the major rivers of the California Central Valley – the Sacramento, American, Feather, Stanislaus, and San Joaquin Rivers – are part of the historical breeding habitat of the cuckoo and the remnant patches of suitable habitat support the remaining breeding populations of the species in Action Area. The current distribution of the species across the Action Area has not been quantified, and no surveys were conducted to support the BA. Outside of the Sacramento River and Feather River (Dettling *et al.* 2015), there have been no large-scale survey efforts for cuckoo in the Action Area by other organizations in recent decades. Based on anecdotal observations, it is believed that cuckoos use other water courses in the Action Area as migratory stop-over habitat for feeding, resting, and sheltering.

Based on the proposed conservation measures, we expect that the potential for injury to cuckoos from restoration projects will be minimized. On average, the operational scenario included in the PA is expected to be comparable to the current operations scenario, resulting in similar habitat conditions. Therefore, the species' distribution is unlikely to be reduced relative to its range-wide distribution as a result of implementation of the PA.

## 15.7 Conclusion

After reviewing the current status of the western yellow-billed cuckoo, the Environmental Baseline for the Action Area, the effects of the PA, and the cumulative effects, it is the Service's biological opinion that the PA is not likely to jeopardize the continued existence of the species. We have reached this conclusion because:

1. The habitat conditions are highly degraded. The effects of the PA, when added to these baseline conditions, are not expected to cause additional loss of cuckoos over the timeframe of this consultation.

2. Reclamation has proposed to implement avoidance and minimization measures designed to avoid affecting occupied habitat from the construction activities, and ultimately may benefit cuckoos through improved habitat over time.

## 15.8 Western Yellow-Billed Cuckoo Literature Cited

Alexander, C.A.D., Robinson, D.C.E. and F. Poulsen. 2014. Application of the Ecological Flows Tool to Complement Water Planning Efforts in the Delta & Sacramento River: Multi-Species effects analysis & Ecological Flow Criteria. Final Report to The Nature Conservancy. Chico, California pp. 228+appendices.

Alexander, C., Poulsen, F., Robinson, D.C.E., Ma, B.O. and R.A. Luster. 2018. Improving Multi Objective Ecological Flow Management with Flexible Priorities and Turn-Taking: A Case Study from the Sacramento River and Sacramento–San Joaquin Delta. San Francisco Estuary and Watershed Science 16(1).

Buer, K., Forwalter, D., Kissel, M. and B. Stohler. 1989. The Middle Sacramento River: Human Impacts on the Physical and Ecological Processes Along a Meandering River. USDA Forest Service General Technical Report PSW-110. U.S. Forest Service, Pacific Southwest Research Station, Albany, California, pp. 11.

Bovee, K.D., Lamb, B.L., Bartholow, J.M., Stalnaker, C.B. and J. Taylor. 1998. Stream habitat analysis using the instream flow incremental methodology (Report No. USGS/BRD/ITR--1998-0004). U.S. Geological Survey, Biological Resources Division, Reston, Virginia.

(CALFED) CALFED Bay-Delta Program. 2000. Flow regime requirements for habitat restoration along the Sacramento River between Colusa and Red Bluff. CALFED Bay Delta Program. Integrated Storage Investigation, Sacramento, California.

California Department of Fish and Wildlife. 2019. California Natural Diversity Database, RareFind 5.

Dettling, M. 2014. Potential Yellow-billed Cuckoo Habitat [ds1122] SDE Feature Class. Point Blue Conservation Science.
Available: https://map.dfg.ca.gov/metadata/ds1122.html (accessed 2019, April 9).

Dettling, M. D., N. E. Seavy, C. A. Howell, and T. Gardali. 2015. Current Status of Western Yellow-Billed Cuckoo along the Sacramento and Feather Rivers, California. PLoS one 10(4): e0125198. doi: http://dx.doi.org/doidoi10.1371/journal.pone.0125198

Dufour, S., Hayden, M., Stella, J., J. Battles and H. Piegay. 2015. Maintaining channel abandonment processes increases riparian plant diversity within fluvial corridors. Ecohydrology 8(5):780-791.

Dybala, K., Clipperton, N., Gardali, T., Golet, G., Kelsey, R. and S. Lorenzato. 2017. Population and Habitat Objectives for Avian Conservation in California's Central Valley Riparian Ecosystems. San Francisco Estuary and Watershed Science 15(1).

Carstensen, D., D. Ahlers and D. Moore. 2015. Yellow-billed Cuckoo Study Results – 2014 Middle Rio Grande from Los Lunas to Elephant Butte Reservoir, NM. U.S. Bureau of Reclamation, Denver Technical Service Center, Denver CO.

EBird. 2019. eBird: An online database of bird distribution and abundance. eBird, Ithaca, New York. http://www.ebird.org.

ESSA Technologies Ltd. 2017. Ecological Flows Tool. https://essa.com/explore-essa/tools/ecological-flows-tool/ (April 17, 2019).

Fremier, A.K., 2003. Floodplain age modeling techniques to analyze channel migration and vegetation patch dynamics on the Sacramento River, California. Master's Thesis. University of California, Davis.

Fremier, A.K., Girvetz, E.H., Greco, S.E., and E. W. Larsen. 2014. Quantifying Process-Based Mitigation Strategies in Historical Context: Separating Multiple Cumulative Effects on River Meander Migration. PLoS One 9(6).

Gaines, D. 1974. Review of the Status of the Yellow-Billed Cuckoo in California: Sacramento Valley Populations. Condor 76:204–209. doi: http://dx.doi.org/10.2307/1366731

Gaines, D. and S.A. Laymon. 1984. Decline, Status, and Preservation of the Yellow-billed Cuckoo in California. Western Birds 15(2):49-80.

