No. 21-15163

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE COUNCIL, et al.,

*Plaintiffs-Appellants,*

v.

DEB HAALAND, in her official capacity as Secretary of the Interior, et al.,

*Defendants-Appellees.*

GLENN-COLUSA IRRIGATION DISTRICT, et al.,

*Intervenors-Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
No. 1:05-cv-01207-DAD-EPG (Hon. Dale A. Drozd)

## APPELLEES/DEFENDANT-INTERVENORS SACRAMENTO RIVER SETTLEMENT CONTRACTORS' JOINT ANSWERING BRIEF

| | |
|---|---|
| SOMACH SIMMONS & DUNN<br>A Professional Corporation<br>ANDREW M. HITCHINGS (SBN 154554)<br>BRITTANY K. JOHNSON (SBN 282001)<br>JARED S. MUELLER (SBN 257659)<br>500 Capitol Mall, Suite 1000<br>Sacramento, CA 95814<br>Telephone: 916.446.7979<br>*Attorneys for Intervenors-Defendants-Appellees*<br>Glenn-Colusa Irrigation District, et al. | DOWNEY BRAND LLP<br>KEVIN M. O'BRIEN (SBN 122713)<br>MEREDITH E. NIKKEL (SBN 254818)<br>SAMUEL BIVINS (SBN 300965)<br>621 Capitol Mall, 18th Floor<br>Sacramento, CA 95814<br>Telephone: 916.444.1000<br>*Attorneys for Intervenors-Defendants-Appellees*<br>Reclamation District No. 108, et al. |

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Appellees/Defendant-Intervenors Glenn-Colusa Irrigation District, Princeton-Codora-Glenn Irrigation District, Provident Irrigation District, Anderson Cottonwood Irrigation District, City of Redding, M & T Chico Ranch (Pacific Realty Associates), Reclamation District No. 1004, Conaway Preservation Group, LLC, David and Alice teVelde Family Trust, Pelger Road 1700, LLC, Reclamation District No. 108, Sutter Mutual Water Company, Natomas Central Mutual Water Company, River Garden Farms Company, Pleasant Grove-Verona Mutual Water Company, Pelger Mutual Water Company, Meridian Farms Mutual Water Company, Henry D. Richter, et al., Howald Farms, Inc., Oji Brothers Farm, Inc., Oji Family Partnership, Carter Mutual Water Company, Windswept Land and Livestock Company, Maxwell Irrigation District, Beverly F. Andreotti, Arnold A. Andreotti, Michael D. Andreotti, Mark C. Andreotti, and Tisdale Irrigation and Drainage Company certify that they have no parent corporation, and no publicly held corporation owns 10% or more of any stock they may have issued.

Appellee/Defendant-Intervenor Knights Landing Investors, LCC (KLI) has no parent corporation which has issued shares to the public, and no publicly held corporation owns any of KLI's stock.

The above-referenced Appellees/Defendant-Intervenors filing this joint

answering brief are collectively referred to herein as "Settlement Contractors."

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................... 14

JURISDICTIONAL STATEMENT ................................ 15

ISSUES PRESENTED FOR REVIEW ........................... 16

STATEMENT OF THE CASE.................................. 17

    I.     The Settlement Contracts .......................... 17

    II.    ESA Section 7 Consultation Structure for Execution of
the Settlement Contracts and Reclamation's Ongoing
CVP Operations......................................... 18

          A.    The Contract Renewal Consultation Was Conducted
in Parallel with the Consultation on Long-Term
Operations of the CVP ...................... 19

          B.    The 2005 Contract Renewal Consultation Thoroughly
Addressed Contract Terms and Their Performance........... 20

          C.    The 2008 Consultation on Long-Term Operations
Superseded the 2005 OCAP Consultation ......................... 22

          D.    Limited Reinitiated Consultations in 2014 and 2015
Ensured Section 7 Compliance During Drought ............... 22

          E.    In 2016, Reclamation Reinitiated Consultation on
Long Term Operations of the CVP.................................... 23

    III.   Legal Challenges to the CVP Long-Term Operations
Consultations and Contract Renewals........................... 24

    IV.   The Fifth Claim ......................................... 27

    V.    The District Court Correctly Found the 2015 Reinitiated
Consultation Complied with Section 7 of the ESA,
and Properly Dismissed Appellants' Fifth Claim ......................... 28

# TABLE OF CONTENTS (Continued)

SUMMARY OF ARGUMENT ........................................................ 31

STANDARD OF REVIEW ........................................................... 33

ARGUMENT ............................................................................. 33

I.    The 2015 Reinitiated Consultation with FWS Satisfied
the Requirements of ESA Section 7 ........................................... 33

    A.    The 2005 Settlement Contract Renewal Consultation
Is Still Valid as Amended by the 2015 LOC .................... 33

        1.    The 2015 LOC Amended the 2005 Consultation
to Address this Court's *En Banc* Opinion ............... 34

        2.    This Court Did Not Hold That the 2005 Settlement
Contract Renewal Consultation Was Inadequate ... 35

        3.    This Court Did Not Preclude Reclamation
from Relying on the 2008 FWS LTO BiOp
on Remand ............................................................. 37

    B.    The 2015 LOC Fully Analyzes the Proposed Action
and Is Based on the Totality of Information Submitted
by Reclamation and Others to FWS .................................. 38

        1.    The Court's Review of the 2015 LOC Is
Not Limited to the Four Corners of the
Concurrence Letter ................................................ 38

        2.    Appellants Misstate the Role and Responsibilities
of a Consulting Agency in a Section 7
Consultation .......................................................... 40

        3.    The ESA Does Not Require Reclamation to
Renegotiate the Settlement Contracts .................... 43

C.   The Record Does Not Support Appellants'
     Arguments Regarding the 2015 Reinitiated Consultation  44

     1.   The Agencies Considered the Status of the
          Species Including Survey Data ............................... 45

     2.   The 2008 FWS LTO BiOp, the 2005 and the
          2015 LOC Fully Analyze All of the Settlement
          Contract Terms ........................................ 46

     3.   Reclamation Provided Accurate Information
          to FWS On Pricing  ................................. 47

     4.   FWS Did Not Defer Analysis to Future
          Consultations  .......................................... 47

     5.   FWS Did Not Ignore Information on Delta
          Outflow During the 2014 and 2015 Drought Years 48

D.   The Term of the 2008 FWS LTO BiOp Need Not be
     Coextensive with the Term of the Contracts  ................... 49

II.   The Court Should Affirm Judgment in Favor of Appellees
      on the Second Claim.................................................... 53

      A.   Appellants Cannot Cure the Defective 60-Day Notice
           for the Second Claim ........................................ 53

      B.   Appellants Have Not Identified Information that
           Reclamation Did Not Take into Account in Relying
           on Its Consultation with FWS............................ 58

III.  The District Court Properly Dismissed the Fifth Claim  ............. 60

      A.   Reclamation Cannot Modify the Settlement Contracts
           to Benefit Listed Salmon  ................................. 62

**TABLE OF CONTENTS (Continued)**

1.    Article 7(b) of the Settlement Contracts Is Not
      an Independent Source of Discretion for
      Reclamation ............................................................. 63

2.    Article 3(i) Does Not Grant Reclamation
      Discretion to Reduce Project Water Supplies
      to Benefit Listed Species .......................................... 68

3.    Reclamation's Conditional Discretion to Approve Water
      Transfers Under Article 3(e) Does Not
      Provide Ongoing Discretion Over Contract Performance
      Generally ................................................................. 72

B.    No Other Sources of Law Allow Reclamation to
      Amend or Modify the Settlement Contracts to Benefit
      Listed Species ........................................................... 73

CONCLUSION .................................................................. 78

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
   772 F.3d 592 (9th Cir. 2014) ..............................................................54

*Animal Legal Def. Fund v. Olympic Game Farm, Inc.*,
   No. C18-6025RSL, 2022 U.S. Dist. LEXIS 160421
   (W.D. Wash. Sep. 6, 2022) .................................................................55

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) .............................................................................53

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*,
   952 F.2d 1173 (9th Cir. 1992) .............................................................53

*California v. United States*,
   438 U.S. 645 (1978) .............................................................................74

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ..............................................................58

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) .............................................................50

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013) .............................................................76

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) .............................................................61

*Crowman Corp. v. United States*,
   51 Fed. Cl. 654 (2002) .........................................................................61

*Envirowatch, Inc. v. Fukino*,
   No. 07-00016 SOM-BMK,
   2007 U.S. Dist. LEXIS 47088 at *8 12
   (D. Haw. June 27, 2007) ...............................................................55, 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
   255 F.3d 1073 (9th Cir. 2001) ............................................................ 29, *passim*

*Forest Conservation Council v. Espy*,
   835 F. Supp. 1202 (D. Idaho 1993) ................................................................44

*Forest Guardians v. United States Bureau of Reclamation*,
   462 F. Supp. 2d 1177 (D. N.M. 2006) .......................................................56, 57

*Hallstrom v. Tillamook Cty.*,
   493 U.S. 20 (1989) .............................................................................. 16, *passim*

*Hallstrom v. Tillamook Cty.*,
   844 F.2d 598 (9th Cir. 1987) ...........................................................................55

*K.C. 1986 Ltd. P'ship. v. Reade Mfg.*,
   33 F. Supp. 2d 1143 (W.D. Mo. 1998) ............................................................55

*Klamath Water Users Protective Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 1999) .........................................................................62

*M&T Bank v. SFR Invs. Pool 1, LLC*,
   963 F.3d 854 (9th Cir. 2020),
   *cert. denied*, 141 S. Ct. 2566 (2021) ..............................................................27

*Mohave Valley Irrigation & Drainage Dist. v. Norton*,
   244 F.3d 1164 (9th Cir. 2001) .........................................................................62

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) .........................................................................70, 76, 77

*Nat'l Audubon Soc'y, et al. v. Superior Court*,
   33 Cal.3d 419 (1983) ..................................................................................73, 74

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ...........................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Natural Resources Defense Council v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) .......................................................29, 30

*Natural Resources Defense Council v. Jewell*,
   749 F.3d 776 (9th Cir. 2014) ............................................. 29, *passim*

*NRDC v. Salazar*,
   No. 09-17661 (9th Cir. Oct. 1, 2012) ...............................................35

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ...........................................................61

*Pacific Coast Fed. of Fishermen's Ass'ns v. Gutierrez*,
   Case No. 1:06-CV-00245-OWW-GSA (E.D. Cal.).........................24

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
   606 F. Supp. 2d 1195 (E.D. Cal. 2008) ...........................................24

*Pacific Coast Federation of Fishermen's Associations v.
   United States Bureau of Reclamation*,
   426 F.3d 1082 (9th Cir. 2005) .........................................................51

*Petzel v. Kane Cty. DOT*,
   No. 16-cv-5435, 2018 U.S. Dist. LEXIS 132841
   (N.D. Ill. Aug. 7, 2018)...................................................................55

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
   962 F.2d 27 (D.C. Cir. 1992).............................................................73

*Proie v. Nat'l Marine Fisheries Serv.*,
   No. C11-5955BHS, 2012 U.S. Dist. LEXIS 60779
   (W.D. Wash. May 1, 2012)...............................................................55

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
   898 F.2d 1410 (9th Cir. 1990) .........................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................ 22, *passim*

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ............................................................42

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water
   Conservation District*,
   49 F.4th 1242 (9th Cir. 2022) ............................................................60

*Stanford Vina Ranch Irrigation Co. v. State of California*,
   50 Cal. App. 5th 976 (2020) ............................................................74

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
   143 F.3d 515 (9th Cir. 1998) ...............................................53, 54, 55

*Tehama-Colusa Canal Auth. v. U.S. Dep't of the Interior*,
   721 F.3d 1086 (9th Cir. 2013) ............................................................62

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*,
   340 F.3d 969 (9th Cir. 2003) ............................................................61

*Tyco Thermal Controls LLC v. Redwood Indus.*,
   No. C06-07164 JF (PVT), 2010 U.S. Dist. LEXIS 47019 (N.D.
   Cal. Apr. 15, 2010) ............................................................55

*Villanueva v. California*,
   986 F.3d 1158 (9th Cir. 2021) ...............................................63, 65, 71

*Wash. Trout v. McCain Foods*,
   45 F.3d 1351 (9th Cir. 1995) ............................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

16 United States Code, section
1531 *et seq.* ........................................................................ 14, *passim*
1536.............................................................................................18
1536(a)(2) ................................................................ 25, *passim*

43 United States Code, section
383.........................................................................................74, 75

California Water Code, section
275............................................................................................74

Valley Project Improvement Act, Pub. L. No. 102-575, 106 Stat.
4600, 4706-31 (1992) ...........................................................19

**Regulations**

40 Code of Federal Regulation, section
1501.2(c) ...............................................................................42
1502.14....................................................................................42

50 Code of Federal Regulation, section
402.02.......................................................................................67
402.03..................................................................................76, 77
402.12.......................................................................................41
402.12-402.15 ........................................................................43
402.12(a)-(k) ..........................................................................39
402.12(j)....................................................................................41
402.12(k)(2) ............................................................................39
402.13.......................................................................................39
402.13(a) .................................................................................39
402.14.......................................................................................41
402.14(g)..................................................................................39
402.16.......................................................................................58

# TABLE OF AUTHORITIES

Page(s)

**Regulations**

51 Federal Register, section
  19926.................................................................................................68
  19958.................................................................................................68

84 Federal Register, section
  44976.................................................................................................68
  44978.................................................................................................68

**Court Rules**

Federal Rule of Appellate Procedure
  26.1.....................................................................................................2

# INTRODUCTION

Appellants present a myopic tale that distorts the complex and multi-layered consultation on the long-term contracts that embody the water rights settlement that is essential[1] to the operation of the Central Valley Project (CVP)—a project that protects Californians from flood, provides water for human consumption and agriculture, and serves to restore and protect fish and wildlife. After this Court approved biological opinions (BiOps) for the ongoing operation of the CVP and held that the U.S. Bureau of Reclamation (Reclamation) retained some discretion in the execution of the Settlement Contracts, Reclamation and the U.S. Fish and Wildlife Service (FWS) conducted a separate but parallel consultation under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, that fully analyzed the impact of the Settlement Contracts on listed species within the broader context of overall CVP operations. Appellants ignore the multiple-benefit operation of Shasta Dam and seek reversal of the district court's detailed and careful analysis of the consultation conducted by Reclamation and FWS without offering any compelling reason to do so.

---

[1] This is so because the Sacramento River Settlement Contracts (Settlement Contracts) define the extent of water diversions by those who possess senior water rights on the Sacramento River, a necessary prerequisite to determining the available water supply for CVP operations.

