No. 21-15163

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Plaintiffs-Appellants*,

v.

DEB HAALAND, in her official capacity as Secretary of the Interior, et al.,
*Defendants-Appellees*,

GLENN-COLUSA IRRIGATION DISTRICT, et al.,
*Intervenor-Defendants-Appellees.*

Appeal from the United States District Court for the Eastern District of California
No. 1:05-cv-01207 (Hon. Dale A. Drozd)

**FEDERAL APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*

ROBERT LUNDMAN
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
999 18th St - Suite 370
Denver, Colorado 80202
(202) 598-3327
katelin.shugart-schmidt@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iv

GLOSSARY ................................................................................ vii

INTRODUCTION ..........................................................................1

STATEMENT OF JURISDICTION.....................................................3

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE............................................................4

    A.    Statutory and regulatory background .....................................4

    B.    Factual background ...........................................................6

        1.    The Central Valley Project and the State Water Project ...................................................................6

        2.    The SRS and DMC Contracts ......................................8

        3.    The contract renewals and consultation process......................10

    C.    Litigation history and additional agency actions ................................13

        1.    The initial lawsuit....................................................13

        2.    The 2008 and 2009 BiOps ........................................14

        3.    The en banc *Jewell* decision .....................................15

        4.    2015 reinitiated consultation......................................17

SUMMARY OF ARGUMENT ..........................................................20

STANDARD OF REVIEW ..............................................................22

ARGUMENT ..............................................................................23

I.     In its 2015 consultation, FWS reasonably analyzed the effects
       of renewing the terms of the contracts, as proposed, on Delta
       smelt.............................................................................................23

       A.     The 2008 OCAP BiOp fully and properly considered the
              effects of implementing the terms of the contracts on
              Delta smelt, and thus FWS did not act arbitrarily to rely
              on it in 2015...........................................................................24

       B.     Reclamation provided, and FWS considered, the best
              available scientific information on the status of the Delta
              smelt. ....................................................................................29

       C.     FWS did not ignore degraded baseline conditions or rely
              on incorrect assumptions....................................................32

       D.     FWS did not fail to consider the full scope of the
              contracts.................................................................................35

       E.     FWS did not impermissibly defer analysis of effects. ........38

       F.     FWS's concurrence was supported by the evidence
              before it..................................................................................40

II.    Under the ESA, Reclamation did not violate any duty to consult
       or fail to avoid jeopardy for the Delta smelt...................................41

       A.     Reclamation complied with its substantive duties under
              the ESA...................................................................................41

       B.     Reclamation did not misrepresent its discretion in the
              contract renewal process. ...................................................43

III.   NRDC's claim that Reclamation was obligated to reinitiate
       consultation with regard to effects on Chinook salmon was
       appropriately rejected by the District Court. ..................................47

       A.     NRDC's claim is time barred. ...........................................47

       B.     Under *EPIC*, NRDC fails to state a viable claim for
              reinitiation. ...........................................................................49

C.     The terms of the SRS Contracts demonstrate
       Reclamation's lack of discretion to modify the Contracts
       to benefit salmon. ...............................................................50

       1.     Discretion under Article 7(b) would occur only in
              the context of a new biological opinion. ....................50

       2.     Article 3(i) does not provide the requisite
              discretion to act for the benefit of listed species. ......52

       3.     Reclamation lacks the asserted discretionary
              control over sales of contract water by the SRS
              Contractors. ..............................................................53

       4.     Reclamation has only limited discretion under the
              SRS Contracts to reduce water releases, and only
              as required by state or federal law. ...........................55

D.     Federal and state law do not permit Reclamation to
       unilaterally violate the contract terms. .................................56

CONCLUSION ....................................................................................58

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*ALCOA v. BPA*,
    175 F.3d 1156 (9th Cir. 1999) ........................................................5

*AquAlliance v. U.S. Bureau of Reclamation*,
    287 F. Supp. 3d 969 (E.D. Cal. 2018) ..........................................57

*Association of Pacific Fisheries v. EPA*,
    615 F.2d 794 (9th Cir. 1980) ......................................................40

*Cherosky v. Henderson*,
    330 F.3d 1243 (9th Cir. 2003) ....................................................47

*Citizens for East Shore Parks v. State Lands Commission*,
    202 Cal. App. 4th 549 (2011) ......................................................57

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ....................................................................22

*Connor v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ....................................................35

*Consolidated Salmonid Cases*,
    713 F. Supp. 2d 1116 (E.D. Cal. 2010) ......................................40

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
    807 F.3d 1031 (9th Cir. 2015) ....................................................46

*Environmental Protection Information Center v. Simpson Timber Co.*,
    255 F.3d 1073 (9th Cir. 2001) ..................................47, 48, 49, 54

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ....................................................................22

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*,
    378 F.3d 1059 (9th Cir. 2004) ..............................................11, 12

*Hall v. Regional Transportation Commission of Southern Nevada*,
    362 Fed. Appx. 694 (9th Cir. 2010) ...........................................................48

*Imperial Irrigation District v. SWRCB*,
    186 Cal. App. 3d 1160 (Cal. Ct. App. 1986)...............................................55

*Karuk Tribe of California v. U.S. Forest Service*,
    681 F.3d 1006 (9th Cir. 2012) .....................................................................23

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...............................................................22, 23

*Nat. Res. Def. Council v. Jewell*,
    749 F.3d 776 (9th Cir. 2014) ................................................................passim

*National Audubon Society v. Superior Court*,
    33 Cal. 3d 419 (1983) ..................................................................................57

*Natural Resources Defense Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007) ...................................................14, 15

*Pacific Coast Federation of Fishermen's Associations v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008) ...........................................13, 54, 55

*Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy*,
    898 F.2d 1410 (9th Cir. 1990) .....................................................................23

*Natural Resources Defense Council v. Rodgers*,
    381 F. Supp. 2d 1212, 1239 (E.D. Cal. 2005) .............................................35

*San Luis & Delta Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................passim

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................................passim

*San Luis Unit Food Producers v. United States*,
    772 F. Supp. 2d 1210 (E.D. Cal. 2011) .......................................................48

*Southwest Center for Biological Diversity v. U.S. Bureau of*
    *Reclamation*, 143 F.3d 515 (9th Cir. 1998)............................................38, 44

*Thompson v. U.S. Department of Labor,*
    885 F.2d 551 (9th Cir. 1989) ...................................................................30, 31

*Turtle Island Restoration Network v. United States Department of*
    *Commerce,* 878 F.3d 725 (9th Cir. 2017)................................................37, 39

*United States v. Estate of Hage,*
    810 F.3d 712 (9th Cir. 2016) .......................................................................47

*Vermont. Yankee Nuclear Power Corp. v. Natural Resources Defense*
    *Council,* 435 U.S. 519 (1978).....................................................................23

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ...................................................................35, 38

**Statutes**

5 U.S.C. § 706(2)(A).............................................................................................22

16 U.S.C. § 1536(a)(2).......................................................................4, 23, 46, 56

16 U.S.C. § 1536(b)(4).........................................................................................5

43 U.S.C. § 383....................................................................................................44

California Water Code §§ 174 .............................................................................55

California Water Code §§ 85000 .........................................................................31

**Regulations**

50 C.F.R. § 402.14 ......................................................................................4, 29, 30

50 C.F.R. § 402.15 .............................................................................................5, 23

50 C.F.R. § 402.16 ...................................................................................6, 36, 47, 49

50 C.F.R. §§ 17.11 ..................................................................................................4

# GLOSSARY

BA                  Biological Assessment

BiOp                Biological Opinion

CVP                 Central Valley Project

Delta               Sacramento-San Joaquin Delta

DMC                 Delta-Mendota Canal

FWS                 U.S. Fish and Wildlife Service

NMFS                National Marine Fisheries Service

OCAP                Operations Criteria and Plan

Reclamation         U.S. Bureau of Reclamation

RPA                 Reasonable and Prudent Alternatives

SRS                 Sacramento River Settlement

SWP                 State Water Project

SWRCB               State Water Resources Control Board

# INTRODUCTION

The United States Bureau of Reclamation ("Reclamation") operates the Central Valley Project ("CVP"), the nation's largest federal water management project. Before the CVP, hundreds of water users along the Sacramento River diverted water for irrigation and other beneficial uses, securing water rights. For over half a century, Reclamation has operated the CVP, pursuant to a series of cooperation agreements with various water rights holders, irrigation districts, individuals, and others. Reclamation entered into these cooperation agreements, or settlement contracts, after a series of congressional hearings and cooperative studies to avoid a decades-long water rights adjudication process for the Sacramento River Basin and to recognize pre-existing water rights.

The contracts specify the quantities and timing of water diversions, which provides Reclamation with some certainty in its operation of the CVP. Without the contracts, Reclamation's ability to operate the CVP would be severely compromised. On top of these contractual requirements, the CVP is subject to ever-evolving statutory, regulatory, and judicially imposed requirements.

More than a decade ago, NRDC filed the first of six complaints in this long-running litigation to address the effects of the joint operations of the CVP and the State Water Project ("SWP") on the Delta smelt, a federally listed threatened fish endemic to the water system, and its critical habitat. In 2005, upon their expiration

(or near expiration), Reclamation renewed the settlement contracts. Before Reclamation executed these contracts, the agency took the steps necessary to comply with the Endangered Species Act (ESA), which requires Reclamation to consult with the Fish and Wildlife Service (FWS) about Delta smelt and National Marine Fisheries Service (NMFS) about Chinook salmon with respect to actions over which Reclamation has some discretion to act to benefit the protected species. Reclamation consulted with both FWS and NMFS.

After litigation, this Court ruled en banc that the lower court had erred in finding that Article 9(a) of the contracts alone withdrew *all* discretion from Reclamation. It left open the question of whether and to what degree other contractual provisions, or applicable federal or state law, withdraw Reclamation's discretion. Reclamation reinitiated ESA consultation with the FWS on the effects of executing the renewed contracts on Delta smelt. After NRDC challenged that consultation, the district court correctly held that both agencies fulfilled their statutory duties.