Girvetz, E. H., and S. E. Greco. 2009. Multi-Scale Predictive Habitat Suitability Modeling Based on Hierarchically Delineated Patches: An Example for Yellow-Billed Cuckoos Nesting in Riparian Forests, California, USA. Landscape Ecology 24:1315–1329. doi: http://dx.doi.org/ 10.1007/s10980-009-9384-2

Golet, G.H., Gardali, T., Howell, C.A., Hunt, J., Luster, R.A., Rainey, W., Roberts, M.D., Silveira, J., Swagerty, H. and N. Williams. 2008. Wildlife Response to Riparian Restoration on the Sacramento River. San Francisco Estuary and Watershed Science 6(2).

Graf, W.L. 2006. Downstream hydrologic and geomorphic effects of large dams on American rivers. Geomorphology 79(3):336-360.

Graf, W.L. 1999. Dam nation: A geographic census of American dams and their large-scale hydrologic impacts. Water Resources Research 35(4):1305-1311.

Greco, S.E., 1999. Monitoring landscape change and modeling habitat dynamics of the yellow-billed cuckoo on the Sacramento River, California. Ph.D. Dissertation. University of California, Davis.

Greco SE. 2008. Long-term conservation of the yellow-billed cuckoo will require process-based restoration on the Sacramento River. Ecesis 18(3): 4–7.

Greco, S. E. 2013. Patch Change and the Shifting Mosaic of an Endangered Bird's Habitat on Large Meandering River. River Research and Applications 29(6):707–717. doi: http://dx.doi.org/10.1002/rra.2568

Greco S.E., Fremier A.K., Plant R.E. and E.W. Larsen. 2007. A tool for tracking floodplain age land surface patterns on a large meandering river with applications for ecological planning and restoration design. Landscape and Urban Planning 81:354–373.

Grinnell J. and A.H. Miller. 1944. The Distribution of the Birds of California. Pacific Coast Avifauna No. 27. Cooper Ornithological Club: Berkeley, California.

Hallmann, C.A., Foppen, R.P., van Turnhout, C.A., de Kroon, H., and E. Jongejans. 2014. Declines in insectivorous birds are associated with high neonicotinoid concentrations. Nature 511:341–343. doi: https://doi.org/10.1038/nature13531.

Hallmann, C.A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12(10):e0185809. doi: https://doi.org/10.1371/journal.pone.0185809.

Halterman, M. D. 1991. Distribution and Habitat Use of the Yellow-Billed Cuckoo (Coccyzus americanus occidentalis) on the Sacramento River, California, 1987–90. MS thesis. California State University, Chico.

Halterman, M.D. 2001. Population status of the yellow-billed cuckoo at the Bill Williams River NWR and Alamo Dam, Arizona, and Southern Nevada: summer 2000. Bureau of Reclamation, Lower Colorado River Division, Boulder City, Nevada, 45 pp.

Halterman, M.D., D.S. Gilmer, S.A. Laymon, and G.A. Falxa. 2001. Status of the yellow-billed cuckoo in California: 1999-2000. Report to the US Geological Survey, Dixon, CA. 73 pp.

Halterman, M.D., M.J. Johnson, J.A. Holmes and S.A. Laymon. 2015. A Natural History Summary and Survey Protocol for the Western Distinct Population Segment of the Yellow-billed Cuckoo: U.S. Fish and Wildlife Techniques and Methods, 45 p.

Hammond J. E. 2001. It was built…did they come? Habitat characteristics of Yellow-billed Cuckoo in restored riparian forests along the Sacramento River, California. M.Sc. Thesis, California State University, Chico. http://csuchicodspace.calstate.edu/handle/10211.4/302.

Hughes, J. M. 2015. Yellow-Billed Cuckoo (Coccyzus americanus), version 2.0. In: P. G. Rodewald (ed.) The Birds of North America. Ithaca, New York: Cornell Lab of Ornithology. https://doi.org/10.2173/bna.418.

James, L.A. and M.B. Singer. 2008. Development of the Lower Sacramento Valley Flood-Control System: Historical Perspective. American Society of Civil Engineers Natural Hazards Review. https://ascelibrary.org/doi/10.1061/%28ASCE%291527-6988%282008%299%3A3%28125%29

Katibah, E. F. 1984. A Brief History of the Riparian Forests in the Central Valley of California. In: R.E. Warner and K.M. Hendrix (eds.) California Riparian Systems: Ecology, Conservation, and Productive Management. University of California Press, Berkeley, California, pp. 51-58.

Larsen E. W., Fremier A.K. and E. H. Girvetz. 2006. Modeling the effects of variable annual flow on river channel meander migration patterns, Sacramento River, California, USA. Journal of the American Water Resources Association 42:1063–1075.

Laymon, S. A. 1980. Feeding and Nesting Behavior of the Yellow-Billed Cuckoo in the Sacramento Valley. Wildlife Management Administrative Report 80-2. Sacramento, CA: California Department of Fish and Game.

Laymon, S. A. 1998. Yellow-Billed Cuckoo (Coccycus americanus). In: The Riparian Bird Conservation Plan: A Strategy for Reversing the Decline of Riparian-Associated Birds in California. California Partners in Flight. http://www.prbo.org/calpif/htmldocs/species/riparian/yellow-billed_cuckoo.htm. Accessed April 30, 2019.

Laymon, S. A., and M. D. Halterman. 1987. Can the Western Subspecies of the Yellow-billed Cuckoo Be Saved from Extinction? Western Birds 18:19–25.

Laymon, S. A., and M. D. Halterman. 1989. A Proposed Habitat Management Plan for Yellow-Billed Cuckoos in California. U.S. Department of Agriculture, Forest Service General Technical Report PSW-110:272–277.

Mahoney, J. M., and S. B. Rood. 1998. Streamflow requirements for cottonwood seedling recruitment—An integrative model. Wetlands 18(4):634-645.

McNeil, S., Tracy, D. and C.D. Cappello. 2015. Loop Migration by a Western Yellow-billed Cuckoo Wintering in the Gran Chaco. Western Birds 46:244-255.