In similar fashion, Appellants ignore the binding authority carefully applied by the district court in analyzing the claim that Reclamation was required to reinitiate consultation with the National Marine Fisheries Service (NMFS) regarding impacts to listed salmonids. Appellants conflate the limited discretion retained by Reclamation in negotiating the Settlement Contracts with Reclamation's performance of the terms of the contracts, and again fail to appreciate the critical role the Settlement Contracts play in ongoing CVP operations. Instead of coming to grips with the district court's conclusion in this case that Reclamation lacks discretion to modify those contracts, Appellants ignore this Court's binding authority and the district court's careful analysis of the contract provisions at issue in order to upend contracts that are essential to the operation of the CVP.

Appellants initiated this litigation nearly two decades ago, with seven different Secretaries of the Interior named as the lead defendant over that time span. It is time to bring this case to an end. The district court's rulings should be affirmed.

## JURISDICTIONAL STATEMENT

The Settlement Contractors agree with the jurisdictional statement submitted by Appellants in their Opening Brief ECF[2] 31 at 2, with the exception that the

---

[2] All ECF references are to Ninth Circuit Electronic Case Files.

Court lacks jurisdiction over the Second Claim because Appellants failed to

provide adequate notice before challenging Reclamation's reliance on the FWS's

2015 Contract renewal reconsultation. *See Hallstrom v. Tillamook Cty.*, 493 U.S.

20, 31 (1989) (*Hallstrom*); *see also infra*, section II.A.

## ISSUES PRESENTED FOR REVIEW[3]

1.   Whether FWS's 2015 Letter of Concurrence (2015 LOC) properly

concluded that the 2005 renewal of the Settlement Contracts would

avoid the likelihood of jeopardy to delta smelt and destruction or

adverse modification of its critical habitat because all possible effects

of furnishing water under those contracts were addressed in the

2008 FWS Long-Term Operations (LTO) BiOp.  3-ER-0533,

4-ER-0748, 1-ER-0008.

2.   Whether Reclamation properly relied on FWS's conclusion in the

2015 LOC.  1-ER-0008.

3.   Whether the executed Settlement Contracts afford Reclamation

discretion to unilaterally and materially amend their terms to benefit

listed species.  1-ER-0096.

---

[3] The Settlement Contractors take no position regarding Plaintiffs/Appellants'
challenges related to the Delta-Mendota Canal (DMC) Contract renewals, and
therefore do not address those contracts in this joint answering brief.

# STATEMENT OF THE CASE

## I.     The Settlement Contracts

The Settlement Contractors are agricultural and municipal entities situated in the Sacramento Valley below Shasta Dam and many miles upstream of the Delta. 3-ER-0496.  The Settlement Contractors (or their predecessors-in-interest) have diverted water from the Sacramento River for beneficial uses pursuant to each Settlement Contractor's respective water rights that vested, under California law, well before authorization of the CVP and construction of Shasta Dam. 3-ER-0473–74, 0526–27.  The Settlement Contractors own and operate their own diversion and water conveyance facilities, and their senior water rights are not dependent in any way upon CVP facilities, operations, or deliveries.  3-ER-0526–27.

In the mid-1960s, the United States resolved the Settlement Contractors' protests against Reclamation's water right applications for the CVP, thereby avoiding a lengthy and expensive adjudication of the CVP and other water rights in the Sacramento Valley.  17-ER-3585–86; *see also* 1-SRSC_SER 0192:19–93:1. The resulting original Settlement Contracts fixed, for the initial 40-year term, the total and monthly quantities of water to be diverted by the Settlement Contractors, the allocation between "Base Supply" and "Project Water," and the place of use. 3-ER-0502, 0546–47.  In this way, the Settlement Contracts provided the certainty

in the timing and quantity of water available for diversion in exchange for the interruption in supply resulting from operation of Shasta Dam. In order to ensure continuity of this certainty, article 9(a) of the original Settlement Contracts states that "[d]uring the term of this Settlement Contract and any renewals thereof . . . [the Settlement Contract] shall constitute full agreement . . . as to the quantities of water and the allocation thereof between Base Supply and Project Water . . . ." *See e.g.*, 18-ER-3837.

With the water rights dispute settled for the term of the Settlement Contracts and "any renewals thereof," the parties have carried out the terms of the Settlement Contracts for nearly 60 years. Without the Settlement Contracts' evergreen provisions regarding the quantities of water to be furnished to the Settlement Contractors and the allocation between Base Supply and Project Water, the foundation of Reclamation's water rights to operate the CVP would crumble.

## II.    ESA Section 7 Consultation Structure for Execution of the Settlement Contracts and Reclamation's Ongoing CVP Operations

Since the 1990s, Reclamation conducts ESA Section 7 (Section 7) consultations[4] regarding impacts caused by ongoing CVP operations, as a whole, on listed species. Separately, Reclamation consulted on the effect of executing the renewal of the Settlement Contracts in 2005 on certain listed species. As detailed

---

[4] *See* 16 U.S.C. 1536.

below, Reclamation and FWS have engaged in multiple such "separate but parallel" consultations on CVP operations and execution of long-term contract renewals.

## A.   The Contract Renewal Consultation Was Conducted in Parallel with the Consultation on Long-Term Operations of the CVP

Following the enactment of the Central Valley Project Improvement Act (CVPIA), Pub. L. No. 102-575, 106 Stat. 4600, 4706-31 (1992), environmental review and Section 7 consultations for the CVP follow an established structure. *See, e.g.*, 2-SRSC_SER 0524-28, Separate consultations are conducted for long-term coordinated operations of the CVP and State Water Project (SWP) (formerly referred to as "OCAP" and now more commonly known as "LTO"), execution of long-term contract renewals for different CVP units, and discrete operation, maintenance, and construction activities. Reclamation and FWS have explained this logical structure in many consultation documents. *See, e.g.*, 3-ER-0377.

At the time of the Settlement Contract renewals, Reclamation described the then-ongoing OCAP consultation as:

> address[ing] impacts to listed species that could be caused by hydrological and water quality conditions resulting from operation of the CVP and SWP facilities . . . . The analyses for the OCAP consultation assume the Settlement Contractors divert their Total Contract quantity with deficiencies in critically dry years in accordance with the existing and renewal contracts. Because maximum contract deliveries are assumed for the Settlement Contractors, the OCAP opinion fully addresses any in-river effects to listed species that could result from long-term contract renewal . . . .

> The consultation does not evaluate impacts that could result during diversion of water by the contractors or the use of diverted water.

3-ER-0377. In contrast, the consultation for the long-term Settlement Contract renewals evaluated "the impacts to listed species that could result from operating the CVP and SWP to deliver CVP water to the points of diversion of the Settlement Contractors . . . ." *Id.*

FWS confirmed its understanding of this consultation structure in its 2005 letter of concurrence (2005 LOC) and described the OCAP consultation as addressing "all the aquatic effects of operating the CVP/SWP." 3-ER-0498. In addition, FWS described consultations on the Settlement Contract renewals as "addressing the diversion of Sacramento River water at prescribed diversion points and times for use of that water on a specified land area (the contractors' service area)." *Id.* FWS summarized the relationship between the parallel consultations:

> In other words, the contracts create a demand (among other demands) for CVP water and the OCAP consultation addresses how the CVP/SWP projects are operated to meet those demands. There clearly is a linkage between contract renewals and the operation of the CVP/SWP. These linkages must, and are being, addressed in <u>separate but parallel</u> consultations such that all possible effects on listed species are being identified and consulted on . . . .

*Id.* (emphasis added).

### B. The 2005 Contract Renewal Consultation Thoroughly Addressed Contract Terms and Their Performance

In August 2003, Reclamation prepared the 2003 Biological Assessment on renewal of the Settlement Contracts (SRSC Renewal BA). 3-ER-0494–531. The

SRSC Renewal BA summarized the background of the Settlement Contracts and defined the consultation project area as the service areas for the 145 Settlement Contractors. 3-ER-0373, 0378. The SRSC Renewal BA further described the water use and management, including conservation policies, within the service areas (3-ER-0380–87, 0469–93); the riverine, wetland, and riparian habitat (3-ER-0394–99, 0466–79); protected species (3-ER-0399–415, 0456–65); and a term-by-term summary of the Settlement Contract renewals and any potential effects caused by each term (3-ER-0418–48). Ultimately, based on this information, Reclamation concluded the Settlement Contract renewals would not affect fish species "with the potential to occur in waterways affected by the delivery and drainage of water from the service areas," and noted "[t]he operations of the CVP . . . are governed by separate criteria in [BiOps] on CVP operations . . . ." 3-ER-0347–48. Reclamation also concluded the Settlement Contract renewals would not affect listed plants in the project area, listed wildlife species, or critical habitat in the project area. 3-ER-0348.

After discussing all the information provided, FWS concurred that the renewal of the Settlement Contracts was not likely to adversely affect federally listed species or critical habitat. 3-ER-0494–531. In so doing, FWS acknowledged the Settlement Contractors' underlying water rights, ownership of their own

diversion and conveyance facilities, and operations independent of the CVP.

3-ER-0526–27.

## C.    The 2008 Consultation on Long-Term Operations Superseded the 2005 OCAP Consultation

In 2006, after the Settlement Contract renewal consultation, Reclamation

began a new consultation on the long-term operation of the CVP.  5-ER-0851.  The

resulting final 2008 consultation documents—the Central Valley Project and State

Water Project Operations Criteria and Plan Biological Assessment and the

Biological Opinion on the Coordinated Operations of the CVP and SWP

(2008 FWS LTO BiOp)—continued to rely on the established parallel consultation

structure.  *See, e.g.*, 5-ER-1037, 1043.  After years of litigation, Appellants

successfully defended that 2008 FWS LTO BiOp before this Court.  *See San Luis*

*& Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (*San*

*Luis*).

## D.    Limited Reinitiated Consultations in 2014 and 2015 Ensured Section 7 Compliance During Drought

The 2008 FWS LTO BiOp provides in its "Reinitiation-Closing Statement"

that if the forecast indicates that the water year will be a second (or more)

consecutive dry or critically dry year, Reclamation must reinitiate consultation.

5-ER-1017.  In 2014, Reclamation reinitiated consultation with FWS pursuant to

this condition and in conjunction with Reclamation's first temporary urgency

change petition (TUCP) to the State Water Resources Control Board (State Water Board) requesting proposed modifications to water quality requirements imposed by State Water Board Decision 1641 (D-1641). 2-SRSC_SER 0484-85. Reclamation acknowledged that D-1641 requirements were part of the project description in the 2008 FWS LTO BiOp and concluded that the "proposed February 2014 modifications to CVP and SWP operation[s] have no additional adverse effects on delta smelt that were not previously analyzed in the [2008 FWS LTO BiOp]." 2-SRSC_SER 0485. Throughout 2014 and 2015, Reclamation consulted with FWS for each TUCP and operational modification, and FWS concurred with Reclamation's assessment.[5]

### E. In 2016, Reclamation Reinitiated Consultation on Long Term Operations of the CVP

On August 2, 2016, Reclamation requested reinitiation of the consultation on the Coordinated Long-Term Operation of the CVP and SWP. 1-ER-0018:21–23. The reinitiation request was "based on new information related to multiple years of drought and recent data demonstrating low Delta smelt populations, and new information available and expected to become available as a result of ongoing work through the collaborative science processes." *Id.*

---

[5] 2-SRSC_SER 000481–83, 000477–80, 000474–76, 000467–73, 000459–66, 000301–458, 000297–300; 1-SRSC_SER 000227–95, 000223–226, 000220–22, 000205–219, 000201–04, 000198–200, 000194–97, 000188–90, 000185–87; 4-ER-0652–735.

### III. Legal Challenges to the CVP Long-Term Operations Consultations and Contract Renewals

The district court accurately recounted the history of legal challenges to the CVP consultations. 1-ER-0137:6–46:3. Relevant to this appeal, Appellants initiated this lawsuit in the district court in February 2005, challenging the 2005 FWS Smelt OCAP BiOp. 1-ER-0138. Separately, certain Appellants also prosecuted a parallel suit in 2006 challenging the 2004 NMFS OCAP Salmonid BiOp. *Pacific Coast Fed. of Fishermen's Ass'ns v. Gutierrez*, Case No. 1:06-CV-00245-OWW-GSA (E.D. Cal.). The district court invalidated that BiOp; but, when denying injunctive relief, the district court held that "the Bureau has a mandatory (i.e., non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the . . . Settlement Contractors." *Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1201 (E.D. Cal. 2008). No appeal was taken of the district court's final judgment in that action. 1-ER-0159 n.4. Critically, this resolved the Appellants' challenges to Reclamation's then-consultation with NMFS concerning long-term operation of the CVP and no challenge was ever asserted in that case or any other case regarding Reclamation's parallel consultation with NMFS for renewal of the Settlement Contracts.

In contrast, on April 8, 2008, Appellants filed their Third Supplemental Complaint (3SC) in this case concerning Reclamation's consultation with FWS on delta smelt, joining certain Settlement and DMC Contractors as defendants that

had not previously intervened in the lawsuit.  2-SRSC_SER 0518–20, ¶ 27.  At that point, Appellants added the following allegation to the Second Claim: "the Bureau has failed and is failing to comply with ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2), by executing and implementing the long-term water supply renewal contracts described above, in reliance on what it knew or should have known to be faulty analysis by the FWS."  2-SRSC_SER 0521, ¶ 85.

Following an appeal to this Court and remand to the district court, on July 30, 2015, Reclamation reinitiated consultation with FWS on the Settlement and DMC Contract renewals.  4-ER-0532–34.  On December 14, 2015, FWS sent Reclamation the 2015 LOC, wherein FWS concluded that the effects of full water deliveries under the renewed Settlement and DMC Contracts were analyzed in the 2008 FWS LTO BiOp, and FWS amended the references to the 2005 FWS Smelt OCAP BiOp in the Settlement and DMC Contract renewal consultations with references to the 2008 FWS LTO BiOp (collectively, "2015 Reinitiated Consultation").  4-ER-0746–49.

In April 2016, Appellants filed their Fourth Supplemental Complaint (4SC). 24-ER-5579.  The 4SC added the Fourth Claim against FWS regarding the 2015 Reinitiated Consultation and 2015 LOC, and also added the Fifth and Sixth Claims against Reclamation and the Settlement Contractors regarding alleged impacts to listed salmonids.