The district court also correctly ruled that Reclamation lacks discretion to change the terms of the contracts to benefit Chinook salmon. While Reclamation retains some discretion in the *implementation* of the contracts, it lacks discretion to mandate the new contract terms desired by NRDC. Reclamation had no duty to reinitiate ESA consultation with NMFS; dismissal of this claim should be upheld.

## STATEMENT OF JURISDICTION

(a)     The district court had subject matter jurisdiction under 16 U.S.C. §1540(c), and 28 U.S.C. § 1331. 1-ER-0003.

(b)     The district court's judgment was final because it disposed of the disputed claims at issue here under Federal Rule of Civil Procedure 54(b). 1-ER-0003. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     The judgment was entered on December 29, 2020. 1-ER-0003. Plaintiffs filed their notice of appeal on January 26, 2021, or 28 days later. 26-ER-6050. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).


## STATEMENT OF THE ISSUES

1.     Whether FWS's 2015 ESA consultation appropriately addressed the effects of renewing the Sacramento River Settlement (SRS) and Delta-Mendota Canal (DMC) Contracts on Delta smelt.

2.     Whether Reclamation engaged in a valid consultation on the effects of renewing the SRS and DMC Contracts on Delta smelt.

3.     Whether Reclamation was required to reinitiate consultation with respect to spring-run and winter-run Chinook salmon.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (en banc) ("*NRDC v. Jewell*") (citing 16 U.S.C. § 1533). FWS and NMFS administer the ESA on behalf of the Departments of the Interior and Commerce, respectively. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). Generally, FWS has jurisdiction over terrestrial and resident aquatic species (like the Delta smelt), while NMFS has jurisdiction over marine and anadromous species (like spring-run and winter-run Chinook salmon).

ESA Section 7 requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2). An agency proposing to take an action (the "action agency") generally prepares a "biological assessment" (BA) to determine whether any listed species present "is likely to be affected" by the action. *Id*. § 1536(c)(1). If the action agency determines in a BA that a threatened or endangered species is likely to be adversely affected, the agency must formally consult with FWS or NMFS. *See id*. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a

4

"biological opinion" (BiOp) by the consulting agency (FWS or NMFS). *See* 16 U.S.C. § 1536(b). If the BiOp concludes that the proposed action is likely to jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), the action may not go forward unless the consulting agency can suggest a "reasonable and prudent alternative[]" (RPA) that avoids jeopardizing the species or adversely modifying critical habitat. *Id*. § 1536(b)(3)(A). If the BiOp concludes that the action or RPA to the agency action avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate Section 7(a)(2), the consulting agency issues an "Incidental Take Statement." That statement exempts the action agency from liability for any taking of a species under Section 9 if the terms and conditions are met. 16 U.S.C. § 1536(b)(4); *see also id.* § 1538(a) (Section 9); *ALCOA v. BPA*, 175 F.3d 1156, 1159 (9th Cir. 1999). After consultation, the action agency must determine whether and how to proceed in view of the consulting agency's expert opinion. 50 C.F.R. § 402.15.

An action agency also must reinitiate consultation under certain circumstances, including where (1) "the amount or extent of taking specified in the incidental take statement is exceeded"; (2) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; or (3) "[i]f the identified action is subsequently

modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16.

## B.    Factual background

### 1.    The Central Valley Project and the State Water Project

The CVP and SWP, "operated respectively by [Reclamation] and the State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id*. The CVP extends from the Cascade Range in Northern California to the Kern River in Southern California. It provides billions of kilowatt-hours of electricity, provides drinking water for about 25 million people, supports over $10 billion in agriculture in more than two hundred water districts, and provides water to 19 federal, state, and local wildlife refuges.

California's SWP is an inter-related set of water projects that shares some facilities with the CVP, and the two systems are operated together. The projects reduce the risks of catastrophic flooding, provide irrigation for agriculture, protect and restore habitat for many rare and unique species, supplement local water supplies for communities, produce hydroelectric power, backstop water quality in

the Sacramento and San Joaquin Delta, and support important commercial and recreational fisheries.

Operationally, the CVP comprises around 20 dams and reservoirs, 11 hydroelectric power plants, and 500 miles of major canals and aqueducts, as well as conduits, tunnels, and other storage and distribution facilities. 1-FedSER-0010. Operation of the CVP and SWP occurs through the storage, pumping, and conveyance of significant volumes of water from the Sacramento and San Joaquin river basins for delivery to users. Federal and state pumping facilities in the Delta near Tracy, California, export water from Northern California to Central and Southern California and are a hub for CVP operations. CVP storage is spread throughout Northern and Central California, with the largest storage facility being the Shasta Dam and Reservoir. The CVP also includes numerous water conveyance facilities, the longest of which is the Delta-Mendota Canal (which runs for 117 miles).

To operate the CVP, Reclamation stores and releases water from northern California reservoirs. As relevant here, the water then flows downstream, diverted by water users along the way—including the SRS Contractors—before it reaches the Sacramento-San Joaquin Delta ("Delta"). Reclamation then operates pumping plants in the southern region of the Delta to divert the water to users in the Delta

region and south of the Delta, such as the DMC contractors. *San Luis v. Jewell*, 747 F.3d at 594-95.

## 2. The SRS and DMC Contracts

In the 1960s, whether there was any unappropriated water available for the CVP was highly uncertain, with many "pre-1914"[1] water right holders, and other pre-Project permitted water users, diverting water throughout the state. After a decision ("D-990") by the California State Water Resources Control Board (SWRCB) granted Reclamation some state water right permits, and to avoid a lengthy and exceedingly complex water rights adjudication process, Congress specifically authorized Reclamation to enter into a number of long-term contracts pertaining to the CVP. *NRDC v. Jewell*, 749 F.3d at 780.

The first set of contracts, known as the Sacramento River Settlement or "SRS Contracts," were forty-year agreements between Reclamation and holders of certain senior water rights. The contracts provide putatively senior water right holders some certainty as to their water supply, while giving Reclamation some rights to the encumbered water. Settlement contracts on the Sacramento River provide for the delivery of two types of water. The first type, Base Supply, is water that is made available for diversion by the contractors at no charge from April

---

[1] In California, a "pre-1914" water right holder acquired water rights before 1914, is exempted from many of California's statutory water right procedures, and does not need a permit to use water.

through October, and represents an agreed upon amount as part of a settlement pursuant to a 1956 study on the nature and extent of state-granted water rights in the Sacramento River basin. The second type, Project Water, is CVP water made available for diversion by the SRS Contractors only in the summer months (none in April or May), and the SRS Contractors must pay associated costs for this water under the federal Reclamation laws. The second set of contracts at issue, the Delta-Mendota Canal or "DMC Contracts," allows water users with contracts for CVP water but no pre-project state-granted water rights to draw water from the Delta-Mendota Canal. *Id.*

The forty-year SRS Contracts began to expire in the early 2000s, and Reclamation began the process of considering renewals. Reclamation had already engaged in a programmatic Section 7 consultation with FWS on implementation of the Central Valley Project Improvement Act (CVPIA), which had made changes to Reclamation's administrative authority and had directed the agency to renew hundreds of CVP contracts. CVPIA § 3404(c). As a result of that consultation, FWS issued a 2000 "Biological Opinion on Implementation of the CVPIA and Continued Operation and Maintenance of the CVP" ("CVPIA BiOp"). 1-FedSER-0003. The CVPIA BiOp set out a roadmap for ESA consultations related to CVPIA actions and programs, including water service contract renewals, explaining:

> This consultation is intended to address, in a comprehensive manner, the numerous and widely varied actions related to implementation of

9

the CVPIA . . . . [T]his biological opinion addresses the effects upon
listed species resulting from implementation of this suite of actions as
a whole, and provides a strategy, or process, to determine how ESA
compliance will be accomplished for individual activities that
cumulatively make up the program.

1-FedSER-0007-08. The CVPIA BiOp outlined a two-track process through which

the operative Operations Criteria and Plan (OCAP) BiOp would address aquatic

impacts of overall CVP and SWP operations on Delta smelt, with the CVPIA BiOp

then serving as a programmatic document for other contract-related impact

analyses. These later contract-related analyses, possibly to include informal

consultations, would then tier off of the CVPIA BiOp.

### 3. The contract renewals and consultation process

The consultation on execution of contract renewal began in August 2003.

Reclamation prepared detailed biological assessments of the potential effects of the

renewal of 145 SRS Contracts and renewal of 20 DMC Contracts on listed species,

including the Delta smelt. 2-FedSER-0206; 2-FedSER-0271. Reclamation

consulted with FWS on whether *renewing* the contracts would "result in changes to

the physical environment and affect a listed species or its critical habitat," 2-

FedSER-0207, 2-FedSER-0282, including the effect of contract renewal on the

Delta smelt. 2-FedSER-0242-44; 2-FedSER-0258-59; 2-FedSER-0394-95.

In a parallel consultation, consideration of the effects of contract

*implementation* was bundled with all operations of the CVP and SWP (the OCAP).

10

1-FedSER-0058. The agencies evaluated the effect of implementing the contracts

in the context of how renewal of the contracts creates a demand for water and how

system-wide operation of the CVP and SWP addresses those demands. 1-FedSER-

0054, 2-FedSER-0367. This process culminated in a 2005 OCAP BiOp, which

concluded that the OCAP would not jeopardize the Delta smelt.[2] 2-FedSER-0394.

On contract *renewal*, Reclamation consulted specifically on the proposed

40-year renewal contracts in 2004 and 2005 and received three letters of

concurrence from FWS in 2005 for the SRS Contracts.[3] 2-FedSER-0205; 2-

FedSER-0283, 2-FedSER-0363. The letters confirmed that the analysis of the

effects of contract *implementation* was bundled with all operations of the CVP. 1-

FedSER-0052-53; 2-FedSER-0208; 2-FedSER-0252; 2-FedSER-0283; 2-FedSER-

0363.