McNeil, S.E., Tracy, D., Stanek J.R. and J.E. Stanek. 2013. Yellow-billed Cuckoo Distribution, Abundance and Habitat Use on the Lower Colorado River and Tributaries, 2008-2012 Summary Report. Submitted to the Submitted to the Lower Colorado River Multi-Species Conservation Program, Bureau of Reclamation, Boulder City, Nevada. 163 pp.

Michalková, M., Piégay, H., Kondolf, G.M. and S.E. Greco. 2011. Lateral erosion of the Sacramento River, California (1942–1999), and responses of channel and floodplain lake to human influences. Earth Surface Processes and Landforms 36(2):257-272.

Millsap, S. and M. Gard. 2017. Use of Cumulative Acre-Days to Evaluate Changes in Floodplain Inundation on the Lower Tuolumne River under Different Hydrological Regimes and Quantification of Mitigation Measures. Unpublished.

Parametrix, Inc., and Southern Sierra Research Station. 2018. Yellow-billed Cuckoo Surveys on the Lower Colorado River, 2017 Annual Report. Submitted to the Lower Colorado River Multi-Species Conservation Program, Bureau of Reclamation, Boulder City, Nevada, by S.E. McNeil and D. Tracy, Southern Sierra Research Station, Weldon, California, and J. Lisignoli, Parametrix, Inc., Albuquerque, New Mexico, under contract No. R14PD0004.

Parametrix, Inc. and Southern Sierra Research Station. 2015. Yellow-billed cuckoo surveys and population monitoring on the lower Colorado River and tributaries, 2014. Annual Report submitted to the Bureau of Reclamation, Boulder City, Nevada. Prepared by S.E. McNeil, and D. Tracy, Southern Sierra Research Station, Weldon, California, and Parametrix, Inc., Albuquerque, New Mexico. February 2015.

(PRBO) Point Reyes Bird Observatory. 2012. Modeling Bird Distribution Response to Climate Change: A Mapping Tool to Assist Land Managers and Scientists in California. California Avian Data Center. http://data.prbo.org/cadc2/index.php?page=154. Accessed May 5, 2019.

(Reclamation) Bureau of Reclamation. 2018. Lower Rio Grande Yellow-billed Cuckoo Survey Results - 2017: Selected Sites within the Lower Rio Grande Basin from Elephant Butte Dam, NM to El Paso, TX. Technical Service Center, Denver, CO. pp. 41.

(Reclamation) Bureau of Reclamation. 2016. Western Yellow-billed Cuckoo Habitat Suitability 2016: Middle Rio Grande, New Mexico. Technical Service Center, Denver, CO. pp. 26.

Richter, B.D., Baumgartner, J.V., Powell, J. and D.P. Braun. 1996. A method for assessing hydrologic alteration within ecosystems. Conservation Biology 10 (1):1163–1174.

Riparian Habitat Joint Venture. 2004. The Riparian Bird Conservation Plan: A Strategy for Reversing the Decline of Riparian-associated Birds in California. Version 2.0. California Partners in Flight. http://www.prbo.org/calpif/pdfs/riparian_v-2.pdf

Rood, S.B., Kalischuk, A.R. and Mahoney, J.M., 1998. Initial cottonwood seedling recruitment following the flood of the century of the Oldman River, Alberta, Canada. Wetlands, 18(4):557-570.

Rood, S. B., J. H. Braatne, and F. M. R. Hughes. 2003. Ecophysiology of riparian cottonwoods: Stream flow dependency, water relations and restoration. Tree Physiology 23:1113-1124.

(SRCAF) Sacramento River Conservation Area Forum. 2003. Sacramento River Conservation Area Forum Handbook. Prepared for The Resources Agency, State of California. Red Bluff, California.

Scott, L.B. and S.K. Marquiss. 1984. An Historical Overview of the Sacramento River. In: R.E. Warner and K.M. Hendrix (eds.) California Riparian Systems: Ecology, Conservation, and Productive Management. University of California Press, Berkeley, California, pp. 51-58.

Sechrist, J., V. Johanson, and D. Ahlers. 2009. Western Yellow-billed Cuckoo Radio Telemetry Study Results – Middle Rio Grande New Mexico – 2007-2008. U.S. Bureau of Reclamation, Technical Service Center, Denver, CO.

Sechrist, J.D., Paxton, E.H., Ahlers, D.D., Doster, R.H. and V.M. Ryan. 2012. One year of migration data for a western yellow-billed cuckoo. Western Birds 43(1):2-11.

Sechrist, J., Ahlers, D.D., Potak Zehfuss, K., Doster, R.H., Paxton, E.H. and V.M. Ryan. 2013, Home Range and Use of Habitat of Western Yellow-Billed Cuckoos On the Middle Rio Grande, New Mexico. The Southwestern Naturalist 58(4):411-419.

Sommer, T.R., Harrell, W.C., Solger, A.M., Tom, B. and W. Kimmerer. 2004. Effects of flow variation on channel and floodplain biota and habitats of the Sacramento River, California, USA. Aquatic Conservation: Marine and Freshwater Ecosystems 14(3):247-261.

Southern Sierra Research Station. 2017. Yellow-billed Cuckoo South Fork Kern River Valley 2017 Annual Report. Weldon, California, 20 pp.

Stanek, J. R. 2014. Yellow-billed Cuckoo South Fork Kern River Valley, 2014 Annual Report.

Stella, J.C., J.J. Battles, J.R. McBride, and B.K. Orr. 2010. Riparian Seedling Mortality from Simulated Water Table Recession, and the Design of Sustainable Flood Regimes on Regulated Rivers. Restoration Ecology 18:284-294.

Tamburello, N., Robinson, D., Alexander, C.A.D., Poulsen, F., Brantigan, J. and R. Luster. 2017. Ecological Flows Tool (EFT) summary indicator briefs for bank swallow, Delta smelt, Fremont cottonwood, longfin smelt, chinook salmon, steelhead trout and Sacramento splittail, Unpublished.

Teachout, E. and G. Miles. 2016. The Western Yellow-billed Cuckoo (Coccyzus americanus) in Washington State. Presentation from The Wildlife Society Washington Chapter Annual Meeting, February 22 - 26, 2016.