The Settlement and DMC Contractors separately moved to dismiss the Second Claim in the then operative 4SC. The district court granted the motions and dismissed the Second Claim "because certain allegations in the claim are moot and because Plaintiffs have failed to comply with the ESA's 60-day notice requirement as to any non-moot allegations." 1-ER-0155:21–22. The Court found that Appellants' 60-day notice letter sent on February 7, 2008 (2008 Notice Letter), 24-ER-5586–96, "does not provide adequate pre-suit notice of a claim based upon the 2015 re-initiated consultation." 1-ER-0154:22–23. The district court noted that "[b]ecause amendment cannot cure these defects, leave to amend is not appropriate at this time," but "express[ed] no opinion as to whether this jurisdictional notice defect" could be cured. 1-ER-0155:22–23 & n.3.

On November 14, 2016, Appellants mailed to the Secretary of the Interior and Commissioner of Reclamation a 60-day notice letter (2016 Notice Letter). 23-ER-5141–51. The parties then entered a stipulation in which Appellants expressed their intent to seek leave "to supplement the complaint for the limited purposes of reviving the Second Claim" and reinitiated consultation. Defendants reserved their "rights to assert additional affirmative defenses . . . with respect to the Second Claim." 1-SRSC_SER-0049:15-17 (citation omitted), 0050:12-14. On March 1, 2017, Appellants filed the Fifth Supplemental Complaint (5SC), for the

limited purpose of adding a jurisdictional allegation to support the Second Claim based on the 2016 Notice Letter.  22-ER-5038–39, ¶ 1, 5047, ¶ 32.[6]

## IV.    The Fifth Claim

The Fifth Claim concerns the Settlement Contracts' alleged impacts on listed salmonids in the Sacramento River.  Unlike the Second and Fourth Claims that Appellants have pursued since 2005, the Fifth Claim was not asserted until April 28, 2016, more than a year after the statute of limitations on challenges to the consultation completed on June 4, 2009, had run.[7]  24-ER-5519, 5581–82, ¶¶ 183-88, 5594–95.

The Fifth Claim asserts that Reclamation failed to reinitiate consultation during the performance of the Settlement Contracts by alleging that Reclamation

---

[6] Appellants subsequently filed their Sixth Supplemental Complaint (6SC) for the limited purpose of adding a Seventh Claim against the Department of Commerce to compel testimony from certain NMFS employees.  22-ER-5038 Preface, 5093–95, ¶¶ 166-75, 5102–03, ¶¶ 206-12.  The 6SC did not include any changes to the Second Claim.  22-ER-5038 Preface.  The 6SC is the current operative complaint.

[7] In the district court, the Settlement Contractors and Federal Defendants/Appellees moved to dismiss the Fifth Claim on the ground that it was filed after expiration of the statute of limitations.  1-SRSC_SER-000153–162, 000059–64, 000139–52, 000075–86.  The district court dismissed the Fifth Claim on other grounds.  1-ER-0116:9–11.  Appellees respectfully submit that this Court may affirm the district court's dismissal of the Fifth Claim on this alternative ground even though it was not relied upon by the district court.  *See M&T Bank v. SFR Invs. Pool 1, LLC*, 963 F.3d 854, 857-59 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2566 (2021).  To avoid duplicative argument, the Settlement Contractors concur with and join in the Federal Defendants' Answering Brief at section III.A, arguing that Appellants' Fifth Claim is time barred.

retains "discretionary federal involvement and control over the implementation of the [Settlement] Contracts." 22-ER-5100, ¶ 198. Appellants allege this supposed discretion required Reclamation to reinitiate consultation with NMFS on the impacts of implementing the Settlement Contracts based on purportedly new information arising from the 2009 NMFS OCAP Salmonid BiOp and alleged temperature-dependent mortality in 2014 and 2015. 22-ER-5100–01, ¶¶ 198-200.

## V. The District Court Correctly Found the 2015 Reinitiated Consultation Complied with Section 7 of the ESA, and Properly Dismissed Appellants' Fifth Claim

The district court's decision granting Appellees' motions for summary judgment on the Second and Fourth Claims was comprehensive and detailed. The district court noted:

> As is the case with many of the major environmental/water cases before this Court, the administrative record in this case is enormous and, understandably, the parties' briefs are lengthy, with dozens of issues raised. The Court has spent many hundreds of hours attempting to address the matters raised as thoroughly as is reasonably possible.

1-ER-0022:1–4. Ultimately, the district court upheld FWS's concurrence with Reclamation's assessment that all possible effects of furnishing water under the Settlement Contracts were evaluated in the 2008 FWS LTO BiOp, which in turn avoids jeopardy to delta smelt or destruction or adverse modification of its critical habitat. 1-ER-0056–71.

The district court dismissed the Fifth Claim after a similarly robust analysis. 1-ER-0074–130, 0131–83. In doing so it determined that this Court's decision in *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) (*EPIC*) controlled its analysis of the Fifth Claim's viability. 1-ER-0090–99. But first, the district court distinguished between the Fourth Claim challenging the impacts of execution of Settlement Contract <u>renewals</u> on delta smelt, versus the Fifth Claim challenging the impacts of <u>implementation</u> of the executed Settlement Contracts on salmonids. 1-ER-0158:18–59:13. The district court concluded that the "only logical reading" of the Fifth Claim is that "Plaintiffs allege Reclamation retains discretionary involvement or control over [Settlement] Contract <u>implementation</u> and that the new information alleged in the complaint regarding impacts of [Settlement] Contract <u>implementation</u> on salmonids requires re-initiation of the consultation regarding [Settlement] Contract <u>adoption</u>." 1-ER-0160:9–12 (emphasis in original). The district court found that *EPIC's* holding controls the disposition of the Fifth Claim, and not *Natural Resources Defense Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014) (*Jewell*), which affects the disposition of the Fourth Claim. 1-ER-0163:11–64:1.

After supplemental briefing, the district court further examined *EPIC* in detail, comparing it to other Ninth Circuit precedent like *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998) (*Houston*).

1-ER-0162:17–63:10.  The district court noted that in *EPIC*, the this Court

emphasized that *Houston*, a case on contract renewal, should not be read to suggest

that "<u>once the renewed contracts were executed</u>, the agency had continuing

discretion to amend them at any time to address the needs of endangered or

threatened species.  *EPIC*, 255 F.3d at 1082."  1-ER-0162:25–63:2 (internal quotes

omitted).  The district court also considered *EPIC*'s focus on examining the terms

of the contract in that case "to determine whether the action agency retained

discretionary control to modify or add to the [contract's] terms by: '<u>mak[ing] new</u>

<u>requirements</u> to protect species that subsequently might be listed as endangered or

threatened'; 'expand[ing] the conservation goals of the [ITP]'; and 'demand[ing]

additional measures to protect new species.'  [Citation.]"  1-ER-0096:20–97:8

(quoting *EPIC*, 255 F.3d at 1081-82).

     Thus, the district court held that the Fifth Claim could not survive unless

Appellants could allege facts showing that the Settlement Contracts' terms allowed

Reclamation to unilaterally and materially modify the contracts themselves to

benefit listed salmonids.  1-ER-0097:12–98:7.  After exhaustively analyzing each

contract term that Appellants alleged as a source of discretion over contract

implementation, the district court correctly found that, under *EPIC,* nothing in the

Settlement Contracts gave Reclamation discretion, and properly dismissed the

Fifth Claim.  1-ER-0099:23–116:11, 0130:7.

# SUMMARY OF ARGUMENT

This Court should affirm the district court's grant of summary judgment in favor of the Settlement Contractors on Appellants' Second and Fourth Claims against Reclamation and FWS challenging the <u>execution</u> of the Settlement Contract renewals based on the alleged inadequacy of the Section 7 consultation on delta smelt conducted by those agencies. Appellants' arguments improperly disregard the well-established separate but parallel consultation structure described above, misread or misstate this Court's prior rulings in *Jewell*, and misapprehend what actually occurred in the 2015 Reinitiated Consultation. As carefully recounted by the district court, that consultation fully analyzed Reclamation's action of executing the renewal contracts and is soundly based upon the totality of the extensive information provided to FWS, none of which was disregarded. In particular, Appellants focus on a calendar year mismatch between the term of the operative BiOp and the term of the Settlement Contracts as an alleged inadequacy in the consultation. This simplistic temporal argument, however, is easily refuted by the extensive record evidence and district court analysis demonstrating that all effects of furnishing water under the Settlement Contracts were analyzed. Across the gamut of the relevant consultation documents—the 2005 LOC, the 2008 FWS LTO BiOp, and the 2015 LOC—FWS fulfilled this Court's directive by fully analyzing the impacts of the Settlement Contracts. FWS fully complied with its

ESA Section 7 obligations.

Appellants' Second Claim alleging that Reclamation violated its Section 7 obligations by relying on the 2015 Reinitiated Consultation similarly fails. First, Appellants did not properly provide notice under the ESA citizen suit provision, thus depriving this Court of jurisdiction. Second, even if jurisdiction does exist, Appellants fail to identify any material information that undermines FWS's conclusions in the 2015 Reinitiated Consultation, and put forth no meritorious basis to question Reclamation's reliance on FWS's conclusions in the 2015 Reinitiated Consultation.

This Court should also affirm the district court's dismissal of Appellants' Fifth Claim challenging Reclamation's decision not to re-initiate consultation regarding the effects of <u>ongoing implementation</u> of the Settlement Contracts on listed Chinook salmon. The district court correctly held that Reclamation retains sufficient discretion to trigger a re-initiation requirement <u>only if</u> the contract itself provides Reclamation authority to modify the contract in a material way. The district court properly found that none of the six Settlement Contract terms Appellants point to provide Reclamation with the authority to modify the contract terms to protect listed species. Similarly, none of the other sources of law that Appellants cite as purportedly imbuing Reclamation with discretion to unilaterally modify the Settlement Contracts to benefit listed species pass muster. Finally, the

statute of limitations has run on the Fifth Claim and this Court can affirm on this alternative ground.

## STANDARD OF REVIEW

The Settlement Contractors agree that this Court reviews the orders at issue *de novo*. In doing so, however, this Court must also defer to the agency decisions upheld by the district court's order. *See San Luis*, 747 F.3d at 601 ("Although our inquiry must be thorough, the standard of review is highly deferential . . . we may not substitute our judgment for that of the agency."). The Court must uphold the agencies' findings even if the evidence is susceptible of multiple interpretations. *Id.* Only if the agencies failed to consider a factor essential to an informed decision may the Court question the merits of the agencies' scientific judgment that the renewed Settlement Contracts would not jeopardize the continued existence of delta smelt or adversely modify its critical habitat. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005).

## ARGUMENT

**I.     The 2015 Reinitiated Consultation with FWS Satisfied the Requirements of ESA Section 7**

**A.     The 2005 Settlement Contract Renewal Consultation Is Still Valid as Amended by the 2015 LOC**

Many of Appellants' arguments about the alleged inadequacy of the 2015 Reinitiated Consultation rely on *Jewell*. Appellants argue that the 2005

Settlement Contract renewal consultation was improperly based on the 2005 FWS Smelt OCAP BiOp, and that Reclamation could not rely on the 2008 FWS LTO BiOp based on language in *Jewell* that the 2008 LTO BiOp did not specifically consult on contract renewal. ECF 31 at 10-11 (citing *Jewell*, 749 F.3d at 782); *see also id.* at 16. Appellants improperly disregard the consultation structure described above, misread *Jewell*, and ignore what actually occurred in the 2015 Reinitiated Consultation. The district court's careful decision to reject these arguments should be affirmed. 1-ER-0029:24–33:2.

### 1. The 2015 LOC Amended the 2005 Consultation to Address this Court's *En Banc* Opinion

The 2015 Reinitiated Consultation took place in response to this Court's 2014 *en banc* ruling. On remand, Reclamation requested consultation to "clarify that the water deliveries under the [Settlement] and DMC Contracts were addressed in the [2008 FWS LTO BiOp]." 4-ER-0750. After discussing the relationship between the 2005 LOC, the 2005 OCAP BiOp, and the 2008 FWS LTO BiOp, FWS declared that "*[b]y this memorandum*, all references to the 2004 and 2005 BiOps in the [Settlement Contract] consultations and the DMC consultations are *amended* to reference the 2008 LTO BiOp." 4-ER-0749 (emphasis added). The 2015 LOC did not replace or supersede the 2005 LOC. 4-ER-0746–49. Rather, the 2015 LOC *amended* the 2005 LOC in a manner that addressed the requested clarification and this Court's concerns. 4-ER-0749. As a

result of this amendment, the 2005 LOC is no longer based on "now-invalidated opinions." *See Jewell*, 749 F.3d at 782.

## 2. This Court Did Not Hold That the 2005 Settlement Contract Renewal Consultation Was Inadequate

Appellants argue that "*Jewell* held that Reclamation's 2005 purported consultation on the contract renewals was invalid because it had been based exclusively on the invalidated [2005 FWS LTO BiOp]." ECF 31 at 10 (citing *Jewell*, 749 F.3d at 781-82). This statement is wrong for multiple reasons. First, the *en banc* opinion included three holdings: (1) the issuance of the 2008 FWS LTO BiOp did not moot Appellants' claims; (2) Appellants have standing to challenge the ESA Section 7 consultation for the DMC Contract renewals; and (3) Reclamation was required to engage in a Section 7 consultation prior to renewing the Settlement Contracts. *Jewell*, 749 F.3d at 779. Nowhere did this Court squarely hold that the 2005 Settlement Contract renewal consultation was inadequate. In fact, the merits of the 2005 Settlement Contract renewal consultation were not before the *en banc* panel. Plaintiffs-Appellants' Petition for Rehearing, or Alternatively, Rehearing En Banc at 9, *NRDC v. Salazar*, No. 09-17661 (9th Cir. Oct. 1, 2012) (*NRDC v. Salazar*), ECF 140-1, *granted en banc* at 710 F.3d 874 (9th Cir. 2013) (statement of issues for rehearing involve procedural rulings on whether ESA consultation was required, not merits issues).

The 2005 Settlement Contract renewal consultation's analysis also went beyond the invalidated 2005 FWS Smelt OCAP BiOp. The 2005 LOC explained that "all possible effects" are "addressed in separate but parallel consultations"— referring to both the contract-specific consultation and the overall project operations consultation. 3-ER-0498. Reclamation prepared a separate biological assessment for the Settlement Contract renewal (2003 SRSC Renewal BA). 3-ER-0357–457. Consistent with the consultation structure for OCAP and contract renewal, the 2003 SRSC Renewal BA extensively analyzed the species and their habitat as well as the Settlement Contracts' terms and potential impacts. 3-ER-0394–99, 0466–68, 0399–415, 0459–65, 0380–87, 0469–93, 0418–48.