The letters of concurrence concluded that execution of the SRS Contracts

would not adversely affect Delta smelt or its habitat, but they also relied on the

2005 OCAP BiOp to address any effects caused by operation of the CVP to deliver

---

[2] FWS issued an initial BiOp in 2004, which concluded that the OCAP would not jeopardize the Delta smelt. Reclamation reinitiated consultation on the OCAP after this Court's decision in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1069 (9th Cir. 2004). FWS issued a revised BiOp in 2005, which also found that the OCAP would not jeopardize the Delta smelt.

[3] Reclamation also consulted on the renewal and execution of the DMC Contracts and received a letter of concurrence from the FWS. 2-FedSER-0252; 2-FedSER-0271.

SRS Contract water. *Id*. The 2005 letters of concurrence for SRS Contract renewal

explained the parallel consultation process.

> The OCAP consultation analyzed the effects of numerous new actions
> on the delta smelt and its designated critical habitat . . . [and] . . .
> addressed the operation of the CVP/SWP in the Sacramento Valley,
> and included all commitments of the SWP and CVP . . . . *Therefore,*
> *the OCAP [BiOp] addressed all the aquatic effects of operating the*
> *CVP/SWP.*

> In contrast, the Service's consultations on the long-term water-service
> contract renewals and *Settlement contract renewals* are addressing the
> diversion of Sacramento River water at prescribed diversion points
> and times for the use of that water on a specified land area (the
> contractors' service area). . . . [T]the contracts create a demand
> (among other demands) for CVP water and the OCAP consultation
> addresses how the CVP and SWP projects are operated to meet those
> demands. There clearly is a linkage between contract renewals and the
> operation of the CVP and SWP. These linkages must, and are being,
> addressed in separate but parallel consultations such that all possible
> effects on listed species are being identified and consulted on.

3-ER-0498 (emphasis added). FWS also concurred that all possible effects on the

Delta smelt and its critical habitat from delivering water under the SRS and DMC

Contracts were consulted on through the 2005 OCAP BiOp. 1-FedSER-0058; 2-

FedSER-0259.

Reclamation separately asked NMFS to prepare a BiOp assessing the impact

of continued and future CVP and SWP operations on winter-run Chinook, spring-

run Chinook, Central Valley steelhead, green sturgeon, and Southern Resident

orca. *San Luis & Delta Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir.

2014). NMFS issued a BiOp in 2004 concluding that the long-term operations of

the CVP and SWP would not result in jeopardy to those species. *Id*. About that same time, Reclamation consulted with NMFS on renewal of the SRS Contracts. NMFS issued its own letter of concurrence for SRS Contract renewal, finding that renewal would not jeopardize the winter-run and spring-run Chinook and other listed species.

Reclamation renewed 141 SRS Contracts and 18 DMC Contracts based on FWS's (and NMFS's) concurrence letters. *NRDC v. Jewell*, 749 F.3d at 781.

### C.    Litigation history and additional agency actions

#### 1.    The initial lawsuit

In 2005, NRDC initiated this lawsuit, challenging the 2005 OCAP BiOp. That same year, the 2004 NMFS OCAP BiOp was challenged. Both BiOps were invalidated. The district court in the NMFS challenge concluded that Reclamation had a non-discretionary legal obligation to make releases from Shasta Reservoir for diversion by the SRS Contractors. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1201 (E.D. Cal. 2008). It also concluded that the BiOp failed to analyze the impact of climate change and resulting damage to salmon and steelhead critical habitat. *Id.*

And the district court in the FWS challenge found that the BiOp's take limits were based on inadequate historical data that did not reasonably estimate the Delta smelt's population, that FWS did not consider available data on climate change and

its possible impacts on the smelt's critical habitat, and that FWS did not establish that mitigation efforts were reasonably certain to occur. *NRDC v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007).

## 2. The 2008 and 2009 BiOps

Following the district court decisions setting aside the 2004 NMFS BiOp and 2005 FWS BiOp, Reclamation again consulted with both FWS and NMFS on CVP operations. At that time, Reclamation and FWS adopted the same process for consulting on the effects of delivering the full contract amounts of water under the SRS and DMC Contracts as they did in 2005. 1-FedSER-0058. Again the agencies addressed contract implementation through an ecosystem-wide approach and considered the effects of contract implementation through consultation on the long-term, coordinated operations of the CVP and SWP. *Id*.

In December 2008, FWS issued a revised BiOp (the "2008 OCAP BiOp"), which, contrary to the findings of the prior OCAP BiOps, concluded that the OCAP *would* jeopardize the Delta smelt and adversely modify its critical habitat, and issued an RPA. 5-ER-0848, 5-ER-1018; *NRDC v. Jewell*, 749 F.3d at 781.

In 2009, NMFS issued a BiOp ("2009 OCAP BiOp") that concluded that the proposed long-term operations of the CVP and SWP were likely to jeopardize the continued existence of winter-run Chinook, spring-run Chinook, the CV steelhead, the green sturgeon, and the Southern Resident orca. *Locke*, 776 F.3d at 988-89.

NMFS accordingly issued an RPA prescribing over 70 actions to avoid jeopardizing species or adversely modifying critical habitat. *Id*. Reclamation implemented that RPA, which allowed for the delivery of water exactly as negotiated in the executed SRS Contracts. Thus, as a matter of law, Reclamation's overall operation of the CVP avoided jeopardy to species.

NRDC vigorously *defended* FWS's analysis in the 2008 OCAP BiOp, and this Court upheld the BiOp as lawful in its entirety, rejecting the ESA challenges to it. *See San Luis v. Jewell*, 747 F.3d 581 (9th Cir. 2014). The Plaintiffs here also vigorously defended the 2009 OCAP BiOp issued by NMFS, which this Court also upheld. *See Locke*, 776 F.3d 971.

### 3. The en banc *Jewell* decision

But before issuance of the revised OCAP BiOps, NRDC filed a third amended complaint in 2008 challenging the sufficiency of FWS's ESA consultation on contract *renewal*. 3-FedSER-0532. In rulings in late 2008 and 2009, the district court ruled that NRDC did not have standing to challenge the DMC Contract renewals. *NRDC v. Kempthorne*, No. 1:05-CV-1207 OWWTAG2008 WL 5054115, at *22 (E.D. Cal. Nov. 19, 2008). The District Court also concluded that as a matter of contract law, under Article 9(a) of the SRS Contracts, Reclamation lacked sufficient discretion to require consultation on the renewal of the SRS Contracts.

Plaintiffs appealed that decision to this court. As part of its defense, the United States argued that the claims were moot due to the issuance of the new 2008 OCAP BiOp. In 2014, this Court sitting en banc reversed and remanded that decision in part, holding that NRDC's claims were not mooted by the 2008 OCAP BiOp, and that NRDC had standing to challenge the DMC contracts. *NRDC v. Jewell*, 749 F.3d at 782-84. The Court also held that Reclamation, as a matter of contract, retained "some discretion" to act in a manner potentially benefiting Delta smelt, such that Reclamation was required to engage in consultation prior to renewing the SRS Contracts. *Id.* at 779. The court expressed no opinion on whether any applicable Federal or state law stripped Reclamation of any discretion to act in a manner to benefit Delta smelt at SRS Contract renewal.

To be clear, the Court did not find that Reclamation was required to propose different contract terms or that Reclamation could dictate changes to all of the *terms* of the contracts at renewal. For example, the Court noted that Article 9(a) specifically speaks to renewing the contracts on the same quantities and allocations as the original SRS Contracts, but also that Reclamation perhaps could have looked to "revising the contracts' pricing scheme or changing the timing of water deliveries" under Article 9(a). *Id.* at 783-85. But this Court did not hold in *Jewell* that Reclamation was obligated to propose new contract terms, or that it could not decide to renew the contract on the preexisting terms.

#### 4. 2015 reinitiated consultation

In response to the *Jewell* decision, Reclamation reinitiated consultation with
FWS on the SRS and DMC Contract renewals in 2015. 3-ER-0532; 3-ER-0535; 3-
ER-0577. Reclamation clarified its reason for reinitiating consultation in
November 2015 and responded to NRDC's comments on the contract renewal
consultation in December 2015. 3-ER-0625; 1-FedSER-0033; 1-FedSER-0012; 1-
FedSER-0044. That consultation closed in December 2015 when FWS issued its
letter of concurrence. 1-FedSER-0040.

As an explicit part of its comprehensive consultation package, Reclamation
provided to FWS supplemental, updated information about the status of Delta
smelt, including the effect of operations during drought years on the species. 3-ER-
0532; 3-ER-0535-0576; 3-ER-0577-0620. In both 2014 and 2015, California
experienced a historic drought. And in both years, because of the drought,
Reclamation operated the CVP under orders issued by the SWRCB approving
Temporary Urgency Change Petitions filed by Reclamation and the California
Department of Water Resources.[4] Reclamation provided information on the
Petitions to FWS. 2-FedSER-0492. Throughout 2014 and 2015, the agencies
closely coordinated on the impact the Petitions had on Delta smelt. 3-FedSER-
0495; 3-FedSER-0498; 3-FedSER-0502; 3-FedSER-0505; 3-FedSER-0513; 3-

---

[4] These changes were to SWRCB Decision 1641 ("D-1641").

FedSER-0517; 3-FedSER-0521; 3-FedSER-0524; 3-FedSER-0526; 3-FedSER-0529. With each exchange of information, FWS *concurred* that the effects of those temporary changes to operations on Delta smelt were within the effects analyzed in the 2008 OCAP BiOp. *See e.g.*, 3-FedSER-0505-12.