The Nature Conservancy, Stillwater Sciences and ESSA Technologies. 2008. Sacramento River Ecological Flows Study: Final Report. Prepared for CALFED Ecosystem Restoration Program. Sacramento, CA. 72 pp.

Toochin, R. and D. Cecile. 2014. Status and Occurrence of Yellow-billed Cuckoo (Coccyzus americanus) in British Columbia. In: Klinkenberg, Brian. (Editor) 2018. E-Fauna BC: Electronic Atlas of the Fauna of British Columbia [www.efauna.bc.ca]. Lab for

Advanced Spatial Analysis, Department of Geography, University of British Columbia, Vancouver. [Date Accessed: April 10, 2019]. http://ibis.geog.ubc.ca/biodiversity/efauna/documents/Yellow-billed_Cuckoo-RT-DC-g.pdf.

(Service) U.S. Fish and Wildlife. 2013. Proposed Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo. Federal Register 78:61622-61662. October 3, 2013.

(Service) U.S. Fish and Wildlife. 2014a. Designation of Critical Habitat for the Western Distinct Population Segment of the Yellow-Billed Cuckoo, Proposed Rule. Federal Register 79: 48547-48652. August 15, 2014.

(Service) U.S. Fish and Wildlife Service. 2014b. Determination of Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo. Federal Register 79:59991-60038. October 3, 2014.

(Service) U.S. Fish and Wildlife Service - Washington Fish and Wildlife Office. 2015. Interim Consultation Guidance for Western Yellow-billed Cuckoo (Coccyzus americanus).

(Service) U.S. Fish and Wildlife Service. 2015. Reinitiation of Formal Consultation on the Hamilton City Flood Damage Reduction and Ecosystem Restoration Project in Glenn County, California.

(Service) U.S. Fish and Wildlife Service. 2016a. Biological Opinion on effects of actions associated with the proposed continuation of the Rio Grande Project Operating Agreement and storage of San Juan-Chama Project water in Elephant Butte Reservoir, New Mexico.

(Service) U.S. Fish and Wildlife Service. 2016b. Formal Consultation on the Proposed Geological Investigations for the Sutter National Wildlife Refuge Water Supply Conveyance Study, Sutter County, California.

Wahl, T. R., B. Tweit and S. Mlodinow. 2005. Birds of Washington: Status and Distribution. Oregon State University Press, Corvallis, Oregon. 436 pp.

Wallace, C.S.A., Villarreal, M.L. and C. van Riper. 2013. Influence of monsoon-related riparian phenology on yellow-billed cuckoo habitat selection in Arizona. Journal of Biogeography 40(11):2094-2107.

Vaghti, M. G. and S. E. Greco. 2007. Riparian Vegetation of the Great Valley. IN: Barbour, M. G., T. Keeler-Wolf and A. Schoenherr (Eds.) Terrestrial Vegetation of California, 3rd ed., UC Press, Berkeley, CA, pp. 425-455.

### 15.8.1 Western Yellow-Billed Cuckoo Personal Communications

Douglas, J.M. 2019. U.S. Fish and Wildlife Service Arizona Ecological Services Office. Personal communication via email and March 8 teleconference with Bay-Delta Fish and Wildlife Office staff.

Ryan, V. 2019. U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office. Personal communication via email and March 8 teleconference with Bay-Delta Fish and Wildlife Office staff.

Seavy, N. 2019. Point Blue Conservation Science. Personal communications via email.

Sferra, S. 2019. U.S. Fish and Wildlife Service Arizona Ecological Services Office. Personal communication via email and March 8 teleconference with Bay-Delta Fish and Wildlife Office staff.

Stanek, J. 2019. Southern Sierra Research Station. Personal communication via email.

# 16.0 INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is defined by the Service to include significant habitat modification or degradation that results in death or injury to listed wildlife species by significantly impairing essential behavioral patterns including breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking incidental to and not the purpose of the agency action is not considered to be prohibited taking under the Act, provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary, and must be undertaken by Reclamation and/or DWR, as appropriate, for the exemption in section 7(o)(2) to apply. Reclamation and DWR have a continuing duty to comply with this ITS. If Reclamation and DWR fail to assume and implement the terms and conditions, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, Reclamation and/or DWR must report the progress of the action and its impact on the species to the Service as specified in the ITS [50 CFR §402.14(i)(3)].

The Service has determined that the PA presents a mixed programmatic action, as defined in 50 CFR 402.02 (i.e., the proposed action includes elements that will not be subject to further section 7 consultation and elements that will be subject to future consultation). Some of the project elements of the PA are analyzed in this BiOp at a site-specific level for near-term implementation with no future Federal action required. For other project elements, Reclamation proposed to initiate subsequent consultations for future Federal actions that will be authorized, funded, or carried out at a later time, and this BiOp uses a programmatic approach to evaluate those elements of the PA. Therefore, consistent with our regulations at 50 CFR 402.14(i)(6), this ITS only covers those standard consultation elements of the PA for which incidental take is reasonably certain to occur. The incidental take exemptions provided for in this ITS are effective only upon Reclamation's issuance of the Record of Decision.

## Amount or Extent of Anticipated Take

In the BiOp, the Service has determined that incidental take is reasonably certain to occur as follows:

The Service anticipates that the PA will result in the incidental take of individual delta smelt due to hydrodynamic effects caused by the operation of the CVP and SWP export facilities in the south Delta, the fish facilities in the south Delta, and other CVP or SWP water diversion and water distribution systems in other parts of the Delta and Suisun Marsh. Regarding the CVP and SWP export of water from the Delta, the Service anticipates take in the form of kill or harm of all delta smelt within the south Delta affected by water operations and other areas of the Delta affected by reduced habitat quality.

Incidental take associated with this action is expected in the following forms: mortality and harm of delta smelt adults, juveniles, and larvae. It is difficult to determine the number of individuals that could be injured or killed (including harm as a result of significant habitat modification) because free-swimming aquatic animals are difficult to observe in large water bodies and because delta smelt have become very rare in recent years. The Service anticipates injury and mortality of individual delta smelt will occur as a result of entrainment and whenever habitat conditions do not support the successful completion of the species' full life cycle.