FWS then issued the 2005 LOC, *e.g.*, 3-ER-0494–531, which also evaluated information about the Settlement Contractors, their service areas and diversion facilities, related consultations, water use and conservation, transfers, terrestrial and riparian species, and impacts of the contract renewal on those species. The 2005 LOC also included conclusions on Reclamation's and the FWS's discretion over the Settlement Contracts. *E.g.*, 3-ER-0507 (explaining that "it is not possible to reduce deliveries" to the Settlement Contracts, other than as provided in the contracts); 3-ER-0526 ("The Settlement Contractors have their own [conveyance] facilities and they could . . . farm and provide M&I water without renewing their Settlement Contract[s] if they exercised their claimed water rights"). As such, the

analysis in the 2005 Settlement Contract renewal consultation did, in fact, go beyond the 2004/2005 FWS Smelt OCAP BiOps.

Although *Jewell* confirms that to the extent the 2005 LOC relies on now-invalidated BiOps, the contract renewal consultations would be invalid because the invalidated BiOps were superseded by the 2008 FWS LTO BiOp, that holding does not control here. 1-ER-0030:1–4. As the district court found, *Jewell* did not require the agencies to "completely abandon the 2005 consultation" on remand. *Id.* Consistent with that available approach, the agencies replaced references to the invalidated BiOps, and "[t]o the extent any analysis in the 2005 contract consultation did not rely on the now-invalided 2005 OCAP BiOp, that information could still service to support the 2015 LOC." *Id.* This is the correct analysis, and this Court should affirm the district court's interpretation of the *Jewell* decision.[8]

### 3. This Court Did Not Preclude Reclamation from Relying on the 2008 FWS LTO BiOp on Remand

The district court also correctly rejected Appellants' argument that this Court already decided that the 2008 FWS LTO BiOp did not represent a consultation on the renewal of the Settlement Contracts. ECF 31 at 11, 16. The district court persuasively explained that *Jewell* "does not address (at least not in a

---

[8] Based on this reasoning, it is also unnecessary for this Court to consider the adequacy of the 2005 Settlement Contract Renewal Consultation as it existed in 2005 because, as explained above, the 2005 LOC has been *amended* by the 2015 LOC.

dispositive manner) whether the 2008 [FWS LTO] BiOp 'considered' the impact of contract renewal," only that at the time of the *Jewell* decision in 2014, the agencies had not yet conducted a contract renewal consultation that relied on the 2008 FWS LTO BiOp. 1-ER-0032:14–22. On remand, the agencies remained free to "rely upon the 2008 [FWS LTO] BiOp to evaluate the impact of contract renewal on delta smelt. *Jewell* simply holds that as of the date of that decision, no such consultation had taken place." *Id.* at 0032:20–22. The district court's analysis is correct and should be affirmed.

**B.** **The 2015 LOC Fully Analyzes the Proposed Action and Is Based on the Totality of Information Submitted by Reclamation and Others to FWS**

In addition to mischaracterizing the holdings in *Jewell*, Appellants effectively ask this Court to hold that the 2015 LOC must expressly include in its text all of the material information set forth in the entire administrative record for the renewal consultation. They also advance a strained reading of Section 7's implementing regulations that elevates form over substance and finds no support in law or practice.

**1.** **The Court's Review of the 2015 LOC Is Not Limited to the Four Corners of the Concurrence Letter**

The 2015 Reinitiated Consultation culminated in the issuance of a four-page letter from FWS to Reclamation in which FWS concurred that "all of the possible effects to delta smelt and its critical habitat by operating the CVP to deliver water

under the [Settlement] and DMC contracts were addressed in the [2008 FWS LTO BiOp]." 4-ER-0748. Appellants appear to assert that the four-page document constitutes the only analysis that was part of the 2015 Reinitiated Consultation. *See* ECF 31 at 15, 17, 31. Not so.

Courts review agency action under the Administrative Procedure Act based on the <u>entire</u> administrative record. *See San Luis*, 747 F.3d at 608-16 (upholding agency decision where there was substantial evidence in the record to "discern the path the agency took to arrive" at the decision). In the context of a Section 7 consultation, the combined preparation of information and analysis by both the action agency and the consulting agency often leads—as it did here—to an "enormous" administrative record. 1-ER-0022:3–5; *see also* 50 C.F.R. § 402.12(a)-(k) (describing multiple requirements for biological assessment and consulting agency's response); *id.* § 402.12(k)(2). In this context it would be unreasonable to require the consulting agency to repeat in the concurrence document all of the information and analysis provided by the action agency.

The district court rightly reached the same conclusion. Although "the law requires that a rationale be reasonably discernable, nothing requires that all information pertaining to that rationale be included within the formal decision-making document." 1-ER-0042:7–15 (citing 5 U.S.C. § 706; *Portland Audubon Soc. v. Endangered Species Comm*., 984 F.2d 1534, 1548 (9th Cir. 1993)). The

district court also noted that the 2015 LOC explicitly incorporates by reference numerous other documents, and correctly emphasized that it would "look beyond the 2015 LOC to the entire record" in reviewing the agency action. 1-ER-0044:21–45:10. Not only is this approach permitted under basic principles of administrative law, it was especially important for the district court to review the entire record here because the 2015 LOC must be read in conjunction with the 2005 LOC it amended.

### 2. Appellants Misstate the Role and Responsibilities of a Consulting Agency in a Section 7 Consultation

Throughout their brief, Appellants argue that the Court's decision in *Jewell* concocted a new standard for Section 7 consultation and that Reclamation and FWS did not live up to this concocted standard. For example, Appellants assume that FWS had to consider alternatives to the terms of the Settlement Contracts. *See, e.g.*, ECF 31 at 20. Appellants also contend that Reclamation misrepresented its ability to negotiate different terms when renewing the Settlement Contracts, implying that as part of the 2015 Reinitiated Consultation, Reclamation had to propose some other alternative to its proposed action of renewing the Settlement Contracts with the same terms negotiated and agreed to in 2005. *See id.* at 33-34. This is not how a Section 7 consultation works.

A Section 7 consultation begins with a proposed action by the action agency. The action agency analyzes the possible effects of the proposed action on listed

species and designated critical habitat. 50 C.F.R. §§ 402.12, 402.13. The

consulting agency then reviews the action proposed by the action agency. *See id*.

§§ 402.12(j), 402.13(a), 402.14(g). In an informal consultation, if the consulting

agency concurs that the proposed action is not likely to adversely affect listed

species or critical habitat, the consultation concludes. 50 C.F.R. §§ 402.12(k),

402.13. The Section 7 consultation process simply does not resemble what

Appellants suggest. Under the informal consultation procedures Reclamation and

FWS followed, FWS was only required to consider whether Reclamation's

proposed action is likely to adversely affect listed species or their critical habitat.

*See* 50 C.F.R. § 402.13. Nothing in the ESA or its implementing regulations

requires Reclamation to propose projects that affirmatively benefit listed species.

The district court noted this distinction: "[I]t is important to keep in mind that

FWS's role in the consultation process is to give its opinion on the impact of a

project as proposed." 1-ER-0036:8–9. Here, FWS did just that by "review[ing]

[the] information available" to determine that renewal of the Settlement Contracts

was "not likely to adversely affect federally listed species or designated or

proposed critical habitat." 3-ER-0526.

With respect to alleged incompatibility between the Settlement Contracts

and the implementation of the reasonable and present alternatives (RPAs) in the

2008 FWS LTO BiOp, the district court carefully reviewed this argument and

found it to be undermined by *San Luis*. 1-ER-0037:24–41:14. In that case, this

Court reviewed in detail challenges to the 2008 FWS LTO BiOp, including

challenges to the RPAs. The 2008 FWS LTO BiOp analyzed Reclamation's then

proposed action, which included operation of the CVP in accordance with the

Settlement Contracts. 1-ER-0039:24–40:25, 5-ER-0848, 0898. Ultimately, this

Court concluded that the RPA was technologically feasible, and could be

implemented consistent with the purpose of the proposed action and Reclamation's

legal authority. *San Luis*, 747 F.3d at 637. In so doing, it necessarily follows that

the RPA was determined to be consistent with all aspects of Reclamation's

proposed action, including operating the CVP in accordance with the Settlement

Contracts. The district court found that these findings by this Court strongly

supported FWS's decision to rely on the 2008 FWS LTO BiOp in the 2015 LOC.

1-ER-0040:17–22; *see also San Luis & Delta-Mendota Water Auth. v. Locke*,

776 F.3d 971, 1002-03 (9th Cir. 2014) ("Under this deferential standard, . . . we

give the agency flexibility to choose among several appropriate [RPAs]").

Again, nothing in the ESA requires Reclamation to inform FWS of different

alternatives to Reclamation's proposed action (i.e., renewing or not renewing the

contracts). *See* ECF 31 at 16. Unlike environmental documents developed in

compliance with the National Environmental Policy Act, Section 7 consultations

do not require an alternatives analysis. *Compare* 40 C.F.R. §§ 1501.2(c), 1502.14

(requiring exploration and analysis of all reasonable alternatives) *with* 50 C.F.R. §§ 402.12-402.15 (no such requirement).  Under Section 7, the consulting agency analyzes the effects of the *proposed action*, not hypothetical alternatives to the proposed action.  *See* 50 C.F.R. § 402.14.  The district court held the same, 1-ER-0041:9–14, and this Court should similarly decline to judicially reinvent the Section 7 consultation process.

### 3. The ESA Does Not Require Reclamation to Renegotiate the Settlement Contracts

Appellants also cite to past documents to erroneously claim that Reclamation has taken different positions on discretion and exercised discretion to negotiate changes to quantity terms when it renewed the Settlement Contracts in 2005.  ECF 31 at 35-36.  The premise of this argument is that Reclamation had to renegotiate the contracts following the *Jewell* decision.  In *Jewell*, this Court found the agency had "some discretion" to renegotiate the Settlement Contracts' terms "that do not directly concern water quantity and allocation," and thus Reclamation had to engage in a Section 7 consultation before executing the renewed contracts. 749 F.3d at 785.  But, the district court recognized:

> This holding . . . has no bearing on whether Reclamation was <u>required</u> to renegotiate those terms, or most importantly . . . whether consultation over impacts of the [Settlement] Contracts on delta smelt required independent evaluation of the pricing and timing terms. What [Appellants] really appear to be requesting – an evaluation of whether alternative pricing and timing terms would have further benefitted smelt – is not . . . required by the ESA.

1-ER-0061:4–9.  Appellants have identified no flaw in this reasoning, nor could they: the ESA requires only that Reclamation and FWS consult on the proposed action.  *See Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1217 (D. Idaho 1993) ("Nor is NMFS required to . . . evaluate alternatives to the action . . .; it must simply evaluate the *effects of the proposed action* . . .").

The relevant question before this Court is whether FWS fully considered the impacts of renewing the Settlement Contracts, as negotiated, on delta smelt, not whether Reclamation should have negotiated different contract terms to constitute the proposed action subject to consultation.  *See* 1-ER-0072:17–18 ("Reclamation was not required to renegotiate those terms and may present its project to FWS as it sees fit within the bounds of the law.").  This Court should reject Appellants' attempt to reinvent the consultation process in order to sidestep a review of the actual 2015 Reinitiated Consultation that took place.

### C.    The Record Does Not Support Appellants' Arguments Regarding the 2015 Reinitiated Consultation

Appellants also advance a scattershot set of arguments that FWS "disregarded" information that is clearly in the administrative record certified by the agencies or cited in documents provided by Reclamation to FWS.  *See, e.g.*, ECF 31 at 23.  Each argument is addressed below.

### 1. The Agencies Considered the Status of the Species Including Survey Data

Appellants argue that the 2015 LOC relies exclusively on the 2008 FWS LTO BiOp, and that FWS did not analyze any information post-dating that opinion. ECF 31 at 17, 23. In fact, the 2015 LOC responded to and relied on Reclamation's request for reinitiation, which included Appendix B to the Supplemental Information document: "2015 Status of the Species and Status of Critical Habitat for the Delta Smelt (*Hypomesus transpacificus*)." 3-ER-0577–620. Appendix B provides an update to the status of delta smelt and includes survey data from 2014 and 2015. 3-ER-0586, 0589. The References section specifically cites the underlying letters from the agency that conducts the surveys. 3-ER-0612. Appendix B also discusses and references the update to the conceptual model for delta smelt detailed in the 2015 "MAST Report" (3-ER-0586–88, 0614), the same report Appellants claim was not considered because it was not discussed explicitly in the 2015 LOC. ECF 31 at 22. Likewise, the 2010 testimony on Delta outflow was "closely related" to the 2015 MAST Report, which was considered in the Status of the Species document. 1-ER-0068:1–12. The district court's finding that FWS considered all of this information should be affirmed. 1-ER-0068:13–14.

## 2. The 2008 FWS LTO BiOp, the 2005 and the 2015 LOC Fully Analyze All of the Settlement Contract Terms

As a result of the 2015 Reinitiated Consultation, FWS confirmed that the "effects of full water deliveries under the renewed [Settlement] and DMC contracts were analyzed by [FWS] as part of the proposed action in the [2008 FWS LTO BiOp]." 4-ER-0749. This conclusion is apparent from the project description in the 2008 OCAP BA. 2-SRSC_SER 00512–16; *see also* 2-SRSC_SER 00505–10 (describing how demands in the Sacramento River Basin are modeled).

Moreover, the 2015 LOC is based on the totality of information submitted by Reclamation and others to FWS. Reclamation's 2015 Supplemental Information document included sections on the Settlement Contract provisions along with a specific discussion of the Settlement Contract terms affecting water availability, such as the shortage, liability, and pricing provisions. 3-ER-0547–49, 0556–60. The 2005 Settlement Contract renewal consultation also detailed the effects of each provision of the Settlement Contracts. 3-ER-0425–48.

The district court correctly found that Appellants are wrong in asserting that the 2008 FWS OCAP Smelt BiOp and the 2015 LOC do not analyze the effects of the Settlement Contracts' terms. 1-ER-0057:4–62:5.