NRDC challenged the validity of the 2015 consultation, arguing both that FWS's concurrences had been arbitrary and capricious and that Reclamation had failed to validly consult with FWS. And for the first time, NRDC claimed that Reclamation had a duty to reinitiate consultation on the SRS Contracts with regard to winter-run and spring-run Chinook salmon.

The district court held for the federal agencies on all three claims. 1-ER-0072-73. It found that the 2015 letter of concurrence was a valid outcome of the consultation on the effects of the contract renewals on the Delta smelt, and that Reclamation thus acted lawfully by accepting the letter. It further found, on the merits, that Reclamation did not have an obligation to reinitiate consultation with regard to the implementation of the contracts in order to act for the benefit of salmon and dismissed the claim.

NRDC moved for, and the district court granted, a Rule 54(b) judgment to permit appeal on those issues, staying a remaining disputed issue. 1-ER-0003.

In 2016, Reclamation reinitiated consultation on the 2008 FWS OCAP BiOp and the 2009 NMFS OCAP BiOp. Based on new information related to multiple

years of drought, recent data about Delta smelt populations, and new information available and expected as a result of ongoing work through collaborative science processes, Reclamation requested reinitiation of ESA consultation with both FWS and NMFS on the coordinated long-term operation of the CVP and SWP.

Then, in 2019, NMFS and FWS issued new BiOps for CVP and SWP coordinated operations, and Reclamation issued a new Record of Decision for those operations in 2020. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 1:20-cv-00431-DAD-EPG, 2022 U.S. Dist. LEXIS 44155, at *27-29 (E.D. Cal. Mar. 11, 2022). All three documents were challenged in district court. *Id*. at 29. In September 2021, the agencies reinitiated ESA Section 7 consultation on CVP and SWP operations due in part to anticipated revisions to the operations analyzed in the 2019 BiOps and 2020 Record of Decision and in response to Executive Order 13990 (Jan. 25, 2021). *Id*. at 29-30.

Both 2019 biological opinions and the 2020 ROD were voluntarily remanded without vacatur in March 2022. *Id*. at 69-70. The reinitiated consultation, remand, and district court litigation are ongoing.

## SUMMARY OF ARGUMENT

NRDC asserts that it is challenging Reclamation's 2015 reconsultation with FWS on the renewal of the SRS and DMC contracts. At its core, what NRDC really wants is a decision by Reclamation not to renew the contracts, or at least to renew them on different terms. But having determined that contract renewal was appropriate for the continued viability and management of the CVP, which it was entitled to do, Reclamation appropriately consulted about that action in 2015, after this Court's en banc decision in *NRDC v. Jewell*. Reclamation fulfilled its procedural and substantive obligations under Section 7(a)(2) by consulting with FWS, which in turn considered the effects of implementing the contracts in tandem with its analysis of the broader long-term coordinated operations of the CVP and SWP.

**I.**     In its 2015 letter of concurrence, FWS concurred that the 2008 OCAP BiOp did in fact analyze the effects of water delivery under the contracts on Delta smelt. *NRDC v. Jewell* did not decide this factual issue, leaving it to the agencies to determine in the first instance. Moreover, FWS properly considered updated scientific information provided by Reclamation, did not ignore the status of the Delta smelt, and did not fail to consider an appropriate time frame in reaching that conclusion.

**II.** Reclamation complied with its substantive obligations under the ESA to ensure that the agency's actions were not likely to jeopardize the continued existence of Delta smelt or adversely modify its critical habitat. Because there was no error in FWS's analysis, Reclamation's decision to rely on the 2015 consultation was not arbitrary or capricious.

Further, Reclamation was not capable of unilaterally imposing new or revised terms on the contractors at the time of contract renewal, and thus lacked independent "discretion" to change the contract terms to further benefit the species. Accordingly, Reclamation appropriately requested analysis by FWS on the renewed contract, not on theoretical alternatives that it could not implement.

**III.** With regard to salmon, Reclamation was not obligated to reinitiate consultation on the contracts again. None of the specific contract provisions to which NRDC points grant Reclamation the discretion to take unilateral action on behalf of listed species in the manner suggested by NRDC.

Importantly, each of these contracts contains provisions that ensure that it will not compel Reclamation to take actions in violation of its obligations under the ESA. The question is not whether Reclamation could theoretically deliver additional water for listed species—what is at issue is whether Reclamation must, as a matter of law, reinitiate consultation. It is not obligated to do so.

The district court's judgment should be affirmed.

## STANDARD OF REVIEW

"We review de novo the district court's decision on cross motions for summary judgment." *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 965 (9th Cir. 2021). "We review the district court's denial of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo[,] accept all well-pleaded factual allegations contained in the complaint as true, . . . and decide whether the complaint articulates 'enough facts to state a claim to relief that is plausible on its face.'" *Starz Ent., LLC v. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236, 1239 (9th Cir. 2022).

Under the Administrative Procedure Act ("APA"), a court may set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This standard is "highly deferential" and requires a reviewing court to consider only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis v. Jewell*, 747 F.3d at 601 (*quoting Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Although the inquiry must be thorough, the agency's decision is "entitled to a presumption of regularity" and the Court "may not substitute [its] judgment for that of the agency." *Id.*

Courts reviewing agency decisions are generally limited to the administrative record. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see also Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (setting forth narrow exceptions).

## ARGUMENT

I. **In its 2015 consultation, FWS reasonably analyzed the effects of renewing the terms of the contracts, as proposed, on Delta smelt.**

At the outset, there is no dispute that Section 7(a)(2) provides flexibility in how agencies choose to conduct consultations under the ESA. 16 U.S.C. § 1536(a)(2). The agencies have latitude in determining how to fulfill their statutory duties, so long as the effects of the agency action on a species have been considered and addressed. *Id.*; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (noting courts should not disturb agencies' determinations regarding the preferred manner in which to fulfill statutory duties). The ESA requires that Reclamation consult in such a manner as is necessary to "insure" that specific operational activities carried out under the SRS and DMC Contracts would not be likely to jeopardize the continued existence of listed species. But the Act does not mandate that consultation take place in a particular way, especially with respect to a complicated collection of federal, state and private-party actions. Nor do its implementing regulations even require

Reclamation to change course following that consultation. 50 C.F.R. § 402.15(a); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990).

Here, Reclamation appropriately fulfilled its procedural and substantive requirements under Section 7(a)(2) by consulting with FWS, which in turn considered the effects of implementing the contracts in tandem with its analysis of the broader long-term coordinated operations of the CVP and SWP. 1-FedSER-0057-58; 3-ER-0498. The agencies recognized the demand for water created by the contracts and opted to analyze the effects of satisfying that demand in the context of system-wide operations. *See, e.g.*, 1-FedSER-0054; 2-FedSER-0367. This approach is logical given the interdependent and complex nature of the CVP and SWP. The outcome of that thorough process was upheld by the district court and should be upheld by this Court.

A. **The 2008 OCAP BiOp fully and properly considered the effects of implementing the terms of the contracts on Delta smelt, and thus FWS did not act arbitrarily to rely on it in 2015.**

NRDC argues that FWS's 2015 consultation and concurrence is invalid because it relies on the 2008 OCAP BiOp, and the 2008 OCAP BiOp did not itself sufficiently address the effects of contract implementation on Delta smelt. This argument fails for two reasons: (1) NRDC's misreading of *Jewell*, and (2) NRDC's

failure to recognize the 2008 BiOp's full consideration of the potential effects of delivering water under the contracts.

First, NRDC's reliance on *NRDC v. Jewell* is misplaced. Contrary to NRDC's assertions, this Court first held on narrow procedural grounds that NRDC's claims about ESA consultation on the contract renewals were not moot based solely on the issuance of the 2008 OCAP BiOp. *NRDC v. Jewell*, 749 F.3d at 782; *see also* 3-FedSER-0623. "The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available." *NRDC v. Jewell*, 749 F.3d at 782. Because "[a] case is not moot if a federal court can grant the parties *any* effective relief," this Court found that NRDC's case was not moot. *Id*. (citations omitted) (emphasis added).[5]

The Court also reversed the district court's conclusion that Reclamation was "not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts because [Reclamation's] discretion in renegotiating these contracts was 'substantially constrained.'" *Id*. at 784. The Court held that Reclamation had "some discretion" to take action benefitting listed species with respect to renewing the Contracts. *Id*. But in reaching this conclusion, the Court did not resolve

---

[5] The Court also concluded that Plaintiffs had standing to challenge the validity of the DMC Contracts. *Id.* at 782-84.

whether the 2008 OCAP BiOp and the 2015 concurrences satisfied the Section 7(a)(2) consultation obligation—that is the issue the district court here resolved in favor of Reclamation and is now before this Court for the first time.

In its brief, NRDC improperly conflates consultation on the *execution* of the contracts and consultation on the operational effects of delivering the water pursuant to the contract terms, *i.e.*, contract *implementation*. Opening Br. 18. But the agencies opted to address execution and implementation of the contracts in separate but parallel processes, which NRDC has explicitly conceded is permissible under the ESA and has expressly not challenged in this litigation. 3-FedSER-0670 (n.9)[6]. However, cumulatively, no effects of the renewal or implementation of the contracts were overlooked.

The important point here is that the 2008 OCAP BiOp fully considered the effects of implementing the contracts as proposed. The agencies' chosen approach to consultation is consistent with the en banc ruling because, as this Court noted, the 2008 consultation was not a substitute for consulting on the effects of contract *execution* in light of the invalidated 2005 BiOp. *See NRDC v. Jewell*, 749 F.3d at 782 ("[Reclamation] has never reconsulted with the FWS regarding the effects of renewing these contracts"). In finding that NRDC's appeal was not moot, this

---

[6] "Defendants go to great lengths to explain the tiered structure of the programmatic OCAP BiOP and subsequent project-level consultations. *E.g.*, Dkt. 1210-1 at 9-11. But Plaintiffs do not challenge the structure of the consultations."