*Surrogate Approach*

In accordance with 50 CFR 402.14(i)(1)(i), a surrogate may be used to express the amount or extent of anticipated incidental take if the BiOp or ITS describes the causal link between the surrogate and anticipated take, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals, and sets a clear standard for determining when the level of anticipated take has been exceeded.

Surrogates are used for this ITS because, as described throughout this BiOp, it is impossible to accurately quantify and monitor the amount or number of individuals that are expected to be incidentally taken as a result of the PA due to the variability associated with the effects of the PA, the declining population size of delta smelt, difficulty in detecting individuals entrained or impinged, annual variations in the timing of various parts of the species' life cycle, and variation in how individual fish use habitat within the Action Area.

The Service is using the ecological conditions described below as the incidental take surrogates for individual delta smelt.

<u>Take from South Delta Entrainment</u>

The Service has determined for the purposes of this BiOp that delta smelt that enter the Old and Middle river corridors are entrained whether or not they survive long enough to reach the CVP or SWP fish facilities. Adult delta smelt have substantial capacity to control their distribution in the Bay-Delta. Thus, some adult delta smelt may 'entrain' themselves during their winter dispersal, while others may cue on hydrodynamics resulting from the export of water while moving up the San Joaquin River and be entrained due to project operations. Delta smelt larvae have some ability to control their distribution but less than older, more competently swimming life stages, making them more vulnerable to tidal currents and the net displacement (or flow) of water over multiple tidal cycles. No delta smelt life stage is known to seek cover in beds of aquatic vegetation, such as those that have proliferated around much of the shallower waterways in Delta, and particularly in the south Delta and its associated flooded islands. Rather, delta smelt are attracted to turbidity in open-water habitats. The hydrodynamic conditions indexed by net negative flow in Old and Middle rivers can affect the dispersal of turbidity into and through the South Delta. During winter dispersal and spring spawning, when turbidity of more than 12 NTU is present in Old and Middle rivers, adult delta smelt may be more likely to move into these channels, become entrained, and become subject to the reduced quality habitat in the channels, adjoining canals, and associated flooded islands (e.g., Mildred Island) due to operations, or be injured or killed as a result of entering the export facilities. Additionally, entrained adult delta

smelt may spawn in areas where their progeny will be lost to the population due to some unquantifiable combination of predation loss associated with submerged vegetation or eventual transport to the CVP and SWP facilities.

Therefore, the level of turbidity present in the South Delta can be causally linked to the level of incidental take of adult delta smelt and some of their offspring due to entrainment caused by operations. The analysis of effects in this BiOp is based, in part, on the PA avoiding the formation of a continuous band of turbidity from the Sacramento River to the export facilities to minimize the number of adult delta smelt that disperse into unfavorable habitat conditions, thus minimizing entrainment of pre-spawning adult delta smelt and the subsequent loss of larval and juvenile delta smelt later in the spring. In addition to potential losses of larvae that may hatch from locations in the south Delta, current information indicates that the hydrodynamic conditions indexed by net negative flow in Old and Middle rivers are one factor that can affect the dispersal of delta smelt larvae spawned outside the south Delta into the channels, adjoining canals, and associated flooded islands of the south Delta (e.g., Mildred Island) where the Service has determined they are considered entrained for the purposes of this BiOp.

The following specific ecological conditions reflect the conditions commensurate with the level of incidental take through entrainment that is anticipated in this BiOp.

1. During the early winter, if and when the single annual, system-wide first flush has been identified pursuant to the criteria identified in the PA, net negative flow in Old and Middle rivers should be held to no greater than a 14-day averaged OMR of -2000 cfs for 14 days to prevent turbidity from being pulled into the south Delta and creating a continuous band of turbidity from the Sacramento River to the export facilities.

2. During the winter and early spring, net negative OMR flows should be held at levels no more negative than a 14-day averaged OMR of -2000 cfs, for at least 5 days, when turbidity at the Bacon Island monitoring station (OBI) is a daily average of 12 NTU or greater. To avoid triggering an OMR flow action during a sensor error or a localized turbidity spike that might be caused by local flows or a wind-driven event, Reclamation and DWR will consider and review data from other locations. In the event that the daily average turbidity at OBI is 12 NTU (or greater) and Reclamation and DWR believe that a Turbidity Bridge Avoidance action is not warranted based on additional data sources (isolated and/or wind-driven turbidity event at OBI), Reclamation and DWR will take no additional action and provide the supporting information to the Service within 24 hours.

3. During March-June, negative OMR flows should be managed at no more negative than -5000 cfs on a 14-day moving average or at the flow determined through use of Service-approved life cycle models to limit recruitment to stable levels.

Injury and mortality of adult, larval, and juvenile delta smelt are anticipated to be minimized due to active real-time management of OMR flow and turbidity in the south Delta as described in the PA. Incidental take resulting from operations of all south Delta CVP and SWP facilities is addressed in the ecological conditions described above consistent with the index equation approach to OMR Management described in the PA. If the conditions described above are not

maintained, the amount or extent of the anticipated level of incidental take will be considered exceeded and reinitiation will be required pursuant to 50 CFR 402.16.

<u>*Take from Rock Slough Intake Operation*</u>

The Service's analysis in this BiOp assumes that all delta smelt that are entrained into the south Delta are lost to the population. The Service considers the injury or mortality of delta smelt due to operation of the Rock Slough Intake to have already been analyzed under entrainment effects in this BiOp. The Rock Slough intake is within the south Delta and the intake does not divert enough water to contribute to the likelihood that additional delta smelt not already accounted for in *Take from South Delta Entrainment* will be entrained at this intake.