### 3. Reclamation Provided Accurate Information to FWS On Pricing

Appellants also complain that Reclamation misrepresented its discretion to make changes to pricing in the Settlement Contracts. ECF 31 at 34-35. While Reclamation may have "retained some . . . discretion to *renegotiate* the [Settlement] Contracts' terms with regard to . . . their pricing scheme . . . nothing in the ESA required Reclamation to renegotiate those terms." 1-ER-0061:1–7; 17:22–23. Moreover, Reclamation cannot unilaterally manipulate prices for Project water for the sole purpose of protecting delta smelt. Reclamation's rate-setting authority is legally constrained to recovery of costs of CVP operations, maintenance, and other statutorily defined activities. 3-ER-0547–48,1-SRSC_SER 0167 – 68; *see also* 1-ER-0103:17–06:17. Appellants once again ignore the authorities that have been cited repeatedly on this issue, and which the district court correctly found to be dispositive.

### 4. FWS Did Not Defer Analysis to Future Consultations

Appellants claim that FWS deferred its analysis of impacts on the species to a speculative, future consultation. ECF 31 at 29. Appellants are incorrect; the water deliveries under the Settlement and DMC Contracts were addressed in the 2008 FWS LTO BiOp, consistent with the procedural findings of this Court. 3-ER-0625–27, 0532–34. On those issues, FWS concluded that the "effects of full water deliveries under the renewed Settlement and DMC contracts were analyzed

by [FWS] as part of the [2008 FWS LTO BiOp]."  3-ER-0627; *see also* 3-ER-0748.  In addition, FWS acknowledged that the 2008 FWS LTO BiOp includes an RPA to avoid adverse impacts to delta smelt "associated with water deliveries under the contracts."  3-ER-0748.  The structure of "separate but parallel" contract renewal and overall OCAP consultations continues to ensure that "all possible effects on listed species are being identified and consulted on . . . ."  *See* 3-ER-0498.  The district court agreed, finding that although the closing paragraphs in the 2015 LOC "are not models of clarity," FWS clearly concurred with Reclamation's assessment that the "effects on delta smelt of delivering water under the [Settlement] and DMC contracts were incorporated into the 2008 [FWS LTO] BiOp, which in turn avoids jeopardy to the continued existence of the delta smelt and destruction or adverse modification of smelt critical habitat."  1-ER-0069:18–70:4.

### 5. FWS Did Not Ignore Information on Delta Outflow During the 2014 and 2015 Drought Years

Appellants claim that FWS failed to address information about the TUCP process's effects on Delta outflow in 2014 and 2015 in the 2015 Reinitiated Consultation.  ECF 31 at 25.  Contrary to Appellants' assertions, Reclamation and FWS specifically acknowledged the TUCP process in the consultation documents.  *See, e.g.,* 3-ER-0607–08, 0619.  Other information in the record also shows that the impacts of modifications approved during the TUCP process were fully consulted

on and analyzed by multiple agencies.[9]   4-ER-0630–32, 0633–735, 0736–38;

7-ER-1491–92; 1-SRSC_SER 0188 – 90, 0185–87; 2-SRSC_SER 0450 – 66.

Those consultations took place pursuant to the reinitiation triggered in the

2008 FWS LTO BiOp, which occurs when a water year is classified as dry or

critically dry for a second consecutive (or more) year(s).  1-SRSC_SER 0185;

5-ER-1017.  FWS concluded that although the modifications to operational

parameters were not anticipated in the project description for the 2008 FWS LTO

BiOp, the range of effects were previously analyzed in the 2008 FWS LTO BiOp,

and the modifications would not result in additional adverse effects on delta smelt

beyond those previously analyzed in the 2008 FWS LTO BiOp.  2-SRSC_SER

0466; 4-ER-0737–38; 1-SRSC_SER 0186  The district court correctly found it was

not necessary for Reclamation and FWS to repeat the TUCP consultation as part of

the Settlement Contract renewal consultation.  1-ER-0062:6–65:8; *see also* 1-ER-

0064:5–16.

### D.     The Term of the 2008 FWS LTO BiOp Need Not be Coextensive with the Term of the Contracts

Appellants' remaining argument challenging the 2015 Reinitiated

Consultation hinges on the difference between the term of the Settlement Contracts

---

[9] As the Settlement Contractors explained to the district court, the full set of TUCP consultation documents, which were compiled in the Sixth Claim Record, may be properly considered by the Court as extra-record evidence to explain the agency's decision.  1-SRSC_SER 0005:2–06:14.

(until 2045) and the term of the 2008 FWS LTO BiOp (until 2030). Based on this

difference, Appellants assert that FWS failed to consider the "*entire* agency action"

in contravention of this Court's precedent. ECF 31 at 26-27 (citing *Wild Fish

Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010), *Conner v. Burford*,

848 F.2d 1441, 1453 (9th Cir. 1988) (*Conner*)). Appellants' argument is based

solely on this simple difference in calendar years; they offer no other reason why

the consultation does not comply with the ESA. The district court carefully

considered this contention, summarizing the issue as follows:

> [T]he [Settlement] Contracts under review have a defined scope of
> 40 years, a temporal scope that is mirrored by the 2015 Contract
> Renewal Reconsultation documents. It is the incorporated
> 2008 OCAP BiOp that reviews an "ongoing" project (coordinated
> operations of the CVP and SWP) and imposes upon that project an
> analytical limitation of 2030. No one disputes that there is a
> mismatch between the scope of these two consultation processes. Is
> this *ipso facto* a violation of the ESA because the project and the
> analysis are not coextensive? Or, is the relevant question whether the
> actual analysis conducted permitted a meaningful evaluation of the
> impacts?

1-ER-0052:1–7.

In *Conner*, this Court did not equate "scope" to mean the duration of the

agency action; the court focused on the lack of analysis of the entire phase of

development under the oil and gas leases at issue. *Conner*, 848 F.2d at 1445, 1452.

Here, the district court reviewed *Conner* and other cases in detail, and found that

the present case was not like *Conner* where an entire phase of agency action was

excluded from analysis. "[T]he time horizon on the computer modeling performed in the 2008 OCAP BiOp to evaluate impacts of water deliveries on delta smelt extends only through 2030, rather than to 2045, but there is no obvious phase of operations that is excluded." 1-ER-0051:21–23.

The district court found *Pacific Coast Federation of Fishermen's Associations v. United States Bureau of Reclamation*, 426 F.3d 1082 (9th Cir. 2005), to be most on point. In that case, this Court explained why a temporal "mismatch between the scope of the project (10 years) and the scope of the analysis (the last two years) was material/meaningful." 1-ER-0052:22–23. Thus, a temporal mismatch alone is insufficient to find a consultation unlawful. That mismatch "also must be material/meaningful in the context of the overall record." *Id.* Accordingly, the district court properly focused on the "ultimate question presented in any consultation: whether a project will cause jeopardy or adverse modification to a species." 1-ER-0053:1–2.

On this question, the district court noted that Appellants offered no record evidence why "extending the analytical horizon from 2030 to 2045 would make a material difference to the outcome of the critical analysis in this case . . . ." 1-ER-0053:3–4. The same is true on appeal. Appellants continue to focus on the simplistic calendar year "mismatch," but do not explain why the mismatch between 2030 and 2045 matters in the context of the agencies' conclusion that all

effects of furnishing water under the Settlement Contracts were analyzed in the 2008 FWS LTO BiOp. *See generally* ECF 31 at 26-29.

In contrast, the record shows that the consultation horizon in the 2008 FWS LTO BiOp—extending to year 2030—was appropriate given the information available at the time. FWS specifically explained, using the best available science on CVP operations for future conditions, why it would be unproductive to predict impacts over a longer term than that considered in the 2008 FWS LTO BiOp based on data and modeling constraints. 2008 BiOp at 5-ER-0863, 0877 (Table P-1 n.d); s*ee San Luis*, 747 F.3d at 617-20 (deferring to FWS's model selection and ultimate "combination of available tools and data"). The district court acknowledged this record evidence, finding that it rationally explained "the choice of 2030 as the time horizon used in the 2008 [FWS] LTO BiOp." 1-ER-0053:17–18.

In sum, in all of the consultation documents—the 2005 LOC, the 2008 FWS LTO BiOp, and the 2015 LOC—FWS fully analyzed the proposed action for which Reclamation requested consultation, and in the case of the 2008 FWS LTO BiOp, FWS proposed RPAs to avoid jeopardy. Reclamation operated according to these RPAs, or has reinitiated consultation when needed. These consultations fulfill the requirements of the ESA and are supported by the record. Accordingly, this Court should affirm the district court's grant of summary judgment in favor of Appellees on the Fourth Claim.

## II. The Court Should Affirm Judgment in Favor of Appellees on the Second Claim

Appellants' Second Claim challenging Reclamation's compliance with the ESA and alleging that Reclamation violated its Section 7 obligations by relying on the 2015 Reinitiated Consultation fails for two reasons. First, Appellants did not provide proper notice under the ESA citizen suit provision, thus depriving this Court of jurisdiction.[10] Second, even if jurisdiction does exist, Appellants fail to identify any information FWS did not take into account that Reclamation should have considered. This Court should affirm the judgment in favor of Appellees on the Second Claim—on either ground.

### A. Appellants Cannot Cure the Defective 60-Day Notice for the Second Claim

The Second Claim is an action brought under the ESA citizen suit provision, which states that "no action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged

---

[10] In the proceedings below, the district court found the Second Claim to derive entirely from the unsuccessful Fourth Claim, granted summary judgment in favor of Appellees, and did not reach the more novel jurisdiction issue. 1-ER-0071:19–72:22. Although the district court did not decide this issue, this Court may consider objections to jurisdiction at any stage of the litigation. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.2d 1173, 1176 (9th Cir. 1992) (considering jurisdictional argument notwithstanding no notice of cross appeal); *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (*Southwest Center*) ("This sixty-day notice requirement is jurisdictional.").

violator . . . ." 1-ER-0151:19–21 (quoting 16 U.S.C. § 1540(g)(2)(A) (internal quotes omitted). This is a jurisdictional requirement. *See All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 597 (9th Cir. 2014) (*Wild Rockies*). "The notice requirement . . . is a '*mandatory condition[] precedent to commencing suit*' under the ESA."[11] *Id.* at 601 (quoting *Hallstrom*, 493 U.S. at 31 (emphasis added)). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Southwest Center*, 143 F.3d at 520. A violation of the 60-day notice requirement will result in dismissal despite the expenditure of significant resources in litigation. *See Hallstrom*, 493 U.S. at 28, 32.

Importantly, the notice must be sent *before* litigation is *commenced* so that the "agencies have an opportunity to review their actions and take corrective measures if warranted." *Southwest Center*, 143 F.3d at 520 (internal quotes omitted). The pre-suit notice period generally "allow[s] the parties time to resolve their conflicts in a nonadversarial time period" before "positions harden and compromise is less likely." *Wash. Trout v. McCain Foods*, 45 F.3d 1351, 1354 (9th Cir. 1995).

---

[11] Although *Wild Rockies* permits plaintiffs whose 60-day notice under the ESA continues to run to pursue non-ESA claims, nothing in that opinion allows such plaintiffs to raise ESA claims during that period.

The vast majority of district courts that have considered this issue have emphasized the importance of a litigation free window by holding that a violation of the 60-day notice requirement cannot be cured through changes to the complaint. *See, e.g., Animal Legal Def. Fund v. Olympic Game Farm, Inc.,* No. C18-6025RSL, 2022 U.S. Dist. LEXIS 160421, at *4-5 (W.D. Wash. Sep. 6, 2022); *Petzel v. Kane Cty. DOT,* No. 16-cv-5435, 2018 U.S. Dist. LEXIS 132841 at *13-15 (N.D. Ill. Aug. 7, 2018); *Proie v. Nat'l Marine Fisheries Serv.*, No. C11-5955BHS, 2012 U.S. Dist. LEXIS 60779 at *8-13 (W.D. Wash. May 1, 2012); *Tyco Thermal Controls LLC v. Redwood Indus.*, No. C06-07164 JF (PVT), 2010 U.S. Dist. LEXIS 47019 at *4-11 (N.D. Cal. Apr. 15, 2010); *Envirowatch, Inc. v. Fukino*, No. 07-00016 SOM-BMK, 2007 U.S. Dist. LEXIS 47088 at *8-12 (D. Haw. June 27, 2007) (*Envirowatch*); *K.C. 1986 Ltd. P'ship. v. Reade Mfg.*, 33 F. Supp. 2d 1143, 1154-56 (W.D. Mo. 1998); *see also Southwest Center*, 143 F.3d at 520 (purpose of the 60-day notice is to allow for resolution "without litigation").[12]

---

[12] This Court's opinion, which the Supreme Court affirmed in *Hallstrom*, 493 U.S. 20, also reasoned that "[t]he pragmatic approach fails to recognize that 'a mere adjustment of the trial date of the filing of a supplemental or amended complaint to cure defective notice cannot restore a sixty-day nonadversarial period to the parties.'" *Hallstrom v. Tillamook Cty.*, 844 F.2d 598, 601 (9th Cir. 1987) (citation omitted).

For example, the plaintiff in *Forest Guardians v. United States Bureau of Reclamation*, 462 F. Supp. 2d 1177 (D. N.M. 2006) (*Forest Guardians*), filed an action on March 21, 2006, alleging violations of the ESA based on Pecos River operations, without sending a notice letter. Federal defendants moved to dismiss the action as barred. *Id.* at 1181. Plaintiff then sent a notice letter on June 5, 2006, and subsequently moved to file a supplemental complaint on August 10, 2006, more than 60 days later. *Id.* The court denied the motion to supplement the complaint, finding that the plaintiff could not cure the defective notice by sending the federal defendants a notice letter after *commencing* the action, and then waiting 60 days to file a supplemental complaint. *Id.* at 1185. The causes of action included in the proposed supplemental complaint were identical to the causes of action asserted in the inadequately noticed complaint. *Id.* The court found that "[t]his is the type of situation the statute is aimed at." *Id.* Prohibiting parties from sending a notice letter after *commencing* an action and then supplementing the complaint "advances Congress' goal of creating a sixty-day nonadversarial period during which the parties might reach a resolution without the need for judicial intervention." *Id.* at 1184.

Courts look to the original complaint, not the amended complaint, to determine whether the plaintiff satisfies the notice requirement. *See Envirowatch*, 2007 U.S. Dist. LEXIS 47088 at *9-10. Here, it was not until Appellants filed

their 4SC that they alleged for the first time (as part of their Second Claim) that Reclamation violated Section 7(a)(2) based on its reliance on the 2015 Reinitiated Consultation. *See* 24-ER-5556–58, ¶¶ 100-106, 5565–70, ¶¶ 132-146. Thus, in the lengthy procedural posture of this case, the "original complaint" is the 4SC. Appellants' 2008 Notice Letter was inadequate to provide pre-suit notice of a claim based on the 2015 Reinitiated Consultation, and the district court dismissed the Second Claim without opinion on whether amendment could cure the defect. 1-ER-0151:14–55:25, 0183:3-5. Appellants did amend the complaint. Yet, the Second Claim in the 5SC and the 6SC is the same claim asserted in the 4SC: Reclamation's violation of ESA Section 7(a)(2) based on its allegedly unlawful reliance on the 2015 Reinitiated Consultation with FWS.