26

Court neither ruled on how consultation on the renewal of the contracts must proceed. *Id*. Nor did this Court rule on whether the full effects of the contracts (*e.g.*, delivery of all water) were considered in the 2008 OCAP BiOp. *Id*. Thus, this Court is not precluded by *Jewell* from determining that FWS reasonably concluded in the 2015 letter of concurrence that the 2008 OCAP BiOp fully analyzed the effects of implementing the contracts.

Second, and moreover, NRDC cannot credibly claim that the 2008 OCAP BiOp failed to analyze the effects of delivering water under the contracts. *See* Opening Brief at 18-19. FWS fully considered the effects of delivering water under the terms of the renewed contracts in the 2008 OCAP BiOp. *See* 3-FedSER-0622-24 (quoting Dkt. 979 at 17 (it is "undisputed that the 2008 BiOp in fact does consider the impacts of *maximum* water deliveries under existing water service contracts")). The BiOp did, in fact, consider how the terms of the contracts, including pricing, timing, and demand, would affect flows for Delta smelt. It analyzed the full impact of contract implementation on Delta flows by incorporating the renewed contract terms into the assumptions of the water operations model. *See* 2-FedSER-0452-87; 1-FedSER-0076-91. In analyzing the effects of the contract terms on Delta smelt, FWS assumed that Reclamation would deliver the full contract amounts for each year of the forty-year contracts. 2-FedSER-0219; 2-FedSER-0293; 2-FedSER-0257. The BiOp considered the full

extent of the demand for water created by the contracts by incorporating the renewed contract terms, including timing of water deliveries, into the operational assumptions used to model CVP and SWP operations for the 2008 OCAP BiOp. 2-FedSER-0401-491.[7]

NRDC's argument that the contracts were the basis of the 2008 OCAP BiOp's jeopardy finding but that the BiOp had no analysis of water delivery under the contract terms is logically inconsistent. FWS did not attribute its jeopardy finding to the contracts, but determined that the coordinated operations as a whole were likely to jeopardize the continued existence of Delta smelt. 1-FedSER-0096. Indeed, the resulting RPA included provisions to provide for additional delta outflow while allowing for implementation of the contracts exactly as executed. 1-FedSER-0099-105; *see also San Luis v. Jewell*, 747 F.3d 581.

NRDC has consistently argued that both the 2008 OCAP BiOp and its RPA were promulgated lawfully and were based on the best available science. This Court agreed, upholding the 2008 OCAP BiOp in its entirety when water contractors had challenged it. *San Luis v. Jewell*, 747 F.3d 581. Reclamation adopted and was implementing the RPA, which included implementation of the contracts. *Id*. NRDC's attempts to now challenge the sufficiency of the 2015

---

[7] To be sure, NRDC wanted Reclamation to renegotiate the terms of the contracts in order to provide more water for listed species, which could have led to a different consultation. But nothing in *Jewell* mandated that result.

consultation on these grounds ultimately amount to a collateral attack on the 2008

OCAP BiOp, and should be rejected.

### B. Reclamation provided, and FWS considered, the best available scientific information on the status of the Delta smelt.

NRDC asserts that FWS "disregarded" or "ignored" up-to-date scientific

information about the status of the Delta smelt in the 2015 consultation. Opening

Br. 21-22. But these claims are directly contradicted by the record, which shows

that FWS considered information about the species' status, including changes in

abundance, as well as the temporary waivers issued in the 2014 and 2015 drought

years.

First, generally, NRDC implies that FWS's consideration of information was

insufficient because FWS relied on information in Reclamation's "Supplemental

Information" document, and its incorporated scientific updates. Opening Br. 21.

But relying on this information was not an error, as the ESA's regulations

anticipate that an action agency will provide the consulting agency with

background information. 50 C.F.R. § 402.14(c) (specifically noting that the action

agency will provide information regarding, among other things, presence or

abundance of listed species); *see also Env't Def. Ctr. v. Bureau of Ocean Energy

Mgmt.*, 36 F.4th 850, 883 (9th Cir. 2022) ("In the case of formal consultation, the

acting agency must first prepare a biological assessment, and then send a letter to

the expert wildlife agency requesting formal consultation and *providing information about the proposed action*." (emphasis added)). It is also the action agency's responsibility to provide the best scientific and commercial data available. 50 C.F.R. § 402.14(d).

Plainly, the information provided by Reclamation is included in the administrative record, and FWS then reasonably considered it. *See Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (defining the record as all materials directly or indirectly considered by the agency); *San Luis v. Jewell*, 747 F.3d at 604-606 (upholding BiOp where overall conclusion was "adequately supported by the record" and court could "discern the agency's reasoning"); *see* 3-ER-0532; 3-ER-0535-0676; 3-ER-0535-0620; 1-FedSER-0027-29; 1-FedSER-0030-32. And FWS neither limited its analysis in the 2015 consultation solely to the 2008 OCAP BiOp nor ignored the best available science, but rather explicitly referenced the status of the species, including recent survey efforts. 1-FedSER-0055.

Second, the specific information sources NRDC points to were all considered by FWS.

The 2015 "MAST Report" was the product of a team of scientists (the so-called Management, Analysis, and Synthesis Team) operating under the Interagency Ecological Program for the San Francisco Estuary." 6-ER-1153; 6-ER-

1172; Opening Br. 22. The MAST Report analyzed new quantitative modeling of the impacts of outflow on Delta smelt and found that juvenile Delta smelt abundance is strongly related to increased spring outflow. 6-ER-1307. FWS concluded in January 2015 in connection with one of the Temporary Urgency Change Petition reconsultations that the "MAST report may provide valid new information that spring outflow has a positive impact on the relative abundance of Delta Smelt surviving to the early juvenile phase of their life cycle." 4-ER-0631 (Jan 30, 2015 letter from FWS to Reclamation). The record shows that Reclamation submitted the data to FWS, it was cited in the 2015 Status of the Species document and explicitly discussed in it, *see, e.g.*, 3-ER-0586-0588.

The 2010 SWRCB information to which NRDC refers, Opening Br. 23, was produced as part of a public process organized by the SWRCB aimed at developing new flow criteria for the Delta ecosystem to protect public trust resources, as required by California's Delta Reform Act of 2009, California Water Code §§ 85000 *et seq. See* 1-FedSER-0203. As part of that process, FWS provided comments indicating that "[i]ncreased Delta inflows are needed to improve the quality and availability of habitat within the Delta." 1-FedSER-0153. And, in district court proceedings, NRDC argued that the SWRCB report and Department of the Interior testimony *were* before FWS and should be included as part of the administrative records. 3-FedSER-0594-96. NRDC argued that these documents

were before the agency and were documents "directly or *indirectly* considered by agency decision-makers." 3-FedSER-0589, citing *Thompson*, 885 F.2d at 555 (emphasis in original). The district court agreed with NRDC and ordered the agencies to supplement the administrative records. 23-ER-5352-53; 23-ER-5355. NRDC cannot now credibly advance the argument that the agencies had not considered these documents after expressly arguing that they had.

As to survey data, Opening Br. 23-24, as part of its consultation package, Reclamation provided "Supplemental Information" to FWS, which included an Appendix updating FWS on the "Status of the Species," including the information about recent population surveys. 3-ER-0585 (discussing survey data through 2015, including the fact that the 2015 "population index was at an all-time historic low at 0.0"). FWS indicated that it considered this information as part of its review. 1-FedSER-0055 (2015 letter of concurrence indicating FWS considered Reclamation's Supplemental Information document, which in turn referenced the Status of the Species update as an Appendix to it (*see* 3-ER-0552)).

For these reasons, the Court should reject NRDC's arguments that FWS ignored the best available data.

### C. FWS did not ignore degraded baseline conditions or rely on incorrect assumptions.

NRDC then suggests that the 2015 concurrence letter is invalid because the letter relied on the baseline assumptions underpinning the 2008 OCAP BiOp that

were no longer accurate. NRDC argues that conditions changed because of actions taken in the 2014 and 2015 drought years -*e.g.*, those related to the state-imposed flow requirements of D-1641 designed in part to maintain suitable conditions in the delta. Opening Br. 25. Not so. While NRDC is correct that the analysis of impacts to Delta smelt in the 2008 OCAP BiOp assumed the operation of state-imposed flow requirements,[8] the deviations were within the range analyzed by the BiOp. 4-ER-0762.

Specifically, NRDC claims "FWS knew that the 2008 FWS BiOp's requirements were not being met." Opening Br. 25. In support of this assertion, NRDC quotes part of a sentence from a letter from FWS.[9] Opening Br. 26. As the district court noted, however, the full sentence reads:

> Although the proposed modifications to D-1641 were not anticipated in the project description for the 2008 [OCAP] BiOp, the resulting effects to Delta Smelt based on the Biological Review provided by Reclamation, *appear to be within the range of effects previously analyzed in the 2008 [OCAP] BiOp.*

4-ER-0762.

---

[8] 5-ER-0863; 5-ER-0870; 5-ER-0878 (explaining that various CalSim-II modeling runs assumed Delta outflow would be controlled in part by D-1641), 5-ER-0882-0885 (explaining how D-1641 operates to constrain the CVP and SWP).

[9] The partial quote reads: "FWS knew that the 2008 FWS BiOp's requirements were not being met—it explicitly recognized in a March 2015 letter that Reclamation's 'proposed modifications to D-1641 [in 2014 and 2015] were not anticipated in the project description for the 2008 BiOp.'" Opening Br. 26.

As the rest of the letter makes clear, FWS concurred with Reclamation that the drought modifications under consideration in that reconsultation would result in no additional adverse effects on Delta smelt or its critical habitat beyond those previously analyzed in the 2008 OCAP BiOp. 4-ER-0737.

Nor was FWS unreasonable in assuming that the temporary waivers (due to drought years in 2014 and 2015) in D-1641 did not change the 2008 baseline. FWS's consultation on the temporary changes concluded that the waivers were "consistent with the range of effects previously analyzed in the 2008 OCAP BiOp." 1-FedSER-0031; 4-ER-0737.