Additionally, the Service anticipates very little observable take at the Rock Slough intake, as Rock Slough has a positive barrier fish screen making injury or mortality of adult and juvenile delta smelt unlikely, and monitoring information at the Rock Slough intake indicates that delta smelt are very rarely present (1 larval delta smelt and 1 adult delta smelt detected from 1999 through 2018). Therefore, because delta smelt are rarely present around the Rock Slough Intake and the effects are already accounted for, injury or mortality of all delta smelt due to operations of the Rock Slough Intake is exempted.

Hydrodynamic conditions related to the rate of diversion at the Rock Slough intake influence the likelihood of delta smelt being drawn into the intake. As the diversion rate increases, the likelihood of entrainment increases. The maximum pumping capacity of the Rock Slough intake is 350 cfs, and the diversion at the intake is generally at capacity except during periods specified for fisheries protection in other biological opinions that provides for minimal pumping to address water quality needs. The current diversion pattern has been demonstrated through monitoring to substantially limit take of delta smelt. Therefore, the diversion rate can be causally linked to the level of incidental take of delta smelt due to impingement or entrainment caused by operations of the Rock Slough intake, and the following specific ecological conditions reflect the conditions commensurate with the level of incidental take anticipated in this BiOp.

> A diversion rate of no more than 350 cfs will be utilized at the Rock Slough intake, except during fishery protection periods, when minimal diversions occur.

If the conditions described above are not maintained, the amount or extent of the anticipated level of incidental take will be considered exceeded and reinitiation will be required pursuant to 50 CFR 402.16.

<u>*Take of Delta Smelt at the North Bay Aqueduct*</u>

Delta smelt are attracted to turbidity and the sloughs and canals of the Cache Slough Complex have turbid water conditions that are believed to be one reason delta smelt inhabit this region all year long. Although the exact locations are unknown, delta smelt are also believed to spawn in the Cache Slough complex every year. The operation of the Barker Slough Pumping Plant can result in the hydrodynamic conditions indexed by net negative flow of turbid water into Barker Slough. These hydrodynamic conditions can entrain larval delta smelt. The Service anticipates

that incidental take of delta smelt larvae will occur at the Barker Slough Pumping Plant and North Bay Aqueduct (NBA). Incidental take is expected to be low since Barker Slough Pumping Plant has positive barrier fish screens making injury or death of adult and juvenile delta smelt unlikely. However, a small number of larval delta smelt may be killed through impingement, entrainment, or sediment and aquatic weed removal.

Hydrodynamic conditions related to the rate of diversion at the NBA influence the likelihood of delta smelt being drawn into the NBA. As the diversion rate increases, the likelihood of entrainment increases. The CalSim II modeling in support of the PA suggested that the maximum cumulative water diversion into the NBA would not exceed 30 TAF during the months of March, April, and May, which is the months of the year that operations could potentially result in take of larval delta smelt. Therefore, the diversion rate can be causally linked to the level of incidental take of delta smelt due to impingement, entrainment, or sediment and aquatic weed removal caused by operations of the Barker Slough Pumping Plant and NBA, and the following specific ecological conditions reflect the conditions commensurate with the level of incidental take anticipated in this BiOp.

> A cumulative total of no more than 30 TAF of water will be diverted through the NBA diversions during the months of March, April, and May.

If the conditions described above are not maintained, the amount or extent of the anticipated level of incidental take will be considered exceeded and reinitiation will be required pursuant to 50 CFR 402.16.

### *Take of Delta Smelt at the Roaring River and Morrow Island Distribution Systems*

Delta smelt frequently reside in the larger sloughs of Suisun Marsh and less frequently reside in the marsh's smaller sloughs. It is anticipated that the PA will increase the use of Suisun Marsh by delta smelt via the Summer-Fall Habitat Action. The Roaring River Distribution System (RRDS) and the Morrow Island Distribution System (MIDS) are used to deliver fresh water flowing into Montezuma and Suisun sloughs to adjacent wetlands and to drain water off of these wetlands. The use of these distribution systems entrains fish. Thus, the Service anticipates that incidental take of delta smelt larvae will occur at the RRDS and take of delta smelt larvae, juveniles, and adults will occur at the MIDS, which is unscreened. Incidental take is expected to be low since RRDS has positive barrier fish screens and the approach velocity is generally low. Therefore, the presence of the screen and approach velocities maintained can be causally linked to incidental take from operation of the RRDS and MIDS.

The following specific ecological conditions reflect the conditions commensurate with the level of incidental take through operation of RRDS and MIDS that is anticipated in this BiOp.

> Approach velocity at the screens is limited to 0.2 ft/second except during mid-September – mid October, when RRDS diversion rates are controlled to maintain a maximum approach velocity of 0.7 ft/second for fall flood up operations.

If the conditions described above are not maintained, the amount or extent of the anticipated level of incidental take will be considered exceeded and reinitiation will be required pursuant to 50 CFR 402.16.

## Effect of the Take

In the accompanying biological opinion, the Service determined that the level of anticipated take is not likely to result in jeopardy to the delta smelt.

## Reasonable and Prudent Measures

The Service has determined that the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of the delta smelt:

1. Minimize the adverse effects of the south Delta pumping facilities on delta smelt.

2. Minimize the adverse effects of habitat degradation in summer and fall by studying the effectiveness of the Summer-Fall Habitat Action implementation. As appropriate, representatives from Reclamation, DWR, CDFW, NMFS and the Service will participate in the Delta Coordination Group as part of this planning process.

3. Minimize the adverse effects of the FCCL supplementation program on delta smelt.

4. Minimize the adverse effects of the operation of the North Bay Aqueduct.

## Terms and Conditions

In order to be exempt from the prohibitions of section 9 of the Act, Reclamation and DWR shall comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are nondiscretionary.

The following Terms and Conditions implement Reasonable and Prudent Measure Number 1:

1. Reclamation and DWR shall ensure the frequency of sampling for the south Delta export facilities (Banks and Jones) will be at least 25% of the time the export facilities are in operation. If this cannot be achieved, the Service shall be notified on a real-time basis.