Appellants' dilatory act violates the requirement of the ESA citizen suit provision to comply with the 60-day notice requirement before *commencing* suit. *See Forest Guardians*, 462 F. Supp. 2d at 1186. Sending a new notice letter, waiting 60 days, and then supplementing the prior but still pending claim cannot revive the Second Claim and is an improper attempt to cure the original defective notice after Appellants already filed the then-operative 4SC.[13] The Second Claim remains barred under the subsequently operative 5SC and 6SC.

---

[13] In the district court, the Settlement Contractors explained in detail why the cases relied upon by Appellants to support their attempt to revive their Second Claim were inapposite. 2-SRSC_SER 0540–43.

## B. Appellants Have Not Identified Information that Reclamation Did Not Take into Account in Relying on Its Consultation with FWS

Since 2005, Reclamation has consulted with FWS on "all possible effects" of renewing the Settlement Contracts. This process began with the submission of the 2003 SRSC Renewal BA, and continued with the conclusion of the 2005 informal consultation and 2005 LOC, the 2008 FWS LTO BiOp, and now the conclusion of the 2015 Reinitiated Consultation with the 2015 LOC. Reclamation reasonably relied on these consultation processes to comply with its ESA Section 7(a)(2) obligations and, as the action agency, is not obligated to "undertake a separate, independent analysis of the issues." *See City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006) (*Tacoma*) (internal quotes and citation omitted) (explaining that a separate analysis by the action agency would "seriously undermine[]" the "expertise of the consultant agency").

"It does not suffice, when urging an action agency to reject the BiOp of a consultant agency, simply to reargue factual issues the consultant agency already took into consideration." *Tacoma*, 460 F.3d at 76. Appellants must point to information that FWS did not take into account, which would challenge its conclusions. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Appellants have not met this burden.

As to the Second Claim, Appellants mostly complain that Reclamation did not negotiate different terms to the Settlement Contracts after *Jewell* and then

attempt to identify alleged inconsistencies between random documents and briefs

to support their argument that such a renegotiation should have occurred.  *See*

ECF 31 at 33-41.[14]  Nothing in Section 7's implementing regulations requires

action agencies to propose new or different terms to benefit listed species when

consulting on a contract.  *See* 1-ER-0072:16–19 ("Reclamation . . . may present its

project to FWS as it sees fit within the bounds of the law").  *Jewell* did not rewrite

those regulations.  That case only held that Reclamation had sufficient discretion to

renegotiate the Settlement Contracts at the time of execution such that consultation

under Section 7 was required.  The relevant issue for the Second Claim is whether

Reclamation reasonably relied on its consultation with FWS, which analyzed the

contracts that Reclamation proposed to execute.  Appellants have identified no

material information that undermines FWS's conclusions in the 2015 LOC, and

have not provided any meritorious basis to question Reclamation's reliance on the

2015 LOC.  Appellees were thus entitled to summary judgment on the Second

Claim, and the district court decision should be affirmed.

---

[14] As an example, Appellants falsely assert that in renewing the Settlement
Contracts in 2005, Reclamation did exercise discretion to negotiate changes in
contract quantities resulting in a net reduction of 170,000 acre-feet from the
original contracts.  The Settlement Contractors thoroughly rebutted and dispensed
with this false assertion in their prior briefing before this Court in 2010 (*see*
2-SRSC_SER 0489–91), and in their December 8, 2015 comment letter to FWS
during the 2015 Reinitiated Consultation responding to Appellants' repeated false
assertions.  1-SRSC_SER 0170, 73.

## III. The District Court Properly Dismissed the Fifth Claim

In arguing that the district court erred in dismissing their Fifth Claim alleging that Reclamation retained sufficient discretion and control over the implementation of the Settlement Contracts to require reinitiation of consultation, Appellants take no issue with the district court's core holding. Specifically, the district court held that Reclamation retains sufficient discretion to trigger a requirement to reinitiate consultation <u>only if</u> the contract itself provides Reclamation with authority to modify the contract in a material way. *See* 1-ER-0096:19–98:7 (citing *EPIC*, 255 F.3d 1073). This holding followed a careful examination of this Court's precedents involving the intersection of executed contracts and ESA consultations. Based on this analysis, the district court reasoned that "in order to trigger the requirement for re-consultation under *EPIC* and 50 C.F.R. § 402.16 in the context of an <u>executed and otherwise valid</u> contract, the action agency must have retained sufficient discretion in that contract to permit material revisions to it that might benefit the listed species in question." 1-ER-0097:8–11.[15]

---

[15] Nothing in this Court's recent decision in *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation District*, 49 F.4th 1242, 1247 (9th Cir. 2022), changes the district court's holding because there the court held that statutory language authorizing the operation of a dam for "other purposes" afforded sufficient discretion to avoid take of listed species. Here, under *EPIC* an action agency that executes a contract must have retained discretion to modify the contract and, as discussed below, there is no federal authorization that allows

Having failed to challenge this holding, let alone even cite *EPIC* as the controlling case,[16] Appellants have waived any argument that the district court applied an improper legal standard in analyzing whether Reclamation retained discretionary involvement and control over Settlement Contract implementation. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 930 (9th Cir. 2015) (matters not "specifically and distinctly argued" in the opening brief not considered).

Instead, working within the district court's legal framework and this Court's precedent in *EPIC*, Appellants point to six specific contract terms as alleged sources of Reclamation's discretion to implement the Settlement Contracts to

---

Reclamation to amend or modify the Settlement Contracts to benefit listed species. *See infra*, at section III.B.

[16] The cases Appellants do cite are easily distinguishable from *EPIC*. In *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 976-77 (9th Cir. 2003), the implementing legislation for the agreement at issue provided NMFS with discretion to issue permits with conditions that could benefit listed species. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) did not involve contracts between the federal government and a third party. And *Crowman Corp. v. United States*, 51 Fed. Cl. 654 (2002), is an out-of-circuit district court case in which the contract at issue explicitly provided "that the Forest Service retained authority to approve both plaintiff's initial plan of operations and any revisions thereto[.]" *Id.* at 656. There is no analogous provision in the Settlement Contracts. Finally, the holding in *Jewell* applies to contract renewal rather than contract implementation, and in any event, the Settlement Contract terms governing the timing and quantities of water made available to the Settlement Contractors are "legal obligation[s]" that make it "impossible for the agency to exercise discretion" in a way that would provide the benefits to listed species that Appellants' Fifth Claim seeks. *Jewell*, 749 F.3d at 784; *see* 22-ER-5100–01, ¶¶ 195-200.

benefit listed species.  ECF 31 at 41-54; *see also* 1-ER-0092:15–20.  Appellants

also contend that Reclamation possesses sufficient discretion to materially revise

the terms of the Settlement Contracts under the CVPIA and California law.  None

of these sources provide sufficient discretion to trigger reinitiation of consultation

under the ESA, and the district court's decision should be affirmed.

### A.     Reclamation Cannot Modify the Settlement Contracts to Benefit Listed Salmon

The district court properly found that none of the Settlement Contract terms

to which Appellants point permit Reclamation to unilaterally modify those terms to

benefit listed species.  Federal law governs the interpretation of federal reclamation

contracts.  *Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164,

1165 (9th Cir. 2001).  Thus, in interpreting Contract articles 7(b), 3(i), 3(e), 3(h),

9(a), and 30(b), this Court should ascertain the parties' intent from the plain

language of the contract.  *Tehama-Colusa Canal Auth. v. U.S. Dep't of the Interior*,

721 F.3d 1086, 1093 (9th Cir. 2013).  "A written contract must be read as a whole

and every part interpreted with reference to the whole, with preference given to

reasonable interpretations."  *Klamath Water Users Protective Ass'n v. Patterson*,

204 F.3d 1206, 1210 (9th Cir. 1999).  The plain language of each subject contract

term is not susceptible to the interpretation Appellants offer.

### 1. Article 7(b) of the Settlement Contracts Is Not an Independent Source of Discretion for Reclamation

Appellants argue that the language of article 7(b) of the Settlement Contracts bestows "continued discretionary federal involvement and control by agreeing that the [Settlement] Contractors would be bound by any restrictions imposed" by a BiOp imposing actions required to avoid jeopardy. ECF 31 at 46. Appellants did not address the issue of whether article 7(b) is an independent source of discretion in the district court, so the issue here has been waived. 1-SRSC_SER 0058 (claiming only that article 7(b) supports Appellants' interpretation of article 30(b).); *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021) (*Villanueva)* (holding an issue waived because it was "not presented or developed before the district court"). Regardless, Appellants' interpretation of article 7(b) is simply incorrect.

First, Appellants improperly attack the district court's 2017 ruling dismissing the Fifth Claim by using statements from the court's 2019 order granting summary judgment on the Second and Fourth Claims. ECF 31 at 44-45 (citing 1-ER-0054–56). This is fundamentally wrong. As explained above, the Second and Fourth Claims involve challenges to the *execution* of the Settlement Contracts, not contract *implementation* that is the subject of the Fifth Claim.[17] *See,*

---

[17] The Second and Fourth Claims also seek to require Reclamation to reinitiate consultation on how the Settlement Contracts affect delta smelt and would in no

*e.g.*, 1-ER-0159–60, 22-ER-5100–01, ¶¶ 183-200.  The district court thus analyzed

two different legal standards when considering article 7(b) for purposes of the Fifth

Claim versus the Fourth Claim.  *Compare* 1-ER-0054:6–56:12 (considering

whether FWS properly considered the entire scope of the action during

consultation) *with* 1-ER-0107:11–08:6 (considering whether Reclamation retained

discretion in the executed Settlement Contracts).  Any interpretation offered by the

district court of article 7(b) in the context of the Second and Fourth Claims lacks

utility in deciding the viability of the Fifth Claim under the distinct legal standard

set out in *EPIC.*  Appellants' attempt to overturn the district court's holding on the

Fifth Claim, by using the district court's interpretation of article 7(b) in its later

order on the Second and Fourth Claims, confuses the nature of the claims and the

standards under which they were decided.[18]  This Court should reject that attempt.

Second, Appellants have provided no authority to justify the use of extrinsic

evidence to interpret article 7(b)'s unambiguous language.  *See* ECF 31 at 45-46

(citing 4-ER-0749, 15-ER-3130, 18-ER-3835, 24-ER-5558–59).  The district court

---

way obligate Reclamation to reinitiate consultation for listed salmon.  *See*
22-ER-5098–100, ¶¶ 183-94.

[18] In any event, the district court's holding with respect to the temporal mismatch
between the term of 2008 FWS LTO BiOp and the term of Settlement Contracts in
the context of the Second and Fourth Claims is that Appellants failed to show that
the mismatch was material and meaningful.  *Compare* 1-ER-0052:8–23 *with*
ECF 31 at 44-45.  The district court's musings about what article 7(b) might permit
in future consultations is mere dicta.

explained why it focused its evaluation of the Fifth Claim on the plain language of the contract and, as in *EPIC*, did not look to extrinsic evidence. 1-ER-0165:11–12. It then allowed for additional briefing on whether extrinsic information should be considered to evaluate discretion under the executed contracts. 1-ER-0167:4–9. Appellants did not provide any authority to the district court to support consideration of extrinsic evidence as part of this analysis, and similarly fail to provide any authority here to support consideration of extrinsic evidence. 1-ER-0114:15–15:6; ECF 31 at 46; *see also Villanueva*, 986 F.3d at 1164 n.4. Accordingly, Appellants' argument relying on conduct or extrinsic information lacks merit and has been waived.

Finally, Appellants fail to show that the plain language of article 7(b) provides Reclamation with ongoing discretion in performing the Settlement Contracts. Article 7(b) provides that each Settlement Contractor must comply with the requirements of "biological opinion(s) prepared as a result of a consultation regarding the execution" of the Settlement Contracts under Section 7 of the ESA. 15-ER-3088. It then goes on to provide that the Settlement Contractors' 40 years of diversions under their original Settlement Contracts will be used to develop an appropriate baseline for any biological assessment prepared under Section 7 and in any other needed environmental review. *Id.*

In referring to consultations regarding the "*execution*" of the Settlement

Contracts, article 7(b)'s plain language only commits the Settlement Contractors to

meet requirements of a BiOp that resulted from the consultation on the Settlement

Contract renewals in 2005. *See* 1-ER-0137:7–38:6 (describing Reclamation's

biological assessments on Settlement Contract renewals and FWS's and the

NMFS's concurrence that renewal was not likely to adversely affect listed species).

It does not provide authority for the federal government to unilaterally impose new

restrictions on the Settlement Contractors in any consultation on the ongoing

system-wide operation of the CVP during the term of the previously executed

Settlement Contracts.[19]  Appellants do not explain how article 7(b) satisfies the

*EPIC* standard by allowing Reclamation to amend the Settlement Contracts to add

terms that benefit delta smelt.  Indeed, the plain language of article 7(b) cannot

support such an interpretation because it provides only that the <u>Contractor</u> must

comply with requirements in applicable BiOps.  This language does not even refer

---

[19] Even if it were applicable to this Court's analysis of the Fifth Claim, the district
court's discussion of article 7(b) in granting summary judgment on the Second and
Fourth Claims does not require a different result.  In its summary judgment order,
the district court held that Reclamation's decision not to make the OCAP BiOp's
term coextensive with the Settlement Contracts' terms did not violate Section 7 of
the ESA.  1-ER-0056:3–5.  In doing so, the district court observed that a BiOp on
systemwide CVP operations after 2030 could conclude that "additional protections
are needed" to protect delta smelt under Section 7 of the ESA.  1-ER-0055:8–13.
In that unique situation, the district court indicated that Federal Defendants could
be obligated *at the time of renewal* to revisit the Settlement Contracts if doing so
were necessary to implement the recommended protections.  *Id.*

to Reclamation and cannot be read to provide Reclamation with discretion to revise the terms of the Settlement Contracts to benefit salmon.