But even if the baseline did shift, the relevant legal question is not whether there was a change in baseline, but whether the action is likely to jeopardize the Delta smelt or adversely modify its critical habitat. The 2008 OCAP BiOp concluded that with the implementation of the RPA, operation of the CVP and SWP was not likely to result in jeopardy or adverse modification. And the drought-related reconsultations reinforced that conclusion—they relatedly concluded that drought-related deviations from D-1641 would result in no additional impacts to Delta smelt, and thus those deviations did not represent a material degradation to the baseline conditions.

## D. FWS did not fail to consider the full scope of the contracts.

NRDC claims that the 2015 concurrence is invalid because "by relying exclusively on the 2008 FWS BiOp that considered the effects of CVP/SWP operations through 2030, the agency entirely failed to consider the effects of renewing the SRS Contracts through 2045." Opening Br. 26. But this Court has made clear the length of time that must be considered for purposes of an ESA consultation must simply be sufficient to allow for a "meaningful determination" as to whether the proposed action would "reduce *appreciably* the likelihood of both the survival and recovery" of the species. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523-24 (9th Cir. 2010) (emphasis added). The scope of the agency action therefore is not necessarily defined by the duration of the action itself, but by the *effect* of the agency action on the listed species. Indeed, this Court faulted FWS for doing just that—consulting on the duration of the action. *Id.*; *see also Connor v. Burford*, 848 F.2d 1441, 1457-58 (9th Cir. 1988); *NRDC v. Rodgers*, 381 F. Supp. 2d 1212, 1239 (E.D. Cal. 2005) (holding FWS was required to consult on the full theoretical delivery of water, even when full delivery was thought to be unrealistic).

There is no requirement from this Court or elsewhere that those time horizons be identical. Rather, the district court accurately distilled the caselaw in this area by articulating the question presented as: "whether the mismatch between

the temporal scope of the SRS Contract renewal (40 years) and the relevant analysis of impacts to smelt (25 years) is material to the ultimate question presented in any consultation: whether a project will cause jeopardy or adverse modification to a species." 1-ER-0052-53.

Here, the agencies meaningfully evaluated the scope of the agency action by considering maximum water deliveries under the contracts, and predicting the effects of those deliveries as far out as was reasonable. 2-FedSER-0404. There were simply no effects of the action that FWS did not evaluate. NRDC's argument that this case is distinguishable from other cases in which the agency action extended beyond the temporal scale of the BiOp's analysis fails to recognize that the coordinated long-term operations of the CVP and SWP are in fact *ongoing* operations that could be revisited before the contracts expire.[10] Nor is there a risk that the SRS Contracts' impact from 2030 to 2045 would never be analyzed because the effect of the *maximum* water deliveries have already been considered. Should delivery of water under the contracts result in effects that were not accounted for in the OCAP BiOp in effect at the time, the agencies do not dispute that they would have to reinitiate consultation. 50 C.F.R. § 402.16.

---

[10] Not only is this theoretically true, but on a practical point revisitation has already occurred in the 2019 BiOps, and the 2021 Long-term Operations consultation.

Further, the selection of 2030 was based on firm scientific grounds, not arbitrary decisionmaking. Much of the analysis in the 2008 OCAP BiOp relied on sophisticated computer modeling, and the planning horizon used in that software matched the planning horizon used in other then-operative decision-making documents relevant to the CVP and SWP, such as the California Water Plan Update. *See* 5-ER-1130 n.c; *see also Turtle Island Restoration Network v. United States Dep't of Com.*, 878 F.3d 725, 739 (9th Cir. 2017) (rejecting challenge to BiOp addressing impacts of plan to permit certain methods of fishing for swordfish, finding plaintiffs failed to demonstrate that 25-year scope of climate modeling was not sufficiently long to allow a meaningful determination because "[t]he [temporal] constraints in the available data supply a reasonable justification for the NMFS to limit its analysis"). In addition, the 2005 letters of concurrence, which the 2015 concurrence letter incorporates and amends, evaluate the contract execution for a period of forty years. *See* 2-FedSER-0363-64; 2-FedSER-0371; 2-FedSER-0375; 2-ER-0336; 3-ER-0494; 4-ER-0804; 4-ER-0767.

And as discussed below in Section III.C.1, the SRS Contractors could be required, under Article 7(b) of their contracts, to comply with requirements set forth in future BiOps "prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7." 3-ER-0548.

## E. FWS did not impermissibly defer analysis of effects.

NRDC argues briefly that FWS's 2015 letter of concurrence unlawfully deferred consideration of whether increased outflows are needed to protect Delta smelt. Opening Br. 29. At the heart of this argument is the proposition that FWS is required to specify the *optimal* operation for smelt, even if reconsultation might be triggered in the future. But NRDC's argument here is simply a generalized statement, which fails to articulate *why* FWS acted unlawfully. Moreover, this Court has already rejected the argument that an action agency is required to pick a specific RPA suggested by FWS, or even the "one that would most effectively protect" a species from jeopardy. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) (emphasis added) ("The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency.").

As discussed above, in *Wild Fish Conservancy*, this Court declined to state the length of time a biological opinion had to cover to be sufficient, stating only that the period covered "must be long enough for [FWS] to make a meaningful determination as to whether the [proposed action] 'reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery'" of the species. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523-24 (9th Cir. 2010). That is exactly what the agencies did here. Indeed, this Court has never required

that the scope of the agency action be defined solely by time-period, only that such a period should allow the agency to make a "meaningful determination." *Id*.

Here, the 2008 OCAP BiOp meaningfully evaluated the scope of the agency action by considering maximum water deliveries under the contracts, as well as predicting the effects of those deliveries as far out as was reasonably foreseeable given resources available at the time. 2-FedSER-042; *see also Turtle Island*, 878 F.3d at 739 (affirming the temporal scale of the agency's analysis in a biological opinion based on the capability of the underlying model). Plaintiffs' collateral attack on the scope of the 2008 OCAP BiOp should be rejected, in light of their defense of the BiOp in *San Luis v. Jewell*. 747 F.3d 581 (9th Cir. 2014).

FWS concurred with Reclamation's assertion that the effects on Delta smelt of delivering water under the SRS and DMC Contracts were incorporated into the 2008 OCAP BiOp, which in turn avoided jeopardy. 3-ER-0548 ("In addition, the effects of delivering water under the terms of the SRS Contracts were incorporated into the 2008 [OCAP BiOp], which avoids jeopardy to the continued existence of the delta smelt and destruction or adverse modification of its critical habitat."); 3-ER-0549 ("Reclamation is not proposing any changes to the DMC contracts, including different pricing terms or changes to the timing of deliveries, because the effects of delivering water under the terms of the DMC contracts were incorporated into the 2008 [Long-term Operations BiOp], which includes a multi-

faceted RPA that avoids jeopardizing the continued existence of the delta smelt and destruction or adverse modification of its critical habitat."). While FWS's 2015 letter of concurrence expressed concern that reconsultation might result in a changed determination in the future, this cautionary note does not change the nature of the consultation that did take place and that is challenged here. To be sure, Reclamation and FWS may have been able to develop more protective operations for the Delta smelt, but that does not mean the proposed operations jeopardized the species.

## F. FWS's concurrence was supported by the evidence before it.

Finally, NRDC makes a broad and unsupported claim that, had FWS considered the information before it in a non "perfunctory" way, the agency could not possibly have come to any other conclusion besides that the renewal of the contracts would adversely impact Delta smelt. Opening Br. 30. But of course FWS is not bound to come to NRDC's preferred conclusion after it evaluates the relevant information; it is simply required to come to one reasonably supported by the record. As discussed above, it did so.

NRDC seeks to support this claim by pointing to a document (RJN Ex. 4) both not in the record and from *after* the 2015 letter of concurrence. As noted in the Motion by the agencies opposing NRDC's request for judicial notice, this document and its corresponding references should not be considered by the Court

in the first instance. *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980) (inappropriate "to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision"); *Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1156 (E.D. Cal. 2010), *supplemented* (June 1, 2010) ("Judicial review under the APA must focus on the administrative record already in existence.").

Further, the later-thoughts or actions of an agency are simply not relevant to evaluating the data actually before it while making decision. There is clearly no requirement that an agency cannot, after making a supported decision, later elect to take a different path based on additional new information.

## II. Under the ESA, Reclamation did not violate any duty to consult or fail to avoid jeopardy for the Delta smelt.[11]

### A. Reclamation complied with its substantive duties under the ESA.

Reclamation complied with its substantive obligations under the ESA to ensure that the agency's actions were not likely to jeopardize the continued existence of Delta smelt or adversely modify its critical habitat. Having already consulted on the effects of implementing the renewed contracts as part of the 2008

---

[11] To avoid duplicative argument, Federal Appellees concur with the SRS Contractors' argument that NRDC has failed to properly provide the requisite 60-day notice for its second claim, and as such the Court lacks jurisdiction over that claim. SRS Contractors Answering Br. Section II.A.

consultation, Reclamation appropriately requested that FWS consider the effect of

contract execution given this Court's procedural ruling in *NRDC v. Jewell*.

Reclamation's representations about the scope of its ability to unilaterally alter the

terms of the contract at renewal were accurate, and in no way did Reclamation's

definition of the agency action hinder the 2015 consultation. Moreover,

Reclamation's reliance on FWS's valid 2015 concurrence letter, the valid 2008

OCAP BiOp and RPA, and FWS's concurrence that the temporary waivers in 2014

and 2015 were within the scope of effects analyzed in the BiOp were all—

individually and in their totality—sufficient to comply with its Section 7

obligations, as discussed above.