2. Reclamation and DWR shall update and provide fish salvage protocols for Skinner Fish Facility and the Tracy Fish Collection Facility to the Service within 1 year of the issuance of this biological opinion. Annual reports of salvage activities will be submitted to the Service documenting the operation and monitoring activities of the fish salvage facilities.

3. If it is determined that an independent panel is necessary to determine the efficacy of the

proposed OMR Management actions, Reclamation shall seek technical assistance from the Service on development of the charter for that panel.

4. If Reclamation or DWR determine that a Turbidity Bridge Avoidance action is not necessary because the event is not believed to be related to an actual turbidity bridge, they will provide the supporting information, including the reason why the action is not warranted, within 24 hours, and the Service will respond within 24 hours. The action will be initiated until Reclamation, DWR, and the Service are in agreement that an action is not necessary.

5. Reclamation and DWR shall monitor OMR flow and turbidity levels (the surrogate parameter identified in the *Amount or Extent of Anticipated Take* section) at locations identified in the PA on a real-time basis. Reclamation and DWR shall ensure monitoring stations have appropriate redundancy to reduce the likelihood of data collection failure due to malfunction. This information shall be made available to the Service on a real-time basis to document the management of the system. This can be done through Bay Delta Live or a similar system. If the Service determines that conditions have led to the exceedance of anticipated take, reinitiation would be required.

6. Reclamation and DWR shall use Service life cycle models or other Service-approved models when available for the purposes of estimating proportion of the population affected by entrainment.

7. Reclamation shall seek technical assistance from the Service on the development of the charter for the independent panel for the proposed Four-Year Review of the "OMR management and measures to improve survival through the south Delta".

8. Reclamation and DWR will comply with all monitoring and reporting requirements as identified in the *Reporting Requirements* section, below.

The following Terms and Conditions implement Reasonable and Prudent Measure Number 2:

1. Reclamation and DWR, in coordination with the Service and Delta Coordination Group, will define specific parameters for implementation of the Summer-Fall Habitat Action. Additionally, mutually agreeable methods for determining parameters for successful recruitment of delta smelt will be developed. These parameters shall include habitat acreages and population trends. This method shall be in place prior to implementation of the Summer-Fall Habitat Action.

2. Reclamation and DWR shall provide annual reports documenting the planning, implementation, and monitoring of the Summer-Fall Habitat Action. In years that an action will be implemented, Reclamation shall provide a draft of the implementation plan to the Service by May 1 and a final report of the action by May 1 of the following year.

3. Reclamation and DWR shall develop a monitoring plan to assess the efficacy of

implementing the Summer-Fall Habitat Action. The plan shall be vetted by the Delta Coordination Group and included in the annual implementation plan. A full report of results shall be provided within one year of the completion of the action.

4. Reclamation shall seek technical assistance from the Service on the development of the charter for the independent panel for the proposed Four-Year Review of "Delta Smelt Summer and Fall Habitat Actions".

5. Reclamation and DWR will comply with all monitoring and reporting requirements as identified in the *Reporting Requirements* section, below.

The following Terms and Condition implement Reasonable and Prudent Measure Number 3:

1. Reclamation shall ensure development of a supplementation strategy for the FCCL supplementation program as described in the PA. This strategy will be in place one year from the issuance of the BiOp.

The following Term and Condition implements Reasonable and Prudent Measure Number 4:

1. DWR shall ensure that regular fish screen maintenance is performed at the North Bay Aqueduct. This maintenance is necessary to avoid incidental take of juvenile and adult delta smelt and to avoid exceeding the incidental take of larvae. DWR shall annually report to the Service with details on fish screen maintenance at these facilities.

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the PA. If, during the course of the action, this level of incidental take is exceeded, reinitiation of consultation and review of the reasonable and prudent measures provided is required. Reclamation must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

## **Reporting Requirements**

In order to monitor whether the amount or extent of incidental take anticipated from implementation of the PA is approached or exceeded, Reclamation shall adhere to the following reporting requirements. Should this anticipated amount or extent of incidental take be exceeded, Reclamation must reinitiate formal consultation as per 50 CFR 402.16.

1. Comply with reporting requirements included in the above Terms and Conditions.

2. For the Summer-Fall Habitat Action, if Reclamation does not accept the recommended action provided through the structured decision making process, Reclamation must notify the Service prior to implementing activities associated with this action to determine if the effects are consistent with the analysis in this BiOp.

3. The Service must be notified within 24 hours of the finding of any injured or dead delta

smelt or any unanticipated damage to its habitat associated with the PA. Notification will be made to the contact below and must include the date, time, and precise location of the individual/incident clearly indicated on a U.S. Geological Survey 7.5 minute quadrangle or other maps at a finer scale, as requested by the Service, and any other pertinent information. When an injured or dead individual of the delta smelt is found, Reclamation and DWR shall follow the steps outlined in the *Disposition of Individuals Taken* section below.

## Disposition of Individuals Taken

Injured or dead delta smelt observed in salvage should be preserved in a container of at least 70% Ethanol containing a paper with the date and time when the animal was found, fork length, the location where it was found, and the name of the person who collected the specimen. The preserved delta smelt are then to be evaluated by an onsite Service-approved biologist who verifies species identification and examines the fish for reproduction maturity and stage. A second fish identification verification is provided by staff of the CDFW or alternatively DWR or Reclamation staff, if needed. Fish specimens confirmed as delta smelt must be stored until custody is transferred to the CDFW for archiving. Annually, a catalog of archived samples transferred from Reclamation and DWR salvage facilities will be provided to Jana Affonso, Assistant Field Supervisor of the Endangered Species Division of the San Francisco Bay-Delta Office.

# 17.0  CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The Service recommends the following actions:

1. The Service recommends that Reclamation and DWR participate in recovery planning and implementation of conservation actions consistent with recovery planning documents. In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

2. Design restoration projects to provide suitable for multiple species dependent upon riparian habitat for breeding, feeding, and sheltering, such as the least Bell's vireo, western yellow-billed cuckoo, and valley elderberry longhorn beetle.