The regulatory definition of "environmental baseline" underscores this interpretation. Under NMFS's and FWS's joint ESA regulations, the term "environmental baseline" refers to the condition of the listed species or its designated critical habitat in the action area, without any consequences that may be caused by a proposed federal action. 50 C.F.R. § 402.02. The environmental baseline includes the past and present impacts of all federal activities in the action area. *Id.* "The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline." *Id.* Both the original Settlement Contracts and the renewal contracts specifically provide that they "constitute full agreement" as to the quantities of water and the allocation thereof that may be diverted during the contracts' term "and any renewal thereof[.]" 17-ER-3736 (art. 9(a)), 15-ER-3094 (art. 9(a)(1)). Far from providing discretion sufficient to trigger reinitiation obligations under Section 7, article 7(b)'s directive that 40 years of ongoing diversions is to be used to develop an appropriate baseline is an explicit recognition that Reclamation's obligation to

meet the Settlement Contracts' unchanged Contract Totals is a non-discretionary existing action that would not cause effects requiring reinitiation of consultation.[20]

### 2. Article 3(i) Does Not Grant Reclamation Discretion to Reduce Project Water Supplies to Benefit Listed Species

Appellants argue that article 3(i) of the Settlement Contracts grants Reclamation discretion to reduce deliveries of Project Water to benefit listed species. ECF 31 at 47-48. The Settlement Contracts categorize the water supplies diverted under the Settlement Contracts into Base Supply and Project Water, which comprise the Contract Total. *See* 1-ER-0099:16–19. Under article 5(a) of the Settlement Contracts, the Contract Total may be reduced only in a Critical Year, and then only by 25 percent. *Id.*; 12-ER-2650 (art. 5(a)). Article 3(i) specifically provides that "if there is a shortage of Project Water" due to actions taken by Reclamation to meet legal obligations, then "no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom." 12-ER-2649.

---

[20] Although the regulatory definition of "environmental baseline" was first codified in 2008 and has changed over the years, the concept has existed since 1986 (51 Fed. Reg. 19926, 19958) and has long been interpreted to not include the effects of the proposed federal action under consultation. Settlement Contractors' Request for Judicial Notice, Ex. 1, at 4-22. Moreover, the current regulatory definition of environmental baseline was intended to clarify the nature of the environmental baseline based on existing law and did not result in a substantive change of the definition. 84 Fed. Reg. 44976, 44978 (2019).

The district court correctly found that article 3(i), as a mere disclaimer of liability, provides no affirmative discretion to Reclamation to amend article 5(a) to permit reductions in Project Water supplies to benefit listed species. *See* 1-ER-0100:21–01:13. The district court made a similar finding that article 3(i) was a "force majeure" clause in a 2009 ruling, and this Court in *Jewell* declined to disturb that part of the district court's decision. *See id.* (citing *NRDC v. Kempthorne*, No. 1:05-CV-01207-OWW-SMS, 2009 U.S. Dist. LEXIS 78424 at *11-12 (E.D. Cal. Sep. 1, 2009), *rev'd on other grounds sub nom. Jewell*, 749 F.3d 776).

None of Appellants' arguments support reversal of this long-standing interpretation of article 3(i). First, there is no need for the Court to even address article 3(i) because none of the releases of water for diversion under the Settlement Contracts that gave rise to the Fifth Claim actually involved Project Water. *See* 1-SRSC_SER 0052:8–53:6. Second, Appellants' citation of the DMC Contracts, State Water Board orders, past briefing, and other extrinsic evidence as part of their argument is improper. ECF 31 at 47-48.

Even if the Court considers extrinsic evidence, Appellants still do not satisfy the relevant *EPIC* standard. For example, article 3 of the Settlement Contracts is plainly different from article 12 of the DMC Contracts. Article 12 of those water service contracts refers broadly to "Condition[s] of Shortage" that prevent

Reclamation from delivering sufficient water to meet the Contract Total, and contains substantial additional language beyond article 12(b) that demonstrates Reclamation's broader discretion over Project Water. 8-ER-1559, 1587–89. Indeed, the DMC Contracts specifically note that the "capacity of the Project to deliver Project Water has been constrained in recent years and may be constrained in the future" such that the "likelihood of the Contractor actually receiving . . . Project Water . . . in any given Year is uncertain." 8-ER-1567 (art. 3(b)). This stands in stark contrast to the sole, unambiguous formula for reducing deliveries of Project Water under article 5(a) of the Settlement Contracts. *See* 12-ER-2650. Thus, Appellants' citations to Reclamation's statements about the DMC Contracts is not applicable to this Court's interpretation of the Settlement Contracts. ECF 31 at 47-48.

Appellants' unsupported interpretation of article 3(i) is also contrary to the non-discretionary nature of the legal obligations imposed by the ESA. Specifically, article 3(i)'s language presupposes the independent existence of a legal obligation. As the district court observed, legally mandated actions are non-discretionary. 1-ER-0101:6–9; *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 673 (2007) (*Home Builders*). Appellants' interpretation of article 3(i), however, suggests that legal obligations under the ESA are instead a source of discretion that Reclamation could somehow exercise to benefit species.

*See* ECF 31 at 48 ("Reclamation's continuing *ability* to reduce project water supplies . . . is, independently, sufficient discretion to reinitiate consultation" (emphasis added)). However, neither the ESA nor the Settlement Contracts expand Reclamation's authority in this way. To the contrary, the ESA is imbued with mandatory language (*e.g.,* 16 U.S.C. § 1536(a)(2)), and multiple Settlement Contract terms show that the parties sought certainty under those contracts that is inconsistent with the exercise of ongoing federal discretionary control. *See* 12-ER-2645 (art. 2(a)), 2650 (art. 5(a)), 2656–59 (art. 9).[21] Thus, the district court properly determined that article 3(i) did not confer Reclamation with discretionary involvement and control over contract implementation sufficient to require reinitiation of consultation on the Settlement Contracts' execution.

---

[21] Appellants' reliance on article 3(h) as an independent source of discretion is also misplaced for this reason. *See* ECF 31 at 50. Article 3(h) also merely limits Reclamation's liability for "a shortage of water . . . on account of errors in operation, drought, or unavoidable causes." 15-ER-3128. Appellants' suggestion that this limitation of liability somehow confers discretion on Reclamation is unsupported, and contrary to the district court's longstanding interpretation of similar language as a force majeure clause. *See* 1-ER-0099:23–101:13; *see also* art. 3(i) at 11-ER-2474 ("In addition to . . . subdivision (h) of Article 3 . . . ." (emphasis added)). In any event, Appellants failed to argue in the district court that article 3(h) conferred Reclamation with sufficient discretion to trigger reinitiation, so their arguments regarding article 3(h) have been waived. *Villanueva,* 986 F.3d at 1164 n.4.

### 3. Reclamation's Conditional Discretion to Approve Water Transfers Under Article 3(e) Does Not Provide Ongoing Discretion Over Contract Performance Generally

Appellants' argument that Reclamation's discretion to approve water transfers under article 3(e) requires reinitiation of consultation on the Settlement Contracts' execution is inconsistent with article 3(e)'s conditional language. Article 3(e) provides that no "sale, transfer, exchange or other disposal" of water on land other than that designated by the applicable Settlement Contract can occur without Reclamation's written consent. 12-ER-2647–48. Reclamation may not unreasonably withhold consent. 12-ER-2648. Settlement Contractors who wish to transfer water under the Settlement Contracts must submit a written proposal that includes sufficient information to enable Reclamation to comply with the ESA. *Id.*

The district court correctly found that article 3(e) does not confer ongoing "discretionary Federal involvement or control" over the implementation of the Settlement Contracts because Reclamation has no authority to reject or condition a transfer unless and until a Settlement Contractor makes a proposal. 1-ER-0107:1-2. Section 7 is only triggered by a federal agency's ability to take unilateral action to benefit listed species, so Reclamation's limited authority to approve proposed transfers does not confer ongoing discretion over the implementation of the Settlement Contracts as a whole. *See* 1-ER-0107:2–10;

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 33-34 (D.C. Cir. 1992) (*Platte River*).

### B.     No Other Sources of Law Allow Reclamation to Amend or Modify the Settlement Contracts to Benefit Listed Species

Appellants argue that California's public trust and reasonable use doctrines imbue Reclamation with discretion to modify the terms of the Settlement Contracts to benefit listed species.  They further argue that not only are these doctrines embodied in articles 9(a) and 30(b) of the Settlement Contracts, but that they constitute an independent grant of discretion that permit Reclamation to breach article 5(a) of the Settlement Contracts.  ECF 31 at 50-51.

If adopted, Appellants' arguments would blur the lines between state and federal governments in a way Congress could not have intended.  As a federal agency, Reclamation has no authority to interpret and enforce state law against the Settlement Contractors.[22]  For example, under the public trust doctrine, it is the State's duty to consider public trust uses and balance them in making water right permitting decisions.  *See Nat'l Audubon Soc'y, et al. v. Superior Court*, 33 Cal.3d 419, 446-47 (1983) (*Nat'l Audubon*) (holding that the State Water Board must "consider the effect" of its water right decisions on public trust interests and

---

[22] Appellants' argument to the contrary is ironic at best and contrary to state law at worst, given that D-990, directed Reclamation to enter the Settlement Contracts in order to ensure it complied with state law in operating the CVP.  26-ER-6033–43.

"preserve, so far as consistent with the public interest, the uses protected by the trust"). Although Congress directed Reclamation to comply with state law in appropriating water, nothing in federal law suggests that Reclamation may assume the State of California's authority under the public trust doctrine to rewrite federal contracts. *See California v. United States,* 438 U.S. 645 (1978); 43 U.S.C. § 383. Even if Reclamation had public trust responsibilities under state law, California's public trust doctrine does not require specific outcomes—such as the duty to avoid jeopardizing the continued existence of listed species. *See* 16 U.S.C. § 1536(a)(2). It requires only that the State Water Board consider how its decisions affect public trust interests and weigh such impacts against other public interests. *Nat'l Audubon*, 33 Cal.3d at 447. Thus, not only does the federal government lack authority to implement California's public trust doctrine, but any such authority would not require Reclamation to reduce contract deliveries to protect listed species, or any other particular outcome.

Appellants also cannot provide any authority to support their argument that Reclamation has independent authority and discretion to determine whether the use of water for agriculture is reasonable and beneficial under state law. Indeed, both federal and state authority provide that the authority to make such determinations rests entirely with the State of California. *See, e.g.,* Cal. Water Code, § 275; *Stanford Vina Ranch Irrigation Co. v. State of California*, 50 Cal. App. 5th 976,

1002-03 (2020) (holding the <u>State Water Board</u> has authority to curtail unreasonable use of water); 43 U.S.C. § 383; *California,* 438 U.S. at 652 n.7; *see also* 1-SRSC_SER 0170, 0181.  So, neither the public trust doctrine nor the reasonable and beneficial use doctrine confer independent, extra-contractual discretion to Reclamation to implement the Settlement Contracts to benefit listed species.

Appellants' argument that articles 9(a) and 30(b) of the Settlement Contracts somehow transmit the State of California's sovereign authority to Reclamation makes no sense.  Although article 9(a) refers to the beneficial use of water, it does not suggest that Reclamation can change water quantities based on whether historical use of water remains reasonable and beneficial.  In fact, article 7(a) explicitly indicates that the parties contemplated the use of water for "agricultural purposes" such as crop irrigation as beneficial.  11-ER-2475–76.  Article 9(a) contains no language authorizing Reclamation to unilaterally revise this term.  *See Platte River,* 962 F.2d at 33-34.  The remainder of article 9 indicates that only a general adjudication of water rights under state law can disturb established agricultural uses of water under the Settlement Contracts.  *See, e.g.,* 11-ER-2482 ("if final judgment in any such general adjudication shall determine that the rights of the parties hereto are different from the rights as assumed herein, the parties shall negotiate an amendment to give effect to such judgment . . .").

Nor does article 30(b) import discretion under the reasonable and beneficial use and public trust doctrines into the Settlement Contracts. Article 30(b) provides that Reclamation "shall have the right to make determinations necessary to administer this Settlement Contract that are consistent with" the Settlement Contract's own provisions, federal law, state law, and rules and regulations promulgated by the Secretary of the Interior. 12-ER-2671. Thus, article 30(b) is not an independent source of discretion, but simply allows Reclamation to administer the Settlement Contracts to comply with the law. Reclamation's duty to comply with mandatory legal obligations is not discretionary for purposes of 50 C.F.R. § 402.03. *See Home Builders*, 551 U.S. at 666-68. Nothing in article 30(b) suggests that Reclamation may privilege one contract term over another, as Appellants suggest (ECF 31 at 51), or that it somehow grants Reclamation discretion it does not otherwise possess under state or federal law.

Appellants also train their sights on the CVPIA as an alleged independent source of discretion. Their argument that the CVPIA provides Reclamation with discretion over contract implementation fails for at least two reasons. First, Appellants waived their argument first by failing to raise it in their opposition to Appellees' motions to dismiss (1-SRSC_SER 0087–138), and then belatedly and obliquely burying it in a footnote in a supplemental brief. *See* 1-SRSC_SER 0057 n.3; *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013) (argument

buried in the middle of a distinct section and not developed before or ruled on by the district court was waived).

Second, Appellants' CVPIA arguments run afoul of the rule that an agency's duty to fulfill mandatory legal obligations is not discretionary under Section 7. *See* 50 C.F.R. § 402.03; *Home Builders*, 551 U.S. at 667-68. For example, CVPIA section 3404(c)(2) simply requires that the Secretary of the Interior incorporate all requirements imposed by existing law into all renewed long-term repayment or water service contracts and administer such contracts in conformance with the CVPIA. CVPIA § 3404(c)(2).[23] Similarly, section 3406(b) simply directs the Secretary to operate the CVP to meet all obligations under state and federal law, including the ESA and decisions of the State Water Board. The CVPIA's directive that the Secretary comply with the ESA does not answer the question of whether Reclamation actually has any discretionary involvement and control over Settlement Contract implementation in the first place. The ESA itself does not independently confer such discretion, nor did this provision of the CVPIA grant any new authority to Reclamation. *See* 50 C.F.R. § 402.03; *Home Builders*, 551 U.S. at 667-68.

---

[23] Long-term repayment and water service contracts are distinct from the Settlement Contracts, so section 3404(c)(2) would not apply to the Settlement Contracts even if it did constitute an independent source of discretion.

Appellants have thus failed to identify any relevant authority that grants Reclamation discretionary authority to unilaterally modify the terms of the Settlement Contracts to benefit listed species. The district court's dismissal of the Fifth Claim should be affirmed.

## CONCLUSION

The Court should affirm the district court's entry of judgment in favor of the Settlement Contractors and the Federal Defendants as to Appellants' Second, Fourth, and Fifth Claims.