NRDC's reliance on *NRDC v. Jewell* to argue against the continuing

viability of the 2005 consultation is misplaced. *See* Opening Br. 31-32. This Court

found not moot *only* NRDC's allegations that Reclamation's continued reliance on

the 2005 OCAP BiOp violated the agencies affirmative obligation to avoid

jeopardy *NRDC v. Jewell*, 749 F.3d at 782. The Court has not ruled on the

continuing viability of the 2005 FWS concurrence letters. Nor has FWS claimed

that the 2015 concurrence letters superseded the 2005 concurrence letters. Rather,

FWS amended the 2005 concurrence letters with the 2015 consultation. 4-ER-0749

("By this memorandum, all reference to the 2004 and 2005 BiOps in the SRS

consultations and the DMC consultations are amended to reference the 2008 [OCAP] BiOp").

Substantively, as addressed in the previous Section, FWS provided a legally sound concurrence letter to Reclamation after considering up-to-date information on the status of the Delta smelt. Because there was no error in FWS's analysis, Reclamation's decision to rely on the 2015 consultation was not arbitrary or capricious.

## B. Reclamation did not misrepresent its discretion in the contract renewal process.

Reclamation also provided an accurate representation of the contract renewal process, and the degree of discretion it retained in that process, when reinitiating consultation with FWS.

As an initial matter, NRDC's argument that Reclamation could opt not to renew the contracts is immaterial. Opening Br. at 33-34. The *purpose* of the consultation was to determine the effects of *renewing the contracts.* Moreover as a practical matter, renewing the contracts avoids a long and costly adjudication of the waters of the Sacramento River. 25-ER-5865-66. The motivations for arriving at a proposed action are of no import under the ESA, only whether the proposed action avoids jeopardy. And NRDC advances no evidence that non-renewal of the contracts (and the resulting necessary water rights adjudication process) would

ultimately result in an outcome more protective of the Delta smelt or its critical habitat.

As to the specific terms of the contracts, because the quantities, allocations, and timing of the diversions stem from a negotiation between Reclamation and the contractors, Reclamation cannot unilaterally alter the contract terms. *See* Opening Br. 35-36. As Reclamation accurately represented, any changes in the contracts' terms from the original to the renewed contracts, including Article 3(i), resulted from *voluntary* changes on behalf of the water rights holders. *See* 4-ER-0742; 1-FedSER-0015; 2-FedSER-0323-24; 4-ER-0752; 4-ER-0743. Likewise, Reclamation's authority to set rates is constrained by specific purposes—namely cost recovery for operating, maintaining, and constructing CVP facilities—it could not charge higher rates solely to benefit Delta smelt. NRDC's arguments about Reclamation's ability to set minimum water prices do not address whether Reclamation has the *authority* to raise water prices specifically to benefit Delta smelt.

But even if Reclamation had discretion to modify the terms of the contracts, assuming that it could have *negotiated for*—and the SRS and DMC Contractors *agreed to*—modified terms, NRDC identifies no legal authority requiring Reclamation to do so. The 2008 OCAP consultation fully analyzed the contract terms *as proposed*. And FWS crafted an RPA that avoided jeopardy to Delta smelt,

while allowing for implementation of the contracts exactly as executed. 5-ER-1008-14; *see also San Luis*, 747 F.3d 581. Thus, the agencies were under no obligation to analyze *different* contract terms to satisfy any substantive obligations under the ESA. *See*, *e.g.*, *Sw. Ctr. for Biological Diversity*, 143 F.3d at 523-24. NRDC also argues that federal and state law operate to give Reclamation discretion to reduce water quantities. Opening Br. 38. Under 43 U.S.C. § 383, nothing in the Reclamation Act "shall be construed as affecting or intended to affect or to in any way interfere with the laws of any of any State . . . relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary . . . shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof." Here, state law grants the pre-Project Water right users a state-granted water right to continued diversions for beneficial use, even if the pre-1914 claims are unadjudicated, barring other action by the State. And further, Reclamation prepared water needs assessments to confirm that each contractor was putting its water to beneficial use. 3-ER-0546; 4-ER-0752; 1-FedSER-0015; 4-ER-0743.

Finally, NRDC fundamentally conflates two questions: whether the SRS Contractors have a "legal entitlement" to renewed contracts on the same terms, and

whether Reclamation, having determined that contract renewal was appropriate for the continued viability and management of the CVP, was capable of unilaterally imposing new or revised terms on the contractors. That the first answer is "no" does not make the second answer "yes"; Reclamation was not legally barred from, and opted to, renew the contracts.

The question here is only whether Reclamation adequately consulted on the impact of *the renewed contracts*. Reclamation's obligation under the ESA in implementing the contracts is to operate the CVP in a manner that "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Reclamation fulfilled that obligation by operating the CVP in compliance with the lawful 2008 OCAP BiOp. 5-ER-1008-1014; *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1051-52 (9th Cir. 2015) (the challenge "this case can appropriately be characterized as claiming that the MOA *does not do enough* to ensure the survival of the [species] in the face of groundwater pumping. Adopting this position, however, would impermissibly broaden FWS's obligations, both as the action agency and as the consulting agency.").

**III.** **NRDC's claim that Reclamation was obligated to reinitiate consultation with regard to effects on Chinook salmon was appropriately rejected by the District Court.**

Only in the latest iteration of this long-running litigation has NRDC sought to put forward new allegations—based on new purported evidence—relating to Chinook salmon. The claim is timed barred, but even were it not, Reclamation satisfied its legal obligations under section 7(a)(2) concerning winter-run and spring-run Chinook as a matter of law through its annual contract *implementation*, along with its myriad other CVP operations, performed in compliance with the 2009 NMFS OCAP BiOp (which, as previously noted, has itself been superseded). *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009-10 (9th Cir. 2014) (dismissing ESA claim against Reclamation). The question here is whether NRDC can credibly allege that Reclamation, after lawfully executing the SRS Contracts, retained continuing discretion to "amend them at any time" to address the needs of listed species. *Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001) ("*EPIC*"). NRDC cannot.

**A.** **NRDC's claim is time barred.**

FWS's and NMFS's regulations specifically enumerate the events that trigger the duty to reinitiate consultation. 50 C.F.R. § 402.16. NRDC alleges that the duty arose with the issuance of the *2009* NMFS OCAP BiOp. Because NRDC's claim accrued more than six years before its filing, it is time barred.

Further, this Court has never extended the narrow "continuing violations doctrine" to ESA or APA claims but made clear that the continuing violations doctrine is an "exception, rather than the rule," *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003), and has reiterated that it "almost certainly does not apply to APA claims." *United States v. Estate of Hage*, 810 F.3d 712, 721 (9th Cir. 2016).

Indeed, in a case concerning the CVP, a court in this district rejected plaintiffs' attempt to extend the doctrine to save a stale claim reviewed under the APA:

> Plaintiffs suggest that the § 2401(a) six-year limitations period should not bar their claims because . . . the violations alleged are continuing . . . . As a general rule in the Ninth Circuit, § 2401(a)'s limitations period is not jurisdictional and is subject to traditional exceptions . . . . The continuing violation doctrine has been [sic] extended the § 2401(a) statute of limitations in federal employment and civil-rights litigation. However, the Ninth Circuit recently refused to extend the continuing violation doctrine to APA claims.

*San Luis Unit Food Producers v. United States*, 772 F. Supp. 2d 1210, 1228 (E.D. Cal. 2011), *aff'd*, 709 F.3d 798 (9th Cir. 2013) (internal citations omitted); *Hall v. Reg'l Transp. Comm'n of S. Nevada*, 362 Fed. Appx. 694, 695 (9th Cir. 2010) ("the 'continuing violations' doctrine 'is not applicable in the context of an APA claim for judicial review'") (citations omitted). This claim should be dismissed as it is time barred.

## B.    Under *EPIC*, NRDC fails to state a viable claim for reinitiation.

But even if the claim is properly presented, under the *EPIC* analysis framework—which NRDC appears to ignore—to state a claim for further consultation on these executed contracts, NRDC must show that Reclamation retained discretion in the *executed* contracts that would permit revisions to executed contracts to address the needs of listed species. *See EPIC*, 255 F.3d at 1082. The district court noted that NRDC faced a "significant hurdle" in plausibly alleging that contract *implementation* could require further consultation on contract *execution*. 1-ER-0036; 1-ER-0039. In fact, this hurdle is insurmountable.

NRDC alleges that Reclamation's alleged "continuing involvement and control" is the basis of the claimed discretion. Opening Br. 43-44. This assertion does not salvage their claim; it underscores that their claim is misplaced. *Jewell*'s holding that Reclamation has discretion in the renewal process to alter the timing of water distribution and the pricing scheme related to contracted-for water does not mean Reclamation retained similar discretion in the executed contracts (or otherwise possess similar discretion pursuant to law) that would permit revisions to executed contracts. In other words, to trigger the requirement for re-consultation under *EPIC* and 50 C.F.R. § 402.16 in the context of an executed and otherwise valid contract, the action agency must have retained sufficient discretion in that contract to permit material revisions to it that might benefit the listed species in

question. NRDC fails to state a viable claim for reinitiation of consultation on the execution of the contracts because Reclamation lacks the necessary discretion to permit those revisions.

### C. The terms of the SRS Contracts demonstrate Reclamation's lack of discretion to modify the Contracts to benefit salmon.

To state a viable claim based on contract implementation, NRDC had to show that Reclamation "retained sufficient discretion and control" over spring releases to implement measures that "inure to the benefit" of the species. Opening Br. 42; *EPIC*, 255 F.3d at 1079-80. NRDC cannot make such a showing for any of the Articles it cites.

### 1. Discretion under Article 7(b) would occur only in the context of a new biological opinion.

NRDC argues that under Article 7(b)[12] of the SRS Contracts, Reclamation retains essentially limitless discretion to force changes to contract terms to benefit listed species. Opening Br. 46. But as it noted in the supplemental information provided to FWS, Reclamation does not retain discretion to unilaterally reduce

---

[12] The text of Article 7(b) states:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973, as amended, that are within the Contractor's legal authority to implement.