3. Restore habitat in tributaries of large rivers with altered hydrology, such as those included in the Action Area, which may have more natural hydrologic conditions to enhance available nesting habitat for riparian birds such as least Bell's vireo and the western yellow-billed cuckoo.

4. Develop a program for the monitoring of least Bell's vireo in potentially suitable habitat within the Action Area to assist in tracking the recovery of the species in the Central Valley.

5. During the implementation of future planned projects within the Central Valley, enhance on-site riparian habitat for the least Bell's vireo by planting native riparian shrubs and trees.

6. During the implementation of future planned projects within the Central Valley, enhance onsite riparian habitat for valley elderberry longhorn beetle.

7. Develop and implement restoration measures in areas designated in the *Valley Elderberry Longhorn Beetle Recovery Plan*.

8. Include elderberry shrubs as part of riparian planting mix when revegetating for temporary impacts from restoration project construction.

9. Directly conduct or fund research projects to address current information gaps in the western yellow-billed cuckoo life history, migration routes, conservation strategies, and recovery needs in the Central Valley.

10. Develop multi-species riparian habitat restoration techniques for the Central Valley that would create benefits for Federally-listed species.

11. Encourage adaptive management of storage, flows and conservation of water to benefit Federally-listed species.

12. Work to secure long-term water sources to support riparian habitat restoration activities in Refuges.

13. Work to further conduct process-based ecosystem restoration projects to create or enhance suitable western yellow-billed cuckoo breeding habitat along the Sacramento River, Feather River, American River, San Joaquin, and Stanislaus River by collaborating with Service Refuges, CDFW, State Parks, Corps, Tribal governments,

and other stakeholders.

14. Monitor, maintain, and expand existing riparian habitat restoration areas to benefit western yellow-billed cuckoo.

15. Establish a 500-foot pesticide-free and non-GMO zone around all known, historical western yellow-billed cuckoo habitat. Explore partnerships with landowners along rivers in the Action Area to improve available prey base for western yellow-billed cuckoos during breeding and migration.

16. Develop and implement a riverine ecosystem mitigation and adaptive management plan to avoid and compensate for the long-term impacts of altered flow regimes on riparian and wetland communities to benefit a broad range of threatened and endangered species in the Action Area.

# 18.0 REINITIATION—CLOSING STATEMENT

This concludes formal consultation on the Reinitiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any additional take may not be exempt from the prohibitions of section 9 of the Act, pending reinitiation.

This BiOp uses a programmatic approach to evaluate the elements of the PA that will be subject to future project-specific consultations because of the need for future Federal approvals. The analysis in this BiOp allows for a broad-scale examination of the potential impacts to listed species and designated critical habitat, and examines how the parameters of the PA align with the survival and recovery needs of listed species occurring in the action area. The remainder of the project elements not addressed programmatically are addressed as a standard, project-level consultation because they are not subject to future Federal approvals. Some project elements and their effects on the species and critical habitat addressed in this BiOp may change as Reclamation and DWR continue to develop the PA through collaborative processes, and, therefore, may require reinitiation if there are effects to listed species or critical habitat that were not analyzed herein.

Shasta Dam Raise Operations

Reclamation is proposing to raise the existing Shasta Dam by 18.5 feet. The effects of the construction of this dam raise are being addressed under a separate section 7 consultation with the Service. According to Reclamation, filling of the reservoir behind Shasta Dam above the current maximum storage capacity of 4.55 MAF to 5.19 MAF (634,000 acre-feet additional storage capacity) would not likely occur before 2025. During construction of the dam raise, Reclamation is not proposing any changes to operations of Shasta Dam and Reservoir beyond what is proposed in the PA of this BiOp. Operations of Shasta Dam would continue in accordance with authorizing statutes and amendments, State Water Resources Control Board water rights permits and orders, and the ROC BiOps (Reclamation 2019). The inundation of the expanded reservoir is expected to result in water levels 20.5-feet higher than the existing full pool elevation.

*Filling Period*

It will take approximately 2 years for the expanded reservoir to fill behind the dam raise (Figure 3 in Reclamation 2019). Reclamation is not currently proposing changes to operations as a result of filling the expanded reservoir that could affect timing or amount of downstream riparian or floodplain inundation or water reaching the Delta. Therefore, this BiOp only analyzes operations

pursuant to the current ROC PA.

*Post-filling Period*

After the initial filling period is complete, if operations are modified as a result of the additional reservoir storage, Reclamation shall assess whether modified operations will result in effects in a manner or to an extent not considered in this BiOp. Effects that shall be considered include, but are not necessarily limited to, the following:

1. reduced riparian, floodplain and channel margin habitats at certain times of years and locations that have not been analyzed;

2. reduced inflow to delta in winter and spring and higher Delta inflow in summer and fall;

3. reoperation of reservoirs and delta pumping facilities to deliver the newly stored water.

If changes to operations are proposed in the future to account for the filling and/or post-filling periods that may affect the amount or timing of how Shasta Dam and Reservoir are operated, reinitiation of this consultation is required if any of the triggers in 50 CFR 402.16 are met.

## Suisun Marsh Salinity Control Gate Operations

The Suisun Marsh Salinity Control Gates are being proposed to direct more fresh water in the Suisun Marsh to improve habitat conditions for delta smelt in the region. Depending on the timing of the proposed operations, these activities could overlap with the breeding season when federally-listed species may be present in the vicinity of the gates and/or shift prey availability due to temporary lowering of marsh salinities. Current information does not demonstrate adverse effects to occur from SMSCG operations. If through planning and implementation of the project-level activities, adverse effects to federally-listed species are likely to occur and were not analyzed herein, reinitiation of this consultation is required if any of the triggers in 50 CFR 402.16 are met.

## 18.1 Reinitiation Literature Cited

(Reclamation). United States Bureau of Reclamation. 2019. Threatened, Endangered, and
    Proposed Species that May be Affected by the Shasta Dam Raise Project. Biological
    Assessment, Shasta County, California. Mid-Pacific Regional Office, Sacramento, CA.