DATED: October 21, 2022

<div style="margin-left: 40%;">

s/ Andrew M. Hitchings
ANDREW M. HITCHINGS (SBN 154554)
BRITTANY K. JOHNSON (SBN 282001)
JARED S. MUELLER (SBN 257659)
SOMACH SIMMONS & DUNN, PC
A Professional Corporation
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
ahitchings@somachlaw.com
bjohnson@somachlaw.com
jmueller@somachlaw.com

*Attorneys for Defendants-Intervenors-Appellees Glenn-Colusa Irrigation District, Princeton-Codora-Glenn Irrigation District, Provident Irrigation District, Anderson Cottonwood Irrigation District, City of Redding, M & T Chico Ranch (Pacific Realty Associates), Reclamation District No. 1004, Conaway Preservation Group, LLC, David and Alice teVelde Family Trust, Knights Landing Investors, LLC, and Pelger Road 1700, LLC*

</div>

*s/ Meredith E. Nikkel*
KEVIN M. O'BRIEN (SBN 122713)
MEREDITH E. NIKKEL (SBN 254818)
SAMUEL BIVINS (SBN 300965)
DOWNEY BRAND LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: (916) 444-1000
kobrien@downeybrand.com
mnikkel@downeybrand.com
sbivins@downeybrand.com

*Attorneys for Defendants-Intervenors-Appellees
Reclamation District No. 108, Sutter Mutual Water
Company, Natomas Central Mutual Water Company,
River Garden Farms Company, Pleasant Grove-
Verona Mutual Water Company, Pelger Mutual
Water Company, Meridian Farms Water Company,
Henry D. Richter, et al., Howald Farms, Inc., Oji
Brothers Farm, Inc., Oji Family Partnership, Carter
Mutual Water Company, Windswept Land and
Livestock Company, Maxwell Irrigation District,
Tisdale Irrigation and Drainage Company, and
Beverly F. Andreotti, Arnold A. Andreotti, Michael D.
Andreotti and Mark C. Andreotti*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Cir. R. 32-1 and 32-2, I certify that:

This brief contains 15,077 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the longer length limit permitted by Cir. R. 32-2(b) because Sacramento River Settlement Contractors are filing a single joint brief in response to multiple briefs.

This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Date:  October 21, 2022

<div align="right">

*s/ Andrew M. Hitchings*
ANDREW M. HITCHINGS (SBN 154554)
SOMACH SIMMONS & DUNN, PC
A Professional Corporation
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
Facsimile: (916) 446-8199
ahitchings@somachlaw.com

*Attorneys for Defendants-Intervenors-Appellees*
*Glenn-Colusa Irrigation District, et al.*

</div>

# ADDENDUM INDEX

Except for the following, all applicable statutes, etc., are contained in the opening brief or addendums previously filed; cited material previously provided is noted in the cross-reference section below.

Page

**TAB A: FEDERAL STATUTES**

5 U.S.C. § 706 ......................................................................... A-1

16 U.S.C. § 1531 *et seq.* (Endangered Species Act)

§ 1536(a)-(d)* .............................................................. A-1

§ 1540(g)(2)(A) ........................................................... A-4

**TAB B: STATE STATUTES**

Cal. Water Code, § 275 ........................................................ B-1

**TAB C: FEDERAL REGULATIONS**

40 C.F.R.

§ 1501.2(c) .................................................................... C-1

§ 1502.14 ...................................................................... C-1

50 C.F.R.

§ 402.03 ......................................................................... C-2

§ 402.12 ......................................................................... C-2

§ 402.14* ....................................................................... C-5

§ 402.15 ......................................................................... C-12

\* Some, but not all, subsections referenced by Settlement Contractors were also provided by Plaintiffs-Appellants in their Opening Brief Statutory Addendum. *See* ECF 31 Statutory Addendum and cross-references herein.

**CROSS-REFERENCE TO AUTHORITY CITED IN OPENING BRIEF**

For the Court's use, below are cross-references to statutes and other
authority provided by Appellants in their opening brief (ECF 31);
for authority provided in Excerpts of Record, cross-references are
included within the brief itself.

**FEDERAL STATUTORY AUTHORITY**                                    PAGE #

**Endangered Species Act, 16 U.S.C. § 1531 et seq.**

§ 1536(a)(2)................................................................................... Add-2

§ 1536(b)(3) .................................................................................. Add-2

§ 1536(b)(4) .................................................................................. Add-4

§ 1536(d) ....................................................................................... Add-4

**Central Valley Project Improvement Act, Pub. L. No. 102-575 (1992)**

§ 3404(c)(2)................................................................................... Add-4

**Reclamation and Irrigation of Lands by Federal Government, 43 U.S.C. Ch. 12**

43 U.S.C. § 383 ............................................................................ Add-5


**FEDERAL REGULATORY AUTHORITY**                                   PAGE #

**ESA Consultation**

50 C.F.R. § 402.02  ...................................................................... Add-6

50 C.F.R. § 402.13 ....................................................................... Add-8

50 C.F.R. § 402.14(a), (b), (e), (g), (h), (j) ............................... Add-9

50 C.F.R. § 402.16  ...................................................................... Add-11

# Tab A

# Federal Statutes

# 5 U.S.C. § 706

## § 706. SCOPE OF REVIEW

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

---

# 16 U.S.C. § 1536(a)-(d)

## § 1536. INTERAGENCY COOPERATION

(a) Federal agency actions and consultations.

(1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act [16 USCS § 1533].

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

(3) Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

(4) Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 [16 USCS § 1533] or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

(b) Opinion of Secretary.

(1)

(A) Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

(B) In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

(i) if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth—

(I) the reasons why a longer period is required,

(II) the information that is required to complete the consultation, and

(III) the estimated date on which consultation will be completed; or

(ii) if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

(2) Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

(3)

(A) Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

(B) Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

(4) If after consultation under subsection (a)(2), the Secretary concludes that—

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.]

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.] with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

(c) Biological assessment.

(1) To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on the date of enactment of the Endangered Species Act Amendments of

1978 [enacted Nov. 10, 1978], request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) [42 USCS § 4332].

(2) Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

(d) Limitation on commitment of resources. After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

---

# 16 U.S.C. § 1540(g)(2)(A)

## § 1540. PENALTIES AND ENFORCEMENT

(g) Citizen suits.

. . .

(2)

(A) No action may be commenced under subparagraph (1)(A) of this section—

(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

(ii) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

(iii) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

# Tab B

# State Statutes

# Cal. Wat Code § 275

**§ 275. PROCEEDINGS OR ACTIONS BY DEPARTMENT AND BOARD**

The department and board shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state.

# TAB C

# FEDERAL REGULATIONS

# 40 C.F.R. § 1501.2

**§ 1501.2 APPLY NEPA EARLY IN THE PROCESS.**

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

. . .

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

---

# 40 CFR 1502.14

**§ 1502.14 ALTERNATIVES INCLUDING THE PROPOSED ACTION.**

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

# 50 C.F.R § 402.03

### § 402.03 APPLICABILITY.

Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.

# 50 C.F.R. § 402.12

### § 402.12 BIOLOGICAL ASSESSMENTS.

(a) Purpose. A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.

(b) Preparation requirement.

(1) The procedures of this section are required for Federal actions that are "major construction activities"; provided that a contract for construction was not entered into or actual construction was not begun on or before November 10, 1978. Any person, including those who may wish to apply for an exemption from section 7(a)(2) of the Act, may prepare a biological assessment under the supervision of the Federal agency and in cooperation with the Service consistent with the procedures and requirements of this section. An exemption from the requirements of section 7(a)(2) is not permanent unless a biological assessment has been prepared.

(2) The biological assessment shall be completed before any contract for construction is entered into and before construction is begun.

(c) Request for information. The Federal agency or the designated non-Federal representative shall convey to the Director either (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment.

(d) Director's response. Within 30 days of receipt of the notification of, or the request for, a species list, the Director shall either concur with or revise the list or, in those cases where no list has been provided, advise the Federal agency or the designated non-Federal representative in writing whether, based on the best scientific and commercial data available, any listed or proposed species or designated or proposed critical habitat may be present in the action area. In addition to listed and proposed species, the Director will provide a list of candidate species that may be present in the action area. Candidate species refers to any species being considered by the Service for listing as endangered or threatened species but not yet the subject of a proposed rule. Although candidate species have no legal status and are accorded no protection under the Act, their inclusion will alert the Federal agency of potential proposals or listings.

(1) If the Director advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required. If only proposed species or proposed critical habitat may be present in the action area, then the Federal agency must confer with the Service if required under § 402.10, but preparation of a biological assessment is not required unless the proposed listing and/or designation becomes final.

(2) If a listed species or critical habitat may be present in the action area, the Director will provide a species list or concur with the species list provided. The Director also will provide available information (or references thereto) regarding these species and critical habitat, and may recommend discretionary studies or surveys that may provide a better information base for the preparation of an assessment. Any recommendation for studies or surveys is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act.

(e) Verification of current accuracy of species list. If the Federal agency or the designated non-Federal representative does not begin preparation of the biological assessment within 90 days of receipt of (or concurrence with) the species list, the Federal agency or the designated non-Federal representative must verify (formally or informally) with the Service the current accuracy of the species list at the time the preparation of the assessment is begun.

(f) Contents. The contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action. The following may be considered for inclusion:

(1) The results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally.

(2) The views of recognized experts on the species at issue.

(3) A review of the literature and other information.

(4) An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies.

(5) An analysis of alternate actions considered by the Federal agency for the proposed action.

(g) Incorporation by reference. If a proposed action requiring the preparation of a biological assessment is identical, or very similar, to a previous action for which a biological assessment was prepared, the Federal agency may fulfill the biological assessment requirement for the proposed action by incorporating by reference the earlier biological assessment, plus any supporting data from other documents that are pertinent to the consultation, into a written certification that:

(1) The proposed action involves similar impacts to the same species in the same geographic area;

(2) No new species have been listed or proposed or no new critical habitat designated or proposed for the action area; and

(3) The biological assessment has been supplemented with any relevant changes in information.

(h) Permit requirements. If conducting a biological assessment will involve the taking of a listed species, a permit under section 10 of the Act (16 U.S.C. 1539) and part 17 of this title (with respect to species under the jurisdiction of the FWS) or parts 220, 222, and 227 of this title (with respect to species under the jurisdiction of the NMFS) is required.

(i) Completion time. The Federal agency or the designated non- Federal representative shall complete the biological assessment within 180 days after its initiation (receipt of or concurrence with the species list) unless a different period of time is agreed to by the Director and the Federal agency. If a permit or license applicant is involved, the 180-day period may not be extended unless the agency provides the applicant, before the close of the 180-day period, with a written statement setting forth the estimated length of the proposed extension and the reasons why such an extension is necessary.

(j) Submission of biological assessment. The Federal agency shall submit the completed biological assessment to the Director for review. The Director will respond in writing within 30 days as to whether or not he concurs with the findings of the biological assessment. At the option of the Federal agency, formal consultation may be initiated under § 402.14(c) concurrently with the submission of the assessment.

(k) Use of the biological assessment.

(1) The Federal agency shall use the biological assessment in determining whether formal consultation or a conference is required under § 402.14 or § 402.10, respectively. If the biological assessment indicates that there are no listed species or critical habitat present that are likely to be adversely affected by the action and the Director concurs as specified in paragraph (j) of this section, then formal consultation is not required. If the biological assessment indicates that the action is not likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat, and the Director concurs, then a conference is not required.

(2) The Director may use the results of the biological assessment in (i) determining whether to request the Federal agency to initiate formal consultation or a conference, (ii) formulating a biological opinion, or (iii) formulating a preliminary biological opinion.

---

## 50 C.F.R. § 402.14

### § 402.14 FORMAL CONSULTATION.

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) Exceptions.

(1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

(2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

(c) Initiation of formal consultation.

(1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

(i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

(A) The purpose of the action;

(B) The duration and timing of the action;

(C) The location of the action;

(D) The specific components of the action and how they will be carried out;

(E) Maps, drawings, blueprints, or similar schematics of the action; and

(F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

(ii) A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (i.e., the action area as defined at § 402.02).

(iii) Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat.

(iv) A description of the effects of the action and an analysis of any cumulative effects.

(v) A summary of any relevant information provided by the applicant, if available.

(vi) Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.

(2) A Federal agency may submit existing documents prepared for the proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).

(3) Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12.

(4) Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The

provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.

(d) Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

(e) Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:
    (1) The reasons why a longer period is required,
    (2) The information that is required to complete the consultation, and
    (3) The estimated date on which the consultation will be completed.
A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

(f) Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

(g) Service responsibilities. Service responsibilities during formal consultation are as follows:
    (1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1) through (3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45-day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45-day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10-day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are

considered like other portions of the action and do not require any additional demonstration of binding plans.

(h) Biological opinions.

(1) The biological opinion shall include:

(i) A summary of the information on which the opinion is based;

(ii) A detailed discussion of the environmental baseline of the listed species and critical habitat;

(iii) A detailed discussion of the effects of the action on listed species or critical habitat; and

(iv) The Service's opinion on whether the action is:

(A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or

(B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

(2) A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

(3) The Service may adopt all or part of:

(i) A Federal agency's initiation package; or

(ii) The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.

(4) A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.

(i) Incidental take.

(1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

(i) Specifies the impact, i.e., the amount or extent, of such incidental taking on the species (A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

(iii) In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

(iv) Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

(v) Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

(2) Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

(3) In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

(4) If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.

(5) Any taking which is subject to a statement as specified in paragraph (i)(1) of this section and which is in compliance with the terms and conditions of that

statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

(6) For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

(j) Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

(k) Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

(1) The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

(2) The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

(3) The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

(4) The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

(5) There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

(l) Expedited consultations. Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.

(1) Expedited timelines. Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this consultation process.

(2) Federal agency responsibilities. To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.

(3) Service responsibilities. In addition to the Service's responsibilities under the provisions of this section, the Service will:

(i) Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and

(ii) Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.

(m) Termination of consultation.

(1) Formal consultation is terminated with the issuance of the biological opinion.

(2) If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

(3) If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

---

## 50 C.F.R. § 402.15

### § 402.15 RESPONSIBILITIES OF FEDERAL AGENCY FOLLOWING ISSUANCE OF A BIOLOGICAL OPINION.

(a) Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.

(b) If a jeopardy biological opinion is issued, the Federal agency shall notify the Service of its final decision on the action.

(c) If the Federal agency determines that it cannot comply with the requirements of section 7(a)(2) after consultation with the Service, it may apply for an exemption. Procedures for exemption applications by Federal agencies and others are found in 50 CFR part 451.