15-ER-3130.

water quantity terms at the time of contract renewal: "At contract renewal, due to requirements of Federal law, state water law, and/or the terms of its water right permits, Reclamation could not alter the quantities, allocations, or timing of SRS diversions from those set forth in the initial SRS contracts." 3-ER-0546.

Separately, the SRS Contractors could be required, pursuant to Article 7(b) of their contracts, to comply with requirements set forth in future BiOps "prepared as a result of a consultation regarding the execution of this Settlement Contract undertaken pursuant to Section 7." 3-ER-0548. As noted by the district court, this interpretation of Article 7(b) was adopted by FWS in its 2015 letter of concurrence focused on Delta smelt:

> Reclamation has identified Article 7(b) of the SRS contracts as one that "may affect the availability of water under the SRS contracts" by requiring compliance with biological opinions prepared as a result of consultation regarding the execution of the SRS contracts. [citation] The DMC contracts contain a similar provision.

> As articulated in Reclamation's letter dated December 11, 2015, we understand the 2008 [OCAP] BiOp is the result of a consultation regarding the execution of the SRS and DMC contracts and any subsequent reinitiation of consultation on the coordinated operations of the CVP and SWP, which are subject to the 2008 [OCAP] BiOp, or the SRS and DMC contract renewals would also be one "regarding the execution of the contract" and would, therefore, be subject to the terms of Article 7(b).

> In future consultations to ensure adequate protection of delta smelt and its critical habitat under the Act, we may require greater certainty as to Reclamation's ability to provide needed outflows through the Delta. If increased outflows are needed and cannot be met under the

51

SRS contracts, those contracts may need to be revisited to ensure consistency with the Act.

1-FedSER-0055. But while the SRS Contracts are subject to possible future restrictions imposed by future OCAP BiOps, any discretion Reclamation might have to affect the availability of water under the SRS Contracts under Article 7(b) is theoretical until and unless a BiOp requires a different implementation of the contracts. That has not occurred.[13]

>    **2.    Article 3(i) does not provide the requisite discretion to act for the benefit of listed species.**

NRDC argues that Article 3(i)[14] affords Reclamation discretion to reduce the diversion of Project Water by the SRS Contractors in order "to meet legal obligations," and points to the 2009 NMFS Salmonid OCAP BiOp as an example of a relevant legal obligation. Opening Br. 47. Article 3(i) is properly read as

---

[13] The 2019 BiOps ultimately resulted in a no jeopardy conclusion. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 1:20-cv-00431-DAD-EPG, 2022 U.S. Dist. LEXIS 44155, at *27-29 (E.D. Cal. Mar. 11, 2022).

[14] The text of Article 3(i) provides:
>    In addition to the provisions of subdivision (h) of Article 3 of this Contract, if there is a shortage of Project Water because of actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 30 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

15-ER-3128.

limiting liability for *damages*, in circumstances where a shortage of Project Water occurs as a result of Reclamation acting to comply with legal obligations. The contract does not address the question of discretion, only the impact of those theoretical changes on the question of liability. Further, any discretion for a reduction read into this provision would apply only to Project Water and have no impact on Base Supply water.

### 3. Reclamation lacks the asserted discretionary control over sales of contract water by the SRS Contractors.

NRDC's argument that Reclamation's authority to approve sales, transfers, and exchanges shows the agency can act to benefit winter-run and spring-run Chinook salmon, Opening Br. at 49, also fails. Article 3(e)[15] is a limitation on the

---

[15] The text of Article 3(e) provides:

> No sale, transfer, exchange, or other disposal of any of the Contract Total . . . or the right to the use thereof . . . shall be made by the Contractor without first obtaining the written consent of the Contracting Officer. Such consent will not be unreasonably withheld and a decision will be rendered in a timely manner . . . . For a proposal to be deemed complete [], it must comply with all provisions required by State and Federal law, including information sufficient to enable the Contracting Officer to comply with the National Environmental Policy Act, the Endangered Species Act, and applicable rules or regulations then in effect; Provided, that such consent does not authorize the use of Federal facilities to facilitate or effectuate the sale, transfer, exchange, or other disposal of Base Supply. Such use of Federal facilities will be the subject of a separate agreement to be entered into between the Contractor and Reclamation.

15-ER-3127.

*contractors'* ability to transfer water in ways that would be inconsistent with Federal and State law. Any approval of such transfer is subject to its own ESA and National Environmental Policy Act compliance, as well as applicable California state law. *Id*. Further, denying a transfer or sale does not alter the amount of water released from the Shasta Reservoir; the same amount of water is released and diverted, it is only the party to which the water would ultimately be diverted to that may change.[16] In the drought years of 2014 and 2015, when Reclamation struggled to physically deliver enough water to meet contractual demands, it asked the SRS Contractors to agree to reschedule Base Water supply in April and May of 2014 and 2015. Reclamation did not (and could not) unilaterally mandate that rescheduling.

This Article does not give Reclamation unilateral authority to change contract deliveries for the benefit of listed species.

---

[16] And as noted above, there is a "mandatory (*i.e.* non-discretionary) legal obligation to make releases from Shasta Reservoir for delivery to the [SRS] Contractors" under Federal law and state law. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1201 (E.D. Cal. 2008).

### 4. Reclamation has only limited discretion under the SRS Contracts to reduce water releases, and only as required by state or federal law.

NRDC then points to a scattershot of provisions within the SRS Contracts to try to create unilateral discretion on the part of Reclamation to act as it desires. But the language of the provisions makes clear that NRDC is incorrect.

For example, Article 3(h) notes that Reclamation will not incur liability for a shortage arising from "errors in operation, drought, or unavoidable causes." But again that provision must be read in context with the other contract provisions, which do not afford Reclamation discretion to take action that would inure to the benefit of listed species; they simply address the consequences of shortage in particular circumstances and Reclamation's liability for it.

NRDC argues that Article 9(a) permits Reclamation to ultimately restrict contract quantities during implementation because it requires water be allocated for "beneficial use." Opening Br. at 50-51. NRDC completely misreads this provision, which memorialized the "full agreement" about the "quantities of water" that "may be diverted … for beneficial use" "[d]uring the term" of the contract and "any renewals" thereof. 15-ER-3135-36. Reclamation cannot unilaterally change this quantity, which "shall not be disturbed" during the term of the contract so long as the contractor fulfills its contractual obligations. *Id*. Moreover, to the extent any entity has authority to determine if diversions must be curtailed due to drought,

waste, or other beneficial uses, it is the SWRCB, not Reclamation. *See* Cal. Water

Code §§ 174, 275; *Imperial Irrigation Dist. v. SWRCB*, 186 Cal. App. 3d 1160,

1164-70 (Cal. Ct. App. 1986) (discussing SWRCB jurisdiction).

Similarly, NRDC's argument that Article 30(b) gives Reclamation the "right

to implement the contracts consistent with . . . law," Opening Br. at 51,

mischaracterizes the purpose of the article. Article 30 is intended to ensure that any

action under the contract complies with the terms of the contract and applicable

law. Critically, however, it does not give Reclamation any power to act in ways not

otherwise specifically identified in the SRS Contracts. Indeed, Article 30(b) does

not obligate the Contracting Officer to take any specific action at all. It merely

established the framework and boundaries on how Reclamation will "make

determinations" when such decisions are required. It thus generally provides

authority to make determinations consistent with the terms of the contracts and

applicable law.

### D. Federal and state law do not permit Reclamation to unilaterally violate the contract terms.

The ESA does not give Reclamation unilateral authority it does not

otherwise possess to alter nondiscretionary provisions of the contracts at renewal.

Opening Br. at 52. Reclamation ensures that it does not jeopardize listed species or

adversely modify designated critical habitat when it exercises its available

discretion to implement the contracts rather than when it renews nondiscretionary

contract provisions. And, as noted above, state law grants the pre-Project Water right users a state-granted water right to continued diversions for beneficial use. In short, Reclamation fulfilled its obligation under the ESA to operate the CVP in a manner that "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2) by having operated the CVP in compliance with the lawful 2008 OCAP BiOp.

Further, Reclamation cannot reduce water quantities according to the public trust doctrine, as Plaintiffs argue. Opening Br. 52-53. Only the SWRCB has the power to adjust water rights in accordance with the public trust doctrine. Cal. Const. art. X § 2. And even if the public trust doctrine prevents unreasonable use of water, Opening Br. 53, citing *Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 444 n.23, 446 (1983), Reclamation prepared water needs assessments to confirm that each contractor was putting their water to beneficial use. 3-ER-0546, 4-ER-0752, 1-FedSER-0014, 4-ER-0743. The waters of the CVP are put to beneficial public uses, including irrigation, in alignment with the nature of public trust resources. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1061 (E.D. Cal. 2018) (discussing *Citizens for E. Shore Parks v. State Lands Comm'n*, 202 Cal. App. 4th 549, 570 (2011)) (the agency "decision had not changed, derogated, or otherwise diminished a public trust use; rather it simply

continued an existing, long-standing public trust use of the navigable

waters . . . .").

Because Reclamation lacks the above asserted discretion to modify the SRS

Contracts, reinitiation of consultation on the effect of executing the contract

renewals on salmonids is not required.

## CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Katelin Shugart-Schmidt*
TODD KIM
*Assistant Attorney General*

ROBERT LUNDMAN
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

October 21, 2022
90-8-6-05960

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        21-15163

I am the attorney or self-represented party.

**This brief contains 13143 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ]  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]  is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ]  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ]  it is a joint brief submitted by separately represented parties;
    [ ]  a party or parties are filing a single brief in response to multiple briefs; or
    [ ]  a party or parties are filing a single brief in response to a longer joint brief.

[ ]  complies with the length limit designated by court order dated _____.

[ ]  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/ Katelin Shugart-Schmidt

**Date**        November 14, 2022